## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

JANIAH MONROE, MARILYN MELENDEZ,  )
EBONY STAMPS, LYDIA HELENA VISION,  )
SORA KUYKENDALL, and SASHA REED,   )
　　　　　　　　　　　　　　　　　　　　)
　　　　　　Plaintiffs,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　v.　　　　　　　　　　　　　　　　)　　　　No. 18-cv-156-DRH-DGW
　　　　　　　　　　　　　　　　　　　　)
BRUCE RAUNER, JOHN BALDWIN,        )
STEVE MEEKS, and MELVIN HINTON,    )
　　　　　　　　　　　　　　　　　　　　)
　　　　　　Defendants.　　　　　　　　　)

## DEFENDANTS BALDWIN, MEEKS, AND HINTON'S ANSWER
## AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' COMPLAINT [Doc. 1]

NOW COME Defendants, JOHN BALDWIN, STEVE MEEKS, and MELVIN HINTON, by and through their attorney, LISA MADIGAN, Attorney General of the State of Illinois, and hereby provide their Answer and Affirmative Defenses to Plaintiffs' Complaint [Doc. 1], stating as follows:

### PRELIMINARY STATEMENT

1.　　　Plaintiffs are women currently in the custody of the Illinois Department of Corrections ("IDOC") who are transgender. Plaintiffs bring this class action on behalf of a class of all prisoners in the custody of IDOC who have requested from IDOC evaluation or treatment for gender dysphoria.

**ANSWER: Defendants admit that the named Plaintiffs are transgender women currently incarcerated within the Illinois Department of Corrections. Defendants deny that this case has been certified as a class action.**

2.　　　The Eighth Amendment to the United States Constitution prohibits cruel and unusual punishment. Failure to properly treat prisoners with serious medical conditions, including

by unreasonably delaying treatment, serves no penological purpose and instead inflicts pain and suffering in violation of the Constitution. Prison officials therefore have a constitutional obligation to provide adequate medical care, including mental health care.

**ANSWER: Defendants admit that the Eighth Amendment prohibits cruel and unusual punishment, but deny this paragraph contains a complete and accurate statement of the law. Defendants deny violating Plaintiffs' Eighth Amendment rights.**

3.       Gender dysphoria is the condition marked by clinically significant "distress that may accompany the incongruence between one's experienced or expressed gender and one's assigned gender." It is recognized as a serious medical condition, including by the American Medical Association, the American Psychiatric Association, the American Psychological Association, the Endocrine Society, the World Professional Association for Transgender Health, and courts across the country. Treatment for gender dysphoria, often consisting of social transition, hormone therapy, and surgery, is medically necessary for many transgender people.

**ANSWER: Defendants admit that gender dysphoria is a recognized medical condition. Defendants admit that the medical treatment needs for individuals diagnosed with gender dysphoria vary from patient to patient.**

**Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.**

4.       IDOC systematically fails to provide necessary medical treatment for gender dysphoria. Among other common and medically necessary treatments, IDOC routinely fails to provide adequate hormone therapy and to accommodate social transition so that a prisoner can live consistently with his or her gender identity. And while gender affirming surgery also is medically necessary for some patients with gender dysphoria, IDOC has adopted a policy that such surgery

can be approved only in "extraordinary circumstances," which in practice means that IDOC never has approved any prisoner for surgical gender dysphoria treatment. If a prisoner does manage to obtain any medical treatment, it is typically after substantial delay, and the treatment ultimately falls woefully short of accepted medical standards.

**ANSWER: Defendants admit that inmates are not routinely transferred from correctional facilities for males to correctional facilities for females. Defendants admit that as of the date this Answer is being filed, IDOC has not approved surgery for the specific purpose of gender change for any inmate incarcerated within IDOC.**

**Defendants deny the remaining allegations in this paragraph.**

5.      IDOC further requires that medical care decisions for gender dysphoria be submitted to a "Gender Identity Disorder Committee" (the "GID Committee")—which centralizes those decisions in the hands of persons who are not specialists in the treatment of gender dysphoria and typically have never examined or even seen the persons whose course of treatment they are deciding. The GID Committee approval process further degrades the quality of medical care provided for gender dysphoria. The GID Committee sometimes denies treatments prescribed by health providers and always introduces additional, and often extreme, delays in receiving medically necessary treatments, causing needless harm, pain, and suffering.

**ANSWER: Defendants admit that IDOC has a Committee which was previously named the Gender Identity Disorder Committee but is now named the Transgender Care Review Committee ("Transgender Committee"). Defendants admit that the Transgender Committee is responsible for reviewing placements, security concerns, and overall health-related treatment plans of transgender offenders or offenders with Gender Dysphoria, and overseeing the gender-related accommodations for these offenders. Defendants admit that**

**the Transgender Committee is comprised, in part, of the Agency Medical Director, the Chief of Mental Health, the Transfer Coordinator, and the Chief of Operations, who do not typically treat patients.**

**Defendants deny the remaining allegations in this paragraph.**

6.    Plaintiffs accordingly seek declaratory and injunctive relief to force IDOC to provide constitutionally adequate medical treatment for prisoners seeking evaluation and treatment for gender dysphoria.

**ANSWER: Defendants admit that Plaintiffs seek declaratory and injunctive relief but deny that Plaintiffs are entitled to any relief.**

<u>JURISDICTION AND VENUE</u>

7.    Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343 because the matters in controversy arise under the Constitution and laws of the United States. This civil action seeks declaratory and injunctive relief under 28 U.S.C. §§ 1343, 2201, and 2202 and 42 U.S.C. § 1983.

**ANSWER: Defendants admit that jurisdiction is proper.**

8.    Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the Southern District of Illinois.

**ANSWER: Defendants admit that venue is proper.**

9.    One or more of the named Plaintiffs have exhausted administrative remedies reasonably available to them prior to bringing their 42 U.S.C. § 1983 civil rights claims in accordance with the Prison Litigation Reform Act, 42 U.S.C. § 1997(e)(a).

**ANSWER: Defendants deny the allegations in this paragraph.**

<u>PARTIES</u>

## I.   NAMED PLAINTIFFS

10.    Plaintiffs Janiah Monroe, Marilyn Melendez, Ebony Stamps, Lydia Heléna Vision, Sora Kuykendall, and Sasha Reed (collectively, the "Named Plaintiffs") are transgender women currently incarcerated in IDOC facilities and, like all other prisoners in the class defined below, have requested evaluation or treatment for gender dysphoria and have suffered serious harm and are at substantial risk of suffering additional serious harm as a result of Defendants' deliberate indifference to their serious medical needs.

**ANSWER: Defendants admit that the named Plaintiffs are transgender women currently incarcerated within IDOC who have requested evaluation or treatment for gender dysphoria.**

**Defendants deny the remaining allegations in this paragraph.**

11.    The Named Plaintiffs do not seek damages in their capacity as proposed class representatives; they seek only declaratory and injunctive relief.

**ANSWER: Defendants admit that Plaintiffs seek declaratory and injunctive relief but deny that Plaintiffs are entitled to any relief.**

### a.   *Janiah Monroe*

12.    Janiah Monroe (Patterson) is 28 years old and was born on the south side of Chicago. She knew she was a girl from a very young age. Janiah's family was not supportive of her gender identity; her father, who was a pastor, was particularly hostile towards Janiah after she told him she felt like a girl. Around the age of twelve Janiah began dressing in female clothing and taking hormones.

**ANSWER: Defendants admit that as of the date this Answer is being filed, Plaintiff Janiah Monroe is 28 years old.**

**Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.**

13.     Janiah entered IDOC custody at the age of sixteen. During her intake, Janiah informed prison officials that she is transgender. While incarcerated, Janiah has been evaluated by multiple health professionals who repeatedly reconfirmed her diagnosis of gender dysphoria and recommended that she begin hormone therapy.

**ANSWER: Defendants admit that Plaintiff Janiah Monroe has been diagnosed with gender dysphoria and that it has been recommended that she begin hormone therapy.**

**Defendants deny the remaining allegations in this paragraph.**

14.     During this waiting period, Janiah experienced increased distress relating to her gender dysphoria. She declared a hunger strike because IDOC refused to provide her with medical treatment. Janiah made several attempts at self-castration, after which in some instances she removed the sutures from the wounds and refused antibiotics with the hope that her genitalia would need to be amputated as a result of infection. Janiah was put in restraints and told that IDOC would not amputate her genitalia. Janiah attempted suicide numerous times as well. Janiah reported to IDOC medical staff that her self-castration and suicide attempts were a result of their failure to provide her with treatment for gender dysphoria. Despite these attempts, Janiah's diagnosis and treatment recommendations, and her history of living as a woman, Janiah experienced a wait of roughly three years before she received hormone therapy.

**ANSWER: Defendants admit that Plaintiff Janiah Monroe has made self-castration and suicide attempts. Defendants admit that Plaintiff has begun receiving hormone therapy.**

**Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.**

15.     Even after receiving hormones, Janiah was denied appropriate therapeutic dosages, denied access to a bra, and denied access to a hair removal product. Though Janiah continued to report dysphoria related to her genitalia, and continued to self-harm, she has been continually denied evaluation for gender affirming surgery. Janiah's request to be considered for transfer to a female facility was denied because she has not had gender affirming surgery.

**ANSWER: Defendants admit that Plaintiff Janiah Monroe has not been approved for any surgery for the specific purpose of gender change. Defendants further admit that Plaintiff has not been approved for a transfer to a female correctional facility.**

**Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.**

16.     Janiah is now a prisoner at Dixon Correctional Center. She seeks and Defendants have denied her necessary medical treatment for gender dysphoria, including proper hormone treatment, social transition, and surgery.

**ANSWER: Defendants admit that Plaintiff Janiah Monroe is currently housed at Dixon Correctional Center.**

**Defendants deny the remaining allegations in this paragraph.**

*b.     Marilyn Melendez*

17.     Marilyn Melendez grew up in Waukegan, Illinois. From a young age, Marilyn knew that she was a girl. As a child, Marilyn often went into her mother's room and tried on her mother's clothes and makeup. She attempted to pierce her own ears. When her mother asked Marilyn whether she preferred to play with toys for boys or girls, Marilyn always chose those toys she

perceived as girls' toys. While many of Marilyn's family members tried to make Marilyn dress and "act like a boy," Marilyn's mother was supportive of her female identity. Marilyn took estrogen and a testosterone blocker in her pre-teen years.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

18.     Marilyn's access to hormones was interrupted at the age of 13 because her mother could no longer afford them. Marilyn's mother warned her that her body would start changing as a result of the cessation. Marilyn became extremely depressed and suffered from serious anxiety when her body began to change and become more masculine in appearance because of puberty. She became distraught when her shoulders began to broaden and she started experiencing more frequent erections; she no longer looked and felt like herself. Marilyn felt confused and upset by the changes in her body, and the teasing from other kids led Marilyn to stand up for herself and get into fights.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

19.     Marilyn entered the juvenile detention system at age 14. The juvenile detention facility denied Marilyn access to hormone therapy while she was detained in the juvenile prison.

**ANSWER: Defendants admit that Plaintiff Marilyn Menendez was previously incarcerated in the Illinois Department of Juvenile Justice.**

**Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.**

20.     When Marilyn turned 17, she was transferred from the juvenile facility to the IDOC adult prison system. Marilyn initially hesitated to out herself as transgender because she feared

retaliation from other prisoners. After she was transferred to Stateville Correctional Center, she told prison officials that she is transgender and requested treatment for gender dysphoria. IDOC refused her request for hormone treatment because there were no records of her prior hormone treatment. Marilyn continued to request hormone therapy but was denied treatment by the GID Committee.

**ANSWER: Defendants deny the allegations in this paragraph.**

21.     After a prolonged wait, Marilyn eventually was able to start again on hormone therapy. However, Marilyn's care is not meeting her medical needs. Marilyn has an ongoing and unmet need for a therapeutically appropriate hormone compound, appropriate bloodwork and laboratory testing, and to be evaluated for gender affirming surgery.

**ANSWER: Defendants admit that Plaintiff Marilyn Melendez is receiving hormone therapy.**

**Defendants deny the remaining allegations in this paragraph.**

22.     Marilyn is now a prisoner at Pontiac Correctional Center. She seeks and Defendants have denied her necessary medical treatment for gender dysphoria, including proper hormone dosages, social transition, and gender affirming surgery.

**ANSWER: Defendants admit that Plaintiff Marilyn Melendez is currently housed at Pontiac Correctional Center.**

**Defendants deny the remaining allegations in this paragraph.**

*c.*     ***Ebony Stamps***

23.     Ebony Stamps grew up on the South Side of Chicago. She came out as gay around age 13, which was also around the time that she became a ward of the state. On one of the occasions when Ebony was placed into foster care, her foster mother was homophobic and sent

Ebony to a mental health facility because she believed that there was no such thing as a lesbian, gay, bisexual, or transgender person. Ebony often ran away from her foster care homes and residential facilities because "she couldn't stay somewhere she couldn't be who she wanted to be."

> **ANSWER: Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

24.     Ebony ultimately was placed in a residential facility on the north side of Chicago. While living there, Ebony met for the first time in her life a woman who was transgender. Before that meeting, Ebony always assumed that she would grow up to be a woman but Ebony now understood how that could happen—through undergoing a gender transition.

> **ANSWER: Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

25.     The residential facility where Ebony was housed refused to allow her to live as a woman. She was denied hormone therapy, and barred from wearing traditionally feminine clothing. Ebony and other transgender minors in the foster care system protested against these constraints on their right to live according to their gender identity by petitioning the Illinois Department of Child and Family Service ("DCFS") to change its policies.

> **ANSWER: Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

26.     Ebony ultimately was successful in persuading DCFS to provide her with hormones, gender affirming items, and access to an endocrinologist. This experience propelled Ebony to continue serving as an advocate for LGBT rights, including running a support group for homeless transgender youth.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

27.    Ebony was detained in Cook County jail starting on April 3, 2013 when she was 22. Ebony was provided hormone therapy during her time in custody there.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

28.    Ebony entered IDOC custody in 2013, and after a long delay was provided hormone therapy for approximately nine months while at Lawrence Correctional Center—albeit a dosage that was too low and not therapeutically appropriate. Ebony was then sent to Hill Correctional Center in 2016. When Ebony arrived at Hill, prison officials kept her in orientation and out of general population because she was taking hormones. Orientation is usually meant to be a temporary holding area for new prisoners who have just arrived at the prison, who remain there for a couple weeks at the most. However, Ebony was kept there for much longer, and during this time was denied a cellmate and denied opportunities to interact with the rest of the prison's general population. When Ebony asked why she was being kept in isolation, a prison official informed her that as long as she was on hormones, she would be kept in orientation and isolated. Being kept in social isolation caused Ebony to experience significant distress and depression. Ebony cut off all her hair, stopped coming out of her cell altogether, and refused to take showers.

**ANSWER: Defendants admit that Plaintiff Ebony Stamps entered IDOC custody on December 17, 2013. Defendants admit that Plaintiff was housed at Lawrence Correctional Center from April 29, 2015 until June 1, 2016. Defendants admit that Plaintiff was treated with hormone therapy while at Lawrence Correctional Center. Defendants admit that Plaintiff was housed at Hill Correctional Center from June 1, 2016 until October 11, 2017.**

**Defendants admit that Plaintiff was housed in orientation at Hill Correctional Center from June 2, 2016 until August 5, 2016; from September 5, 2016 until September 8, 2016; from February 3, 2017 until February 4, 2017; from March 10, 2017 until March 17, 2017; from June 11, 2017 until June 14, 2017; and from August 19, 2017 until September 14, 2017.**

**Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.**

29.     Ultimately, in order to regain social contact, Ebony ceased taking her hormones. Soon after, Ebony was released into general population. Ebony never wanted to stop taking her hormones, but she felt that if she did not have social contact, she would suffer another mental breakdown that she would not survive. Being effectively forced to stop taking her hormones has taken a severe physical and emotional toll on her, causing her to be severely depressed and hopeless about the future.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

30.     Ebony no longer recognizes the person she sees in the mirror and is terrified that she will never again look like, or be, the woman she was when she entered IDOC custody. She becomes desperate at times, is afraid of another mental breakdown, and is so deeply depressed that she thinks at times about hurting herself.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

31.     A few months after Ebony was released back into the general population at Hill Correctional Center, she told prison officials she wanted to restart hormone therapy. She was not provided this treatment and filed a grievance documenting her need for hormone therapy and

requesting that she be put back on the medication. Yet, she did not receive her hormones while at Hill. Ebony recently was transferred to Graham Correctional Center. She was told that when she arrived at Graham she would have the opportunity to meet with the psychologist and restart her hormone therapy. But Ebony has been at Graham for over three months and IDOC has not resumed her hormone treatment.

**ANSWER: Defendants admit that Plaintiff Ebony Stamps told mental health treaters at Hill Correctional Center that she wanted to restart hormone therapy. Defendants admit that on October 11, 2017, Plaintiff transferred from Hill Correctional Center to Graham Correctional Center. Defendants admit that Plaintiff has not restarted hormone therapy.**

**Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.**

32.   Ebony remains a prisoner at Graham Correctional Center. She seeks and Defendants have denied her necessary medical treatment for gender dysphoria, including proper hormone treatment, access to someone with expertise in treating persons with gender dysphoria, and social transition.

**ANSWER: Defendants admit that Plaintiff Ebony Stamps is currently housed at Graham Correctional Center.**

**Defendants deny the remaining allegations in this paragraph.**

*d.*   *Lydia Vision*

33.   Lydia Vision (Padilla) is 38 years old. She was raised in Granite City, Illinois. Lydia identified as female and had outwardly feminine traits and mannerisms from a young age. Around the age of eight or nine, Lydia attempted to cut off her penis. She was told by her family that she

needed to "man up" and "act more masculine." Because of her family's lack of support, Lydia suppressed her femininity and transgender identity until years later.

**ANSWER: Defendants admit that as of the date this Answer is being filed, Plaintiff Lydia Vision is 38 years old.**

**Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.**

34.     Lydia entered IDOC custody in June of 2004. Lydia has taken advantage of the educational opportunities offered in prison and has earned her associate's degree while in custody. She is currently taking collegiate-level classes. So that Lydia could continue to receive her ongoing education, she was transferred to Danville Correctional Center in December 2015.

**ANSWER: Defendants admit that Plaintiff Lydia Vision entered IDOC custody on June 17, 2004. Defendants admit that Plaintiff was transferred from Western Illinois Correctional Center to Danville Correctional Center on December 17, 2015.**

**Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.**

35.     While at Danville, Lydia informed IDOC personnel that she is transgender and was diagnosed with gender dysphoria in March 2016. At this time, Lydia began requesting treatment for gender dysphoria. Yet despite her diagnosis and her repeated requests for hormone treatment and gender affirming clothing and grooming items, she has been denied these treatments. Prison officials have instead required her to attend sessions for an unrelated post-traumatic stress disorder (PTSD) diagnosis saying that she must complete them before being treated with hormone therapy.

**ANSWER: Defendants deny the allegations in this paragraph.**

36.     In July of 2016, Lydia was referred to an IDOC psychiatrist who evaluated her via Skype and confirmed the prior diagnosis of gender dysphoria. During the evaluation, the psychiatrist confirmed that Lydia's continued lack of hormone treatments was causing her extreme distress. Yet despite these multiple diagnoses, IDOC has provided Lydia no treatment beyond individual therapy sessions for her gender dysphoria.

**ANSWER: Defendants deny the allegations in this paragraph.**

37.     Lydia is currently a prisoner at Danville Correctional Center. She seeks and Defendants have denied her necessary medical treatment for gender dysphoria, including hormone treatments and social transition.

**ANSWER: Defendants admit that Plaintiff Lydia is currently a prisoner at Danville Correctional Center.**

**Defendants deny the remaining allegations in this paragraph.**

*e.     Sora Kuykendall*

38.     Sora Kuykendall is 25 years old. Sora was raised in Columbia, Illinois and first identified as female at the age of 6 when she asked her family to call her by her preferred feminine name. She stopped trying to present as female, however, once her brother began to bully her for using a feminine name and having feminine mannerisms. Sora was 11 or 12 before she finally had a way of describing what she was experiencing, and she came out as transgender in January 2014. Sora believes her family mistakenly thought she was just going through a phase and that they were in denial about the reality of Sora's female gender. Sora's family has become more accepting, but she still has limited contact with most family members.

**ANSWER: Defendants admit that as of the date this Answer is being filed, Plaintiff Sora Kuykendall is 25 years old. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.**

39.     Sora entered IDOC custody in November 2014. During intake at Menard Correctional Center, a social worker asked Sora "you're a boy, right," to which Sora responded "no." Within her first week of incarceration, Sora asked for hormones and explained that she wanted to transition. IDOC did not evaluate Sora for gender dysphoria and did not provide any treatment. As a result, and after becoming disturbed by the fact that she was for the first time growing facial hair, Sora attempted to castrate herself by tying her testicles in order to stop the flow of testosterone. When Sora was denied hormones, she felt like she was in the wrong body, which was agonizing.

**ANSWER: Defendants admit that Plaintiff Sora Kuykendall entered IDOC custody on November 20, 2014.**

**Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.**

40.     Following repeated requests, Sora began taking hormones on approximately February 28, 2015. Sora first requested a bra in June 2015 but did not receive one until almost six months later. Sora repeatedly has requested gender affirming clothing and grooming items and gender affirming surgery throughout her incarceration, but she has never received any of these items other than a bra and never has been evaluated for surgery by IDOC officials.

**ANSWER: Defendants admit that Plaintiff Sora Kuykendall was approved for hormone therapy on February 28, 2015.**

**Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.**

41.    Sora is now a prisoner at Menard Correctional Center. She seeks and Defendants have denied her necessary medical treatment for gender dysphoria, including therapeutically appropriate estrogen compounds at a proper dosage, appropriate bloodwork and laboratory testing, gender affirming surgery, and social transition.

**ANSWER: Defendants admit that Plaintiff Sora Kuykendall is housed at Menard Correctional Center.**

**Defendants deny the remaining allegations in this paragraph.**

*f.    Sasha Reed*

42.    Sasha Reed is 26 years old and was raised outside of Chicago. When she was 3 years old, DCFS took Sasha away from her mother after a fire broke out in their home. Sasha's aunt adopted her in 1999, but two years later, she was sent to Maryville Academy in Des Plaines, Illinois. Beginning in 2004, Sasha lived in Allendale Association in Lake Villa, Illinois, where she first felt and presented as female. In 2011, Sasha moved to a transitional living program in Chicago. By that time, she was consistently presenting as female in private.

**ANSWER: Defendants admit that as of the date this Answer is being filed, Plaintiff Sasha Reed is 26 years old.**

**Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.**

43.    Sasha entered IDOC custody in July 2013. During the intake process at Stateville Correctional Center, Sasha told a female corrections officer that she is transgender. Despite this, IDOC never referred Sasha to a mental health professional at Stateville. In part because of her

untreated gender dysphoria, Sasha tried to harm herself while housed there, including a suicide attempt.

**ANSWER: Defendants admit that Plaintiff Sasha Reed was admitted into IDOC Custody on July 12, 2013. Defendants admit that Plaintiff was housed at the Stateville Northern Reception and Classification Center for 17 days, from July 12, 2013 until July 29, 2013.**

**Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.**

44.    Sasha was transferred to Menard Correctional Center in March 2015, and in November 2015 she told a mental health professional at Menard that she is transgender and wanted to begin hormone therapy. The mental health professional asked Sasha to fill out a questionnaire and told her that it would be sent to the GID Committee for review. In February 2016, the GID committee responded and denied hormones because they needed to "rule out a psychotic process." Sasha was told that she needed to wait six weeks while doctors investigated her conceptualization of gender identity. Instead, Sasha waited sixteen months before starting hormones in April 2017.

**ANSWER: Defendants admit that Plaintiff Sasha Reed was transferred from Pontiac Correctional Center to Menard Correctional Center on March 11, 2015. Defendants admit that Plaintiff was diagnosed with gender dysphoria on or about November 2, 2015. Defendants admit that the Transgender Committee made a recommendation to rule out a psychotic process before starting feminizing hormones for Plaintiff on February 19, 2016.**

**Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.**

45.     Sasha is now housed at Lawrence Correctional Center. She continues to seek and Defendants have denied her necessary medical treatment for gender dysphoria, including proper hormone treatment and appropriate bloodwork and laboratory testing, social transition, and gender affirming surgery.

**ANSWER: Defendants admit that Plaintiff Sasha Reed is currently housed at Lawrence Correctional Center.**

**Defendants deny the remaining allegations in this paragraph.**

**II.     DEFENDANTS**

46.     Defendant Bruce Rauner is the Governor of the State of Illinois. He is sued in his official capacity. The Governor is the Chief Executive Officer of the State of Illinois. He is responsible for ensuring the provision of constitutionally adequate medical care for all prisoners in the custody of IDOC, including those who have requested evaluation or treatment for gender dysphoria. In all his actions described in this Complaint, Defendant Governor Rauner is acting under color of state law and in the course of his employment.

**ANSWER: Defendant Rauner is the subject of a separate motion to dismiss. Defendants admit that Bruce Rauner is the Governor of the State of Illinois.**

**Defendants deny the remaining allegations in this paragraph.**

47.     Defendant John R. Baldwin is Director of IDOC and is sued in his official capacity. As Director of IDOC, Defendant Baldwin is responsible for establishing, monitoring, and enforcing overall operations, policies, and practices of the Illinois state prison system, which includes the provision of constitutionally adequate medical care for all prisoners in the custody of IDOC, including those who have requested evaluation or treatment for gender dysphoria. In all his

actions described in this Complaint, Defendant Baldwin is acting under color of state law and in the course of his employment.

**ANSWER: Defendants admit that John Baldwin is the Acting Director of IDOC. Defendants admit that Defendant Baldwin may be responsible for carrying out injunctive relief ordered by the Court in connection with this litigation. Defendants admit that Defendant Baldwin acted under color of state law and in the course of his employment.**

**Defendants deny the remaining allegations in this paragraph.**

48.    Defendant Dr. Steve Meeks is the Chief of Health Services for IDOC and is sued in his official capacity. As Chief of Health Services, Defendant Meeks is responsible for ensuring that IDOC healthcare policies, directives, and protocols are properly implemented at all facilities and for updating and creating administrative directives, clinic, and health guidelines, including those that relate to care for gender dysphoria. In all his actions described in this Complaint, Defendant Meeks is acting under color of state law and in the course of his employment.

**ANSWER: Defendants admit that Dr. Steve Meeks is the Medical Director for IDOC. Defendants admit that Defendant Meeks may be responsible for carrying out injunctive relief ordered by the Court in connection with this litigation. Defendants admit that Defendant Meeks acted under color of state law and in the course of his employment.**

**Defendants deny the remaining allegations in this paragraph.**

49.    Defendant Dr. Melvin Hinton is the statewide Mental Health Supervisor for IDOC and is being sued in his official capacity. As Mental Health Supervisor, Defendant Hinton acts as the statewide mental health supervisor and facilitates and oversees several facets of mental health services. He oversees and provides psychological care, psychiatric evaluations, and crisis intervention. These services include treatments that relate to the care for gender dysphoria. In all

of his actions described in this Complaint, Defendant Hinton is acting under color of state law and in the course of his employment.

**ANSWER: Defendants admit that Dr. Melvin Hinton is the Chief of Mental Health Services for IDOC. Defendants admit that Defendant Hinton may be responsible for carrying out injunctive relief ordered by the Court in connection with this litigation. Defendants admit that Defendant Baldwin acted under color of state law and in the course of his employment.**

**Defendants deny the remaining allegations in this paragraph.**

50.     Defendants Meeks and Hinton are also members of the GID Committee for IDOC. The members of the GID Committee are responsible for health related treatment plans for transgender prisoners, including medical treatment for gender dysphoria.

**ANSWER: Defendants admit that the Medical Director and Chief of Mental Health Services are members of IDOC's Transgender Care Review Committee. Defendants admit that as Medical Director and Chief of Mental Health Services, Defendants Meeks and Hinton are currently members of the Transgender Care Review Committee.**

**Defendants deny the remaining allegations in this paragraph.**

<u>NATURE OF THE CASE AND FACTUAL ALLEGATIONS</u>

## I.     TRANSGENDER IDENTITY AND GENDER DYSPHORIA.

51.     Transgender persons have a gender identity that does not align with the gender they were assigned at birth. Gender identity is "a person's deeply felt, inherent sense of being a girl, woman, or female; a boy, a man, or male; a blend of male or female; or an alternative gender." Everyone has a gender identity.

**ANSWER: Defendants admit that a transgender individual is an individual whose gender identity is different from his or her assigned gender at birth. Defendants admit everyone has a gender identity.**

**Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.**

52.     Most people have a gender identity consistent with the sex that they were assigned at birth. Transgender persons have a gender identity that is not fully aligned with their assigned gender. Attempting to conform an individual's gender identity to their assigned sex by trying to change an individual's gender identity is not only futile and unethical, but also may exacerbate the distress associated with the incongruity between a transgender individual's assigned gender and the gender they know themselves to be.

**ANSWER: Defendants admit that a transgender individual is an individual whose gender identity is different from his or her assigned gender at birth. Defendants admit that transgender persons have a gender identity that is not fully aligned with their assigned gender.**

**Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.**

53.     Indeed, while not all transgender or gender nonconforming persons experience clinically significant psychological distress as a result of the conflict between gender identity and assigned sex at birth, for others this distress can be extreme. The medical diagnosis of gender dysphoria refers to the condition characterized by clinically significant "distress that may accompany the incongruence between one's experienced or expressed gender and one's assigned gender." Gender dysphoria is not a mild discomfort with one's assigned sex. Rather, it is a

profound disturbance that, if left untreated or inadequately treated, can lead to severe mental anguish and the inability to function normally at school, at work, or in a relationship. The *Diagnostic and Statistical Manual of Mental Disorders*, Fifth Edition (the "DSM-5") classifies gender dysphoria as a serious medical condition.

**ANSWER: Defendants admit that gender dysphoria is a specific mental health disorder meeting diagnostic criteria of the current version of the Diagnostic and Statistical Manual of Mental Health Disorders (DSM) that includes a marked incongruence between an individual's experienced or expressed gender and his or her assigned gender.**

**Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.**

54.    The DSM-5 lists six criteria which, when present in some combination, trigger a diagnosis of gender dysphoria. These are (i) a marked incongruence between one's gender identity and one's sex characteristics; (ii) a strong desire to be rid of one's sex characteristics because of that incongruence; (iii) a strong desire for the sex characteristics of the other gender; (iv) a strong desire to be of another gender; (v) a strong desire to be treated as another gender; and (vi) a strong conviction that one's feelings and reactions are typical of another gender. An individual must experience two or more of these criteria for at least six months to be diagnosed with gender dysphoria.

**ANSWER: Defendants admit that the DSM-5 lists six criteria for gender dysphoria in adolescents and adults. Defendants further admit that DSM-5 provides that gender dysphoria in adults is diagnosed by "a marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration, as manifested by at least two [of the six criteria]."**

**Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.**

55.     If not properly treated, gender dysphoria often causes anxiety, depression, substance-related disorders, self-harm, and suicide. Suicide attempt rates are particularly alarming: over forty percent of transgender individuals report having attempted suicide, as compared with between 1.6 and 4.6 percent of the general population. High levels of stigmatization, discrimination, and victimization cause and exacerbate these dangers.

**ANSWER: Defendants admit that untreated gender dysphoria can lead to adverse consequences.**

**Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.**

56.     The World Professional Association for Transgender Health ("WPATH") is a nonprofit, multidisciplinary professional association dedicated to understanding and treating gender dysphoria. WPATH is recognized internationally as the leading professional organization devoted to the understanding and treatment of gender dysphoria. WPATH publishes and regularly updates the *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* (the "Standards of Care"), based upon the best available science and expert professional consensus. The seventh and current version of the Standards of Care was released in September 2011. The Standards of Care is widely recognized in the medical community as the authoritative standard for the provision of transgender healthcare. In particular, the Standards of Care have established medical treatment standards for persons living with gender dysphoria that are recognized and accepted within the medical community, and that reflect "the consensus expert opinion among professionals in this field on the basis of their collective clinical experience as well

as a large body of outcome research." Courts also have acknowledged that the Standards of Care provide widely accepted protocols for treating individuals with gender dysphoria.

**ANSWER: Defendants admit that WPATH publishes** *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People***.**

**Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.**

57.     The Standards of Care explicitly state that they apply in institutional environments such as prisons:

> The [Standards of Care] in their entirety apply to all transsexual, transgender, and gender nonconforming people, irrespective of their housing situation. People should not be discriminated against in their access to appropriate health care based on where they live, including institutional environments such as prisons .... Health care for transsexual, transgender, and gender nonconforming people living in an institutional environment should mirror that which would be available to them if they were living in a non-institutional setting within the same community.

**ANSWER: Defendants admit that this paragraph accurately quotes from the Standards of Care but deny that Defendants are constitutionally required to follow the recommendations of WPATH's Standards of Care.**

58.     The Standards of Care emphasize that "[a]ll elements of assessment and treatment ... can be provided to people living in institutions," and that "[a]ccess to these medically necessary treatments should not be denied on the basis of institutionalization or housing arrangements."

**ANSWER: Defendants admit that this paragraph accurately quotes from the Standards of Care but deny that Defendants are constitutionally required to follow the recommendations of WPATH's Standards of Care.**

59.     Additionally, the National Commission on Correctional Healthcare recommends that medical care for prisoners with gender dysphoria "should follow accepted standards developed by professionals with expertise in transgender health," citing the Standards of Care.

**ANSWER: Defendants admit that this paragraph accurately quotes from the Standards of Care but deny that Defendants are constitutionally required to follow the recommendations of the National Commission on Correctional Health Care.**

60.     There are a variety of therapeutic treatments for individuals with a medical need for gender dysphoria treatment. The Standards of Care list the following principal types of treatment:

- Changes in gender expression and role, which may involve living part time or full time in another gender role, consistent with one's gender identity;

- Hormone therapy to feminize or masculinize the body;

- Surgery to change primary and/or secondary sex characteristics (e.g. breasts/chest, external and/or internal genitalia, facial features, body contouring);

- Psychotherapy (individual, couple, family, or group) for purposes such as exploring gender identity, role, and expression; addressing the negative impact of gender dysphoria and stigma on mental health; alleviated internalized transphobia; enhancing social and peer support; improving body image; or promoting resilience.

**ANSWER: Defendants admit that this paragraph accurately quotes from the Standards of Care but deny that Defendants are constitutionally required to follow the recommendations of WPATH's Standards of Care.**

**Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.**

61.    For a given individual suffering from gender dysphoria, one or all of these components may be necessary for effective treatment. Various secondary treatment options are also listed in the Standards of Care, including (i) peer support groups, (ii) voice and communication therapy aimed towards facilitating gender identity comfort, (iii) hair removal, (iv) outward-appearance aids such as padding or prostheses, and (v) name and/or gender marker changes on identity documents.

**ANSWER: Defendants deny that they are constitutionally required to follow the recommendations of WPATH's Standards of Care. Defendants deny providing Plaintiffs' putative class with ineffective treatment.**

**Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.**

62.    When gender dysphoria is effectively treated through the therapies described above, the symptoms can be effectively addressed and the condition can be cured. Absent that treatment, persons with gender dysphoria will experience anxiety, depression, substance-related disorders, and/or the inability to function effectively at school, at work, or in a relationship. In the most serious cases, untreated gender dysphoria leads to self-harm, and suicide.

**ANSWER: Defendants admit that untreated gender dysphoria can lead to adverse consequences.**

**Defendants deny the remaining allegations in this paragraph and deny violating Plaintiff's constitutional rights.**

## II.   IDOC POLICIES CONCERNING THE CARE OF TRANSGENDER PRISONERS AND PRISONERS WITH GENDER DYSPHORIA.

63.     Despite the fact that proper diagnosis and effective treatment of gender dysphoria are well-understood among medical professionals, IDOC has adopted policies, procedures, and practices that deny prisoners evaluation and medically necessary treatment for gender dysphoria in contravention of medical science.

**ANSWER: Defendants deny the allegations in this paragraph.**

64.     IDOC Administrative Directive 04.03.104, "Evaluation of Offenders with Gender Identity Disorders," effective as of May 1, 2013 (the "GID Directive"), sets forth IDOC's policies and procedures for the evaluation and treatment of prisoners with gender dysphoria.

**ANSWER: Defendants admit that the version of IDOC's Administrative Directive 04.03.104 that went into effect on May 1, 2013 is titled "Evaluation of Offenders with Gender Identity Disorders." Defendants admit that Administrative Directive 04.03.104 contains policies and procedures related to the evaluation and treatment of prisoners with gender dysphoria.**

65.     By mandating unnecessary requirements for approval of treatment for gender dysphoria, the GID Directive causes harmful delays in and interference with the treatment and care decisions of individuals with gender dysphoria. For example, the GID Directive states that "[t]he Department shall not perform or allow the performance of any surgery for the specific purpose of gender change, except in extraordinary circumstances as determined by the Director who has consulted with the Agency Medical Director." Similarly, by requiring prior approval of the Agency Medical Director, the GID Directive restricts prisoners' ability to receive hormone therapy, despite the fact that such therapy is medically necessary and prescribed by a medical professional. These

policies have the design and effect of delaying necessary medical evaluation and treatment and making effective treatment more difficult to obtain.

**ANSWER: Defendants admit this paragraph accurately quotes the GID Directive but deny that Defendants are constitutionally required to follow the GID Directive.**

**Defendants deny the remaining allegations in this paragraph.**

66.     The GID Directive also establishes the GID Committee. The GID Committee is responsible for reviewing "placements, security concerns, and overall health related treatment plans" for transgender prisoners. It is headed by IDOC's medical director and includes, at a minimum, IDOC's chief of mental health, transfer coordinator, and chief of operations. The GID Committee currently consists of Steve Meeks, the director of medical services; Melvin Hinton, the chief of mental health; Doug Stephens, the transfer coordinator; and Mike Atchison, the chief of operations.

**ANSWER: Defendants admit that IDOC has a Committee which was previously named the Gender Identity Disorder Committee but is now named the Transgender Care Review Committee ("Transgender Committee"). Defendants admit that the Transgender Committee is responsible for reviewing placements, security concerns and overall health-related treatment plans of transgender offenders or offenders with Gender Dysphoria, and overseeing the gender-related accommodations for these offenders. Defendants admit that the Transgender Committee is comprised, in part, of the Agency Medical Director, The Chief of Mental Health, the Transfer Coordinator (or designee), and the Chief of Operations (or designee). Defendants deny that these individuals are the only individuals who participate on the Transgender committee.**

Defendants admit that as IDOC's Medical Director, Dr. Steve Meeks is a member of the Transgender Committee. Defendants admit that as the Chief of Mental Health Services, Dr. Melvin Hinton is a member of the Transgender Committee. Defendants admit that as Transfer Coordinator, Doug Stephens or his designee is a member of the Transgender Committee. Defendants admit that Mike Atchison was previously the Chief of Operations for IDOC.

Defendants deny the remaining allegations in this paragraph.

67. The GID Committee is charged with evaluating "an offender who presents with gender identity issues . . . to make final recommendations" regarding a prisoner's "overall health-related treatment plans" and "gender related accommodation[s]."

ANSWER: Defendants admit that the Transgender Committee is responsible for reviewing placements, security concerns and overall health-related treatment plans of transgender offenders or offenders with Gender Dysphoria, and overseeing the gender-related accommodations for these offenders.

Defendants deny the remaining allegations in this paragraph.

68. The Standards of Care recommend that all mental health professionals working with gender dysphoric adults should have a number of minimum credentials, including a master's degree (or equivalent) in a clinical behavioral science field; competencies in using the DSM-5 and/or the International Classification of Diseases for diagnostic purposes; ability to recognize and diagnose co-existing mental health concerns and to distinguish these from gender dysphoria; documented supervised training and competence in psychotherapy or counseling; knowledge of gender nonconforming identities and expressions, and the assessment and treatment of gender dysphoria; and continuing education in the assessment and treatment of gender dysphoria.

**ANSWER: Defendants admit that this paragraph accurately quotes from the Standards of Care but deny that Defendants are constitutionally required to follow the recommendations of WPATH's Standards of Care.**

**Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.**

69.     None of the members of the GID Committee meet these minimum criteria and none are the prisoner's treating medical professional. Despite lacking these requisite qualifications, the GID Committee oversees all medical treatment for gender dysphoria offered by IDOC. Typically without meeting or hearing directly from the prisoner, the GID Committee provides "final recommendations" for "hormone therapy, clothing, showers, searches," housing, and other accommodations. The GID Committee can, and often does, deny a prisoner hormone therapy and other necessary medical interventions despite a diagnosis of gender dysphoria, sometimes overruling the medical judgment of the treating medical professional's recommendations. Even if the GID Committee ultimately approves the treatment, it does so after causing significant delay, which causes severe harm to prisoners with gender dysphoria.

**ANSWER: Defendants deny the allegations in this paragraph.**

70.     These IDOC policies related to the medical treatment of gender dysphoria have the design and effect of delaying necessary medical evaluation and treatment and making effective treatment more difficult to obtain. This causes great suffering to class members whose medically necessary treatment is delayed or denied outright.

**ANSWER: Defendants deny the allegations in this paragraph.**

III.     **DEFENDANTS FAIL TO PROPERLY EVALUATE AND PROVIDE NECESSARY MEDICAL CARE FOR GENDER DYSPHORIA.**

71.     IDOC and each of the named Defendants is and has been deliberately indifferent to the systemic failures to evaluate and provide treatment to prisoners with gender dysphoria. IDOC perpetuates and tolerates myriad systemic deficiencies in treating gender dysphoria: lengthy and dangerous delays in evaluating, prescribing, and initiating appropriate treatment; significant delays in providing or continuing hormone treatment, coupled with inadequate hormone dosages, improper hormone regimens, and lack of or inadequate hormone level monitoring for prisoners who obtain hormone therapy; failure to accommodate social transition, including by mechanically assigning gender dysphoric prisoners to facilities that do not match their gender, allowing routine strip-searches of gender dysphoric women prisoners by male staff, referring to gender dysphoric prisoners by gender-inappropriate names and pronouns, and denying prisoners access to basic gender affirming clothing and grooming products, such as bras for transgender women and treatment and products for body hair and facial hair removal to achieve a more feminine appearance; failure to consider or to provide gender affirming surgery as is medically necessary for some patients with gender dysphoria; lack of medical personnel with knowledge of and qualifications to treat gender dysphoria, combined with a failure to refer prisoners to clinicians competent to treat gender dysphoria; and failure to provide appropriate psychotherapy to prisoners with gender dysphoria.

**ANSWER: Defendants deny the allegations in this paragraph.**

A.     *IDOC Fails to Evaluate Prisoners for Gender Dysphoria and Delays Treatment.*

72.     Transgender prisoners face significant delays before IDOC evaluates them for gender dysphoria and even longer delays before IDOC initiates medically necessary treatment. These delays are contrary to the Standards of Care, which indicate that patients "should receive

prompt and attentive evaluation, with the goal of alleviating their gender dysphoria and providing them with appropriate medical services."

**ANSWER: Defendants deny the allegations in this paragraph.**

73.    IDOC fails to adequately evaluate prisoners for gender dysphoria during the intake process. Attempts to ask new prisoners about their transgender status or treatment for gender dysphoria are sporadic at best, and when a prisoner does indicate that they are transgender during an intake evaluation, the statement is routinely disregarded or ignored. Many transgender prisoners repeatedly request evaluation for gender dysphoria before receiving it, if they receive it at all, and once evaluated, many prisoners wait weeks, months, or even years before receiving medically necessary treatments including hormone therapy.

**ANSWER: Defendants deny the allegations in this paragraph.**

74.    Lydia Vision identified as transgender to IDOC officials in December 2015. Her case was evaluated by the GID Committee in March 2016. Despite identifying as transgender and being diagnosed with gender dysphoria by IDOC mental health professionals, the GID Committee refused to provide Lydia proper treatment including hormone treatments and gender affirming clothing and grooming items. To date, Lydia still has not received any medical treatment for gender dysphoria beyond limited individual therapy sessions despite repeated requests.

**ANSWER: Defendants deny the allegations in this paragraph.**

75.    Sasha Reed requested hormone treatment from IDOC in November 2015. Her mental health professional asked Sasha to fill out a questionnaire and told her that it would be sent to the GID Committee for review. In February 2016, the GID Committee responded and denied her hormones. Sasha was told that she needed to wait while doctors investigated her conceptualization of gender identity. Sasha waited sixteen months before finally being treated with

hormone therapy in April 2017. Her treatment, however, is still inadequate for the reasons set forth below, leaving her depressed, anxious, and at serious risk of suicide or self-harm.

**ANSWER: Defendants admit that the transgender committee did not recommend hormone therapy for Plaintiff Reed in February 2016.**

**Defendants deny that Plaintiff Sasha Reed's treatment is inadequate.**

**Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.**

76.     In some instances, IDOC does not respond to a prisoner's need for treatment until their distress manifests in self-harm. Sora Kuykendall was forced to wait approximately four months before receiving treatment and her resulting distress from the delay in treatment manifested in Sora tying her testicles in order to stop the production of testosterone. It was only after Sora's self-castration attempt that IDOC finally provided some treatment for her gender dysphoria. Her treatment, however, is still inadequate for the reasons set forth below, leaving her depressed, anxious, and distressed.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief about the truth concerning whether Plaintiff Kuykendall experienced distress as a result of the alleged delay in treatment, which manifested in Plaintiff Kuykendall engaging in self-harm. Defendants deny the remaining allegations in this paragraph.**

77.     Similarly, Janiah Monroe requested treatment for gender dysphoria for approximately three years before she was finally approved for hormone treatments in April 2012. The distress associated with the delay resulted in Janiah attempting her own treatment by self-castrating multiple times before she finally was provided care. Her treatment, however, is still

inadequate for the reasons set forth below, leaving her depressed, anxious, and at risk of potential suicide or self-harm.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief about the truth concerning whether Plaintiff Monroe experienced distress as a result of the alleged delay in treatment, which manifested in Plaintiff Monroe engaging in self-harm. Defendants deny the remaining allegations in this paragraph.**

B.    *IDOC Fails to Provide Adequate Hormone Therapy Treatment to Prisoners with Gender Dysphoria.*

78.    IDOC inadequately provides hormone therapy to prisoners with gender dysphoria. Even once a prisoner obtains hormone therapy, IDOC routinely provides hormones that are not medically recommended or appropriate, fails to adequately monitor the prisoner's hormone levels, and fails to ensure proper dosages.

**ANSWER: Defendants deny the allegations in this paragraph.**

79.    The Standards of Care specify that "feminizing/masculinizing hormone therapy – the administration of exogenous endocrine agents to induce feminizing or masculinizing changes – is a medically necessary intervention for many transsexual, transgender, and gender nonconforming individuals with gender dysphoria." The consequences of withdrawing hormone treatment or not providing hormone treatment when medically necessary "include a high likelihood of negative outcomes such as surgical self-treatment by autocastration, depressed mood, dysphoria, and/or suicidality."

**ANSWER: Defendants admit that this paragraph accurately quotes from the Standards of Care but deny that Defendants are constitutionally required to follow the recommendations of WPATH's Standards of Care**

80.     Despite the medical necessity of hormone treatment for some transgender prisoners, the GID Directive creates barriers that prevent prisoners from receiving hormone treatment, requiring approval of the Agency Medical Director. Thus, IDOC's Medical Director, who does not have expertise in the treatment of persons with gender dysphoria and is not the prisoner's treating medical provider, can deny hormone treatments despite a diagnosis for gender dysphoria and a prescription by the medical professional familiar with the prisoner's case.

**ANSWER: Defendants admit that the version of Administrative Directive 04.03.104 that went into effect on May 1, 2013 states that hormone therapy shall require prior approval of the Agency Medical Director.**

**Defendants deny the remaining allegations in this paragraph.**

81.     The GID Committee also can override the treating provider's determination of whether a prisoner receives hormone treatments, despite its members' lack of expertise in the treatment of gender dysphoria. Upon information and belief, IDOC has isolated no other medical condition for approval by the medical director and/or a committee comprised of personnel with no expertise in treating that condition before such treatment is administered.

**ANSWER: Defendants admit that the version of Administrative Directive 04.03.104 that went into effect on May 1, 2013 states that hormone therapy shall require prior approval of the Agency Medical Director.**

**Defendants deny the remaining allegations in this paragraph.**

82.     These barriers result in unjustified outright denial or substantial delays in prisoners receiving hormone treatments. Lydia Vision has requested hormone treatments for over a year. She continues to be denied hormone therapy by the GID Committee despite ongoing requests and a diagnosis of gender dysphoria.

**ANSWER: Defendants deny the allegations in this paragraph.**

83.     Marilyn Melendez received a gender dysphoria diagnosis around March 2015. Despite this, the GID Committee denied Marilyn's request and forced her to wait before she could seek reevaluation. Marilyn was not approved for hormone treatment by the GID Committee until July 2015 and her treatment did not begin until August.

**ANSWER: Defendants admit that the Transgender Committee did not recommend hormone therapy for Plaintiff Marilyn Melendez in March of 2015. Defendants admit that on July 17, 2015 the Transgender Committee recommended that Marilyn Melendez begin hormone therapy.**

**Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.**

84.     IDOC forced Ebony Stamps to choose between continued hormone treatment and isolation. Ebony opted to cease her hormone therapy after several weeks in "orientation" so that she would no longer be kept in isolation but could return to the general population, with social interaction, the denial of which was causing her physical and mental health to deteriorate rapidly. Ebony has undergone a period of extreme distress from the cessation of her hormones so she has requested that they be restarted, but months have passed and she still has not been able to restart that treatment resulting in severe depression, continuous anxiety, and extreme distress.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief about the truth of whether Plaintiff Stamps opted to cease her hormone therapy so that she could return to general population. Defendants deny the remaining allegations in this paragraph.**

85.     Even after a prisoner is approved for hormone treatments, IDOC routinely provides outdated hormones that are no longer recommended by the Endocrine Society, and provides inadequate hormone dosages and hormone level monitoring.

**ANSWER: Defendants deny the allegations in this paragraph.**

86.     The type of hormones that should be provided to an individual depends on the gender of the individual seeking treatment as well as the individual's gender assigned at birth. Individuals prescribed feminizing endocrine treatments, i.e., women who were assigned the gender of male at birth, who have not had their testicles surgically removed, require a dual course of hormone treatment: estrogen and testosterone blockers. Generally approved estrogen treatments include: oral doses of estradiol, transdermal doses of estradiol, or parenteral doses of estradiol valerate or cypionate. Accepted antiandrogens, or testosterone blockers, include Spironolactone or Cyproterone acetate. The Endocrine Society also recommends an injection of GnRH agonist taken monthly.

**ANSWER: Defendants admit that the treatment needs of an individual can vary from individual to individual.**

**Defendants deny that they are constitutionally required to follow the recommendations of the Endocrine Society. Defendants deny the remaining allegations in this paragraph.**

87.     Instead of these accepted treatments, Marilyn Melendez and Sora Kuykendall have been prescribed a conjugated equine estrogen, which is not recommended by the Endocrine Society because it is also impossible to meaningfully measure estrogen levels in blood and therefore regulate appropriate doses.

**ANSWER: Defendants deny that they are constitutionally required to follow the recommendations of the Endocrine Society.**

**Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

88.     Further, IDOC fails to adequately monitor prisoner hormone levels and other health markers for prisoners taking hormone therapy. Like many prescription medications, taking hormones can have side effects, especially when not properly monitored. The Standards of Care direct that "clinicians who prescribe hormone therapy . . . [p]rovide ongoing medical monitoring, including regular physical and laboratory examination to monitor hormone effectiveness and side effects." Similarly, the Endocrine Society recommends "appropriate regular medical monitoring . . . for both [female to male] and [male to female] transsexual persons during the endocrine transition and periodically thereafter," including patient evaluations every 2-3 months in the first year of hormone or endocrine treatment and then 1-2 times per year thereafter. The Endocrine Society recommends measuring serum testosterone and estradiol every three months, and that estrogen doses be adjusted according to the serum levels of estradiol.

**ANSWER: Defendants admit this paragraph accurately quotes the Standards of Care but deny that Defendants are constitutionally required to follow the recommendations of the Endocrine Society or WPATH's Standards of Care. Defendants deny that IDOC fails to provide adequate medical treatment.**

**Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.**

89.     Despite being on hormones in IDOC custody for more than two years, Marilyn Melendez has only once had her blood drawn to test her hormone levels. Similarly, Sora Kuykendall has not received regular monitoring of her hormone levels. Janiah Monroe's hormone levels have not been regularly monitored since she was first prescribed hormone treatments in 2012.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

90.     Failing to monitor hormone levels could result in dangerous levels of estrogen: an increased risk for blood clots or strokes if the estrogen level is too high, or for osteoporosis if the estrogen levels are too low, among other potential complications. Accordingly, the Standards of Care dictate that "[m]onitoring for adverse events should include both clinical and laboratory evaluation." Janiah's most recent bloodwork revealed estrogen levels that would be considered post-menopausal. Such levels are inadequate to protect her from bone loss and may not be sufficient to treat her gender dysphoria. Despite this, Janiah's hormone dosages have not been increased to provide therapeutically appropriate treatment.

**ANSWER: Defendants admit that this paragraph accurately quotes from the Standards of Care but deny that Defendants are constitutionally required to follow the recommendations of WPATH's Standards of Care**

**Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

91.     Once a person has been provided with hormone therapy to treat gender dysphoria, there are significant risks of long-term harm if that person is no longer provided hormone therapy. Surgical care often reduces many risks related to hormone therapy.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained with this paragraph.**

C. *IDOC Fails to Permit, Accommodate, and Facilitate Social Transition Necessary to Treat Gender Dysphoria.*

92. IDOC fails to permit, accommodate, and facilitate social transition—"living part time or full time in another gender role, consistent with one's gender identity"—that is medically necessary treatment for gender dysphoria. Among other things, IDOC (i) mechanically places transgender women in facilities for male inmates, without considering whether a female facility would be more appropriate; (ii) routinely subjects transgender women to strip searches performed by male staff; (iii) mis-genders prisoners with gender dysphoria, failing to recognize and respect their gender identity; and (iv) denies transgender women access to gender affirming clothing and grooming items. These failures prevent, or seriously limit, gender dysphoric prisoners' ability to live consistent with their gender identity, which in turn worsens their gender dysphoria.

**ANSWER: Defendants deny the allegations in this paragraph.**

93. IDOC fundamentally fails to accommodate social transition necessary to treat gender dysphoria by treating transgender women not as women but as men. This mis-gendering begins immediately upon arrival, when transgender women automatically are assigned to male facilities, and not considered for placement in a female facility. This IDOC policy disregards the National Standards to Prevent, Detect, and Respond to Prison Rape Under the Prison Rape Elimination Act (PREA), which state that "[i]n deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates, and in making other housing and programming assignments, the agency shall consider on a case-by-case basis whether a placement would ensure

the inmate's health and safety, and whether the placement would present management or security problems."

**ANSWER: Defendants admit this paragraph accurately quotes the National Standard to Prevent, Detect, and Respond to Rape Under the Prison Rape Elimination Action (PREA) but deny that Defendants have violated PREA.**

**Defendants deny the remaining allegations in this paragraph.**

94.      Once transgender women inevitably are placed in IDOC facilities for men, they then are routinely subjected to demeaning and harmful strip-searches by male staff. This, too, disregards PREA's directive that a facility "shall not conduct cross-gender strip searches or cross-gender visual body cavity searches" except in exigent circumstances or when performed by medical practitioners. These women then routinely are referred to by staff and other inmates by the wrong name and gender, even after they request to be addressed by the correct name and gender.

**ANSWER: Defendants admit this paragraph accurately quotes the Prison Rape Elimination Act (PREA) but deny that Defendants have violated PREA.**

**Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.**

95.      Similarly, IDOC fails to provide gender affirming clothing and grooming items to prisoners with gender dysphoria. These clothing and grooming items can significantly enhance an individual's ability to function healthily in their environment, and are an essential component of gender transition and treatment for gender dysphoria for many persons with the condition. In addition, many women in IDOC facilities who are transgender have developed breasts as a result of either past or current hormone treatment or past surgery. Without a bra, these women suffer

pain and discomfort. Similarly, IDOC often denies access to grooming products such as shaving razors, hair removal products, or lotions to offset the dry skin that can result from taking spironolactone, an anti-androgen commonly used in feminizing hormone therapy.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief about the truth of whether many transgender women in IDOC facilities have developed breasts as a result of either past or current hormone treatment or past surgery. Defendants lack knowledge or information sufficient to form a belief about the truth of whether the transgender woman referenced within this paragraph now suffer pain and discomfort from not being provided a bra.**

**Defendants deny the remaining allegations in this paragraph.**

96.     Janiah Monroe has specifically requested that she be considered for placement in a female facility. Her request was denied because she has not completed gender affirming surgery—and her requests for gender affirming surgery likewise have been denied. Lydia Vision, Sora Kuykendall, and Sasha Reed have all repeatedly requested clothing and grooming items provided to non-transgender women. IDOC continues to deny each prisoner's request. Marilyn Melendez and Janiah Monroe have both received bras from IDOC only after grieving IDOC's repeated denials of this care. IDOC, however, continues to deny their requests for other gender affirming clothing and grooming items.

**ANSWER: Defendants admit that Plaintiff Monroe's requests for gender-affirming surgery have been denied. Defendants admit that Plaintiff Monroe's requests to be transferred to a female facility have been denied.**

**Defendants deny the remaining allegations in this paragraph.**

D.    *IDOC Fails to Consider and/or Provide Surgery as Part of Medically Necessary Treatment for Gender Dysphoria.*

97.    IDOC refuses to consider or provide surgery to prisoners suffering from gender dysphoria despite medical research and evidence demonstrating that surgery may be necessary in some cases and is an effective treatment, effectively imposing a blanket ban on surgical treatment for gender dysphoria. Under the Standards of Care, gender affirming surgery can be an "essential and medically necessary" treatment for gender dysphoria. Hormone therapy alone for certain individuals is not sufficient:

> While many transsexual, transgender, and gender-nonconforming individuals find comfort with their gender identity, role, and expression without surgery, for many others surgery is essential and medically necessary to alleviate their gender dysphoria. ... For the latter group, relief from gender dysphoria cannot be achieved without modification of their primary and/or secondary sex characteristics to establish greater congruence with their gender identity.

**ANSWER: Defendants admit that this paragraph accurately quotes the Standard of care but deny that Defendants are constitutionally required to follow the recommendations of WPATH's Standards of Care. Defendants deny that they refuse to provide medically necessary treatment.**

**Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.**

98.    Several of the Named Plaintiffs meet the criteria to be candidates for gender affirming surgery, having been on hormones and lived in their congruent gender role for at least a year. Those who do not meet these criteria would likely have done so if IDOC had provided medically necessary treatment on a timely basis.

**ANSWER: Defendants deny that several of the named Plaintiffs meet the criteria to be candidates for gender affirming surgery, having been on hormones and lived in their congruent gender role for at least a year.**

**Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.**

99.   The Standards of Care apply equally to prisoners and non-prisoners. The Standards of Care dictate that "[a]ll elements of assessment and treatment" can be provided in prisons, and that "access to medically necessary treatments should not be denied on the basis of institutionalization." While "[r]easonable accommodations to the institutional environment can be made in the delivery of care consistent with the [Standards of Care]," "[d]enial of needed changes in gender role or access to treatments, including sex reassignment surgery, on the basis of residence in an institution are not reasonable accommodations ...."

**ANSWER: Defendants admit that this paragraph accurately quotes from the Standards of Care but deny that Defendants are constitutionally required to follow the recommendations of WPATH's Standards of Care. Defendants deny that they refuse to provide medically necessary treatment.**

**Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.**

100.   On information and belief, no IDOC prisoner is or ever has been approved for gender affirming surgery or has even been evaluated to determine whether they need gender affirming surgery to treat their gender dysphoria. Janiah Monroe has requested gender affirming surgery on multiple occasions and has been continually denied. Similarly, despite repeated requests from Marilyn Melendez, IDOC has taken no meaningful steps to evaluate her as a

candidate for surgery. Sora Kuykendall first requested surgery in June 2015. IDOC has taken no steps to evaluate her as a candidate in the past two and a half years.

**ANSWER: Defendants admit that as of the date this Answer is being filed, IDOC has not approved surgery for the specific purpose of gender change for any inmate incarcerated within IDOC.**

**Defendants deny the remaining allegations in this paragraph.**

101.    Instead, IDOC has a practice and a policy that it makes it a practical impossibility for prisoners to receive medically necessary surgical treatment. IDOC's GID Directive mandates that "[t]he Department shall not perform or allow the performance of any surgery for the specific purpose of gender change, except in extraordinary circumstances as determined by the Director who has consulted with the Agency Medical Director." In other words, under the GID Directives, IDOC's Director, who is not competent to treat gender dysphoria, can refuse to provide a prisoner with a medically-necessary surgery, despite that prisoner meeting the criteria listed in the Standards of Care and receiving the required referrals from treating medical personnel.

**ANSWER: Defendants admit that version of IDOC's Administrative Directive 04.03.104 that went into effect on May 1, 2013 provides that "The Department shall not perform or allow the performance of any surgery for the specific purpose of gender change, except in extraordinary circumstances as determined by the Director who has consulted with the Agency Medical Director. " Defendants admit that as of the date this Answer is being filed, IDOC has not approved surgery for the specific purpose of gender change for any inmate incarcerated within IDOC.**

**Defendants deny the remaining allegations in this paragraph.**

E.     *IDOC Fails to Provide Access to Clinicians Competent to Treat Gender Dysphoria, Resulting in Misdiagnosis and Inappropriate Treatment.*

102.    IDOC's medical professionals who treat prisoners with gender dysphoria do not have any meaningful knowledge of, experience with, or training regarding the Standards of Care, nor do they have any meaningful training or experience regarding the proper treatment of gender dysphoria. The Standards of Care specify that, at minimum, all mental health professionals working with gender dysphoric adults should (i) be knowledgeable about gender nonconforming identities and expressions; (ii) be knowledgeable about the treatment and assessment of gender dysphoria including the DSM-5 and/or the International Classification of Diseases; and (iii) possess the ability to recognize and diagnose co-existing mental health concerns and to distinguish these from gender dysphoria. The Standards of Care also recommend that treating clinicians actively seek continuing education on the treatment and assessment of gender dysphoria, including through professional meetings, workshops, and/or seminars. Mental health professionals who are new to working with individuals with gender dysphoria "should work under the supervision of a mental health professional with established competence in the assessment and treatment of gender dysphoria."

**ANSWER: Defendants admit that this paragraph accurately quotes from the Standards of Care but deny that Defendants are constitutionally required to follow the recommendations of WPATH's Standards of Care.**

**Defendants deny the remaining allegations in this paragraph.**

103.    The Standards of Care explicitly state that in an institutional setting, "[i]f the in-house expertise of health professionals ... does not exist to assess and/or treat people with gender dysphoria, it is appropriate to obtain outside consultation from professionals who are knowledgeable about this specialized area of health care." Multiple Named Plaintiffs have

requested referrals to health professionals who are competent to treat gender dysphoria because of IDOC's inadequate treatment.

**ANSWER: Defendants admit that this paragraph accurately quotes from the Standards of Care but deny that Defendants are constitutionally required to follow the recommendations of WPATH's Standards of Care**

**Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.**

104.    IDOC's treatment providers are not knowledgeable or experienced in gender dysphoria. Indeed, they display a profound and fundamental lack of understanding of the disorder by referring to it as "gender identity disorder"—despite a change in nomenclature in 2013—as well as "tg disorder," "sex dysphoria," and other incorrect and inaccurate descriptions. Treatment providers frequently refer to their own gender dysphoric patients with incorrect names and pronouns.

**ANSWER: Defendants deny the allegations in this paragraph.**

105.    As a result of IDOC's inadequate knowledge of and training provided to medical professionals regarding the treatment of gender dysphoria, those medical professionals misdiagnose prisoners who have gender dysphoria with other conditions. These misdiagnoses lead to inappropriate treatment that prolongs the suffering associated with gender dysphoria and delays medically appropriate and necessary treatments.

**ANSWER: Defendants deny the allegations in this paragraph.**

106.    Prisoners with gender dysphoria commonly present with symptoms of depression or past psychotic episodes. These prisoners are often prescribed medications that fail to treat the underlying gender dysphoria, focusing instead on the individual symptoms. For example, Sasha

Reed was diagnosed with schizophrenia and placed on antipsychotic medication prior to receiving treatment for her gender dysphoria. IDOC and the GID Committee repeatedly used Sasha's history of psychiatric treatment as an excuse to deny her hormone treatment.

**ANSWER: Defendants deny the allegations in this paragraph.**

107.    Janiah Monroe's request for a bra and gender affirming surgery was presented to the GID Committee in February 2016. Rather than address her requests for medical treatment, the GID Committee decided that her chart should be reviewed by psychiatry to reassess her psychotropic medication regimen.

**ANSWER: Defendants deny the allegations in this paragraph.**

108.    Similarly, Lydia Vision has been denied hormone therapy for medically unfounded and clinically inappropriate reasons. Despite a diagnosis of gender dysphoria, the GID Committee denied Lydia access to hormone therapy, instead recommending support, treatment, and monitoring for PTSD symptoms.

**ANSWER: Defendants deny the allegations in this paragraph.**

109.    IDOC's failure to employ or contract with clinicians competent to treat gender dysphoria has caused prisoners to withhold potentially useful information out of fear that it will lead to an incorrect diagnosis or treatment. For example, throughout the process of obtaining hormones, Marilyn Melendez was often afraid to tell IDOC medical professionals that she had suicidal thoughts out of a fear that she would be placed on suicide watch instead of receiving hormone therapy.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief about the truth of whether Plaintiff Melendez was often afraid to tell IDOC medical**

professionals that she had suicidal thoughts out of a fear that she would be placed on suicide watch instead of receiving hormone therapy.

**Defendants deny the remaining allegations in this paragraph.**

F.    *IDOC Fails to Provide Necessary and Clinically Appropriate Psychotherapy to Treat Gender Dysphoria.*

110.    IDOC does not provide transgender prisoners with the necessary individual and group psychotherapy sessions. The Standards of Care recommend individual and group therapy in order for the individuals with gender dysphoria to "explor[e] gender identity, role, and expression; address[] the negative impact of gender dysphoria and stigma on mental health; alleviat[e] internalized transphobia; enhance[e] social and peer support; improve[e] body image; or promot[e] resilience."

**ANSWER: Defendants admit that WPATH's Standards of Care provide recommendations for treatment of gender dysphoria.**

**Defendants deny the remaining allegations in this paragraph.**

111.    IDOC systematically fails to provide regular individual and group therapy to transgender prisoners and those with gender dysphoria. When IDOC provides such "therapy" at all, the programming is effectively a peer support group rather than a bona-fide therapeutic experience.

**ANSWER: Defendants deny the allegations in this paragraph.**

112.    While some individuals may benefit from socialization, group support, and psychotherapy, none is a substitute for the medically-necessary medical and surgical interventions necessary to treat gender dysphoria.

**ANSWER: Defendants deny the allegations in this paragraph.**

<u>Class Certification Allegations</u>

113.    All Plaintiffs bring this action on their own behalf and, pursuant to Rules 23(a), 23(b)(1), and 23(b)(2) of the Federal Rules of Civil Procedure, on behalf of a class of all prisoners in the custody of IDOC who have requested from IDOC evaluation or treatment for gender dysphoria, whether or not they used that specific term (collectively, the "Plaintiff Class").

**ANSWER: Defendants deny that plaintiffs have file a motion seeking class certification. Defendants deny class certification is appropriate.**

114.    **Numerosity**. The class is so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1). Further, the Plaintiff Class members are identifiable using records maintained in the ordinary course of business by IDOC.

**ANSWER: Defendants deny the allegations in this paragraph.**

115.    **Commonality**. There are questions of law and fact common to members of the class. Such questions include, but are not limited to:

    a.    Whether the Defendants have failed to establish and administer a medical care system that provides constitutionally adequate medical care for prisoners needing to be evaluated or provided treatment for gender dysphoria in violation of the cruel and unusual punishment clause of the Eighth Amendment;

    b.    Whether the Defendants are deliberately indifferent to the serious medical needs of class members with gender dysphoria;

    c.    Whether the Defendants have failed to employ clinicians competent to treat gender dysphoria to ensure the delivery of constitutionally adequate medical care for the condition;

d.      Whether the Defendants have routinely and systemically failed to provide reasonably prompt medical care for gender dysphoria;

e.      Whether the Defendants have routinely and systemically failed to adequately train medical treatment providers regarding the evaluation and treatment of gender dysphoria;

f.      Whether the Defendants have routinely and systemically failed to identify and correct incompetent medical treatment providers and inadequate treatment for gender dysphoria;

g.      Whether the Defendants have failed to promulgate and follow policies, practices and protocols reasonably necessary to ensure the delivery of constitutionally required medical care for gender dysphoria;

h.      Whether the Defendants have failed to ensure compliance with policies, practices and protocols reasonably necessary to ensure the delivery of constitutionally required medical care for gender dysphoria;

i.      Whether the GID Directive and Defendants' actions pursuant to the GID Directive fail to ensure the delivery of constitutionally required medical care for gender dysphoria; and

j.      Whether Defendants Meeks and Hinton, in their role as members of the GID Committee (charged under the GID Directive with evaluating "an offender who presents with gender identity issues . . . to make final recommendations' regarding a prisoner's "overall health-related treatment plans" and "gender-related accommodation[s]"), have failed to establish and administer a medical care system that provides constitutionally

adequate medical care for prisoners needing to be evaluated or provided

treatment for gender dysphoria in violation of the cruel and unusual

punishment clause of the Eighth Amendment.

**ANSWER: Defendants deny the allegations in this paragraph.**

116.    **Typicality**. The claims of the Plaintiffs are typical of those of the Plaintiff Class. Each of the named Plaintiffs is subject to the Defendants' knowing failure to provide constitutionally adequate medical care, and as such their claims arise from the same policies, practices, or courses of conduct; and their claims are based on the same theory of law as the class's claims.

**ANSWER: Defendants deny the allegations in this paragraph.**

117.    **Adequacy**. Plaintiffs are capable of fairly and adequately protecting the interest of the Plaintiff Class and will diligently serve as class representatives. Plaintiffs do not have any interests antagonistic to the class. Plaintiffs, as well as the Plaintiff Class members, seek to enjoin the unlawful acts and omissions of the Defendants. Finally, Plaintiffs are represented by counsel experienced in civil rights litigation, prisoners' rights litigation, litigation on behalf of transgender people, and complex class action litigation, and have the resources necessary to fairly and adequately represent the class.

**ANSWER: Defendants deny the allegations in this paragraph.**

118.    **Rule 23(b)(1)**. This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(1) because the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for the Defendants. Additionally, the prosecution of separate actions by individual

members could result in adjudications with respect to individual members that, as a practical matter, would substantially impair the ability of other members to protect their interests.

**ANSWER: Defendants deny the allegations in this paragraph.**

119.    **Rule 23(b)(2)**. This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) because the Defendants have acted, or failed to act, on grounds generally applicable to all members of the class, and because the Defendants' policies, practices, actions, and omissions that form the basis of this complaint are common to and apply generally to all members of the class. The injunctive and declaratory relief sought is appropriate and will apply to all members of the class. All IDOC medical care policies relating to gender dysphoria are centrally promulgated, disseminated, and enforced, and the failure to address the systemic deficiencies is the result of policies and practices of IDOC, not any particular person. The injunctive and declaratory relief sought is appropriate and will apply to all members of the Plaintiff Class.

**ANSWER: Defendants deny the allegations in this paragraph.**

<u>CLAIM FOR RELIEF</u>
<u>CAUSE OF ACTION</u>
<u>(42 U.S.C. § 1983; EIGHTH AMENDMENT)</u>

120.    By their policies and practices described herein, Defendants subject all Plaintiffs and the Plaintiff Class to a substantial risk of serious harm and injury from inadequate and delayed evaluation and treatment of gender dysphoria. These policies and practices have been and continue to be implemented by Defendants and their agents, officials, employees, and all persons acting in concert with the under color of state law, in their official capacities, and are the proximate cause of the Plaintiffs' and the Plaintiff Class's ongoing deprivation of rights secured by the United States Constitution under the Eighth Amendment.

**ANSWER: Defendants deny the allegations in this paragraph and deny violating Plaintiffs' constitutional rights whatsoever.**

121.    Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

**ANSWER: Defendants deny the allegations in this paragraph.**

122.    Plaintiffs and the Plaintiff Class they represent have no adequate remedy at law to redress the wrongs suffered as set forth in this complaint. Plaintiffs have suffered and will continue to suffer irreparable injury as a result of the unlawful acts, omissions, policies, and practices of the Defendants, as alleged herein, unless Plaintiffs and the Plaintiff Class they represent are granted the relief they request. The need for relief is critical because the rights at issue are paramount under the United States Constitution and the laws of the United States.

**ANSWER: Defendants deny the allegations in this paragraph.**

PLAINTIFFS' REQUESTED RELIEF

Defendants deny that Plaintiffs are entitled to any relief whatsoever.

JURY DEMAND

Defendants demand a trial by jury.

AFFIRMATIVE DEFENSES

**1.    Injunctive Relief Barred**

To the extent Plaintiffs and their putative class are suing Defendants for injunctive relief that is not intended to address ongoing constitutional violations, the Eleventh Amendment and sovereign immunity bar such claims.

**2.    Injunctive Relief Limited**

The injunctive relief that Plaintiffs are seeking is not narrowly drawn and is thus barred by

the Prison Litigation Reform Act.

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C.A. § 3626(a)(1)(A).

**3.      Administrative Exhaustion**

Plaintiffs' lawsuit concerns the conduct of correctional officers and officials while they were in the custody of the Illinois Department of Corrections, and is barred by 42 U.S.C. 1997e(a), as Plaintiffs haves failed to exhaust administrative remedies prior to filing this suit.

**4.      Statute of Limitations**

The alleged constitutional violations committed by Defendants in the amended complaint that occurred more than two years before the filing of this suit are barred by the statute of limitations, absent a showing of an ongoing violation or applicable tolling.

**5.      Collateral Estoppel and *Res Judicata***

One or more of Plaintiffs' claims involve the claims and issues in *Lippert et al. v. Ghosh et al*, N.D. Ill. Case No. 10-cv-4603, and *Rasho et al v. Walker et al*, C.D. Ill. Case No. 07-cv-01298. To the extent that Plaintiffs are members of the classes that have been certified in *Lippert* and *Rasho*, Plaintiffs' claims are duplicative and potentially barred by the doctrines of *res judicata* and collateral estoppel.

WHEREFORE, for the above and foregoing reasons, Defendants respectfully request this Honorable Court deny Plaintiffs any relief in this matter whatsoever.

Respectfully submitted,

JOHN BALDWIN, STEVE MEEKS, and MELVIN HINTON,

Defendants,

Kyle A. Rockershousen, #6321396   LISA MADIGAN, Attorney General
Assistant Attorney General      State of Illinois
500 South Second Street
Springfield, Illinois 62701      Attorney for Defendants,
(217) 557-0261 Phone
(217) 524-5091 Fax       By: /s/ Kyle A. Rockershousen
Email: krockershousen@atg.state.il.us   Kyle A. Rockershousen

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

JANIAH MONROE, MARILYN MELENDEZ,   )
EBONY STAMPS, LYDIA HELENA VISION,   )
SORA KUYKENDALL, and SASHA REED,   )
                                                            )
        Plaintiffs,   )
                                                            )
     v.   )        No. 18-cv-156-DRH-DGW
                                                            )
BRUCE RAUNER, JOHN BALDWIN,   )
STEVE MEEKS, and MELVIN HINTON,   )
.,   )
        Defendants.   )

## CERTIFICATE OF SERVICE

I hereby certify that on April 18, 2018, the foregoing document, **Answer and Affirmative Defenses**, was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

| | |
|---|---|
| John A. Knight | jknight@aclu.il.org |
| Amelia H. Bailey | amelia.bailey@kirkland.com |
| Catherine L. Fitzpatrick | cfitzpatrick@kirkland.com |
| Erica B. Zolner | ezolner@kirkland.com |
| Ghirlandi Guidetti | gguidetti@aclu.il.org |
| Matthew John Smart | matthew.smart@kirkland.com |
| Megan M. New | mnew@kirkland.com |
| Scott H. Lerner | scott.lerner@kirkland.com |
| Sydney L. Schneider | Sydney.schneider@kirkland.com |
| Jordan M. Heinz | jheinz@kirkland.com |
| Sarah Hunt | sarahjane@tkennedylaw.com |
| Thomas E. Kennedy, III | tkennedy@tkennedylaw.com |

/s/ Kyle A. Rockershousen
Kyle A. Rockershousen, #6321396
Assistant Attorney General
Office of the Attorney General
500 South Second Street
Springfield, Illinois 62701
(217) 557-0261 Phone
(217) 524-5091 Fax
Email: krockershousen@atg.state.il.us