## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil No. 3:18-cv-00156-NJR-MAB |
| v. | ) ) | |
| JOHN BALDWIN, STEVE MEEKS, and MELVIN HINTON, | ) ) ) | |
| Defendants. | ) | |

## MOTION AND MEMORANDUM IN SUPPORT OF A PRELIMINARY INJUNCTION

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS ............................................................................................. 4

I.      GENDER DYSPHORIA AND STANDARDS OF CARE FOR TREATMENT ....................................................................................................... 4

II.     IDOC POLICIES CONCERNING THE CARE OF PRISONERS WITH GENDER DYSPHORIA ......................................................................................... 5

III.    IDOC FAILS TO PROPERLY EVALUATE AND PROVIDE NECESSARY MEDICAL CARE FOR GENDER DYSPHORIA ....................................... 8

      A.     IDOC Denies and Delays Hormone Therapy for Reasons that are Not Recognized by the Medical Community .................................................... 8

      B.     IDOC Fails to Provide Adequate Hormone Therapy and Hormone Monitoring. ........................................................................................... 11

      C.     IDOC Fails to Consider and Provide Surgery as Part of Medically Necessary Treatment for Gender Dysphoria ........................................... 14

      D.     IDOC Prevents and Fails to Permit, Accommodate, and Facilitate Social Transition Necessary to Treat Gender Dysphoria ........................... 16

      E.     IDOC Fails to Provide Access to Clinicians Competent to Treat Gender Dysphoria, Resulting in Misdiagnosis and Inappropriate Treatment. ................. 20

LEGAL STANDARD ................................................................................................... 21

ARGUMENT ................................................................................................................. 22

I.      PLAINTIFFS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR CLAIM .......................................................... 22

      A.     Gender Dysphoria is an Objectively Serious Medical Need. ............... 23

      B.     Defendants Have Acted with Deliberate Indifference to Plaintiffs' Serious Medical Needs. ........................................................................ 24

II.     PLAINTIFFS WILL BE IRREPARABLY HARMED ABSENT PRELIMINARY RELIEF ...................................................................................... 28

III.    THE EQUITIES AND PUBLIC INTEREST FAVOR PRELIMINARY RELIEF .................................................................................................................... 30

i

## TABLE OF CONTENTS (CONT'D)

**Page**

IV.   THIS COURT SHOULD EXTEND INJUNCTIVE RELIEF TO PLAINTIFF
      CLASS MEMBERS ............................................................................................ 31

V.    REQUESTED RELIEF ..................................................................................... 33

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Campbell v. Miller*,
  373 F.3d 834 (7th Cir. 2004) .................................................................................32

*City of Chicago v. Sessions*,
  888 F.3d 272 (7th Cir. 2018) .................................................................................21

*Cleveland-Perdue v. Brutsche*,
  881 F.2d 427 (7th Cir. 1989) .................................................................................24

*Coleman v. Wilson*,
  912 F. Supp. 1282 (E.D. Cal. 1995).......................................................................24

*Edmo v. Idaho Dep't of Corr.*,
  358 F. Supp. 3d 1103 (D. Idaho 2018) ........................................................... *passim*

*Estelle v. Gamble*,
  429 U.S. 97 (1976)............................................................................................22, 23

*Farmer v. Brennan*,
  511 U.S. 825 (1994)..........................................................................................22, 24

*Farnam v. Walker*,
  593 F. Supp. 2d 1000 (C.D. Ill. 2009) ...................................................................31

*Fields v. Smith*,
  653 F.3d 550 (7th Cir. 2011) ............................................................................23, 24

*Flower Cab Co. v. Petitte*,
  685 F.2d 192 (7th Cir. 1982) .................................................................................28

*Foster v. Ghosh*,
  4 F. Supp. 3d 974 (N.D. Ill. 2013) ....................................................................25, 28

*Gammett v. Idaho State Bd. of Corr.*,
  No. CV05-257-S-MHW, 2007 WL 2186896 (D. Idaho July 27, 2007) .................31

*Gordon v. Holder*,
  721 F.3d 638 (D.C. Cir. 2013).................................................................................30

*Graham v. Med. Mut. of Ohio*,
  130 F.3d 293 (7th Cir. 1997) .................................................................................21

i

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Gray v. Hardy*,
  826 F.3d 1000 (7th Cir. 2016) ............................................................................27

*Greeno v. Daley*,
  414 F.3d 645 (7th Cir. 2005) ..............................................................................22

*Hampton v. Baldwin*,
  No. 3:18-CV-550-NJR-RJD, 2018 WL 5830730 (S.D. Ill. Nov. 7, 2018) .............5, 16, 22, 23

*Helling v. McKinney*,
  509 U.S. 25 (1993) .............................................................................................22

*Hicklin v. Precynthe*,
  No. 4:16-cv-01357-NCC, 2018 WL 806764 (E.D. Mo. Feb. 9, 2018) .......................23, 25, 29

*Hobby Lobby Stores, Inc. v. Sebeliu*s,
  723 F.3d 1114 (10th Cir. 2013) (en banc), *aff'd sub nom. Burwell v. Hobby
  Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014) .............................................................31

*Ill. League of Advocates for the Developmentally Disabled v. Ill. Dep't of Human
  Servs.*,
  No. 13 C 1300, 2013 U.S. Dist. LEXIS 90977 (N.D. Ill. June 28, 2013) ...............................32

*Konitzer v. Frank*,
  711 F. Supp. 2d 874 (E.D. Wis. 2010) ...................................................................27

*Lee v. Orr*,
  No. 13-cv-8719, 2013 WL 6490577 (N.D. Ill. Dec. 10, 2013) ................................32

*Meriwether v. Faulkner*,
  821 F.2d 408 (7th Cir. 1987) ..............................................................................23

*Mills v. D.C.*,
  571 F.3d 1304 (D.C. Cir. 2009) ...........................................................................30

*Mitchell v. Kallas*,
  895 F.3d 492 (7th Cir. 2018) ..............................................................................23

*Monterey Mech. Co. v. Wilson*,
  125 F.3d 702 (9th Cir. 1997) ..............................................................................30

*Norsworthy v. Beard*,
  87 F. Supp. 3d 1164 (N.D. Cal. 2015) ................................................................23, 25, 26, 28

*Perez v. Fenoglio*,
  792 F.3d 768 (7th Cir. 2015) ..............................................................................25

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Petties v. Carter*,
  836 F.3d 722 (7th Cir. 2016), as amended (Aug. 25, 2016), *cert denied*, 137 S.
  Ct. 1578 (2017) ..................................................................................................24, 25

*Phillips v. Mich. Dep't of Corr.*, 731 F. Supp. 792 (W.D. Mich. 1990),
  *aff'd*, 932 F.2d 969 (6th Cir. 1991) .........................................................................31

*Preston v. Thompson*,
  589 F.2d 300 (7th Cir. 1978) ...................................................................................30

*Rasho v. Walker*,
  No. 07-1298, 2018 WL 2392847 (C.D. Ill. May 25, 2018) .....................................24

*S./Sw. Ass'n of Realtors, Inc. v. Vill. of Evergreen Park*,
  109 F. Supp. 2d 926 (N.D. Ill. 2000) .......................................................................22

*Soneeya v. Spencer*,
  851 F. Supp. 2d 228 (D. Mass. 2012) .......................................................................26

*Vaquería Tres Monjitas, Inc. v. Irizarry*,
  587 F.3d 464 (1st Cir. 2009) ....................................................................................30

*Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
  858 F.3d 1034 (7th Cir. 2017) ......................................................................22, 28, 30

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)......................................................................................................21

**Statutes**

225 ILCS 60/1 ..................................................................................................................6

18 U.S.C. § 3626(a)(2)....................................................................................................21

## **INTRODUCTION**

Plaintiffs endure daily mental and physical anguish because the Illinois Department of Corrections ("IDOC") refuses to provide them basic, competent treatment for their gender dysphoria. Gender dysphoria is a recognized condition with established, understood, and medically-accepted treatment protocols that, when followed, significantly improve the health and well-being of patients and minimize the distress that accompanies the condition. Despite the relatively straightforward nature of providing treatment in accordance with accepted guidelines, IDOC provides treatment, if at all, that falls so woefully outside of prevailing medical standards that it is nothing short of inhumane. Treatment decisions for each individual with gender dysphoria throughout the system are controlled by a single "Transgender Committee" of IDOC administrators and staff, several having no medical training whatsoever and none with expertise in gender dysphoria, a medical condition requiring specialized care. This centralized committee (which IDOC has created for no other medical condition), consists of unqualified individuals who *vote* to make medical decisions, which results in irrational decision-making untethered from recognized medical standards. The outcome is unjustified delays or outright denials of necessary treatment, prolonging and deepening Plaintiffs' suffering.

For example, IDOC denies hormone therapy, which is proven to be effective, for reasons that have no basis in medical science. Among other illegitimate excuses to deny or delay hormone therapy, IDOC frequently refuses to provide *treatment* for gender dysphoria until the patients no longer display certain *symptoms* of gender dysphoria (such as depression and anxiety)—symptoms that the withheld treatment is designed to alleviate.

When IDOC does provide access to hormone therapy, the regimens are riddled with errors and contrary to accepted medical practice. For example, necessary bloodwork is done irregularly if at all, so IDOC has no way to determine if the individual's hormone levels are adequate to treat

gender dysphoria or put patients at risk for other, sometimes life-threatening conditions that a hormone imbalance may cause.  IDOC also prescribes an outdated form of estrogen that is not recommended because it is impossible to measure in bloodwork.

In addition to the barriers to effective hormone therapy, IDOC forecloses altogether the possibility of surgical treatment for gender dysphoria, which is medically necessary for some patients.  IDOC has adopted a policy that such surgery can be approved only in "extraordinary circumstances,"—a de facto ban under which the Department has never approved such treatment, and does not evaluate prisoners as candidates for surgical care.  Whether rooted in misunderstanding, bias or outright hostility, IDOC's refusal to even consider surgery should shock the conscience no less than if IDOC adopted a policy that effectively banned surgical treatment for cancer, heart disease, or any other serious medical condition.

IDOC additionally prevents prisoners from living consistently with their gender, which is a recognized and necessary cornerstone of medical treatment for gender dysphoria often referred to as "social transition."  With only exceedingly rare exceptions, IDOC forces gender dysphoric women to live with men in a men's facility, to wear men's clothes and underwear, to use men's grooming products, and to be strip searched by male guards.  IDOC denies access to female undergarments, including bras to transgender women (who often have developed breasts), and denies access to effective hair removal and grooming products available to non-transgender women in custody.  Despite the well-recognized harm caused by misgendering gender dysphoric people, IDOC personnel (and prisoners) consistently refer to women with gender dysphoria as men, and men with gender dysphoria as women—as well as slurs such as "he-shes" or "shemales." The medical and mental health professionals entrusted with providing prisoners treatment for gender dysphoria routinely misgender their own patients, demonstrating either profound ignorance

2

or outright indifference.   IDOC has provided no meaningful training to address these known practices, and does not engage specialists to correct its deficient treatment.   At bottom, IDOC disregards the medical consensus that gender dysphoria is real, serious, and treatable.

IDOC's failure to provide necessary treatment has led to profound suffering that serves no penological purpose, and indeed no purpose at all.   It has led Plaintiffs to perform excruciating acts of self-harm in attempts to conform their bodies to their gender.   One Plaintiff, in one of several autocastration attempts, used a staple to open her scrotum, refusing antibiotic treatment for the resulting wound in the hope that an infection would force IDOC to remove her genitalia. Another Plaintiff, desperate to stem the flow of testosterone to her body, tied string around her testicles.   Many of the Plaintiffs have attempted suicide, lending a haunting credulity to their pleas that they would rather be dead than continue to live in a body of the wrong gender.   These acts of self-harm come as no surprise:   they are the natural manifestations of the persistent and often acute distress that accompanies untreated gender dysphoria.

As Plaintiffs' gender dysphoria goes untreated or inadequately treated by IDOC, Plaintiffs continue to have a heightened risk of self-harm, autocastration, and suicide.   Plaintiffs continue to experience profound distress that could be alleviated with basic medical treatment.   Knowing as much and yet still refusing to provide adequate treatment, IDOC violates the Constitution's prohibition on cruel and unusual punishment.   For these reasons and as further explained below, Plaintiffs seek a preliminary injunction halting IDOC's policies and practices that deny and delay competent treatment to prisoners with gender dysphoria, and instructing IDOC to provide medically-necessary treatment that is long overdue.

<u>**STATEMENT OF FACTS**</u>

**I.      GENDER DYSPHORIA AND STANDARDS OF CARE FOR TREATMENT**

Gender dysphoria refers to a condition in which a person experiences clinically significant distress stemming from incongruence between one's experienced or expressed gender and one's assigned gender.  Declaration of Dr. Randi Ettner ("Ettner Decl.") ¶ 15.  Gender dysphoria appears in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-V").  *Id.* ¶ 24.  The American Medical Association, the American Psychiatric Association, the American Psychological Association, the Endocrine Society, and the World Professional Association for Transgender Health ("WPATH") all recognize gender dysphoria as a serious medical condition.  *Id.* ¶ 24.

The WPATH Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People (the "Standards of Care") provide the authoritative treatment protocol for gender dysphoria.  *Id.*  The Standards of Care apply equally to all individuals irrespective of their housing situation and explicitly state that all treatment standards are equally applicable to patients in prison (Section XIV).  *Id.* ¶ 26.  The National Commission on Correctional Health ("NCCHC") recommends treatment in accordance with the Standards of Care for people in correctional settings.  *Id.*  IDOC and its Transgender Committee purport to follow the Standards of Care.  Ex. 1, Reister 30(b)(6) Dep. at 36:16–22, 51:6–23, 80:9–81:4; Ex. 2, Puga 30(b)(6) Dep. at 82:2–7, 84:3–16.

Under the Standards of Care, medically-necessary treatment for gender dysphoria may include:  (1) social transition, *i.e.,* living in a way that is consistent with one's gender identity; (2) hormone therapy to alter the face and body in typically feminine or masculine ways; and/or (3) surgery to change primary and/or secondary sex characteristics.  Ettner Decl. ¶¶ 34, 35, 42.  The medical community recognizes all of these treatments to be safe and effective.  *Id.* ¶¶ 38, 41, 46.

## II.    IDOC POLICIES CONCERNING THE CARE OF PRISONERS WITH GENDER DYSPHORIA

IDOC has adopted policies, procedures, and practices that deny prisoners evaluation and medically necessary treatment for gender dysphoria in contravention of medical science.  IDOC Administrative Directive 04.03.104, "Evaluation of Offenders with Gender Identity Disorders," effective as of May 1, 2013 (the "GID Directive"), sets forth IDOC's policies and procedures for the evaluation and treatment of prisoners with gender dysphoria.  *See* Defs.' Answer ¶ 64.  These stated policies have the design and effect of delaying necessary medical evaluation and treatment and making effective treatment more difficult or even impossible to obtain.

The GID Directive states that "[t]he Department shall not perform or allow the performance of any surgery for the specific purpose of gender change, except in extraordinary circumstances as determined by the Director who has consulted with the Agency Medical Director."  *See* Ex. 3, IDOC Administrative Directive 04.03.104.  Similarly, by requiring prior approval of the Agency Medical Director, the GID Directive restricts prisoners' ability to receive hormone therapy.  *See id.*  The Agency Medical Director admits that he would not consider himself an expert in providing care to transgender people, or in the administration of hormone therapy.  Ex. 4, Meeks Dep. (*Hampton v. Baldwin*, No. 3:18-CV-550-NJR-RJD) at 35:23–36:5, 129:16–18; *Hampton*, 2018 WL 5830730, at *3 (S.D. Ill. Nov. 7, 2018).

The GID Directive also establishes the "Transgender Committee," *see* Defs.' Answer ¶ 66, which vests authority for the medical treatment for prisoners with gender dysphoria in the hands of non-experts and lay people.  The Transgender Committee is responsible for evaluating "an offender who presents with gender identity issues … to make final recommendations" regarding a prisoner's "overall health-related treatment plans" and "gender related accommodation[s]." Ex. 3.  It bears responsibility for "placements, security concerns and overall health-related

treatment plans" for transgender prisoners.  *Id.*   Pursuant to the Administrative Directive, the Transgender Committee is comprised of IDOC's Medical Director, IDOC's Chief of Mental Health, the Transfer Coordinator, and the Chief of Operations.  *Id.*  IDOC's Chief of Psychiatry was added to the Transgender Committee in July or August 2018 and serves as its chair by appointment.  Ex. 2 at 14:15–15:7.

The Transgender Committee puts medical care decisions to a majority *vote* of its five members.  *Id.* at 18:9–12, 42:8–11, 105:13–106:1.  IDOC's Rule 30(b)(6) designee testified that for "clinical decisions" the vote somehow may be "more weighted toward the clinical people"— while acknowledging that even the members without any medical training (the Transfer Coordinator and Chief of Operations) still play a role in the decision.[1]  *Id.* at 125:3–24.  IDOC submits no other medical decisions to a formal committee.  *Id.* at 45:20–22.  Prisoners are allotted six minute slots for a treatment decision to be made, although that time can be extended.  *Id.* 104:15–24.  The Medical Director testified that medical records and mental health records are not provided to the Committee.  Ex. 4 at 24:18–25:8.

Even the members of the Transgender Committee with medical backgrounds do not have expertise treating patients with gender dysphoria, and none are the prisoners' treating medical professional.[2]  *See* Ex. 5, Defs.' Resp. to Interrog. No. 4 (listing names of Transgender Committee

---

[1]   It bears noting that Illinois prohibits the unauthorized or unlicensed practice of medicine.  Illinois Medical Practice Act (225 ILCS 60/1 *et seq.*) § 3.5.  The Act similarly prohibits "[a]iding and abetting an individual not licensed under this Act in the practice of a profession licensed under this act," with penalties including revocation of license and fines of up to $10,000 for each violation.  *Id.* § 22.

[2]   The American Psychological Association's Ethical Principles of Psychologists and Code of Conduct, Section 2.01 ("Boundaries of Competence") directs psychologists to "provide services, teach, and conduct research with populations and in areas only within the boundaries of their competence …." The Code of Ethics goes on: "Where scientific or professional knowledge in the discipline of psychology establishes that an understanding of factors associated with … gender [and] gender identity … is essential for effective implementation of their services or research, psychologists have or obtain the training, experience consultation, or supervision necessary to ensure the competence of their services, or they make appropriate referrals…"

members); *id.* at Defs.' Resp. to Interrog. No. 5 (listing "with specificity the medical or other qualifications to treat gender dysphoria" of the Transgender Committee members, and listing no qualifications at all for some members); Ettner Decl. ¶ 134.

IDOC understands that gender dysphoria is a specialized area of care.  Ex. 1 at 157:14–21. Yet IDOC has never engaged an outside specialist to advise the committee.  Ex. 2 at 101:20–22. It has never hired an outside expert to help it provide better medical care, or to review the treatment plan for gender dysphoria.  Ex. 1 at 156:20–157:11.  Its Rule 30(b)(6) designee, who claimed that both he and another IDOC colleague have expertise in gender dysphoria, is not a WPATH member, has never been to a WPATH conference, does not prescribe hormones, seemingly never has treated a transgender patient *for gender dysphoria*, and was unable to name even a single expert in the field.  Ex. 2 at 36:13–37:12, 31:4–34:8.

Despite lacking basic qualifications or experience, the Transgender Committee oversees all medical treatment for gender dysphoria offered by IDOC.  Without meeting or hearing directly from the prisoner, the Transgender Committee provides "final recommendations" for "hormone therapy, clothing, showers, searches," housing, and other accommodations.  Ex. 3; Ex. 2 at 89:14–90:4.  The Transgender Committee can, and often does, deny a prisoner hormone therapy and other necessary medical interventions despite a diagnosis of gender dysphoria, sometimes overruling the medical judgment of the treating medical professional's recommendations.  Ettner Decl. ¶ 138. Even if the Transgender Committee ultimately approves the treatment, it does so after causing significant delay.  *E.g.*, *id.* ¶¶ 82, 99, 109, 117, 128.  The Transgender Committee routinely denies or delays medical care for gender dysphoria for reasons that have no medical basis, as described in further detail below.  *Id.* ¶ 127.

III.    **IDOC FAILS TO PROPERLY EVALUATE AND PROVIDE NECESSARY MEDICAL CARE FOR GENDER DYSPHORIA**

   A.    **IDOC Denies and Delays Hormone Therapy for Reasons that are Not Recognized by the Medical Community.**

The Standards of Care indicate that patients "should receive prompt and attentive evaluation, with the goal of alleviating their gender dysphoria and providing them with appropriate medical services."   Ex. 6, WPATH SOC at 25.   They further specify that "[f]eminizing/masculinizing hormone therapy—the administration of exogenous endocrine agents to induce feminizing or masculinizing changes—is a medically necessary intervention for many transsexual, transgender, and gender-nonconforming individuals with gender dysphoria."  Ex. 6 at 33; Ettner Decl. ¶ 35.   The consequences of withdrawing hormone therapy or not providing hormone therapy when medically necessary include a high likelihood of negative outcomes such as surgical self-treatment by auto-castration, depressed mood, dysphoria, and/or suicidality.  Ex. 6 at 68; Ettner Decl. ¶ 68.

Despite the medical necessity of hormone therapy for many transgender prisoners, IDOC routinely denies and delays hormone therapy for reasons that are not accepted by the medical community.   IDOC requires prior approval of the Agency Medical Director to begin hormone therapy.  *See* Ex. 3.  IDOC's 30(b)(6) designee admitted that there are no other medications that require sign off from the agency medical director before they can be prescribed.  Ex. 2 at 56:20–58:17.   As a result of this and other artificial hurdles, many transgender prisoners repeatedly request evaluation for gender dysphoria before they are evaluated, and once evaluated, many prisoners wait weeks, months, or even years before receiving medically necessary hormone therapy.

In some instances, IDOC does not respond to a prisoner's need for treatment until their distress manifests in self-harm.  Plaintiff Janiah Monroe requested treatment for gender dysphoria

for approximately three years before she was finally approved for hormone therapy.  Declaration of Janiah Monroe ("Monroe Decl.") ¶¶ 2, 7.  The distress associated with the delay resulted in Ms. Monroe attempting her own treatment by self-castrating multiple times before she finally was provided some care.  *Id.* ¶¶ 3–4.  Sora Kuykendall waited four months before being evaluated for gender dysphoria.   Declaration of Sora Kuykendall ("Kuykendall Decl.") ¶¶ 3–4.   Ms. Kuykendall's resulting distress from the delay in treatment manifested in tying her testicles in order to stop the production of testosterone.  *Id.* ¶ 4.  It was only after Ms. Kuykendall's self-castration attempt that IDOC finally provided some treatment for her gender dysphoria.  *Id.*

Plaintiff Lydia Vision identified herself as transgender to IDOC officials in December 2015.  Declaration of Lydia Vision ("Vision Decl.") ¶ 3.  Ms. Vision was diagnosed by an IDOC psychiatrist with gender dysphoria in early 2016, and her case was evaluated by the Transgender Committee in March 2016.  *Id.* ¶ 3; Ettner Decl. ¶ 105.  Despite identifying as transgender and being diagnosed with gender dysphoria by IDOC mental health professionals, the Transgender Committee refused to provide Ms. Vision with hormone therapy, citing PTSD as a rationale for denying treatment.  Ettner Decl. ¶ 106.  There is no legitimate medical basis for denying treatment because a patient has been diagnosed with PTSD.  *Id.* ¶ 41.  Over the course of the following two-plus years, Ms. Vision was denied hormone therapy for numerous other reasons that have no medical foundation and are not contraindications to treatment:  that her gender dysphoria "may not fully manifest itself in the correctional environment"; that she had "potential for further victimization and isolation as the physical effect of feminizing hormones become apparent"; and that she had insufficient support in a correctional environment to "undergo the physiologic changes associated with feminizing hormones."  *Id.* ¶¶ 106–08.  While (absent contraindications) patients who meet the criteria and request hormone therapy should be prescribed without any delay

whatsoever, Ms. Vision waited more than two years before finally being treated with hormone therapy.  Ettner Decl. ¶ 109; Declaration of Dr. Vin Tangpricha ("Tangpricha Decl.") ¶ 21.  The wait caused Ms. Vision to experience severe depression and anxiety, to quit her job in the facility laundry room, and to feel hopeless about ever receiving appropriate care.  Vision Decl. ¶¶ 10–11.

Unnecessary delay is the rule, not the exception.  Plaintiff Marilyn Melendez received a gender dysphoria diagnosis around March 2015.  Declaration of Marilyn Melendez ("Melendez Decl.") ¶ 4; Ettner Decl. ¶ 115.  Despite this, the Transgender Committee denied Ms. Melendez's request and forced her to wait before she could seek reevaluation, claiming she needed counseling before hormones could be prescribed.  Melendez Decl. ¶¶ 4–5; Ettner Decl. ¶ 116.  She was not approved for hormone therapy by the Transgender Committee until July 2015 and her treatment did not begin until August—a several month wait for no accepted medical reason.  Ettner Decl. ¶¶ 115–117.  Plaintiff Sasha Reed requested hormone therapy from IDOC in November 2015.  Declaration of Sasha Reed ("Reed Decl.") ¶ 3.  Her mental health professional asked Ms. Reed to fill out a questionnaire and told her that it would be sent to the Transgender Committee for review.  *Id.*  In February 2016, the Transgender Committee denied her hormones.  *Id.*  Ms. Reed was told that she needed to wait while doctors investigated her conceptualization of gender identity—an amorphous hurdle found nowhere in medical literature, and certainly not a contraindication to treatment.  Ettner Decl. ¶¶ 96–97; Reed Decl. ¶ 3.  Ms. Reed waited sixteen months before finally receiving hormone therapy in 2017.  Reed Decl. ¶ 3; Ettner Decl. ¶ 99.

There are an extremely limited number of reasons[3] for not starting a person diagnosed with gender dysphoria on hormone therapy, but these circumstances rarely arise.  Typically, once a

---

[3]   According to the Standards of Care, the criteria for hormone therapy are (1) persistent, well-documented gender dysphoria; (2) capacity to make a fully informed decision and to consent for treatment; (3) being age of maturity; and (4) if significant medical or mental health concerns are present, they are reasonably well-controlled. Ex. 6 at 34; Tangpricha Decl. ¶ 19.  Medical contraindications to hormone therapy are: "previous venous thrombotic

patient has been diagnosed with gender dysphoria, treatment should begin without delay. Tangpricha Decl. ¶ 21; Ettner Decl. ¶ 41.  IDOC internal documents acknowledge that the most common form of feminizing hormone, oral estradiol, is "[e]asy to administer, inexpensive, [and] improves physical characteristics," Ex. 7, 124696–700 at 124698.  Despite this, IDOC has invented a whole slew of excuses for delaying and denying treatment that have no basis in medical science.

### B.    IDOC Fails to Provide Adequate Hormone Therapy and Hormone Monitoring.

Even once a prisoner obtains hormone therapy, IDOC routinely provides hormones that are not medically recommended or appropriate, fails to adequately monitor the prisoner's hormone levels, and fails to ensure proper dosages.  Tangpricha Decl. ¶ 43.

IDOC often prescribes outdated hormones that are not recommended by the Endocrine Society.  *Id.*  IDOC purports to follow the standards of the Endocrine Society.  Ex. 2 at 93:11–94:16; 95:20–23.  The type of hormones that should be provided to an individual depends on the gender of the individual seeking treatment as well as the individual's gender assigned at birth. Individuals prescribed feminizing endocrine treatments require a dual course of hormone therapy: estrogen and a testosterone blocker (also known as an antiandrogen) called spironolactone. Tangpricha Decl. ¶ 24.  The recommended hormones and dosages under the Guidelines for transgender women is an estrogen-derivative known as estradiol (if oral route, 2 to 6 mg/d, or milligrams per day) and spironolactone (if oral route, 100-300 mg/d).  *Id.* ¶ 25.  Recommended hormone therapy for transgender men typically involves provision of testosterone, either parenterally (through injection) or transdermally (through the skin).  *Id.* ¶ 27.

---

events related to an underlying hypercoagulable condition, history of estrogen-sensitive neoplasm, and end-stage chronic liver disease."  Ex. 6 at 44; Tangpricha Decl. ¶ 21.

Instead of these accepted treatments, IDOC has prescribed some transgender prisoners, including Ms. Melendez, Ms. Kuykendall, and additional Plaintiff Class members, a conjugated estrogen. *Id.* ¶¶ 54, 56, 68. This type of estrogen is not recommended by the Endocrine Society because it is impossible to meaningfully measure estrogen levels in blood and therefore regulate appropriate doses. *Id.* ¶ 40. Unmonitored doses can lead to imbalanced hormone levels and cause a prisoner's gender dysphoria to go untreated. *Id.* In addition to concerns about their efficacy, conjugated estrogens pose a higher risk of thromboembolism (blood clots) in patients, which can lead to heart failure and death. *Id.* IDOC's internal documents reflect that conjugated estrogen has these "drawbacks," including "[l]imited clinical data, higher thromboembolic risk, [and] lack of monitoring." Ex. 7 at 124698. IDOC nonetheless in many cases opts for the conjugated estrogens that cost between 19 to 27 times as much as oral estradiol that is safer and more effective. Tangpricha Decl. ¶ 40.

Even for prisoners prescribed an appropriate form of hormone therapy, IDOC fails to adequately monitor hormone levels and other health markers, and relatedly fails to provide the correct hormone dosages. The Standards of Care direct that "clinicians who prescribe hormone therapy . . . [p]rovide ongoing medical monitoring, including regular physical and laboratory examination to monitor hormone effectiveness and side effects." Ex. 6 at 42; Tangpricha Decl. ¶ 30. The Endocrine Society recommends patient evaluations every 2–3 months in the first year of hormone or endocrine treatment and then 1–2 times per year thereafter. Tangpricha Decl. ¶ 30.

Part of this monitoring regimen is to ensure that a patient's gender dysphoria is adequately treated—providing inadequate hormone dosages will very likely fail to treat the condition. *Id.* ¶ 33. In addition, failing to monitor hormone levels could result in dangerous levels of estrogen in transgender women leading to an increased risk for blood clots or strokes if the estrogen level

is too high, increased risk for cardiac arrhythmia/hyperkalemia due to high potassium levels, and potential blindness caused by unchecked growth of the pituitary gland, among other potential complications.  *Id.* ¶¶ 31–40.  Likewise, failing to monitor hormone levels in transgender men could result in dangerous levels of testosterone.  *Id.* ¶ 42.

Despite the inefficacy of an inadequate hormone regimen and well-documented serious side effects that accompany a hormone imbalance, IDOC rarely performs bloodwork to measure hormone levels and other health markers for prisoners taking hormone therapy.  For example, Ms. Monroe's hormone levels have not been regularly monitored since she was first prescribed hormone therapy in 2012.  *Id.* ¶ 46.  When she was finally tested—roughly 3 years after she began her hormone therapy—her bloodwork revealed estrogen levels below the recommended range for transgender women.  *Id*. ¶ 47.  Such levels are insufficient to address the dysphoria caused by the testosterone her body produced and also inadequate to protect her from bone loss.  *Id.*  This inadequate hormone dosage has caused Ms. Monroe's gender dysphoria symptoms to worsen.  *Id.* ¶ 50.  Despite this, Ms. Monroe's hormone dosages have not been increased to provide therapeutically appropriate treatment.  *Id.* ¶ 49.  Similarly, Ms. Reed has been on hormones since April 2017.  *Id.* ¶ 57.  However, to this day, Ms. Reed's testosterone levels are far above the recommended therapeutic level for a transgender woman.  *Id.* ¶ 59.

Ms. Kuykendall has repeatedly requested blood testing because she is afraid her hormone levels may not be stable.  Kuykendall Decl. ¶ 6.  But even after these repeated requests, the medical records indicate she has only had her blood levels checked once since she started hormones.  Tangpricha Decl. ¶ 56.  Despite being on hormones in IDOC custody for more than two years, Ms. Melendez has only once had her blood drawn to test her hormone levels.  *Id.* ¶ 54.  Because Ms.

Kuykendall and Ms. Melendez are on conjugated estrogens, however, even if bloodwork testing were done it would not reliably measure estrogen levels. *Id.* ¶ 40.

> ### C.     IDOC Fails to Consider and Provide Surgery as Part of Medically Necessary Treatment for Gender Dysphoria.

IDOC refuses to consider or provide surgery to prisoners suffering from gender dysphoria despite medical consensus that in some cases, surgery is an effective and necessary treatment. IDOC's policy, in aim and effect, imposes a blanket ban on surgical treatment for gender dysphoria.  Under the Standards of Care, gender affirming surgery can be an "essential" and "medically necessary" treatment for gender dysphoria, Ettner Decl. ¶ 55:

> While many transsexual, transgender, and gender-nonconforming individuals find comfort with their gender identity, role, and expression without surgery, for many others surgery is essential and medically necessary to alleviate their gender dysphoria.  For the latter group, relief from gender dysphoria cannot be achieved without modification of their primary and/or secondary sex characteristics to establish greater congruence with their gender identity.

Ex. 6 at 54–55; Ettner Decl. ¶ 42.

Several of the Plaintiffs and Plaintiff Class members meet the criteria to be candidates for gender affirming surgery, having been on hormones and lived in their congruent gender role for at least a year. *E.g.*, Ettner Decl. ¶¶ 84, 94, 103, 113, 123, 132.  And incarceration is not a basis to deny surgical care.  While "[r]easonable accommodations to the institutional environment can be made in the delivery of care consistent with the [Standards of Care]," "[d]enial of needed changes in gender role or access to treatments, including sex reassignment surgery, on the basis of residence in an institution are not reasonable accommodations …."  Ex. 6 at 68; Ettner Decl. ¶ 27.

Ms. Monroe has requested gender affirming surgery on multiple occasions and has been continually denied.  Monroe Decl. ¶ 9.  Similarly, despite repeated requests from Ms. Melendez, IDOC has taken no meaningful steps to evaluate her medical needs for surgery.  Melendez Decl.

¶ 8; Kuykendall Decl. ¶ 9.  Since 2015, Ms. Kuykendall has repeatedly requested surgery through the formal grievance procedure and with her mental health clinicians at IDOC.  Kuykendall Decl. ¶ 9.  One IDOC mental health professional who treated her acknowledged that she would "advocate" for Kuykendall to receive surgery.  *Id.*  Despite this recommendation from her treating clinician, IDOC has taken no steps to evaluate her as a candidate for surgery.  *Id.*  Ms. Reed has filed multiple grievances requesting gender affirming surgery, but has still never been evaluated for surgery.  Reed Decl. ¶ 12.  The denial of gender affirming surgery has caused some transgender prisoners to resort to self-castration attempts.  *E.g.,* Monroe Decl. ¶ 4; Kuykendall Decl. ¶ 4.

Rather than evaluate whether surgery may be necessary, IDOC has a practice and a policy that it makes it a practical impossibility for prisoners to receive surgical treatment.  IDOC's GID Directive rules out surgical care "except in extraordinary circumstances as determined by the Director who has consulted with the Agency Medical Director."  Ex. 3; Defs.' Answer ¶ 101.  Thus, IDOC has a de facto ban on the treatment that can only be overridden by IDOC's Director, who admittedly is not an expert in treating gender dysphoria and can refuse a medically-necessary surgery, despite that prisoner meeting the criteria listed in the Standards of Care.

IDOC's 30(b)(6) designee was unaware of any other forms of surgery that require this level of approval, and could not explain why this hurdle is imposed. Ex. 2 at 55:8–56:15.  IDOC has told Plaintiffs who requested surgery that "there is no policy in place" at IDOC to provide surgery.  Monroe Decl. ¶ 8.  And indeed, no IDOC prisoner is or ever has been approved for gender affirming surgery or has even been evaluated to determine whether they need gender affirming surgery to treat their gender dysphoria.  Defs.' Answer ¶ 100; Ex. 2 at 99:9–14.  IDOC has never brought in a specialist to evaluate any gender dysphoric prisoners for surgical care.  Ex. 2 at 101:20–102:3.  IDOC's policies and practices amount to an effective ban on surgical care as a

component of treatment—a prohibition that is just as outrageous as if surgical care were banned for treatment of any other medical condition.

### D. IDOC Prevents and Fails to Permit, Accommodate, and Facilitate Social Transition Necessary to Treat Gender Dysphoria.

IDOC denies prisoners the social transition—"living part time or full time in another gender role, consistent with one's gender identity"—that is medically necessary treatment for gender dysphoria. Ettner Decl. ¶¶ 25, 60–67. Among other things, IDOC (i) mechanically places transgender women in facilities for male prisoners, without considering whether a female facility would be safer and more consistent with the prisoner's medical needs; (ii) routinely subjects transgender women to strip searches performed by male staff; (iii) misgenders prisoners with gender dysphoria (even in patient records), failing to recognize and respect their gender identity; and (iv) denies transgender women access to gender affirming clothing and grooming items. IDOC similarly treats transgender men as women, denying them social transition. These failures prevent, or seriously limit, gender dysphoric prisoners' ability to live consistent with their gender identity, which in turn worsens their gender dysphoria.

#### 1. *No Individualized Placement Determinations*

IDOC fundamentally fails to accommodate social transition necessary to treat gender dysphoria by treating transgender women not as women but as men, and transgender men not as men but as women. This misgendering begins immediately upon arrival, when transgender prisoners are assigned to facilities based on genitalia. *See Hampton v. Baldwin*, No. 3:18-CV-550-NJR-RJD, 2018 WL 5830730, at *4 (S.D. Ill. Nov. 7, 2018) (noting that, as of that date, "currently all prisoners in the IDOC are housed based on their genitalia").[4]

---

[4] This IDOC policy disregards the National Standards to Prevent, Detect, and Respond to Prison Rape Under the Prison Rape Elimination Act (PREA), which state that "[i]n deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates, and in making other housing and programming assignments, the

Plaintiffs' repeated requests to be considered for placement in a female facility never have been taken seriously by IDOC, absent litigation or a court order.[5] Ms. Kuykendall has repeatedly complained about being housed with male prisoners and expressed fears for her safety; she eats alone in her cell to stay safe.  Kuykendall Decl. ¶ 12.  Ms. Reed likewise feels unsafe in a male facility and continuously is harassed. Reed Decl. ¶ 13.  She wants to live as a woman and without harassment and threats in female facility.  *Id.*  The other named Plaintiffs also wish to be evaluated to transfer to a female facility.  Melendez Decl. ¶ 9; Vision Decl. ¶ 18.

2.     ***Cross-Gender Strip Searches***

Once transgender women mechanically are placed in IDOC facilities for men, they then are routinely subjected to demeaning and harmful strip-searches by male staff.  IDOC's 30(b)(6) designee acknowledged its practice that a woman who is transgender in a male facility will be searched by a male correctional officer, but testified that "is not something that the Transgender Committee would address."  Ex. 1 at 132:3–133:3.  This disregards PREA's directive that a facility "shall not conduct cross-gender strip searches or cross-gender visual body cavity searches" except in exigent circumstances or when performed by medical practitioners.

Strip searches conducted by male officers in the presence of male prisoners are humiliating and cause transgender prisoners to feel violated and unsafe.  Ettner Decl. ¶ 63.  Ms. Kuykendall has been so humiliated by cross-gender strip searches that she has isolated herself so as to avoid harassment and these strip searches.  Kuykendall Decl. ¶ 10.  She raised this issue repeatedly with IDOC personnel, and even submitted a grievance in March 2017 requesting that if strip searches

---

agency shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems."

[5] Plaintiffs understand that two transgender women—Ms. Hampton and Ms. Monroe—recently have been transferred to a female facility after litigation challenging IDOC's policy.

are necessary, she be strip-searched by a female officer away from the male prisoners.  *Id.*  Her repeated requests have been denied, and she continues to be subjected to these distressing searches.  *Id.*  Likewise, Ms. Melendez has been physically and verbally assaulted by male officers during strip searches.  Melendez Decl. ¶ 9.

### 3.  *Misgendering of Prisoners with Gender Dysphoria*

Misgendering is extremely harmful to gender dysphoric persons and their mental health; it humiliates and degrades them and threatens their identity.  Ettner Decl. ¶ 61; Melendez Decl. ¶ 9; Kuykendall Decl. ¶ 11; Reed Decl. ¶ 13.  IDOC understands that misgendering is "psychologically harmful, stressful, and interferes with treatment."  Ex. 1 at 125:1–8.  It understands that gender-appropriate names and pronouns are important and part of treatment for gender dysphoria.  Ex. 2 at 66:15–68:20.  Yet Plaintiffs routinely are misgendered by IDOC staff and by other prisoners.  Melendez Decl. ¶ 9; Kuykendall Decl. ¶ 11; Reed Decl. ¶ 13.  The use of the wrong pronouns serves to further exacerbate Plaintiffs' gender dysphoria, including thoughts of self-harm, anxiety and depression.  Ettner Decl. ¶ 61.  Beyond misgendering, IDOC internal emails reflect that prison staff "find humor in calling coworkers 'faggots' in the armory or transgender offenders 'he/shes' or 'shemales.'"  Ex. 8, 218620.

Beyond the institutional staff, IDOC medical and mental health staff and even members of the Transgender Committee—the very people entrusted with treating gender dysphoria—regularly misgender Plaintiffs and members of the Plaintiff Class.  Ettner Decl. ¶¶ 134–135.  An IDOC Office of Health Services quarterly meeting presentation given by IDOC's former agency medical director—*i.e.*, the role with ultimate approval of hormone therapy and surgery—refers to "[g]ender [d]ysphoria [t]ransgenders" and uses an offensive image of a face that is half male and half female.  Ex. 9, 120739–49 at 120743.  This evidences a profound lack of knowledge about gender dysphoria and basic precepts of interacting with transgender prisoners.  Ettner Decl. ¶¶ 134–35.

4.      ***Lack of Access to Gender Affirming Clothing and Grooming Items***

IDOC fails to provide gender affirming clothing and grooming items to prisoners with gender dysphoria.  These items can significantly enhance an individual's ability to function healthily in their environment, and are an essential component of gender transition and treatment for gender dysphoria for many persons with the condition.  Ettner Decl. ¶ 60.  In addition, many women in IDOC facilities who are transgender have developed breasts as a result of either past or current hormone therapy or past surgery.  Without a bra, these women suffer pain and discomfort. To be clear, even without breast tissue development, a bra is an important symbol of femininity. *Id.* ¶ 65.  Aside from bras, IDOC does not provide feminine clothes or underwear. Ex. 2 at 97:12–99:8.  Like a bra, there is an important treatment component that comes from the affirmation of one's identity, but the tighter fitting underwear also prevents dysphoria by holding the genitalia in place.  Ettner Decl. ¶ 65.  Similarly, IDOC often denies access to grooming products such as shaving razors, hair removal products (IDOC never has approved permanent hair removal, Ex. 2 at 121:22–122:7), or lotions to offset the dry skin that can result from taking spironolactone, an anti-androgen commonly used in feminizing hormone therapy.  Tangpricha Decl. ¶ 37.

Plaintiffs all repeatedly have requested clothing and grooming items available to non-transgender women.  Kuykendall Decl. ¶ 7; Vision Decl. ¶¶ 12, 13, 17, 19; Reed Decl. ¶¶ 5, 6, 13; Monroe Decl. ¶¶ 8, 9; Melendez Decl. ¶¶ 6, 9.  IDOC continues to deny each prisoner's request. Monroe Decl. ¶¶ 8, 9; Melendez Decl. ¶¶ 7, 9.  Ms. Vision requested gender affirming and grooming items three years ago, yet has still not been provided with the clothing and grooming items provided to non-transgender women.  Vision Decl. ¶ 17.  Similarly, IDOC officials continue to deny Ms. Reed access to appropriate female clothing or undergarments.  Reed Decl. ¶ 13.  The lack of access to these items undermines Plaintiffs' medical treatment and causes them physical and mental distress by preventing them from experiencing life as women.  Ettner Decl. ¶ 65.

E.    **IDOC Fails to Provide Access to Clinicians Competent to Treat Gender Dysphoria, Resulting in Misdiagnosis and Inappropriate Treatment.**

IDOC's Transgender Committee members and IDOC medical professionals who treat prisoners with gender dysphoria do not have any meaningful knowledge of, experience with, or training regarding the Standards of Care, nor do they have any meaningful training or experience regarding the proper treatment of gender dysphoria.  Ettner Decl. ¶¶ 128, 134, 135.  The Standards of Care specify that, at minimum, all mental health professionals working with gender dysphoric adults should (i) be knowledgeable about gender nonconforming identities and expressions; (ii) be knowledgeable about the treatment and assessment of gender dysphoria including the DSM-5 and/or the International Classification of Diseases; and (iii) possess the ability to recognize and diagnose co-existing mental health concerns and to distinguish these from gender dysphoria.  Ettner Decl. ¶ 29.  The Standards of Care also recommend that treating clinicians actively seek continuing education on the treatment and assessment of gender dysphoria, including through professional meetings, workshops, and/or seminars.  *Id.*  Mental health professionals who are new to working with individuals with gender dysphoria "should work under the supervision of a mental health professional with established competence in the assessment and treatment of gender dysphoria."  *Id.* ¶30.  In an institutional setting, "[i]f the in-house expertise of health professionals … does not exist to assess and/or treat people with gender dysphoria, it is appropriate to obtain outside consultation from professionals who are knowledgeable about this specialized area of health care."  Ex. 6 at 67; Ettner Decl. ¶ 137.

IDOC's treatment providers are not knowledgeable or experienced in assessing or treating gender dysphoria.  IDOC's 30(b)(6) designee was unsure whether IDOC clinicians received continuing education in assessing and treating gender dysphoria.  Ex. 1 at 50:5–51:5.  IDOC itself did not provide training with respect to transgender health until very recently, *id.* at 137:22–138:1,

and only after this Court ordered it to do so.  IDOC treatment providers display a profound lack of understanding of the condition by referring to it as "gender dysphoria disorder," "gender identification disorder," "tg disorder," and "sex dysphoria," as well as and other incorrect and inaccurate descriptions.  Ettner Decl. ¶ 135.  Treatment providers frequently undermine the gender dysphoria treatment by referring to their own gender dysphoric patients with incorrect names and pronouns.  *Id*.  The abysmal treatment decisions that the Committee and IDOC medical providers make reflect fundamental misunderstanding and ignorance about gender dysphoria—experts in gender dysphoria would not make such egregious mistakes.  *Id*. ¶¶ 134–135.  IDOC performs no quality assurance review regarding the treatment of gender dysphoria.  Ex. 2 at 122:8–23.

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that [s]he is likely to succeed on the merits, that [s]he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in h[er] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also City of Chicago v. Sessions*, 888 F.3d 272, 282 (7th Cir. 2018).  The Prison Litigation Reform Act provides that a preliminary injunction must be "narrowly drawn, extend no further than necessary to correct the harm ...," and "be the least intrusive means necessary to correct that harm."  18 U.S.C. § 3626(a)(2).  Plaintiffs here seek both that IDOC cease its policies and practices that deny gender dysphoric prisoners with competent care, and to provide medically-necessary care.  To the extent the injunction requires an affirmative act by the defendants, the preliminary injunction is mandatory.  *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997).

## ARGUMENT

I. **PLAINTIFFS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR CLAIM**

Plaintiffs[6] have a "substantial likelihood" of prevailing on their Eighth Amendment claim against Defendants.  To show a "substantial likelihood of success," "[a] party moving for preliminary injunctive relief need not demonstrate that she has a likelihood of absolute success on the merits, but rather that her chances are 'better than negligible,' which is a 'low threshold.'" *Hampton*, 2018 WL 5830730, at *10 (quoting *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1046 (7th Cir. 2017)).  A plaintiff need "only to present a claim plausible enough that (if the other preliminary injunction factors cut in their favor) the entry of a preliminary injunction would be an appropriate step." *See S./Sw. Ass'n of Realtors, Inc. v. Vill. of Evergreen Park*, 109 F. Supp. 2d 926, 927 (N.D. Ill. 2000).

"[D]eliberate indifference to serious medical needs of prisoners violates the [Eighth] Amendment because it constitutes the unnecessary and wanton infliction of pain contrary to contemporary standards of decency." *Helling v. McKinney*, 509 U.S. 25, 32 (1993) (internal quotation marks omitted) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  To demonstrate deliberate indifference, Plaintiffs must show that:  (1) they suffer from a serious medical need which presents an objectively substantial risk of harm, *Greeno v. Daley*, 414 F.3d 645, 652 (7th Cir. 2005), and (2) Defendants knew that the risk existed and that Defendants either intentionally or recklessly ignored it and will continue to do so in the future.  *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

---

[6]   Plaintiffs' Complaint was filed by six named plaintiffs on behalf of the putative class.  One named plaintiff, Ebony Stamps, subsequently has been released from IDOC custody.  As a result, plaintiffs now are represented by the remaining five putative class representatives.

Courts consistently have held that the failure of prison officials to provide adequate treatment for gender dysphoria constitutes deliberate indifference and warrants preliminary injunctive relief.  *See Edmo v. Idaho Dep't of Corr.*, 358 F. Supp. 3d 1103, 1129 (D. Idaho 2018) (granting preliminary injunction ordering Idaho's Department of Corrections to provide transgender prisoner with "adequate medical care, including gender confirmation surgery"); *Hicklin v. Precynthe*, No. 4:16-cv-01357-NCC, 2018 WL 806764, at *15 (E.D. Mo. Feb. 9, 2018) (granting preliminary injunction and ordering defendant "to provide [plaintiff prisoner] with care that her doctors deem to be medically necessary treatment for her gender dysphoria, including hormone therapy, access to permanent body hair removal, and access to 'gender-affirming' canteen items"); *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1195 (N.D. Cal. 2015) (granting preliminary injunction ordering the California Department of Corrections and Rehabilitation to provide transgender prisoner "adequate medical care, including sex reassignment surgery…as promptly as possible"); *cf. Hampton*, 2018 WL 5830730, at *16–17 (granting preliminary injunction to prisoner with gender dysphoria who had faced assault, harassment, and misgendering by prison staff ordering training of prison staff, participation in trans support group while in segregation, and evaluation by Transgender Committee of potential transfer).

### A.      Gender Dysphoria is an Objectively Serious Medical Need.

To meet the objective requirement of the deliberate indifference standard, an incarcerated individual must demonstrate the existence of a serious medical need.  *Estelle*, 429 U.S. at 104. The Seventh Circuit first established that gender dysphoria constitutes a "serious medical need" over thirty years ago, *Meriwether v. Faulkner*, 821 F.2d 408 (7th Cir. 1987), and has reaffirmed this holding in numerous subsequent cases, *e.g., Fields v. Smith*, 653 F.3d 550, 555 (7th Cir. 2011) (gender identity disorder is a serious medical need for purposes of the Eighth Amendment); *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018) (same).

### B.   Defendants Have Acted with Deliberate Indifference to Plaintiffs' Serious Medical Needs.

The subjective component of the analysis requires a plaintiff to show that Defendants "actually knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (emphasis removed), as amended (Aug. 25, 2016), *cert denied*, 137 S. Ct. 1578 (2017).   The subjective deliberate indifference prong "entails something more than mere negligence . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835.  If Defendants knew that the risk existed and either intentionally or recklessly ignored it, and will continue to do so in the future, then the subjective test has been met.  *Id.* at 837–47.

Where Plaintiffs complain that defendants systematically fail to provide adequate health care, "a prison official's failure to remedy systemic deficiencies in medical services … constitute[s] deliberate indifference to an inmate's medical needs." *Rasho v. Walker*, No. 07-1298, 2018 WL 2392847, at *18 (C.D. Ill. May 25, 2018) (citing *Cleveland-Perdue v. Brutsche*, 881 F.2d 427, 430–31 (7th Cir. 1989)); *see also Coleman v. Wilson*, 912 F. Supp. 1282, 1304 (E.D. Cal. 1995) (finding deliberate indifference where "defendants have known for years of the gross deficiencies in the provision of mental health care to inmates …, and that they have failed to take reasonable steps to avert the obvious risk of harm to mentally ill inmates that flows from the failure to remedy those deficiencies").

Courts also have routinely found deliberate indifference where, like here, prison officials: (1) ***deny access to care that medical professionals deem medically necessary***, *e.g. Fields*, 653 F.3d at 557 ("[T]here was no evidence of uncertainty about the efficacy of hormone therapy as a treatment.  Just as the legislature cannot outlaw all effective cancer treatments for prison inmates, it cannot outlaw the only effective treatment for a serious condition like GID."); (2) ***inexplicably***

***delay medically-necessary treatment for no penological purpose***, *e.g., Petties*, 836 F.3d at 822; *Perez v. Fenoglio*, 792 F.3d 768, 777–78 (7th Cir. 2015) ("A delay in treatment may show deliberate indifference if it exacerbated the inmate's injury or unnecessarily prolonged his pain," and "even brief, unexplained delays in treatment may constitute deliberate indifference."); (3) ***continue in a harmful course of conduct,*** *Petties*, 836 F.3d at 728, ***or persist in a course of treatment known to be ineffective***, *e.g., Foster v. Ghosh*, 4 F. Supp. 3d 974, 981 (N.D. Ill. 2013) (treating physician "was 'persisting in a course of treatment  known to be ineffective,' demonstrating deliberate indifference to Foster's serious medical need.") (citation omitted); or (4) ***make a treatment decision that constitutes a "substantial departure from accepted judgment, practice, or standard***," *e.g., Petties*, 836 F.3d at 729; *Edmo*, 358 F. Supp. 3d at 1126 (finding deliberate indifference where "Defendants misapplied the recognized standards of care for treating [plaintiff inmate's] gender dysphoria"); *Norsworthy*, 87 F. Supp. 3d at 1189 (finding deliberate indifference where prison officials had access to the Standards of Care yet failed to provide a transgender prisoner with the appropriate treatment).

Here, IDOC's deliberate indifference is apparent.  IDOC understands that severe symptoms of gender dysphoria are triggered when hormone therapy and surgery are not available, Ex. 1 at 127:1–12, and it understands that the inability to have medical interventions and social transition is harmful to psychological well-being, *id.* at 128:1–21.  Yet IDOC and each of the named Defendants has allowed systemic failures in evaluating and providing treatment to prisoners with gender dysphoria to persist.  IDOC perpetuates and tolerates myriad systemic deficiencies described above.  Courts have found that tolerating these deficiencies amounts to deliberate indifference.  *See Hicklin*, 2018 WL 806764, at *15 (granting preliminary injunction and ordering defendant "to provide Ms. Hicklin with care that her doctors deem to be medically necessary

treatment for her gender dysphoria, including hormone therapy, access to permanent body hair removal, and access to 'gender-affirming' canteen items"); *Edmo*, 358 F. Supp. 3d at 1126 (granting preliminary injunction and finding deliberate indifference where Defendants "insufficiently trained their staff with materials that discourage referrals for surgery and represent the opinions of a single person who rejects the WPATH Standards of Care").

Refusal to consider or provide gender affirming surgery that is known to be medically necessary also amounts to deliberate indifference. *See Norsworthy*, 87 F. Supp. 3d at 1189 (defendants acted with deliberate indifference by failing to provide plaintiff (or any transgender prisoners) with sex reassignment surgery when they had "access to the relevant Standards of Care and evidence that [sex reassignment surgery] was medically necessary for [plaintiff]"); *see also Soneeya v. Spencer*, 851 F. Supp. 2d 228, 252 (D. Mass. 2012) (granting permanent injunction requiring defendant to conduct "an individualized evaluation of Plaintiff's medical needs, and prepare and implement a treatment plan that adequately treats Plaintiff's gender identity disorder. This treatment plan must be based on an individualized consideration of Plaintiff's medical needs, and must consider whether sex reassignment surgery or other treatments are medically indicated at this time.").

Defendants long have known about these deficiencies and have failed to act. IDOC's 30(b)(6) designee testified that the Committee is—and long has been—aware of the heightened risk of suicidality among transgender individuals; aware of the heightened risk among people with gender dysphoria; and aware that suicidality can be a symptom of untreated or poorly treated gender dysphoria. Ex. 1 at 96:17–97:20. IDOC's Chief of Psychiatry circulated an article to the Transgender Committee entitled "Suicide Risk in Transgender Inmates," which explains that "[t]here have been several … cases of transgender inmates attempting suicide and self-castration

while incarcerated.  Most of these self-harming behaviors seem to originate in the context of being denied medical treatment for their gender dysphoria."  *See* Ex. 10, 146747–48.

IDOC's Transgender Committee meeting minutes reflect knowledge that Plaintiffs sought treatment, and that some had attempted self-harm or suicide, yet IDOC failed to respond to the known risk.  *See, e.g.*, Ex. 1 at at 109:24–110:13; Ex. 11, 004991 (noting plaintiff's "indicat[ion] that *he* would commit additional self-mutilations if *he* had the opportunity") (emphasis added to highlight misgendering); Ex. 12, 004990 (noting "history of episodic self-mutilation and at least one suicide attempt (by hanging)," as well as "one [instance of self-mutilation] involving expulsion of a testicle"); Ex. 13, 001303 (noting "a report that the offender had engaged in trying to tie off *his* genitals with a string around the base of *his* testicular sac," and that "[t]he reason for doing this was to try to stop testosterone from getting into the bloodstream") (emphasis added to highlight misgendering); Ex. 14, 001338–39 (noting that "[s]ince entering IDOC on 7/12/13, I/M has been placed on 3 crisis watches," and that "I/M was found with a sheet around *his* neck on 7/16/13 and attempted to cut *his* wrists on 7/31/13") (emphasis added to highlight misgendering).   This demonstrates deliberate indifference.  *See, e.g., Konitzer v. Frank*, 711 F. Supp. 2d 874, 884 (E.D. Wis. 2010) (finding deliberate indifference where "a psychiatrist and Medical Director of the [prison] knows that attempted castration has been an issue for [plaintiff] from time to time, and is aware that [plaintiff] attempted suicide at the [prison]").

Defendants' knowledge is further reflected in the myriad grievances submitted by Plaintiffs and Plaintiffs Class members complaining about the deficient care they are receiving.  *See, e.g.*, Ex. 15, 000213–14 (grievance requesting care for gender dysphoria:  "to be honest, without … [gender dysphoria] medical treatment and medications I would rather be dead so my pain and heartache would be no more."); *see Gray v. Hardy*, 826 F.3d 1000, 1008 (7th Cir. 2016)

27

("[Plaintiff's] grievance demonstrates the prison and warden's knowledge of the conditions about which he is complaining.").

Finally, despite Defendants' awareness that the Standards of Care should govern treatment for gender dysphoria, Ex. 1 at 36:16–22, 51:6–23, 80:9–81:4, they in fact violate the Standards of Care at every turn.[7]  *See Edmo*, 358 F. Supp. 3d at 1126 (finding deliberate indifference where "Defendants misapplied the recognized standards of care for treating [plaintiff inmate's] gender dysphoria"); *Norsworthy*, 87 F. Supp. 3d at 1189 (finding deliberate indifference where prison officials had access to the relevant Standards of Care yet failed to provide a transgender prisoner with the appropriate treatment outlined in the Standards of Care).

## II.    PLAINTIFFS WILL BE IRREPARABLY HARMED ABSENT PRELIMINARY RELIEF

A preliminary injunction is necessary to prevent the irreparable harm to Plaintiffs and Plaintiff Class members.  *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044–46 (7th Cir. 2017).   Absent a preliminary injunction, they will continue to suffer unnecessarily and will be at severe risk of worsening mental health, self-harm, physical pain, social isolation, and fears for their safety—none of which has an adequate remedy at law.[8]

---

[7]    When asked if "there are any ways in which [IDOC is] failing to live up to the standards," IDOC's 30(b)(6) designee testified—after IDOC counsel ensured that the question was "as the department's representative" and "[n]ot his personal opinion"—that "[f]rom the department's perspective, it is consistent with the standards."  Ex. 1 at 87:11–22.  When then asked about the designee's personal perspective, and whether his personal opinion differed from the institutional opinion, IDOC counsel instructed the designee not to answer the question.  *Id.* 87:23–89:11.

[8]    Plaintiffs are not seeking money damages in this case, and money damages cannot protect Plaintiffs and Plaintiff class members from the ongoing mental and physical anguish they are suffering due to IDOC's failure to treat their gender dysphoria.  *See, e.g., Flower Cab Co. v. Petitte*, 685 F.2d 192, 195 (7th Cir. 1982) (stating that in prison conditions cases, "the quantification of injury is difficult and damages are therefore not an adequate remedy"); *Foster*, 4 F. Supp. 3d at 983 (granting preliminary injunction to prisoner requiring medical attention; no adequate remedy at law exists because "the consequence of inaction at this stage would be further deteriorated vision in both eyes").

IDOC's refusal to provide Plaintiffs and Plaintiff Class members' with medically-necessary treatment for their gender dysphoria has caused them, and will continue to cause them, to suffer from severe clinical emotional and physical distress.  *See e.g.,* Ettner Decl. ¶ 71, 73.  Absent an injunction, IDOC's actions in withholding medically necessary will cause harm to Plaintiffs and Plaintiff Class Members, including the possibility of permanent injury or death.  Ettner Decl. ¶¶ 68–71.  Several Plaintiffs already have resorted to self-harm due to IDOC's failure to provide treatment for their gender dysphoria.  For example, Ms. Kuykendall and Ms. Monroe have made attempts at self-castration.  Monroe Decl. ¶ 4; Kuykendall Decl. ¶ 4.  Ms. Monroe and Ms. Reed have attempted to kill themselves because they have not received appropriate treatment for their gender dysphoria while in the custody of IDOC.  Monroe Decl. ¶ 5; Reed Decl. ¶ 2.  Other transgender prisoners live with the constant despair of being unable to experience life as women.  *E.g.*, Monroe Decl. ¶ 12; Kuykendall Decl. ¶ 13; Vision Decl. ¶¶ 18–19; Reed Decl. ¶ 13; Melendez Decl. ¶¶ 8–9.  Dr. Randi Ettner,[9] a licensed clinical and forensic psychologist with a specialization in the diagnosis and treatment of gender dysphoria, has determined from a review of medical records and in-person meetings with several Plaintiffs that many are in danger of near-term self-harm or death due to their untreated gender dysphoria.  Ettner Decl. ¶¶ 81, 91, 100, 110.

Courts repeatedly have held that emotional distress, anxiety, depression and physical pain resulting from inadequate medical treatment for gender dysphoria amount to irreparable harm.  *See Hicklin*, 2018 WL806764, at *10, *14 (enjoining prison system's denial of medically necessary transition-related treatments to transgender plaintiff in Eighth Amendment case, finding plaintiff showed irreparable harm based on evidence of worsening emotional distress and a substantial risk

---

[9]   IDOC's 30(b)(6) designee recognizes Dr. Ettner as a "top person" providing care in the specialized area of gender dysphoria, has seen her speak, and uses information from her resources in his role.  Ex. 1 at 157:14–158:7.

of self-harm, including "intrusive thoughts of self-castration" and suicidal ideation); *Edmo*, 358 F. Supp. 3d at 1128 (finding transgender prisoner plaintiff satisfied the irreparable harm prong "by showing that she will suffer serious psychological harm and will be at high risk of self-castration and suicide in the absence of gender confirmation surgery"); *cf. Whitaker*, 858 F.3d at 1045–46 (affirming preliminary injunction enjoining school from enforcing policy barring transgender boy from using boys' restrooms, concluding that evidence that the policy caused plaintiff "significant psychological distress" constituted irreparable harm).

In addition*,* Defendants' continual deprivation of Plaintiffs' and Plaintiff Class members' Eighth Amendment rights, as previously described, is an irreparable harm sufficient to warrant a preliminary injunction.  *See Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978) ("The existence of a continuing constitutional violation constitutes proof of an irreparable harm, and its remedy certainly would serve the public interest."); *Vaquería Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 484 (1st Cir. 2009) (finding irreparable harm for "long-standing violations of constitutional rights for extensive protracted periods of time"); *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[A] prospective violation of a constitutional right constitutes irreparable injury.") (citation omitted); *Mills v. D.C.*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) ("It has long been established that the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") (internal quotations and citation omitted); *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997) (noting that "it is not apparent" how monetary damages would remedy the harm from "unconstitutional discrimination").

## III.   THE EQUITIES AND PUBLIC INTEREST FAVOR PRELIMINARY RELIEF

The balance of harms substantially weighs in favor of granting injunctive relief. Defendants' refusal to provide Plaintiffs and Plaintiff Class members with medically necessary care has caused them mental and physical anguish that they continue to suffer on a daily basis.  In

contrast, Defendants will not suffer any harm—much less irreparable harm—from providing medically necessary care consistent with their constitutional obligations. *See, e.g.*, *Gammett v. Idaho State Bd. of Corr.*, No. CV05-257-S-MHW, 2007 WL 2186896, at *15–16 (D. Idaho July 27, 2007) (finding balance of harms "sharply" favored plaintiff, who would experience suicidality and mental harm without gender dysphoria treatment); *Farnam v. Walker*, 593 F. Supp. 2d 1000 (C.D. Ill. 2009) (granting preliminary injunction after finding that the burden on the prison of administrating medical treatment as greatly outweighed by plaintiff's prolonged pain, suffering, and decreased quality of life); *Edmo*, 358 F. Supp. 3d at 1128 (holding balance of equities and public interest favor transgender plaintiff prisoner where she has established "irreparable harm in the form of unnecessary physical and emotional suffering and denial of her constitutional rights").

In addition, the public interest also favors injunctive relief because Plaintiffs seek to vindicate their right to medically adequate treatment under the Eighth Amendment. *See Farnam*, 593 F. Supp. 2d at 1017 ("[T]he public has an interest in ensuring that the plaintiff's health is maintained during the pendency of the case, given that the plaintiff has shown a fair likelihood of success."); *accord Phillips v. Mich. Dep't of Corr.*, 731 F. Supp. 792, 801 (W.D. Mich. 1990) (finding "the public interest will be served by safeguarding Eighth Amendment rights" of prisoners with gender dysphoria), *aff'd*, 932 F.2d 969 (6th Cir. 1991); *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) (en banc) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.") (citation omitted), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014).

## IV. THIS COURT SHOULD EXTEND INJUNCTIVE RELIEF TO PLAINTIFF CLASS MEMBERS

As further described in Plaintiffs' Motion for Class Certification and in the declarations of Dr. Ettner and Dr. Tangpricha, the IDOC policies and practices that have led to Plaintiffs receiving

delayed and inadequate care for gender dysphoria similarly affect the putative class, and preliminary relief should be extended to the putative class.[10]  As with the named Plaintiffs, all medical decisions for Gender Dysphoria are routed through the Transgender Committee.  This represents an unnecessary hurdle that IDOC imposes for no other medical condition.  In addition, the Committee, which lacks expertise in Gender Dysphoria and contains non-medical members, is profoundly unequipped to render treatment decisions.

As with the named Plaintiffs, IDOC routinely denies and delays hormone therapy for reasons that are not accepted contraindications.  Ettner Decl. ¶¶ 127, 133.  Even once hormone therapy is prescribed, IDOC then fails to provide hormone therapy at therapeutically effective and safe levels—most putative class members' hormone levels have ***never once*** demonstrated levels within the therapeutic range.  Tangpricha Decl. ¶ 69.  Monitoring is not done with anywhere near the regularity directed by the Guidelines.  *Id.* ¶ 71.  And IDOC continues to prescribe conjugated estrogen compounds that could not be measured in bloodwork even if monitoring was performed. *Id.* ¶ 70.

IDOC also imposes a policy and practice classwide of not considering surgical treatment as an option for prisoners with gender dysphoria.  Ettner Decl. ¶ 132; Ex. 2 at 55:8–56:15.  No IDOC prisoner has been approved for gender affirming surgery or has even been evaluated to

---

[10]   To the extent the Court addresses Plaintiffs' Motion for Preliminary Injunction prior to their Motion for Class Certification, it has the authority to issue class-wide injunctive relief to both the Plaintiffs and Plaintiff class members pending class certification.  *See Ill. League of Advocates for the Developmentally Disabled v. Ill. Dep't of Human Servs.*, No. 13 C 1300, 2013 U.S. Dist. LEXIS 90977, at *9 (N.D. Ill. June 28, 2013) ("District courts have the power to order injunctive relief covering potential class members prior to class certification."); *see also Lee v. Orr*, No. 13-cv-8719, 2013 WL 6490577, at *2 (N.D. Ill. Dec. 10, 2013) ("The court may conditionally certify the class or otherwise order a broad preliminary injunction, without a formal class ruling, under its general equity powers …").  Courts, including within the Seventh Circuit, grant preliminary injunctions that extend relief beyond the named parties where, like here, such an injunction serves the public interest in efficiency and is necessary to ensure the application of the law to and to protect constitutional or civil rights.  *See Campbell v. Miller*, 373 F.3d 834, 840 (7th Cir. 2004) (collecting cases).

determine whether they need gender affirming surgery to treat their gender dysphoria.  Defs.'
Answer ¶ 100; Ex. 2 at 99:9–14.  IDOC has never brought in a specialist to evaluate any gender
dysphoric prisoners for surgical care.  Ex. 2 at 101:20–102:3.

IDOC has a policy and practice of denying prisoners the ability to live consistently with
their gender identity—treating gender dysphoric women as men for purposes of housing
assignments, clothing and undergarments, and grooming products.  Ettner Decl. ¶ 131. IDOC
routinely misgenders Plaintiffs and members of the Plaintiff Class alike.  Ettner Decl. ¶¶ 134–135.
And IDOC systemically refuses to provide training or to engage specialists to remedy its
correctional and medical staff's shocking lack of knowledge about gender dysphoria.  *Id.* ¶137;
Ex. 2 at 101:20–22; Ex. 1 at 156:20–157:11.

Because of the system-wide nature of harm inflicted by IDOC's policies and practices,
relief to the putative class as well as the named Plaintiffs is necessary to fully address that harm.

## V.     REQUESTED RELIEF

For the foregoing reasons, Plaintiffs seek a preliminary injunction halting IDOC's policies
and practices that deny and delay competent treatment to prisoners with gender dysphoria, and
instructing IDOC to provide medically-necessary treatment.   Plaintiffs seek a preliminary
injunction that directs Defendants to, among other things:  (i) cease the policy and practice of
allowing the Transgender Committee, a committee of non-experts and laypeople, to make the
medical decisions regarding gender dysphoria resulting in denials and delays of treatment; (ii)
cease the policy and practice of denying and delaying hormone therapy for reasons that are not
recognized as contraindications to treatment; (iii) cease IDOC's policy and practice of refusing to
evaluate and provide surgery to treat gender dysphoria; (iv) cease the policy and practice of
depriving gender dysphoric prisoners of medically-necessary social transition, including by
mechanically assigning housing based on genitalia.  Plaintiffs further seek medically-necessary

medical treatment for Plaintiffs and Plaintiff Class members, including: (i) access to clinicians who meet the competency requirements stated in the Standards of Care to treat gender dysphoria; (ii) evaluation for gender dysphoria upon request or clinical indications of the condition; (iii) timely medically-prescribed treatment for gender dysphoria, including, but not limited to, hormone therapy and monitoring, and gender affirming surgery; (iv) medically necessary social transition, including individualized placement determinations, avoidance of cross-gender strip searches, and access to gender affirming clothing and grooming items; and (v) training for IDOC staff on the importance of social transition, including using proper names and pronouns for transgender prisoners.

Because IDOC medical professionals and the Transgender Committee have demonstrated a profound inability to provide the medically-necessary treatment for Plaintiffs' and Plaintiff Class members' gender dysphoria, Plaintiffs further request that this Court appoint a medical expert in gender dysphoria to oversee IDOC's implementation of the above-referenced relief. This expert shall work with Plaintiffs and IDOC to develop a plan to eliminate the substantial risks of serious harm that Plaintiffs and Plaintiff Class members suffer due to Defendants' woefully deficient evaluation and treatment of gender dysphoria.

Dated: May 2, 2019

Respectfully submitted,

By: /s/ *Jordan M. Heinz*
John A. Knight
Ghirlandi Guidetti
Carolyn M. Wald
ROGER BALDWIN FOUNDATION OF ACLU, INC.
150 North Michigan Avenue, Suite 600
Chicago, Illinois 60601
Telephone:  (312) 201-9740
Facsimile:  (312) 201-9760
*jknight@ACLU-il.org*
*gguidetti@ACLU-il.org*
*cwald@aclu-il.org*

Catherine L. Fitzpatrick
Jordan M. Heinz
Erica B. Zolner
Megan M. New
Scott Lerner
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200
*catherine.fitzpatrick@kirkland.com*
*jordan.heinz@kirkland.com*
*erica.zolner@kirkland.com*
*megan.new@kirkland.com*
*scott.lerner@kirkland.com*

Thomas E. Kennedy III
Sarah Jane Hunt
KENNEDY HUNT P.C.
906 Olive Street, Ste. 200
Saint Louis, MO 63101
Telephone:  (314) 872-9041
*tkennedy@KennedyHuntLaw.com*
*sarahjane@KennedyHuntLaw.com*

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 2, 2019, I electronically filed the foregoing document and any attachments with the Clerk of this Court by using the CM/ECF system, which will accomplish service through the Notice of Electronic Filing for parties and attorneys who are Filing Users.

/s/ *Jordan M. Heinz*
Jordan M. Heinz