## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil No. 3:18-cv-00156-NJR-MAB |
| JOHN BALDWIN, STEVE MEEKS, and MELVIN HINTON, | ) ) ) | |
| Defendants. | ) ) | |

## <u>MOTION AND MEMORANDUM IN SUPPORT OF CLASS CERTIFICATION</u>

# TABLE OF CONTENTS

Page

INTRODUCTION........................................................................................................... 1

ARGUMENT .................................................................................................................... 2

I.      LEGAL STANDARD AND SUMMARY OF ARGUMENT ........................................ 2

II.     PLAINTIFFS SATISFY THE REQUIREMENTS OF RULE 23(A):
        NUMEROSITY, COMMONALITY, TYPICALITY, AND ADEQUACY ................. 3

        A.     Numerosity........................................................................................... 3

        B.     Commonality........................................................................................ 5

        C.     Typicality ........................................................................................... 18

        D.     Adequacy ........................................................................................... 28

III.    PLAINTIFFS SATISFY THE REQUIREMENTS OF RULE 23(B)(2)..................... 30

CONCLUSION ............................................................................................................... 32

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
    133 S. Ct. 1184 (2013)................................................................................................2

*Arenson v. Whitehall Convalescent & Nursing Home*,
    164 F.R.D. 659 (N.D. Ill. 1996)................................................................................4

*Bolden v. Walsh Constr. Co.*,
    688 F.3d 893 (7th Cir. 2012) ....................................................................................6

*Boundas v. Abercrombie & Fitch Stores, Inc.*,
    280 F.R.D. 408 (N.D. Ill. 2012)................................................................................6

*Brand v. Comcast Corp.*,
    302 F.R.D. 201 (N.D. Ill. 2014)................................................................................6

*Brown v. Club Assist Rd. Serv. U.S., Inc.*,
    No. 12-cv-5710, 2015 WL 13650775 (N.D. Ill. Mar. 13, 2015) ..............................4

*Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chi.*,
    797 F.3d 426 (7th Cir. 2015)...................................................................................32

*Cima v. WellPoint Health Networks, Inc.*,
    250 F.R.D. 374 (S.D. Ill. 2008) ...............................................................................4

*Copeland v. Washington*,
    162 F.R.D. 542 (N.D. Ill. 1995)..............................................................................31

*De La Fuente v. Stokely–Van Camp, Inc.*,
    713 F.2d 225 (7th Cir. 1983) ..................................................................................19

*DG ex rel. Stricklin v. Devaughn*,
    594 F.3d 1188 (10th Cir. 2010) ..............................................................................32

*Fields v. Maram*,
    No. 04 C 0174, 2004 WL 1879997 (N.D. Ill. Aug. 17, 2004)...................................5

*Flanagan v. Allstate Ins. Co.*,
    223 F.R.D. 489 (N.D. Ill. 2004)................................................................................5

*Flynn v. FCA US LLC*,
    327 F.R.D. 206 (S.D. Ill. 2018) ..............................................................................19

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Gaspar v. Linvatec Corp.*,
    167 F.R.D. 51 (N.D. Ill. 1996)..................................................................................19

*Gen. Tel. Co. of Sw. v. Falcon*,
    457 U.S. 147 (1982).......................................................................................18, 29

*Gray v. Cty. of Riverside*,
    No. EDVC 13-00444-VAP, 2014 WL 5304915 (C.D. Cal. Sept. 2, 2014)............................29

*Hampton v. Baldwin*,
    No. 3:18-CV-550-NJR-RJD, 2018 WL 5830730 (S.D. Ill. Nov. 7, 2018)............................18

*Healey v. Int'l Bhd. of Elec. Workers, Local Union No. 134*,
    296 F.R.D. 587 (N.D. Ill. 2013)...................................................................................4

*Hohmann v. Packard Instrument Co.*,
    399 F.2d 711 (7th Cir. 1968) ......................................................................................3

*Holmes v. Godinez*,
    311 F.R.D. 177 (N.D. Ill. 2015)...............................................................................2, 7

*Ill. League of Advocates for the Developmentally Disabled v. Ill. Dep't of Human Servs.*,
    No. 13 C 1300, 2013 U.S. Dist. LEXIS 90977 (N.D. Ill. June 28, 2013)..............................3

*Imasuen v. Moyer*,
    No. 91 C 5425, 1992 WL 26705 (N.D. Ill. Feb. 7, 1992).............................................31

*In re Sulfuric Acid Antitrust Litig.*,
    No. 03 C 4576, 2007 WL 898600 (N.D. Ill. Mar. 21, 2007)........................................30

*Lee v. Orr*,
    No. 13-cv-8719, 2013 WL 6490577 (N.D. Ill. Dec. 10, 2013).......................................3

*Lewis v. Tully*,
    96 F.R.D. 370 (N.D. Ill. 1982)..................................................................................31

*Lippert v. Baldwin*,
    No. 10 C 4603, 2017 WL 1545672 (N.D. Ill. Apr. 28, 2017)................................2, 6, 31

*Love v. City of Chi.*,
    No. 96 C 396, 1997 WL 120041 (N.D. Ill. Mar. 11, 1997)........................................31

*Massie v. Ill. Dep't of Transp.*,
    No. 96 C 4830, 1998 WL 312021 (N.D. Ill. June 5, 1998) ........................................32

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*McKenzie v. City of Chicago*,
   118 F.3d 552 (7th Cir. 1997) .................................................................................3

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   672 F.3d 482 (7th Cir. 2012) ...............................................................................32

*Metro. Area Hous. All. v. U.S. Dep't of Hous. & Urban Dev.*,
   69 F.R.D. 633 (N.D. Ill. 1976)............................................................................32

*N.B. v. Hamos*,
   26 F. Supp. 3d 756 (N.D. Ill. 2014) ......................................................................6

*O.B. v. Norwood*,
   170 F. Supp. 3d 1186 (N.D. Ill. 2016), *aff'd*, 838 F.3d 837 (7th Cir. 2016) ...........3

*Oshana v. Coca-Cola Co.*,
   472 F.3d 506 (7th Cir. 2006) ...............................................................................19

*Parsons v. Ryan*,
   754 F.3d 657 (9th Cir. 2014) ...............................................................................29

*Patrykus v. Gomilla*,
   121 F.R.D. 357 (N.D. Ill. 1988)..........................................................................31

*Riordan v. Smith Barney*,
   113 F.R.D. 60 (N.D. Ill. 1986).............................................................................30

*Rodriguez v. Vill. of Montgomery*,
   No. 08 C 1826, 2009 WL 310893 (N.D. Ill. Feb. 9, 2009).....................................31

*Rosario v. Livaditis*,
   963 F.2d 1013 (7th Cir. 1992) .......................................................................19, 30

*Small v. Sullivan*,
   820 F. Supp. 1098 (S.D. Ill. 1992)........................................................................4

*Smentek v. Sheriff of Cook Cty.*,
   No. 09 C 529, 2010 WL 4791509 (N.D. Ill. Nov. 18, 2010)..................................28

*Spano v. Boeing Co.*,
   633 F.3d 574 (7th Cir. 2011) ...............................................................................19

*Suchanek v. Sturm Foods, Inc.*,
   311 F.R.D. 239 (S.D. Ill. 2015) .....................................................................19, 28

*Swanson v. Am. Consumer Indus., Inc.*,
   415 F.2d 1326 (7th Cir. 1969) ...............................................................................4

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Trainor v. Gebke*,
    No. 3:17-cv-00627-DRH-DGW, 2018 WL 3216045 (S.D. Ill. Jan. 22, 2018)........................30

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)..................................................................................................6, 18, 29, 32

**Rules**

28 C.F.R. § 115.15 ..................................................................................................................16

28 C.F.R. § 115.42 ..................................................................................................................18

FED. R. CIV. P. 23(a)..........................................................................................................*passim*

FED. R. CIV. P. 23(b)..........................................................................................................*passim*

FED. R. CIV. P. 23(g)(1) ....................................................................................................30, 31

## INTRODUCTION

Defendants are responsible for the systemic failure to provide constitutionally adequate medical care to transgender prisoners in the custody of the Illinois Department of Corrections ("IDOC"). Defendants' deliberate indifference to these systemic failures has harmed Plaintiffs and created a substantial risk of serious harm to them in violation of the Eighth Amendment to the United States Constitution.

Plaintiffs Janiah Monroe, Marilyn Melendez, Lydia Helena Vision, Sora Kuykendall, and Sasha Reed (collectively, the "Named Plaintiffs")[1] are transgender women currently incarcerated in IDOC facilities, who seek to represent a class of all prisoners in the custody of IDOC who have requested evaluation or treatment for gender dysphoria (the "Class"). By this motion, Plaintiffs seek an order certifying the case as a class action under Federal Rule of Civil Procedure 23(b)(2). Plaintiffs seek declaratory and injunctive relief, including an order compelling Defendants to develop and implement a plan to provide Plaintiffs and the proposed Class with constitutionally adequate medical care. Plaintiffs do not seek damages.

Defendants' chronic failure to provide even the most basic treatment for gender dysphoria has caused immense mental and physical anguish for Plaintiffs and proposed Class members. Gender dysphoria is not a novel medical condition, nor is its treatment unknown or untested. Indeed, decades of research establish that gender dysphoria is a serious medical condition that can be effectively treated through social transition, hormone therapy, and surgery. Nevertheless, to the extent Defendants provide any treatment at all for the condition, it is so inadequate as to fall far below what is constitutionally required.

---

[1] Ebony Stamps was named as a Plaintiff in the Complaint, but has since been released from IDOC custody.

## ARGUMENT

### I.   LEGAL STANDARD AND SUMMARY OF ARGUMENT

Plaintiffs seek certification of a class of "all prisoners in the custody of IDOC who have requested from IDOC evaluation of treatment for gender dysphoria."  District courts in the Seventh Circuit have certified similar classes of IDOC prisoners who have been deprived of adequate care or accommodations.  *See Lippert v. Baldwin*, No. 10 C 4603, 2017 WL 1545672, at *10 (N.D. Ill. Apr. 28, 2017) (certifying class of "all prisoners in the custody of the Illinois Department of Corrections with serious medical or dental needs"); *Holmes v. Godinez*, 311 F.R.D. 177 (N.D. Ill. 2015) (certifying class of deaf or hard-of-hearing IDOC prisoners); Order on Pls.' Mot. for Class Certification Under Rule 23(b)(2) at 4, *Rasho v. Walker*, No. 07-1298-MMM, Dkt. 252 (C.D. Ill. Aug. 14, 2015) (certifying class of mentally ill IDOC prisoners).

For a class to be certified, it must satisfy the requirements of Federal Rules of Civil Procedure 23(a) and (b) ("Rule 23").  When making such a determination, courts may consider the merits of the case to the extent "they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194–95 (2013).

The proposed Class meets each of the requirements of Rule 23(a).  First, the proposed Class consists of at least 100 current transgender prisoners who have been deprived of adequate medical treatment for gender dysphoria, which is sufficiently numerous under Rule 23(a)(1).  Second, none of the transgender prisoners seeking treatment for gender dysphoria have received constitutionally adequate medical treatment for their condition, raising "questions of law or fact common to the class," as required by Rule 23(a)(2).  Similarly, all of the proposed Class members are subject to Defendants' centralized policies, procedures, and practices, and medical care decisions are made by a single body – the Transgender Committee (formerly, the "Gender Identity Disorder

2

Committee" or "GID Committee"). Thus, Plaintiffs' claims are common to, and typical of, those of the Class. FED. R. CIV. P. 23 (a)(2), (3). Finally, Plaintiffs and their counsel adequately represent the Class, as required by Rule 23(a)(4). The Named Plaintiffs, as Class representatives, would benefit from the same relief as the rest of the Class, and their counsel are experienced in civil rights, class action, and complex civil litigation.

The proposed Class also satisfies the requirements of Rule 23(b). Defendants have "acted or refused to act on grounds that apply generally to the class, such that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole" by depriving Plaintiffs and proposed Class members of constitutionally adequate medical treatment for gender dysphoria through IDOC's system-wide policies and practices. FED. R. CIV. P. 23(b)(2). Accordingly, class certification is appropriate under Rule 23(b)(2).[2]

## II. PLAINTIFFS SATISFY THE REQUIREMENTS OF RULE 23(A): NUMEROSITY, COMMONALITY, TYPICALITY, AND ADEQUACY

### A. Numerosity

A class may be certified if it is "so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). The Seventh Circuit has interpreted Rule 23 broadly to "permit a class suit where several persons jointly act to the injury of many persons so numerous that their voluntarily, unanimously joining in a suit is concededly improbable and impracticable." *Hohmann v. Packard Instrument Co.*, 399 F.2d 711, 715 (7th Cir. 1968). Courts typically presume joinder impracticable when the class exceeds 40 members. *See, e.g.*, *Swanson v. Am. Consumer Indus.*,

---

[2] While the proposed Class meets the Rule 23 requirements for class certification, the court may, in the exercise of its equitable authority, preliminarily enjoin unlawful conduct prior to ruling on a class certification motion. *See Lee v. Orr*, No. 13-cv-8719, 2013 WL 6490577, at *2 (N.D. Ill. Dec. 10, 2013) ("District courts have the power to order injunctive relief covering potential class members prior to class certification.") (citing *Ill. League of Advocates for the Developmentally Disabled v. Ill. Dep't of Human Servs.*, No. 13 C 1300, 2013 U.S. Dist. LEXIS 90977, at *9 (N.D. Ill. June 28, 2013)); *O.B. v. Norwood*, 170 F. Supp. 3d 1186, 1200 (N.D. Ill. 2016), *aff'd* (on appeal of preliminary injunction), 838 F.3d 837 (7th Cir. 2016); *but see, McKenzie v. City of Chicago*, 118 F.3d 552, 555 (7th Cir. 1997) (reversing injunction).

*Inc.*, 415 F.2d 1326, 1333 (7th Cir. 1969) (finding a class of 40 members was sufficiently numerous); *Cima v. WellPoint Health Networks, Inc.*, 250 F.R.D. 374, 378 (S.D. Ill. 2008) ("A class of more than 40 individuals raises a presumption that joinder is impracticable . . . . [C]ourts have found the numerosity element satisfied where the putative class would number in the range of as few as ten to forty class members.") (internal quotation marks and citations omitted).

Here, there are over 100 members of the proposed Class, which easily satisfies the numerosity requirement of Rule 23(a)(1).  Defendants report 106 putative class members in IDOC custody in May 2018 (Ex. 1, May 28, 2018 Transgender Population Totals By Facility, 004175–201), 110 putative class members in June 2018 (Ex. 2, June 28, 2018 Transgender Population Totals By Facility, 004202–28), and 113 in July 28, 2018 (Ex. 3, July 28, 2018 Transgender Population Totals By Facility, 004229–55).

When determining whether a proposed class meets the numerosity requirement of Rule 23(a), courts may also take into account practical considerations of litigating a matter through a single class: "[t]he crux of the numerosity requirement is not the number of interested persons per se, but the practicality of their joinder into a single suit." *Arenson v. Whitehall Convalescent & Nursing Home*, 164 F.R.D. 659, 663 (N.D. Ill. 1996) (quoting *Small v. Sullivan*, 820 F. Supp. 1098, 1109 (S.D. Ill. 1992)).  Factors such as "judicial economy, the ability of class members to initiate individual suits, geographic dispersion of the putative class, and the practicability of relitigating a common core of issues" are relevant to the court's determination that joinder of all members is impracticable.  *Brown v. Club Assist Rd. Serv. U.S., Inc.*, No. 12-cv-5710, 2015 WL 13650775, at \*10 (N.D. Ill. Mar. 13, 2015) (quoting *Healey v. Int'l Bhd. of Elec. Workers, Local Union No. 134*, 296 F.R.D. 587, 593 (N.D. Ill. 2013)); *see Flanagan v. Allstate Ins. Co.*, 223 F.R.D. 489, 493 (N.D. Ill. 2004) ("When determining whether joinder is impracticable, the court considers not only the

size of the class, but also its geographic dispersion, the relief sought, and the ability of individuals to bring their own claims."). Relatedly, impracticability of joinder is determined based on the difficulty class members would face based on the particular circumstances. *See e.g., Fields v. Maram*, No. 04 C 0174, 2004 WL 1879997, at *5 (N.D. Ill. Aug. 17, 2004) (finding the numerosity requirement satisfied where "class members reside throughout the state, and because they are disabled and therefore are often of limited financial resources").

Under any metric, the proposed Class meets the numerosity requirements of Rule 23(a). First, the prisoners are located in IDOC facilities across the state. Ex. 3 (identifying 113 transgender prisoners across 21 different IDOC facilities). Second, most are likely to lack the resources and familiarity with the judicial process to effectively prosecute individual suits, and would face significant barriers to individual joinder, such as the resources required to hire experts. *See, e.g.*, CAROLINE WOLF HARLOW, EDUCATION AND CORRECTIONAL POPULATIONS, BUREAU OF JUSTICE STATISTICS: SPECIAL REPORT (2003) (finding that 18 percent of the general population age 18 or older had not finished the 12th grade whereas about 41 percent of incarcerated individuals had not completed high school or its equivalent); ADAM LOONEY & NICHOLAS TURNER, THE BROOKINGS INSTITUTION, WORK AND OPPORTUNITY BEFORE AND AFTER INCARCERATION 11–12 (2018) (incarcerated individuals are disproportionately from lower-income families).

### B.    Commonality

To meet the commonality requirement of Rule 23(a), Plaintiffs must show there are "questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2). In particular, Plaintiffs must show that the Class members' claims "depend upon a common contention" that is "capable of classwide resolution." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *Bolden v. Walsh Constr. Co.*, 688 F.3d 893, 896 (7th Cir. 2012); *Brand v. Comcast Corp.*, 302 F.R.D. 201, 218 (N.D. Ill. 2014). The central inquiry is thus whether "a classwide proceeding [has the capacity]

to generate common answers apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350 (emphasis removed).  Members of the class are not required to present identical claims. *Boundas v. Abercrombie & Fitch Stores, Inc.*, 280 F.R.D. 408, 413 (N.D. Ill. 2012) ("Rule 23(a)(2) does not demand that every member of the class have an identical claim.") (citation omitted). Indeed, "some degree of factual variation will not defeat commonality provided that common questions yielding common answers can be identified." *Id.*

Plaintiffs assert that Defendants' system-wide policies and practices have deprived all proposed Class members of constitutionally adequate medical care.  Courts have held that the commonality requirement is met where, as here, "overarching systemic deficiencies" create "risk of harm" for all class members.  *See Bolden*, 688 F.3d at 898 ("[A] single policy spanning all sites could be contested in a company-wide class"); *N.B. v. Hamos*, 26 F. Supp. 3d 756, 773 (N.D. Ill. 2014) (finding that the Seventh Circuit "specifically allows" for the finding of commonality "where a 'systemic failure' or an 'illegal policy' is alleged; . . . the policy is the 'glue' that unites otherwise individualized claims").

Courts routinely find commonality among classes of prisoners alleging chronic failures or system-wide practices. *See, e.g.*, *Lippert v. Baldwin*, No. 10 C 4603, 2017 WL 1545672, at *4 (N.D. Ill. Apr. 28, 2017) ("The question common to all plaintiffs . . . is whether each of defendants' policies and practices do in fact put prisoners with serious medical conditions at risk. As other courts have held, such a question satisfies Rule 23's commonality requirement."); Order on Pls.' Mot. for Class Certification Under Rule 23(b)(2) at 4, *Rasho v. Walker*, No. 07-1298-MMM, Dkt. 252 (C.D. Ill. Aug. 14, 2015) (certifying a class of mentally ill prisoners in IDOC and finding commonality where "the proposed class as a whole is subject to the same policies which foster inadequate mental health diagnosis and treatment"); *Holmes v. Godinez*, 311 F.R.D. 177, 220

(N.D. Ill. 2015) (certifying a class of deaf and hard-of-hearing prisoners in IDOC and finding commonality where plaintiffs alleged and "sufficiently proved the existence of the statewide policies and practices").

Here, each member of the proposed Class is seeking treatment for the same medical condition and, as a result of Defendants' policies and practices, has received wholly inadequate treatment for that condition. As a result of Defendants' actions and failures to act, each member of the proposed Class has been harmed and is at risk of additional harm.

While gender dysphoria treatment must be tailored to each individual's needs, there are clear standards and guidelines defining appropriate treatment. Declaration of Dr. Randi Ettner ("Ettner Decl.") ¶¶ 25–26. IDOC's systemic policies and practices have resulted in an utter failure to provide treatment in compliance with these standards, which extends across the proposed Class. Further, all treatment decisions for gender dysphoria are funneled through the Transgender Committee: a single, consolidated body tasked with evaluating prisoners seeking treatment for gender dysphoria, as well as overseeing these prisoners' treatment plans and "gender-related accommodation[s]." *See* Defs.' Answer ¶ 67. Treatment prescribed (or denied) by the Transgender Committee for members of the proposed Class share a host of common defects, and members are therefore seeking substantially similar remedies. Accordingly, and as further explained below, Plaintiffs raise questions of law and fact that are common to the proposed Class, as required by Rule 23(a)(2).

### 1. Defendants chronically permit under-qualified medical professionals and non-medical prison staff to evaluate and design treatment plans for IDOC prisoners who are seeking treatment for gender dysphoria.

Defendants have a policy and practice whereby medical decisions regarding gender dysphoria treatment are denied or delayed by the Transgender Committee, which consists of non-experts and laypeople. Each IDOC prisoner seeking treatment for gender dysphoria is channeled

through the "Transgender Committee," a single body responsible for "placements, security concerns, and overall health related treatment plans" for all transgender prisoners. *See* Defs.' Answer ¶ 66. Defendants' policies and procedures for the evaluation and treatment of prisoners with gender dysphoria, including the establishment of the Transgender Committee, are set forth by IDOC Administrative Directive 04.03.104, "Evaluation of Offenders with Gender Identity Disorders," effective as of May 1, 2013 (the "GID Directive"). *See id.* ¶¶ 64, 66. Despite the Transgender Committee's specific and specialized mandate, it has no members with even the most rudimentary expertise in treating gender dysphoria. *See* Ex. 4, Defs.' Resp. to Interrog. No. 4 (listing names of Transgender Committee members); *id.* at Defs.' Resp. to Interrog. No. 5 (listing "with specificity the medical or other qualifications to treat gender dysphoria" of the Transgender Committee members, and listing no qualifications at all for some members); Ettner Decl. ¶ 134.

The WPATH Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People (the "Standards of Care") are recognized as the authoritative standards of care by leading medical organizations, the U.S. Department of Health and Human Services, and several courts. *See id.* ¶ 24. The current version of the Standards of Care, released in 2012, is the seventh update to the original 1979 document. THE WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH, STANDARDS OF CARE FOR THE HEALTH OF TRANSSEXUAL, TRANSGENDER, AND GENDER-NONCONFORMING PEOPLE n. 1 (2012), available at https://www.wpath.org/media/cms/Documents/SOC%20v7/Standards%20of%20Care_V7%20Full%20Book_English.pdf. Under the Standards of Care, all mental health professionals should have certain minimum credentials before treating patients with gender dysphoria, including a master's degree (or equivalent) in a clinical behavioral science field; competencies in using the DSM-5 and/or the International Classification of Diseases for diagnostic purposes; ability to recognize and

diagnose co-existing mental health concerns and to distinguish these from gender dysphoria; documented supervised training and competence in psychotherapy or counseling; knowledge of gender nonconforming identities and expressions, and the assessment and treatment of gender dysphoria; and continuing education in the assessment and treatment of gender dysphoria.  Ettner Decl. ¶ 29.

Not a single member of the Transgender Committee meets these baseline criteria.  *Id.* ¶¶ 134–35.  For example, Dr. Steve Meeks, Chief of Health Services and former Chair of the Transgender Committee, admitted he is not an expert in providing care to transgender individuals. *See* Ex. 5, Meeks Evid. Hr'g Testimony (*Hampton v. Baldwin*) at 297:20–22 ("Q: You are no expert in providing care to transpeople, correct? A: I would not consider myself an expert in this area.").  Similarly, when asked if he believed himself to be an expert in the treatment of gender dysphoria, Dr. William Puga, the Chief of Psychiatry and current Chair of the Transgender Committee, stated that "[he] would probably say [he has] more experience and . . . more working knowledge than the average person – the average psychiatrist," though he has only treated two transgender patients (and *not* for gender dysphoria) and does not prescribe hormone therapy. Ex. 6, Puga 30(b)(6) Dep. at 35:3–11, 31:4–33:23.  Worse still, the Transgender Committee includes non-medical IDOC staff who are entirely unqualified to participate in decision-making about medical treatment plans.  *Id.* at 26:16–27:17. The Transgender Committee also puts medical treatment decisions to a vote without regard to medical expertise or knowledge of the particular medical needs of an individual prisoner, which is a wholly inappropriate method of determining a medical treatment plan. *Id.* at 42:8–11.

IDOC medical professionals display a shocking lack of knowledge regarding gender dysphoria and its treatment.  For instance, a basic tenet of working with transgender individuals is

the importance of respecting each individual's gender identity. Ettner Decl. ¶ 61. Refusing to use a transgender person's correct pronouns and preferred name can be psychologically damaging and can exacerbate the distress caused by the condition. *Id.* ¶ 62; Ex. 7, Reister 30(b)(6) Dep. at 125:1–8 (misgendering is "psychologically harmful, stressful, and interferes with treatment"). Nevertheless, IDOC treating clinicians and mental health professionals consistently misgender transgender prisoners. Ettner Decl. ¶ 134. Even more disconcerting, the Transgender Committee at times misgenders transgender prisoners in its notes and rarely, if ever, use their gender-consistent names. *Id.* The Transgender Committee notes also discuss gender dysphoria using outdated language, which reflects its lack of expertise and familiarity with the subject matter at hand. *Id.* For example, Transgender Committee notes describe transgender prisoners as "transgenders," which is offensive and outdated nomenclature, and refer to "gender identification disorder"—which is not and never has been a term for gender dysphoria (previously "gender *identity* disorder"). *Id.* IDOC personnel also call the condition "tg disorder," and "sex dysphoria," as well as and other incorrect and inaccurate names. *Id.* ¶ 135.

The consequences of the Transgender Committee's inadequacy reverberate across the proposed Class. Undeterred by lack of credentials, knowledge, or experience, the Transgender Committee provides recommendations regarding hormone therapy, clothing, showers, searches, housing, and other accommodations. *See* Defs.' Answer ¶¶ 64, 66. In making these recommendations, the Transgender Committee does not meet with the prisoners or the prisoners' treating clinicians, nor does it review the prisoners' medical records or mental health records. Ettner Decl. ¶ 138; Ex. 8, Hinton Dep. (*Hampton v. Baldwin*) at 92:20–93:3, 94:12–15. Instead, the Transgender Committee reviews a short "snapshot" update form filled out by mental health professionals. Ex. 6 at 42:22–44:9.

10

As a result of the Transgender Committee's lack of expertise, prisoners who have been diagnosed with gender dysphoria are frequently denied hormone therapy or other necessary medical care for reasons that directly contradict the Standards of Care.  Ettner Decl. ¶ 139. Even when medical treatment is prescribed, it is often only after long delays, and is ultimately inadequate to meet the prisoner's medical needs.  *Id.* ¶¶ 133, 139; Declaration of Dr. Vin Tangpricha ("Tangpricha Decl.") ¶ 21.

### 2.     Defendants routinely deny or delay hormone treatment, including by imposing arbitrary, medically unnecessary requirements.

IDOC has a policy and practice whereby hormone therapy is denied and delayed for reasons that are not recognized as contraindications to treatment.   For most transgender individuals, hormone therapy is "essential and medically indicated treatment" for gender dysphoria.  Ettner Decl. ¶ 35.  Hormone therapy in accordance with the Standards of Care is recognized by the American Medical Association, the Endocrine Society, the American Psychiatric Association and the American Psychological Association as safe, effective, and medically necessary treatment for many individuals with gender dysphoria.  *Id.* ¶ 36. Without adequate medical treatment, adults with gender dysphoria "experience a range of debilitating psychological symptoms such as anxiety, depression, suicidality, and other attendant mental health issues." *Id.* ¶ 68.  However, Plaintiffs and proposed Class members often experience delays of months – or even years – following a gender dysphoria diagnosis (sometimes, following multiple diagnoses of gender dysphoria) before receiving hormone therapy.  *Id.* ¶ 126.

The Transgender Committee regularly delays or denies hormone therapy for reasons that have no medical basis.  *Id.* ¶ 127.  For example, the Transgender Committee frequently delays hormone treatment because it interprets a prisoner's *symptoms* of gender dysphoria (such as distress, anxiety, and depression) as a lack of "stability" that prevents *treating* the gender

dysphoria.  *Id.*  Although co-occurring mental health conditions should be evaluated when prescribing hormone therapy (or any medical treatment), such conditions would present no barrier to starting hormone therapy absent the most exceptional circumstances – for example, where the individual is so delusional as to be unable to consent to the initiation of hormone therapy.  *Id.* ¶ 41; Tangpricha Decl. ¶ 21.  But the majority of individuals with untreated gender dysphoria will exhibit other mental health conditions such as depression, anxiety, or suicidality, which are often in fact symptoms of the untreated or inadequately treated gender dysphoria, rather than an independent mental health condition.  Ettner Decl. ¶¶ 39, 41; Tangpricha Decl. ¶ 21.  By delaying hormone treatment until a prisoner is deemed "stable," the Transgender Committee fails to recognize that this purported instability may be *caused by* lack of adequate treatment for gender dysphoria.  Ettner Decl. ¶ 127; Tangpricha ¶ 23.  Necessary treatment of serious conditions is not ordinarily withheld from "unstable" individuals, and absent a medical basis, such a requirement is unconstitutional.

The Transgender Committee imposes myriad other non-clinical hurdles to obtaining hormones, and denies treatment for reasons that are not medically accepted contraindications.  For instance, the Transgender Committee will delay treatment for prisoners to undergo "counseling," which is unnecessary to initiate hormone therapy.  Tangpricha Decl. ¶ 21.  The Transgender Committee also regularly denies or delays hormone treatment without providing any medical justification whatsoever. Ettner Decl. ¶¶ 129–32.

### 3.  Defendants routinely fail to prescribe or administer appropriate hormones and dosages, as well as fail to provide sufficient monitoring of prisoners' health while receiving hormone treatment.

IDOC has a policy and practice whereby prisoners with gender dysphoria are given inadequate or inappropriate hormone doses or varieties, and whereby blood work necessary to ensure safety and efficacy is rarely and haphazardly done.  For gender dysphoric prisoners who

are prescribed hormone therapy, often after long delays, Defendants routinely fail to provide appropriate treatment or adequate monitoring. Testosterone or estrogen levels should be sufficient to maintain the desired sex characteristics and relieve gender dysphoria, while within certain ranges to avoid potentially life-threatening health risks. Tangpricha Decl. ¶ 22. Defendants routinely prescribe low doses that often are insufficient to treat gender dysphoria, and consistently fail to perform blood work. *Id.* ¶¶ 66–69.

Failure to provide appropriate hormone therapy can have serious – and potentially fatal – consequences. For transgender women, estrogen levels that are too high or too low can cause osteoporosis, hot flashes, and mood disorders. *Id.* ¶ 26. Defendants frequently prescribe conjugated estrogen, which is not recommended under the Guidelines "because of the inability to regulate doses by measuring serum levels and the risk of thromboembolic disease (also known as blood clots)." *Id.* ¶¶ 40, 70. Further, transgender women taking testosterone suppressants (*i.e.* spironolactone) must be regularly monitored to ensure potassium, creatinine, prolactin levels are within a safe range. *Id.* ¶¶ 36–38. Without proper monitoring, transgender women risk cardiac arrhythmia, kidney failure, loss of eyesight, and death. *Id.* Transgender men receiving testosterone injections must also be monitored to ensure testosterone levels are maintained within a safe range. Testosterone can cause high hemoglobin (red blood cells), which can cause blood clots, heart attack and stroke. *Id.* ¶ 42.

Defendants rarely conduct adequate monitoring of prisoners on hormone therapy. *Id.* ¶¶ 64–65. The Endocrine Society recommends "appropriate regular medical monitoring . . . for both transgender males and females during the endocrine transition and periodically thereafter." *Id.* ¶ 30. Typically, patients should be evaluated every 2–3 months during the first year of hormone treatment, and then 1–2 times per year afterwards. *Id.* However, Plaintiffs and proposed Class

members are infrequently and irregularly tested. *Id.* ¶¶ 64–65, 69. Similarly, many are prescribed a very low dose of hormones that is seldom, if ever, increased or adjusted. *Id.* ¶¶ 64, 68. When blood work is done, the vast majority of patients fall outside of the recommended range, which means their gender dysphoria is being inadequately treated, in addition to being exposed to serious medical risks. *Id.* ¶¶ 69, 71.

### 4.   Defendants have a policy and practice of denying gender confirmation surgeries.

Defendants have a policy and practice whereby IDOC does not evaluate and consider surgery as a treatment option for gender dysphoria. Defendants disregard medical consensus surrounding the medical necessity of gender confirmation surgeries, and maintain a *de facto* policy of refusing to permit surgical treatment of gender dysphoria. Ettner Decl. ¶ 132. More than three decades of research confirms that gender confirmation surgery is effective treatment for gender dysphoria. Indeed, for many patients with severe gender dysphoria, gender confirmation surgery is the *only* effective treatment. *Id.* ¶ 45. Despite clear consensus by the major medical associations, the Transgender Committee, as a rule, does not even evaluate prisoners for gender confirmation surgery. IDOC's GID Directive states that "[t]he Department shall not perform or allow the performance of any surgery for the specific purpose of gender change, except in extraordinary circumstances as determined by the Director who has consulted with the Agency Medical Director." *See* Defs.' Answer ¶ 65. As a practical matter, this means that no IDOC prisoner is or ever has been approved for gender affirming surgery or has even been evaluated to determine whether they need gender affirming surgery to treat their gender dysphoria. *Id.* ¶ 100; Ex. 7 at 130:12–15.

Denying medically necessary surgical care can have dire consequences for prisoners with severe gender dysphoria. Without access to appropriate care, many transgender people experience

extreme depression and suicidality, with one recent study finding that 41% of transgender people unable to receive medically necessary care attempt suicide.  Ettner Decl. ¶ 68.  Some transgender women resort to life-threatening attempts at auto-castration – amputating one's own testicles – in the hopes of cutting off the flow of testosterone and removing a key source of dysphoria.  *Id.* Indeed, many of the Plaintiffs and Class members have considered suicide, and some have either attempted to take their own lives or attempted to auto-castrate.  *Id.* ¶¶ 75, 77, 91, 95, 119.

> **5.**  **Defendants' policies and practices effectively prohibit prisoners with gender dysphoria from social transition.**

Defendants have a policy and practice of depriving transgender prisoners of medically necessary social transition, including by mechanically assigning housing based on genitalia.  For transgender individuals, living consistently with one's gender identity – or, social transition – is a key pillar of gender dysphoria treatment.  *Id.* ¶¶ 34, 67.  Social transition typically includes using names and pronouns associated with one's gender identity, using restrooms or other facilities consistently with one's gender identity, as well as expressing one's gender identity through grooming or clothing.  *Id.* ¶ 34.  Nevertheless, Defendants prevent prisoners with gender dysphoria from socially transitioning by using improper names and pronouns, cross-gender body searches, withholding access to gender-appropriate grooming (including permanent hair removal) and personal care items, and by refusing to evaluate prisoners for placement in correctional centers matching that correspond with their gender identity (except in rare circumstances—where litigation has been filed challenging placement of transgender women in male facilities).  *See id.*

> **a.**  **Defendants have a policy and practice of prohibiting or hindering social transition through use of improper pronouns and names, and cross-gender body searches.**

Plaintiffs and proposed Class members are regularly misgendered by IDOC staff, including medical staff and mental health professionals. Ettner Decl. ¶¶ 134–35; Melendez Decl. ¶ 9;

Kuykendall Decl. ¶ 11; Reed Decl. ¶ 13.  IDOC staff "find humor in calling coworkers 'faggots' in the armory or transgender offenders 'he/shes' or 'shemales.'"  Ex. 9, 218620.  Similarly, Transgender Committee members sometimes misgender prisoners, including referring to transgender women as "transgender males" – both disrespecting the prisoners' gender identity as well as indicating confusion over the definition of "transgender."  *See* Ettner Decl. ¶ 134.

Prison officers and other IDOC staff similarly impede transgender prisoners' ability to socially transition, by refusing to respect their gender identity and subjecting them to cross-gender body searches.  Despite the National Standards to Prevent, Detect, and Respond to Prison Rape Under the Prison Rape Elimination Act (PREA) directive that prisons "shall not conduct cross-gender strip searches or cross-gender visual body cavity searches" except in exigent circumstances or when performed by medical practitioners, 28 C.F.R. § 115.15, transgender prisoners are regularly subjected to such searches.  Melendez Decl. ¶ 9; Kuykendall Decl. ¶ 10; Reed Decl. ¶ 13; Vision Decl. ¶ 18.  Strip searches of transgender prisoners conducted by officers of a different sex than those prisoners (*e.g.*, male officers strip searching female prisoners who are transgender), often in the presence of different-sex prisoners, is humiliating, degrading, often traumatizing. Ettner Decl. ¶ 63.  This treatment is the result of IDOC personnel viewing transgender women as men.

> b.  **Defendants have a policy and practice of hindering social transition by delaying or denying requests for gender affirming clothing, hygiene products, and grooming products.**

Defendants have a policy and practice of delaying or denying requests for gender-affirming clothing and personal care products, which are necessary components of social transition.  Gender-affirming clothing is an important component of social transition, as well as a physical necessity in many cases.  Defendants have a policy and practice of denying all requests for gender affirming clothing except bras for some transgender women, and even then such requests are routinely denied

16

or delayed for illogical reasons or no reason at all. *Id.* ¶ 131. Similarly, Defendants have a policy and practice of denying requests for gender-appropriate personal care products, such as cosmetics and gender-appropriate lotions, deodorants and body washes available to non-transgender women in custody. *Id.*

Defendants also limit or outright deny the provision of hair removal products for transgender women. Face and body hair is a common source of gender dysphoria for transgender women, and being able to remove this hair is an critical component of social transition. *Id.* ¶ 60. Transgender women prisoners often have only limited access to razors or "magic shave," a chemical hair removal cream that is not recommended for use on the body. *See* Monroe Decl. ¶ 8; Melendez Decl. ¶ 7; Kuykendall Decl. ¶ 8; Vision Decl. ¶¶ 10–11. Defendants also summarily ignore requests for permanent hair removal procedures, which is a common medical treatment for gender dysphoria – indeed, IDOC has never approved permanent hair removal. Ex. 6 at 121:22–122:7.

> c. **Defendants have a policy and practice of hindering social transition by refusing to even evaluate transgender prisoners' transfer to a correction center that accords with their gender identity.**

Social transition often includes the use of facilities that are consistent with one's gender identity. Ettner Decl. ¶ 67. Additionally, PREA recommendations state that "[i]n deciding whether to assign a transgender or intersex prisoner to a men's or women's facility, and in making other housing and programming assignments, the agency shall consider on a case-by-case basis whether a placement would ensure the prisoner's health and safety, and whether the placement would present management or security problems." 28 C.F.R. § 115.42. However, despite this clear directive, Defendants do not make individualized assessments of whether to assign transgender prisoners to men's or women's correctional centers. Instead, IDOC's current policy – with only

limited exception as a result of litigation – is to house "all prisoners based on their genitalia." *See Hampton v. Baldwin*, No. 3:18-CV-550-NJR-RJD, 2018 WL 5830730, at *4 (S.D. Ill. Nov. 7, 2018) (noting that "currently all prisoners in the IDOC are housed based on their genitalia").

### C.    Typicality

Because the Defendants' policies and practices raise common questions that satisfy Rule 23(a)(2)'s commonality requirement, Rule 23(a)(3)'s typicality requirement is presumed also to be met.   Indeed, the U.S. Supreme Court has held that "the commonality and typicality requirements of Rule 23(a) tend to merge.  Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 n.5 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157–58, n.13 (1982)).

Plaintiffs' claims in this case are "typical of the claims or defenses of the class, as required by Rule 23(a)(3).  According to the Seventh Circuit, the typicality requirement ensures that "there [is] enough congruence between the named representative's claim and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group." *Spano v. Boeing Co.*, 633 F.3d 574, 586 (7th Cir. 2011).  The named Plaintiffs' claims must "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members and [be] based on the same legal theory." *Flynn v. FCA US LLC*, 327 F.R.D. 206, 223 (S.D. Ill. 2018) (quoting *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006)).   Nevertheless, "typicality does not require the facts underlying every claim to be identical" and the standard "'may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members.'" *Suchanek v. Sturm Foods, Inc.*, 311 F.R.D. 239, 255 (S.D. Ill. 2015) (citing *De La Fuente v. Stokely–Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983)); *see*

*also Gaspar v. Linvatec Corp.*, 167 F.R.D. 51, 57 (N.D. Ill. 1996) ("[T]he typicality requirement is liberally construed."). Under Rule 23(a)(3), courts must "look to the defendant's conduct and the plaintiff's legal theory." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992).

In this case, the claims of named Plaintiffs Janiah Monroe, Marilyn Melendez, Lydia Helena Vision, Sora Kuykendall, and Sasha Reed are typical of the proposed Class as a whole. For all of the proposed Class members and the named Plaintiffs, medical care is guided and overseen by the Transgender Committee, which is unqualified and has demonstrated an inability to provide constitutionally adequate care for gender dysphoria by inadequately treating class members and named Plaintiffs. Moreover, the Defendants' failure to institute appropriate policies or procedures to protect transgender prisoners has harmed and continues to harm everyone in the proposed class, including the named Plaintiffs. For example, IDOC mechanically places transgender women in facilities for men and routinely subjects them to demeaning and harmful strip-searches by male staff. Moreover, IDOC routinely misgenders transgender prisoners and demeans them with offensive and derogatory terms. IDOC also fails to provide gender affirming clothing and grooming items to prisoners with gender dysphoria, including by not making such items available in prison canteens and by specifically denying requests for such items.

### 1.    Janiah Monroe

Janiah Monroe is a transgender woman incarcerated at Logan Correctional Center. Monroe Decl. ¶ 13. As is typical of the Class, Ms. Monroe experienced an unjustifiably long delay before receiving inadequate hormone therapy and subsequent monitoring, was denied even an evaluation for gender-affirming surgery, and has been unable to socially transition due to Defendants' policies and practices.

Ms. Monroe first requested hormone therapy from IDOC in 2008, during her intake at the Northern Reception Center. *Id*. ¶ 2. Despite her unequivocal request that she "needed hormone

therapy" and the fact that she had previously received hormone therapy, IDOC forced her to wait *four years*. *Id*. ¶¶ 2, 7.   In the interim, Ms. Monroe filed multiple grievances and, increasingly desperate, resorted to several attempts at self-castration before IDOC provided her with hormones in mid-2012.  *Id*. ¶¶ 3–4.   Between her intake in 2008 and IDOC providing her with hormone treatment in 2012, IDOC mental health professionals repeatedly evaluated Ms. Monroe for gender dysphoria and reconfirmed her diagnosis. *Id*. ¶ 2.   These medical professionals recommended that Ms. Monroe start hormone therapy, but the Transgender Committee continued to deny her hormone treatment.   Ettner Decl. ¶ 78.   Nothing in IDOC's medical records for Ms. Monroe justifies the approximately four-year delay in her treatment.   Tangpricha Decl. ¶ 44; Ettner Decl. ¶ 82.  Indeed, Dr. Tangpricha found that in his decades of professional experience, Ms. Monroe's "quality of care is among the worst cases [he has encountered]."  Tangpricha Decl. ¶¶ 3–5, 51.

Despite ultimately being provided hormone therapy, Ms. Monroe has not been provided care or monitoring in accordance with accepted medical standards.  Ms. Monroe's medical records show that since she started hormone therapy, IDOC has not monitored her hormone levels in accordance with the Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline ("Guidelines").  *Id.* ¶ 42.   Over the course of six years, monitoring of her levels has been extremely rare, and the few blood tests that IDOC has performed indicate estradiol levels consistently measuring below the recommended physiologic range under the Guidelines.  *Id.* ¶¶ 42, 49.   Nevertheless, IDOC has not adjusted her dosage and IDOC is therefore failing to adequately treat her gender dysphoria.  *Id.* ¶¶ 49–50.

As is universal across the Class, Defendants have refused to provide Ms. Monroe with gender-affirming surgery.   Defendants have summarily dismissed her as "not a candidate for a reassignment surgery," despite remaining critically dysphoric for nearly seven years after starting

hormone therapy.  Monroe Decl. ¶ 6.  Ms. Monroe's multiple requests have been denied, and her subsequent grievances have been ignored.  *Id.* ¶¶ 6, 8.

As is typical of the Class, Defendants have impeded Ms. Monroe's social transition in a variety of ways.  For example, Defendants permit IDOC staff, including medical and mental health professional, to call her by a male name and to use male pronouns when referring to her.  *Id.* ¶ 7.  Defendants also hindered Ms. Monroe's social transition by denying her requests for feminine underwear, a bra, and a safe and reliable way to remove her facial and body hair.  *Id.* ¶¶ 5–6.  She eventually received a bra after filing multiple grievances.  *Id.* ¶ 5.  Defendants' unreasonable delay in providing her a bra, as well as its ongoing refusal to provide her with feminine underwear, electrolysis hair removal, and gender-appropriate clothing and personal grooming items are typical of the class' claim.  *Id.* ¶¶ 5–6.

### 2.      Marilyn Melendez

Marilyn Melendez is a transgender woman incarcerated at Pontiac Correctional Center.  Melendez Decl. ¶ 9.  As is typical of the Class, Ms. Melendez experienced an unjustifiably long delay before receiving inadequate hormone therapy and subsequent monitoring, was denied even an evaluation for gender-affirming surgery, and has been unable to socially transition due to Defendants' policies and practices.

Ms. Melendez was forced to wait several months before she was provided with hormone therapy, despite a gender dysphoria diagnosis.  *Id.* ¶¶ 4–5.  Nothing in Ms. Melendez's medical records justifies the delay in her treatment.  Tangpricha Decl. ¶ 56; Ettner Decl. ¶ 121.

Even after finally receiving hormone therapy, Ms. Melendez has not been provided appropriate care or monitoring.  IDOC personnel have prescribed Ms. Melendez Menest and Premarin, which are both conjugated estrogens.  Tangpricha Decl. ¶ 53.  This form of estrogen is completely inappropriate and highly risky for any transgender individual, due to the inability to

monitor for serious health risks.  *Id.* ¶¶ 53–54.  In addition to prescribing an inappropriate form of estrogen, Defendants have also failed to regularly test her hormone levels in accordance with the Guidelines.  *Id.* ¶ 54.  A blood test in April 2017 indicates an estradiol level of 82.9 pg/ml, falls below the acceptable therapeutic range.  *Id.*  However, because Ms. Melendez is on a conjugated estrogen, it is impossible to know if this result is accurate, meaning her estradiol levels could be even lower than this number or very far above the safe range, including even dangerously high. *Id.*

Ms. Melendez has also requested gender-affirming surgery because she is "disgusted" by her own body and would rather be dead that continue to live without surgery.  Melendez Decl. ¶ 8.  Her grievance was summarily denied.  *Id.*  Indeed, Ms. Melendez has never even been evaluated for surgery, despite meeting the criteria for surgery.  Ettner Decl. ¶ 123.

Defendants have also impeded Ms. Melendez's ability to socially transition.  For example, Defendants have denied her requests for feminine clothing; Ms. Melendez is not permitted to wear any women's clothing or undergarments except the sports bra she was issued.  Melendez Decl. ¶¶ 6, 9.  Defendants have also ignored her requests for access to better hair removal, such as a non-electric razor to use while showering, despite the fact that her facial and body hair are a source of significant distress to her.  *Id.* ¶ 7.

Defendants also permit prisoners and IDOC staff, including some of the medical and mental health staff, to disrespect her female gender identity.  *Id.* ¶ 9.  Few officers refer to her as "Ms." or use female pronouns—many still refer to her with male pronouns, and will sometimes use offensive and dehumanizing terms like "sissy" or "fag."  *Id.*  During strip-searches, male officers have cupped her breasts or butt and called her names like "bitch" or "whore." *Id.*

Defendants refuse to recognize Ms. Melendez as the woman she is by keeping her in a facility for men. *Id.*

###   3.   Lydia Helena Vision

Lydia Helena Vision is a transgender woman incarcerated at Centralia Correctional Center. Vision Decl. ¶ 2.  As is typical of the Class, Ms. Vision experienced an unjustifiably long delay before receiving inadequate hormone therapy and subsequent monitoring, was denied even an evaluation for gender-affirming surgery, and has been unable to socially transition due to Defendants' policies and practices.

Ms. Vision began requesting hormone therapy to treat her gender dysphoria after being diagnosed in March 2016.  *Id.*  Prison officials required her to attend therapy sessions for an unrelated post-traumatic stress disorder ("PTSD") diagnosis before they would treat her gender dysphoria with hormone therapy.  *Id.*  Even if this dubious diagnosis were accurate, PTSD on its own is not a legitimate reason to delay or deny treatment.  Ettner Decl. ¶¶ 41, 112.  In its records, the Transgender Committee repeatedly used male pronouns to refer to her.  *Id.* ¶ 106.  Ms. Vision was again diagnosed with gender dysphoria in July 2016, but she did not begin to receive hormone therapy until November 2018, over *two-and-a-half years* after her first diagnosis and after *at least twenty* requests.  *Id.* ¶¶ 4, 17, 19.  Nothing in her medical records justifies this delay in treatment. Tangpricha Decl. ¶ 72; Ettner Decl. ¶ 112.

As is typical of the Class, Defendants have imposed significant barriers to Ms. Vision's ability to socially transition while in IDOC custody.  Ms. Vision has repeatedly requested and grieved denials for gender-affirming clothes and grooming items.  Vision Decl. ¶¶ 3, 4, 9.  She requested a bra, women's underwear, feminine hygiene supplies, makeup, and body hair removal products, such as waxing strips.  *Id.* ¶ 4.  IDOC denied her request for a bra and ignored her other requests. *Id.* Ms. Vision was eventually approved for a bra, but did not receive one until February

2019, over *three months* after being *approved*. *Id*. ¶ 19.  The bras, however, are the wrong size, causing them to cut into her ribs when she wears them. *Id*.

Ms. Vision is also prevented from socially transitioning because Defendants permit IDOC staff to treat her as if she were a man.  Ms. Vision's mental health counselors regularly misgender her in person and in her records.  *Id*. ¶¶ 4, 16, 21.  She is also misgendered by other IDOC personnel and is searched by male officers, which is particularly traumatic.  *Id*. ¶ 21.  Ms. Vision feels ill when subjected to cross-gender searches and has to dissociate herself in order to cope with being touched by male officers.  *Id*.  She describes being in a men's correctional facility as "torture." *Id*.

### 4.    Sora Kuykendall

Ms. Kuykendall is a transgender woman incarcerated at Menard Correctional Center. Kuykendall Decl. ¶ 10.  As is typical of the Class, Ms. Kuykendall experienced an unjustifiably long delay before receiving inadequate hormone therapy and subsequent monitoring, was denied even an evaluation for gender-affirming surgery, and has been unable to socially transition due to Defendants' policies and practices.

Ms. Kuykendall requested hormone therapy within the first week of her incarceration in November 2014.  *Id.* ¶ 3.  IDOC denied her request without even evaluating her for gender dysphoria. *Id.* ¶ 4.  With her dysphoria untreated, Ms. Kuykendall resorted to self-castration. *Id*. Only then did IDOC evaluate her for gender dysphoria.  *Id*.  IDOC recognized Ms. Kuykendall's gender dysphoria in February of 2015 and she began hormone therapy later that month.  *Id.* ¶¶ 4– 5. Nevertheless, Ms. Kuykendall has yet to receive adequate hormone therapy and monitoring. Ms. Kuykendall was prescribed Premarin, a conjugated estrogen.  Tangpricha Decl. ¶ 62.  Initially, Ms. Kuykendall received no blood testing of her hormone levels despite her repeated requests and the serious – and potentially lethal – health risks associated elevated hormone levels.  *Id*. ¶ 63; Kuykendall Decl. ¶ 6.  It was not until May 2017 that IDOC finally ordered laboratory work for

24

her blood, and the tests showed an estradiol level of 112 pg/ml. It is impossible to know if her estradiol level is within the acceptable therapeutic range because Ms. Kuykendall is being treated with a conjugated estrogen. Tangpricha Decl. ¶ 64.

Ms. Kuykendall first requested surgery in June 2015, and she has continued to do so. Kuykendall Decl. ¶ 9. She spoke with IDOC mental health professionals about surgery on at least three different occasions from 2016 to 2017, and filed a grievance requesting it to treat her ongoing distress and gender dysphoria. *Id.* Nevertheless, as with the other Class members, she has never even been evaluated for surgery. *Id.*

Due to Defendants' policies and practices, Ms. Kuykendall has also been prevented from socially transitioning. In June 2015, Ms. Kuykendall requested a bra due to her breast development, but did not receive a bra until *six months* later. *Id.* ¶ 7. She has also repeatedly requested other gender-affirming clothing and grooming items, filing formal grievances for these items. *Id.* All of her requests have been ignored or denied. *Id.* Ms. Kuykendall experiences severe distress from her body and facial hair and has requested hair removal treatment. *Id.* ¶ 8. She has not been provided adequate hair removal products, so has resorted to using nail clippers to painfully remove individual hairs, one-by-one, from her face each morning. *Id.*

Other prisoners and IDOC staff are consistently disrespectful of Ms. Kuykendall's gender identity, including by referring to her by a male name and with male pronouns. *Id.* ¶ 11. She is also subjected to inhumane search procedures, such as strip-searches conducted by male officers in the presence of male prisoners. *Id.* ¶ 10. These humiliating searches leave her feeling so violated and unsafe that she refuses visitors and opportunities to leave her cell in order to avoid being searched by male officers. *Id.* She has effectively cut herself off from human contact to prevent further trauma. Ettner Decl. ¶ 92. On March 14, 2017, she filed a grievance requesting

that strip searches only be conducted by a female officer away from the male prisoners.  *Id*.  She has not received a response to this grievance and continues to be subjected to these distressing searches.  *Id*.  Ms. Kuykendall is not able to be herself in a men's prison and would like IDOC to transfer her to a facility for women.  *Id*.  Being in a facility for men, as a woman, is causing her to slip into a deeper depression.  *Id*.

### 5.    Sasha Reed

Ms. Reed is a transgender woman incarcerated at Lawrence Correctional Center.  Reed Decl. ¶¶ 2, 8.  As is typical of the Class, Ms. Reed experienced an unjustifiably long delay before receiving inadequate hormone therapy and subsequent monitoring, was denied even an evaluation for gender-affirming surgery, and has been unable to socially transition due to Defendants' policies and practices.

Ms. Reed identified herself as transgender during her intake at Stateville in 2013, but IDOC provided her with no evaluation or treatment.  *Id*. ¶ 2.  In November 2015, Ms. Reed spoke with a mental health professional and requested hormone therapy.  *Id*. ¶ 3.  The mental health professional asked her to complete a questionnaire for the Transgender Committee to review. *Id*.  Ms. Reed did so, but it was not until February 2016 that she received a response to her request for hormone therapy: the request was denied because IDOC needed to "rule out a psychotic process."  *Id*. ¶ 2. The GID Committee, along with the mental health professional, misdiagnosed her gender dysphoria as schizophrenia and forced Ms. Reed to wait *another seventeen months* while doctors investigated her "conceptualization of gender identity."  *Id*. ¶ 3; Ettner Decl. ¶ 102.  Finally, in April 2017, she was allowed to begin hormone therapy. Reed Decl. ¶ 3. Ms. Reed's medical records contain no medical justification for this delay in treatment – or indeed, any indication of psychosis – even though such delays cause extreme suffering and put a patient at extreme risks for self-harm or suicide.  Ettner Decl. ¶ 102; Tangpricha Decl. ¶¶ 60–61.

26

Ms. Reed was ultimately prescribed estradiol at 2 mg/d and spironolactone at 200 mg/d. Tangpricha Decl. ¶ 68.  Her hormone levels have only been monitored *once* in the past *two years*. *Id*. ¶ 69.  Ms. Reed had a blood test in July 2017 that showed a very low estradiol level at 45 pg/ml that is well below the recommended therapeutic range of 100–200 mg/pl, and her testosterone levels were at 400 ng/ml, well above the recommended therapeutic level of 50 ng/ml for patients with gender dysphoria.  *Id.*  Despite both of these results being far out of the range recommended by the Guidelines, there has been no documentation of a change in Ms. Reed's prescriptions, nor any follow up blood tests.  *Id.* ¶ 70.

Ms. Reed has also repeatedly requested, grieved, and been denied gender-affirming surgery.  Reed Decl. ¶ 12.  She has never been evaluated to determine whether surgery is necessary to treat her gender dysphoria, despite being severely dysphoric and meeting the criteria for surgery. *Id*.; Ettner Decl. ¶ 103.

Defendants have also hindered Ms. Reed's ability to treat her gender dysphoria through social transition.  Ms. Reed is not allowed to wear any women's clothing or undergarments except for the bra IDOC provided her after initially denying and delaying the request.  Reed Decl. ¶¶ 5, 6, 13.  Ms. Reed's female identity is consistently disrespected by prisoners and IDOC staff and she is continuously sexually harassed by other prisoners.  *Id.* ¶ 1.  She is also regularly subjected to distressing body searches by male officers.  *Id*.  Ms. Reed feels unsafe and believes she would be better able to live as a woman, without harassment or threats, if IDOC would transfer her to a facility for women.  *Id*.

\*\*\*\*\*\*\*\*\*\*

The named Plaintiffs and proposed Class experience nearly identical treatment and harm as a result of Defendants' failure to provide adequate medical care for gender dysphoria.

Accordingly, they seek the same injunctive relief: reform of the systemic deficiencies in the provision of healthcare to individuals suffering from gender dysphoria.  Differences in the precise details of the named Plaintiff's injuries and those of the proposed class are irrelevant to the determination of typicality.  *Suchanek v. Sturm Foods, Inc.*, 311 F.R.D. 239, 255 (S.D. Ill. 2015).  S*ee also Smentek v. Sheriff of Cook Cty.*, No. 09 C 529, 2010 WL 4791509, at *7 (N.D. Ill. Nov. 18, 2010) ("Although differences in plaintiffs' and the class members' injuries and treatment times are undeniable, this is not fatal to a finding of typicality as typical does not mean identical.") (internal quotations and citation omitted); *Parsons v. Ryan*, 754 F.3d 657, 686 (9th Cir. 2014) ("It does not matter that the named plaintiffs may have in the past suffered varying injuries or that they may currently have different healthcare needs; Rule 23(a)(3) requires only that their claims be 'typical' of the class, not that they be identically positioned to each []other or to every class member."); *Gray v. Cty. of Riverside*, No. EDVC 13-00444-VAP (OPx), 2014 WL 5304915, at *35 (C.D. Cal. Sept. 2, 2014) (finding typicality where the named Plaintiffs' "alleged injury among the class members is that the Defendant's medical and mental health policies result in exposure to a substantial risk of serious harm," noting that "[a]ny differences in the named Plaintiffs' specific medical or mental needs do not defeat typicality").  Because the risk of injury arises from the same system-wide policies and practices, the Plaintiffs' claims are typical of those of the Class.

### D.     Adequacy

As with typicality, because Plaintiffs have demonstrated the commonality and typicality of their claims, Rule 23(a)(4)'s adequacy-of-representation requirement is presumed to be met with respect to Plaintiffs' ability to represent the interests of the Class. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 n.5 (2011) ("Those requirements [of commonality and typicality] therefore also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest.")

28

(quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157–58 n.13 (1982)).   Nevertheless, Plaintiffs meet all aspects of Rule 23(a)(4)'s adequacy requirement.

### 1.   The named plaintiffs have no conflicts with the proposed class.

A class may be certified only if "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4).   In analyzing the ability of the named Plaintiffs to represent the class, courts look to whether the named Plaintiffs have "sufficient interest in the outcome to ensure vigorous advocacy," *Riordan v. Smith Barney*, 113 F.R.D. 60, 64 (N.D. Ill. 1986), as well as any interests "antagonistic to the interests of the class." *Trainor v. Gebke*, No. 3:17-cv-00627-DRH-DGW, 2018 WL 3216045, at *3 (S.D. Ill. Jan. 22, 2018) (citing *Riordan v. Smith Barney*, 113 F.R.D. 60, 64 (N.D. Ill. 1986)).   Here, named Plaintiffs' interests are coextensive with those of the Class.   As transgender people living with gender dysphoria while incarcerated in IDOC facilities, the named Plaintiffs have a genuine concern with the outcome of this class action, and are committed to its vigorous prosecution.   As discussed at length with respect to Rule 23's commonality and typicality requirements, the interests of the named Plaintiffs' and the class directly align.   Plaintiffs' request for relief – that Defendants cease their policies and practices of denying care and implement a constitutionally sound system of healthcare for prisoners with gender dysphoria – benefits all class members.   Nor are there any conflicts, whether actual or apparent, between the named Plaintiffs and the Class.   The named Plaintiffs will therefore adequately and vigorously protect the class interests.

### 2.   Proposed class counsel are qualified, experienced, and able to conduct the proposed litigation.

A court that certifies a class must appoint class counsel. FED. R. CIV. P. 23(g)(1).   Rule 23(a)(4) requires that the named Plaintiffs' counsel be "qualified, experienced, and able to conduct the proposed litigation." *In re Sulfuric Acid Antitrust Litig.*, No. 03 C 4576, 2007 WL 898600, at

*5 (N.D. Ill. Mar. 21, 2007) (citing *Rosario*, 963 F.2d at 1018).  Plaintiffs' counsel at the Roger Baldwin Foundation of ACLU, Inc., Kirkland & Ellis LLP, and Kennedy Hunt P.C. are highly experienced and knowledgeable in litigating class actions and other complex civil litigation, including on behalf of prisoners and transgender individuals.  *See* Ex. 10, Counsel Qualifications and Experience.  Plaintiffs' counsel also have committed and will continue to commit considerable staffing and resources to the case's prosecution.  The requirements of Rule 23(a)(4) are satisfied, and Plaintiffs' counsel should be appointed as class counsel under Rule 23(g)(1).

## III.     PLAINTIFFS SATISFY THE REQUIREMENTS OF RULE 23(B)(2)

In addition to satisfying Rule 23(a), the proposed Class has the defining attributes of a Rule 23(b)(2) class: Defendants have "acted or refused to act on grounds that apply generally to the class such that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole" by failing to provide Plaintiffs and proposed Class members with constitutionally adequate medical treatment for gender dysphoria.  FED. R. CIV. P. 23(b)(2).  Class certification under Rule 23(b)(2) is "particularly appropriate in class actions brought to vindicate civil or constitutional rights," *Love v. City of Chi.*, No. 96 C 396, 1997 WL 120041, at *5 (N.D. Ill. Mar. 11, 1997); *Rodriguez v. Vill. of Montgomery*, No. 08 C 1826,  2009 WL 310893, at *4 (N.D. Ill. Feb. 9, 2009); *Patrykus v. Gomilla*, 121 F.R.D. 357, 362–63 (N.D. Ill. 1988), such as cases challenging conditions in prisons or jails. *See, e.g.*, *Lippert v. Baldwin*, No. 10 C 4603, 2017 WL 1545672 (N.D. Ill. Apr. 28, 2017); *Copeland v. Washington*, 162 F.R.D. 542, 543 (N.D. Ill. 1995); *Imasuen v. Moyer*, No. 91 C 5425, 1992 WL 26705, at *3 (N.D. Ill. Feb. 7, 1992); *Lewis v. Tully*, 96 F.R.D. 370, 378 (N.D. Ill. 1982).

First, Plaintiffs have alleged a host of actions and refusals to act on the part of Defendants, based on grounds generally applicable to the proposed Class, which have deprived Plaintiffs and the proposed Class of their constitutionally mandated right to adequate medical care.  *See* FED. R.

CIV. P. 23(b)(2).  Because the grounds are generally applicable to the class, Rule 23(b)(2) is satisfied, and this would be true "'even if [the action or inaction] has taken effect or is threatened only as to one or a few members of the class.'"  *Massie v. Ill. Dep't of Transp.*, No. 96 C 4830, 1998 WL 312021, at \*5 (N.D. Ill. June 5, 1998) (quoting advisory committee's note to 1966 amendment); *Metro. Area Hous. All. v. U.S. Dep't of Hous. & Urban Dev.*, 69 F.R.D. 633, 638 (N.D. Ill. 1976); *see also DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1201 (10th Cir. 2010) (same).

In particular, Plaintiffs have alleged that Defendants' system-wide policies and practices have permitted the Class to be subjected to: (1) inadequate evaluation and medical treatment by under-qualified staff, (2) unreasonable delays or denials of medically necessary hormone therapy, (3) unsafe and inappropriate dosage and prescriptions of hormones, (4) summary denial of evaluation for gender confirmation surgeries, (5) refusal to provide the clothing and personal care products necessary to live consistently with their gender identity, (6) subjection to humiliating body searches by officers of a different gender, as well as failure to respect transgender prisoners names and pronouns, (7) refusal to provide individualized assessment for transfer to a correctional center that accords with transgender prisoners' gender identity.

Second, Defendants failure to provide adequate medical care applies "generally to the class, so that final injunctive relief . . . is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2).  Under Rule 23(b)(2), certification is appropriate because "'a single injunction or declaratory judgment would provide relief to each member of the class.'" *Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chi.*, 797 F.3d 426, 441–43 (7th Cir. 2015) (reversing denial of Rule 23(b)(2) certification where plaintiffs sought the same injunctive and declaratory relief for all) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 355–56 (2011)); *see McReynolds v.*

31

*Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 487–90 (7th Cir. 2012) (affirming class certification under Rule 23(b)(2) where plaintiffs requested only injunctive relief when challenging company-wide policies common to all class members); s*ee* FED. R. CIV. P. 23(b)(2).

Here, Plaintiffs assert that Defendants' failure to provide adequate medical treatment for gender dysphoria has caused severe mental and physical anguish, and seek to reform Defendants' system-wide policies and practices that are common to all proposed Class members.  Accordingly, Plaintiffs have prayed for injunctive relief to address these systemic failures, including, but not limited to, (i) ceasing the policy and practice whereby medical decisions regarding gender dysphoria are second-guessed and treatment is denied and delayed by the Transgender Committee, a committee of non-experts and laypeople; (ii) ceasing the policy and practice whereby hormone therapy is denied and delayed for reasons that are not recognized as contraindications to treatment; (iii) ceasing the policy and practice whereby IDOC does not evaluate and consider surgery as a treatment option for gender dysphoria; (iv) ceasing the policy and practice of depriving gender dysphoric prisoners of medically-necessary social transition, including by mechanically assigning housing based on genitalia.  This relief would apply to and benefit all members of the proposed Class.  As such, class certification is appropriate under Rule 23(b)(2).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully move this Court to certify a class of "all prisoners in the custody of IDOC who have requested from IDOC evaluation of treatment for gender dysphoria," and to designate the Roger Baldwin Foundation of ACLU of Illinois, Inc., Kirkland & Ellis LLP, and Kennedy Hunt P.C. attorneys as Class counsel.

Dated: May 2, 2019                          Respectfully submitted,

                                            By: /s/ *Jordan M. Heinz* _____
                                            John A. Knight
                                            Ghirlandi Guidetti
                                            Carolyn M. Wald
                                            ROGER BALDWIN FOUNDATION OF ACLU, INC.
                                            150 North Michigan Avenue, Suite 600
                                            Chicago, Illinois 60601
                                            Telephone: (312) 201-9740
                                            Facsimile: (312) 201-9760
                                            *jknight@ACLU-il.org*
                                            *gguidetti@ACLU-il.org*
                                            *cwald@aclu-il.org*

                                            Catherine L. Fitzpatrick
                                            Jordan M. Heinz
                                            Erica B. Zolner
                                            Megan M. New
                                            Scott Lerner
                                            KIRKLAND & ELLIS LLP
                                            300 North LaSalle Street
                                            Chicago, Illinois 60654
                                            Telephone: (312) 862-2000
                                            Facsimile: (312) 862-2200
                                            *catherine.fitzpatrick@kirkland.com*
                                            *jordan.heinz@kirkland.com*
                                            *erica.zolner@kirkland.com*
                                            *megan.new@kirkland.com*
                                            *scott.lerner@kirkland.com*

                                            Thomas E. Kennedy III
                                            Sarah Jane Hunt
                                            KENNEDY HUNT P.C.
                                            906 Olive Street, Ste. 200
                                            Saint Louis, MO 63101
                                            Telephone: (314) 872-9041
                                            *tkennedy@KennedyHuntLaw.com*
                                            *sarahjane@KennedyHuntLaw.com*

                                            *Attorneys for Plaintiffs*

33

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 2, 2019, I electronically filed the foregoing document and any attachments with the Clerk of this Court by using the CM/ECF system, which will accomplish service through the Notice of Electronic Filing for parties and attorneys who are Filing Users.


/s/ *Jordan M. Heinz*
Jordan M. Heinz