**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**
**EAST ST. LOUIS DIVISION**

| | | |
|---|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, | ) | |
| LYDIA HELENA VISION, | ) | |
| SORA KUYKENDALL, and SASHA REED, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| - vs- | ) | No. 18-156-NJR-MAB |
| | ) | |
| JOHN BALDWIN, MELVIN HINTON, | ) | |
| and STEVE MEEKS, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION
## FOR A PRELIMINARY INJUNCTION

The Defendants, ROB JEFFREYS,[1] MELVIN HINTON, and STEVE MEEKS, by and through their attorney, Kwame Raoul, Attorney General for the State of Illinois, provide the following response in opposition to Plaintiffs' motion for a preliminary injunction [d/e 123]:

### Introduction

The five Plaintiffs[2] in this suit are inmates in the custody of the Illinois Department of Corrections.   On January 31, 2018, they filed this suit as a putative class action against Defendants in their official capacities only, and are seeking equitable relief.   [d/e 1].

On May 2, 2019, Plaintiffs filed a motion and memorandum seeking a preliminary injunction [d/e 123] and a motion and memorandum seeking class certification [d/e 124]. Defendants are now responding to Plaintiff's motion for preliminary injunction.   [d/e 123].

---

[1]  Plaintiffs sued John Baldwin in his official capacity as Acting Director of the Illinois Department of Corrections. In June 2019, Baldwin was replaced by Rob Jeffreys, who is the current Acting Director of IDOC.   Pursuant to Federal Rule of Civil Procedure 25(d), Rob Jeffreys is automatically substituted as a party to this action.

[2]  Plaintiffs acknowledge in their brief that Ebony Stamps is no longer in IDOC custody and is no longer a remaining Plaintiff.   [d/e 123, p. 28, n. 6].

As listed in their motion, Plaintiffs are requesting the following preliminary injunctive relief:

a) For IDOC to cease using the Transgender Committee—a multidisciplinary body—to make decisions regarding transgender inmates' requests;

b) To cease a purported policy and practice of denying and delaying hormone therapy for unrecognized treatment reasons;

c) To cease a purported policy and practice of refusing to evaluate and provide surgery to treat gender dysphoria;

d) To cease a purported policy and practice of depriving gender dysphoric prisoners of "medically-necessary social transition";

e) "[A]ccess to clinicians who meet the competency requirements stated in the [WPATH] Standards of Care to treat gender dysphoria";

f) Evaluation for gender dysphoria upon request or clinical indications of the condition;

g) "[T]imely medically-prescribed treatment for gender dysphoria, including, but not limited to, hormone therapy and monitoring, and gender affirming surgery";

h) Medically necessary social transition; and

i) Training for IDOC staff on the importance of social transition, including preferred names and pronouns.

[d/e 123, pp. 33-34].   These requests are incredibly broad and unnecessary.   In their motion, Plaintiffs argue that IDOC's Transgender Committee "controls" all treatment decisions for individuals with gender dysphoria—but that is simply not the case.   In their motion, Plaintiffs also imply that IDOC policy fails to provide for personal items or treatment necessary for gender dysphoria; however, the IDOC policy allows for review on a case-by-case basis so that individualized assessments may be made.   In short, there are no policies to be enjoined here.

As set forth below, Plaintiffs are not entitled to the injunctive relief they seek.   Plaintiffs cannot establish that a preliminary injunction is warranted in this case.   The Plaintiffs fail to

meet either the threshold test or the balancing test necessary to support a motion for preliminary injunction.   Furthermore, Plaintiffs' sweeping requests are barred by both the Eleventh Amendment and the Prison Litigation Reform Act, 18 U.S.C. § 3626.

## Statement of Facts

The Illinois Department of Corrections (IDOC) is an agency of the State of Illinois. IDOC has an internal policy concerning the general review and treatment of transgender inmates in its custody:   Administrative Directive 04.03.104.   (Attached as Exhibit 1).   The policy currently in place was effective on May 1, 2013.   (Ex. 1).   The policy is presently under revision. (*See* current "Key Draft" attached as Exhibit 2).   When enacted, the Key Draft attached as Exhibit 2 will supersede the directive attached as Exhibit 1.   Yet, the IDOC mental health standard operating procedure follows the newly drafted, but not yet implemented, policy.   (Dep. of Dr. Reister, attached in entirety as Exhibit 3,[3] at p. 11).   In revising the mental health section, Dr. Reister attempted to align it with the standards of the World Professional Association of Transgender Health (WPATH).   (Ex. 3, at p. 11).   In addition to WPATH standards of care, IDOC providers also provide the general medical and mental health standards.   It is IDOC's intent to follow all applicable, current standards in providing care for transgender individuals. (Ex. 3, at p. 80).   The mental health standards applied are to ensure appropriate care, sensitivity, and cultural awareness.   (Ex. 3, at p. 79).

IDOC has a Transgender Care Review Committee (called "Transgender Committee" or "TCRC").   The TCRC is a multidisciplinary team in place to review placements, security concerns, and overall health-related treatment plans of transgender offenders or those diagnosed

---

[3] Doctors Reister and Puga were put forth as IDOC representatives pursuant to Federal Rule of Civil Procedure 30(b)(6) on various topics.   Plaintiffs filed portions of both deposition transcripts with their motion for preliminary injunction; however, Plaintiffs did not file the transcripts in their entirety.

with gender dysphoria, and to oversee the gender-related accommodations for those offenders. (Ex. 1, p. 3, G.; Ex. 3, at p. 35).   The current TCRC chairperson is Dr. William F. Puga.   (Dep. of Dr. Puga, attached as Exhibit 4, at p. 14).   Dr. Puga has held the chairperson role since July or August 2018.   (Ex. 4, at p. 15).   The Transgender Committee is familiar with WPATH standards.   (Ex. 3, at p. 35).   Dr. Puga is not a WPATH member, but plans to attend a WPATH conference in September 2019.   (Ex. 4, at p. 36).   The Transgender Committee does not ignore input from nonvoting members—everyone involved in the Committee presentation is able to give input.   (Ex. 4, at p. 44).   There has generally been consensus among the Committee members; but, not every member has an equal vote.   (Ex. 4, at p. 125).   Clinical decisions are not going to be made by people without clinical background.   (Ex. 4, at p. 125).

In addition, there are monthly transgender care case teleconference meetings.   (Ex. 3, at p. 32).   Those meetings discuss site treatment plans, security plans, and any other issues that are raised for discussion.   (Ex. 3, at p. 32).   The facility mental health providers interview inmates and discuss complaints or grievances in preparation for discussion with the Committee.   (Ex. 3, at p. 67).

Dr. Reister is the IDOC Southern Regional Psychologist Administrator.   (Ex. 3, at p. 19). Dr. Reister is a WPATH member and has been for approximately five years, though he has not completed the WPATH certification.   (Ex. 3, at p. 18).   Dr. Reister is involved in the mental health staff training for transgender mental health care and the sensitivity training for all staff. (Ex. 3, at p. 22).   The sensitivity training discusses the difference between sexual assignment at birth, gender identity, gender expression, and sexual orientation.   (Ex. 3, at p. 23).   The sensitivity training also discusses how to interpersonally communicate with transgender people, such as avoiding misgendering, what misgendering is, etc.   (Ex. 3, at p. 23).   In addition, the

training discusses the Prison Rape Elimination Act and how the transgender community may be disproportionately affected by sexual assault.   (Ex. 3, at p. 23).   The sensitivity training not only discusses gender dysphoria, but how to be mindful of interactions with individuals at various levels of care.   (Ex. 3, at p. 24).

The Committee is familiar with the importance of using pronouns consistent with a patient's gender identity.   (Ex. 4, at p. 66).   The Committee expects facilities to use pronouns consistent with a patient's gender identity.   (Ex. 4, at pp. 66-67).   When someone speaking to the Committee has used the wrong pronoun, they have been corrected and the Committee reiterates the importance of using the pronoun requested by the patient.   (Ex. 4, at p. 68). The TCRC reviews requests by inmates to go by chosen names and encourages facilities to use the names chosen by the individual to be consistent with their gender identity.   (Ex. 4, at p. 68). Though, under Illinois law, felons are not allowed to legally change their names unless they meet certain criteria.   735 ILCS 5/21-101(b).

Inmate searches are not specifically addressed by the TCRC.   The default is that the search is done by the gender that would normally do it, given the circumstance of the facility. (Ex. 3, at p. 131).   Such issues are addressed from a site level.   (Ex. 3, at p. 131).   They are controlled by the Prison Rape Elimination Act (PREA). (Ex. 3, at p. 131).   PREA contains standards for searches performed in adult prisons and jails.   28 C.F.R. § 115.15.   PREA mandates training and education for employees, volunteers, contractors, and inmates.   28 C.F.R. §§ 115.31 - 115.35.   It also contains audit requirements and disciplinary sanctions to enforce compliance with the standards.   28 C.F.R. §§ 115.76 – 115.78 & 115.93.

Treatment plans for gender dysphoric inmates are supposed to continue from one facility to the next.   (Ex. 4, at p. 71; Ex. 3, at p. 38).   The TCRC also reviews clothing requests related

to gender identity.   (Ex. 4, at p. 74).   Not all such requests come to the Committee—Wardens

have been able to make the decision regarding bras for male inmates who identify as female

since December 2018 or January 2019—but some requests are still presented to the TCRC.   (Ex.

4, at pp. 74-77).   The Committee considers requests for permanent hair removal; however, the

Committee has not yet approved permanent hair removal and it is currently not available within

IDOC.   (Ex. 4, at p. 122).

As for hormone therapy, decisions regarding the type or dosage of hormone therapy are

not necessarily referred to the Committee.   (Ex. 4, at pp. 79, 95).   There is no policy concerning

the type or dosage of hormone therapy.   (Ex. 1, Ex. 2).   Those decisions are largely left to the

professional judgment of the treating medical doctor, though the Committee may be consulted if

the physician has questions.   (Ex. 4, at p. 79).   The Committee must be consulted before the

initiation of hormone therapy, for questions of social transition, and requests for surgical

treatment.   (Ex. 4, at p. 81).   The review process is in place to help ensure access to care and the

quality of care across the state.   (Ex. 3, at pp. 52-53).   The Committee is not supposed to be a

gatekeeper to stop access to hormones, but to help facilitate treatment for gender dysphoria.

(Ex. 3, at p. 55). The standard at all receiving centers is that hormone therapy continues.   (Ex. 3,

at p. 105).   There is no rule that inmates attend therapy to obtain hormone treatment.   (Ex. 3, at

p. 135).   There is no hard rule as to who is denied hormone therapy.   (Ex. 3, at pp. 94-95).   As

Dr. Reister, put forth as an IDOC 30(b)(6) representative, testified:

> Q:   So if someone is deeply depressed, then you would not start
> them on hormone therapy.
>
> A:   It depends.   We have some people who are deeply depressed
> directly related to the gender dysphoria, and we—we have started
> hormones even though they were still symptomatic.   But if
> somebody was on a crisis watch recently, we might want them to
> stabilize a little bit longer before we initiate hormones.

> Q:   Are—isn't it true that someone with untreated gender dysphoria could be on crisis watch?
>
> A:   And that's why it's a case-by-case basis.   That's why we do it by committee and we don't just set rules out there.   Because then we would discuss in the committee what the nature of the crisis watch was.

(Ex. 3, at pp. 94-95).

  At this point, surgical treatment has not been approved by the IDOC Committee. (Ex. 4, at p. 99).   Such determinations are made on an individual basis.   (Ex. 4, at p. 100).

## Argument

A preliminary injunction is a way to maintain the *status quo* until merits issues may be resolved at trial.   *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 783 (7th Cir. 2011). "[A] preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it."   *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of Am., Inc.*, 549 F.3d 1079, 1085 (7th Cir. 2008).   Mandatory injunctions— which require an affirmative act by a party—are "cautiously viewed and sparingly issued." *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997), *quoting Jordan v. Wolke*, 593 F.2d 773, 774 (7th Cir. 1978) and *citing W.A. Mack, Inc. v. Gen. Motors Corp.*, 260 F.2d 886, 890 (7th Cir. 1958) ("mandatory injunctions are rarely issued and interlocutory mandatory injunctions are even more rarely issued, and neither except upon the clearest equitable grounds").

### I.   Plaintiffs cannot establish that a preliminary injunction is warranted here.

Injunctions may only be granted when specific criteria are clearly met by the movant and based on substantial proof.   *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).   To determine whether a preliminary injunction is warranted, the court must analyze the case in two stages: a threshold stage and a balancing stage.   *Girl Scouts of Manitou Counsel*, 549 F.3d at 1086. Before consideration of the balancing stage, the party seeking the preliminary injunction must

satisfy the three requirements of the threshold stage: (1) that the party will suffer irreparable harm prior to final resolution of its claims; (2) that traditional legal remedies would be inadequate; and (3) that the party's claim has some likelihood of succeeding on the merits.   *Id*. If the moving party fails to demonstrate any one of the three threshold requirements, the court must deny the injunction.   *Id*.   If, on the other hand, the moving party meets the initial threshold phase, then the court analyzes the balance of harms.   *Id*.   Here, Plaintiffs cannot meet their burden. They fail to establish that they will suffer irreparable harm, that traditional legal remedies would be inadequate, and that they have likelihood of succeeding on the merits of their claims.   Even though they fail to meet the threshold phase, the balance of the harms also weighs in favor of the Defendants.

### A.  Plaintiffs fail to show that they face an existing threat sufficient to disturb the *status quo*.

A party seeking preliminary injunctive relief is required to demonstrate that he or she will suffer irreparable harm without an injunction in place prior to resolution of their claims.  *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1086.   This requires a showing that harm is likely as opposed to a mere remote possibility.   *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

For a finding of irreparable harm, a party is not required to show that an alleged harm is occurring or certain to occur; however a "presently existing actual threat must be shown." *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d at 789, *quoting* 11A Charles Alan Wright, et al., Federal Practice and Procedure, § 2948.1, at 154-55 (2d ed. 1995).   The Supreme Court has held that an inmate-plaintiff must come forward with evidence to show that prison official-defendants were "knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so . . . during the remainder of the litigation and into the

future." *Farmer v. Brennan*, 511 U.S. 825, 846-47 (1994).   A court may only grant appropriate injunctive relief if it finds the requesting party satisfied the required objective and subjective elements of deliberate indifference necessary for an Eighth Amendment violation.   *Id.* at 846-47.

The Eighth Amendment standard above is not to be confused with a request for the community standard of care.   Prisoners are not entitled to demand specific care or even the best possible care, rather they are entitled only to "adequate medical care."   *See, e.g., Arnett v. Webster*, 658 F.3d 742, 758 (Prisoner not entitled to best or most appropriate treatment, but entitled only to measures sufficient to meet a substantial risk of serious harm); *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006) (Prisoner entitled to adequate medical care—medical malpractice, negligence, nor gross negligence equate to deliberate indifference); *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997) (The Eighth Amendment does not provide prisoners with specific medical treatment).   Plaintiffs claim that IDOC policies are violating their rights; however, the IDOC policies are not presenting any threat to the Plaintiffs' care.   The policies require individualized determinations.   Plaintiffs fail to show a presently existing actual threat in this matter.   Accordingly, they do not meet their burden with respect to that element.

**B.  Plaintiffs cannot show that traditional legal remedies would be inadequate here.**

Only if a party will suffer irreparable harm in the interim—that is, harm that cannot be prevented or fully rectified by the final judgment after trial—can he or she get a preliminary injunction. In saying that the plaintiff must show that an award of damages at the end of trial will be inadequate, the standard is not whether damages are wholly ineffectual; rather, it requires a showing that damages are seriously deficient as a remedy for the harm suffered. *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984).

As Plaintiffs point out in their motion, they are not seeking money damages in this action;

however, such a tactical decision does not rule out the potential that traditional legal remedies would be adequate here.   The standard is not whether they have *requested* damages, but whether damages could be calculated and recoverable at the conclusion of the action.   *Roland Mach. Co.*, 749 F.2d at 386.   As for these named Plaintiffs, legal remedies may be all that they could recover for some of their claims.   For instance, these Plaintiffs seek injunctive relief to control the initial prescription of hormone therapy; yet, these Plaintiffs have all received hormone therapy.   Accordingly, any relief they could receive with respect to the receipt of hormone therapy would be limited only to monetary damages.   The same holds true with respect to requests for transfer to a female prison for female-identifying Plaintiffs—Plaintiff Monroe has already been transferred to a female facility—therefore, she cannot seek injunctive relief compelling her transfer to a female facility.   Plaintiffs put very little analysis in this section, but it is incumbent upon them to show that damages are seriously deficient to address any alleged harm.

### C.  Plaintiffs cannot show a better than negligible chance of prevailing.

For the third element in the threshold stage, a court is required to assess whether the moving party has some likelihood of succeeding on the merits.   *Girl Scouts of Manitou Counsel*, 549 F.3d at 1086.   This is an early measurement of the quality of the underlying lawsuit. *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d at 787-788.   A plaintiff need only show a better than negligible chance of prevailing as part of the discussion of probability of success. *D.U. v. Rhoades*, 825 F.3d 331, 338 (7th Cir. 2016).   This burden is low.   *Id.*     Yet, the Plaintiffs here cannot show that they have likelihood of success on the merits of their claims. For instance, Plaintiffs complain of delays in receiving hormone therapy.   The Seventh Circuit Court of Appeals recently analyzed a complaint about the length of time to receive hormone therapy while incarcerated.   In *Mitchell v. Kallas*, a transgender prisoner who had identified as a

woman her entire life filed suit against officials in the Wisconsin Department of Corrections.
895 F.3d 492 (7th Cir. 2018).   Mitchell claimed that it took over a year for her to receive
hormone therapy and other treatments that she needed to express her gender identity.   *Id*. at 495.
The Seventh Circuit found that the district court had prematurely dismissed some claims, but
affirmed the dismissal of her claim alleging a 13-month delay for evaluation for hormone
therapy.   *Id*. at 496.   There, the court was critical of the claimed delay, but noted:   "It is true
that delays in care for 'non-life-threatening but painful conditions may constitute deliberate
indifference if the delay exacerbated the injury or unnecessarily prolonged in inmate's pain.' . . .
Yet prisons have limited resources, and that fact makes some delay inevitable."   *Id*. at 500.
There, the court was required to weigh the seriousness of the condition with the ease of
providing treatment.   *Id*.   Although the serious nature of gender dysphoria was not disputed,
there was little evidence of the ease of hormone evaluations.   *Id*.   Further, the Seventh Circuit
cited to other courts, which had determined that delays over a year did not amount to deliberate
indifference.   *Id*., *citing Rowe v. Corr. Med. Svcs, Inc.*, 08-cv-827, 2010 WL 3779561 at *7
(W.D. Mich. Aug. 10, 2010) (15-month delay of hormone therapy in prison setting could not be
considered deliberate indifference) & *Arnold v. Wilson*, 13-cv-900, 2014 WL 7345755 (E.D.
Virginia Dec. 23, 2014) (nearly two-year delay in prescribing prisoner with hormones was not
deliberate indifference).   In dicta, the court discussed that denial of hormone therapy based on a
blanket rule, rather than an individualized medical determination, could constitute deliberate
indifference.   *Id*. at 501.   Yet, as addressed above, there is no blanket rule concerning hormone
therapy in IDOC.   The type or dosage is left to the professional judgment of the treating doctor.
The TCRC is not a gatekeeper to stop access to hormones but to help facilitate treatment and

continuation of care.   Allowing for continuity of care and individualized treatment is not constitutionally deficient.

As for surgery, there is little law that supports Plaintiffs' contention that sex reassignment surgery is constitutionally mandated.   Just this year, the Fifth Circuit Court of Appeals held: "A state does not inflict cruel and unusual punishment by declining to provide sex reassignment surgery to a transgender inmate."   *Gibson v. Collier*, 920 F.3d 212 (5th Cir. Mar. 29, 2019), *citing Kolisek v. Spencer*, 774 F.3d 63 (1st Cir. 2014) (en banc). The policies at issue in both *Gibson* (Texas) and *Kosilek* (Massachusetts) did not allow sex reassignment surgery.

In *Gibson*, the court discussed the WPATH Standards of Care.   The Fifth District wrote: "As the First Circuit has concluded, however, the WPATH Standards of Care reflect not consensus, but merely one side in a sharply contested medical debate over sex reassignment surgery."   920 F.3d at 221.   It found that there was no evidence that the WPATH-suggested treatment of sex reassignment surgery was so universally accepted, that to provide some but not all of the treatments recommended by WPATH amounted to deliberate indifference.   *Id.* at 220.

With surgery—as with the other relief sought by Plaintiffs—the IDOC policy allows for individualized assessment.   Because the policies here are less restrictive than those analyzed at the federal appellate level,[4]  Plaintiffs cannot establish that they have a better than negligible chance of prevailing in this action.

**D.  The balance of the harms favors Defendants.**

The second phase of the preliminary injunction analysis—the balancing phase—requires a court to attempt to minimize the cost of potential error by balancing "the nature and degree of the plaintiff's injury, the likelihood of prevailing at trial, the possible injury to the defendant if

---

[4]  The Seventh Circuit Court of Appeals has not addressed such a claim.

the injunction is granted, and the wild card that is the public interest." *Girl Scouts of Manitou Council*, 549 F.3d at 1086 (internal citation and quotation omitted).

### i.  Public interest favors denying Plaintiffs' request for injunctive relief.

Plaintiffs argue that public interest favors granting their requested relief because the public has an interest in seeing that inmates receive proper medical care.   That is correct, but it is not the only interest the public has in these matters.   Section 1983 allows for equitable relief as well as damages, but a party seeking to enjoin the activity of a government agency "must contend with the well-established rule that the Government has traditionally been granted the widest latitude in the dispatch of its own internal affairs." *Rizzo v. Goode*, 423 U.S. 362, 378-79 (1976) (internal quotations omitted).   Prison administrators have been charged with maintaining the security of their facilities and providing for the safety of all the inmates in the Department. Maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of prisoners. *Bell v. Wolfish*, 99 S.Ct. 1861, 1878 (1979).   Prison officials must be free to take appropriate action to ensure the safety of inmates and correctional personnel. *Id.*   The problems that arise in the day-to-day operation of a corrections facility are not susceptible to easy solutions and prison administrators should be given wide-ranging deference in the adoption and execution of policies that are in their judgment needed to preserve internal order and discipline and to maintain institutional security. *Id*.

The injunctive relief sought by the Plaintiffs would remove the Transgender Committee from the process of determining proper care and placement.   The Department has to make these decisions taking into account the totality of each patient's circumstances, including other mental health or medical issues, as well as the needs of the Department and its other inmates.   The

Committee has members who specialize in medicine, mental health, security and assigning inmates to specific prisons.   Only by incorporating all of those concerns can the Department ensure its final decisions accommodate the needs of all parties.   Logan Correctional Center, the Department's primary female facility, has over 1,500 inmates.   The Defendants are equally responsible for the safety of those inmates as for any of the Plaintiffs in this action.   The Department has not refused to transfer all transgender inmates to Logan, but reviews transfer requests in a deliberative manner.   Any relief that impairs the Department's ability to consider the needs of all its inmates runs counter to the public's interest in letting the penological experts run their facilities as they determine is best.   It is contrary to the public interest for prisoners to by-pass prison policies and procedures to dictate the conditions and terms of their confinement. *Aguado v. Godinez*, No. 13-cv-3378, d/e 76 (C.D. Ill. June 26, 2015).   Similarly, allowing the Plaintiffs to dictate what medical treatment they receive is contrary to public interest.   *See Siler v. Green*, No. 08-15077, 2009 WL 1393411 at *3 (E.D. Mich. May 18, 2009) ("The public would not be served by the Court ordering what might be unnecessary medical treatment or referrals.")   Plaintiffs seek sweeping changes to the more measured approach, which is based on treatment on an individualized basis.   Instead of allowing IDOC's medical, mental health, and security experts to weigh in, Plaintiffs seek to dictate all aspects of their care regardless of what is best for each individual patient-prisoner.   The public interest does not favor such an approach.

## II.  Plaintiffs' requested relief is barred by sovereign immunity and the Prison Litigation Reform Act

Sovereign immunity bars federal courts from entering injunctive relief against state actors where there is no ongoing violation of federal law.   *Green v. Mansour*, 106 S.Ct. 423, 427 (1985).   This is true even where there may have been a violation of federal law at the time a case was filed.   *Toney v. Burris*, 829 F.2d 622, 626 (7th Cir. 1987) (finding that the Eleventh

Amendment would bar injunctive relief if the Illinois Comptroller implemented new rules that comport with due process during the pendency of a claim). "When there is no continuing violation of federal law, injunctive relief is not part of a federal court's remedial powers." *Kress v. CCA of Tennessee, LLC*, 694 F.3d 890, 894 (7th Cir. 2012), quoting *Al-Alamin v. Gramley*, 926 F.2d 680, 685 (7th Cir. 1991).

Even where a court finds an ongoing violation of federal law, the ability to enter injunctive relief is strictly limited.   The Prison Litigation Reform Act provides that:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C.A. 3626(a)(1)(A).   The PLRA further provides:

> Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm.   The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief…   Preliminary injunctive relief shall automatically expire on the date that is 90 days after its entry, unless the court makes the findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period.

18 U.S.C.A. 3626(a)(2).

Plaintiffs seek a range of injunctive relief.   Much of that relief is directed to claims where there is no ongoing violation of the federal rights of the five Plaintiffs.   The requested relief also extends beyond what is necessary to correct the alleged violations of federal law.

**Transgender Committee**

The Plaintiffs seek to compel the Defendants to cease allowing the Transgender Committee to make medical decisions regarding gender dysphoria that result in denials and delays of treatment.   However, Plaintiffs make no showing that the use of the Transgender Committee itself is a violation of federal law. Despite the Plaintiffs' description of the Committee as "non-experts and laypeople," the members include a medical doctor, a psychiatrist and a psychologist.   Additionally, Dr. Reister, a member of WPATH, despite not being a member of the Committee, regularly participates in its proceedings. The Committee and Dr. Reister, while admittedly not the foremost experts in the field of transgender care, do have broader experience with the concerns of transgender inmates than any other medical professional employed by the Department.   They have the opportunity to review the treatment of transgender inmates from across the Department, as opposed to individual treaters who work at one or a few facilities.   A medical professional's failure to follow instructions from a specialist can lead to the inference of deliberate indifference.   *Zaya v. Sood*, 836 F.3d 800, 806 (7th Cir. 2016). Here, the Department and its medical staff seek and follow the advice of the more experienced Committee.   That is the opposite of deliberate indifference.

The Plaintiffs challenge some of the specific medical decisions made by the Committee, but a disagreement among medical professionals as to the appropriate treatment is not grounds for a finding of deliberate indifference.   *Estate of Cole v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996), *citing Estelle v. Gamble*, 429 U.S. 97, 107 (1976) & *White v. Napoleon*, 897 F.2d 103, 109-10 (3rd Cir. 1990).   Even if those decisions amounted to malpractice, the Defendants would not be deliberately indifferent. *Estelle*, 429 U.S. at 106.   Even if true, Plaintiffs' allegations regarding the role of the Transgender Committee would, at most, present only a claim for

malpractice, not a violation of the Eighth Amendment's prohibition of cruel and unusual punishment.   Sovereign immunity bars injunctive relief to address issues of malpractice. The PLRA does not allow prospective relief, including the preliminary injunction sought by Plaintiffs, beyond what is required to correct the violation of a federal right.   Plaintiffs' attempt to bar the operation of the Transgender Committee is beyond the scope of relief allowed by the PLRA.

### Hormone Therapy

The Plaintiffs seek to compel the Defendants to cease delaying and denying the provision of hormone therapy to transgender inmates.   However, in their motion for preliminary injunctive relief, the Plaintiffs admit that each of them is receiving hormone therapy.   *See* Motion and Memorandum in Support of a Preliminary Injunction, d/e 123, pp. 15-16 and Kuykendall Decl. at d/e 123-6, ¶ 5.   No injunctive relief is available in the absence of an ongoing violation of federal law.   Even if there was an unconstitutional delay in providing hormone therapy to the Plaintiffs, they would be entitled to pursue damages, not injunctive relief.   None of the Plaintiffs could benefit from an order compelling faster provision of hormone therapy as they are already receiving it.

### Surgery

According to IDOC TCRC members, no transgender inmate has yet been approved for sex reassignment surgery while in IDOC custody.   Yet, the criteria applied in IDOC is evaluated on an individual basis.   There is no blanket ban that is either unconstitutional or that otherwise requires this Court's intervention.   In the *Gibson* opinion—from just a few months ago—the Fifth Circuit Court of Appeals wrote in no uncertain terms—"But the unmistakable conclusion that emerges from the testimony is this:   There is no medical consensus that sex reassignment

surgery is a necessary or even effective treatment for gender dysphoria."   920 F.3d at 222-23. Accordingly, the mere fact that no sex reassignment surgery has been approved by IDOC thus far is no basis for the issuance of an injunction requiring surgery as treatment for gender dysphoria.

**Social Transition**

The Plaintiffs seek to compel the Defendants to allow social transition for transgender inmates in the form of consideration for placement at female facilities, avoidance of cross-gender searches, and gender-affirming clothing and grooming supplies.   The first of these is moot, as Plaintiffs admit one of them and another transgender inmate have been assigned to Logan Correctional Center, a female facility. The Department of Corrections is considering transgender inmates for placement at female facilities, but it requires a case-by-case evaluation.   Thus, there is no further relief available in that regard.

As discussed above, IDOC's current policy follows the PREA guidelines.   There is no ongoing violation of federal law related to searches that warrants this Court's intervention.

The Plaintiffs have also admitted that each of them has been provided with bras.   *See* Kuykendall Decl. at d/e 123-6, p. 2, ¶ 7; Reed Decl. at d/e 123-7, p. 4, ¶ 13; Melendez Decl. at d/e 123-4, p. 3, ¶ 6; Vision Decl. at d/e 123-5, ¶ 16; and Monroe Decl. at d/e 123-3, p. 3, ¶ 8. Although each of the Plaintiffs would like additional items, there is not a blanket policy against transgender inmates having female personal items.   Individual determinations are made as to what property is appropriate. Any injunctive relief would have to go further than the existing policy, requiring unlimited access to female items.   There is no requirement under federal law that medical professional or security staff abandon their discretion and allow all such items.

**Clinicians**

The Plaintiffs seek to compel access to clinicians who meet the competency requirements stated in the Standards of Care to treat gender dysphoria.   However, while failure to adhere to standards of care could be considered medical malpractice, it is not deliberate indifference or a violation of federal law.   *Estelle*, 429 U.S. at 106.   No injunctive relief is available to address alleged malpractice.

**Evaluation**

The Plaintiffs seek to compel the Defendants to evaluate them for gender dysphoria. However, four of the Plaintiffs admit they have been diagnosed and are receiving treatment.   *See* Kuykendall Decl. at d/e 123-6, p. 2, ¶ 4; Melendez Decl. at d/e 123-4, p. 2, ¶ 4; Vision Decl. at d/e 123-5, pp. 1-2. ¶ 3; and Monroe Decl. at d/e 123-3, pp. 1-2, ¶ 2.   The fifth Plaintiff does not explicitly state she has been diagnosed with gender dysphoria, but admits she has been receiving hormone treatments.   *See* Reed Decl. at d/e 123-7, p. 2, ¶ 3.   That therapy would only be provided if Reed has been diagnosed with gender dysphoria.   As each of the Plaintiffs has already received the requested evaluation, there is no further action to compel.

**Training**

The Plaintiffs seek to compel the Defendants to train IDOC staff on the importance of social transition, including using proper names and pronouns for transgender inmates.   As discussed above, Dr. Reister has already developed such training and has begun the process of providing that training to staff.   This is another moot issue, as the training is in progress and there is nothing left to enjoin.

**Conclusion**

In conclusion, there is no basis for the preliminary injunction that Plaintiffs seek.

Plaintiffs cannot meet their burden as to the necessity of an injunction against these Defendants,

in their official capacities as officials of IDOC.   Further, the balance of harms weighs in favor of

the Defendants, as Plaintiffs' broad requests are contrary to public policy.   Moreover, such

requests are barred by the Eleventh Amendment's sovereign immunity and the Prison Litigation

Reform Act.

WHEREFORE, Defendants respectfully request that this Court deny Plaintiffs' motion

for preliminary injunction.


Respectfully submitted,

ROB JEFFREYS, MELVIN HINTON, and
STEVE MEEKS,

Defendants,

Christopher Higgerson, #6256085
Lisa A. Cook, #6298233                KWAME RAOUL, Attorney General
Assistant Attorney General           State of Illinois
500 South Second Street
Springfield, Illinois   62701             Attorney for Defendants,
(217) 557-0261 Phone
(217) 524-5091 Fax                   By:   s/Lisa A. Cook
Email: lcook@atg.state.il.us              Lisa A. Cook

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**
**EAST ST. LOUIS DIVISION**

| | | |
|---|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, | ) | |
| EBONY STAMPS, LYDIA HELENA VISION, | ) | |
| SORA KUYKENDALL, and SASHA REED, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| - vs- | ) | No. 18-156-NJR-MAB |
| | ) | |
| JOHN BALDWIN, MELVIN HINTON, | ) | |
| and STEVE MEEKS, | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on June 13, 2019, the foregoing document, **Defendants' Response to Plaintiffs' Motion for a Preliminary Injunction**, was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

| | |
|---|---|
| John A. Knight | jknight@aclu.il.org |
| Catherine L. Fitzpatrick | cfitzpatrick@kirkland.com |
| Erica B. Zolner | ezolner@kirkland.com |
| Ghirlandi Guidetti | gguidetti@aclu.il.org |
| Megan M. New | mnew@kirkland.com |
| Sydney L. Schneider | Sydney.schneider@kirkland.com |
| Jordan M. Heinz | jheinz@kirkland.com |
| Cameron N. Custard | cameron.custard@kirkland.com |
| Sarah Jane Hunt | sarahjane@tkennedylaw.com |
| Thomas E. Kennedy, III | tkennedy@tkennedylaw.com |
| Brent P. Ray | brent.ray@kirkland.com |
| Samantha G. Rose | sam.rose@kirkland.com |
| Austin B. Stephenson | austin.stephenson@kirkland.com |
| Carolyn M. Wald | cwald@aclu-il.org |

s/ Lisa A. Cook
Lisa A. Cook, #6298233
Assistant Attorney General
Office of the Attorney General
500 South Second Street
Springfield, Illinois   62701
(217) 557-0261 Phone
(217) 524-5091 Fax
Email: lcook@atg.state.il.us