UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>JOHN BALDWIN, STEVE MEEKS, and MELVIN HINTON,<br><br>　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)　Civil No. 3:18-cv-00156-NJR-MAB<br>)<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFFS' REPLY IN SUPPORT OF**
**MOTION FOR A PRELIMINARY INJUNCTION**

In order to receive basic care to address serious medical needs, Plaintiffs have no choice but to seek a preliminary injunction against Defendants. There is no dispute that Plaintiffs and a putative class of similarly situated individuals require treatment for gender dysphoria. Yet Plaintiffs and the putative class continue to endure abysmal and life-threatening care at the hands of poorly trained or indifferent IDOC staff under Defendants' direction and control.

In response to Plaintiffs' claims, Defendants argue that IDOC meets its constitutional obligations by providing *some* care to *some* Plaintiffs. The law, however, requires more. The Seventh Circuit has "repeatedly … rejected the notion that the provision of some care" means that a party has met "the basic requirements of the Eighth Amendment." *Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016). In this case, that inadequate "care" puts Plaintiffs and the putative class at daily risk of severe physical and mental harm.

Defendants' own admissions prove their failure to adequately care for the Plaintiffs. IDOC has *never* allowed a transgender individual to obtain gender-affirming surgery (Opp. at 7), and refuses to even evaluate it as an option for prisoners who request it (Melendez Decl. ¶ 8; Kuykendall Decl. ¶ 9). IDOC's "Transgender Committee," which contains voting members with no medical background, "must be consulted" prior to making medical decisions such as initiation of hormone therapy. (Opp. at 6.) IDOC has no protocol in place regarding the types or dosages of hormones that should be provided (*id.*), despite the fact that there are well-established standards of care governing the same, which they claim to be following (Mot. at 4, 11). The list goes on and on. Meanwhile, Defendants fail to address entire portions of Plaintiffs' opening brief. Even more glaring, Defendants do not even mention, much less attempt to rebut, Plaintiffs' experts—an endocrinologist and a psychologist both specializing in transgender health issues.

As long as IDOC's deliberate indifference toward Plaintiffs' care is allowed to continue, Plaintiffs will continue to suffer severe emotional and physical harm, including risk of self-harm, auto-castration, and suicide.

I.   **PLAINTIFFS MEET THE STANDARD FOR A PRELIMINARY INJUNCTION**

   A.   **Plaintiffs Have Demonstrated Irreparable Harm, and that Money Damages are an Insufficient Remedy.**

Absent a preliminary injunction, Plaintiffs will continue to suffer from Defendants' deliberate indifference. Plaintiffs detailed the direct, negative effects of Defendants' indifference in their opening brief, including severe risk of worsening physical and mental health, self-harm, social isolation, and fears for their safety—none of which have an adequate remedy at law.[1]

---

[1] Defendants make the absurd and heartless argument that Plaintiffs have made a "tactical decision" not to seek damages. (Opp. at 9–10.) Defendants therefore conclude that damages would be sufficient to repair the injuries posed by IDOC's deliberate indifference, barring Plaintiffs' request for injunctive relief. (*Id.*) But the ongoing physical and mental anguish Plaintiffs are suffering due to Defendants' failure to treat their gender dysphoria cannot be remedied by money. *See, e.g., Flower Cab Co. v. Petitte*, 685 F.2d 192, 195 (7th Cir. 1982) (in prison conditions cases, "the quantification of injury is difficult and damages are therefore not an adequate remedy.").

Suffering from Defendants' failure to provide adequate care, Plaintiffs committed acts of self-harm, including attempts at auto-castration. (Monroe Decl. ¶¶ 3–4; Kuykendall Decl. ¶ 4.) Several Plaintiffs attempted suicide. (Monroe Decl. ¶ 5; Reed Decl. ¶ 2; Kuykendall Decl. ¶ 2.)

These harmful and life-threatening acts were a direct result of Defendants' failure to treat Plaintiffs' gender dysphoria. For example, IDOC's inadequate provision of hormone therapy, and its denial or delay in the provision of gender-affirming undergarments and the opportunity for social transition, exacerbate symptoms of gender dysphoria. (Ettner Decl. ¶¶ 68–73, 75, 126.) Defendants do not dispute that gender dysphoria is a serious medical condition that can lead to extreme harm if left untreated, or if treated improperly. Yet they persistently ignore the substantial harms already suffered by Plaintiffs, as well as the ongoing potential for future harm.

Defendants argue that because Plaintiffs were granted access to hormone therapy since they filed this lawsuit, monetary damages are Plaintiffs' only available remedy. Incorrect. The hormone therapy provided by IDOC, often after substantial and needless delay, is woefully inadequate. (Tangpricha Decl. ¶¶ 62–72.) IDOC medical staff prescribe transgender inmates the wrong form of hormones (*id*. ¶¶ 53–54, 56, 64); they prescribe the wrong, typically too low, dosages (*id*. ¶¶ 49–50, 54, 58–59, 64); and they fail to monitor the hormone levels of these patients according to the applicable standards of care (*id*. ¶¶ 46–48, 54, 56, 59, 64–65). Defendants' incompetent provision of hormone therapy not only fails to adequately treat Plaintiffs' gender dysphoria; it creates serious additional health risks for these individuals. (*Id*. ¶¶ 62–65.) Defendants do not even attempt to argue to the contrary.

Defendants also allege that because one of the named Plaintiffs, Janiah Monroe, was transferred to a female facility, she is ineligible for the requested injunctive relief. (Opp. at 10.) Putting aside that Ms. Monroe requested other relief that was denied—such as an evaluation for

the gender-affirming surgery she needs by a competent medical provider—Defendants ignore that this case involves numerous Plaintiffs and a *putative class* of similarly situated individuals. Defendants cannot magically cure the ongoing harm posed by IDOC's deliberate indifference by addressing a discrete issue involving a single Plaintiff.

   **B.**  **Plaintiffs Have Demonstrated Likelihood of Success on the Merits.**

Defendants admit that Plaintiffs "need only show a better than negligible chance of prevailing … [t]his burden is low." (Opp. at 10.) Yet Defendants address the merits of only two of Plaintiffs' *nine* requests for relief: hormone therapy and gender-affirming surgery. Even confining their discussion to these two claims, Defendants' arguments fail.[2]

With regard to hormone therapy, Defendants argue that Plaintiffs' claims are foreclosed by a distorted reading of *Mitchell v. Kallas*, 895 F.3d 492 (7th Cir. 2018). In *Mitchell*, the Seventh Circuit in fact reversed the dismissal of one claim, though it also held that the medical director of a Wisconsin prison was entitled to qualified immunity on the claim that her delay in assessing a transgender prisoner for hormone therapy was unreasonably long. *Id.* at 500-01.

*Mitchell* is inapposite. First, the *Mitchell* court had "little evidence about the typical length of these evaluations [for initiation of hormone treatment], either in prisons or in the community." *Id*. Not so here. Plaintiffs have made a strong factual showing based on records obtained in discovery and expert testimony on this topic. Medical records show an undeniable pattern of

---

[2] Defendants argue that because IDOC does not have written policies in place regarding provision of much-needed care of transgender inmates with gender dysphoria, there "are no policies to be enjoined here." (Opp. at 2.) This argument is a red herring. As outlined in detail in Plaintiffs' opening brief, Defendants have demonstrated a clear pattern of inadequate medical treatment for transgender inmates, which poses an ongoing and serious risk of harm to Plaintiffs and putative class members. This Court has the clear authority to enjoin this conduct—whether articulated in a written policy or not. *See, e.g., Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983) ("As a practical matter, 'deliberate indifference' can be evidenced by 'repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff.'") (quoting *Ramos v. Lamm,* 639 F.2d 559, 575 (10th Cir. 1980)); *Gates v. Cook*, 376 F.3d 323, 337 (5th Cir. 2004). The very fact that there are no policies in place to ensure that adequate medical care is provided to transgender inmates is exactly the problem, along with the lack of medical staff with sufficient expertise and training to implement such policies.

4

delays in providing hormones even after hormones have been recommended by facility medical staff.  (*See* Tangpricha Decl. ¶¶ 63–66; Ettner Decl. ¶¶ 125–130.)  Expert testimony, as well as the Defendants' own records, demonstrate the ease of starting someone on hormone therapy, the extremely limited medical bases for delaying such care, and the Committee's lack of any medical justification for denying hormone therapy to patients who meet the standards.  (*See* Ettner Decl. ¶¶ 127, 133; Tangpricha Decl. ¶ 43.)  To make matters worse, the delay in assessing transgender inmates is just part of a *continuum* of inadequate and dangerous treatment.  Second, the record in that case showed the prisoner was experiencing "non-life-threatening but painful conditions," 895 F.3d at 500 (citation omitted), whereas the record here shows that Plaintiffs were suicidal and engaging in efforts to self-castrate due to delays in providing necessary hormone therapy.

Regarding gender-affirming surgery, Defendants incorrectly downplay the significance of the WPATH standards while dismissing any claim for surgery using highly questionable readings of authority from other jurisdictions.  (*See* Ettner Decl. ¶ 24.)  Defendants claim that "the IDOC policy [regarding surgery] allows for individualized assessment."  (Opp. at 12.)  The facts tell a different story.  Defendants *admit* that IDOC has *never* approved a request for surgery.  A policy of "individualized assessments" that always results in a denial of treatment denial is illusory.  Instead, the record demonstrates that IDOC maintains a *de facto* policy of denying gender-affirming surgery across the board, even in cases where it is medically necessary to relieve symptoms of gender dysphoria.  (Mot. at 15.)  This is a blatant violation of the Defendants' constitutional obligations:  blanket policies denying surgical treatment for gender dysphoria, such as IDOC's *de facto* policy, are unconstitutional under the Eighth Amendment.  *Fields v. Smith*, 653 F.3d 550, 559 (7th Cir. 2011).

IDOC's *de facto* policy of denial is also evident from the admissions of its own medical staff. For example, Plaintiff Monroe requested gender-affirming surgery from IDOC multiple times over the course of years, and each time IDOC denied treatment without even evaluating her. (Monroe Decl. ¶ 9.) In discussing one of Ms. Monroe's grievances regarding denial of surgery, the Psychology Services Administrator at Pontiac Correctional Center, Dr. John Garlick, wrote to a colleague: "I guarantee you he [*sic*] is not approved or, for that matter, *even considered* for reassignment surgery. I strongly suggest you consult the Legal Department before responding to this." (Ex. 1, 000058.)[3] IDOC simply does not take requests for gender-affirming surgery seriously, even when medically necessary.

### C. Defendants Fail to Articulate a Cognizable Harm to the "Public Interest."

Defendants argue that amorphous "security" concerns outweigh Plaintiffs' need for adequate treatment of their serious medical condition. They recite case law holding that prison administrators have an interest in maintaining order within their prisons and instituting discipline among the prisoners. (Opp. at 13–14.) None of the cited cases are applicable to the case at hand, and Defendants fail to connect any "security" concerns to any perceived harm. *See Fields*, 653 F.3d at 558 (holding that the district court did not abuse its discretion in concluding that defendants' evidence failed to establish any security benefits associated with a ban on hormone therapy and surgery).

First, Defendants do not attempt to link any requested treatment with an identifiable risk. For example, they do not attempt to explain how provision of adequate hormone therapy to prisoners would threaten prison security, or how provision of gender-affirming clothing would hamper the staff's ability to maintain discipline.

---

[3] All emphasis added unless otherwise noted.

Second, Defendants' complaint that Plaintiffs "would remove the Transgender Committee from the process of determining proper care and placement" misses the mark. (Opp. at 13.) The problem is that this unqualified Committee should not be making decisions about medically necessary care in the first place. The solution cannot be to sustain a broken system merely because it is already present.

Last, Defendants' contention that IDOC "has not refused to transfer all transgender inmates to Logan, but reviews transfer requests in a deliberative manner" is misleading at best. (Opp. at 14.) There have been **_two_** transfers of transgender female inmates to Logan Correctional Center, and both occurred very recently and **_only after_** two separate lawsuits were filed demanding that relief after both had been sexually assaulted. *See Monroe v. Baldwin*, C.D. Ill., No. 19-cv-1060; *Hampton v. Baldwin*, S.D. Ill., No. 18-cv-550. Consistent with prior rhetoric, Defendants insist that transfer decisions are made on "an individualized basis." (Opp. at 14.) The facts say otherwise. Only after an inmate files a federal lawsuit does the inmate get considered for transfer. There is no other policy.

## II. SOVEREIGN IMMUNITY AND THE PRISON LITIGATION REFORM ACT (PLRA) DO NOT BAR PLAINTIFFS' CLAIMS

Defendants claim that Plaintiffs' claims are barred (1) by sovereign immunity, because there is no ongoing violation of federal law, and (2) by the PLRA, because "[t]he requested relief [ ] extends beyond what is necessary to correct the alleged violations of federal law." (Opp. at 15.) Both arguments are wrong.

### A. Sovereign Immunity Does Not Bar Plaintiffs' Claims of Deliberate Indifference Subjecting Plaintiffs to Ongoing and Immediate Harm.

Defendants' violations of the Eighth Amendment are ongoing and will continue until the Court intervenes. Defendants attempt to excuse their behavior by a scattershot listing of "too little, too late" steps—namely that (i) Plaintiffs were granted access to hormone therapy, (ii) Plaintiffs

7

were provided with sports bras, (iii) IDOC provided some training regarding "the importance of social transition, including using proper names and pronouns," and (iv) one Plaintiff (Ms. Monroe) was transferred to an all-female facility. (Opp. at 10, 17–19.) Even taken together, these actions do not support Defendants' attempt to hide behind sovereign immunity.

First, these actions do nothing to address the continuing inadequacy of Plaintiffs' hormone therapy. Even though therapy was approved for some Plaintiffs, it was only after extreme and unjustified delay. Even when approved, Plaintiffs' current hormone therapy is woefully inadequate to treat their gender dysphoria and, in some cases, puts their present health at risk. (Tangpricha Decl. ¶¶ 50–51, 53, 56, 59, 62, 64–65.) Defendants set forth no evidence that IDOC is training clinicians to provide *adequate* hormone therapy. That is not surprising, given that none of the members of the Transgender Committee are qualified to provide the Plaintiffs with the medical care they require. (Ettner Decl. ¶¶ 134–35; Mot. at Ex. 2.)

Second, these actions do nothing to address the myriad of other continuing harms that presently threaten Plaintiffs' well-being. Aside from inadequate types and dosages of hormones, several Plaintiffs are in serious need of transfer to an all-female facility but have not filed individual lawsuits to request it. (Kuykendall Decl. ¶ 12; Reed Decl. ¶ 13; Melendez Decl. ¶ 9; Vision Decl. ¶ 18.) Plaintiffs, like Ms. Monroe, also repeatedly request surgery, yet are denied medical evaluation for it, without any valid medical justification. (Ettner Decl. ¶ 80.) Defendants do not articulate any rationale for IDOC's *de facto* blanket rule against providing surgery or gender-affirming clothing (other than bras) or grooming items, for any Plaintiff.

Finally, Defendants' sovereign immunity argument ignores that this case involves a putative class action. Defendants do not even attempt to argue that there is no ongoing harm to the putative class members. Nor could they. As Plaintiffs detailed in their opening brief, IDOC

routinely denies and delays hormone therapy to transgender prisoners without any legitimate medical justification. (Ettner Decl. ¶¶ 127, 133.) As with the named Plaintiffs, once hormone therapy is prescribed to transgender prisoners, it is ineffective and potentially dangerous due to incorrect prescriptions and dosages. (Tangpricha Decl. ¶ 69.) And IDOC's *de facto* policies of denying gender-affirming surgery, gender-affirming clothing and grooming items, and transfer to all-female facilities harm all putative class members, not just the named Plaintiffs.

> **B.     Plaintiffs' Requested Relief is Narrowly Tailored to Address the Harm Posed by IDOC's Deliberate Indifference.**

The PLRA does not bar Defendants' claims. The statute does not materially alter the standard Plaintiffs must meet for a preliminary injunction. *See Gomez v. Vernon*, 255 F.3d 1118, 1129 (9th Cir. 2001); *see also Fields*, 653 F.3d at 558 (citing *Gomez*). For any preliminary injunction, the relief requested must be "narrowly tailored to remedy the specific harm." *Neb. Dep't of Health & Human Servs. v. Dep't of Health & Human Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006) (citation omitted). The requested relief meets that standard—as discussed in detail in Plaintiffs' opening brief, the requested relief tracks the very constitutional violations that Plaintiffs are suffering, and therefore is narrowly tailored to remedy them. *See, e.g., Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1194–95 (N.D. Cal. 2015) ("An injunction granting [transgender inmate plaintiff] access to adequate medical care, including referral to a qualified surgeon for SRS, is narrowly drawn."); *Hicklin v. Precynthe*, No. 4:16-cv-01357-NCC, 2018 WL 806764, at *15 (E.D. Mo. Feb. 9, 2018) (granting preliminary injunction and ordering defendant "to provide Ms. Hicklin with care that her doctors deem to be medically necessary treatment for her gender dysphoria, including hormone therapy, access to permanent body hair removal, and access to 'gender-affirming' canteen items"); *Edmo v. Idaho Dep't of Corr.*, 358 F. Supp. 3d 1103, 1129 (D. Idaho

2018) (granting preliminary injunction ordering Defendants to provide transgender inmate plaintiff with "adequate medical care, including gender confirmation surgery").

Defendants' only argument that Plaintiffs' requested relief is not sufficiently narrow relates to IDOC's Transgender Committee. They incorrectly claim that Plaintiffs made "no showing that the use of the Transgender Committee itself is a violation of federal law." (Opp. at 16.) Incorrect. Plaintiffs' experts explained in detail how the Transgender Committee plays a central role in systematically depriving transgender inmates with gender dysphoria of much-needed care. For example, the Committee (i) consistently makes decisions to arbitrarily and/or unreasonably withhold hormone therapy from transgender inmates who were diagnosed with gender dysphoria (Ettner Decl. ¶¶ 126–30); (ii) denies gender-affirming clothing and grooming items when they are medically indicated (*id*. ¶ 131); and (iii) has never authorized a medical evaluation for gender-affirming surgery (*id*. ¶ 132).

## III.   CONCLUSION

The Court should grant Plaintiffs' motion for a preliminary injunction, and provide the specific relief requested in their complaint and in the opening brief submitted in support of the motion.

Dated: June 20, 2019                                Respectfully submitted,

By: /s/ *Brent P. Ray*
John A. Knight
Ghirlandi Guidetti
Carolyn M. Wald
ROGER BALDWIN FOUNDATION OF ACLU, INC.
150 North Michigan Avenue, Suite 600
Chicago, IL 60601
Telephone: (312) 201-9740
Facsimile: (312) 201-9760
*jknight@ACLU-il.org*
*gguidetti@ACLU-il.org*
*cwald@aclu-il.org*

Catherine L. Fitzpatrick
Jordan M. Heinz
Erica B. Zolner
Megan M. New
Brent P. Ray
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
*catherine.fitzpatrick@kirkland.com*
*jordan.heinz@kirkland.com*
*erica.zolner@kirkland.com*
*megan.new@kirkland.com*
*brent.ray@kirkland.com*

Thomas E. Kennedy III
Sarah Jane Hunt
KENNEDY HUNT P.C.
906 Olive Street, Ste. 200
Saint Louis, MO 63101
Telephone: (314) 872-9041
*tkennedy@KennedyHuntLaw.com*
*sarahjane@KennedyHuntLaw.com*

*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I certify that on June 20, 2019, I electronically filed the foregoing document and any attachments with the Clerk of this Court by using the CM/ECF system, which will accomplish service through the Notice of Electronic Filing for parties and attorneys who are Filing Users.

/s/ *Brent P. Ray*
Brent P. Ray