UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil No. 3:18-cv-00156-NJR-MAB |
| JOHN BALDWIN, STEVE MEEKS, and MELVIN HINTON, | ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR CLASS CERTIFICATION**

**I.   PLAINTIFFS MEET THE REQUIREMENTS FOR CLASS CERTIFICATION UNDER RULE 23(A)**

Defendants' Response studiously ignores the myriad ways that IDOC systematically fails to provide adequate medical care for prisoners with gender dysphoria, painting a false portrait of a functional system that does not violate constitutional norms or, indeed, medical standards of care. Defendants mischaracterize this case as one primarily about delays in providing hormone therapy and denials of surgery, dismissing the broad spectrum of egregious inadequacies in IDOC's treatment of gender dysphoria. The constellation of inadequate care that Plaintiffs have experienced flows from a common source: IDOC's system-wide policies and practices regarding the treatment of gender dysphoria.

As discussed at length in Plaintiffs' Motion for Preliminary Injunction, Plaintiffs are routinely and consistently endangered by IDOC's failure to provide even minimally adequate treatment for their treatable condition. They are given incorrect doses of hormones, prescribed conjugated estrogen (an outdated and potentially dangerous form of estrogen), subjected to long

delays for receiving hormones, and rarely provided blood testing to monitor their hormone and other levels to mitigate risks associated with hormone usage. Plaintiffs have further shown that IDOC has de facto policies and systemic practices of failing to even evaluate prisoners for gender-affirming surgeries or to provide social transition treatment through individualized housing assessments, gender-affirming clothing and grooming items, same-gender body searches, and proper use of names and pronouns. Rather than address the full scope and magnitude of IDOC's failures, Defendants zero in on delays in hormone treatment and surgery denials and dismiss the rest.

All of these inadequacies are part of a continuum of failure driven by common causes. Plaintiffs' treatment is overseen by a single body that is unqualified and ill-equipped to oversee the treatment of gender dysphoria. The abysmal care received by Plaintiffs is the direct product of IDOC's decision to delegate oversight to a Committee that lacks the competence to oversee medical treatment of gender dysphoria, as well as its system-wide policies and practices, which amount to comprehensive failure to address a recognized and treatable medical condition and put Plaintiffs and the class at substantial risk of serious harm. Ultimately, Defendants' Response fails to even address many of Plaintiffs' arguments in support of class certification and utterly fails to undermine the strong showing Plaintiffs have made in support of class certification.

## A. Plaintiffs Meet the Numerosity Requirement of Rule 23(a)(1)

Defendants attempt to minimize their systemic failures—not to mention shrink the class—by narrowing the scope of Plaintiffs' claims to ones about hormone delays. Defendants argue accordingly that Plaintiffs have failed "to establish that there are sufficient members with legitimate claims" because the seventy IDOC prisoners who "fall under the definition of 'transgender'" and who are currently receiving hormones cannot "challenge a continuing denial for prescription of hormones." (Opp. at 7–8.) Defendants therefore claim that the proposed class

2

comprises only the remaining forty-five prisoners who have requested hormone treatment for gender dysphoria but not received it. (*Id.*) However, *all* class members, regardless of when or if they received hormone treatment, are receiving woefully inadequate care due to IDOC's system-wide policies and practices described above and in Plaintiffs' opening brief, which include permitting a Committee made up of individuals lacking expertise in this field to oversee gender dysphoria treatment. (Ettner Decl. ¶ 134.)

In reducing the case to one about delayed hormone treatment, Defendants ignore the other ways the Committee inadequately supervises administration of gender dysphoria treatment. In addition to long, medically unjustified delays, (Ettner Decl. ¶ 126), class members are given incorrect doses of hormones, prescribed conjugated estrogen (an outdated and potentially dangerous form of estrogen), and seldom have their blood tested to ensure their hormone and other levels are within a safe range. (Tangpricha Decl. ¶ 66.) Defendants also ignore Plaintiffs' claims that IDOC's policies and practices do not permit assessment for gender-affirming surgeries or allow social transition through individualized housing assessments, gender-affirming clothing (with the exception of bras for some transgender female class members) and grooming items, same-gender body searches, and proper use of names and pronouns. (Ettner Decl. ¶¶ 131–32).

Because the systemic failures described above are both rampant across the class and the result of the same system-wide policies and practices, Defendants' attempt to split off bite-sized portions of the class must fail. As discussed below, Plaintiffs' claims can only be adequately addressed through class-wide relief in the form of systemic reforms. Therefore, Plaintiffs present a sufficiently numerous class[1] of over 100 members with legitimate claims.

---

[1] Defendants have asked this Court to adopt a new requirement for Plaintiffs to establish sufficient numerosity: that "many inmates would want to join in *this* suit [*sic*] particular suit." (Opp. at 8 (emphasis in original).) Rule 23(a)

### B.      Plaintiffs Meet the Commonality Requirement of Rule 23(a)(2)

Defendants assert that Plaintiffs do not share common questions of law or fact that can be resolved by a "*single answer*." (Opp. at 4 (emphasis in original).) In support of this proposition, Defendants cite *Jaime S. v. Milwaukee Public Schools*, which found certification improper where the proposed class was made up of "unidentified but potentially eligible disabled students [under the Individuals with Disabilities Education Act ("IDEA")]" represented by named plaintiffs with "disabilities ranging from deafness to Asperger's syndrome to various emotional disturbances." 668 F.3d 481, 487, 496 (7th Cir. 2012). In *Jamie S.*, the court found the facts and questions raised by the class were not sufficiently common, and described a hypothetical scenario where: "[O]ne has a disability and would be eligible for special education but has never been identified as being disabled nor gone through the IEP process; another was identified as disabled and received a timely IEP meeting, but the child's parents did not attend the IEP meeting and were not notified of their right to do so." *Id*. at 498. Each of these scenarios raised "individualized questions of fact and law," where "the answers [were] unique to each child's particular situation." *Id*. In particular, the court found that the "child-find violations" of the IDEA were too "child-specific" to raise sufficiently common questions because the plaintiffs presented insufficient proof of systemic failure to find and refer children for IEP evaluations. *Id*.

The facts presented here are entirely different. First, in contrast to *Jamie S.*, all proposed class members share a common medical condition—gender dysphoria—which is subject to a uniform set of effective treatments, as described by the WPATH Standards of Care and the Endocrine Society Guidelines. Second, this class is not "too indefinite to be certified," as it only

---

does not require Plaintiffs to make such a showing and Defendants provide no legal support for their assertion to the contrary.

4

extends to prisoners who have sought treatment for gender dysphoria and therefore have identified themselves to IDOC. *See id*. at 496. Third, the proposed class members have suffered a set of common harms that are a direct result of IDOC's system-wide policies and practices which fail to provide adequate treatment to prisoners with gender dysphoria. These common harms can and should be addressed by class-wide relief, as described more fully below.

Defendants again mischaracterize this case as one solely about delays in hormone treatment to support their argument regarding commonality, contending that Plaintiffs have failed to establish commonality across the proposed class because delays of treatment may be "tolerable in one context [but] may not be tolerable in another." (Opp. at 5.) Nevertheless, this case is not only about delays in treatment; delays are just one manifestation of the overarching inadequacy of care. Here, Plaintiffs and class members are exposed to "systemic and gross deficiencies" such that "the inmate population is effectively denied access to adequate medical care." *Phillips v. Sheriff of Cook Cty.*, 828 F.3d 541, 554 (7th Cir. 2016) (citation omitted). Plaintiffs' experts have testified that gender dysphoria is a serious and readily treatable medical condition that, when left untreated, "will result in serious harm." The declarations of Plaintiffs' experts further show that the Committee is unqualified to treat this condition, therefore causing system-wide and medically unjustified delays of treatment. (Ettner Decl. ¶¶ 24, 70–71, 133–35.) Plaintiffs' experts are also clear that IDOC's policies and practices prevent Plaintiffs and class members alike from receiving adequate medical care including hormone treatment (not just in the form of medically unjustified delays), evaluations for gender-affirming surgeries, and accommodations to permit social transition. Accordingly, IDOC's routine denials and delays of hormone treatment rise to the level of deliberate indifference, as does the entire range of inadequacies shown by the facts in this case.

The policies and practices described above, and in Plaintiffs' Motion for Preliminary Injunction, stem from a common source: the Committee's lack of expertise and IDOC's de facto policies of denying certain types of care. Courts have found commonality in other cases "where a single decision-making body enforced a general, albeit discretionary, policy." *Phillips*, 828 F.3d at 554-55 (describing *Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of Chi.*, 797 F.3d 426, 439-40) (7th Cir. 2015)). As in *Chicago Teachers Union*, Plaintiffs assert that a "single decision-making body" (i.e. the Committee) has policies and practices that result in constitutionally inadequate treatment for gender dysphoria. That some of the Committee's decisions are based on its review of individual prisoners' "snapshot" update forms does not change the fact that the harms caused by its policies and practices are experienced class-wide. (Mot. at 12.)

The facts at hand resemble those presented in *Lacy v. Cook County*, despite Defendants' argument to the contrary. 897 F.3d 847 (7th Cir. 2018) (affirming certification for a class of prisoners who used wheelchairs and faced illegal structural barriers at county courthouses). The class members in *Lacy* required common solutions to manage their shared condition of using wheelchairs, including various structural modifications and the provision of assistance when navigating the court buildings. Similarly, Plaintiffs require common solutions in order to manage their shared condition of gender dysphoria. This includes relief from IDOC policies and practices such as its de facto policy of refusing to provide gender-affirming surgery or gender-appropriate clothing (except, to an extent, bras), as well as IDOC's practice of delegating supervision of medical treatment to a Committee that lacks the requisite training and expertise in gender dysphoria to ensure adequate medical care. (Ettner Decl. ¶¶ 131–32, 133–35.)

Additionally, Defendants assert that gender dysphoria is a new diagnosis that lacks clear consensus about how to treat it, such that IDOC's policies cannot be an "illegal policy [that] might

provide the 'glue' necessary to litigate otherwise highly individualized claims as a class." (Opp. at 7 (citing *Phillips*, 828 F.3d at 551).) Defendants ignore the existence of the WPATH Standards of Care, which are recognized as the authority on treatment of gender dysphoria by all major American medical organizations and have been in place for over two decades. (Ettner Decl. ¶¶ 24, 26.) Defendants also mischaracterize Dr. Randi Ettner's testimony, which unequivocally states that there is, and has long been, a clear medical consensus about the necessity and efficacy of treatments for gender dysphoria, including hormone therapy, gender-affirming surgeries, and social transition. (Ettner ¶¶ 24–26.)

Further, Defendants imply that all previous research about transgender individuals or how to treat gender dysphoria was rendered obsolete following the 2013 renaming of "Gender Identity Disorder" as "Gender Dysphoria" in the DSM-V. (Opp. at 6.) Defendants claim that IDOC has no way of knowing the "correct manner of treatment for gender dysphoria" because this renaming reflected "*significant changes* in the understanding" of transgender people. (*Id*.) In fact, this change was meant to acknowledge what practitioners and researchers already knew: that *being* transgender is not a disorder; rather, the clinically significant distress associated with identifying differently than one's sex assigned at birth is a serious but treatable medical condition. (Ettner Decl. ¶ 17.) Tellingly, Defendants cite no support for the absurd assertion that there is no medical consensus regarding how to treat gender dysphoria, and cannot present a single medical authority to contradict the WPATH Standards of Care.

Instead, Defendants maintain that "it is neither medically nor legally established that surgery is a necessary or effective treatment for gender dysphoria," improperly citing to a decision from a different circuit to support this factual assertion. (Opp. at 7 (citing *Gibson v. Collier*, 920 F.3d 212, 222–23 (5th Cir. 2019)).) Except in limited circumstances not relevant here, a plaintiff

7

is not bound—by issue preclusion, judicial notice, or any other legal principle—to factual findings in a case in which the plaintiff was not a party. *See Taylor v. Sturgell*, 553 U.S. 880, 884 (2008). The evidence in *Gibson* is not before this Court, and Plaintiffs have had no opportunity to challenge, for example, the qualifications of the experts or the reliability of their opinions. Plaintiffs are entitled to their "own day in court." *Id*. at 893–94. The evidence considered in *Gibson* is inadmissible hearsay and the court's findings are irrelevant. Furthermore, Plaintiffs in this case have shown that decades of medical research overwhelmingly establish that surgery is necessary and effective treatment for gender dysphoria. (Ettner Decl. ¶¶ 42–58.) In addition, the Seventh Circuit has recognized that a blanket exclusion of surgical treatment violates the Eighth Amendment. *Fields v. Smith*, 653 F.3d 550 (7th Cir. 2011).

There exists no medical standard under which IDOC could conceivably be considered to provide adequate medical treatment for gender dysphoria. Defendants intimate that IDOC is in fact providing individualized treatment that takes into account the "evolving nature of gender dysphoria and potential treatments." (Opp. at 6.) The record shows otherwise. Members of IDOC's own Committee admit they are not experts in treating gender dysphoria, and IDOC's own documents support a clear finding that the treatment received by prisoners is grossly subpar. (Mot. at Ex. 6, Puga 30(b)(6) Dep. at 35:3–36:16; Ettner Decl. ¶ 132.)

### C. Plaintiffs Meet the Typicality Requirement of Rule 23(a)(3)

Defendants assert that Plaintiffs do not meet the typicality requirements of Rule 23(a)(3) because although "Plaintiffs appear to have shared experiences . . . their background or treatment within IDOC is [not] typical of that of *all* IDOC prisoners." (Opp. at 9 (emphasis added).) As an initial matter, Plaintiffs do not claim that their experiences are typical of *all* IDOC prisoners. Rather, Plaintiffs allege that class representatives, like all IDOC prisoners seeking treatment for gender dysphoria, receive treatment that is, at best, abysmal and, at worst, non-existent.

Defendants dispute that Plaintiffs' inadequate treatment is typical of the class, complaining that Plaintiffs' experts traffic in "generalizations" without "giving specific data to compare the typicality of their claims." (Opp. at 9.) This is not so. For example, Dr. Tangpricha provides the following quantification:

> *Roughly half* of the putative class had no record of ever being tested for [electrolytes, potassium, creatinine, prolactin] levels . . . . In the *vast majority* of cases (*over 90 percent*), testing was not performed with the regularity dictated by the Guidelines.

(Tangpricha Decl. ¶ 71 (emphasis added).) Plaintiffs' experts describe the shockingly inadequate care experienced by "many" or the "vast majority" of class members based on their personal review of the immense volume of medical records and Committee notes produced by Defendants. (Ettner Decl. ¶¶ 74, 125–33; Tangpricha Decl. ¶¶ 66–72.) These are not unfounded statements based only upon a hunch. Further, Defendants present no evidence to contradict Plaintiffs' experts' findings that IDOC's policies and practices have caused widespread harm across the class.

Finally, it is irrelevant whether every prisoner seeking treatment for gender dysphoria "wants to have sex reassignment surgery or the other items sought by these Plaintiffs." (Opp. at 9.) First, *every* class member, including those for whom surgery is medically necessary, is denied even the possibility of being evaluated for surgery. (Ettner Decl. ¶ 132.) Second, Plaintiffs are seeking injunctive relief to ensure constitutionally adequate medical care—not to require identical treatment plans—for every class member. In fact, by its very nature, adequate medical care must involve individualized clinical assessments by a medical provider who is qualified to treat gender dysphoria. (Ettner Decl. ¶¶ 28–29.) Because all class members experience the same pattern of inadequate treatment, are subject to the same system-wide policies and practices, and are overseen by the same unqualified decision-making body, that individual class members might experience

slight variations in how these inadequacies manifest does not defeat typicality. The myriad harms result from the same defects.

### D. Plaintiffs Meet the Adequacy Requirement of Rule 23(a)(4)

Defendants argue that Plaintiffs will not "fairly and adequately protect the interests of the class" as required by Rule 23(a)(4) because they do not represent the "wide range of variation" within the class. Specifically, Defendants claim that because the named Plaintiffs are transgender women[2], they "completely disregard" the interests of transgender men. Defendants ignore the fact that the established clinical standards, both the WPATH Standards of Care and the Endocrine Society Guidelines, apply to people of all gender identities, including both transgender men and transgender women. (Ettner Decl. ¶ 15; Tangpricha Decl. ¶¶ 16, 24, 27.) Under these standards, the same types of treatment provided to transgender women are also provided to transgender men, including social transition, hormone therapy, and/or gender-affirming surgeries. (Ettner Decl. ¶ 15.)

Further, IDOC's system-wide policies apply equally to transgender men and women. As discussed above, no prisoner with gender dysphoria—regardless of gender identity—is provided or even evaluated for gender-affirming surgeries. (Ettner Decl. ¶ 132.) Additionally, IDOC's policy and practice is to place all prisoners in male or female facilities "based on their genitalia," which in turn dictates the gender of the officers who conduct body searches and the type of gendered clothing and personal care items that will be available. (Dkt. No. 123 at 16–19.) Further, IDOC has empowered the Committee, who lacks training and expertise in treating gender

---

[2] Defendants describe the named Plaintiffs as being "born biologically male," which reflects a misunderstanding of both gender and biology. There is scientific consensus that "gender identity is biologically based" and caused by our individual brain composition. (Ettner Decl. ¶¶ 21–23.) It is accurate instead to describe the named Plaintiffs as having been "assigned male at birth," which is typically based only on the appearance of an infant's external genitalia.

dysphoria, to oversee the medical treatment of *all* prisoners seeking treatment for gender dysphoria, and Plaintiffs' experts have concluded that *none* of these prisoners—men or women—are receiving adequate care. (Ettner Decl. ¶ 139.) Defendants have identified no conflict of interest or other reason why they believe that transgender women would be inadequate to represent transgender men, because there is simply no basis for such a claim. All prisoners with gender dysphoria are receiving inadequate care due to IDOC's system-wide policies and practices, and Plaintiffs are well positioned to represent the interests of all class members.

Defendants further complain that Plaintiffs have "presented no putative class member who has gender dysphoria but chooses not to receive hormone treatment," (Opp. at 10), but provide no evidence regarding its hypothetical plaintiff, nor explain why this plaintiff's interests would conflict[3] with the class representatives' interests. Like Defendants' assertion about surgery, the question of whether a particular form of treatment is medically necessary for a particular prisoner with gender dysphoria is beside the point. The case is about systemic deficiencies and the resultant harms and risks of future harm to class members, which include denials of a variety of treatments other than hormone therapy. Although Defendants suggest otherwise, class certification does not require a showing that each class members' medical needs are exactly the same, (s*ee Spano v. Boeing Co.*, 633 F.3d 574, 585 (7th Cir. 2011) ("Rule 23(a)(2) does not demand that every member of the class have an identical claim.")), and some degree of factual variation will not defeat commonality provided that common questions yielding common answers can be identified. (Mot. at 5.)

---

[3] A class representative may not present a claim that is "in conflict with or antagonistic to those of other class members," (*see Brieger v. Tellabs, Inc.*, 245 F.R.D. 345, 355 (N.D. Ill. 2007) (citing *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 598 (7th Cir. 1993))), however such a conflict must be *actual* and not, as here, merely "speculative or hypothetical." See *Rosario v. Livaditis*, 963 F.2d 1013, 1018–19 (7th Cir. 1992).

## II. PLAINTIFFS MEET THE REQUIREMENTS FOR CLASS CERTIFICATION UNDER RULE 23(B)(2)

Defendants assert that Plaintiffs do not meet the requirements of Rule 23(b)(2) because they fail to show a basis for injunctive relief. (Opp. at 10–11.) A comprehensive response to this assertion is provided in Plaintiffs' Motion for Preliminary Injunction.

Additionally, Defendants claim that Plaintiffs have failed to request specific relief that would provide relief for each member of the class, instead "asking for generic, one-size-fits-all relief, [ignoring] the obvious fact that difficult medical decisions cannot be made in such a manner without greater risk of harming any one patient." (Opp. at 11.) Plaintiffs' prayer for relief is only "generic" in that it seeks constitutionally adequate medical care for all IDOC prisoners seeking treatment for gender dysphoria. Plaintiffs have not suggested that all prisoners diagnosed with gender dysphoria should receive the exact same dose of hormones, be forced to have gender-affirming surgeries, or receive identical accommodations to allow for social transition. On the contrary, Plaintiffs have clearly outlined the specific, system-wide reforms necessary to achieve constitutionally adequate care. Indeed, it is IDOC who has demonstrated itself to be wholly unequipped to make "difficult medical decisions," (*id.*), and who has already caused great harm to members of the proposed class by allowing an unqualified Committee to prescribe medical care, including abiding by harmful system-wide policies that Plaintiffs now seek to enjoin. (*Id.*) Plaintiffs seek to prevent IDOC from continuing its harmful policies and practices, which include allowing a Committee of non-experts and laypeople to make medical decisions regarding the treatment of gender dysphoria, causing delays and denials of treatment for medically unjustified reasons, as well as enforcing de facto policies of refusing to evaluate and provide gender-affirming surgeries and hindering medically necessary social transition. (Dkt. No. 123 at 33–34.)

### III.  CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court certify a class of "all prisoners in the custody of IDOC who have requested from IDOC evaluation of treatment for gender dysphoria," and designate the attorneys of Roger Baldwin Foundation of ACLU of Illinois, Inc., Kirkland & Ellis LLP, and Kennedy Hunt P.C. as Class counsel.

Dated: June 28, 2019

Respectfully submitted,

By: /s/ *Brent P. Ray*
John A. Knight
Ghirlandi Guidetti
Carolyn M. Wald
ROGER BALDWIN FOUNDATION OF ACLU, INC.
150 North Michigan Avenue, Suite 600
Chicago, IL 60601
Telephone: (312) 201-9740
Facsimile: (312) 201-9760
*jknight@ACLU-il.org*
*gguidetti@ACLU-il.org*
*cwald@aclu-il.org*

Catherine L. Fitzpatrick
Jordan M. Heinz
Erica B. Zolner
Megan M. New
Brent P. Ray
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
*catherine.fitzpatrick@kirkland.com*
*jordan.heinz@kirkland.com*
*erica.zolner@kirkland.com*
*megan.new@kirkland.com*
*brent.ray@kirkland.com*

Thomas E. Kennedy III
Sarah Jane Hunt
KENNEDY HUNT P.C.
906 Olive Street, Ste. 200

Saint Louis, MO 63101
Telephone: (314) 872-9041
*tkennedy@KennedyHuntLaw.com*
*sarahjane@KennedyHuntLaw.com*

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that on June 28, 2019, I electronically filed the foregoing document and any attachments with the Clerk of this Court by using the CM/ECF system, which will accomplish service through the Notice of Electronic Filing for parties and attorneys who are Filing Users.

/s/ *Brent P. Ray*
Brent P. Ray