## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

JANIAH MONROE, MARILYN                    )
MELENDEZ, LYDIA HELÉNA VISION,            )
SORA KUYKENDALL, and SASHA REED,          )
individually and on behalf of a class of  )
similarly situated individuals,           )
                                          )
                   Plaintiffs,            )      Case No. 3:18-cv-00156-NJR
                                          )
        v.                                )
                                          )
ROB JEFFREYS, MELVIN HINTON,              )
and STEVE MEEKS,                          )
                                          )
                   Defendants.            )

## PLAINTIFFS' RENEWED REQUEST FOR
## APPOINTMENT OF INDEPENDENT MONITOR

More than nine months ago, this Court ordered Defendants to *immediately* cease certain policies and practices that denied Plaintiffs medically necessary care and treatment for gender dysphoria, and also to institute new policies and practices to remedy that denial. The Defendants subsequently assured the Court they had already ceased certain practices and were working hard to achieve the Court's other ordered relief. *See* Dkt. 202, Compliance Report; Dkt. 210, Compliance Report Reply. As a result, this Court denied Plaintiffs' request for an independent expert to ensure Defendants followed through on their promises to the Court. Dkt. 215, Compliance Report Order. Recent discovery shows that it is now time for the Court to revisit that ruling.

Discovery, including deposition testimony from named defendants, has made clear that the Illinois Department of Corrections (IDOC) is in violation of the Court's Preliminary Injunction Order. First, this Court ordered "Defendants to immediately . . . cease the policy and practice of allowing the Transgender Committee to make the medical decisions regarding gender dysphoria."

Dkt. 212, Am. Prelim. Inj. Order at 1, ¶ 1. Nonetheless, the Transgender Care Review Committee (the Committee) **still** makes medical decisions relating to hormone therapy and surgery, and IDOC **continues** to restrict access to medically necessary items for social transition. Second, Defendants were ordered to "*immediately* . . . cease the policy and practice of depriving gender dysphoric prisoners of medically necessary social transition, including by mechanically assigning housing based on genitalia and/or physical size or appearance." *Id.* at 1, ¶ 3. Despite this, IDOC has not transferred any transgender prisoners to facilities that match their gender identity and continues to operate under the **exact same** policy for cross-gender searches as it did prior to the Preliminary Injunction. Finally, IDOC has failed to implement **any** new policies related to transgender prisoners since the Preliminary Injunction was entered.

Accordingly, Plaintiffs hereby renew their request for the Court to appoint an independent expert to monitor Defendants' compliance with the Preliminary Injunction. Plaintiffs' wellbeing—if not their lives—depend on compliance. There is no question the Court has the authority to appoint an independent monitor to ensure IDOC develops a strict plan and schedule for complying with all aspects of the Court's order and to evaluate and report to the Court on whether IDOC is abiding by that plan and schedule. The recent testimony of IDOC's witnesses makes it abundantly clear that, left to their own devices, Defendants are either unable or unwilling to provide treatment sufficient to meet their obligations under the Eighth Amendment.

## FACTUAL BACKGROUND

Plaintiffs filed this action for declaratory and injunctive relief on January 31, 2018 to force IDOC to provide constitutionally adequate medical treatment for prisoners seeking evaluation and treatment for gender dysphoria. Dkt. 1, Complaint. On December 19, 2019—following a two-day hearing during which the Court was presented with testimony from three of the named Plaintiffs

and declarations from two of the named Plaintiffs, two of Plaintiffs' expert witnesses, and the leading members of IDOC's Committee—this Court entered a Preliminary Injunction prohibiting Defendants from continuing certain policies and practices imposing irreparable harm on Plaintiffs. Dkt. 186, Prelim. Inj. Opinion (the "Opinion"); Dkt. 187, Prelim. Inj. Order.

By order of this Court, Defendants filed a Report on Compliance (the "Report") on January 22, 2020, and then moved for reconsideration of the Court's Preliminary Injunction Order one week later. Compliance Report; Dkt. 203, Mot. Reconsider. In response, Plaintiffs flagged numerous problems with Defendants' conduct and urged the Court to appoint an expert to oversee Defendants' compliance with the Preliminary Injunction through trial. Dkt. 207, Compliance Report Resp., at 12–13. Defendants assured the Court that no court-appointed expert was necessary. Compliance Report Reply at 5–8. On March 4, 2020, however, the Court partially granted Defendants' Motion for Reconsideration, vacated the Order, and entered an Amended Preliminary Injunction Order. Dkt. 211, Am. Prelim. Inj. Opinion; Dkt. 212, Am. Prelim. Inj. Order (the "Order").

On March 20, 2020, the Court denied Plaintiffs' request for a court-appointed expert under Federal Rule of Evidence 706 based on Defendants' assurances of compliance with the Preliminary Injunction. Compliance Report Order. The order states that, although a Court-appointed expert was not warranted "at this time" because the Defendants were taking steps to comply with certain aspects of the Preliminary Injunction, the Court was nevertheless "not entirely convinced" that Defendants were complying with ***all of*** the Preliminary Injunction's directives. *Id.* at 2–3. The order specifically invited the parties to file "a proper motion" "regarding compliance with the preliminary injunction order" and left open the possibility of appointing a special master under FED. R. CIV. P. 53 at a later date. *Id.* at 4.

3

Discovery in the case was stayed on October 17, 2019 pending a decision on class certification. Dkt 174, 10/17/2019 Minute Entry. The Court granted Plaintiffs' motion for class certification on March 4, 2020, at which point discovery resumed. Dkt. 214, Class Cert. Order. Plaintiffs were eventually forced to file a motion to compel document production from Defendants after repeated delays and insufficiencies. Dkt. 222, Mot. Compel. Nonetheless, Plaintiffs pushed forward with depositions of Defendants and other IDOC witnesses to move the case forward towards trial, currently scheduled for March 2021. To date, Plaintiffs have deposed 15 witnesses, and several additional depositions are scheduled to take place in the coming weeks. The witnesses deposed thus far have all either directly or indirectly admitted that IDOC has never complied with the Court's Preliminary Injunction and continues to violate Plaintiffs' Eighth Amendment Rights.

## ARGUMENT

## I. IDOC IS NOT CAPABLE OF OR WILLING TO PROVIDE NECESSARY MEDICAL CARE

The Court's Order is clear, yet Defendants continue to violate it in significant ways. Whatever scant efforts Defendants have made fall well short of substantial compliance. Worse, Defendants' actions and inactions contradict their own statements made to the Court in their Report. Simply put, Defendants' refusal to comply jeopardizes the lives and wellbeing of Plaintiffs and those of other class members.

Case 3:18-cv-00156-NJR   Document 225   Filed 08/21/20   Page 5 of 19   Page ID #2666

A.    <u>The Committee continues to make medical decisions regarding gender dysphoria.</u>

The Court ordered Defendants to *immediately* cease the policy and practice of allowing the Committee to make medical decisions or recommendations regarding the treatment of transgender prisoners. Dkt. 212, Order at 1, ¶ 1. The Court found that Plaintiffs "put forth evidence that the Transgender Committee is unqualified to make medical decisions for transgender inmates." Dkt. 186, Opinion at 34.

In their Report, Defendants assured the Court that "[t]he Department has ceased the policy and practice of allowing the [Committee] to make medical recommendations" and "[t]he [Committee] will only be consulted for placement, security, and gender-related accommodation issues." Compliance Report at 2, ¶ 4. While the Court found that this consulting role did not violate its Order, the Court "emphasize[d] that Defendants were ordered to *immediately cease* the practice of allowing the [Committee] to make medical decisions and recommendations regarding gender dysphoria." Compliance Report Order at 3.

Nine months later, Defendants continue to allow unqualified, non-physician Committee members to make medical decisions and recommendations regarding the treatment for gender dysphoria. On June 25, 2020, Dr. Hinton, IDOC's Chief of Mental Health and Addiction, and a member of IDOC's Committee, testified that the Committee: (1) decides whether a transgender prisoner should begin hormone therapy (Ex. A, 6/25/2020 Hinton Dep. Tr. at 62:8–14, 70:6–71:2, 84:12–17); (2) makes a recommendation on whether a transgender prisoner should undergo gender confirmation surgery (*id.* at 55:17–56:1); and (3) decides whether a transgender prisoner is allowed access to gender-affirming products (*id.* at 134:21–135:1). IDOC's blatant refusal to comply with the Court's Order has resulted in serious harm to Plaintiffs.

B.     IDOC continues to deprive transgender prisoners of medically necessary social transition in violation of the Court's Order.

After hearing evidence that IDOC denied social transition treatments by, among other things, denying prisoners access to female commissary items and conducting invasive cross-gender strip searches, Opinion at 34, the Court ordered Defendants to "immediately . . . cease the policy and practice of depriving gender dysphoric prisoners of medically necessary social transition" and to "develop a policy to allow transgender inmates medically necessary social transition," Order at 1 ¶ 3, 2, ¶ 3. Instead, according to the Court, a new policy must account for individualized placement determinations, avoidance of cross-gender strip searches, and access to gender-affirming clothing and grooming items. *Id.* Seven months ago, Defendants assured the Court that the Committee "will recommend housing by gender identity when appropriate," Compliance Report at 3-4, ¶ 8, and that IDOC was reviewing and drafting policies in compliance with this portion of the Order, *id.* at 5, ¶ 11.

Despite Defendants' assurances, Dr. Hinton testified that the Committee continues to deny requested social transition treatment, including electrolysis, gender-affirming social transition items, and gender confirming surgery. (*See, e.g.*, 6/25/2020 Hinton Dep. Tr. at 62:8–14, 55:17–56:1, 126:6–20.) Perversely, the Committee relies on the development of a new policy as an excuse to delay access to gender-affirming clothing for class members: "Request for undergarments will be postponed until [the] new policy [is] in effect." (Ex. B, 6/25/2020 Hinton Dep. Ex. 4 at 4.) But a "new policy" is nowhere to be seen. In fact, despite hiring The Moss Group in March 2020 to help it develop new policies related to transgender prisoners and receiving the "framework" for policies from its consultant, Wendy Leach, within the 90-day contract period, IDOC's policy is "not even close" to final and could take a year or more to finalize. (Ex. C, 8/12/2020 Moss Group Dep. Tr. at 176:19-21, 177:7–180:5.)

6

Other IDOC deponents confirmed that Plaintiffs continue to be denied medically necessary social transition. Ms. Tangenise Porter, Chief of Women and Family Services and a member of the Committee, testified that, not only was she asked to weigh in on transgender prisoners' transfer requests without any guidance from IDOC, she was unsure if any criteria existed—***at all***—to determine when and under what conditions transfer requests should be granted. (Ex. D, 6/26/2020 Porter Dep. Tr. at 74:8–75:15, 85:15–22, 90:3–13.) She also confirmed that, since she joined IDOC in February 2020, no transgender female prisoners were transferred from a male facility to a female facility, even though prisoners were regularly transferred between facilities. (*Id.* at 90:23–91:2, 160:22–161:10.) Ms. Glenda Wortley, the designee for the Transfer Coordinator—whose office is "responsible for the movement and placement of all offenders throughout [IDOC]" (Ex. E, 6/22/2020 Stephens Dep. Tr. at 9:10–11)—testified that she could not recall any changes made to the Committee's process for evaluating transfer requests and could not point to a single transgender prisoner whom IDOC has transferred to a facility that matches their gender identity since December 2019. (Ex. F, 7/27/2020 Wortley Dep. Tr. at 116:20–117:12 ("I don't believe we've moved any offenders either male to female or female to male since December….").)

Similarly, Mr. Nottingham testified that he is only aware of two transgender women whom IDOC transferred to women's facilities, both of whom were transferred only after filing lawsuits against IDOC. (Ex. G, 6/30/2020 Nottingham Dep. Tr. at 133:8–134:9.)[1] Mr. Nottingham also testified that IDOC currently operates under the ***exact same*** policy for cross-gender searches as it did prior to the Preliminary Injunction:

> Q.  The memo also provides that "Searches should be completed in accordance with facility policy based upon the gender of the facility (male facility equals male offender). Unless given other direction." So --

---

[1] The record shows that both of these transfers—of Ms. Monroe and Ms. Hampton—occurred well *before* the Court's first preliminary injunction order. *See* Dkt. 158, 8/1/2019 Prelim. Inj. Hr'g Tr., at 403:9–23.

A.     Correct.

Q.     -- a transgender woman housed in a men's facility can be searched by a male guard without triggering the cross-gender search protections; correct?

A.     Correct.

Q.     And this is the current practice and policy that's in effect; correct?

A.     Correct.

Q      How long has this been IDOC's policy?

A      I think for quite some time.

(*Id.* at 187:4–20; *see also id.* 178:22–179:6 ("The policy still stands.").) In fact, Mr. Nottingham confirmed there are only two avenues for a transgender woman to avoid routine cross-gender searches, and ***both*** require Committee approval: (1) transfer to a women's facility; or (2) "voice the[ir] concerns for the [C]ommittee to determine that unclothed searches would be performed by sex of a different gender of the facility." (*Id.* at 197:12–19; *id.* at 137:11–14.) And Mr. Nottingham is not aware of the Committee ***ever*** making a determination that an unclothed search would be performed by a different gender than that of the facility. (*Id.* at 197:20–198:5.) Instead, transgender women assigned to male facilities are still to this day routinely searched by male officers. (*Id.* at 188:9–12.)

C.     <u>IDOC continues to operate under the same policies in place prior to the Court's Preliminary Injunction.</u>

Defendants readily admit they failed to implement any new or revised policies for the care and treatment of transgender prisoners. The Court ordered Defendants to develop new policies:

(i)     To ensure that decisions about treatment for gender dysphoria are made by medical professionals;

(ii)    Which allow transgender inmates access to clinicians who meet the competency requirements stated in the WPATH Standards of Care to treat gender dysphoria; and

> (iii)    To allow transgender inmates medically necessary social transition, including individualized placement determinations, avoidance of cross-gender strip searches, and access to gender-affirming clothing and grooming items.

Dkt. 212, Order at 1, ¶ 1; *id.* at 2, ¶¶ 1, 3.

Despite having ***nine months*** to institute these policies, Defendants' progress is slim to none. They are not even close to finalizing drafts of these policies, much less implementing them. Dr. Hinton—a named Defendant who certified to the Court that he reviewed the Preliminary Injunction hearing transcript and Order—testified that the current Administrative Directive in place regarding the treatment of transgender prisoners became effective on ***July 1, 2019***. (6/25/2020 Hinton Dep. Tr. at 49:22–50:14.) This fact was confirmed during the parties' July 2, 2020 meet and confer. *See* Dkt. 222, Pls.' Mot. to Compel at 8. And IDOC has not implemented any new policies regarding social transition and clinician competency under the WPATH standards. (6/25/2020 Hinton Dep. Tr. at 62:8–14, 55:17–56:1; 8/12/2020 Moss Group Dep. Tr. at 176:21, 177:7–180:5.)

## II.    IDOC'S COMPLETE FAILURE TO CHANGE ITS POLICIES TO COMPLY WITH THIS COURT'S ORDER DEMANDS OUTSIDE OVERSIGHT

The Court noted in its preliminary injunction opinion that "there is no doubt that Plaintiffs face irreparable harms," including "serious mental health issues" due to the denial and delay of proper medical treatment for gender dysphoria. Dkt. 186, Opinion at 35–36. Yet, in the months since that Order, little has changed. Inexperienced and unqualified people continue to make medical decisions, "creating arbitrary barriers to the medical care necessary for prisoners who desperately require treatment." (*See* Ex. H, Ettner Decl. ¶ 4.) The situation Plaintiffs face is dire, and though given ample opportunity to do so, Defendants have completely failed to comply with the Court's Order or satisfy their responsibilities under the Constitution. The time for them to

9

demonstrate their willingness and ability to comply has passed, and urgent action must now be taken in the form of the appointment of an independent monitor.

Plaintiffs' counsel have repeatedly shown flexibility to Defendants to meet their obligations under the unusual circumstances of the COVID-19 pandemic. But, one life-threatening crisis does not trump another, and the Eighth Amendment guarantees adequate medical care for all prisoners. Despite Defendants' unwillingness to take this case seriously, their refusal to provide proper treatment for transgender prisoners in their custody is an unequivocal life-threatening crisis. Two named Plaintiffs are currently facing an imminent threat of self-harm and contemplating suicide, because of the inadequacies in the medical care they are receiving. (Ettner Decl. ¶¶ 10, 15.) Regardless of COVID-19, Defendants knew about their obligations under the Preliminary Injunction Order since December 19, 2019, three months **before** Illinois lockdowns began. There is no excuse for their inability, or flat out refusal, to comply with the Court's Order.

Indeed, IDOC's own employees and consultants agree they would benefit from external assistance. (*See, e.g.*, 6/26/2020 Porter Dep. Tr. at 157:5–8 ("Q: And wouldn't it be helpful to have some additional guidance from someone who has specialized knowledge in the treatment of transgender individuals? A: Yes."); Ex. I, 6/24/2020 Eilers Dep. Tr. at 95:16–20 ("Q: I think you agreed with me, Chief, that the transgender prisoners would benefit from additional help outside of IDOC; is that right? A: Yes."); 6/30/2020 Nottingham Dep. Tr. at 258:21–259:12; Ex. J, 8/17/2020 Reister Dep. Tr. at 51:22–52:6.)[2] Even Dr. Anderson—IDOC's retained consultant— admitted that: (1) there are no concrete plans to keep her engaged on implementing her

---

[2] The exhibit is a rough transcript. As of the date of this filing, Plaintiffs have not received the final deposition transcript. Plaintiffs will file the final version of the transcript with the Court once they receive it.

suggestions; and (2) outside monitoring of IDOC's implementation would clearly benefit both IDOC and the transgender prisoners. (*See* Ex. K, 7/29/2020 Anderson Dep. Tr. at 155:6–22.)

Yet these pleas and instructions fall upon deaf ears. For example, despite The Moss Group's recommendation in mid-2019 that IDOC "immediately review current practice in addressing the transgender population" at Logan Correctional Center, Ms. Leach was "not aware" of anything IDOC had done to address the problems identified by The Moss Group at that time and could not say that IDOC had actually done anything at all. (Ex. L, 8/12/2020 Moss Group Dep. Ex. 2, at 12; 8/12/2020 Moss Group Dep. Tr. at 127:11–14, 128:2–3.) Ms. Leach also testified that on June 4, 2020, she sent IDOC a proposal to continue and complete her work to help IDOC finalize and implement a new policy, including by training IDOC staff. But, at her deposition on August 12, 2020, IDOC had not agreed to continue The Moss Group's work. (*Id.* at 191:16–192:11.)

A.   <u>The Court has equitable powers to appoint an independent monitor to ensure compliance with this Court's Orders.</u>

Plaintiffs move this Court to appoint an independent monitor as an exercise of its inherent power to do so. The longstanding inherent power of courts to appoint monitors is broader than the express authority in Federal Rule of Civil Procedure 53 (authorizing the appointment of "masters"). *See, e.g., Ruiz v. Estelle*, 679 F.2d 1115, 1161 (5th Cir. 1982) ("[R]ule 53 does not terminate or modify the district court's inherent equitable power to appoint a person, whatever be his title, to assist it in administering a remedy."), *amended in part, vacated in part*, 688 F.2d 266 (5th Cir. 1982).

Courts have long recognized and exercised their inherent power to appoint agents, experts, and monitors. *See In re Peterson,* 253 U.S. 300, 312–13 (1920) ("Courts have . . . inherent power . . . to appoint persons unconnected with the court to aid judges in the performance of specific

11

judicial duties" including "special masters, auditors, examiners, and commissioners."); *Powell v. Ward*, 487 F. Supp. 917, 935 (S.D.N.Y. 1980) (recognizing that "Courts have inherent authority to appoint nonjudicial officers to aid in carrying out their judicial functions" in addition to the statutory authority in Rule 53); *Michaelian v. Lawsuit Fin., Inc.*, No. 17-13321, 2018 WL 5603622, at *1 (E.D. Mich. Oct. 30, 2018) (same). This includes the power to appoint an independent monitor to oversee compliance with court-ordered relief. *See, e.g.*, *Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*, No. 14-cv-748-wmc, 2016 WL 1696912, at *2 (W.D. Wis. Apr. 27, 2016) ("The court agrees with plaintiff that a monitor is necessary to ensure compliance with the court's injunction.").

Alternatively, Rule 53(a)(1)(C) allows the Court to appoint a master to "address pretrial and posttrial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district." Fᴇᴅ. R. Cɪᴠ. P. 53(a)(1)(C). *See Lightfoot v. Walker*, 486 F. Supp. 504, 528 (S.D. Ill. 1980) (master was "empowered to monitor compliance with and implementation of the relief ordered" regarding unconstitutional prison conditions and to "advise and assist the Court to the fullest extent possible"), *aff'd*, 826 F.2d 516, 517–18 (7th Cir. 1987). *See also H.B. by Bartolini v. Abbott Labs., Inc.*, No. 13-CV-326-NJS-SCW, 2017 WL 2868424, at *2 (S.D. Ill. July 5, 2017) (appointing a special master, discussing the authority for the duties of a special master—including the advisory committee's notes to Rule 53—and enumerating duties that included "[d]irect, supervise, monitor, and report upon implementation and compliance with the Court's Orders, and make findings and recommendations on remedial action if required" and "[m]onitor compliance with structural injunctions, as may become necessary.").

In addition to Southern District of Illinois court in *Lightfoot*, many other courts have appointed monitors to oversee correctional facilities' compliance with court orders. For example,

12

in *Newman v. Alabama*, the Fifth Circuit endorsed the used of monitors "with full authority to observe, and to report [their] observations to the Court" in order "to ensure compliance with its remedial decree." 559 F.2d 283, 290 (5th Cir. 1977), *judgment rev'd in part on other grounds sub nom. Alabama v. Pugh*, 438 U.S. 781, 98 S. Ct. 3057, 57 L. Ed. 2d 1114 (1978). Similarly, *Kendrick v. Bland*, 740 F.2d 432 (6th Cir. 1984), the Sixth Circuit explained that:

> [A]n order enjoining a continuation of the practices, policies or conditions adjudged as constitutionally infirm whereby the state authority is charged with the responsibility of developing a program to safeguard against abridgement of constitutional rights in the future…may be attended by the appointment of a monitor with authority to observe defendants' conduct and thereby permit the federal court to oversee compliance with its continuing order.

*Id.* at 438.

Recently, an Alabama court appointed an independent monitor to assist the court in bringing a prison system into compliance with the mandates of the Constitution. *See Braggs v. Dunn*, 383 F. Supp. 3d 1218, 1281 (M.D. Ala. 2019). Over defendant's objection, the court held that "[n]oncompliance with remedial requirements supports the need for court monitoring. This makes sense: The more someone fails to do something he agreed to do, the bigger the need to supervise whether he does it in the future." *Id.* The court found that the Alabama Department of Correction's failure to "adequately monitor" its own compliance was a particularly compelling justification for an external monitor, as was its lack of internal resources. *Id.* at 1280–81.

An independent monitor is equally justified here: IDOC continues to fail to fulfill its promises to the Court and responsibilities to the Plaintiffs. The monitor should work with IDOC to develop a detailed plan and strict timeline for revising IDOC's policies and practices for the medical treatment of prisoners with gender dysphoria. These include: (1) replacing the Committee with qualified medical and mental health professionals; (2) providing gender-affirming clothing and grooming items at all facilities; (3) retraining medical and mental health professionals to

ensure their competence to evaluate and treat prisoners with gender dysphoria, including through prescribing and monitoring hormone therapy treatment and contracting with outside specialty medical providers, as necessary; (4) establishing policies regarding searches of transgender prisoners and staff retraining to put an end to IDOC's policy of having guards conduct cross-gender searches of transgender prisoners; and (5) retraining of staff to stop misgendering and otherwise refusing to recognize the gender of transgender prisoners. The external monitor would report to the Court on IDOC's compliance with the plans and timelines.

      B.    <u>The class members are suffering life-or-death conditions</u>.

This Court has already recognized the unacceptable harm to Plaintiffs that Defendants cause by denying them adequate healthcare for gender dysphoria. Indeed—nine months after the Court first ordered reforms—the situation has not improved.

For example, Ms. Kuykendall continues to suffer the same harms raised during the preliminary injunction hearing. After hearing from Ms. Kuykendall, the Court found that being "strip-searched by male officers and in the presence of other males [] makes her feel humiliated and violated." *See* Order at 26. Nonetheless, Ms. Kuykendall was needlessly strip-searched by men ***two times in one day***. (Ex. M, 6/30/2020 Nottingham Dep. Ex. 3.) When asked during his deposition about Ms. Kuykendall's January 2020 grievance related to these strip searches, Mr. Nottingham confirmed that these searches were consistent with IDOC's current policy. (6/30/2020 Nottingham Dep. Tr. at 200:17–206:23) Without this Court's intervention, IDOC will continue to humiliate Ms. Kuykendall, leading to further depression and despair. *See* Order at 35–36 (describing Ms. Kuykendall as "slipping into a deeper depression" and "struggling with constant thoughts of self-harm" because of IDOC's treatment of her).

For other prisoners, the situation has gotten even worse. With no end to the suffering in sight, at least two of the named Plaintiffs are currently facing an imminent threat of self-harm and

contemplating suicide.[3] (Ettner Decl. at ¶¶ 10, 15.)) Defendants continue to deny Ms. Monroe meaningful social transition by isolating her from other prisoners. (*Id.* ¶¶ 7–10.) As a result, her psychiatric condition is extremely serious, and will remain so unless IDOC is forced to act. (*Id.* ¶ 10.) Similarly, Ms. Reed is now also experiencing suicidal ideation because of the continued denial of the care she needs, including social transition and surgery.[4]

The Court can reasonably infer that these three named Plaintiffs are not alone in their desperation and suffering. With a class of over 100 transgender prisoners, none of whom are receiving adequate medical treatment, it is a near certainty that many others are experiencing the same plight. For example, IDOC's witnesses confirm that it continues to (1) deny the class members of gender-affirming clothing and grooming items, (2) subject them to cross-gender searches, and (3) withhold access to gender-affirming surgery. (*See, e.g.*, 6/25/2020 Hinton Dep. Tr. at 62:8–14, 55:17–56:1; 6/30/2020 Nottingham Dep. Tr. at 206:7–22.) These sub-standard medical practices subject Plaintiffs to unacceptable harm.

C.   Appointment of a monitor is the narrowest relief necessary to remedy Defendants' unconstitutional practices.

After nine months of Defendants' "compliance with its remedial responsibilities [being] ***consistently incomplete and inadequate***," they leave this Court no option but to appoint an independent monitor. *See Benjamin v. Fraser*, 343 F.3d 35, 49 (2d Cir. 2003), *overruled on other grounds by Caiozzo v. Koreman*, 581 F.3d 63 (2d Cir. 2009). Ample evidence supports the appointment of an independent monitor at this stage in the case and establishes that this relief is now the narrowest and least intrusive relief the Court can enter to finally end Defendants'

---

[3] Undersigned counsel immediately informed counsel for Defendants about these Plaintiffs' imminent threats of self-harm and suicide, but thus far, no action by IDOC is evident.

[4] Plaintiffs' counsel shared this information with Defendant's counsel by email on July 15, 2020.

violations of Plaintiffs' constitutional rights. Although probably unnecessary, the Court would be on the firmest ground if its order—should it grant Plaintiffs' motion—included findings sufficient to show satisfaction of the needs-narrowness-intrusiveness requirements of the PLRA, codified at 18 U.S.C. § 3626(f).[5] The PLRA specifically requires the Court to make such findings in order to appoint a Rule 53 special master. *Id.*[6]

## CONCLUSION

There is no shortage of evidence warranting the appointment of an independent monitor. Ultimately, the necessary and narrowly tailored relief that Plaintiffs seek is the only apparent way to end Defendants' unconstitutional conduct and ensure compliance with the Court's Order. Plaintiffs respectfully request the Court grant their motion in its entirety.

---

[5] Should the Court grant Plaintiffs' request for appointment of a monitor, undersigned counsel could submit such proposed findings.

[6] Some courts have questioned whether the PLRA requires an order appointing a monitor to include findings that it complied with the needs-narrowness-intrusiveness requirements. *Compare Carruthers v. Jenne*, 209 F. Supp. 2d 1294, 1300 (S.D. Fla. 2002) (determining that the appointment of a monitor is not an order for "prospective relief" subject to the PLRA's needs-narrowness-intrusiveness requirement because "monitoring is not an 'ultimate remedy' and only aids the prisoners in obtaining relief") *with Benjamin*, 343 F.3d at 49 (declining to answer the question given that the monitoring satisfied the needs-narrowness-intrusiveness) and *Braggs*, 383 F. Supp. 3d at 1282–83 (same).

Dated: August 21, 2020

By: /s/ *John A. Knight*

John A. Knight
Camille E. Bennett
Ghirlandi Guidetti
Carolyn M. Wald
ROGER BALDWIN FOUNDATION OF
ACLU, INC.
150 North Michigan Avenue, Suite 600
Chicago, IL 60601
Telephone: (312) 201-9740
Facsimile: (312) 288-5225
*jknight@ACLU-il.org*
*cbennett@ACLU-il.org*
*gguidetti@ACLU-il.org*
*cwald@ACLU-il.org*

Catherine L. Fitzpatrick
Jordan M. Heinz
Sydney L. Schneider
Austin B. Stephenson
Amelia H. Bailey
Sam G. Rose
KIRKLAND &ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
*catherine.fitzpatrick@kirkland.com*
*jordan.heinz@kirkland.com*
*sydney.schneider@kirkland.com*
*austin.stephenson@kirkland.com*
*amelia.bailey@kirkland.com*
*sam.rose@kirkland.com*

Brent P. Ray
KING &SPALDING LLP
353 North Clark Street
Chicago, IL 60654
Telephone: (312) 995-6333
Facsimile: (312) 995-6330
*bray@kslaw.com*

Abby L. Parsons
KING & SPAULDING LLP
1100 Louisiana Street, Suite 4000
Houston, TX 77002

17

Telephone: (713) 751-3294
*aparsons@kslaw.com*

Thomas E. Kennedy III
Sarah Jane Hunt
KENNEDY HUNT P.C.
906 Olive Street, Suite 200
Saint Louis, MO 63101
Telephone: (314) 872-9041
*tkennedy@KennedyHuntLaw.com*
*sarahjane@KennedyHuntLaw.com*

## CERTIFICATE OF SERVICE

I certify that on August 21, 2020, I electronically filed the foregoing document and any attachments with the Clerk of this Court by using the CM/ECF system, which will accomplish service through the Notice of Electronic Filing for parties and attorneys who are Filing Users.


/s/ *John A. Knight*

John A. Knight