IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS DIVISION

| | |
|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELENA VISION, SORA KUYKENDALL, and SASHA REED, <br><br> Plaintiffs, <br><br> - vs- <br><br> ROB JEFFREYS, MELVIN HINTON, and STEVEN BOWMAN, <br><br> Defendants. | ) ) ) ) ) ) ) ) No. 18-156-NJR ) ) ) ) ) ) |

**DEFENDANTS' RESPONSE TO PLAINTIFFS'
RENEWED REQUEST FOR APPOINTMENT OF INDEPENDENT MONITOR**

The Defendants, ROB JEFFREYS, MELVIN HINTON, and STEVEN BOWMAN (each sued in their official capacity as an official of the Illinois Department of Corrections [referred to as "IDOC" or "the Department"]), by and through their Attorney, Kwame Raoul, Attorney General for the State of Illinois, provide the following in response to Plaintiffs' renewed motion seeking the appointment of an independent monitor [Doc. 225]:

**Introduction**

In February 2020, in response to Defendants' report on compliance with the preliminary injunction orders, Plaintiffs argued for the need of an expert to oversee compliance. [Doc. 207, pp. 13-14]. Defendants sought time and leave of Court in order to file a reply, which was filed on February 28, 2020. [Docs. 208-10]. On March 20, 2020, this Court found that the appointment of an expert was not warranted at the time. [Doc. 215, p. 3].

On August 21, 2020, Plaintiffs filed a motion renewing their request for the appointment of an independent monitor. Plaintiffs' motion is replete with emotion but exceeds the requirement of zealous advocacy and crosses into distasteful litigation tactics. In an effort to gain

more influence over the process of transgender care in IDOC, Plaintiffs are willing to ignore testimony, manipulate the facts, and misrepresent the state of affairs. As explained more fully below, Plaintiffs' legal arguments fall short of proving a need for an independent monitor or special master. In addition, Defendants have to provide the facts largely omitted by Plaintiffs to explain what the consultants already contracted with IDOC have been doing and how they feel about the work being done within IDOC. And, Defendants spend a substantial amount of time merely correcting the record on the facts already provided in this matter. Defendants find it worth noting below that the 90-day time period imposed by the Prison Litigation Reform Act (PLRA) has expired; however, that has made no difference in the actions taken by IDOC to improve transgender care for the prisoners in its custody. For all of these reasons, Plaintiffs' motion must be denied.

## Argument in Response to Plaintiffs' Motion

**I. Plaintiffs fail to address Defendants' prior arguments on this issue and fail to establish exceptional circumstances for appointment of a monitor or special master.**

Plaintiffs are attempting to assert themselves in IDOC's day-to-day operations. As Defendants pointed out initially, IDOC has the authority to run its facilities and Plaintiffs have no decision-making authority over IDOC. [Doc. 210, p. 5, *citing to Bell v. Wolfish*, 441 U.S. 520 (1979) & *Rizzo v. Goode*, 423 U.S. 362, 378-79 (1976)]. Defendants pointed out then (and it still remains true) that Plaintiffs cannot show that the consultants hired by IDOC are unqualified for the work at hand. [*See* Doc. 210, pp. 7-8].

Plaintiffs also fail to discuss why they should be exempted from the requirements of Federal Rule of Civil Procedure 53. [*See* Doc. 210, p. 8]. Plaintiffs have never asked for Defendants to consent to a special master. And, Plaintiffs do not ask for relief that this Court is unable to understand or render a determination, either through the District Judge or through referral to a Magistrate Judge. The Committee Notes from the 2003 Amendment to Rule 53

provide: "The core of the original Rule 53 remains, including its prescription that appointment of a master must be the exception and not the rule." Fed. R. Civ. P. 53 committee notes-2003 amendment.

In support of their renewed request, Plaintiffs cite to several cases; however, Plaintiffs ignore the actual substance and pertinent background of the cited cases. For most, they provide snippets of information without accounting for the case-specific details that actually work against Plaintiffs' position.

First, they cite to *Ruiz v. Estelle*, 679 F.2d 1115 (5th Cir. 1982), *amended in part, vacated in part on unrelated grounds*, 688 F.2d 266. The *Ruiz* opinion begins as follows:

> There is no iron curtain drawn between the Constitution and the prisons of this country. When the remedial powers of a federal court are invoked to protect the constitutional rights of inmates, the court may not take a "hands-off" approach.
>
> The duty to protect inmates' constitutional rights, however, does not confer the power to manage prisons, for which courts are ill-equipped, or the capacity to second-guess prison administrators. Federal courts should not, in the name of the Constitution, become . . . enmeshed in the minutiae of prison operations. Our task is limited to enforcing constitutional standards and does not embrace superintending prison administration.

*Ruiz*, 679 F.2d at 1126 (internal quotations and footnotes omitted). That case dealt with a class action on behalf of 33,000 inmates in the Texas Department of Corrections, which was characterized in the opinion as the then-largest prison system in the United States. *Id*. at 1127. A 159-day trial was completed in September 1979, where 349 witnesses testified and 1,565 exhibits were admitted into evidence. *Id*. The court entered a 118-page memorandum opinion indicating that it would grant relief to the prisoners, and the parties subsequently entered into and filed a proposed consent decree that was approved by the court. *Id*. at 1127-28. Only then, after final relief was entered, the Court appointed a special master to monitor the implementation of the relief. *Id*. at 1128. The rationale behind the appointment of a special master was based on

several factors, not just the plaintiffs' complaints but a record of "intransigence" by the prison system, complexity of class members and facilities at issue, failure to acknowledge "completely evident" constitutional violations, and overall failure of the prison system to conform. *Id*. at 1160-61. Even so, the Fifth Circuit made clear that the "court's appointed agents should not intrude to an unnecessary extent on prison administration." *Id*. at 1161-62. And, the order appointing the monitor was amended by the Fifth Circuit to restrain the special master's authority where it was found to be too sweeping. *Id*. at 1162-63.

*Ruiz* and some of the other cases cited by Plaintiffs meet the requisite exceptional circumstances to justify appointment of an independent monitor. In *Powell v. Ward*, an order entered in 1975 was ignored for over three years. 487 F.Supp. 917, 934 (S.D.N.Y. Feb. 27, 1980). The defendant in that action was found to be in civil contempt, fined with a monetary sanction, and a special master was appointed to oversee the compliance process and report to the court until the court was satisfied that its constitutional protections were incorporated. *Id*. at 935. In *Newman v. State of Alabama*, the Fifth Circuit ordered the appointments of special masters in place of a 39-member "Human Rights Committee" that had been established and appointed by the district court to oversee remediation of excessive overcrowding and other inhumane conditions of confinement found in Alabama state prisons. This occurred at a time when the Eighth Amendment prisoner rights cases were considered a "comparatively new field of the law" at the federal level. 559 F.2d 283, 287-90 (5th Cir. 1977), *cert. granted in part, judgment rev'd in part sub nom. Alabama v. Pugh*, 438 U.S. 781 (1978). In lieu of the court-appointed committee, a monitor was to be appointed for each of the prisons involved to report observations to the court but "with no authority to intervene in daily prison operations." *Id*. at 290.

In *Epic Systems Corporation v. Tata Consultancy Services Limited*, a permanent injunction was entered against the defendants, and special monitor was appointed to "insure

compliance with the court's injunction in light of the extent of unauthorized and undocumented access to its trade secrets and confidential information within TCS." 2016 WL 1696912 at *2 (W.D. Wis. Apr. 27, 2016). In *Epic Systems*, the plaintiff was responsible for compensating the monitor.[1] 2016 WL 6477011 at *2 (W.D. Wis. Nov. 2, 2016). In *Michaelian v. Lawsuit Financial, Inc.*, a special master with specific expertise was appointed to investigate the financial health of the defendant-corporation. 2018 WL 5603622 at *1 (E.D. Mich. Oct. 30, 2018). The parties consented to limited duties to be performed by the special master, and one was selected by the court with the fees and costs to be borne by the defendants. *Id*. at *2.

In a number of the cases cited by Plaintiffs, the parties had *consented* to the appointment. In *H.B. by Bartolini v. Abbott Laboratories, Inc.*, a case overseen by the District Judge assigned to this matter, a special master was appointed to assist the Court with trial-related duties. 2017 WL 2868424, at *1 (S.D. Ill. Jul. 5, 2017). Importantly, there, the parties consented to the special master. *Id*. Plaintiffs cite to *Braggs v. Dunn*, but fail to provide any context as to the district court appointment of a monitor. 383 F. Supp. 3d 1218 (M.D. Ala. May 4, 2019). *Braggs* is a years-long class action suit where the parties reached an agreement "early" in the litigation (two years before the order cited by Plaintiffs), and the court granted separate prospective relief for immediate suicide-prevention measures. *Id*. at 1226-27. In late 2018, the parties had each proposed "global monitoring schemes" and the parties had agreed that court monitoring was necessary. *Id*. at 1278. Contrary to Plaintiffs' characterization of the monitor appointment, the defendants only opposed monitoring on the immediate relief that was the subject of the court's order, and argued in essence that "the court should wait to impose a global monitoring scheme that covers all remedial orders." *Id*. at 1282. The court found that the discrete monitoring for the

---

[1] There, the monitor's appointment was initially set at 2 years. This may explain why the issue was not raised in the recent Seventh Circuit opinion arising from the same case: *Epic Systems Corp. v. Tata Consultancy Services, Ltd.*, 2020 WL 4882891 (7th Cir. Aug. 20, 2020).

immediate suicide-prevention measures could not wait. *Id*. The court ordered the appointment of an external monitor to conduct site visits, review records, and periodically report to the court. *Id*. at 1285-87. In addition, the court ordered the prison system to establish a "formal internal monitoring scheme focused on the immediate suicide-prevention relief ordered [there]." *Id*. at 1286-87. These cases are inapposite comparisons to this suit.

And, *Benjamin v. Fraser*, is appallingly unrelated to the request sought by Plaintiffs here. 343 F.3d 35 (2d Cir. 2003), *overruled on other grounds by Caiozzo v. Koreman*, 581 F.3d 63 (2d Cir. 2009). The opinion cited by Plaintiffs discussed whether a monitoring group put in place prior to the PLRA comported with the Act. *Id*. at 43. In *Benjamin*, pretrial detainees in New York City facilities filed related class actions in 1975 alleging unconstitutional conditions of confinement. *Id*. at 40. The parties entered into consent decrees in 1978 and 1979. *Id*. Three years later, and *after the agreement of the parties*, the court ordered the creation of an "Office of Compliance Consultants" (OCC) to monitor and assist with compliance efforts. *Id*. The OCC's involvement continued by agreement of the parties from 1982 to 1987. *Id*. In 1987, the parties were unable to agree on terms of renewal, so the district court ordered the renewal of the OCC's mandate to ensure compliance with the consent decrees. *Id*. at 43. The OCC was found to not be a special master or appointee under Rule 53. The Second Circuit Court of Appeals found the following:

> The OCC's functions are quite different from those of a Rule 53 special master. The OCC was not appointed to hold hearings, subpoena witnesses, take testimony, or rule upon evidence. It does not prepare reports to assist in the court's determination of discrete issues of law or fact, and its factual findings are not legally entitled to deference. The OCC's reports, which are neither formally filed in the court's docket nor adopted, modified, or rejected by the court, serve a different function from the typical report of a special master. Besides informing the court of ongoing compliance efforts, these reports facilitate the City's awareness of its compliance with remedial directives. In other words, the OCC serves a monitoring

function; it does not exercise quasi-judicial power.

*Id*. at 45. Not only were the functions at issue in *Benjamin* extremely limited and quite separated from the judicial process, the parties had *consented* to the OCC in both its creation and, for many years, its oversight.

Nearly as bad as Plaintiffs' failure to recognize the difference between consent to a special master and a court's imposition of one is Plaintiffs' reliance on *Kendrick v. Bland,* a 36-year-old opinion from a different circuit. There, a district court entered a preliminary injunction after a class action had been pending for over four years. 740 F.2d 432, 434 (6th Cir. 1984). Then, the parties entered into a consent decree which essentially converted the preliminary injunction to permanent relief. *Id*. When the plaintiffs felt that the consent decree was not being met, they asked the court to disqualify prison officials from certain posts, and the court granted that request. *Id*. at 435-36. On appeal, the Sixth Circuit found such relief exceeded the remedies available to the district court. *Id*. at 439. In dicta, the Sixth Circuit discussed potential, less intrusive alternatives for the court to oversee the consent decree agreed upon, such as a special monitor or contempt proceedings. *Id*. at 438-39. Nowhere in the Sixth Circuit's opinion was a special monitor appointed or ordered.

In none of the instances cited by Plaintiffs was a monitor appointed to interfere with prison operations by developing a detailed plan or strict timeline as requested by the Plaintiffs in their motion. [*See* Doc. 225, pp. 13-14]. And, no compliance monitoring is necessary here. As argued more fully in sections II, III, and IV, below, Plaintiffs' arguments fail to present a fair picture to the Court. Even so, no permanent relief has been entered, nor any consent decree, and IDOC is working comprehensively to identify and solve issues highlighted by the Court in its preliminary injunction order.

## II. Plaintiffs refer to the consultants hired by IDOC, but ignore the testimony of each of the consultants because it was favorable to Defendants.

When Defendants filed their notice with this Court after the preliminary injunction ruling, Defendants noted that IDOC had entered into a consulting contract with USPATH President-elect Dr. Erica Anderson. [Doc. 202, p. 5, ¶ 11]. Defendants also represented that IDOC made initial contact with Wendy Leach, a Senior Consultant for The Moss Group. [*Id*. at pp. 5-6, ¶ 13]. IDOC entered into a 60-day contract with The Moss Group in March 2020. It is clear that soon after the Court's preliminary injunction was entered, IDOC voluntarily engaged consultants for their expertise and guidance.

Plaintiffs deposed both consultants, who were hired by IDOC to assist with re-working its transgender policies and training. Both consultants expressed optimism about the work being done by IDOC. Although witnesses deposed for this action agreed when asked leading questions about whether outside advice would be helpful with respect to transgender care, none of the individuals deposed volunteered such testimony. And, no one testified that a monitor would be any more helpful than Dr. Anderson or The Moss Group. To the contrary, Dr. Reister explained that having impartial feedback was one of the reasons IDOC brought in The Moss Group. [Doc. 225-10 at 4:7-5:15].

### A. The Moss Group

Wendy Leach is a Senior Consultant at The Moss Group, and she "provides her expertise in inmate and youth physical and sexual safety, conditions of confinement and the Prison Rape Elimination Act (PREA) and facility operations." (Exhibit 1, Leach CV). In early 2020, The Moss Group contacted the Director of IDOC about ongoing transgender issues. (Exhibit 2, Deposition of The Moss Group by Wendy Leach, Dep. 131:1-132:15). The Moss Group entered into a 60-day contract geared to assist with policy framework and staff training to manage transgender offenders. (Ex. 2, Leach Dep. 132:12-133:16). Ms. Leach *suggested* the 60-day

period for the recent contract. (Ex. 2, Leach Dep. 135:16-136:9). There was a component for on-site review; however, that was not able to be completed due to the COVID-19 pandemic. (Ex. 2, Leach Dep. 133:17-134:13). The goal was for The Moss Group to start earlier in 2020, but COVID-19 pushed it out and the work began in earnest in May. (Ex. 2, Leach Dep. 143:19-144:17). The delay was not due to IDOC, but because the circumstances of the pandemic forced The Moss Group to extend all of its contracts. (Ex. 2, Leach Dep. 148:16-150:20, 162:12-163:1). The extension did not affect the work of Ms. Leach. (Ex. 2, Leach Dep. 162:21-163:1).

In 2018, Ms. Leach assisted the Georgia Department of Corrections in updating its transgender and intersex offender policy. (Ex. 2, Leach Dep. 69:3-70:16). She has also assisted other correctional systems with policies. (Ex. 2, Leach Dep. 178:2-180:5). Georgia took about 18 months to finalize its transgender policy. (Ex. 2, Leach Dep. 178:2-9). Ms. Leach estimates that a system that is very serious and has nothing holding it up could probably complete a new policy in 60-90 days. (Ex. 2, Leach Dep. 177:16-178:1). Obviously, IDOC has had something holding up its newly revised policy: the COVID-19 global pandemic, which was cited by many witnesses in addition to Ms. Leach as the reason that more has not been accomplished by now.

Even so, Plaintiffs wrongly represent that IDOC's policy is not even close to final and could take a year or more to finalize. [Doc. 225, p. 6]. As Wendy Leach explained in the page following Plaintiffs' quotation, IDOC has not communicated to her when it expects to finalize the policy. (Ex. 2, Leach Dep. 177:1-5). In fact, she has not seen a version of it since she sent her template in May 2020. It was merely her opinion that implementation of the new directive could take much longer. (Ex. 2, Leach Dep. 177:7-178:1). Nevertheless, she believed that her involvement was to set the foundation and then IDOC could work more going forward to flesh out the policy, work more on staff training, come up with different housing and environmental ideas. (Ex. 2, Leach Dep. 134:2-135:5). Her involvement was "just a starting point." (Ex. 2, dep

p. 135:3). But, Plaintiffs have the testimony of Dr. Reister who testified on August 17, 2020, that the policy is out of the hands of "the developers" and with the IDOC Policy and Directives Unit, which is far along in the process. (Exhibit 8, Reister Dep. 99:15-100:8). Dr. Reister does not know with certainty when it will be complete but characterized the anticipated time as "very short." (Ex. 8, Reister Dep. 100:4-8).

Plaintiffs asked Ms. Leach about whether it would be helpful to have a court order requiring IDOC to continue the work with her. Defendants objected based on foundation, but as required, Ms. Leach provided her response anyway:

> I would say no. I – I would say no anyway. And here's why. The reality is that for sustainability and for people who really care about this stuff and really want to do it, it shouldn't take a court order to get anybody to do anything, right? I mean, I don't think there's been any push-back -- I've gotten no push-back on anything that we've pushed forward and said, "What about this? What about that?" And I know Dr. Anderson has, you know -- she has some views on transitioning and on surgery and other things that are way beyond where my world is. I don't know how they feel about any of that. But I do know that the stuff that I proposed, they've been very positive about it, haven't pushed back on it. So my thinking is, then, just do that stuff.
>
> Now understanding that there's other priorities, sometimes people get delayed, but it seems to me that we all kind of want the same thing. And that's what I've, you know, talked about about this. But we all want everybody to be safe and everybody to be healthy and fine and everything to go kind of smoothly. So how do we get there? It's not necessarily that we always have to fight about it in court.

(Ex. 2, Leach Dep. 276:18-279:11).

### B. Dr. Erica Anderson

Dr. Anderson has a Ph.D. in clinical psychology and is currently employed as staff at the University of California, San Francisco. (Exhibit 3, Anderson Dep. 20:1-22:21). In addition, Dr. Anderson works in private practice with a focus on gender, sexuality, and trauma. (Ex. 3, Anderson Dep. 23:10-13). Plaintiffs deposed Dr. Anderson for several hours but attached only

one sheet of Dr. Anderson's condensed deposition transcript to their motion, reflecting a mere four pages of questions and answers. [Pl Ex. K at Doc. 225-11, including Anderson Dep. 154-157]. Important information was intentionally omitted from Plaintiffs' motion.

    Dr. Anderson signed her contract with IDOC on January 10, 2020, and began performing her services for IDOC at that time. (Ex. 3, Anderson Dep. 57:8-13). Although the contract does not require IDOC to act on Dr. Anderson's assessment or recommendations, she noted the obvious incentive for IDOC to treat her recommendations seriously and appropriately incorporate them, and in her experience that is what IDOC had been doing. (Ex. 3, Anderson Dep. 59:1-5: "I think, as we can all recognize, there's a very big incentive for them to treat seriously all my recommendations and as is appropriate incorporate them, and that's my experience is what they are doing."). Dr. Anderson acknowledged that she is "a very well-paid consultant." (Ex. 3, Anderson Dep. 110:5-7). IDOC's contract with Dr. Anderson has an agreed term from January 16, 2020 to December 31, 2020. (Exhibit 4, IDOC-Anderson contract, p. 9). Plaintiffs have not even let Dr. Anderson fulfill her initial term before concluding that IDOC will not retain her for future services.

    One of Dr. Anderson's tasks is to assist with bringing in WPATH's Global Education Initiative (GEI) training. (Ex. 3, Anderson Dep. 89:11-20). IDOC, with the assistance of Dr. Anderson, is completing a contract for customized training for medical and mental health care providers throughout IDOC. (Ex. 3, Anderson Dep. 89:15-90:17). Dr. Anderson also testified about what she has seen of IDOC since she began consulting for it in January 2020. She testified that: "My impression is that—is that the leaders in the health arena for IDOC are highly motivated to accept recommendations and improve the processes whereby decisions are made about care and they're committed to training professionals to raise their level of sophistication in this area. So I think we're moving in the right direction." (Ex. 3, Anderson Dep. 143:18-144:1).

Based solely on the deposition testimony of these consultants, Plaintiffs' request for the need for a court monitor is without merit.

### III. Plaintiffs disregard facts that further explain IDOC's actions taken after the Court's preliminary injunction order.

In the motion at hand, Plaintiffs contend that the Transgender Care and Review Committee continues to allow non-medical members to make medical decisions regarding treatment for gender dysphoria. Plaintiffs cite to the testimony of Dr. Hinton to support their motion. Yet, in areas omitted from Plaintiffs' filing, Dr. Hinton stressed that the current Administrative Directive (AD) states certain things but that they were being changed.

At one point Dr. Hinton stated:

> So, again, it's really important to make it clear, this process is kind of evolving as we speak, and so by the time of this particular revision or addition of this AD, the transgender committee would make a recommendation as to whether or not to move forward or not. But, again, my understanding is that is changing . . . .

(Exhibit 5, Hinton Dep. 53:15-22). The recommendations regarding gender-affirming surgery contained in the AD were in the process of changing so that it would be strictly a medical decision. (Ex. 5, Hinton Dep. 54:20-55:8). Part of the transcript referenced by Plaintiffs clearly discussed what the current Administrative Directive states (Ex. 5, Hinton Dep. 69:16-70:11), which is different from the current practice. Although Dr. Hinton testified that he could recall an instance in 2020 where the committee made a decision on initiating hormone treatment for a transgender prisoner (Ex. 5, Hinton Dep. 70:12-71:2), Dr. Hinton later clarified that if brought to the Committee it could vote on issues presented, but the physician actually makes the decision to administer or prescribe the hormone treatment (Ex. 5, Hinton Dep. 98:18-99:17). He also testified that the attending physicians were currently tasked with prescribing gender-affirming clothing items, not the Transgender Care and Review Committee. (Ex. 5, Hinton Dep. 74:6-74:18). Some of Dr. Hinton's testimony is, admittedly, unclear if read in a vacuum, as it is not

clear from the transcript whether some of his answers referred to the written policy (which, again, is under revision), the actual practice, or both. Dr. Hinton explained he is not a physician and does not oversee the medical side of IDOC. (Ex. 5, Hinton Dep. 196:13-21).

Fortunately, Plaintiffs' attorneys have taken depositions of those who are more directly involved with the medical components and revisions for the medical provisions in the working draft of the Administrative Directive. Dr. Lamenta Conway—who is not mentioned once in Plaintiffs' motion—is the Deputy Chief of Health Services for IDOC. (Exhibit 6, Conway Dep. 10:8-10). Dr. Conway explained the expected two-committee system for IDOC's oversight of transgender issues. (Ex. 6, Conway Dep. 46:15). The Transgender Health and Wellness Committee (THAW) will be comprised of medical and mental health professionals trained and knowledgeable of the WPATH standards and, eventually, WPATH-certified. (Ex. 6, Conway Dep. 46:15-47:1). The THAW Committee will handle appeals from patients with concerns about the treatment provided at the facility level and consider requests for surgery, which Dr. Conway characterized as "a major agenda item." (Ex. 6, Conway Dep. 47:9-19, 259:7-14). The Transgender Administration Committee will handle operational concerns including housing, PREA and commissary. (Ex. 6, Conway Dep. 48:8-15, 54:2-8). They are working to add a surgical expert and a WPATH certified endocrinologist to THAW. (Ex. 6, Conway Dep. 78:11-81:8).[2] Dr. Conway confirmed that hormones are being prescribed and monitored by facility level medical staff and that IDOC wants to ensure that they have the type of the support they need. (Ex. 6, Conway Dep. 79:4-17). Wexford has provided training to everyone who will be

---

[2] This was also proposed by Dr. Anderson, and she is assisting with fulfilling this goal, although it has not been finalized. (Ex. 3, Anderson Dep. 132:14-134:16).

prescribing hormones. (Ex. 6, Conway Dep. 180:1-181:23).[3] Dr. Conway checked in with Wexford in May 2020 after receiving a couple of complaints about delays of hormone prescriptions. (Ex. 9, Fisher Dep. 52:13-18). In addition, Dr. Conway and IDOC are also working on Quality Assurance components for transgender care. COVID halted everything, but they are hoping to have rolled out the bulk the changes before the end of the year. (Ex. 6, Conway Dep. 170:2-172:17). Gender-affirming surgeries, specifically, were delayed by COVID-19. (Ex. 6, Conway Dep. 265:13-17). Dr. Conway was scheduled to take WPATH training, but WPATH cancelled its scheduled training due to COVID-19. (Ex. 6, Conway Dep. 25:23-26:6).

With respect to transfers, Plaintiffs completely disregard all of the other testimony and evidence on this point. Plaintiffs are well aware that four transgender prisoners have been evaluated for transfer and two have been approved since Monroe's transfer last year. (Exhibit 10, Defs' Resps to Pls' 2d Set of Ints., p. 2, #3). Even at the time of Dr. Conway's deposition, there was no inmate movement of any gender, so there were no transfers to women's facilities for social transition. (Ex. 6, Conway Dep. 175; see also Ex. 8, Reister at 232:16-233:17).

In fact, the State halted transfers of prisoners at the beginning of the pandemic. Viruses can easily spread throughout prisons and correctional centers due to the close proximity of prisoners and staff and the number of hours people are kept indoors. There are concerns associated with movement between facilities because the movement can make it difficult to control infection rates. In *Landers v. Pritzker*, 20-MR-70 (Logan County) a number of Sheriffs in Illinois sued the State for a court order to force IDOC to accept prisoners from county jails. Even though the Governor's Executive Action had been amended to no longer prohibited transfers from counties to IDOC, the IDOC Director was still able to enact criteria to limit the spread of

---

[3] Dr. Conway's testimony with respect to hormones was corroborated by Dr. Reister (Ex. 8, Reister Dep. 100:15-101:1, 112:8-16, 224:2-12) and Dr. Fisher as the Wexford Health Sources, Inc., 30(b)(6) Representative (Exhibit 9, Fisher Dep. 45:17-46:5). Dr. Fisher also corroborated Dr. Conway's testimony as to the Wexford Training. (Ex. 9, Fisher Dep. 59:16-22).

COVID-19. Regardless, the Logan County Court entered a preliminary injunction for resumption of all transfers regardless of whether the inmates met the criteria, and IDOC was required to admit several new inmates. That order was eventually stayed by the State's Fourth District Court of Appeals on August 20, 2020. No. 4-20-0356. So, all of the orders from county jails and the rippling effect that created transfers within IDOC has been lessened. As of now, "all interagency transports have been suspended except for court writs, medical and mental health appointments, and emergency transfers." IDOC website COVID-19 Frequently Asked Questions at: https://www2.illinois.gov/idoc/facilities/Pages/Covid19Questions.aspx (last accessed Sept. 2, 2020).

Plaintiffs cite to Tangenise Porter's lack of knowledge as to transfer procedures as evidence of IDOC's failures [Doc. 225, p. 7]; however, Ms. Porter began in her position in February 2020 and attended a Committee meeting on February 18, 2020, right after she started her position on February 1, 2020 (Exhibit 7, Porter Dep. 14:1-4, 53:22-54:4). She understood that she was on the February call to see how the process worked. (Ex. 7, Porter Dep. 108:12-17). Movement was stopped shortly thereafter. At the time of her deposition, Ms. Porter had only attended two Committee meetings. (Ex. 7, Porter Dep. 54:5-7).

Additionally, Plaintiffs discuss improper strip searches and the Plaintiffs' overall wellbeing as bases for an independent monitor. As to the search rules, Ryan Nottingham, who is presently the Departmental PREA Coordinator, testified in his deposition that it is generally the type of prison (male versus female) that determines the gender of the searching officer, but that default rule may be adjusted if the prisoner raises a concern to the searching officers. (Exhibit 11, Nottingham Dep. 176:8-177:19). The Court's preliminary injunction order as to this point was to "develop a policy to allow transgender inmates . . . avoidance of cross-gender strip searches." [Doc. 187, amended at Doc. 212, p. 2, ¶ 3]. Written policy articulating what Nottingham testified

to is expected to be in the new IDOC transgender care directive.[4] Plaintiffs raise the example of Plaintiff Kuykendall being strip-searched twice in a day by male officers; however, Plaintiffs confuse the date of the grievance. Ms. Kuykendall's grievance filed as Exhibit M [Doc. 225-13] concerned strip searches conducted on December 13, 2019, and was signed by Kuykendall on December 16, 2019. The Court's order and preliminary injunction were first entered on December 19, 2019. Even so, it is clear that the grievance was reviewed in the light of a potential PREA violation as claimed by Ms. Kuykendall. Per Ms. Leach, PREA does not prohibit someone of the opposite gender identity from searching a transgender prisoner. (Ex. 2, Leach Dep. 270:19-271:4).

Plaintiffs also discuss threats of harm and suicide by Plaintiffs Monroe and Reed. In footnotes 3 and 4, Plaintiffs express that their counsel informed defense counsel of the information "but thus far, no action by IDOC is evident." [Doc. 225, p. 15]. Plaintiffs are not entirely clear on what they are attempting to convey by the footnotes; however, to the extent the footnotes could be interpreted as a failure by defense counsel in this matter, such is not the case. On July 17, 2020, the undersigned responded to the July 15 email to inform Plaintiffs' counsel that we had passed the concerns raised to IDOC and we understood that the concerns would be forwarded to the appropriate persons to be resolved.[5] The parties' attorneys have not had further discussions with respect to those individuals' concerns.

---

[4] And, it is the approach that Ms. Leach, who is a PREA auditor and trainer, also states is the best practice under PREA. (Ex. 2, Leach Dep. 269:7-271:4)

[5] The referenced emails are part of a long chain that discuss a number of matters, so they will not be attached here; however, the full text of the undersigned's response on the issue is: "As for the concerns you relayed about your clients, Ms. Monroe and Ms. Reed, we have passed those along to IDOC. We understand those concerns will be forwarded to the appropriate persons."

## IV. The preliminary injunction order has expired under the PLRA; however, Defendants are still working within its confines and following the Court's orders.

The PLRA provides that: "Preliminary injunctive relief shall automatically expire on the date that is 90 days after its entry, unless the court makes the findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period." 18 U.S.C. § 3626(a)(2). The Court has not made its December 2019 order final.[6] Although the amended preliminary injunction was entered on March 4, 2020, case law from the Eleventh Circuit suggests that clarification or a change is not the same as renewal of the injunction. *U.S. v. Sec'y, Fla. Dep't of Corr.*, 778 F.3d 1223, 1228 (11th Cir. 2015).

The Ninth Circuit has found that there is nothing in the PLRA that limits the number of times a court may enter preliminary relief, but "the provision simply imposes a burden on plaintiffs to continue to prove that preliminary relief is warranted." *Mayweathers v. Newland*, 258 F.3d 930, 936 (9th Cir. 2001). Defendants do not wish to invite any additional evidentiary hearings at this time—frankly, moving forward at this moment is not productive because IDOC is still tying up loose ends with new policies and relationships, such as that with the University of Illinois-Chicago Transgender Clinic—but it is worth noting that the injunction has expired under the law, the world has been in the midst of a pandemic, and IDOC still continues to push forward. No monitor is needed to finalize the changes for transgender care in IDOC.

## Conclusion

In conclusion, this Court should deny Plaintiffs' renewed request seeking the appointment of an independent monitor. Plaintiffs call Defendants' efforts "scant"—and they may appear scant if viewed in the limited and skewed frame presented by Plaintiffs—however, it is clear that progress is being made, even if not overnight. Plaintiffs contend that the relief they

---

[6] Plaintiffs represent that there is a trial currently scheduled for March 2021 [Doc. 225, p. 4], but this Court's docket reflects no such trial date. In fact, the Court's March 24, 2020, docket entry accompanying Doc. 216 (scheduling order) states: "A trial date will be set after the Court renders a decision on the dispositive motions."

seek in their motion seeking appointment of a monitor is "necessary and narrowly tailored" but the relief they seek meets neither of those definitions. Defendants have voluntarily made efforts to ensure appropriate treatment for transgender prisoners within IDOC and have staff committed to fulfill those goals.

WHEREFORE, for these reasons, Defendants respectfully request that this Court deny Plaintiffs' renewed motion for appointment of an independent monitor.

Respectfully submitted,

ROB JEFFREYS, MELVIN HINTON, and STEVEN BOWMAN,

Defendants,

| | |
|---|---|
| Lisa A. Cook, #6298233<br>Assistant Attorney General<br>500 South Second Street<br>Springfield, Illinois  62701<br>(217) 782-9014 Phone<br>(217) 524-5091 Fax<br>Email: lcook@atg.state.il.us | KWAME RAOUL, Attorney General<br>State of Illinois<br><br>Attorney for Defendants,<br><br>By:  s/Lisa A. Cook<br>       Lisa A. Cook |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS
# EAST ST. LOUIS DIVISION

| | |
|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELENA VISION, SORA KUYKENDALL, and SASHA REED, )<br><br>Plaintiffs, )<br><br>- vs- )<br><br>ROB JEFFREYS, MELVIN HINTON, and STEVEN BOWMAN, )<br><br>Defendants. ) | No. 18-156-NJR |

## CERTIFICATE OF SERVICE

    I hereby certify that on September 4, 2020, the foregoing document, *Defendants' Response to Plaintiffs' Renewed Request for Appointment of Independent Monitor*, was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

| | |
|---|---|
| Amelia H. Bailey | amelia.bailey@kirkland.com |
| Abby Parsons | aparsons@kslaw.com |
| Anne Hudson | anne.hudson@kirkland.com |
| Austin Stephenson | austin.stephenson@kirkland.com |
| Brent Ray | bray@kslaw.com |
| Camille Bennett | cbennett@aclu-il.org |
| Carolyn Wald | cwald@aclu-il.org |
| Catherine L. Fitzpatrick | cfitzpatrick@kirkland.com |
| Erica B. Zolner | ezolner@kirkland.com |
| Ghirlandi Guidetti | gguidetti@aclu.il.org |
| John A. Knight | jknight@aclu.il.org |
| Jordan M. Heinz | jheinz@kirkland.com |
| Megan M. New | mnew@kirkland.com |
| Samantha Rose | sam.rose@kirkland.com |
| Sarah Hunt | sarahjane@kennedyhuntlaw.com |
| Sydney L. Schneider | sydney.schneider@kirkland.com |
| Thomas E. Kennedy, III | tkennedy@tkennedylaw.com |
| Thomas Leahy | thomas.leahy@kirkland.com |

                                                       s/ Lisa A. Cook
                                                       Lisa A. Cook, #6298233
                                                       Assistant Attorney General
                                                       500 South Second Street
                                                       Springfield, Illinois   62701
                                                       (217) 782-9014 Phone
                                                       Email: lcook@atg.state.il.us