IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS DIVISION

| | |
|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELENA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals <br><br> Plaintiffs, <br><br> vs. <br><br> ROB JEFFREYS, MELVIN HINTON, and STEVE MEEKS, <br><br> Defendants. | Case No. 18-156-NJR |

## DEFENDANTS' MOTION TO BAR SOME EXPECTED OPINIONS OF PLAINTIFF'S EXPERT JAMES E. AIKEN

NOW COME the Defendants, Rob Jeffreys, Melvin Hinton and Steve Meeks, by and through their attorney, Kwame Raoul, Attorney General of the State of Illinois, and for their Motion to Bar Some Expected Opinions of Plaintiff's Expert James E. Aiken, state as follows:

### Introduction

The Plaintiffs have disclosed James E. Aiken as an expert in this matter. On August 31, 2020, Mr. Aiken prepared a written report of the opinions he had formed after review of the record in this case. On October 8, 2020, counsel for the Defendants deposed Mr. Aiken, eliciting further explanation of the opinions he expects to offer if called as a witness and the bases for those opinions. In his written report, Mr. Aiken offered the following opinions:

   a. There is no security justification for denying transgender prisoners medically necessary social transition. (Ex. A, Expert Witness Report of James Evan Aiken 5.)

    b. There are no legitimate security reasons for denying transgender prisoners medically-recommended housing placements. (*Id.* at 8.)

    c. Requiring transgender prisoners the option of being searched by correctional staff of the same gender is surrounded by sound correctional practices. (*Id.* at 16.)

Mr. Aiken worked in correctional settings from 1971 to 1994. (Ex. B, Aiken Dep. Tr. 4, 35.) His positions ranged from drug abuse counselor/social worker to director of entire correctional systems. (*Id.* at 4, 32.) He never worked with inmates labeled as transgender, but he did recognize a type of inmate with more feminine qualities who he believed were more susceptible to victimization. (*Id.* at 6-7.) Although he was responsible for classification of inmates he did not create a separate classification for these individuals. (*Id.* at 6-7.)

## Legal Standard

Federal Rule of Evidence 702, governing the admissibility of expert testimony, provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

"In short, the rule requires that the trial judge ensure that any and all expert testimony or evidence admitted 'is not only relevant, but reliable.'" *Queen v. W.I.C., Inc. d/b/a Sniper Treestands*, 2017 WL 1191224 *1 (S.D. Ill. March 31, 2017) (quoting *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013)). "When an expert offers an opinion relevant to applying a legal standard *** the expert's role is 'limited to describing the sound professional standards and identifying departures from them.'" *Ashley v. Schneider Nat'l Carriers, Inc.*, Nos. 12-cv-8309, 13-cv-3042,

2016 WL 3125056, *12 (N.D. Ill., Eastern Div. June 3, 2016) (quoting *Jiminez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013); *U.S. v. Blount*, 502 F.3d 674, 680 (7th Cir. 2001) ("There is a difference between stating a legal conclusion and providing concrete information against which to measure abstract legal concepts.")).

"District judges possess considerable discretion in dealing with expert testimony." *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990). However, "[i]t is the duty of the Court, not experts, to determine the meaning of statutes and regulations. *Ashley*, 2016 WL 3125056, at *12 (quoting *U.S. v. Caputo*, 517 F.3d 935 (7th Cir. 2008) ("The only legal expert in a federal courtroom is the judge."); *see also Bammerlin v. Navistar Int'l Transp. Corp.*, 30 F.3d 898, 900-01 (7th Cir. 1994) ("The meaning of federal regulations is not a question of fact to be resolved by the jury after a battle of experts."), *abrogation on other grounds recognized by Kaiser v. Johnson & Johnson*, 947 F.3d 996, 1012–13 (7th Cir. 2020). Based on the forgoing analysis, the *Ashley* Court barred the opinions of the plaintiff's expert that amounted to legal conclusions based on his own statutory and regulatory interpretations. *Ashley*, 2016 WL 3125056, at *12.

## Argument

This Court should bar Mr. Aiken's opinions related to social transition, facility assignments, and search procedures. These will be discussed in turn below.

### Social Transition

Mr. Aiken assumed in forming his opinion that social transition was medically necessary for the Plaintiffs and included having a female hairstyle, wearing female clothing and makeup, using a female name and pronouns, using female toiletries, and using a female bathroom. He concluded that items available for sale in female facilities should be available in male facilities of the same

security level. (Ex. A, at 6-7.) That portion of his opinion is not challenged here.[1]

As part of his discussion of social transitioning, Mr. Aiken also addresses misgendering of transgender inmates, or the practice of calling them by pronouns appropriate for their assigned gender rather than the gender with which they identify. He believes that misgendering of transgender inmates by staff reinforces the stigma against transgender individuals and increases the risk of abuse or assault by other prisoners. (*Id.* at 8.) When asked how a director or warden can control the actions of staff in relation to inmates, Mr. Aiken stated it is not a matter of control, but of facilitating and ensuring that staff treat inmates with respect. Training for staff is part of that process. (Ex. B, at 45.) Mr. Aiken does not remember reviewing the training developed by Dr. Reister to teach staff how to interact with transgender inmates. (*Id.* at 46.)

Beyond training, Mr. Aiken believes prison administrators, including the director and wardens, promote respect for inmates by demonstrating that respectful behavior. (*Id.* 45-47.) Mr. Aiken has seen no indication in the record of Director Jeffreys demonstrating inappropriate behavior towards transgender inmates. (*Id.* at 48.)

To prevent abuse of transgender prisoners by other inmates, Mr. Aiken believes IDOC must implement rules and regulations that show abuse and harassment will not be tolerated and those rules and regulations must be observed and incorporated on a daily basis. (*Id.* at 56-57.) Staff have to show respect to transgender inmates and make other prisoners do the same. (*Id.* at 57.) Mr. Aiken has seen nothing in the record that would indicate harassment of transgender inmates was reported but not addressed. (*Id.* at 58-59.)

---

[1] IDOC has no policies prohibiting female hairstyles or pronouns of choice. IDOC has implemented new commissary procedures that will allow transgender women in facilities that predominantly house males to purchase all the same items that are available to inmates in facilities that predominantly house females. (Ex. C, Email from Warden Locke.)

The portion of Mr. Aiken's opinion that there is no security justification for allowing misgendering is irrelevant because he has identified no policy where a security justification for misgendering has been advanced. His opinion is that prison administrators must train staff to be respectful and then demonstrate that same behavior. He has not identified any failure of Defendant Jeffreys, who as Director of IDOC is supposed to model this respectful behavior, or any instance where Defendant Jeffreys has acted disrespectfully. He says training is a significant component of ensuring staff act respectfully, but has not reviewed the training IDOC has in place before forming an opinion as to its adequacy. Without identifying a policy he believes is inappropriately justified by security concerns to allow misgendering, Mr. Aiken offers no opinion relevant to misgendering and that portion of his testimony should be barred.

## Facility Assignment

Mr. Aiken cites to the determination of the Prison Rape Elimination Commission (on which he served) that genital status alone should not be the determining factor in assigning a transgender inmate to a facility. He notes that the Department of Justice has adopted regulations that provide for a variety of factors to consider in making a case-by-case determination of facility assignment. He concludes that IDOC has failed to comply with these regulations when they use genital status alone to make housing decisions. (Ex. A, at 9.) Mr. Aiken further concludes that, to the extent placement in a facility for females is medically necessary for a transgender woman, IDOC is required to find a way to make that placement consistent with security needs. (*Id.* at 9-10.)

Section 115.42 of the PREA regulations provides direction on assigning transgender inmates to facilities. 28 C.F.R. § 115.42. Health and security concerns are both factors to be considered. Mr. Aiken believes medical concerns are the most important, although he admits the regulation itself provides no formula for balancing these concerns and that after all factors are considered a

transgender inmate can be placed in either a facility for males or a facility for females. (Ex. B, at 61-66.) The regulation further requires that the placement decision be re-evaluated at least twice a year. (*Id.* at 66.)

Mr. Aiken's belief that medical concerns take precedence over security concerns arises from his understanding of the law as it applies to the medical care of inmates. Mr. Aiken is not a lawyer. Giving top priority to medical concerns is common practice in correctional systems, but Mr. Aiken is unable to identify any specific standard that requires this. (*Id.* at 83-85.) His opinion is contradicted by Wendy Leach, who works for The Moss Group, which has advised IDOC on changes to its policies for transgender inmates. Ms. Leach testified that security must come first, and medical needs must be met in a manner that satisfies security concerns. (Ex. D, Leach Dep. Tr. 217-19.) Mr. Aiken's inability to identify any standards that support his position highlights that this is a question of how the law applies to the potentially conflicting responsibilities of correctional officials and is not a matter to be resolved by reference to industry practices. Mr. Aiken does not recognize a difference between treatment that is medically recommended and treatment that is medically required. (Ex. B, at 68.)

Mr. Aiken did not review the investigational materials related to allegations of sexual assault allegedly perpetrated by Plaintiff Monroe and only has "jumbled knowledge" about that. (*Id.* at 70.) Mr. Aiken has no knowledge about how IDOC classifies inmates. (*Id.* at 88.)

The question of whether IDOC only considers genital status in making facility assignments is for the trier of fact to decide. Mr. Aiken's opinion is that PREA allows for transgender inmates to be placed in any facility, but that medical concerns override all other factors listed in the PREA regulations. He admits the PREA regulation itself does not describe any kind of priority or weighting of the relevant factors. His opinion regarding the significance of medical needs is based

on his understanding of the law, or as he described it, "connotations of judicial mandates." (*Id.* at 83.) Mr. Aiken is not qualified to interpret the law as it applies to the responsibility of prison officials to comply with directions from medical providers. Even if he had some relevant expertise in that area, the question of what the law requires is for the Court to decide.

To the extent Mr. Aiken is allowed to offer an opinion as to the legal requirement to provide a transfer as medical care, he lacks a sufficient factual basis to state that requirement outweighs the security concerns presented. Mr. Aiken believes it would be easy to address any security concerns that arise from transferring a transgender woman to a facility for females because "that's what we are supposed to do on a daily basis." (*Id.* at 69-70.) However, during the 23 years he worked for correctional systems, he never transferred a transgender inmate to a facility for females. (*Id.* at 39.) He also failed to familiarize himself with IDOC's history of such transfers. He states that there have been only two recent transfers of transgender women to Logan Correctional Center, an institution for females, and he is aware that Plaintiff Monroe is one of them. (Ex. A, at 8; Ex. B at 70.) However, despite some awareness that Monroe was accused of sexually assaulting another prisoner at Logan, he only reviewed records related to that incident sufficient to gain a "jumbled" or "miniscule" knowledge of the incident. (Ex. B, at 70, 74.) It is impossible to form a valid opinion that IDOC has "no legitimate security reasons for denying transgender prisoners medically-recommended placements" without an understanding of what types of issues have been presented after the most recent transfer. Failure to educate himself on the single most significant security incident related to the transfer of a transgender woman to Logan undermines any ability Mr. Aiken has to form a credible opinion on security issues in this case, as his testimony is plainly not "based on sufficient facts or data." Fed. R. Evid. 702. His testimony regarding the lack of security reasons for not transferring transgender women to Logan should be barred.

**Searches**

In regards to strip searches of transgender inmates, Mr. Aiken cites to the PREA standards that do not allow cross-gender strip searches or visual cavity searches. (Ex. A, at 16.) Mr. Aiken further clarified that, for purposes of strip searches, "gender" means gender identity. (*Id.* at 17.) Mr. Aiken also states that, beyond what PREA requires, if the medical staff determines that only female staff should search a specific inmate, IDOC must comply with this direction unless in an emergency situation. (*Id.* at 17.) Mr. Aiken admits he misspoke if he said the PREA standard 28 C.F.R. § 115.15 explicitly states "gender" means gender identity in the context of cross-gender searches. (Ex. B, at 79-80.)

Although Mr. Aiken's opinion regarding searches as stated on page 21 of his report is a bit jumbled, he appears to be saying that PREA requires that a transgender inmate be searched by correctional staff of the same gender as the inmate, while IDOC policy allows a transgender inmate to be searched by staff of the same gender as the facility is designated unless the inmate protests. Mr. Aiken's opinion is based on his interpretation of "gender" as an inmate's gender identity rather than his or her gender as assigned at birth. However, he admits that interpretation is his own understanding and is not explicit in the regulation. This lack of clarity is reinforced by the testimony of Wendy Leach, who noted that the PREA regulations are not clear and the usual practice is for inmates, transgender or otherwise, to be searched by an officer that is the same gender as the inmates predominantly housed in the facility (male officers search inmates in facilities for males). (Ex. D, at 268-69, 271.) She went on to say that the best practice is to allow the inmate their choice whenever possible. (*Id.* at 269.) Even this best practice raises concerns, as employees also have a right to refuse to perform cross-gender searches, a right often defended by unions. (*Id.* at 269-70.) Just as with his attempts to apply the legal requirements of providing

medical care, Mr. Aiken is both unqualified to opine on the legal requirements pertaining to searches of gender dysphoric prisoners and is, in part, encroaching on the role of the Court. If the regulation is not read to bar searches of transgender inmates by staff of the same gender as the inmate is assigned, there is nothing left of Mr. Aiken's opinion. His opinion on this matter should be barred as an issue to be resolved by the Court.

WHEREFORE, for the above and foregoing reasons, Defendants respectfully request this Honorable Court bar Plaintiff's expert James E. Aiken from offering the above opinions relating to social transition, facility assignment, and searches.

                                              Respectfully submitted,

                                              Rob Jeffreys, Melvin Hinton, and Steve Meeks,

                                                    Defendants,

                                              KWAME RAOUL, Attorney General,
                                              State of Illinois,

                                              Attorney for Defendants,

Christopher L. Higgerson, #6256085
Assistant Attorney General
500 South Second Street
Springfield, IL 62704
(217) 782-1841                       BY:    s/ Christopher L. Higgerson
Email: chiggerson@atg.state.il.us            Christopher L. Higgerson, #6256085
                                                                         Assistant Attorney General

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 2, 2020, I electronically filed a copy of the foregoing Defendants' Motion to Bar Some Expected Opinions of Plaintiff's Expert James E. Aiken, with the Clerk of the Court using the CM/ECF system, which will send electronic notice to the following:

> John A. Knight  at Email: jknight@aclu-il.org
> Abby L. Parsons  at Email: aparsons@kslaw.com
> Anne J. Hudson  at Email: anne.hudson@kirkland.com
> Brent P. Ray  at Email: bray@kslaw.com
> Camille E. Bennett  at Email: cbennett@aclu-il.org
> Carolyn M. Wald  at Email: cwald@aclu-il.org
> Catherine L. Fitzpatrick  at Email: cfitzpatrick@kirkland.com
> Erica B. Zolner  at Email: ezolner@kirkland.com
> Ghirlandi Guidetti  at Email: gguidetti@aclu-il.org
> Megan M. New  at Email: mnew@kirkland.com
> Samantha G. Rose  at Email: sam.rose@kirkland.com
> Sarah Jane Hunt  at Email: sarahjane@kennedyhuntlaw.com
> Sydney L. Schneider  at Email: sydney.schneider@kirkland.com
> Thomas E. Kennedy , III  at Email: tkennedy@tkennedylaw.com
> Thomas J. Leahy  at Email: thomas.leahy@kirkland.com
> Jordan M. Heinz  at Email: jheinz@kirkland.com

        s/ Christopher L. Higgerson
        Christopher L. Higgerson
        Assistant Attorney General

Christopher L. Higgerson, #6256085
Assistant Attorney General
500 South Second Street
Springfield, Illinois 62701
Phone:  (217) 782-1841
Fax: (217) 782-8767
Email: chiggerson@atg.state.il.us
  & gls@atg.state.il.us