## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS
## EAST ST. LOUIS DIVISION

| | | |
|---|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, | ) | |
| LYDIA HELENA VISION, | ) | |
| SORA KUYKENDALL, and SASHA REED, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| - vs- | ) | No. 18-156-NJR |
| | ) | |
| ROB JEFFREYS, MELVIN HINTON, | ) | |
| and STEVEN BOWMAN, | ) | |
| | ) | |
| Defendants. | ) | |

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Defendants, ROB JEFFREYS, MELVIN HINTON, and STEVEN BOWMAN (sued in their official capacities only as IDOC Officials), by and through their attorney, Kwame Raoul, Attorney General for the State of Illinois, move for summary judgment in their favor pursuant to Federal Rule 56 and Local Rule 7.1(c).

**Introduction**

Plaintiffs allege that Defendants subject them and a class of prisoners with gender dysphoria to a substantial risk of serious harm that violates the Eighth Amendment. Their claim is based on policies and practices of IDOC pertaining to the evaluation and treatment of gender dysphoria. [Doc. 1, at 36, ¶ 120.]

Plaintiffs seek a permanent injunction enjoining the alleged violations and requiring:

Defendants . . . to develop and implement, as soon as practical, a plan to eliminate the substantial risk of serious harm that Plaintiffs and members of the Plaintiff Class suffer due to Defendants' inadequate evaluation and treatment of gender dysphoria. At a minimum, this plan should include: (i) Prisoner access to clinicians to treat gender dysphoria who meet[ ] the competency requirements stated in the Standards of Care; (ii) Prompt evaluation for gender dysphoria upon request or clinical indication of the condition; (iii) Timely fulfillment of medically prescribed treatment for gender dysphoria, including, but not limited to, hormone therapy and gender affirming surgery; (iv) Accommodation of medically necessary social transition, including individualized placement determinations, avoidance of cross-gender strip searches, and access to gender affirming clothing and grooming items; and (v) Ceasing the practice whereby medical decisions regarding gender dysphoria are second-guessed and treatment is governed by the GID Committee.

[Doc. 1, at 36-37.]

In addition, Plaintiffs request the Court "[r]etain jurisdiction . . . until Defendants have fully complied with the orders of this Court, and there is a reasonable assurance that Defendants will continue to comply in the future absent continuing jurisdiction." [Doc. 1, at 38, ¶ f.]

This Court certified a plaintiff class, defined as "all prisoners in the custody of IDOC who have requested evaluation or treatment for gender dysphoria." [Doc. 213, at 11.] Plaintiffs are not entitled to the relief they seek whether as a class or only on behalf of the five representative individuals. Plaintiffs are unable to meet their burden, as they cannot show that IDOC is violating or will continue to violate their Eighth Amendment rights. Further, Plaintiffs are unable to meet the other elements necessary for a permanent injunction. Moreover, Plaintiffs' requests are out of

bounds set by the Eleventh Amendment and the Prison Litigation Reform Act. For these reasons, as argued more fully below, Defendants are entitled to summary judgment in their favor.

## Preliminary Injunction

On December 19, 2019, after considering evidence presented over the course of a two-day hearing and the arguments of the parties, the Court granted Plaintiffs' request for preliminary injunctive relief. [*See* Doc. 123 (Pl.'s Mot.); Doc. 145 (Defs.' Resp.).] Defendants were ordered to cease certain policies and practices and mandated to take further action. [Docs. 186-87.] Defendants sought reconsideration of the Court's order. [Doc. 203.]

On March 4, 2020, the Court clarified its order [Doc. 211] and entered an amended preliminary injunction. [Doc. 212.] The Court ordered Defendants to immediately:

> 1. cease the policy and practice of allowing the Transgender Committee to make the medical decisions regarding gender dysphoria and develop a policy to ensure that decisions about treatment for gender dysphoria are made by medical professionals who are qualified to treat gender dysphoria;

> 2. ensure that timely hormone therapy is provided when medically necessary, including the administration of hormone dosage adjustments, and to perform routine monitoring of hormone levels; and

> 3. cease the policy and practice of depriving gender dysphoric prisoners of medically necessary social transition, including by mechanically assigning housing based on genitalia and/or physical size or appearance.

[Doc. 212, at 1-2.] The Court also ordered Defendants to:

> 1. develop policies and procedures which allow transgender inmates access to clinicians who meet the competency requirements stated in the WPATH Standards of Care to treat gender dysphoria;

> 2. allow inmates to obtain evaluations for gender dysphoria upon request or clinical indications of the condition;

> 3. develop a policy to allow transgender inmates medically necessary social transition, including individualized placement determinations, avoidance of cross-gender strip searches, and access to gender-affirming clothing and grooming items; and

4. advise the Court what steps, if any, IDOC has taken to train all correctional staff on transgender issues, including the harms caused by misgendering and harassment—by both IDOC staff and other inmates.

[*Id.* at 2.]

## Statement of Facts

<u>Relevant IDOC Policies and Training</u>

At the time of the Court's preliminary injunction order, IDOC followed an Administrative Directive titled "Evaluations of Transgender Offenders." (Ex. 1, A.D. 04.03.104, eff. July 1, 2019.) The Directive provided for a Transgender Care Review Committee (TCRC) that would review placements, security concerns, health-related treatments, and gender-related accommodations for prisoners diagnosed with gender dysphoria. (Ex. 1, at 3, ¶ G.) Prisoners were to be screened during the reception and classification process for prisoners who self-identified as transgender or "for whom there are questions regarding gender identity or Gender Dysphoria." (Ex. 1, at 3, ¶ H.1.) The reception and classification facility medical director was to take steps to ensure the prisoner would be housed and provided with necessary gender specific clothing, in accordance with the prisoner's gender-related needs. (Ex. 1, at 4, ¶ H.4.) After arrival to a parent facility or after a new disclosure of gender identity, a mental health professional (with the assistance of a health care representative) was required to complete a form and to present the prisoner to the TCRC, which would then make a final recommendation for housing and "any additional matters that may be of issue including, but not limited to, hormone therapy, gender specific clothing, showers and searches." (Ex. 1, at 4-5, ¶ H.5.) The TCRC was to conduct follow-up reviews on an as-needed basis. (Ex. 1, at 5, ¶ H.6.) Hormone therapy would only be provided after consultation with and approval by the Agency Medical Director or Chief of Psychiatry (or designees). (Ex. 1, at 3, ¶ H.1.b.)

After the initial preliminary injunction order, the TCRC ceased making decisions regarding direct medical treatment for gender dysphoria. [Doc. 202, at 2, ¶ 4.] IDOC and Wexford have made continuing efforts to ensure that prisoners diagnosed with gender dysphoria continue to receive timely and appropriate hormone therapy. *See*, *e.g.*, Doc. 226 at 13; Doc. 226-6, pp. 180-81; Doc. 226-9, pp. 45-46, 59; Ex. 5, Email BATES 320535-320536. The TCRC structure is being changed to delineate between a medical committee and one overseeing security-related accommodations. *See, e.g.*, Doc. 226, pp. 12-14; Ex. 2, p. 9.

IDOC also contracted with Dr. Erica Anderson and The Moss Group for consultation services and assistance in drafting a new Directive to replace A.D. 04.03.104. [Doc. 202, at 5-6, ¶¶ 11, 13; Doc. 226, at. 8-12]. IDOC desires to maintain WPATH Standards of Care (Standards) and to meet other prison standards. *E.g.,* Doc. 226; Doc. 226-6, p. 10; Ex. 2, Reister Tr. at 90. In recent weeks, IDOC has updated its commissary items for transgender prisoners. (Ex. 3, eff. Nov. 5, 2020.) While the initial plan had been noted as one to offer universal items throughout all facilities, the policy eventually adopted and effective November 5, 2020, is applicable to transgender female prisoners. (*Id.*) This change allows transgender female prisoners to purchase items such as bras, panties, makeup, facial hair remover, and scrunchies regardless of the facility in which they are housed. (*Id.*).

Many prisoners come to IDOC with a gender dysphoria diagnosis. (Ex. 2, at 268.) In those instances, they may very quickly have such diagnoses confirmed. (*Id.* at 269.) If someone needs a diagnosis clarified, they are brought to the attention of mental health staff through screening that specifically asks about being transgender. (*Id.* at 269.) If gender dysphoric symptoms are disclosed while working with a mental health provider, that provider is authorized to make a diagnosis. (*Id.* at 270.)

IDOC had already been in the process of providing training on transgender concerns to all staff members. (*Id.*, at 123-24.) In January 2020, Defendants noted that training was underway to provide an introduction to IDOC staff. [Doc. 202, at 6, ¶12.] IDOC used a two-hour training developed by Dr. Shane Reister to provide training to all staff members. (Ex. 2, at 46, 123, 130.) Dr. Reister provides a separate two-part training for mental health providers. (*Id.* at 128-29.) Dr. Reister also incorporated into both trainings information as to the psychological impact and microaggressive form of transphobia related to individuals misgendering prisoners. (*Id.* at 93.) This means that every staff member in IDOC, regardless of position, received training to not misgender prisoners. (*Id.* at 94.) IDOC has a "very clear policy on not misgendering offenders." (*Id.* at 93.) IDOC also worked with WPATH for a targeted training to be done via Zoom for medical and mental health providers. (*Id.* at 46-47.) In September 2020, they completed part one of the WPATH training.

IDOC employees operate under a code of conduct that requires them to conduct themselves in a manner that will not reflect unfavorably on the Department and that will not impair the operations of the Department. 20 Ill. Admin. Code § 120.30. After receiving complaints about employees' use of social media that put down certain groups of prisoners, IDOC set forth an Administrative Directive reiterating that IDOC employees are required to "conduct themselves in a professional manner when engaging in personal use of social media platforms and, whether on duty or off duty, not engage in conduct that is unbecoming of a State employee or that may reflect unfavorably on or impair operations of the Department." (Ex. 4, A.D. 03.02.113, eff. Nov. 1, 2019.) The policy prohibits employees from posting, displaying, or otherwise transmitting content that disparages a person or group based on race, religion, sexual orientation or any other protected class. (*Id.* at 3, ¶ II.G.4.g.)

<u>Representative Plaintiffs</u>

There are five representative Plaintiffs prosecuting this action: Janiah Monroe, Marilyn Melendez, Lydia Helena Vision, Sora Kuykendall, and Sasha Reed.[1]

**1. Janiah Monroe**

Plaintiff Monroe is housed, since April 1, 2019, at Logan Correctional Center, an institution that houses female prisoners. (Ex. 6, Monroe Tr. 6.) In June 2019, Monroe was nearly moved to another facility (*Id.* at 6), but that transfer was stopped. Ms. Monroe filed a separate action in the Central District of Illinois seeking equitable relief pertaining to her housing and care at Logan: *Monroe vs. Jeffreys*, CDIL no. 19-1060. That case remains pending.

At Logan, Monroe has access to makeup, female cosmetics, perfume, female hair care products, and female clothing and shoes. (*Id.* at 42-43.) Monroe finds the female clothing to be reassuring. (*Id.* at 43.) Monroe is unable to say at this time that there is any other property that she would need for social transition that she does not already have access to. (*Id.* at 44-45.) Strip searches of Monroe, if penologically required, are done only by female security officers. She still "sometimes" experiences misgendering, but it is less common than it was for her at a men's prison. (*Id.* at 47-48.)

Ms. Monroe testified in August 2020 that she had been participating in group treatment for gender dysphoria, which was paused while on quarantine. (*Id.* at 36-37.) Monroe's treatment is led by Dr. Pfost, who Monroe feels tries but does not "have a lot of knowledge to offer." (*Id.* at 37.) Monroe believes that she should be receiving additional treatment to prepare her for surgery, which

---

[1] These are the Plaintiffs' preferred names, but not their legal names. Generally, IDOC records use prisoner legal names rather than preferred names. Defendants will use Plaintiffs' preferred names throughout this filing; however, as a practical matter, legal names are used in underlying IDOC records.

she has discussed with her treating physician, Dr. Sang. Besides that preparation there, is nothing else on the mental health side that she believes is lacking. (*Id.* at 38.)

Ms. Monroe continues receiving hormone therapy at Logan Correctional Center, prescribed by Dr. Sang. (*Id.* at 39.) Monroe has her blood drawn and hormone levels monitored. (*Id.* at 39.) Yet, as recently as July 2020, there have been concerns that Monroe has not been taking her hormone therapy as prescribed. A progress note dated July 24, 2020, and signed by Dr. Daphne Maurer, M.D. notes that Monroe's Tegretol had recently been crushed to avoid "cheeking" medication. Her Tegregtol levels were noted to be low, but Monroe quit taking it after it was crushed. (Ex. 7, BATES 357976-357980.) Dr. Maurer noted staff would give "her the benefit of the doubt" and cease crushing her Tegretol at that time. (*Id*. at 357978.)

### 2. Marilyn Melendez

Ms. Melendez is incarcerated at Pontiac Correctional Center. She has not had a cellmate per her request since the end of 2018. (Ex. 8, Melendez Tr. 11-12.) Ms. Melendez testified that she has attempted suicide close to five times, most recently in early August 2020. (*Id.* at 25.) Ms. Melendez testified that her recent suicide attempt came because of her gender dysphoria and feelings related to her "life of constantly being ridiculed, disrespected, looked at as a freak, as an abomination . . . . the fact that [she has] to take medications . . . [and] attempt to get surgeries so [she] can feel aligned with herself." (*Id.* at 27.) Ms. Melendez began taking feminizing hormones in 2015, the same year she was diagnosed with gender dysphoria. (*Id.*, at 43.) Melendez has some concerns as to the hormone levels she is receiving, and as of her deposition in August, had received a lab test within a few months and requested to see her treating physician, Dr. Tilden. (*Id.*, at 43-46.) At the time of her deposition, she had not heard back from Dr. Tilden but had been told either that he was not present at the facility or was taking care of patients with serious needs, so she

would not be able to see Dr. Tilden unless it was an emergency. (*Id.*, at 48.) Ms. Melendez has asked her physician for surgery, including breast augmentation, liposuction, lipofilling, contouring of the abdomen, a trachea shave, and gender-affirming surgery. (*Id.*, at 59.) Dr. Tilden has denied these requests, but told Melendez he would look into the orchiectomy she requested. (*Id.*, at 58-60.) Sometime in 2019, Ms. Melendez began regularly attending a monthly transgender group. (*Id.*, at 61-63.) Melendez has not requested a transfer to a female institution since about 2017, because she has been at Pontiac for about five years and is accustomed to where she is. (*Id.*, at 68-69.) Ms. Melendez is still misgendered by the majority of staff at Pontiac and, although some staff will speak to her respectfully when she brings it to their attention, the majority of staff is disrespectful to her. (*Id.*, at 69, 72-73.) But, Ms. Melendez is not aware of any of the staff members acting unprofessional being reported for discipline. (*Id.*, at 74.) Ms. Melendez has made only one PREA complaint for staff harassment. (*Id.*, at 88-89.) Ms. Melendez has a number of item requests: a stronger brush, comb, scented shampoo, lotions, soaps, "better hair ties," women's undergarments and shoes. (*Id.*, at 77-82.) Typically, Melendez has no issue with searches and may choose a female officer to pat-search her, though there have been a few instances where the Tactical Team came in and refused to accommodate her request for a female to conduct the strip search. (*Id.*, at 85-86.)

### 3. Sora Kuykendall

Ms. Kuykendall is incarcerated at Menard Correctional Center. She receives feminizing hormonal therapy and laboratory follow-ups to monitor her hormones. Though she recently refused labs in May 2020, she was scheduled for a transgender clinic and after a provider spoke to her in June, Ms. Kuykendall agreed to have labs taken. (Ex. 9, BATES 361313.) She has since raised

concerns with her hormone therapy and had labs re-taken in October 2020. (*Id.*, BATES 361352-361356.)

Ms. Kuykendall still desires placement in a female institution plus gender affirming surgery, including "general reassignment surgery, voice feminization surgery, [and a] tracheal shave." (Ex. 10, Kuykendall Tr. 94). She also wants the same items that any other woman in IDOC gets. (*Id.*, at 95).

### 4. Sasha Reed

Ms. Reed is also incarcerated at Menard Correctional Center, and receives feminizing hormones. (Ex. 11, Reed Tr. 43). In June 2020, she asked for hormonal injections rather than pills, and she also requested female panties and bras. (Ex. 12, BATES 361357.) She was provided with a medical permit for sports bras and women's underwear in June 2020. (*Id.*) She also had lab work done in June 2020 and August 2020. Her hormones were adjusted in September 2020 after it was noted that her prolactin level was elevated. (*Id.*, BATES 361427.) Ms. Reed desires to have gender-affirming "bottom" surgery and breast implants. (Ex. 11, at 45, 80).

### 5. Lydia Helena Vision

Plaintiff Lydia Helena Vision was diagnosed with gender dysphoria in 2016, while in IDOC custody. (Ex. 13, Vision Tr.. 8.) Ms. Vision began receiving hormone therapy in late 2018. (*Id.* at 16.) As of her deposition at the end of August 2020, Ms. Vision had no complaints about the hormones that she was taking. (*Id.* at 16.) When she was initially prescribed hormone therapy, Ms. Vision complained that the nurses and medical staff were giving her a smaller percent of the hormones than she had been prescribed, but it only took about a month or two to correct. (*Id.* at 16-17.) Ms. Vision has not had any complaints about her hormones since then. (*Id.* at 18.) Labs are drawn to review the amounts of hormones in her system and she meets with a medical doctor

to discuss the results of her lab work. (*Id.* at 18.) Ms. Vision is at a facility that houses males, but she is single-celled and showers alone. (*Id.* at 9, 18.) Ms. Vision does not feel she is given sufficient privacy in the shower on her wing—it is a single shower with a curtain containing mesh over the top half and is located in a place where people pass; when she raised the issue, she was given the option to go to another building to shower. (*Id.* at 18-20.) Ms. Vision declined the offer because it would require her to make a 30-minute round trip and the other shower was in a location similar to one from a different facility where she filed a PREA complaint. (*Id.* at 20-21.) Ms. Vision has been approved for a transfer to a female facility, but has not been moved due to restrictions associated with COVID-19. [Doc. 226, at 14-15; Doc. 226-10, at 2, #3.] Ms. Vision believes that a transfer to a female facility will alleviate some of her concerns about threats. (Ex. 13 at 21-23.) Ms. Vision testified that she is strip-searched by male security staff and that she asked for a female security member to search her but did not get a pleasant response. (*Id.* at 27-28.) She believes that she wrote a grievance on the issue but does not know if she kept a copy of it[2] and does not remember obtaining a response. (*Id.* at 28-29.) Ms. Vision would like to obtain surgery and voice coaching.

Plaintiffs have identified no unnamed class members to provide evidence.

Plaintiffs' Experts[3]

Dr. Tangpricha is an endocrinologist who has authored many publications related to transgender care. His primary employment is as a professor and endocrinologist at Emory University. (Ex. 14, Tangpricha Tr. 30-31.) According to Dr. Tangpricha, there are a large number of transgender patients in the Atlanta area and not all of them are seen at Emory. (*Id.* at 38.) In his

---

[2] Ms. Vision has produced no documents.
[3] Two of Plaintiffs' three experts, Dr. Tangpricha and Dr. Ettner, testified in the preliminary injunction hearing. James Aiken's opinions are challenged by separate motion.

experience, not all transgender patients are treated by an endocrinologist. And, as he stated: "hormones are not restricted to endocrinologists. Any physician is able to prescribe hormone therapy, provided they do it safely and know what regimes to use, and those are all public knowledge." (*Id.* at 38.) Dr. Tangpricha testified that physicians are able to receive training that will make them comfortable and competent in prescribing hormone therapy. (*Id.* at 49-50.) But, Dr. Tangpricha also believes that nearly all transgender patients who want hormone therapy receive it, though this is contradicted by news in Illinois and nationally. (*See* Ex. 15; Ex. 16; Ex. 17 (*Insurance Coverage and Use of Hormones Among Transgender Respondents to a National Survey*, 18 Annals Fam. Med. 528 (2020).)

Dr. Ettner is a psychologist who has worked for WPATH and received numerous awards and accolades. Dr. Ettner is not a medical doctor, and did not go to medical school nor does she have the ability to prescribe medications. (Ex. 18, Ettner Tr. 7.) Dr. Ettner does not distinguish whether a particular treatment is medical in nature, but rather considers all treatments and accommodations related to gender dysphoria, including social transition, as medically necessary. (*Id.* at 9-11, 49.) Dr. Ettner believes that female accommodation requests are a necessary part of medical treatment for gender dysphoria and that individuals should have a right to that treatment.

WPATH formed a Global Education Initiative in 2014 to provide an introduction to the field by people trained to do so. (*Id.* at 19, 28.) WPATH's trainers provide the training offered through its Initiative. (*Id.* at 53.) As of October 2020, Dr. Ettner was aware that IDOC had provided the first part of the WPATH training online. (*Id.*) Dr. Ettner considers the training a "first step" but thinks the two-day training is a "good introduction and overview to the field." (*Id.* at 53.) Per its website, the Global Education Initiative courses are offered to "increase access to knowledgeable healthcare providers for the transgender community by training those providers

globally in the context and principles of the WPATH Standards of Care, and their implementation into clinical practice." (Ex. 20.) The courses "serve as the Core Curriculum for WPATH Members pursuing WPATH GEI SOC7 Certification." (*Id.*) According to Dr. Ettner, the Initiative had not been brought into other state prison systems like in Illinois. (Ex. 18 at 54.)

WPATH currently has a nine-step certification process. (*Id.* at 21-22.) The first step is to complete the foundations training, which is typically eight hours. (*Id.* at 21-22.) There are also the following prerequisites: "eight hours of an advanced coursework, four hours of additional workshops, ten hours of outside approved WPATH workshops, five years of some community experience or work, evidence of knowledge or expertise in the field, such as publication in a peer review journal, 20 approved WPATH . . . continuing education courses every two years, and ten hours of mentorship at the time that an individual sits to take the certification exam." (*Id.* at 22 (see errata correction).)

Dr. Ettner is a co-chair of WPATH'S Committee for Incarcerated Persons. (Ex. 18 at 29-31.) All of the people on this Committee have had interaction with incarcerated persons, but Dr. Ettner is not aware of whether any individuals on the Committee have actually worked day-to-day in a correctional facility. (*Id.* at 31.) The WPATH Standards of Care pertaining to all institutionalized persons provide that the treatment should mirror that which is available in the community. (*Id.* at 33; Ex. 19, § XIV at 67-68.) The WPATH Standards for incarcerated persons contemplate changes to the delivery of care, but not changes or denials based on security concerns. Dr. Ettner was not able to answer whether a denial of social accommodation based on security concerns would be inconsistent with the Standards, but she opined simply that "denial of social role transition is placing a gender dysphoric prisoner at risk." (Ex. 18 at 33-38.) Dr. Ettner has been hired to conduct forensic work for prisoners in other lawsuits. Dr. Ettner reviewed IDOC

records for this case and interviewed the representative Plaintiffs. Dr. Ettner has interviewed only one other IDOC prisoner, who has been released from IDOC custody, and was not interviewed as part of this case. (*Id.* at 64.) Dr. Ettner has opined that all five of the representative Plaintiffs in this action are at a serious risk of self-harm. (*Id.* at 45-46.) Out of the 40 or more prisoners she has evaluated, she can think of only about two that she found were not at risk of self-harm at the time she evaluated them. (*Id.* at 14, 44-45.) Dr. Ettner testified that she saw instances in her review of the class members' records where she observed that prisoners were receiving hormones correctly and appeared to be stable. (*Id.* at 65.)

## Argument

### I.   **Plaintiffs are not entitled to a permanent injunction.**

First and foremost, a plaintiff must be able to succeed on the merits of their case before permanent injunctive relief may be entered. *E.g., Plummer v. Am. Inst. of Certified Pub. Accountants*, 97 F.3d 220, 229 (7th Cir. 1996). Then, "[a]ccording to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). It is the Plaintiffs' burden here to establish that: (1) the class has suffered irreparable injury; (2) the remedies available at law are inadequate to compensate the class for that injury; (3) the benefits of granting the injunction outweigh the injury to the Defendants; and (4) the public interest would not be harmed by a permanent injunction. *Id.*; *see also ADT Sec. Servs. Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 672 F.3d 492, 498, (7th Cir. 2012) (citing *Collins v. Hamilton*, 349 F.3d 371, 374 (7th Cir. 2003)).

Plaintiffs will be unable to succeed on their Eighth Amendment claim and cannot meet the accompanying burden to warrant the imposition of injunctive relief.

### A. Plaintiffs cannot succeed on their Eighth Amendment claim.

In order to proceed past summary judgment where a prisoner seeks injunctive relief based on an Eighth Amendment claim, the plaintiff "must come forward with evidence from which it can be inferred that the defendant-officials were at the time suit was filed, and are at the time of summary judgment, knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so." *Farmer v. Brennan*, 511 U.S.825, 846-47 (1994). To be eligible for injunctive relief, the plaintiff "must demonstrate the continuance of that disregard during the remainder of the litigation and into the future." *Id*. at 847. Plaintiffs cannot meet this burden. Although the Plaintiffs contend that they are facing an objectively serious risk of harm, it is not so clear. *See Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013) (distinguishing between a serious medical condition and the risk of harm for failure to treat condition). For purposes of this motion, however, Defendants will not focus on the objectively serious prong, but will instead focus on the state of mind required for an Eighth Amendment claim.

### 1. Precedent sets constitutional limits for Eighth Amendment cases claiming deliberate indifference and there is no strict liability; rather there must be some sort of punishment or subjective cruelty.

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. In assessing the Plaintiffs' claim here, it is necessary to look to Supreme Court precedent regarding Eighth Amendment medical indifference claims. In *Estelle v. Gamble*, the Supreme Court concluded that a claim of deliberate indifference to serious medical needs falls under the Eighth Amendment prohibition of cruel and unusual punishments. 429 U.S. 97, 104 (1976). In so holding, the Supreme Court considered prior Eighth Amendment case law with respect to torture and barbarous methods of punishment. *Id*. at 102. It also reiterated previous holdings that the Eighth Amendment must remain in line with "evolving standards of decency that

mark the progress of a maturing society." *Id.*, *quoting Trop v. Dulles*, 356 U.S. 86, 101 (1958) (Discussing prior recognition that the words of the Eighth Amendment "are not precise, and that their scope is not static.").

The Court drew a fine point to its holding by adding: "This conclusion does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Estelle,* 429 U.S. at 105. An inadvertent failure to provide adequate care does not violate the Eighth Amendment. The Court continued:

> Similarly, in the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.

*Id*. at 105-06.

Eighteen years after its holding in *Estelle*, the Court considered an Eighth Amendment claim raised in *Farmer* where the Court further discussed the meaning of the term "deliberate indifference." 511 U.S. 825. Although the Constitution does not mandate comfortable prisons, the Eighth Amendment imposes duties on prison officials to provide humane conditions of confinement, which includes "adequate food, clothing, shelter, and medical care" and that they must "take reasonable measures to guarantee the safety of the inmates." *Id*. at 832-33 (internal quotations omitted). But, there is no strict liability for failure to meet this constitutional floor. *Id*. at 834. Prison officials may only violate the Eighth Amendment when two requirements are met: "First, the deprivation alleged must be, objectively, sufficiently serious; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities," *id*. (internal quotations and citations omitted); and, second, a prison official must have acted with a "sufficiently culpable state of mind," *id*. This test remains in effect for adjudicating Eighth

Amendment prison conditions cases. *See Giles v. Godinez*, 914 F.3d 1040, 1049-50 (7th Cir. 2019) (no deliberate indifference where non-medical officials reasonably rely on the judgment of medical professionals). The Court again was clear that there must be some form of *punishment* at issue. *Farmer*, 511 U.S. 837. The requirement that the prison official first know of and then disregard an excessive risk to inmate health or safety was found to comport with the Eighth Amendment because it "does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.'" *Id*.

      **2.**    **Plaintiffs are attempting to expand the Eighth Amendment beyond its limits because they cannot show that they are suffering punishment rather than individual medical complaints.**

In light of the applicable case law, Plaintiffs will be unable to establish a likelihood of success on the merits. Plaintiffs cannot establish that Defendants, who have been sued in their capacities as IDOC officials rather than as individuals, nor any other high-ranking IDOC officials are indifferent to their needs. The Defendants are not subjecting Plaintiffs to *punishment* that violates the Eighth Amendment. Instead, Plaintiffs have couched medical malpractice claims as constitutional violations, which are not equivalent. Neither medical malpractice nor common law negligence are sufficient to meet the high hurdle of deliberate indifference. *E.g., Farmer*, 511 U.S. at 837; *Holloway v. Delaware County Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012); *Rosario v. Brawn,* 670 F.3d 816, 821 (7th Cir. 2012); *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). Courts have strained to set forth a balance between constitutional backstops and tort claims, but they have been clear that the Eighth Amendment is not a medical malpractice statute for prisoners. *See e.g., Forbes v. Edgar*, 112 F.3d 262, 266-67 (7th Cir. 1997) (The Eighth Amendment does not provide either specific treatment or foolproof protection from infection); *Snipes v. DeTella*, 95 F.3d 586, 590-92 (7th Cir. 1996) (discussed below); *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) (comparing ADA with Eighth Amendment and writing: "Moreover, the courts have labored

mightily to prevent the transformation of the Eighth Amendment's cruel and unusual punishments clause into a medical malpractice statute for prisoners.").

In *Snipes*, the Seventh Circuit rejected a prisoner's attempt to expand the Eighth Amendment to prevent "a risk of needless pain." 95 F.3d at 592. There, the court noted that:

> [T]he Constitution is not a medical code that mandates specific medical treatment. *Davis* [*v. Jones*, 936 F.2d 971, 972 (7th Cir. 1991)] did not find deliberate indifference to "needless pain," even though the authorities knew plaintiff was injured but did nothing. The issue there was delay in treatment, not the constitutional threshold of when pain is "needless."

> Whether and how pain associated with medical treatment should be mitigated is for doctors to decide free from judicial interference, except in the most extreme situations. *A prisoner's dissatisfaction with a doctor's prescribed course of treatment does not give rise to a constitutional claim unless the medical treatment is "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition."*

*Snipes*, 95 F.3d at 592 (emphasis added) (some internal citations omitted)..

Here, Plaintiffs seek full accommodation for whatever they request regardless of how it may impact IDOC operations and security, or fellow prisoners. Their expert, Dr. Ettner, sees no difference between accommodations for prisoners and those outside of prison. And, the WPATH Standards of Care provide for very limited exceptions for care to those in institutional environments, which include both prisons and health care facilities. (Ex. 19 § XIV at 67-68.) The only exceptions contemplated by the WPATH Standards are those that "do not jeopardize the delivery of medically necessary care to people with gender dysphoria." (Ex. 19 at 68.) The only example given is using one method to deliver hormones, if not medically contraindicated, as opposed to another. (*Id.*) Aside from that one example, the Standards of Care do not elaborate. But, the standards for incarcerated persons have been criticized for setting forth aspirations rather than acknowledging reality. (Ex. 21, Arch Sex Behav., 45:1649-1663). In a journal article published in 2016, the authors identified the issue succinctly: "Its confident simplicity may not

adequately take account of the clinical and contextual complexities that inmates with GD present."

(*Id*. at 1651.) The authors elaborated on some of these complexities:

> Many inmates who seek treatment for GD in prison never sought treatment in the community. Many have lived troubled, chaotic lives characterized by early family and economic instability, substance abuse and other psychiatric problems, failed school and employment experiences, and early involvement in crime. Inmates who seek treatment for GD typically display little resemblance to the patients who present for treatment in the community, and prison life bears little resemblance to life in the community. The SOC were not developed with the complexities, vulnerabilities, and life circumstances of incarcerated persons in mind.

(*Id*.) And, Dr. Anderson has questioned whether all items related to social transition are medically necessary support as opposed to "psychosocial support." [Doc. 226-3, p. 18, at 148]. Yet, even aside from complexities underlying the specific requests the Plaintiffs have made, it is unclear at what point accommodation falls outside of necessity and is just based on "a risk of needless pain."

### 3. Defendants are not constitutionally mandated to provide the relief sought by Plaintiffs.

Defendants are entitled to summary judgment in this action because they are not constitutionally mandated to comport with WPATH Standards of Care. Mental health and medical providers working in IDOC facilities have strived to follow the WPATH Standards; however, those standards are not the constitutional floor for adequate treatment. *Brown v. Plata*, 563 U.S. 493, 539-40 (2011) (citing *Rhodes v. Chapman*, 452 U.S. 337, 348 n.3 (1981)) ("Of course, courts must not confuse professional standards with constitutional requirements."). Prisoners are not entitled to "preferred therapy." *Forbes*, 112 F.3d at 267. Nor are prisoners entitled to demand specific care or the best care possible under the Eighth Amendment. *Id*. In a recent opinion involving a Fourth Amendment constitutional claim, the Seventh Circuit reiterated that best practices, while relevant, do not set the constitutional floor. *Turner v. City of Champaign*, 979 F.3d 563, (7th Cir. Nov. 3, 2020) (citing *United States v. Brown*, 871 F.3d 532, 536-37 (7th Cir. 2017) and *Mays v. Dart*, 974 F.3d 810, 823-24 (7th Cir. 2020)). It has been noted by others and bears

repeating here that while WPATH Standards are general and non-specific and subject to modification by professionals, they also lack evidentiary support for some of their standards. *See* Ex. 19 at 2; Ex. 2 at 56; Ex. 21 at 1650-51; *see also Edmo v. Corizon*, 949 F.3d 489, 499 (9th Cir. Feb. 10, 2020) (O'Scannlain. J., dissenting) ("The panel's disposition results from its failure to put the WPATH Standards in proper perspective.").

Nor are Defendants constitutionally required to provide the same care as that set forth by Plaintiffs' experts, Dr. Tangpricha and Dr. Ettner, who sit on the WPATH Board. Expert opinions may be relevant to the question of how to remedy constitutional violations or useful in determining what is obtainable and acceptable in the prison context. *Id*. at 540. But, here, the Plaintiffs' experts provide little that is useful in the context of prison reform. Rather, Plaintiffs' experts attempt to change a necessarily regimented system into one that matches the best potential and preferential care instead of acting within the context of incarceration and the Eighth Amendment's limitations.

Analysis of the Eighth Amendment must above all be based in objective factors. *Rhodes*, 452 U.S. at 346. This requires a review of contemporary standards such as those "derived from history, the action of state legislatures, and the sentencing by juries." *Id*. at 346-47. A review of history with respect to the care and treatment of gender dysphoria shows that there is no set treatment, let alone one that may easily be determined in the prison environment. This history is also reflected in the case law, which articulates no set Eighth Amendment standard for the care and treatment of gender dysphoria. The cases specific to the types of claims and relief at issue here have set no clear lines. Even since the hearing in this matter on Plaintiffs' motion for preliminary injunction, recent cases involving similar claims have pulled in different directions.

In *Campbell v. Kallas*, the Seventh Circuit rejected a gender dysphoric prisoner's attempt to proceed on an Eighth Amendment claim framed at a "'high level of generality." 936 F.3d 536,

545 (7th Cir. Aug. 19, 2019). There, the Court reviewed a denial of qualified immunity, which does not apply here, but the Court's findings and discussion are instructive for this case. The court reiterated its prior determination that "'inmate medical care decisions must be fact-based with respect to the particular inmate' rather than the product of categorical rules." *Id*. at 546 (quoting *Roe v. Elyea*, 631 F.3d 843, 859, 863 (7th Cir. 2011)). The Court wrote:

> But prisons aren't obligated to provide every requested treatment once medical care begins. In a deliberate-indifference case challenging the medical judgment of prison healthcare professionals who actually diagnose and treat an inmate's medical condition (as opposed to ignoring it), we necessarily evaluate those discrete treatment decisions. And we defer to those decisions 'unless no minimally competent professional would have' made them. *Sain*, 512 F.3d at 895 (quotation marks omitted). Deciding whether a particular treatment plan was a 'substantial departure from accepted professional judgment, practice, or standards'—a necessary predicate to establish an Eighth Amendment violation—requires a close examination of professional standards and the specific choices made by care providers. *Id*. (quotation marks omitted).

*Campbell*, 936 F.3d at 548. The Court of Appeals found that qualified immunity for the prison officials was appropriate because there was no clearly established right to the sex-reassignment surgery sought by the prisoner. At most, there was arguably a right to hormone therapy to treat gender dysphoria. *Id*. at 549. And, there was no prior indication that "denying arguably nonmedical cosmetic accommodations" such as electrolysis and makeup violated the Eighth Amendment. *Id*. Even though Defendants may not assert qualified immunity for this action, *Campbell* establishes that this class of Plaintiffs cannot show a clear right to the relief they seek.

And, if we expand our search beyond the Seventh Circuit to look at the national jurisprudence, there is less support for Plaintiffs' position. As discussed by Defendants in their response to Plaintiffs' motion for a preliminary injunction, the Fifth Circuit recently declined to find that providing some but not all of the treatments recommended by WPATH amounted to deliberate indifference. *Gibson v. Collier*, 920 F.3d 212, 220 (5th Cir. 2019), *cert. denied*, 140 S. Ct. 653 (Dec. 9, 2019). Just prior to that, the Tenth Circuit affirmed summary judgment in favor

of prison officials and against a prisoner who claimed that she was receiving inadequate care for her gender dysphoria. *Lamb v. Norwood*, 899 F.3d 1159, 1161 (10th Cir. 2018) ("We have consistently held that prison officials do not act with deliberate indifference when they provide medical treatment even if it is subpar or different from what the inmate wants."). And in *Edmo v. Corizon, Inc.*, the Ninth Circuit upheld an injunction requiring Idaho prison officials to provide gender confirmation surgery to avoid subsequent self-castration attempts. 935 F.3d 757, 803 (9th Cir. Aug. 23, 2019), *cert. denied*, ___ S. Ct. ___, 2020 WL 6037411 (Memo) (Oct. 13, 2020).

In *Keohane v. Florida Department of Corrections Secretary*, the Eleventh Circuit followed a similar vein to that in the Seventh Circuit, but *Keohane* more closely resembles this suit than *Campbell*. There, the Eleventh Circuit held that there was no Eighth Amendment violation that warranted injunctive relief based on prison officials' denial of social transitioning accommodation to a gender dysphoric prisoner. 952 F.3d 1257, 1262 (11th Cir. Mar. 11, 2020). The prisoner-plaintiff raised three main issues with her gender dysphoria treatment, but two of the issues were mooted during the pendency of the suit. *Id.* at 1263. The only live controversy that remained related to the prisoner's requests to grow her hair long, use makeup, and wear female undergarments. *Id.* at 1272. The parties did not agree that the plaintiff's social transitioning requests were medically necessary to treat her gender dysphoria. *Id.* at 1264. In a carefully considered opinion, contested by one dissenting Judge, the Eleventh Circuit reversed the district court's entry of a permanent injunction directing prison officials to allow the plaintiff to socially transition, noting the court could not say that failing to provide the total preferred treatment was sufficient to show deliberate indifference. *Id.* at 1277, 1279.

This case differs from *Keohane* and *Campbell* in a major way: those cases (along with the others cited above) were brought by one plaintiff rather than a class, which allowed for a court and

the parties to present adequate testimony as to individual needs rather than a group as a whole. But, even there, where the parties were able to look at specific needs and the specific care and treatment afforded for the prisoner-plaintiffs, the courts were unwilling to find that such demands for accommodation violated the Eighth Amendment. Yet, even analyzing the holdings in *Campbell* and *Keohane* more broadly in the context of this case, there can be no showing sufficient to establish that the care and treatment provided by IDOC violates the Eighth Amendment.

And, though it is an outlier in the group of recent cases on this topic, *Edmo* only supports the need for an individualized assessment. The Ninth Circuit opinion—in acknowledging that transgender health care has changed throughout the decades based on the medical community's understanding of medical necessity—explained that the original injunction and its affirmance were based on the unique facts and circumstances presented in that case and were not to be construed as a general finding. *Edmo*, 935 F.3d at 783. Despite the court's assurances as to the limitations to the injunction ordered in *Edmo*, nine Judges called the decision an "unjustified" and "unprecedented" expansion of the Eighth Amendment in a "highly controversial area of medical practice." *Edmo*, 949 F.3d at 490 (O'Scannlain, J., dissenting from denial of reh'g en banc).

This Court must also take into account the efforts made following its preliminary injunction order. *Farmer,* 511 U.S. 845-47; *Helling v. McKinney*, 509 U.S. 25, 36-37 (1993). Although Defendants did not agree with the injunction entered by this Court, and do not agree that they are violating the Eighth Amendment, this Court should consider the steps it has taken when deciding whether this case should proceed. These steps include: restructuring administrative oversight of the care provided to transgender prisoners by working to replace the TCRC with a two-committee structure; providing additional training to staff and working with the WPATH Global Education Initiative for provider training; engaging consultants with correctional expertise and gender-

informed mental health expertise to update IDOC's policies and practices for gender dysphoric prisoners; and changing commissary restrictions to allow transgender female prisoners the ability to purchase makeup, undergarments, and other gender-affirming items. In her deposition in June 2020, Dr. Anderson, one of the consultants hired by IDOC, noted that the IDOC system had been "moving in a very positive direction" in spite of challenges with "a number of moving parts." [Doc. 226-3, p. 17 at 143]. Ultimately, Plaintiffs fail to establish Defendants are knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so. For these reasons, Defendants are entitled to summary judgment on Plaintiffs' Eighth Amendment claim.

### B. Plaintiffs will be unable to carry the burden required for the issuance of a permanent injunction.

As noted above, in addition to showing they can prevail on the merits of their claim, Plaintiffs are tasked with meeting a four-part test before a permanent injunction may issue. *See eBay Inc.*, 547 U.S. at 391; *ADT Sec. Servs. Inc.*, 672 F.3d at 498. The determination as to a permanent injunction differs from that of a preliminary injunction, and a court's findings of facts and conclusions of law in granting a preliminary injunction are not binding on the merits of a final determination. *Univ. of Texas v. Camenisch*, 451 U.S. 1830, 1833-34 (1981); *e.g., Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 782 (7th Cir. 2011) (findings made at the preliminary injunction stage do not bind the court as the case progresses); *Ayres v. City of Chicago,* 125 F.3d 1010, 1013 (7th Cir. 1997) (purpose of a preliminary injunction is not a decision on the merits).

### 1. Plaintiffs cannot show irreparable injury here.

Throughout this suit, Plaintiffs have merely hinted at the *possibility* that IDOC's policies lead to a risk of harm. Dr. Ettner has opined that the five representative Plaintiffs are at a substantial risk of serious harm, but, as noted above, she finds the same in nearly all of the forensic analyses

she performs. Regardless, Plaintiffs cannot show that there is a "presently existing actual threat" as a result of IDOC policies. *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d at 789 (quoting 11A Charles Alan Wright, et al., Federal Practice and Procedure, § 2948.1, at 154-55 (2d ed. 1995)). Although the Plaintiffs have each discussed complaints about the treatment and accommodations they receive, some of the more recent issues (like Ms. Vision's wait for a transfer [Doc. 226, at 14-15; Doc. 226-10, at 2, #3] and Ms. Melendez's request for an appointment with her physician (Ex. 8 at 48.)) are largely outside of IDOC's immediate control due to COVID-19 restrictions. These are not creations of Departmental policy, but result from the need to control the spread of COVID or different priorities for health care providers who work in the prison. As Dr. Conway testified and others echoed, much of the work for the transgender prisoners has been disrupted by COVID-19, including a "major agenda item" such as gender-affirming surgeries. [Doc. 226-6 at 7-8 pp. 25-26; *id*. at 28, p. 259]. Other complaints are outside the scope of IDOC policy or practice, such as Plaintiffs' allegations that individual staff are disregarding IDOC's policies and training, and are dependent on numerous factors specific to the facilities where the representative Plaintiffs are housed and the specific needs of the Plaintiffs themselves.

In a recent opinion, the Seventh Circuit reversed the entry of a preliminary injunction where equivocal evidence as to a risk of harm was insufficient to meet the necessary hurdle for irreparable harm. *Orr v. Shicker*, 953 F.3d 490, 502 (7th Cir. Mar. 23, 2020). The court concluded that the district court's analysis was flawed because it found only that a substantial risk *could* arise rather than irreparable harm was *likely*. *Id*. Similarly, here, the evidence is equivocal. Plaintiffs' evidence fails to rise to the level of likely irreparable harm. Accordingly, Plaintiffs are not entitled to a permanent injunction.

### 2.   Plaintiffs cannot show traditional legal remedies are inadequate.

The Plaintiffs must also show that traditional legal remedies ("i.e., money damages") would be inadequate to compensate them for any harm. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1096 (7th Cir. 2008). "In saying that the plaintiff must show that an award of damages at the end of trial will be inadequate, we do not mean wholly ineffectual; we mean seriously deficient as a remedy for the harm suffered." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984). The Seventh Circuit notes several reasons why damages could be inadequate, and thus warrant injunctive relief—a business could shutter while waiting for a damage award; a plaintiff could be unable to finance his lawsuit without revenues impacted by a suit; damages may be unobtainable from the defendant; lost profits may be difficult to calculate in the distant future. *Id.* But, here, if Plaintiffs do in fact suffer a compensable injury, they are able to seek damages for such an injury. Due to the vague and general nature of this suit, Plaintiffs are unable to establish that traditional legal remedies are inadequate.

Defendants acknowledge that a risk of suicide or self-harm related to an unconstitutional policy could be sufficient to establish that there are no adequate remedies at law. *See Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1046 (7th Cir. 2017). But, the *Whitaker* case involved a discrete issue and policy related to whether a student could use the restroom associated with the student's gender identity. At issue was a preliminary injunction entered in the individual student's favor. *Id.* at 1039. The student had been able to show that the policy exacerbated an underlying medical condition that made the student susceptible to fainting and seizures and, additionally, that the policy caused him "educational and emotional harm, including suicidal ideations." *Id.* The court found that the student adequately established that there was no adequate remedy of law available to him. *Id.* at 1046. By contrast, here, it is not clear that

injunctive relief will resolve any one individual prisoner's feelings of self-harm. The burden is on the Plaintiffs here, and they cannot show that traditional legal remedies would be inadequate to resolve their civil right claims.

### 3. Issuance of a permanent injunction will cause injury to Defendants that outweighs the harm to the Plaintiffs.

As Defendants have raised previously, the Department is entitled to substantial deference in handling its agency. Governmental actors in general, and prison officials in particular, are given deference in managing and fulfilling their public obligations. *See, e.g., Johnson v. California*, 543 U.S. 499, 529 (2005) ("[E]xperienced prison administrators, and not judges, are in the best position to supervise the daily operations of prisons across this country."). Although various aspects of Plaintiffs' suit have been mooted by changes in IDOC practices and informal policies, IDOC has not yet finalized the new directive pertaining to the care and treatment of transgender prisoners. This final piece may entirely moot Plaintiffs' complaints. IDOC's attempts to modify its policy should be given weight. *Compare Fed'n of Adver. Indus. Representatives, Inc. v. City of Chicago*, 326 F.3d 924, 929 (7th Cir. 2003) ("[W]hen the defendants are public officials . . . . we place greater stock in their acts of self-correction, so long as they appear genuine.") (internal quotations and citations omitted) *and Ragsdale v. Turnock*, 841 F.2d 1358, 1365 (7th Cir. 1988) ("cessation of the allegedly illegal conduct by government officials has been treated with more solicitude by the courts than similar action by private parties.") *with ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 724 F.3d 854, 864 (7th Cir. 2013) (change in policy did not moot dispute over modified permanent injunction because it did not resolve parties' dispute). IDOC should be allowed to fully implement its new policies before this Court intervenes.

Additionally, Plaintiffs have suggested that Defendants have failed to provide access to competent clinicians. While all IDOC providers are required to meet minimum competency

requirements, any order that imposes WPATH requirements on every provider would be too difficult to achieve. WPATH-certification is not feasible, as it requires completion of a nine-step process that will take even a dedicated specialist many years. The providers are, however, able to meet the basic competency requirements. With some exceptions, most facility providers within IDOC prisons are contractual employees, contracted with Wexford Health Sources, Inc. The IDOC-Wexford contract requires that all mental health providers be licensed and meet educational requirements including knowledgeability of co-occurring mental health concerns and the DSM-V. (Ex. 2 at 81.) Facility mental health providers are required to: (1) have a master's degree or its equivalent in a clinical behavioral science field; (2) meet competence in using the DSM and/or International Classification of Diseases; (3) demonstrate DSM competency for licensure; and (4) document supervised training and competence in psychotherapy or counseling as required by educational prerequisites (but the amount varies). (*Id.* at 264-66.) IDOC has taken steps to improve providers' knowledgeability about gender non-conforming identities and expressions and the assessment of gender dysphoria through trainings. (*Id.* at 266.) And, they are providing continuing education in assessment and treatment of gender dysphoria through training and transgender specific case conferences. (*Id.* at 266-67.) The final WPATH competency requirement—working with someone in the field—is part of the reason IDOC engaged with Dr. Anderson. (*Id.* at 267-68.) IDOC has expended effort and money to provide additional training to its providers. To hold the providers to a specialty standard and require that IDOC provide the specialty standard through its providers injures Defendants in a way that outweighs harm to the Plaintiffs.

Plaintiffs complain about lack of competent care, yet both of Plaintiffs' experts testified that there is no one way to become competent. Dr. Tangpricha testified about very simple training that may be undertaken for prescribing gender-affirming hormones. He also explained that "there

are many paths to get training in . . . dealing with people with transgender identity" though not all training is equal. (Ex. 14 at 55-56.) WPATH just recently offered a certification course which allows a provider to say they are WPATH-certified in transgender health. As of August 2020, it had just recently launched and only a few had been certified to Dr. Tangpricha's knowledge. (*Id.* at 53-54.) And, Dr. Ettner testified that she has noticed more available providers in metropolitan areas than in rural areas, but any determination of competency would have to be looked at on an individual basis. (Ex. 18 at 26.) Because of the steps IDOC has already taken with respect to competency, and the fact that there is no set course to obtain competency, this Court should deny a permanent injunction with respect to such request.

In addition, the other requests sought in Plaintiffs' prayer for relief will burden Defendants in a way that outweighs any potential harm to Plaintiffs in the absence of such relief. Plaintiffs' requests for "[p]rompt evaluation for gender dysphoria[,] . . . [t]imely fulfillment of medically prescribed treatment for gender dysphoria, including, but not limited to, hormone therapy and gender affirming surgery[, and] . . . [a]ccommodation of medically necessary social transition, including individualized placement determinations, avoidance of cross-gender strip searches, and access to gender affirming clothing and grooming items" are broad, vague, and over-inclusive. What would constitute "prompt" or "timely" action is not readily discernible, and Plaintiff proposes no metric to assess compliance. Plaintiff's list of treatments or accommodations is open ended ("including, but not limited to"), while those items that are specified would not be expected to apply across the board to every person in the plaintiff class. Further, the list is not sufficiently cabined by the "medically necessary" term, because whether an accommodation or treatment meets that standard will depend on the discretion of individual health providers. There are no

workable metrics to guide Defendants' compliance, or monitor the same, regarding such nebulous relief.

### 4.   Public interest weighs against the permanent injunction sought here.

The public interest is not served by Plaintiffs' approach. Institutional reform injunctions, such as the one sought here, raise "sensitive federalism concerns" because they involve "areas of core state responsibility." *Horne v. Flores*, 557 U.S. 433, 448 (2009). Here, Plaintiffs ask this Court to usurp the role of the IDOC and, by extension, the State. But this is not the role given to federal courts. Rather,

> It is the role of courts to provide relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm; it is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution.

*Lewis v. Casey*, 518 U.S. 343, 349 (1996).

For these reasons, in addition to those raised by Defendants in prior filings, the relief sought by Plaintiffs and the manner in which they have tried to obtain it disserves the public interest.

## II.   Plaintiffs' requested relief is barred by the Eleventh Amendment.

Eleventh Amendment concerns are implicated by requests for prospective as well as for retrospective relief. *Green v. Mansour*, 474 U.S. 64, 68 (1985). The *Ex Parte Young* exception allows a federal court to grant equitable relief against a state official acting in violation of the constitution or federal law. *Ex Parte Young*, 209 U.S. 123 (1908). The exception is very narrow and is not intended for suits such as the one brought here. Instead, the exception requires an unconstitutional act carried out by a state official claimed to be proceeding under authority of their government capacity to enforce an unconstitutional and, therefore, void law. *Id*. at 159-60. Such an act strips the individual of "official or representative character" and subjects them "to the consequences of [their] individual conduct." *Id*. at 160. This very limited purpose treats the official

as outside of "the state" to render the Eleventh Amendment inapplicable. *Id.*; *Green*, 474 U.S. at 68. But, without this clear violation of the law, such a suit against a state officer "should be treated for what it is: a suit against the state." *Watkins v. Blinzinger*, 789 F.2d 474, 484 (7th Cir. 1986) ("*Young* is a narrow and somewhat anomalous sidestep . . . ."). And, suits brought against the state—whether for damages or injunctive relief—are barred. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984).

The *Ex Parte Young* exception is limited to the "precise situation" "when a federal court commands a state official to do nothing more than refrain from violating federal law"; however, it does not apply when the "judgment sought would expend itself on the public treasury or domain, or interfere with public administration." *Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011) (quoting *Pennhurst*, 465 U.S. at 101, n.11). The relief sought by Plaintiffs here is not limited to stop a federal violation, but is rather engineered to control and interfere with the public administration of IDOC duties. This is evident from the Plaintiffs' court filings, including most recently their motion for appointment of a monitor.

The *Ex Parte Young* exception to the Eleventh Amendment does not allow "reparation for the past." *Endelman v. Jordan*, 415 U.S. 651, 665 (1974) (quoting *Rothstein v. Wyman*, 467 F.2d 226 (2d Cir. 1972)). Nor does it allow for deterrence or notice injunctions based on past conduct. *Green*, 474 U.S. at 68-69. Many of Plaintiffs' individual complaints are moot, and the entire process at issue is undergoing change. As noted above, IDOC has taken substantial steps to improve the care offered to gender dysphoric inmates in its custody. There are still some aspects pending finalization. Yet, it is not left to Defendants to establish that the federal claims are moot in order for the Eleventh Amendment to apply; such a view is "backwards." *Watkins*, 789 F.2d at 474. The rule "is that federal courts may not entertain suits against the states." *Watkins*, 789 F.2d

at 474. And, Plaintiffs' attempts to control the State through this suit are barred by the sovereign immunity afforded to the States.

### III.    The injunctive relief sought by Plaintiffs is not narrowly tailored.

The injunctive relief sought by Plaintiffs is overly broad. There is nothing that is narrowly tailored about the relief they seek. But under the Prison Litigation Reform Act:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

18 U.S.C. § 3626. Although judicial remedies may have collateral effects, they are required to be narrowly tailored in the context of prison remedies. *Brown v. Plata*, 563 U.S. 493, 531 (2011). This means that there must be a "fit between the remedy's ends and the means chosen to accomplish those ends." *Id*. Even in non-prisoner civil rights suits, the law has been clear that a mere finding of a constitutional violation is insufficient to justify *any and all* remedies, but rather the scope and nature of the violation must be of sufficient magnitude to justify the magnitude of the remedy imposed. *Dayton Bd. of Edu. v. Brinkman*, 433 U.S. 406, 414 (1977).

Therefore, to find that relief is narrowly drawn and extends no further than necessary to correct the violation of the federal right, the Court must first, necessarily, identify the violation with sufficient precision. Here, there is no clarity as to the precise violation, as this case is built on a patchwork of individualized complaints that attempt to piece together a broad claim to buttress broad relief. But, such an approach broadens the scope of the case much more than is necessary and sweeps in reforms that were not needed in 2019 and are not needed now.

A finding of a "cumulative violation"—like that sought by Plaintiffs here and discussed by the Court in its order granting preliminary relief to Plaintiffs—is not sufficient for a system-wide

remedy that exceeds the scope of the evidence. *See Dayton*, 433 U.S. at 416-17 (lower courts' findings of cumulative violations in school desegregation case and imposition of overly broad remedy went beyond legal confines). Such requests are not appropriate without specific evidence of necessity for class members. *See, e.g., Barrow v. Shearing*, 2017 WL 3866818, at *3 (S.D. Ill. Sep. 5, 2017) ("Directing prison employees to give [the plaintiff] 'community standard of care treatment' and requiring a broad range of medical procedures without specific evidence of their necessity is hardly the least intrusive means."). Similarly, this Court has previously considered a prisoner's request for "proper medical treatment" and found that such a request was overly broad in contravention of the PLRA requirement for narrowly drawn relief. *See Owens v. Duncan*, 2017 WL 119173, at *8 (S.D. Ill. Jan. 12, 2017).

And, Plaintiffs' request for ongoing judicial enforcement is a blanket request that must be denied under the PLRA. The PLRA sets forth specific timing for the termination of prospective relief in civil actions concerning prison conditions. 18 U.S.C. § 3626(b). Such relief is terminable two years after the date that prospective relief was granted or approved or one year after a prior termination denial made under the Act. § 3626(b)(2). When termination is sought, it shall not terminate only if the court makes written findings on the record that the relief remains necessary and otherwise complies with the PLRA. § 3626(b)(3). Plaintiffs' prayer for relief has never been narrowed. Yet, it is clear that Defendants have taken steps to improve the care and treatment of gender dysphoric prisoners in IDOC custody. In light of the actions already taken by IDOC to alleviate Plaintiff's complaints, Plaintiff's requests for relief are not narrowly tailored and exceed what is necessary to correct any violation Plaintiffs could demonstrate.

## Conclusion

Judgment should enter in Defendants' favor. The Eleventh Circuit noted earlier this year that cases like this "stir[ ] emotions" and the questions at issue are sensitive. *Keohane*, 952 F.3d at 1278. Defendants and IDOC appreciate the sensitive issues here and have made attempts to provide care that is better than adequate to treat gender dysphoric prisoners. Plaintiffs cannot show that IDOC is presently violating or will in the future violate the Eighth Amendment with respect to this class claim. Plaintiffs also fail to meet the corresponding burden required for a permanent injunction. Moreover, the relief sought by Plaintiffs exceeds that which is allowed under the Eleventh Amendment and the PLRA. For these reasons, Defendants are entitled to summary judgment.

WHEREFORE, Defendants respectfully request that this Court grant their motion for summary judgment and enter judgment in their favor.

Respectfully submitted,

ROB JEFFREYS, MELVIN HINTON, and
STEVEN BOWMAN,

Defendants,

Lisa A. Cook, #6298233
Assistant Attorney General
500 South Second Street
Springfield, Illinois 62701
(217) 782-9014 Phone
(217) 524-5091 Fax
Email: lcook@atg.state.il.us

KWAME RAOUL, Attorney General
State of Illinois

Attorney for Defendants,

By:   s/Lisa A. Cook
Lisa A. Cook

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**
**EAST ST. LOUIS DIVISION**

| | | |
|---|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, EBONY STAMPS, LYDIA HELENA VISION, SORA KUYKENDALL, and SASHA REED, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| - vs - | ) ) | No. 18-156-NJR-MAB |
| JOHN BALDWIN, MELVIN HINTON, and STEVE MEEKS, | ) ) ) ) | |
| Defendants. | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on December 2, 2020, the foregoing document, *Defendants' Motion for Summary Judgment,* was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

| | |
|---|---|
| John A. Knight | jknight@aclu.il.org |
| Catherine L. Fitzpatrick | cfitzpatrick@kirkland.com |
| Erica B. Zolner | ezolner@kirkland.com |
| Ghirlandi Guidetti | gguidetti@aclu.il.org |
| Megan M. New | mnew@kirkland.com |
| Sydney L. Schneider | Sydney.schneider@kirkland.com |
| Jordan M. Heinz | jheinz@kirkland.com |
| Sarah Jane Hunt | sarahjane@tkennedylaw.com |
| Thomas E. Kennedy, III | tkennedy@tkennedylaw.com |
| Brent P. Ray | bray@kslaw.com |
| Samantha G. Rose | sam.rose@kirkland.com |
| Austin B. Stephenson | austin.stephenson@kirkland.com |
| Carolyn M. Wald | cwald@aclu-il.org |
| Amelia Bailey | abailey@kirkland.com |
| Camille Bennett | cbennett@aclu-il.org |

s/ Lisa A. Cook
Lisa A. Cook, #6298233
Assistant Attorney General
Office of the Attorney General
500 South Second Street
Springfield, Illinois   62701
(217) 782-9014 Phone
(217) 524-5091 Fax
Email: lcook@atg.state.il.us