IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JANIAH MONROE,<br>MARILYN MELENDEZ,<br>LYDIA HELÉNA VISION,<br>SORA KUYKENDALL, and<br>SASHA REED, individually and on<br>behalf of a class of similarly situated<br>individuals,<br><br>      Plaintiffs,<br><br>v.<br><br>ROB JEFFREYS,<br>STEVE MEEKS,[1] and<br>MELVIN HINTON,<br><br>      Defendants. | Case No. 3:18-CV-00156-NJR |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

This matter is before the Court on Defendants' Motion to Bar Some Expected Opinions of Plaintiffs' Expert James E. Aiken (Doc. 236) and Defendants' Motion for Summary Judgment. (Doc. 238). Plaintiffs filed a response to each motion. (Docs. 243, 248). Defendants filed a reply brief on January 29, 2021. (Doc. 249).

## BACKGROUND

Plaintiffs are transgender women currently incarcerated in Illinois Department of Corrections ("IDOC") facilities. They brought this civil action pursuant to 42 U.S.C. § 1983

---

[1] Defendants' most recent pleadings (Docs. 237, 238, 249) name Steven Bowman as a defendant in place of the official capacity claims against Defendant Steve Meeks; however, Defendants have not filed a motion to substitute party.

alleging violations of their constitutional rights, specifically, the IDOC's failure to provide constitutionally adequate medical treatment for inmates seeking evaluation and treatment for gender dysphoria,[2] in violation of the Eighth Amendment. (Doc. 1, p. 3). Plaintiffs request declaratory and permanent injunctive relief to compel Defendants to develop and implement a plan to eliminate the substantial risk of serious harm that Plaintiffs suffer due to Defendants' inadequate evaluation and treatment of gender dysphoria. (Doc. 1, p. 37). Defendants include the IDOC Director, Chief of Health Services, and Mental Health Supervisor, each sued in his official capacity.

On December 19, 2019, after a two-day evidentiary hearing, the Court ordered preliminary injunctive relief. (Docs. 186, 187; modified in Doc. 212 on March 4, 2020). The preliminary injunction included orders for Defendants to develop policies to ensure that treatment decisions for inmates with gender dysphoria are made by qualified medical professionals; to provide timely hormone therapy when medically necessary including monitoring and dosage adjustments; to stop depriving gender dysphoric prisoners medically necessary social transition and to develop a policy to allow such transition (including individualized placement decisions, avoidance of cross-gender strip searches, and access to gender-affirming clothing and grooming items); to develop policies allowing transgender inmates access to competent clinicians; to allow inmates to obtain evaluations for gender dysphoria; and to advise the Court regarding steps taken to train correctional staff on transgender issues. (Doc. 212).

---

[2] Gender dysphoria is a medical condition in which a person experiences clinically significant distress stemming from incongruence between one's experienced or expressed gender and one's assigned gender. (Doc. 157, p. 95; Doc. 158, p. 14).

On March 4, 2020, the Court certified the Plaintiff class, which includes "all prisoners in the custody of IDOC who have requested evaluation or treatment for gender dysphoria." (Doc. 213).

### RELEVANT FACTS

Plaintiff Janiah Monroe has been incarcerated since 2008. (Doc. 186, pp. 17-18). She had taken hormones before entering prison. Her requests for gender-affirming surgery, hormone therapy, and electrolysis were denied by IDOC earlier in her incarceration. She engaged in self harm and suicide attempts following the denial of these treatments. IDOC did not diagnose Monroe with gender dysphoria until 2012. She was transferred to a female facility in 2019 where she has access to female clothing and personal products. (Doc. 238, pp. 7-8). She is receiving hormone therapy with dosage monitoring. She has been informed that her request for gender-affirming surgery was approved but was then stopped by an IDOC official. (Doc. 248, p. 18).

Marilyn Melendez entered IDOC custody in 2012 and has been housed in male facilities since then. (Doc 186, pp. 19-22). She has been in a single cell since late 2018 after her cellmate attempted to sexually assault her; nonetheless, IDOC staff have tried to place another inmate with her. (Doc. 238, pp. 8-9; Doc. 248, p. 10). She took hormones in her youth but had to discontinue the treatment because of cost. Her requests for evaluation for gender dysphoria were rebuffed by IDOC officials until 2015; she began hormone therapy in July or August 2015, approximately 4-5 months after her diagnosis. Medical consultation on the adequacy of her hormone dosage has been delayed. (Doc. 238, p. 8). Her requests for gender-affirming surgery have been denied. After delays, she has

obtained some female clothing and grooming products but has requested additional items not yet made available. Since the preliminary injunction was entered, she has continued to be subjected to strip searches by male officers. (Doc. 248, p. 12). She is still misgendered (referred to by male pronouns rather than by female pronouns in accordance with her identified gender) by most correctional staff. She has attempted suicide five times, most recently in August 2020. (Doc. 238, p. 8; Doc. 248, p. 19).

Sasha Reed has been an IDOC inmate since 2013 and is housed in a male facility. (Doc. 186, pp. 22-23; Doc. 238, p. 10). After initial refusals of her requests for treatment and a suicide attempt, she was diagnosed with gender dysphoria in 2015. Her hormone therapy was initially denied by the Transgender Committee; she was allowed to begin this treatment in March 2017. Her medication was adjusted in September 2020. She has been denied a transfer to a female facility and access to female grooming items. (Doc. 186, p. 23). In 2017, she was permitted to have a bra, and in June 2020, she got a medical permit for women's undergarments. She has requested gender-affirming surgery since 2016 without success.

Sora Kuykendall came to the IDOC in 2014 and is housed in a male facility. She sought hormone therapy and evaluation for gender dysphoria but was not evaluated until she attempted self-castration in 2015. (Doc. 186, pp. 25-26). She began hormone therapy in 2015 but her hormone levels were not monitored for four years. She developed breasts but was denied a bra until six months after requesting one. Her requests for feminine products, transfer to a female institution, and gender-affirming surgery have been denied. (Doc. 238, p. 10; Doc. 248, pp. 9-10, 17-18). She has been repeatedly strip-

searched by male officers and in the presence of other males, and she is sexually harassed by male prisoners and officers. (Doc. 248, pp. 11-12; 17). She was recently placed on crisis watch for suicidal ideation, which resulted in denial of her hormone therapy. (Doc. 248, p. 19).

Lydia Heléna Vision has been in IDOC custody in male institutions since 2004. She was diagnosed with gender dysphoria in 2016 but was denied hormone therapy until late 2018. (Doc. 186, pp. 27-28). Her requests for female clothing and grooming items were likewise denied; she was allowed a bra in 2017, but no other items. She is currently single celled, and while she showers alone, the shower has only limited privacy. (Doc. 238, p. 11). IDOC has approved her for transfer to a female prison, but Defendants state the move has been delayed due to COVID-19-related restrictions. Since 2016, she has made multiple requests for gender-affirming surgery but received no response. (Doc. 248, p. 17).

When the preliminary injunction was granted, IDOC had in place Administrative Directive 04.03.104 for "Evaluations of Transgender Offenders." (Doc. 238, pp. 4-5; Doc. 238-1, eff. July 1, 2019). It established a "Transgender Care Review Committee" ("TCRC") to review placements, security concerns and overall health-related treatment plans, and gender related accommodations for transgender prisoners and those diagnosed with gender dysphoria. *Id.* at 2. It provided for screening of incoming prisoners, and evaluation and recommendation for housing and accommodations such as hormone therapy, gender specific clothing, showers, and searches. *Id.* at 2-5. After the injunction order, Defendants began making changes to the TCRC so that medical

decisions and security-related accommodations will be handled by separate committees. (Doc. 238, p. 5; Doc. 238-2, p. 9). IDOC has contracted with consultants to replace the Administrative Directive referenced above and states it desires to maintain WPATH Standards of Care.[3] Changes have recently been made to give transgender female prisoners in all institutions access to commissary items such as bras, panties, makeup, facial hair remover, and scrunchies. (Doc. 238, p. 5; Doc. 238-3). A two-hour training has been provided to all IDOC staff to educate them on the need to avoid misgendering prisoners. Part one of the WPATH training for medical and mental health providers was completed in September 2020. (Doc. 238, p. 6).

Plaintiffs point out that IDOC's planned policy changes have not been put into effect and assert that practices which subject Plaintiffs to serious harm have not changed. (Doc. 248, pp. 23-26).

Two of Plaintiffs' experts (endocrinologist Dr. Vin Tangpricha and psychologist Dr. Randi Ettner) testified at the preliminary injunction hearing. (Doc. 186, pp. 12-16, 29-32; Doc. 238, pp. 11-14). Plaintiffs' expert James E. Aiken prepared a written report and was deposed by Defendants; his expected trial testimony is the subject of the instant Motion to Bar Some Expected Opinions. (Doc. 236; Doc. 236-1). Aiken has a professional background in several correctional settings and extensive consulting experience.

---

[3] WPATH is the World Professional Association for Transgender Health, a professional association dedicated to understanding and treating gender dysphoria. This Court previously found its medically accepted Standards of Care to be the "appropriate benchmark" for treating gender dysphoria. (Doc. 186, p. 31). Treatment options include social role transition, cross-sex hormone therapy, psychotherapy, and surgery. (Doc. 158, p. 14; Doc. 186, pp. 3-7).

## LEGAL STANDARDS

### I.   *Summary Judgment Standard*

Federal Rule of Civil Procedure 56 governs motions for summary judgment. "Summary judgment is appropriate only 'if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Anderson v. Donahoe*, 699 F.3d 989, 994 (7th Cir. 2012) (quoting FED. R. CIV. P. 56(a)). *Accord Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir. 2014). The moving party bears the initial burden of demonstrating the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once a properly supported motion for summary judgment is filed, the adverse party "must set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. *Accord Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017).

In assessing a summary judgment motion, the Court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Donahoe*, 699 F.3d at 994; *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). As the Seventh Circuit has explained, as required by Rule 56(a), "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving her the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in her favor." *Spaine v. Cmty. Contacts, Inc.*, 756 F.3d 542, 544 (7th Cir. 2014).

## II. *Eighth Amendment Deliberate Indifference*

The Eighth Amendment prohibits cruel and unusual punishment and "imposes a duty upon states to provide adequate medical care to incarcerated individuals." *Boyce v. Moore,* 314 F.3d 884, 888-89 (7th Cir. 2002). Deliberate indifference to the "serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) (citation omitted).

In order to prevail on a claim of deliberate indifference, a prisoner who brings an Eighth Amendment challenge of constitutionally deficient medical care must satisfy a two-part test. *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). The first consideration is whether the prisoner has an "objectively serious medical condition." *Id. Accord Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). "A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Hammond v. Rector*, 123 F. Supp. 3d 1076, 1084 (S.D. Ill. 2015) (quoting *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)).

The second element requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health. *Greeno,* 414 F.3d at 653. A plaintiff need not show the official "literally ignored" his complaint, but that the official was aware of the condition and either knowingly or recklessly disregarded it. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). "Something more than negligence or even malpractice is required" to prove deliberate indifference. *Pyles,* 771 F.3d at 409. Deliberate indifference involves "intentional or reckless conduct, not mere negligence."

*Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) (citing *Gayton*, 593 F.3d at 620).

In this case, Plaintiffs challenge the delivery of medically necessary care and treatment on a systemic, statewide level in IDOC correctional institutions. *See, e.g., Wellman v. Faulkner,* 715 F.2d 269, 272 (7th Cir. 1983); *Cleveland–Perdue v. Brutsche,* 881 F.2d 427, 430–31 (7th Cir. 1989) (recognizing claims of systemic health care deficiencies as a distinct category of deliberate indifference claims, as opposed to one based on "isolated instances of indifference to a particular inmate's medical needs"). Where systemic deficiencies are alleged, deliberate indifference can be demonstrated by "proving there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care[,]" or by showing "repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff" which result in an excessive risk of serious harm. *Wellman*, 715 F.2d at 272; *see also Phillips v. Sheriff of Cook Cnty.*, 828 F.3d 541, 554 (7th Cir. 2016); *Rasho v. Walker*, 376 F. Supp. 3d 888, 906-07, 914-15 (C.D. Ill. 2019).

### III.     Admissibility of Expert Testimony

Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), govern the admissibility of expert testimony. *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 673-74 (7th Cir. 2017). The *Daubert* standard applies to all expert testimony, whether based on scientific competence or other specialized or technical expertise. *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S.137, 141 (1999)). Rule 702, as amended after *Daubert*, provides:

> A witness who is qualified as an expert by knowledge, skill, experience,

> training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. Simply stated, "Rule 702 requires that expert testimony be relevant, reliable, and have a factual basis—requirements that must be met before the jury is allowed to hear and perhaps be persuaded by the expert testimony." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 809 (7th Cir. 2012).

The trial judge acts as the gatekeeper for expert testimony, and "the key to the gate is not the ultimate correctness of the expert's conclusions," rather, it is "the soundness and care with which the expert arrived at her opinion." *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013). The Court's inquiry focuses "solely on principles and methodologies, not on the conclusions they generate." *Id.* (quoting *Daubert*, 509 U.S. at 595). Evaluating reliability requires a flexible inquiry. The relevant consideration is whether the testimony falls outside the range where experts might reasonably differ. *Kumho*, 526 U.S. at 153-54. With respect to an expert proffered for his experience, "[i]t is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support." *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003) (citing *Gen. Elec. v. Joiner*, 522 U.S. 136, 146 (1997)).

Notably, "[a] *Daubert* inquiry is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy." *Lapsley*, 689 F.3d at 805. "If the proposed expert testimony meets the *Daubert* threshold of relevance and

reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof'." *Id.* (quoting *Daubert*, 509 U.S. at 596).

Courts in the Seventh Circuit conduct a three-step analysis under *Daubert*. *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007); *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017).[4] First, the district court must determine whether the person whose testimony is offered is in fact an expert, as codified in Rule 702 through "knowledge, skill, experience, training or education." *Id.* (citing FED. R. EVID. 702). Second, the district court must determine that the expert's reasoning or methodology is reliable. *Ervin,* 492 F.3d at 904; *see Mihailovich v. Laatsch*, 359 F.3d 892, 918 (7th Cir. 2004) (citing *Kumho*, 526 U.S. at 147). In assessing reliability, the court looks at a non-exhaustive list of factors that include: "(1) whether the scientific theory can be or has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether the theory has been generally accepted in the scientific community." *Ervin*, 492 F.3d 901, 904 (7th Cir. 2007) (citing *Daubert*, 509 U.S. at 593-94). "[T]he district court may apply these factors flexibly as the case requires." *Gopalratnam*, 877 F.3d at 780 (quoting *Krik*, 870 F.3d at 674, and citing *Kumho*, 526 U.S. at 150). Finally, the "testimony must assist the trier of fact to understand the evidence or to determine a fact at issue. *Ervin*, 492 F.3d at 904.

---

[4] The Court notes the Seventh Circuit has also described the *Daubert* analysis as a two-step process. *See Chapman v. Maytag Corp.*, 297 F.3d 682, 686 (7th Cir. 2002). However, as *Chapman* simply combines the first two steps described in *Ervin* as a single test of reliability, whether the analysis is described as a three-step or two-step process does not substantively change the Court's analysis.

Resolution of an expert's credibility or the correctness of his or her theories under the particular circumstances of a given case is a factual inquiry, left to the jury's determination after opposing counsel has cross-examined the expert at issue as to the conclusions and facts underlying his or her opinion. *Smith*, 215 F.3d at 718 (citing *Walker*, 208 F.3d at 589-90).

## ANALYSIS

### I.     *Motion for Summary Judgment*

Defendants have conceded that Plaintiffs' gender dysphoria is an objectively serious medical condition. (Doc. 186, pp. 29-30). The parties' dispute centers on whether Defendants have been deliberately indifferent to Plaintiffs' risk of serious harm from their condition. As this Court stated when issuing the preliminary injunction in this case, "Plaintiffs must show IDOC consciously disregarded a known and substantial risk of harm associated with gender dysphoria." (Doc. 186, p. 32) (citing *Greeno*, 414 F.3d at 653). Defendants assert that Plaintiffs cannot show that IDOC is violating their Eighth Amendment rights, cannot meet the necessary elements to obtain a permanent injunction, and that the requested injunctive relief exceeds the limitations of the Eleventh Amendment and the Prison Litigation Reform Act. (Doc. 238, pp. 2-3).

Initially, Defendants argue that Plaintiffs are unable to show they have suffered "punishment or subjective cruelty" at the hands of Defendants and are instead pursuing what amounts to medical malpractice claims. (Doc. 238, pp. 15-19). But there is much evidence before the Court to support Plaintiffs' claims of significant harm—including self-mutilation, actual and contemplated suicide attempts, and clinically significant

psychological distress—resulting from IDOC's refusal to provide the most basic care for transgender individuals, including timely evaluations for gender dysphoria, lengthy delays in providing hormone therapy once a diagnosis of gender dysphoria is obtained, and failure to provide necessary monitoring of hormone levels to many transgender prisoners who are receiving hormones.[5] This Court found in December 2019 that "IDOC is well-aware that transgender inmates are at a high risk of suffering from mental health issues and resorting to self-harm." (Doc, 186, p. 32). Evidence adduced since that time indicates that Plaintiffs continue to suffer due to their inability to obtain necessary medical treatment while in IDOC custody.[6] (Doc. 248, pp. 14-16, 17-19). The parties' filings demonstrate that the question of whether Defendants actually knew of, yet disregarded, a substantial risk of harm to Plaintiffs relating to medical care is a factual issue that remains in dispute. *See Farmer v. Brennan*, 511 U.S. 825, 842 (1994) ("[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact").

Defendants further argue that they are not constitutionally mandated to provide treatment that aligns with the WPATH Standards of Care and that there are no set Eighth Amendment standards for the care and treatment of gender dysphoria. (Doc. 238, pp. 19-24). However, contemporary standards for medical care are relevant to a deliberate

---

[5] Plaintiffs link these harms not only to the delays/denials of medical evaluation and treatment, but also to denials of social transition requests including cross-gender strip searches, persistent misgendering, and denials of transfer requests.

[6] Defendants' objection to the consideration of Plaintiffs' previously undisclosed statement of Chonna Anderson and the supplementary opinion of Dr. Tangpricha based on Anderson's statement (Doc. 249, pp. 2-5) is well taken. The Court has not considered the Anderson declaration, medical records, or the supplemental opinion (Docs. 248-11, 248-12, and 248-13) in ruling on the motion for summary judgment.

indifference inquiry, and this Court has determined that it "will continue to use the WPATH Standards of Care as guidelines for constitutionally adequate care under the Eighth Amendment" unless Defendants offer an alternative constitutionally adequate standard. (Doc. 211, p. 7). Defendants' motion does not set forth any alternative standard of care. Indeed, their consultant, Dr. Erica Anderson, testified that the WPATH Standards of Care are referenced "for transgender healthcare around the world[.]" (Doc. 248, p. 28, n.7, quoting Anderson Dep. At 30:1-17). Defendants' argument does not persuade the Court that it should abandon the WPATH Standards of Care as a benchmark to evaluate Plaintiffs' Eighth Amendment claims. More to the point, their challenge to the use of the WPATH Standards in the Eighth Amendment context, and Plaintiffs' response, emphasizes that a material factual dispute exists on this important matter.

Defendants further argue that they are entitled to summary judgment based in part on the efforts that have been made to comply with the preliminary injunction (Doc. 238, pp. 23-24). They are "working to replace the TCRC with a two-committee structure; providing additional training … engaging consultants with correctional expertise and gender-informed mental health expertise to update IDOC's policies and practices for gender dysphoric prisoners; and changing commissary restrictions" so that transgender female prisoners may access female items. *Id.* Positive as these developments may be, Plaintiffs point out that Defendants have not yet implemented the policy changes they describe, and many practices which gave rise to this suit are still ongoing. (Doc. 248, pp. 23-26). Defendants have not provided drafts of their new policies, and the changes they describe are not yet completed. Plaintiffs assert that the 13-month delay in

implementing a new administrative directive to replace the TCRC (which provides for non-medical staff to participate in making medical decisions regarding gender dysphoria) creates a factual dispute regarding the current and future risk of harm to Plaintiffs. (Doc. 248, p. 23). Similarly, the parties dispute the adequacy of IDOC's staff and provider training on transgender issues, including misgendering, to prevent harm to Plaintiffs. (Doc. 248, p. 25). Plaintiffs' testimony that misgendering by correctional staff is frequent, ongoing, and harmful casts doubt on the efficacy of training efforts to date. While Defendants provided a list of commissary items that, as of November 2020, were to be made available to transgender female prisoners (Doc. 238-3), Plaintiffs dispute the actual availability of these items and note that the changes do not address the social transition needs of transgender men, who are included in the Plaintiff class. (Doc. 248, pp. 13-14, 26). Disputed factual issues remain that are material to the resolution of Plaintiffs' deliberate indifference claims, and the evidence set forth would allow a reasonable jury to find for Plaintiffs.

Finally, the Court is not convinced at this juncture that Plaintiffs will be unable to establish the requirements for the issuance of a permanent injunction. (Doc. 238, pp. 24-30; Doc. 248, pp. 29-38). This Court found that Plaintiffs faced irreparable harm that monetary damages could not remedy when the preliminary injunction was issued, and the question of whether that harm is ongoing and likely to continue absent permanent injunctive relief is an inquiry involving disputed material facts. For example, Plaintiffs question Defendants' assertion that potential transfers of transgender women to female facilities, physician visits related to hormone and other treatment, and consideration of

gender-affirming surgeries have been unavoidably delayed because of restrictions related to the COVID-19 pandemic. Plaintiffs point out that other prisoner transfers and physician visits have been accomplished even during the pandemic. (Doc. 238, p. 25; Doc. 248, p. 33). Further, while not conceding the point in this case, Defendants acknowledge that a risk of suicide or self-harm related to an unconstitutional policy may suffice to show that no adequate remedy at law exists. (Doc. 238, p. 26). These are matters that cannot be resolved at the summary judgment stage. As well, it is premature for the Court to conclude that the harm to Defendants from a permanent injunction will outweigh the harm to Plaintiffs if one is issued, that permanent injunctive relief would not serve the public interest, or that such relief would necessarily violate the Eleventh Amendment or the constraints of the Prison Litigation Reform Act. (Doc. 238, pp. 30-33; Doc. 248, pp. 38-41).

To summarize, the Court finds that genuine issues of material fact exist as to whether Defendants were and are deliberately indifferent to the serious risk of harm to Plaintiffs associated with their gender dysphoria. Defendants thus are not entitled to summary judgment.

## II.   *Motion to Bar Some Expected Opinions of Expert Aiken*

Defendants do not challenge James E. Aiken's qualifications as an expert, which include nearly fifty years of experience in correctional administration, facility operations and management, with much focus on remediation of "program and security shortfalls and staff misconduct" in prison systems. (Doc. 236-1, pp. 2, 21-33). Mr. Aiken served as one of nine Commissioners of the National Prison Rape Elimination Commission, which

was tasked with formulating standards to prevent, detect, and eliminate prison rape. (Doc. 236-1, p. 3). The Commission's work included consideration of "the appropriate standard for the safe housing and placement of transgender inmates." *Id.* The Court is satisfied with Mr. Aiken's qualifications as an expert in the corrections field.

Defendants seek to bar Mr. Aiken's opinions that: (1) there is no security justification for denying transgender prisoners medically necessary social transition, particularly relating to misgendering; (2) there are no legitimate security reasons to deny transgender prisoners medically-recommended housing placement; and (3) sound correctional practice requires giving transgender prisoners the option of being searched by correctional staff of the same gender. (Doc. 236, pp. 1-2).

Defendants do not challenge Mr. Aiken's opinion that transgender inmates in male prisons should have access to the same commissary items available to female prisoners in facilities of the same security level.[7] (Doc. 236, pp. 3-4). They argue that Mr. Aiken's opinion that there is no security justification for allowing misgendering of transgender prisoners should be barred as irrelevant, because he has not identified an IDOC policy that allows misgendering based on a security justification, nor has he reviewed IDOC's training on the matter or identified any failure of IDOC Director Jeffreys to model respectful behavior. (Doc. 236, pp. 4-5). Plaintiffs counter that Mr. Aiken's testimony is relevant to their claim that misgendering by corrections staff amounts to denial of medically necessary social transition. They note that the evidence shows a widespread

---

[7] Defendants assert they have implemented new commissary procedures to allow transgender women in male facilities to purchase all of the same items available in female institutions. (Doc. 236, p. 4 n.1).

practice of misgendering of which IDOC is aware, and that Mr. Aiken is not required to identify a policy permitting misgendering in order for his testimony to be relevant. (Doc. 243, p. 5).

The Court finds that Mr. Aiken's opinion that misgendering of transgender prisoners increases their risk of abuse/assault by other prisoners, as well as the risk of self-harm and suicide is relevant to security concerns within the prison system and to the issue of whether Defendants have been deliberately indifferent to Plaintiffs' medical needs for social transition treatment. His opinions are based on his extensive experience and specialized knowledge in the corrections field and his review of documents related to this case. As such, his testimony on this matter is likely to advance the inquiry and aid the trier of fact on these matters. The motion to bar will be denied on this issue.

Regarding housing placement of transgender prisoners, Defendants argue that Mr. Aiken cannot identify a standard that requires prison officials to give top priority to medical concerns, as opposed to security concerns, when making housing decisions, thus his opinion that medical recommendations should take precedence should be excluded. Defendants also claim that Mr. Aiken's proffered opinion oversteps the boundary of his expertise by interpreting the law applicable to prison officials' duty to comply with directions from medical providers. (Doc. 236, pp. 6-7). Finally, Defendants argue that Mr. Aiken did not sufficiently review records relating to security issues that arose after Plaintiff Monroe's transfer to a female prison, thus his opinion that IDOC has no legitimate security reasons to deny medically recommended placements to transgender prisoners is not based on sufficient facts or data. *Id.* at 7.

The Court does not find these to be sufficient reasons to bar Mr. Aiken's testimony. Defendants may offer their own expert testimony as to the interplay between medical and security concerns when determining housing placements, and the trier of fact may take into account the relevant standards (or lack thereof) in assessing whether Defendants were deliberately indifferent to Plaintiffs' medical needs in making housing decisions. Cross examination is available to challenge Mr. Aiken's familiarity with records and facts relating to a particular Plaintiff's placement and whether his opinion sufficiently considered that information; exclusion of his expected testimony is not warranted on this basis.

The Court does not view Mr. Aiken's opinion that no legitimate security reason exists to deny medically recommended housing placements for transgender inmates as an improper legal conclusion. His report explains that his opinions are grounded in guidance offered by the Prison Rape Elimination Commission, the goals and purposes of the PREA Standards, and Department of Justice regulations, as well as his extensive professional corrections experience. (Doc. 236-1, pp. 8-16). Cross examination, as well as the Court's understanding of the law and appropriate instructions to the jury, will ensure that Mr. Aiken's opinion testimony is not taken as an improper legal interpretation by a non-lawyer.

Similarly, Mr. Aiken's opinion that sound correctional practice requires giving transgender prisoners the option of being searched by correctional staff of the same gender is not an impermissible legal opinion, nor does it encroach on the role of the Court. He states that the PREA Standards were promulgated to stop sexual assault and violence

rather than to address transgender prisoners' medical needs. (Doc. 236-1, p. 17). He opines that these standards and sound correctional practices support same-gender searches based on the prisoner's gender identity, and notes that other states have implemented this kind of policy. Defendants assert that the PREA regulations are unclear, as noted by their expert. But this is a matter for the trier of fact to consider, as is the weight to be given to those standards as they relate to IDOC's policy on cross-gender searches. Defendants' arguments to bar Mr. Aiken's opinions are not persuasive.

## CONCLUSION

For the above reasons, Defendants' Motion to Bar Some Expected Opinions of Plaintiff's Expert James E. Aiken (Doc. 236) and Defendants' Motion for Summary Judgment (Doc. 238) are **DENIED**.

A telephonic status conference will be set by separate order for the purpose of selecting a firm trial date.

**IT IS SO ORDERED.**

DATED:  February 4, 2021

*Nancy J. Rosenstengel*
_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**