## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

JANIAH MONROE, MARILYN          )
MELENDEZ, LYDIA HELÉNA VISION,  )
SORA KUYKENDALL, and SASHA REED, )
individually and on behalf of a class of )
similarly situated individuals,  )
                                 )
        Plaintiffs,           )    Case No. 3:18-cv-00156-NJR
                                 )
    v.                         )
                                 )
ROB JEFFREYS, MELVIN HINTON,     )
and STEVE MEEKS,                 )
                                 )
        Defendants.           )

## PLAINTIFFS' OPPOSITION TO DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

**STATEMENT OF FACTS** ................................................................................................ **2**

    A.    Cross-Gender Placement Continues To Cause Plaintiffs Substantial Harm .......... 2

    B.    Defendants Continue To Subject Plaintiffs To Cross-Gender Searches ................. 4

    C.    Access To Gender-Affirming Clothing And Grooming Items Remains
        Speculative, At Best ......................................................................................... 6

    D.    IDOC Does Not Properly Administer Hormone Therapy While
        Monitoring Remains Infrequent And Incomplete ................................................ 7

    E.    Plaintiffs Are Consistently Misgendered And Subject To Harassment
        From IDOC Staff ............................................................................................. 9

    F.    Defendants Do Not Contest That They Continue To Deny Plaintiffs
        Gender-Affirming Surgery ............................................................................... 10

    G.    Plaintiffs Are Suicidal And At Serious Risk Of Imminent Self-Harm ................ 11

**ARGUMENT** ................................................................................................................ **12**

**I.**      **STANDARD OF REVIEW.** ................................................................................ **12**

**II.**    **NUMEROUS ADDITIONAL DISPUTED FACT ISSUES PRECLUDE
        SUMMARY JUDGMENT ON PLAINTIFFS' EIGHTH AMENDMENT
        CLAIMS** ............................................................................................................ **13**

    A.    Plaintiffs' Evidence Is Sufficient To Support A Finding That Defendants
        Consciously Disregarded A Substantial Risk of Harm ........................................ 15

    B.    Defendants' Admission That They Do Not Meet The WPATH Standards
        Of Care Is Sufficient To Raise A Triable Fact Precluding Summary
        Judgment .......................................................................................................... 19

**III.**   **PLAINTIFFS HAVE PROVIDED SUFFICIENT EVIDENCE TO
        ESTABLISH EACH OF THE REQUIREMENTS FOR A PERMANENT
        INJUNCTION.** ................................................................................................. **22**

    A.    The Record Evidence Supports A Finding Of Irreparable Harm ........................ 23

    B.    Defendants Concede That The Adequacy Of A Remedy At Law Is
        Disputed ........................................................................................................... 26

C.     Defendants Fail To Show That, As A Matter Of Law, The Balance Of
       Harms Tips In Their Favor. ................................................................. 27

D.     Granting A Preliminary Injunction Does Not Disserve The Public Interest. ....... 30

IV.    **DEFENDANTS' REMAINING ARGUMENTS DO NOT ENTITLE THEM
       TO SUMMARY JUDGMENT** ................................................................. **31**

A.     Defendants Are Not Entitled To Summary Judgment On Their Eleventh
       Amendment Defense. ............................................................................ 31

B.     Defendants' Objection Under The PLRA Is Premature And
       Unmeritorious. ................................................................................... 33

**CONCLUSION** ..................................................................................................... **34**

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*,
  724 F.3d 854 (7th Cir. 2013) ..................................................................28

*AM Gen. Corp. v. DaimlerChrysler Corp.*,
  246 F. Supp. 2d 1030 (N.D. Ind. 2003) ...........................................20, 21

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)..............................................................................25

*Brown v. Plata*,
  563 U.S. 493 (2011)..............................................................................34

*Campbell v. Kallas*,
  2020 WL 7230235 (W.D. Wis. Dec. 8, 2020) .......................................22

*Campbell v. Kallas*,
  936 F.3d 536 (7th Cir. 2019) ................................................................22

*Casey v. Uddeholm Corp.*,
  32 F.3d 1094 (7th Cir. 1994) ................................................................23

*City of Chi. v. Barr*,
  961 F.3d 882 (7th Cir. 2020) ................................................................23

*City of Chi. v. Sessions*,
  321 F. Supp. 3d 855 (N.D. Ill. 2018), *aff'd and remanded sub nom. City of
  Chi. v. Barr*, 961 F.3d 882 (7th Cir. 2020) ...........................................24

*Commodity Futures Trading Comm'n v. Bd. of Trade of City of Chi.*,
  701 F.2d 653 (7th Cir. 1983) ................................................................20

*Council 31 of the Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Quinn*,
  680 F.3d 875 (7th Cir. 2012) ...........................................................32, 33

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006)..............................................................................23

*Edelman v. Jordan*,
  415 U.S. 651 (1974) .............................................................................33

*Edmo v. Corizon, Inc.*,
  935 F.3d 757 (9th Cir. 2019), *cert. denied sub nom.*, *Idaho Dep't of Corr. v.
  Edmo*, 2020 WL 6037411 (Oct. 13, 2020)...........................................24

*Edmo v. Idaho Dep't of Corr.*,
   358 F. Supp. 3d 1103, *aff'd by Edmo v. Corizon, Inc.* 935 F.3d 757 (9th Cir.
   2019) ........................................................................................................30

*Egan v. Freedom Bank*,
   659 F.3d 639 (7th Cir. 2011) ...................................................................1, 13

*Estelle v. Gamble*,
   429 U.S. 97 (1976)................................................................................14, 15

*Farmer v. Brennan*,
   511 U.S. 825 (1994)........................................................................14, 15, 19

*Farnam v. Walker*,
   593 F. Supp. 2d 1000 (C.D. Ill. 2009) .....................................................30

*Fields v. Smith*,
   653 F.3d 550 (7th Cir. 2011) ...................................................................34

*Flynn v. Doyle*,
   630 F. Supp. 2d 987 (E.D. Wis. 2009)......................................................30

*Foster v. Ghosh*,
   4 F. Supp. 3d 974 (N.D. Ill. 2013) ...........................................................30

*Friends of the Earth, Inc. v. Laidlaw Evt'l. Servs. (TOC), Inc.*,
   528 U.S. 167 (2000)...............................................................................27, 28

*Gammett v. Idaho State Bd. of Corr.*,
   2007 WL 2186896 (D. Idaho July 27, 2007) ...........................................30

*Hawksbill Sea Turtle v. Fed. Emerg. Mgmt. Agency*,
   126 F.3d 461 (3d Cir. 1997).......................................................................20

*Helling v. McKinney*,
   509 U.S. 25 (1993)................................................................................14, 19

*Hicklin v. Precynthe*,
   2018 WL 806764 (E.D. Mo. Feb. 9, 2018).............................................24, 26

*Horne v. Flores*,
   557 U.S. 433 (2009)....................................................................................31

*Idaho v. Coeur d'Alene Tribe of Idaho*,
   521 U.S. 261 (1997)....................................................................................32

*Ind. Emp. Sec. Div. v. Burney*,
   409 U.S. 540 (1973)....................................................................................28

iv

*Johnson v. California*,
543 U.S. 499 (2005) ...............................................................................29

*Lewis v. Casey*,
518 U.S. 343 (1996).................................................................................31

*Lindell v. Frank*,
377 F.3d 655 (7th Cir. 2004) ..................................................................34

*Lummus Co. v. Commonwealth Oil Refin. Co.*,
297 F.2d 80 (2d Cir. 1961).....................................................................21

*Mata v. Saiz*,
427 F.3d 745 (10th Cir. 2005) ...............................................................20

*Michalic v. Cleveland Tankers, Inc.*,
364 U.S. 325 (1960)................................................................................15

*Milwaukee Police Ass'n v. Jones*,
192 F.3d 742 (7th Cir. 1999) ..................................................................28

*Mission Prod. Holdings, Inc. v. Tempnology, LLC*,
139 S. Ct. 1652 (2019)...........................................................................28

*Monroe v. Baldwin*,
424 F. Supp. 3d 526 (S.D. Ill. 2019), *on reconsideration in part sub nom.*
*Monroe v. Meeks*, 2020 WL 1048770 (S.D. Ill. Mar. 4, 2020)...............14

*Mortland v. Lights Out Devs., LLC*,
No. 2020 WL 3577867 (S.D. Ind. July 1, 2020).....................................29

*Orr v. Schicker*,
953 F.3d 490 (7th Cir. 2020) .............................................................24, 25

*Payne v. Pauley*,
337 F.3d 767 (7th Cir. 2003) .............................................................13, 25

*Petties v. Carter*,
836 F.3d 722 (7th Cir. 2016) (en banc) ............................14, 15, 16, 19

*Phillips v. Mich. Dep't of Corr.*,
731 F. Supp. 792 (W.D. Mich. 1990), *aff'd*, 932 F.2d 969 (6th Cir. 1991)............................31

*Piercy v. Warkins*,
2017 WL 1477959 (N.D. Ill. April 25, 2017).........................................15

*Pourghoraishi v. Flying J, Inc.*,
449 F.3d 751 (7th Cir. 2006) ..................................................................13

*Roe v. Elyea*,
    631 F.3d 843 (7th Cir. 2011) ......................................................................15

*Square D Co. v. Fastrak Softworks, Inc.*,
    107 F.3d 448 (7th Cir. 1997) ......................................................................28

*United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*,
    563 F.3d 257 (7th Cir. 2009) ......................................................................28

*United States Army Corps of Engineers*,
    667 F.3d 765, 789 (7th Cir. 2011) ..............................................................24

*United States v. Raines*,
    362 U.S. 17 (1960) ......................................................................................30

*Valance v. Wisel*,
    110 F.3d 1269 (7th Cir. 1997) ....................................................................12

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*,
    535 U.S. 635 (2002) ....................................................................................32

*Vickery v. Jones*,
    100 F.3d 1334 (7th Cir. 1996) ....................................................................32

*Westefer v. Neal*,
    682 F.3d 679 (7th Cir. 2012) ......................................................................33

*Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
    858 F.3d 1034 (7th Cir. 2017) ...............................................................26, 27

*Zaya v. Sood*,
    836 F.3d 800 (7th Cir. 2016) ...........................................................13, 14, 15

**Rules**

FED. R. CIV. P. 56(c)....................................................................................1, 12

**Other Authorities**

Wright & Miller, 18A Fed. Prac. & Proc. Juris. § 4434 (3d ed.)..................20

Defendants ignore their heavy burden on summary judgment. To avoid a trial, Defendants must establish that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). In other words, they must show that the evidence, viewed in the light most favorable to the Plaintiffs and drawing all reasonable inferences therefrom, could not support a judgment in Plaintiffs' favor. *E.g., Egan v. Freedom Bank*, 659 F.3d 639, 642 (7th Cir. 2011). Defendants' burden is insurmountable given the record in this case, including Defendants' concession that Plaintiffs' gender dysphoria is an objectively serious medical condition, this Court's findings that "IDOC is well-aware that transgender inmates are at a high risk of suffering from mental health issues and resorting to self-harm," and that "[d]espite these known risks, there is evidence that IDOC denies and delays the diagnosis and treatment of gender dysphoria without a medical basis or penological purpose." Dkt. 186, PI Mem. & Op. at 32–33.

Defendants want this Court to rule that they are entitled to judgment as a matter of law, but they cannot show that this Court's findings were wrong, let alone that they were contrary to undisputed facts. And far from proving, as a matter of law, that there is no longer a federal interest in protecting Plaintiffs' Eighth Amendment rights, that Plaintiffs and the class no longer face substantial irreparable harm, or that there is an adequate legal remedy, there is ample evidence that the treatment of transgender prisoners remains the same and that Defendants' have not implemented the changes required to eliminate their ongoing constitutional violations.

To defeat Defendants' motion, Plaintiffs need not discredit Defendants' evidence, nor prove their case. Nevertheless, it bears noting that the named Plaintiffs' testimony alone establishes that treatment of transgender prisoners continues to cause unthinkable suffering.

1

Plaintiffs and the class remain at a high risk of self-harm and suicide—the tragic, irreversible consequences of Defendants' continued failure to meet their Constitutional responsibilities.

## STATEMENT OF FACTS

Thirteen months after this Court entered its preliminary injunction, Defendants admit that "IDOC has not yet finalized the new directive pertaining to the care and treatment of transgender prisoners." Dkt. 238, Defs.' Motion for Summary Judgment ("Mot.") at 27. Defendants' assertion that the Department's revised directive—once approved and implemented at some unknown date in the future—"may entirely moot Plaintiffs' complaints," *id.*, ignores Plaintiffs' evidence that the treatment of transgender prisoners remains the same and continues to cause ongoing and irreparable harm. And IDOC's compliance with any future directive is far from certain given their undisputed delay in implementing the preliminary injunction. The existence and efficacy of Defendants' "changes" are disputed facts that cannot be resolved as a matter of law.

### A.      Cross-Gender Placement Continues To Cause Plaintiffs Substantial Harm.

Although Defendants have continued in the last thirteen months to transfer prisoners among facilities, it is undisputed that in that period, Defendants have not transferred any transgender prisoners, nor assigned any incoming transgender prisoners, to a gender-appropriate facility. (Ex. 1, Porter Dep. at 90:23–91:2, 160:22–161:10; Ex. 2, Wortley Dep. at 116:20–117:12.) IDOC has refused to complete these transfers, despite Plaintiffs' numerous requests. (*See, e.g.*, Ex. 3, Kuykendall Dep. at 64:7–20 ("[M]ultiple mental health counselors" and "one of the doctors" have told her transfer to female facility "was not going to happen.").)

The evidence shows that, as a result, Plaintiffs suffer undue psychological stress, torment, and humiliation. For example, in cross-gender facilities, Plaintiffs lack access to gender-appropriate grooming and other personal items, which prevents medically necessary social transition treatment. (Ex. 4, Ettner Dec. ¶¶ 63, 66–68.) In addition, multiple Plaintiffs testified

about the constant sexual harassment they endure while housed in facilities not aligned with their gender.  Named Plaintiff Sora Kuykendall testified that she continues to experience "nonstop sexual harassment" from male prisoners at her facility and that, as a result, she rarely interacts with others.  (Kuykendall Dep. at 66:2–7; *id.* 69:19–22 ("I've had sexual harassment from, basically, everybody . . . . [I]t's kind of a constant thing here.  It's a men's prison where there are no women,"); *id.* 88:1-15 (explaining that transgender women are considered "untouchables" among the general prison population, and the only people who talk to her sexually harass her).)  Ms. Kuykendall was also told by IDOC employees that it was too unsafe for her to hold a job at her facility.  (*Id.* at 72:3–14 ("I can't get a job here because it wouldn't be safe for me to get a job here. . . . I've been told that, if I did put in for a job, I wouldn't get it.").)  In addition, named Plaintiff Sasha Reed testified that other prisoners "walk past my cell that harass me, sexual harass me, and make little statements to me," and that she does not feel safe at her current facility as a result.  (Ex. 5, Reed Dep. at 52:10–20, 83:2–9.)

Plaintiffs housed in facilities not aligned with their gender are also at risk of being housed with cellmates that pose substantial threats to their well-being, and prison authorities often disregard that risk.  Named Plaintiff Marilyn Melendez testified that, after her cellmate attempted to sexually assault her, she was placed on single cell status.  (Ex. 6, Melendez Dep. at 13:25–14:21.)  Since then, IDOC staff has asked her on four separate occasions to accept a cellmate "to either make room or accommodate somebody."  (*Id.* at 16:21–17:3.)  When asked to accept a cellmate—despite her documented need to be single celled—Ms. Melendez asked to have input into the choice of cellmate, but was told in response "we knew you would say that sissy, you're just trying to have somebody so you can have sex."  (*Id.* at 15:10–25.)

Additionally, multiple Plaintiffs testified about the complete lack of privacy and protection while showering.  Ms. Reed explained that, although she is allowed to shower by herself, "there's no privacy" because the shower stall has "open bars."  (Reed Dep. at 54:11–17.)  As a result, "[other inmates] come back looking and making comments and stuff like that.  So there's no privacy at all."  (*Id.*)  Ms. Kuykendall is so uncomfortable using the showers—where the wall "only comes up to [] waist level" and don't "give you privacy at all"—that she no longer uses them.  (Kuykendall Dep. at 123:20–124:3.)  She instead chooses to "shower" in her cell, using a rag to wipe herself down and washing her hair in the sink.  (*Id.*)

IDOC witnesses acknowledged the threat posed to transgender prisoners from inappropriate housing placements.  According to Dr. Steven Bowman, IDOC's acting chief of the Office of Health Services, "[b]eing at an all-male facility as a transgender woman is difficult."  (Ex. 7, Bowman Dep. at 42:20–43:7.)  Dr. Bowman testified that "there's a risk for being a woman in a male facility," and that "transgender individuals may be more vulnerable to harassment, particularly by . . . other offenders."  (*Id.*)  Yet Plaintiffs' cross-gender housing placements remain unchanged, at great risk to their health and safety.

### B.   Defendants Continue To Subject Plaintiffs To Cross-Gender Searches.

In its order granting preliminary injunction, this Court identified Plaintiffs' evidence that cross-gender strip searches deny Plaintiffs social transition and are deeply traumatizing.  *See, e.g.*, Dkt. 186 at 26.  Yet IDOC has made no efforts to stop, or even minimize, the prevalence of this practice.  (*See* Ex. 8, Nottingham Dep. at 178:22–179:6, 187:4–20.)

Since the preliminary injunction hearing, Ms. Kuykendall was on two occasions required to expose her naked body to male officers.  First, Ms. Kuykendall was told that she was required to submit to a strip search by a male officer when meeting with a visitor, and was subjected to that search even after she refused the visit: "I was told that I had to get a strip search and I had to go

4

on my visit and, if I refused, I would be taken to seg and get strip searched anyways.  And I asked if I could go back to my cell and just refuse my visit, but I was -- I was told, no, I have to go or I will be taken to seg." (Kuykendall Dep. at 114:20–115:20.)  During the search, two additional officials entered the room and observed the entire search.  (*Id.*)  Second, Ms. Kuykendall was forced to sit through a breast exam in a room entirely devoid of curtains, while IDOC officials looked in through the windows.  (*Id.* at 54:1–7.)  When Ms. Kuykendall told the nurse practitioner performing the exam that she was uncomfortable, she was told "that was the way I had to do it" and "if I refuse a breast exam, then they can take my hormones away."  (*Id.* at 54:11–19.)

Ms. Melendez similarly testified that she continues to be strip searched by male officers, despite repeated requests for same-gender searches:

> [T]his month already twice we've been stripped down . . . I ask here, is there a female officer here?  They're saying yeah.  I say well can you bring her here so I can get strip searched?  He said that they don't do cross gender searches.  I said what do you mean? ***He's like basically it has to be male-male searches.  I said okay, man, I'm transgender.*** I said . . . ***at least give me the option of having another staff search me.  He says that's not going to happen, are you gonna strip or not?*** . . . If not, we'll just Mace you, open your door and restrain you.

(Melendez Dep. at 84:22–85:25 (emphasis added).)  Ms. Reed likewise testified that when she asked to be searched by a female employee, IDOC officials told her "I'm in a male facility, I don't need no female officer to pat me down."  (Reed Dep. at 89:5–14; *see also* Ettner Dec. ¶ 111 (noting that Ms. Reed continues "to be strip-searched exclusively by male officers").)

Plaintiffs' expert Dr. Ettner has explained that cross-gender searches can exacerbate gender dysphoria "and lead to serious mental health complications, including worsening depression, anxiety, and hopelessness."  (Ettner Dec. ¶ 67.)  Plaintiffs' testimony confirmed Dr. Ettner's opinion.  For example, Ms. Melendez explained that these searches often result in unwanted groping and harassment.  (Melendez Dep. at 86:14–87:1.)  Ms. Reed testified that searches from male officers make her feel "really uncomfortable."  (Reed Dep. at 89:5–14.)  And Ms. Kuykendall

described the experience as "[t]errible . . . . usually during it, I breakdown into tears and I'm shaking.  And then when I get back to my cell, I do the same thing."  (Kuykendall Dep. at 116:14–18.)  In addition, Plaintiffs' security expert James Aiken—a former member of the National Prison Rape Elimination Commission that drafted the Prison Rape Elimination Act ("PREA")—likewise stated that "[o]ur intent in these [PREA] regulations was to prohibit the practice currently being followed by the IDOC."  (Ex. 9, Aiken Rpt. at 17.)  And that instead "sound correctional practices" supported "[r]equiring [IDOC to provide] transgender prisoners the option of being searched by correctional staff of the same gender."  (*Id.* at 16.)

### C.    Access To Gender-Affirming Clothing And Grooming Items Remains Speculative, At Best.

In support of their motion, Defendants rely on their recent adjustments to the list of available commissary items, which they claim has been in effect since November 5, 2020.  Mot. at 5.  The impact of this change has yet to be seen, and, regardless, it does not provide class-wide relief.  *Id.*  (policy only effects transgender women in male facilities.)  But, critically, the change is well-past due, coming only on the eve of summary judgment.  Given Defendants' longstanding and repeated refusals to make gender-affirming clothing and hygiene items available to Plaintiffs, it is far from guaranteed that IDOC's implementation of this change will prove effective.

For example, named Plaintiff Lydia Helena Vison testified that she was told she was not allowed access to any female-specific hygiene items, including "soap, shampoos, deodorants, razors, [and other] things of that nature."  (Ex. 10, Vison Dep. at 26:1–10.)  Ms. Kuykendall likewise testified that she has filed multiple grievances requesting gender-affirming hygiene items, but all were either ignored or denied.  (Kuykendall Dep. at 106:13–17.)  And Ms. Melendez testified that she even approached the warden of her facility to request these items, but was told "don't get my hopes up anytime soon."  (Melendez Dep. at 76:22–77:5.)

6

Without consistent and continuing access to these items, Plaintiffs will continue to be denied proper social transition treatment and suffer harm. Ms. Reed explained that IDOC's refusal to provide these items "caused me to [] think about harming myself." (Reed Dep. at 86:17–25.) Dr. Ettner likewise explained that "[t]he physical changes facilitated by hormones in these patients make gender-affirming clothing and grooming items necessary not only for the mental health of these patients, but also for their basic physical comfort and dignity." (Ettner Dec. ¶ 69.) And there is not—and never was—any security justification for IDOC's denial. According to Mr. Aiken, "Defendants cannot use prison security as an excuse or justification to deny grooming items to transgender women in male facilities while simultaneously selling female grooming items to women in their female facilities." (Aiken Rpt. at 7.)

### D. IDOC Does Not Properly Administer Hormone Therapy While Monitoring Remains Infrequent And Incomplete.

Defendants assert that they "have made continuing efforts to ensure that prisoners diagnosed with gender dysphoria continue to receive timely and appropriate hormone therapy." Mot. at 5. But the evidence tells a starkly different story. For example, class-member Chonna Anderson, has been requesting hormones since she was first placed into IDOC's custody 2007, (Ex. 11, Anderson Dec. ¶¶ 4, 8, 11), and was recognized by IDOC as "transsexual" in 2018, if not earlier.[1] Nonetheless, she has yet to receive hormones. (*Id.* ¶ 12.) Ms. Anderson was told that her prior cancer treatment precludes her from receiving hormone, (*Id.* ¶ 8), but a history of cancer is not a legitimate medical basis for denying hormone therapy. (Tangpricha Dec. ¶ 9 (explaining that Ms. Anderson's cancer is not hormone-sensitive and there was thus no reason to delay hormone

---

[1]     (Ex. 12, Tangpricha Dec. ¶ 6.) Plaintiffs' expert Dr. Vin Tangpricha noted that that the terminology "transsexual" is "no longer used," but this diagnosis "clearly indicates that IDOC medical staff were on notice by then that Ms. Anderson should be promptly evaluated for gender dysphoria and hormone therapy." (*Id.* ¶ 6.)

therapy.)  IDOC finally **approved** her request for hormones on November 5, 2020, but she has yet to **begin** this life-saving treatment.  (*See* Ex. 13, Bates 314634-7; Anderson Dec. ¶ 12.)

In addition, Plaintiffs' expert Dr. Vin Tangpricha, a certified endocrinologist and current president of WPATH, reviewed Plaintiffs' medical records produced between April 2019 and August 2020.  He found that "the significant majority of class members continue to have bloodwork testing that demonstrates levels of estrogen and/or testosterone outside of the therapeutic ranges recommended under the [WPATH] Guidelines."  (Ex. 14, Tangpricha Rpt. ¶ 80.)  He additionally found that IDOC "rarely" performed "corrective action," "and many of the class members have only had one laboratory test conducted in the past year, while some have had none at all."  (*Id.* ¶ 81.)  The same is true for the named Plaintiffs, as almost all had estrogen and/or testosterone levels outside of the medically recommended range.  (*Id.* ¶ 75.)  Dr. Tangpricha also noted that IDOC administered some class members—including Ms. Kuykendall and Ms. Melendez—conjugated estrogen, an "outdated and unaccepted form of estrogen" that "can jeopardize the safety and health of the prescribed patient."  (*Id.* ¶ 82; *see also* Kuykendall Dep. at 105:2–14.)  Moreover, Plaintiffs have reported inexcusable gaps in hormone administration, sometimes going as long as a month without receiving them.  (Melendez Dep. at 50:4–6; Ex. 15, Kuykendall Dec. ¶ 7.)

Dr. Tangpricha's review of the medical records also confirmed that IDOC still does not properly or regularly test for electrolytes, potassium, creatinine, and prolactin.  (Tangpricha Rpt. ¶¶ 76, 85.)  "Roughly half of all class members have no record of being tested for these levels since mid-2019.  Shockingly, this is approximately the same number of class members that had no record of being tested for these levels at the time of my April 2019 Report."  (*Id.*)  Dr. Tangpricha

8

also observed that, among those who did receive testing, some demonstrated what he deemed to be unsafe levels, but there was no corresponding responsive action from IDOC.  (*Id.*)

As a result of IDOC's deficient administration of hormone therapy, Plaintiffs' gender dysphoria continues to be exacerbated.  For example, Ms. Melendez testified that she continues to experience erections and ongoing hair growth, (Melendez Dep. at 43:21–46:5), and explained that going prolonged periods without hormones causes her anxiety, hot flashes, and nausea, (*id.* at 54:7–55:12).  And, critically, IDOC's failure to properly monitor Plaintiffs' bloodwork is a ticking time bomb.  In one alarming example, Ms. Reed reported to IDOC officials in April 2020 that she was experiencing bilateral breast pain and headaches—symptoms signaling complications from her hormone therapy, including hyperprolactinemia or prolactin-producing tumors.  (Tangpricha Rpt. ¶ 69.)  IDOC conducted no follow up, such as bloodwork, an MRI, or a mammogram.  (*Id.*; *see also* Reed Dep. at 88:4–23 (testifying that IDOC staff initially ordered a mammogram to examine her breast pain, but Wexford denied the request).)

**E.      Plaintiffs Are Consistently Misgendered And Subject To Harassment From IDOC Staff.**

Misgendering—the act of referring to a person by the incorrect gender—remains a rampant problem among IDOC staff.  All named Plaintiffs testified that they continue to experience near-constant misgendering.  (Ex. 16, Monroe Dep. at 47:16–48:21; Melendez Dep. at 69:10–70:1; Vision Dep. at 30:9–1; Reed Dep. at 83:10–84:21; Kuykendall Dep. at 85:23–86:3.)  Indeed, Ms. Kuykendall testified that "everybody" misgenders her, (*id.* at 85:23–86:3), while Ms. Monroe testified that she is misgendered by medical staff, superior officers, and sergeants, (Monroe Dep. at 47:16–48:21).  Dr. Ettner has stated that misgendering "is harmful to the mental health of transgender persons. It threatens their identity and exacerbates the mental health problems attendant to Gender Dysphoria."  (Ettner Dec. ¶ 65.)

9

But IDOC staff's demeaning and harmful behavior extends beyond misgendering. Plaintiffs also report that the majority of IDOC staff subjects them to verbal harassment that causes them great mental and emotional distress. For example, Ms. Reed testified that she does her best to "stay out of [IDOC staff's] way, because I deal with them harassing me and making sexual comments towards me." (Reed Dep. at 54:18–23). Ms. Melendez testified that the few staff members that have tried to address her by the correct gender and treat her with respect "get [] cursed out or chewed out or ma[de] fun of saying oh, you got a crush on the sissy, you're calling it a girl." (Melendez Dep. at 72:12–73:2.) Ms. Kuykendall described an incident where a lieutenant woke her up in the middle of night, banged on the bars of her cell, and said to her:

> I'm tired of this . . . shit. Going to put a stop to this. ***And then he asked me, do you have a dick***, and then I was silent. And then he said -- he had two COs with him and ***he said, if you don't answer, we're going to come in there***. And then -- so I said -- I answered him and then he said you're a man and then left.

(Kuykendall Dep. at 81:17–82:5 (emphasis added).) There can be no doubt that this psychological torture is extremely harmful to Plaintiffs. Indeed, Ms. Kuykendall testified that her treatment by IDOC staff makes her feel like she "doesn't matter," (*id.* at 113:23), describing it as "dehumanizing" because "the people who are supposed to be keeping me safe were behaving like that," (*id.* at 111:6–112:6). She explained, "I can't escape this in here." (*Id.* at 113:13–23.)

## F. Defendants Do Not Contest That They Continue To Deny Plaintiffs Gender-Affirming Surgery.

Defendants do not dispute that no class member or named Plaintiff has received gender-affirming surgery despite Plaintiffs' repeated and continuing requests to allow them this medically necessary social transition. Ms. Vision testified that she has requested gender-affirming surgery "dozens" of times since 2016, but she has yet to receive a response from IDOC mental health or medical staff. (Vision Dep. at 23:8–24:17.) Ms. Kuykendall likewise testified that she has requested surgery from multiple staff members at her facility, including "most, if not all, of the

10

mental health counselors" and "all of the doctors" she has seen, but has been "ignored or told that we can't do that or we'll see." (Kuykendall Dep. at 63:13–64:1.) Ms. Reed has also been told by multiple mental health professionals that IDOC does not provide gender-affirming surgery. (Reed Dep. at 46:5–8.) Although Ms. Monroe has heard that she was approved for surgery, that same staff member told her that Dr. Reister "stopped her." (Monroe Dep. at 41:1–24.)

As to the purported effect of COVID-19 on Defendants' compliance with the injunction, there is no evidence in the record that IDOC has declined to approve other medically necessary surgeries since the pandemic began. Nor is there evidence that anything related to COVID-19 prevents IDOC medical staff from *evaluating* Plaintiffs for surgery. Defendants have not contended, for example, that all physician and mental health visits have ceased since March 2020. What the evidence does suggest, however, is "an ignorance on the part of IDOC officials of the fact that gender-affirming surgery may be a medically necessary treatment for Gender Dysphoria." (Ettner Dec. ¶ 146.) Indeed, IDOC has not taken even minimal steps to make surgery possible in the future: it has not even *considered* any surgeons to consult on drafting a surgical plan, (Ex. 17, Conway 30(b)(6) Dep. at 151:13–19), let alone *contracted* a surgeon to perform operations, (*id.* at 211:19-212:1). Nor has it even begun to draft a policy with respect to pre-surgery preparation or post-surgical care. (*Id.* at 212:2–215:12.) Without this medically necessary treatment, Plaintiffs will continue to suffer ongoing harm and exacerbation of their gender dysphoria. (*See, e.g.*, Ettner Dec. ¶¶ 125, 138 (describing serious risk of self-harm and suicide for Plaintiffs if IDOC does not provide gender-affirming surgery).)

**G.      Plaintiffs Are Suicidal And At Serious Risk Of Imminent Self-Harm.**

Given the absence of improvements in IDOC's treatment and care of transgender prisoners, Plaintiffs continue to suffer from mental distress, suicidal thoughts, and a great risk of self-harm. For example, Ms. Monroe testified that she continues to "struggle with suicidal ideations,"

(Monroe Dep. at 35:19–24), while Ms. Vision testified that she has felt suicidal in recent months (Vision Dep. at 32:8–10).  Ms. Melendez explained during her deposition that she has attempted suicide five times, most recently on August 5, 2020, which she attributes to her untreated gender dysphoria.  (Melendez Dep. at 25:2–13, 27:1–23.)  Ms. Reed likewise testified that she experiences depression and anxiety because she is "not receiving adequate medical treatment."  (Reed Dep. at 85:2–15.)  And Ms. Kuykendall was recently placed on "crisis watch" due to suicidal ideation, despite pleas to her counselor that this would serve to only further deteriorate her mental health.  (Kuykendall Dec. ¶¶ 3-5.)  Ms. Kuykendall's fears turned out to be true.  While on "crisis watch," she was denied access to her prescribed hormone therapy, as well as an electric razor, which undoubtedly exacerbated her gender dysphoria and mental anguish.  (*Id.* ¶¶ 7, 11.)  Nor was she timely provided soap or eating utensils, which prevented her from eating for two days.  (*Id.* ¶ 8.)

As Dr. Ettner explains, and the evidence shows, "Gender Dysphoria left untreated or inadequately treated, will result in serious physical harm. The depression and hopelessness associated with the condition causes suicidal ideation, which will result in actual suicide for many individuals."  (Ettner Dec. ¶ 75.)[2]

## ARGUMENT

## I.     STANDARD OF REVIEW.

To prevail on their motion, Defendants must establish that there is no genuine issue as to any material fact and that they are entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  A fact is material if it would affect the outcome of the suit under governing law.  *See Valance v. Wisel*, 110 F.3d 1269, 1274-75 (7th Cir. 1997).  "A dispute is 'genuine' 'if the evidence is such

---

[2]    If anything, this risk is understated, as Defendants have yet to comply with this Court's order on December 17, 2020 to produce suicide records.  Dkt. 242.

that a reasonable jury could return a verdict for the nonmoving party.'" *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016) (quotation omitted).  In evaluating a summary judgment motion, courts may not make credibility determinations nor weigh the evidence.  *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (courts should "avoid[] the temptation to decide which party's version of the facts is more likely true").  The Court must deny the motion unless Defendants establish that there is no evidence, when viewed in the light most favorable to the Plaintiffs and drawing all reasonable inferences therefrom, that would support a judgment in Plaintiffs' favor.  *Id.*; *see also Egan v. Freedom Bank*, 659 F.3d 639, 642 (7th Cir. 2011).

Plaintiffs, have identified substantial evidence supporting their Eighth Amendment claim and their entitlement to an injunction, so Defendants' motion must fail.  A fact-finder is not required to believe Defendants' version of the facts, such as their description of purported efforts to comply with the Court's preliminary injunction, characterization of named Plaintiffs' deposition testimony regarding treatment, and assessment of the credentials and opinions of the parties' witnesses.  Mot. at 4–14.  Defendants' brief simply confirms that there are multiple disputed issues of fact precluding summary judgment.  *Cf. Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 753–54 (7th Cir. 2006) ("[S]ummary judgment briefs that present different versions of the facts arouse our attention . . . .  [M]ultiple versions of the facts increase the chances that at least one of those conflicting facts will be material to the outcome of the case."); *Payne*, 337 F.3d at 770 ("Where the parties present two vastly different stories . . . it is almost certain that there are genuine issues of material fact in dispute.").

## II.   NUMEROUS ADDITIONAL DISPUTED FACT ISSUES PRECLUDE SUMMARY JUDGMENT ON PLAINTIFFS' EIGHTH AMENDMENT CLAIMS.

"'[W]hen the State takes a person into its custody and holds [them] there against [their] will, the Constitution imposes upon it a corresponding duty to assume some responsibility for

[their] safety and general well being.'"  *Helling v. McKinney*, 509 U.S. 25, 32 (1993) (citations omitted).  "[T]he Eighth Amendment safeguards the prisoner against a lack of medical care that 'may result in pain and suffering which no one suggests would serve any penological purpose.'"  *Petties v. Carter*, 836 F.3d 722, 727 (7th Cir. 2016) (en banc) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)).  "[D]eliberate indifference to serious medical needs of prisoners violates the Amendment because it constitutes the unnecessary and wanton infliction of pain contrary to contemporary standards of decency."  *Helling*, 509 U.S. at 32; *see also Zaya*, 836 F.3d at 805.

"To determine if the Eighth Amendment has been violated in the prison medical context, [the court] perform[s] a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition."  *Petties*, 836 F.3d at 727–28 (*citing Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  Defendants concede that Plaintiffs meet the first step of this analysis— *i.e.*, that Plaintiffs' gender dysphoria is an objectively serious medical condition.  Mot. at 15.

The second step—deliberate indifference—requires "evidence that an official *actually* knew of and disregarded a substantial risk of harm."  *Petties*, 836 F.3d at 728 (citing *Farmer*, 511 U.S. at 837).  The Supreme Court has explained that, whether a prison official "had the requisite knowledge of a substantial risk" is not a legal question, it is "***a question of fact*** subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may [for example] conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."  *Farmer*, 511 U.S. at 834 (emphasis added); *Zaya*, 836 F.3d at 805; *see also Monroe v. Baldwin*, 424 F. Supp. 3d 526, 542 (S.D. Ill. 2019), *on reconsideration in part sub nom. Monroe v. Meeks*, 2020 WL 1048770 (S.D. Ill. Mar. 4, 2020).  Plaintiffs are not

14

required "to show that the official intended harm or believed that harm would occur." *Petties*, 836 F.3d at 728.[3]

### A.   Plaintiffs' Evidence Is Sufficient To Support A Finding That Defendants Consciously Disregarded A Substantial Risk of Harm.

Plaintiffs put forth a wealth of evidence—direct as well as circumstantial[4]—sufficient to raise a disputed issue on whether defendants "actually knew of and disregarded" a substantial risk of harm. *See Zaya*, 836 F.3d at 805. The Seventh Circuit has found that a factfinder could reasonably infer deliberate indifference (and that "no exercise of professional judgement actually occurred") "if the defendant's chosen 'course of treatment' departs radically from 'accepted professional practice.'" *Zaya*, 836 F.3d at 805 (citation omitted). *See also, e.g., Roe v. Elyea*, 631 F.3d 843, 861 (7th Cir. 2011) ("[T]he choice of an 'easier and less efficacious treatment' can demonstrate that the actor displayed 'deliberate indifference.'") (quoting *Estelle*, 429 U.S. at 104 n.10); *Petties*, 836 F.3d at 729–30 (noting that "minimally competent medical judgment" could be inferred where "a prison official persists in a course of treatment known to be ineffective"); *Zaya*, 836 F.3d at 806 ("[A factfinder] can infer conscious disregard of a risk from a defendant's decision to ignore instructions from a specialist.").

Indeed, Defendants cannot seriously contend that they are unaware of the substantial risk of harm to Plaintiffs, as the Court already found that "IDOC is well-aware that transgender inmates

---

[3]   Defendants' suggestion that there is no violation without "some sort of punishment or subjective cruelty" is unhelpful. Mot. at 15–17. The "punishments" aspect of the Eighth Amendment in a case alleging failure to provide adequate medical care is reflected in the requirement that deliberate indifference refers to a subjective state of mind. *See Farmer*, 511 U.S. at 837.

[4]   Circumstantial evidence is no less probative than direct evidence, and is sufficient to establish conscious disregard if a factfinder could reasonably infer that the fact at issue is more likely true than not. *See Piercy v. Warkins*, 2017 WL 1477959, at *11 (N.D. Ill. April 25, 2017) (J. Pallmeyer) (denying summary judgment on deliberate indifference claim because "[c]ircumstantial evidence may always be considered, and in some circumstances has more weight than direct evidence"). *See also Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330 (1960) (overturning directed verdict because trial court did not properly consider circumstantial evidence, which was "not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence").

are at a high risk of suffering mental health issues and resorting to self-harm."  Dkt. 186, at 32.

And yet Plaintiffs' evidence shows that the treatment this Court found inadequate remains the

same.  *See supra*, Statement of Facts; *see also Petties*, 836 F.3d at 732 (affidavit from plaintiff

testifying to harm experienced was sufficient to create factual dispute warranting denial of

summary judgment on Eighth Amendment claim).

Defendants' plea to the Court that it must "take into account" their efforts made following

the preliminary injunction are unavailing.  Mot. at 23.  As noted, Defendants admit that they have

not yet finalized a new directive for the care and treatment of transgender prisoners.  *See id*. at 27.

Thus, despite Defendants' assertions that they have taken "steps" to remedy the harms previously

recognized by the Court, and that "various aspects of Plaintiffs' suit have been mooted," *id.*,

Defendants have not even changed the policies, let alone the practices, that have caused, and

continue to cause, transgender prisoners the serious harm and injury this Court identified.  As a

result of Defendants' failure to identify the scope and specifics of the new administrative directive,

this Court cannot evaluate the adequacy of what they ultimately plan to do, or their progress toward

implementing any such plan.[5]  Moreover, Defendants' prolonged delay in implementing a new

directive—13 months and counting since the preliminary injunction was entered—is more than

enough to create a factual dispute about the current and future risk of harm to Plaintiffs.  *See*

*Petties*, 836 F.3d at 729–30 (finding evidence that "a prison official persists in a course of treatment

known to be ineffective" could establish deliberate indifference).

In the meantime, the "steps" they have purportedly taken during the last year fall far short

of what they were ordered to do.  Many of "these steps" are, in fact, plans for future actions yet to

---

[5]   To be clear, Defendants have yet to produce any drafts of the new administrative directive that post-date April
2020, let alone the final administrative directive.

be implemented, making it impossible to judge their effectiveness or sufficiency.  *See* Mot. at 23

(citing to IDOC's planned "restructuring" of the TCRC committee and to additional training that

has not yet been delivered).  The few tangible efforts actually effected by the Department in the

past year are far from certain to alleviate Plaintiffs' harm.  For example, Defendants engaged

consultants, Dr. Erica Anderson and The Moss Group, who are providing "services and assistance

in drafting a new [d]irective," Mot. at 5, but these consultants have no authority to effect

meaningful change.  Dr. Anderson and IDOC witnesses testified that her charge is only to provide

suggestions to IDOC, which the Department is free to disregard should it so choose.  (Ex. 18,

Anderson Dep. at 58:5–59:13 ("A. [T]hey are free to disregard my advice, yes."); Ex. 19, Reister

Dep. at 158:1–10 ("Q. [Dr. Anderson]'s making recommendations, but it's still not the personnel

that are having to make the decisions, right? A. At the end of the day, what the director says goes.

So everything is ultimately his decision, responsibility.").)  Moreover, despite The Moss Group's

recommendation in mid-2019 that IDOC "[i]mmediately review current practice in addressing the

transgender population" at Logan Correctional Center, the Group's corporate representative—

Wendy Leach—was "not aware" of anything IDOC had done to address this at the time of her

deposition in August 2020. (Ex. 20, Moss Group Dep. at 127:11–14, 128:2–3; Ex. 21, Moss Group

Report at 12.)

Critically—even assuming that IDOC has, in good faith, considered and accepted

recommendations from their consultants on the new directive—neither has been retained to

oversee the ***implementation*** of the new policies, whenever they are finally approved.  (Ettner Dec.

¶ 148.)  Ms. Leach testified that on June 4, 2020, she sent IDOC a proposal to continue and

complete her work to help IDOC finalize and implement a new policy, including by training IDOC

staff. But, by the time of her deposition several months later, IDOC had not agreed to continue

17

The Moss Group's work.  (Moss Group Dep. at 191:16–192:11.)  Defendants' motion does not suggest otherwise; it cites only to Defendants' January 2020 report on compliance.  Mot. at 5.

Defendants also point to training that has been conducted for all IDOC staff, as well as "targeted training" for mental health providers.  Mot. at 6.  Plaintiffs' evidence raises genuine disputes on whether this training is sufficient to prevent harm to Plaintiffs, or whether it will ever occur.  IDOC's corporate representative, Dr. Lamenta Conway, testified that mental health providers currently receive only one gender dysphoria-specific training per year, even though diagnosis and treatment of gender dysphoria is a specialized area of medicine that requires more than such a cursory annual primer.  (Conway 30(b)(6) Dep. at 26:10–15.)  And, even under the new administrative directive, medical providers—who are responsible for prescribing and administering hormones—would receive only an *optional* training from IDOC.  (*Id.* at 121:16–122:7.)  This training—should providers opt to take it—is a WPATH "foundations" course, (*Id.* at 109), which is insufficient on its own to qualify providers to diagnose or treat gender dysphoria, (Ex. 22, Ettner Dep. at 53:3–19 (describing this course as a "first step")).  Indeed, IDOC witnesses concede that they have no oversight over the qualifications of Wexford employees, who provide the majority of healthcare to all Plaintiffs.  (Reister Dep. at 104:15–22, 249:18–24.)

In addition, the effectiveness of *the single training* administered to all IDOC staff on misgendering is disputed by the very IDOC employee who developed and conducted the training, Dr. Shane Reister.  (Reister Dep. at 133:8–14 ("[The two-hour staff training is] received once. And then that's why I'm working on some follow-up trainings because it will take more than one exposure to the information.").)  IDOC's consultant testified that this training was not "suited for correction staff" because it does not include important information such as how to conduct searches, and corrections staff may simply "reject it all."  (Moss Group Dep. 202:1–203:10.)

18

Finally, Defendants assert that "IDOC has updated its commissary items for transgender prisoners," but concede that the revised list applies only to transgender female prisoners. Mot. at 5. In other words, Defendants admit their changes fail to address the social transition needs of transgender men, and therefore have no class-wide impact. Regardless, even as to transgender women, the impact of this new policy—however incomplete—is disputed as none of the Plaintiffs have yet received access to social transition treatment. *See* Statement of Facts, Section C, *supra*.

But even if Defendants had implemented meaningful changes to their treatment and care of Plaintiffs, there would *still* be remaining issues of fact regarding the adequacy of that treatment and whether Defendants have eliminated the substantial risk of harm of which they are now aware. Although Defendants' "current attitudes and conduct" are relevant in deciding deliberate indifference, *Farmer*, 511 U.S. at 845; *Helling*, 509 U.S. at 36 (1993), this Court cannot on summary judgment determine whether to believe Defendants' evidence over Plaintiffs'.

Put simply, viewing all evidence in the light most favorable to Plaintiffs, a factfinder could reasonably determine that IDOC is presently "knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so." *Farmer*, 511 U.S. at 846. That is all that is required of Plaintiffs to survive summary judgment. *Id.*

**B.      Defendants' Admission That They Do Not Meet The WPATH Standards Of Care Is Sufficient To Raise A Triable Fact Precluding Summary Judgment.**

Defendants argue that they are not constitutionally required to follow the WPATH Standards of Care ("SOC"). Mot. at 19. They appear to believe that unless courts announce agreement on what medical treatment for gender dysphoria would satisfy the Eighth Amendment, then, as a matter of law, there can be no constitutional violation. Not so. As noted above, deviation from the applicable professional standards is relevant evidence of deliberate indifference. *See Petties*, 836 F.3d at 727 ("While published requirements for health care do not create constitutional

19

rights, such protocols certainly provide circumstantial evidence that a prison health care gatekeeper knew of a substantial risk of serious harm.") (quoting *Mata v. Saiz*, 427 F.3d 745, 757–58 (10th Cir. 2005) ("'[C]ontemporary standards and opinions of the medical profession . . . are highly relevant in determining what constitutes deliberate indifference to medical care'") (citation omitted)). The weight of this evidence is for the trier of fact to determine, and thus will vary depending on the particular circumstances of the case.

Defendants also ignore this Court's prior holding in its preliminary injunction orders adopting the WPATH standards as "guidelines for constitutionally adequate care."

> Unless Defendants offer an alternative constitutionally adequate standard of treatment or an expert who can speak to differing medically accepted treatment criteria regarding gender dysphoria, *the Court will continue to use the WPATH Standards of Care as guidelines for constitutionally adequate care under the Eighth Amendment*.

Dkt. 211 at 6–7 (emphasis added). Yet Defendants have not suggested, let alone provided undisputed evidence of, an alternative SOC by which to measure their conduct. Instead, they argue that the WPATH SOC do not control.

Because Defendants failed to provide an alternative SOC, the Court's decision to rely on the WPATH SOC is law of the case. *See AM Gen. Corp. v. DaimlerChrysler Corp.*, 246 F. Supp. 2d 1030, 1035 (N.D. Ind. 2003) (interpretation of contract for purposes of preliminary injunction was law of the case for purposes of summary judgment) (citing *Commodity Futures Trading Comm'n v. Bd. of Trade of City of Chi.*, 701 F.2d 653, 657–658 (7th Cir. 1983) (recognizing that findings made during a preliminary injunction hearing could be given preclusive effect)).[6]

---

6    According to the Seventh Circuit, the court can decide that findings made in preliminary injunction proceedings bar relitigation "if the circumstances make it likely that the findings are accurate [and] reliable." *Id.* at 657; *cf. Hawksbill Sea Turtle v. Fed. Emerg. Mgmt. Agency*, 126 F.3d 461, 474 n.11 (3d Cir. 1997) (holding that treating the holdings as final is "particularly appropriate in a second action seeking the same injunctive relief") (citing Wright & Miller, 18A Fed. Prac. & Proc. Juris. § 4434 (3d ed.)).

Here, the circumstances surrounding this Court's adoption of the WPATH SOC demonstrate that the Court decided this issue. *See AM Gen. Corp.*, 246 F. Supp. 2d at 1034–35 (considering "the nature of the decision (i.e., that it was not avowedly tentative), the adequacy of the hearing, and the opportunity for review") (quoting *Lummus Co. v. Commonwealth Oil Refin. Co.*, 297 F.2d 80, 89 (2d Cir. 1961)). The Court heard both sides at the preliminary injunction hearing regarding the appropriate standard of care, including testimony from Plaintiffs' two qualified experts who endorsed the WPATH SOC. The Court agreed and wrote a detailed opinion, even reconsidering and reconfirming its decision a second time. Dkt. 211 at 6–7. And Defendants could have appealed the preliminary injunction order, but chose not to do so. Nor did Defendants come forward with expert evidence of an alternative SOC, as this Court suggested. Dkt. 186 at 31. Although this Court is free to modify its previous holdings in connection with preliminary injunction, Defendants may not simply ignore the Court's prior decision. Their untimely argument to reject the SOC is not a sufficient reason to disregard the law of the case. That the WPATH SOC govern here was indeed "a thing decided."

Even if it were not contrary to the law of the case, Defendants have not established that, *as a matter of law*, "they are not constitutionally mandated to comport with WPATH Standards of Care." Mot. at 19. Plaintiffs have provided evidence that the WPATH standards are the minimally acceptable treatment for gender dysphoria; Defendants disagree, but have offered no evidence.[7] For example, Defendants rely on "history with respect to the care and treatment of gender dysphoria," which they claim shows "there is no set treatment, let alone one that may easily be

---

[7]    Moreover, IDOC's consultant, Dr. Erica Anderson, testified that the WPATH standards of care "constitute the standards of care for transgender healthcare around the world," and that WPATH's guidance for the treatment of transgender individuals in prison is "similar to the guidance general[ly] for transgender people, that they should be treated with respect and accorded the opportunity to live in their . . . identified gender and given access to needed medical and psychological care."  (Anderson Dep. at 30:1–17.)

determined in the prison environment." *Id.* at 20. They also claim the case law "articulates no set Eighth Amendment standard for the care and treatment of gender dysphoria," and they "have set no clear lines," even stating that "recent cases involving similar claims have pulled in different directions." *Id.* Defendants' arguments that the WPATH SOC are—at most—not universally accepted, simply highlights the existence of a material factual dispute.

Furthermore, one of Defendants' principal cases expressly adopted the WPATH SOC and found deliberate indifference. *See* Mot. at 20–21 (analyzing *Campbell v. Kallas*, 936 F.3d 536, 545 (7th Cir. 2019)). Just six days after Defendants filed their motion, the district court in that case, on remand, enjoined the Wisconsin prison to provide gender reassignment surgery. *See Campbell v. Kallas*, 2020 WL 7230235, at *8 (W.D. Wis. Dec. 8, 2020) (finding conscious disregard by IDOC for refusing inmate the one effective treatment as a matter of policy). *Campbell* found "that the diagnostic and treatment criteria in the WPATH standards of care represent the ***consensus of qualified medical professionals*** regarding the appropriateness of various treatments for gender dysphoria, including sex reassignment surgery." *Id.* at *4 (emphasis added).

The WPATH standards' weight is a matter for the factfinder, as is the evaluation of the credibility of Defendants' assertions that "any order that imposes WPATH requirements on every provider would be ***too difficult to achieve***." Mot. at 28 (emphasis added). These factual disputes preclude summary judgment on Plaintiffs' Eighth Amendment claim.

## III. PLAINTIFFS HAVE PROVIDED SUFFICIENT EVIDENCE TO ESTABLISH EACH OF THE REQUIREMENTS FOR A PERMANENT INJUNCTION.

Defendants assert that summary judgment must be granted because Plaintiffs "cannot meet the accompanying burden to warrant the imposition of injunctive relief." Mot. at 14. The showings required for a preliminary and permanent injunction are essentially the same, except that "[t]he standard for preliminary injunctive relief requires only a showing of a likelihood of success

on the merits, whereas permanent relief requires a determination on the merits." *City of Chi. v. Barr*, 961 F.3d 882, 893 (7th Cir. 2020).  As discussed above, Plaintiffs have sufficient evidence to prevent summary judgment on the merits.  Plaintiffs have already presented evidence from which this Court found (1) irreparable injury; (2) inadequacy of available remedies at law; (3) that the balance of hardships supports a remedy in equity; and (4) that an injunction serves the public interest.  Dkt. 186; *see eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (setting out elements of permanent injunction).  Just as Defendants' new evidence fails to establish a lack of disputed facts regarding deliberate indifference, it also falls far short of establishing the other elements in their favor as a matter of law.   In short, Plaintiffs' arguments regarding their entitlement to a permanent injunction raise, at bottom, disputed fact issues precluding summary judgment.  *See Casey v. Uddeholm Corp.*, 32 F.3d 1094, 1098 (7th Cir. 1994) ("It is axiomatic that when there are contested issues of material fact, the district court is precluded from granting summary judgment.").

### A.    The Record Evidence Supports A Finding Of Irreparable Harm.

Defendants assert that "[t]hroughout this suit, Plaintiffs have merely hinted at the *possibility* that IDOC's policies lead to a risk of harm."  Mot. at 24.  Not so.  As Defendants' own brief makes clear, there is ample evidence of past, present, and ongoing irreparable harm caused by Defendants' policies and practices.  *See, e.g.*, *id*. at 8 (describing Ms. Melendez's multiple suicide attempts); *id.* at 14 ("Dr. Ettner has opined that all five of the representative Plaintiffs in this action are at a serious risk of self-harm.").

If anything, the evidence is undisputed that Plaintiffs have suffered—and will continue to suffer—these injuries absent injunctive relief.  Testimony from each named Plaintiff demonstrates that there is a continuing and substantial risk of suicide, self-harm, and psychological decompensation associated with IDOC's continued failure to provide adequate treatment for their

23

gender dysphoria.  *See* Statement of Facts, *supra*.  Critically, Defendants have put forth no evidence to dispute any of these injuries or harms.  Accordingly, viewing the evidence in the light most favorable to Plaintiffs, as the Court must, a jury could reasonably find that Plaintiffs will continue suffering irreparable harm absent an injunction.  *See, e.g.*, *Edmo v. Corizon, Inc.*, 935 F.3d 757, 798 (9th Cir. 2019) (affirming finding of irreparable harm where plaintiff demonstrated "profound, persistent distress" caused by gender dysphoria), *cert. denied sub nom.*, *Idaho Dep't of Corr. v. Edmo*, 2020 WL 6037411 (Oct. 13, 2020); *see also Hicklin v. Precynthe*, 2018 WL 806764, at *10, *14  (E.D. Mo. Feb. 9, 2018) (plaintiff showed irreparable harm based on evidence of worsening emotional distress and a substantial risk of self-harm).[8]

Defendants' brief does not dispel the existence of disputed facts.  Their reliance on *Michigan v. United States Army Corps of Engineers* to support their assertion that Plaintiffs must "show that there is a 'presently existing actual threat' as a result of IDOC policies" is misplaced.  Mot. at 25 (citing 667 F.3d 765, 789 (7th Cir. 2011)).  In that case, the Seventh Circuit *overruled* the district court's denial of a preliminary injunction because the district court was too exacting on the question of risk of irreparable harm.  *Id.* at 788–89.  According to the Seventh Circuit, the harm at issue in *Michigan*—the presence of Asian carps in Lake Michigan—was irreparable because it was "difficult—if not impossible—to reverse."  *Id.* at 788.  The same is undoubtedly true here.

*Orr v. Schicker*, 953 F.3d 490, 502 (7th Cir. 2020), is likewise unavailing.  There—ruling on a request for a preliminary injunction—the court found that the evidence was "equivocal"

---

[8]     Further, Defendants' continual deprivation of Plaintiffs' Eighth Amendment rights, as described in Section I, is in itself an irreparable harm sufficient to warrant a permanent injunction. *See, e.g.*, *Edmo v. Corizon, Inc.*, 935 F.3d 757, 798 (9th Cir. 2019) (noting that "the deprivation of Edmo's constitutional right to adequate medical care [was also] sufficient to establish irreparable harm," and upholding permanent injunction); *City of Chi. v. Sessions*, 321 F. Supp. 3d 855, 878 (N.D. Ill. 2018) (granting permanent injunction and noting "a constitutional injury alone can constitute irreparable harm"), *aff'd and remanded sub nom. City of Chi. v. Barr*, 961 F.3d 882 (7th Cir. 2020).

because multiple doctors testified that the medical condition at issue—hepatitis C—was a "slow-moving disease" and that "there was probably not significant harm" absent plaintiff's requested treatment. *Id.* (internal quotations omitted). In contrast, the Court here has already granted Plaintiffs preliminary relief, finding "there [was] no doubt that Plaintiffs face irreparable harms that cannot be compensated by monetary damages." Dkt. 186 at 36. And the evidence developed since the preliminary injunction shows—at a minimum—that material factual disputes remain on the question of whether Plaintiffs currently, and will continue to, experience that same harm.

Defendants also raise a number of factual arguments to support their assertion that Plaintiffs cannot show irreparable harm, but their efforts only highlight the factual disputes that preclude summary judgment. First, Defendants attempt to discount the record evidence by claiming that Dr. Ettner "finds the same [as she does here] in nearly all of the forensic analyses." Mot. at 24. But, "[o]n summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Payne*, 337 F.3d at 770 (reversing summary judgment where district court erroneously weighed the credibility of competing expert testimony) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).[9] Moreover, even if these criticisms were appropriate on summary judgment, Defendants offer no persuasive reason to discount this expert testimony. Defendants do not proffer their own expert in response to Dr. Ettner, and their own witness has conceded Dr. Ettner's expertise. (*See* Reister Dep. at 157:22–158:7.) This Court has also already expressly rejected these arguments, finding Dr. Ettner to be qualified and credible. Dkt. 186 at 30–32.

Second, Defendants argue that COVID-19 has disrupted and delayed appointments with physicians, transfers, and gender-affirming surgeries. Mot. at 25. But, as noted, the merit of this

---

[9]    To be clear, Defendants have not filed to exclude or bar expected testimony from Dr. Ettner.

excuse for the continued failure to provide adequate medical care presents—at most—a dispute of material fact for trial. The evidence is far from clear that COVID-19 prevents IDOC from enacting new policies or practices. For example, although no transgender prisoner has been transferred or placed in a facility matching their gender identity since December 2019, IDOC's own witnesses admitted transfers were still occurring generally during the pandemic. *See* Statement of Facts, Section A, *supra*. Likewise, IDOC provides no explanation for why COVID-19 precludes surgery or, at a minimum, evaluation for surgery, as there is no evidence that physician visits ceased altogether once the pandemic began. The fact remains that—COVID delay or not—Plaintiffs continue to suffer irreparable harm from IDOC's policies and practices. Accordingly, Defendants' assertion that Plaintiffs cannot as a matter of law show irreparable harm does nothing but highlight disputes of material fact for trial, and is therefore unmeritorious.

### B. Defendants Concede That The Adequacy Of A Remedy At Law Is Disputed.

It is difficult to imagine harms less adequately addressed by monetary damages than psychological distress, self-harm, suicide, and serious medical complications. Defendants do not seriously suggest otherwise. Nor could they.

Defendants expressly concede that "a risk of suicide or self-harm related to an unconstitutional policy could be sufficient to establish that there are no adequate remedies at law." Mot. at 26. Because the evidence of Plaintiffs' risk of suffering those harms is, at the very least, disputed, this should end the inquiry. *See Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1045-46 (7th Cir. 2017) (finding suicide and diminished well-being are irreparable harms within an adequate remedy at law); *Hicklin*, 2018 WL 806764, at *14.

Nevertheless, Defendants contend, for the first time, that this lawsuit is too "vague" and "general," which therefore means Plaintiffs are "unable to establish that traditional legal remedies are inadequate." Mot. at 26. But as the Court has found, Defendants are well aware of the

irreparable harms alleged here (to which Plaintiffs and experts alike have testified at great length). *See, e.g.,* Dkt. 186 at 36 ("[T]here is no doubt that Plaintiffs face irreparable harms that cannot be compensated by monetary damages."). Defendants provide no case law or evidence to explain why the Court's previous finding was erroneous and should be disregarded.

Equally without merit is Defendants' claim that Plaintiffs have not made it "clear that injunctive relief will resolve any one individual prisoner's feelings of self-harm." Mot. at 27. The court in *Whitaker*—Defendants' only citation in support of this assertion—did not impose any such requirement. It instead required the plaintiff to demonstrate "that any award would be 'seriously deficient as compared to the harm suffered.'" *Whitaker*, 858 F.3d at 1046 (citation omitted). The court found the plaintiff's assertion "that the policy caused him to contemplate suicide," which was credited by an expert report, was sufficient to establish no adequate remedy at law. *Id.* As detailed above, a trier of fact could find IDOC's policies and practices have caused Plaintiffs to contemplate suicide. Hence, plaintiffs have not established that Plaintiffs cannot show an inadequate remedy at law.

## C.     Defendants Fail To Show That, As A Matter Of Law, The Balance Of Harms Tips In Their Favor.

Defendants seem to suggest that the ongoing harm to Plaintiffs should be altogether discounted because IDOC's forthcoming policies and practices "*may* entirely moot Plaintiffs' complaints." Mot. at 27 (emphasis added). Their argument fails on both the law and the facts. "It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. If it did, the courts would be compelled to leave the defendant free to return to his old ways." *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). As a result, the standard to show mootness due to voluntary cessation is demanding: "Under settled law, we may dismiss the case

27

for [mootness] only if 'it is impossible for a court to grant any effectual relief whatsoever' to [plaintiffs] assuming [they] prevail[]." *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1660 (2019) (citation omited). "The 'heavy burden of persua[ding]' the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Friends of the Earth, Inc.*, 528 U.S. at 189 (citation omitted).[10]

Defendants have not met that burden here. At most, Defendants have raised a triable issue of fact on the cessation of their harmful policies. Defendants are still operating under the same unconstitutional policy that this Court reviewed over one year ago. Defendants themselves recognize that, without a revised administrative directive, the Court should not grant summary judgment: "IDOC should be allowed to fully implement its new policies before this Court intervenes." Mot. at 27.

But, critically, the sufficiency of any new directive—once implemented—would also be a question of fact. *See Square D Co. v. Fastrak Softworks, Inc.*, 107 F.3d 448, 451 (7th Cir. 1997) ("The issue of whether a claim for specific injunctive relief is moot is a fact-specific one."). As Defendants point out, Mot. at 27, the Seventh Circuit has held that a revised ordinance did not moot a plaintiff's claim where the plaintiff "would still face a variety of injuries stemming from the new ordinance," and "the new ordinance ke[pt] several requirements from the original ordinance that would continue to injure" the plaintiffs. *ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 724 F.3d 854, 863–64 (7th Cir. 2013). Moreover, IDOC's pattern of willful and

---

[10]    Even assuming that Defendants had complied with the Court's preliminary injunction—which Plaintiffs do not concede—case law is clear that complying with an order does not moot a case. *See Ind. Emp. Sec. Div. v. Burney*, 409 U.S. 540, 545 (1973) ("[I]t is well established that compliance with a court order pendente lite does not moot the underlying controversy."); *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 747 (7th Cir. 1999) ("Temporary compliance with a decree pending appeal . . . clearly should not moot a case unless other circumstances show that official policies really have changed."); *United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 563 F.3d 257, 275 (7th Cir. 2009) (holding the "district court . . . was within its discretion to find that an agreement signed only after a lawsuit has been filed is not voluntary, and that even a voluntary cessation is not determinative.").

deliberate indifference shows that—assuming a new directive is eventually implemented—their compliance with that directive cannot be assumed.

Defendants also argue that they will be impermissibly burdened from a permanent injunction.  Mot. at 29.  Yet Defendants do not identify a single cognizable harm—much less irreparable harm—they will suffer from providing medically necessary care consistent with their constitutional obligation. Instead, Defendants raise frivolous arguments, none of which tips the balance of harms in their favor as a matter of law.

Defendants argue that they are "entitled to substantial deference . . . in managing and fulfilling their public obligations."  Mot. at 27.  The authority they quote, however, is the *dissenting* opinion in *Johnson v. California*. 543 U.S. 499, 529 (2005) (Thomas, J., dissenting) ("[E]xperienced prison administrators, and not judges, are in the best position to supervise the daily operations of prisons across this country.").   The majority in *Johnson* denounced this standard as "too lenient," and expressly stated it was ***not*** applicable to Eighth Amendment claims in the prison context.  *Id.* at 513 (majority opinion).  And not only is Defendants' stated legal standard wrong, their argument is perverse.   Defendants' failure to enact and implement constitutional policies cannot be a reason to ***dismiss*** this case.  Defendants' failure to implement new policies (despite a court order issued over a year ago) is precisely why the Court ***needs*** to intervene and enjoin Defendants permanently from continuing to harm the Plaintiff class.

Defendants also argue that imposing "WPATH requirements on every provider would be too difficult to achieve."  Mot. at 28.  But this burden is not a cognizable harm, and certainly not one that would tip the balance in their favor as a matter of law.  *See, e.g.*, *Mortland v. Lights Out Devs., LLC*, No. 2020 WL 3577867, at *2 (S.D. Ind. July 1, 2020) (finding the balance of harms weighs in favor of plaintiffs when defendants articulate no hardship beyond the cost of complying

29

with the law).   Moreover, Defendants' position is undermined by its argument that there is more

than one way to obtain competency.  Mot. at 28–29.  This would make obtaining competency ***less***

***burdensome***, not more.  Even if obtaining competency were too burdensome (though it is not),

"prisons regularly refer prisoners to specialists when they are unable to fully treat them."  *Foster*

*v. Ghosh*, 4 F. Supp. 3d 974, 984 (N.D. Ill. 2013) (finding the cost to defendants associated with

providing adequate care to plaintiff did not outweigh the harm plaintiff will endure if plaintiff's

medical issues remain untreated.).  And Defendants' "no workable metrics" argument has no

stopping point.  Taken to its logical conclusion, it would mean that no court could ever order a

prison to remedy its refusal to provide adequate medical care to a class of prisoners.

In sum, a trier of fact could clearly find the balance of harms favors Plaintiffs.  *See, e.g.*,

*Edmo v. Idaho Dep't of Corr.*, 358 F. Supp. 3d 1103, 1128, *aff'd by Edmo v. Corizon, Inc.* 935

F.3d 757, 803 (9th Cir. 2019); *Farnam v. Walker*, 593 F. Supp. 2d 1000, 1017-18 (C.D. Ill. 2009)

(granting preliminary injunction after finding that the burden on the prison of administrating

medical treatment was greatly outweighed by plaintiff's prolonged pain, suffering, and decreased

quality of life); *Gammett v. Idaho State Bd. of Corr.*, 2007 WL 2186896, at *15–16 (D. Idaho July

27, 2007) (finding balance of harms "sharply" favored plaintiff, who would experience suicidality

and mental harm without gender dysphoria treatment).

**D.      Granting A Permanent Injunction Does Not Disserve The Public Interest.**

The public has the "highest" interest in preventing the violation of a party's constitutional

rights.  *See United States v. Raines*, 362 U.S. 17, 27 (1960).  Here, the public interest strongly

favors injunctive relief because Plaintiffs seek to vindicate their right to medically adequate

treatment under the Eighth Amendment. *See, e.g.*, *Flynn v. Doyle*, 630 F. Supp. 2d 987, 993 (E.D.

Wis. 2009) ("The public has a strong interest in the provision of constitutionally-adequate health

care to prisoners."); *Phillips v. Mich. Dep't of Corr.*, 731 F. Supp. 792, 801 (W.D. Mich. 1990)

(finding "the public interest will be served by safeguarding Eighth Amendment rights" of prisoners with gender dysphoria), *aff'd*, 932 F.2d 969 (6th Cir. 1991).  Thus, far from a "disservice" to the public, the public interest actually compels injunctive relief here.

The cases relied on by Defendants do not hold otherwise.  The decision in *Horne v. Flores*, Mot. at 30, related to an injunction which "dicta[ed] state or local budget priorities," and thus the "highest public interest" was not implicated.  557 U.S. 433, 448 (2009).  And *Lewis v. Casey*, Mot. at 30, is inapposite.  518 U.S. 343 (1996).  The language cited by Defendants relates to standing, not public interest.  *Lewis* stands for the proposition that Court intervention is not appropriate when a claimant has suffered ***no*** injury.[11]  Defendants do not—and cannot—contend that Plaintiffs have suffered no injury here.  Thus, summary judgment must be denied.

## IV.   DEFENDANTS' REMAINING ARGUMENTS DO NOT ENTITLE THEM TO SUMMARY JUDGMENT

Defendants make two final arguments in support of their motion: (1) the Eleventh Amendment bars Plaintiffs' requested relief; and (2) Plaintiffs' requested relief is not sufficiently narrowly tailored under the Prison Litigation Reform Act ("PLRA").  Mot. at 30, 32.  Neither argument is supported by the case law nor justifies summary judgment.

### A.   Defendants Are Not Entitled To Summary Judgment On Their Eleventh Amendment Defense.

"In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'"

---

[11]   In *Lewis v. Casey*, the plaintiffs had not suffered any injury as a result of any constitutional violation.  The court analogized the case to "a healthy inmate who had suffered no deprivation of needed medical treatment [being] able to claim violation of his constitutional right to medical care, simply on the ground that the prison medical facilities were inadequate." *Lewis*, 518 U.S. at 350 (internal citation omitted).

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (citation omitted); *see also Council 31 of the Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Quinn*, 680 F.3d 875, 882 (7th Cir. 2012).

Here, Plaintiffs allege and have provided evidence that Defendants have violated Plaintiffs' Eighth Amendment rights, and continue to do so.  *See supra* Argument, Section II.  Defendants even admit they have not discontinued the conduct found unlawful nor fulfilled the requirements of the preliminary injunction.  Their contrary assertion that their purported "substantial steps to improve the care offered to transgender inmates" make injunctive relief unnecessary in order to enforce federal law—therefore making *Ex parte Young* in applicable—is mistaken.  Mot. at 31.

Any doubt over whether Plaintiffs will be able to prove their allegations is immaterial for determining application of *Ex parte Young*.  *See Verizon Md., Inc.*, 535 U.S. at 646 ("[T]he inquiry into whether suit lies under *Ex parte Young* does not include an analysis of the merits of the claim.") (citation omitted); *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 281 (1997) ("An allegation of an ongoing violation of federal law where the requested relief is prospective is ordinarily sufficient . . . .").  Indeed, Defendants' admission that they have not complied with the preliminary injunction, and their many objections to the proposed reforms, demonstrate that the federal interests protected by *Ex parte Young* are far from eliminated.   *Cf. Vickery v. Jones*, 100 F.3d 1334, 1348 (7th Cir. 1996) ("When a party, in response to an interlocutory order, refrains from engaging in the challenged practice, yet provides no assurance that the moratorium on implementing that practice is permanent, the federal interest in asserting authority to enforce federal law does not vanish as a result.").

Finally, Defendants object to the "fiscal consequences to state treasuries" that would be necessary to comply with the injunction.  These fiscal consequences, however, are "the necessary result of compliance with decrees" prospectively enforcing federal law:

> State officials, in order to shape their official conduct to the mandate of the Court's decrees, would more likely have to spend money from the state treasury than if they had been left free to pursue their previous course of conduct. Such an ancillary effect on the state treasury is a permissible and often an inevitable consequence of the principle announced in *Ex parte Young*.

*Edelman v. Jordan*, 415 U.S. 651, 668 (1974) (holding that injunction and declaratory relief seeking payment of retroactive welfare benefits was outside *Ex parte Young*).  The Defendants here identify no more that the inevitable "ancillary" effects of bringing their programs into compliance with the Constitution, and are therefore not entitled to summary judgment on Eleventh Amendment immunity.  *Cf. Council 31 of the Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO*, 680 F.3d at 882 (*Ex parte Young* did not apply where plaintiffs sought injunction challenging state employees' pay freeze as violation of Contract Clause, and the "essence" of the relief was payments from the treasury to employees).

### B.     Defendants' Objection Under The PLRA Is Premature And Unmeritorious.

"The PLRA circumscribes the scope of the court's authority to enter an injunction in the corrections context.  ***Where prison conditions are found to violate federal rights***, remedial injunctive relief must be 'narrowly drawn, extend no further than necessary to correct the violation of the Federal right, and use the least intrusive means necessary to correct the violation of the Federal right.'"  *Westefer v. Neal*, 682 F.3d 679, 683 (7th Cir. 2012) (emphasis added).  That is, the PLRA does not bear on the determination of Defendants' constitutional violation nor on Plaintiffs' entitlement to injunctive relief.  Instead, it bears only on the Court's crafting of the scope of an injunction.  This is why the Seventh Circuit has upheld findings of Eighth Amendment violations and the necessity of injunctive relief, even when it simultaneously remanded with

33

instructions to narrow the scope of an injunction.  *See, e.g.*, *Lindell v. Frank*, 377 F.3d 655, 660 (7th Cir. 2004) (finding that the district court was "correct to award . . . injunctive relief on this claim," but remanding to "modify the injunction to make it conform more closely to the violation that was found").  Because the Court has not yet issued a permanent injunction here, Defendants' objection is premature.

Moreover, Defendants' objection is without merit.  Defendants assert that this lawsuit is composed of a "patchwork of individualized complaints," Mot. at 32, but Plaintiffs have presented a clear account of IDOC's myriad failures to provide constitutionally adequate medical treatment for gender dysphoria.  Contrary to Defendants' assertions that "reforms [] were not needed in 2019 and are not needed now," *id.*, the evidence is clear that Plaintiffs continue to suffer at the hands of Defendants.  Across the class, IDOC does not provide for adequate hormone treatment, does not permit social transition, and has no plan in place for patients to receive medically necessary surgery. Plaintiffs' request is simple: IDOC must provide constitutionally adequate medical care. This request is properly remedied with injunctive relief. Indeed, the Seventh Circuit has upheld an injunction enforcing such care specifically for prisoners with gender dysphoria.  *Fields v. Smith*, 653 F.3d 550 (7th Cir. 2011).  Defendants simply have not shown that the Court is unable to do the same here.  As the Supreme Court makes clear, "[c]ourts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration."  *Brown v. Plata*, 563 U.S. 493, 511 (2011).

## CONCLUSION

WHEREFORE, Plaintiffs request that this Court deny Defendants' Motion for Summary Judgment.  Defendants cannot show an absence of material disputes of fact nor that they are entitled to summary judgment as a matter of law.

Dated: January 15, 2021

By: /s/  Amelia H. Bailey
John A. Knight
Camille E. Bennett
Ghirlandi Guidetti
Carolyn M. Wald
ROGER BALDWIN FOUNDATION OF
ACLU, INC.
150 North Michigan Avenue, Suite 600
Chicago, IL 60601
Telephone: (312) 201-9740
Facsimile: (312) 288-5225
*jknight@ACLU-il.org*
*cbennett@ACLU-il.org*
*gguidetti@ACLU-il.org*
*cwald@ACLU-il.org*

Catherine L. Fitzpatrick
Jordan M. Heinz
Amelia H. Bailey
Sam G. Rose
KIRKLAND &ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
*catherine.fitzpatrick@kirkland.com*
*jordan.heinz@kirkland.com*
*amelia.bailey@kirkland.com*
*sam.rose@kirkland.com*

Brent P. Ray
KING & SPALDING LLP
353 North Clark Street
Chicago, IL 60654
Telephone: (312) 995-6333
Facsimile: (312) 995-6330
*bray@kslaw.com*

Abby L. Parsons
KING & SPALDING LLP
1100 Louisiana Street, Suite 4000
Houston, TX 77002
Telephone: (713) 751-3294
*aparsons@kslaw.com*

35

Thomas E. Kennedy III
Sarah Jane Hunt
KENNEDY HUNT P.C.
906 Olive Street, Suite 200
Saint Louis, MO 63101
Telephone: (314) 872-9041
*tkennedy@KennedyHuntLaw.com*
*sarahjane@KennedyHuntLaw.com*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 15, 2021, I electronically filed the foregoing document and any attachments with the Clerk of this Court by using the CM/ECF system, which will accomplish service through the Notice of Electronic Filing for parties and attorneys who are Filing Users.

/s/ Amelia H. Bailey