IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JANIAH MONROE,
MARILYN MELENDEZ,
LYDIA HELÉNA VISION,
SORA KUYKENDALL, and
SASHA REED, individually and on
behalf of a class of similarly situated
individuals,

          Plaintiffs,

v.                                                                   Case No. 3:18-CV-00156-NJR

STEVE MEEKS,
MELVIN HINTON, and
ROB JEFFREYS,

          Defendants.

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

This litigation was brought on behalf of a class of Plaintiffs, consisting of all prisoners in the custody of IDOC (Illinois Department of Corrections) who have requested evaluation or treatment for gender dysphoria. (Doc. 213). The named Plaintiffs are transgender women currently incarcerated in IDOC facilities. The named Defendants are, respectively, the IDOC Chief of Health Services, IDOC Mental Health Supervisor, and the IDOC Director, all sued in their official capacity. The Court previously granted preliminary injunctive relief on December 19, 2019 (Docs. 186, 187, amended at Doc. 212) and certified the class in an order dated March 4, 2020 (Doc. 231).

The preliminary injunction ordered Defendants to cease the policy and practice of allowing the Transgender Care Review Committee to make medical decisions regarding

gender dysphoria, to develop a policy to ensure that treatment decisions for inmates with gender dysphoria are made by medical professionals qualified to treat gender dysphoria; to ensure that timely hormone therapy is provided when medically necessary, including the administration of hormone dosage adjustments, and to perform routine monitoring of hormone levels; to cease the policy and practice of depriving gender dysphoric prisoners of medically necessary social transition and to develop a policy to allow such transition (including individualized placement decisions, avoidance of cross-gender strip searches, and access to gender-affirming clothing and grooming items); to develop policies and procedures allowing transgender inmates access to clinicians who meet the WPATH[1] competency requirements; to allow inmates to obtain evaluations for gender dysphoria upon request or clinical indications; and to advise the Court regarding steps taken to train all correctional staff on transgender issues. (Doc. 212).

The Court adopts the discussion of the claims in its previous order (Doc. 186) regarding preliminary injunctive relief here and, prior to the entry of final judgment, will summarize the testimony of each witness at trial and the depositions and exhibits submitted at the trial. The Court now briefly summarizes IDOC's response to the Court's order granting preliminary injunctive relief entered on December 19, 2019, and amended on March 4, 2020, and some of the evidence introduced at trial as it relates to that response. This order is not meant to be an exhaustive recitation of the evidence; it is being issued simply to provide *some* of the bases for the Court's verbal findings and rulings

---

[1] World Professional Association for Transgender Health. This organization's Standards of Care for the treatment of gender dysphoria are the benchmark for appropriate care of individuals with this diagnosis. (Doc. 186, pp. 3-4, 31).

issued at the conclusion of trial last week.

In January 2020, IDOC contracted with Dr. Erica Anderson, a clinical psychologist, as a consultant to improve delivery of transgender health care. Her contract currently extends through December 2021. Dr. Anderson has 40 years' experience in her field as a university professor, healthcare executive, and over the last 10 years, as a consultant on transgender issues. Transgender herself, Dr. Anderson has provided meaningful guidance which has led to some positive changes in IDOC. Specifically, she worked with IDOC officials and consultant Wendy Leach to help draft IDOC's new Administrative Directives to comply with the preliminary injunction, including ensuring that medical decisions regarding transgender prisoners' care would be made by qualified providers, changing the structure of delivery of care, and implementing training and education of IDOC staff. At her recommendation, the former Transgender Care Review Committee was split into two separate committees, the Transgender Health and Wellness Committee ("THAW") and the Transgender Administrative Committee ("TAC"), in an effort to separate medical and mental health care decisions from issues relating to security and administration. Dr. Anderson continues to serve as a non-voting advisor to those committees.

Dr. Lamenta Conway, a physician board certified in internal medicine, was hired by IDOC in September 2019 as the Deputy Chief of Health Services (trial testimony August 4, 2021, Doc. 326, pp. 652-53). Following the entry of the preliminary injunction, Dr. Conway's responsibilities were expanded to include the care of transgender inmates. (Doc. 326, pp. 656-657). She serves on IDOC's THAW and TAC committees.

IDOC has contracted with an endocrinologist, Dr. Ravi Iyengar, and is working to finalize a contract with a surgeon who specializes in gender-affirming surgery, Dr. Loren Schechter.

On April 1, 2021, IDOC adopted two new Administrative Directives: (1) Administrative Directive 04.03.104 "Evaluation, Treatment and Correctional Management of Transgender Offenders" (Trial Exhibit 600; Doc. 323, p. 502), and (2) Administrative Directive 05.01.113 "Search of Offenders" (Trial Exhibit 601, Doc. 323, p. 502). Administrative Directive 04.03.104 mandates a number of new procedures related to transgender inmates. One of its most notable changes involves dismantling the former Transgender Care Review Committee ("TCRC") discussed at length in the Court's order granting preliminary injunctive relief. The TCRC is now replaced by two committees, the THAW Committee and TAC. Each committee meets monthly. The THAW Committee considers inmate requests for gender affirming surgery (as presented by the inmate's medical/mental health provider(s)) and other medical needs. The TAC reviews requests for inmate transfers such as when a transgender woman requests a transfer from a men's to a women's facility and matters such as what gender-affirming commissary items will be available to transgender inmates. Although the duties are divided in an attempt to separate medical and mental health issues from security considerations, the identity of members on each committee is similar to those previously serving on the TCRC. For instance, Dr. Puga (Chief of Psychiatry), Dr. Hinton (Chief of Mental Health), Dr. Conway (Deputy Chief of Health Services), and Dr. Shane Reister (Southern Regional Psychologist Administrator) all served on the former TCRC and now serve on the THAW Committee.

Dr. Puga, Dr. Conway, and Dr. Reister also serve on the TAC along with other officials including the chief of operations, chief of women's services, and transfer coordinator. (trial transcript, August 5, 2021). Administrative Directive 05.01.113 set forth new procedures governing Searches of Offenders.

IDOC also has offered training to its medical and mental health staff. Some of it was mandatory; some of it was not. Dr. Reister has developed and provided training on transgender issues for IDOC mental health clinicians, and an hour and twenty-minute training for all IDOC staff. (Doc. 325, pp. 604-08). A 2-day entry level WPATH Global Education Initiative ("GEI") training has been offered on three separate occasions—in late 2020, February 2021, and May 2021—to IDOC mental health providers. While the training was designated as "mandatory," the certificates of attendance document that several mental health providers who had problematic interactions with named Plaintiffs never attended this training. (Doc. 325, pp. 619-23; Doc. 326, pp. 628-30). This introductory course, taught by WPATH faculty, was held virtually due to the ongoing pandemic. Besides all required personnel not participating, there is no way to verify that those who joined the virtual training paid attention during the course, and there was no quiz to verify a basic understanding of the materials. And Plaintiffs' expert Dr. Ettner testified that recent comments by medical staff and mental health professionals in the records suggest that many still lack the most basis understanding of gender dysphoria. (Doc. 323, pp. 515-516).

Dr. Puga attended an online training session offered through the Mayo clinic. He and Dr. Anderson have met with staff at Logan Correctional Center to discuss

transgender issues, including transfers. And there have been many meetings between IDOC personnel and their consultants. There has not, however, been any training offered to correctional officers. There likewise has been no training to staff regarding the new Administrative Directives, though one is apparently in the works for some time soon.

At this point, as set forth on the record at the conclusion of the trial and below, the Court finds that adoption of IDOC's new Administrative Directives has not resulted in improved treatment and care of members of the class. While there are certainly some flaws in the policy, the bigger problem is that the policy is not being fully implemented and all staff are not following it. Simply put, IDOC has not accomplished what the Court previously ordered it to do.

While it will take time to analyze the flaws in the new policy (and, as set forth below, the Court has invited the parties to weigh in), the undersigned finds that the evidence introduced at trial shows serious ongoing violations of the Eighth Amendment that must be immediately addressed. Progress has certainly been made, including some training, the hiring of consultants on transgender policies and medical issues, and an attempt to separate medical/mental health treatment for transgender inmates and security issues. The Court is now satisfied that IDOC is taking the issue of its care and treatment of transgender inmates seriously. The Court noted in the order granting preliminary injunctive relief that the changes ordered "will take time"—and the COVID-19 global pandemic understandably caused some delays. But IDOC relies too heavily on the pandemic to excuse its ongoing constitutionally inadequate care and treatment of transgender inmates. Of course transfers were not possible for over a year between the

time of the preliminary injunction order and trial, and during that time, staff was consumed with other issues when they otherwise could have been developing new policies and procedures and getting them implemented. But the pandemic is not an excuse for hormone therapy to be denied or delayed or hormone levels for those on hormone therapy to go unmonitored, or for the failure to titrate medication doses in response to bloodwork to bring hormone levels into acceptable ranges, or for the failure to order additional, medically necessary diagnostic testing.

Although progress has been made (two inmates, including named Plaintiffs Janiah Monroe and Lydia Vision have been transferred to a women's facility, and two members of the class have consulted with a surgeon,[2] and further progress is underway, the Court must ensure that there is follow through, completion, and implementation of the work that has been started. While IDOC urges the Court to simply "let the process play out," in light of the amount of time between when this case was filed in 2018, the grant of preliminary injunctive relief in December 2019, and four days of trial testimony in the first week of August 2021—and the minimal amount of progress that has been made— the undersigned finds that further injunctive relief is appropriate.

The Court previously found that Defendants were displaying deliberate indifference to Plaintiffs' serious medical needs related to their gender dysphoria. While IDOC argues that its new Administrative Directives and the changes underway have

---

[2] Although, as will be explained in more detail in a subsequent order, the priority given to reviewing requests for gender affirming surgery and transfer is nonsensical. In other words, the THAW Committee seems to pick and choose who gets evaluated and sometimes spends time reviewing requests for individuals likely not in the class certified by this Court.

changed that, there are still serious violations of Plaintiffs' constitutional rights happening every day. Specifically, there are ongoing delays in treatment that constitute deliberate indifference because those delays have injured members of the class and unnecessarily prolonged their suffering in some cases. *See Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012). For the same reasons stated in the order granting preliminary injunctive relief, Defendants continue to be deliberately indifferent to Plaintiffs' gender dysphoria by either not adequately addressing their needs or delaying changes required by the preliminary injunction. In a nutshell, without discussion of the testimony of each witness at this time, the evidence presented at trial shows that the hormone levels of class members receiving hormone therapy are not being monitored, and their hormone doses are not titrated in response to bloodwork. As the Court stated at the conclusion of trial, it's like a physician ordering a cholesterol test, the results coming back over 300, and yet the physician does nothing but put the lab results in the chart. In addition, there are still some class members who are being denied hormone therapy treatment for gender dysphoria. Even under the new Administrative Directive, transfer request and review policies and procedures are still flawed (medical/mental health issues sometimes blurred with security issues); some class members have inexplicably been *taken off* hormones for a period of time for absolutely no medical reason (such as being transferred to segregation); and not a single inmate has received gender affirming surgery, although IDOC is working to contract with a surgeon for that purpose. While IDOC claims it has provided access to gender affirming items in the commissary at each facility, the testimony at trial shows that the items are sometimes not available. Even more troubling,

there continue to be instances of cross-gender strip searches of transgender inmates, and transgender female inmates being forced to shower without privacy in male facilities. Meanwhile, there have been more suicide attempts, more threats of suicide, attempted self-castration, and untreated serious medical conditions (like elevated prolactin levels), ongoing harassment and humiliation, and ongoing misgendering by inmates and staff. Even Dr. Conway, testified—in fact volunteered—that if an IDOC inmate "ha[s] the diagnosis of gender dysphoria, they should be treated … there's no decision that has to be made regarding hormone therapy. It should be done and it should be done immediately[.]" (Doc. 326, pp. 660-61).

Not *one* defense witness rebutted (or even attempted to rebut) the opinions of Plaintiffs' expert endocrinologist Dr. Vin Tangpricha about unmonitored hormone levels, hormone levels not within range, and lack of dose titration. (Doc. 323, pp. 376-480). And, inexplicably, some class members are being treated by medical and mental health staff who do not understand gender dysphoria and refuse to treat them for it (in one case, asking a transgender inmate to ponder what Jesus would think about her request). This Court has never seen such deliberate indifference to a serious medical need. *Such providers should have no contact with class members from this point forward*.

The evidence presented at trial establishes that gender dysphoria is a serious medical condition with mental health components that requires treatment. The first issue should be to address the medical need. And, *of course*, there are security issues attendant to transgender inmates, as opposed to a transgender individual in the general community. *But the lines cannot be blurred*. The medical and mental health issues must be

addressed first and foremost, and security issues cannot be used as a trump card that results in unconstitutional care and treatment of class members.

Fortunately, IDOC knows the identity of some, if not all, of the class members who are being subjected to deliberate indifference. IDOC's Southern Regional Psychologist Administrator, Dr. Shane Reister, recently did a survey which at a minimum reflects individuals interested in consult/evaluation for hormone therapy, gender affirming surgery, and transfer. (Doc. 326, pp. 634-641). And Dr. Tangpricha's unrefuted testimony shows that eleven class members do not have hormone levels within the range set out in the Endocrine Society Guidelines and many inmates have unmonitored and untitrated hormone therapy treatment. At the end of the day, there are less than 130 individuals in the class; we are not talking about thousands of people.

Thus, having heard the evidence presented by the parties during the bench trial held on August 2-5, 2021, and issued preliminary factual findings, the Court hereby **CONTINUES** its previous preliminary injunction (Doc. 212) and **ORDERS** the following additional relief to members of the class:

1. Plaintiffs Sora Kuykendall and Sasha Reed shall, within **7 days** of the date of this Order, be given lab tests to check their prolactin levels. If those levels are still elevated, they shall be given an MRI test within **5 days** of receipt of the prolactin results.

2. Each member of the Plaintiff class who is currently receiving hormone therapy shall, within **14 days** of the date of this Order, be given blood tests to assess hormone levels, as well as potassium, creatinine, and prolactin levels (for transgender females) and hemoglobin/hematocrit levels (for transgender males). Thereafter, if the hormone levels are not within the appropriate range set forth by the Endocrine Society Hormone Guidelines (for transgender females, testosterone of less than 15 nanograms/deciliter and estradiol between 100-200 picograms/milliliter; for transgender males,

testosterone levels between 400-600 nanograms/deciliter), Defendants shall ensure that the individual's hormone medication is titrated following receipt of the bloodwork results and bloodwork repeated at least every **3 months** until the levels are within an appropriate range.

3. Any Plaintiff class member who has requested hormone therapy to date shall, within **21 days** of the date of this Order, get baseline bloodwork done and hormone therapy started within **14 days** thereafter, with follow-up bloodwork at least every **3 months** until the levels are within an appropriate range.

4. Each Plaintiff class member receiving hormone therapy shall get bloodwork done at least once a year to assess hormone levels, as well as potassium, creatinine, and prolactin levels (for transgender females) and hemoglobin/hematocrit levels (for transgender males) and shall be treated as medically indicated by the results. No Plaintiff class member shall be prescribed conjugated estrogen.

5. Any Plaintiff class member whose hormone levels are within the appropriate range, and who has requested evaluation for gender affirming surgery, shall be evaluated for such surgery within **120 days** of the date of this Order with inmates being evaluated in *chronological* order of the date of the inmate's original request for surgery. Each class member so evaluated shall be provided a prompt written notification of the decision and, if surgery is denied, the written notification shall include an explanation of the reasons for denial and a timeframe to request another evaluation thereafter.

6. Plaintiff class members shall be allowed to choose the gender of the correctional officer who will conduct a search of their person, and the search **SHALL BE** conducted by a correctional officer of the gender requested.

7. Each Plaintiff class member who has requested transfer to a facility matching his or her expressed gender (female facility for transgender women, male facility for transgender men) shall be evaluated for transfer within **120 days** of the date of this Order, with inmates being evaluated in *chronological* order of the date of the inmate's original request for transfer. Each class member so evaluated and denied transfer shall be promptly provided with a written explanation of each reason for the denial and allowed to request another evaluation for transfer within **180 days** thereafter.

8. Each Plaintiff class member shall immediately be provided with access to

gender affirming items in the commissary and shall immediately be provided with a list of available gender affirming items. Defendants shall immediately ensure all approved gender affirming items are available at the commissary at each class member's institution. Defendants shall, within **30 days** of the date of this Order, provide the Court with a list of all commissary items available at each facility.

9.  Defendants shall immediately ensure that medical care and mental health treatment of Plaintiff class members shall be conducted only by medical staff and mental health professionals who have taken WPATH training and are committed to continuing education on issues of transgender health. Similarly, medical providers and mental health professionals who hold personal or religious beliefs that prohibit their treatment of inmates with gender dysphoria shall have no contact with any member of the class from this date forward.

10. Defendants shall immediately ensure that transgender inmates are allowed access to a private shower.

Again, the Court acknowledges Defendants have made some progress toward compliance with the Court's orders for preliminary injunctive relief (Docs. 186, 187, amended at Doc. 212), and recognizes that the COVID-19 pandemic has caused some of the delays in accomplishing compliance. This progress must continue. To that end, the Court further **ORDERS** Defendants to finalize the following "in progress" projects **within 120 days** of this Order.

1.  Finalize the contract with Wexford to provide hair removal services to Plaintiff class members;

2.  Finalize the contract with Dr. Schechter to provide gender affirming surgery to Plaintiff class members who are approved to receive such surgery;

3.  Finalize and implement the CQI (Continuing Quality Improvement) program for transgender care;

4.  Finalize IDOC's written surgical standards for transgender care;

5.  Finalize and implement the PRISM project (the special population program) (discussed in Doc. 326, pp. 640, 648-49, 651)

6.  Finalize and implement additional and ongoing training for *all* correctional staff on transgender issues and awareness, including the harm caused by misgendering and harassment;

7.  Finalize and implement training for inmates and staff at Logan Correctional Center regarding incoming/transferred transgender inmates;

8.  Finalize and implement IDOC's transgender identification policy.

The Court further **ORDERS** Defendants to provide the Court and Plaintiffs' counsel with a report on the status of each Plaintiff class member's (1) hormone levels; (2) status of any request for transfer; and (3) status of any request for surgery within **60 days** of the date of this Order. This report shall be filed under seal.

As recently ordered on the record following the bench trial, Plaintiffs are granted additional time, up to and including **30 days** from the date of this Order, to file supplemental evidence obtained in late produced documents referenced in the motion for sanctions (Doc. 316).

Plaintiffs shall provide supplemental briefing outlining the deficiencies in the new Administrative Directive they assert were proven at trial (with citations to the testimony and exhibits supporting their position) on or before **Monday, August 16, 2021**. Plaintiffs may also request additions and changes to the above injunctive relief at that time.

Defendants shall seek clarification of anything in this order on or before **Monday, August 16, 2021**.

Defendants shall respond to Plaintiffs' briefing on or before **Monday, August 30, 2021**, specifically identifying which proposed changes are reasonable to them, which ones

are not (and why), and, where appropriate, propose alternative language. Defendants shall make specific citations to the testimony/exhibits when objecting to the proposed changes and suggesting alternative language.

      **IT IS SO ORDERED.**

      **DATED:   August 9, 2021**

                                            **NANCY J. ROSENSTENGEL**
                                            **Chief U.S. District Judge**