**DEFENDANTS' EXHIBIT 1**

| | |
|---|---|
| SONIA DOE (a pseudonym), | SUPERIOR COURT OF NEW JERSEY |
| Plaintiff, | LAW DIVISION - MERCER COUNTY |
| v. | Docket No. MER-L-1586-19 |
| NEW JERSEY DEPARTMENT OF CORRECTIONS, et al. | <u>CIVIL ACTION</u> |
| Defendants. | **SETTLEMENT AGREEMENT AND RELEASE** |

## <u>SETTLEMENT AGREEMENT AND RELEASE</u>

### I.    <u>RELEASOR AND RELEASEES</u>

This Settlement Agreement and Release (hereinafter "Agreement" or "Release") is made between the "Releasor" (or "Plaintiff") and Releasees (or "Defendants"). The Releasor is Sonia Doe (a pseudonym), and her heirs, representatives, successors, and assigns. The Releasees are: the New Jersey Department of Corrections ("DOC"), including all of its departments, divisions, agencies, officials, employees and agents, past and present; and Victoria Kuhn, Patrick Nogan, Leslie Russell, Lt. N.R., Ofc. S.R., and Ofc. J.L., in their individual and official capacities. The Releasor and Releasees shall be referred to jointly as the "Parties."

### II.   <u>RECITALS</u>

WHEREAS, the DOC adopted a policy addressing Transgender and Intersex Inmates effective September 1, 2016; and

WHEREAS, the DOC's policy addressing Transgender and Intersex Inmates was revised between its September 1, 2016 adoption and the filing of a lawsuit entitled *Sonia Doe (a pseudonym) v. New Jersey Department of Corrections, et al.*, filed in the Superior Court of New

Jersey, Law Division, Mercer County on August 14, 2019, Docket No. MER-L-1586-19 (the "Litigation"); and

WHEREAS, in the Litigation, Plaintiff complained of shortcomings in the DOC's policy addressing Transgender and Intersex Inmates, including but not limited to the scope of protections and the alleged lack of notification to transgender and intersex prisoners of the policy's existence; and

WHEREAS, Plaintiff asserted claims against Defendants for damages and preliminary and permanent injunctive relief under the New Jersey Constitution and New Jersey Law Against Discrimination, arising out of her confinement in men's prisons between March 2018 and August 2019, as more fully set forth in the Litigation; and

WHEREAS, along with her Verified Complaint, on August 14, 2019, Plaintiff filed an Order to Show Cause with Temporary Restraints, seeking her immediate transfer to Edna Mahan Correctional Facility for Women ("EMCF") in line with her female gender identity; and

WHEREAS, on August 28, 2019, counsel for Defendants informed the Court that the DOC had determined Plaintiff would be transferred to EMCF no later than the week of September 15, 2019, in reliance on which Plaintiff withdrew her Order to Show Cause on August 30, 2019; and

WHEREAS, on September 20, 2019, Plaintiff was transferred to general population at EMCF; and

WHEREAS, in her Verified Complaint, counsel for Plaintiff noted a related case in the Superior Court, Appellate Division, which is entitled *Sonia Doe (a pseudonym) v. New Jersey Department of Corrections*, Docket No. A-5101-18; and

WHEREAS, the related Appellate Division case addressed an appeal of a final agency determination which had adjudicated Plaintiff guilty of prohibited acts *.002, assaulting any

2

person, N.J.A.C. 10A:4-4.1(a)(1)(ii), and *.306, conduct which disrupts the orderly running of the corrections facility, N.J.A.C. 10A:4-4.1(a)(2)(xxix), and imposed sanctions of 270 days' administrative segregation and 270 days' loss of commutation time, among others; and

WHEREAS, on June 3, 2020, the Appellate Division issued an opinion in the related case, which affirmed the guilty adjudications, and also remanded the matter to the DOC for reconsideration of sanctions, while retaining jurisdiction; and

WHEREAS, on October 20, 2020, in light of the DOC's decision to vacate the sanctions on remand, Plaintiff and the DOC stipulated to dismissal of that appeal with prejudice; and

NOW, IN CONSIDERATION of the payment to Releasor provided for by this Agreement, and other good and valuable consideration and the promises and covenants contained herein, the receipt and sufficiency of which the Parties acknowledge, the Parties do hereby agree as follows:

## III.   <u>NO ADMISSION OF LIABILITY</u>

Releasees expressly deny the validity of Releasor's disputed claims and nothing contained herein may be used or viewed as an admission of liability by Releasees.  Releasor expressly denies the validity of the Department of Corrections' disciplinary charges against her, and nothing contained herein may be used or viewed as an admission of liability by Releasor.

## IV.   <u>RELEASE</u>

Releasor releases and gives up any and all claims and rights which Releasor may have against Releasees. This releases all claims, demands, damages, causes of action, or suits, which have been or could have been brought by Releasor against Releasees. This releases all claims by Releasor against Releasees up to now, including those of which Releasor is not aware and those not mentioned in this Release. This releases all claims by Releasor against Releasees resulting from anything that has happened up to now, including but not limited to all claims, which were or

could have been brought in the action entitled *Sonia Doe (a pseudonym) v. New Jersey Department of Corrections, et al.*, Docket No. MER-L-1586-19, pending in the Superior Court of New Jersey, Mercer County Vicinage.

Nothing in this Agreement shall be construed to represent an agreement or concession by any Party as to the proper jurisdiction or forum for complaints, appeals, or other legal challenges regarding classification, housing, or other decisions by Defendants under the Policy on Transgender, Intersex, and Non-Binary Inmates, described in Section VI below.

## V.    <u>MONETARY DAMAGES AND ATTORNEYS' FEES</u>

In consideration of Releasor's releasing the claims enumerated in this Agreement, Releasees have agreed to pay Releasor $125,000 in damages. Of the amount to be paid by Releasees to Releasor, money will be deducted to pay any outstanding state liens against Releasor. The deduction of liens is discussed later in this Agreement.

Additionally, Releasees agree to pay $45,000 in attorneys' fees to counsel for Releasor, from which taxes shall not be deducted at the time of the issuance of payment.

Accordingly, the combined total amount Releasees will pay under this Agreement is $170,000, representing the sum total of damages to Releasor and attorneys' fees to her counsel as specified above. This total, after deduction of any liens on the damages award, shall be made payable in a lump sum to American Civil Liberties Union of New Jersey Attorney Trust Account. A 1099 shall be issued to the American Civil Liberties Union of New Jersey.

The Parties acknowledge that these sums are in full satisfaction of all of Plaintiff/Releasor's claims against Releasees, including claims for costs and attorneys' fees, and are consideration to which Releasor is not otherwise entitled. This sum represents full payment, including all attorney

fees, costs, and expenses in this case. Releasor agrees she will not seek anything further from Releasees in full settlement of this Litigation.

The payment of the amounts discussed in this section shall not be made unless counsel for Releasees has received this Release signed by Releasor and notarized, a Child Support Certification, a State of New Jersey W9 executed by Releasor's counsel, and a signed Stipulation of Dismissal with Prejudice. The signed Stipulation of Dismissal with Prejudice will be held until Releasor's attorney receives the payment. Releasor understands that while the Releasee makes no guarantee, payment may be made within 60 days after counsel for Releasees receives this Release signed by Releasor and notarized, a State of New Jersey W9 executed by Releasor's counsel, and a signed Stipulation of Dismissal with Prejudice.

## VI.    POLICY ON TRANSGENDER, INTERSEX, AND NON-BINARY INMATES

Defendant New Jersey Department of Corrections has adopted and agrees to maintain in good faith policies, procedures and practices that ensure the health, safety, and dignity of transgender, intersex, and non-binary inmates in its custody, including ensuring inmates' ability to live in line with their gender identity, by providing the substantive terms included in the attachment at Exhibit A: Internal Management Procedure # PCS.001.TGI.01 on Transgender, Intersex, and Non-Binary Inmates, approved June 25, 2021 and effective July 1, 2021 ( "Policy").

The DOC agrees to maintain the Policy attached at Exhibit A for a period of at least one year from the date of this Agreement. Specifically, by and through the attached Policy, and any additional procedures and practices necessary to implement it, the DOC agrees to provide for a period of at least one year from the date of this Agreement a presumption that all inmates will be housed in line with their gender identity, rather than their sex assigned at birth, as well as certain procedural protections for inmates regarding such housing decisions, including a right to

participate in housing reviews, a right to challenge housing decisions, and a right to request a written record of the decision-making.

To the extent there is any ambiguity in the Policy, the DOC agrees that, in the case of any inmate, the DOC shall not deem a "significant adjustment issue" alone to be cause to transfer an inmate to a facility that is not in line with the inmate's gender identity, though it may be reason for a change of housing assignment within a particular gender-appropriate facility (i.e., within a facility in line with their gender identity).

Within 30 days of the date of this Agreement, the DOC will provide a copy of the Policy to, at a minimum, all correctional police officers regardless of rank, Administration staff, Intake staff, Special Investigations Division staff, the Sexual Assault Advisory Council, including the PREA Accommodation Committee ("PAC"), and every facility's Institutional PREA Compliance Manager ("IPCM"), and require those individuals to sign and acknowledge that they have received and read the Policy. Additionally, within a reasonable time after the date of this Agreement, and as soon as practicable, the DOC shall provide training specific to the Policy to, at a minimum, all Administration and Intake staff, the Sexual Assault Advisory Council, including the PREA Accommodation Committee ("PAC"), and all IPCMs. The DOC may, within its discretion, provide additional training specific to the Policy. Non-compliance with the Policy may be subject to appropriate disciplinary action, in accordance with the DOC's existing internal procedures and protocols regarding staff discipline and misconduct.

## VII.  RESCISSION OF DISCIPLINARY SANCTIONS REGARDING ASSAULT

The Parties agree that any effect on Plaintiff/Releasor's disciplinary record as a result of the May 24, 2019 assault has been resolved in the related case *Sonia Doe (a pseudonym) v. New Jersey Department of Corrections*, Appellate Division Docket No. A-5101-18. As outlined in the

October 20, 2020 stipulation of dismissal in that matter, the Parties agree that, pursuant to the Appellate Division opinion and the DOC's decision on remand, while the adjudication of guilt for prohibited acts *.002 (assaulting any person) and *.306 (conduct which disrupts or interferes with the security or orderly running of the correctional facility) remains, all sanctions imposed on Releasor for those disciplinary offenses are and will remain rescinded. Specifically, except for any time already served prior to the Appellate Division's July 29, 2019 Stay Order, Releasor was not, and will not, be required to serve any time in disciplinary housing as a result of those charges. The DOC further represents, and the Parties agree, that the 270 days' commutation time lost as part of disciplinary sanctions has now been restored.

## VIII.  NO RETALIATION

Releasees will not retaliate against Releasor for seeking information, requesting appropriate treatment or action related to her rights or protections under the Policy, or lodging a complaint pursuant to this Agreement, or otherwise pursuing or challenging Defendants/Releasees' compliance therewith.

## IX.  TAXES

Releasor agrees and understands that the Releasees have not made any representation to Releasor regarding the tax treatment of the sums paid pursuant to this Agreement. In the event a claim for such taxes, and/or penalties and interest, is assessed by any taxing authority, Releasor shall be solely responsible for such payment, and Releasor agrees to, and does hereby hold, the Releasees harmless and indemnify Releasees against any and all tax liability, interest and/or penalties as due thereon from Releasor.

## X.   <u>LIENS</u>

Releasor shall be solely responsible for the payment of any claims or liens that may be asserted against the proceeds of this settlement, as appropriate and required by law. In the event a claim for such payment is asserted by anyone, including Medicare and/or Medicaid, Releasor agrees to make those payments and does hereby hold the Releasees harmless and indemnify Releasees against any and all liability for same.

Releasor acknowledges that if a debt/lien is owed to the State, its agencies or departments, such debt/lien shall be deducted from the damages payment prior to its disbursement to Releasor. The holders of such liens/debts may include but are not limited to: Office of the Public Defender, the Motor Vehicle Commission, Division of Taxation, Division of Developmental Disabilities, Department of Corrections, Department of Children and Families, the Probation Division of the Administrative Office of the Courts, and the State Parole Board.

## XI.   <u>ATTORNEYS' FEES</u>

This Agreement includes all claims for attorneys' fees and costs.

## XII.   <u>NON-ASSIGNMENT</u>

Releasor acknowledges that none of the proceeds given herein have been assigned.

## XIII.   <u>CHILD SUPPORT CERTIFICATION</u>

Releasor hereby acknowledges and understands her obligation to comply with the legal requirements of N.J.S.A. 2A:17-56.23b, including, but not limited to, the requirement to perform a certified child support judgment lien search and to provide Releasees with said documentation prior to the Releasees' disbursement of the Payment. Releasor agrees that she shall direct her attorneys to perform the judgment search required by N.J.S.A. 2A:17-56.23b, and deliver a copy of the certification to Releasees' counsel. Releasor further understands and acknowledge that, (a)

no settlement funds due to Releasor under this Agreement shall be released prior to the receipt of the judgment search certification, and (b) any fees incurred, and payments made, by Releasees in connection with N.J.S.A. 2A:17-56.23b shall be deducted from the payment prior to its disbursement to Releasor.

## XIV.   DISMISSAL OF LAWSUIT

Releasor hereby authorizes and instructs her legal counsel of record to sign a Stipulation of Dismissal with Prejudice as to all claims and all Defendants named in the matter docketed as *Sonia Doe (a pseudonym) v. New Jersey Department of Corrections, et al.*, filed in the Superior Court of New Jersey, Law Division, Mercer County on August 14, 2019, Docket No. MER-L-1586-19. Releasor further authorizes her counsel to provide that signed Stipulation of Dismissal to counsel for the Defendants at the time of execution of this Release. The Stipulation of Dismissal shall be filed by counsel for Releasees upon tender of the settlement checks to Releasor's counsel.

## XV.   ENTIRE AGREEMENT

This Agreement, including exhibits, contains the sole and entire agreement between Plaintiff and Defendants and fully supersedes any and all prior agreements and understandings with respect to the subject matter of the Agreement.

Plaintiff and Defendants represent and acknowledge, in executing the Agreement, that they have not relied upon any representation or statement not set forth herein made by any other party to the Agreement or their counsel or representatives with regard to the subject matter of the Agreement.  No other promises or agreements shall be binding unless in writing and signed by the Parties hereto.

## XVI.  SEVERABILITY

The Parties agree that if any provision of the Agreement is determined by a court of competent jurisdiction to be illegal, invalid or unenforceable, that provision shall not be a part of the Agreement. The legality, validity and enforceability of the remaining provisions of the Agreement shall not be affected by a determination that a provision herein is illegal, invalid or unenforceable.

## XVII.  CHOICE OF LAW

New Jersey law shall govern the Agreement, and any action under, and/or touching upon or affecting, the terms of the Agreement, shall be brought in the Superior Court of New Jersey, Law Division, Mercer County.

## XVIII.  SIGNED AGREEMENT WITH LEGAL NAME

This Agreement may be executed and delivered in any number of counterparts, each of which, when so executed and delivered, shall constitute an original, fully enforceable counterpart for all purposes and such counterparts together shall constitute but one and the same instrument. Plaintiff/Releasor shall cause to be executed an additional copy of this Agreement containing her full legal name, which shall be notarized, and shall be maintained in the files of Defendants or their counsel as a confidential record and subject to the Consent Protective Order entered in this Litigation. However, a copy of this Agreement bearing Plaintiff's pseudonym shall become a matter of public record upon execution and approval by all Parties.  To the extent any documents are required to be executed by any of the Parties to effectuate this Agreement, each Party hereto agrees to execute and deliver such and further documents as may be required to carry out the terms of this Agreement.

The undersigned each represent and warrant that they are authorized to sign on behalf of, and to bind, the respective Parties of this Agreement. By signing, Releasor states and represents that she understands and agrees to its terms, including the terms of the release; has had sufficient opportunity to review it with counsel of her choice; and signs it knowingly and voluntarily. Releasor warrants that she is of legal age and fully competent to execute this Agreement.

**[THIS SPACE INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF,** the Parties have executed and delivered the Settlement Agreement and Release intending to be bound hereby effective as of _____June 28_____, 2021.

**SONIA DOE, a pseudonym**

**NEW JERSEY DEPARTMENT OF CORRECTIONS, VICTORIA KUHN, PATRICK NOGAN, LESLIE RUSSELL, LT. N.R., OFC. S.R., OFC. J.L., in their official capacities**

By: _____

      Michael Vomacka
      Deputy Attorney General
      New Jersey Office of the Attorney General
      *Attorney for Defendants*

**APPROVED AS TO FORM AND CONTENT**

ATTORNEYS FOR PLAINTIFF

By: _____

      Tess Borden
      American Civil Liberties Union
          of New Jersey Foundation

By: *s/ Robyn Gigl*

      Robyn Gigl
      Gluck Walrath LLP

ATTORNEY FOR DEFENDANTS

By: _____

      Michael Vomacka
      Deputy Attorney General
      New Jersey Office of the Attorney General

# Exhibit A



| NJ Department of Corrections<br>Level I / III<br>Internal Management Procedures | Internal Management Procedure<br>PCS.001.TGI.01 |
|---|---|
| | Page 1 of 11 |

| Internal Management Procedure Title: | | |
|---|---|---|
| **Transgender, Intersex and Non-Binary Inmates** | | |
| **Effective Date:**<br><br>December 15, 2019 | **Revised Effective**:<br><br>July 1, 2021 | **Authority:** NJ DOC PCS.001.008<br>**Related Authority:** Federal Prison Rape Elimination Act of 2003 (PREA) 42 U.S.C. §§15601, 28 C.F.R. § 115.86 |
| **Promulgating Office:**<br>Office of the Commissioner | | **Professional Association Standard cited:** NA |
| **Applicability**: This Level I/Level III Internal Management Procedure applies to all organizational units of the New Jersey Department of Corrections. | | |
| **Supersedes**: *PCS.001.TGI.01 dated December 15, 2019* | | |
| **Review Schedule**:<br>This document is scheduled for review on or about July 1, 2023. | | |

**This document was reviewed and approved by:**

**Victoria L. Kuhn, Esq., Acting Commissioner on June 25, 2021.**

Documentation of the reviews/approvals are maintained by the APPM Unit.

## I.    PURPOSE

To establish procedures regarding the health, safety, and dignity of transgender, intersex, and non-binary inmates in the custody of the NJDOC, including ensuring inmates' ability to live in line with their gender identity.

## II.    DEFINITIONS

The following terms, when used in this procedure, shall have the following meanings, unless the context clearly indicates otherwise:

**Cisgender** means a person whose gender assigned at birth (sometimes referred to as sex assigned at birth) matches their gender identity.  For instance, if a person was assigned female at birth, and self-identifies as a woman or girl, that person is cisgender.

**Electronic Medical Record (EMR)** means the primary healthcare record of an inmate in an electronic format that contains recorded information concerning the medical, dental and mental

| Internal Management<br>Procedure Title:<br><br>**Transgender, Intersex and<br>Non-Binary Inmates** | Effective Date:<br>**December 15, 2019**<br><br>**Revised:<br>July 1, 2021** | Internal Management<br>Procedure #<br>**PCS.001.TGI.01** |
|---|---|---|
| | | **Page 2 of 11** |

health history and related health activities of the inmate. This is the primary healthcare record of all inmates who are processed in the NJDOC system.

**Gender** means a person's sex-related or gender-related characteristics, including one's gender identity.

**Gender Expression** means a person's gender-related appearance and behavior, whether or not stereotypically associated with the person's assigned gender at birth. It is the manner in which a person represents or expresses their gender to others, such as through their behavior, clothing, hairstyles, activities, voice or mannerisms.

**Gender Identity** means a person's internal, deeply held knowledge of their own gender, regardless of the gender they were assigned at birth. All people have a gender identity, not just transgender people.

**Gender Non-Conforming** means a person whose gender expression does not conform to traditional gender expectations.

**Inmate Personal Property** means items owned by an inmate that have been approved for inmate retention while incarcerated in a correctional facility. Inmate personal property may also be property held by a correctional facility on behalf of an inmate and handled in accordance with N.J.A.C. 10A:1-11.

**Institutional PREA Compliance Manager (IPCM)** means the NJDOC staff member designated by the institutional Administrator to coordinate and supervise PREA compliance within the facility. This position will be at the level of an Assistant Superintendent or higher.

**Intersex** means a person whose sex characteristics may not fit medical definitions of male and female. These characteristics may include, but are not necessarily limited to, internal reproductive organs, external genitalia, and sex chromosomes.

**iTAG** or **IMS** means the NJDOC's computerized database used to track events of an inmate's incarceration. iTAG contains inmate sentencing information, alerts, and chronological history.

**New Jersey Department of Corrections (NJDOC)** means that agency in the Executive Branch of the New Jersey State Government whose functions are to protect the public and provide for the custody, care, discipline, training and treatment of persons committed to State correctional facilities. In this document, this is also referred to as the "Department" or the "NJDOC."

**Non-Binary** means a gender that is not exclusively male or female. The term also means those with more than one gender or with no gender at all. It is also inclusive of terms such as gender fluid, agender, bigender, or gender expansive.

**PREA** means the Federal Prison Rape Elimination Act of 2003. This act was established to provide for the analysis of the incidence and effects of prison rape in Federal, State, and local institutions and provide information, resources, and recommendations and funding to protect individuals from prison rape, sexual abuse and sexual harassment. The major provisions of

| Internal Management Procedure Title:<br><br>**Transgender, Intersex and Non-Binary Inmates** | **Effective Date:**<br>**December 15, 2019**<br><br>**Revised:**<br>**July 1, 2021** | Internal Management Procedure #<br>**PCS.001.TGI.01** |
|---|---|---|
| | | **Page 3 of 11** |

PREA include adherence to a zero-tolerance standard for the incidence of inmate sexual assault and rape, the development of standards for the detection, prevention, reduction and punishment of prison rape and the collection and dissemination of information on the incidence of prison rape.

**PREA Accommodation Committee (PAC)** means the sub-committee of the Sexual Assault Advisory Council responsible for making individualized determinations about transgender, intersex, or non-binary inmates' privacy, housing, and programming assignments.

**PREA Agency Coordinator** means the NJDOC staff member designated by the NJDOC Commissioner to coordinate and guide agency and individual facility implementation of a zero-tolerance approach to preventing, detecting and responding to sexual abuse and sexual harassment.

**PREA Standards** means written rules that require all correctional facilities to comply with minimum acceptable benchmarks in order to reduce and eliminate the incidence of prison rape. These directions are directed toward the states by the federal government, as published in 28 CFR Part 115.

**Sexual Assault Advisory Council** means the NJDOC committee that establishes guidelines and standards and works to support those guidelines and standards for the prevention, detection, protection, and elimination of prison rape within the NJDOC (referred to as "Council" in this policy).

**Sexual Orientation** means a person's romantic or sexual attraction to people of another and/or the same gender. Common terms used to describe sexual orientation include, but are not limited to, straight, lesbian, gay, bisexual, and asexual. Sexual orientation and gender identity are different: gender identity refers to one's internal knowledge of their gender, while sexual orientation refers to whom one is attracted to.

**Transgender** means people whose gender identity and/or expression is different from cultural expectations based on the gender they were assigned at birth.  Being transgender does not imply any specific sexual orientation.  Therefore, transgender people may identify as straight, gay, lesbian, bisexual, etc.  This term is an adjective.  Using this term as a verb (i.e., transgendered) or noun (i.e., transgenders) is offensive and should be avoided.

## III.    POLICY

It is the policy of the NJDOC to address the needs of transgender, intersex, and non-binary inmates in a manner consistent with federal Prison Rape Elimination Act (PREA) standards, the New Jersey Law Against Discrimination (NJLAD), and in accordance with departmental regulations, policies and procedures.

Once the NJDOC learns and confirms an inmate's gender identity, using the procedures laid out in this document, it shall determine the inmate's facility and housing unit assignment, with a presumption that the inmate will be housed in line with their gender identity. The PREA Accommodation Committee (PAC) may deviate from the presumptive placement after an

| Internal Management<br>Procedure Title:<br><br>**Transgender, Intersex and<br>Non-Binary Inmates** | **Effective Date:**<br>**December 15, 2019**<br><br>**Revised:**<br>**July 1, 2021** | Internal Management<br>Procedure #<br>**PCS.001.TGI.01** |
|---|---|---|
| | | **Page 4 of 11** |

individualized determination and upon written certification that the placement would jeopardize the inmate's health and safety. When making such determinations, the inmate's own views with respect to their safety shall be given serious consideration.

## IV.  PROCEDURES

### A.  Identifying Inmates' Gender Identity

1. Inmates are able to provide information to NJDOC about their gender identity at any time during their incarceration at NJDOC. This includes, but is not limited to, initial reception, facility intake, and intra-institutional transfer or at any time during their incarceration.

2. While court documents are the documents of record for identification and reception purposes at NJDOC, these may be supplemented by other sources or records that indicate an inmate's gender identity, intersex, and/or non-binary status, of which NJDOC may receive notice.

3. Upon initial reception/intake at NJDOC, as part of the PREA Risk Assessment, and through communication with NJDOC including but not limited to communication with Medical, Social Services, or Administration, inmates shall have the opportunity to inform the NJDOC that they are transgender, intersex, or non-binary.   At any time during their incarceration, inmates may identify as transgender, intersex, or non-binary or otherwise provide information about their gender identity.

4. Inmates identified as transgender, intersex, or non-binary, including those who self-identify, will be referred to the Institutional PREA Compliance Manager (IPCM).

5. Within three business days of notification, the facility IPCM shall confidentially meet with the inmate. During this meeting, the inmate will be afforded the opportunity to express their own views with respect to safety and housing and will be notified of the rights and accommodations available to them under PREA and under this Policy, including referral to the relevant section of inmate handbook or other written summary. The inmate will complete the PREA Accommodation Committee (PAC) *Gender Identity Information form*.

6. The IPCM will contact the Central Office PREA Compliance Unit to schedule a PAC housing/program review in accordance with Part IV.B. below.

7. In addition to information provided by the IPCM, the inmate handbook for each facility will contain a statement providing inmates with information on how to exercise their rights under this policy, including but not limited to how an inmate may request a meeting with the IPCM, and how to request housing in line with the inmate's gender identity.

| Internal Management Procedure Title: | Effective Date: | Internal Management Procedure # |
|---|---|---|
| | **December 15, 2019** | **PCS.001.TGI.01** |
| **Transgender, Intersex and Non-Binary Inmates** | **Revised:** **July 1, 2021** | |
| | | **Page 5 of 11** |

8. Transgender, intersex, or non-binary inmates will be housed in single cell status until final housing and programming assignments are made in accordance with Part IV.B below.  However, single cell status as used in this paragraph shall not mean isolation or restrictive housing.  This paragraph shall not prevent an inmate from requesting and being provided voluntary protective custody until the final housing and programmatic assignments are made if the inmate feels unsafe in their current placement.

**B. Housing and Classification Reviews**

1. The NJDOC considers whether the particular placement would present management or security problems in all housing and programmatic assignments. This consideration will be applied equally to all inmates, regardless of their sex or gender identity, and may justify a deviation from an inmate's presumptive placement in line with gender identity for cisgender, transgender, intersex, and non-binary inmates alike.  Although this consideration therefore applies to Part IV.B of this document, under no circumstances will a transgender, intersex, or non-binary inmate's placement in line with their gender identity be considered a management or security problem solely due to their gender identity.

2. Once the NJDOC learns and confirms the gender identity of an inmate using the procedures laid out in this document, it shall determine the inmate's facility and housing unit assignment, with a presumption that the inmate will be housed in line with their gender identity. The PREA Accommodation Committee (PAC) may deviate from the presumptive placement after an individualized determination and upon written certification that the placement would jeopardize the inmate's health and safety.

   a. In some cases, NJDOC may learn and confirm that an inmate's gender identity is neither male nor female. In such cases, inmates shall be housed in the most appropriate placement, taking into consideration whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems. The inmate's own views with respect to their safety shall be given serious consideration.

3. In deciding transgender inmates' precise housing and programming assignments, pursuant to PREA Standard 115.42 (b-e), the NJDOC makes individualized determinations about how to ensure the safety of each inmate, and considers on a case-by-case basis whether a particular placement would ensure the inmate's health and safety.  When determining such assignments, the transgender inmate's views with respect to their safety shall be given serious consideration. At all times, the facility assignment will be in compliance with Parts IV.B.1-2 of this document.

4. A transgender, intersex, or non-binary inmate's housing assignment will be reviewed by the PREA Accommodation Committee (PAC) as follows:

| Internal Management Procedure Title:<br><br>**Transgender, Intersex and Non-Binary Inmates** | **Effective Date:**<br>**December 15, 2019**<br><br>**Revised:**<br>**July 1, 2021** | Internal Management<br>Procedure #<br>**PCS.001.TGI.01** |
|---|---|---|
| | | **Page 6 of 11** |

a. At all times, the PAC will ensure that the inmate's facility assignment complies with Parts IV.B.1-2 of this document. If the PAC has a substantiated, credible, and non-discriminatory basis for believing that an inmate is not sincere in their assertion of their gender identity and is asserting it for an improper purpose, the PAC may ask further questions to better understand the inmate's identity and offer the inmate a fair opportunity to present additional information. The PAC must make a written record of the basis for its belief, which shall be included in the inmate's classification file and available to the inmate should they challenge the PAC's decision pursuant to Part IV.B.3(e) or other procedures.

b. Because multiple classifications and placements exist for male inmates within male facilities and female inmates within female facilities, in deciding the specific placement for a particular inmate, the PAC will consider:

    i. All aspects of an inmate's social and medical transition when formulating recommendations to address safety and privacy concerns, including factors such as behavioral history, institutional adjustment, overall demeanor, and likely interactions with other inmates; and the inmate's own views with respect to safety.

    ii. Whether a placement would threaten the orderly operation, management and security of the correctional facility and/or pose a risk to other inmates in the facility (e.g., considering inmates with histories of trauma, privacy concerns, etc.). This consideration will be applied equally to all inmates, regardless of their gender identity.

    iii. The following factors on a case-by-case basis:

        1. The Gender Identity Information Form, if completed;
        2. custody level and sentencing information;
        3. criminal history;
        4. institutional disciplinary history;
        5. current gender expression;
        6. the inmate's own views regarding safety;
        7. medical and mental health needs/information/status;
        8. compliance with medically recommended treatments;
        9. vulnerability to sexual victimization;
       10. likelihood of perpetrating sexual abuse;
       11. facility-specific factors including physical layouts; and
       12. any other relevant information.

| Internal Management Procedure Title:<br><br>**Transgender, Intersex and Non-Binary Inmates** | **Effective Date:**<br>**December 15, 2019**<br><br>**Revised:**<br>**July 1, 2021** | Internal Management Procedure #<br>**PCS.001.TGI.01** |
|---|---|---|
| | | **Page 7 of 11** |

These factors are also considered on a case-by-case basis in deciding the specific placement for a cisgender inmate.

    iv.    The considerations outlined in Part IV.B.3(b)(i) through (iii) shall not apply to decisions to place a transgender inmate in a facility in line with their gender identity.

    c.    The transgender, intersex, or non-binary inmate shall be afforded the opportunity to attend the PAC meeting unless contraindications exist or they choose not to attend. The inmate's presence is not required. If the inmate refuses to meet with the IPCM or PAC, the PAC shall convene, as required, and complete the review based upon available information. If contraindications exist and prevent attendance, the PAC must make a written record of the contraindications and the reasons they prevent attendance, which shall be included in the inmate's classification file and available to the inmate should they challenge the PAC's decision pursuant to Part IV.B.4(e) or other procedures.

    d.    The PAC will make a decision regarding housing within 14 business days. The inmate will be notified in writing of the PAC's decision, which shall include a written statement of reasons, via the classification meeting process as denoted in NJAC 10A:9. The decision will be recorded in the inmate's classification meeting notes.

    e.    If the inmate disagrees with the decision of the PAC, they may submit an appeal to the Commissioner, or the Commissioner's designee, who will render a final decision, which shall include a written statement of reasons, and notify the inmate within 14 business days.  Upon request by the inmate, the full record of the decision-making of the PAC and Commissioner, or Commissioner's designee, shall be made available to the inmate within 7 business days.  If any items cannot be disclosed to the inmate because of confidentiality, the inmate shall be informed why such items are confidential.

    f.    The procedures outlined in Part IV.B.3 shall apply regardless of when NJDOC learns an inmate is transgender, intersex, or non-binary, whether at intake or after a significant period of NJDOC custody.  Inmates may request, via the IPCM or Administration staff, a review by the PAC pursuant to Part IV.B.3 if they believe their current placement does not align with their gender identity and considerations enumerated in this section.

5.    The housing assignment/transfer of inmates approved to be housed in a different facility due to their gender identity will be handled in accordance with all applicable operational policies and procedures and the provisions set forth in N.J.A.C. 10A.

| Internal Management Procedure Title:<br><br>**Transgender, Intersex and Non-Binary Inmates** | **Effective Date:<br>December 15, 2019**<br><br>**Revised:<br>July 1, 2021** | Internal Management Procedure #<br>**PCS.001.TGI.01** |
|---|---|---|
| | | **Page 8 of 11** |

6. In keeping with PREA standard 115.42, the particular placement of a transgender, intersex, or non-binary inmate shall be reassessed by the IPCM and supplemental staff as deemed appropriate by the facility Administrator, or the Administrator's designee, at least twice each year.

7. An Administrator, or Administrator's designee, who receives an inmate at a facility consistent with the inmate's gender identity may request an immediate review when significant adjustment issues emerge, or upon the request to return to the previous facility. The Administrator shall make this request through the PAC. The Administrator, or administrator's designee, shall provide a written description of the significant adjustment issues and reasons for the request, which shall be included in the inmate's classification file and available to the inmate should they challenge the PAC's decision pursuant to Part IV.B.3(e) or other procedure.

8. In accordance with PREA standards, all transgender, intersex, and non-binary inmates will receive an in-person review every six months to assess the inmate's institutional adjustment and safety. The PREA Compliance Manager will meet with the inmate prior to this review and complete the ***Gender Identity Information Reassessment form.*** This form will be maintained by the IPCM. A record of these reviews will be recorded and maintained in the inmate's iTAG Progress Notes.

9. In keeping with PREA standard 115.42, NJDOC shall not place transgender, intersex, or non-binary inmates in dedicated facilities, units, or wings solely on the basis of such identification or status.

**C. Respect and Confidentiality Responsibilities**

1. Staff shall not harass or discriminate against any inmate based on their actual or perceived gender identity. Unprofessional and derogatory references towards any inmate is not acceptable under any circumstances.

2. Like all other NJDOC inmates, transgender, intersex, and gender non-binary inmates shall be referred to in a gender-neutral form of address (e.g., by the legal last name or "Inmate" last name). However, if staff are using gender-specific pronouns, and/or honorifics (Mr., Ms., Mx. or any other used by the inmate) to refer to an inmate, they must use the pronouns and honorifics associated with that inmate's gender identity. Intentional and repeated misuse of gender pronouns or titles is prohibited.  The name entered on the inmate's Judgment of Conviction/Commitment Order and court documents will remain the official committed name for all departmental records (incident reports, progress reviews, sentence calculations, etc.). However, any additional names or aliases can be entered into ITAG as appropriate.

3. With respect to requests by inmates for legal name changes or to change gender markers on their official legal forms of identification, NJDOC has no authority over

| Internal Management Procedure Title:<br><br>**Transgender, Intersex and Non-Binary Inmates** | **Effective Date:**<br>**December 15, 2019**<br><br>**Revised:**<br>**July 1, 2021** | Internal Management Procedure #<br>**PCS.001.TGI.01** |
|---|---|---|
| | | **Page 9 of 11** |

such procedures and such requests shall be processed in accordance with the governing agency's procedures and in accordance with applicable state law.

4. Staff shall only share information regarding transgender, intersex or non-binary status for purposes of risk assessment, classification, or housing placement, medical and mental health care, programming placement, and any other reason that could affect the safety and security of the inmate and/or of the correctional facility.

5. Any references to an inmate's transgender, intersex, or non-binary status shall be redacted from non-medical reports prior to issuance, to include any OPRA requests.

### D. Medical Treatment

1. Medical/mental health treatment of transgender, intersex, and non-binary inmates, including but not limited to medically appropriate gender-affirming care, will be provided as medically necessary in accordance with procedures determined by the Department's health care provider.

2. Staff shall not handle an inmate's request for medical attention with any less urgency or respect because of that inmate's actual or perceived gender identity or gender expression.

### E. Privacy and Searches

1. Pursuant to PREA Standard 115.15, transgender, intersex, and non-binary inmates shall be given the opportunity to shower separately from other inmates.

2. Pursuant to PREA Standards, Staff shall conduct searches of inmates, including transgender, intersex, or non-binary inmates, in a professional and respectful manner, and in the least intrusive manner possible, consistent with security needs. Search procedures for all inmates are delineated in *Internal Management Procedure CUS.001.SEA.01 Searches of Inmates and Correctional Facilities*.

In line with N.J.A.C. 10A:3-5.7, strip searches shall be conducted by staff of the same gender identity as the inmate, except under emergent conditions as ordered by the Administrator, Associate Administrator, Assistant Superintendent or the highest ranking custody supervisor on duty.  In line with PREA Standard 115.15, pat-downs of female inmates, including cisgender and transgender women, shall be conducted by staff of the same gender identity as the inmate, except under emergent conditions as ordered by the Administrator, Associate Administrator, Assistant Superintendent or the highest ranking custody supervisor on duty.

3. Staff shall not search or physically examine a transgender, intersex, or non-binary inmate for the sole purpose of determining the inmate's genital status.

| Internal Management Procedure Title:<br><br>**Transgender, Intersex and Non-Binary Inmates** | **Effective Date:**<br>**December 15, 2019**<br><br>**Revised:**<br>**July 1, 2021** | Internal Management Procedure #<br>**PCS.001.TGI.01** |
|---|---|---|
| | | **Page 10 of 11** |

### F. Personal Property

1. Inmates identified as transgender, intersex, or non-binary shall be issued, allowed to purchase, and allowed to retain undergarments, clothing, and other personal property in line with their gender identity, subject to the requirements of Part IV.E.2, regardless of which facility they are in and consistent with their custody status.

2. Inmates will be informed of their ability to obtain gender-specific personal property as outlined in the *Gender Identity Information form*, regardless of housing assignment. For transgender, intersex, or non-binary inmates housed in line with their gender assigned at birth, but nevertheless in compliance with Parts IV.B.1-2 of this Policy:

   a. Any such gender-specific personal property requests will be processed by the institutional PREA Compliance Manager and reviewed by the facility Administrator, or the Administrator's designee, and Operations Director for safety and security purposes prior to approval.

   b. The facility Administrator, or the Administrator's designee, will coordinate having the appropriate number of approved items sent to the facility for purchase/distribution to the inmate. Retention amounts of these items shall be in accordance with *Policy Statement IMM.010.001 Basic Inmate Clothing Issues, Bedding and Linen* and its associated Internal Management Procedures.

| Internal Management Procedure Title:<br><br>**Transgender, Intersex and Non-Binary Inmates** | Effective Date:<br>**December 15, 2019**<br><br>**Revised:**<br>**July 1, 2021** | Internal Management Procedure #<br>**PCS.001.TGI.01** |
|---|---|---|
| | | **Page 11 of 11** |

## V. CROSS REFERENCE DOCUMENTS AND POLICIES

| Document/Policy Number | Title | Effective - Revision Date |
|---|---|---|
| PCS.001.008 | PREA Compliance | April 2020 |
| IMM.001.004 | Zero Tolerance Policy:  Sexual Assault | April 2019 revised |
| CLS.005.001 | Review of inmates by Classification and Review Committees | January 2019 revised |
| CUS.001.011 | Searches of Inmates and Correctional Facilities | September 2020 revised |
| IMM.009.001 | Inmate Personal Property | June 2007 |
| IMM.010.001 | Inmate Clothing Issues, Bedding and Linens | September 2009 |
| CUS.001.SEA.001 | Searches of Inmates and Correctional Facilities | August 2020 revised |
| MED.MHS.001.001 | Access to Mental Health Services | January 2021 revised |
| MED.IMA.001 | Health Appraisals at Reception | February 2021 revised |
| MED.IMA.005 | Intersystem Transfers | February 2021 revised |

## VI.   APPLICABLE FORMS

| Form Number | Form Title | Effective/ Revision Date |
|---|---|---|
| | Consolidated Gender Identity Information Form | Pending |
| | | |
| | | |