IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JANIAH MONROE,[1]
MARILYN MELENDEZ,
LYDIA HELÉNA VISION,
SORA KUYKENDALL, and
SASHA REED, individually and on
behalf of a class of similarly situated
individuals,

        Plaintiffs,

v.

STEVE MEEKS,
MELVIN HINTON, and
ROB JEFFREYS,

        Defendants.

Case No. 3:18-CV-00156-NJR

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Pursuant to Federal Rule of Civil Procedure 53 and 18 U.S.C. § 3626, the Court gives notice to the parties of its intent to appoint a Special Master/Monitor (hereinafter "Monitor")[2] to oversee Defendants' compliance with the Court's Preliminary Injunctions (Docs. 212, 332, 336), implementation of the Illinois Department of Corrections' April 2021 revised Administrative Directives regarding transgender prisoners, and to assess and advise the Court and the parties whether further revisions of Illinois Department of Corrections ("IDOC") policies and Administrative Directives are necessary in order to

---

[1] The named Plaintiffs, and many members of the Plaintiff class, use chosen names reflecting their gender identity rather than their given names at birth. Throughout this Order, the Court refers to each Plaintiff by their chosen name, which may not match the name in IDOC records.
[2] *See* 18 U.S.C. § 3626(g)(8).

remedy the unconstitutional treatment of transgender prisoners in IDOC facilities. *See* FED. R. CIV. P. 53(b)(1).

The Plaintiff class consists of all prisoners in the custody of IDOC who have requested evaluation or treatment for gender dysphoria. (Doc. 213). Approximately 130 individuals have been identified as belonging to the class.

The Court's initial preliminary injunction of December 19, 2019 (Docs. 186, 187, amended on March 4, 2020 at Doc. 212) ordered Defendants to make and implement several policy changes and conduct staff training to provide constitutionally adequate evaluation and medical treatment of class members by qualified professionals, and medically necessary social transitioning for inmates with gender dysphoria. (Doc. 212).

After a bench trial in August 2021, the Court found that Defendants had not accomplished what the preliminary injunction ordered them to do over 19 months earlier, and IDOC's new Administrative Directives adopted in April 2021 in response to the December 2019 injunction had not been fully implemented and had not resulted in improved treatment and care of class members. (Doc. 331, p. 6). In sum, the Court concluded that despite some progress, serious violations of the Eighth Amendment are ongoing. The Court continued the first preliminary injunction (Doc. 212) and ordered additional injunctive relief. (Docs. 331, 332, corrected at Doc. 336).

The August 9, 2021 preliminary injunction, among other requirements, set timelines for Defendants to complete blood tests for class members on hormone therapy, to adjust their medication where indicated and conduct regular testing, and to monitor blood levels of potassium, creatinine, prolactin, and hemoglobin/hematocrit and give

treatment as medically indicated. Class members who have requested gender affirming surgery and who have appropriate hormone levels were to be evaluated for surgery within 120 days, in chronological order according to the date the inmate originally requested surgery. Transfer requests were likewise to be evaluated in chronological order by that 120-day deadline, which fell on December 7, 2021. Defendants were ordered to file under seal—within 60 days—a report on each class member's hormone levels, status of any transfer request, and status of any request for surgery. (Doc. 331, p. 13).

Gender affirming commissary items were to be made immediately available and transgender inmates must immediately have access to a private shower.[3] Medical and mental health treating professionals must have completed WPATH[4] training in order to treat class members. Within 120 days of the order, Defendants were to finalize contracts for outside surgical and hair removal services, as well as finalize and implement training and certain policies/programs relating to transgender inmates. (Doc. 331, pp. 12-13; Doc. 332, pp. 3-4).

The parties have now submitted post-trial briefing (Docs. 335, 346), Defendants have filed their 60-Day Status Report (Sealed Doc. 357), and Plaintiffs have responded to the Status Report (Sealed Doc. 359). On December 8, 2021, Defendants filed a 120-Day Status Report outlining progress toward completion of the action items due by that deadline. (Doc. 369).

---

[3] The 30-day and 60-day status reports indicate Defendants have not fully complied with the commissary and private shower directives. (Doc. 351; Doc. 359, p. 8).
[4] World Professional Association for Transgender Health.

Plaintiffs' Post-Trial Brief (Doc. 355) presents cogent arguments for the appointment of a Monitor, noting that IDOC had not adequately responded to the Court's December 2019 injunction, the revised Administrative Directive had not been implemented and is not being fully followed by staff, and Defendants' witnesses admitted that they need but had not drafted—let alone implemented—a quality assurance program to ensure that medical and mental health practitioners are providing adequate care to class members and are following IDOC's written policies. (Doc. 355, pp. 20-28). Defendants oppose the appointment of a Monitor but are willing to consider some of Plaintiffs' proposals on policy changes. (Doc. 346).

In January 2021, when the Court denied Plaintiffs' Renewed Request for Appointment of an Independent Monitor, the Court accepted Defendants' assurances of their progress toward meeting the requirements of the initial December 2019 preliminary injunction, despite some reservations about their compliance. (Doc. 246). The August 2021 trial testimony demonstrated, however, that Defendants had not made or implemented the changes necessary to comply with the December 2019 injunction, despite having an additional eight months to do so. This record underscores the need for a Monitor to provide more intensive and regular oversight of Defendants' actions to comply with the Court's Orders of December 2019 and August 2021.

The 120-Day Status Report demonstrates progress, but also reveals that Defendants have not fully implemented the requirements of the August 2021 order. For example, IDOC will deploy five body scanners "to ensure no cross-gender searches occur." (Doc. 369; Doc. 369-1). While these units should reduce the incidence of cross-

gender body searches, the scanners will be placed in only five prisons (Stateville, Logan, Pontiac, Lawrence, and Menard), which together house approximately 60 transgender prisoners, according to Defendants' report filed in October 2021.[5] (Sealed Doc. 357). Approximately 90 members of the Plaintiff class are housed in 15 other prisons which will not receive the scanners. *Id.* Defendants' 120-day report does not address what steps will be taken to *ensure* that class members' choice of gender of the officer conducting a body search will be honored in prisons that do not have a body scanner, in the event of a breakdown of the scanner, or when officials determine that a physical strip search or body cavity search is necessary.[6] And it is unclear when the units will be installed and operational.

Based on the briefing and in particular the voluminous material in Defendants' 60-Day Status Report (Sealed Doc. 357), the Court concludes that the post-trial remedial phase of this matter is sufficiently complex to exceed the Court's ability to effectively and timely evaluate the records to determine whether Defendants are making adequate progress toward compliance with the Court's orders. Defendants' 60-day report includes approximately 1,700 pages of documents regarding individual inmates' hormone treatment, laboratory test results and other medical/mental health records, and

---

[5] Of these five prisons, Stateville does not house any transgender prisoners, according to Defendants. (Sealed Doc. 357, p. 73).

[6] The Court acknowledges that Defendants report they have finalized and implemented a transgender identification policy, which will memorialize a prisoner's gender identification change and preference for gender of the officer conducting a search in the IDOC prisoner tracker (Offender360). (Doc. 369-9). The gender identity status may or may not be displayed on the individual's ID card. No information has yet been provided regarding how this new system is operating "on the ground" regarding body searches in the institutions housing transgender prisoners.

committee records on surgery and transfer requests. Plaintiffs point out that these documents omit significant information that is necessary to determine, for example, whether Defendants are taking sufficient steps to ensure that class members' hormone treatment is achieving therapeutic levels, or whether endocrinology referrals are proceeding for the numerous class members who have elevated prolactin levels. (Doc. 359). IDOC has completed evaluations of Plaintiff class members who have requested gender-affirming surgery and transfers, but this process will be ongoing for those whose requests were denied. The new Continuing Quality Improvement tool, PRISM project, and training programs represent progress (Doc. 369, pp. 3-5), but Defendants' past track record on implementation of policy revisions raises concern over when and how effectively these changes will be fully put into practice to produce tangible results and improve conditions for the Plaintiff class. And by Defendants' own description, these changes are still in the beginning stages and not fully implemented.

The Court does not possess the resources or expertise to effectively and timely evaluate this complex material or the additional information that will be required to monitor compliance with the ordered injunctive relief, including implementation of new policies, procedures, and programs, and concludes the appointment of a Monitor is warranted. *See* 18 U.S.C. § 3626(f)(1)(B); Fed. R. Civ. P. 53(a)(1)(C).

The parties' briefs indicate that with continued effort, the parties may be able to agree on meaningful revisions to policies and procedures that will result in improved care and conditions for the Plaintiff class while addressing concerns raised by both sides. In addition to monitoring compliance with the specific directives in the Court's Orders,

the Monitor will assist the parties in the development of remedial plans to achieve compliance with the Court's Orders, to include modifications of IDOC's policies and procedures regarding medical and mental health treatment, social transition, and related accommodations for the Plaintiff class. *See* 18 U.S.C. § 3626(f)(6)(C); Docs. 212, 332, 336).

### I. Duties of Monitor

#### A. Treatment for Gender Dysphoria — Hormone Therapy

The Monitor will review IDOC's records relating to Plaintiff class members' hormone therapy, including blood tests for hormone levels and levels of other substances monitored for safety and efficacy of hormone treatment, to assess whether Defendants are conducting blood tests at the intervals ordered in the Preliminary Injunction (at least every three months for persons whose hormone levels were not within range or who just started hormone therapy; and at least yearly for those whose hormone levels were previously within range) (see Docs. 332, 336) and whether Defendants are responding promptly and appropriately to those test results by titrating hormone dosages to reach the appropriate ranges set for the by the Endocrine Society Hormone Guidelines,[7] and by providing treatment/testing for any class members whose tests show blood levels of prolactin, potassium, creatinine (for transgender women), or hemoglobin/hematocrit (for transgender men) that indicate medical intervention is appropriate.[8]

The Monitor shall assess whether Defendants are ensuring that all medical and

---

[7] The Endocrine Society Hormone Guidelines set these blood level ranges for persons on hormone therapy: for transgender females, testosterone of less than 50 nanograms/deciliter and estradiol between 100-200 picograms/milliliter; for transgender males, testosterone levels between 400-600 nanograms/deciliter. (Doc. 336).

[8] For example, an endocrinology referral and/or MRI test for elevated prolactin levels.

mental health treatment of Plaintiff class members is rendered only by medical/mental health professionals who have taken WPATH training and are committed to continuing education on issues of transgender health, that class members have access to clinicians who meet the competency requirements stated in the WPATH Standards of Care to treat gender dysphoria, and that inmates are allowed to obtain evaluations for gender dysphoria upon request or clinical indications of the condition. The Monitor shall assess whether Defendants are ensuring that decisions about treatment for gender dysphoria are made by medical professionals who are qualified to treat gender dysphoria, and that providers who hold personal or religious beliefs that prohibit their treatment of inmates with gender dysphoria have no contact with any member of the Plaintiff class. (Docs. 212, 332).

Defendants shall provide the Monitor and Plaintiffs' counsel with all medical/mental health records, reports, documents, data, and other information necessary to conduct this monitoring, beginning with the materials filed under seal at Doc. 357, to be supplemented at intervals of at least every three months or as determined by the Monitor. Plaintiffs shall provide the Monitor with their responsive materials filed under seal at Doc. 359. Medical/mental health information on Plaintiff class members that is filed with the Court shall be filed under seal. Plaintiffs' counsel shall keep this material obtained from Defendants confidential (except that information on a particular individual may be disclosed to that person only) and use it in this matter only.

The Monitor shall inform the Court and the parties whether Defendants are in compliance, partial compliance, or not in compliance with the ordered injunctive relief,

at the intervals set forth below and at such additional times as the Monitor finds necessary.

### B. Treatment for Gender Dysphoria—Gender Affirming Surgery

The Monitor will review IDOC's records relating to Plaintiff class members' requests for gender affirming surgery and assess whether Defendants are in compliance with the ordered injunctive relief. (Doc. 332). Defendants were ordered to evaluate requests for gender affirming surgery from class members whose hormone levels were within the appropriate range, by December 7, 2021, in chronological order of the inmate's original surgery request; to provide written notification of the decision and explanation of the reasons for any denial; and where denied, to inform the inmate of a timeframe to request another evaluation. Defendants shall provide the Monitor and Plaintiffs' counsel with all records, reports, documents, data, and other information necessary to conduct this monitoring. The Monitor shall inform the Court and the parties whether Defendants are in compliance.

For any class members whose requests for surgery have been denied, Defendants shall inform the Monitor, the Court, and Plaintiffs' counsel of the date when each inmate originally requested surgery, the reasons for the denials, and the timeline when the inmates may request another evaluation.

The Monitor shall oversee the implementation of Defendants' contracts, arrangements, programs, and standards as follows: Contract with Wexford to provide hair removal services to Plaintiff class members; contract/arrangement with Dr.

Schechter[9] to provide gender affirming surgery to Plaintiff class members whose surgery requests are approved; implementation of the CQI (Continuing Quality Improvement) program for transgender care; and implementation of IDOC's written surgical standards for transgender care. (Doc. 332, pp. 3-4). The Monitor shall assess and report to the Court and the parties whether surgery and related treatment is being provided to class members in a timely manner relative to inmates' requests.

### C. Transfers and PRISM Project

The Monitor will review IDOC's records relating to Plaintiff class members' requests for transfer to a facility matching his or her expressed gender (female facility for transgender women, male facility for transgender men) and assess whether Defendants have complied with the ordered injunctive relief. (Doc. 332). Defendants were ordered to evaluate class members' transfer requests by December 7, 2021, in chronological order of the inmate's original transfer request, to provide the inmate with written explanation of each reason for any denial, and to allow the inmate to request another evaluation for transfer within 180 days after a denial. Defendants were also ordered to immediately ensure that transgender inmates who remain in institutions not matching their expressed gender are allowed access to a private shower. (Doc. 332). Defendants shall provide the Monitor and Plaintiffs' counsel with all records, reports, documents, data, and other information necessary to conduct this monitoring. The Monitor shall inform the Court

---

[9] The Court accepts Defendants' clarification that no contract is necessary for Dr. Schechter to provide gender affirming surgery to class members; he will perform such surgery as individual patients are referred, at IDOC expense. IDOC did contract with Dr. Schechter to provide expert surgical consulting to IDOC providers and education to class members regarding gender affirming surgery. (Doc. 369, p. 3).

and the parties whether Defendants are in compliance with the ordered relief.

For any class members whose transfer requests have been denied, Defendants shall inform the Monitor, the Court, and Plaintiffs' counsel of the date when each inmate originally requested transfer, the date of denial and reasons for the denial, and whether the inmate has been informed of the timeline when he or she may renew the transfer request.

Defendants report they finalized the PRISM project (the special population program) at Centralia Correctional Center by the deadline of December 7, 2021, but its implementation is ongoing. The Monitor shall assess and report to the Court and the parties regarding Defendants' continued implementation of the PRISM program, which involves additional inmate transfers, staff training, and may include up to 100 inmate participants. (Doc. 332; Doc. 326, pp. 640, 648-49, 651; Doc. 369, pp. 3-4; Doc. 369-6).

### D. Gender Affirming Commissary Items

On August 9, 2021, Defendants were ordered to immediately provide class members with access to all approved gender affirming items (clothing and personal care/hygiene items) in the commissary at each class member's institution, and to immediately provide class members with a list of available gender affirming items. Defendants' 30-day report to the Court indicated that not all commissary items were yet available at each institution. (Doc. 332; Doc. 351). Defendants shall provide to the Monitor and to Plaintiffs' counsel the list of gender affirming items available at each institution housing class members. The Monitor shall assess whether Defendants have complied with the ordered relief and report any noncompliance to the parties and to the Court.

### E. Cross-Gender Searches and Transgender Identification Policy

Defendants were ordered to allow Plaintiff class members to choose the gender of the correctional officer who will conduct a search of their person, and the search must be conducted by an officer of the gender requested. (Doc. 332). Defendants were also ordered to finalize and implement IDOC's transgender identification policy by December 7, 2021; they report they have done so. (Doc. 369, p. 5; Doc. 369-9). The Monitor will assess whether Defendants have developed and implemented policies and staff training to ensure that class members are not being subjected to cross-gender searches, and whether Defendants' new transgender identification policy ensures that staff can verify an inmate's transgender status without endangering the inmate by revealing the transgender status to others if the inmate does not want such status revealed. Defendants shall provide the Monitor and Plaintiffs' counsel with any documents/records/data necessary for the Monitor to conduct this assessment, and Defendants shall permit the Monitor to access correctional facilities and speak to staff and inmates as part of this assessment, upon at least 48 hours' prior notice to Defendants' counsel. The Monitor shall report any noncompliance to the parties and to the Court.

### F. Training

Defendants were ordered to finalize and implement additional and ongoing training for *all* correctional staff on transgender issues and awareness, including the harm caused by misgendering and harassment, and to finalize and implement training for inmates and staff at Logan Correctional Center regarding incoming/transferred transgender inmates, by December 7, 2021. (Doc. 332). Defendants report they have

contracted with an outside group (Queer Works) to provide staff training to all IDOC employees, which must be completed by March 30, 2022, and to conduct training for prisoners at Logan Correctional Center (the women's facility where a number of transgender women are housed). (Doc 369, p. 4; Doc. 369-7). Another contractor (The Moss Group) will provide future trainings on transgender issues at Logan and in IDOC's male prisons. (Doc. 369, p. 4; Doc. 369-8). The Monitor shall review the ongoing implementation of this training to assess whether Defendants are in compliance and report any noncompliance to the parties and to the Court. Defendants shall provide the Monitor and Plaintiffs' counsel with any documents/records/data necessary for the Monitor to conduct this assessment, and Defendants shall permit the Monitor to access correctional facilities and speak to staff and inmates as part of this assessment, upon at least 48 hours' prior notice to Defendants' counsel.

### G. Reporting and Facilitation

For any component of the ordered injunctive relief detailed above, if the Monitor concludes that Defendants are not in compliance, the Monitor shall report such finding to the parties and to the Court, within **14 days** of such finding. Either party shall have **14 days** in which to respond to a report of the Monitor.

The Monitor shall make an initial report to the Court and the parties indicating Defendants' compliance, partial compliance, or noncompliance with each of the components listed above within **90 days** of the Monitor's appointment. Thereafter, the Monitor shall submit follow-up reports at intervals to be determined by the Court, which shall address the identified areas of Defendants' partial compliance or noncompliance.

Either party shall have **30 days** in which to respond to a report.

The Monitor shall assist and facilitate the parties' efforts to develop remedial plans, which may include further revisions/modifications to IDOC's Administrative Directives, policies and procedures regarding medical and mental health treatment for transgender prisoners including hormone therapy, surgery and related treatment; social transition including placement/transfer considerations; and other policies affecting class members in order to ensure Defendants' compliance with the ordered injunctive relief. (See Post-Trial Briefs, Docs. 335, 346, and attachments). At the Monitor's discretion, the Monitor may arrange and facilitate conferences which the parties' counsel shall attend, and which Defendants and/or identified IDOC staff members shall attend as directed by the Monitor, in order to achieve timely compliance with the Court's Orders and to assist in developing policies/procedures to ensure ongoing compliance.

### II. Selection of Monitor

The Monitor shall be independent, impartial, and knowledgeable about the management and oversight of correctional medical and mental health programs. Each party shall submit names of candidates for appointment as Monitor as set forth below; the Court will then select the Monitor unless the parties jointly agree on an individual to serve as Monitor.

### III. Compensation of Monitor

The Monitor shall be compensated from the Court's appropriated funds at a rate not to exceed the hourly rate established under 18 U.S.C. § 3006A for payment of court-appointed counsel (currently $155), plus costs reasonably incurred by the Monitor.

18 U.S.C. § 3626(f)(4); FED. R. CIV. P. 53(g)(2)(B).

### IV. Review of Monitor's Appointment

The Court shall review the Monitor's appointment every six months following the appointment, to determine whether the services of the Monitor continue to be required during the remedial phase of this matter. 18 U.S.C. § 3626(f)(5).

**IT IS THEREFORE ORDERED:**

1.   Pursuant to Rule 53(b)(1), this Order serves as notice to the parties that a Monitor will be appointed.

2.   On or before **14 days** from the date of this Order, each party shall submit to the Court and each other the names of up to **5** candidates for appointment as Monitor. *See* 18 U.S.C. § 3626(f)(2). Within **7 days** of the submission of both lists, each party may remove up to **3** persons from the opposing party's list and shall notify the Court and the other party of the removed names. The Court will select the Monitor from the persons remaining on the parties' lists. Alternatively, if the parties reach agreement on an individual to serve as Monitor, they shall jointly notify the Court of their selection on or before **14 days** after the submission of both lists. The Court will notify the Monitor of his/her selection.

3.   Within **7 days** of such notification, the Monitor shall file an affidavit with the Court disclosing whether there is any ground for his/her disqualification under 28 U.S.C. § 455. If a ground is disclosed, the parties shall inform the Court within **3 business days** whether they waive the disqualification. *See* FED. R. CIV. P. 53(b)(3).

4.   On or before **21 days** from the date of this Order, the parties shall submit any

proposed modifications to the above summary of the Monitor's duties.

**IT IS SO ORDERED.**

**DATED:  December 13, 2021**

**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**