**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

**JANIAH MONROE,[1]
MARILYN MELENDEZ,
LYDIA HELÉNA VISION,
SORA KUYKENDALL, and
SASHA REED, individually and on
behalf of a class of similarly situated
individuals,**

      **Plaintiffs,**

**v.**

**STEVE MEEKS,
MELVIN HINTON, and
ROB JEFFREYS,**

      **Defendants.**

**Case No. 3:18-CV-00156-NJR**

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

On August 5, 2021, at the conclusion of a four-day bench trial, the undersigned issued a verbal ruling for specific preliminary injunctive relief in this case, later set forth in the written Order/Preliminary Findings of Fact and Conclusions of Law dated August 9, 2021. (Doc. 331; Doc. 349, pp. 972-92).[2] That Order noted that the previous (December 2019) Preliminary Injunction continues in force. (Doc. 212). And, of course, at this time the injunctive relief issued in August 2021 remains in effect.

---

[1] The named Plaintiffs, and many members of the Plaintiff class, use chosen names reflecting their gender identity rather than their given names at birth. Throughout this Order, the Court refers to each Plaintiff by their chosen name, which may not match the name in IDOC records.

[2] *See also* Preliminary Injunction at Doc. 332 and correction at Doc. 336, separately setting forth the additional preliminary injunctive relief pursuant to *MillerCoors LLC v. Anheuser-Busch Companies, LLC,* 940 F.3d 922 (7th Cir. 2019).

This Memorandum and Order more fully summarizes the August 2021 bench trial testimony and the depositions and exhibits submitted at trial, factual findings, and conclusions of law supporting the preliminary injunctive relief previously ordered. *See* Docs. 331, 332, and 336. The Court does not repeat all of its findings from August 2021 because they are incorporated into this Memorandum and Order. The preliminary injunctive relief is set forth again below; of course, certain deadlines have already passed. The Court will summarize progress made to date toward compliance with the ordered injunctive relief, as well as areas where compliance has not yet been achieved. And, as discussed below, in light of the parties' supplemental filings, the Court finds further injunctive relief is warranted.

## INTRODUCTION

This litigation was brought on behalf of a class of Plaintiffs, consisting of all prisoners in the custody of the Illinois Department of Correction ("IDOC") who have requested evaluation or treatment for gender dysphoria. (Doc. 213). The named Plaintiffs are transgender women currently incarcerated in IDOC facilities. The named Defendants are, respectively, the IDOC Chief of Health Services, IDOC Chief of Mental Health, and the IDOC Director, all sued in their official capacity.

Plaintiffs assert that Defendants' policies and practices subject the class to a substantial risk of serious harm and injury from inadequate and delayed evaluation and treatment of gender dysphoria, in violation of their rights under the Eighth Amendment. (Doc. 1, p. 36). They seek injunctive relief to remedy the flaws in IDOC's treatment of transgender inmates. (Doc. 1, pp. 36-38). Problems include: IDOC's use of a committee of

unqualified officials to make decisions regarding the medical treatment, security, and placement of transgender inmates; widespread delays or denials in evaluating prisoners for gender dysphoria and in providing hormone therapy and hormone monitoring; failure to consider or provide gender-affirming surgery as part of medically necessary treatment for gender dysphoria; failure to accommodate and facilitate social transition for individuals with gender dysphoria, such as failing to allow access to gender-affirming clothing and grooming items, failing to make individualized housing placement decisions, and permitting cross-gender strip searches; and failing to provide access to medical and mental health providers competent to treat gender dysphoria.

## PROCEDURAL HISTORY

After a two-day evidentiary hearing completed on August 1, 2019, the Court granted preliminary injunctive relief. (Docs. 186, 187, amended on March 4, 2020. *See* Doc. 212). The class, defined as "all prisoners in the custody of IDOC who have requested evaluation or treatment for gender dysphoria," was certified in an order dated March 4, 2020. (Doc. 213).

The initial Preliminary Injunction ordered Defendants to: cease the policy and practice of allowing the Transgender Care Review Committee ("TCRC") to make medical decisions regarding gender dysphoria; to develop a policy to ensure that treatment decisions for inmates with gender dysphoria are made by medical professionals qualified to treat gender dysphoria; to ensure that timely hormone therapy is provided when medically necessary, including the administration of hormone dosage adjustments and routine monitoring of hormone levels; to cease the policy and practice of depriving

gender dysphoric prisoners of medically necessary social transition and to develop a policy to allow such transition (including individualized placement decisions, avoidance of cross-gender strip searches, and access to gender-affirming clothing and grooming items); to develop policies and procedures allowing transgender inmates access to clinicians who meet the WPATH[3] competency requirements; to allow inmates to obtain evaluations for gender dysphoria upon request or clinical indications; and to advise the Court regarding steps taken to train all correctional staff on transgender issues. (Doc. 212).

A four-day bench trial was held from August 2 to 5, 2021, and culminated in the second order for preliminary injunctive relief. (Docs. 331, 332).[4] On August 18, 2021, the Court corrected an error in the Preliminary Injunction. (Doc. 336).

On August 16, 2021, at the Court's direction, Plaintiffs submitted a post-trial brief outlining the deficiencies in IDOC's new Administrative Directives of April 1, 2021, and requested additions/changes to the injunctive relief. (Doc. 335). Defendants responded to that brief on September 7, 2021. (Doc. 346).

Subsequently, Defendants filed status reports setting forth steps they have taken toward compliance with the preliminary injunctive relief ordered by the Court. (60-day Status Reports at Doc. 355 and Sealed Doc. 357; Plaintiffs' Response at Doc. 359); (120-day Status Report at Doc. 369).

---

[3] World Professional Association for Transgender Health. This organization's Standards of Care for the treatment of gender dysphoria are the benchmark for appropriate care of individuals with this diagnosis. (Doc. 186, pp. 3-4, 31).
[4] *See also* Preliminary Injunction at Doc. 332 and correction at Doc. 336.

**FACTUAL BACKGROUND**

*Treatment of Gender Dysphoria*

As previously set forth in the first order for preliminary injunctive relief (Doc. 186, pp. 3-6), gender dysphoria is a condition in which a person experiences clinically significant distress stemming from incongruence between one's experienced or expressed gender and one's assigned gender. (Doc. 157, p. 95; Doc. 158, p. 14);[5] *see also Campbell v. Kallas*, 936 F.3d 536, 538 (7th Cir. 2019). Gender dysphoria is considered a serious medical condition with psychiatric components; it has been removed from the mental and behavioral disorders in the World Health Organization Classification of Diseases and the Diagnostic and Statistical Manual of Mental Disorders. (Doc. 158, p. 95; Doc. 325, p. 538-39; Doc. 353, p. 379).

The World Professional Association for Transgender Health ("WPATH") is a professional association dedicated to understanding and treating gender dysphoria. (Doc. 157, p. 98). WPATH dictates medically accepted Standards of Care for treating gender dysphoria. (*Id.* at 7). According to WPATH, its Standards of Care are "the highest standards of health care" for transgender people. (Doc. 123, Ex. 13, p. 8). IDOC purports to follow the Standards of Care and has updated its mental health standards operating procedure manual to incorporate them. (Doc. 143, Ex. 4, pp. 4, 10). According to WPATH, treatment options for gender dysphoria include social role transition, cross-sex hormone therapy, psychotherapy, and surgery. (Doc. 158, p. 14).

---

[5] Docs. 157 and 158 are the transcripts of the Preliminary Injunction Evidentiary Hearing on July 31 and August 1, 2019.

WPATH lists the minimum qualifications a mental health professional must attain in order to assess and treat gender dysphoria. (*Id.* at 25). Specifically, a person must: hold a master's degree in behavioral science; be familiar with the Diagnostic and Statistical Manual of Mental Disorders ("DSM") or the International Classification of Diseases; have documented supervision in psychotherapy; understand the variations of gender identities and gender expressions; have continuing education in the assessment and treatment of gender dysphoria; have cultural competence; and be aware of the growing body of literature in the area. (Doc. 158, pp. 25-26). Individuals who are new to the field should work under the supervision of someone with competence who is regarded as an expert in gender dysphoria. (*Id.* at 26).

**Social Role Transition**

Social role transition is living in the gender role congruent to one's affirmed identity. For instance, in the case of a transgender woman, social transition would include wearing a female hairstyle, female clothing, and makeup, and using a feminine name, female toiletries, and a female bathroom. (Doc. 158, p. 16). In a prison setting, social transition would require a transgender woman be afforded the same commissary items that female prisoners can access, have means to safe and effective hair removal, be referred to by a female name, and be permitted to wear makeup or clothing that affirms her gender. (*Id.* at 17).

**Psychotherapy**

Psychotherapy helps individuals become more resilient, deal with stigma, manage family situations, and cope with the social problems that are attendant to gender

dysphoria. (Doc. 158, p. 14).

**Surgery**

There are different surgical options for transgender individuals, including reconstruction of the genitalia, also known as gender-affirming surgery. (Doc. 158, pp. 20, 90). Reconstruction eliminates the major source of hormones that contribute to and cause gender dysphoria. (*Id.* at 20-21). After reconstruction, the urogenital organs function and appear the same as one's peers. (*Id.*). Medicare declared gender-affirming surgery to be medically necessary and safe in 2014. (*Id.* at 88). Studies indicate that less than one percent of patients who undergo gender-affirming surgery around the world experience regret. (*Id.* at 90). Other studies show suicide and self-harm dramatically decrease following reconstruction surgery. (*Id.*). Other surgical options include removal of the breasts and chest reconstruction. (*Id.* at 21).

**Cross-Sex Hormone Therapy**

Cross-sex hormone therapy involves taking hormones to masculinize or feminize the body. (Doc. 158, p. 14). An individual should not begin hormone therapy unless he or she has well-documented gender dysphoria above the age of majority and has no significant mental health concerns that prevent him or her from giving informed consent. (*Id.* at 19). Hormone therapy is often a necessary component of treating gender dysphoria. (Doc. 157, p. 156).

The Endocrine Society Guidelines are internationally recognized baseline guidance for the adequate treatment of gender dysphoria. (Doc. 157, p. 91). Hormone therapy that falls below the Guidelines is considered less-than-adequate treatment.

(Doc. 157, pp. 98-99). The Guidelines state that once a person begins hormone therapy, they should undergo baseline lab testing to monitor hormone levels. (Doc. 157, p. 102). Hormone levels need to be checked every two to three months for the first year of treatment, and dosages should be adjusted accordingly until a target hormone level is achieved. (*Id.*). After this period, hormone levels should be checked once or twice each year. (*Id.*). An individual who suddenly stops taking hormones is at risk for serious medical or mental health complications. (*Id.* at 103).

Spironolactone and Estradiol are the two main agents involved in hormone therapy for transgender women. (*Id.* at 103-04). Spironolactone is a testosterone blocker, and Estradiol is estrogen. (*Id.* at 104, 109). Estradiol is administered at a starting dose of two milligrams and titrated to four or six milligrams. (*Id.* at 104). Four milligrams typically results in target concentrations. (*Id.* at 105). For transgender men, hormone treatment involves testosterone injections. (*Id.* at 106).

Spironolactone is a diuretic that can elevate potassium levels and cause heart arrhythmias, kidney failure, and death. (Doc. 157, p. 107). Estradiol enlarges the pituitary gland, which can cause blindness if the gland gets too big. (*Id.* at 107-08). Thus, monitoring hormone levels, as well as levels of potassium, creatinine (a kidney function marker), and prolactin, is important for efficacy and safety. (*Id.* at 107-08).

There are other forms of estrogen besides Estradiol, but the Endocrine Society Guidelines do not recommend them because they are very difficult to monitor. (*Id.* at 109-110). For example, Premarin and Menest, which are conjugated estrogens, are not naturally produced by the body; they come from pregnant horse urine. (Doc. 157, p. 110).

Transgender individuals may receive hormone therapy but still experience symptoms of gender dysphoria because their body does not match their gender identity. (Doc. 157, p. 109). Hormone therapy does not shrink genitals or make them disappear. (*Id.*).

### *IDOC's Policies on Transgender Inmates*

At the time of the July-August 2019 evidentiary hearing, IDOC's policies and procedures for evaluating and treating inmates with gender dysphoria were set forth in Administrative Directive 04.03.104, "Evaluation of Offenders with Gender Identity Disorders" ("the GID Directive"), effective May 1, 2013. (Doc. 186, pp. 7-8); (Doc. 1, p. 17; Doc. 123-10; Doc. 143, p. 3). The GID Directive created a Gender Identity Disorder Committee ("GIDC") to review transgender inmates' "placements, security concerns and overall health-related treatment plans…and to oversee the gender related accommodation needs of these offenders." (Doc. 123-10, pp. 3-4; Doc. 348, p. 303). But Defendants represented that as of June 2019, the GID Directive was "under revision," and IDOC officials were following the revised draft policy even though it had not been officially implemented. (Doc. 143, p. 3; Doc. 143-2).

The 2019 revised draft of Administrative Directive 04.03.104 replaced the GIDC with the Transgender Care Review Committee ("TCRC"),[6] tasked with "reviewing placements, security concerns, and overall health related treatment plans of transgender

---

[6] The TCRC is frequently referred to as the "Transgender Committee" in the transcripts and other documents of record. The Court will refer to this committee by its acronym in order to distinguish it from the differently-named committees which replaced it under the newer Administrative Directive adopted in April 2021.

offenders and offenders diagnosed with Gender Dysphoria, and to oversee [their] gender related accommodations[.]" (Doc. 143-2, p. 3). The TCRC had five voting members: IDOC's Chief of Psychiatry (Dr. William Puga, TCRC Chair), Chief of Health Services (Dr. Steve Meeks), Chief of Mental Health Services (Dr. Melvin Hinton), Chief of Operations (Mr. Eilers), and Transfer Coordinator (Ms. Wortley) (Doc. 158, pp. 102, 146-52). None of these individuals met WPATH's minimum qualifications for treating transgender people; two had no medical training (Doc. 158, pp. 146-51).

The TCRC met once each month to review inmates' treatment and care, reviewing about 20 cases at each meeting, including treatment plans and inmate requests for surgery and/or transfers. (*Id.* at 105; Doc. 348, p. 322-23). IDOC's therapists would present issues to the TCRC on behalf of the inmate. (*Id.* at 111-13). The TCRC reviewed information about each inmate, including the inmate's treatment plan, but did not review an inmate's complete medical records. (*Id.* at 113, 163). The TCRC generally allotted six minutes to hear an inmate's case. (*Id.* at 162). The TCRC decided issues based on a majority vote of its five members, but nonmedical members did not vote on medical issues. (*Id.* at 157, 187). After the TCRC rendered a decision, the inmate's therapist or physician was responsible for carrying out the plan. (*Id.* at 113). There was no formal appeals process for challenging the TCRC's decisions. (*Id.* at 160-61).

Following the December 2019 Preliminary Injunction, on April 1, 2021, IDOC adopted two new Administrative Directives: (1) Administrative Directive ("AD") 04.03.104, entitled "Evaluation, Treatment and Correctional Management of Transgender Offenders" (Tr. Ex. 600), and AD 05.01.113 "Searches of Offenders." (Tr. Ex. 601).

(Doc. 353, p. 502). IDOC began to implement changes under these policies governing care of transgender inmates. (Doc. 348, pp. 304-05; testimony of Dr. Melvin Hinton). The former TCRC was broken into two separate committees, the Transgender Health and Wellness Committee ("THAWC" or "THAW Committee") and the Transgender Administrative Committee ("TAC"). (Doc. 348, pp. 304-05). Each committee meets monthly. All requests for gender-affirming surgery must go to the THAWC, which decides whether to approve surgery and addresses other medical and mental health care concerns. (*Id.* at 314-15, 352). The TAC focuses on safety and security matters, handling nonmedical, non-mental health related issues including inmate transfer requests (such as when a transgender woman seeks a transfer from a men's to a women's facility) and what gender-affirming commissary items will be available to transgender inmates. (*Id.* at 352-53).

Although the duties are divided in an attempt to separate medical and mental health issues from security considerations, the identity of members on each committee is similar to those previously serving on the TCRC. Dr. Puga, Dr. Hinton, Dr. Conway (Deputy Chief of Health Services), and Dr. Shane Reister (Southern Regional Psychologist Administrator) all served on the former TCRC and now serve on the THAW Committee. Dr. Puga, Dr. Conway, and Dr. Reister also serve on the TAC along with other officials including the chief of operations' designee, chief of women's services, and transfer coordinator. (Doc. 354, pp. 787-88, 822-25). Administrative Directive 05.01.113 sets forth revised procedures governing searches of transgender prisoners.

## TRIAL TESTIMONY

### *Plaintiffs' Evidence*

**Marilyn Melendez**

Melendez is a 27-year-old IDOC inmate housed at Pontiac Correctional Center ("Pontiac") at the time of her testimony on August 2, 2021. (Doc. 347, p. 32, 46). She was also at Pontiac, a male facility, when she testified at the evidentiary hearing on July 31, 2019. (Doc. 186, p. 19; Doc. 157, pp. 13-16, 40). She explained she was assigned male at birth but identified at a young age as female. *Id.* Her mother started her on hormones, testosterone blockers, and estrogen at age eight or nine, but at age 13—after starting to develop breasts—she was unable to continue that treatment due to cost. Melendez then went through male puberty, growing taller, developing muscles and a deep voice, and began experiencing erections. *Id.* She "felt like a monster," endured taunting from peers, and got into fights and drugs, which led to her incarceration in 2012. (Doc. 186, p. 19; Doc. 157, p. 16). Upon entering prison, Melendez told prison officials that she was transgender, but she was not evaluated for gender dysphoria or hormone therapy for three years. (Doc. 186, p. 19; Doc. 157, pp. 16-20; Doc. 347, pp. 32-33, 67). In March 2015 she was diagnosed with gender dysphoria, but the TCRC did not initially approve her for hormone therapy; she started that treatment in July or August 2015. (Doc. 186, p. 20; Doc. 157, pp. 21-22).

Melendez testified in 2019 that her hormone dosage seemed inadequate, as she was still growing excess facial and body hair and was experiencing frequent erections. (Doc. 186, p. 20; Doc. 157, pp. 23-25). She had requested gender-affirming surgery but

was told IDOC would not pay for it. (Doc. 186, p. 20; Doc. 157, p. 26). Her request for hair removal was denied, and she was unable to access commissary products available to females. She was not allowed to have a bra until two years after requesting one and has been unable to obtain other gender-affirming clothing or undergarments. (Doc. 186, p. 21; Doc. 157, pp. 29-30, 32-36, 48). Melendez has been strip-searched by male correctional officers in front of male inmates. IDOC staff have laughed at her, verbally harassed and groped her, and have frequently misgendered her, including calling her "it" and "he-she." (Doc. 186, p. 21; Doc. 157, pp. 36-38, 52). These conditions have caused Melendez severe psychological distress including suicidal ideation, as well as physical discomfort. (Doc. 186, pp. 21-22; Doc. 157, pp. 27, 33-34, 38-39, 48).

On August 2, 2021, Melendez testified that the care she is presently receiving is worse than it was in July 2019. (Doc. 347, p. 33). Her hormone therapy has been interrupted at least twice for lengthy periods. In February 2020, her medication was interrupted for a month and a half when she was placed in segregation, despite her submitting several letters and grievances seeking to have her prescriptions restored. (Doc. 347, pp. 33-41, 79; Plaintiffs' Exhibits 470, 471, 472, 473, 475). In August 2020 her refill of hormones was delayed for three weeks and she was completely without medication for a week. (Doc. 347, pp. 39-40, 76-78). There have been other delays in timely providing her with refills so that the medications may be properly taken together. (*Id.* at 79-80). She had been switched from Premarin to Estradiol and then back to Premarin between July and October 2019. (*Id.* at 41-42). Her current therapy consists of 5 mg Estradiol and 200 mg Spironolactone daily, but she still has excessive hair growth and

frequent erections. (*Id.* at 42-43). Her treating physician, Dr. Tilden, has not looked into why Melendez continues to have these issues, has not altered her dosages, and will not disclose her testosterone or estrogen levels. (*Id.* at 44-46, 80-81). She has had blood work about four times since July 2019 but is unsure whether she was tested for hormone levels. (*Id.* at pp. 45, 81). She has not succeeded in requesting copies of her medical records due to COVID-19 related law library restrictions. (*Id.* at 86-87).

Melendez had requested gender-affirming surgery as of July 2019 but was not evaluated for it. (*Id.* at pp. 46-47). She asked her mental health professional (Ms. Yuhas) to pursue a surgery evaluation and received a letter on October 14, 2020, informing her that the TCRC would consider her surgery request on January 5, 2021. (Doc. 347, pp. 48-49; Pl. Ex. 477). In March 2021, Ms. Yuhas told Melendez her surgery was approved and she was on the waiting list, but nothing further had happened as of August 2, 2021, and she had not been shown any paperwork to confirm the approval or describe what type of surgery was approved. (Doc. 347, pp. 50, 88-91; Def. Ex. 623).

Melendez continues to experience humiliation and disrespect as a result of being housed with male inmates. (Doc. 347, pp. 52-53). Before coming to court for trial, she was strip searched by a female officer for the first time, but only after she showed this Court's Order to the lieutenants in charge. (*Id.* at 53, 94). A few weeks earlier Melendez requested to be searched by a female officer but was threatened with mace and a beating if she did not submit to a strip search by a male officer during a shakedown. (*Id.* at 54). All other strip searches of Melendez at Pontiac since the Preliminary Injunction in December 2019 had been performed by male officers, despite her attempts to inform staff of the

Preliminary Injunction. (Doc. 347, pp. 54-55, 92-93). In July 2021, Melendez spoke with Warden Leonta Jackson during his tour of the gallery with other officials, telling him about the misgendering and strip searches, and she showed him the Preliminary Injunction Order. Jackson grabbed Melendez's copy of the Order, threw it off the gallery, and said that she was a man, she is in a male institution, she has a penis, and she will be searched by men. (*Id.* at 55, 69-70).

Melendez testified at trial that the mistreatment and harassment she experiences from some IDOC officers is worse than in July 2019. (*Id.* at 56). The officers who try to be respectful and use her proper pronouns are ridiculed by other officers. Certain staff make a point of calling Melendez derogatory names and write her a disciplinary ticket if she says anything back. She is regularly misgendered both verbally and in documents, including those written by medical and mental health staff. (*Id.* at 56-57, 101-02).

As of July 2019, Melendez had not requested to transfer to a women's facility because she had heard of problems experienced by other transgender women there. By the time of trial, she had changed her mind due to the worsening treatment by Pontiac staff and the lack of consequences for the harassers. (Doc. 347, pp. 57-58). Melendez requested a transfer, but in December 2020 was told that before it could be considered, she would have to sign out of protective custody and go to general population, where she would risk physical assault. (*Id.* at 58-60, 99-100; Pl. Ex. 476).

The commissary made makeup items available for purchase in March 2021, well over a year after the Court's initial Preliminary Injunction. As of the time of trial, however, female undergarments, shoes, and hair products were not available. (*Id.* at 60-

61, 94-98). New male undergarments are given to inmates every six months, but Melendez has not received a new bra since 2018. (Doc. 347, p. 62).

Melendez initially hoped that things would improve after the December 2019 Preliminary Injunction but became increasingly exhausted and hopeless when conditions instead became worse. (*Id.* at 62-63). She attempted suicide in August 2020. Her current mental health professional, Joe Ramos, does not want to talk about her anxiety or depression related to her gender dysphoria and tells her it is not his field or expertise. Every time Melendez sees Ramos he asks her about her religious beliefs; for example, he asked in June 2021 how God would feel about her "desecrating the temple" of her body by transitioning. (*Id.* at pp. 63-65). She has attended the "GIFT" program, a group for transgender prisoners that started in 2020, but states it was not therapeutic. (*Id.* at pp. 82-84).

Overall, Melendez's care and treatment in prison has not meaningfully changed since the December 2019 injunction; the only difference she has observed is that makeup was added to the commissary. (*Id.* at pp. 67-68).

Melendez had not heard of IDOC's new Administrative Directive, the Transgender Administrative Committee ("TAC") or the Transgender Health and Wellness Committee ("THAWC") and would not know how to contact those committees in order to request treatment. (Doc. 347, pp. 65-66, 91).

**Sora Kuykendall**

Kuykendall, age 29, did not testify in the 2019 evidentiary hearing that led to the first Preliminary Injunction (Doc. 212) but submitted a sworn declaration setting forth her

experience during her incarceration. (Doc. 123-6; Doc. 186, pp. 25-26). At the time of her trial testimony in August 2021, Kuykendall had been housed in Menard Correctional Center ("Menard"), a male prison, since entering IDOC custody in November 2014. (Doc. 347, pp. 104-05).

Kuykendall first identified as a girl at about age five but was never evaluated for gender dysphoria because her family did not support her gender identity. (Doc. 123-6; Doc. 186, p. 25; Doc. 347, pp. 105-07). She became extremely depressed when she went through puberty, acted out, cut herself, and attempted suicide. (Doc. 123-6; Doc. 186, p. 25; Doc. 347, p. 106).

Kuykendall asked for hormone therapy soon after her placement at Menard in November 2014. (Doc. 123-6; Doc. 186, p. 25; Doc. 347, pp. 107-08, 143). IDOC officials denied her hormone therapy request and refused to evaluate her for gender dysphoria. Only after she attempted to castrate herself was Kuykendall evaluated and diagnosed with gender dysphoria in February 2015, and she began taking hormones (Spironolactone and Menest) that month. (Doc. 123-6; Doc. 186, p. 25; Doc. 347, pp. 108-10, 144-46). The dosage for her testosterone blocker was too low, however, and she experienced more facial hair growth; nothing was done despite her many requests over seven months for a dosage adjustment. (Doc. 347, pp. 110, 147). Her estrogen was later changed to Premarin. *Id.* She has not received regular monitoring for blood hormone levels. (Doc. 126, p. 2; Doc. 186, p. 25; Doc. 347, p. 110). In 2020, she was still receiving conjugated estrogen rather than the recommended Estradiol and her requests to switch medications were denied until after her August 2020 deposition for this case. (Doc. 347, pp. 111-14, 150-51).

At some time in 2020 she had blood work and was told her estrogen level was fine at 33, but she believes the correct level should be between 150 to 200.[7] (Doc. 347, pp. 114-15). She was given a breast exam while a male officer was in the room, in disregard of her privacy concerns, and was threatened with having her hormones discontinued if she refused the exam. (*Id.* at 115-16, 153-54). Kuykendall is currently taking 8 mg of Estradiol and 200 mg of Spironolactone per day but does not know the results of her blood work in 2021. (*Id.* at 123-24, 151-52). Her mood improved after her Estradiol dosage was increased in the fall of 2020. (*Id.* at 168).

As of July 2019, Kuykendall's repeated requests since 2015 for gender-affirming surgery and hair removal had been denied without any evaluation. (Doc. 126, p. 3; Doc. 186, p. 25; Doc. 347, pp. 126-27). In 2021, she was told she would be evaluated for surgery in January, but it was rescheduled to July 2021 and then put off again. (Doc. 347, pp. 127-29, 159-64). She has not met with anybody on the THAW Committee and has not received any response. (*Id.* at 129-31). If she does not receive gender-affirming surgery, she will almost certainly kill herself. (*Id.* at 132).

Kuykendall was given a bra 10 months after starting hormone therapy after multiple requests. (Doc. 347, pp. 111, 148-50). When she went to commissary in July 2021 there were no female items available; she has no underwear. (*Id.* at 124-25, 140, 164-65). She also has no hair removal products other than an electric razor, and she uses nail clippers to pull hair out of her face. (*Id.* at 126).

---

[7] Testimony by Plaintiffs' expert Dr. Vin Tangpricha, both in 2019 and 2021, established that under the Endocrine Society Guidelines, the target blood estrogen/estradiol level for a transgender female is 100-200 picograms per milliliter. (Doc. 157, pp. 121-22; Doc. 353, p. 384).

Kuykendall has been subjected to strip searches by male officers in the presence of male inmates, causing her to feel violated and unsafe, and triggering crying and shaking. (Doc. 126, pp. 3-4; Doc. 186, p. 26; Doc. 347, pp. 111, 117). In December 2019, when faced with a strip search by male officers before visiting her mother, she tried to refuse the visit but was told she would be searched anyway and sent to segregation. (Doc. 347, pp. 117-18). Since then, she has refused visits in order to avoid being strip searched. (*Id.* at 118, 154-55). Her March 2017 grievance asking to be strip searched by a female officer was unanswered. (Doc. 126, pp. 3-4; Doc. 186, p. 26).

Kuykendall continues to experience depression, anxiety, and daily thoughts of self-harm related to her gender dysphoria, constant misgendering, and verbal harassment. (Doc. 126, pp. 3-4; Doc. 186, p. 26; Doc. 347, pp. 118-19, 137-38). In January 2021, when she disclosed her suicidal thoughts and her planned method to a mental health professional, she was placed on crisis watch despite her protests that her suicidal thoughts were nothing new and she did not feel that she would go through with it. (Doc. 347, pp. 119-20, 157-59). The crisis watch cell was dirty and contaminated with feces on the wall; she was denied soap and eating utensils and had only a smock to wear that did not cover her breasts. (Doc. 347, pp. 119-22, 156-57). Because of the noise and these conditions, she was unable to use her primary coping mechanism of meditation. She was not given her hormones for the six days she was on crisis watch and was unable to shave or use nail clippers to remove her facial hair. This experience left her in a worse mental state than when she began crisis watch. (*Id.* at 119-22). She is cautious about what she says to mental health providers about her suicidal thoughts because of her fear of being

returned to crisis watch. (Doc. 347, pp. 170-71).

Kuykendall would like to be housed in a female facility to escape the sexual harassment, groping, beatings, hostility, and threats to her safety in Menard. (Doc. 347, pp. 132-35, 139, 172-75). Male prisoners have exposed themselves to her on multiple occasions. Her transfer requests have not been granted. She had not used the shower at Menard since 2014 (with one exception in 2015 while she was in the medical unit), because showers are open to view by male inmates and staff; instead, she washes her body and hair in her cell. (*Id.* at 136, 170-71).

Since filing this lawsuit, Kuykendall's gender dysphoria symptoms have worsened, and her care and treatment has not substantially improved. (*Id.* at 140-42).

**Xavier Ball**

Xavier Ball, age 30, has been incarcerated since 2010, currently at the Illinois River Correctional Center ("IRCC"). (Doc. 347, pp. 176, 191). She realized she was different from other boys at age 13. She first heard the term gender dysphoria after arriving at Pinckneyville Correctional Center ("Pinckneyville") in March 2016. About a year later, she started attending a support group for transgender inmates. (Doc. 347, pp. 177-78).

Ball first requested hormone therapy in 2016 at Pinckneyville, but her repeated requests were denied without explanation. (*Id.* at 178-80). She was transferred to Danville Correctional Center in early 2018 and was able to start hormone therapy in January 2019. (*Id.* at 180-81, 192). She did not, however, stay on hormones for long (six weeks to three or four months). (*Id.* at 181-84, 193). In February 2019, Ball was transferred to IRCC and made the decision to stop hormone therapy while she became accustomed to the new

prison, out of concerns for her safety and social isolation. (Doc. 347, pp. 181-84). In late 2019 or early 2020, she requested to start hormone therapy again but was initially denied because she had been on suicide watch and was seen as unstable. (*Id.* at 184-88, 194-95). Ball made six successive requests for hormone therapy and was denied each time with no explanation. (*Id.* at 188-89, 196-97). During that time, she was stressed, depressed, angry, sad, and frustrated to the extent she felt like giving up her quest for treatment. She was finally allowed to resume hormone therapy in late June 2021. (*Id.* at 189-90).

Like Melendez, Ball had not heard of the changes in the committee structures (TAC and THAWC) under the revised Administrative Directives and would not know how to contact those committees regarding transgender issues. (*Id.* at 190-91).

**London Fulton**

London Fulton has been in IDOC custody since May 2019 and at the time of trial was incarcerated at Pontiac. (Doc 347, pp. 198, 204). Assigned male at birth, she realized at age seven that she didn't feel like a boy. She was first diagnosed with gender dysphoria in January 2012, at age 17, while incarcerated in the Cook County Jail. She was able to receive hormone therapy in Cook County at that time. (Doc 347, pp. 199-201). Fulton was also on hormone therapy in IDOC facilities in 2014 and 2015, and again at the Cook County Jail from 2017 to 2019 before her current IDOC custody. (*Id.* at 202-04).

When Fulton was transferred from Cook County to Stateville in May 2019, she was told she could not restart hormone therapy until after she arrived at her IDOC parent facility and was re-diagnosed with gender dysphoria. (*Id.* at 205). But Stateville staff continued the medication she had taken at Cook County for depression (Remeron) about

a week after her arrival. (Doc. 347, pp. 204-05). She was devastated and traumatized from losing the hormone therapy she had been on consistently for two years, and her anxiety and depression intensified. (*Id.* at 206-07). At the time of Fulton's testimony in August 2021, 26 months later, she had still not received the hormone treatment she requested numerous times during her IDOC custody. (*Id.* at 207-08, 222, 224-25).

At her first institution, Menard, Fulton had to wait five months for a response to her medication request and did not see the doctor who could prescribe hormones until May 2020, nearly a year after her arrival. (*Id.* at 208-09). Dr. Siddiqui questioned Fulton's decision to go on hormones, tried to persuade her not to take them, and did not listen to her. (*Id.* at 209-10, 232). The appointment was so distressing that Fulton refused to get the hormone prescription even though she wanted it, because if she took it, she would have to see Dr. Siddiqui going forward. (*Id.* at 211). A mental health provider arranged for Fulton to see a nurse practitioner instead, but in June 2020 she learned her prolactin level was elevated, which prevented her from getting the hormone prescription. (*Id.* at 212-13). She went off her other medications, but her prolactin level remained too high. About seven months later, in January 2021, she was sent to get an MRI to rule out a tumor as the cause of the high prolactin. The MRI came back negative, but Fulton still was not restarted on hormones. (Doc 347, pp. 213-14, 227). She contests the accuracy of a March 2021 IDOC medical record that stated she did not want to get back on hormones at that time. (*Id.* at 228-32; Def. Ex. 670). She filed several grievances at Menard regarding the lack of transgender treatment but got no response. (Doc. 347, pp. 215-16).

Fulton was transferred to Pontiac on May 25, 2021. (Doc. 347, p. 216). Prior to her

transfer, Fulton had to undergo a strip search at Menard by male guards; when she protested the attempt to conduct the search in full view of male inmates, a lieutenant had her searched behind a barrier wall. (*Id.* at 217-18). On the day Fulton was taken to this Court from Pontiac for the trial, she was strip searched by male officers after being told she didn't have a court order to be strip searched by a female, despite the fact that Marilyn Melendez was allowed to be searched by a female guard on the same day to go on the same transport. (*Id.* at 218-19).

After two months at Pontiac, Fulton still had not seen a professional about receiving treatment for her gender dysphoria and had not been able to restart hormone therapy. (*Id.* at 219-21). Nor had she been able to access any female items from the commissary (makeup and sports bras) because she did not yet have a permit. (*Id.* at 221-22, 227-28). Her inability to get hormone treatment has added to her depression. (*Id.* at 223). The single time she discussed possible gender-affirming surgery with a professional (at Menard), Fulton was told a prerequisite to being considered was that she had to be on hormones for a certain period. (*Id.* at 223-24). The same condition applied to being considered for a transfer to a female prison; thus, Fulton has been blocked from these potential accommodations. (Doc. 347, pp. 223-24).

### Janiah Monroe

Janiah Monroe testified at the July 2019 evidentiary hearing. (Doc. 157, pp. 184-222; Doc. 186, pp. 16-18). She has been in IDOC custody since 2008. At the time of the 2021 trial, she was at Logan Correctional Center ("Logan"), a female prison, where she had been for about two years (she was housed there at the time of the July 2019 hearing).

(Doc. 157, p. 184; Doc. 348, pp. 271-72, 283). Since her transfer to Logan, Monroe spent about a month in the Elgin mental health facility after a suicide attempt. (Doc. 348, pp. 272-73).

Monroe was assigned male at birth but knew from the age of three that she was a female. She played with her girl cousins rather than with her brothers and wore female clothing when she could get away with it. Her family was very religious and disapproving of homosexuals, and her father beat her when she would exhibit feminine characteristics. (Doc. 157, pp. 185-87; Doc. 186, pp. 16-17).

Monroe began taking hormones and birth control pills obtained from her friends at about age eleven. (Doc. 157, p. 188; Doc. 186, p. 17). She felt "horrible" being perceived as a male when she identified as a woman, and she began to hate herself, her body, and the way she sounded and looked. (Doc. 157, pp. 188-89; Doc. 186, p. 17). This distress led her to attempt suicide while she still lived with her family. (Doc. 157, pp. 189-90; Doc. 186, p. 17).

Monroe entered IDOC custody in 2008. At Stateville, her first institution, she identified as transgender and requested gender reassignment surgery, hormone therapy, and electrolysis. (Doc. 157, pp. 191-92; Doc. 186, p. 17). She also disclosed at intake that she had been experiencing suicidal thoughts. She was told by mental health officials that IDOC would not provide hormone therapy unless she had legally been on this treatment before incarceration. (Doc. 157, pp. 192-93; Doc. 186, p. 17). Her inability to obtain any treatment for her gender dysphoria was "[e]xcruciatingly painful" for her, leading her to attempt self-castration six times and other self-harm. She chewed through her arteries in

both arms, chewed out a vein, carved a swastika in her wrist to show her hate for her body, and hung herself. (Doc. 157, pp. 193, 200-02; Doc. 186, p. 17).

IDOC eventually diagnosed Monroe with gender dysphoria in 2012, and she began hormone therapy in April that year. (Doc. 157, pp. 199-200: Doc. 186, p. 18). The hormone therapy helped her to some extent, but she described it in July 2019 as "putting a Band-Aid on a wound that needs stitches," and she believed her dosages were inadequate because her hormone levels would fluctuate up and down. (Doc. 157, pp. 202-03; Doc. 186, p. 18). Her dosages were adjusted after her transfer to Logan, and she was on the maximum dosage of Spironolactone (100 mg twice a day) as of July 2019. (Doc. 157, pp. 204-05). But she has continued to cut her genitals, hoping they would become infected so IDOC would be forced to remove them. *Id.* She also has attempted suicide approximately four times because her needs for surgery and social transition have been overlooked. (Doc. 348, pp. 273-74). As of July 2019, she had never been evaluated for gender-affirming surgery despite making numerous requests and filing at least 10 grievances. (Doc. 157, pp. 213-14; Doc. 186, p. 18).

Monroe testified in August 2021 that she was told by Dr. Conway and Dr. Horn in June 2021 that she was medically approved for the gender-confirmation surgery she had first requested in 2008. She understood the next steps to be a meeting with Dr. Puga and Dr. Reister for their approval, followed by evaluation by the surgeon. (Doc. 348, pp. 268-71). Surgery would eliminate officials' fear that Monroe could get another Logan inmate pregnant and, most importantly, would help her mind and body align with each other so she could exist in peace. (*Id.* at 275). Based on Monroe's past experience of promised

changes not being implemented by IDOC, she does not trust that she will be able to have gender-affirming surgery. (Doc. 348 at p. 289-90).

Monroe was housed in various men's prisons for the first decade of her incarceration, where she was subjected to verbal harassment and multiple physical and sexual assaults at the hands of other inmates and IDOC officers. (Doc. 157, pp. 193-96; Doc. 186, p. 17). When she stood up for herself in the face of abuse, some officers would purposely place her in a cell with a known violent inmate, laugh at her when she called for help, and then not punish the other inmate for the assault. (Doc. 157, p. 197; Doc. 186, p. 17). She was often punished when she defended herself against assaults; her grievances over mistreatment were denied or ignored. (Doc. 157, pp. 197-98; Doc. 186, p. 17).

Monroe requested a transfer to a female facility in approximately 2010 or 2011 but was not transferred to Logan until after she filed a lawsuit over a sexual assault by a male officer, which led to another suicide attempt. (Doc. 157, pp. 194-96). At Logan, she has access to the female undergarments, grooming items, and makeup available to other women prisoners, in contrast to having only a bra while in the male prisons. (Doc. 157, p. 204; Doc. 186, p. 18). She is now searched by female officers; at the male prisons she was always searched by male officers who often commented inappropriately on her body during a strip search or groped her during pat downs. *Id.* As of July 2019, however, she was still misgendered and disrespected by some Logan staff, especially when it first became known she is transgender. (Doc. 157, pp. 207-10). By August 2021, the misgendering had diminished but still occurred; Monroe believes prison staff who misgender her now are doing so deliberately. (Doc. 348, pp. 287-88).

Monroe has had complaints filed against her by other inmates at Logan. (Doc. 157, pp. 210-12, 221). One was by a woman with whom she had a consensual sexual relationship. IDOC determined the allegation of sexual assault was false. (Doc. 348, p. 292). Monroe believed the accuser was jealous of her friendship with another woman and testified that Logan inmates often file false PREA[8] complaints. (*Id.* at 293-94). Monroe feels that because she is transgender, she has been punished more harshly than female prisoners for the same sexual misconduct charges. (*Id.* at 276-77). She has had only one disciplinary ticket for fighting during her time at Logan, when another inmate spit in Monroe's face and she pushed her back. (*Id.* at 283-84, 294-95). She has had about 15 tickets for "intimidation and threats." (*Id.* at 292-93).

Monroe testified in July 2019 that during her entire time at Logan, her penis has not been fully functioning. (Doc. 157, p. 222; Doc. 186, p. 18). Even though she is in a women's prison, she has only been allowed to be in general population "like everybody else" for short durations and is given hoop after hoop to jump through to have restrictions lifted. (Doc. 348, pp. 275, 292). In August 2021, Monroe was in restricted housing where she was unable to socialize or be outside her cell for more than one hour per day. (*Id.* at 278-79). Other inmates in such placement would get moved out after 30 days, but Monroe at one point had been kept there for eight or nine months without another incident and still was not moved. *Id.* Her extended time in near isolation led to a suicide attempt. (*Id.* at 280).

There are currently four other transgender women at Logan; two are housed in a

---

[8] Prison Rape Elimination Act.

unit designated for transgender people and those who want to be housed with them. (Doc. 348, pp. 285-86, 300). Monroe would like to be housed there but has not been given the opportunity. (*Id.* at 285-86, 298-300). As of August 2021, she was no more socially integrated than she had been in July 2019. (*Id.* at 289).

**Dr. Melvin Hinton (Party Defendant, Called by Plaintiffs as Adverse Witness)**

Dr. Hinton is IDOC's Chief of Mental Health, a position he has held since 2012. (Doc. 348, pp. 302-03). He is responsible for overseeing mental health staff for all IDOC facilities. He has served on the various committees on transgender care since their inception in 2014. (*Id.* at 303). He is a voting member of the THAW Committee. (*Id.* at 303-04, 309). The THAWC determines whether to approve transgender prisoners' requests for surgery. (*Id.* at 314). He is aware that if gender dysphoria is not adequately treated, it can lead to severe mental decompensation and increased risk of suicide. He also is aware of transgender prisoners in IDOC who have attempted suicide and self-harm. (*Id.* at 306-08). He read the transcript from the August 2019 evidentiary hearing (as ordered), in which class members testified that they would kill themselves if they didn't get gender-affirming surgery, and acknowledged that two years later, none of the individuals had yet received such surgery although one person's process of evaluation was underway. (Doc. 348, pp. 311-14).

Dr. Hinton acknowledged that between December 2019 and June 2021, thousands of prisoners were transferred between different IDOC facilities; hundreds of transfers took place each month between August 2020 and February 2021, and the monthly transfers between March 2021 and May 2021 numbered at least 1,000. (*Id.* at 316-21;

Exhibits 507, 508). According to Defendants' pretrial brief, however, no transgender inmate was transferred to a facility matching their gender identity between December 2019 and June 2021. (Doc. 348, p. 327). Dr. Hinton participated in a March 2020 TCRC meeting, during which the committee considered and denied a transgender inmate's renewed request for transfer to a women's prison even though the inmate had attempted suicide three times. (Doc. 348, pp. 329-32; Exhibit 453). In April 2020, the person attempted suicide again. A month later, she again sought a transfer to a female facility. The request was denied, but the plan was to transfer her to a residential treatment unit (in a male facility) for a higher level of mental health care, which was done in June 2021 after yet another suicide attempt. (Doc. 348, pp. 334-40, 347-49; Exhibits 141, 466, 402). Dr. Hinton maintained that "routine" transfers were on hold during the COVID-19 pandemic but transfers still took place for urgent or emergent reasons. (Doc. 348, pp. 346-47). Under the former committee structure (the TCRC), Dr. Hinton did vote to approve one transgender inmate's transfer to Logan, but he voted to deny other requested transfer(s). (*Id.* at 355-56).

Dr. Hinton admitted that this Court's December 2019 Preliminary Injunction ordered IDOC to immediately cease the policy and practice of allowing the transgender committee (TCRC) to make medical decisions regarding gender dysphoria. (Doc. 348, pp. 340-41). Yet despite the order and Defendants' representation of compliance in January 2020, the TCRC, which included Dr. Hinton as a voting member, continued to make medical decisions on gender dysphoria as late as June 2020, according to his June 2020 deposition. (*Id.* at 341-42). He maintained that under both the old and new

committee structures, he did not have input into whether hormone therapy would be approved, but he weighed in on mental health issues coming before the committee. (Doc. 348, pp. 349-50, 353-54). Dr. Hinton testified that under the current policies, the treating physician makes the decision whether to prescribe hormones for an individual. (*Id.* at 354). Two medical doctors, Dr. Puga and Dr. Conway, serve on the THAWC. *Id.*

Work began on revising the transgender administrative directives and committee structure immediately after the December 2019 Preliminary Injunction. (*Id.* at 350-53). Dr. Puga and Dr. Reister, as well as other IDOC officials, were involved in the development, and outside experts and resources were consulted. Dr. Hinton had input but was not charged with authoring the new directives. *Id.* The TCRC was disbanded and replaced with the two committee structure, in order to separate administrative and nonmedical/non-mental health issues from the health and wellness concerns. (*Id.* at 352-53).

Dr. Hinton participated in an online two-part training session put on by WPATH (the GID Foundations Course in September-November 2020) and stated that close to 100 percent of mental health treating professionals have had some type of online WPATH training. (Doc. 348, pp. 361-62; Doc. 353, p. 374). Inmates who have problems with a mental health provider can use the grievance process to raise complaints, and there is a training/orientation and quality assurance process for those providers within IDOC. (Doc. 348, pp. 362-65).

*Plaintiffs' Experts*

**James Aiken**

James Aiken, who testified on August 3, 2021, is a criminal justice consultant who has 50 years of experience in the field, including as a warden in the South Carolina Department of Corrections, Deputy Regional Administrator in the Indiana Corrections system, and Director of Corrections for the U.S. Virgin Islands. (Doc. 348, pp. 241-42, Pl. Ex. 446). He has taught and provided technical assistance in many states on improving prison security and stabilizing problematic prison systems. (*Id.* at 243-45). He served on the commission that developed standards for implementing the PREA. (*Id.* at 243). At Plaintiffs' request, he evaluated the treatment of transgender prisoners with gender dysphoria in IDOC's custody regarding their vulnerability to violence/intimidation, as well as housing and commissary issues and searches, including review of IDOC's administrative directives and other records. (*Id.* at 244-45).

Aiken prepared an Expert Witness Report dated August 31, 2020. (Doc. 236-1).[9] In it, he concluded that there is no security justification for denying transgender prisoners medically necessary social transition (including gender-affirming clothing and grooming items, and being addressed by a name and pronouns consistent with their affirmed gender); there are no legitimate security reasons for denying transgender prisoners medically-recommended housing placements (aligning with the prisoner's gender

---

[9] Aiken's report and his opinions set forth in the report were referenced during his trial testimony (Doc. 348, pp. 244-47, 249-52), but the report was not admitted as a trial exhibit. The report was previously filed of record by Defendants as an exhibit to their motion to bar some expert opinions, and the Court uses that document number (Doc. 236-1) in citing to Aiken's report.

identity rather than their genital status); and providing transgender prisoners the option of being searched by correctional staff of the same gender is supported by sound correctional practices. (Doc. 236-1, pp. 5-19).

Aiken testified to his opinion that transgender prisoners' medical needs take priority with respect to access to gender-affirming commissary items, and prison officials have the responsibility to provide access to those items in a safe, secure manner. He was not aware of any security reason to deny transgender inmates access to gender-affirming items. (Doc. 348, pp. 245-46). His report notes:

> Sourcing medically necessary items that meet a facility's security needs is an essential function of a prison healthcare system, and this task is commonly performed for other medically necessary devices like casts, canes, walkers, and back braces. It is an operational/security mandate to accommodate the medical needs of the prisoners.

(Doc. 236-1, p. 7).

As to housing placement, if a medical decision has been made regarding housing of a transgender person for social transitioning, sound correctional practice is to implement the placement and build the security system to protect the transgender person, as well as other inmates and staff. (Doc. 348, pp. 246-47). In Aiken's experience, placement of transgender women in a female facility reduces the possibility of random and systemic violence. (*Id.* at 247). Aiken's report points to the recommendation set forth by the Prison Rape Elimination Commission that prisons should make an individualized determination about how to ensure the safety of each inmate, and placement of transgender, LGBTQ, or other gender-nonconforming inmates in a particular facility or unit should not be made solely on the basis of the person's sexual orientation, genital

status, or gender identity. (Doc. 236-1, p. 9; Doc. 348, pp. 253-54). He notes that Department of Justice regulations also reject the practice of housing transgender prisoners solely based on their genital status. *Id.*, citing 28 C.F.R. § 115.42(c) and (e). Aiken observed that IDOC's policy of housing transgender prisoners solely on the basis of their genital status failed to comply with these regulations. (Doc. 236-1, p. 9). Aiken further expressed concern that IDOC's decision-making process regarding housing transgender prisoners improperly relied on security-related concerns to deny placements recommended by medical staff and allowed non-medical correctional staff to vote down such transfers. (Doc. 236-1, pp. 11-13; Doc. 348, pp. 255-57). He opined that IDOC was not adequately considering the elevated risk of sexual and physical assault faced by transgender women housed in male prisons when making transfer decisions. (Doc. 236-1, pp. 14-15).

Aiken testified that allowing a transgender prisoner to choose the gender of the guard who will conduct a body search does not jeopardize the security of an institution. Further, the practice eliminates conflict and accusations of illicit conduct by staff that may occur with cross-gender searches. (Doc. 348, pp. 251-52). Aiken's report noted that IDOC staff conducted searches of prisoners according to the gender of the facility (*e.g.*, male officers search a transgender woman housed in a male prison), contrary to PREA standards limiting cross-gender searches except in exigent circumstances. (Doc. 236-1, pp. 16-17). In the context of cross-gender searches, a prisoner's "gender" is based on their gender identity. (Doc. 236-1, 17).

The Plaintiffs' testimony demonstrated to Aiken that IDOC staff are not putting

into practice the policies that are intended to address the vulnerability of transgender inmates. (Doc. 348, pp. 248, 261-62). Aiken had reviewed IDOC's new administrative directives and noted that having a policy is only the first step in making changes; it will be necessary for all officials from the top down to personify and model the changes, engaging staff in discussions to manage change, reinforcing behavior, and moving staff into compliance and commitment to the policy. (Doc. 348, pp. 249-50, 252). He acknowledged that the 2021 Administrative Directive gives transgender inmates a choice on the gender of the person who will search them but testified that he didn't see that being practiced, and Plaintiffs' testimony demonstrated that the directive was not always followed. (*Id.* at 265-66).

**Dr. Vin Tangpricha**

Dr. Vin Tangpricha is a medical doctor specializing in endocrinology and the treatment of transgender individuals with gender dysphoria and is a professor of medicine at Emory University. He reviewed medical records of Plaintiff class members, prepared a report (Doc. 123-2) supporting Plaintiffs' motion for preliminary injunction, and testified at the evidentiary hearing in 2019, as well as at the August 2021 bench trial. (Doc. 157, pp. 88-184; Doc. 186, pp. 11-14; Doc. 353, pp. 376-481).

Dr. Tangpricha testified at trial that he has treated roughly 400 transgender patients over the past 10 years. (Doc. 353, p. 377). He co-authored the WPATH standards of care, is a past president of WPATH and serves on its board, and was a co-author of the Endocrine Society Guidelines for treatment of transgender people, which sets forth the minimum standards for care of gender dysphoria. (Doc. 157, pp. 91-92; Doc. 353, pp. 378,

382). The first version of the Guidelines was published in 2008, and an updated version was published in 2017 (Doc. 157, p. 145).

Dr. Tangpricha testified that if a transgender person is on hormone therapy but their blood hormone levels are not within the guidelines set by the Endocrine Society, the individual is not receiving effective care. (Doc. 353, pp. 384, 386, 388). A transgender female should have a blood testosterone level of less than 50 nanograms[10] per deciliter and Estradiol between 100-200 picograms per milliliter. (Doc. 353, p. 384; Doc. 157, pp. 121-22).[11] For a transgender man, the testosterone level should be between 400-700 nanograms per deciliter. *Id.* If these levels are not achieved with the initial hormone medication at maximum dosages, the guidelines indicate a switch to a different medication regimen is in order. (Doc. 353, pp. 386-87, 389). Blood hormone levels should be monitored every three months so the clinician can adjust the hormone dosages. (*Id.* at 390). For safety reasons, transgender women must be monitored for kidney function, prolactin, and potassium levels, and transgender men must have their blood counts monitored. (*Id.* at 385).

If a person has a hormone-sensitive cancer or blood clots, those conditions should be treated before starting hormone therapy. (*Id.* at 391). No other medical conditions would justify denying or discontinuing hormone therapy to treat gender dysphoria. (Doc. 353, pp. 391-92). An elevated prolactin level may be caused by another medication

---

[10] The bench trial transcript (Doc. 353, p. 384) erroneously stated the testosterone level should be below 15 nanograms per deciliter. (*See* Doc. 336).

[11] The Court notes that Dr. Tangpricha testified to these target blood hormone levels in 2019, as well as in 2021.

or a brain tumor; screening (such as an MRI to rule out a tumor) must be done to determine the cause, but a transgender woman could still be given Spironolactone to start hormone therapy. (*Id.* at 393-95). A transgender person on hormone therapy faces several health risks if therapy is suddenly stopped, including increased anxiety, depression, more self-harm, hot flashes, sweats, and loss of bone density. (Doc. 353, p. 397).

When Dr. Tangpricha testified at the July 2019 evidentiary hearing, he stated that IDOC was "rarely" doing blood work for transgender prisoners. When lab tests were done, hormone levels in 90 percent of the tests were not in the accepted guideline ranges; he found no evidence that doses were being adjusted to achieve proper blood levels; and safety monitoring was not being done. (Doc. 157, pp. 142-44; Doc. 353, pp. 398-400). Two of the named Plaintiffs were on conjugated estrogen, which is not a recommended therapy. Dr. Tangpricha concluded in 2019 that hormone therapy for the Plaintiff class did not meet the Endocrine Society Guidelines and put their health at risk. (Doc. 157, pp. 142-44; Doc. 353, p. 400).

Dr. Tangpricha prepared an updated report in August 2020, summarizing his review of medical records for the Plaintiff class between August 2019 and August 2020. (Doc. 353, pp. 400-01). As of August 2020, only one named Plaintiff (Janiah Monroe) was receiving blood tests to monitor hormones at the recommended frequency and had hormone levels in the proper range, but none of the safety blood tests had been done (for potassium, creatinine, and prolactin). (*Id.* at 402). The other four named Plaintiffs were not given blood tests at the recommended frequency and did not have hormone levels within the guideline ranges. (Doc. 353, p. 402). Two named Plaintiffs continued to be on

conjugated estrogen. Dr. Tangpricha found no evidence that medical providers had taken any action in response to the blood tests or to symptoms reported by two individuals (continued frequent erections, breast pain, and headaches) that should have prompted further testing. (Doc. 353, pp. 402-04). For the larger Plaintiff class, out of the "several dozen" sets of medical records he reviewed, only six showed both the Estradiol and testosterone levels within the guideline ranges. (*Id.* at 405). Five people on hormones had undergone no blood tests at all, and another 15 had only one instance of blood work. Hormone doses were only "very rarely" adjusted to try to get blood levels within the correct range. Dr. Tangpricha concluded that the Plaintiff class's hormone therapy had not meaningfully changed since he testified in July 2019 and "remained woefully inadequate." (*Id.* at 405).

Dr. Tangpricha prepared his most recent report in June 2021, analyzing medical records for the named Plaintiffs and other class members from August 2020 to June 2021. (*Id.* at 406-07). Of the named Plaintiffs, Melendez's most recent blood work was in March 2020, showing Estradiol at a "very low" level of 49, only half the guideline level, and it had dropped from the year before. Her testosterone level was higher than the guideline range. (*Id.* at 408). Additional records produced after June 2021 showed that Melendez was still on the same hormone dosages that resulted in levels outside the recommended ranges, and she continued to have distress from experiencing erections. She had not had repeat blood testing for hormone levels since 2020—even though some other blood work was done in February 2021. (*Id.* at pp. 408-10).

As of June 2021, Kuykendall's most recent blood work from October 2020 showed

testosterone levels in the guideline range, but her estrogen level was "extremely low," having dropped significantly from her November 2019 test. (*Id.* at 410). Her prolactin level was more than twice the normal level, yet no provider had questioned her about symptoms or recommended any tests to determine why prolactin was elevated, nor had her Estradiol dose been adjusted. (Doc. 353, pp. 410-11). After Dr. Tangpricha's June 2021 report, he obtained blood test records from May 2021 on Kuykendall, which showed her Estradiol and testosterone were within the guideline ranges for the first time since 2015, but her prolactin level had not been checked. (*Id.* at 413). Dr. Tangpricha concluded her hormone therapy was inadequate and put her at risk because it should not have taken six years to achieve therapeutic hormone levels, and nothing had been done to investigate the cause of her elevated prolactin.

Monroe's records showed blood work from March 2021 with testosterone in the guideline range, but her Estradiol level was too low and showed a decline of nearly 50 percent within the past two years. (*Id.* at 414). Her May 2021 blood tests showed the same results, there had been no adjustment in her medications, and she was still having "intense symptoms of gender dysphoria." (*Id.* at 414-15).

Sasha Reed's last blood work was done in June 2020; it showed Estradiol within the proper range, but her testosterone was too high. (*Id.* at 415-16). Her prolactin levels were checked in August and September 2020 and were elevated, but as of June 2021 she had not been given an MRI to confirm or rule out a pituitary tumor. Additional records produced since June 2021 showed no further blood or diagnostic testing, placing her at risk.

Lydia Vision's records as of June 2021 showed no blood testing since November 2019 and no safety lab testing in over a year. Her testosterone was last checked in April 2018 and the level was 54, above the guideline range. (Doc. 353, pp. 416-17). Newer records since June 2021 showed Vision's testosterone within the guideline range but her Estradiol had decreased to below the guideline range, despite her being on a higher than maximum dose of oral Estradiol. She had not been put on a different estrogen medication as the Endocrine Society Guidelines recommend. Her Spironolactone had been decreased without any explanation in the records. (Doc. 353, p. 417).

Based on this review, Dr. Tangpricha concluded *none* of the five named Plaintiffs was receiving adequate hormone therapy, despite his testimony nearly two years prior that specified what needed to be done to properly treat these individuals, as well as other members of the Plaintiff class. (*Id.* at 418).

Dr. Tangpricha also reviewed medical records produced for over 100 class members and concluded their treatment was likewise still inadequate. (*Id.* at 418-19). Only eight individuals had hormone levels in the correct range, blood work was not done often enough and did not always check levels of all hormones, and there was rarely any response to the lab results. After June 2021, Dr. Tangpricha received additional records on over 90 class members, which showed an increase in the frequency of blood testing in the past six months but revealed that out of 91 people, only 11 had hormone levels within the guideline ranges. (*Id.* at 419). Conjugated estrogen had been discontinued, but potassium and kidney levels were still not being measured, and no changes were made to hormone dosages in response to blood tests. (Doc. 353, pp. 419-24; Exhibits 488A, 488B,

488C, 488D).

Dr. Tangpricha testified in detail about the medical records of three individuals.[12] (Doc. 353, pp. 420-47). Two of the transgender women's medical records reflected their diagnoses as "GID" (Gender Identity Disorder), an outdated and no longer medically accepted term. (*Id.* at 424-25, 445). The first individual's hormone levels were not in the correct range in October 2020, yet the provider documented her condition as "GID stable, good," and did not recommend any change in her hormone dosages. (*Id.* at 425-26). This person's April 2021 lab tests showed her hormone levels were even farther outside the guideline ranges, with the testosterone level having tripled to 729. (*Id.* at 427-28; Exhibits 488E, 488F). Her clinic notes dated June 18, 2021, showed the same Estradiol and testosterone levels, with another note, "Transgender, good, stable. Leaving in August." (*Id.* at 328-29).

The second individual started hormone therapy around February 2020, but no blood work was done until October 2020 when she should have been tested at least three times in that interval. (*Id.* at 429-33; Exhibits 489A, 489B). Her Estradiol level was 36, less than half of the target 100-200 range, her testosterone level was not tested, and her prolactin level was very high at 21.3. (Doc. 353, pp. 431-32). Nothing was done to investigate the reason for the elevated prolactin,[13] no testing had been done for other

---

[12] While these individuals' names are redacted from the official transcript, the redacted and unredacted transcripts confirm the testimony covered records for three people. (Doc. 353, p. 446).
[13] Dr. Tangpricha noted that this individual was on a medication, Remeron, which is known to increase prolactin, but her records contained no evidence that her provider had considered changing that medication or taking any other steps to address her elevated prolactin. (Doc. 353, pp. 437-38).

safety issues (potassium and kidney function), and her hormone dosages were not adjusted in response to the labs. Her October 2020 evaluation of suicide potential ranked her at 10 out of 10 for both depression and anxiety, which are known symptoms of untreated gender dysphoria, yet she was described in November 2020 as "GID good, stable." (Doc. 353, pp. 433-38; Exhibits 489C, 489D, 489E). No additional blood tests had been done since October 2020, and in May 2021 her hormone dosages were the same as in May 2020. (Doc. 353, pp. 436-37).

The third individual had formerly been on hormone therapy, but her estrogen was discontinued, causing her to undergo unwanted physical changes and experience depression, anger, and frustration. (*Id*. at 438-47; Exhibits 491A, 490A, 490B, 490C). As of August 2020, she had been off estrogen for two and a half years and had been told the reason was because her A1C level (a marker for diabetes control) was elevated. According to Dr. Tangpricha, elevated A1C is not a medically accepted reason to discontinue hormone therapy because diabetes can be treated alongside gender dysphoria. (Doc. 353, pp. 440). Discontinuing hormones for a person with gender dysphoria would be expected to increase anxiety and depression—as this individual reported—and creates a risk of osteoporosis and bone loss. (*Id*. at 440-41). Her March 2021 records showed she still was not receiving hormone therapy and had contacted mental health about the matter. (*Id*. at 441-42). On April 20, 2021, she reported to mental health that she was still upset about not receiving hormone therapy. (*Id*. at 443). Her A1C had reached a normal level but hormones had not been restarted. (*Id*. at 442-45). She was again prescribed Estradiol and Spironolactone, at a time when her A1C level had gone back to above normal. (Doc. 353,

pp. 445-46, 457).

Dr. Tangpricha testified these records indicate the medical providers were not qualified to properly administer hormone therapy because no medication adjustments were made when tests showed hormone levels out of therapeutic ranges, blood tests were not being done at proper intervals and often did not include safety monitoring, and when safety substances were tested, providers were not reacting to results such as elevated prolactin with further diagnostic measures. (*Id.* at 426, 429, 438, 446, 477-78). These three individuals' cases were not "outliers" but were typical of the problems found in records for many of the 90-plus class members. (*Id.* at 446-48). Dr. Tangpricha concluded that IDOC has not meaningfully improved hormone therapy for Plaintiff class members during the two years since the 2019 hearing (that led to the Court's first Preliminary Injunction). In his opinion, Plaintiffs are still being placed at risk with ineffective and unsafe treatment. (*Id.* at 447).

**Dr. Randi Ettner**

Dr. Ettner testified for the Plaintiffs in the 2019 evidentiary hearing and again at the August 2021 trial. (Doc. 158, pp. 4-100; Doc. 186, pp. 14-16; Doc. 353, pp. 481-516; Doc. 325, pp. 523-574). She is a clinical and forensic psychologist specializing in the assessment and treatment of gender dysphoria. (Doc. 158, p. 5; Doc. 353, p. 482). She has treated over 3,000 patients with gender dysphoria including imprisoned individuals, has consulted with prisons on policies for transgender inmates, and has authored numerous peer-reviewed publications on transgender health. (Doc. 158, pp. 7-8; Doc. 353, pp. 482-85). She has been involved with WPATH since 1992, holding leadership positions

including chairing the committee for incarcerated persons since 2009 and co-authoring the new update of the WPATH Standards of Care. (Doc. 353, pp. 485-86).

Prior to the 2019 hearing, Dr. Ettner personally evaluated each named Plaintiff and reviewed their medical records, concluding that each has severe gender dysphoria that IDOC is not adequately treating by delaying hormone therapy or denying it altogether for reasons that are not medically justified, failing to facilitate social transition, and failing to assess them for surgical intervention. (Doc. 158, pp. 9-10, 34-44, 38; Doc. 186, p. 14). Her review of records of other Plaintiff class members showed the same pattern of inadequate treatment. (Doc. 158, pp. 10-12, 37-38; Doc. 186, p. 14). Dr. Ettner concluded that none of the members of the former TCRC were competent to treat gender dysphoria, and IDOC mental health staff, in general, were likewise not competent to treat gender dysphoria. (Doc. 158, pp. 50-51, 55-56; Doc. 186, p. 15). In sum, she opined that transgender inmates in IDOC facilities were at risk for self-harm, psychological decompensation, and suicide because of the deficiencies in medical treatment for gender dysphoria. (Doc. 158, pp. 58-59; Doc. 186, pp. 15-16; Doc. 353, pp. 489-90).

Since the 2019 hearing, Dr. Ettner has spoken to all the named Plaintiffs, visited Monroe in prison, talked with two other Plaintiff class members, and reviewed "tens of thousands" of documents including medical and mental health records, transcripts, Administrative Directives, emails, and recordings of committee meetings. (Doc. 353, pp. 486-89). She testified in August 2021 that she had "slightly" changed her conclusion regarding the adequacy of the named Plaintiffs' care since 2019. (*Id*. at 490). As of August 2021, Monroe and Vision had obtained a transfer, Vision had begun hormone treatment,

there was "some recognition" that the named Plaintiffs require surgery, and Vision had met with a surgeon. (Doc. 353, p. 490). But Dr. Ettner still maintained that care of the named Plaintiffs and the wider class fell below the WPATH Standards of Care and was inadequate because they have not had sufficient social transition including access to commissary items, were subject to searches and pat downs by male officials, had not been evaluated for surgery, and were not receiving adequate endocrine treatment. (Doc. 353, pp. 490-94). For the individuals who had been transferred to a women's prison, Dr. Ettner had concern whether adequate training had been done so that the transgender prisoners could be successfully integrated into the facility. (*Id.* at 491-92).

Class members' records were "peppered with examples" of prisoners being denied hormone treatments based on psychological factors such as not being "stable," having engaged in self-harm, or getting disciplinary tickets—none of which are reasons to withhold hormones—and instead underscore the need for hormone treatment for a person with gender dysphoria. (Doc. 353, pp. 494-95; Doc. 325, pp. 541-44). Dr. Ettner cited several examples of mental health providers failing to understand the difference between symptoms of gender dysphoria and separate psychological concerns, as well as many examples of misgendering and lack of basic understanding and vocabulary surrounding gender dysphoria. (Doc. 353, pp. 495-97; Doc. 325, pp. 549-51).

Dr. Ettner saw no developments since 2019 to change her opinion that IDOC's treating staff lack the expertise to provide adequate treatment to class members with gender dysphoria. (Doc. 353, pp. 514-16). While WPATH certification is not a requirement for a provider to render adequate care to transgender prisoners, a provider should have

experience, qualifications, and understanding about what constitutes adequate care. (Doc. 325, pp. 568-69). In her opinion, IDOC providers have not displayed minimal competence in treating gender dysphoria, and members of the THAW Committee are not providing adequate care for transgender prisoners. (Doc. 325, pp. 568-69).

Dr. Ettner testified that IDOC's process for approving individuals for gender-affirming surgery does not align with the WPATH Standards of Care because the template for the assessment by the prisoner's mental health professional is inadequate to inform the surgeon about the patient's needs. (Doc. 353, pp. 497-500). The surgical assessment/referral should include a thorough psychological review of the therapist's interaction with the patient; the provider should know the patient well or have followed him/her over a period of time; and there should be a second independent review by a different provider. (Doc. 325, p. 572-74). Dr. Ettner saw no indication that this type of assessment had occurred for any of the class members seeking surgery, and it was unclear whether individuals met with the same provider consistently who was able to get to know the patient over a period of time. (*Id.* at 573-74).

Dr. Ettner discussed the IDOC's recently revised Administrative Directives[14] and the procedures under those documents. (Doc. 353, pp. 502-11). She concluded that the Directives are not consistent with the WPATH Standards of Care because they provide that medical decisions are still made by a committee of people who are not the treating providers for the transgender individuals; they do not include shared decision-making

---

[14] "Evaluation, Treatment, and Correctional Management of Transgender Offenders" (Exhibit 600) and "Searches of Offenders" (Exhibit 601).

that honors the patient's decision on medically indicated treatment; and in practice, inappropriate criteria such as a person's sexual activity, disciplinary tickets, ordinal crime, and physical stature are used to deny medical treatment. (Doc. 353, pp. 502-09).

Dr. Ettner opined that a decision whether to transfer a transgender prisoner to a facility matching their expressed gender is a medical decision, because it facilitates social role transition, which is a medical accommodation. (Doc. 325, pp. 529-31, 562-63). Likewise, access to gender-affirming commissary items and the ability to choose the gender of the officer who conducts a body search are part of medical treatment for gender dysphoria. (*Id*. at 531-32). Cross-gender body searches do not align with the standards of care or gender-affirming care.

Dr. Ettner concluded in 2019 that the TCRC members did not meet the qualifications set forth in the WPATH Standards of Care,[15] and in 2021 she opined that the officials still have not met those criteria although they have gained some knowledge. (Doc. 353, pp. 512-13; Doc. 325, pp. 544-45). Some committee members have taken the WPATH GEI (Global Education Initiative) Foundations Course, which is introductory level training in the field of transgender healthcare, and participated in other meetings, but those sessions do not confer expertise to qualify as a mental health professional under the WPATH Standards. (Doc. 353, pp. 513-14).

In her reviews of records and interactions with the named Plaintiffs since the 2019 hearing, Dr. Ettner observed that they and other class members have suffered harm

---

[15] Dr. Ettner referred specifically to the minimum criteria in the Standards of Care at 22 and 23 for a qualified mental health professional who can assess and treat gender dysphoria.

including emotional and psychological decompensation (major depressive disorders, anxiety, trauma, self-harm, suicidal ideation, and suicide attempts) due to inappropriately treated or untreated gender dysphoria. (Doc. 325, pp. 533-36).

*Defendants' Evidence*

**Dr. Shane Reister**

Dr. Reister, a Licensed Clinical Psychologist, has been the Southern Regional Psychologist Administrator for IDOC since 2013 and previously worked in IDOC for five years as a Wexford Health Sources contract employee. He is responsible for overseeing mental health services for 11 prisons and two boot camps, as well as for quality assurance and trainings. (Doc. 325, pp. 576-78, 609). Dr. Reister participated on the former TCRC and is a voting member of both the THAWC and TAC based on his appointment to the TAC by Dr. Puga (TAC co-chair) and his appointment to the THAWC by Dr. Bowman (*Id.* at 614-17). He updates trainings and consultations with IDOC clinicians based on problems that come to the attention of those committees. Dr. Reister assisted in drafting the April 2021 Administrative Directive (Exhibit 600) and emphasized the need for access to surgeries for transgender inmates, based on his research. (*Id.* at 594-96).

Dr. Reister consults with mental health providers throughout the state on transgender care issues, holding monthly transgender care case conferences for providers (who must attend at least 50 percent of these), and he visits facilities to assist clinicians if they request help. (*Id.* at 577-78, 582-85, 611-12; Doc. 354, p. 633). Each inmate's treatment plan is created by the on-site mental health provider in consultation with the patient. (Doc. 325, pp. 592-93). Dr. Reister will consult with the provider and the client in the event

of a disagreement over treatment if the matter is brought to his attention. (*Id.* at 593-94).

Dr. Reister attended the two-part GEI special training that WPATH conducted for IDOC and has attended other WPATH conferences. (Doc. 325, p. 578). He has been a WPATH member but is not certified by WPATH. WPATH offered its entry-level GEI training to IDOC on three different occasions, and it was mandatory for mental health providers. (*Id.* at 619-20; Exhibits 510, 511, 512).

Most of the IDOC mental health providers who treat gender dysphoria have volunteered to do so based on their interest. (*Id.* at 581-82). Yet five of the providers who volunteered to give transgender care never attended the "mandatory" WPATH training. (Doc. 354, p. 629; Exhibit 513). The providers who refused to treat Melendez for gender dysphoria, one of whom (Ramos)[16]—who recently asked her what Jesus would want and told her to learn to live in the body she has—did not participate in the WPATH training. (Doc. 325, pp. 622-23). Ramos had three opportunities to take the training since he was hired in 2020 yet did not. (Doc. 354, p. 628). For the providers who did attend the online training, there was no test or follow-up to ascertain whether the provider engaged with the training or absorbed the material, and there has been no formal training on how to implement the new Administrative Directives. (*Id.* at 630-31).

The mental health providers in IDOC are Wexford Health Sources employees, most of whom have master's level licensing. Dr. Reister does not supervise or hire these Wexford employees but does consult with them. (Doc. 325, pp. 579, 610). In addition to the WPATH GEI training, Dr. Reister developed a 10-hour training on transgender care

---

[16] (Melendez testimony, Doc. 347, pp. 63-65).

in corrections, which is given over two days and is offered two or three times per year. (Doc. 325, pp. 580, 585-86, 589-91). Dr. Reister consulted outside providers in developing his staff training programs. (Doc. 325, pp. 603-04). Dr. Reister also consults with Dr. Erica Anderson (a consultant for IDOC discussed below) on a weekly basis. (*Id.* at 592).

In addition to training mental health staff, Dr. Reister provides a recorded annual training on transgender matters for all IDOC staff including new employees on issues such as misgendering and respect for transgender inmates. (*Id.* at 586-89, 605-07). The transgender portion of the training runs for about an hour and 20 minutes. (*Id.* at 608). As of the August 2021 trial, he had not yet been able to update this training to include the April 1, 2021 Administrative Directives. (*Id.* at 596-97; Doc. 354, p. 631). IDOC staff are responsible for reviewing all administrative directives on their own. (Doc. 325, pp. 606-07).

Dr. Reister has disseminated information on the additional commissary items that are to be available to transgender prisoners but was unaware until hearing Plaintiffs' testimony that some facilities still did not have some items in stock and were not providing undergarments to transgender prisoners as required. (*Id.* at 599-600).

Under the new THAWC, hormone treatment decisions are made by the site provider rather than by the committee, but the committee still must give final approval to transfers and surgery requests after the site provider presents a case. (*Id.* at 614). Under the former TCRC, the committee would handle between six and 10 cases per month. With the new THAWC structure, the process has been slower in considering surgery requests. (Doc. 325, pp. 601-02).

Dr. Reister sent out a survey in August 2021 in order to make a complete list of transgender individuals and what surgical procedures they want. (Doc. 325, p. 602). Prior to 2020, Dr. Reister had conducted a comprehensive survey of all known transgender prisoners in IDOC, which he shared in April 2021 with Dr. Conway, Dr. Puga, and Dr. Anderson so that the THAW Committee would have a list of all prisoners requesting surgeries. (Doc. 354, pp. 634-36; Ex. 509). The survey showed that 28 of the 139 prisoners listed had requested hormones but had not received treatment. Dr. Reister did not know whether follow-up had been done to see why those people were not on hormones. (*Id.* at 637). Fifty-one of the individuals on the list had requested a facility transfer, and 97 of the 139 had a desire for surgery. No surgeries had been approved as of the August 2021 trial, but four surgery requests had been reviewed. (*Id.* at 637-39).

Dr. Reister is developing the PRISM program—a special housing unit located in Centralia Correctional Center—in consultation with the Moss Group, to address safety concerns of transgender prisoners housed in facilities that do not align with their gender identity. (*Id.* at 648-51). Prisoners accepted for placement in the unit must agree to take part in peer education on anti-racism, anti-transphobia, anti-heterosexism, and anti-sexism; staff and inmates will participate in training in these areas. Inmates in the unit may be transgender or cisgender and are referred for transfer to the unit by on-site staff.

**Dr. Lamenta Conway**

Dr. Conway is a board-certified physician in internal medicine who has been the IDOC's Deputy Chief of Health Services since September 2019, with responsibility to improve inmates' health. (Doc. 354, pp. 652-53). Her 22 years of experience is primarily

in academic medicine. She cared for transgender patients in her earlier primary care practice but was not involved in diagnosing gender dysphoria. (Doc. 354, p. 691). She was assigned responsibility for care of transgender inmates around the time of this Court's December 2019 Preliminary Injunction. (*Id.* at 653).

One of the first changes made after that injunction was for the TCRC to stop making decisions on whether an inmate would get hormone therapy; going forward those decisions are made by the treating medical provider. (*Id.* at 657-58). The COVID-19 pandemic slowed progress on revising policies and changing to the dual committee structure of the THAWC and TAC. (*Id.* at 658-60). Dr. Conway chairs the THAWC and serves with Dr. Puga, Dr. Reister, and Dr. Anderson on both committees. (*Id.* at 660-63). Their membership on both committees provides oversight because inmates' medical concerns are affected by the operational and safety matters that are the province of the TAC, but no operational staff are included in the THAWC.

After the committee change took effect, the THAWC discussed several requests for transfer to Logan from inmates who had not previously identified as transgender and had not requested hormone therapy, some of whom were designated as sexually dangerous persons.[17] (*Id.* at 664-66).

In order to comply with the Preliminary Injunction's requirement that decisions on treatment for gender dysphoria are to be made by medical professionals who are qualified to treat the condition, Dr. Conway ensures that newly hired physicians have

---

[17] Prisoners designated as "Sexually Dangerous Persons" are not eligible for transfer away from Big Muddy Correctional Center. (Doc. 354, p. 666).

proper credentials. (Doc. 354, pp. 667-68). Some physicians have been terminated. (*Id.* at 668-69). Dr. Conway advocated for WPATH training for medical providers, noting that self-study is not adequate for the highly specialized area of hormone care and surgical care for transgender patients. (*Id.* at 694-95). The WPATH GEI Foundations course has been offered to medical directors, providers, health care administrators, and operational staff including majors, lieutenants, and wardens. (*Id.* at 668-69). Wexford has updated its policy on transgender care and has trained providers on hormone therapy. (*Id.* at 677).

The THAWC had its first meeting in April 2021 and held four meetings prior to the bench trial. (*Id.* at 661-62). The main role of the THAWC is to make sure that gender-affirming surgery is provided without barriers and in alignment with the WPATH recommendations. The patient must have capacity to give informed consent, have lived in their gender role for over a year, been on hormone therapy, and any psychiatric issues must be under reasonable control or care. (*Id.* at 681-82). The THAWC also assists with management of hormone therapy in challenging cases. (*Id.* at 697). Surgery requests are presented to the THAWC by the mental health provider who has been caring for the patient; the medical provider may also participate in the presentation. (*Id.* at 681-82, 714-15). Letters of support from both the mental health provider and medical provider are prepared after THAWC approval, based on templates provided by Dr. Conway, and are given to Dr. Loren Schechter, who will perform gender-affirming surgeries. (*Id.* at pp. 715-16, 740). The THAWC approved two inmates—whose cases had been considered before the pandemic—for surgery in May 2021. Four others were approved in July 2021, and three patients were denied approval for surgery at that time. (*Id.* at 682-

83, 725-26, 731-33). One was denied based on concern over medication compliance and high testosterone levels; the other two had never previously identified as transgender, were only recently diagnosed with gender dysphoria, were not on hormone therapy, and had expressed interest in surgery but had not actually requested it. (Doc. 354, pp. 731-35).

Some inmates whose surgery requests had been previously considered and denied by the former TCRC have not yet been reconsidered by the THAWC, while newer requests were considered ahead of them. (*Id.* at 747-48). Dr. Conway stated the committee needs to catch up and re-present those cases "fairly quickly." (*Id.* at 730-31). Similarly, the THAWC needs to address and fix the situation of the 28 prisoners who have been diagnosed with gender dysphoria and have not been put on hormone therapy. (*Id.* at 748).

Work is underway to arrange for hair removal for surgery patients, and for post-operative care at an appropriate facility, but these provisions have not been finalized as of August 2021. (*Id.* at 685-88, 721). When surgery is approved, the patient must be approved for Medicaid coverage, which is a process for all inmates who get inpatient treatment outside IDOC. (*Id.* at 689, 722-23).

Dr. Ravi Iyengar, an endocrinologist, sits on the THAWC to advise and educate the members on issues relating to hormone therapy. He is also available for clinical case conferences. (Doc. 354, pp. 662, 670-72, 697-98). An interagency agreement is being finalized with the University of Illinois Department of Endocrinology, under which a team headed by Dr. Brian Layden will provide direct care for all transgender prisoners in the state and participate in case conferences. (*Id.* at 670-73). Dr. Schechter (the surgeon) will conduct the final evaluation for inmates who are approved for gender-affirming

surgery. Dr. Schechter also will sit on the THAWC and will provide educational videos for surgery candidates. (Doc. 354, pp. 674, 682, 685). Dr. Erica Anderson has consulted on revising the committee structure and participates in THAWC meetings as a non-voting member. (*Id.* at 674-75).

To address the Court's mandate to provide timely hormone therapy, Dr. Conway is initiating a continuous quality improvement ("CQI") process, which should catch those cases where the inmate has requested but not been given hormone treatment and address problems of labs not being done timely. (*Id.* at 678-79). Southern Illinois University is contracted to work with IDOC on the CQI system to cover transgender health care, as well as overall health care in IDOC. *Id.* At the time of trial, the CQI system had not yet been drafted or implemented. (*Id.* at 713-14).

The TAC is responsible for addressing the transfer aspect of social transition for transgender prisoners, but the THAWC is responsible for looking at the mental health and stability of inmates seeking a transfer and for referring cases to the TAC where transfer is needed. (*Id.* at 679-80). The TAC deals with issues related to searches, gender-appropriate commissary, placement, and transfers, which are also aspects of medical care. (*Id.* at 679-80, 696).

New inmates undergo an initial medical exam and mental health screening within 24 hours of entry to IDOC and, if indicated, a more comprehensive mental health evaluation is to be done within seven days. Inmates may or may not identify themselves as transgender during intake, and Dr. Conway was unsure whether psychiatry has oversight in place to make sure the intake procedures are followed. (Doc. 354, pp. 705-

710). The THAWC is supposed to be notified of every inmate who identifies as transgender. (Doc. 354, pp. 746-47). Hormone therapy is to be continued if the new inmate had previously been prescribed such medication, but if a prescription cannot be verified, the person must go through the process to be evaluated by an IDOC provider before hormone therapy can be given. (*Id.* at 709-11).

**Dr. William Puga**

Dr. Puga is a physician specializing in psychiatry who has practiced since 1990. (Doc. 349, p. 763). He worked for Wexford as a treating psychiatrist in two Illinois prisons for a year before becoming the IDOC's Chief of Psychiatry in March 2018. (*Id.* at 764-65). Dr. Puga is responsible for overseeing psychiatric care in all IDOC facilities, where the providers include approximately 50 Wexford contract psychiatrists, as well as other mental health staff. (*Id.* at 765-66).

Dr. Puga was chair of the former TCRC and was involved with other IDOC officials in revising policies on transgender inmates, beginning in September 2019 and continuing after the December 2019 Preliminary Injunction, though the process was slowed by the pandemic. (*Id.* at 770-80). Four transgender women prisoners were transferred to Logan before the revised Administrative Directives were adopted in April 2021, and four more transgender women have been moved or assigned to Logan since then. (Doc. 349, pp. 781-84). In June 2021, Dr. Puga met with the newly formed transgender committee at Logan to prepare them to assist transgender inmates transferring there, and he has had follow-up communication with them regarding ongoing supervision and assistance. (Doc. 349, pp. 784-86, 880-82). The Logan committee

includes mental health and medical professionals, security, and education staff.

Dr. Puga serves on the THAWC as a voting member and is co-chair of the TAC along with co-chair Mike Chappell, a security specialist assigned to the committee by the Chief of Operations. (Doc. 349, pp. 787-88). Other members of the TAC are Dr. Conway (Deputy Chief of Health Services), Twyla Pillow (Transfer Coordinator), Tangenise Porter (Chief of Women's Services), Dr. Reister, Deputy Director Smith, and Ryan Nottingham. (*Id.* at 822-23). The THAWC members are Dr. Puga, Dr. Conway, Dr. Hinton, Dr. Reister, and a Regional Nursing Administrator and medical consultants as appointed by the Medical Director. (*Id.* at 823-24). The former TCRC was made up of Dr. Puga, Dr. Hinton, Twyla Pillow, Mike Chappell, and Dr. Meeks (former Medical Director) who was replaced on the TCRC by Dr. Conway, and Dr. Reister. (*Id.* at 824-25).

Dr. Puga testified that he thinks IDOC addressed the problems identified in the 2019 Preliminary Injunction, which ordered Defendants to cease mechanically assigning housing assignments based on a prisoner's genitalia and/or physical size or appearance. (*Id.* at 835-36). The April 2021 Administrative Directive states that transgender prisoners are not to be assigned to gender-specific facilities based solely on their external genitalia, specifies new prisoners must have medical and mental health screenings at intake, and includes procedures to follow when a prisoner first identifies as transgender. (Doc. 349, pp. 836-42). But when the co-chair of the TAC, Mr. Chappell, described the current practice in his July 2021 deposition, he confirmed that the TAC is not consulted about the initial housing placement of a newly arrived transgender prisoner, and the new prisoner

will be assigned based on his/her genitalia alone.[18] (Doc. 349, pp. 842-43). Only if a transfer is requested by a transgender prisoner already in IDOC will the matter be brought to the THAWC and the TAC. *Id.* Under the directive, the TAC is only authorized to make transfer decisions, not initial placement decisions. (*Id.* at 844-45). As of the August 2021 trial, Dr. Puga had provided only limited training for staff on how to implement the new Administrative Directives. (*Id.* at 848-49).

Dr. Puga acknowledged that despite his testimony in July 2019 that IDOC had a quality assurance program in place to ensure that WPATH standards of care were followed for transgender prisoners, no quality assurance program specific to transgender prisoners existed then or currently. (*Id.* at 831-34). Dr. Puga was informed in April 2020 by Dr. Reister, with reference to inmate London Fulton, that Dr. Siddiqui continued to not prescribe hormones despite directions from Wexford. Dr. Puga then referred the matter to Dr. Conway. (*Id.* at 868-69). At the mental health weekly administrative meeting on May 1, 2020, Dr. Reister again brought up Dr. Siddiqui's delay in giving hormone treatment to a transgender prisoner (London Fulton) and the doctor's alleged comment that "it won't hurt to be a straight man a little longer." (Doc. 349, pp. 869-70). Dr. Hinton responded that immediate action should be taken regarding this patient, and he understood Dr. Puga was doing so. *Id.* Dr. Puga recalled referring the matter to

---

[18] Dr. Puga and Mr. Chappell both noted a recent exception where a transgender woman assigned male at birth and who had previously been housed at Logan, was released from IDOC and then was assigned back to Logan upon her re-entry to IDOC custody. In that case, an informal meeting of the TAC was convened and voted to make the initial placement of the individual at Logan rather than at a male facility. (Doc. 349, pp. 841-43). There was one other instance of a new incoming transgender inmate being assigned to a facility matching their expressed gender, and the new Administrative Directive does not provide for this situation. (Doc. 349, pp. 886-87).

Dr. Conway but he did not follow up with Dr. Siddiqui.[19] Dr. Conway had the authority to interface with Wexford directors on matters involving their providers, and Defendants introduced her email regarding a follow up meeting. (Doc. 349, pp. 876-77; Ex. 636).

Dr. Puga believes that the training component of the Preliminary Injunction was satisfied by bringing the WPATH two-day online training to IDOC staff, which he attended. (*Id.* at 857-62). But some staff members' certificates of attendance for the WPATH training (Dr. Siddiqui and Mike Chappell) appear to be contradicted by electronic sign-in sheets showing that those individuals did not sign into the session on the day of the training. *Id.* Dr. Puga explained that some staff at the facility signed in under one person's name and other participants were present in the room.

After the April 2021 Administrative Directives, all commissary items available to women prisoners at Logan are to be made available to transgender women housed in men's prisons, however, not all items are currently in stock there. (*Id.* at 789-92). A survey of transgender men at Logan did not indicate problems with access to men's commissary items there. (*Id.* at 799-80).

Dr. Puga has been notified that cross-gender searches have still occurred even though they are prohibited under the new Administrative Directive, and he has alerted operations staff to the problem. (Doc. 349, pp. 792-93).[20] On cross-examination, it was

---

[19] As set forth above, London Fulton testified at the bench trial that she still was not receiving hormones and refused to see Dr. Siddiqui after his comments to her. (Doc. 347, pp. 208-11).
[20] The Directive on "Searches of Offenders" prohibits cross-gender *strip* searches. (Ex. 601, p. 2). It also provides that if an offender "claims to identify as transgender, yet has not been confirmed as such, [and] expresses concern for the gender of the staff performing a strip search, staff shall proceed with the search" and prepare a report for the TAC to review and take appropriate action. (Ex. 601, p. 11). Once a prisoner has been officially designated as transgender and listed as such

pointed out that the Directive on transgender offenders permits a pat or body search to be performed on a transgender prisoner by either male or female staff in a male prison, but only female staff should perform a pat or body search in a female facility. (Doc. 349, pp. 850-51; Exhibit 600, p. 9).

When an attorney for Kuykendall sought assurance that her client would not be subjected to a strip search by a male guard before a July 2021 in-person visit at Menard, the request was rejected by a lower-level official with a statement that the search "will be performed by a male officer since this is a male facility;" the Menard official attached the new April 2021 Administrative Directive as support. (*Id.* at 854-55, 878-79). Only when the matter was referred to Dr. Puga was it clarified to facility staff that a transgender prisoner is given the choice of which gender officer will search them. (Doc. 349, pp. 854-55, 878; Ex. 516). The process to follow in the event no female officer is available to search a transgender woman is still being refined. (Doc. 349, p. 793). Work is underway to allow identification of inmates as transgender in the "Offender 360" database, which is available to IDOC staff, and on the inmate's ID card if the person is willing to be publicly identified as transgender. (*Id.* at 801-04).

An inmate's request for transfer is presented to the TAC via the "DOC-400" form;[21] the person's diagnosis and medical/mental health history is presented by the mental health provider, and a representative from the warden's office and medical is often there.

---

in the Offender 360 database, his or her ID card should specify the gender of staff who will perform strip searches. (*Id.*; Ex. 600, pp. 8-9).

[21] The DOC-400 is to be a "comprehensive snapshot" of the individual, including diagnostic criteria and checklists of prescribed medication, completed by the mental health provider in coordination with the physician. (Doc. 349, p. 795).

(Doc. 349, pp. 794-95). Dr. Puga, along with Dr. Reister and Chief Porter of the women's division, conducts an interview of the prisoner to consider the factors listed in the Administrative Directive (Exhibit 600) regarding placement and programming. (*Id.* at 796-97). An individual's "predator" designation is not an absolute bar to transfer if there is reason to re-evaluate that status. *Id.* An individual's body size will not prevent her transfer to Logan. (*Id.* at 797-98). There is an appeal process for reconsideration of rejected transfer requests. (*Id.* at 804-05).

Dr. Puga acknowledged receiving a copy of Dr. Reister's comprehensive survey of transgender inmates in April 2021, which reported that 28 of the 135 prisoners were interested in (and apparently not on) hormone therapy, about 70 percent had requested surgery, and 37 percent wanted a transfer. (*Id.* at 872-74; Exhibit 509). Since that time, Dr. Puga had never added this data to a meeting discussion agenda and had not forwarded it to anyone for follow up. (Doc. 349, pp. 874-75).

**Dr. Erica Anderson**

Dr. Anderson, Defendants' final witness, is a clinical psychologist with 40 years' experience in her field as a university professor, healthcare executive, and over the last 10 years, as a consultant on transgender issues. Transgender herself, she has treated hundreds of transgender patients with gender dysphoria and trauma. (Doc. 349, pp. 890-91, 907). She has served as a consultant to the IDOC since January 2020, contracted through December 2021, to assist in improving the delivery of transgender health care. (*Id.* at 891-92). She worked with IDOC officials and Wendy Leach of the Moss Group (another IDOC consultant) to propose changes to bring IDOC policies into compliance

with the Court's 2019 Preliminary Injunction, and she helped draft the April 2021 Administrative Directives. (Doc. 349, pp. 893-96; Ex. 600). She recommended the change to the two-committee structure set forth in that directive—to separate medical/mental health care decisions from security/administration issues—and she serves as a nonvoting advisor and participant in the THAWC and the TAC. (*Id.* at 897-902). She participates in Dr. Reister's telephonic case conferences with treating mental health staff and convenes weekly with Dr. Puga, Dr. Reister, and Dr. Conway on matters relating to the new policies. (*Id.* at 898, 906).

Dr. Anderson created the customized GEI training program on WPATH standards of care that IDOC medical and mental health treating professionals have participated in, first offered in late 2020 and conducted twice in 2021. (*Id.* at 902-04, 910-11, 913). At the time of her trial testimony, she was the president of USPATH (the U.S. affiliate of WPATH) and on the board of WPATH. She suggested Dr. Ravi Iyengar and Dr. Loren Schechter as endocrinology and surgical consultants, respectively, for IDOC. (*Id.* at 905).

No training on matters relating to transgender prisoners had yet been prepared or offered to correctional officers and non-medical/mental health IDOC staff, though proposals for such training have been solicited. (*Id.* at 912-13).

Dr. Anderson agreed that a transgender person could be highly distressed if they are prevented from making social transition changes to live in their affirmed gender. (*Id.* at 918). She acknowledged that despite the new directive's provisions on access to gender-affirming commissary items, providing hormone treatment in accordance with endocrine guidelines, prevention of cross-gender searches, and housing assignments, the

written policies have not yet been implemented. (Doc. 349, pp. 918-43, 948-49, 951-53).

## LEGAL STANDARDS

### *Eighth Amendment Deliberate Indifference*

The Eighth Amendment prohibits cruel and unusual punishment and "imposes a duty upon states to provide adequate medical care to incarcerated individuals." *Boyce v. Moore,* 314 F.3d 884, 888-89 (7th Cir. 2002). Deliberate indifference to the "serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) (citation omitted). Deliberate indifference has two elements. The first is whether the prisoner has an "objectively serious medical condition." *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011); *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). The second element requires a showing that a prison official has subjective knowledge of—and then consciously disregards—an excessive risk to inmate health. *Greeno,* 414 F.3d at 653; *see also Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). Deliberate indifference involves "intentional or reckless conduct, not mere negligence." *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010).

Here, Plaintiffs point to pervasive deficiencies in delivery of medically necessary care and treatment on a systemic, statewide level in IDOC correctional institutions. *See, e.g., Wellman v. Faulkner,* 715 F.2d 269, 272 (7th Cir. 1983); *Cleveland–Perdue v. Brutsche,* 881 F.2d 427, 430–31 (7th Cir. 1989) (recognizing claims of systemic health care deficiencies as a distinct category of deliberate indifference claims, as opposed to one based on "isolated instances of indifference to a particular inmate's medical needs"). In

this context, deliberate indifference can be demonstrated by "proving there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care[,]" or by showing "repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff" which result in an excessive risk of serious harm. *Wellman*, 715 F.2d at 272; *see also Rasho v. Jeffreys*, 22 F. 4th 703, 710 (7th Cir. 2022) ("persistence in a course of action known to be ineffective" can support an inference of deliberate indifference) (citing *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662–63 (7th Cir. 2016); *Phillips v. Sheriff of Cook Cnty.*, 828 F.3d 541, 554 (7th Cir. 2016)).

*Injunctive Relief*

Preliminary injunctions are extraordinary and drastic remedies that should not be granted unless the movant makes a clear showing that it has carried its burden of persuasion. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Under Federal Rule of Civil Procedure 65, the party moving for an injunction has the burden of showing that it has some likelihood of succeeding on the merits, that no adequate remedy at law exists, and that it will suffer irreparable harm in the interim period prior to final resolution of its claims. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of America, Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). If the movant establishes these elements, the Court must then balance the potential harm to the movant if the preliminary injunction were wrongfully denied against the potential harm to the non-movant if the injunction were wrongfully granted. *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999). The Court should also take into consideration the effect that granting or denying the injunction will have on the

public. *Girl Scouts*, 549 F.3d at 1086.

The Prison Litigation Reform Act ("PLRA") applies to suits filed by incarcerated people and limits the equitable relief a district court can order. 42 U.S.C. § 1997e & 18 U.S.C. § 3626. "The PLRA states that no prospective relief shall issue with respect to prison conditions unless it is narrowly drawn, extends no further than necessary to correct the violation of a federal right, and is the least intrusive means necessary to correct the violation." *Brown v. Plata*, 563 U.S. 493, 530 (2011) (citing 18 U.S.C. § 3626(a). "When determining whether these requirements are met, courts must give substantial weight to any adverse impact on public safety or the operation of a criminal justice system." *Id.* (internal quotations omitted)).

## DISCUSSION

Defendants long ago conceded that Plaintiffs' gender dysphoria is a serious medical condition. (Doc. 186, pp. 29-30). In issuing the December 2019 Preliminary Injunction, the Court concluded that Plaintiffs met their burden of showing a likelihood of success on the merits of their deliberate indifference claim. (Doc. 186, p. 35). The evidence at the August 2021 trial amply demonstrated that Defendants were aware that Plaintiffs were not receiving adequate medical care or social transition for their gender dysphoria and have suffered serious harm including suicide attempts as a result—yet they allowed these conditions to persist over the two-year period following the 2019 evidentiary hearing that culminated in the first Preliminary Injunction.

The Court adopts the discussion of the claims in its previous orders (Doc. 186; Doc. 331) regarding Plaintiffs' entitlement to injunctive relief here. As previously noted,

Plaintiffs' 2021 trial testimony underscored the irreparable harm that they have experienced and continue to suffer from—anxiety, depression, suicidal ideation and suicide attempts, and self-mutilation—due to Defendants' failure to provide even minimally adequate treatment of their gender dysphoria. Monetary damages cannot compensate for these harms. The balance of harms and the public interest continue to weigh heavily in favor of granting injunctive relief, and the trial evidence and supplemental filings demonstrate that constitutional violations persist.

As the Court stated previously in its Preliminary Findings of Fact and Conclusions of Law (Docs. 331, 332), the new Administrative Directives do not comply with the Court's previous order that medical treatment decisions regarding gender dysphoria must be made only by medical professionals who are qualified to treat gender dysphoria. (Doc. 212, p. 1). Social transition (including housing in a facility matching one's gender identity and access to gender-affirming clothing and other items) is a medically necessary component of treatment for some prisoners with gender dysphoria, yet under the TAC, nonmedical staff continue to have the power to block transfer requests even if the medical or mental health providers recommend transfer as part of an individual's treatment. Further, the Administrative Directives as currently written do not guarantee that a transgender prisoner's choice of gender of the officer who will conduct a body search (pat down or strip search) will be honored. Again, this can be a medically necessary accommodation. Testimony demonstrated that the April 2021 Administrative Directives are not sufficient to inform prison staff of class members' right to choose the searching officer's gender prior to undergoing a search, and cross-gender searches are still routine.

Following trial, as set forth on the record (Doc. 349, pp. 972-92) and in the Preliminary Findings of Fact and Conclusions of Law (Doc. 331), the Court concluded that adoption of IDOC's new Administrative Directives (Exs. 600 & 601) did not result in improved treatment and care of members of the class and that further revisions of the Administrative Directives and implementation "on the ground" of revised policies was necessary to ensure constitutionally adequate treatment of Plaintiff class members.

The undersigned acknowledged that it would take time to analyze the flaws in the new policy, and the Court wanted the parties' input on the process. The Court's verbal rulings on the last day of trial and Preliminary Findings of Fact and Conclusions of Law (Doc. 331) were issued because the Court felt that certain issues could not wait, because, as explained at the time, the evidence introduced at trial showed serious ongoing violations of the Eighth Amendment.

The Court has now reviewed the parties' supplemental briefing on the April 2021 Administrative Directive 04.03.104. Plaintiffs submitted their detailed revisions, and Defendants set forth their counterproposal. Plaintiffs' most sweeping proposed change to Administrative Directive 04.03.104 is abolition of the two-committee ("THAWC" and "TAC") structure. (Doc. 335, pp. 4-7). The purpose of that proposed change is to ensure that only qualified medical providers will make treating decisions for prisoners with gender dysphoria ("GD"), as the Court ordered in December 2019. Plaintiffs urge that the THAWC/TAC division has not resulted in substantive changes in how decisions are made. Instead, it merely reshuffles the deck and keeps the same "cast of characters" in place to make decisions. For example, transfer, placement, and commissary issues fall

within the range of medical treatment for GD yet are under the control of TAC, which includes members not qualified to make medical decisions. Plaintiffs assert that the once-per-month committee meetings are too infrequent and perpetuate the problem of decisions being made without considering a prisoner's full medical and mental health record.

In place of the committees, Plaintiffs suggest that IDOC hire or appoint two new professionals, the Transgender Mental Health Lead (TMHL) and Transgender Medical Lead (TML), both qualified to treat gender dysphoria, to oversee services statewide for transgender prisoners. They also suggest a new position of Surgical Consultant.

In response, Defendants urge that overall, Plaintiffs' proposed revisions to AD 04.02.104 go way too far. (Doc. 346, pp. 3-5, 8-10). They warn that an injunction that does not defer to IDOC on how to plan and implement the relief ordered would run afoul of the constraints of the PLRA and *Westefer v. Neal*, 682 F.3d 670 (7th Cir. 2012). (Doc. 346, pp. 10-12). On the proposal for new positions (TMHL, TML, and Surgical Consultant), Defendants advise that IDOC cannot unilaterally create a new position and that the agency must go through state-required procedures for approval (*see* Doc. 346-2, Declaration of Mandy Page), so this will not be a timely fix for the problems Plaintiffs identify. In fact, gaining approval for any new position will take about four to nine months for an "exempt" position and six to 12 months for a "term" position. Finally, Defendants argue that replacing the THAWC and TAC committees with the proposed new positions will be unworkable, as well as cause significant delay. Defendants also point out that the proposed lead positions won't report to anyone and don't provide for

collaborative decision-making or training for other providers.

Defendants' point regarding constraints on what the Court can order here is well taken. While changes certainly need to be made to accomplish the relief the Court has ordered, the Court simply cannot, under Seventh Circuit jurisprudence, implement the wide-sweeping revisions to Administrative Directive 4.03.104 Plaintiffs seek. *Westefer*, 682 F.3d 670; *Rasho v. Jeffreys*, 22 F.4th 703, 2022 WL 108568, at *5 (7th Cir. 2022). And, of course, any relief ordered here must be limited to the class as defined in this litigation.

How the Administrative Directives should be revised is an issue for the Monitor (Special Master)[22] to explore with the parties. (Doc. 370, p. 14). The focus must be on the *outcome*—that is, what new Administrative Directives will achieve. As explained previously and in this Order, class members must have timely decisions and action on requested treatment for gender dysphoria—including hormone therapy, surgery requests, placement, transfer, commissary, and search accommodations. And qualified professionals who are competent to make medical decisions on treatment for gender dysphoria must be the ones making decisions. These requirements likely will require some restructuring of the TAC so that medically necessary placements recommended by a treating professional cannot be vetoed by non-medical staff, but the Court leaves that up to the Monitor to analyze and make appropriate proposals.

The Court also learned at the time of trial that IDOC had offered training to its medical and mental health providers, including the two-day entry level WPATH Global

---

[22] As more fully discussed below, the Court advised the parties in December 2021 that a Monitor (Special Master) will be appointed in this case. (Doc. 370).

Education Initiative ("GEI") training, Dr. Reister's training on transgender issues for mental health staff, and Dr. Reister's annual hour and twenty-minute training for all IDOC staff. (Doc. 325, pp. 604-08). While the GEI training was described as "mandatory" for mental health providers, the Court expressed concern in August 2021 that several providers—including individuals who had problematic interactions with named Plaintiffs—never attended this training. As previously explained, besides all required personnel not participating, there was no verification that those who joined the virtual training paid attention during the course, and there was no quiz to verify a basic understanding of the materials. Again, Dr. Ettner testified that recent comments by medical staff and mental health professionals in the records suggest that many still lack the most *basic* understanding of GD. (Doc. 323, pp. 515-516). And, at the time of trial, IDOC had offered no training for correctional officers or other staff regarding the new Administrative Directives.

The Court makes one final observation on a matter with respect to the need to revise IDOC's policies that should receive priority treatment. The Monitor must promptly address concerns about initial placement of incoming transgender inmates that came out at trial. (Doc. 349, pp. 836-42). This testimony indicated that in spite of purported revisions to the policies, incoming inmates were continuing to be assigned to facilities based on their genitalia and would then have to go through TAC to obtain a transfer at some later date. Some provision needs to be made to determine on a timely basis the initial assignment of a transgender inmate to a prison matching their gender identity, as well as other matters, without inordinate delay.

As previously stated, the undersigned finds that the evidence introduced at trial shows serious ongoing violations of the Eighth Amendment. It was for that reason the Court ordered immediate injunctive relief and outlined additional injunctive relief that was needed but would take time when the trial concluded. (Docs. 331, 332; 349, pp. 972-992).

Since the conclusion of trial, the Court advised the parties on December 13, 2021, that it will appoint a Monitor (Special Master) to oversee Defendants' compliance with the injunctive relief ordered. (Doc. 370). The Monitor also will assess and advise the Court on what revisions to IDOC policies and Administrative Directives are necessary in order to remedy the unconstitutional treatment of transgender prisoners in IDOC custody outlined by this Court and work with the parties to accomplish those revisions. Nonetheless, the Court sets forth below what has and has not been accomplished since trial and orders additional action by Defendants.

## INJUNCTIVE RELIEF

Following the presentation of evidence by the parties during the bench trial held from August 2 to 5, 2021, the Court issued factual findings, **CONTINUED** its previous Preliminary Injunction (Doc. 212), and **ORDERED** additional relief to members of the class. (Docs. 331, 332, and corrected at Doc. 336).

*Relief Ordered on August 9, 2021:*

1. Plaintiffs Sora Kuykendall and Sasha Reed shall, within **7 days** of the date of this Order, be given lab tests to check their prolactin levels. If those levels are still elevated, they shall be given an MRI test within **5 days** of receipt of the prolactin results.

2. Each member of the Plaintiff class who is currently receiving hormone therapy shall, within **14 days** of the date of this Order, be given blood tests to assess hormone levels, as well as potassium, creatinine, and prolactin levels (for transgender females) and hemoglobin/hematocrit levels (for transgender males). Thereafter, if the hormone levels are not within the appropriate range set forth by the Endocrine Society Hormone Guidelines (for transgender females, testosterone of less than 50 nanograms/deciliter [as corrected on August 18, 2021, at Doc. 336] and estradiol between 100-200 picograms/milliliter; for transgender males, testosterone levels between 400-600 nanograms/deciliter), Defendants shall ensure that the individual's hormone medication is titrated following receipt of the blood work results and blood work repeated at least every **3 months** until the levels are within an appropriate range.

3. Any Plaintiff class member who has requested hormone therapy to date shall, within **21 days** of the date of this Order, get baseline blood work done and hormone therapy started within **14 days** thereafter, with follow-up blood work at least every **3 months** until the levels are within an appropriate range.

4. Each Plaintiff class member receiving hormone therapy shall get blood work done at least once a year to assess hormone levels, as well as potassium, creatinine, and prolactin levels (for transgender females) and hemoglobin/hematocrit levels (for transgender males) and shall be treated as medically indicated by the results. No Plaintiff class member shall be prescribed conjugated estrogen.

5. Any Plaintiff class member whose hormone levels are within the appropriate range, and who has requested evaluation for gender-affirming surgery, shall be evaluated for such surgery within **120 days** of the date of this Order with inmates being evaluated in *chronological* order of the date of the inmate's original request for surgery. Each class member so evaluated shall be provided a prompt written notification of the decision and, if surgery is denied, the written notification shall include an explanation of the reasons for denial and a timeframe to request another evaluation thereafter.

6. Plaintiff class members shall be allowed to choose the gender of the correctional officer who will conduct a search of their person, and the search **SHALL BE** conducted by a correctional officer of the gender requested.

7. Each Plaintiff class member who has requested transfer to a facility matching his or her expressed gender (female facility for transgender

women, male facility for transgender men) shall be evaluated for transfer within **120 days** of the date of this Order, with inmates being evaluated in *chronological* order of the date of the inmate's original request for transfer. Each class member so evaluated and denied transfer shall be promptly provided with a written explanation of each reason for the denial and allowed to request another evaluation for transfer within **180 days** thereafter.

8. Each Plaintiff class member shall immediately be provided with access to gender-affirming items in the commissary and shall immediately be provided with a list of available gender-affirming items. Defendants shall immediately ensure all approved gender-affirming items are available at the commissary at each class member's institution. Defendants shall, within **30 days** of the date of this Order, provide the Court with a list of all commissary items available at each facility.

9. Defendants shall immediately ensure that medical care and mental health treatment of Plaintiff class members shall be conducted only by medical staff and mental health professionals who have taken WPATH training and are committed to continuing education on issues of transgender health. Similarly, medical providers and mental health professionals who hold personal or religious beliefs that prohibit their treatment of inmates with gender dysphoria shall have no contact with any member of the class from this date forward.

10. Defendants shall immediately ensure that transgender inmates are allowed access to a private shower.

The Court acknowledged in its August 2021 preliminary ruling that Defendants had made some progress toward compliance with the Court's Orders for preliminary injunctive relief (Docs. 186, 187, amended at Doc. 212) and recognized that the COVID-19 pandemic caused some of the delays in accomplishing compliance. (Doc. 331). Urging that the progress should continue, the Court ordered the following additional injunctive relief, to be completed within **120 days** (on or before **December 7, 2021**), with respect to projects that were "in progress" as of the time of trial:

1. Finalize the contract with Wexford to provide hair removal services to Plaintiff class members;

2. Finalize the contract with Dr. Schechter to provide gender-affirming surgery to Plaintiff class members who are approved to receive such surgery;

3. Finalize and implement the CQI (Continuing Quality Improvement) program for transgender care;

4. Finalize IDOC's written surgical standards for transgender care;

5. Finalize and implement the PRISM project (the special population program) (discussed in Doc. 326, pp. 640, 648-49, 651)

6. Finalize and implement additional and ongoing training for *all* correctional staff on transgender issues and awareness, including the harm caused by misgendering and harassment;

7. Finalize and implement training for inmates and staff at Logan Correctional Center regarding incoming/transferred transgender inmates;

8. Finalize and implement IDOC's transgender identification policy.

A status report concerning this relief was filed on December 8, 2021 (Doc. 369).

The Court furthered ordered Defendants to provide the Court and Plaintiffs' counsel with a report (filed under seal) on the status of each Plaintiff class member's (1) hormone levels; (2) status of any request for transfer; and (3) status of any request for surgery within **60 days** (on or before October 8, 2021). A status report on these issues was filed on October 8, 2021 (Doc. 355; Doc. 357 (supporting information)). Plaintiffs responded to Defendants' status report on October 27, 2021 (Doc. 359).

The Court allowed Plaintiffs additional time to file supplemental evidence obtained in late-produced documents referenced in the motion for sanctions filed a day before trial commenced (Doc. 316). The Court also invited supplemental briefing

concerning the new Administrative Directives and invited Plaintiffs to request additional injunctive relief and offered Defendants an opportunity to seek clarification of the Court's Order. Plaintiffs filed a post-trial brief on August 16, 2021 (Doc. 335), and Defendants responded on September 7, 2021 (Doc. 346).

*Additional New Injunctive Relief*

Now, having reviewed the parties' post-trial briefing and status reports, the Court finds it necessary to modify some of the previously ordered relief. Specifically, with respect to the "immediate" relief ordered in August 2021, the Court provides the following additional injunctive relief.

First, in addition to the relief ordered in paragraph 2 regarding blood work to assess hormone levels and titration of hormone medication (*see* p. 71 above), the Court **FURTHER ORDERS** that:

> Defendants shall ensure that any necessary follow-up medical tests/treatment to address the results of potassium, creatinine, and prolactin level testing for transgender females and hemoglobin/hematocrit for transgender males takes place on a timely basis (for example, MRI tests for transgender females with elevated prolactin levels).

Moreover, in addition to the injunctive relief ordered in paragraph 1 concerning "in progress" projects as of August 9, 2021 (specifically, hair removal services, *see* Doc. 332, p. 3, para. 1), the Court **FURTHER ORDERS** that:

> Defendants shall ensure the availability to class members of all medically necessary hair removal services, in addition to and including hair removal to prepare for gender-affirming surgery, within **30 days** of the date of this Order.

*Follow-Up Injunctive Relief – Class Members Kuykendall and Reed*

The Court ordered Defendants to test the prolactin level of Plaintiffs Sora Kuykendall and Sasha Reed by August 9, 2021. (Doc. 332, p. 1, para. 1). Defendants reported on October 8, 2021 (Doc. 355, p. 1) that the tests were completed as ordered and were in normal range. The results were provided to Plaintiffs' counsel. Nothing further is required from Defendants on this item.

*Follow-Up Injunctive Relief – Blood Work for Class Members Receiving Hormone Therapy*

The Court ordered Defendants to ensure that each member of the Plaintiff class who was receiving hormone therapy shall have blood work done to assess hormone levels, as well as potassium, creatinine, and prolactin levels (for transgender females) and hemoglobin/hematocrit levels (for transgender males), and that each individual's hormone medication is titrated following receipt of the blood work results *and blood work repeated at least every 3 months until the levels are within an appropriate range* (emphasis added) (Doc. 332, pp. 1-2, para. 2).[23] Unfortunately, while Defendants appear to have partially complied with this portion of injunctive relief (they report that labs were drawn for initial results) (*see* Doc. 355, p. 2; Doc. 357), it is unknown whether blood work was done again three months later as ordered (in November 2021)[24] or whether any doses have been titrated or follow up tests or treatment ordered. In October 2021, Plaintiffs challenged Defendants' compliance with the lab work directive, noting that at that time

---

[23] Today the Court also ordered Defendants to ensure necessary follow-up medical tests and treatment take place on a timely basis.

[24] Of course, on the three-month timeline, blood work would be due to be completed again this month, February 2022.

63 class members had elevated prolactin levels. Although most of those individuals had been "referred to endo," it is not clear when such referrals were made, to whom they were made, if any of them have been seen by an endocrinologist, or what, if anything has been done to address the elevated prolactin levels. Plaintiffs also noted that the overwhelming majority of class members continue to have hormone levels outside of the ranges recommended by the Endocrine Society Guidelines. In fact, Plaintiffs asserted that fewer than 15 class members—less than 10 percent of the class—had hormone levels within the recommended ranges.

Defendants shall provide an update to the Court on this issue (whether blood work was done in November 2021 and is scheduled for February 2022, whether any doses have been titrated or follow up tests or treatment ordered, what has been done to address elevated prolactin levels, and whether class members with hormone levels outside of the recommended ranges have been brought within range) within **14 days** of the date of this Order.

### Follow-Up Injunctive Relief – Blood Work for Class Members Requesting Hormone Therapy

The Court also ordered Defendants to conduct baseline blood work and start hormone therapy for any Plaintiff class member who has requested hormone therapy by August 30, 2021, and to start hormone therapy within 14 days thereafter, with follow-up blood work conducted at least every three months thereafter until the hormone levels are within an appropriate range (Doc. 332, p. 2, para. 3).

While Defendants reported that baseline blood tests were done for those inmates

who did not refuse blood work (*see* Doc. 355, p. 2; Doc. 357), the Court has not been informed whether (or when) hormone therapy started or whether there has been any follow up blood work or medication titration. Defendants shall provide an update to the Court on this issue within **14 days** of the date of this Order.

*Follow-Up Injunctive Relief – Annual Blood Work for Class Members*

Defendants were ordered to conduct blood work for each Plaintiff class member receiving hormone therapy at least once a year to assess hormone levels, as well as potassium, creatinine, and prolactin levels (for transgender females) and hemoglobin/hematocrit levels (for transgender males) and to treat each Plaintiff as medically indicated (and to not prescribe conjugated estrogen—*see* summary of Dr. Tangpricha's testimony, above). (Doc. 332, p. 2, para. 4). As this was ordered in August 2021, the timeframe for completion is months away, in August 2022. Nonetheless, the Court directs Defendants to provide updated information concerning blood work as set forth above.

*Follow-Up Injunctive Relief – Surgery*

The Court ordered Defendants to have Plaintiff class members whose hormone levels were within appropriate range and who had requested gender-affirming surgery to be evaluated for surgery by December 7, 2021, in chronological order of the inmate's original surgery request. (Doc. 332, p. 2, para. 5). As of October 8, 2021, IDOC was working through prior requests. Twenty-six inmates had been discussed in three meetings; 10 more inmates had been approved to move forward. (Doc. 355, p. 3). As of December 8, 2021, Defendants reported:

> All surgical requests received to present have been considered by the Transgender Health and Wellness Committee (THAW). Letters providing the decision and explanation in the event of a denial have been sent to the individuals. They were also informed that they can request gender-affirming surgery again at the recommended interval. If any other recommendations were made, they were included in the same letter.

(Doc. 369, p. 2, para. 5).

Plaintiffs challenged Defendants' October 2021 assertions regarding surgical evaluations, pointing out numerous inconsistencies and a lack of supporting documentation. (Doc. 359, pp. 7-8).

Defendants shall provide an update on the status of those approved for surgery, including whether any preliminary treatment—such as hair removal—has occurred, whether any surgeries have occurred, and the plans for post-surgery facility placement and treatment. Defendants shall also provide a detailed explanation as to why individual requests for surgery were denied (between August 9, 2021, and today) and report when those individuals can request re-evaluation. These status updates are due within **30 days** of the date of this Order.

*Follow-Up Injunctive Relief – Searches*

The Court ordered Defendants to allow Plaintiff class members to choose the gender of the officer who will search their person and to ensure that searches were conducted by an officer of the requested gender. (Doc. 332, p. 2, para. 6). Defendants report that body scanners will be deployed in five prisons (Doc. 369), but the Court is unsure whether this covers all class members. It is likewise not clear whether all cross-gender searches have ceased (discussed below).

The Court orders Defendants to clarify these issues and to provide an update on steps taken to implement, inform, and train staff on policies to avoid cross-gender searches within **30 days** of the date of this Order.

*Follow-Up Injunctive Relief – Transfers*

The Court ordered Defendants to evaluate Plaintiff class members who have requested transfer to a facility matching the inmate's expressed gender for transfer by December 7, 2021, in chronological order of the inmate's original transfer request. (Doc. 332, pp. 2-3, para. 7).

Defendants reported that initial evaluations were in progress as of October 8, 2021 (Doc. 355, p. 2). As of that date, five transgender females were at Logan (Doc. 359, p. 5), and three more were expected to be transferred by mid-October 2021. At that point, Defendants reported that the TAC had reviewed 16 class members who requested transfer. Defendants also reported that two additional transgender females had been interviewed and would proceed to the TAC for an official determination. Two more transgender inmates were to be interviewed soon for probable transfer, and approximately 12 class members were pending determination at the October TAC. Thirty-nine other class members had been approved to enter the PRISM program once it is finalized. (Doc. 355, p. 2).

As of December 8, 2021, Defendants reported that the TAC:

has considered all gender-affirming transfer requests made up until the present. Letters to requesting individuals explaining either the granting or denial of the transfer requests have been issued. Several class members have been transferred to facilities consistent with their gender.

(Doc. 369, p. 2).

On October 27, 2021, Plaintiffs responded to Defendants' initial status report and challenged some of its assertions and pointed out numerous inconsistencies in the record. (Doc. 355).

Defendants shall provide an update on the status of evaluations for transfer that have occurred since October 8, 2021 (as previously ordered), including detailed reasons for any denials, within **30 days** of the date of this Order. Defendants also shall address the numerous inconsistencies identified by Plaintiffs in October 2021. (Doc. 359).

*Follow-Up Injunctive Relief – Commissary Items*

Defendants were ordered to make gender-affirming commissary items available to the Plaintiff class and to provide class members with a list of available items. The Court further ordered Defendants to provide a list of all items available at each facility by September 9, 2021. (Doc. 332, p. 3, para. 8). In that September 2021 report (Doc. 351), Defendants reported that not all items were available.

Defendants shall provide the Court with an updated list of all commissary items available at each facility and an explanation of when any unavailable items will be stocked within **14 days** from the date of this Order.

*Follow-Up Injunctive Relief – Medical and Mental Health Providers*

The Court ordered that Plaintiff class members should be treated only by medical and mental health providers who have taken WPATH training and are committed to continuing education on transgender health issues. The Court also ordered that providers whose beliefs prohibit their treatment of inmates with gender dysphoria shall have no

contact with any Plaintiff class member. (Doc. 332, p. 3, para. 9).

Defendants have not provided an update on compliance with this item. The Court orders Defendants to report whether changes have been made to ensure compliance with the relief ordered within **30 days** of the date of this Order.

*Follow-Up Injunctive Relief – Showers*

The Court ordered that transgender inmates should have immediate access to a private shower. (Doc. 332, p. 3, para. 10). Plaintiffs' counsel reported in October 2021 (Doc. 359, p. 8) that Defendants had produced a photograph of a sheet that IDOC personnel had placed over the shower cell in Menard Correctional Center, where named Plaintiff Sora Kuykendall was housed. (Doc. 359-7). Plaintiffs asserted that the photograph makes clear that the sheet covering is see-through (indeed it is) and, as a result, Sora Kuykendall did not take a shower at any point between the time the Preliminary Injunction was entered on August 9, 2021, and her transfer to Logan in late October 2021. It appears other Plaintiff class members housed at Menard remain without access to a private shower. Thus, Defendants have not complied with the Court's Order. Defendants shall inform the Court of measures taken at each prison housing transgender inmates to provide them access to a private shower within **14 days** from the date of this Order.

As for the other injunctive relief that was ordered to be completed by December 7, 2021, some progress has been made, but there is more to be done.

*Follow-Up Injunctive Relief – Contract for Hair Removal Services*

Defendants were ordered to finalize the contract with Wexford to provide hair

removal services to Plaintiff class members by December 7, 2021. (Doc. 332, p. 3, para. 1). Defendants reported on December 8, 2021 (Doc. 369) that an electrolysis machine was purchased for Logan for hair removal to be done onsite.

This is certainly progress, but it is not clear whether treatment has begun. And what about Plaintiff class members who are not at Logan? Defendants shall provide an update on these matters within **30 days** of the date of this Order.

And, as set forth above, today the Court has ordered Defendants to ensure the availability of all medically necessary hair removal services, in addition to and including hair removal to prepare for gender-affirming surgery, within **30 days** of this Order.

*Follow-Up Injunctive Relief – Contract with Dr. Schechter*

Defendants were ordered to finalize the contract with Dr. Schechter to provide gender-affirming surgery to Plaintiff class members who are approved for surgery. (Doc. 332, p. 3, para. 2). In a status report filed on December 8, 2021 (Doc. 369, p. 3, para. 2), Defendants clarified that no contract is necessary for Dr. Schechter to perform surgery for approved class members. Defendants further advised that approved surgeries will be paid for by IDOC or Medicaid. Defendants have contracted with Dr. Schechter, however, to provide expert surgical consulting to IDOC and its medical providers. Dr. Schechter is also providing in-person education to class members to discuss what gender-affirming surgery will involve.

This appears to be full compliance and, unless anything has changed since Defendant's status report, no update is needed on this item.

*Follow-Up Injunctive Relief – CQI Program for Transgender Care*

Defendants were ordered to finalize and implement the CQI (Continuing Quality Improvement) program for transgender care by December 7, 2021. (Doc. 332, p. 4, para. 3). Defendants reported on December 8, 2021 (Doc. 369, p. 3, para. 3) that the CQI tool is complete, and implementation of the tool is underway.

Defendants shall provide an update on the progress made since December 2021 within **30 days** of the date of this Order.

*Follow-Up Injunctive Relief – Written Surgical Standards for Transgender Care*

Defendants were ordered to finalize IDOC's written surgical standards for transgender care by December 7, 2021 (Doc. 332, p. 4, para. 4) Defendants reported on December 8, 2021 (Doc. 369, p. 3, para. 4) that the guidelines (Doc. 369-5) are complete. This appears to be full compliance.

*Follow-Up Injunctive Relief – PRISM Project*

Defendants were ordered to finalize and implement the PRISM project (the special population program discussed in the summary of Dr. Reister's testimony above). (Doc. 332, p. 4, para. 5). On December 8, 2021 (Doc. 369, pp. 3-4, para. 5), Defendants reported that the program (Doc. 369-6) has been finalized and will be located in Centralia Correctional Center. Staff members have been trained on transgender issues as part of the PRISM project. Defendants further reported that prisoners who are part of the PRISM project but who do not identify as transgender also will be trained on transgender issues.

Eighteen inmates had been transferred to the program as of December 8, 2021, and other inmates had been approved to transfer to the program after the initial group. The

Court understands that completion of the project is planned in phases to allow for additional staff training. Ultimately, PRISM will house up to 100 inmates in four dedicated housing units at Centralia.

This appears to be full compliance. Nonetheless, the Court orders Defendants to provide an additional update on the PRISM project within **30 days** of the date of this Order.

*Follow-Up Injunctive Relief – Training for Correctional Staff*

Defendants were ordered to finalize and implement additional and ongoing training for all correctional staff on transgender issues and awareness, including the harm caused by misgendering and harassment by December 7, 2021. (Doc. 332, p. 4, para. 6). On December 8, 2021 (Doc. 369, p. 4, para. 6), Defendants reported they had contracted with an outside group, Queer Works,[25] to train all IDOC staff by March 30, 2022. A link to the training was sent to all IDOC employees. (Doc. 369-7). In addition, Defendants contracted with Moss Group to do future trainings directed to transgender issues at Logan, as well as men's facilities.

This is progress. Defendants shall provide an update to the Court on the status of training actually completed (and scheduled to be completed this year) within **30 days** of the date of this Order.

---

[25] Queer Works is a 501(c)(3) organization with headquarters in the Coachella Valley. Its mission is to ameliorate disparities faced by transgender, gender non-binary and intersex people as well as help reduce similar disparities among our lesbian, gay and bisexual communities. https://www.queerworks.org/ (last accessed Feb. 3, 2022).

***Follow-Up Injunctive Relief – Training for Inmates and Staff at Logan Correctional Center***

Defendants were ordered to finalize and implement training for inmates and staff at Logan regarding incoming/transferred transgender inmates by December 7, 2021 (Doc. 332, p. 4, para. 7). Defendants reported on December 8, 2021 (Doc. 369. p. 4, para. 7), that its contract with Queer Works—discussed above with respect to employee training— also will provide training to Logan inmates to educate on the harms caused by misgendering and harassment. This training is available on the inmate channel at Logan. And, similar to the training for all correctional staff discussed above, the Moss Group will conduct future training for Logan employees.

Defendants also reported that Logan staff have taken further steps to welcome class members transferred for gender-affirming social transition, including:

    **a.** The Mental Health Administrator (MHA) meets with each individual to review the gender identity form and to provide orientation and disclosure regarding support services;

    **b.** The MHA provides information as to gender-affirming surgery either during intake or after new identification of transgender individuals;

    **c.** The MHA screens housing unit peers to create a LGBTQIA+-friendly environment with individuals who have no disciplinary issues and can provide guidance on success at Logan;

    **d.** The mental health staff participate in statewide case conference calls with other institutions regarding the care and concerns of transgender prisoners;

    **e.** Two primary Mental Health Practitioners oversee the transgender specialized caseload;

    **f.** Staff participate in weekly multidisciplinary meetings to coordinate transgender care;

**g.** The MHA reviews all incident reports pertaining to individuals identified as transgender to determine needs for additional services, placement recommendations, or referral to the TAC or THAWC;

**h.** Celebration of PRIDE month included [sic] round table meetings with allies and/or self-identified LGTBQIA+ individuals;

**i.** Celebration of transgender awareness week;

**j.** Preferred names are included in communications and updates to administration;

**k.** The Warden and MHA review requests to ensure equivalent access to services are provided to transgender and cisgender women; and

**l.** And there is more, including a training for crisis team members specific to transgender individuals.

(Doc. 369, pp. 4-5, para. 7).

This is yet another sign of progress. Defendants shall report on the status of training actually completed (and scheduled to be completed this year) within **30 days** of the date of this Order.

***Follow-Up Injunctive Relief – Transgender Identification Policy***

Defendants were ordered to finalize and implement IDOC's transgender identification policy by December 7, 2021 (Doc. 332, p. 4, para. 8). On December 8, 2021 (Doc. 369, pp. 5-6, para. 8), Defendants reported that this item has been finalized and implemented. Specifically, Defendants developed a form for gender identification change ("DOC 0655-Gender Identification Change: Mental Health Authority to B of I"). (Doc. 369-9). The Mental Health Authority completes this form and forwards it to the Bureau of Identification, which changes the prisoner identification card and gender in

Offender 360, the IDOC prisoner tracker. This should result in clarity as to the inmate's choice of gender of the officer who will conduct a search of the inmate's person. This process then triggers a commissary prompt to allow transgender commissary access. Forms had already been submitted on behalf of all transgender inmates.

Defendants shall update the Court within **30 days** of the date of this Order on whether this policy has eliminated cross-gender body searches.

The status reports ordered above from Defendants shall be filed under seal to the extent they contain individuals' names or private health information or reveal other confidential information about an individual, such as the person's transgender status.

Finally, the Court invites Defendants to advise the Court whether the contract with Dr. Anderson was renewed (and whether any other changes have occurred with respect to transgender issues since trial). The Court **FURTHER ORDERS** Defendants to work with the Monitor (once appointed) to develop and implement new Administrative Directives that cure the deficiencies outlined above and to ensure the comprehensive training is provided to all staff tasked with responsibility of implementing those directives. Pursuant to *MillerCoors LLC v. Anheuser-Busch Companies, LLC*, 940 F.3d 922 (7th Cir. 2019), the Court will enter the terms of the preliminary injunctive relief set forth above in a separate document.

      **IT IS SO ORDERED.**

      **DATED:  February 7, 2022**

                                  **NANCY J. ROSENSTENGEL**
                                  **Chief U.S. District Judge**