*JANIAH MONROE, et. al. v. STEVE MEEKS, et. al.*

*Case No. 3:18-CV-00156-NJR*

*United States District Court for the Southern District of Illinois*

Initial report of the first Co-Monitor

August 3, 2022

Submitted by: Amanda L. Harris, MD, MPH (First Co-Monitor)

**Section 1: Introduction**

This report is respectfully submitted to the Court and the involved parties in accordance with the Memorandum and Order filed by the Court on April 5, 2022 (Document 418), with a 30 day extension of time granted on July 5, 2022. The Order stipulates:

> Dr. Harris shall make an initial report to the Court and the parties indicating Defendants' compliance, partial compliance, or noncompliance with the matters set forth in Parts A, B, C of Doc. 370 and the related sections of Doc. 384 within 90 days the date of this Order.

The First Co-Monitor has had verbal, video conference, email, and written communication with members of the medical and mental health staff at IDOC and affiliated medical facilities (notably the Endocrinology Department of the University of Illinois) and has received a written confidential memorandum from Plaintiff's counsel regarding on-going complaints by class members elucidated during legal visits (July 14, 2022). In addition, the First Co-Monitor has had a video conference with the Second Co-Monitor, julie graham, for the purpose of information

sharing and coordination of duties.  Much of the information requested by the First Co-Monitor to properly evaluate the items laid out in the Order dated December 13, 2021 (Doc. 370) was delivered in a timely manner and with the full cooperation of IDOC staff. However, due to the volume of information and the lack of an electronic medical record for remote review (a systemic problem in many correctional settings), as well as the need to orient to the case and parties involved, the process of reviewing and organizing information was time-consuming, leading to the request for extension to file this report. Even after the extension was granted, additional records obtained from IDOC (Endocrinology progress notes) made plain that information provided previously to the First Co-Monitor was incomplete or needed further clarification.

In the interest of the class members to not delay any further, and in the hopes of encouraging all parties to develop a more efficient method of tracking compliance, the First Co-Monitor has resolved to issue this report based on information provided, however incomplete. A note will be made at any point when information may be in question or out of date. Subsequent reports by this Co-Monitor will address any inaccuracies that may be the result of incomplete information in this initial report.

After a brief overview of the class population, the report will detail findings related to each of the 3 areas stipulated in the Order: A. Treatment for Gender Dysphoria – Hormone Therapy; B. Treatment for Gender Dysphoria – Gender Affirming Surgery; and C. Transfers and PRISM Project.  Within each section, the report will review the Defendants level of compliance with regard to the timing and delivery of care and identify any areas where information may still be lacking or unclear, as well as make note of areas for improvement or barriers to care.

**Section 2: Overview of the Class Population**

IDOC staff have provided a spreadsheet, lab reports, and specialist progress notes with information related to 195 individuals who were identified, at some point, as members of the class, defined as "prisoners in the custody of IDOC who have requested evaluation or treatment for gender dysphoria" (Doc. 370, page 2). Of those 195 individuals, 175 are listed as in custody at the time of this report, with the remainder either paroled or released. Of the 175 still in custody, 126 identify as Trans Women (72.0%), 22 (12.6%) have no identity listed, 24 (14.0%) identify as Trans Men, 2 (1.1%) identify as Cis Men, and 1 (0.6%) identifies as non-binary.



While it is reasonable to expect that not all individuals with gender dysphoria will identify with any fixed gender, or that they might experience some fluidity in their identity, it is also reasonable to question whether the circumstances of the prison environment may affect any individual's ability to live the gender in which they feel most comfortable. The

large number (22) of individuals with an undefined identity, or who have been noted as refusing hormone treatment, or who now identify as cis gendered, after being flagged as members of the class, raises the question of whether there are any as-yet-unidentified or unaddressed barriers to care and successful transition. Whenever possible, individuals have been cross-referenced to other provided documents to ascertain a gender identity when it was not listed.

For example, four of these undefined individuals are housed in a female facility and have elevated testosterone levels, indicating possible exogenous testosterone administration (and thus simply a recording error with regard to their gender identity). They have also made surgery requests and/or been evaluated by an Endocrinologist. In these cases, the gender identity is presumed to be trans man and corrected in the data. The remainder show no or normal cis-gendered laboratory data, no transfer requests, and no other indication of the reason why they are included in the list but not receiving any targeted care. These individuals are distributed across all facilities, with a slight bias toward Pinckneyville, where six of the 21 members placed in male facilities are housed. It is entirely unclear at this point if these individuals are simply mischaracterized or included as gender dysphoric when in fact they simply identify as gay or lesbian (as Co-Monitor julie graham has found in some cases). Clarification of the status of these individuals and a thorough understanding of their circumstances will require direct interviews or more in-depth review of clinical and mental health notes that were not readily available at this time. Such a review will hopefully ascertain whether the lack of services is their choice and not the result of coercion or neglect. It is noted as an item for follow up in a subsequent report and to be discussed further with the Second Co-Monitor.

During the video conference conducted on July 25, 2022, members of the IDOC medical and mental health staff shared that most class members are identified at intake when they arrive with a medical history from a previous institution or are known already to the system from prior incarcerations. Less frequently, members are identified via interactions with mental health or medical staff, when they may disclose symptoms of gender dysphoria. In all cases, the process for receiving treatment is filtered through mental health for a diagnosis of gender dysphoria and through a medical evaluation to ensure there is no contraindication to treatment. The IDOC staff interviewed felt the Court's elimination of the previous committee in charge of determining who received treatment was a positive one. They felt that it reduced barriers to care and removed non-clinical staff from participating in clinical decisions. They also felt that it sped up the process considerably. However, given the number of individuals with undetermined gender identity in the class, it is worth questioning whether more can be done to remove barriers to care so that individuals can safely pursue treatment. Staff reported that the number of individuals getting care pre- and post- removal of the committee was "not a huge change."

**Section 3: Treatment for Gender Dysphoria – Hormone Therapy**

**Finding: PARTIALLY COMPLIANT**

> *NOTE: Medication records cited here are likely incomplete. During review, discrepancies were found regarding patients seen in the Endocrine clinic and those listed on the tracking spreadsheet provided to the Co-Monitors. An additional 22 patients were started on hormones after August 2021, bringing the total to approximately 114. Lab records were updated to May, 2022.*

Hormone therapy is often a central component of treatment for gender dysphoria, particularly if the individual intends to transition to a different gender. Laboratory monitoring of

5

hormone levels is part of standard transgender care and can guide the process of feminization or masculinization. Even so, it is important to note that hormone level monitoring does not provide a complete picture of this process and desired physical changes can occur with different hormone levels depending on the individual. Nonetheless, there are accepted standards for safety, monitoring, and proper titration of hormones and androgen blockers, as noted in previous commentary from this Court. The Court laid out, consistent with Endocrine Society Hormone Guidelines, monitoring intervals of 3 months for hormone naïve or recently titrated medication, and 1 year for those who are stable and at goal on their dose. The Court also noted goals of less than 55ng/dl testosterone and 100-200 pg/ml estradiol for trans women and testosterone levels of 400-600ng/dl for trans men, in addition to other monitoring as clinically appropriate. It is important to note that these ranges are reasonable goals, but not universally agreed upon in the medical community. Nonetheless, in a security environment where treatment of transgender individuals is relatively new, it is practical to set goals and strive to meet them without being overly prescriptive or rigid.

*Trans Women*

Of the 175 class members now in custody, 114 (65.1%) are reportedly receiving gender affirming medication, while 74 (34.9%) are not. Of the 126 identified trans women, 101 (80.2%) are on gender affirming medication according to those same records. Of those, 47 (37.3%) now show a testosterone level suppressed below the recommended 50ng/dl and 19 (18.8%) are achieving a physiologic level of estradiol. Only 10 trans women on hormones (8.8%) are at goal on both levels. As reported in August 2021, only one of the 114 trans women on hormones was taking injectable estradiol valerate; the remainder were on oral estradiol. It is evident that the

proportion of trans women now on an injectable formulation has increased since that time, but accurate records were not available for review at the time of this writing.

In the Confidential Memorandum of July 14, 2022, Plaintiff's counsel noted that several class members complained of interruptions in access to hormone therapy and difficulty with access to pills. It is unclear at this point, why there should be an interruption in medication and whether this is an operational systemic problem or represents an isolated incident. However, based on the laboratory results reported and summarized above, it appears that very few trans women are achieving physiologic levels of estradiol despite reportedly being given hormone therapy. This finding is consistent with reports of interruption in medication administration or inadequate titration.

The option of utilizing injectable estradiol valerate as an alternative to oral formulations was raised by the First Co-Monitor during the video conference with the medical and mental health staff previously cited. It was pointed out that injectable formulations have the advantage in a security environment of fewer trips to the medical clinic and no opportunity for diversion. While it may carry slightly higher risk of blood clot and may not be as desirable for maintaining steady levels of hormone, it also has the advantage of fewer daily reminders of the gender transition process. Other individuals may prefer oral medications due to unacceptable risk or needle phobia. Offering each person the opportunity to make an informed choice as to the formulation they prefer has the added benefit of engendering trust and mutual respect. Plaintiff's counsel noted in the memorandum previously cited that several class members were requesting injectable hormones to ensure access and avoid delays. While this may be a reasonable work-around, the fact remains that there should be no interruption in access to medication to begin

with and the choice of formulation should be based on an informed consent process, and not as a workaround for poor access to medication.

*Trans Men*

Trans men make up a much smaller population, with only 24 individuals identified. It appears that 12 (50%) are on testosterone. All are receiving standard dosing of 60-100mg injectable testosterone every 2 weeks. Of those, four (33%) have a testosterone level between 400-600ng/dl, four (33%) have levels above 600ng/dl, and four (33%) have levels below 400ng/dl. In the case of testosterone elevation, it should be noted that many community practitioners set a reasonable goal as between 300-1000ng/dl while keeping hemoglobin and hematocrit in range and achieving the desired masculinization. Using that standard, seven achieved the range, two individuals exceeded it, and three fell below it; none had elevations of hemoglobin and hematocrit. Information regarding physical changes was not available for review, but are a central determinant in titration of medication.

*Safety and monitoring*

In terms of the safety and monitoring dangerously high estradiol, potassium, prolactin (for trans women) and hemoglobin and hematocrit there are few concerns.  There were no noted potassium level elevations or elevations of hemoglobin and hematocrit of clinical concern (as previously stated). Estradiol elevations were noted in 12 (10.5%) of trans women on hormones, with only one elevated to a considerable degree.

Prolactin elevations, however, were noted to be exceedingly common; of the 101 trans women on hormone therapy, 49 (48.5%) were flagged as having an elevated prolactin and subsequently referred to Endocrinology. This is unnecessary and burdensome.  It is common to

see mild elevations of prolactin with exogenous estrogen and with many psychiatric medications. The typical follow-up is to assess for signs of prolactinoma (a rare type of tumor) by assessing visual fields, galactorrhea, or new onset headache. In the absence of any clinical concern, there is typically no need for further investigation. Notably, the Plaintiff's counsel's memorandum (July 14, 2022) cited prolactin level elevation as a reason that individuals were denied access to hormones. This allegation has not been independently verified, but medical staff deny that an elevated prolactin would cause a discontinuation of hormone therapy. In any event, all parties are agreed that prolactin level monitoring and the follow-up of elevated levels requires a more circumscribed and evidence-based approach that is consistent with community standards of care.

It may not have been the Court's intent, but the medical staff and the Endocrinology specialists interpreted the Court's Order regarding prolactin levels, specifically, as mandatory. Further, they took this to mean that they should regularly test, monitor, and quickly obtain an MRI for any elevation of prolactin, whether clinically significant or not. This runs contrary to accepted clinical practice and would be deemed "over testing" in the community. A more patient-centered approach to this practice is needed.

*Timely Titration of Medications*

The decentralization of decisions regarding gender-affirming hormones is a laudable achievement in terms of normalizing access to care, but it makes central oversight of medication titration more challenging. It has proven cumbersome to obtain medicine administration records from multiple facilities and to ensure fair and unbiased decisions when different facilities are managed by different medical directors. Thus far, although staff have completed training in the treatment and care of individuals with gender dysphoria, there is no clear evidence that a

standardized medication protocol exists; hormone adjustments appear to largely fall under the purview of the Endocrinology specialists who are, in fact, more successful in obtaining desired levels of hormones.

Using goal testosterone suppression and estradiol levels as a barometer of success, only 15% of trans women overall have achieved a goal level of estradiol while this rate increases to 20% if they have also been seen by an Endocrinologist. Testosterone suppression has been achieved in 38% of all trans women, but in more than twice as many (75%) of those who have been seen by an Endocrinologist. This finding should not be interpreted to mean that all class members can or should expect or need to be managed by an Endocrinologist, but rather that each facility has room to improve in terms of the basic management of gender-affirming hormones. In a community setting, gender-affirming medication titration is a straightforward and relatively simple process that is managed by primary care practices. In terms of complexity, it is arguably on par with managing hypertension and less complex than managing diabetes, areas that are commonly successfully managed in a primary care setting. It is probable that the barrier to success is simply a lack of practical guidance and training. Further exploration of this potential area for improvement will be a part of the work of Co-Monitors going forward, as this will expand capacity and reduce wait times, which is a common frustration among class members. It will also benefit IDOC as it could reduce administrative burden and costs associated with specialty care. Specialists will continue to be necessary, but only in cases of extreme complexity or for clinical management oversight and training.

**Section 4: Treatment for Gender Dysphoria – Gender Affirming Surgery**

**Finding: PARTIALLY COMPLIANT**

IDOC has made strides with regard to a standard process for patients to access certain gender-affirming surgery (orchiectomy, top surgery, vaginoplasty). A process was shared with staff in a presentation by Dr. Lamenta Conway prior to the trial date for this case. The process includes a formal request for surgery, review by THAW (Transgender Health and Wellness) Committee and then a "pathway to consent" that includes an educational and informed consent process for the patient. To date, a total of 6 trans men and 11 trans women have been approved for surgery. Two have since been released from custody. No completed surgeries have been reported. The reason for this delay is uncertain and requires investigation.

Additional information regarding who has requested surgery, the reasons for denial, and the timing for reconsideration has not been shared with the Co-Monitors. Notably, in the Plaintiff's Memorandum to Monitors, some class members allege that they are caught in a Catch-22, being denied hormone therapy (a pre-condition for surgery) and thus ineligible to request it; others allege they are being coerced to cancel requests in exchange for release from isolation. These allegations have not been independently verified but raise significant concerns. It is beyond the scope of this initial report to tease out these serious allegations.

Medical staff report that hair removal services are being offered. This process is being offered to class members in preparation for vaginoplasty, but class members complain that the sessions are limited to a finite number instead of a goal outcome. Further investigation is needed.

**Section 5: Transfers and PRISM Project**

**Finding: NON-COMPLIANT / UNABLE TO ASSESS**

To date, records shared with the First Co-Monitor list 58 people who have requested transfers. Only 6 have been granted. The population of the PRISM project, intended to foster social transition, is estimated to be approximately 20-25, but no census records were made available. There has reportedly been attrition from the project due to interpersonal conflict among inmates and lack of programming and access to education and jobs. Clarification of the process for trans women to move from PRISM to the women's prison at Logan is needed; Plaintiff's counsel reports that class members have been told that they would be returned to a male prison prior to any transfer consideration. This, if true, would raise serious safety concerns for trans women in the process of social transition. Further investigation and interviews with class members and staff in charge of the PRISM project on a day-to-day basis may provide greater insight, but could not be accomplished in time for this report. It will be prioritized in a future report.

Plaintiff's counsel also raised serious allegations regarding substandard conditions and warehousing of trans men in a punitive unit at Logan. As previously noted, some class members report that they are being coerced to cancel surgery requests in order to be released from isolation in D-Wing. If the allegation is true, more effort is required to discover the motivation for such coercion. Given that no surgeries have yet been performed, it is not possible to demonstrate that this is attainable at all. Policies and procedures must be put in place to protect class members from bias and discrimination so they may safely pursue social transition.

**Section 6: Conclusion and Next Steps**

This initial report is based primarily upon documents previously provided by IDOC to the Court and newer information obtained directly from medical and mental health staff. While reviewing the vast collection of documents, it became clear that the Defendants have put effort into devising new policies and procedures to address the needs of the class, but they have not yet developed a way to track their efforts and measure their successes or failures. Without being able to gauge the effectiveness of their actions, they will not be positioned to modify and adapt to achieve their goals.

For class members who have already waited a long time to see any progress on these issues, it is unfair to ask them to continue to wait while policies and procedures are rolled out that increase the bureaucratic burden but are not tied to targeted outcomes. If the Defendants wish to move forward in good faith, setting some achievable goals would provide a benchmark for care of class members. It might be possible for the security, medical, and mental health staff to accept input from class members to set such goals so that class members can be assured their interests are represented.

This initial report admittedly falls short of the ambitious task laid out by the Court's Order. Many issues have not yet been addressed or investigated and, no doubt, more issues will come to light as this oversight proceeds in the coming months. Every effort will be made to address any errors or omissions from this report in subsequent reports.