JANIAH MONROE,  et al v. STEVE MEEKS

Case No. 3:18-CV-00156-NJR

United States District Court for the Southern District of Illinois

Initial report by the second co-monitor

Submitted by: julie graham, MS (Second Co-Monitor)

August 31, 2022

Organization of this Report

Section 1 Duties

Section 2 Introduction

Section 3 Process

Section 4 Compliance

     Subsection 4a Searches

     Subsection 4b Training

     Subsection 4c. Showers

     Subsection 4d Commissary

     Subsection 4e. Cultural issues

Section 5 Discussion

Section 6 Recommendations

## Section 1 Duties

This report is respectfully submitted to the court and the involved parties in accordance with the Memorandum and Order 423 filed by the court on May 10, 2022.   This was followed by an extension Order 431 to submit by August 31, 2022

Specific to this monitor was

"…duties include monitoring Defendants 'compliance with the ordered injunctive relief on access to gender-affirming commissary items (clothing, personal care, and hygiene); elimination of cross-gender body searches and implementation of IDOC's transgender identification policy (including access to private showers); and training (on transgender issues and awareness for all correctional staff, and for Logan Correctional Center inmates and staff regarding incoming transgender inmates)."

And

"As set forth in Doc. 370, p. 14, the Co-Monitor's duties will include assisting and facilitating the parties 'development of remedial plans, including possible further revisions to IDOC's Administrative Directives governing transgender prisoners. Ms. graham may arrange conferences with counsel for the parties and with IDOC staff as appropriate, which may include coordination with the first Co-Monitor. (See Doc 370, p. 14).

## Section 2 Introduction

Essentially, this monitor was charged with monitoring commissary, cross body searches and implementation of the identification policy including showers, and training issues in the IDOC. (Illinois Department of Corrections)

These categories seem discrete yet they are deeply interconnected. For instance, commissary access provides the tools for social transition to decrease gender dysphoria and that exists within the larger culture of IDOC and its individual facilities. The requirement for training is assumed to improve that culture, to ensure safe and equitable treatment for incarcerated transgender people.

'Accommodating and facilitating social transition' has a variety of components, one aspect of which is access to gender relevant clothing and sundries, which means commissary, but it also means the clothing room—where everyone gets their kit and where indigent people can access clothing. Another aspect is use. While an individual might able to purchase something in commissary, if she cannot wear the item outside of her cell it doesn't truly represent accommodating social transition.  While a person might be able to purchase an item, it doesn't mean it's the correct item for their skin or hair or body. In this way, the culture of a facility impacts accommodation to social transition. This monitor discusses these three areas both broadly and individually.

**"The Monitor shall assess whether Defendants have complied with the ordered relief and report any noncompliance to the parties and to the Court."**

At first this seemed like a straightforward question, a fairly binary question, either IDOC has complied or it hasn't. It has required some degree of investigation on the part of this monitor to get the answers that are presented in this document.

The IDOC is comprised of 33 facilities. Each facility has its own degree of compliance to each of the topic areas. Each facility has its own culture.  There are differences in the issues that the facilities that are designated as women's facilities face as opposed to the issues in the facilities designated as men's facilities.  Of the 33 facilities, 19 facilities housed 160 transgender people in July 2022 according to the IDOC. The census changes. The changing census may matter in terms of problem solving issues related to commissary and planning for cultural change in a facility.

Some facilities like Graham or Robinson have 1 incarcerated person who identifies as transgender and some facilities like Centralia or Logan have over thirty incarcerated transgender and non binary people and can expect that census to increase.

The simple is answer regarding compliance is partial compliance. However, this observer believes that the IDOC has been making a good faith effort towards compliance.  Logan even made steps that were outside the court mandate in terms of identifying transgender men and addressing their needs without a mandate. There are extenuating circumstance for much of the noncompliance in terms of what individual wardens and administrators can do. Commissary concerns for transgender people are an example of this problem, hampered by rules that prevent simple solutions, they must confront the same purchasing issues that exist for other items, like food.  IDOC has its own struggles and these are compounded by the struggles that individual facilities face, particularly regarding staffing issues and these impact compliance. These are also briefly referenced in the individual sections.

There is some degree of confusion at IDOC. Depending on who was asked questions, different answers would emerge. This created problems in determining compliance. Commissary is again an example. Some members of TAC stated IDOC had moved to a Gender Neutral Commissary and other administrators did not believe they had or were unsure; that it was still in discussion. It was hard to determine if they were making items available when what was to be included in commissary for transgender people was unclear. What this means is that what is aspirational is, at times, believed to be what is enacted. This causes confusion and disappointment.

Certain documentation at IDOC appears to be a work in progress. This monitor expected to be able to report what percentage of staff had completed the training mandated by 3.30.2022 and for those who had not completed, the explanation and the plan for remediation.  Documentation regarding training, while plentiful, was inadequate to assess the question of completion of the training for all employees. Staff who have completed the training may not have been tracked as having completed. The documentation system that tracks training, OneNet, only had data input from some of the facilities so the report is inaccurate. This is detailed below in the training section.

The list of transgender people was also not entirely accurate. There were people who were cisgender on the list of people identified as transgender. These were individuals who were housed in the PRISM program and were gay or bisexual. This monitor did not interview all 160 people on the list so it's unclear if the two identified are the only two errors or if there are more.

That said, there was a vagueness or lack of clarity or state of confusion regarding information and that meant investigative work and more hands on work than was expected.

The intent of training, this monitor believes, is to shift the behavior and thus the culture of the IDOC.  Despite partial compliance and clear steps to improve, this observer also notes that transgender people who are incarcerated at IDOC experience a high level of distress related to the culture within the facilities. There are members of this class who are terrified related to their experience in their facility solely related to their gender identity. Over and over this monitor heard from incarcerated people in multiple facilities that they were called slurs, told they are men when they are women,  taunted, sneered at and even have staff member refuse to touch them.  Training is a component of creating a respectful, tolerant culture that permits social transition and decreases stigma, and shame for transgender people.

Despite the many improvements this monitor heard about and genuine barriers the administration continues to encounter, transgender people in IDOC have been told for long time that substantial change is coming and are frustrated by how long this process is taking.  Some incarcerated people in IDOC are afraid for their safety and for their lives.

## Section Two:  Process

This monitor made the decision to initially survey the the landscape of the IDOC regarding the above stated concerns. This monitor has had numerous phone contacts and email correspondence with administration at IDOC; conversations and email exchanges with directors of commissaries, an internal affairs officer, various staff members, phone conversations with randomly selected incarcerated people across nine IDOC facilities, and a brief video conference with attorney's Cook and Higgerson, Dr. Amanda Harris, and the Moss Group. This monitor has also reviewed policies and procedures and legal documents relevant to the scope of this report. This includes the Plaintiff's memorandum dated July 14, 2022. After this report is filed and feedback is garnered from the court and the other parties, there are certain facilities that likely will require the monitor to physically visit their site.

The monitor received a list with 160 incarcerated people's names who are located at 19 facilities in July. 133 incarcerated transgender people are held at the 9 institutions where individuals were randomly selected to interview, and 48 were actually interviewed. One was psychiatrically unstable, and one had to leave. Two of the people on the list were not transgender, rather they were cisgender and one individual was questioning. Phone interviews were held in private and facilitated by the corrections staff.

This monitor heard a variety of complaints and concerns and listened for patterns and commonalities that are reflected in this document. Where quick interventions could be made, some of these were addressed when possible, another are many yet to address. Those interventions by IDOC are also included in the document.

### Cooperation and Compliance with the Monitor

The Administrative Staff of Corrections to whom this monitor spoke were cooperative and forthcoming and genuinely trying to comply with the order and with this monitor. Warden Case and Warden Mendoza were very concerned about providing responsible and equitable care for transgender people in Women's facilities. They openly acknowledge there are barriers and have been a host of difficulties. They also are asking for guidance. Chief Hammers has been exceptionally cooperative and responsive and is interested in problem solving specific areas of concern and this monitor will follow up with him the first week of September on several issues.  Each of the individual wardens of the facilities contacted quickly facilitated contact with their staff and incarcerated people at their sites. Everyone this monitor had contact with was focused on solving problems and action oriented.

The incarcerated transgender people with whom this monitor spoke were even handed and seemed fair in their accounting of their treatment at IDOC. They acknowledged the progress IDOC has made as well as identified where IDOC fell short. Their concerns are described briefly in the various sections and are referenced in the section on themes.

## Section Four: Compliance

While this monitor understands there has been an ongoing issue with commissary, searches, showers, respect, etc. this monitor can only start at the moment in time they began to collect information.  This section will discuss searches, commissary, training and the larger issue of the culture of IDOC.  Each topic section is divided into  the topic question, what DOC reports, what inmates report,  what staff report when there is information from staff, and then remedies that DOC is currently taking to address the issue or improve compliance. This is followed by a discussion section and recommendations.

### 4a) Searches

1) Is DOC compliant regarding cessation of cross gender strip searches?

Mostly so, although there are significant limitations and challenges.

Cross gender searches have generally stopped, but there is not yet a well-functioning system in place to search incarcerated transgender people. This causes systemic problems. There was one reported cross gender search at Pontiac during a medical transport.

**What DOC reported:**

AD 05.01.113 (4/1/2021) prohibits cross-gender searches.  Cross gender strips searches have ceased to occur.  When inmates are strip-searched, on the back of their ID card it states their gender and the gender of the officer by whom they are to be searched. If a transgender woman is to be strip searched, and her ID has the correct marker, she will be searched by a female officer. A female corrections staff will be identified to search the incarcerated person.

**What inmates reported:**

Inmates interviewed reported that cross gender strip searches are not occurring in the facilities at this time.  They reported they had in the recent past. When transgender female inmates were strip searched in the past two months, they were strip searched by a female staff member and reported being treated with respect and that the search was done professionally. "They have been in compliance, professional, respectful."

Some inmates reported having to wait for a long time to be searched while a female officer was identified and arrived. One woman at Pontiac stated it was over 8 hours.

One inmate reported that a custody officer wanted to search her but she showed the officer her ID card and the officer went away to get information from a more experienced officer. The ID card worked for that individual.

There was one report of a strip search related to a medical writ at Pontiac- a transgender woman was being transferred for medical care on June 2, 2022 and was improperly

searched causing distress for the patient.  She told the Lt. that she was to be searched by a female and was informed that there was no one available and that she was being given a direct order. (She states she filed a grievance that went unresponded to by corrections.)

Incarcerated people report that there are times they haven't been searched because no female officer could be identified.

There was a report of an inmate at Pontiac being held with her hands handcuffed behind her back for a prolonged period of time (over 4 hours) while waiting for a female officer to arrive to search her.

**What staff of IDOC reported**

This is a summary of comments unless in quotes.
"The staff of IDOC hate the search policy." There was no preparation and no planning for the policy and so implementation was simply a directive without support or follow up. "There are times when someone must come from 90 minutes away to search an individual." Female staff refuse to search transgender women. "It is a union issue." There hasn't been any assistance for dealing with staff who refuse to work with transgender people. Is it okay to refuse to touch a transgender woman? Is that a union issue?

There is tension between the staff who are willing to search and staff who refuse to search transgender people. A female staff member confirmed that she has been pressured in front of transgender inmates not to search transgender people.

Incarcerated people who must wait for prolonged periods of time have asked to be searched by any available staff rather than the gender of staff on their ID card and the staff must follow what is on the card so people have missed appointments or visits.  It doesn't work for individuals in custody or for the custody staff.

There are times when an administrative assistant has had to search a person. Because IDOC did not prepare the staff for this policy, staff see transgender people as the problem rather than IDOC's lack of preparation and follow through. It's possible they take this out on incarcerated people.

**Current IDOC remedies**

When strip searches occur, a female corrections staff will be identified in the facility to search the incarcerated person. If there is not a female corrections officer in the facility, a female officer from the closest facility will be asked to search the individual. This means the incarcerated person will have to wait until that officer arrives to search them.

<u>Planned Remedies through IDOC</u>
In discussion with Chief Hammers:

**Strip Searches**

Newly hired staff, as a condition of employment, must agree to provide strip searches, as requested.

**Body Scanners**
Body scanners will be utilized in 5 locations. The scanners are installed and staff have been trained in five locations: Logan Correctional Center, Centralia Correctional Center, Menard Correctional Center, Pontiac Correctional Center and Stateville Correctional Center.

Policies and procedures need to be completed.  A working group was formed to develop these and individuals sections are due on 9.2.22 with a follow up meeting planned for two weeks later where the draft will be finalized and submitted for review. Following the release of the policy and procedures for the use of the body scanners, these will be used when necessary.  An IDOC-wide tracking systems must be included to ensure inmates are not exposed to high levels of radiation from repeated searches and that this information follows an inmate should they be transferred.

**Searches when an incarcerated person is transported**
When incarcerated people are being transported for medical care or legal writs and are to be searched, there must be a plan in place to ensure that they are searched by the gender of officer they have selected. These are planned procedures so adding that component to the plan is necessary.  Staff will be reminded about this planning process by Chief Hammers.

**Restraining transgender people while waiting for searches**
Transgender people are not to be restrained while waiting for a search unless there is a reason to do so.  Chief Hammers will remind custody staff.

**Discussion from the monitor**

Staffing is a problem related to strip searches.  Transgender women who choose, need to be searched by a female officer. Apparently, the union has taken the position that female employees will not participate in strip searches. This has limited who is available to provide strip searches. It's outside the knowledge and purview of this observer to begin to address this issue. Clearly more staff are needed to provide this basic security function. IDOC is hiring new employees with the expectation that they will perform these searches. However, hiring is not moving forward very quickly.

There are only 5 institutions with scanners and 19 institutions with a census that included transgender people in July. If body scanners are to be the answer, other facilities need to acquire and utilize scanners as well, particularly those without easy access to female staff who will perform necessary searches.

On December 1, 2021 IDOC reported they had entered into a purchase contract for 5 body scanners. These have taken time to install and train. Chief Hammers initially reported that Body Scanners were scheduled to be installed July 5th, with training beginning on July 7th at Logan Correctional Center, Centralia Correctional Center, and Menard Correctional Center.  However, this did not happen on schedule and these were installed and training completed in August.  They have yet to be deployed, partly

because of the need to ensure the safety of incarcerated people subjected to the use of scanner.  Very likely these will not be used until October as the working group will be completing the final draft in September.

**Policy Concerns**
The language of the Administrative Directive refers to male offenders and to female offenders.  Step 8 c  Steps for an Unclothed Search of an Offender uses language that indicates that male offenders have penises and scrotums and female offenders have breasts and Step 11 indicates that female offenders have vaginas.

Transgender men may have vaginas and breasts, transgender women may have breasts and penises, some non-binary people have vaginas and penises. The policy should be move away from gender-based languaging and towards external organ inventories. People with breasts, people with penises, people with vaginas, etc.

**ID cards**

It can be dangerous for transgender women to have markers on their ID cards that indicate they are transgender. One inmate at Menard scraped off the marker on her ID card because she was in fear of her safety as other incarcerated people threatened her and demanded to see what was on her badge to determine if she was transgender.

Some transgender people feel outed or regarding having a marker on their badges. Some transgender people do not identify as transgender, rather they identify as men or women or a non-binary and do not want a marker of their history of a transgender identity on their name tag. This may be a dilemma as staff report that they need to know in order to follow the rules for interacting with transgender people.

Individuals in custody did not discuss the concerns about privacy regarding the badges during searches. It is clear from the above situation that this is a possibility.  It could be that this is so new that it hasn't been an issue as of yet. It could also be that it is such a step forward for IDOC that it feels very positive to many of the women and men I spoke with. It's been a source of protection for them to show to custody staff.

**Discussion of this issue related to culture**

Because corrections facilities were unprepared to address the needs of transgender people, they were unable to respectfully provide this security function. Searching transgender people has problematized them. This lack of preparation has added a further burden to their existence in the facilities they are in. Rather than IDOC's implementation strategy being seen as the problem, the transgender people themselves are seen as the problem. Staff have to step out of what were previously normal routines to meet the needs of transgender people and frequently don't have the support and resources (body scanners) to do their jobs further taxing an understaffed system.

Incarcerated women report hearing corrections staff admonishing or criticizing or teasing female staff who are willing to provide searches. One female staff person confirmed that this has happened to her.  That behavior demonstrated a lack of professionalism and problems in collegiality.  Discussions of this nature in front of

incarcerated people reinforce stigma. Transgender women reported hearing that staff would not touch them. A staff member reportedly refused to transport a transgender woman for a shower when she was in segregation because she would have had to handcuff her and take her to the shower area and take the handcuffs off of her there. Another staff member had to do this. It created a rumor mill about the transgender individual—ie, what had she done to the corrections officer to make her not want to touch her? This unprofessional conduct creates or exacerbates a hostile culture for the transgender people, rather than the conduct of the officer involved. When staff refuse to do their jobs, with a group of people, it stigmatizes those individuals.

<u>Recommendations from the monitor</u>

An aspect of normalizing the existence of transgender people in facilities is planning for their needs, rather than creating crisis or drama filled situations that are unnecessary if approached with informed foresight. Any transport, such as medical and legal transfers, but also passes or any event that likely requires a strip search is generally a planned occurrence and steps must be taken to ensure appropriate staffing related to searches are included as part of the planning process. It is simply a change in the way things are done to accommodate the needs of a different population. Staffing must be planned so that the transgender individual is not the focus of the poor planning.

Purchasing more scanners and/or ensuring appropriate staffing in facilities where transgender people are housed is critical. Transgender people should not have to wait for prolonged periods of time to be searched because of staffing issues. Institutions know what their census is and IDOC must assist them to staff their facilities appropriately.


**4b) Training**

Five instances of training were mentioned in the court reports identified by this monitor:

These are discussed in order of completeness.

1) Ongoing training
2) The Moss Group training for Logan staff
3) The Moss group training for inmates
4) Training related to searches
5) The training to have been completed by 3.30.22

**1) Ongoing training**
As part of the the yearly cycle training that all corrections staff are required to attend, a section called: **Rehabilitation, Safety Management and Care for Transgender People in Correctional Settings** has been included in this training on the second day.

Trainings are staggered throughout the year to ensure coverage in the facility. Staff who attend sign in and out and a supervisor co-signs. The training coordinator then logs this into OneNet, the statewide learning management system. Each staff person has a face

sheet with all of the trainings they have attended in their training file. It takes an entire year for the staff of IDOC to be trained through this process.

**2) The Moss Group for Staff**
The Moss Group will begin training on September 7 and 8th. They were to start by offering 4 sessions for 30 participants, but due to a Covid spike there will only be 20 participants per session. 80 employees. Their plan is to then train staff to offer training for trainers. Those trainers will then train the rest of the Logan staff and potential training through the IDOC system. The outline for training is included with this document.

There is no timetable set for the training for trainers or a detailed plan for the implementation of those trainings.

The Moss Group met with staff from Logan for a needs assessment.  Warden Case reported the meeting helped her develop her thinking on transgender people in custody. Needs assessments are critical.

**3) The Moss Group for incarcerated people**
This training is still in outline form and will be developed following feedback from the employee focused training.  After the trainings for staff, they will adjust and offer a training for incarcerated people. It is expected to mirror the training for staff.
There is no timetable set for this training.

**4)The training regarding searching transgender inmates.**
Newly hired female employees are being trained in the academy how to appropriately search transgender inmates. It is a condition of their employment.

Female corrections officers have refused to search transgender employees. Their union supports this and thus only female commissioned officers, are called upon to search transgender women who request to be searched by a female staff member. So to some extent, training staff to strip-search transgender people is a moot point.

There have been trainings at the five facilities where the body scanner have been placed. There are staff who can do these virtual searches once the policies are completed.

**5)The sensitivity training mandated by 3/30/22**
The mandated training is not verifiably implemented at IDOC.

There are three issues discussed here.
First, the inaccurate data on the completion of the mandated training.
Second, the percentage of people who were not compliant.
Third, this monitor's concerns regarding the queer works training

Chief Hammers did, in fact, mandate that all employees were to watch the the 30 minute training, **Transgender and non-binary individual in Correctional Settings: A guide to Rehabilitation, Safety Management and Care,** by 3/30/2022. I believe the training was developed by Queer Works. (The video doesn't list credits and several people I talked with weren't sure where exactly it came from.)

It is unclear what percentage of the staff has watched the 30 minute training. It was very difficult to get the information regarding training completion. While the training coordinators acknowledged that it was a mandate, and that staff members did watch the video, several reported that they were understaffed and did not have time to enter the completion information into OneNet. One training coordinator was reassigned from the training department, others were also behind in data entry. Data was also lost.

From the Acting Manager of Staff Development and Training, the Statewide Transgender Training Report, as of 4-1-22 listed 6467 staff completed out of the current number of 13,902 employees listed in OneNet.  (46%)
As of 8/8/2022 there were 7,427 completed in OneNet.  (53%)

These are inaccurately low numbers as individual facilities are behind in entering this data into OneNet. So, this data was generally unhelpful in determining if the training was completed.

Data entry and tracking problems aside, it is also clear that a significant number of staff did NOT comply with Chief Hammers mandate by 3/30/2022 and that a significant number of individuals still have not complied with that mandate.  Leaves of absence explain some of the lack of compliance.

Just a as an example three facilities for which this monitor does have easily accessible data:

Big Muddy 137/423  have not completed the training as of 8/12/22   32% non-compliant

Logan 185/676  as of 7/30/2022.  27% non-compliant (when various LOA are add it increases to 30% non-compliant.)

Pontiac 563/736 as of  76% non-compliant 8/8/22

While I believe other facilities had high compliance it's simply difficult to prove.

**IDOC remedy:**

Chief Hammers is reminding people of the mandate to complete the training with a new completion date of 9/16/22. At facilities where the data was lost some individuals will have to repeat the 30-minute training. It is also this monitors understanding that training coordinators have been encouraged to enter any date they have not yet entered to bring OneNet up to date.

**Discussion**
From speaking with some of the training coordinators, there was a data entry problem but also a tracking problem. They have a stack of forms from people who watched the video. For staff who had not watched the video, there was no plan in place to ensure that they would watch the video. There was no follow through. It is also clear that many of these staff are overstretched. The IDOC training coordinator is the acting training

coordinator and while an experienced trainer, began in this role in July of 2022. The training coordinator at Logan began in her role in July as well. This is a theme throughout IDOC where many people are new or are acting or DTD in their current positions.  I want to reiterate the vagueness and lack of information consistent available. This, too, is a theme throughout IDOC related to transgender people in custody. Tracking down information was difficult although the staff was cooperative and tried to comply.

After the the 9/16/22 mandate and the data is reentered, there will be better sense of compliance with the training mandate and then issues can be identified and addressed.

**Content of the 30-minute training**

It is unclear to me how useful the QueerWorks training is for frontline correctional staff at this point in time.  Given the continuing types of negative experiences many transgender people who are incarcerated in Illinois are reporting, sensitivity training might have been a mismatch for some of the staff of IDOC.

When people's personal beliefs come into the workplace, that is an issue of professionalism. Incarcerated people report being told they are in men's facilities so they will be referred to as men, or worse, report being referred to by derogatory names, such as f*ggot or worse.

It is the opinion of this monitor that there may be a mismatch between the training needs assessment for the corrections staff and the QueerWorks training. Effective training matches the needs of the people attending the trainings. This is particularly true for employees who are stressed and feel over stretched. The experiences this monitor heard about from inmates and some staff about the current culture within the facilities, is such that the 30-minute training misses the mark in terms of what officers need to know and may also reinforce the myth of "special" treatment" as opposed to equitable, fair treatment; treatment for gender dysphoria, social transition and causing additional harms.

Many of the staff need more basic information that will assist them in carrying out their work. When staff are calling people "f*ggots and and telling them they are men because they have a penis and are in a men's facility and will always be a man, it's a miss step to give them information about the details of non-binary people also self-describing as transgender and expecting that staff person to use that language. When the video tells people "We don't say" when people are saying "it" or "he/she" or "Sir" to cause harm, that is ineffective. There is something else occurring.

Corrections is based on ideas like firm, fair, and consistent.  When changes occur that seem outside of these precepts corrections staff need to fully understand the rationale for the change. Why is it fair as opposed to special treatment?  Why is it inconsistent to treat transgender people differently from other incarcerated people? How are they, the staff, behaving inconsistently?

From this monitors point of view, much of what is going awry in IDOC facilities is a lack of basic professionalism. These are not sensitivity issues, rather they are professionalism issues and cultural issues within those facilities. Employees are not following the Standard Code of Conduct. This lack of professionalism is targeted at transgender people. One professional stated that staff need to leave their beliefs in the parking lot and behave as professionals. The training coordinator has gotten feedback from individuals who viewed the trainings that is consistent with this monitors view- "that they just need to know what rules and policies they need to follow."

"Most people (Corrections) look at us as a problem or an issue, a situation dropped in their laps, they think 'we want out way,' we don't, we want human treatment, not special treatment. There needs to be more sensitivity, more education, training that everyone should go through. There needs to be a code of conduct you have to abide by." Dixon resident.

The IDOC Standards of Conduct state that "The Department shall require employees to conduct themselves in a professional manner and, whether on duty or off duty, not engage in conduct that is unbecoming of a State employee or that may reflect unfavorably on or impair operations of the Department." Behaviors such as mocking or taunting incarcerated people, not responding to their legitimate requests, or calling individuals f*ggot violates those standards.

 "Employees shall comply with departmental rules, written procedures, bulletins and written or verbal orders issued by proper authorities." Many people did not comply with the mandate to view the training. Many staff continue to misgender transgender people. Employees are not complying with written departmental policies and procedures. There are issues of training and issues of accountability and holding staff accountable for following the Standards of Conduct. Accountability must be addressed.

One administrator suggested that staff misunderstand and believe that the directives regarding transgender people will change with subsequent political administration and are simply waiting for that change. Training that addresses Administrative Directive 03.02.108 Standards of Conduct Section G Requirements, Item 1 Compliance with Laws and Regulations subsection b. Employees shall obey all applicable court decisions and orders related to the performance of their job duties." Staff need to comply with orders they disagree with, with policies they may have personal or moral disagreements with, or they do not meet the requirements of the position.

The law recognizes that transgender women are women, and they are living in male facilities so there are women in male facilities. It's not an issue of belief. Trainings that address law and policy might be more successful at shifting the behavior of correction staff as well as creating culture of professionalism.

Online training of material that some people find controversial, or with which people personally disagree has other limitations. The online training can be "on" and not watched and this still counts as completion. There is no test or way to know if a participant was paying attention. How is it determined that people learned the minimum they need to know in order to do their job?

IDOC is in the early stages of understanding how to provide for transgender people in custody.  This monitor suggests that there be levels of training, initially focusing on professionalism, and handling common situations that arise. This is essentially skill building, providing tools for situations that officers will encounter, giving them appropriate language and information about how to handle situations.

Staff at Logan and Centralia likely need more in-depth training about identities and more complex situations that will arise. The Moss Group has begun this effort but training a handful of staff is not enough.

Recommendations
Hire the Moss group or another group for more time and more extensive needs assessments.
Determine if the existing training materials are the best for this moment in time for each facility.


**4c) Showers**

This is a complicated area. What feels private and safe to one person feels intrusive to another. That said, there remains problems related to showers in several of the facilities according to the incarcerated people.

Experiences faced by incarcerated people run the gamut of reporting that showers are safe, private and appropriate to people who are terrified or taking sponge baths in their cells because they feel the facilities are not private or safe. Some women report they will never feel safe showering in a male facility.

There are facility specific issues and sometimes gallery specific issues ranging from an incarcerated person reporting that they requested a shower curtain and a Lt. supplied it and they now feel safe and private showering at Pontiac, to multiple reports of people feeling unsafe and frightened to shower at Pontiac.

**What DOC reports:**

The DOC believes that private showers are available. Facilities are directed to provide private access to showers. Some individuals shower in medical facilities. Some individuals have special shower times. Shower curtains provide coverage from

There had been a problems where some transgender people were told they could be out to use the phones or they could take their shower and this was corrected because they are permitted to do both.  Issues have been addressed as they arise.

**What transgender incarcerated people report:**

Menard

There is a report that while there is an appropriate shower curtain installed at Menard, the corrections staff intentionally take it down when an individual showers. "Workers and the custody staff can see us." The individual will not report because they believe they face retaliation and do not trust that anything would change. Another individual feels the showers are safe and private.

Pontiac

Showers feel unsafe to some of the women and feel fine to others.  There are a range of reasons why it feels unsafe or lacks privacy. One woman reported having an asthma attack in the shower and the custody officer would not help her.  Another says when she goes into the shower the custody staff leave and and she is scared of what might happen to her in the shower.  Women report feeling exposed or even ogled when they leave the shower as there are not hooks to hang a towel on— people must exit the shower naked in order to get their towel. There are workers on the gallery who can see them and this makes the shower not private. Another woman stated she asked a Lt. To put up a shower curtain and he did so and she feels it's private. Logan

Logan

At Logan there is only one functioning shower on each floor of D. This restricts when people can take a shower. One person states they go upstairs to show despite it being against the rules and another has received a ticket for doing so. It reportedly is more private to shower upstairs.

Centralia

There is a camera pointed at the shower in Centralia.  People feel there is not enough privacy and that staff can see them showering as well as people in the day room can stand in certain places to see them showering. They want more privacy.

Dixon

A transgender person has been told to take a shower like everyone else. That other inmates complain that special showering time is interferes with their time in some way.

Shawnee

Safe but not private they leave the door open we go one by one.  Porters could come since the doors are not locked; Safe; one at a time, Used to not shower,  safer now.

Big Muddy

Very comfortable. Some COs were letting workers out on the deck. We complained and it stopped; No issues; Supposed to let us out and they don't. I have to keep asking. Some won't. Some days I don't get a shower. I don't know how to grieve this;  Real Good about this. Get me out early on 2nd shift.

Pickneyville

Staff get on the loud speaker "Okay all you weirdos get ready, it's time for the show, Get ready special showers. It's ignorant."  People aren't comfortable being known (outed); People on the top deck can look down so we bring a towel to ensure we are covered. We asked to fully cover showers, they are half covered. Some officers let them have privacy other do not. It doesn't cover out breast well; No privacy quarter length coverage. I'm afraid of being assaulted or bashed. We use towels to cover.

Shower curtains

Tall individuals do not feel the shower curtain provide enough coverage.

**DOC Remedies/responses:**

There are at least two facilities where staff who stand up in the bubble (control unit) can see down into the shower negating the privacy curtain. This is a physical structure problem that Chief Hammers will follow up on and problem-solve how to address.

Chief Hammers reports that camera at Centralia may appear to be pointing at the showers it can only see a limited area. (See enclosed photos of Centralia)

At Logan, there are reported to be only one functioning shower on each level of D. This is true and is a plumbing problem that is in the process of being addressed by Warden Case. It is expected to be addressed this coming week. Logan is 90 years old and has antiquated facilities.

There are reports that staff take the shower curtains down. That is concerning.  This is an item Chief Hammers will follow up on.

The issue I alluded to before about staff feeling hassled about the specialness of showers and telling inmates they can take showers like everyone else. That in one facility they actively dissuade people from taking showers because of the inconvenience to themselves and other inmates. This should not be occurring and can be followed up on.

Recommendations

This monitor feels the need to have more details about each of the facilities at this point. There was such conflicting information. Some of it I suspect was out of date. This monitor will follow up with Chief Hammers and individual wardens regarding conners raised about shower facilities.

**Section 4 D. Commissary**

Is DOC compliant regarding provision of commissary?

No. Not exactly.

This is difficult to answer without discussing the spirit behind the commissary list. Transgender women in male facilities were to be eligible to receive items from a list referred to as transgender commissary. These items were to be available to transgender women as women in male facilities, but also to reduce gender dysphoria and facilitate social transition. At least, this is how the transgender women are experiencing their need for these items and how the court discussed provision of some of these items.

**DOC:**

In November of 2020, an email from Director Locke sent out along with a transgender female commissary list, to all commissary directors to stock the items on the list and to make them available to transgender women. They were not actually in stock until February of 2022.   Following their appearance in commissaries, many of these items sold out.

There were significant changes in commissary purchasing recently. Commissary, in the past had a sole source supplier. IDOC's solicitation for a comprehensive contract was protested and determined to have materials errors and they were required to have a rebid.  Until that occurs, there are five different providers for IDOC which creates confusion and a cumbersome process that no one is happy about. They must purchase everything from these five suppliers. One commissary director stated that in the past if there was a need for something special, they could easily acquire it and now it takes months and months, and often, they cannot get it at all or they get it in quantities that creates problems.

**DOC readily acknowledges that they cannot get everything on the list to incarcerated transgender people due to the above stated issues and supply chain problems. They report that they have gotten most things but have had difficulty acquiring some items.**

All commissaries I spoke with reported they had bras and underwear and boxers available. There were problems with certain sizes at various points in time but  most felt they had those problem addressed at this time. In speaking to staff who run commissaries, similar themes were in evidence. These include the lack of supply, the frustration with new process, the difficulty using the new list process, ordering and not receiving what was ordered.

**Reports from incarcerated people:**

In speaking to individuals in custody there were several themes across most commissaries. Shortages impacted most people. Individuals in custody were unable to

consistently access items important to them for decreasing gender dysphoria. Some reported that there were initially items available and then they were gone. This increased their frustration.

Incarcerated people stated that they had difficulty getting sizes of underwear and bras on either side of the spectrum of sizes. Size 4 underwear or XXXL bras, for instance.

Incarcerated people are frustrated that they were able to get necessary make up and then it was replaced with make-up of lesser quality that did not work as well.

They also expressed concern about the cost of make-up. Individual items cost over twenty dollars.

Various institutions had differing problems. A Latina woman could not get makeup in the proper skin tone and was offered make up for white or black skin.

Women have been told that they have to purchase the makeup that is in stock before other make up is purchased.  The colors might not be correct for their skin tone or the cost is too high. They are told to take it or leave it.

Women report they cannot get the color of foundation they need or cannot get foundation at all. Currently they can get hydrator instead of foundation, but hydrator, even when tinted does not work in the same way foundation works.

People in the PRISM program report that commissary was a tool of enacted stigma and discrimination. Allegedly, incarcerated people who are employed in the commissary intentionally would not give people from the PRISM program food and other commissary items they requested, consistently saying they were out of these items. Initially, PRISM members accepted this, but it became a pattern and they repeatedly saw that other people who went to commissary after them who were given those out-of-stock items. Almost to a person, the people I interviewed told the same story about their commissary experience at Centralia.

A transgender man said he was unable to get masculine scented products at Logan. He didn't want to smell like a flower. Another man said that the deodorant they had didn't work well for people on testosterone. "It doesn't hold us."

One incarcerated person was told " I could not wear makeup outside of my cell. Some other transgender people are permitted to. I can't wear clothing to express myself."

Another woman was told she could not wear fitted clothing and was given only oversize clothes to wear when she requested smaller clothes that fit her.

Individual commissaries do not respect the privacy of the people purchasing and will say things about their purchases very loudly, effectively outing them.

Discussion:

A) Transgender Commissary List is incomplete

The transgender commissary list provided to this monitor in July (see appendix A) is incomplete. For instance, it doesn't specifically list hygiene products for women. This seems to be an oversight. Many transgender women complained about the lack of deodorant, shampoo, conditioner, body lotion, etc. for women, including for all types of skin and hair. An individual commissary could follow the exact list and be in compliance without following the spirit of the list or understanding the actual purpose of the list. Transgender women who are socially transitioning, or have transitioned, generally do not want to smell like typical men and have needs related to hair care. The transgender commissary list also doesn't list male hygiene products other than deodorant.

A commissary may carry the item that is on the commissary list, however, they may not have it in all the shades necessary for the skin tones of all the women who are living in their facilities. That is a complex issue in facilities with a small number of women who use that item.

B) The presence of items in commissary is inconsistent.

Commissary, whether for transgender people or for all incarcerated people, has been hampered by the same supply chain issues that have impacted all stores. There have been shortages. There has also been a significant change to purchasing over the past year.

Commissary directors were very frustrated by the commissary process. It changed demonstrably from what it had been in the past. Currently, the they are given a new list monthly from which they choose items to purchase.  They cannot order what is **not** on their list. Even when they do order items, they are not guaranteed to receive those items. The vendors change frequently and the brands that are available change. The prices of items do not stay consistent across orders so one month eyeliner might be a certain price and two months later it is a much higher price. These business variances are significant problems for transgender women, particularly when people are treating dysphoria with their limited monies.

B1) The practical problems in commissary impact transgender people disproportionately.

Transgender people are using commissary for the reasons all incarcerated people do, for comfort, for sustenance, to maintain some individuality, etc, but they are using it for treatment of gender dysphoria and to socially transition. When supplies are unavailable, it creates harm for them, not simply inconvenience.

C) Individual commissaries make decisions about purchasing for their whole institution that make practical sense for the facility, but misunderstand the needs of transgender women. Items for transgender women are not just nice to have items.

Directors have a certain amount of money to spend for all inmates. In facilities with one or three transgender inmates, purchasing expensive items that must be purchased in a case can influence what is purchased. So for instance, purchasing a few bottles of a particular color of foundation may significantly reduce dysphoria for an incarcerated transgender person, but it means that many bottles sit on the shelf and if the individual is transferred or released those bottles simply expire.

Commissary has rules about using up supplies that are currently available. Commissary worked following these rules can create problems. If a person needs a specific color of a makeup item, they have been told they cannot get it until other colors are purchased. Women report being told to take what is offered or take nothing.

One woman stated "They make us look like clowns." This is a particularly poignant statement. A woman trying to socially transition, to appear as the woman she is, feels forced to use make up that makes her appear clownish. For a commissary worker who does not understand dysphoria or worse, perhaps thinks negatively of transgender people, this is an act of harm. It reinforces some people beliefs that transgender people are freakish.

Commissary directors also must purchase the least expensive items on the list. Some of these items will not work well for transgender women's needs. There is a difference between seeing make up as a nice to have and a must have item. For cost-conscious commissary directors there are many rules and procedures that makes sense—for treating gender dysphoria it does not.

D) Another spirit versus following a list concern is the information or beliefs that whomever is purchasing or choosing makeup or hygiene products have about those products.

One very honest and earnest commissary director informed this monitor that he hadn't realized that there was a difference between shampoo for men and for women. Another commissary director said she purchased gender neutral hygiene supplies—this often works for no one who has a gender they want to express. People who are unaware of the differences in skin tones, who never had to look for those details on a list with shifting inventory, may not order colors that are needed or even see the difference in the colors.

This is also reflected in the creation of the commissary list itself-that it is missing key items that matter for people who are socially transitioning and are attempting to reduce their dysphoria.

A common complaint was the lack of foundation. Hydrator is not foundation. It will not cover well is one is covering what might be referred to as five o'clock shadow. People who are familiar with the use of makeup for transgender women, or perhaps the

women themselves, could advise what is necessary. While there are items that may work for cisgender women, they may not work well for transgender women.

E) Transgender women in segregation or C-grade have limited access to commissary due to their placement and this therefore limits their access to items that will decrease gender dysphoria or enhance social transitioning.

DOC Response:

Chief Hammers believes that there are solutions to some of the facility issues that can address small barriers like keeping limited amounts of colors of foundation in stock.  It requires out of the box thinking that perhaps commissary directors do not feel empowered to utilize.

Robert Fanning: The Department plans to move to a gender-neutral commissary. This has been approved and its implementation is the goal of the Department. Prior to moving to a gender-neutral commissary the Department will need to amend Administrative Directive 04.03.104 Evaluation, Treatment, and Correctional Management of Transgender Offenders ("AD"), establish a reliable contract for the items, update the orientation manuals at the facilities, and provide explanation to the facilities.

The current version of the AD notes special commissary accommodations for transgender individuals in custody.  (II.I.1.e). The Department will need to amend the AD to indicate the items shall be available on a gender-neutral commissary to all individuals in custody.

**Discussion**

Commissary to facilitate social transition and treat gender dysphoria has proved to be a poor idea. Legally, incarcerated people do not have the right to commissary.  However, transgender people with gender dysphoria are using access to commissary for access to items that support social transition, including bras, gender appropriate underwear, makeup, and other gender congruent sundries. Whether it's supply chain issues, contract issues, shortages, lack of knowledge on the part of purchasers,  or being in C grade, or other constraints, it creates a disproportionately negative health impact on transgender women.

When incarcerated people face constant discrimination, issues like commissary problems that are due to structural issues can feel personal and part of the ongoing discrimination. This monitor followed up with the concerns raised by incarcerated people at Logan who stated they go last for commissary and there is nothing left and it felt like discrimination. Warden Case stated that Commissary occurs on a rotating basis and incarcerated people may not know this and that also it hasn't been happening the same as there hasn't been regular commissary due to shortages.

The same concern was stated at Centralia. This monitor followed up with Centralia's commissary director who stated that there was a rotating schedule. The director was unaware of the issues that this monitor raised based on speaking with incarcerated

people. He immediately decided to remind both staff and employed incarcerated people of their responsibilities and appropriate behavior and to more closely monitor the situation in commissary at Centralia.

**Use**

People should be permitted to wear makeup or clothing they are wearing to socially transition.

### The Clothing Room

Many incarcerated people did not know they were eligible to receive free bras and underwear from the clothing room. It's the understanding of this monitor that transgender women should be able to get 2 bras and 2 pairs of panties 2x a year.

Incarcerated people were generally uncertain of the rules regarding this. Some were entirely unaware. Some believed they could get clothing once a year. Some believed that they could not get clothing.  Other incarcerated people reported they asked and did not receive boxers or bras and panties. In some instances, they were told this is a mens facility, you get boxers. Pontiac allegedly refused to provide panties. One individual at Shawnee stated she was told by the clothing room she had to purchase underwear and bras. One individual reported that she was unable to get clothing that actually fit her, that they intentionally gave her clothing that was too large and she felt it was because they did not want her to wear fitted clothing.

<u>Recommendations</u>

This monitor will meet with Chief Hammers and discuss individual facilities and commissary and problems that individuals report or the directors of commissary report related to bulk purchasing, expiration, etc.  Size inventories in smaller facilities.

That the list itself is incomplete and that gender neutral hygiene products, while nice for some,  are not a replacement for female or male products. The list should be updated to more specifically include all necessary items so people who follow the list rather than the spirit of the list can meet the needs of transgender people. Apparently, there is an annual process for updating it. Have a transgender person or a very knowledgeable person about transgender face care advise about issues such as foundation.

Clothing Rooms must carry necessary clothing and distribute them. Incarcerated people must be informed of their right to access these items.

Remind staff that transgender people can wear clothing and makeup outside of their cells.

**Section 4e. Culture (Misgendering and the environment)**

Misgendering  by Custody Staff

While there are staff who are trying to follow the directives and treat people with respect, consistent across all male facilities, incarcerated transgender women report not being referred to as the correct gender. Misgendering is the norm.

Inmates report that some corrections staff legitimately are trying and make errors and correct themselves, but most report that it is very intentional and the officer let them know through inflection, repetition and exaggeration that it is intentional. Most transgender people felt they could tell when people simply made an error and many appreciated that some staff were trying.   "Sometimes they say he and then she, they are trying to get used to saying it, trying to adjust. I can honor that, they didn't grow up around it.

Centralia was marginally better than the other male facilities and there are also higher expectations within the PRISM program.  At Logan, there are fewer reports of misgendering and staff use the incarcerated peoples last names which is permitted under PREA, and is okay with most respondents. It can feel to some like it's a way to circumvent respecting the individual's gender. Some staff at time will exaggerating a person's name or their correct pronoun to demonstrate they are following the rule and that they feel disdain for it.

Incarcerated people report observing staff criticizing or teasing other staff who do use the correct pronoun to let the staff member know what the culture is in that facility. Female staff who are willing to search transgender staff are criticized or confronted, openly, in front of transgender inmates about their willingness to perform searches. (This monitor confirmed that this has occurred with a female staff person. This creates a hostile experience for the female employee as well as the transgender person.) Staff demonstrate disdain or disgust

Incarcerated people report that a few staff have referred to individuals as "it" or "he/shes." Some non-verbally demonstrate disgust.  Officers reinforce stigma, including the officer who allegedly refused to touch transgender people in the performance of her duties at Logan.  Some officers talk about transgender people within earshot of the people they are discussing and say hostile or negative things about them or having to work with them. Officers reportedly laugh and giggle and look in an individual's direction so she will knows the discussion is about her.

During a shakedown one inmate reported they took away all her bras and she was without them for a week. Several incarcerated people reported that during shakedowns the officers intentionally break or destroy their belongings. One inmate won't file grievances because she doesn't want the retaliation of having her cell searched. One inmate reported that a staff member gave a list of transgender people to other incarcerated people. The individual I spoke with was confronted by those inmates and

was so concerned about her safety, she removed the marker from the back of her ID that indicated she was transgender and she plans to go off of hormones so that no one knows she is transgender, so temporarily detransitioning.

Several people described experiences that sound like HIPAA violations. Staff loudly stating so that other incarcerated people can hear "we are taking you for your hormone levels" or that people are on hormones. Another said that when it was time for showers, the guards were on the loud speaker saying the it was time for freaks, the "show" the special showers.

Officers in male facilities routinely remind transgender women they are in a men's facility and that there are no women there, that they have a penis and therefore will be treated as men. Some of them use more graphic language. Some point at genitals or non non-verbally indicate genitals.

Staff members surveil transgender women more closely than other people. Transgender men, transgender women in male and female facilities all reported this experience of being more closely monitored. While cisgender men are permitted to help each other work out, to help each other stretch, transgender women are not permitted to touch anyone ever without it being misperceived as sexual. Cisgender women are permitted to casually touch each other but transgender women causally touching is perceived as sexual. This further isolates transgender people.

Some staff members reportedly do not intervene when inmates are bullied by others. Some inmates have been told they are going to have to fight in order to be safe, it's just the way it is. Some are ignored when they raise concerns. Some are dismissed saying they are emotional because they are on hormones or are "fags," etc. (Discussing their medication is a HIPAA violation, fag is a slur and the hormone comment seems like misogyny.)

Inmates have attempted to protect themselves physically and psychologically in a variety of ways, the one mentioned above where the inmate is detransitioning to stay safe is the most extreme that I heard. Some inmates have hardened themselves regarding this and others stay in their cell to avoid interacting with both staff and inmates. Many report poor mental health related to experience of enacted stigma.


What transgender people report:

Across all facilities where this monitor spoke to transgender women, they report being misgendered and hearing slurs.

"Sometimes it's a mistake, but with most, it's willful, blatant, disregard. Told you are in a male institution. You've got a penis between your legs." Many transgender women reported hearing: "You've got a dick, you are not a woman" or 'You've got a penis, you are a man." Some staff gesture to genitals.

"Staff members call us f*g, homosexuals, I was told, "I am not gonna call you female"'

"Its intentional—if you see me, I wear make up"  "I look female"

"Mental health people say "her" and "she," it is the custody staff who don't."

"They laugh at me when I ask them to use the correct pronouns."  "I am a complete and utter joke, to them.  I just want to be treated as a regular person."

"There aren't many of us here, we're a joke they aren't honoring the rules."

Commonly heard slurs. F*g, Silly b*tches, F*ggot, F*cking F*ggots. Incarcerated transgender people are referred to by these words and others like punk or "it" or "he/she." All derogatory terms. Also referring to transgender people as homosexuals when they are not is inappropriate.

"We had an argument about what I am and what it is. Some are brutal,  you are a dude you got a dick."

"You were born a man, you will always be a man, you are not a girl."

"Well this is a male facility."

Several incarcerated people report that staff will intentionally goad incarcerated people by exaggerating saying Sir, or Mr.  "They are trying to get to me." Multiple incarcerated people report staff "do thing things to get us in trouble, to get us tickets." They try to incite a reaction from us to give us tickets.

"Female staff mostly respect us, the male staff call us bro, dude, say you are in a mens' institution you are a man."

Conversely another incarcerated person reported that male staff were trying, it's the female staff that have problems with us.

The experience for transgender people with other inmates

**Other inmates**

"Other inmates are the biggest problem especially if you are smaller. We aren't welcome, we aren't included. People literally run away from us, the refuse to eat near you. I am on edge all the time"

Other inmates harass and bully transgender inmates. Other inmates try to get them into trouble, provoking or harassing. Constant derogatory language. There are transgender people who report they rarely leave their cell because of the constant harassment-including demands for sex, insults, slurs and physical or sexual threats.

The facility did not prepare the current residents for having transgender women here. That was true for the transgender men and the cisgender women. The trans women feel that there are women who are intentionally trying to get them infracted. One of the specifically described other women walking into her and then reporting that she was

the one touching them. She reported the initial interaction and the staff didn't take it seriously which gave other inmates permission to continue to do this to her. She has had multiple issues arise related to being shoulder butted where she is reported the aggressor.  Many people reported that other incarcerated people attempted to get them infracted.

Transgender people are kept from using the phones for fear they will have "monkeypox" or simply because they are a stigmatized population. Mail is their only connection to the outside. This is problematic on several issues. If PREA is accessible through a hotline and people cannot access the hotline, ie the phone, then PREA is not accessible. Incarcerated people report that in some instances the Lieutenant on call determines if something rises to the level of PREA and if they have a bias or are misinformed then the hotline is their primary remedy. If the phone, ie the hotline, is unavailable that is a serious concern. And while the phone issue was not relevant in this instance, it is true that the ACLU memo documented a PREA allegation that appears to have been mishandled by a Lt.  (Warden Case followed up on that specific issue. Chief Hammers is following up on the phone issue, polling institutions to see the current status of phone utilization and review and recommend a rotating schedule)

Transgender incarcerated people are ostracized by other incarcerated people. People will move away from them when they sit down to eat at chow. When they don't have access to each other or other LGBT people they are entirely alone. Prison for transgender women in male facilities means isolation, ostracism. (This points to the importance of transfers to PRISM and the need for PRISM to function as well as transfers to Logan)

Loneliness is an issue for many of the women I spoke with. People would like to know how to have their status as vulnerable or not vulnerable reassessed. An inmate  who was declared vulnerable at a young age when they entered ten years later would like to have that status reassessed so they could have a cell mate because they are terribly lonely. They want someone to talk to and they are isolated. People who came out after they were assessed and who now feel vulnerable would like to have the option to be assessed as vulnerable because they are frightened. There is a great deal of information that transgender inmates lack.

Many people report being hypersurveilled. Staff think they are always trying to be sexual  or are promiscuous and they are not. They feel treated differently because of their gender identity.

Other issues in the facilities
While work was not part of this monitor's mandate, it must be mentioned that many transgender people spoke to the fact that they cannot be hired into jobs because they are transgender. One woman does not disclose to anyone she is transgender because she is certain she will lose her job. Some of the dissatisfaction with the PRISM program was that individuals reported they are not receiving programming, yet they can't get a job because their time is blocked out for programming. One is leaving so that she can get a job. Work is important to many people for income, socialization, activity, skill building and self-esteem.

There is a great deal of distress over celling and the ways people are moved around. Some people stay in their cell to cope with conditions that feel unsafe to them. While housing related to transfers is outside of this monitors scope, many issues arose in speaking to incarcerated people about the distress they experience related to cells as opposed to transfers. Women feel they must choose between personal safety

There are incarcerated people who are terrified about cellmates. They feel stuck between being perceived as defiant and uncooperative and punished for this as opposed to attempting to keep oneself safe.  Because cell assignment can change without an individual understanding the reason or having a say in who their cellmate is, it creates a background sort of distress for people who are not single celled.

"They tried to put me in a cell where the person didn't want me. They assumed that I was trying to manipulate the system."

Being placed with a new cell mate is an unknown. Transgender people are worried about being sexually assaulted, once their new cell mate discovers their gender identity and this is particularly so if they have breasts. They also worry they will be bashed for being trans or perceived as gay. This keeps them in an elevated state of distress and they cannot get relief for this because if they object to a cell mate they are refusing a cell assignment and face consequences.

One transgender woman at Dixon who has had the same cellmate for some time recently was told they were going to change her cellmate and put someone new in-this is not at her or her cellmate's request. She has been distressed over this. She feels targeted by this move by staff as there was no discernible reason for the change and this makes sense to her as Dixon generally feel unsupportive and unsafe for her as a transgender woman. Similar to others she reports she can't refuse a cell assignment or cell mate without risking being sent to segregation or getting downgraded to C grade and losing everything. She is in school and she will lose her place in school if she is sent to seg. She has to choose her safety over her schooling. In C Grade she will also receive less access to commissary items, ie, items that treat her dysphoria.

Another woman at Dixon reported something similar.  She reports she is living in fear of who they will put in her cell with her. She reports that they put people in with her and then she goes to crisis or seg and complains and they say they made a mistake, and remove the person, but they keep making the same mistake, so it doesn't feel like a mistake to her; she feel targeted as well. (She is classified as vulnerable and is transgender).

There are multiple issues about Logan and the sense that people feel they are in a punishment wing. The sense of punishment is part of the culture that transgender people are struggling with at Logan. For instance, the July 14th ACLU memo as well as reports from individual incarcerated people suggest that Doing lacks access to cleaning supplies. They are also concerned that they lack access to cable and that there are issues with the access to showers. Some people felt they lacked access to recreation space. (Warden Case immediately responded to ensure that cleaning supplies were being

delivered to D wing when this was brought to her attention. She also checked to determine the status of the repairs to cable which is stuck in the procurement process and impacting other units in Logan as well and the showers are in the process of being repaired.) She agreed there are differences-pros and cons to being in any of the units and works to make sure they are equitable.

Complaints and grievances.
Many believe that if they complain they fear reprisal or retaliation. Many believe that nothing will happen and that filing grievances is useless as they are not responded to or if it is between a staff member and themselves, the staff member will be believed because they are a felon. If the issue is with another inmate, if that inmate is cisgender, it becomes a he said/she said issue,  and they are already in a one down position as a transgender person. As a member of a stigmatized group, they will not be believed. They have a sense of hopelessness.

"It's an issue of our word against theirs, and they'll tell us that we're nothing, we're black, transgender, felons. They are right, we are wrong, just because of who we are and who they are." Dixon resident. This was repeated by man, many people.

DOC has policy and procedures and has a multiple step process where incarcerated people are to be given a ticket that documents the grievance they have filed. If a resident files a grievances they get a receipt confirming that IDOC received a grievance And there are timeframes that need to be tracked. Grievances are documented in electronic case management. One Lt. admitted that there are always some that fall through cracks. However, the expectation is that if someone tells you tells you they never got a response we can look it up on that log and track it.

Institutions like Dixon have over 60-80 grievances per day and they are behind due to the sheer volume of grievances and the lack of staffing to meet that volume of grievances.

Also, some incarcerated people do not understand what the process is for grievances. Some people don't know they really can file grievances. Many do not know what their rights are.

**Summary**

Transgender women in many facilities are frightened.

"I am afraid they will do something to me. I am scared to death here. I am not safe."
"There are no cameras to watch what they are doing."

An inmate stated that a correction staff gave the names of transgender people to an incarcerated person who then threatened transgender people. She scraped the gender marker off her ID card in order to stay so she could show it to prove she was not trans. The ID card became a symbol, a pink triangle really. She decided to temporarily refuse hormones and detransition in order to be safe.

"I stay in my cell.  Every time I come out I feel disrespected."

"Even though we are transgender we should be treated with respect and dignity."

**Structural Concerns and extraordinary circumstances**

Of the 33 facilities on the list I received on 7/18.22, approximately 1/3 of the warden positions were vacant, almost 1/3 of the assistant warden of operations positions were vacant. Several of these positions were being staffed by temporary or day-to- day staff.

Chief Hammers has been in his current position for approximately 6 months. Chief Mendoza is the Acting Chief of Women's Facilities and has been in this position as well as managing her previous position for 2 months and Warden Case has been in her position at Logan for approximately one year.

I point these two facts out because the IDOC has experienced an extraordinary amount of churn. These are crucial positions in a change process related to transgender people in carceral settings and all of these, while experienced corrections officials, are new to the positions.

It's this monitors view that IDOC was unprepared for this initiative. That Wardens perhaps felt that the AD did not provide enough information and support to address the myriad of actual implementation questions that arose from the AD. Wardens and staff were to implement policies and felt adrift and not knowledgeable about how best to implement the policies. It was unclear to whom to address implementation questions to. There wasn't follow through, there was no one checking back in to determine how the implementation was going and troubleshooting the problems and challenges that arose.

# Recommendations

There is a parable in public health where health workers are working hard to pull drowning people out of a river. They get exhausted because there are so many people in the river and they have to keep pulling people out. Finally, one person says they are going to stop pulling folks out and go up stream to see why people are falling in the river in the first place. This monitor is fundamentally a public health worker at heart. IDOC has been struggling with this issue for a while. These suggestions are attempts to stop people from falling in the river—pulling people out of a river takes way more resources and exhausts staff in a way that preventing people from falling in the river in the first place does not.

Transgender people have been waiting in IDOC for a very long time. Yet, transgender people are simply another population among multiple populations in IDOC. IDOC staff are overbusy—I communicated with staff who were ill, staff who working in the evenings, Chief Mendoza literally had a facility struck by lightning as we were speaking. There was no malice towards transgender people in the administrative people I spoke with, rather everyone was compassionate, concerned, respectful, open,

responsible…completely professional yet the transgender incarcerated people I spoke with are in significant distress. Warden Case has made significant positive changes at Logan, yet incarcerated people are struggling there. Chief Hammers was clearly frustrated by issues that arose that could be handled simply yet these issues were occurring.

The themes that continue to emerge were confusion and lack of clarity, uncertainty about how to get things done, how to make things happen, stagnation, frustration on the part of staff and incarcerated people.

**Lack of information on the part of inmates (and staff) about how things work in IDOC for transgender and non-binary people.** Increasing frustration and stagnant processes. "No one seems to know."

A) A simple fix is to create a "tool kit." A tool kit is a pamphlet or handout that explains what a transgender or non-binary person is eligible for and how to access those things and what the timeline is for those things so for instance, how to get state issued bras. How to get a binder or a gaff; How to access surgery and surgery timelines, how to access the PRISM program, how to request new cellmates, how to change your ID card, etc. This would feel like a step forward.

TAC and THAW create a handout immediately that explains what transgender people are entitled to and how to get those things and that this is available to incarcerated people and staff and updated immediately as changes develop. This would make what transgender people need to know clear and transparent to everyone.

B) Another possible remedy is hiring a transgender navigator
Great step forward to have a navigator for transgender people who are incarcerated who can walk them through what their legal rights are and assist them to get the things that they need and are legally entitled to within the facility they are assigned to. People will feel less isolated alone and less targeted. They will feel they have more recourse when they are feeling harassed or abused.

**Wardens and staff need more support and institution needs a consistent memory**
There is a lack of clarity about the current status of various initiatives and who to ask about what. The administrative directives are not enough. There is lack of organizational memory.

A) **Hiring a single responsible leader to guide IDOC through the implementation of this initiative.** IDOC like many large organizations is a siloed organization. Shifting to be responsive to the needs of transgender people across the IDOC requires the focus of a single individual.  This is a quickly evolving social movement in an environment of corrections that is slow moving, and mired in bureaucratic processes.

While the court could have monitors attempt to disentangle and sort out where things are going awry, there needs to be institutional memory and accountability built into the administration of IDOC. Wardens and staff need help problem solving issues that arise. Providing appropriate care to transgender people in carceral settings is a major

undertaking that requires significant planning, support, responsiveness etc. When this doesn't happen, it creates hardship for transgender people.

The staff who comprise TAC and THAW have other responsibilities and specific expertise. Obviously Chief Hammers has other responsibilities. There needs to be a single individual responsible for holding this information and ensuring forward movement for transgender people's needs in IDOC. While the CQI is important there needs to be someone who holds the stake of transgender people across the siloed aspects of IDOC while they are in this transition phase.

B) Provide Wardens Mendoza and Case with a consultant to discuss complex issues about managing the incorporation of transgender responsive care in a carceral setting. This individual should understand carceral settings and the needs of transgender people. This is a speciality and a community consultant on transgender health may lack experience with carceral issues and a carceral expert may lack experience with gender dysphoria and social transition related concerns. Too much time has passed already for many of the people in IDOC custody.

There are many issues ahead-even the binary frame that Warden Mendoza is in charge of Women's facilities, yet there are men in Women's facilities and Women in Men's facilities. Corrections settings across the nation and internationally are struggling with best practices for this population. Perhaps this is another role for the Moss Group.

C) Larger facilities like Logan and Centralia, should appoint a person to oversee processes within those institutions. Wardens have significant workloads, especially in short staffed situations, and transgender people, at this time, need to be front and center. For example, Warden Case tracking down what happened to binders—which required significant investigation—is work that could be done by others and simply reported to her.

D) Staffing
This is a problem not just for custody staff but for specialty staff as well. (Mental health, medical etc.) It is clear that there are vacancies throughout IDOC and this has an extremely negative impact that filters down to harm transgender people who are perceived as creating a new burden of special treatment, special searches, etc.

Hiring must be a priority.

Scanners and staffing
Facilitates that serve transgender woman must have either scanners or female staff on site and the same is true for sites that have transgender men. There must be a male staff available. Expecting transgender people to wait 90 minutes or 3 hours isn't reasonable. There must be a plan must be in place for transport or passes so that transgender people are not subjected to cross gender searches because there is no appropriately gendered staff.

E) Training
Do a simple needs assessment of the various facilities and provide training that matches those needs. What Centralia with the PRISM program will need to start will be

somewhat different from Shawnee where people are consistently referred to as "It." In person training are better choices so that staff can ask questions and be engaged by the facilitators. Live trainings are a better choice for actual sensitivity training.  Identify how best to assist officers to alter behavior that is antithetical to professional conduct. Do periodic trainings reminding people about professionalism and give them skills and language to handle situations and to respond to colleagues who violate professional conduct. Help the staff succeed in this way.

F) Commissary and clothing Room
TAC and THAW should rethink commissary as treatment for gender dysphoria — treating gender dysphoria cannot depends on the vicissitudes of the market or inventories.

Clothing rooms must be reminded that they must provide bras and panties, boxers to all folks who ask for them—gender neutral—and that they demonstrate that they have them in stock or can access them within 72 hours.

G) Transfers
Many issues for currently incarcerated people related to the culture of certain facilities may be solved when people are able to move to PRISM, or to Logan.  For instance, women who will never feel safe showering in in a men's facility.  Housing is outside of this monitors responsibility, but many incarcerated people are waiting, hoping desperately to be able to transfer out of the placement they are in to what they believe will be a safer placement.

These two facilities need the support to be successful. Currently, incarcerated people in the PRISM program express much dissatisfaction with their situation. There is little programming and their presence in PRISM means they cannot work. They also feel their presence in PRISM stigmatizes them and they are hyper surveilled. Incarcerated people in PRISM reported wanting to leave.

PRISM is a positive idea that needs support to staff it. It is clearly understaffed and hasn't realized the aspirational goals it espoused. It seems to be a specialized staffing issue.