IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,<br><br>        Plaintiffs,<br><br>v.<br><br>ROB JEFFREYS, MELVIN HINTON, and STEVEN BOWMAN,<br><br>        Defendants. | Civil No. 3:18-cv-00156-NJR |

**PLAINTIFFS' RESPONSE TO INITIAL REPORT OF FIRST CO-MONITOR**

Pursuant to the Court's orders concerning the Co-Monitors' initial reports, Plaintiffs submit this response to the Initial Report of the first Co-Monitor, Dr. Amanda Harris (Dkt. 439; "Harris Report"):[1]

**Introduction**

Plaintiffs recognize the significant effort that went into reviewing voluminous Class member records in a limited period of time to create the Harris Report—a task made substantially more difficult by the fact that IDOC lacks an electronic medical record system. Plaintiffs have no concerns with the substance of the Harris Report, its professional judgments, or most of its recommendations. Unfortunately but unsurprisingly, Dr. Harris's review confirms Class member reports as to questionable management of hormone treatment (with only 8.8% of trans women Class members at goal), unexplained delays in progress towards surgery,

---

[1] The Court's Order appointing Monitor and subsequent Order appointing Dr. Harris as the first Co-Monitor provide that either party shall have thirty days in which to respond to a monitor's report. Dkt. 370 at 14; Dkt. 418 at 7. Dr. Harris submitted her initial report on August 3, 2022. Dkt. 439.

1

dysfunction in the PRISM program, and punitive and coercive housing conditions for trans men. Dkt. 439 at 6, 11, 12. It is disappointing, to say the least, that more progress has not been made in three years since the first injunction hearing and almost three years since the Court issued its initial order in this case.

Plaintiffs' sole concern with the Harris Report pertains to two of its recommendations, concerning management of hormones at the facility level without specialist involvement, and use of oral rather than injectable hormones requested by a number of Class members. Plaintiffs believe that these recommendations were made without background information that Dr. Harris might have found useful, and may find useful in the future, about the overall conditions pertaining to medical care within IDOC. Plaintiffs doubt that the Harris Report recommendation as to hormone management at the facility level, in most cases without specialist oversight, can be implemented in the foreseeable future given the state of physician staffing within IDOC, and Plaintiffs believe that some Class members' desire for injectable hormones, which the Harris Report questions as a matter of medication management, may be warranted given the poor state of medication administration in IDOC.

**The *Lippert* case**

Physical healthcare (medical and dental care) within IDOC is currently subject to a consent decree entered in May 2019 in *Lippert v. Jeffreys*, No. 10-cv-4603, in the United States District Court for the Northern District of Illinois. The *Lippert* decree mandates broad systemic reforms of IDOC medical care, including as to hiring and staffing, vendor oversight, continuous quality improvement, medication administration, and a host of other issues. (A copy of the

*Lippert* Amended Consent Decree is attached as Exhibit 1.)[2] The *Lippert* decree required IDOC to complete an implementation plan laying out the steps and timetables by which IDOC would address these reforms. (*See* Ex. 1, *passim* and at 18-19 [§ IV.A-B].) Unfortunately, that plan is now almost three years overdue, and the *Lippert* defendants were recently found in contempt for their failure to "failure to complete an implementation plan as required by the Consent Decree and their failure to comply with this Court's orders respecting an implementation plan." (8/5/2022 *Lippert* Minute entry attached as Exhibit 2.)

Pursuant to the *Lippert* decree, a court-appointed monitor reports twice a year on IDOC's compliance. These reports are based on data and information provided by IDOC itself. (*See* Ex. 1 at 20, 21 [§§ V.E, G]; *see also* Health Care Monitor Fifth Report, *Lippert v. Jeffreys*, June 22, 2022, attached as Exhibit 3, *passim*.) The *Lippert* Monitor's most recent report, the Fifth Report (Ex. 3) was issued in June, and contains information pertinent to the Harris Report's recommendations as to management of hormones at facility level and medication access in IDOC as well as general information about the state of medical care in IDOC.

**Hormone management and IDOC physician staffing**

The Harris Report makes the following observations and proposals concerning the management of gender-affirming hormones at the facility level and plans for future management:

> Using goal testosterone suppression and estradiol levels as a barometer of success, only 15% of trans women overall have achieved a goal level of estradiol while this rate increases to 20% if they have also been seen by an Endocrinologist. Testosterone suppression has been achieved in 38% of all trans women, but in more than twice as many (75%) of those who have been seen by an Endocrinologist. This finding should not be interpreted to mean that all class members can or should expect or need to be managed by an Endocrinologist, but rather that each facility has room to improve in terms of the basic management of gender-affirming hormones. In a community setting, gender-affirming medication titration is a

---

[2] The Amended *Lippert* decree differs from the original May 2019 decree only in a change to Section IX.B.5 (concerning compliance and termination timing) and the substitution of the names of the current official capacity parties.

> straightforward and relatively simple process that is managed by primary care practices. In terms of complexity, it is arguably on par with managing hypertension and less complex than managing diabetes, areas that are commonly successfully managed in a primary care setting. It is probable that the barrier to success is simply a lack of practical guidance and training. Further exploration of this potential area for improvement will be a part of the work of Co-Monitors going forward, as this will expand capacity and reduce wait times, which is a common frustration among class members. It will also benefit IDOC as it could reduce administrative burden and costs associated with specialty care. Specialists will continue to be necessary, but only in cases of extreme complexity or for clinical management oversight and training.

Dkt. 439 at 10.

Plaintiffs do not doubt that Dr. Harris is correct that management of gender-affirming medication titration *should* be possible at the facility level in most cases, but under current conditions, Plaintiffs have grave doubts about the conclusion that the "probable . . . barrier to success is simply a lack of practical guidance and training," and that IDOC can hope to reduce the use of specialists to oversee this care except in "cases of extreme complexity." The current state of physician staffing in IDOC health services makes it extremely unlikely that "practical guidance and training" will solve the identified problems with Class member hormone management in the foreseeable future, and Plaintiffs believe that widespread access to specialists will continue to be necessary until IDOC addresses its physician staffing crisis.

First, IDOC is dangerously short on physicians, so the personnel to address (and with time to address) "gender-affirming medication titration" at the facility level are simply not available. The *Lippert* Monitor's Fifth Report describes current physician staffing:

> The IDOC provided the facility assignments of physicians on 6/6/22. Due [to] the shortage of physicians, five physicians are serving as medical directors of more than one site. One physician is assigned as medical director at four IDOC facilities and backup coverage of two additional sites; these six facilities house 6,246 patient-inmates. A total of eight medical directors of one or more facilities are also currently assigned to provide backup coverage at one or more other facilities. IDOC again has not provided the number of physician hours or percent time that physicians are assigned to provide care at multiple facilities. The shortage of

4

>physicians *has created an access to care crisis at multiple facilities in the IDOC* and must be urgently addressed.

(Ex. 3 at 57; emphasis added.) This problem has worsened in the course of the last year; the Report observes that "The number of physicians has been reduced by six (19% reduction) since our last report [the Fourth Report, dated September 16, 2021]." (*Id.*)

This shortage directly affects sites where Class members are clustered. Based on conversations with Class members and other information, Plaintiffs' counsel believe that the physician identified by the *Lippert* Monitor's Fifth Report as the "[o]ne physician" who "is assigned as medical director at four IDOC facilities" and also provides "backup coverage of two additional sites" is Dr. Percy Myers, the medical director at Centralia. As of the most recent Class list provided to Plaintiffs, in mid-July, Centralia housed a large number of Class members (28), including those participating in the PRISM program.[3] In addition, according to Class members interviewed in late May, the physician assigned as medical director to Logan Correctional Center, with 38 Class members resident, was on site there only 1-2 days per week. It is Plaintiffs' counsel's understanding that Pontiac Correctional Center, with 23 Class members, is currently without any physician staffing at all. Finally, and impacting the ability of IDOC to manage healthcare issues on site, other key healthcare positions are also vacant throughout the system—for instance, Centralia reportedly does not have either a Healthcare Unit Administrator or a Director of Nursing. In short, IDOC simply does not have sufficient coverage of trained professionals on site for it to be realistic to reduce reliance on outside specialists for the management of this new healthcare area in the foreseeable future.

---

[3] The numbers in this paragraph are from an updated Class member list provided to Plaintiffs' counsel by Defendants' counsel on July 11, 2022.

In addition, there are still some physicians practicing within IDOC who do not have the primary care or equivalent credentials[4] required as a result of the *Lippert* decree, and thus may be less able to manage issues which, per the Harris Report, are typically successfully managed in the community in a primary care settling. As of the *Lippert* Monitor's Fifth Report, only three of these physicians (out of 26 total) were still practicing in IDOC, but this still means that over ten percent of the (very thinly stretched) physician staffing lacks these credentials. (Ex. 3 at 54-58.) Overall, the *Lippert* Monitor's Fifth Report comments: "Based on record reviews, physician quality is still poor. There are still physicians [within IDOC] who practice in an unsafe and clinically inappropriate manner who should not be allowed to do so." (*Id*. at 58.).

For a number of years now, IDOC has relied on relationships with UIC (University of Illinois at Chicago) Medical Center to manage the treatment of IDOC residents with HIV/AIDS and Hepatitis C; the *Lippert* Monitor's Fifth Report notes these as among the few areas of current successful treatment management within the IDOC system. (Ex. 3 at 8, 94, 162-65.)[5] Reportedly, IDOC has recently also contracted with UIC for assistance with the management of diabetic residents. In sum, IDOC itself clearly recognizes its need for outside expert assistance with some processes that are otherwise "managed by primary care practices" except in complex cases; for the system to undertake management at the facility level of management of gender-affirming hormones is a worthy goal but not a realistic option at this time.

**Injectable hormones and medication administration**

As to certain Class members' wish for injectable hormones, the Harris Report comments:

---

[4] The *Lippert* decree requires physicians practicing in IDOC to be credentialed in primary care, internal medicine, or emergency medicine. (*See* Ex. 1 at 8-9 [§ III.A.2].)

[5] *See* Ex. 3 at 94: "Though care of patients with HIV and hepatitis C at UIC is of excellent quality once referred, care of patients with chronic disease through the IDOC chronic care clinic program is extremely poor. This item remains noncompliant."

> Plaintiff's counsel noted in the memorandum previously cited that several class members were requesting injectable hormones to ensure access and avoid delays. While this may be a reasonable work-around, the fact remains that there should be no interruption in access to medication to begin with and the choice of formulation should be based on an informed consent process, and not as a workaround for poor access to medication.

Dkt. 439 at 7-8.

Again, Plaintiffs' counsel have no disagreement with this conclusion, but note that the current realities of medication administration and access within IDOC may justify Class members' requests.

"Pharmacy and Medication Administration" was given a rating of "noncompliance" in the *Lippert* Monitor's Fifth Report. (Ex. 3 at 140.) In the records provided, the *Lippert* Monitoring team found that medication order processing was "one of the most frequent type of medication errors reported," and the errors included "transcription errors, not processing the order, not discontinuing an old order, and discontinuing an order in error." (*Id*. at 142.) "Chart review completed for this report period found many of the same types of errors as reported in the CQI [continuous quality improvement] minutes. As an example, one patient had an order for HIV medication which expired without being noticed. The error was not discovered for a period of ten days . . ." (*Id*. at 143.) Further:

> The CQI minutes and pharmacy inspection reports also denote issues with inventory control. Five facilities of 16 providing information about pharmacy inspections were found noncompliant with the Administrative Directive on Control of Medications and Instruments during this report period.[] Findings were that inventory was not kept or documented, the Institutional Directive had not been updated, and having excess stock on hand. Other findings were medication stored at the wrong temperature, refrigerator temperatures not taken, count discrepancies, controlled substances unlocked, and missing emergency medications. Finally, outdated medication on hand or in use and the failure to label multidose vials were frequent citations. It is good that these problems are identified, however there is a lack of inquiry into the root cause about why the problems are occurring and development of corrective action that addresses root causes. If corrective action is discussed at all, it most often is training and admonishment to staff with

7

> acknowledgement in writing of expectations. Some sites document repeated findings on multiple pharmacy inspections which indicates inadequate or nonexistent problem solving and performance improvement. The CQI program needs to emphasize problem analysis and performance improvement.

(*Id*. at 144.) In summary, the Report states: "The failure to address poor practices in medication management contributed to under-treatment and mistreatment of patients with significant disease whose charts were reviewed this reporting period." (*Id*. at 13.)

**Conclusion**

Unfortunately, the *Lippert* implementation plan is not the only deadline IDOC has missed in that case—a comprehensive set of healthcare policies was supposed to have been completed by July 2020, and an electronic medical record was to have been up and running throughout IDOC by this month (there is not even a contract in place yet). (*See* Ex. 1 at 5-6, 7 [§§ II.B.4, II.B.8]; Ex. 3 at 43-44, 46.) These are only two examples of many. Accordingly, the conditions which affect the Harris Report recommendations discussed above are unlikely to change soon.

Dated: September 2, 2022

Respectfully submitted by:

*/s/* Camille E. Bennett

**Brent P. Ray**
KING & SPALDING LLP
110 N. Wacker Drive, Suite 3800
Chicago, IL 60606
Telephone: (312) 995-6333
Facsimile: (312) 995-6330
*bray@kslaw.com*

**Abby L. Parsons**
KING & SPALDING LLP
1100 Louisiana Street, Suite 4100
Houston, TX 77002
Telephone: (713) 751-3294
*aparsons@kslaw.com*

**Thomas E. Kennedy III**
**Sarah Jane Hunt**
KENNEDY HUNT P.C.
906 Olive Street, Suite 200
Saint Louis, MO 63101
Telephone: (314) 872-9041
*tkennedy@KennedyHuntLaw.com*
*sarahjane@KennedyHuntLaw.com*

**Camille E. Bennett**
**Michelle T. García**
ROGER BALDWIN FOUNDATION OF ACLU, INC.
150 North Michigan Avenue, Suite 600
Chicago, IL 60601
Telephone: (312) 201-9740
Facsimile: (312) 288-5225
*cbennett@aclu-il.org*
*mgarcia@aclu-il.org*

**Amelia H. Bailey**
**Sam G. Rose**
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
*amelia.bailey@kirkland.com*
*sam.rose@kirkland.com*

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that on September 2, 2022, I electronically filed the foregoing document with the Clerk of this Court by using the CM/ECF system, which will accomplish service through the Notice of Electronic Filing for parties and attorneys who are Filing Users.


Dated: September 2, 2022                     /s/ Camille E. Bennett
                                             Camille E. Bennett