# Exhibit 1

# THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DON LIPPERT, *et al.*,      )
                                )
                 Plaintiffs,     )       No. 10-cv-4603
                                )
          v.               )       Judge Jorge L. Alonso
                                )       Magistrate Judge Susan E. Cox
ROB JEFFREYS, *et al.*,      )
                                )
              Defendants.   )

## AMENDED CONSENT DECREE

## INTRODUCTION AND BACKGROUND

Plaintiffs, a class of Illinois prisoners in the Illinois Department of Corrections, filed this case as a putative class action lawsuit on October 7, 2011, seeking declaratory and injunctive relief to redress alleged violations of the class members' constitutional rights. Plaintiffs allege that they are denied adequate medical and dental care and are at substantial risk of serious harm which violates the class members' rights under the Eighth and Fourteenth Amendments to the United States Constitution.

Defendants deny all Plaintiffs' allegations in this case and maintain the medical and dental care provided to the Plaintiff class is constitutionally adequate.

## DECREES

### I. INTRODUCTION AND PROCEDURAL PROVISIONS

**A. Jurisdiction.** The Court has jurisdiction over this litigation pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

**B. Class Definition.** The class is defined as "all prisoners in the custody of the Illinois Department of Corrections with serious medical or dental needs."

**C. Definition of Terms.** As used herein, the following terms have the following meanings:

1. "Class" and "Class Members" mean the persons who, as of the date on which this Decree is approved by the Court or at any time in the future while this lawsuit is pending and during the time covered by the Decree, meet the definition set forth in Section I.B, above.

2. "EMR" means electronic medical records.

3. The "Effective Date" shall be the date on which the Court approves this

Decree after a class action fairness hearing.

4. "HCU" means a facility health care unit.

5. "HCUA" means a state-employed health care unit administrator.

6. "Health care" means medical and dental care for Class Members' serious medical needs.

7. "Preliminary Approval Date" means the date on which this Decree receives preliminary Court approval.

8. "Serious medical need" means a condition that has been diagnosed by a clinician as mandating treatment to address the immediate need for care and/or alleviate unnecessary pain and suffering or one that is so obvious that even a lay person would perceive the need for a doctor's attention.

9. "IDOC" means the Illinois Department of Corrections.

10. "KOP" means keep on person.

11. "OHS" means the IDOC Office of Health Services.

12. "Clinician" means physician, physician's assistant, or nurse practitioner.

13. "Medical Provider" means any licensed professional providing medical care to prisoners in IDOC facilities.

14. "Drop filing" means the procedure of batch filing prisoner medical records in one file to sort out at a later date.

15. "Partial Compliance" occurs when the Defendants have achieved less than substantial compliance with all of the components of a particular section of the Decree, but have made some progress toward substantial compliance on most of the key components of the section. A partial compliance rating encompasses a wide range of performance by

3

the Defendants. Specifically, a partial compliance rating can signify that the Defendants are nearly in substantial compliance, or it can mean that the Defendants are only slightly above a non-compliance rating.

16.     "Substantial Compliance" occurs when the Defendants perform the Decree's essential, material components even in the absence of strict compliance with the exact terms of the Decree.  Substantial compliance shall refer to instances in which any violations are minor or occasional and are neither systemic nor serious.  Substantial compliance can be found for obligations imposed under this Decree either state-wide or at specific facilities.

**D.     Plaintiff Class.** Plaintiffs are prisoners in the custody of the Illinois Department of Corrections, an agency of the State of Illinois, who are incarcerated at one of the state prisons located in the State of Illinois and who have serious medical or dental needs. The Court certified the class on April 28, 2017.

**E.     Defendants.** Defendants are Rob Jeffreys, in his capacity as the Director of the Illinois Department of Corrections; Steven Bowman, in his capacity as the Director of Health Services for the Illinois Department of Corrections; and J.B. Pritzker, in his capacity as the Governor of the State of Illinois. Defendants are sued in their official capacities.

**F.     Purpose.** The purpose of this Decree is to settle the above captioned case, and ensure Defendants implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs while ensuring the availability of necessary services, supports and other resources to meet these needs. Accordingly, the parties stipulate and the Court finds that this Decree complies in all respects with the Prison Litigation Reform Act

("PLRA"), 18 U.S.C. § 3626(a).

    **G.**    **Facility Scope.** This Decree applies to all IDOC facilities.

    **H.**    **Denial of Wrongdoing.** Defendants deny all the allegations in the Complaint filed in this case.

## II.    HEALTH CARE GENERAL PROVISIONS

    **A.**    **General Statement.** Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet these needs.

    **B.**    **General Requirements**.

    The Parties agree that:

    1.    IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care; and

    2.    IDOC shall require, *inter alia*, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and, as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.

    3.    IDOC must also provide enough trained clinical staff, adequate facilities, and oversight by qualified professionals, as well as sufficient administrative staff.

    4.    No later than 120 days after the Effective Date of this Decree, IDOC shall have selected an EMR vendor and executed a contract with this vendor for implementation of EMR at all IDOC facilities. Implementation of EMR shall be completed no later than

36 months after execution of the EMR contract.

5.  Continuity of care and medication from the community and back to the community is also important in ensuring adequate health care.

6.  IDOC agrees to implement changes in the following areas:

a.  Initial intake screening, and initial health care assessment;

b.  Urgent care;

c.  Medication administration records—both for directly administered medications and KOP;

d.  Medication refusal;

e.  Informed care for patients who return to IDOC facilities after being sent to an offsite service provider;

f.  Chronic disease care: diabetes, Chronic Obstructive Pulmonary Disease ("COPD"), asthma, HCV, HIV/AIDs, hypertension, hyperlipidemia;

g.  Timely access to diagnostic services and to appropriate specialty care;

h.  Dental care access and preventative dental care;

i.  Morbidity and mortality review with action plans and follow-through;

j.  Analysis of nutrition and timing of meals for diabetics and other Class members whose serious medical needs warrant doing so;

k.  Appropriate staffing, physical conditions, and scope of services for infirmary care;

l.  Effective quality assurance review;

m.     Preventable adverse event reporting;

n.     Action taken on reported errors (including near misses);

o.     Training on patient safety;

p.     Adequately equipped infirmaries;

q.     Annual assessment of medical, dental, and nursing staff competency and performance;

r.     That Defendants and the vendor shall timely seek to discipline and, if necessary, seek to terminate their respective health care staff that put patients at risk;

s.     Summarizing essential health information for patient and anticipated community providers; and

t.     Upon release, providing bridge medications for two weeks along with a prescription for two more weeks and the option for one refill, if medically appropriate.

7.     The implementation of this Decree shall include the development and full implementation of a set of health care performance and outcome measurements. Defendants and any vendor(s) employed by Defendants shall compile data to facilitate these measurements.

8.     The implementation of this Decree shall also include the development and implementation, with the assistance of the Monitor, of a comprehensive set of health care policies, within eighteen (18) months of the Preliminary Approval Date. These policies shall be consistent throughout IDOC, and cover all aspects of a Health care program.

9.     The implementation of this Agreement shall also include the design, with

the assistance of the Monitor, of an audit function for IDOC's quality assurance program which provides for independent review of all facilities' quality assurance programs, either by the Office of Health Services or by another disinterested auditor.

## III.    HEALTH CARE SPECIFIC PROVISIONS[1]

### A.    Staffing and Leadership.

1.    The Chief of Health Services shall hereafter be board certified in one of the specialties described in paragraph III.A.2, *below*.  The Deputy Chiefs of Health Services shall be either board certified or currently board-eligible in one of the specialties described in paragraph III.A.2, *below*.

2.    All physicians providing direct care in the IDOC (whether they are facility medical directors or staff physicians) shall possess either an MD or DO degree and be either board certified in internal medicine, family medicine, or emergency medicine, or have successfully completed a residency in internal medicine which is approved by the American Board of Internal Medicine or the American Osteopathic Association, or have successfully completed a residency in family medicine which is approved by the American Board of Family Medicine or the American Osteopathic Association, or have successfully completed a residency in emergency medicine which is approved by the American Board of Emergency Medicine.

3.    Physicians currently working in IDOC who do not meet these criteria shall be reviewed by the Monitor and the IDOC Medical Director to determine whether the quality of care they actually provide is consistent with a physician who has the above described credentials and who is practicing in a safe and clinically appropriate manner. If

---

[1] The provisions of III are not intended to limit the obligations expressed heretofore in II.

the Monitor and the IDOC Medical Director cannot agree as to the clinical appropriateness of a current IDOC physician, IDOC shall not be found non-compliant because of that vacancy for nine (9) months thereafter.

4.      If a current physician's performance is questionable or potentially problematic, and the Monitor and the IDOC Medical Director believe that education could cure these deficiencies, the IDOC will notify the vendor that said physician may not return to service at any IDOC facility until the physician has taken appropriate CME courses and has the consent of the Monitor and the IDOC Medical Director to return.

5.      Defendants may hire new physicians who do not meet the credentialing criteria, only after demonstrating to the Monitor that they were unable to find qualified physicians despite a professionally reasonable recruitment effort and only after complying with the provisions of paragraph 5, *below*.

6.      Physician candidates who do not meet the credentialing requirements shall be presented to the Monitor by the Department.  The Monitor will screen candidates who do not meet the credentialing criteria after a professionally reasonable recruitment effort fails and determine whether they are qualified. The Monitor will not unreasonably withhold approval of the candidates. The Monitor will present qualified candidates to the IDOC for hiring approval. If the IDOC Medical Director has concerns regarding the rejected candidates, he or she will meet and confer with the Monitor in an attempt to reach a resolution. In instances in which the Monitor rejects all viable candidates for a particular vacancy, the Department will not be found noncompliant because of that vacancy at any time during the next twelve (12) months.

7.      The credentialing requirements contained in paragraph 2 above do not apply

9

to physicians employed by universities.

8.      Within eighteen (18) months of the Effective Date Defendants shall create and fill two state-employed Deputy Chiefs of Health Services positions reporting to the Chief of Health Services to provide additional monitoring and clinical oversight for IDOC health care.

9.      Within nine (9) months of the Effective Date every facility shall have its own Health Care Unit Administrator ("HCUA"), who is a state employee. If a HCUA position is filled and subsequently becomes vacant Defendants shall not be found non-compliant because of this vacancy for nine (9) months thereafter.

10.      Each IDOC facility shall have registered nurses conducting all sick calls. Until IDOC has achieved substantial compliance with nursing provision of the staffing plan, facilities may use licensed practical nurses in sick call, but only with appropriate supervision.

11.      Any dispute resulting from this section shall be governed by the dispute resolution provisions outlined in Section X., *below*.

**B.      Clinical Space and Sanitation.**

1.      IDOC shall provide sufficient private and confidential sick-call areas in all of its facilities to accommodate medical evaluations and examinations of all Class members, including during intake, subject to extraordinary operational concerns and security needs of IDOC including, but not limited to, a lockdown.

2.      These areas shall be equipped to fully address prisoner medical needs. The equipment shall be inspected regularly and repaired and replaced as necessary. Each area shall include an examination table, and a barrier on the examination table that can be

replaced between prisoners. The areas shall provide hand washing or hand sanitizer.

**C.     Reception.**

1.      IDOC shall provide sufficient nursing staff and clinicians to complete medical evaluations during the intake process within seven (7) business days after a prisoner is admitted to one of IDOC's Reception and Classification Centers.

2.      IDOC shall provide sufficient private and confidential areas in each of its intake facilities for completion of intake medical evaluations in privacy, subject to extraordinary operational concerns and security needs of IDOC including, but not limited to, a lockdown.

3.      IDOC shall ensure that a clinician or a Registered Nurse reviews all intake data and compiles a list of medical issues for each prisoner.

4.      If medically indicated, IDOC shall ensure follow up on all pertinent findings from the initial intake screening referenced in C.3. for appropriate care and treatment.

**D.      Intra-System Transfers.**

1.      With the exception of prisoners housed at Reception and Classification Centers, IDOC shall place prisoners with scheduled offsite medical services on a transfer hold until the service is provided, contingent on security concerns or emergent circumstances including, but not limited to, a lockdown.  Transfer from Reception and Classification Centers shall not interfere with offsite services previously scheduled by IDOC.

2.      When a prisoner is transferred from one facility's infirmary to another facility, the receiving facility shall take the prisoner to the HCU where a medical provider will facilitate continuity of care.

E.      **Medical Records.**

1.      IDOC shall maintain a list of prisoners' current medical issues in their medical charts.

2.      Lists and treatment plans will be amended pursuant to the order of a clinician only.

3.      IDOC shall abandon "drop-filing."

4.      The medical records staff shall track receipt of offsite medical providers' reports and ensure they are filed in the correct prisoner's medical records.

F.      **Nursing Sick-Call.**

1.      Sick-call shall be conducted in only those designated clinical areas that provide for privacy and confidentiality, consistent with the extraordinary operational concerns and security needs of IDOC including, but not limited to, a lockdown.

2.      There shall be no set restrictions on the number of complaints addressed during a specific sick call appointment. Medical providers must use their medical judgment to triage and determine which issues should be evaluated and treated first to maximize effective treatment and relieve pain and suffering.

G.      **Urgent/Emergent Offsite Services.**

1.      Each facility HCUA shall track all emergent/urgent services in a log book, preferably electronic.

2.      Appropriate medical staff shall have the obligation to determine whether a situation is urgent or emergent.

3.      IDOC shall use best efforts to obtain emergency reports from offsite services when a prisoner returns to the parent facility or create a record as to why these

reports were not obtained.

4.      Facility medical staff shall ensure that a prisoner is seen by a Medical Provider or clinician within 48 hours after returning from an offsite emergency service. If the Medical Provider is not a clinician, the Medical Provider shall promptly review the offsite documentation, if obtained, with a clinician and the clinician shall implement necessary treatment.

**H.      Scheduled Offsite Services.**

1.      Medical staff shall make entries in a log, preferably electronic, to track the process for a prisoner to be scheduled to attend an offsite service, including when the appointment was made, the date the appointment is scheduled, when the prisoner was furloughed, and when the prisoner returned to the facility. This log shall be maintained by the HCUA.

2.      Within three days of receiving the documentation from scheduled offsite services, the documentation will be reviewed by a medical provider.  Routine follow-up appointments shall be conducted by facility medical staff no later than five (5) business days after a prisoner's return from an offsite service, and sooner if clinically indicated.

3.      If a prisoner returns from an offsite visit without any medical documentation created by the offsite personnel, IDOC shall use best efforts to obtain the documentation as soon as possible. If it is not possible to obtain such documentation, staff shall record why it could not be obtained.

4.      Provided that IDOC receives documentation from offsite clinicians, all medical appointments between a prisoner and an offsite clinician shall be documented in the prisoner's medical records, including any findings and proposed treatment.

13

5.     Within six (6) months after the Preliminary Approval Date of this Decree or until Defendants are able to fill both Deputy Chief of Health Services positions, they will make reasonable efforts to contract with an outside provider to conduct oversight review in instances where the medical vendor has denied any recommendation or taken more than five (5) business days to render a decision, including cases in which an alternative treatment plan has been mandated in lieu of the recommendation and cases in which the recommendation has not been accepted and more information is required. If no contract with an outside provider is reached, then the Monitor or his or her consultants shall conduct oversight review in instances where the medical vendor has denied any recommendation or taken more than five (5) business days to render a decision, including cases in which an alternative treatment plan has been mandated in lieu of the recommendation and cases in which the recommendation has not been accepted and more information is required.. Once Defendants have filled both Deputy Chief positions, the Deputy Chiefs will replace any outside provider, the Monitor or his or her consultants to conduct oversight review in the instances described in this paragraph.

**I.    Infirmary.**

1.     A registered nurse will be readily available whenever an infirmary is occupied in the IDOC system.

2.     At every facility regularly housing maximum security prisoners, there shall be at least one registered nurse assigned to the infirmary at all times, twenty-four (24) hours a day, seven (7) days a week.

3.     All facilities shall employ at least one registered nurse on each shift. If a prisoner needs health care that exceeds the IDOC infirmary capabilities, then the prisoner

shall be referred to an offsite service provider or a hospital.

4.     All infirmaries shall have necessary access to security staff at all times.

5.     All infirmaries and HCUs shall have sufficient and properly sanitized bedding and linens.

6.     The above requirements of this section (nos. 1-5) shall be implemented according to the guidelines and benchmarks set forth in Defendants' Staffing and Implementation Plan.

**J.     Infection Control.**

1.     IDOC shall create and staff a statewide position of Communicable and Infectious Diseases Coordinator. This position shall be filled within fifteen (15) months of the Preliminary Approval of this Decree.

2.     Facility staff shall monitor the negative air pressure in occupied respiratory isolation rooms which shall be documented each day they are occupied by prisoners needing negative pressure. If unoccupied, they shall be monitored once each week. Facility staff shall report such data to the Communicable and Infectious Diseases Coordinator on a monthly basis.

3.     Facility medical staff shall conduct and document safety and sanitation inspections of the medical areas of the facility on a monthly basis.

**K.     Dental Program.**

1.     All dental personnel shall use the Subjective Objective Assessment Plan ("SOAP") format to document urgent and emergency care.

2.     Each facility's orientation manual shall include instructions regarding how prisoners can access dental care at that facility.

3.     IDOC shall implement screening dental examinations at the reception centers, which shall include and document an intra- and extra-oral soft tissue examination.

4.     IDOC shall implement policies that require routine disinfection of all dental examination areas.

5.     IDOC shall implement policies regarding proper radiology hygiene including using a lead apron with a thyroid collar, and posting radiological hazard signs in the areas where x-rays are taken.

6.     Routine comprehensive dental care shall be provided through comprehensive examinations and treatment plans and will be documented in the prisoners' dental charts.

7.     Dental hygiene care and oral health instructions shall be provided as part of the treatment process.

8.     Routine and regular dental cleanings shall be provided to all prisoners at every IDOC facility.  Cleanings shall take place at least once every two years, or as otherwise medically indicated.

9.     Within twenty-one (21) months of the Preliminary Approval Date of this Decree, IDOC shall establish a peer review system for all dentists and annual performance evaluations of dental assistants.

10.     Dental Extractions:

(a)     Diagnostic radiographs shall be taken before every extraction.

(b)     The diagnosis and reason for extraction shall be fully documented prior to the extraction.

(c)     A prisoner shall consent in writing once for every extraction done

at one particular time. In instances where a prisoner lacks decision making capacity the Department will follow the Illinois Health Care Surrogate Act. In the event a prisoner verbally consents to an extraction, but refuses to consent in writing, dental personnel shall contemporaneously document such verbal consent in the prisoner's dental record.

11. Each prisoner shall have a documented dental health history section in their dental record.

12. Dental personnel shall document in the dental record whenever they identify a patient's dental issue and dental personnel shall provide for proper dental care and treatment.

13. IDOC shall conduct annual surveys to evaluate dental equipment and to determine whether the equipment needs to be repaired or replaced. Any equipment identified as needing repair or replacement will be repaired or replaced.

**L.    Continuous Quality Improvement.**

1. Pursuant to the existing contract between IDOC and the University of Illinois Chicago (UIC) College of Nursing, within fifteen (15) months of the Preliminary Approval Date, UIC will advise IDOC on implementation of a comprehensive medical and dental Quality Improvement Program for all IDOC facilities, which program shall be implemented with input from the Monitor

**M.    Miscellaneous Provisions.**

1. Defendants or their contracted vendor(s) shall ensure that:

(a)    All prisoners will be offered an annual influenza vaccination.

(b)    All prisoners with chronic diseases will be offered the required

17

immunizations as established by the Federal Bureau of Prisons.

    (c)    All prisoners ages 50 to 75 will be offered annual colorectal cancer screening and PSA testing, unless the Department and the Monitor determine that such testing is no longer recommended.

    (d)    All female prisoners age 45 or older will be offered a baseline mammogram screen, then every 24 months thereafter unless more frequent screening is clinically indicated, unless the Department and the Monitor determine that such testing is no longer recommended.

    2.    Mortality reviews shall identify and refer deficiencies to appropriate IDOC staff, including those involved in the Quality Assurance audit function. If deficiencies are identified, corrective action will be taken. Corrective action will be subject to regular Quality Assurance review.

## IV.    STAFFING ANALYSIS AND IMPLEMENTATION PLAN

    **A.**    **Overview.** The Defendants, with assistance of the Monitor, shall conduct a staffing analysis and create and implement an Implementation Plan to accomplish the obligations and objectives in this Decree. The Implementation Plan must, at a minimum:

    1.    Establish, with the assistance of the Monitor, specific tasks, timetables, goals, programs, plans, projects, strategies and protocols to ensure that Defendants fulfill the requirements of the Decree; and

    2.    Describe the implementation and timing of the hiring, training and supervision of the personnel necessary to implement the Decree.

    **B.**    Within 120 days from the date the Monitor has been selected, the Defendants shall provide the Monitor with the results of their staffing analysis. Within sixty (60) days after

submission of the staffing analysis, Defendants shall draft an Implementation Plan. In the event the Monitor disagrees with any provision of the Defendants' proposed Implementation Plan, the matter shall be submitted to the Court for prompt resolution.

      **C.**    The Implementation Plan, and all amendments or updates thereto, shall be incorporated into, and become enforceable as part of this Decree.

## V.    MONITORING AND COMPLIANCE

      **A.**    **Appointment of a Monitor.** Within two weeks of the Preliminary Approval Date of this Decree, the Parties will use best efforts to agree on an independent and impartial Monitor who is knowledgeable about the management and oversight of correctional medical and dental programs to perform the responsibilities enumerated in this Decree.

      **B.**    If the Parties fail to agree on a Monitor, Plaintiffs and Defendants will each submit two suggested candidates to the Court. The Court will use whatever process it determines appropriate to select a Monitor from the group of four submitted. Once selected, the Monitor shall begin work as soon as practicable but in no event later than 45 days after the Monitor has been selected.

      **C.**    If for any reason, including as provided in (D), *below*, the Monitor can no longer serve, the Parties will attempt to agree on the selection of a replacement Monitor to propose to the Court. If the Parties are unable to reach agreement, each Party will nominate one person to serve as Monitor and the Court will select the replacement Monitor. Once selected, the Monitor shall begin work as soon as practicable but in no event later than 45 days after the Monitor has been selected.

      **D.**    **Dismissal of a Monitor.** At any time after the first anniversary of the Effective Date of this Decree Defendants may request dismissal of the Monitor if it becomes demonstrably clear that they have acted reasonably and are no longer able to work collaboratively with the

Monitor. Should the Plaintiffs object, they will have seven (7) business days to present any written objections to Defendants. Seven (7) business days thereafter, the Parties will meet and confer. Should the Parties be unable to come to an agreement concerning the dismissal of the Monitor, the Court shall determine whether dismissal is appropriate. The moving party must establish good cause by a preponderance of the evidence.

**E.** **Duties.** The Monitor's duties include assisting the IDOC in assessing staffing needs and assisting IDOC with the preparation of an initial staffing plan, including the number of medical/dental staff required to provide medical and dental care in IDOC, providing input to the creation and implementation of IDOC's quality assurance plan and developing an audit function for same, and providing input on the Defendants' Implementation Plan. Though the Monitor will provide assistance with IDOC's staffing and implementation plans, responsibility for implementing these plans shall remain with IDOC. The Monitor shall also evaluate Defendants' compliance with this Decree, including identifying actual and potential areas of substantial compliance, partial compliance and non-compliance and bringing these areas to the Parties' attention. Twice yearly, the Monitor will report to the Parties and the Court regarding compliance with the Decree. Should either Party choose to respond, they will have thirty (30) days to do so. The Monitor's reports shall include the information necessary to evaluate Defendants' compliance or non-compliance with the terms of the Decree. The Monitor may file additional reports as necessary to address instances of substantial compliance, partial compliance and non-compliance. The Monitor's reports will be filed initially under seal but will be filed in the public docket thirty (30) days thereafter unless either Party shows cause as to why a portion or all of the report should remain under seal.

**F.** **The Monitor's Consultants.** The Monitor may retain no more than three (3)

consultants subject to the Defendants' approval, which shall not be unreasonably withheld.

G. **Review and Evaluation of Data and Information**. Every six (6) months for the first two (2) years and yearly thereafter, Defendants shall provide the Monitor and Plaintiffs with a detailed report containing data and information sufficient to evaluate Defendants' compliance with the Decree and Defendants' progress towards achieving compliance, with the Parties and Monitor agreeing in advance of the first report on the data and information that must be included in such report. Defendants will not refuse any request by the Monitor for documents or other information reasonably related to the Monitor's review and evaluation of Defendants' compliance with the Decree. Defendants will, upon reasonable notice, permit private interviews of Defendants' staff or consultants, in the presence of their attorneys and union representatives at staff's request. It is Defendants' obligation to ensure that the attorneys and union representatives are present on site during any tour days so that staff who request their presence may be interviewed by the Monitor. Defendants will use best efforts to ensure that any vendor complies with all provisions of this paragraph in the same fashion as Defendants. In furtherance of this effort, Defendants represent that any vendor contract will require vendors to comply with all court orders, policies and procedures of IDOC. The Monitor will have reasonable access to all Class Members and their records and files, as well as to those service providers, facilities, buildings and premises that serve, or are otherwise pertinent to, Class Members, where such access is reasonably related to the Monitor's review and evaluation of Defendants' compliance with this Decree. The Monitor's access to information or data for the purpose of fulfilling his or her duties under this Decree shall be subject to an Agreed Protective Order.

H. **Monitor's Access to On-Site Information.** The Monitor and each approved consultant shall have the opportunity to conduct tours of IDOC prison complexes, no more than

ten (10) tour days each per year. For purposes of this paragraph a year begins on the Effective Date of this Decree. A "tour day" is any day on which the Monitor or a consultant is present at a given facility relating to this Decree. A tour day shall last not more than eight hours. All tours must be scheduled and completed during normal business hours. Any prison tour scheduled to last more than one (1) day must occur on consecutive days. No prison will be toured more than once per quarter. Tours shall be scheduled with at least two weeks' advance notice to Defendants. Defendants shall make reasonable efforts to make available for brief interviews IDOC employees and any employees of any vendor that have direct or indirect duties related to the requirements of this Decree. The interviews shall not unreasonably interfere with the performance of their duties. The Monitor and Monitor's consultants shall be able to have confidential out-of-cell interviews with prisoners during these tours, unless safety or security concerns are implicated. (The Monitor must provide the Parties with any documentation relied upon to prepare reports to the Court or testimony.) The Monitor shall be able to review medical and dental records of Class Members during the tours. The Monitor shall make reasonable efforts to conduct telephonic or in person exit interviews upon the conclusion of each site visit. Defendants retain the ability to deny a Monitor's request for documentation concerning ongoing security investigations and sensitive security materials. The Monitor and his or her consultants will use best efforts to minimize interference with the mission and operation of IDOC.

I.    **Plaintiffs' Access to Information.** The Parties shall cooperate so that Plaintiffs' counsel has reasonable access to information directly related to the medical and dental care of Plaintiffs and Defendants' quality assurance program without unduly burdening Defendants. Defendants will permit confidential phone conversations between Plaintiffs' counsel and Class members in the same fashion as other legal calls between attorneys and clients. Plaintiffs' counsel

shall not use documentation or information provided pursuant to this Decree in any other matter or litigation.

      **J.**       **Compliance.** The Monitor may find that the Defendants have substantially complied, partially complied, or are not in compliance with the Decree. In the event the Monitor finds Defendants not in compliance with the Decree, within thirty (30) days the Monitor and the Defendants shall confer and confer as to the steps necessary to achieve compliance including the time frame within which these steps shall be completed, and such steps and time frame shall be memorialized in writing and provided to Plaintiffs.

      **K.**       **Compensation of the Monitor.** Defendants shall compensate the Monitor and staff at a rate agreed to by the Defendants and the Monitor. If the Defendants and the Monitor cannot agree, the issue will be submitted to the Court. All travel expenses will be subject to IDOC travel reimbursement policy. IDOC will reimburse for travel only within the continental United States.

## VI.     ATTORNEYS' FEES AND COSTS

      **A.**       After the Preliminary Approval Date, Plaintiffs will provide Defendants with their current amount of attorneys' fees, costs, and expenses they claim to have incurred for the prosecution of this cause of action, through the Effective Date of this Decree.

      **B.**       The parties will use their best efforts to agree on the amount of attorneys' fees, costs, and expenses to which Plaintiffs are entitled for the prosecution of this cause of action, through the Effective Date of this Decree.

      **C.**       If the parties cannot come to an agreement, the Court shall determine the amount of attorneys' fees, costs, and expenses to which Plaintiffs are entitled for the prosecution of this cause of action, through the Effective Date of this Decree.

      **D.**       Plaintiffs shall not seek fees or expenses for the first thirty (30) months after the

Effective Date unless, pursuant to the PLRA, Defendants move to vacate this Consent Decree. If, in the first thirty (30) months, Defendants make such a motion, Plaintiffs can petition the Court for fees and expenses incurred as a result of successfully defending against that motion to vacate. After the first thirty (30) months, Plaintiffs may seek an award of fees and expenses, capped at three hundred thousand (300,000) dollars, incurred as a result of any successful motion for contempt filed more than thirty (30) months after the Effective Date. However, if pursuant to the PLRA, Defendants move to vacate this Consent Decree, the cap of three hundred thousand (300,000) dollars shall not apply. Beginning in the fourth year after the Effective Date, Plaintiffs shall be entitled to any fees and expenses awarded by the Court.

## VII.    MISCELLANEOUS PROVISIONS

**A.    Final Approval of the Decree.** Final approval of the Decree shall be deemed to occur on the date the Court approves this Decree after a class action fairness hearing.

**B.    Costs of Notices.** The cost of all notices hereunder or otherwise ordered by the Court shall be borne by Plaintiffs for an amount of up to ten thousand dollars ($10,000). Any costs in excess of ten thousand dollars ($10,000) shall be borne by Defendants.

**C.**    The information gathered by the Monitor during the life of this Decree, including all reports and materials supplied by Defendants to the Monitor, together with the Monitor's reports, may be used in only in a proceeding to enforce this Decree and in any proceeding arising out of a Termination Request.

**D.**    A review of records by the Monitor or his staff shall not constitute a waiver of IDOC's quality assurance privilege. Moreover, any such disclosures shall not constitute a waiver or serve as precedent in other legal proceedings with respect to the aforementioned quality assurance privilege. In addition, Plaintiffs and the Monitor and his staff agree to keep said documentation confidential, if the documentation is confidential, and not to disclose, publish or

use for public consumption any of the records reviewed by Plaintiffs, the Monitor or his staff.

## VIII.   RESERVATION OF JURISDICTION

A.      The Parties consent to the reservation and exercise of jurisdiction by the District Court over all disputes between and among the Parties arising out of this Decree.

## IX.    TERMINATION OF THE DECREE

A.      The Parties agree that, upon approval of this Decree by the Court, this litigation will not be dismissed and will remain on the Court's active docket, until the Court's jurisdiction terminates consistent with the terms of this Decree. Defendants shall not move to decertify the class for the duration of this Decree.

B.      The Court's jurisdiction shall terminate, and the obligations under this Decree shall be complete, consistent with the following procedures:

1.      At any time after two (2) years from the Effective Date, Defendants may make a written request that the Court terminate the Court's jurisdiction and the monitoring and reporting process described herein ("Termination Request"). The request can relate to the entire Decree, or any portion thereof.

2.      Following any Termination Request, Plaintiffs, through Class Counsel, shall have forty-five (45) days to respond. During those forty-five (45) days, Plaintiffs shall have the opportunity to obtain information from IDOC concerning factual issues relevant to the determination of compliance. Should Defendants not provide reasonably complete and timely information during this period, Plaintiffs may ask the Court to order Defendants to do so, and if the Court grants Plaintiffs' request, the Court shall extend Plaintiffs' time to respond to the Termination Request as appropriate, to allow Plaintiffs to receive sufficient information and evaluate it.

3.      The Court will grant Defendant's Termination Request and terminate its

jurisdiction and the reporting process as to part or all of the Decree, as applicable, if the Court finds that Defendants have shown they have substantially complied with the terms of the Decree.

4. Termination of the Court's jurisdiction over the Decree, and underlying case, in whole or in part, may occur upon a successful Termination Request consistent with the terms of this Decree or by virtue of the sunset provision outlined below. During the pendency of any Termination Request, the provisions of this Decree, including the Implementation Plan, shall remain in full force and effect.

5. This Decree and the Court's jurisdiction over the Decree and underlying case shall terminate five (5) years after the Effective Date, with respect to any provisions of the Decree for which there is no outstanding determination that Defendants are not in substantial compliance. If the Court determines that Defendants are not in substantial compliance with any provisions of the Decree at any time during the five (5) year period of the Decree, the Court's jurisdiction with respect to such provisions shall continue for the remainder of the five (5) year period or for a period to be determined by the Court of not more than three (3) years from the date of the Court's finding the Defendants are not in substantial compliance. If after eight (8) years, the Court determines that the Defendants have failed to come into substantial compliance with respect to one or all provisions of the Decree, the Court's jurisdiction with respect to such provisions shall continue for a period of not more than two (2) additional years for that particular provision(s). In any event, this Decree shall terminate no later than ten (10) years after its Effective Date.

## X. DISPUTE RESOLUTION

A. If Plaintiffs believe that the Defendants are not in substantial compliance with any

provision of this Decree, Plaintiffs shall provide the Defendants, in writing, specific reasons why they believe that the Defendants are not in substantial compliance with such provision or provisions, referencing the specific provision or provisions. Plaintiffs may not allege that the Defendants are not in Substantial Compliance based on minor or isolated delays in compliance. To the extent Plaintiffs rely on observations or opinions of the Monitor to support an allegation that the Defendants are not in substantial compliance, Plaintiffs shall make a reference to the written reports of the Monitor and to portions thereof which support Plaintiffs' belief. To the extent Plaintiffs rely upon documents provided by Defendants to support an allegation that Defendants are not in substantial compliance, Plaintiffs shall make reference to the specific information or documents which support Plaintiffs' belief.

      **B.**    Defendants shall have the opportunity to consult their designated expert with respect to Plaintiffs' allegations that the Defendants are not in substantial compliance with such provision or provisions. The Defendants shall provide Plaintiffs with a written response to the notification within thirty (30) days of its receipt.

      **C.**    Plaintiffs agree to advise Defendants of their acceptance or rejection of Defendants' response within seven (7) business days of its receipt. The parties shall meet to discuss and attempt to resolve any disputes addressed in the written submissions. The Defendants and Plaintiffs shall meet with fourteen (14) business days of Plaintiffs' rejection of Defendants' response, unless a later meeting is agreed to by both sides.

      **D.**    If Defendants and Plaintiffs are not successful in their efforts to resolve their dispute, they may jointly or individually seek relief from the Court. In any court proceeding related to this Decree, the information gathered by the Monitor during the life of this Decree, the Monitor's reports, including all reports and materials supplied by Defendants, may be used, and the Monitor

and his or her consultants may testify and opine upon ultimate issues in this case.

SO ORDERED THIS 24th DAY OF JUNE, 2022.

 

_____

Jorge L. Alonso

United States District Judge