**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>ROB JEFFREYS, MELVIN HINTON, and STEVEN BOWMAN,<br><br>Defendants. | ) | Civil No. 3:18-cv-00156-NJR |

**PLAINTIFFS' RESPONSE TO INITIAL REPORT OF SECOND CO-MONITOR**

Pursuant to the Court's orders concerning the Co-Monitors' initial reports, Plaintiffs submit this response to the Initial Report of the second Co-Monitor, julie graham (Dkt. 444; "graham Report" or "Report").[1] As with the initial report of Dr. Harris, Plaintiffs recognize the significant effort that went into creating the graham Report in a limited period of time.

At the outset, it appears that IDOC's own conduct impacted some of the conclusions—through no fault of julie graham—of the Report. For example, although graham notes cooperation by wardens and staff, the graham Report describes no contact with the named plaintiffs (all currently housed on D-Wing at Logan in restrictive conditions). Indeed, Ms. Monroe believed that no trans woman on D-Wing had spoken to graham. Therefore, the graham Report may be limited in certain respects. Despite this, graham describes continued, serious

[1] The Court's Order appointing Monitor and subsequent Order appointing julie graham as the second Co-Monitor provide that either party shall have thirty days in which to respond to a monitor's report. Dkt. 370 at 14; Dkt. 423 at 5. The graham Report was submitted on September 1, 2022. Dkt. 444.

ongoing violations and failure to comply with this Court's preliminary injunctive orders by IDOC, as described in more detail below.

## I. INTRODUCTION

Over a year after trial, and three years after the preliminary injunction hearing, the graham Report unfortunately confirms that the Plaintiff Class members are still living under the same inhumane and unconstitutional conditions. Despite multiple orders requiring change, IDOC continues to deny Class members the care they need—care that is constitutionally required. graham notes that Class members remain "afraid for their safety and their lives" and they continue to be "stigmatized" by unprofessional staff conduct that "creates or exacerbates a hostile culture." Dkt. 444 at 5, 11. Staff training has been largely ineffective, and Defendants cannot even muster evidence that staff have participated in it. Transgender women are still "told they are in men's facilities so they will be referred to as men, or . . . report being referred to by derogatory names, such as f*ggot or worse." *Id.* at 14. Hopelessness and desperation prevail: "[m]any believe that if they complain they fear reprisal or retaliation . . . They have a sense of hopelessness": "many . . . are waiting, hoping desperately to be able to transfer out of the placement they are in to what they believe will be a safer placement." *Id*. at 30, 34.

Despite its dark findings, the graham Report deliberately takes the "short view," with graham observing that, to assess compliance, they "can only start [assessing] at the moment in time they began to collect information." Dkt. 444 at 7. The Report describes significant deficits in IDOC's compliance with this Court's orders, yet its conclusions are muted by sympathy for the mid-level administrators tasked with executing poorly planned initiatives and hampered by IDOC's chronic staff shortages and administrative incompetence. But the Report's findings should be considered in the short- ***and*** long-view of the case. That responsibility needs to be laid

where it belongs: on the official capacity Defendants (Messrs. Jeffreys, Hinton, and Bowman), who are ultimately responsible for IDOC's compliance with the Court's orders. That their failures have persisted far into 2022 is deeply troubling.

## II. ASSESSMENT

### A. Defendants have failed to address the policy changes that would enable orderly and progressive change.

Policies direct how prisons are run. Many of Defendants' failures implicate policies. Well over a year ago, post-trial, Plaintiffs proposed detailed policy revisions which would have addressed many of the very issues graham found and criticized in their Report. These proposals have languished, ignored by Defendants. Searches are still a vexed issue: "The staff of IDOC hate the search policy." Dkt. 444 at 8. The results of this hatred are borne by Class members. "Rather than IDOC's implementation strategy being seen as the problem, transgender people themselves are seen as the problem. . . . Incarcerated women report hearing corrections staff admonishing or criticizing . . . female staff who are willing to provide searches," and are told that "staff would not touch them." *Id*. at 10-11. "[M]ore staff are needed to provide this basic security function." *Id*. at 9. In August 2021, Plaintiffs' proposed revisions to the Administrative Directive (AD) recognized this issue and would have mandated the availability of willing staff. *See* Dkt. 335-1 at 17 ("Availability of Officers"). In the meantime, Defendants' proposed solution to the issue—body scanners—remains a hypothetical, as the body scanners are not in operation (and would be insufficient even if they were in use). Even now, IDOC is not using the five scanners acquired in **December 2021**: graham reports "[t]hey have yet to be deployed." Dkt. 444 at 9. "Policies and procedures" relating to the scanners still "need to be completed." *Id.* Finally, even if this was a sensible solution to the problem (and it appears not—repeated radiation exposure is

a concern), there are only "5 institutions with scanners and 19 institutions with a census that included transgender people." *Id*.

Similarly, graham reports general "Policy Concerns" regarding the AD and how it refers to male and female prisoners. Dkt. 444 at 10. Plaintiffs' August 2021 submission rewrote the AD to address these exact issues, and it could have been implemented a year ago. Dkt. 335-1 at 4-5. graham notes the "danger[]" to transgender women posed by markers on their ID cards, and other problems around mandatory identification (Dkt. 444 at 10). This, too, was noted in Plaintiffs' August 2021 filing and addressed by proposed revisions to the AD. *See* Dkt. 335 at 19-20, 335-1 at 14-15. More generally, the graham Report notes a "[l]ack of information on the part of inmates (and staff) about how things work in IDOC for transgender and non-binary people. Increasing frustration and stagnant processes. 'No one seems to know.'" Dkt. 444 at 32. The "tool kit," proposed by graham is not dissimilar to the revised AD Plaintiffs wrote over a year ago, one that IDOC has not considered or even begun to implement. graham independently suggests some of the things Plaintiffs incorporated, like hiring additional dedicated consultant staff. *Id*. at 32-33. In sum, problems which were identified months ago have festered through Defendants' inaction, only to become subjects of the graham Report now.

**B. Defendants have failed to implement the Court's orders as to showers and training.**

Even the simplest things have gone unfixed. Over a year ago, the Court directed in no uncertain terms that: "Defendants shall ***immediately*** ensure that transgender inmates are allowed access to a private shower." Dkt. 349 at 229-30 (emphasis added). While graham notes difference of views as to the privacy of showers at some (unnamed) facilities, it is clear that IDOC remains in violation of this Order at eight large prisons (Menard, Pontiac, Logan, Centralia, Dixon, Shawnee, Big Muddy, and Pinckneyville). Dkt. 444 at 17-18. Horrifyingly, at

Pinckneyville, graham reported that staff "get on the loud speaker" and say things like, "Okay all you weirdos get ready, it's time for the show, Get ready special showers. . ." *Id*. at 18.[2]

This is a training problem. Putting aside whether it was reasonable for Defendants to think that the training they selected for their staff—a 30-minute video—would actually effectuate the Court's order to "train[] all correctional staff on transgender issues and awareness, including the harm caused by misgendering and harassment," graham was unable to determine how many staff had actually watched the video because ***Defendants care so little about this that they did not collect the data***. Dkt. 444 at 13. In addition, "it is also clear that a significant number of staff did not comply with [the] mandate by 3/30/22, and that a significant number of individuals have still not complied . . .." *Id.*

There is no word in the graham Report about the additional requirement for training for other individuals in custody at Logan (Dkt. 349 at 231), which, based on Class member reports, is sorely needed.

### C. Defendants are in flagrant violation of the Court's orders concerning commissary.

The graham Report details a plethora of problems in commissary inventory and access. The list provided to the co-monitor was "incomplete" (lacking hygiene products for women).[3] Dkt. 444 at 19. "Shortages impacted most people": it took sixteen months (from November 2020 to February 2022) to stock items on the list and then "many of these items sold out." *Id*. Among other things, IDOC failed to provide underwear or bras in the right size, or other hygiene products, such as deodorant for a trans man that did not "smell like a flower." Dkt. 444 at 20. As

[2] There were reportedly pictures accompanying the Report of the shower at Centralia but they were not included in the filing (Dkt. 444 at 18).
[3] This list is also reported to have been attached to the Report as an appendix (Dkt. 444 at 21) but it is also not included in the filing.

in the past (*see* Dkt. 351 at 2-3, filed September 9, 2021), Defendants blamed contracting difficulties and supply chain problems. Dkt. 444 at 19. Somehow Defendants cannot manage to get things that anyone can buy at their Wal-Mart, or to sell those things at reasonable prices when they do manage to procure them.

The conclusions of the graham Report as to commissary are somewhat confusing. The Report states that "Commissary to facilitate social transition and treat gender dysphoria has proved to be a poor idea. Legally, incarcerated people do not have the right to commissary," and that "TAC and THAW should rethink commissary as treatment for gender dysphoria—treating gender dysphoria cannot depend[] on the vicissitudes of the market or inventories." *Id*. at 23, 34. Plaintiffs assume that this means that graham believes that Defendants must find an alternative mechanism for providing Class members with the items necessary for social transition, and agree that they should not be singled out within IDOC as the only people who are required to obtain their medical supplies from commissary (IDOC does not require, for example, that individuals with sprains purchase braces from commissary).

Alarmingly, IDOC may be doing away with these medically necessary commissary items altogether without providing an alternative. According to the report, IDOC's general counsel Robert Fanning reported to graham that "[t]he Department plans to move to a gender-neutral commissary," and that "[t]his ***has been approved and its implementation is the goal of the Department***." Dkt. 444 at 23 (emphasis added). This appears to be happening. Within the past two weeks, a Class member at Logan told Plaintiffs' counsel that most cosmetics and women's hair products had been removed from the commissary list, implying that these gender-affirming items will no longer be available anywhere. This is in direct violation of the Court's orders and

contrary to widely accepted medical practices for transgender health, as recognized by all witnesses at trial last summer, including IDOC's own expert, Dr. Erica Anderson.

At trial, Dr. Anderson agreed that "within the prison context, social transition would include access to gender-affirming commissary items," and that the inability to make the social transition changes needed to affirm gender identity could be "highly distressing." Dkt. 349 at 160-61. Defendants' counsel, in closing, assured the Court that the commissary lists would catch up to the commissary policy—"That's going to happen." *Id.* at 210. As the graham Report makes abundantly clear, it did not happen. It is critical that IDOC provide gender-affirming items to transgender prisoners in their custody; anything less is a direct violation of the court's orders and compromises transgender prisoners' medical treatment.

## III. CONCLUSION

As with the initial report of Dr. Harris, graham reports serious, ongoing violations and lack of compliance with the Court's preliminary injunctive orders. Plaintiffs intend to file a request for status conference with the Court and propose possible solutions for improvement.

Dated: September 30, 2022

Respectfully submitted by:

*/s/ Camille E. Bennett*

**Camille E. Bennett**
**Michelle T. García**
ROGER BALDWIN FOUNDATION OF ACLU, INC.
150 North Michigan Avenue, Suite 600
Chicago, IL 60601
Telephone: (312) 201-9740
Facsimile: (312) 288-5225
*cbennett@aclu-il.org*
*mgarcia@aclu-il.org*

**Amelia H. Bailey**
**Sam G. Rose**
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
*amelia.bailey@kirkland.com*
*sam.rose@kirkland.com*

**Brent P. Ray**
KING & SPALDING LLP
110 N. Wacker Drive, Suite 3800
Chicago, IL 60606
Telephone: (312) 995-6333
Facsimile: (312) 995-6330
*bray@kslaw.com*

**Abby L. Parsons**
KING & SPALDING LLP
1100 Louisiana Street, Suite 4100
Houston, TX 77002
Telephone: (713) 751-3294
*aparsons@kslaw.com*

**Thomas E. Kennedy III**
**Sarah Jane Hunt**
KENNEDY HUNT P.C.
906 Olive Street, Suite 200
Saint Louis, MO 63101
Telephone: (314) 872-9041
*tkennedy@KennedyHuntLaw.com*
*sarahjane@KennedyHuntLaw.com*

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that on September 30, 2022, I electronically filed the foregoing document with the Clerk of this Court by using the CM/ECF system, which will accomplish service through the Notice of Electronic Filing for parties and attorneys who are Filing Users.

Dated: September 30, 2022

*/s/ Camille E. Bennett*
Camille E. Bennett