JANIAH MONROE, et al v. STEVE MEEKS
Case No. 3:18-CV-00156-NJR
United States District Court for the Southern District of Illinois
Minor Update by the second co-monitor pursuant to the 14 day mandate
Submitted by: julie graham, MS (Second Co-Monitor)
October 19, 2022

### Showers

At Illinois River, an individual I interviewed stated she could be seen from above and below by people when she got in and out of the shower. There isn't a private place to get dressed. I informed Chief Hammers that this is a PREA violation and he was informing the Agency PREA coordinator.

At Western Illinois, an individual I spoke with stated that when she was in segregation she had to take a shower in a location where she was seen by incarcerated people who made cat calls and commented on her body. She reports she filed a grievance and it was denied. I informed Chief Hammers that this is a PREA violation, further, I'm confused how it could be "denied." Either people can see or not and she reported sexual harassment.

That same individual at Western takes showers in healthcare, which is appropriate, but healthcare is in another building. (Trans women can take showers either at healthcare or on the deck at a later time.) Showering at healthcare means going *outside* in the rain and, in the future, the snow, and by the time she returns from her shower, her clothing, hair and body are rain soaked. She has requested to take showers in the facility when it is raining and reports she is told that since she files grievances and wants special treatment she must go to healthcare.

An individual at Illinois River reported that she has a condition related to taking hormones (she lactates) and had a medical release saying she could shower in the evening. Staff are resentful about having to accommodate her needs and let her know that and complained to the warden who overruled the medical directive. I'm concerned that corrections overruled a medical directive and that according to Chief Hammers there should be latitude for her to shower after her dayroom.

### Searches

The scanners are not yet in operation. The legal review is not yet complete.
Individuals at both Illinois River and Western brought up the delay in getting the signifier on their ID badge to ensure they are searched by the staff of the appropriate gender. I am going to try to get a definitive answer to this. It seems to take months and that is too long.

### Commissary

I spoke to the business directors of both Western and Illinois River and they were wonderful—one would go with transgender women to medical to get them measured to order the correct bras; the other insisted that the staff ensured that transgender women had privacy in commissary to protect them. The reality that the inmates report is far afield from what both these directors are trying to create and believe occurs. This feels like an ongoing theme in IDOC.

They could not access bras from the clothing room and much is not in stock in commissary. Chief Hammers is following up, as am I. He reports they continue to have issues acquiring needed products from the vendors they are permitted to use. They are changing to a gender neutral commissary.

### Training

Chief Hammers reports that the training mandated for 3.30.22 is still not 100%.
Warden Case reports that 72 Logan staff attended the Moss training and that no training is yet set up for incarcerated individuals. The training went well according to Warden Case and the union. There is a plan for more training, but it isn't set. The Moss group is going to do a system wide survey to conduct a needs assessment.

Chief Hammers has insisted that there be more focus on professionalism, reiterating policies on harassment and discrimination, for the professional staff.

### Miscellaneous

Detail what should be in a tool kit for incarcerated people was provided to Chief Hammers, including examples of problems that incarcerated transgender people encounter. Chief Hammers was taking that back to THAW. Chief Hammers has developed a FAQ for CO's. I provided Chief Hammers with some articles, none of which I think are terribly helpful, but they are what currently exist in the literature.

### ID Badges

Having a marker on a badge puts incarcerated people at risk. People who live in prisons that are less safe are at risk from other incarcerated people who are struggling with transphobia or homophobia. A marker is similar to a pink triangle. While most incarcerated people I've spoken with are relieved to have a signifier, it is due to the fact that they are desperate to be acknowledged for who they are and to not be inappropriately searched by security staff. It's essentially a marker that says "don't abuse me." Some states have a card that people can carry, but that doesn't seem optimal either. Some states the security staff check on a computer for search instructions. The incarcerated person who scraped off the signifier because she was threatened by a gang who insisted on seeing her badge as proof she wasn't transgender was at genuine risk.

Perhaps using bar codes or QR codes for all incarcerated people which are not readable without a scanner. That is an infrastructure issue. However, it would mean that other incarcerated people would not be able to determine someone's gender identity from their ID.

### Staff Issues

There are concerns on the part of staff that people who are not transgender are asking to be searched by female officers for reasons other than respecting their gender identity.

*julie graham*     October 19, 2022