**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil No. 3:18-cv-00156-NJR |
| v. | ) ) | |
| ROB JEFFREYS, MELVIN HINTON, and STEVEN BOWMAN, | ) ) ) ) | |
| Defendants. | ) | |

## PLAINTIFFS' MOTION FOR FINDING OF CONTEMPT

After a four-day trial in August 2021, this Court issued immediate preliminary orders from the bench because "there are simply some issues that have to come to light in the past four days that are so serious, such serious violations of the Eighth Amendment, that they must be *immediately* addressed." Dkt. 328 at 9 (emphasis added). These orders, and those that followed, were plain, specific and comprehensive: IDOC was ordered to provide constitutionally adequate medical care to transgender people in its care. Defendants systemically, for months upon months, failed to obey these orders.

The transgender prisoners of Illinois should not have to wait any longer. Contempt is warranted.

In addition, Plaintiffs respectfully seek the following relief: (1) set this motion for hearing on the day of the status conference (December 15, 2022); (2) order the parties to participate in person on that date (Plaintiffs believe the monitors could participate by remote means); and (3) modify the preliminary injunctions to add short deadlines for Defendants' compliance and

reporting. In accordance with the Court's order (Dkt. 453), Plaintiffs will suggest those short deadlines and any other modifications to the preliminary injunctions, and provide any additional evidentiary support in the form of Class member declarations, no later than December 14, 2022.

## FACTUAL BACKGROUND

To implement and oversee compliance with its orders, this Court appointed two co-monitors (Dkt. 418), each of whom submitted reports detailing initial findings. Dkts. 439, 444, 450. The recent Court-appointed monitor reports reveal that Defendants repeatedly failed to comply with the Court's orders. In the following critical areas, the record reflects:

- Over *one-third* of the Class is not receiving hormones, and only 8.8% of transgender women and 29% of transgender men who receive hormones are within the ranges established by the Endocrine Society Guidelines.

- Not one Class member has been scheduled for, let alone received, gender-affirming surgery, and very few Class members have received the prerequisite electrolysis.

- Most transgender women who requested transfers remain at male facilities, and of the few women transferred to Logan, most remain isolated in "D-wing," segregated from other prisoners with restricted privileges.

- The PRISM program is not a program; Defendants have not developed it as a resource as ordered nor should it be viewed as an alternative to being transferred to Logan.

- The commissaries have struggled—or outright failed—to provide gender-affirming clothing or grooming items, and Defendants are now defying the Court's order to provide gender-affirming items through commissary.

- Cross-gender searches remain a persistent problem, and IDOC's use of IDs to identify Class members as transgender is dangerous and subjects Class members to increased risk of violence.

- At least ten IDOC prisons that house Class members have no private showers.

- Not all staff received even a 30-minute basic transgender issues training, and the quality of this training is poor.

Faced with these disturbing facts, Defendants' responses to the monitors' reports make little effort to defend their performance and even less effort to provide a plan for improvement. Indeed, over a year later, Defendants failed to follow through on what they promised to do imminently at trial.

The impact of Defendants' failures on the Class members cannot be overstated. After securing additional injunctive relief last August, Class members felt hopeful. But in the fifteen months since trial, hope has turned into despair. The consequences are severe. Specific instances of harm abound, each of which is disturbing enough to warrant a finding of contempt. In one case, Defendants refused to transfer a transgender woman despite her reports that she was being raped repeatedly by a male prisoner. Another Class member—despondent over her inability to get adequate hormone treatment—attempted suicide by ingesting batteries.

Plaintiffs do not file this motion lightly, but under the present facts and circumstances are compelled to act. Only a finding of contempt and further orders compelling compliance will cure Defendants' ongoing misconduct and disregard.

## LEGAL STANDARD

District courts have "wide latitude to craft civil contempt sanctions to coerce obedience to the court's orders[.]" *Iglesias v. Federal Bureau of Prisons*, No. 19-CV-415-NJR, 2022 WL 1136629, at *4 (S.D. Ill. April 18, 2022) (quoting *Teledyne Techs. Inc. v. Shekar*, 739 F. App'x 347, 351 (7th Cir. 2018)). A movant seeking an order of contempt bears a clear and convincing burden of proof that the "party has violated the express and unequivocal command of a court order." *Iglesias*, 2022 WL 1136629, at *4 (quoting *In re Res. Tech. Corp.*, 624 F.3d 376, 387 (7th Cir 2010).

The touchstone of civil contempt is the contemnor's "lack of reasonable diligence" in complying with court orders. *Bailey v. Roob*, 567 F.3d 930, 935 (7th Cir. 2009). Notably, civil contempt does not require a court to find that the violation was "willful," only that the court "be able to point to a decree [] which sets forth in specific detail an unequivocal command which the party in contempt violated." *Manez v. Bridgestone Firestone N. Am. Tire, LLC*, 533 F.3d 578, 590-91 (7th Cir. 2008). And the movant must have suffered harm as a result of the violation. *Id.* at 591.

Three years after the Court issued its first preliminary injunction order, Defendants' persistent failures and lack of reasonable diligence continue to inflict ongoing suffering on Class members. The Court should find Defendants in contempt.

## ARGUMENT

### I.    Three Years Later, Defendants Have Not Shown Reasonable Diligence in Complying with the Court's Unequivocal Orders to Provide Constitutional Care.

Defendants' failure to comply with the Court's unequivocal orders to provide constitutionally adequate medical care is clear and convincing. The Court ordered immediate remedial action in the following categories: hormone therapy, gender-affirming surgery, social transition, safety issues, and education and monitoring of staff. As detailed below, Defendants categorically failed to comply, let alone to show "reasonable diligence" in complying.

#### A.    Hormone Therapy

Hormone therapy is a medical necessity. Dr. Harris describes the process to provide adequate hormone therapy as "straightforward and relatively simple." Dkt. 439 at 10. Plaintiffs' expert, Dr. Vin Tangpricha, testified to the same at trial. Dkt. 353 at 389. Yet, despite its simplicity and countless roadmaps, Defendants fail to provide this essential care.

The Court's December 2019 preliminary injunction order required Defendants to provide hormone therapy in a timely fashion and titrate it within range. Dkt. 186 at 37. It further required

Defendants to employ competent clinicians trained according to the accepted WPATH Standards of Care. *Id.* at 38. At trial, the evidence was overwhelming that Defendants failed to provide this care to the Class.

The Court's August 2021 order specifically required baseline bloodwork and provision of hormone therapy for any Class member seeking it *within a matter of days*. Dkt. 331 at 10-11. A February 2022 order added requirements for regular bloodwork checks and other testing designed to ensure compliance. Dkt. 383 at 74-77. In short, this Court's orders regarding hormone therapy were unequivocal: provide hormone therapy to anyone who needs it and check regularly to make sure it is effective.

### 1. Defendants' failure to provide hormone therapy to over a third of the Class demonstrates a lack of reasonable diligence.

After three years, Defendants still have not resolved the first problem: "delaying hormone therapy with no medical justification." Dkt. 186 at 33. In August 2022, Dr. Harris reported that 35% of the Class members are not receiving hormone therapy at all. Dkt. 439 at 6. Why not? Class members have reported blanket refusals from providers when they sought hormone therapy. Some providers even laugh in their faces. Sadly, this is a familiar story. Defendants' medical staff erect one roadblock after another to hormone therapy. When one Class member showed a copy of the Court's February 2022 order to her facility medical director, he told her that he had never heard of such a lawsuit.

### 2. Less than 15% of all Class members receiving hormone therapy in IDOC are at goal levels.

Defendants' track record on the second problem—getting Class members' hormone levels titrated to a "therapeutic range"—is even worse. *See* Dkt. 186 at 33. Three years ago, the Court ordered "timely hormone therapy" for the Class, including the "administration of hormone dosage

adjustments," "routine monitoring of hormone levels," and access to competent providers. Dkt. 331 at 2.

Defendants' compliance rates are abysmal. Dr. Harris reported that of the more than 100 transgender women on hormone therapy, *less than ten percent* were at goal. Dkt. 439 at 6. For the smaller population of transgender men (24), only half were even on hormone therapy and only seven were in range. *Id.* at 8. The "lack of reasonable diligence" could hardly be clearer.

Worse still, Defendants' failure to manage a straightforward and simple process of administering hormone therapy and monitoring progress is doubly problematic because having "appropriate" hormone levels is the gate-keeper for surgery. *See* Dkt. 384 at 3 ("Any Plaintiff class member whose hormone levels are within the appropriate range, and who has requested evaluation for gender-affirming surgery, shall be evaluated for such surgery."). One Class member was denied surgery earlier this year due to elevated testosterone, and has yet to be re-evaluated after months of delay in adjusting her hormones. Defendants also continue to use hormone levels as reasons to defer or deny transfer requests.

In response to Dr. Harris' Report, Defendants admit that "hormone levels are not within the ideal range for all class members." Dkt. 446 at 1. Despite this admission, they offer nothing to show they have acted with reasonable diligence and are taking appropriate steps to comply with the Court's orders. For example, Defendants assert, "the WPATH Transgender Health training for all medical providers [has] been helpful." *Id.* Provider responses to Class member hormone treatment requests show otherwise.

Instead of addressing the problems, Defendants set out five useless steps for "oversight" and hormone level management. *Id.* at 2. None of the steps involve training, two of the steps relate solely to access to records, and none provide a clear timetable or measurable goal. For example,

Defendants propose that "THAWC Chair and other designees will meet with each facility and review abnormal labs and create a plan for the patient" (*id*.), but with 19 facilities housing some 170 Class members, this is yet another of IDOC's unworkable plans that will result in built-in delays to care. Further, Defendants state, "UIC Transgender Health has agreed to take on more patients beyond just complicated patients. The Office of Health Services will communicate this at an upcoming quarterly meeting on Thursday, September 8, 2022." *Id.* This, too, is too little, too late.

### B.    Gender-Affirming Surgery

Defendants' track record on gender-affirming surgery is no better. In 2019, the Court noted that surgery "can be medically [required] to treat gender dysphoria" and highlighted the fact that "IDOC has not evaluated a single transgender inmate for surgery." Dkt. 186 at 33. The Court's August 2021 order explicitly required evaluation of requests for surgical treatment and set a timetable for this evaluation, starting with the earliest-made requests. Dkt. 331 at 11. Over a year later there has been no progress whatsoever.

#### 1.    Defendants have not scheduled anyone for surgery and have ceased evaluations.

In November 2022, no Class member has had gender-affirming surgery—indeed, no Class member has even been *scheduled* for surgery—and the process of surgical evaluations has ground to a halt. The Harris Report, issued August 3, 2022, stated, "To date, a total of 6 trans men and 11 trans women have been approved for surgery. Two have since been released from custody. No completed surgeries have been reported." Dkt. 439 at 11. This is essentially the same as was reported to the Court in early March 2022, when Defendants filed an under seal list of 16 individuals who had been considered and approved for surgery. Dkt. 415 at 7-8.

As to surgeries for the handful who have been approved, there has been a similar lack of progress. In their Response to the Harris Report, Defendants stated they were still negotiating a contract with Rush Medical Center, but that only "questions related to security protocols" remained and they "intend[] to schedule surgeries as soon as practical."[1] Dkt. 446 at 3. Yet, as of November 2022, Class members report there are still no dates for surgeries—they are now told there is no location for post-surgical care. Defendants have not even scheduled any in-person consultations with Dr. Schechter—the first step for scheduling a surgery. This inaction will delay surgeries further because Dr. Schechter's surgical calendar is already full through March 2023. *See e.g.*, October 28, 2022 Joint Status Report (Dkt. 295) at 2, *Iglesias v. Federal Bureau of Prisons*, No. 19-CV-415-NJR (S.D. Ill.), attached as Exhibit 1.

Defendants' delays are unconscionable. At least one Class member was turned down for surgery—to her profound distress—because the delays have run on so long that she is now too close to her "out date" to be scheduled for surgery.[2] Less complex surgical procedures, such as breast reduction for transgender men and orchiectomy for transgender women, could reasonably be performed by providers other than Dr. Schechter. In addition, these procedures also do not require the same level of post-operative care as vaginoplasties. The "post-surgical care" excuse is especially outrageous for transgender men, because cisgender women who have breast surgery routinely return to Logan for post-surgical care.

### 2.    Not one Class member has completed pre-surgical hair removal.

Defendants' provision of pre-surgical hair removal is also proceeding at a glacial pace. Defendants' Response to the Harris Report stated that *one* patient was "approximately 90% clear,"

---

[1] Plaintiffs' counsel had learned of the Rush negotiations in early summer and repeatedly sought information about their progress from both Defendants and Rush counsel with limited success.
[2] To add insult to injury, this is someone whom medical staff had already recognized as needing a partial orchiectomy due to a testicular issue, which they never scheduled.

two patients were "approximately 70% clear," and "the remaining patients" were "between 30% - 60% clear." Dkt. 446 at 3. In sum, Defendants are "slow-walking" essential medical care, in violation of the Court's orders.

### C.    Social Transition

Part of necessary care for gender dysphoria, as the Court recognized from the start, is social transition. *See, e.g.*, Dkt. 186 at 34-35. The December 2019 order directed Defendants to "cease the policy and practice of depriving gender dysphoric prisoners of medically-necessary social transition, including by mechanically assigning housing based on genitalia and/or physical size or appearance." Dkt 384 at 2. This already clear directive was supplemented in August 2021 by instructions and a timetable for evaluating the request of any "class member who has requested transfer to a facility matching his or her expressed gender." *Id*. at 3-4. These orders, too, have been neglected.

### 1.    Defendants have not transferred about 80% of the transgender women out of male prisons.

Most transgender women Class members remain trapped in men's prisons. In October 2021, Defendants reported to the Court that their consideration of transfers to Logan was proceeding apace. Dkt. 355 at 2. One year later, Defendants are silent as to what has happened since and why they only granted six of 58 transfer requests. *See* Dkt. 439 at 12. Based on the most updated information Plaintiffs have, some 80% of known Class members are still housed with men. *See* Exhibit 2 (filed under seal) (July 11, 2022 email from Lisa Cook and attached "updated tracking spreadsheet" "dated as of June 1, 2022");[3] Dkt. 446-1 at 3 at ¶ 13.

---

[3] Plaintiffs' counsel requested an updated class list from Defendants in mid-October but have not yet received it.

That Defendants almost always deny requests, as currently appears, is "paper compliance" at its worst. *American Fletcher Mortg. Co. v. Bass*, 688 F.2d 513, 518 (7th Cir. 1982) (contempt is warranted by efforts that amount to mere "paper compliance" with orders). As both monitors have emphasized, there are "serious safety concerns" for transgender women in the process of social transition in male prisons. Dkt. 439 at 12; Dkt. 444 at 5, 34 ("[s]ome incarcerated people in IDOC are afraid for their safety and for their lives"; "[M]any incarcerated people are waiting, hoping desperately to be able to transfer . . ..").

### 2.     Defendants have isolated transgender women at Logan in the D-Wing, preventing social transition.

While most Class members remain in male prisons, Defendants have segregated a small population of transgender women—including all the named Plaintiffs—in Logan's D-Wing, where "out time" is severely restricted.[4] Defendants' explanations for Class members' placement on D-Wing have shifted over time. In the past, Defendants said disciplinary considerations; now, Defendants insist that it has to do with "security" and that D-Wing is not a disciplinary wing. Dkt. 446 at 4. Regardless of the reasons, Class members on D-Wing report that the conditions are not the same as on general population wings at Logan. Defendants do not claim otherwise, indeed while stating that D-Wing "is afforded hours of out-of-cell time each day," Defendants' filing is noticeably devoid of any assurance that the D-Wing "out-of-cell time" is consistent with other general population units at Logan. *Id.* at 4. Defendants have created an environment where transgender women feel ostracized and punished, even after they are transferred to a prison that is consistent with their gender.

---

[4] Defendants have made a concerted effort to minimize the D-Wing issue. Of the 32 transgender prisoners at Logan (including the 23 transgender men) they said "only six" are housed on D-Wing (Dkt. 446-1 at 3, ¶ 15) but this was disingenuous, since the declaration containing this acknowledges that at the time of the declaration there were *only nine* transgender women total at Logan (*id.* at ¶ 13).

### 3.     Defendants' promised "PRISM" Program is not a program at all, let alone a viable alternative to transfer to a women's prison.

The Court's August 2021 order included the directive to "Finalize and implement the PRISM project," which Defendants had testified at trial was one of their initiatives, within 120 days of August 9. *See* Dkt. 384 at 4-5; Dkt. 354 at tr. 648. This has not happened. Both the Harris Report and the graham Report describe a "program" whose status is unclear, except that some unknown number of Class members have been transferred to Centralia.[5] Dkt. 439 at 12; Dkt. 444 at 34. In their October 2021 filing, Defendants told the Court that 39 Class members had already been approved to go to the PRISM program, but as of July 2022, records indicate that there were only 28 Class members at Centralia, the site of the PRISM program. Dkt. 355 at 2; *cf.* Exhibit 2 at 5. A report of the John Howard Association ("JHA") on Centralia issued this month states that Centralia staff had told JHA that as of April 2022 the program had a capacity for 50 participants. (John Howard Association, Monitoring Visit to Centralia Correctional Center 2022, attached as Exhibit 3, at 38.)

The monitors' reports and the JHA report confirm what Class members had told Plaintiffs' counsel. The benefit of PRISM is being housed with other transgender prisoners in an environment that seems at least marginally safer than the other men's prisons, but there is "little programming," what programming exists (*e.g.*, anti-bias training) is puzzling and unfocused, and participation in PRISM cuts its participants off from education and jobs. Dkt. 439 at 12; Dkt. 444 at 34; Exhibit 3 at 35-46. graham emphasizes, however, that the solution is not to eliminate PRISM, but to do what the Court ordered: implement the program. Dkt. 444 at 34.

---

[5] Per the Harris Report, "The population of the PRISM project, intended to foster social transition, is estimated to be approximately 20-25, but no census records were made available." Dkt. 439 at 12.

4.        **Gender-affirming items.**

The Court's August 2019 order included a requirement that Defendants "develop a policy to allow transgender inmates medically-necessary social transition, including . . . access to gender-affirming clothing and grooming items." Dkt. 384 at 2. This was supplemented in August 2021 by the order that "Each Plaintiff class member shall *immediately* be provided with access to gender-affirming items in the commissary . . ." Dkt. 384 at 4 (emphasis added). Defendants had promised, at the close of trial, "That's going to happen." Dkt. 349 at tr. 967.

Over a year later, Defendants have failed to keep their promise. The chaos around Defendants' failure to provide medically-necessary gender-affirming items to Class members is extensively detailed in the graham Reports. *See* Dkt. 444 at 19- 24; Dkt. 450 at 1-2. A year after the Court's August 2021 order, Defendants had not even been able to generate a complete *list* of items, let alone provide them. *See* Dkt. 444 at 21, 22. In addition, Defendants were supposed to provide some gender-affirming items (undergarments) without charge, but graham found that "Many incarcerated people did not know [this]" and others reported that they asked and did not get them, or were told "this is a mens facility, you get boxers." *Id*. at 24.

Having failed, over the course of three years, to muster "reasonable diligence" to make ordinary products available to Class members, Defendants' solution to their own chaos now appears to be open defiance of the Court's orders. Defendants plan to move to a "gender-neutral" commissary, a directive which appears to have come from the top of IDOC's legal department. *See* Dkt. 444 at 23; Dkt. 450 at 2. *A "gender-neutral" commissary is not a "gender-affirming" commissary*.

In their November 3, 2022 filing, Defendants carefully avoid calling their new initiative "gender-neutral," instead saying that "[a] universal commissary" was "put into place on October 4, 2022." Dkt. 454 at 3. Defendants acknowledge that they still are not providing gender-affirming

items to Class members through commissary and articulate no alternative method for providing these medically-necessary items to Class members. *See id*. at 3-4. They note that they have been "experiment[ing]" with having "IDOC Industries" make sports bras and vaguely describe having assigned an "IDOC project manager" to "monitor" commissary stock. *Id*. Neither Defendants' past conduct nor their future plans show "reasonable diligence" in following the Court's orders.

### D.     Search and Safety Issues

The Court's August 2019 order directed Defendants to develop a policy to achieve "avoidance of cross-gender strip searches"; in August 2021, the Court ordered that "Plaintiff class members shall be allowed to choose the gender of the correctional officer who will conduct a search of their person, and the search **SHALL BE** conducted by a correctional officer of the gender requested." Dkt. 384 at 2, 3 (emphasis in original). Defendants have not complied with those orders.

### 1.     Defendants are allowing staff of the wrong gender to search Class members and are not using the five scanners.

A year after the Court's mandate, graham's report noted "systemic" problems remain with searches, leading to delays and humiliation of Class members. Dkt. 444 at 7-10. Some Class members continue to be searched by staff of the wrong gender (*id*. at 7); one Class member has reported that she was recently not just searched but fondled by a male staff member. "[M]ore staff are needed to provide this basic security [search] function," graham comments. *Id*. at 9. Defendants' November 3, 2022 Response provides excuses as to why they cannot currently make staff available, but no solutions. Dkt. 454 at 2-3.

This lack of available staff would seem to make Defendants' deployment of the five scanners acquired in December 2021 that much more urgent, but graham's September 1 report and October 19 update reflect that Defendants are not using the scanners. Dkt. 444 at 9-10; Dkt. 450

at 1. As to this, Defendants' November 3, 2022 filing now reports that the final scanner was "installed" at Logan in mid-August—but they are *still not in use* pending finalization of an Administrative Directive, which is apparently sitting on the Director's desk. Dkt. 454 at 3. Even once they are, there are only five scanners and (at least) nineteen prisons with Class members. Not only have Defendants failed to comply with the Court's orders, it appears compliance is nowhere in sight.

### 2. Defendants have implemented identification policies that place Class members at risk of harm.

The Court's August 2021 order directed Defendants to "[f]inalize and implement IDOC's transgender identification policy" within 120 days. Dkt. 384 at 5. graham's reports highlight two defects in Defendants' compliance with this directive, one relating to implementation and one relating to the policy itself. Dkt. 444 at 10-11; Dkt. 450 at 2. As to Defendants' implementation, it takes too long to get the IDs: "It seems to take months and that is too long." Dkt. 450 at 1. Some Class members cannot obtain the IDs at all.

As to the policy, Defendants' chosen methodology has created, rather than eliminated, risks. graham's initial report commented bluntly that "[i]t can be dangerous for transgender women to have markers on their ID cards that indicate they are transgender," citing the example of a woman at Menard who "scraped off the marker" on her ID card for fear of her safety. Dkt. 444 at 10; *see also* Dkt. 450 at 2 ("[A] marker on a badge puts incarcerated people at risk"). Plaintiffs identified this problem and proposed a way to address it over a year ago (Dkt. 335 at 19-20, 335-1 at 14-15); graham proposes other possible solutions (including a bar code or QR code). Dkt. 450 at 2. Defendants' response is silence ("[B]ecause IDOC does not have another way to convey this information, the information must be on the prisoner ID badges"). Dkt. 454 at 6.

14

**3.      Defendants still have not complied with the Court's urgent order to provide private showers.**

In August 2021, the Court directed in no uncertain terms that: "Defendants shall *immediately* ensure that transgender inmates are allowed access to a private shower." Dkt. 349 at tr. 986-987 (emphasis added). graham's initial report found that Defendants were still in violation of this order at *eight large prisons* (Menard, Pontiac, Logan, Centralia, Dixon, Shawnee, Big Muddy, and Pinckneyville). Dkt. 444 at 17-18. graham's update report submitted October 19 reports non-compliance with the private shower requirement at an additional two prisons (Illinois River and Western Illinois). Dkt. 450 at 1. While Defendants dispute the findings concerning Illinois River[6] and Western, they do not contest the findings as to the first eight prisons. *See* Dkt. 454 at 2; Dkt. 448. In sum, Defendants have failed to comply with this simple physical space requirement for over a year now.

**E.      Education and Monitoring of Staff**

The Court's August 2019 order directed Defendants to "advise the Court what steps, if any, IDOC has taken to train all correctional staff on transgender issues, including the harms caused by misgendering and harassment—by both IDOC staff and other inmates." Dkt. 384 at 2. In August 2021, the Court ordered Defendants to "[f]inalize and implement additional and ongoing training for *all* correctional staff on transgender issues and awareness, including the harm caused by misgendering and harassment" (emphasis in original) within 120 days, and also to "[f]inalize and implement training for inmates and staff at Logan Correctional Center regarding incoming/transferred transgender inmates (these were also "in progress" projects based on

---

[6] Defendants admit that there is an "open vestibule" outside the shower at Illinois River, but state that it has a "toilet with a half-wall" and the "shower curtain may be set aside for privacy outside of the shower." Dkt. 454 at 2. It is not clear what this means.

Defendants' trial testimony). Dkt. 384 at 4-5. Despite this clear directive, Defendants have made no meaningful progress in implementing an effective training program.

**1.      Defendants have all but disregarded the Court's orders to implement an effective training policy.**

As to staff training, graham's initial report showed that Defendants had not only failed to comply with this order, they were not even keeping track of their progress towards compliance. *See* Dkt. 444 at 13 ("It is unclear what percentage of the staff has watched the 30 minute training. It was very difficult to get the information regarding training completion"). graham noted that Defendants had given themselves a new "due date" of September 16, 2022 for completion. *Id.* They missed that deadline: on October 3, Defendants asserted that "over 80% of the registered individuals" have completed the training (Dkt. 448 at 2), but all this means is that, over a year after being ordered to complete an initiative of their own, Defendants have still not complied. *See* Dkt. 450 at 2. As of November 3, Defendants *still* do not claim that the training is complete. Dkt. 454 at 4.

Equally serious, it was evident that the training (a 30-minute video) is inadequate and has not worked. graham's Report details ongoing abuse of Class members, and Plaintiffs' counsel hear the same every time they speak to a Class member. Defendants' Response to graham's Report was blasé: "[a]ll staff will continue" to receive the existing training. Dkt. 448 at 2. graham's October 19 non-compliance update then reported that "the Moss group is going to do a system wide survey to conduct a needs assessment" and Defendants say there is a "plan," at least at Logan, for "more training"—but "it isn't set." Dkt. 450 at 2. Defendants claim that an "updated statement of work" is in process which "will provide for additional staff training sessions" but provide no explanation of how many sessions, for how many staff, and at how many sites. Dkt. 454 at 4. Likewise, Defendants purportedly have a proposal for future work (which will include the "development of

16

training for the offenders" which the Court ordered over a year ago)—but as this is just a "proposal," it will only be "presented to IDOC" soon. *Id*. Of course a proposal does not need to be accepted, and Defendants have made promises about training before. In the face of ongoing abuse of Class members by Defendants' staff, neither Defendants' past conduct nor their future plans show "reasonable diligence."

### 2. There still is no Continuing Quality Improvement program.

In August 2021, the Court ordered Defendants to "[f]inalize and implement the CQI (Continuing Quality Improvement) program for transgender care" within 120 days (this was yet another "in progress" project that Defendants testified to at trial). Dkt. 384 at 4, Dkt. 354 at tr. 678. More than a year later, Defendants have not implemented any such program.

In their 120-day status report (Dkt. 368) Defendants assured the Court that: "The CQI tool for transgender care has been completed and distributed. *See* attached Exhibit 4," and also that Dr. Puga had started to deploy this "audit tool." Dkt. 368 at 3; *see also* Dkt. 414 at 4 (same). But Dr. Harris could find no sign of a quality improvement process at all:

> While reviewing the vast collection of documents,[7] it became clear that the Defendants have put effort into devising new policies and procedures to address the needs of the class, but *they have not yet developed a way to track their efforts and measure their successes or failures*. Without being able to gauge the effectiveness of their actions, they will not be positioned to modify and adapt to achieve their goals.

---

[7] The Court's orders as to the co-monitors also directed that Defendants provide Plaintiffs with the documents the monitors received. *See* Dkt. 370 at 8. Plaintiffs are unclear whether this has happened. Although Plaintiffs did receive data supplied to Dr. Harris, Plaintiffs' counsel are now not sure whether it is all the data, and it seems that julie graham received at least some documentary information, such as the "data" supporting training compliance, which Plaintiffs have not seen at all. Plaintiffs' counsel asked Defendants' counsel about this in connection with Plaintiffs' mid-October document and information request; to date, Defendants have not responded.

Dkt. 439 at 13 (emphasis added). Did Defendants abandon this process? Did they audit themselves and fail? All that is clear is that, here again, they have failed to comply with the Court's order despite earlier promises.

*       *       *

Defendants' Responses to the co-monitor reports radiate a lack of urgency. Faced with the catastrophic summary of their lack of compliance with orders that are, in most cases, close to three years old, they acknowledge only that they have "not yet achieved full compliance" but promise to "continue to work" towards that "goal." Dkt. 448 at 4. They bridle at the suggestion that Plaintiffs might have some "ideas," and say that they should just be left alone to work with the monitors. *Id*. At the same time, they sketch out only a few vague plans to address some problems reported by Dr. Harris and either ignore, quibble at, or systematically reject, virtually all of julie graham's recommendations—for example, a transgender navigator for the system is "something" Defendants "may consider" but is a "complicated matter" which they speculate will bog down in the State hiring process. Dkt. 448 at 3. Defendants' responses reflect a lack of respect for the monitors or any acknowledgement that their conduct to date has not demonstrated the reasonable diligence Class members need.

## II.    The Plaintiff Class Has Been Indisputably Harmed by Defendants' Failure to Comply with the Court's Unequivocal Orders.

There is little doubt that Plaintiffs have suffered and will continue to suffer as a direct result of Defendants' failures to comply. Indeed, "'[r]efusing to provide effective treatment for a serious medical condition serves no valid penological purpose and amounts to torture.'" Dkt. 186 at 33 (quoting *Fields v. Smith*, 653 F.3d 550, 556 (7th Cir. 2011)).

Throughout 2022, Class members have continued to report a wide range of harms because Defendants have not complied with the Court's orders. These range from indignities that cause

psychological humiliation, to serious physical harm including rape and attempted suicide. Plaintiff Sora Kuykendall, discouraged and profoundly depressed in Logan's D-Wing, rarely comes out of her cell. Lead plaintiff Janiah Monroe, long housed in D-Wing and currently in IDOC's new inpatient mental health facility, seeks transfer to the California prison system, where she believes surgery will come more quickly than here in Illinois.

These issues extend beyond the named Plaintiffs. Multiple Class members have complained about the lack of gender-affirming items in the commissary at various facilities, as well as the staff's dismissive attitude when they ask for specific items to be stocked. One Class member in the PRISM program, although she is a transgender woman, is only given male shirts and shoes. When she requests gender-affirming clothing, staff simply laugh in her face and dismiss her. Her mental health has suffered as a result. Defendants' failure to have searches conducted by officers of the appropriate gender recently allowed a male corrections officer to fondle the breasts of a transgender woman at the Joliet Treatment Center during a search. Class members who seek hormones from facility doctors continue to be rebuffed; one, at Big Muddy River, was even laughed at by the doctor who should have provided her with necessary medical care.

Other Class members are harmed by delayed hormone therapy, titration, and monitoring. One has repeatedly requested that medical staff adjust her hormones to bring her testosterone levels back into range, but her requests have been ignored. Despite the fact that her hormones were out of range, medical personnel recently let her testosterone blocker expire with no explanation or recourse. As a result of these failures, she has experienced severe emotional distress. She has made multiple suicide attempts, including one in which she ingested batteries. She has sought transfer to Logan for more than a year, but is told she can't transfer because her hormones aren't in the right range. For the same reason, Defendants will not consider her for gender-affirming surgery.

As monitor julie graham has said, Class members remain fearful for their safety and their lives. Dkt. 444 at 5. One Class member requested to transfer from Centralia to Logan in March 2022, but while she waited for the transfer, a male inmate repeatedly raped her over a period of three months. After she reported the rape, the staff at Centralia did not provide her with medical care or therapy, including refusing to give her an HIV test. In October 2022, Defendants finally transferred her to Logan where she feels safer because she is with women. Another Class member, isolated at Danville, where she believed she was the only transgender woman, sought transfer to Logan but was instead moved to Pinckneyville, where she lives in terror of her male cellmate.

## CONCLUSION

Over three years have passed and IDOC prisoners with gender dysphoria are still waiting for Court-mandated and constitutionally required health care. It is clear that Defendants have "not been reasonably diligent and energetic" in working to accomplish what this Court ordered. Faced with the monitors' reports of non-compliance and Defendants' responses with no real plan to correct it, Plaintiffs respectfully request that the Court (1) set this motion for hearing on the day of the status conference (December 15, 2022) and hold an in-person hearing on that date (Plaintiffs believe the monitors could participate by remote means); (2) find Defendants in civil contempt for failure to comply with the Court's orders; and (3) modify the injunction to have short deadlines for Defendants' compliance and reporting.

Dated: November 14, 2022                    Respectfully submitted by:

                                            /s/ Camille E. Bennett
                                            **Camille E. Bennett**
**Amelia H. Bailey**                        **Michelle T. García**
**Sam G. Rose**                             ROGER BALDWIN FOUNDATION OF ACLU, INC.
KIRKLAND & ELLIS LLP                        150 North Michigan Avenue, Suite 600
300 North LaSalle Street                    Chicago, IL 60601
Chicago, IL 60654                           Telephone: (312) 201-9740
Telephone: (312) 862-2000                   Facsimile: (312) 288-5225
Facsimile: (312) 862-2200                   *cbennett@aclu-il.org*
*amelia.bailey@kirkland.com*                *mgarcia@aclu-il.org*
*sam.rose@kirkland.com*

**Brent P. Ray**                            **Abby L. Parsons**
KING & SPALDING LLP                         KING & SPALDING LLP
110 N. Wacker Drive, Suite 3800             1100 Louisiana Street, Suite 4100
Chicago, IL 60606                           Houston, TX 77002
Telephone: (312) 995-6333                   Telephone: (713) 751-3294
Facsimile: (312) 995-6330                   *aparsons@kslaw.com*
*bray@kslaw.com*

**Thomas E. Kennedy III**
**Sarah Jane Hunt**
KENNEDY HUNT P.C.
906 Olive Street, Suite 200
Saint Louis, MO 63101
Telephone: (314) 872-9041
*tkennedy@KennedyHuntLaw.com*
*sarahjane@KennedyHuntLaw.com*

                                            *Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on November 14, 2022, I electronically filed the foregoing document and any exhibits with the Clerk of this Court by using the CM/ECF system, which will accomplish service through the Notice of Electronic Filing for parties and attorneys who are Filing Users.

By: */s/ Camille E. Bennett*