# Exhibit 3

**Facility Report**



# Monitoring Visit to Centralia Correctional Center 2022

# Table of Contents

Key Observations ........................................................................................................ 3

Recommendations ..................................................................................................... 4

Executive Summary .................................................................................................. 6

Staffing ...................................................................................................................... 9

Population & Housing ..............................................................................................12

COVID-19 ..................................................................................................................17

Hunger Strikes ......................................................................................................... 22

Healthcare ................................................................................................................ 24

Transfers from Pontiac MSU .................................................................................. 28

PRISM Program ....................................................................................................... 35

Educational Programming ...................................................................................... 47

Industries ................................................................................................................. 48

Discipline ..................................................................................................................51

Commissary .............................................................................................................. 56

Grievances ................................................................................................................ 59

# Key Observations

1.  Historically JHA receives fewer concerns regarding Centralia than many other prisons in IDOC; however, heightened COVID-19 restrictions, staffing, and commissary issues that plagued the entire system had not spared this prison, and there had been an uptick in hunger strikes in early 2022.

2.  At the time of JHA's April 2022 visit, Centralia had longstanding and serious healthcare staffing deficits, including key positions and 50% of allocations.

3.  Two months after the February 2022 mass transfer of 170+ people from the Pontiac Medium Security Unit to Centralia, people were still dealing with property, healthcare, and other fallout from the move, raising concerns regarding IDOC's preparation and communication.

4.  Need for increased productive opportunity was also a common concern.

5.  As disciplinary practices are changed, more tracking and reporting of progressive discipline use is needed to ensure desired reforms take hold.

6.  The novel PRISM program at Centralia for vulnerable individuals, including transgender people, began in late 2021. While it benefited from being perceived as a safer environment, it was not yet well-formed, likely in part due to COVID impediments and ongoing staffing issues.

7.  PRISM program eligibility criteria were not clear, nor was type of specialized programming offered, and participants reported very little programming available and lack of specialized mental health treatment for transgender individuals at the time of the JHA visit.

# Recommendations

1. STAFFING
   o IDOC should comprehensively evaluate staffing in light of the current population's needs to generate solutions that make best use of limited staff while increasing productive activity in prisons.
   o Healthcare and mental health staffing and needs must be considered by IDOC in placement and transfer decisions.
   o Increased transparency regarding IDOC staffing deficits and improved recruitment are needed.
   o We reiterate what JHA stated at the outset of the pandemic: IDOC must "Aggressively recruit staff because of anticipated attrition. Be proactive for anticipatable staffing shortages, particularly with healthcare staffing."

2. PHYSICAL PLANT
   o As IDOC concludes a contractual Master Plan review of its physical plant system, Illinois must invest wisely to better ensure health and safety, undertaking proactive maintenance and preventative planning.
   o Lessons must be learned from the transfer from Pontiac MSU, which highlights the importance of preventative maintenance as well as need for better emergency response planning.
   o JHA continues to advise additional camera coverage and review for safety and ability to investigate.

3. HEALTH & WELLNESS
   o More outside healthcare must be utilized if prisons cannot meet needs.
   o As JHA has stressed since the onset of the pandemic, IDOC should have consistent, public COVID policy to inform expectations, understanding that the novel conditions will require modifications.
   o We continue to urge IDOC to increase COVID booster availability.
   o Implementing Electronic Medical Records remains critical to care.
   o Time out of cell throughout IDOC must be increased.
   o IDOC should advance safety and humane respectful treatment throughout the system.

4. POLICY TRANSPARENCY
   o JHA continues to push IDOC to make all of its policies publicly available that are not restricted for legitimate security concerns.
   o We again advise that mail and publication rules be made available and if prohibitions are not made clear, people should not be sanctioned.

# Recommendations, cont.

- o Greater transparency regarding property rules is needed, as well as consistency of implementation and enforcement across prisons.
- o JHA again urges IDOC to increase public accounting for Inmate Benefit Fund and articulate its actual benefit for the population.

5. GRIEVANCE SYSTEM
   - o We repeat our recommendation that prison-level grievance data by subject matter and resolution be regularly collected, monitored, and made public.
   - o JHA continues to recommend review and improvement to the grievance system, including that response time should be shortened.

6. DISCIPLINE
   - o JHA continues to encourage IDOC to reduce use of isolation and monitor for use of progressive discipline.
   - o IDOC should revisit sanction categorization to better reflect and track use of discipline as policies are revised.
   - o We continue to recommend reconsideration of privilege grade restrictions, particularly restrictions on outside communications.

7. PROGRAMMING & SENTENCING CREDIT
   - o Greater clarity regarding the PRISM program is needed.
   - o All people in IDOC should be encouraged to further their education.
   - o Assignment criteria should be transparent and assignments should be reviewed to better address concerns regarding bias.
   - o IDOC should increase use of peer education and mentoring.
   - o Although some people are excluded from eligibility under the law, JHA again encourages IDOC to widely interpret and use discretionary credits.

# Executive Summary

The John Howard Association (JHA) visited Centralia on April 5, 2022. Centralia is a medium-security Illinois Department of Corrections (IDOC) prison, which housed 1,176 people at the time of the visit. Due to the pandemic, it had been some time since our last visit to Centralia. JHA aimed to resume a more regular monitoring schedule to review people's concerns, including heightened COVID, medical, and commissary issues over the prior months. JHA was also eager to see new developments at Centralia and speak with people involved in the novel Prison Rehabilitation & Identity Sensitive Mentoring or "PRISM" program (which includes transgender individuals), as well as to check in with other people who were abruptly transferred to Centralia from the Pontiac Medium Security Unit (MSU or farm) on February 9, 2022.



From JHA's April 2022 visit, onsite interviews, and review of PRISM program literature provided, it seemed that this program benefits from being perceived as a safer environment for vulnerable people, but was not yet well-formed likely in part due to COVID impediments and ongoing staffing issues. Eligibility criteria was not clear, nor was type of specialized programming offered, and participants reported very little programming available and lack of specialized mental health treatment for transgender individuals. Additionally, it was unclear why people who are discriminated against and the subjects of others' bias were the individuals in IDOC being trained regarding the topic and had to bear the burden of attempting to educate others. It seemed that staff should be better trained to keep vulnerable individuals safe and everyone should be treating others respectfully. An administrator tried to better explain the intent of programming such as training trans people regarding transphobia to JHA by stating it involves helping people to accept themselves and that one trans woman reported that the program increased her self-acceptance. They also noted the importance of having more comfort in the setting. JHA appreciates that Centralia generally offers a better setting than many others for vulnerable people in IDOC.

> The first participants joined the PRISM program at Centralia in December 2021. PRISM is described in program literature as a specialized housing unit "for diverse people in custody who historically have been the targets of peer abuse or stigma based on their identity, or others' perception of their identity," and "PRISM is a space for those who are invested in forming a diverse culturally sensitive peer-mentor community. … participat[ing] in producing peer education programming and acting as role models for positive change. It is an opportunity offered to residents who are willing to withstand the discomfort of addressing self-improvement, attitude change and community building while giv[ing] back to the community through team projects designed to address bias. The goal is to help participants grow in confidence, humility, [and] service-mindedness so they can be positive role models in and out of corrections."

The February 2022 mass transfer of 170+ people from Pontiac MSU was described by staff at Centralia during the visit as "*disastrous*," and two months later people were still dealing with property and healthcare fallout from the move. Prior to the visit, JHA had received concerns

from people who had been transferred from the Pontiac MSU and their outside contacts about the situation; JHA also had heard concerns from staff. From what JHA learned, it seems much about the transfer was not handled well and Centralia staff had to accommodate the influx of people with the prison's own limited resources, notably lack of healthcare staffing, which was an extremely serious concern at this prison.

Generally, Centralia is considered to be a better prison than many others in IDOC and JHA historically does not receive as many or as serious concerns regarding this prison. Staff described Centralia as "*functioning under the radar.*" Experienced JHA visitors commented regarding JHA's April 2022 Centralia visit that housing units and facilities seemed in comparatively good condition, and noted some incarcerated people reported adequate out-of-cell time, some positive comments regarding staff and food, and that we did not seem to hear as many of the typical concerns regarding living conditions that we commonly hear on other visits, although some people mentioned ants. For an example of a comparatively positive review, while not everyone agreed, one individual in custody opined that compared to other IDOC prisons staff at Centralia are more respectful and the food is better, but he was discouraged that he has not yet been able to get in educational programming, which is a common problem throughout IDOC, particularly for individuals who either have too little or too much time until their release, as only a small percentage of people (approximately 10%) are in educational classes in IDOC at any one time. There were several comments during this visit that reflected issues that relate to IDOC-wide policy and challenges, and were not specific to Centralia.

Centralia administrators discussed how the prison was implementing more of an incentive-based framework in line with Departmental philosophy shift. In addition to use of sentencing credits, they use jobs and special programming as incentives and said such opportunities were expanding. They noted that offering sentencing credits for group participation and work had also helped. Staff noted that just having something to do affects good behavior and that even those who are not eligible for sentencing credit often want to participate for the benefits of education, the ability be productive, or the possible effects on clemency consideration. Staff mentioned particular incarcerated people they knew who were subject to Truth-in-Sentencing terms and ineligible for sentence credits under law who participate and are positive members of their community, such as an individual who recognized having a GED will help when he is released, or someone who works as a law library clerk who likes to stay busy, and an artist who painted many of the murals around the prison, including in the gym and an isolation cell in healthcare

that was painted with a forest and mountain scene in shades of blue. Administrators noted that in the near past, people with longer terms had not been allowed to participate in much. However, looking further in the past, there was at one point much more productive activity made available to more people.[1]

# Staffing

At the time of the April 2022 JHA visit, the Warden had been at Centralia for about three months and was retiring at the end of the month. JHA visitors noted that lack of continuity in management is a recurrent issue throughout IDOC. Despite this Warden's short tenure, staff expressed that they felt positive changes had been accomplished by leadership within that period, which also coincided with some easing of COVID-19 restrictions after an increase of cases in late 2021 and early 2022. JHA heard some concern from incarcerated people during the visit about the Warden leaving because they also felt he was effective. Staff reported there had been swifter action to address issues and noted that in the past they felt that they could not receive answers from administrators or were just told things could not be done. There seemed to be uncertainty from staff about whether prison-level leadership had decision-making authority over some areas, or if some administrators were just making excuses not to take action.

The major challenge administrators reported for Centralia was staffing, particularly for healthcare, noting if they had the needed staff the prison "*would run like clockwork*." Centralia was reportedly down about 60 staff, but they had a new class of 20 correctional officers (COs) graduating the week of the visit from the cadet academy. At the time of the visit, administrators reported there were 480 authorized state positions at Centralia with 419, or 87%, filled. However, these numbers do not include consideration for the additional staff on leaves of absence (LOAs) at any point in time. JHA has received some concerns in 2022 from incarcerated people at Centralia about lack of appropriate staff presence, attentiveness or even sleeping, permitting bullying on units and other rules violations, resulting in safety concerns.

---

[1] IDOC officials were provided with a draft of this report August 15, 2022; draft review was conducted September 29, 2022 and written comments were provided by IDOC administrators to JHA on October 3, 2022.

**Nationwide corrections agencies report that recruitment is lagging the numbers needed to replace staff retirements, promotions, and attrition.** Illinois is comparatively fortunate in that unlike many states, IDOC positions are well compensated, and the prison population is down substantially. In July 2022, IDOC administrators shared that for security staff **system-wide they had a 27% vacancy rate for COs** (2,283), 13% for Sergeants (184), 12% for Lieutenants, and 7% for Majors or Shift Supervisors (16).  Centralia administrators noted that many of the restrictions on workers in correctional settings make hiring a challenge. For one example, staff cannot have cell phones inside prisons. In the current environment of competing employment opportunities, this is a problem for a significant portion of the recruiting pool. **JHA encourages IDOC to comprehensively evaluate staffing needs in light of reduced population and population needs and to generate solutions that make best use of limited staff while increasing productive activity inside the facilities.**

**Importantly at the time of the visit, Centralia did not have a doctor, Medical Director, or Healthcare Unit Administrator, and was soon losing their Director of Nursing. Further, Centralia had nursing and mental health staff vacancies exceeding 50% of the allocated positions**. These healthcare positions are a mix of both state and contractual. Data from IDOC administrators (which does not contain information regarding mental health staffing allocations and vacancies) reflects that as of March 21, 2022, Centralia had seven of 11 (64%) state non-mental health healthcare positions vacant and approximately 17 of 37 (46%) contractual Wexford positions vacant. Despite years long, ongoing monitoring by court appointed experts pursuant to litigation related to inadequate provision of healthcare, **across IDOC in March 2022 there was about a 46% vacancy rate for non-mental health healthcare positions**, with about 39% state healthcare positions vacant (197 of 511) and 49% (530 of 1079) Wexford healthcare positions vacant. Moreover, some of the most critical roles were unfilled. **At Centralia, given the February 2022 influx of people transferred from Pontiac including many older individuals with greater healthcare needs, and the needs of people in the relatively new PRISM program, the healthcare staffing issues were particularly concerning**. In April 2022, Centralia had 557 people (47% of the population) on the mental health caseload and 146 people (12%) who were identified as seriously mentally ill. **IDOC must proactively consider healthcare and mental health staffing and needs in placement and**

**transfer decisions. As the state has a duty to provide care for those in its custody, more outside care must be utilized if prisons cannot meet people's needs.**

Administrators and staff have offered valuable suggestions for improving recruitment including offering loan forgiveness, better expectation-setting regarding length of time for state hiring, and providing personalized outreach. Many other correctional agencies now offer substantial recruitment and retention bonuses. State leaders must be made aware of areas of required resources and staffing need, which is a compounding problem where understaffed prisons become even tougher work environments with more restrictive conditions for people who live there, with further negative outcomes for people who live and work inside.

> **JHA again advises** that IDOC be more transparent regarding staffing deficits and recruitment initiatives. As we recommended more than two years ago at the start of the pandemic, there is need for IDOC to "Aggressively recruit staff because of anticipated attrition. Be proactive for anticipatable staffing shortages, particularly with healthcare staffing."

Additionally, publicizing IDOC's efforts to improve conditions for people who live and work in prisons may help with recruitment as less crowded, safer, and more humane treatment-centered environments benefit everyone. **As IDOC concludes a contractual Master Plan review of its system, Illinois must invest more wisely going forward including better ensuring safety, undertaking proactive maintenance and preventative planning**. For one example of physical plant improvement with multiple benefits, the head of Mississippi's prison system noted that adding air condition to prisons was expected to have an additional benefit of helping with staffing.

Administrators stated that physical plant wish list items at Centralia included adding another generator, construction of a new clinical services-mental health office building with crisis cells, and climate control for programming, "as it is our feeling that programming can be further enhanced if the individuals are not distracted with oppressive heat in the summer while attempting to work on programming and schoolwork." They would also like for the whole prison to have air conditioning, noting that heat is often linked to other problems. Centralia reportedly also needed a new dishwashing machine because of age and cost of maintenance on the existing one.  When JHA visited the dietary area, staff there said they had maintenance needs including an area without proper cooling, and they noted there had been issues with the boiler that had affected their operations. An administrator explained that the recent water heater issues at the prison were tied to the boiler and they had difficulty obtaining parts; however, in addressing the issue they had ensured they had back up parts on hand going forward. Administrators stated that they had replaced most heating elements in the water heaters and were also upgrading the fire alarm systems. Lastly, they suggested converting a housing unit to become ADA compliant in order to accommodate wheelchairs and meet other needs. Given the aging prison population, this is a sound suggestion. Administrators stated that the consultants contracted with for assessment of IDOC facilities and development of a Master Plan had been onsite.

# Population & Housing

Centralia was opened in 1980, consisting of 14 housing units arranged in three housing unit clusters. Administrators explained that Centralia did not have any special housing areas other than the PRISM program, Restrictive Housing (RH - formerly known as disciplinary segregation), and a Receiving Unit, generally used to house people coming into the prison. The prison also has a 15-bed healthcare unit. At the time of the visit, there were eight people housed in RH, spread out on different wings. One general population housing unit housed a

concentration of incarcerated workers who worked in dietary or Illinois Correctional Industries (ICI).

JHA spoke to someone who was housed in Receiving who was going home in a few months, who appeared to be so housed to avoid conflict in general population in sort of a protective custody (PC) placement, although PC only formally exists in maximum-security prisons in IDOC and is much more regulated. **JHA supports this consideration of this person's safety but encourages IDOC to do more to ensure concerns regarding other housing are addressed.** This individual wanted to be able to work on the Receiving unit as a porter so that he could continue to earn sentencing credit.

People with pending transfers out of Centralia were also housed in Receiving, in addition to people coming into the prison. Staff and administrators reported that prior to early 2022, there had been no disciplinary transfers from Centralia in two years, reportedly due to IDOC COVID restrictions. They stated there had been 30 people waiting to transfer from Centralia and they had been able to transfer out 21 of them in two months. Public reporting shows zero transfers from Centralia in January 2022 and 49 in February, which would include both disciplinary transfers and lateral or positive transfers. This was one major area where staff noted appreciation of the Warden's action. However, as JHA noted in our 2021 Sheridan report, during much of the pandemic movement between facilities was highly restricted and many people across IDOC were waiting excessive periods, often in unduly restrictive and punitive conditions, for transfers. It was unclear what action or pandemic condition change permitted movement for disciplinary transfers to eventually resume. The Receiving housing area was also used for individuals in custody who were COVID positive on a separate wing. Previously in the pandemic when there were more positive cases in the Centralia population, housing units were used for quarantine.

JHA spoke with someone in Receiving who had been recently transferred to Centralia from Dixon who reported he did not know he would be transferred, did not want to be moved, and did not think he should be housed at Centralia because he had been disciplinarily transferred from there in the past. He said property of his had been taken including photos, magazines, and hygiene items, and that he was ticketed for possessions of "hot shots," or commercial nude photos, but said he had none and had filed a grievance.

JHA's understanding is that commercial images of nudity but not penetration are permitted in IDOC, but we commonly hear that nudity is censored and were not able to review relevant policy as requested. IDOC administrators clarified that non-commercial (personal) nude photos are not allowed because of potential conflict and inability to verify age. **JHA again advises that mail and publication rules be made available and if prohibitions are not made clear, people should not be sanctioned.** Additionally, many people want greater information about transfer policies within IDOC especially as rules have been modified further limiting people's ability to request transfers.

In draft review administrators provided Centralia's October 1, 2022 orientation manual and a September 2, 2015 memo, which they stated remains in effect, stating that "effective immediately" Centralia (not IDOC) will not allow purchase of nude, semi-nude, or scantily-clad photos and that after September 18, 2015 such items will be considered contraband and people will be subject to discipline. The only search result JHA could locate in the orientation manual relating to nudity pertained not to mail, but to the rule that "open display of nude images" is prohibited. It is unclear to JHA if the 2015 memo issued at Centralia reflects IDOC-wide policy and how people newly transferred in may have been expected to have seen it. IDOC's webpage FAQs just say no mail that is "obscene" or dangerous.

Prior to the COVID-19 pandemic on February 28, 2020, Centralia housed 1,265 people. In April 2022, Centralia housed 1,176 people, representing about a 7% decrease in population over the pandemic compared to about a 22% population reduction from 37,731 to 29,198 in IDOC's population overall. At Centralia in April 2022, 7% of the population were reported to be 18-25 years old, while 23% were over 50. Likely largely showing the influx of individuals from the

Pontiac MSU transfer, public information from IDOC's population datasets shows that between December 31, 2021 and March 31, 2022, Centralia's population increased from 1,068 to 1,179 and the median age at the prison increased from 37 to 39, which was also the current median age for all of IDOC (which has also been increasing). This data also shows that at the end of 2021, about 20% of Centralia's population at that time (212 people) were 50 or older, while at the end of March 2022, about 23%, or 268 people, were over 50. Notably of the people over 50 at Centralia, 31% (66 people) were 60 years old or older at the end of 2021, and 35% (95 people) were 60 or older at the end of March 2022, likely showing the effect of older individuals transferred in.

At Centralia, 29% of the population was reported to have less than a year left to serve, 12% had one to two years, 21% had two to five years to serve, 13% had five to eight years, 13% had eight to 20 years, 4.9% had more than 20, and 2% had Life. This projection of time left to serve from IDOC notably does not include possible eligibility and application of sentencing credits, including programming or contractual credits and discretionary credits. Using data visualization tools JHA has developed from IDOC's public datasets it appears that at the end of March 2022 approximately 520 people (44%) at Centralia would be potentially eligible (e.g., not be statutorily excluded from eligibility) for Earned Discretionary Sentencing Credits (EDSC). At the end of March 2020, prior to the efforts to depopulate prisons during the pandemic largely effectuated through greater use of sentencing credits, 55% of the Centralia population (698 people) were EDSC eligible. At the end of March 2022, about 50% of the Centralia population had Truth in Sentencing terms requiring them to serve 85% or 100% of their sentence, compared to 42% of the Centralia population in March 2020.



*Image: JHA's data visualization tool showing EDSC eligibility for Centralia's population vs. all other facilities*

As of April 2022, more than 50% of the Centralia population was committed to IDOC custody from Cook or the Collar Counties. The racial makeup of the population was reported to be 54% Black, 30% White, 14% Hispanic, and 1% Asian. Nearly 77% of the population were identified by IDOC as having some sort of security threat group (STG or gang) affiliation. About 10% of the population was committed for Murder convictions, 38% for Class X felonies, 13% for Class 1, 19% for Class 2, and about 20% for Class 3 or 4 felonies. 55% of the population was classified as medium-security while 45% was minimum.

At the time of draft review for the instant report, IDOC administrators reported that as of September 29, 2022, of the 1,274 individuals housed at Centralia:

- 51.2 % were committed to IDOC from Cook or the Collar Counties.
- The racial makeup of the population was 56% Black, 29.3% White, and 14% Hispanic.
- 70.6% were identified as having a STG affiliation.
- 8.4% were committed for Murder convictions, 35% for Class X felonies, 14.2% for Class 1, 21.1% for Class 2, 11.6% for Class 3 and 9.6% of Class 4.
- 59.7% were classified as medium-security and 40.3% were minimum-security



# COVID-19

JHA has heard from many prison-level administrators that during COVID they felt hands were tied regarding operational decisions at their prisons, as many protocols were being set by IDOC's Office of Health Services (OHS). As stated at Centralia, with IDOC COVID protocols many facility-level administrators feel they are "*just following directions.*" An administrator stated that COVID-19 had "*wrecked normalcy,*" but explained how communication was key to mitigating issues that could otherwise result in more negative consequences including violence or unnecessary suffering.

At the time of the April 5, 2022 JHA visit, administrators reported that over the course of the pandemic, the prison had had 383 staff COVID positives and 667 positives in the population. Two individuals in custody at the prison had reportedly <u>died from COVID</u>, one Black man in his 60s in October 2020 and one White man in his 60s in November 2020. While Centralia had not reported any staff COVID fatalities, people noted that it was widely known in the community that a recently retired staff member who was not vaccinated and had other health conditions had died due to COVID, as well as some of his family members. One individual in custody was positive at the time of the April 2022 JHA visit, and six were quarantined. There had been a recent surge in cases in the population that peaked at 46 positives. Administrators stated that most (estimating 90%) of the recent positive cases of COVID at Centralia were asymptomatic (both staff and incarcerated people), and that people felt like they should be able to still do things because they did not feel ill. They stated that mitigation measures, including increased testing, had been effective to bring the case numbers back down. However, there was no offered explanation for the source of the recent outbreak of cases. IDOC has been testing only

unvaccinated people during regular surveillance testing, and only testing everyone under special circumstances. An administrator stated that at an IDOC minimum-security prison, Vandalia, which has dorm housing, they had been able to test the entire housing unit at once when someone tested positive, so they could quarantine everyone who was positive right away. However, this was not approved at Centralia because it has cells. JHA appreciated seeing that Centralia administrators shared memos to the population explaining various COVID restrictions in place over time.

IDOC reported as of April 29, 2022 for Centralia that staff headcount for all staff (including correctional staff) at Centralia under the vaccine mandate was 477, and 318 staff were fully vaccinated, or 67%. Five staff had the first shot only, and the percentage fully vaccinated plus first shot only was 68%. **150 Centralia staff, or <u>31%</u>, were considered currently <u>not eligible</u> for the COVID vaccine** and the discipline process for not complying with the vaccine mandate or applying for an exemption had started for five (1%), and this discipline count includes IDOC discipline as well as notice to contractor Wexford to initiate discipline for staff. Reasons staff may be counted "not eligible" by IDOC include having a pending or approved medical or religious exemption, staff have a doctor's note saying they cannot be vaccinated until a specific date because they recently had COVID, or that the staff are on leave. 85 Centralia staff reportedly had a booster, or 17.81%. **The total vaccination rate for IDOC staff statewide with one or more shot as of the end of April 2022 was 78%. Statewide booster percentage for staff was 21.8%.** Of the IDOC prisons, Shawnee had the lowest level of staff vaccination of 55%, with 42.93% considered not eligible. <u>Illinois Central Management Services</u> is charged with reviewing vaccine exemption requests for IDOC employees, and contractors review exemption requests of their employees. There was not much movement regarding these numbers as of October 2022. JHA will continue to request updated statewide vaccination and exemption data.

As of April 29, 2022, IDOC reported Centralia's individuals in custody population was 1,234, with 894 or 79% vaccinated. 459 were boosted, or 40.47%. Overall, the vaccination rate for people in custody of IDOC was 73%. The total IDOC population percentage boosted was 42.3%. **JHA has been urging IDOC to increase booster availability.** In October the number of people incarcerated at Centralia who were vaccination or boosted had improved but booster rates were still low. In December 2021, someone at Centralia wrote to JHA that he had requested a booster but that on the day they were offered, he did not receive one. One person reported to a JHA visitor during the April JHA Centralia visit that they had requested vaccination

in January but had not received it; however, others reported that the vaccination process had been easy.

Regarding COVID protocols and restrictions, the Warden noted when he started at Centralia in early 2022 people were being let out of cells two cells at a time and observed that this meant they were not offering much out-of-cell time with 100 people in the area and that this was a stress on everyone. This was modified first to five cells or 10 people being out at once. At the time of the April 2022 JHA visit, people were no longer under these COVID restrictions. Administrators stated at the time of the visit, they would just quarantine the cell of someone who tests positive and the cells on either side of it and not the whole housing area. JHA notes that this practice seems to have been approved by OHS on a prison-by-prison basis as individuals at Illinois River reported during a late-June JHA visit, that policy had only recently been modified to allow this practice there. **JHA has stressed since the onset of the pandemic the importance of having consistent, public COVID policy to inform expectations, understanding that the novel conditions may require frequent modifications and updated communications**.

At Centralia, administrators stated that they gave recreation to people in quarantine, which they noted relieved pressure of being locked behind solid doors in small cells. JHA appreciated this awareness. Again, administrators stressed communication and said that they put out bulletins to tablets and the institutional tv channel, as well as hard copies. They stated that although people had to buy tablets, most had them.

> During draft review, Centralia administrators informed JHA that as of September, of the 1,274 individuals in custody, 858 or 67.3% had GTL tablets. Some people interviewed on the visit seemed to greatly value having tablets, although JHA again notes that many incarcerated people want greater tablet functionality, e.g., additional features enabled.

> During the visit, JHA spoke with someone who had been incarcerated for many years who reported he thought COVID had been handled okay at Centralia and that they had been able to come out of their cells two to four hours a day, and now they can sometimes be out all day. He reported that he knew people were locked up all the time at some of the other prisons.

Lastly, administrators also reported that tension went down when they went to 10-day COVID quarantines from 14 days based on updated CDC guidance, noting the extra four days was "*dog years*," for people locked in cells, especially over the weekend.

At the time of JHA's visit, Centralia administrators reported that with their current COVID protocols people could eat in the dietary area again. People were able to go to the barber. They had increased from 25 to 50 people on a yard at once. Yards were offered daily by housing unit for intervals of just 45 minutes instead of an hour, so people could wipe down weights and other equipment in between groups. The weights on yard were mentioned as a positive about Centralia by incarcerated people. During the pandemic many prisons did not permit use of weights. Administrators wanted to get people newer weight equipment. Night yard was reportedly offered starting on March 28, 2022, increasing opportunities for industry workers to attend yard time. People were still being advised to wear their KN-95 masks outside.

The gym was also back to use since the end of February for recreation for 50 people, who were still expected to mask and social distance. The gym also continued to be used for COVID testing. An administrator noted that they would like to see the carpeted gym floor replaced, noting that as a 40-year-old institution, Centralia is showing its age. Although not ideal, the gym carpet looked in fairly good condition, compared to what JHA has seen in some other prisons. Centralia was trying to have more open-air activities and administrators mentioned their Leisure Time

> Administrators shared that they sometimes had to authorize overtime for staff to be able to run yard and noted that they had 12 staff working overtime on the day of the visit. JHA appreciated that administrators seemed to take seriously the importance of recreation opportunity to overall well-being and smoother prison operation.

Services (LTS) activities included things like cornhole, volleyball, no touch football, and three-on-three basketball tournaments.

Administrators reported that Centralia just started working on going back to full capacity in programming. Capacity in the chapel for religious services had been increased from 10 people to 30 and administrators noted that Alcoholic Anonymous volunteers had returned. They also noted that at the time of the visit they were sending 10 people at a time to shop at the commissary instead of bag shopping and delivering commissary to housing units, which takes more time.

> During the visit, JHA interviewed someone in the Receiving unit who had recently transferred to Centralia from another prison. He expressed that he felt IDOC COVID protocols did not comply with current CDC guidance. At his former prison, he said incarcerated people were told that getting vaccinated would create more freedom or fewer restrictions, but he lamented that the gym there was closed for two years and there was no yard, unlike what JHA was told was current practice at Centralia. Again, JHA has observed inconsistency over time and across prisons due to changing COVID protocols or quarantines that have been very restrictive and difficult to predict and track due to lack of public comprehensive information.

Another noted improvement in COVID restrictions was that people's visitors, who have been required to be vaccinated or have an approved exemption since January 30, 2022, can now hug the incarcerated person regardless of whether the incarcerated person is vaccinated. JHA observed murals throughout the prison created by incarcerated people, including in visitation where there was a child-friendly mural with cartoon animals. Visitation tables had Plexiglas dividers and at the time of the visit a woman with a tiny baby was visiting a man in custody who was observed to be leaning around the Plexiglas to be able to communicate with his visitors. JHA questions the utility of these limited physical barriers; however, we have not yet heard any plans to change such restrictions despite the visitor vaccination and masking requirements that are in place. Administrators acknowledged that they had some complaints regarding hearing difficulties with the dividers, as JHA has heard at several prisons, and said that they could seat people further apart from others to try to make it easier to hear.

During the pandemic use of technology for outside communications has increased, notably through electronic messaging and video visits facilitated through vendor GTL devices. During the visit, JHA received some concerns from individuals in custody that there were delays in receiving messages and one person shared that his female visitors are made uncomfortable on video visits when male staff check them in and reportedly make them stand up to look at what they are wearing.

# Hunger Strikes

Centralia administrators acknowledged that there had been an uptick in hunger strikes in late 2021 and early 2022 resulting from a combination of concerns relating commissary, healthcare, and COVID practices. While again, these have been common issues observed throughout IDOC, public reporting shows that for December 2021 and January 2022, Centralia had 24 and 25 recorded hunger strikes, which was high for the prison and some of the highest recorded numbers for those months in IDOC.

During this period JHA heard from people reporting heightened concerns and stress of COVID lockdowns, lack of healthcare, and commissary at Centralia. Someone wrote to JHA from Centralia in December that "*I declared a hunger strike, then and only then did I receive my property. Hunger strikes are a big issue here right now. As that is the ONLY way to achieve what should be already done per staff. There are inmates on hunger strike right now because staff won't allow them to be seen by a doctor.*" Someone wrote JHA about a loved one at Centralia, "*He is being punished again… I have called the warden on multiple occasions and have never received a call back! My loved one was having major anxiety and I was concerned for his mental health! I called the mental health professional and they did go down to speak with him but after the one visit there was absolutely no follow up! The Sargent said that no one would come back and speak to him because they thought he was trying to "manipulate" the situation!*"

Someone shared with JHA a grievance regarding treatment during late 2021 COVID administrative quarantine lockdowns at Centralia that had lasted weeks at the time of writing, that states "*We are subjected to cruel and unusual punishment: no exercise; extremely limited*

*communication with our family and loved ones, only being allowed to come out to use the phone for 20 minutes every other day; and some of the staff who work always seem to cut the 20 minutes short and force us back inside of these cells; in between the days that we don't have permission to use the phone, we get one 10-minute shower every other day. …We never get to clean out our assigned cells during quarantine. … All this so-called quarantine is is a way for the Administration authorizing the staff to mistreat us causing mental, physical and emotional harm. I am fully vaccinated, and I have taken the booster shot… there's no way that I should be treated as though I tested positive for COVID 19. I follow the mask mandate and try to stay as clean as possible…. We're only allowed to shop at commissary every three weeks, with an extreme limit… Even the chowhall staff has been sending us spoiled food to eat… [he reports health complications including constipation, nausea and acid reflux]… I am being solitary confined for 23 hours and 40 minutes a day on certain days and 23 hours and 50 minutes a day on the other days…. No exercise or fresh air…. I am not trying to rot and die in prison."*

JHA also received a report in January 2022 that someone incarcerated at Centralia had reportedly been prevented from engaging in a hunger strike who wanted to protest his conditions but was told by a supervisor that if he did, he would be ticketed and lose his job. IDOC's policy regarding management of hunger strikes is not publicly available, however, the policy states that when a person declares a hunger strike staff must notify the Warden and write an incident report. Threatening someone with discipline would be inappropriate. His loved one wrote JHA *"[he] was simply practicing his right as an American to peacefully protest."*

The Warden who started in January 2022 stated that he had been able to resolve many hunger strike issues by talking to the individuals involved, noting he had worked 39 days straight without a day off and that the COVID protocol changes over time had relieved pressure. As <u>JHA has reported</u>, commissary provision has major impacts on people's wellbeing in prison and administrators noted that a large commissary delivery in February 2022 also brought tension down. They eliminated privilege <u>grade</u> level restricted shopping and increased the spending limit once there were supplies. They also explained that for a while under IDOC COVID guidance, they could only let people in two cells out at a time, meaning that people got very little time out of cell. When they could let more people out at once again, this helped increase out-of-cell time and improved morale. Staff acknowledged that lockdowns cause people to act out, and this can particularly be the case when people who are seriously mentally ill are isolated. **JHA has continually stressed the need to prioritize and increase time out of cell throughout IDOC.**

# Healthcare

Contractual healthcare vendor Wexford is responsible for staffing the majority of the healthcare positions at Centralia. At the time of the JHA April visit, Centralia did not have a doctor at the prison; a doctor from another prison was reportedly onsite two days a week. There had been no Healthcare Unit Administrator for eight months and the Director of Nursing was leaving. Additionally, there was no Medical Director at Centralia at the time of the visit. While the prison was allocated 12 nurses, they only had seven with one was on a leave of absence.

Centralia was also reportedly authorized for eight state Correctional Medical Technician (CMT) positions, which is a licensed practical nurse (LPN) role, and had four. During draft review, nearly six months after the visit, Centralia administrators reported that as of September 29, Centralia was authorized for eight LPNs and has four on staff; however, one was on an extended leave of absence. The facility had posted the vacant positions on three different occasions for two weeks each time and received four applicants. Three applicants declined the position when offered; one accepted, and was in background review for hiring at the time of draft review. Centralia was awaiting the remaining vacancies to be posted again.

> JHA received a letter from someone at Centralia in April 2022 that stated the doctor who provides some coverage at Centralia *"does everything he can to deny us outside hospital care and proper medical treatment"* and reported the outside doctor's orders were being not followed.

At the time of the April 2022 JHA visit, Centralia did have a physician's assistant start in February and they were working on catching up on physical exams that were past due. Administrators stated that they sent people for outside care as needed.

Administrators commented they had been close to hiring another healthcare staff person, but the person declined the offer. The main response regarding the reasons for staffing shortages from IDOC was that Wexford was having a difficult time finding people to fill open positions as healthcare providers are in great demand and the positions are not as desirable as others due to factors including better pay and work schedules elsewhere. Also, Wexford was reportedly missing leadership positions, which was perhaps further hampering recruiting efforts. Like other IDOC prisons, Centralia had used supplemental contractual temporary nurses during the

pandemic. Administrators noted the tensions between full time nursing staff and temporary staff because the temporary workers typically are paid more and cannot be mandated to work overtime, noting "*existing staff are exhausted by mandates.*" JHA visitors were told by staff that some nurses were working 16-hour shifts. Some noted nurses elsewhere could work just three days for 12-hour shifts at a hospital instead. Additionally, the prison was on "crisis status" with healthcare vendor Wexford, because of the nursing deficit allowing them to have Wexford nurses from other prisons come work there. One person incarcerated at Centralia who reported several healthcare concerns commented in a March 2022 letter to JHA, "*this place goes through nurses like you would not believe.*"

For mental health staffing, Centralia reportedly had two qualified mental health professionals but is supposed to have four. They were also reportedly short one behavioral health technician. In total, administrators reported that they had four mental health staff for a population of 1,176, with 47% on the mental health caseload, and were short at least as many at the time of the visit. Administrators reported that the PRISM program is overseen by a social worker (who has other caseloads), and a regional mental health provider was reportedly onsite regularly to assist with the program and required reporting.

When JHA visited Centralia's healthcare unit, staff noted backlogs but said that things had improved. **Staff noted that the transfer of people from Pontiac MSU increased their older population and that seven men had been sent back to Pontiac for continuity of care** because they were receiving outside treatment in Chicago. **Staff also noted that some of the people transferred to Centralia should have had medical holds.** Lack of electronic medical records (EMR) continues to be a serious concern and although under the consent decree in the *Lippert* class action litigation regarding healthcare in IDOC requires adoption of EMR; IDOC has not yet been able to enter into a contract. In July 2022, IDOC officials reported that they had attempted to award the contract for EMR but that there was a protest from an unsuccessful vendor that needed to be resolved. Staff again note that EMR would help tremendously in providing a continuum of care for transfers and outside treatment.

Because Centralia did not have a fulltime doctor onsite, people had to be sent offsite for more minor issues such as stiches, bone setting, and treating sprains. Administrators stated that telehealth was used but that 90% of the time, if someone goes to telehealth, they end up going for outside treatment. The number of off-site emergency room visits and medical furloughs are

publicly reported monthly by prison. While JHA was pleased to hear that people needing care were reportedly being sent out to receive it, this can be an inefficiency given the security demands of sending people for outside care. Additionally, we continued to hear reports that there were delays and continuity of care was lacking with outside visits.

For dental issues, the new dentist explained he was busy dealing with a backlog of emergencies and that it would be a while until he could get to more routine dental needs. Waitlists reported were four months for non-emergent extractions, 20 weeks for dentures, 22 months for fillings, and 23 months for cleanings. **The dentist reportedly had 600 visits and had done 96 extractions in March.** Staff stated the amount of pain an individual in custody was in determined how quickly they were seen. Materials provided to JHA state that previously during the pandemic in February 2021 there was a backlog of 6 months with 127 people waiting for dental extractions.

When JHA inquired, Centralia administrators were not aware of having had any recent visits from any of the court-appointed healthcare monitors in the *Lippert* litigation around healthcare and/or *Rasho* litigation regarding mental health provision in IDOC, although staffing numbers are likely regularly reported for these cases. They noted that due to low medical staffing they were not proceeding with American Correctional Association (ACA) accreditation at this time, noting that this had been postponed twice due to concern regarding their ability to properly prepare files for review and that it was thought that they would fail.

In January 2022, JHA received a letter from someone at Centralia who reported they could not get a response from medical regarding a recalled CPAP machine. Someone else incarcerated at Centralia sent JHA a medical grievance where the Grievance Officer found in the person's favor stating that he *"sent this grievance to the Health Care Unit multiple times and has received no response. This Grievance Officer is unable to substantia[te] that Centralia C.C. HCU and Wexford Health Sources have provided appropriate care. Wexford Health Sources, the contracted provider, is failing in their responsibility to provide Medical Care for Centralia C.C."* The person writing had still not received care and was looking to pursue a lawsuit. JHA is pleased to see a resolution that seems fair and notes the rarity of a medical grievance resolved in someone's favor; however, the lack of subsequent action is concerning.

In February 2022, JHA received a letter from someone at Centralia with an attached emergency grievance regarding lack of medication renewal, and he stated nothing had happened and he had been out of medication for several days. He writes there had been no assigned doctor at the prison in the six months he's been at Centralia. Further he stated that there had been no nurse sick call since December because of COVID outbreaks and the nurses were not conducting sick call on the housing units. He explains that someone else had to go on a hunger strike to be seen by medical. He writes in the grievance describing his medication need that he requested the renewal over a month prior and "*I cannot go "cold turkey" off of [it]. It can cause heart attacks and strokes.*"

A few incarcerated people commented that they felt medical care at Centralia was okay. However, in addition to repeated reports about lack of access to healthcare, notably from the people transferred from Pontiac MSU, JHA received some reports that a few named nursing staff were disrespectful. Unfortunately, such manifestation of frustration is common for overextended staff.

> JHA spoke with an incarcerated man during the April 2022 Centralia visit who reported that he saw a doctor in early March. He was prescribed a medication but had been waiting over a month to get it, and that no matter what his medical complaint was, the nurses just told him to drink a lot of water. He also has hearing loss and reported that he had difficulty getting batteries for his hearing aids. IDOC is also under a settlement agreement in the Holmes litigation pertaining to hearing accommodations that requires in part that IDOC provide people with auxiliary aids and services necessary for effective communication, which explicitly includes batteries for hearing aids.

> JHA spoke to someone in the healthcare unit waiting area who said it had taken him eight days to be seen for chest pain and that he was told by staff to put in for sick call instead of having this treated as an emergency. He said his lawyer had called the prison and he felt that was the only reason he was being seen.

# Transfers from Pontiac MSU

JHA spoke to many men during the April 2022 Centralia visit who had been transferred from Pontiac MSU (or "farm") in February who reported medication or other healthcare issues that were unresolved in the months after their transfer. As noted above, staff reported that six or seven people were quickly sent back to Pontiac due to medical need, and that some people should have had medical holds preventing their transfer. Centralia staff also noted that the influx had increased their population who are older than 50, which is often considered elderly for incarcerated people due to the prevalence of healthcare issues in the population. The impact of this population change was emphasized both during interviews on the visit and by data regarding the population shift.

During the April 2022 visit, JHA visited a housing unit where many people who had been transferred from the Pontiac MSU were housed, as well as speaking with some people who had been transferred in elsewhere in the prison. Additionally, both Centralia staff and staff at Pontiac during JHA's subsequent May 2022 visit to that prison recounted some of their experiences of the February mass transfer. Centralia administrators were frank that there were many issues with the transfer and grievances pending.

Public reporting shows that in February 2022 Centralia received 269 transfers into the prison compared to 24 in January 2022 and the more typical 134 in August 2022 before the intensified COVID restrictions in fall 2021 during Omicron early waves. Typically transfers into the facility would not occur all at once or all from the same

JHA was provided with compiled data regarding grievances filed at Centralia in 2021 and first three months of 2022 showing 3,187 grievances were recorded under various issue areas over 15 months, however, this compiled information did not permit observation of trends over time or grievance response time or resolutions. One man wrote JHA from Centralia in March 2022 that he had filed a grievance four months prior without response. He grieved that he had not been allowed a bottom bunk permit at Centralia when he had been assigned a bottom bunk due to healthcare needs while in jail and while on a writ at Stateville. **JHA recommends prison-level grievance data by subject matter and resolution be regularly collected,**

prison. The same public reporting shows that in February 2022 Pontiac transferred out 200 people and transferred in 11.

At Centralia, staff told JHA from their perspective the transfer was done on very short notice. Centralia administrators stated that although they did not have much notice, they at least got everyone clothes, mattresses, and housing. People in custody were reportedly transferred from the Pontiac MSU with "*the clothes on their backs.*" Centralia administrators stated that they were notified around noon that people were being transferred there from Pontiac MSU. People gave varying accounts of there being five to seven buses of people sent from Pontiac. Centralia staff reportedly received 171 individuals in custody in less than 12 hours with the last bus coming in at 1:30am. JHA received prior reports from various sources including staff, incarcerated people, and loved ones who said people were being transferred until even later, after 3am, which may be a result of general confusion or explained by the fact that some people were immediately sent back to Pontiac. Staff felt that no one at Centralia knew to expect the influx of people, and they did not think the executive-level staff knew either. **This transfer experience raises the need for and importance of increased and improved communications along with better emergency response planning**, **regardless of whether or not the instant transfer was in fact based on emergent need.**

Individuals in custody are typically not told when or where they will be transferred for security reasons. People incarcerated at the Pontiac MSU were given a short amount of time to pack up, and multiple people in custody who were transferred and spoke with JHA at Centralia stated that they were informed that they were being moved with only 1-2 hours' notice. Some men said they were told that they had to immediately pack as a judge had ruled the MSU had to close because of asbestos and mold. Some people reported that they were transferred from Pontiac MSU between 8pm and 1am. The drive between the prisons is approximately 190 miles, which typically takes about three hours and 15 minutes.

There was broad consensus among individuals in custody, staff, and administrators at Centralia that **Pontic staff did not inventory people's property** prior to sending it to Centralia, so that staff there did not know what property a person should have been transferred with. Although property was inventoried by staff when it arrived at Centralia, people could not demonstrate what may have been lost or broken because of the lack of inventory at the Pontiac MSU origin.

Many people reported that their property was lost, stolen, or damaged during the transfer. For example, one individual in custody stated that a lot of his food was gone, and he did not know whether it was stolen or confiscated, and that for the first two days at Centralia he did not have shower shoes or toothpaste. Another man reported that his tablet got cracked during the transfer. One man said over $500 worth of his books were missing. **Some people reported that they did not get their legal property.** Several men also reported that their money in their trust fund at Pontiac had not transferred or was delayed; for example, someone said it took three weeks to get his funds at Centralia, while another reported it took a month and a half. This would mean even if they were given opportunity to shop at commissary, they would not be able to purchase anything without these funds.

People also reported that items they had purchased at the commissary at Pontiac were confiscated as contraband. This commonly occurs when people transfer between prisons because of historical differences in commissary offerings across prisons and over time. Some of the transferred people also reported that Centralia staff were conducting shakedowns of their cells and were spending "*an hour in room with door closed,*" taking items reportedly previously approved at Pontiac with no opportunity to send items home, or without giving forms for shakedowns and confiscated property, as is supposed to happen. Some men who had recently transferred from Pontiac MSU reported that they were ticketed for improper storage of property, and that they pointed out they were storing materials per Administrative Directive (AD or IDOC policy) and were reportedly told, "*we don't follow the administrative directive.*" **Again, greater transparency regarding rules and consistency of implementation and enforcement across prisons is needed.**

People also reported they had to wait two weeks after the transfer to be able to shop at Centralia, and when they finally got to commissary, there were a lot of items that were unavailable, as has been the case throughout the ongoing commissary disruption within IDOC. For example, one man said that post transfer there were two to three weeks where they had limited soap and that there was "*nothing on commissary,*" as discussed further in that section below of the instant report.

Centralia administrators published a memo to the population more than a month after the mass transfer on March 24, 2022 entitled "Personal Property Issues-Pontiac Transfers/Population," which stated that "Individuals in Custody will need to file a grievance with their respective counselor regarding damage to their personal property in transit for consideration for replacement. The Counselors have been instructed to ensure these grievances are treated expeditiously. Be guided accordingly. We will ensure that you receive a response in a timely fashion."

As discussed above, the transfer resulted in numerous claims for missing property. At Centralia during the visit, JHA was told that special procedures were being used to resolve property claims, including review of recent commissary purchases at Pontiac to see what they could show that people may have owned. Administrators at Centralia stated that they got permission for individuals in custody transferred from Pontiac MSU to be reimbursed at 75% of the value of lost property up to a $50 dollar threshold and that people could appeal their property grievances if they disagreed. Reimbursing at a fractional rate for items lost due to IDOC's error and lack of care in inventory and moving people's possessions, and relying on a lengthy and ineffective grievance and appeal process to get people relief does not seem equitable. JHA was told the money for this reimbursement would be funded from the Centralia's Inmate Benefit Fund (IBF, which is funded by profits from commissary) and then reimbursed from Pontiac's. **JHA questions the propriety of using IBF funds for this, and again urges IDOC to increase transparency around IBF and actual benefit for the population.**

Another difficulty faced by some of the men who were transferred to Centralia noted by administrators was that some people with hearing issues were transferred from the Pontiac MSU without their audio equipment, such as tactile watches, and some had to see an audiologist. They noted some people do not want an evaluation, just the watch. Administrators stated that control room officers are trained and report notifications to tactile watches for movement, which are audited to ensure they are properly used to notify people, which seems to be good practice.

Many men moved from Pontiac MSU commented about healthcare problems. JHA also spoke with some people who reported all or part of their medical records were missing, such as

missing x-rays, blood tests, or prescriptions. One man said his medical records were "*lost 55 days.*" **Again, JHA stresses that EMR are critical to improving care.**

Multiple people reported they were told that the waitlist to see a doctor at Centralia was 700 people-long, or commented that you have to be having a medical emergency to get treatment. Some people reported that the doctor from Pinckneyville was onsite only once or twice a month. Other men reported that at Centralia there was no eye doctor and no mental health staff, and that healthcare was "*nonexistent.*" One man reported that he is diabetic and was supposed to be going to a chronic clinic, and although he had been submitting medical request slips since he arrived in February, he still had not seen a doctor in April. Further he noted it took him 35 days after the transfer from Pontiac to get his pills and he was told the delay was because of how they were transferred. Another person reported waiting over a month to get medication relating to his blood platelets. Many people commented that healthcare staff at Centralia were not continuing their medications that they were on at Pontiac.

An older individual who was transferred explained that when he got to Centralia, he was put on a different medication than what he had been taking at Pontiac, and that he had previously had a prior bad reaction to that substituted medication. Another person reported that he could not take a substituted medication because of liver surgery. Another older individual reported to JHA that he has high blood pressure, COPD, and asthma as well as diabetes and was also on pain medications for his legs. He too had trouble getting various medications. When some of these issues were brought to administrators' attention by JHA, they indicated they would be addressed. However, **given that the transfer had occurred nearly two months prior to the JHA visit, it was disappointing that so many issues remained unresolved. Given Centralia's healthcare staffing deficits, such difficulties were foreseeable.** Additionally lack of EMR and use of paper medical records means that patient history is not easily reviewable.

One man who had transferred from Pontiac felt that staff at Centralia were not responsive to his healthcare concerns and attributed this to racism or laziness, describing their conduct as illogical and disrespectful, stating staff "*play games*" and "*talk any way*" to people in custody and that one had said "*FU*" to him in denying help. He felt staff were dismissive in telling people to file requests and that people could get a response only if they were belligerent. He stated he wanted a transfer. In contrast another man expressed to JHA that Centralia is in general great compared to Pontiac; however, the one problem he has is that at Pontiac he was on pain

medications to help him sleep since he has had spinal cord surgery and also has arthritis, and that he was taken off this medication when he got to Centralia with the explanation that "*we don't give pain medication here.*" Many people reported lack of pain therapy at this prison, and this is a common issue within carceral settings. Another man reported that he had been on pain medication for seven years but was just given Tylenol after transferring to Centralia.

Another issue raised by people transferred from Pontiac MSU related to Centralia being unprepared for their mass intake was that the men who transferred in from Pontiac did not get a facility orientation or rulebook for Centralia until about a week after arriving. Some people told JHA that they were incarcerated close to home at Pontiac but were further away at Centralia. Some transferred men shared that they felt at Centralia they were housed in small cells not meant for two people. One man reported that the housing unit had pests and on the day of the JHA visit just one cell had been treated. A few people reported that ants came into their living areas through vents and although an exterminator came some people were not satisfied with the timeliness or thoroughness of the response.

One man transferred from the Pontiac farm reported issues there including only having cold water, as well as bad food and the presence of mold. JHA had received similar complaints from other people housed in the MSU in the period prior to the transfer. Another man who was transferred from the MSU stated that there had also been no hot water on his housing unit at Centralia, observing this was the same as at Pontiac MSU, although he noted it had been fixed at Centralia. He commented that IDOC prisons in general were "*all ragged.*" Centralia administrators also commented regarding the water heater issues and shared memos with JHA including a March 6, 2022 memo to the population acknowledging issues, stating repairs were underway and asking for people to continue to report observed problems and a March 24, 2022 memo to the population stating that repairs had been made, thanking people for their patience, and informing them that additional parts had been ordered to ensure they have replacements on hand in case of future problems. **JHA commends this effort at more proactive maintenance going forward and respectful communication.**

The official reason for the transfer from the Pontiac MSU was reportedly a problem with the water system, but there was skepticism as to whether that is the real reason from staff and incarcerated people. Later JHA was again told by IDOC administrators that lack of hot water and related failures of a heating system necessitated the rapid transfer. Some people felt that

the transfer was an undisclosed part of IDOC's plan to reorganize the prison system. While IDOC had plans to close part of the maximum-security housing at Pontiac, JHA was not aware of any efforts to close the farm. Some people felt that IDOC was attempting to address staffing issues at Pontiac by closing the MSU. Some staff expressed that they felt IDOC created a reason to transfer people in Pontiac MSU because they wanted to shut the unit down, commenting that lack of hot water is not an uncommon issue endured in prisons and physical plant issues were longstanding, suggesting it was not emergent to move people to Centralia.

Concerningly, multiple transferred people reported that aspects of their classifications became more restrictive on transfer, for example, someone wrote JHA that "*All inmates transferred from the Farm in Pontiac to Centralia are receiving a higher security level, blue ID, plus all their medication is changed!*" During the visit some people raised that they had gotten their identification card color changed from white to blue, indicating a higher escape risk. One man in this situation stated that he had not had a ticket in 36 years. He reasonably did not understand how if nothing changed about him, why he was reclassified. He later wrote JHA, "*I have a clemency pending and now they changed my ID to blue. That doesn't look good in a clemency. … I have worked hard to keep my nose clean. My counselor and social worker and Warden [at Pontiac] granted me my white ID. … I was a clerk in Pontiac.*"

At the time of the visit, Centralia had 37 people, or 3% of the population, identified as moderate escape risks. While the IDOC policy regarding escape level designation, Administrative Directive 5.5.110, is supposed to be publicly available, it was not yet available on IDOC's webpage as of July 2022. **JHA continues to encourage IDOC to make all policies available that are not purposely restricted for legitimate security concerns.** People at Centralia also reported that they could not get copies of their IDOC master files to help them resolve issues they were having since the transfer. A new law effective January 1, 2023 should permit people greater access to this information.

In addition to finding out about people's unresolved issues from the transfer, JHA also asked people transferred in general how their experiences at Centralia were comparing to Pontiac MSU and received mixed responses. Some people were generally positive, other than expressing healthcare issues, and some shared that staff treatment or time out of cell at Centralia was okay. One person who transferred from Pontiac MSU noted that at Centralia the food is good, but the commissary situation was very bad. Another incarcerated person JHA

spoke with reported that at Centralia the COs are good, the food is okay, and even the medical care is okay. He reported that he was getting out of cell time from 8am until 11am, three hours a day. However, he reported had he had requested another transfer because he "*doesn't like the atmosphere*" at Centralia. Another man who had transferred from Pontiac MSU felt that treatment by staff at Centralia was worse, noting "*COs have to go behind the wall,*" meaning that IDOC staff who typically deal with people  housed in maximum-security (largely behind solid walls in IDOC), like those at Pontiac, sometimes are better at dealing respectfully with incarcerated people because they appreciate that they will be together for a longer time, or perhaps have a healthy fear of the population reacting violently to being treated badly. One man who had experienced various difficulties on transfer reported that he had been there 60 days and felt there was "*nothing better*" about Centralia. In general, the way this transfer was conducted did not set incarcerated people up for a smooth transition or give staff at Centralia much chance at success in absorbing the population without issues.

# PRISM Program

A colorful pamphlet that was created to recruit participants from other prisons for the "Prison Rehabilitation & Identity Sensitive Mentoring" (PRISM) program states: "The PRISM Program uses a self-contained Housing Unit Cluster at Centralia Correctional Center. This provides a safe space for diverse people in custody to be their true self. … PRISM aims to foster a gender and race affirming "space" where LGBTQ+ and other bullied individuals in custody will create peer education on the topics of: Racism, Transphobia, Heterosexism, Islamophobia, Sexism, Neurodiversity Bias. … Join other PRISM peers with building a better culture in IDOC. … The goal is to help participants grow in confidence, humility, and service-mindedness so they can be positive role models in and out of corrections. … Prism has groups, restorative justice work, and LGBTI+ affirmative 12-Step Programming." Administrators confirmed during draft review that this pamphlet is in all IDOC facilities' Mental Health Departments and is made available to individuals in custody on request.

It appeared from the literature and participant handbook that PRISM is intended to be a therapeutic community model, as is used elsewhere in IDOC for substance use disorder treatment, but it did not appear particularly formalized on the living units. The participant

handbook's voluntary participation agreement also states, "this is a behavior modification program that requires I change my unhealthy behaviors and criminal thinking."

Prior to the visit, people within IDOC had described the PRISM program to JHA as being special housing for transgender or other vulnerable people. IDOC is required under court order in the *Monroe* litigation, regarding treatment of transgender people in IDOC, to create special housing. However, the PRISM program is not exclusive to that population. On the day of the Centralia visit, JHA was told that there were in total 157 people identified as transgender in IDOC's population, housed at various prisons. While it would be legally questionable to force transgender people to be housed together to ensure their safety absent a court order, it is permissible for there to be a voluntary opportunity and concentration of resources. Nonetheless, transgender people in custody will continue to have a variety of security classifications, treatment needs, possible interpersonal conflicts, and program interests, necessitating different types of housing while **IDOC continues to have a duty to ensure the safety and proper medical treatment of all people in custody throughout the system**.

> IDOC Administrative Directive 04.03.104, Evaluation, Treatment and Correctional Management of Transgender Offenders (effective 4/1/2021) states:
> "The Department seeks to foster an environment where all offenders, including transgender, intersex and gender incongruent offenders, are living in a dignified manner with full respect of their right to be free from discrimination, harassment, victimization, bullying or violence whether emotional, physical or verbal. The Department seeks to meet the medical, mental health, transition and security needs of all segments of the population."

IDOC has two committees that make decisions regarding the treatment of people who are transgender, intersex, "gender incongruent," or diagnosed with gender dysphoria. The Transgender Administrative Committee (TAC), co-chaired by the Chief of Operations and the Chief of Psychiatry, makes "safety and security" decisions, such as housing. The Transgender Health and Wellness Committee (THAW), chaired by the Agency Medical Director or Deputy Chief of Health Services, reviews medical and mental health care. Committee reviews involve

"case-by-case determination." Policy requires review twice a year of placement and programming assignments "to review any threats to safety experienced or posed by the offender." Some factors per policy considered in assignments are any prior violent or sexual criminal history and compliance with medical and mental health treatment plans.

LGBTQ+ people are incarcerated at a higher rate than those who are heterosexual and cisgender. In particular, LGBTQ+ women are overrepresented compared to free world population percentages. LGBTQ+ people are also more frequently subjected to sexual abuse and harassment while incarcerated. Historically isolation was commonly used to provide LGBTQ+ people with a "safer" environment. Now there is wider recognition of the harms attendant to use of isolation.

**People who are transgender must be housed with serious consideration of their own feelings of safety** under the federal Prison Rape Elimination Act (PREA), and the gender of staff used for physical searches must be considered on a case-by-case basis. JHA has received reports of various difficulties experienced by trans women housed in male prisons in IDOC. Notably, during a November 2021 JHA visit to Dixon, there were no non-administrative level female staff willing to search trans women, limiting their ability to partake in movement (e.g., for visitation) if they were unwilling to be searched by male staff. JHA believes this staff unwillingness reflects lack of proper staff training. PREA Standard 115.15(f) requires that the agency train security staff how to conduct searches of transgender people in a professional and respectful way. IDOC policy also requires that "All staff shall participate in transgender, intersex and gender incongruence training during Pre-service Orientation Training (PSOT) or Pre-service Corrections Training (PSCT) and annually thereafter as developed by the Training Academy in conjunction with the Office of Mental Health." **JHA staff have requested to observe this specific training but have yet to be allowed to attend.**

During draft review Centralia administrators reported that as of the end of September, all Centralia staff currently working at the facility had completed Transgender Training, which is a half-hour video training. There were 11 Centralia State of Illinois staff on long-term leaves of absence who had not completed this training, and a process had been established for these staff to complete the training on the first day returning to work. There were also nine contractual (Wexford) staff who are "As Needed-PRN" who had not completed the training and if these staff were called in to work, a process had been established for these PRN staff to complete the

training on the shift they are utilized. Certification of completion of the training is tracked. IDOC also reported that statewide by the end of September about 90% of IDOC staff working in prisons had completed the training, noting that about five percent of staff are on leaves.

Administrators at Centralia informed JHA that the PRISM program had a capacity in April 2022 of 50 people, each of whom would be single-celled. The first group of 15 people assigned to the PRISM program started on December 8, 2021. Since the inception, more people have entered the program, and administrators reported that at the time of the April 2022 JHA visit there were 27 participants, with 25 individuals identified as transgender. As of the end of September during draft review, administrators reported there were 27 participants in PRISM, of which 24 were identified as transgender. Shortly prior to JHA's April Centralia visit, four people had been removed from the PRISM program, reportedly two for sexual misconduct and two for fighting. Administrators stated that generally people who are removed will go back to where they transferred into the program from if they came from another prison, but if they came into the program from another housing unit at Centralia they could be transferred to another prison. People who leave the program by choice or due to disciplinary removal reportedly can reapply after six months. Administrators noted that they had someone who signed out of the PRISM program and went back to Centralia general population who reportedly wanted to be back in, but the required wait time was not up yet. JHA noted and appreciated that administrators at Centralia were good at using correct pronouns or not misgendering trans women, which is not always the case within prisons. Administrators stated there had been a departmental directive on use of pronouns and that incarcerated people who were trans now had this indicated on the back of their ID cards.

At the time of the visit, the participants in the PRISM program were housed on different housing unit wings, which participants reported did not mix, although they wanted to. There may be some participants who have "Keep Separate From" (KSF) orders from others, but the rationale for lack of overlap between the housing areas was unclear. The PRISM housing units were decorated with postings and murals, as is more typical of programming-focus units in IDOC.

The PRISM housing unit reportedly had an additional security staff member assigned, with three instead of two as in Centralia's other general population units, which house at least twice as many people (100) at full capacity, and a Sargent was also assigned to the PRISM housing unit. JHA was informed that there were ongoing union bargaining regarding the PRISM program

because it is considered a change in working conditions. The details or concerns regarding this were unclear, although it was mentioned that the union wanted additional supervisory staff assigned. Staff and administrators, as well as program materials, indicated that further expansion of this program is contemplated.

**During JHA's April 2022 Centralia visit, administrators, staff, and PRISM program participants interviewed had some difficulty articulating who was intended to participate, or the screening criteria to get into this new program, or what exactly the program might possibly entail, including duration.** Additionally, administrators commented that no one knew what the PRISM program participants were going to do after they finish the program, but they did not think they had to leave the program when they were done. Again, the expected duration or method of completion for the program for participants was unclear.

Although this lack of clarity raised concerns, it is not unusual for new initiatives within the Department or population transitions to take more than six months to take hold. Transitions have also been severely impeded during COVID. Also, as mentioned above, staffing at Centralia was problematic and JHA did not have opportunity to interview staff at the prison or IDOC level who are in charge of the program during the visit. **We hope as the program becomes more established, we will be able to get a better, more well-informed impression, but since this is a novel and potentially helpful program for vulnerable incarcerated individuals, we felt it was important to check in early with people participating.**

A proposal for the PRISM program, which was shared with JHA by a participant and not by IDOC officials, lists that PRISM is for trans, intersex, and gender non-binary or conforming people; gay, lesbian or bisexual people who have difficulty adapting in general population; people being victimized due to lower intellectual functioning; people with Autism or those who are highly socially awkward; people perceived by staff to need extra supervision due to Prison Rape Elimination Act (PREA) screening or factors relating to them being targeted for bullying or abuse due to atypical adaptive functioning; people who did poorly in Protective Custody due to negative peer behavior; or "Prior history of physical or sexual victimization due to identity-related status, including hate crimes outside of IDOC." People will be precluded from participating according to the proposal if they are designated in IDOC as a predator without an administrative or multidisciplinary team recommendation for an exception, or if they are screened to be

discriminatory or violence-prone to protected groups. That is, to participate in PRISM and educational programming regarding such issues, they are already pre-screened to have "low prejudice/discriminatory attitudes toward LGBTI, radial differences, religious differences and those with serious intellectual disabilities or Autism."

While some participants interviewed reported they were satisfied with the idea of the program in general, the substance of the program appeared not to have been worked out yet, including what classes are to be offered. Some people in the program liked the idea of participating mostly because they were able to "*be around people like ourselves*" and said there was less bullying. Another person in describing their decision to participate stated she "*Came for a safe place as a trans woman to be with other trans people,*" but she did not like that "*access* [to a safe place] *is tied to programming.*"

One person stated that they were transferred from another medium-security prison where they reported that trans people could not have jobs, and they hoped that program participation might be a pathway to being able to get a job. It was unclear whether work assignments were being denied at the other prison because of perceived vulnerability, but it did not sound as recounted as if the prison was making case-by-case individualized determinations or attempting to accommodate people appropriately. Another issue may be that people with sex offense convictions (as was the case with this individual) often have difficulty getting assignments within prisons, although it does not seem to be an official IDOC policy to deny them.

Several people who were in the PRISM program reported that prior to transfer they really had no idea of what the program would be like. They thought there would be group sessions for discussion and "*homework*" of some sort. They thought that it would last 12 weeks but had no idea of what would happen then. Participants wondered and worried about whether after they completed the program they would be sent back to their transferring institutions, and several people stated they do not want to be sent back. One individual JHA spoke with had a projected release date in less than 12 weeks.

Another person who seemed better informed and was very familiar with the *Monroe* court orders, stated that mental health staff at their prior prison had shared program materials as they were developed and stated they thought that they would be "*living and breathing the program,*" but after the transfer they are still not clear regarding "*What's the program?*" They also thought healthcare staff working with them would be trained regarding <span style="color:red">WPATH</span> standards, but some believed that some staff working with them lacked basic credentials, e.g., licensure, let alone specialized credentials. One person recounted that they had told mental health staff at Centralia that they were happy to talk to someone who specializes in transgender treatment and the provider laughed. Some people felt that there had been a "*bait and switch*" regarding the programming available, or felt that promised specialized mental health treatment had not been made available.

> Another participant's primary concern was that they entered the program anticipating receiving good time program sentencing credit for participation, but to date no good time had been awarded, and they had not signed contracts. This person felt they are just in limbo and feared this would result in being incarcerated longer than they should, even if they eventually receive the good time. As of draft review, administrators reported that all 27 PRISM participants have sentence credit contracts for good time while participating in the program and stated that they will receive credit for prior participation from the time they entered the program.

At the time of JHA's April visit, some newer PRISM participants reported that they had only had two days of programming since they arrived or that they have programming for only 45 minutes one day a week. Other people who had been in the program longer told JHA that they had not had much programming either. Some echoed that over the prior three weeks they had had programming just one day per week. Some people described the programming they had as addressing racism or transphobia, and some said during February for Black History Month they had talked about implicit bias. Some people commented that they did not find the programming they had thus far to be particularly relevant to being trans, as it all had been related to racism. Moreover, **people reasonably did not understand why they need anti-bias programming when they are the ones being discriminated against.**

As of September 29, 2022 in draft review administrators reported that programming for PRISM included a regional Psychologist Administrator conducting an Educational Group Therapy one day a week from 12:00pm- 2:00pm; self-help programming groups Monday-Friday 8:00am-2:30pm, including topics such as Art, Mediation, AA, Anger Management, and Game Nights; and that beginning the week of October 17, 2022 administrators reported a Behavioral Health Therapist (BHT) will conduct a Psycho-Educational group regarding Relationships and Interpersonal Coping Skills every Friday, with two sessions, one from 10:00am-11:00am and the second session from 11:00am-12:00pm. JHA was pleased to hear that programing sentencing credit has been made available and that there are reported to be more offerings.

In discussing the issue of who needed anti-bias training during the visit debrief, administrators commented that they had Diversity, Equity, and Inclusion (DEI) training provided by IDOC that was good and helpful, but that it was not yet more widely available or mandated for non-administrative staff. They thought it should be. They appreciated getting to have open dialogue and talk about all type of stereotypes in the training, noting that this affects everyone and people have stereotypes about people who work in corrections or live downstate. An administrator mentioned for example that people from Chicago think of everyone south of highway I-80 as a southern stereotype, "like they are from Kentucky." JHA's understanding is that this training was supposed to be for all staff and the population and implemented years ago, although there may have been some COVID delays.

During draft review, administrators reported that all IDOC staff are now required to complete DEI Training by November 1, 2022. They report that this training is in partnership with the Department of Human Rights Institute and Development, that the training course is 90 minutes in length, and completion is tracked. Administrators again gave this training very positive reviews.

One positive observed and commented on by people in in the PRISM program was that they were able to be out of their cells most of the day. People said that being able to have open dayroom was a positive and that they are able to use the phone. They leave the housing unit for dietary, yard, and commissary. Some people in the program commented that they eat at the same time as some of the incarcerated men in general population at Centralia and that they had not had any problems with other individuals in custody yet. One trans woman said she sometimes gets catcalls from them, but she did not consider it a problem. During the visit, some

cisgender individuals reported to JHA that they believe more unfair discipline is occurring because trans individuals' presence who "*provoke*" them, but it was unclear what was meant by this. When asked negative things about the prison, one person stated there was "*discrimination against trans inmates from straight inmates.*"

Notably, no one in the PRISM program expressed to JHA visitors that they felt unsafe during the visit. However, one trans woman said that she did not ask to come to the PRISM program, and that she wanted to be housed at Logan, a female prison. Administrators stated such decisions are made by the special committee. Some incarcerated people shared that they were grateful to be in the PRISM program and felt safer. They liked having a single cell. Single-celling often is reported to improve quality of life. JHA was also told that one individual in the program had written "*hundreds*" of grievances; as this person was not specifically identified to us, to our knowledge we did not have the opportunity to interview that individual.

Some individuals in the PRISM program commented that their activities were monitored more closely than in other housing units, that there were more cameras, and that they felt this was not fair. JHA generally supports use of comprehensive camera coverage in prisons for purposes of security enforcement and transparency. However, the objection from the PRISM program participants seem to relate to perceiving being treated differently than others. People stated that some staff are "*nit picking*" them. Participants pointed out how there are yellow lines on the floor referred to as "*no no zones,*" such as around the shower, which people are not supposed to cross. People felt that they were being treated differently by having these sorts of rules that did not apply in general population. While taking steps to offer people greater privacy in shower areas may be welcome elsewhere in prisons, this was seen as further sexualizing or imposing additional rules or potential discipline on people for their identity when it just was applied for those in PRISM. There was a tension between recognizing the potential vulnerability of some people in the programming and treating them as trusted peer leaders. **In general, it seemed some people just want to be safe and treated equally, and that creating special segregated populations, programs and parameters may not always best meet this need**.

JHA was pleased to hear from some people in the PRISM program that the COs on their unit were "*amazing*" and "*go out of their way to help*" them with problems. When asked good things about the prison, one person stated that "*the guards in the trans unit are very respectful*" and

another stated that the "*guards are humane.*" Someone who had transferred to the program from Big Muddy reported they "*Love it here.*"

However, several people commented that when they leave the unit, they are targeted by other COs, who are looking for reasons to ticket them. Reportedly some COs outside those assigned to the PRISM program at Centralia "*bully*" and "*try to provoke*" them. Some people shared that they felt that some Centralia staff do not want them there.

It is common for trans people to be ticketed for gender expression in prisons. One example of this that JHA heard from a trans woman in the PRISM program at Centralia was that she was told her shirt was too tight by staff and she had to replace it. The ticket was for altering, but she stated she had not altered it. She noted that men wear shirts just as tight but did not get in trouble for it.

> A trans woman told JHA that she had experienced discrimination and bullying from other individuals in custody because of her gender identification at two other IDOC medium-security prisons. Examples of this included not letting her have access to the phones and interference with her laundry. In contrast to those experiences at other prisons, she felt there was discrimination from staff but not from other incarcerated people at Centralia.

Another issue raised by some people in the PRISM program was that some staff at commissary reportedly would not sell them things, such as makeup or undergarments, and call them degrading names, e.g., "*fag.*" These concerns were uniform and specific and were raised to administrators. One person expressed that they feel staff at Centralia is finding ways to retaliate against the program being there, giving commissary as an example and being given ill-fitting "*big panties.*" One trans woman commented that it was sometimes hard to get makeup on commissary and staff would claim to be out, but she wonders who they are selling to or how they could be selling out because there were not a lot of women at Centralia. Administrators later stated that they were still waiting on an order of makeup.

Other people in the PRISM program commented that they are often told that they cannot shop and the commissary is out of things, but they see other people leaving commissary with those things. It was unclear if this was further evidence of discrimination or was related to the

unpredictability of commissary supply. Some people commented that they had not yet been to commissary since being in the PRISM program. Other individuals in the program had opportunity to go to commissary while JHA was visiting on the unit.

People in the PRISM program also expressed concerns about other issues that were commonly reported at Centralia relating to supply issues and healthcare. Some people in the PRISM program reported that on the morning of the April 5th JHA visit they had been given milk that expired on April 1st and tasted sour; they showed JHA visitors a carton with the expiration date on it. Other people in the PRISM program reported they thought that the food generally was pretty good. People in the PRISM program also reported that they had encountered a delay in getting their medications. Deficits of healthcare and mental health care staffing at Centralia raised concerns particularly for treatment of people who may need closer medication monitoring, although treatment for some people in the program should at least be regularly monitored through statewide THAW committee reviews. One person reported that they had not been seen by a doctor or physician's assistant when they transferred in December 2021 to Centralia, and that they were not seen by a doctor until late January 2022. Another person who had been housed at Centralia prior to being in the PRISM program stated that they had been waiting 55 weeks to see a doctor. One trans woman reported she went to the emergency room and was prescribed antibiotics and pain medication, but Centralia only filled the prescriptions for the antibiotics. She reported having difficulty getting her medical information including the ER discharge papers and prescription, which she reported made it hard to file a grievance regarding the issue. **IDOC commonly does not follow the prescriptions of outside providers, considering them recommendations, not orders.**

Someone else reported at other IDOC prisons they had been able to see their medical chart but that this had not been allowed at Centralia. JHA wonders if this is due to inadequate staffing. Typically, in IDOC people can request copies of their medical records and the first 50 pages are free with some charge for copies assessed for excess pages. JHA also received a letter from someone in March 2022 at Centralia that stated he had been asking for copies of his x-rays and medical records for three months and had no response. People also can sign medical releases to enable outside contacts to access that information.

As noted above, it was still unclear whether program completion was contemplated and what might come next. According to the PRISM proposal document, which JHA is not sure is a final

or official, discharge criteria from the program would include voluntary attrition; RH placement for a major disciplinary behavior; being "Found no longer in need of placement due to lack of cooperation with unit rules and expectations" (JHA notes that need for placement seems totally unrelated to whether someone might be cooperative); scheduled reassessment, minimally annually, including the participants perception of safety and needs and desire to remain in the program; recommendation by a healthcare provider due to healthcare or mental healthcare instability; recommendation by staff working in the unit due to disruptive behaviors, which may be appealed; transition to other programming; or legal court order.

**JHA shared with Centralia administrators that after visiting the program unit, we were left with basic questions regarding what the program is and who it is the program serves.** They acknowledged that they were waiting on staff to be able to improve the program. One administrator commented that they need to treat everyone with respect, stating "*It's 2022 not 1975*," and acknowledging that others outside the PRISM program in IDOC need a class on acceptance. Staff representatives reported although they also wanted better staffing for the program, they want it at Centralia and think it is beneficial.

After the visit, JHA received a letter from a former participant who had been removed from the PRISM program reportedly because a relative of a victim of her offense worked at the prison. This individual was now housed at a minimum-security prison, suggesting that her behavior had been good enough to earn a reduction in security. However, she was now housed with men and had concerns about being able to use the facilities privately, as is required under PREA. She wrote of her desire to return to the program "*My ability to effectively socially transition as a transgender female has been severely limited. This was the primary reason the PRISM program was created – to provide a safe living environment in which we could socially transition. … I never received a single disciplinary report. To the contrary, I was a leader who was held in high regard. I invested in bettering my own life while also affirming the positive changes I saw in others. … My simple goal is to return to the place that allows me to better myself while encouraging growth in those around me.*" **JHA will continue to monitor this program and the treatment of vulnerable individuals throughout the system.**

# Educational Programming

In public reporting for February 2022, IDOC reported that there were at total of 55 people in educational programming at Centralia, or about 4.5% of the population. 27 individuals in custody at Centralia were in Adult Basic Education (ABE, generally for those with a Test of Adult Basic Education (TABE) score below a sixth-grade equivalency), 10 were in Advanced ABE, eight were in Adult Secondary Education (ASE or GED-level), and zero people were enrolled in vocational programming, which historically typically included Career Technologies, Commercial Custodian, Construction Occupations, and Culinary Arts classes at the prison. Unique to IDOC prisons, vocational programming at Centralia is offered by neighboring Kaskaskia College.

In line with IDOC's efforts to transform vocational programming and opportunity within prisons to better train people for desirable workforce opportunities, JHA notes that since our visit Kaskaskia posted a job for an HVAC instructor at Centralia, and there was a news story regarding a new warehouse program. During the April 2022 JHA visit, we were told renovations for these programs were underway.  However, at that time, Centralia administrators explained that the vocational programs were at a standstill, as during much of the pandemic, and did not offer packet work as was used by general education programs during various more restrictive phases of the pandemic with quarantines. People also reported there was interest in having more Commercial Driver's License training available.

Administrators also noted that they recently had a period with only two educational teachers for a population over 1,000. At the time of the visit there were four teachers and waitlist numbers for programming were expected to improve with this and increased COVID capacity in classrooms. During much of the pandemic classes were limited to 10 or fewer students due to attempts at social distancing. Staff commented that Centralia had at one point in the past six educators, but reportedly after one retired in 2016 and another in 2019, they had not been able to replace them. They reported they had staff who were qualified to be Temporarily Assigned as educators, but they had been unable to get that approved. JHA asked about the feasibility of having some increased peer education or mentoring and tutoring, and some staff stated that they did not want the state to sidestep its responsibility and there might be security concerns with giving individuals in custody authority over others. Staff noted that individuals in custody often wanted to get into classes because they could get sentencing credit and that they allowed people to retake the TABE and some of people could then test into higher level classes.

**Allowing retests and more advanced opportunity is good practice. Students should be encouraged to further their education and not to remain and take up needed space in remedial programming due to lack of other available programming or sentence credit opportunity.**

JHA again spoke with several people in custody at Centralia who reported that they wanted more programming and for it to be made available to people who have longer terms remaining on their sentences.  In draft review, administrators stated that Centralia offers programming for individuals with longer sentences including peer educator positions teaching Civics Classes or assisting with facility orientation through the Clinical Services Department, and participating in the "Soaring Program" where individuals complete one-on-one tutoring through the Academic Department.

People commonly reported lack of programming was a negative for them about Centralia during the April visit. One person shared he had been on an educational waitlist five years. Another man reported that he cannot go to school because he had too much time; however, he shared that his case was being dismissed because he was one of the individuals who was tortured by Chicago Police Commander John Burge. While JHA has no way to confirm this, it is a good reminder that people sometimes are released earlier than their projected outdate and that providing more programming at the outset would best help people build skills and be prepared for release. **Operating from a scarcity mindset where limited programming spots and positive opportunities are reserved for few people with short terms misses opportunity to improve prisons and individual outcomes**. **Additionally, JHA has long supported increased use of peer education and mentoring as an untapped resource within IDOC.** Administrators acknowledged that the policy prioritized people within three years of release for programming and stated that they need more educators.

# Industries

JHA visited Centralia's Illinois Correctional Industry (ICI or industry) area. There was a new <u>CAT simulator</u> onsite, as JHA has observed at several prisons post-pandemic, but it was not yet operational. Industries at Centralia consists of recycling and a "knit shop" which makes clothes for people in custody and staff, as well as things like shower curtains, mattress covers, and

suicide blankets. Materials provided to JHA state that Centralia on average recycles 50 tons of cardboard, six tons of paper, 13 tons of cans and nine tons of plastic, in addition to wooden pallets. The supervisor mentioned that one of the most valuable experiences in ICI is potentially earning a forklift driver certificate, which provides good employment opportunity post-incarceration.

Generally, ICI assignments are some of the more desirable ones within prisons, in part due to sentence credit award eligibility and higher pay, which can help decrease the dependence incarcerated people have on their families or outside supports or help those who lack any outside supports have a more comfortable existence in prison. **ICI jobs can award day-for-day sentence credit for those eligible under law as opposed to half a day awarded for other job assignments, and people can make more than a dollar an hour as opposed to less than a dollar a day**. Materials provided to JHA at the time of the visit stated that about 70% of the approximately 40 people with ICI assignments at Centralia were eligible for sentencing credits. JHA spoke with someone at Centralia who mentioned that he had transferred to Centralia to have the chance to participate in ICI. At many of the prisons JHA has visited since COVID, ICI is no longer running, employing fewer people, or the direction of future production remains unclear. At the time of the visit, the Centralia Warden noted that with IDOC resuming ICI operations, instead of having it be more of a separate entity, this is now falling under different budgeting including for maintenance, equipment and supplies and that money for repairs was an issue.

In draft review, administrators provided an ICI update that in June, Centralia's current Warden modified the hiring criteria to provide greater opportunity for more individuals to get a job assignment in the ICI shop. The criteria were expanded from individuals required to have no more than 10 years remaining on their sentence to qualify for an ICI job to allow individuals with up to 20 years. In addition, the requirement of a TABE test score of 8.0 to qualify for an ICI job was lowered to a 7.0.  Administrators report these changes have afforded a larger number of individuals to qualify for ICI job placement. **At the time of the April 2022 JHA visit there were 38 ICI incarcerated workers at Centralia; as of September 29, there were 37. However, administrators report under the June 2022 modification an additional 12 people have been hired under the new criteria guidelines.**

JHA spoke with someone during the visit who had been working in the Centralia knit shop for eight years who did administrative work and reported he liked his work because it was "*the easy part of the job.*" Typically, incarcerated people are rotated off of assignments periodically to give others opportunity, since demand for assignments typically vastly exceeds supply, but JHA has been told that some ICI positions are exempt from that practice because it takes a long time to train people for them. **Lack of transparency regarding rules, public reporting of unique participation, and consistency across prisons make evaluation of ICI or other assignment practices challenging.** People commonly reported lack of desirable jobs was a negative for them about Centralia. Someone incarcerated at Centralia expressed that others with short sentences "*steal*" all the good job assignments.

At the beginning of the pandemic, the knit shop produced face masks and safety gowns, with people working 12-hour days. Some of these products were used in other state agencies. A few ICI incarcerated workers had questions regarding sentence credit awards. One man recounted that he had been told by his counselor that he was not eligible but not told why, which is a common concern that eligibility or reasons are not well-explained. Often application of sentencing credits is not easily understandable and there are complexities to eligibility requirements in laws.  As an example, in this case, it seems the person had concurrent sentences, under one he was ineligible, while under the other he would be able to earn credits. Another man stated that he had worked 12-hour days on mask production alongside others and that IDOC only gave EDSC to individuals with drug offenses, which he did not think was fair. **Although some people are excluded from eligibility under the law, JHA again encourages IDOC to widely interpret discretionary sentencing credit to reward good behavior.** At the time of the visit the Warden noted he understood the importance of notifying people of any issues regarding their

> JHA spoke with two dietary workers at Centralia who reported that they were supposed to get 45 days of sentencing credit for every 90 days they worked; they were only getting 30. They reported they think they are being penalized for holidays. JHA has been told in another context that IDOC will not award sentencing credit for work in excess of 40 hours a week, although incarcerated people may be working this overtime. **This should be clearly communicated if this is the source of the discrepancy.**

eligibility as well as the need to give people fair consideration under the law governing EDSC and to use sentencing credits more for population control.

During COVID lockdowns JHA received a lot of concerns regarding whether people who restricted from working due to COVID quarantines would be able to continue to receive sentence credit since the reason they were not able to work was not their fault. **Again, there is need to communicate the policy and expected practice. Additionally, although JHA commonly hears from people who want to work within IDOC due to the benefit of having some activity, pay, or sentence credit eligibility, incarcerated people are particularly vulnerable for** abusive labor conditions. JHA appreciated that a Centralia administrator acknowledged that there have been some past practices in corrections that are not acceptable, like having incarcerated workers shoveling snow without hats and gloves.

# Discipline

In JHA's initial meeting with Centralia administrators, we requested to sit in on a disciplinary hearing. While some administrators were receptive, others and staff representatives expressed hesitation, and ultimately it was not permitted during this visit. The Warden stressed that at Centralia there will be full investigations including talking to all possible witnesses, mentioning in relation to one incident in February (where 14 people were transferred to Pinckneyville for not locking up or returning to their cells) that staff had interviewed the whole unit.

JHA requested an overview of data regarding discipline at the prison for 2021 and the first part of 2022. In the first three months of 2022, 418 minor tickets had been finalized at Centralia. Of these, approximately 23% were dismissed, 45% received verbal reprimands, zero received commissary denials (perhaps due to the limited nature of commissary provision), and 32% received an "Other" unspecified sanction. In the same period there were 146 major tickets finalized, for which people may be subject to confinement in restrictive housing, with 23% dismissed, 5% receiving commissary denials, 22% resulted in grade demotion, 7% resulted in segregation ("restrictive housing") placement, 29% resulted in segregation placement and an additional sanction; one person received a verbal reprimand, 14% received an "Other" unspecified sanction, and reportedly zero people received a program change or transfer sanction. However, given the available data it is likely that that these categories pertain solely to

the named sanctions, and that if someone were to receive segregation **and** transfer recommendation, they would fall under the "Other" label. At the time of the visit about 7% of the population had disciplinary grade restrictions, with about 4% of the population in B grade and about 3% in the most restricted C grade. **JHA recommends IDOC revisit sanction categorization to better reflect and track use of discipline as policies are revised. Additionally, JHA continues to recommend modifications to grade restrictions, particularly restrictions on outside communications.**

In 2021, there were in total 565 major and 2,370 minor tickets written at Centralia by a total of 269 reporting employees regarding 1,025 individuals. Again, JHA was encouraged to see that tickets were dismissed and that a variety of sanctions were imposed; however, without reviewing the full case histories we could not further opine on outcomes of individual cases or overall use of discipline.

**Importantly, in reviewing Centralia's disciplinary data it appeared that at least some varieties of sanctions were being utilized and that some people were not found guilty, unlike what JHA has observed at some other prisons previously.**

> JHA continues to encourage IDOC to reduce use of isolation and utilize and monitor for use of progressive discipline. Historically, harshly sanctioning people "across the board" with all types of sanctions at once has caused people to accumulate harmful disciplinary sanctions and eliminated necessary opportunities to incentivize improved behavior.

Many experts agree that confinement should only be used in instances to prevent harm; for example, the U.S. Department of Justice's guiding principles for use of restrictive housing state that people "should be housed in the least restrictive setting necessary to ensure their own safety, as well as the safety of staff, other inmates, and the public." IDOC policy, as reflected in the Centralia Orientation Manual, now requires that "Individuals in custody shall only be place in RH when they pose a direct threat to the safety of persons, or an elevated, clear, and ongoing threat to the safe and secure operations of the facility. … RH may only be used when

there is a clear and documented threat to the safety and security of the facility or the general public that cannot be mitigated without the use of RH."

Of the major tickets at Centralia in the first months of 2022 that possibly involved direct physical harm to others, six of the major tickets were for assaults of other incarcerated people, 19 were for fighting, and four were for sexual misconduct (not assault). However, as with offenses in the free world, past acts of violence are not often good predictors of future dangerousness. Often removal from the conflict will resolve issues. Other types of major tickets may have involved instances where some future risk of possible harm may have been perceived, e.g., threats or dangerous communications, and such predictions or interpretations of motivation and intent can be faulty or biased.

JHA visited the restrictive housing unit, which housed eight people total spread out on three different wings. Administrators commented that someone had recently been placed in RH for receiving mail that had K2 (synthetic marijuana or "spice") on it. JHA has increasingly heard of this being an issue. JHA did not speak to anyone who reported they had been housed in RH for more than 15 days. We did speak with several people who were housed in RH for about a week without having had a hearing, which is permitted under <span style="color:red">agency rules</span>. Time in pre-hearing detention would be credited towards any RH time applied, with progressive discipline being recommended in agency policy to be administered in increments starting at seven days for most, but not all, disciplinary offenses. As RH disciplinary terms as sanctions are given less often and for shorter durations due in part to recognition of the potential harm of isolation and availability of other less restrictive effective consequences, review of the considerable time people may spend in RH awaiting hearings or under <span style="color:red">investigative status</span> is also warranted. Some other reports regarding gang activity from individuals in custody included drug and tattooing on units and bullying, and having people outside find out case information about others, particularly those with sex offenses, and targeting them.

Another person JHA spoke with in RH was there for charges of fighting, assault, and Security Threat Group (STG or gang) activity. He had only been in RH for a day or two and did not yet know how long he would be disciplined since he had not had a hearing yet. Another person who had not yet had a hearing after about a week in RH said he had been accused by gang members of helping to beat someone, but he had witnesses to prove it untrue, there was no physical evidence of an assault, and he was not accused until days after the assault supposedly

occurred. He was told confidential sources implicated him, and his ticket just referred to unnamed "reliable sources." JHA observed that after the Centralia visit, this person had been transferred to another medium-security prison. Someone else in RH similarly stated that he had been accused of an assault but there was no evidence.

**JHA advises additional camera coverage and review for safety and ability to investigate.** An October 2020 Centralia PREA audit states, "Interviews with the Warden and the on-site observations revealed that the facility has not installed or updated a video monitoring system, electronic surveillance system, or other monitoring technology since the last PREA audit [2018]. The Warden stated that the facility has asked for cameras to enhance visual/video monitoring. The CCC has been included in the Agency wide camera project to add or install a CCTV System to meet PREA (Prison Rape Elimination Act) requirements that would provide video monitoring and video archive of areas where required by judicial ruling. Areas include all cell houses, inmate dining, recreation areas, areas of inmate line movement,

One person interviewed in RH reported that he felt that he had been targeted on his housing unit by other incarcerated people because he is older, educated, and not in a gang. He reported he had been sexually harassed by someone on his housing unit and reported it; he believed because of reporting, he had then been reported by one of that individual's friends for "intimidation and threats under PREA," which he did not understand. He believed this happened because someone wanted him moved out of the housing unit. He reported he felt that gang members think they are in charge and that when an allegation is made against a gang member, no one will talk, but they would when the allegation was against him. This individual had been in RH status for about five days and stated he understood that he had to let the process play out, but he was frustrated about how the allegation and RH had disrupted his life; for example, he was not able to continue his work assignment. He noted that the initial altercation which escalated was over the use of the phone.

Limited access to phones is a frequently reported source of conflict. JHA received a letter from someone at Centralia in February 2022 that recounts that gang members assaulted someone to get him to pay $2 for using the phone.

inmate recreation yards and gymnasiums, and any other areas required per PREA requirements."

A JHA visitor interviewed someone who was accused of assaulting a trans individual who said he did not and that the trans individual was not investigated. He felt the disciplinary process was rushed and favored trans people. In contrast, some people felt trans individuals are disciplined more often.

Another person in RH reported he transferred to Centralia from Lawrence where he reported they had the phone every other day but at Centralia in RH they would only get the phone one day a week. He stated he had not received a ticket in seven years and just wanted to finish his time. He reported that he had his tablet while in RH but there were signal issues, so he could use it to listen to music but not send messages. He reported that he had his legal box on

During draft review, as of September 29, 2022, administrators provided an update that all General Population housing units have been equipped with surveillance cameras with recording; that cameras were being installed in the Receiving Unit and Restrictive Housing Unit; and that upon all housing units being completed, cameras will be installed in the Dietary Department and throughout other buildings, walkways, and multi-purpose areas.

Someone wrote to JHA from Centralia in February 2022 that he had been assaulted by gang members after asking staff to be removed from the housing unit, and that he had been taken to RH after being taken to healthcare and to be interviewed by Internal Affairs, he wrote, *"I'm in seg., all my property, clothing, shoes, food, most things are missing because the officers in the housing unit are too lazy to stand by my cell door while the inmates pack my stuff … so most of my stuff was stolen by inmates and now no one wants to be responsible. I know if I stay in Centralia C.C. this is going to happen again. I asked for a transfer so I could be safe, they told me that they are going to think about it. I just want someone to know what is happening to me because I know that I will get injured again or I will injure someone because I will defend myself."* He was still at Centralia. JHA frequently hears property concerns when staff do not pack and inventory property, as is supposed to occur.

investigative status and not his other property. **JHA has noted inconsistency between prisons regarding permitted property in RH and for individuals on investigative status.**

Some people interviewed in RH reported getting an hour a day out of cell, usually in the yard, and getting showers on Monday, Wednesday, and Friday.

# Commissary

As JHA has extensively focused, reported and surveyed people on over the past year, <u>issues with commissary</u> have heightened tension during the pandemic. Someone in custody at Centralia expressed to JHA during the April 2022 visit that he felt incarcerated people were "*punished*" for IDOC's change in commissary vendors. JHA was provided with an April 2022 commissary list from Centralia with pricing information, but this list does not reflect the availability of items.

> During JHA spoke with someone in RH who stated he has been in a lot of prisons, but Centralia is a good deal. When he has a problem, staff are not aggressive or act like they are not trying to help. They try to reason with him. One time when he violated a rule because he was mad, he was taken to mental health, and told if he has a problem and asks for help, they will try to help him if they can. **This seemed to be a positive example of how corrections staff could try to productively redirect people.**

JHA visited Centralia's commissary area and spoke with staff working there. Staff reported Centralia was not getting any commissary delivered for a while, and then it all came at once. At one point they had many empty shelves or only $30,000 worth of inventory, compared to at the time of the visit when they had over $200,000 of available items. However, things were still missing. For example, they had ordered ramen on the last four orders and had not received any, so they were totally out. In contrast, they had a lot of powdered milk and rice in stock. Staff stated that packaged meats were hard to get and very expensive but attributed this to global supply chain issues rather than an IDOC purchasing issue. Incarcerated people mentioned lack of meat products as a particular deprivation.

Food from commissary is especially important to incarcerated people who often report they need it to supplement their diet. **Several people commented during the visit that while they felt the food quality from Centralia was okay, the portions were too small.** Materials provided by Centralia administrators state that as of February 2022, they had 141 incarcerated workers assigned to work in dietary on three eight-hour shifts and had a capacity to employ 170. These workers help prepare an average of 2,900 meals for the population and 360 meals for staff daily. The average cost per meal was reported to be about $1, calculated by dividing the annual dietary budget by average number of meals served. Reportedly the garden at the prison supplements dietary. Previously during prior COVID lockdowns at Centralia, JHA received some concerns regarding poor quality or even spoiled food and repeating items.  Dietary staff acknowledged that the prison had to change menus due to supply issues. They also noted that there had been a change to the statewide menu and they had been serving more fresh produce starting the past fall. Staff noted people did not always like it when they were served fruit instead of brownies. On the visit date, tater tot casserole was on the menu.  JHA did not receive complaints regarding the sanitation of the kitchen, as is unfortunately a common concern at some other prisons; however, one person expressed a concern that food trays were tied to COVID spread.

For commissary items, some Centralia staff commented on the inconsistency in what they could get and whether they can get particular items, and said at the time of the visit they had "*quantity not quality.*" Also, they were more limited in the variety of product they could offer. People commonly reported lack of quality commissary was a negative for them about Centralia. Individuals in custody also lamented the lack of variety in products available. Staff gave an example that they used to carry a more expensive coffee (Folgers brand) and a cheaper coffee made by correctional commissary supplier Keefe, but with the emergency contracts they could only order Keefe because it was the cheapest coffee available.

Administrators stated that they provide clothing replacements when clothes are worn or damaged as much of the clothing is made by ICI onsite. Also, they reported that both commissary and state-issued underclothing and socks had been stocked to pre-2015 levels. Commissary staff reported they just started being able to get socks and underwear, that T-shirts are hit or miss depending on size, and that they could not get sweats. Someone sent JHA an answered grievance from Centralia from January 2022 which was denied because "*there is no incident date,*" where the person stated for the prior three months "*I have been requesting for*

*yearly whites, underwear, T-shirts and socks on multiple occasions, because every time I order commissary they claim that clothing items are out of stock. Every time I sent a request slip to the clothing room trying to get these items I never receive provision, nor do I receive a reply. I have holes in my socks, and I had holes in my boxers… The industry within this facility manufactures these items.*"

For electronics, commissary staff stated they just received 150 TVs and 55 fans, but they still had not been able to get hair trimmers. Staff reported they got a lot of hygiene items in all at once, so they had not had to reorder any recently, and reportedly detergent was being distributed, although it may not be the preferred brand. Lack of cleaning supplies was a reported issue from a few incarcerated people on the visit and some people mention that some cleaning tools available to them on housing units, e.g., brooms, were themselves unclean. Administrators stressed that core hygiene supplies are distributed and handled separately than commissary hygiene items. Materials provide to JHA included a February 1, 2022 memo regarding core hygiene stating "**Items will be provided based upon availability of supplies on hand at the facility**."

Some of people transferred from Pontiac MSU had concerns regarding the unavailability of art supplies in particular and said they were told there is no vendor for these products. This issue had been going on for months and people wanted to be allowed to order the supplies direct from a supplier, as they are allowed to do for books and card games. Administrators told JHA during our onsite debrief that some art supplies were recently delivered but they were waiting to see if the pencils and paintbrushes were going to have to be cut down for security reasons. They noted there are issues with cutting them down because people do not want to pay full price for half a pencil.

Staff reported that people in custody shop on a two-week rotation and that ability to shop improved once they started being able to bring people 10 at a time to the commissary again. Delivering to the units was a lot more onerous, and staff acknowledged was likely on a monthly rotation. People expected to be able to shop weekly. During the visit, several incarcerated people reported they shop once every three weeks and that there was still no food or not enough particular food items, like coffee, available in commissary. People want to rotate the commissary schedule for housing units because they felt they did not have equal opportunity to

shop. Administrators stated that they had explored various rotations but with unpredictable supply they did not think it was a fix for their issues.

Someone housed in Receiving reported on transfer to Centralia staff took his soap and detergent because they said the amount he had was excessive. However, he reported because of an allergy issue, he could not use the state supplies and needed to buy these items through commissary. He had not yet been able to shop in the two weeks he had been at Centralia, but he reported he was told he would be allowed to shop in the current week. He reported he had grieved the property confiscation issue, because he did not think he should have to buy new supplies to replace what was taken but was told by staff that it could be a while before he got a result.

# Grievances

One incarcerated person reported to JHA during the visit that they want to be able to file grievances on their tablet because of the common concern that the staff who is reading the grievances often knows the officers who are being grieved and worries about possible retaliation and fairness, although this person did not recount any specific instance of someone being retaliated against.

Under IDOC grievance policy staff can take two months or more to reply to non-emergency grievances. **JHA continues to recommend grievance response time be shortened.** Someone wrote to JHA in December 2021 stating that "*The grievance process here right now is 5-6 months. And that's before Springfield [appeal]. The time frame for staff to process a grievance by law is 60 days.*"

In May 2021 IDOC first filled the position of Chief Inspector, an administrative position tasked with the review and improvement of the grievance system, a process that has been ineffective and lacking in procedural fairness for quite some time. **JHA continues to follow up in order to learn of plans to address this system which has been widely acknowledged by IDOC to be problematic; we have not learned of any scheduled changes as of the writing of this report but will continue to inquire and advocate for improvements to the grievance system.**



This report was written by JHA staff. Media inquiries should be
directed to JHA's Executive Director Jennifer Vollen-Katz
at (312) 291-9555 x205 or jvollen@thejha.org

Incarcerated individuals can send privileged mail to report issues to the John Howard
Association, P.O. Box 10042, Chicago, IL 60610-0042. JHA staff are reading every letter and
tracking this information to monitor what is occurring behind prison walls and to advocate for
humane policies and practices. Family and friends can contact JHA via our website
www.thejha.org or by leaving us a voicemail at (312) 291-9183.

Since 1901, JHA has provided public oversight of Illinois' juvenile and adult correctional
facilities. Every year, JHA staff and trained volunteers inspect prisons, jails, and detention
centers throughout the state. Based on these inspections, JHA regularly issues reports that are
instrumental in improving prison conditions. JHA humbly thanks all the persons who agreed to
be interviewed for this report and who graciously shared their experiences and insights with us.



The John Howard Association was the proud recipient of the 2015 MacArthur Award
for Creative and Effective Institutions