IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS DIVISION

| | |
|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELENA VISION, SORA KUYKENDALL, and SASHA REED, <br><br> Plaintiffs, <br><br> - vs- <br><br> ROB JEFFREYS, MELVIN HINTON, and STEVEN BOWMAN, <br><br> Defendants. | No. 18-156-NJR |

**DEFENDANTS' RESPONSE TO PLAINTIFFS'
MOTION FOR FINDING OF CONTEMPT**

The Defendants, ROB JEFFREYS, MELVIN HINTON, and STEVEN BOWMAN (sued in their official capacities only) by and through their attorney, Kwame Raoul, Attorney General for the State of Illinois, provide the following response opposing the Plaintiffs' motion for finding of contempt [Doc. 455]:

**Introduction**

This case was certified as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2). This Court entered a preliminary injunction in December 2019. [Doc. 186]. In August 2021, following a multi-day bench trial, the Court entered a second preliminary injunction. [Doc. 332, corrected in part at Doc. 336]. A third preliminary injunction that summarized all of the Court's prior orders was entered on February 7, 2022. [Doc. 384]. No permanent injunction has entered nor has there been any final relief set.

On December 13, 2021, after multiple requests by and the urging of Plaintiffs, the Court granted Plaintiffs' request that a monitor be appointed. [Doc. 370]. Eventually, the Court

appointed two co-Monitors in this action—Dr. Harris was appointed April 5, 2022, and julie graham was appointed on May 10, 2022. [Docs 418 & 423]. Monitor Dr. Harris has submitted one report, filed on August 3, 2022, and Monitor julie graham submitted an initial report filed August 31, 2022, a full report and two supplements. [Docs 439, 444, 450, & 460]. The second supplemental report by Monitor julie graham was only filed on December 1, 2022.

On November 14, 2022, Plaintiffs moved for contempt. The timing alone of this motion is questionable, given the short period of time in which the Monitors—who, again, were requested by Plaintiffs based upon the argument that the appointment of Monitors was necessary—have been able to review the various issues and work with IDOC officials. Further, in contrast to the rhetoric contained in Plaintiffs' contempt motion, the co-Monitors' findings have been more even-handed and, in some instances, complimentary to the actions and attitudes of certain IDOC officials. Regardless, Plaintiffs cannot meet the burden required for contempt to issue. As will be explained below, Plaintiffs' motion for contempt should be denied.

**Factual Responses**

Plaintiffs complain about every aspect of care provided to the class members in this case. Defendants have noted in prior briefing how this case is a poor vehicle to determine a violation under the Eighth Amendment, as neither the individualized assessment of an objectively serious medical need nor the state of mind of the individual providing the care seem to be of much import. [Doc. 238, pp. 15-24]. Further, Defendants have raised red flags concerning how the injunctive relief at issue is overly broad and not easy to measure. [Doc. 238, pp. 29-30, 32]. Defendants' concerns are bolstered by the Plaintiffs' filings, which seek civil contempt and ask for timelines of compliance that will likely be unachievable given what Defendants will explain in this response and the barriers that have been reported in the past.

In July 2022, Plaintiffs raised some of the same complaints in a written memorandum directed to the Co-Monitors and sent to the Court's coordinator, as well as defense counsel. *See* attached Exhibit 1. Rather than allow the Monitors to follow up on these concerns and address them with IDOC, Plaintiffs filed this motion for contempt. Plaintiffs' attempts to work around the Monitors, again who were requested *by the Plaintiffs*, shows that Plaintiffs have no interest in allowing the process to proceed in an efficient and orderly process, but rather that the Plaintiffs are only concerned with the amount of time it is taking without any recognition that speed should not be the primary concern when dealing with prison policy changes, and certainly not with medical care that will result in irreversible changes to one's physical anatomy.

Defendants will respond to each of the factual items raised by Plaintiffs' motion. This will require a reference to old and new materials and comparison with the Court's various preliminary orders. As will be argued more fully below, Plaintiffs fail to show by clear and convincing evidence that Defendants have violated this Court's clear and unambiguous orders.

### I. Hormone Therapy

Initially, in December 2019, the Court ordered Defendants to "ensure that timely hormone therapy is provided when medically necessary, including the administration of hormone dosage adjustments, and to perform routine monitoring of hormone levels." [Doc. 186]. Subsequently, in August 2021, this Court ordered specific timelines for hormone levels to be checked for Plaintiffs Kuykendall and Reed, that hormone levels be checked and blood work repeated at three-month intervals if out of range, and that any plaintiff class member who requested hormone therapy be given baseline bloodwork and hormone therapy within 14 days thereafter. [Doc. 332, corrected at Doc. 336]. On February 7, 2022, this Court further ordered that Defendants ensure that necessary follow-up tests and treatment with respect to hormone therapy take "place on a

timely basis." [Doc. 384, p. 5]. Defendants were also to provide follow-up information to the Court regarding hormone therapy and blood work. [Doc. 384, pp. 6-7].

Defendants provided an initial status update on hormone therapy on October 8, 2021. [Doc. 355]. The information was provided directly to Plaintiffs' counsel and subsequently filed with the Court under seal. [*See* Docs 355, 358, & 359]. On February 22, 2022, Defendants explained how IDOC had followed up on bloodwork and referred patients to the UIC Endocrinology clinic. [Doc. 393].

Defendants met the specific and unambiguous directions of the Court. IDOC continues to monitor bloodwork for those receiving hormone therapy. However, as to each individual patient's decision whether to begin hormone therapy, their decision to take the medication once prescribed, and whether to stay on hormone therapy, such decisions are outside of Defendants' control. Plaintiffs allude to generalized complaints of refusals and to an individual class member who was outright denied hormone therapy; however, without a name or any other identifying information, Defendants are unable to provide a specific response to Plaintiffs' allusions. Plaintiffs point to the numbers alone as support for their motion, but they cannot simply rely on the percentage of class members who are not taking hormones to establish that Defendants have failed to comply with this Court's orders in that regard.

Aside from the few complaints Plaintiffs provide, they rely on the August 30, 2022, report authored by Monitor Dr. Harris. Although she found partial compliance, Dr. Harris noted that there were some incomplete or inconsistent records, and that an additional 22 patients had been started on hormones after August 2021. [Doc. 439, pp. 5-8]. Dr. Harris's report makes no findings as to why a particular class member is not receiving hormone therapy, it just presents the numerical data. Dr. Harris was also unable to opine on why hormone levels were not within

range, only finding that the discrepancies were "consistent with reports of interruption in medication administration or inadequate titration." [Doc. 439, p. 7]. This does not mean that the underlying policies or procedures are not in place, nor that Defendants failed to follow this Court's orders, but that more investigation must be completed. This is precisely why Defendants are taking steps to centralize oversight and change the manner in which hormone therapy is provided for class members. [*See* Doc. 446, pp. 1-2]. IDOC medical administrators are also conducting site visits to review laboratory results and to communicate with providers as to where individual break-downs are occurring. This is not "too little, too late," but is instead a direct response to Dr. Harris's report and discussions with the Monitor overseeing the Court's orders with respect to hormone therapy.

## II.     Gender-affirming Surgery

As to gender-affirming surgery, this Court ordered that certain class members were to be evaluated in chronological order by request within 120 days of the Court's August 2021 order. The injunction also required Defendants to provide a prompt written notification that included an explanation of the decision and a timeframe for any subsequent request. [Doc. 332, pp. 2-3, ¶ 7]. Defendants complied with that order and, after the preliminary injunction entered in February 2022, provided the follow-up information required by the Court. [Docs 384 & 387]. Notably, the Court's order contained no requirement that the actual surgery be completed within a certain timeframe. Plaintiffs criticize the pace of the provision of surgery and contend that "there has been no progress whatsoever." Yet, Plaintiffs cannot dispute that IDOC has provided the evaluations that were ordered. Although not proceeding at the pace Plaintiffs prefer, there is no question that IDOC has complied with the timelines set by the Court.

Plaintiffs also fail to account for the actual issue underlying the Rush Medical Center negotiations. Dr. Schechter changed positions and changed the hospital that he works for, moving to Rush Medical Center. This required a re-start on scheduling these prisoners for the next step in surgery because Rush needed to make sure that its requirements were met before surgeries of IDOC prisoners could be scheduled.

Plaintiffs argue instead that the gender-affirming surgeries should be performed by a provider other than Dr. Schechter. Plaintiffs' motion does not propose any actual alternate physicians and ignores the dearth of gender-affirming surgeons that otherwise meet the qualifications *they have demanded*. It is very simple for Plaintiffs to suggest that something different may be done, but it is another matter for alternatives to be undertaken by IDOC. Regardless, it is simply outside the scope of the preliminary injunctions entered in this matter.

In the injunction entered February 7, 2022, the Court ordered some additional follow-up. Again, there was no order or direction as to the timing of any surgeries that occur. Defendants were simply ordered to provide an update within 30 days. [Doc. 384, pp. 7-8]. Defendants did so. Despite Plaintiffs' argument to the contrary, IDOC has continued to work on the surgical aspect of gender-affirming care. In an email dated October 26, 2022, Dr. Lamenta Conway followed up on the post-operative component needed for the surgeries to proceed. Exhibits 2 & 3. She noted that she had already followed up on resources in place at the Joliet Inpatient Treatment Center (JITC) located in Joliet, Illinois. Ex. 3. As of October 26 when she sent her emails, Dr. Conway was hopeful that surgery could begin after December 15, 2022, and that they would need the JITC prepared for post-operative patients as of that date. Ex. 3. On December 2, 2022, Dr. Conway forwarded letters regarding five patients' upcoming surgical consultations. Exhibit 4, filed under seal. Three of the five patients are scheduled to see Dr. Schechter this month.

It is clear that Defendants have not violated any of the Court's orders with respect to gender-affirming surgery. Although it has not proceeded as quickly as Plaintiffs desire, there can be no argument made that such procedures should be rushed as the adverse consequences can greatly outweigh the associated delays.

### III.   Electrolysis

Relatedly, Plaintiffs complain of the "glacial pace" of pre-surgical hair removal. [Doc. 455, p. 8]. Plaintiffs point to Defendants' response to Dr. Harris's initial report, which was filed on September 2, 2022. [*See* Doc. 446]. Electrolysis has continued in the months since that report was filed, adding prisoners from Centralia Correctional Center as well as Logan Correctional Center, where the patients are much closer to having the electrolysis process completed.

Notably, Plaintiffs cite to no Court order when discussing the electrolysis component of their request for contempt. Likely that is because the Court ordered Defendants to finalize a contract for hair removal services by December 2022 (which they did) and then the Court's subsequent order was to make the hair removal services available (which they did). [Docs. 332, 384].

### IV.   Continuing Quality Improvement (CQI)

This Court ordered Defendants to: "Finalize and implement the CQI (Continuing Quality Improvement) program for transgender care." [Doc. 332, p. 4; Doc. 384, p. 11]. In their December 2021 60-day report, Defendants explained the status of Continuing Quality Improvement. [Doc. 369, p. 3]. Per this Court's direction, Defendants also updated the Court on the status of CQI on March 9, 2022. [Doc. 414].

Plaintiffs hypothesize that the process has been abandoned or failed. [Doc. 455, p. 18]. Although Defendants have not specifically addressed this in recent filings in the past 9 months, the quality review process has undergone changes in the past year. Exhibit 5, Declaration of Dr.

Puga. First, when the CQI instrument was implemented, approximately 10 patients were reviewed, but data was lost. Ex. 5, ¶ 3. In Spring 2022, after a site visit to Pontiac Correctional Center, 21 charts were reviewed. Ex. 5, ¶ 4. The data necessary for the CQI instrument was difficult to compile from the charts and the tool questions were revamped. Ex. 5, ¶ 5. Regional administrators were given feedback to ensure that treatment plans documented gender dysphoria interventions. Ex. 5, ¶ 6. In July 2022, Dixon Correctional Center charts were reviewed and entered into the instrument. Ex. 5, ¶ 7. Again, it was determined that the instrument required changes and that treatment planning at the facility level was deficient. *Id*. The instrument was changed in July 2022 to review patients at the Joliet Treatment Center. Ex. 5, ¶ 8.

IDOC continues to work with compliance administrators in order to develop better processes to track and monitor the care provided to transgender prisoners. Ex. 5, ¶ 9. This has not been abandoned but, like any system, should evolve based upon the information gathered and ultimate goal of the process. Defendants have complied with the Court's order on this point.

### V. Transfers and Social Transition

Plaintiffs complain about the rate of transgender prisoners transferred to facilities of their choosing. But, Plaintiffs confuse this Court's order to evaluate prisoners with an order to automatically transfer prisoners consistent with their request. This Court's orders have been to evaluate class members for transfer. [Docs 332, pp. 3-4, 384, pp. 8-9]. This Court did not order that all requests be *granted.* If that were the case, what would the point be of evaluating the prisoners and giving them detailed reasons if the transferred request was denied?

IDOC has continued to evaluate transfer requests since the Defendants' March 2022 update. *See* Exhibit 6, Table of Documented Transgender Transfer Requests, as of Nov. 7, 2022, filed under seal. There are varying reasons for denying transfer requests. A few were denied because

the prisoner did not wish to transfer. Other transgender women were denied for reasons including violent histories against women that would make them unsuitable for Logan Correctional Center. Several of the entries show multiple dates of consideration. Defendants have complied with the Court's order to evaluate class members' transfer requests and to provide the basis for their denials with a time that the class members may resubmit. The decision of whether and where to transfer a particular prisoner is expressly within the discretion of prison officials. *See, e.g., McKune v. Lile*, 536 U.S. 24, 39 (2002), & other cases cited at Doc. 375, pp. 3-4. There is no basis for a finding of contempt with respect to transfers.

The Court had previously ordered that "individualized placement determinations" be made for housing assignments to allow for any medically necessary social transition. [Docs. 186 & 212]. Again, Plaintiffs' complaints about their housing assignments at their preferred facility do not establish that individualized placements are not occurring. As Defendants explained previously, there are several reasons why an individual may be placed on D Wing. [Doc. 387, pp. 2-3]. Importantly, the Committee that reviews transfer requests, the TAC, does not approve individual housing placement in a facility; the TAC merely reviews the requests and, if a particular transfer request is approved, it initiates the facility-to-facility transfer. The facility at issue (in this instance, Logan Correctional Center), makes the decision as to where to house each individual in custody. Logan Correctional Center is a multi-level security facility as opposed to a set facility that houses only maximum, medium, or minimum-security prisoners. The placement in Logan's D Wing may be dependent on security level, including criminal and disciplinary history, predator or vulnerable status, and any other relevant factors. D Wing is a general population wing and is not punitive in nature; however, the set-up is different than other wings at Logan Correctional Center. D Wing units have a private, single-person shower and there are cells

that hold only up to two individuals. By contrast, other housing units at Logan Correctional Center have rooms that contain up to four inmates, the showers and restrooms are for groups and have little privacy, and there is more open movement for prisoners who meet the qualifications for more freedom and have lower security levels. The out-of-cell time for the prisoners housed in D Wing is in no way tied to gender status.

### VI.     PRISM Program

Plaintiffs contend that the PRISM Program is not a program and that they do not know how many prisoners are in it, so it must not conform with this Court's order. Again, Plaintiffs rely on speculation to carry the day. Even though Plaintiffs acknowledge that IDOC was ordered to finalize and implement the program (which happened), and the Court noted an appearance of full compliance but ordered an update (which Defendants provided), Plaintiffs believe that criticism of the program warrants contempt.

As an initial matter, the number of participants in the program will continue to vary. Prisoners get released, they may be transferred due to disciplinary reasons, they have other programs they prefer to engage in, etc. There are a multitude of reasons why a prisoner will not remain at any one location for a determined amount of time. In October 2022, three prisoners were transferred into the PRISM program. Exhibit 7, PRISM Tracker as of Nov. 16, 2022, filed under seal; Exhibit 8, Declaration of Dr. Reister, ¶ 12. As of November 16, 2022, thirty-one prisoners were in the program, many of whom were transgender women, Ex. 7 at 14, and fifteen prisoners had already been removed from the program for various reasons. Ex. 7 at 5; Ex. 8. It is important to note that anyone who is threatening to an individual in the program or receives a 100 or 200-level disciplinary infraction is removed from the program. Ex. 8, ¶ 11. It is a program for which prisoner may earn Earned Program Sentencing Credits (good time credits). Ex. 8, ¶ 2.

Although there have been staffing issues, and some classes have been cancelled due to too little coverage, there are topics that change from month-to-month. Ex. 8, ¶ 5. Those in the modified PRISM wings at Centralia CC are able to attend school and have jobs while still participating in the PRISM peer education project. Ex. 8, ¶ 8. They also have opportunities to work on special projects and have jobs outside of the PRISM program. Ex. 8, ¶¶ 8-9. At least one individual in the program was prevented from obtaining a dietary assignment; however, that denial was due to a vulnerable designation that had nothing to do with PRISM. Ex. 8, ¶ 10. Centralia currently lacks both a Mental Health Authority and a Wexford Qualified Mental Health Professional. Ex. 8, ¶¶ 3-4. There were interviews scheduled for the Mental Health Authority position but Dr. Reister was not aware of any applicants for the Qualified Mental Health Professional vacancy. Ex. 8, ¶ 4.

### VII. Commissary

Defendants have been open with this Court and with Monitor julie graham as to the evolving status of commissary. There have been supply issues and, in order to comply with this Court's orders, IDOC entered into several emergency contracts in an attempt to address the supply issues. [Doc. 387, p. 5]. Even with emergency contracts, IDOC was unable to acquire all of the items. [Doc. 387, pp. 5-6]. IDOC then turned to its own Industries to make its own sports bras, socks, shirts, and underwear. [Doc. 454, p. 3]. IDOC has also assigned a project manager to monitor the commissary stock of gender-affirming items. [*Id.*]. IDOC has attempted to work around the issues as they arise.

Defendants are confused by Plaintiffs' argument that a gender-neutral commissary is not the same as a gender-affirming commissary. IDOC has <u>not</u> taken the position that class members have no entitlement to gender-affirming items; rather, IDOC is attempting to make it easier for

all prisoners (including class members in this case) to obtain the items they are most comfortable with and that meet their needs. That is the point of a universal commissary—it does not require prisoners to "out" themselves as transgender in order to receive gender-affirming items.

In a recent supplement titled "Minor Update by the second co-Monitor pursuant to the 14 day mandate" [Doc. 460], julie graham discussed ongoing commissary issues at Logan Correctional Center. According to julie graham's report, there was a temporary improvement reported by some of the prisoners. [Doc. 460, p. 2]. The most recent report appears mixed—some benefits and some negatives [Doc. 460, pp. 2-3]—but the facts to do not evidence a failure to comply with an unambiguous order. The report also seems hopeful that the project manager will address some of the vendor-related issues. [Doc. 460, p. 3]. The project manager, Brittney Schroeder, has been able to distribute make-up received by IDOC from a central location and is working on a commissary order sheet to see what class members need that has not been made available to them. Schroeder has been in contact with Monitor julie graham, as this topic falls under julie graham's purview.

### VIII. Searches and Identification Policy

Plaintiffs contend that Defendants have violated the Court's injunctions by using staff of the wrong gender to conduct searches, by not using the scanners purchased for searches, and by using an identification policy that was criticized by Monitor julie graham. [Doc. 455, pp. 13-14].

Again, Plaintiffs allude to class member complaints that Defendants are unable to follow up on and that may be illuminated by some potential future declaration. Yet, Defendants have shown this Court and the parties their written policy regarding searches of transgender prisoners. Defendants have explained that the search preference must be determined and identified so that security staff do not have to delay to resolve any preference at the time of search rather than

ahead of time. IDOC has also received labor complaints from employees and has bargained with employee unions regarding prisoner searches. According to the memoranda of understanding between IDOC and the unions, the individual in custody must have an identification that indicates a transgender designation and the individual's desired gender for the performance of a search. Exhibits 9 & 10, Memoranda of Understanding. This has led to some additional complexity regarding who will be performing searches of transgender prisoners. *Id*. This all goes to show that IDOC is not ignoring or disregarding the Court's search order but continues to implement the direction in the order and has worked with its employees and their unions to ensure that the employees have clear guidance and controls to work within.

Monitor julie graham has already acknowledged that the scanner policy is complete, so Plaintiffs' contention regarding the completion of the scanner policy is baseless. However, Plaintiffs cannot rely on delays in the use of the scanners as a basis for contempt. Plaintiffs cite to no provision in the Court's orders directing IDOC to begin using the scanners, let alone within a particular time frame.

Further, Plaintiffs contend that Defendants are placing class members at risk of harm based upon the identification policy. Plaintiffs' position has been that the search preference be included in a database for all security and operations staff; however, not all security staff have regular access to a computer. Monitor julie graham recommended use of a bar code or QR system, but that would entail wholly new technology that seems to be similar in scope to the use of an ID marker—if someone has a preference, there would be a mark on the ID badge. Again, this is entirely optional but is in place to protect both groups involved, the prisoners and the employees.

But, here, Defendants were expressly ordered to finalize and implement the transgender identification policy that Defendants have adopted. [Doc. 332, p. 4, ¶ 8]. In his trial testimony,

Dr. Puga explained that the back of the ID Cards would indicate transgender identity as well as their preference for search. [Doc. 334, pp. 44-47]. What Dr. Puga discussed on August 5, 2021, is what Defendants were ordered to do and what Defendants have done. Regardless of whether there are other options or preferred methods to communicate this information, Defendants have done what was ordered of them with respect to the identification policy. This undercuts any request for contempt relief as to this aspect.

### IX. Showers

This Court ordered that transgender prisoners have access to a private shower. [Docs 332, 384, p. 10]. Defendants previously provided declarations from each facility housing transgender prisoners to explain the access provided to those prisoners. [Doc. 400-2, pp. 1-43]. Plaintiffs contend that Monitor julie graham's initial report reported non-compliance, however, these were not julie graham's findings, but merely class members' reports. [Doc. 444, pp. 17-18, "What transgender incarcerated people report"]. Again, these reports were mixed, and IDOC was already in the process of following up to address them when the report was filed. [Doc. 444, p. 18]. Monitor julie graham's recommendation was to get more information. Even in the more recent report by julie graham, the reports are mixed. [Doc. 460, p. 2]. This not a showing of non-compliance.

### X. Training

Defendants have reported the various training aspects associated with this case. There has been all-staff sensitivity training, mental health and medical provider training, WPATH training, and the QueerWorks training that was criticized by julie graham. IDOC has attempted to train all pertinent staff in the various areas; however, Defendants have explained that those who have not been trained are technically on the IDOC roster, but are on leaves of absence, suspended, or not

actively working. This does not mean that IDOC has failed to comply with the Court's directives, but rather that IDOC has been unable to reach people who are not actively working. When those individuals return to work, they will be obligated to catch up on all training requirements, including the trainings at issue here.

Further, IDOC has continued to work with The Moss Group since its last report on training. IDOC is contracting to work with The Moss Group to provide training to prisoners and staff and technical assistance, in addition to the needs assessment. This will come at a substantial cost, however, IDOC remains committed to obtaining quality training.

## Analysis

Plaintiffs' motion for contempt contains very little legal analysis. This appears to be based upon an assumption that the complaints presented in the motion entitle them to contempt by default. However, even ignoring the evidentiary deficiencies in Plaintiffs' motion, the facts provided in it fall short.

Courts "have inherent power to enforce compliance with their lawful orders through civil contempt." *Spallone v. United States*, 493 U.S. 265, 276 (1990), *quoting Shillitani v. United States*, 384 U.S. 364, 370 (1966). The use of contempt power is somewhat limited, however, and a court is obliged to use the least possible power adequate to the end required. *Id*. In establishing civil contempt, the moving party must prove by clear and convincing evidence that (1) a court order sets forth an unambiguous command; (2) the alleged contemnor violated that command; (3) the violation was significant, meaning the alleged contemnor did not substantially comply with the order; and (4) the alleged contemnor failed to make a reasonable and diligent effort to comply. *Prima Tek II, LLC v. Klerk's Plastic Indus., B.V.*, 525 F.3d 533, 542 (7th Cir. 2008).

### I. Plaintiffs have not met their burden of proof.

It is Plaintiffs' burden to prove that Defendants have violated this Court's orders by clear and convincing evidence. *Bailey v. Roob*, 567 F.3d 930, 934-35 (7th Cir. 2009). Plaintiffs make several factual statements but lack the evidence to back them up. Although Plaintiffs controlled when they filed this motion, they have not filed any evidence in the way of declarations and committed only to file declarations "no later than December 14, 2022," which is the day before their motion is to be heard per Plaintiffs' request. [Doc. 455, p. 2]. Plaintiffs allude to some serious issues in an attempt to garner sympathy and appeal to a reader's emotions, but without any evidence to back it up or even any names, dates, or any identifying information, they fail to present clear and convincing evidence for many of the assertions in their motion.

Even setting aside the specific class member complaints, Plaintiffs merely speculate as to many of the issues identified in their motion. Plaintiffs guess as to the progress of surgery, they hypothesize as to the status of CQI, they surmise that the PRISM program is not a real program, and they speculate as to the reasons transfers are denied or particular housing decisions are made. Plaintiffs' motion should be denied outright for failing to meet the basic evidentiary standards for a motion as significant as a motion for contempt.

### II. Plaintiffs have not shown a violation of this Court's unambiguous command.

In comparing the Court's commands in the various preliminary injunctions with Plaintiffs' contentions in their contempt motion, Plaintiffs are unable to establish that Defendants violated an unambiguous command. The critical issue for purposes of contempt is whether "a sufficiently specific order had been directed to defendants so that failure to comply could constitute a basis for a civil contempt." *H.K. Porter Co. v. Nat'l Friction Products Corp.*, 568 F.2d 24, 25 (7th Cir. 1977). The court must set forth in specific detail an unequivocal command. *Id*. at 27.

Above, Defendants compare the language of the actual orders with the steps taken by Defendants and with Plaintiffs' complaints. Defendants have met the unequivocal commands of this Court. Plaintiffs' issues appear to be with how Defendants carry out the more generalized commands, such as the orders regarding surgery, hormones, and transfers. But, this is not enough to meet the elements required for contempt. Plaintiffs fail to show that Defendants violated unambiguous commands in the Court's orders. And, in some instances, Plaintiffs seek contempt because Defendants either followed the Court's order or acted in the absence of a specific order. For example, Plaintiffs seek contempt because they do not agree with the ID Card procedure; however, Defendants were ordered to implement that policy and did so. Defendants were also ordered to finalize the PRISM program, and did so. Plaintiffs also seek contempt as IDOC has attempted to make commissary access easier, by negatively framing the use of a universal commissary. Plaintiffs also use the timing of the scanners as a basis for contempt, when there has been no order that scanners be used by IDOC.

### III. Plaintiffs cannot show that Defendants are responsible for a significant violation or failed to make reasonable and diligent compliance efforts.

The burden lies with Plaintiffs to show that Defendants have significantly violated the Court's orders and have failed to act with reasonable diligence. *Bailey v. Roob*, 567 F.3d 930, 935 (7th Cir. 2009). Plaintiffs cannot meet this burden. As detailed above, Defendants have met the black letter of the Court's orders and, even taking their complaints at face value, Plaintiffs do not show otherwise. Further, the reporting by Defendants and even the reports of co-Monitors Dr. Harris and julie graham show that Defendants have acted with reasonable diligence. Where Defendants have encountered obstacles to meeting the spirit of the Court's order, they have explained the circumstances and what they have done in an effort to work around the obstacles. For instance, IDOC has tried several different methods to help the commissary run smoothly, it

has plans to investigate the breakdowns with hormone therapy, it continues to work on providing quality training, and continues to work with prisoners who seek other showering accommodations. This is not a violation of the Court's order, as they are otherwise meeting what the Court clearly laid out, but is going a step further to accommodate individual class members' requests.

### IV. Plaintiffs' burden is particularly important here, where they seek coercive contempt against a State agency.

The use of contempt power against a public agency should be "carefully tailored to the proposed end." *Bailey*, 567 F.3d at 937-38. As noted in the *Bailey* opinion, courts should be more sensitive when dealing with a governmental agency. *Id.* at 938. Defendants have flagged concerns over federalism in this matter. [Doc. 375, p. 3]. Yet, in their motion, the apparent desire of Plaintiffs is that they be allowed a more active role in how IDOC implements the injunctions that have been entered in this case. Defendants will maintain an objection to such requests, as it is very easy for Plaintiffs to remark on what could or should be done but they are not involved in actually carrying out the Court's orders and fail to understand what is involved in providing care and treatment to class members in this case. Plaintiffs should be required to make a sufficient showing for contempt to issue against Defendants here.

## Conclusion

In conclusion, Plaintiffs' motion for contempt must be denied. Plaintiffs fail to meet their burden underlying the request for contempt. Plaintiffs do not establish the necessary elements by clear and convincing evidence and fail to establish that Defendants violated a clear and unambiguous order by this Court. Plaintiffs similarly fail to establish that Defendants have committed a significant violation or are otherwise failing to act with reasonable diligence. This

burden is especially important here, where Plaintiffs seek to have more control over a State agency.

Furthermore, Plaintiffs should allow the monitoring process—which they requested and which was ultimately granted after several requests—to play out. The Monitors have been involved for less than eight months and have been working with IDOC to review the policies and procedures. Plaintiffs' change in strategy here only muddies up what the Monitors are to do. For these reasons, the Monitors should continue their duties until they are released by the Court. Plaintiffs should not try to usurp their roles.

WHEREFORE, Defendants respectfully request that this Court deny Plaintiffs' motion for a finding of contempt.

Respectfully submitted,

ROB JEFFREYS, MELVIN HINTON, and STEVEN BOWMAN,

Defendants,

Lisa A. Cook, #6298233
Assistant Attorney General
500 South Second Street
Springfield, Illinois 62701
(217) 785-4555 Phone
(217) 524-5091 Fax
Email: lisa.cook@ilag.gov

KWAME RAOUL, Attorney General
State of Illinois

Attorney for Defendants,

By: s/Lisa A. Cook
Lisa A. Cook

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS DIVISION**

| | |
|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELENA VISION, SORA KUYKENDALL, and SASHA REED, ) ) ) ) | |
| Plaintiffs, ) ) | |
| - vs- ) ) | No. 18-156-NJR |
| ROB JEFFREYS, MELVIN HINTON, and STEVEN BOWMAN, ) ) ) ) | |
| Defendants. ) | |

**CERTIFICATE OF SERVICE**

    I hereby certify that on December 5, 2022, the foregoing document, **Defendants' Response to Plaintiffs' Motion for Finding of Contempt**, was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Abby L. Parsons     aparsons@kslaw.com
Sarah Jane Hunt     sarahjane@tkennedylaw.com
Thomas E. Kennedy, III     tkennedy@tkennedylaw.com
Brent P. Ray     bray@kslaw.com
Samantha G. Rose     sam.rose@kirkland.com
Amelia Bailey     abailey@kirkland.com
Camille Bennett     cbennett@aclu-il.org
And all other counsel of record

                        s/ Lisa A. Cook
                        Lisa A. Cook, #6298233
                        Assistant Attorney General
                        Office of the Attorney General
                        500 South Second Street
                        Springfield, Illinois   62701
                        (217) 785-4555 Phone
                        (217) 524-5091 Fax
                        Email: lisa.cook@ilag.gov