Defendants' Exhibit 1

## Cook, Lisa

| | |
|---|---|
| **From:** | Camille Bennett <CBennett@aclu-il.org> |
| **Sent:** | Wednesday, July 13, 2022 3:59 PM |
| **To:** | drharris@urbanfamilydoctor.com; j graham |
| **Cc:** | Barbara_Brundage@ilsd.uscourts.gov; Cook, Lisa; Higgerson, Christopher; Brent Ray; Abby Parsons; Bailey, Amelia; Rose, Sam G.; thomas.leahy@kirkland.com; Josh Blecher-Cohen; Chris Romer |
| **Subject:** | [EXTERNAL] Monroe v Jeffreys, 18-cv-156-NJR/memorandum from Plaintiffs |
| **Attachments:** | Monroe v Jeffreys 2022 07 14 Confidential Memo to Expert Monitors.pdf |

Dear Dr. Harris and ms. graham (and cc'ing Ms. Brundage and counsel for Defendants),

In recent weeks, we (*Monroe* Plaintiffs' counsel) have made a concerted effort to reach out to class members and interview them about the current status of compliance with the Court's orders in this matter, including visiting the named Plaintiffs and class members at three sites (Pontiac, Logan, and Centralia) at the end of May.  Attached is a memorandum summarizing what we have learned.  We would be happy to discuss this further in a meeting with Defendants' counsel if that would be useful to you, or to expand upon the information in writing if there are particular questions.

Best,

**Camille E. Bennett**
Director, Corrections Reform
ACLU of Illinois
150 N. Michigan Ave., Ste. 600, Chicago, IL 60601
*Pronouns: she/her*

▪ 312.201.9740 x336 ▪ cbennett@aclu-il.org

**CONFIDENTIAL MEMORANDUM**

| | |
|---|---|
| **TO:** | Dr. Amanda Harris<br>julie graham |
| **FROM:** | Camille Bennett, Joshua Blecher-Cohen<br>Counsel for Plaintiffs |
| **CC:** | Ms. Barbara Brundage<br>Counsel for Defendants |
| **DATE:** | July 14, 2022 |
| **RE:** | Compliance Report from Plaintiffs<br>Monroe v. Jeffreys, et al., No. 18-cv-156-NJR |

**EXECUTIVE SUMMARY**

Plaintiffs' counsel conducted legal visits with the *Monroe* named Plaintiffs and other class members at Pontiac, Logan, and Centralia from May 23-27, 2022. During these visits, and in conversations with other class members since the visits, serious issues of compliance with the Court's orders were found relating to each of the areas of relief ordered by the Court. Plaintiffs' counsel details these issues of compliance below and are available to discuss these matters and remedial action at the convenience of the expert monitors.

**DETAILED REPORT**

**I.     Hormone Therapy**

Defendants are not in compliance with the Court's Orders regarding hormone therapy. *See* Comprehensive Preliminary Injunction at Section II (Aug. 9, 2021), ¶¶ 2-5, 7 and 9 (Dkt. 384, pp. 2-4), and ¶¶ 1-5 (*id.*, pp. 4-5). This section falls within the oversight of Dr. Harris. *See* Dkt. 418 at 3.

*First*, the class members do not have uninterrupted access to hormone therapy and, in many cases, no access at all. Class members have been denied access to hormone therapy for reasons that are not recognized as absolute contraindications by WPATH, including elevated prolactin levels and a history of seizures. Other members have repeatedly experienced gaps in their dosages of both estrogen and testosterone blockers; these gaps have ranged from a few days to three weeks and, in particular, have resulted in transgender women experiencing noticeable side effects from being taken off testosterone blockers.

As a result, several class members at multiple facilities expressed an interested in receiving hormones by injection to avoid or mitigate repeated delays in access to pills. However, many of them have been refused injectable hormones, including by Dr. Myers.[1]

---

[1] Dr. Percy Myers is the acting medical director at Centralia (and four other IDOC facilities). He is employed by Wexford Health Sources, Inc.

Plaintiffs' Memorandum to Monitors
July 14, 2022
Page 2

*Second*, Defendants are not adequately monitoring hormone levels and adjusting dosages accordingly. For both transgender men and women, hormone levels do not generally appear to be titrated to ensure therapeutic dosages. Moreover, class members reported that staff lowered dosages and changed medicines to generic versions, resulting in lower levels of hormones. At least one person said that her estrogen levels are starting to decrease despite staying on the same dosage; she had not seen a doctor in three months despite 13 sick call requests to try and fix the issue.

Other monitoring issues include the fact that no one we spoke with had been able to see an expert endocrinologist in more than eight months. Issues regarding prolactin levels, histories of blood clots, and seizures have all been noted—and in some cases referred to Dr. Layden—but class members have not been able to reach him or get these issues addressed. In one case, a class member had been seeing Dr. Layden remotely for blood-clot issues but that was discontinued upon her transfer to Pontiac.

*Third*, class members had additional complaints about administering injectable hormones in front of other people and about staff crushing hormone medications with other medications, so that they could not refuse other medications without being documented as refusing hormone therapy. Each of these issues is significant and warrants prompt attention.

## II.     Gender-Affirming Surgery and Hair Removal

Defendants are not in compliance with the Court's Orders regarding surgery and related care. *See* Comprehensive Preliminary Injunction at Section III (Feb. 7, 2022), ¶¶ 1-2 (Dkt. 384, p. 5). This section also falls within the oversight of Dr. Harris. *See* Dkt. 418 at 3.

Since trial nearly a year ago, there remains no class member with a scheduled date for any gender-affirming surgery. This fact is a source of considerable anxiety for class members who have been approved for such surgery. Some class members have been told (including in writing, in response to a grievance) that dates for surgery are "on hold" pending a search for "funding" for the surgery.

Preparations for surgery are ineffective and inconsistent. Several class members at Logan are in the middle of electrolysis in preparation for vaginoplasty, though there is reportedly a 12-session maximum regardless of hair remaining. These electrolysis sessions are somewhat sporadic and can be interrupted, though shortened sessions are still counted toward the 12-session total.

Other issues related to surgery persist as well. For example, class members who have been denied access to hormone therapy at Centralia and Pontiac expressed frustration that they cannot be considered for surgery without the very therapy they are being denied. Transgender men at Logan reported being moved to isolation and only released from that isolation once they signed off to cancel their request for gender-affirming top surgery. *See* Part III.B *infra*. And class members also want a broader array of gender-affirming surgeries to treat their gender dysphoria on an individualized basis, including facial-feminization surgery and breast augmentation. None of this care is being considered.

Plaintiffs' Memorandum to Monitors
July 14, 2022
Page 3

### III. Housing and Transfer

Defendants are not in compliance with the Court's Orders regarding housing and transfers. *See* Comprehensive Preliminary Injunction at Section IV (Feb. 7, 2022), ¶¶ 1-4, 6, 8, 10-13 (Dkt. 384, pp. 6-11). This section also falls within the oversight of Dr. Harris. *See* Dkt. 418 at 3.

#### A. Most transgender women at Logan are housed in D-Wing, in punitive conditions.

Contrary to the spirit and the letter of the Court's orders permitting the social transition of transgender women, Defendants have clustered most of them together in "D-Wing" at Logan.[2] D-Wing is effectively solitary confinement, although the warden has recently asserted that it is "general population." Some class members, like Ms. Monroe, have been there for many months. Others have been transferred there more recently without any explained basis (for example, a disciplinary infraction).

Class members who were originally placed in other (general population) units at Logan report that the conditions in D-Wing are not the same. For example, residents of D-Wing are permitted out of their cells at most 2-3 hours/day (most said that it was only 2 hours). There are only two functioning showers, and one class member received a disciplinary ticket for using the shower that was not on her level. That means, for all practical purposes, there is only ***one available shower*** for each 20-person tier. The day room lacks cable tv (unlike general population wings), and WiFi does not work except in the common spaces. Thus, the only access to email and other material available through "tablets" is during the limited hours of "out" time. Moreover, unless it is 85 degrees or higher, while residents are in their cells, the chuckholes are closed. D-Wing is also dirty; there are significant accumulations of mold, and the ventilation units are clogged with dust and debris. In other units it is possible to get cleaning supplies but they are not available on D-Wing.

Defendants' clustering transgender women together in these conditions punish them for having gender dysphoria and this practice does not comply with the Court's order allowing social transition.

---

[2] The estimates ranged from 70-90%. One class member was confident that, as of the end of June 2022, there were 11 trans women at Logan and 9 were on D-Wing.

Plaintiffs' Memorandum to Monitors
July 14, 2022
Page 4

### B. Transgender men at Logan are also disadvantaged in exercise and housing.

Transgender men at Logan fare no better. Although communication was limited due to COVID quarantine on their unit, the transgender men we spoke to complained that "good yard" was not available to them because they are confined to a "patio" and cannot get "real rec". One of the transgender men also reiterated that—as previously reported by Plaintiffs' counsel—Defendants are trading surgery for freedom from isolation. This class member had been so desperate to move away from the isolation he felt in "center wing" at Logan that he had agreed to withdraw his request for surgery, which was a requirement for the move. Recently one of the psychologists who works with the transgender population at Logan had asked him if he wished to sign up again for surgery, but he is afraid to do so because he fears that Logan will find another way to isolate him. These practices are not acceptable.

### C. The PRISM program at Centralia, though better than being in any other men's prison, lacks programming and its participants are disadvantaged in other ways.

While the PRISM program at Centralia is safer for transgender women than any men's prison, it is no replacement for Court-ordered social transition. Dr. Reister testified at trial that PRISM would include robust and regular programming. Yet, PRISM transferees consistently report that—with the exception of a weekly visit and group meeting with Dr. Reister and program director Ms. Michelle Dulle—there is no such programming. The only other groups are ones which residents have started for themselves, including a meditation group and an art class. Dr. Reister's once-weekly meetings have focused on a variety of topics not limited to LGBTQ issues, including racial bias. PRISM participants are puzzled why the programming (limited though it is) is not more focused on gender identity issues.

The "program" was originally described as being a 12-week program, but the timeframe has been extended to 24 weeks or even longer. Participants in PRISM cannot access education or jobs. A few participants have even withdrawn to access these opportunities.

PRISM participants effectively cannot seek a transfer to Logan. Ms. Dulle has told PRISM participants that they are under "contract" and Centralia is not their "home" institution. If they wanted to transfer to Logan, they would have to return to the (men's) prison from which they were transferred first. This absurd policy poses an absolute bar for transgender women transferring to Logan. PRISM participants also have been threatened that they will be transferred back to their "home" prisons if they have conflicts with others or even if they complain. This has happened to at least two program participants, and one participant avoided this fate only by going on a hunger strike. These policies, too, violate the Court's orders on housing and transfer to facilitate medically necessary social transition.

Plaintiffs' Memorandum to Monitors
July 14, 2022
Page 5

      **D.**    **Transfers of transgender women to both Logan and Centralia appear to be largely stalled.**

Without the watchful eye of the Court and Plaintiffs' counsel, Defendants have all-but stopped transferring anyone to Logan or to the PRISM program at Centralia. A comparison of class member lists obtained from Defendants dated February 28, 2022 and June 1, 2022 reveals that, at Logan, there were 34 class members in late February and 37 as of June; and at Centralia there were 22 in late February and 28 as of June. Reportedly only one transgender woman has been transferred to Logan in the past two months, and both sites now seem to be under "one-in-one-out" conditions. Consequently, the *vast majority* of class members remain in men's facilities throughout the state, including a substantial concentration at Pontiac (23), known for its harsh conditions.

**IV.**    **Commissary Access and Medical Items.**

Defendants are not in compliance with the Court's Orders regarding gender-affirming commissary items. *See* Comprehensive Preliminary Injunction at Section II (Aug. 9, 2021), ¶¶ 6, 8, 10 (Dkt. 384, pp. 3-4), and ¶¶ 6-8 (*id.*, p.5). This section falls within the oversight of julie graham. *See* Dkt. 423 at 4.

Class members at Centralia have repeatedly sought medical supplies to facilitate social transition, including gaffs to assist with tucking and breast pads. Supposedly the gaffs were approved, but they have not arrived and Dr. Myers anticipated at the end of April that it could take an additional six months before they were available. Class members at other locations (*e.g.*, Big Muddy River) have been told by the physician that he does not know what a gaff is (and thus will not order one).

In addition, several class members have not been able to get access to appropriate underwear. Transgender women at Pontiac reported that there were generally no bras or panties available and that, when they were, they were only available for purchase and none were provided by IDOC as part of the basic allotment of undergarments. A class member at Danville reported that, although she has panties from a previous site, she has been persistently unable to obtain a bra. At Centralia, one class member was forced to wear a bra of significantly smaller size than necessary (i.e., a 3XL bra, where size 4XL or 5XL fits best) but was told that she will be sent to seg if she goes braless. As a result, she wore the too-small bra, which hurts and causes rashes. One staffer told her that IDOC wouldn't give people things just because they keep gaining weight. While we resolved this particular issue by reaching out to Defendants' counsel, these issues generally persist.

Finally, in addition to the issues with obtaining gender-affirming items through commissary, at both Logan and Centralia, class members complained that they are discriminated against in access to commissary generally by being the last units to go to commissary. That means by the time they get access, many everyday items are sold out.

**V.**    **Problems with showers, misgendering, and other abusive conduct are ongoing.**

Defendants are not in compliance with the Court's Orders regarding showering and misgendering by staff. *See* Comprehensive Preliminary Injunction at Section IV (Feb. 7, 2022), ¶¶ 5, 7, 9, 14-16

Plaintiffs' Memorandum to Monitors
July 14, 2022
Page 6

(Dkt. 384, pp. 8-12). This section also falls within the oversight of julie graham. *See* Dkt. 423 at 4.

Defendants still have not addressed showering issues at Centralia. Privacy remains an issue, including previously reported problems having to do with cameras pointed at the shower, a flimsy shower curtain, and upper-body visibility through a window.

At all sites visited (Pontiac, Logan, Centralia), and at others based on recent conversations with class members, while some staff are respectful, others continue to misgender class members and use abusive language (*e.g.*, "faggot"). Misgendering extends to some senior staff at Logan. We heard at least one complaint of misgendering by the warden.

Some prisoners at Logan also use abusive language, and there is a perception among class members that this conduct is tolerated or even encouraged by institutional management. Class members at Logan do not understand why other prisoners who are not tolerant and use abusive language are placed on the same living units with class members. Class members sometimes feel that they are being deliberately provoked and infer from this that there is a desire for them to incur disciplinary infractions.

Class members also feel that non-class members receive less, or no disciplinary action for abusive conduct towards class members. One especially egregious example involved a class member who reported that she was surrounded by other prisoners who called her a "faggot" and threatened to "stick a broom up [her] ass," which they insisted she would "like." Ultimately, the abusers did get disciplinary tickets, but the investigating officer refused to write these up as PREA violations because (he said) it did not involve a threat of "rape."