# Exhibit 2

| | **Illinois Department of Corrections** **Administrative Directive** | |
|---|---|---|
| Number: **04.03.104** | Title: **Evaluation, Treatment and Correctional Management of Transgender Offenders** | Effective: **__/__/2021** |

| Authorized by: | *[Original Authorized Copy on File]* | **Rob Jeffreys** Acting Director |
|---|---|---|
| Supersedes: | 04.03.104 effective 4/1/2021 | |

| Authority: 730 ILCS 5/3-2-2, 5/3-7-2 and 5/3-8-2 PREA Authority: Title 42 USC Sections 15601-15609 | Related ACA Standards: 5-ACI-3A-21 |
|---|---|
| Referenced Policies: 04.01.301, 05.01.109, 05.01.113, 05.07.101 [plus the new hormone therapy policy] | Referenced Forms: DOC 0282 – Mental Health Progress Note DOC 0400 – Transgender Committee Recommendation DOC 0434 – Incident Report DOC 0494 – Screening for Potential Sexual Victimization or Sexual Abuse DOC 0616 – Medical Provider Initial Gender Determination for Gender Non-Conforming Offenders [note the new title] |

I.     **POLICY**[1]

The Department seeks to foster an environment where all offenders, including Gender Non-Conforming Offenders (defined below), are living in a dignified manner with full respect of their right to be free from discrimination, harassment, victimization, bullying or violence whether emotional, physical or verbal. The Department seeks to meet the medical, mental health, transition and security needs of all segments of the population.

II.    **PROCEDURE**

A.     **Purpose**

To establish a written procedure for the identification, institutional management, facility assignment/placement and medical and mental health care for Gender Non-Conforming Offenders. This includes a written procedure to address the adjustment of offenders self-identified as transgender or suspected of having Gender Dysphoria or other concerns related to gender identity, and to make appropriate accommodations to the prison environment related to gender identity throughout their incarceration.

B.     **Applicability**

This directive is applicable to correctional facilities within the Department.

---

[1] Dr. Harris notes that barriers to care persist. *See* Initial Report of First Co-Monitor Harris ("Harris Report") Dkt. 439 at 5 ("[G]iven the number of individuals with undetermined gender identity in the class, it is worth questioning whether more can be done to remove barriers to care so that individuals can safely pursue treatment. Staff reported that the number of individuals getting care pre- and post- removal of the committee was 'not a huge change.'"). Likewise, the Harris Report states unequivocally that "[p]olicies and procedures must be put in place to protect class members from bias and discrimination so they may safely pursue social transition." *Id.* at 12. The initial report by julie graham also suggests that there is confusion within IDOC regarding its current policies and procedures; therefore, clarity is needed. *See* Initial Report of Second Co-Monitor graham ("graham Report") Dkt. 444 at 4 ("There is some degree of confusion at IDOC. Depending on who was asked questions, different answers would emerge.").

| | Illinois Department of Corrections<br>Administrative Directive | Page **2** of 21 |
|---|---|---|
| Number:<br>    04.03.104 | Title:<br>Evaluation, Treatment and Correctional Management of<br>Transgender Offenders | Effective:<br>  __/___/2021 |

C.     **Facility Review**

A facility review of this directive shall be conducted at least annually.

D.     **Designees**

Individuals specified in this directive except the Transgender Medical Lead and Transgender Mental Health Lead may delegate stated responsibilities to another person or persons unless otherwise directed.

E.     **Definitions**

**Gender Dysphoria** – A medical diagnosis for individuals experiencing a marked incongruence between their experienced or expressed gender and their assigned gender that is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning. The Diagnostic and Statistical Manual of Mental Health Disorders (DSM) also requires at least two of the following criteria:

1.     A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics).

2.     A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics).

3.     A strong desire for the primary and/or secondary sex characteristics of the other gender.

4.     A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).

5.     A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).

6.     A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).

Sexual orientation is irrelevant to a gender dysphoria diagnosis.

**NOTE:** Anxiety, depression, and psychological distress frequently present in individuals with gender dysphoria, either due to inadequate treatment of their gender dysphoria or the minority stress that individuals with gender dysphoria experience as a result of social stigma. These symptoms of gender dysphoria should not be confused for distinct mental health concerns that can or should be treated independently from an individual's underlying gender dysphoria.

**Gender identity** – A person's internal sense of being male, female, or an alternative gender regardless of anatomical genitalia at birth or sexual orientation.  Gender identity is a result of genetics and environmental influences and may be manifested by appearance, behavior or other aspects of the individual's lifestyle.

**Gender Non-Conforming Person** – A person whose gender identity or gender expression does not conform to socially defined male or female gender norms.

| | Illinois Department of Corrections<br>Administrative Directive | Page **3** of **21** |
|---|---|---|
| Number:<br>04.03.104 | Title:<br>Evaluation, Treatment and Correctional Management of<br>Transgender Offenders | Effective:<br>__/__/2021 |

**Gender Non-Conforming Offender** - For purposes of this directive, Gender Non-Conforming Offender shall refer to any offender who is diagnosed with Gender Dysphoria or who is reasonably identifiable from any source as:

1.   Transgender;

2.   Intersex;

3.   Nonbinary; or

4.   Otherwise possessing a gender identity or gender expression that differs from the offender's assigned gender.

An offender shall not require any legal document or specific diagnosis to qualify as a Gender Non-Conforming Offender. Where an offender is not diagnosed with Gender Dysphoria but seeks any of the protections afforded under this directive, any questions as to whether the offender qualifies as a Gender Non-Conforming Offender shall be referred to the TMHL for determination.

**Intersex Person** – A person whose sexual or reproductive anatomy or chromosomal pattern does not seem to fit typical definitions of male or female. Intersex medical conditions are sometimes referred to as differences of sex development. Intersex people may identify their gender in a variety of ways, as do non-intersex people. Some, but not all, intersex individuals identify as transgender because they were assigned a sex at birth that does not match their gender identity. Being intersex is not the same as being transgender.

**Nonbinary Person** – A person who does not identify as either a man or a woman.

**Transgender Medical Lead (TML)** – Individual responsible for overseeing all medical decisions made, recommended or suggested by each Medical Provider providing care to a transgender prisoner. Qualifications and responsibilities are listed below in Section J.

**Transgender Mental Health Lead (TMHL)** – Individual responsible for overseeing all mental health decisions made, recommended or suggested by each MHP and MHA providing care to a transgender prisoner.  Qualifications and responsibilities are listed below in Section K.

**Surgical Consultant** – Individual responsible for counseling and meeting with offenders with gender dysphoria who are interested in being considered for surgeries, conducting assessments for surgeries, and drafting letters of referral for surgeries. Qualifications and responsibilities are listed below in Section L.

**Surgical Provider** – Individual responsible for providing surgical treatment of gender dysphoria. Qualifications and responsibilities are listed below in Section M.

**Medical Provider** – For purposes of this directive, shall mean a Physician, Physician's Assistant or a Nurse Practitioner.

**Mental Health Authority (MHA)** – The facility's Psychology Administrator, or in event of absence, a mental health professional who has been designated by the Chief of Mental Health to make mental health decisions.

**Mental Health Professional (MHP)** – A physician who is licensed to practice medicine and is board certified in psychiatry by the American Board of Psychiatry and Neurology ("ABPN") or the American Osteopathic Board of Psychiatry and Neurology ("AOBPN"), or has completed four (4) years of an accredited post-graduate training program in psychiatry; a psychologist with a Ph.D./Psy. D and licensed as a clinical psychologist; a licensed psychiatric nurse (i.e., a nurse licensed as an R.N. and certified in psychiatric-mental health); a licensed clinical social worker; an individual licensed to provide mental

| | Illinois Department of Corrections<br>Administrative Directive | Page **4** of **21** |
|---|---|---|
| Number:<br>04.03.104 | Title:<br>Evaluation, Treatment and Correctional Management of<br>Transgender Offenders | Effective:<br>__/__/2021 |

health services with a Ph.D./Psy. D or master's degree in Psychology, Counseling, Social Work or similar degree program. "Licensed" means currently licensed by the State of Illinois.

**Transgender Person** – An individual whose gender identity is different from the gender assigned at birth, including nonbinary people, transgender women, and transgender men.

**Transgender Woman** – A person assigned male at birth who identifies as female.

**Transgender Man** – A person assigned female at birth who identifies as male.

F.     <u>General Provisions</u>

1.     In accordance with Administrative Directive 05.07.101, all offenders shall undergo a detailed medical history, physical examination, and mental health screening during the reception and classification process. This shall be completed at the Reception and Classification Center (R&C) on the offender's first full day of admission whenever possible.

2.     Further evaluations shall be completed in accordance herein for any offender self-identified as transgender or suspected of qualifying as a Gender Non-Conforming Offender. The further evaluation shall:

     a.     Occur within seven working days for those offenders identified at the R&C during screening; or

     b.     For any offender newly disclosing any type of gender non-conformity at their parent facility, a like evaluation shall be completed within seven working days of the disclosure.

3.     An individual's gender identity, sexual orientation, diagnosis and treatment for gender dysphoria, and transgender, intersex, and gender non-conforming status shall be maintained as confidential and shall only be disclosed on a need-to-know basis.

G.     <u>Transgender Information Databases</u>[2]

The TML and TMHL shall be jointly responsible for creating and maintaining two databases: a Transgender Health Database and a Transgender Accommodations Database. Both Databases shall include the names and identifying information of all Gender Non-conforming Offenders in the Department. Whenever a Gender Non-conforming Offender enters the Department or is newly identified as such, the TML or TMHL shall ensure that the offender's name and appropriate information are immediately entered into both Databases.

Gender Non-conforming Offenders shall have the right to timely receive a copy of their information as recorded in either Database upon written request. The offender may advise their primary care physician or MHP of any necessary corrections to the information, which corrections the primary care physician or MHP shall have the power to make on behalf of the offender.

---

[2] The Harris Report demonstrates a clear need for a centralized transgender healthcare database. Dr. Harris reported that "reviewing and organizing information was time-consuming" and "[e]ven after the extension was granted, additional records obtained from IDOC (Endocrinology progress notes) made plain that information provided previously to the First Co-Monitor was incomplete or needed further clarification." Dkt. 439 at 5; *id.* ("NOTE: Medication records cited here are likely incomplete. During review, discrepancies were found regarding patients seen in the Endocrine clinic and those listed on the tracking spreadsheet provided to the Co-Monitors."). Further, Dr. Harris issued the report "based on information provided, however incomplete," "[i]n the interest of the class members to not delay any further, and ***in the hopes of encouraging all parties to develop a more efficient method of tracking compliance***." *Id.* (emphasis added).

| | Illinois Department of Corrections<br>**Administrative Directive** | Page **5** of **21** |
|---|---|---|
| Number:<br>04.03.104 | Title:<br>Evaluation, Treatment and Correctional Management of<br>Transgender Offenders | Effective:<br>__/__/2021 |

1.    Transgender Health Database

    a.    Contents

In addition to basic identifying information, the Transgender Health Database shall include all information relevant to Gender Non-Conforming Offenders' medical and mental health, including:

    (1)    The offender's gender identity

    (2)    The offenders' preferred name to be used in medical settings

    (3)    The offenders' preferred pronouns to be used in medical settings

    (4)    Whether the offender is diagnosed with Gender Dysphoria

    (5)    A list of the offenders' currently prescribed medications and their dosages, including any gender affirming hormones

    (6)    The dates and results of the offenders' hormone therapy-related blood tests, if applicable

    (7)    A list of any gender-affirming procedures that the offender has undergone

    (8)    A list of any gender-affirming therapies or procedures that the offender has requested (including transfer requests) and the date(s) of those requests

    (9)    The names of the offender's current primary care physician and MHP

    (10)   Any information recorded for the offender in the Transgender Accommodations Database

The TML and/or TMHL may recommend additional categories of information to be included in the Transgender Health Database.

    b.    Confidentiality

The Transgender Health Database shall be kept strictly confidential. Access to the Transgender Health Database shall be limited on a need-to-know basis to Medical Providers and MHPs. During the pendency of *Monroe v. Jeffreys*, No. 18-156-NJR (S.D. Ill.) the Transgender Health Database shall be shared with counsel, the appointed monitors, and the Court. An offender's primary care physician and/or MHP shall be responsible for updating information in the Transgender Health Database as it comes to their attention.

2.    Transgender Accommodations Database

    a.    Contents

In addition to basic identifying information, the Transgender Accommodations Database shall include all information relevant to security and operations staff who interact with Gender Non-Conforming Offenders, including:

    (1)    The offenders' preferred name to be used in the presence of other offenders and/or correctional staff

| | Illinois Department of Corrections<br>Administrative Directive | Page **6** of 21 |
|---|---|---|
| Number:<br>04.03.104 | Title:<br>Evaluation, Treatment and Correctional Management of<br>Transgender Offenders | Effective:<br>__/__/2021 |

    (2) The offenders' preferred pronouns to be used in the presence of other offenders and/or correctional staff

    (3) The gender of the officer who shall search the offender, as designated by the offender

    (4) Whether the offender shall have access to male-facility commissary items, female-facility commissary items, or both

    (5) The location of the private shower available to the offender

    (6) Whether the offender has requested a transfer to a facility that aligns with their gender, the date(s) of that request, the reason for the decision, and the current facility

    (7) Any other gender-related accommodations provided to the offender

   b. Confidentiality

    The Transgender Accommodations Database shall not be made publicly available. Access to the Transgender Accommodations Database shall be limited on a need-to-know basis to the Department's employees and agents, who shall take reasonable steps to ensure the information contained in the Database is not disclosed to other offenders or the public. During the pendency of *Monroe v. Jeffreys*, No. 18-156-NJR (S.D. Ill.) the Transgender Accommodations Database shall be shared with counsel, the appointed monitors, and the Court. Training on the use of the Transgender Accommodations Database shall be provided to Department staff.

  3. Information Tracking[3]

   At least once every six months, the TML and TMHL shall be jointly responsible for conducting a survey to validate and update, as necessary, all the information contained in the Transgender Health Database and Transgender Accommodations Database. Nothing in this section shall relieve the TML, the TMHL, or offenders' primary care physicians and MHPs from timely updating the Databases as needed.

**H. Evaluation Requirements of a Gender Non-Conforming Offender**

  1. Intake Procedures

   For an any offender who self-identified as Gender Non-Conforming within the reception and classification process, the following steps must be followed as soon as practicable after such identification:

   a. Absent medical reasons to adjust or discontinue, as determined and documented by the facility medical provider under the supervision of the Facility Medical Director, an offender shall continue to receive gender affirming hormones at intake or upon transfer at least for thirty (30) days or until further evaluation for hormones can be determined.

---

[3] The Harris Report found inconsistencies and errors in IDOC's identification of class members. Dkt. 439 at 4 ("For example, four of these undefined individuals are housed in a female facility and have elevated testosterone levels, indicating possible exogenous testosterone administration (and thus simply a recording error with regard to their gender identity). They have also made surgery requests and/or been evaluated by an Endocrinologist. In these cases, the gender identity is presumed to be trans man and corrected in the data.").

| | Illinois Department of Corrections<br>**Administrative Directive** | Page **7** of **21** |
|---|---|---|
| Number:<br>04.03.104 | Title:<br>Evaluation, Treatment and Correctional Management of<br>Transgender Offenders | Effective:<br>__/__/2021 |

      b.     The facility medical provider shall document the preliminary determination of gender status, including any diagnosis of Gender Dysphoria or determination as a Gender Non-Conforming Offender, in the offender's medical record, shall document the offender's preferences regarding housing and searches, and shall within twenty-four hours provide this information to the TMHL and TML.

      c.     After meeting with the Gender Non-Conforming Offender at R&C (in-person or by video teleconference), and in conjunction with the offender, the TMHL and TML shall within twenty-four hours determine the gender of officers who shall conduct searches of a Gender Non-Conforming Offender and within 3 days determine the appropriate temporary housing placement of the offender in a parent facility. Such determinations regarding searches and temporary housing placement shall be included in the Transgender Accommodations Database and shall be honored.

      d.     The temporary housing placement determination shall be consistent with the Gender Non-Conforming Offender's gender identity and preferences regarding housing.

    2.     General Evaluation Procedures

A detailed medical examination and mental health screening shall be conducted within seven days for any offender who self-identified as transgender within the reception and classification process or for any offender who newly discloses any type of gender non-conformity at a facility. The evaluation shall include the following:

      a.     Medical History

          A medical provider shall elicit information about

          (1)    previous operative procedures related to gender identity; and

          (2)    Hormone therapy.

          The medical provider shall also ask the offender questions that would:

          (1)    Clarify the offender's sense of gender identity; and

          (2)    Reveal any plans the offender may have for future surgery.

          The medical provider shall inquire as to past medical providers' management of the offender's gender related treatment prior to incarceration.

          **NOTE:** If possible, the medical provider managing the offender's gender related treatment prior to incarceration shall be contacted for verification of the course of treatment and to obtain relevant medical records.

      b.     Notifications

          (1)    The Facility Medical Director shall notify the Health Care Unit Administrator of the preliminary gender determination and any recommended accommodations by submitting the Medical Provider Initial Gender Determination for Gender Non-Conforming Offenders, DOC 0616.

| | Illinois Department of Corrections<br>Administrative Directive | Page **8** of **21** |
|---|---|---|
| Number:<br>04.03.104 | Title:<br>Evaluation, Treatment and Correctional Management of<br>Transgender Offenders | Effective:<br>__/__/2021 |

      (2)     The Health Care Unit Administrator shall forward a copy of the DOC 0616 to the Mental Health Administrator, Chief Administrative Officer (CAO), the TML, and the TMHL.

   c.    Mental Health Evaluation

A Mental Health Provider shall, as part of the mental health evaluation, evaluate the offender to determine:

      (1)     If the offender has Gender Dysphoria using the current DSM criteria;

      (2)     The offender's capacity to give informed consent and make a fully informed decision;

      (3)     The offender's current gender identification;

      (4)     The regularity and history of any hormone therapy and if the hormones were prescribed and monitored by a physician; and

The MHP shall determine whether an offender qualifies as a Gender Non-Conforming Offender and, if confirmed, shall inform the facility Mental Health Authority of this determination. If a diagnosis of Gender Dysphoria is not made, but questions remain as to whether the offender may nonetheless qualify as a Gender Non-Conforming Offender, the offender shall be referred to the TMHL for determination.

  3.    Post-Intake Procedures

Within 30 days of a Gender Non-Conforming Offender arriving at the assigned parent facility from an R&C, transferring to another facility, or making an initial or new disclosure of transgender identity or gender non-conformity at the current facility, a Mental Health Professional (MHP) shall:[4]

   a.    Complete a social history interview and review any relevant information regarding gender expression or life experience the offender may have had in the gender role of the opposite gender assigned at birth.  The social history shall be documented on the Mental Health Progress Note, DOC 0282, and shall include, but may not be limited to, the offender's:

      (1)     Mental health history including substance abuse history;

      (2)     Current mental health status;

      (3)     General adaptive functioning;

      (4)     Gender identity and the development of gender identity or Gender Dysphoria over the lifespan, as applicable;

      (5)     Positive or stigma experiences in community and correctional social settings, as well as coping strategies;

---

[4] The Harris Report reported IDOC's compliance with requirements related to Transfers and PRISM Project as "NON-COMPLIANT/UNABLE TO ASSESS."  *See* Dkt. 439 at 12. The Harris Report notes that "[t]o date, records shared with the First Co-Monitor list 58 people who have requested transfers. Only 6 have been granted." *Id.*

| | Illinois Department of Corrections<br>Administrative Directive | Page **9** of 21 |
|---|---|---|
| Number:<br>04.03.104 | Title:<br>Evaluation, Treatment and Correctional Management of<br>Transgender Offenders | Effective:<br>__/__/2021 |

(6)     The availability of support in the community and in the correctional setting; and

(7)     Experiences during any previous incarceration(s), if applicable.

b.     With the assistance of a Medical Provider, complete Sections I through IX of the Transgender Committee Recommendation, DOC 0400, documenting any social or medical transition or considerations to do so. This may include, but not be limited to, history of name changes or gender marker or any gender-related chest binding or body padding.

c.     Determine the offender's preference for housing placement, including to document efforts to obtain hormone therapy or gender confirming surgeries or gender confirming surgery or procedures including preparation for surgery and the offender's self-identified personal pronouns.[5]

d.     Perform screening for potential of sexual victimization or sexual abuse in accordance with Administrative Directive 04.01.301, and complete DOC 0494, within 72 hours of intake and again within 30 days.

e.     Contact the TMHL and TML and confer the results of the interview, offender preference, and recommendation by the MPH, within 14 days.

f.     The TMHL and the TML together will recommend placement for the Gender Non-Conforming Offender that shall be honored and the offender shall be transferred within 7 days.

g.     In making placement recommendations for a Gender Non-Conforming Offender, the offender's length of time on gender affirming hormones and hormone levels shall not be considered, and in no circumstances should a Gender Non-Conforming Offender's hormone levels prevent placement that is consistent with the Gender Non-Conforming Offender's gender identity and preferences for housing.[6]

H.     **Medical Treatment**

1.     If an offender is diagnosed with Gender Dysphoria, the medical provider and MHP shall provide informative materials to the offender on the condition and treatment of Gender Dysphoria.

2.     Gender affirming Hormone Treatment[7]

a.     If an offender arrives to the facility having already started on gender affirming hormones, the medical provider will provide continued hormone treatment as determined by the medical provider.

---

[5] Dkt. 439 at 12 ("Clarification of the process for trans women to move from PRISM to the women's prison at Logan is needed.").

[6] *See* Dkt. 462, Ex. 6, Table of Documented Transgender Transfer Requests, as of Nov. 7, 2022 at 11, 12, 22 (table listing transfer decisions including several instances where transfer requests were denied due to the offender being "new to hormones" or the offender's "hormones not in range.").

[7] As the Harris Report notes, "[h]ormone therapy is often a central component of treatment for gender dysphoria, particularly if the individual intends to transition to a different gender." IDOC is only "PARTIALLY COMPLIANT" with the Court's orders with respect to Hormone Therapy. Dkt. 439 at 5.  Dr. Harris reported that over one-third of the Class, 34.9%, is not receiving hormone therapy at all. *Id.* at 6.

| | Illinois Department of Corrections<br>Administrative Directive | Page **10** of 21 |
|---|---|---|
| Number:<br>04.03.104 | Title:<br>Evaluation, Treatment and Correctional Management of<br>Transgender Offenders | Effective:<br>__/__/2021 |

      b.    If a Gender Non-Conforming Offender is not on gender affirming hormones but requests it, the facility medical provider shall provide the offenders with appropriate gender-related mental health and gender affirming hormone services, as necessary, throughout their incarceration.

      c.    The offender's hormone levels and appropriate metabolic parameters will be managed by the designated primary care provider and shall be monitored and supervised by the Facility Medical Director in accordance with the Gender Affirming Hormone Therapy Treatment Policy.[8]

    3.    Gender Affirming Surgery[9]

      a.    If an offender who has been diagnosed with Gender Dysphoria expresses interest in surgical treatment of Gender Dysphoria, the MHP will, within 7 days:

          (1)  provide informative materials on such surgical treatments, and

          (2)  refer the offender to the designated Surgical Consultant. The Surgical Consultant shall possess the qualifications outlined in Section L.[10]

      b.    Within 90 days of a MHP referring an offender to the Surgical Consultant(s), a Surgical Consultant will meet with the offender:

          (1)    to discuss the patient's hopes and expectations for surgery, and

          (2)    to determine if the offender has met the pre-requisites for the desired procedure(s), as indicated in the WPATH Standards of Care.[11]

      c.    If an offender does not meet the pre-requisites:

          (1)    The Surgical Consultant will provide a written explanation as to why the offender does not yet meet the pre-requisites.[12]

          (2)    The offender may seek to re-present a request for surgery by contacting the

---

[8] As the Harris Report recognizes, "[i]n a community setting, gender-affirming medication titration is a straightforward and relatively simple process that is managed by primary care practices. In terms of complexity, it is arguably on par with managing hypertension and less complex than managing diabetes, areas that are commonly successfully managed in a primary care setting." *Id.* at 10. Yet, in IDOC, of the more than 100 transgender women on hormone therapy, *less than ten percent* were at goal. *See Id.* at 6-7 ("[V]ery few trans women are achieving physiologic levels of estradiol despite reportedly being given hormone therapy. This finding is consistent with reports of interruption in medication administration or inadequate titration.") For the smaller population of transgender men, only half were even on hormone therapy and only seven were in range. *Id.* at 8. The Harris Report notes, "there is no clear evidence that a standardized medication protocol exists," and "[i]t is probable that the barrier to success is simply a lack of practical guidance and training." *Id.* at 9-10.

[9] Defendants Response to the Initial Report of Co-Monitor Dr. Amanda Harris admits that "[t]here have been delays in the provision of gender-affirming surgery." Dkt. 446 at 2. These delays have resulted in class members who were approved for surgery being released from IDOC, before surgery could occur. Dkt. 439 at 11.

[10] As noted by the Harris Report, and detailed in Plaintiffs' Memorandum to Monitors, class members have reported that "they are being coerced to cancel requests [for surgery] in exchange for release from isolation." *See* Dkt. 439 at 12.

[11] The Harris Report notes, and the Plaintiff's Memorandum to Monitors details, that "some class members allege that they are caught in a Catch-22, being denied hormone therapy (a pre-condition for surgery) and thus ineligible to request it." Dkt. 439 at 11.

[12] The Harris Report notes the lack of available information provided by IDOC regarding denials for gender affirming surgery. *Id.* at 11 ("Additional information regarding who has requested surgery, the reasons for denial, and the timing for reconsideration has not been shared with the Co-Monitors.").

| | Illinois Department of Corrections<br>Administrative Directive | Page **11** of **21** |
|---|---|---|
| Number:<br>    04.03.104 | Title:<br>Evaluation, Treatment and Correctional Management of<br>Transgender Offenders | Effective:<br>__/__/2021 |

Surgical Consultant or MHP. The Surgical Consultant will re-assess the patient within 60 days of receiving the request.

(3)    If appropriate, the surgical consultant will provide pre-surgery counseling to the offender.

d.    If the offender meets the pre-requisites:

(1)    The Surgical Consultant will review the offender's medical records and will meet with the MHP familiar with the offender to discuss the case.

(2)    The Surgical Consultant will meet with the offender (in-person or via tele-health) and conduct a thorough assessment consistent with the WPATH Standards of Care and, if appropriate, draft a letter of referral.

(3)    For genital surgeries, a MHP who has worked with the offender long enough to be familiar with and knowledgeable about the offender will meet with the offender, conduct a thorough assessment consistent with the WPATH Standards of Care, and if appropriate, draft a second letter of referral.

(4)    The Surgical Consultant will work with the TMHL and TML to provide the letter(s) of referral and any other necessary information to the surgical provider within 7 days.  The Surgical Consultant will arrange a pre-surgery consultation with the surgical provider as soon as possible given the surgical providers schedule and provide any necessary information the surgical provider may request. The surgical provider shall have expertise performing the requested surgical treatments of gender dysphoria.

(5)    The Surgical Consultant will work with the TMHL and TML to arrange for permanent genital hair removal if necessary for the procedure.

(6)    The Surgical Consultant will provide pre- and post-surgery counseling.

e.    The offender shall be provided safe and sanitary transportation to and from the operation.

f.    The offender shall be provided safe and sanitary housing placement following surgery.

3.    Permanent Hair Removal

a.    At the recommendation of a MHP or based up on a request by an offender to their MHP for permanent hair removal for treatment of gender dysphoria, such MHP shall work with the TMHL and TML to make arrangements for the hair removal, as necessary to treat the offender's gender dysphoria. If a MHP denies a request by an offender for permanent hair removal for treatment of gender dysphoria, the denial and reason for denial shall be provided to the offender in writing by the MHP within seven (7) days of the request and a copy forwarded to the TMHL. The offender will also have the right to appeal the denial to the TMHL within thirty (30) days of receipt of the MHP's written explanation of denial.[13]

---

[13] The Harris Report notes that this service is "being offered to class members in preparation for vaginoplasty," but that "class members complain that the sessions are limited to a finite number instead of a goal outcome." Dkt. 439 at 11. Further, Defendants' response to the Harris Report states that no patients have completed the process, with only 3 class members being more than 70% complete. Dkt. 446 at 3.

| | Illinois Department of Corrections | Page **12** of 21 |
|---|---|---|
| | **Administrative Directive** | |
| Number:<br><br>04.03.104 | Title:<br>Evaluation, Treatment and Correctional Management of<br>Transgender Offenders | Effective:<br><br>__/___/2021 |

4.      Gender Affirming Items and Commissary[14]

a.      Gender Non-Conforming Offenders shall be offered undergarments in appropriate sizes of their identified gender, of the same quality[15] and quantity as are provided to non-transgender (cisgender) offenders of the same gender.[16] The Department shall provide the same number of undergarments to Gender Non-Conforming Offenders throughout their incarceration as it provides to cisgender offenders and shall not charge Gender Non-Conforming Offenders for undergarments that would be provided free of charge to cisgender offenders.[17] Additional undergarments should be available for purchase by Gender Non-Conforming Offenders at commissary to the same degree they are provided to cisgender offenders housed at facilities designated by the Department for housing such cisgender offenders.

b.      Gender Affirming items are considered medical appliances.[18] The THML and TML shall develop and as needed update an approved list of Gender Affirming items which shall be distributed to all MHPs and Medical Providers. For items such as makeup, the list will include an annual quota per offender beyond which the offender will be required to purchase the item unless a MHP or Medical Provider determines that this purchase fee should be waived for a particular offender.  For Gender Affirming items not on the list, the MHP or Medical Providers may recommend these items, or the Gender Non-Conforming Offenders may request them of the MHP or Medical Provider and, if approved, they will be ordered as a medical device. If a MHP or Medical Provider denies a Gender Non-Conforming Offender's request for a non-list item, the denial and reason for denial shall be provided to the offender in writing by the MHP or Medical Provider within seven (7) days of the request and a copy forwarded to the TMHL and TML. The offender will have the right to appeal the denial to the TMHL or TML within thirty (30) days of receipt of the MHP's and Medical Provider's written explanation of denial.  Offenders diagnosed with gender dysphoria should be informed at least once per year that these items are available as medical appliances and provided at that time with a list of such items. Such items also should be available for purchase at commissary.

---

[14] The graham Report notes the "confusion and disappointment" surrounding IDOC's policy on providing gender-affirming commissary items. Dkt. 444 at 4 ("Some members of TAC stated IDOC had moved to a Gender Neutral Commissary and other administrators did not believe they had or were unsure; that it was still in discussion. It was hard to determine if they were making items available when what was to be included in commissary for transgender people was unclear.").

[15] According to the graham Report, class members were frustrated when their makeup was replaced with lower-quality makeup that did not work as well. *Id.* at 20.

[16] As the graham Report states, "[i]ndividuals in custody were unable to *consistently* access items important to them for decreasing gender dysphoria" and that "they had difficulty getting sizes of underwear and bras on either side of the spectrum of sizes." *Id.* at 19-20 (emphasis added).

[17] The graham Report notes how "many incarcerated people did not know they were eligible to receive free bras and underwear from the clothing room," and that class members "were generally uncertain of the rules regarding this." *Id.* at 24.

[18] The graham Report emphasizes the disproportionate impact of commissary on transgender individuals and implies why gender-affirming items are medically necessary. "Transgender people are using commissary . . . for treatment of gender dysphoria and to socially transition. When supplies are unavailable, it creates harm for them, not simply inconvenience." Moreover, "[w]hen incarcerated people face constant discrimination, issues like commissary problems that are due to structural issues can feel personal and part of the ongoing discrimination." *Id.* at 21, 23.

| | Illinois Department of Corrections<br>**Administrative Directive** | Page **13** of **21** |
|---|---|---|
| Number:<br>04.03.104 | Title:<br>Evaluation, Treatment and Correctional Management of<br>Transgender Offenders | Effective:<br>__/__/2021 |

      c.     All Gender Non-Conforming Offenders shall be provided access to all commissary items available to cisgender offenders of the same gender housed at facilities designated by the Department for housing such cisgender offenders, including but not limited to clothing (in appropriate sizes), hair-removal devices, grooming, and hygiene products. No additional permits are required to access such items.

      d.     All Gender Non-Conforming Offenders will be provided at intake with a kit containing a thirty (30) days' supply of Gender Affirming items, the contents of said kit to be determined by the THML and TML.[19]  Additional kits may be provided to a Gender Non-Conforming Offender at the instruction of a MHP or Medical Provider (if a MHP or Medical Provider gives such an instruction, a kit *will* be provided).

            **NOTE:**  A CAO of an individual facility may request restrictions of gender affirming commissary items for the safety, health, or security of their facility. Such items may not be restricted as a punishment for disciplinary offenses such restrictions only may be imposed with written approval of the TMHL. The Department shall provide a copy of any such written decision to the Gender Non-Conforming Offender. The use of make-up or other gender-affirming items does not inherently prevent accurate identification of the offender nor constitute a security threat. However, make-up or other items shall not be worn in a manner that prevents such accurate identification.

I.       **Operations**

     1.     Identification

         a.     A Transgender Accommodations Database of Gender Non-Conforming Offenders in custody shall be established and maintained by the TMHL and TML as described above.

         b.     When Gender Non-Conforming Offenders status is established as above, the Mental Health Authority shall ensure Bureau of Identification (B of I) is notified.

         c.     A Gender Non-Conforming Offender's status shall be maintained as confidential and shall only be disclosed to the extent necessary to make treatment, placement, search, commissary, shower, and other related accommodations.

         d.     The B of I shall add gender identification to the offender's ID unless the offender opts to decline gender identification on their ID card. All offender ID's shall have the same appearance and shall include that same information, including an offender's gender identify, to the extent possible.

         e.     ID Cards for those identified shall identify an offender's choices for purposes of the gender of guards who will search them, their authority to access commissary items consistent with their gender, and their right to shower separately from other prisoners, etc.

         f.     The name entered on the offender's Judgment and Commitment Order shall remain the official committed name for all IDOC records.

         g.     The Transgender Accommodations Database serve as an alternative for those Gender Non-Conforming Offenders to be provided accommodations, including their search choices, commissary access, and private shower access, but do no not wish to have

---

[19] The graham Report supports this proposed idea because graham suggested giving class members a "tool kit" that includes a "pamphlet or handout that explains what a transgender or non-binary person is eligible for and how to access those things and what the timeline is for [obtaining] those things[.]" *See* Dkt. 444 at 32.

| | Illinois Department of Corrections<br>Administrative Directive | Page **14** of 21 |
|---|---|---|
| Number:<br>04.03.104 | Title:<br>Evaluation, Treatment and Correctional Management of<br>Transgender Offenders | Effective:<br>__/___/2021 |

those accommodations listed on their ID card. At the direction and in the sole discretion of the TMHL and TML, the Department shall compile those preferences in the Transgender Accommodations Database, which shall be available only to those correctional staff who need to have access to it.

2.   Search[20]

a.   In General

Regardless of whether an offender is a Gender Non-Conforming Offender, all searches shall be conducted in a respectful and professional manner and in the least intrusive manner possible. Unless otherwise indicated, the provisions of this Section I.3 shall apply to both pat or body searches and unclothed visual searches.

**NOTE:** At no time shall two officers of different genders split up body search areas to search a Gender Non-Conforming Offender.

b.   Availability of Officers and Scanners

At all times, 24/7, all facilities that house at least one Gender Non-Conforming Offender shall have at least one male and one female officer available and willing to perform both pat or body searches and unclothed visual searches of Gender Non-Conforming Offenders.[21] The facility must provide an officer of the gender designated by a Gender Non-Conforming Offender to conduct the search. If such an officer is not available, and the facility has an operational scanner, then the facility must use the operational scanner to conduct the search.[22]

A facility that does not have such available staff or an operational scanner shall not be used to house Gender Non-Conforming Offenders.  If, due to unforeseen circumstances, an officer of the gender designated by a Gender Non-Conforming Offender is not available and willing to perform a search of that offender, the search shall not take place. All such incidents shall be recorded in a log provided on a weekly basis to the TMHL.[23] If the number of such incidents exceeds five (5) in any given month or ten (10) over the course of three consecutive months at any facility, that facility shall not be used to house Gender Non-Conforming Offenders.

c.   Designation of Searching Officer's Gender

(1)   Offenders Documented as Gender Non-Conforming

[20] The graham Report notes that "[c]ross gender searches have generally stopped, but there is not yet a well-functioning system in place to search incarcerated transgender people. This causes systemic problems." Dkt. 444 at 7.
[21] According to the graham Report, there are significant delays with the current IDOC search policy, with one class member in Pontiac, for example, waiting over 8 hours to be searched. *Id.* There was also "a report of an inmate at Pontiac being held with her hands handcuffed behind her back for a prolonged period of time (over 4 hours) while waiting for a female officer to arrive to search her." Dkt. 444 at 7-8; *see also* Dkt. 460 at 2 ("An incarcerated person at Pontiac reports that she had her pants pulled down by a corrections officer in response to requesting to be searched by a female staff member[.]").
[22] The graham Report initially stated that body scanners would be utilized in five facilities (*see* Dkt. 444 at 9), but recent updates from the monitor indicate that the scanners are not yet operational. *See* Dkt. 450 at 1; Dkt. 460 at 2. Moreover, as graham notes, "[i]f body scanners are to be the answer, other facilities need to acquire and utilize scanners as well, particularly those without easy access to female staff who will perform necessary searches." Dkt. 444 at 9.
[23] The graham report demonstrates the obvious need for a tracking system, because, as previously stated, IDOC "does not yet [have] a well-functioning system in place to search incarcerated transgender people." *Id.* at 7.

| | Illinois Department of Corrections<br>Administrative Directive | Page **15** of **21** |
|---|---|---|
| Number:<br>04.03.104 | Title:<br>Evaluation, Treatment and Correctional Management of<br>Transgender Offenders | Effective:<br>__/___/2021 |

A designation of an offender's search preferences on their ID or in the Transgender Accommodation Database shall be honored—without the need for the offender to renew the designation—unless such designation is contradicted by the Gender Non-Conforming Offender at any time prior to or during a search.

At any time, a Gender Non-Conforming Offender who wishes to identify or change their designation regarding the gender of the officer who shall search the offender may make that designation to their MHP, the TMHL, or the TML either orally or in writing. Such designation by the offender shall be honored.

Whenever a Gender Non-Conforming Offender designates the gender of the officer that shall search the offender, the offender's file in the Transgender Accommodation Database shall be immediately updated by the TMHL to reflect that designation, if it is not already so documented.

In no case shall information in an offender's Transgender Accommodation Database prevent a Gender Non-Conforming Offender from making a new designation under this Section I.3.c.1.

(2)     By Offenders Not Previously Documented as Gender Non-Conforming

If an offender identifies themselves as a Gender Non-Conforming Offender but is not identified as such by their ID or the Transgender Accommodation Database, staff decide not to honor the offender's designation at their discretion only if there is no other evidence that would reasonably identify the offender as a Gender Non-Conforming Offender.

Whenever such a search takes place over the objection of the offender, staff shall immediately complete an incident report and forward it to the TMHL for additional action to be taken at the TMHL's sole discretion, including but not limited to a determination as to whether the offender qualifies as a Gender Non-Conforming Offender.

(3)     Non-Retaliation

No offender may be subject to discipline or denied privileges because they made a designation under Section I.3.c.1 or Section I.3.c.2.[24] No privileges shall be conditioned on a Gender Non-Conforming Offender (1) waiving their right to make a designation under Section I.3.c.1 or (2) submitting to a search that does not comply with the offender's proper designation.

d.     Unclothed Visual Searches

Unclothed visual searches of Gender Non-Conforming Offenders shall occur in full compliance with Section I.3.c, above, and in a manner that ensures as much privacy to the offender as practical. An unclothed visual search of a Gender Non-Conforming Offender shall occur in a room or other enclosure that prevents anyone other than the searching officer(s) from viewing any part of the offender's unclothed body.

3.     Showers

---

[24] As the graham Report notes, IDOC's "lack of preparation has added a further burden to [class member's] existence in the facilities they are in. Rather than IDOC's implementation strategy being seen as the problem, the transgender people themselves are seen as the problem." Dkt. 444 at 11.

| | Illinois Department of Corrections<br>Administrative Directive | Page **16** of 21 |
|---|---|---|
| Number:<br>04.03.104 | Title:<br>Evaluation, Treatment and Correctional Management of<br>Transgender Offenders | Effective:<br>__/__/2021 |

Gender Non-Conforming Offenders shall be allowed the same frequency of showers in accordance with his or her classification.[25]  Showers shall be separate and private from other offenders.[26] Gender Non-Conforming Offenders shall have the right to grieve shower conditions directly to the TMHL. If the TMHL determines that a facility is unable to provide separate and private showers to offenders in accordance with this provision, that facility shall not be used to house Gender Non-Conforming Offenders.

4.      Double Celling

Any time a cellmate is considered for a Gender Non-Conforming Offender, the Placement Officer shall consider the placement on a case by case basis to ensure the offender's health and safety and whether the placement would present management or security concerns.  No Gender Non-Conforming Offender will be placed in a cell with a cellmate of the opposite gender without the Gender Non-Conforming Offender's written consent. A Gender Non-Conforming Offender's refusal to consent to such a cellmate *will not be deemed refusal of housing*.

5.      Transports

Any transport required to move at least one Gender Non-Conforming Offender shall have at least one male and one female officer present to comply with the requirements of Section I.3.b.

**NOTE:**  Gender Non-Conforming Offenders may be encouraged, but not required, to sit at the front of the van or bus, in closest proximity to transportation staff for their own safety.

J.      **Transgender Medical Lead**[27]

1.      All medical needs of transgender prisoners shall be overseen by the Transgender Medical Lead (TML).

2.      The TML must possess the following minimum qualifications:

a.      Meet the minimum requirements for treating gender dysphoria as set forth in the WPATH Standards of Care; and

b.      Have substantial and direct experience prescribing and monitoring hormone levels for transgender individuals.

3.      The primary responsibilities of the TML include:

a.      Ensuring that, at the facility-level, only those medical personnel qualified to treat gender dysphoria are doing so;

b.      Ensuring that any medical personnel who (i) are not qualified to treat gender dysphoria,

---

[25] As the graham Report notes, at Logan there is "only one functioning shower on each floor" which "restricts when people can take a shower." *Id.* at 17.

[26] The graham Report goes into great detail about various reports of class members not having access to separate and private showers at certain facilities. IDOC staff reportedly remove shower curtains, leave doors open, and have cameras where class members shower. *See* Dkt. 444 at 17; *see also* Dkt. 460 at 2.

[27] The Harris Report makes plain the need for a qualified, dedicated Transgender Medical Lead within IDOC to oversee and monitor care directly. Dr. Harris concludes Defendants have "not yet developed a way to track their efforts and measure their successes or failures. Without being able to gauge the effectiveness of their actions, they will not be positioned to modify and adapt to achieve their goals. For class members who have already waited a long time to see any progress on these issues, it is unfair to ask them to continue to wait while policies and procedures are rolled out that increase the bureaucratic burden but are not tied to targeted outcomes" Dkt. 439 at 13.

| | Illinois Department of Corrections<br>Administrative Directive | Page **17** of **21** |
|---|---|---|
| Number:<br>    04.03.104 | Title:<br>Evaluation, Treatment and Correctional Management of<br>Transgender Offenders | Effective:<br>__/___/2021 |

<div style="margin-left:2em;">

or (ii) are not interested in treating transgender prisoners have no contact with such prisoners;

c.      Ensuring that there is adequate staffing at each IDOC facility that is qualified and willing to treat gender dysphoria;

d.      Holding mandatory and regular (i.e., at least once per month) meetings with all medical personnel who treat transgender prisoners at the facility-level;

e.      In conjunction with the Endocrinology Consultant, regular review of transgender prisoner hormone levels and related blood work, and order changes as necessary;

f.      Regular review of access to gender affirming items, gender affirming procedures (e.g., private showers) and requests for the same, and order changes as necessary;

g.      Participating in initial temporary placement determinations upon intake of new offenders that identify as transgender, and regular review of requests to transfer to a facility that align with a transgender prisoner's gender identity;

h.      Review (annually or upon request) all placement and programming assignments for all Gender Non-Conforming Offenders to detect any threats to safety experienced or posed by the offender and implement changes accordingly;

i.      Regular review of medical personnel records and files to ensure care is being provided to transgender prisoners in accordance with the WPATH Standards of Care and/or Endocrine Society Guidelines; and

j.      Along with the TMHL, creation and maintenance of the Transgender Identification Database (see Section II.G, *supra*) and regular tracking of relevant medical data regarding the same.

k.      Carry out the Surgical Consultant's medical recommendations.

l.      Perform the duties set forth in Sections [ ], *above*.

</div>

4.      The TML (i) must be a full-time employee of the Department and (ii) must not have a dual role within the Department.

5.      The authority of the TML to make medical decisions regarding transgender prisoners must not be abridged or limited by the Agency Medical Director or the Chief of Psychiatry.

6.      The TML may consult with the TMHL as desired.

K.      **Transgender Mental Health Lead**

1.      All mental health needs of transgender prisoners shall be overseen by the Transgender Mental Health Lead (TMHL).

2.      The TMHL must have the following minimum qualifications:

<div style="margin-left:2em;">

a.      Meet the minimum requirements for treating gender dysphoria as set forth in the WPATH Standards of Care; and

b.      Have substantial and direct clinical psychological experience treating individuals with gender dysphoria.

</div>

| | Illinois Department of Corrections<br>Administrative Directive | Page **18** of **21** |
|---|---|---|
| Number:<br>    04.03.104 | Title:<br>Evaluation, Treatment and Correctional Management of<br>Transgender Offenders | Effective:<br>__/___/2021 |

    3.      The primary responsibilities of the TMHL include:

          a.      Ensuring that, at the facility-level, only those mental health personnel qualified to treat gender dysphoria are doing so;

          b.      Ensuring that any mental health personnel who (i) are not qualified to treat gender dysphoria, or (ii) are not interested in treating transgender prisoners, have no contact with such prisoners;

          c.      Ensuring that there is adequate staffing at each IDOC facility that is qualified and willing to treat gender dysphoria;

          d.      Holding mandatory and regular (i.e., at least once per month) meetings with all mental health personnel who treat transgender prisoners at the facility-level;

          e.      Participation in initial temporary placement determinations upon intake of new offenders that identify as transgender, and regular review of requests to transfer to a facility that align with a transgender prisoner's gender identity;

          f.      Review (annually or upon request) all placement and programming assignments for all Gender Non-Conforming Offenders to detect any threats to safety experienced or posed by the offender and implement changes accordingly;

          g.      Regular review of requests for gender-affirming surgeries;

          h.      Regular review of mental health personnel records and files to ensure care is being provided to transgender prisoners in accordance with the WPATH Standards of Care and/or Endocrine Society Guidelines; and

          i.      Along with the TML, creation and maintenance of the Transgender Identification Database (see Section II.G, *supra*) and regular tracking of relevant mental health data regarding the same.

          j.      Carry out the Surgical Consultant's mental health recommendations.

          k.      Perform the duties set forth in Sections [ ], *above*.

    4.      The TMHL must (i) be a full-time employee of the Department and (ii) not have a dual role within the Department.

    5.      The authority of the TML to make mental health decisions regarding transgender prisoners must not be abridged or limited by the Chief of Mental Health or the Chief of Psychiatry.

    6.      The TMHL may consult with the TML as desired.

L.      **Surgical Consultant**

    1.      All mental health needs of transgender prisoners seeking surgery shall be overseen by the Surgical Consultant.

    2.      The Surgical Consultant must have the following minimum qualifications:

          a.      Meet the minimum requirements for treating gender dysphoria as set forth in the WPATH Standards of Care; and

| | Illinois Department of Corrections<br>Administrative Directive | Page **19** of **21** |
|---|---|---|
| Number:<br>04.03.104 | Title:<br>Evaluation, Treatment and Correctional Management of<br>Transgender Offenders | Effective:<br>__/___/2021 |

        b.      Have substantial and direct clinical psychological experience treating individuals with gender dysphoria.

        c.      Have substantial and direct clinical psychological experience treating individuals who will undergo and/or have undergone surgical treatment of gender dysphoria, including experience writing letters of referral for gender-affirming surgeries.

   3.     The primary responsibilities of the Surgical Consultant include:

        a.      Meeting with Transgender Offenders interested in surgical treatment of Gender Dysphoria to evaluate for surgery, following meeting with the offender, consulting with the offender's MHP, and reviewing the offender's medical records.

        b.      Writing letters of referral for surgical treatment of Gender Dysphoria when appropriate.

        c.      Providing additional information to the Surgical Provider.

        d.      Working with TMHL and TML to carry out the Surgical Consultant's recommendations for surgical treatments.

        e.      Providing pre- and post-surgical counseling to Transgender Offenders.

**M.**    **Surgical Provider**

   1.    All surgical treatments of gender dysphoria shall be provided by a third-party Surgical Provider.

   2.    The Surgical Provider must have the following qualifications:

        a.   Board-certified physician and surgeon in good standing, and

        b.   Significant experience and expertise in providing surgical treatments of gender dysphoria.

   3.    The primary responsibilities of the Surgical Consultant include:

        a.   Reviewing letters of referral.

        b.   Determining if the criteria for specific surgeries are met.

        c.   Providing a preoperative surgical consultation with the Transgender Offender to discuss: surgical techniques available, the advantages and disadvantages of each technique, the limitations of the procedures (including photographs of both successful and unsuccessful outcomes). And the inherent risks and possible complications of the various techniques (including the surgeon's own complication rates with each procedure).

        d.   Obtaining informed consent regarding the surgical procedures.

        e.   Providing surgery.

        f.   Providing appropriate after care and consultation with the Transgender Offender, Surgical Consultant, TMHL, and TML.

**N.**    <u>**Training and Mentoring**</u>

   1.    All staff shall participate in Gender Non-Conforming Offender training during Pre-service

| | Illinois Department of Corrections<br>Administrative Directive | Page **20** of **21** |
|---|---|---|
| Number:<br>04.03.104 | Title:<br>Evaluation, Treatment and Correctional Management of<br>Transgender Offenders | Effective:<br>__/__/2021 |

Orientation Training (PSOT) or Pre-service Corrections Training (PSCT) and annually thereafter as developed by the Training Academy in conjunction with the Office of Mental Health. During the pendency of *Monroe v. Jeffreys*, No. 18-156-NJR (S.D. Ill.), all such training will be submitted for approval by and must be approved by monitor julie graham or their successor.[28]

2.    All persons in custody who are housed at a facility housing Gender Non-Conforming Offenders must participate in Gender Non-Conforming Offender training and education which will be delivered annually. During the pendency of *Monroe v. Jeffreys*, No. 18-156-NJR (S.D. Ill.), all such training will be submitted for approval by and must be approved by monitor julie graham or their successor.[29]

3.    Mental Health staff who work with Gender Non-Conforming Offenders shall participate in the following training:[30]

a.    Work under the supervision of a MHP for the first six months after joining the staff who are treating Gender Non-Conforming Offenders;

b.    Foundations in Transgender Health (2-day course) from WPATH Global Education Initiative (GEI);

c.    Advanced Mental Health training (1-day course) from WPATH GEI;

d.    Advanced Planning and Documenting Workshop (1-day course) from WPATH GEI;

e.    Advanced Ethics Workshop (1-day course) from WPATH GEI; and

f.    Complete yearly training and mentoring in the discretion of TMHL.

4.    Medical staff who work with Gender Non-Conforming Offenders shall complete the following training from WPATH GEI:

a.    Monthly consultation with the TML for the first six months after joining the staff who are treating Gender Non-Conforming Offenders;

b.    Foundations in Transgender Health (2-day course) from WPATH GEI;

c.    Advanced Medical Treatment training (1-day course) from WPATH GEI;

d.    Advanced Ethics Workshop (1-day course) from WPATH GEI; and

e.    Complete yearly training and mentoring in the discretion of TML.

---

[28] The graham Report demonstrates unequivocally the need for rigorous training and accountability in IDOC's training. It is noted there are issues with "inaccurate data on the completion of [] mandated training," as well as a lack of clarity about what percentage of the staff has completed such training. *See* Dkt. 444 at 12-13.

[29] Evidently, this kind of training is necessary based on the graham Report. As the graham Report notes, "[i]t is the opinion of this monitor that there may be a mismatch between the training needs assessment for the corrections staff and the Queer Works training." "The experiences this monitor heard about from inmates and some staff about the current culture within the facilities, is such that the 30-minute training misses the mark in terms of what officers need to know[.]" "Many of the staff need more basic information that will assist them in carrying out their work." *Id.* at 14.

[30] graham explicitly suggests "levels of training" that will provide "tools for situations that officers will encounter, giving them appropriate language and information about how to handle situations" in their report. *Id.* at 16.

| | Illinois Department of Corrections<br>Administrative Directive | Page **21** of **21** |
|---|---|---|
| Number:<br>04.03.104 | Title:<br>Evaluation, Treatment and Correctional Management of<br>Transgender Offenders | Effective:<br>__/__/2021 |

O.      **Staff Discipline.**[31]

a.      Administrative Directive 03.02.108 requires all employees to conduct themselves in a professional manner. In accordance with that requirement, all supervisors shall document, and any employee shall report, any instance of unprofessional conduct by an employee towards a Gender Non-Conforming Offender, including but not limited to [using the wrong pronouns or using discriminatory language,[32] refusing to search someone, interfering in the provision of gender-affirming medical care or items, disciplining Gender-Non Conforming Offenders for requesting accommodations, and failing to attend training],[33] Failure of a supervisor to document such instances of unprofessional conduct, and failure of an employee to act in a professional manner towards Gender Non-Conforming Offenders, shall result in disciplinary action that may result in discharge.

---

[31] According to the graham Report, employees are flagrantly "not complying with written departmental policies and procedures," and thus "accountability must be addressed." Dkt. 444 at 15. Moreover, this "lack of professionalism is targeted at transgender people." *Id.*
[32] The graham Report includes examples of IDOC staff referring to class members as "it" or "he/shes." *Id.* at 25.
[33] As the graham Report notes, IDOC staff continue to refer to class members in derogatory terms and "tell them they are men because they have a penis and are in a men's facility and will always be a man." *Id.* at 14.