IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals, <br><br> Plaintiffs, <br><br> v. <br><br> LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN, <br><br> Defendants. | ) ) ) ) ) ) ) Civil No. 3:18-cv-00156-NJR ) ) ) ) ) ) ) ) |

**PLAINTIFFS' RESPONSE TO CO-MONITORS' REPORTS**

In accordance with the Court's orders (Docs. 418 at 7, 370 at 14), within 30 days, Plaintiffs submit this response to the Report of Co-Monitor julie graham (Doc. 591) and Commentary on Working Meetings from Co-Monitor Dr. Harris (Dkt. 592).[1]

**Introduction**

Plaintiffs appreciate the Co-Monitors' concerted efforts to evaluate Defendants' repeated non-compliance with the Preliminary Injunctions and the Co-Monitors' attempts to correct any issues directly with IDOC's officials and staff. Monitor julie graham has taken on an "ombudsperson" role on showers and searches, and Monitor Dr. Harris is working to create a centralized system to track class members and a system to aggregate hormone care, transfer, and surgery requests, and the outcomes of those requests. Dkt. 584 at 4-5. But, even with the Co-Monitors engaging in robust monitoring on certain issues, Defendants continue to fail to provide necessary and constitutionally mandated gender-affirming care to all class members. *See e.g.,* Dkt.

---

[1] Dr. Harris's Commentary indicates that a report concerning hormone therapy, surgeries, a census of the class members, and transfer decisions is forthcoming. *See* Dkt. 592 at 3.

1

584 at 8 (Defendants scheduled surgery consultations for only thirteen class members to take place three months after the Court's extended deadline). And after only four working meetings with Plaintiffs and the Co-Monitors, Defendants filed motions to avoid the Court's sanctions and oversight, including meeting with Plaintiffs and the Co-Monitors. *See* Dkts. 588 at 2; 601 at 2.

**Working Meetings with Co-Monitors and Plaintiffs**

In January 2023, the Court directed the Co-Monitors, Plaintiffs, and Defendants to meet regularly to work on "policy revisions and other matters … to ensure correction of the unconstitutional treatment of Plaintiff class members and provide for their safety within custody." Dkt. 522 at 2. Since that direction, the Co-Monitors and the Parties have met four times to discuss commissary, an accurate census of the class, tracking of class members' health care, transfers, and changes to the Administrative Directive. Dkts. 522, 552, 584. As reflected in the Joint Status Report, after Defendants filed their motions to vacate and stay the Court's orders on May 31, Defendants have not met with the Co-Monitors and Plaintiffs. *See* Dkt. 601 at 2.

Plaintiffs recognize that these initial working meetings have not resulted in Defendants providing constitutionally required medical care to our clients. Indeed, Co-Monitor Dr. Harris has described these initial meetings as "especially not productive" (Dkt. 592 at 2). At the same time, these meetings are important for Plaintiffs to advocate for our clients. Plaintiffs have, for the first time since the August 2021 trial, the ability to hear from and ask questions of Defendants' procurement, medical, mental health, and commissary officials and providers. Additionally, these working meetings allow Plaintiffs (who cannot engage in ex parte communications) to speak directly to, learn from and ask questions of the Co-Monitors. To advocate for systemic changes to benefit the class, Plaintiffs need to know how Defendants' systems operate, who are the decision-makers, what changes are possible, and whether the Co-Monitors see the same systemic problems and solutions.

These working meetings can be a tool for Defendants to reach compliance if they bring decision-makers to the meetings, follow up appropriately, and make *any* recommended changes. For example, at the May 10 working meeting, Plaintiffs reiterated our recommendation that Defendants should hire two medical providers to oversee WPATH gender-affirming care for class members as outlined in our draft Administrative Directive (AD). *See* Dkt 485-2 (Transgender Medical Lead to oversee medical decisions and Transgender Mental Health Lead to oversee mental health decisions). Defendants continue to rely on committees with existing staff to decide whether class members receive surgeries and transfers. Despite this difference, the Co-Monitors and the parties discussed another hiring possibility. Defendants could hire a Transgender Care Advocate or Navigator, to help oversee the provision of care and housing for class members. *See* Dkt. 592 at 3. Defendants seemed amenable to this idea but months after the meeting, Defendants have not indicated if they will decide to hire someone.

Plaintiffs have no doubt that the Co-Monitors' direct efforts with Defendants to make minor changes, such as Dr. Harris's modifications to Defendants' gender dysphoria form (Doc. 592 at 3), will help class members, but that is just one method to reach compliance. Whether these working meetings result in the correction of Defendants' unconstitutional treatment of class members depends on whether Defendants attend, are transparent on their current treatment of inmates, and choose to take any remedial action.

**Administrative Directive**

Dr. Harris has described the AD as a "philosophy" document as opposed to an actual workflow of how Defendants treat class members. Dkt. 592 at 2. This is true because Defendants have not updated the AD. Plaintiffs do not oppose Dr. Harris' recommendation that further meetings could also focus on "information-gathering" and identifying barriers to care. *See id*. Defendants, however, must also revise the AD because it provides consistent guidance to

3

Defendants' leaders and staff on how to care for the class. Indeed, Co-Monitor graham reported that concerning the searches of women who had had surgery, Logan Correctional Facility's Warden, "feel like they must follow the AD unless instructed differently." Dkt. 591 at 2.

**Transgender Care Navigator or Advocate**

As Dr. Harris reported in the Commentary, at the meeting concerning the AD, there was a discussion about Defendants hiring a transgender navigator or advocate to "bridge the current gap between the class members' lived experience and IDOC's perception of the care they provide." *See* Doc. 592 at 3. Even though this proposal differs from the staffing proposed in Plaintiffs' AD, Plaintiffs support this position if the hire is permanent and has authority. Almost two months later, Defendants have not explained whether or when they would reach a decision on posting for this position.

**Transfer Requests**

Defendants continue to fail to transfer class members to housing that corresponds with their gender. Contrary to the Court's Order (Dkt. 584 at 11), Defendants did not propose boilerplate language for letters and object criteria for transfer requests to Plaintiffs and the Co-Monitors. *See* Dkt. 601 at 2. Since May 31, they also declined to meet with Plaintiffs and the Co-Monitors to discuss transfers and Plaintiffs' proposed language, and they have been unavailable for any other meetings. *Id.* at 1-2. On June 15, Defendants failed to file with the Court a list of class members who received the first round of notices denying transfers and their current locations. *See* Dkt. 584 at 11. Moreover, Defendants' own records reflect that they have approved only two people's transfer requests to live in housing that corresponds with their gender in 2023. *See* Exhibit 1 (filed under seal).

**Commissary**

Defendants' commissary permits transgender and cisgender inmates to purchase items from

4

the same list. As Co-Monitor graham reported in June, inmates purchase make-up as art supplies resulting in transgender women not having make-up, and cisgender women purchase boxers so that transgender men do not have gender-appropriate underwear. *See* Dkt. 591 at 1. On May 15, Plaintiffs proposed an intake kit of gender-appropriate clothing and grooming items, and other items available upon request to a medical/mental health provider to the Co-Monitors and Defendants, but Defendants have not responded in any way. *See* Exhibit 2.

**Showers**

Despite Defendants' certifications to the contrary, Defendants continue to fail to provide private showers to class members. Co-monitor graham continues to investigate and respond to claims that there are no private showers. For example, Co-monitor graham reported in June that Pinckneyville did not have all shower curtains installed and would not have them until mid-June. Dkt. 591 at 1. Indeed, on June 15, Plaintiffs filed two notifications of no private showers at Menard and Big Muddy River. Dkt. 596. To better understand whether class members have access to private showers at their current facility, on June 29, 2023, Plaintiffs sent a survey to all class members identified by Dr. Harris about whether they had access to a private shower and if officers of their preferred gender conducted searches. Dkt. 601 at 2-3. Plaintiffs intend to share the results of this survey with the Court, Defendants, and the Co-Monitors. *Id.*

**Conclusion**

Getting Defendants to comply with the Court's orders will take more than the Co-Monitors' robust monitoring. Defendants must attend working meetings with Plaintiffs and the Co-Monitors, be transparent in their treatment of class members, be open to innovative ideas, including those from Plaintiffs, and be willing to make overdue systemic changes. Rather than embracing this path to provide the constitutionally required care for class members, Defendants have chosen to file unnecessary motions and have actively stopped complying with the Court's orders.

Dated: July 6, 2023

**Brent P. Ray**
KING & SPALDING LLP
110 N. Wacker Drive, Suite 3800
Chicago, IL 60606
Telephone: (312) 995-6333
Facsimile: (312) 995-6330
*bray@kslaw.com*

**Abby L. Parsons**
KING & SPALDING LLP
1100 Louisiana Street, Suite 4100
Houston, TX 77002
Telephone: (713) 751-3294
*aparsons@kslaw.com*

**Thomas E. Kennedy III**
**Sarah Jane Hunt**
KENNEDY HUNT P.C.
906 Olive Street, Suite 200
Saint Louis, MO 63101
Telephone: (314) 872-9041
*tkennedy@KennedyHuntLaw.com*
*sarahjane@KennedyHuntLaw.com*

**Malita Picasso**
AMERICAN CIVIL LIBERTIES UNION
125 Broad Street
New York, NY 10004
Telephone: (212) 549-2561
*mpicasso@aclu.org*

Respectfully submitted by:

*/s/* Michelle T. García
**Camille E. Bennett**
**Michelle T. García**
**Alexis Picard**
ROGER BALDWIN FOUNDATION OF ACLU, INC.
150 North Michigan Avenue, Suite 600
Chicago, IL 60601
Telephone: (312) 201-9740
Facsimile: (312) 288-5225
*cbennett@aclu-il.org*
*mgarcia@aclu-il.org*
*apicard@aclu-il.org*

**Amelia H. Bailey**
**Thomas J. Leahy**
**Sam G. Rose**
**Ashton Dubey**
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
*amelia.bailey@kirkland.com*
*thomas.leahy@kirkland.com*
*sam.rose@kirkland.com*
*ashton.dubey@kirkland.com*

*Attorneys for Plaintiffs*

6

## **CERTIFICATE OF SERVICE**

I certify that on July 6, 2023, I electronically filed the foregoing document and any exhibits with the Clerk of this Court by using the CM/ECF system, which will accomplish service through the Notice of Electronic Filing for parties and attorneys who are Filing Users.

By: */s/* Michelle T. Garcia