IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS DIVISION

| | |
|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELENA VISION, SORA KUYKENDALL, and SASHA REED, <br><br> Plaintiffs, <br><br> - vs- <br><br> LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN, <br><br> Defendants. | ) ) ) ) ) ) ) ) No. 18-156-NJR ) ) ) ) ) ) |

**DEFENDANTS' RESPONSE TO PLAINTIFFS' FOURTH REPORT OF PRIVATE SHOWER NONCOMPLIANCE AND FIRST REPORT OF DEFENDANTS' NONCOMPLIANCE WITH SEARCHES**

NOW COME the Defendants, LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN (sued in their official capacities as IDOC administrators), and hereby provide their Response to Plaintiffs' Plaintiffs' Fourth Report of Private Shower Noncompliance and First Report of Defendants' Noncompliance with Searches [d/e 615], stating as follows:

**INTRODUCTION**

On August 11, 2023, Plaintiffs filed a Fourth[1] Report of Private Shower Noncompliance and First Report of Defendants' Noncompliance with Searches. [d/e 615]. The report was based upon a survey distributed to class members within the Illinois Department of Corrections ("IDOC"). Plaintiffs attach survey responses received from seventy-three class members and provided analysis of the responses. [*See* d/e 615].[2] While the surveys asked eight distinct

---

[1] Plaintiffs note Defendants did not respond to Plaintiff's Third Report of Private Shower Noncompliance [d/e 595] after previously seeking an extension. [d/e 600]. Prior to Defendants' response deadline, co-monitor julie graham responded, addressing the allegations. [d/e 602].

[2] Plaintiffs' August 11 filing was the first time these surveys had been shared with defense counsel.

questions, the survey responses were recorded using discretion based on the comments section. *Id*. It is Defendants' position that in doing so, the nuance and actual circumstances are lost. Here, the surveys themselves indicate the circumstances within the facilities are better than as alleged within Plaintiffs' Notice [d/e 615].

## **RESPONSE**

As noted above, the survey responses to the eight questions posed to Class Members reveal the circumstances are far more nuanced and dependent upon the reporting individual. By seeking to condense the responses and categorizing them in an absolute fashion, the individual circumstances are lost and in doing so, Plaintiffs overstate the issues identified by the surveys.

### I.     Shower Compliance

Plaintiffs contend 25 Class Members responded they had no access to a private shower and 16 additional class members "marked 'Yes, Unsure, or Yes/No' but provided written comments indicating that they did not have access to private showers." [d/e 615, ¶ 6]. Per the Declaration of Natalie Geismar [Plaintiffs' Exhibit 3], if a class member checked "yes, unsure, or yes/no" but there was additional commentary, "[she] deferred to the class members' written explanations and used those to calculate the totals that appear in the Tables in the Report." [Pl. Ex. 3, ¶ 8].

Plaintiffs' Table 1 [d/e 615, p. 3] purports to represent access to private showers by facility; however, the interpretations made by Geismar appear to stray from and expand upon the actual results. [Compare d/e 615, p. 3 with Plaintiffs' Ex. 2; see also Survey Responses By Question, attached hereto as Exhibit A; see also Survey Responses by Facility, attached hereto as Exhibit B]. For example, Plaintiffs contend the results from Big Muddy River indicate 5 class members had access to shower and 4 had no access. [d/e 615, p. 3]. Review of the underlying survey responses for Big Muddy reveal there were in fact 8 individuals who indicated they had access to private

showers and only 2 indicated no access. [*See* Pl. Ex. 2, pp. 2-36; *see also* Ex. B]. For the individuals who responded "Yes" that Plaintiffs potentially logged as a "No" based on commentary, Member R.B. indicated, "Showers are the same showers as everyone else uses only at a time when everyone else is locked in their cells"; Member H.P. indicated she reported to staff that the shower was "messed up" and had holes or was not long enough; and Member V.R. indicated she felt the facility "could have better shower curtains to cover" so no one could see in. [Pl. Ex. 2, pp. 3, 7-8, 32]. However, these do not support an interpretation that they do not have access to private showers. These reports also match with the declaration of Warden Hvarre, filed on February 28, 2023, which attested that transgender individuals are to be given private shower time when all other individuals in custody are secured in their cells. [d/e 540-1, p. 12, ¶ 3].

Likewise, concerning Centralia, Plaintiffs represent 6 class members had access to private showers and 4 did not have such access. [d/e 615, p. 3]. However, the direct survey results indicate 9 class members had access to showers and only one reported not having access. [Pl. Ex. 2, pp. 37-67; *see also* Ex. B]. Further, 2 of the 10 individuals reported they had never asked for a private shower. [Pl. Ex. 2, pp. 43, 50; *see* Ex. B]. Review of the survey commentary indicates 2 individuals who marked yes indicated: "we've had a few incidents since the new shower curtains [were] installed where we've had a staff member literally look in the shower or under the shower curtains as he does his 30-min walk" (Response of Member T.H), and "sometimes in certain cellhouses not all workes [sic] are locked up when one showers…" (Response of Member T.J). [Pl. Ex. 2, pp. 50, 61-62, 65]. Another individual wrote things improved for the better since her last discussion with julie graham, noting better shower curtains and painted windows. [Pl. Ex. 2, p. 48].

For Dixon, Plaintiffs report 3 individuals reported private shower access while 3 did not. [d/e 615, p. 3]. The direct results indicate 5 individuals stated they had private access while 1

indicated no access. [Pl. Ex. 2, pp. 80-100; *see* Ex. B]. The commentary provided on individuals' responses who indicated "yes" that may have been changed to "no" were: "if we do get a private shower its only 1 time a day on second shift" (Response from Member J.A) and "we are only allowed private showers when general population or gte [sic] segregation does not even though there are workers on the wing while we shower" (Response of A.W). [Pl. Ex. 2, pp. 81, 98]. One of the individuals indicated they did not want to use a private shower but also reported having asked for a private shower. [Pl. Ex. 2, p. 84]. These two circumstances do not rise to a violation of the private shower requirement as both of these individuals self-reported having access to such. *Id*.

Four Class Members responded from Menard Correctional Center and of the 4, 3 indicated they did not have access to a private shower after requesting one; however, the Warden of Menard Correctional Center, Anthony Wills, represents Class Members are offered private showers with curtains. [Wills email to co-Monitor julie graham, attached hereto as Exhibit C]. Further, he indicated that reports of feeling of unsafe and a report of sexual harassment are of concern to him as well. *Id*. Complaints regarding Menard's showers were previously discussed in a report from co-Monitor julie graham, who reviewed photographs of the shower curtains and noted that they seemed adequate. [d/e 602, p. 1].

Plaintiffs represent 3 individuals at Logan reported access to private showers while 8 reported no access. [d/e 615, p. 3]. The direct survey responses actually show that 4 class members indicated they had access while 5 indicated they did not. [Pl. Ex. 2, pp. 152-186; *see* Ex. B]. It is not clear from the comments why some of these responses were reported as "No." For example, one survey response that was blank, authored by Member M.M. indicated, "I go to the back shower and close my curtain and everyone respects that on my unit!" [Pl. Ex. 2, p. 176]. Further, of the

reporting class members, 3 indicated they did not want a private shower and 5 indicated they had not asked for a private shower. [Pl. Ex. 2, pp. 152-186]. At Pinckneyville, Plaintiffs report 2 individuals state they have access to private showers while 4 indicate they do not; however, the direct responses from the survey indicate 3 individuals stated they have private shower access and only 2 indicated they did not. [d/e 615, p. 3; Pl. Ex. 2, pp. 205-228; *see* Ex. B].

Of the 10 reporting Class Members at Pontiac, Plaintiffs represent that 2 individuals report access to private showers while 8 indicated they did not. [d/e 615, p. 3]. The direct survey responses stated 3 individuals have access to private showers, but Member L.F. indicated the showers do not have curtains. [Pl. Ex. 2, pp. 229-270; *see* Ex. B]. However, counsel for Pontiac Correctional Center provided photos indicating there are curtains and/or partial doors within the shower, set inside the bars, to provide privacy. [*See* Photos of Pontiac Showers, attached hereto as Exhibit D]. At Danville, only one of the 3 reporting Class Members indicated they did not have access to a private shower. [Pl. Ex. 2, pp. 68-75; *see* Ex. B]. At Taylorville, the singular reporting Class Member indicated they had asked for a private shower but had not had access to one because other prisoners would use a sink near the shower during the shower time. [Pl. Ex. 2, pp. 275-278; *see* Ex. B]. Undersigned counsel was unable to follow up on all of the allegations made within the survey responses; however, the Warden of Taylorville Correctional Center previously explained the process for affording private showers to Class Members, which is to secure individuals in custody who are not Class Members after the 9:30 p.m. count. [d/e 540-1, pp. 15-16]. At Illinois River, the 3 reporting Class Members indicated they asked for private showers and all 3 received them. [Pl. Ex. 2, pp. 106-118; *see* Ex. B].

Three Class Members from Western Illinois Correctional Center submitted survey responses. [Pl. Ex. 2, pp. 279-290; *see* Ex. B]. Two indicated they wanted a private shower and 1

Class Member indicated they did not want a private shower, though all 3 reported asking for them. *Id*.

The singular Class Member at Jacksonville reported having access to private showers but this response was recorded as "No" by Plaintiffs' counsel due to the commentary, which stated in part, "The showers I take at 7am or 3pm people still walk to the window but they are very respectful sometimes!" [Pl. Ex. 2, pp. 119-122; d/e 615]. At Lawrence, the reporting class member indicated she did not have access to a private shower. [Pl. Ex. 2, pp. 148-151; *see* Ex. B]. At Joliet, the direct results indicated both Class Members indicated they had access to private showers; however, Plaintiffs' response was amended to indicate one of the two reported no due to comments indicating the showers were "bad" and that residents could "see you when you [sic] out of shower. And the corr. Officers can see you also!" [Pl. Ex. 2, pp. 123-147]. At Decatur, the singular reporting Class Member indicated they wanted a private shower, asked for a private shower, and in fact had access to such. [Pl. Ex. 2, pp. 76-79; *see* Ex. B]. Likewise, the singular reporting Class Member at Shawnee reported she received private showers. [Pl. Ex. 2, pp. 271-274; *see* Ex. B].

In sum, only 25 of the 73 Class Members personally indicated they were being denied private showers. [*See* Pl. Ex. 2; *see* Ex. B]. While some of the individual comments indicate there may have been instances or circumstances of non-compliance, there is not evidence of flagrant disregard of private showers. Five class members indicated they did not want private showers (though some report having asked for them). *Id*. All or at least the majority of the reporting Class Members at Big Muddy, Centralia, Danville, Decatur, Dixon, Graham, Illinois River, Jacksonville, Joliet, Pinckneyville, Shawnee, and Western Illinois- 12 of the 17 surveyed facilities- report they have access to private showers. [*See* Pl. Ex. 2; *see* Ex. B].

## II. Search Compliance

Plaintiffs contend only 10 of the 73 class members who responded indicated they can request an officer of their gender to search them without having to wait. [d/e 615, ¶ 10]. The survey responses, however, show 12 class members indicated they did not have to wait. [*See* Pl. Ex. 2; *see also* Ex. A; Ex. B]. More importantly, the reported wait times range from mere minutes to a few outliers reporting a five or seven hour wait. Plaintiffs' Table 2 [d/e 615, p. 5] purports to represent access to searches by officers of the Class Member's Gender by facility; however, there are discrepancies within this reporting and consideration is not made for the reported waits. Similarly, Plaintiffs make the point that 49 of the Class Members are not at facilities with scanners; however, the surveys indicate it was only 44 individuals who reported no scanner and more importantly, many of the facilities where scanners are not available are in fact facilities where the Class Members report they are able to request a search by an officer of a particular gender and have minimal wait times. [*See* Pl. Ex. 2; *see also* Ex. A; Ex. B].

For instance, at Logan, Plaintiffs reported 3 individuals indicated no search, 4 individuals indicated a search with a wait, and 4 additional individuals indicated a proper search with no wait. [d/e 615, p. 5]. Direct survey responses indicate 2 individuals reported the inability to request officers of a specific gender for searches. [Pl. Ex. 2, pp. 152-186; *see also* Ex. B]. At Pontiac, Plaintiffs report 2 individuals state they do not have the ability to request a search a specific gender of officer; however, the direct responses indicate only one Class Member indicated such. [d/e 615, p. 5; Pl. Ex. 2, pp. 229-270; *see* Ex. B]. In response to the inquiry as to whether they had to wait when requesting an officer of a specific gender, 7 individuals from Pontiac indicated there may be a 30 minute to 5-hour wait while 2 reported no wait. *Id*.

At Big Muddy, of the 8 individuals who report having to wait for an officer of a specific gender to search them, the reports vary from 5 minutes to 1 hour. [Pl. Ex. 2, pp. 2-36; ("1 hr. sometimes but no more than 45 min.")]. All 10 reporting Class Members from Centralia reported the ability to request an officer of a specific gender to search them, and the wait times for such ranged from 15 minutes to 1 hour. [Pl. Ex. 2, pp. 37-67; *see* Ex. B]. At Dixon, the 6 reporting class members all indicate they were able to request an officer of a specific gender but that all had to wait for the search. [Pl. Ex. 2, pp. 80-100; *see* Ex. B]. The search times ranged from 1 hour to 5 hours. *Id*. Two Class Members indicated they waited an hour or less, a third Class Member indicated she waited up to 2.5 hours, and the remaining 2 Class Members indicated they have waited over 5 hours on occasion. *Id*. Likewise, at Western Illinois, although only 1 Class Member indicated they could request an officer of a specific gender to search them, all 3 reported having to wait when an officer of a specific gender is requested. [Pl. Ex. 2, pp. 279-290; *see* Ex. B]. The reported wait times ranged from 30 minutes to 7 hours. *Id*. One Class Member indicated 30 minutes, another Class Member indicated "about an hour into [sic] some one [sic] come," and the third indicated "the first couple time [sic] seven hours." *Id*.

At Illinois River, the 3 reporting Class Members indicate the facility does not utilize scanners; however, all 3 indicated they were able to request an officer of a specific gender for a search with reported wait times of 1 minute to one and a half hours. [Pl. Ex. 2, pp. 106-118; *see* Ex. B]. Similarly, the individual from Jacksonville[3] reported the facility does not use scanning machines but they indicated they did not have to wait for officer of a requested gender to search them and only waited a few minutes. [Pl. Ex. 2, pp. 119-122; *see* Ex. B]. At Lawrence, the reporting

---

[3] The reporting Class Member from Jacksonville checked "no" in response to the question inquiring if they were able to request an officer of a specific gender; however, reported affirmatively as to waiting for the officer when requested. [Pl. Ex. 2, pp. 119-122]. Therefore, both parties reflected the response to the initial question of being able to request a specific gender as "yes."

Class Member indicated no scanning machine was used but indicated they were able to request an officer of a specific gender and waited a variable amount of time. [Pl. Ex. 2, pp. 148-151; *see* Ex. B].

At Pinckneyville, the 5 reporting Class Members all indicated the facility utilizes scanning machines for searches. [Pl. Ex. 2, pp. 205-228; *see* Ex. B]. Only 3 of the 5 indicated they could request an officer of a specific gender to search them; however, all 5 indicated they had to wait if an officer of a specific gender was requested. *Id*. Therefore, this leads one to believe all 5 in fact could request an officer of a specific gender. The reported wait time for the search, if requested, ranged from only 5 to 30 minutes. *Id*.

Of the reporting Class Members at Logan Correctional Center, 6 indicated scanning machines were used while 4 indicated they were not. [Pl. Ex. 2, pp. 152-186; *see* Ex. B]. Seven individuals reported they were able to request a correctional officer of a specific gender. 4 indicated there was no wait and 4 indicated wait times varying from 15 minutes to two hours. *Id*. At Menard, the 4 reporting Class Members indicate none are able to request an officer of a specific gender; however, 1 answered if they request an officer of a specific gender to search them, 1 had a wait and another reported no wait. [Pl. Ex. 2, pp. 187-204; *see* Ex. B]. Two of the 4 reported scanning machines were utilized. *Id*.

While Plaintiffs contend 49 class members are at facilities without scanners, the survey in fact shows only 44 class members indicated their facility does not utilize scanner machines. [d/e 615, ¶ 20; *see* Pl. Ex. 2; *see* Ex. A; Ex. B]. And some of the responses were mixed, with different responses coming from the same facility. Plaintiffs report 4 individuals at Pontiac report using a scanner, 4 indicate no scanner, and 2 indicated "other." [d/e 620, p. 7]. However, the direct responses from the survey indicate 7 individuals from the facility said Pontiac used a scanner while

3 did not. [*See* Pl. Ex. 2]. While Plaintiffs point to a survey response indicating one Class Member changed her ID to "search male" to avoid long wait times, such is not dispositive of an ongoing issue as this individual seemingly concedes she is not actively requesting and waiting for these searches as a result. [d/e 615, ¶ 15].

The singular Class Member at Decatur represented the facility did not have a scanner; however, this Class Member affirmatively stated they were searched by an officer of a requested specific gender with no comment on wait. [Pl. Ex. 2, pp. 76-79; Ex. B]. Similarly, the lone reporting Class Member from Graham indicated scanners were not utilized but they have been able to request an officer of a specific gender and only waited 15 to 30 minutes. [Pl. Ex. 2, pp. 102-03; *see* Ex. B]. The 3 reporting class members at Danville reported the facility has a scanner. [Pl. Ex. 2, pp. 68-75; *see* Ex. B]. Further, of the 2 who indicated they were able to request an officer of a specific gender to search them, the reported wait time ranged from 5 minutes to one hour. *Id*.

At Graham, the singular class member indicated there was a search wait and indicated the facility does not have a scanner. [Pl. Ex. 2, pp. 101-05; *see* Ex. B]. At both Shawnee and Taylorville, the singular class members housed at each of those facilities indicated there was no scanning machine but searches were done by the requested gender with a wait. [Pl. Ex. 2, pp. 272, 276; *see* Ex. B]. At Taylorville, the reporting Class Member indicated the wait was only approximately 30 minutes. [Pl. Ex. 2, p. 276]. At Joliet, the 2 reporting Class Members indicated scanners were not used but both reported the ability to request an officer of a specific gender. [Pl. Ex. 2, pp. 123-147; *see* Ex. B]. One Class Member indicated there was no wait in those circumstances, and the other Class Member indicated there may be a 30-minute wait. *Id*.

In sum, only 10 of the 17 surveyed facilities report no use of scanning machines, specifically Big Muddy, Decatur, Graham, Illinois River, Jacksonville, Joliet, Lawrence,

Pinckneyville, Shawnee, and Taylorville. [*See* Pl. Ex. 2; *see* Ex. B]. However, at those facilities, all or at least the majority of reporting Class Members indicated they are able to request an officer of a specific gender. *Id*. Additionally, as previously noted, while there are reports of having to wait, it was up to the Class Member's discretion regarding what in fact amounted to a "wait" with reports varying between mere minutes to hours. *Id*.

## CONCLUSION

Plaintiffs' representations as to the results of these surveys are not entirely accurate or complete. In any event, there is certainly insufficient evidence to support their contention that Defendants have "systematically failed to provide class members in eighteen prisons access to private showers and searches by officers of their preferred gender." [*See* d/e 615, p. 7, ¶ 21].

WHEREFORE, for the above and foregoing reasons, Defendants respectfully request that this Honorable Court accept their Response to Plaintiffs' Fourth Report of Private Shower Noncompliance and First Report of Defendants' Noncompliance with Searches. [d/e 615].

Respectfully submitted,

LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN,

Defendants,

Kyrstin Beasley #6323618
Assistant Attorney General
201 West Pointe Dr., Ste. 7
Belleville, IL 62226
(618) 236-8781 Phone
(618) 236-8620 Fax
Email: kyrstin.beasley@ilag.gov

KWAME RAOUL, Attorney General
State of Illinois

Attorney for Defendants,

By:  s/Kyrstin Beasley
      Kyrstin Beasley

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS
## EAST ST. LOUIS DIVISION

| | |
|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELENA VISION, SORA KUYKENDALL, and SASHA REED, )<br><br>Plaintiffs, )<br><br>- vs- )<br><br>ROB JEFFREYS, MELVIN HINTON, and STEVEN BOWMAN, )<br><br>Defendants. ) | No. 18-156-NJR |

## CERTIFICATE OF SERVICE

I hereby certify that on August 25, 2023, the foregoing document, ***Defendants' Response to Plaintiffs' Plaintiffs' Fourth Report of Private Shower Noncompliance and First Report of Defendants' Noncompliance with Searches***, and exhibits filed under seal, with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

| | |
|---|---|
| Abby L. Parsons | aparsons@kslaw.com |
| Sarah Jane Hunt | sarahjane@tkennedylaw.com |
| Thomas E. Kennedy, III | tkennedy@tkennedylaw.com |
| Brent P. Ray | bray@kslaw.com |
| Samantha G. Rose | sam.rose@kirkland.com |
| Amelia Bailey | abailey@kirkland.com |
| Camille Bennett | cbennett@aclu-il.org |
| And all other counsel of record | |

                                                                                                                               s/ Kyrstin Beasley
                                                                                                                              Kyrstin Beasley #6323618
                                                                                                                              Assistant Attorney General
                                                                                                                              Office of the Attorney General
                                                                                                                              201 West Pointe Drive, Ste. 7
                                                                                                                              Belleville, Illinois 62226
                                                                                                                              (618) 236-8781 Phone
                                                                                                                              (618) 236-8620 Fax
                                                                                                                              Email: kyrstin.beasley@ilag.gov