JANIAH MONROE, et. al. v. STEVEN MEEKS, et. al.
Case No. 3:18-CV-00156-NJR
United States District Court for the Southern District of Illinois
Report from the Second Co-monitor
julie graham August 31, 2023 Report

**Consolidating the number of facilities**
Apparently, there is progress in the plan to reduce the facilities. I am not privy to that plan except to know that there has been progress and IDOC intends to ask incarcerated people if they want to move to one of reduced number of facilities. There is a plan to train the staff at the reduced number of facilities.  I think that the monitors and the plaintiffs, should have a say in which facilities. I say that not because I want to control IDOC's decisions, but rather, we know where the bulk of the complaints come from. We have heard which facilities are the ones that are most distressing to the incarcerated people.

Consolidation is important as targeting resources towards a fewer number of facilities should improve the experience of transgender people in IDOC and let IDOC plan more effectively to provide for transgender people and concentrate resources.

**Administrative Directive**
There are changes that are needed in the AD. I have identified a range of questions about the AD and apparently there has been a revision to the AD that may address some of my concerns, but I can't get a copy of the revised AD.  I have been raising concerns for months and have not made any progress. It is disappointing to not have a chance to offer suggestions about the AD prior to it's approval based on what we know about transgender people who are incarcerated nationally and what responses we have from incarcerated people in Illinois.

**Tool Kit**
Tool Kit has improved, but still lacks some detail. Some of that detail is dependent on the revised AD. The detail is necessary to reduce confusion and improve clarity about pathways and processes. As noted previously, the tool kit needs to be more specific, example: a person will be given access to gender appropriate clothing thru the clothing room within 48 hours.  If you are still waiting 2 weeks later, then you know something isn't working.

**Next steps**
I have requested that all individuals fill out a gender preferences form. They would be given the tool kit version that exists now. They will fill this form out themselves unless they cannot read or write.  They will fill this out with a staff person who can answer basic questions. When people ask what a transfer or access to medical care or ID involves, and the staff member will clarify the process.

The staff person will contact the TAC/THAW and identify any individuals who need specific follow up-for instance they have asked for an ID 5 times and been unable to receive it or they believe they have completed the process for transfer or surgery and feel they are in limbo.

The ACLU survey demonstrated once again that there are people who believe they are in a process or have asked for something like mental health care and report they cannot get it. This way, there is a shared basic starting point. It is also a chance for a staff person to educate incarcerated people about the processes. It should prevent the inconsistencies that occurred in the the ACLU survey. The staff member can clarify with the person if there is an inconsistency similar to where they say the shower is private and then detail that people are out when they are showering.

**Training**
I reached out to the Moss Group, but haven't heard back. I will reach out again.

**Grievances**
Pickneyville
I did not interview the individual with whom the ACLU wanted to transfer from Pickneyville. She previously indicated that she not didn't want to speak with me as I couldn't make changes happen. I did  reach out to the Warden at Pickneyville and requested an investigation and provided information for him to follow up with that individual. It happened immediately.

I read the report from the investigation at Pickneyville. It is clear that a great deal of staff time and effort goes into these investigations. It was a substantial document.  I was happy to get the report, as I would like to see these investigations, but as so many of these investigations go, it was unsubstantiated.

Grievance about the non-binary person at Pickneyville
I reached out to Dr. Puga on 8/2 and he immediately investigated this and on follow up, had a complete response by 8/4. Their documentation was not consistent with the individuals expressed identity. Someone was to speak with the individual. (This speaks to why I want the form I described earlier-there can be a mismatch between what individuals believe-even about their very identity—and what IDOC knows. )

Menard
Last month I reached out to Menard related to the individual who was in distress and complained to the ACLU. Her complaints were also investigated and found to be unsubstantiated or unfounded. I did not get the details of the investigation there.

## Big Muddy River Interviews
Showers/Bathrooms
Most people felt that they received their showers and they were safe when showering. There is some concern that the shower curtains do not cover people's bodies. One person stated that porters or people with ADA's are, at times, out too, and I checked to see if this changed in the past month and she said they were still out—that custody staff who were new seemed to be the major concern. Other individuals said that the porters and people with ADAs were *not* out.

Someone complained that the bathrooms in medical, and the yard and the school are not private.

Searches
When female staff have searched transgender women they are respectful and professional.

Searches-writs
There is a concern that female staff do not accompany transgender women on writs-that male staff make them use the men's bathrooms or that they are uncomfortable on medical writs where they may be unclothed. The paperwork has their male name and everyone misgendered them as a result.

One individual reported she is pat searched by men and that if they request a female they are harassed over this and when the female staff arrives she is angry about searching her. She reports staff swear at her where she requests the. Appropriate search be followed.

Staff behavior
Pretty much everyone said that staff do not use the correct pronouns or names. Some people felt that it was intentional-that staff will accentuate the words sir, or man, he him. The staff will say 'chicks with dicks' or that they don't have to use the correct name or pronoun. If the women complain, some will say things like "don't get your panties in a bunch." There are staff who behave professionally, but still don't use the correct pronoun. The staff who supervised the interviews I conducted consistently said he and him.

Several individuals feel that they, transgender women, are targeted for tickets that non-transgender people do not get for the same behaviors. The staff use nicknames with some of the other incarcerated people, but refuse to use the transgender women's names. It feels intentionally inconsistent. If they ask staff to use the correct pronoun, several report being threatened by staff, told they are talking back, or being insolent and are threatened with tickets.

Several people felt that the prison officials didn't understand how at risk they feel, that they have to sit next to people who hate them because of their identity and that **it's hard to eat if you are worried about getting punched.** One woman reported getting a ticket for refusing to sit in medical (in small chairs that are connected) next to someone who made it clear they dislike transgender people. She was frightened of what might happen. She felt the officers didn't understand why that was a powder keg sort of situation for her and that she didn't want it to explode. They feel the staff do not understand that some of the other incarcerated people want to harm them. There seems to be harassment that is deeply troubling to several of the women. Other women cope by not leaving their cell. One woman is terrified as she is on C grades with sex offenders and she is similar to their victim profile.

Clothing room
Most of the women didn't know they were eligible to receive bras and underwear from the clothing room for free.

I provided feedback to Warden Hvarre about the concerns there and have not heard back. Again, I will follow up.

## The ACLU Survey

Showers
I carefully read the ACLU document and the Plaintiffs response. I found the same inconsistencies in the checkboxes as compared to the written narrative that IDOC found.

Sometimes checkboxes confuse people. Sometimes there is such nuance, that it can be misunderstood if you haven't spoken with people. For instance, while someone might be offered a private shower, using the private shower time can out them as transgender, putting them at risk. There are facilities where people feel so unsafe they pretend to be cisgender in order to stay safe. So in fact the person does have *private* access but it's not *safe* for them to use it.

There are likely functional explanations behind confusing responses.  Also some incarcerated people do not know their rights and don't expect much because of their histories of discrimination and so may be inclined to say "Yes," but in the detail say something different that evidences a lack of privacy or another problem. (Yes it's private, but people walk by-sorts of answers.)

There are structural issues that need to be problem solved around the timing of showers at some facilities or the inability of certain facilities to provide what they are supposed to. I think Logan fits that explanation. Other structural problems like timing of opening and closing cells and and ensuring that everyone is back in their own cell after med lines or other activities may need to have schedules reworked.

I am following up with all the facilities where people indicated that there was a problem and comparing those comments to previous comments from individuals at those facilities. Centralia and Pontiac are investigating or following up on issues from the ACLU survey. I am interviewing incarcerated people at Pontiac in September. Logan has a new warden  and she had not yet seen the the survey results and we will meet again after she has read them. For people who don't want a private shower, we have to look at what is underneath this. Some part of this is about the hassle of the restrictions of showering at Logan.

Pontiac has a stall with a door that would likely cover a person's genital region, but not breasts if they were tall. In response they have these sheets they hang up over the front of the cell that houses the shower that depending on how they hang cover or don't cover. Further, I can't imagine these meet safety/security requirements, because they cover everything and not just the individuals body. There has to be a better solution but in an attempt to meet the privacy requirements, the attempted solution hasn't worked well.

Parity
Many people note that some facilities offer people two showers a day in the summer in the hot weather. Transgender people are only entitled to one shower a day. While I wouldn't want the individual who gets two showers a day to lose access to that, it is a lack of parity. This was also raised in my interviews with transgender people.

Logan
There is a new Warden at Logan. I met with her and Director Smith. I want to point out something I said in my first report. There is such turnover in IDOC and continued staffing problems that it makes sustained change problematic. This is part of why changing the AD is so critical.

Searches are a problem at Logan. People have to wait a long time. I know, too, that some trans men agree to be searched by women simply because it expedites their ability to move freely for visitation, etc. One problem is the AD-that transgender women post surgery are treated the same as transgender women pre surgery. This means they must wait long times to be searched which creates gender-related distress.

Searches and writs and visitation
I requested that Chief Hammers follow up again on the issue of visitation and writs. Medical and legal writs and visitation—these are planned. Someone needs to be in charge of ensuring these are appropriately staffed. People report their visitation is cut short because of the lack of staff to search them in a timely manner. There are still people being inappropriately searched or accompanied by the wrong gender staff on medical writs. The impact is that people stop going for medical care, don't urinate all day, lose visitation time, or feel very uncomfortable at a very vulnerable time, etc.

I will also follow up with the issues about individuals being both scanned and strip searched. There are many people who have complained about pat searches by male staff. Again I will follow up.

General comments

I want to reiterate that I can recommend and, even when they may take my recommendations seriously, much of IDOC is glacial in response. Change is happening really slowly. I find myself repeating myself, and repeating the original very exhaustive report that I completed last year. While IDOC has improved, it's a slow process for them; that slowness is at the expense of transgender people.

Two things are true at once-IDOC is changing and there are well-meaning and committed professionals at IDOC trying to do the right thing or at minimum comply with the court order AND it's not happening fast enough. There is no one I've spoken with on the admin side of things who hasn't been professional and interested in getting things changed to meet the goals of the court and/or who genuinely care about the people incarcerated at IDOC. It also varies from facility/warden to facility/warden.

When it's something concrete—I can get it attended to directly with some of the wardens. I can also do some basic education about how transgender people move through life and it's generally appreciated by the wardens I've had the chance to interact with directly. For instance, transgender women take longer in the shower than cisgender men. This can be misperceived as

being difficult or slow, when in truth, they have more to do. If you don't understand this, trans women can be perceived as non compliant. Warden Monti said he'd look at changing schedules to accommodate this. Warden Case at Logan and now Warden Eddy are very open to learning. There are other wardens I've asked to speak with, but always hit barriers.

One of the things I see over and over again is how fair many of the transgender people are in their responses, both to the survey and to me—for instance, explaining it's only one or two custody staff or that it is new staff who don't follow the rules. That is not an excuse, but it does show some progress, however slow. No one should *ever* have a staff member look under the curtain or have porters out while they are showering. I think many wardens are attempting to get staff members to ensure privacy during shower times. I've seen memos and communicated with wardens.

I do believe that there are staff who behave inappropriately. I do think there are staff that are ill-informed and make mistakes. (Mistakes made once are mistakes, but mistakes made repeatedly is aggression. Also that irrespective of the intent of the staff, the impact on the TGD person is the same-because it was an innocent error on the part of staff, it still might be the fiftieth time that day that someone misgendered that individual and it feels very harmful or impactful.)

I am not in the position of being able to determine what is true or not true. There are incidents that really disturb me and when people say something glaring I respond to these things immediately.  When these allegations are contradictory with facts, it's a problem. For example, alleging that one was in a wheel chair as the result of custody abuse and it turns out they are not in a wheel chair and denied physical abuse when interviewed by the investigating staff. One individual stated she can't receive underwear, the warden confirmed they in fact did receive underwear-even before I complained. I had someone say she was shackled with her hands behind her back for a prolonged period of time and the Warden informed me she had Orange Crush footage that she was not. I think some of the alarming things people raise are in response to how frightened they are living in unsafe environment. They feel imperiled. And I am aware there can also be other reasons.

Living 24/7 in an environment where people dislike or hate you or disapprove of your existence or believe you are delusional or let you know you are an affront to G-d, takes a toll on people. The comment earlier from the woman at Big Muddy I think is instructive. If the person next to you may attack you because they have a problem with transgender people, you are hyper vigilant any time you are out. If you are forced to sit next to a person in cramped chairs where you might accidentally touch them or be touched by them and they have expressed hatred towards you in the past, it can be terrifying. Actions trans women take to protect themselves can be misunderstood.

Because I've seen the Pickneyville documentation—unlike concerns I've raised at other institutions (Pontiac, for instance)—its clear they truly investigated this. Can I determine that everyone was telling the truth? Not at all.  The alleged victim could not provide a lot of missing information and didn't tell the investigators the same things they disclosed to the ACLU.  What I can say is that Warden Mitchell responded immediately, investigated, and responded each time I reached out.

I believe the consolidation of facilities is the answer to many problems like this. It is too complicated to keep tabs on all of IDOC's facilities, with their challenging staffing issues and other complicating factors. If there were 6 facilities, it would be easier to ensure that all staff followed the rules. Staff could have appropriate training. Commissary could be more easily managed and monitored. There could be more support offerings and MHPs and PCPs that are comfortable and well-versed in TGD healthcare. There would be less confusion because there would be more people holding correct information.

I also believe that a staff member meeting with each individual and the individual filling out a document for themselves about their gender preferences will go a long way towards creating a baseline and reducing misinformation.

Completing the AD will also help. I'm concerned it will disappoint in that it was created inside IDOC without monitor and Plaintiff's input.

I still believe there should be a navigator who can assist transgender people to get their needs met until caring for gender issues become part of the normal practices of IDOC.

# Gender Preferences Form

| # | Question | | | | |
|---|---|---|---|---|---|
| 1 | What is the name that you use? (sometimes referred to as your preferred name) | | | | |
| 2 | What pronoun do you use? Circle or fill in the blank | She | He | They | Something else |
| 3 | What is your IDOC number | | | | |
| 4 | What is the name that IDOC uses for you? | | | | |
| 5 | Do you want to keep your gender identity confidential and private? | Yes | No | | |
| 6 | What is your gender?   Circle as many as fit for you or write how you identify you gender | Male    Female | Transgender | Trans man    Trans woman | Genderqueer binary |
| | | Masculine spectrum | Feminine Spectrum | Agender | Gender Fluid |
| 7 | Sex at birth | Male | Female | A doctor told me I was intersex | |
| 8 | Have you completed a search preference for your ID card? | Yes | No | I don't know | |
| 9 | Have you received an ID card with your search preference on it? | Yes | No | | |
| 10 | Do you feel physically safe where you are housed?If no, please explain on the back of this form | Yes | No | | |
| 11 | Are you being harassed, bullied, threatened, or called names where you are housed? Please explain on the back of this form. | Yes | No | | |
| 12 | Where are you currently housed: | | | | |
| 13 | Where would you like to be housed? | | | | |
| 14 | Have you applied to be transferred? | Yes | No | I don't know | |
| 15 | If you have applied for a transfer, do you know where you are at in the  process | Yes | No | I don't know | |
| 16 | Are you receiving hormones? | Yes | No | | |
| 17 | Are you interested in surgery? | Yes | No | Maybe | |
| 18 | If you have applied for medical care related to gender, do you know where you are at in the process? | Yes | No | I don't know | |
| 19 | Have you ever changed your ID or anything about your person to stay safe in the facility you are in? (For example, cut your hair, grew a beard, removed a search preference, stopped taking hormones, etc.) Please explain on the back. | Yes | No | I don't know | |
| 20 | Who is helping you complete this form? | | Your signature saying you agree to everything on this form. | Date | |
| 21 | | | | | |