JANIAH MONROE, et. al. v. STEVEN MEEKS, et. al.
Case No. 3:18-CV-00156-NJR
United States District Court for the Southern District of Illinois
Report from the Second Co-monitor
julie graham  October 6, 2023 Report

**Pontiac**
I informed the court of a shower and alleged search violation reports at Pontiac. I followed up with Warden Nurse and with Chief Hammers on 9/11/23. They have been developing a response. The way the showers are constructed inside a cell means that it's difficult to put up a privacy curtain that also permits custody staff to ensure that an individual is not in harm's way.

**Logan**
I reviewed the concerns from the ACLU survey with the new warden at Logan. We also discussed historical issues. She will also reiterate to directors about private showers and ensure that individuals have private shower time. She will remind her staff and put out a memo about search protocols. There is still no directive on post-surgical searches for transgender women; this needs to be addressed.

There are different types of housing units at Logan. In some, women can go in and out of them freely. In others, there are designated times. This impacts the parity issue of a once or twice-a-day shower. Warden Eddy will reiterate that transgender people are to be permitted to shower privately and precisely what that means.

Searches at Logan
As more people are searched without incident, Warden Eddy hopes that more staff will be willing to search transgender individuals. There are currently times that there are waits due to needing staff to come in from another facility or bring them in from off duty.

**Pinckneyville Correctional Center**
When the ACLU sent out the new exhibits related to Pinckneyville on 10/5/23, I provided Warden Mitchell with a summary. I requested a meeting, and we spoke the following morning. He had already assigned an engineer to go to each shower to identify if there was damage to the curtains. He stated that the staff members that were identified by name will be investigated by Internal Affairs. When concerns are brought to him, he responds, following the protocols within IDOC.

He reports he had met with the individual who was on a hunger strike the previous week and says that she did not disclose to him why she was on a hunger strike other than she wanted to be transferred, so there was nothing actionable learned from that meeting.

Warden Mitchell immediately responds to concerns that I have identified. Warden Mitchell uses the correct pronouns with people, something that should go without saying, but many people in IDOC do not use the correct pronouns or stumble over them.

Once again, something needs to be fixed in the grievance system. Incarcerated people allege they can't easily get grievance forms. Warden Mitchell reports that people file many grievances, and the grievance forms are available from counselors and staff. There is a disconnect.

—————————-

**Grievances in IDOC**
This is a problem almost everywhere. Incarcerated people report that grievances take a long time to process and that most come back unsubstantiated. Some people report they can not get grievance forms. These two issues are problems through IDOC. It raises the question of if there can be a different way for incarcerated people to access the forms.

Suggestions regarding Grievances
- Grievance forms should be available in the day room, removing custody staff from a middleman position.
- The warden of a facility or an assistant warden meet with the transgender women and non binary people about their concerns once a month until these issues are resolved. This lets people feel heard and gives them direct access to people who can fix the problems that are occurring. Often wardens don't know that curtains have been torn or that staff aren't following directives. Wardens make changes based on feedback. If they don't get the grievances, they don't make the changes. They don't address problems they don't know about. Staff people aren't empowered to make changes, but also don't seem to pass along the need to fix a problem that exists. Wardens report they aren't getting grievances regarding showers and searches from TGD individuals.
- A timeline for responses to grievances is adhered to—if it is to take 10 days, then it should be no longer then 10 days. People need to know what to expect.
- I believe the court asked that the monitors be able to review grievances against staff members. The attorneys for the defendants have made the results of two investigations related to the upcoming court case, available, but otherwise no information is provided to me other than investigations are occurring or are complete.
- 

**Searches in IDOC**
Facilities should have someone on every shift who can search the individuals who live there. When there are writs that involve searches, there should be staff available as these are planned events. When there are transportation issues, a staff member of the gender of the incarcerated person should be available to accompany the individual to ensure they can use the correct bathroom facilities while they are out. This is happening inconsistently across IDOC.

Searching transgender individuals should be considered regular work duties. Because of union-related concerns, the current arrangement is that upper-level staff and staff who volunteer search transgender people. New hires must agree to search when necessary. In the facilities that have scanners, they can also be scanned, although that, too, has to have individuals who are volunteering to search transgender people.

While the wardens know the administrative directives, the front-line staff do not always follow the AD and, according to transgender individuals in custody, resent their need to be searched by a person of the same gender. It problematizes the transgender individual rather than the system that has failed to provide access to gender-matched searches. Facilities that do not have enough volunteer staff need to develop other arrangements—whether that is a scanner or if it is possible to create incentives or change the contract with the union to see searches as part of normal operations. I do not know the union's concerns, but there might be a different way to address them. There may be education that could assist them in making that shift. Perhaps offering incentives to people who will search transgender individuals? Although, Im not even sure that is workable in a state that is unionized.

**Training**
Dr. Reister is developing training focused on culture change and not simply didactic education. This is critical because in addition to information, custody staff and others need to have the opportunity to talk about professionalism related to this population. This is a valuable adjunct to the didactic training that should occur. Staff need the chance to be heard and to educate each other in order to normalize custody issues for transgender people.

**Commissary**

It seems to have improved, particularly in the areas that Ms. Schoeder is involved. However, she was primarily charged with makeup as her area and has tried to have influence in other commissary areas like body products and underwear. While technically IDOC has created a universal commissary, the individual facilities need to ensure they have body products that are scented in typical masculine or feminine ways.

Ms. Schroeder reported that Warden Tack at Dixon ensured that all of the transgender women were taken to the clothing room and provided with underwear and bras. This was a wonderful idea. It creates a clean slate. All trans people at Dixon now should have the minimum underclothing they need and there won't be any confusion because I know that occurred. If someone could do this at each facility, it would help.

There is still lack of knowledge that people are eligible for clothing items from the clothing room in many facilities. It seems like people continue to be told different things by different people.

Ms. Schroeder was going to follow up on the list below:

**Universal=/=male**
When facilities move toward being gender neutral, often that default is "male." Its been upsetting for women both transgender and cisgender that they can't get shoes or t-shirts for females. Unscented or unisex toiletries generally don't decrease gender dysphoria for people—they want to smell like typical men or women. So while a few people want unscented, most people want a scented product.

**Things that people who are not transgender do not think about.**
For instance, thermal underwear that has a fly can cause distress to women who don't want to have a penis. Thermal underwear for women doesn't have a fly opening. If you've never had an

unwanted penis, it might not bother you. If you are trying to minimize the impact having a penis has in your life, its upsetting.

**Logan and deodorant**
Need to have male deodorant as these guys are on testosterone and that changes their body chemistry. They complain it doesn't hold for them.

**Consistently facilities lack things like body scrubbers and scented body products.**

**Non-transgender people buying up supplies before transgender people have a chance**
While there are items listed on commissary lists, they are often out of stock. In places like Logan, trans men need boxers but cisgender women prefer boxers to sleep in, etc. Masculine lesbian prefer boxers as well. When these items are ordered for trans men, they are purchased by cisgender people. The same is true of people using makeup items as art supplies. Trans women want eyebrow pencils, etc. and non-trans people buy them for art projects.

**Sizes are out of stock**
There are always size issues both for men and women. Very large and very small are often unavailable.

**Bras**
Trans women only get sports bras. This is a genuine problem. If you are a 40 E, your breasts need more support. Yes, they cannot have underwire but there are more supportive bras that do not have wire. Conversely, if your breasts have just begun to develop, compressing them is a bad idea.

Trans men complain of not being able to get sport bras because they want the compression to hide their breasts and they often can only get regular support bras.

**Hair removal**
Transgender women remove hair all over their bodies-so razors are ineffective. Some people use magic shave, but it doesn't work for everyone. Transgender women want to be able to purchase Nair for hair removal. Transgender women have to shave their arms, legs, chest, back and face. And unlike most cisgender men, they may shave more than once a day. They need more options for hair removal.

**Commissaries that are staffed by incarcerated people**
Some incarcerated people allegedly withhold items from transgender people they do not like. I've heard this from several institutions. So the products are there but they are told they are not.

—————————

**Issues I have raised before**

IDOC is a reactive system. When an issue is raised, they react. There is work they are doing, but they need to share it; otherwise, it appears they are not doing anything. Irrespective of their work, when they don't share it, it can't be implemented so the progress remains glacial.

1) The new AD needs to be released for review and input. Because it is not, it creates problems for non-binary individuals. There needs to be timelines about what should happen and when. We have people complaining about not getting their IDs. The tool kit will be dependent on the changes in the AD.

2) I believe someone should meet with every TGD individual and complete a form that asks about their needs while providing the tool kits and other accurate information. That staff member would report back to Dr. Puga about the needs of that individual, and IDOC would track that information. It gives everyone information and a starting point.

3) IDOC needs to **reduce the number of facilities and place concentrated resources** in those facilities. Given the scarcity of Mental health providers with gender experience in IDOC, this handful of facilities needs to be properly staffed. Right now very little mental health care related to gender incongruence is occurring—very few facilities have groups—and concentrating care in to a smaller number of facilities would help. It also means training can be concentrated where there are the highest numbers of TGD individuals.

4) There is a staff shortage, both custody and specialty services staff, which means overworked staff. This is a national problem. It also means lockdowns and restrictions. When the staff is overworked, they are probably less likely to adjust to the changes necessary to keep transgender people safe.

5) There is a culture problem in IDOC, and it's easier to change six facilities than 23. Even in more desirable facilities like Logan or Centralia, there are staff who are inappropriate or unprofessional. This change will take place over time, and as I've raised before, it's at the expense of transgender people now. Even if people are relocated, there will continue to be problems at the new site that need to be addressed. And as Dr. Harris reminded several months ago, each facility needs to be trans competent. People will newly come out or be placed in facilities related to geographic or programming needs. All facilities need to shift this culture. It might be possible to incentivize officers to call out other staff for inappropriate behavior. Support the training efforts of Dr. Reister—it's a necessary adjunct. This is staff intensive.