IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JANIAH MONROE,
MARILYN MELENDEZ,
LYDIA HELÉNA VISION,
SORA KUYKENDALL, and
SASHA REED, individually and on
behalf of a class of similarly situated
individuals,

        Plaintiffs,[1]

v.

STEVEN BOWMAN,
MELVIN HINTON, and
LATOYA HUGHES,

        Defendants.[2]

Case No. 3:18-CV-00156-NJR

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

    As context for this Order, this case proceeds as a certified class action consisting of all prisoners in custody of the Illinois Department of Corrections ("IDOC") who have requested evaluation or treatment for gender dysphoria. (Doc. 213). To manage this case, and in light of the serious deficiencies in IDOC's treatment of transgender prisoners, the Court has issued several injunctive orders, entered enforcement orders, and required ongoing status reporting. (*See* Docs. 186, 187, 211, 212, 332, 336, 384, 522, 552, 584).

---

[1] The named Plaintiffs are transgender women currently incarcerated in IDOC facilities. Like many members of the Plaintiff class, the named Plaintiffs use chosen names reflecting their gender identity rather than their legal names or given names at birth.

[2] The named Defendants are the IDOC Chief of Health Services, the IDOC Chief of Mental Health, and the IDOC Acting Director, respectively, all sued in their official capacities.

Early in this litigation, the Court held an evidentiary hearing to determine the appropriateness of preliminary injunctive relief. (Docs. 157, 158). On December 19, 2019, as a result of a two-day hearing, the Court issued its first Preliminary Injunction Order. (Docs. 186, 187 (amended on March 4, 2020, at Doc. 212)). In that Order, the Court thoroughly summarized the evidence presented at the hearing and noted that the parties agreed that gender dysphoria qualified as a serious medical condition. (Doc. 186). The Court analyzed Plaintiffs' likelihood of success on the merits of its deliberate indifference claim, assessed the showing of irreparable injury and inadequate remedy at law, and balanced the possible harms and the public interest. The ordered injunctive relief included disbanding the Transgender Care Review Committee for medical decisions related to treatment of gender dysphoria, ensuring timely hormone therapy and proper monitoring, ending the practices preventing necessary social transition, crafting procedures permitting access to clinicians who are competent and qualified in treating gender dysphoria,[3] providing a path for evaluation for gender dysphoria, determining placement on an individual basis, avoiding cross-gender strip searches, creating access to gender-affirming clothing and grooming items, and developing training for correctional staff on transgender-related issues.

This case proceeded to a four-day bench trial in August 2021. The testimony at that trial made clear that IDOC demonstrated only minimal progress since the inception of

---

[3] The World Professional Association for Transgender Health ("WPATH") organization developed the Standards of Care for the treatment of gender dysphoria, which are the benchmark for appropriate care of individuals with this diagnosis. (Doc. 186, pp. 3-4, 31). To be considered competent and qualified, clinicians must meet the WPATH competency requirements.

the case, even with the prior preliminary injunctive relief. (Docs. 319-328, 331, 332, 336). While IDOC highlighted some progress, the Court recognized that serious constitutional violations abounded—delays in treatment, unmonitored hormone levels, lack of documentation or adjustment to dosages based on bloodwork, denial of hormone therapy for treatment of gender dysphoria for some class members, lack of surgical consultation, inconsistent access to gender affirming commissary items, cross-gender strip searches, inappropriate shower accommodations, and persistent harassment, humiliation, and misgendering. Days after trial, the Court issued an order reflecting its preliminary findings of fact and conclusions of law, foreshadowing its ultimate decision, and ordered preliminary injunctive relief to immediately address some of the most egregious constitutional violations demonstrated at trial until the Court could finalize its findings. (Docs. 331, 332, 336). In December 2021, the Court announced its intention to appoint a Special Master or Monitor to oversee Defendants' compliance with the ordered injunctive relief, to track implementation of IDOC's revised Administrative Directives regarding transgender prisoners and advise the Court and the parties as to the overall progress in remedying the unconstitutional treatment of class members. (Doc. 370). Ultimately, the Court decided that the path towards justice required further injunctive relief.[4] (Docs. 331, 332, 336).

    To draw the curtain on the bench trial, the Court entered its Final Findings of Fact

---

[4] The undersigned issued a verbal ruling for specific preliminary injunctive relief at the close of the bench trial on August 5, 2021, later set forth in the Order of August 9, 2021, the Preliminary Findings of Fact and Conclusions of Law. (Docs. 331; 349, pp. 972-92). Moreover, a correction to the ordered injunctive relief was made on August 18, 2021, to reflect the correct target testosterone level for transgender females undergoing hormone treatment. (Doc. 336).

and Conclusions of Law on February 7, 2022 ("February 2022 Order") holding that IDOC violated the class members' Eighth Amendment rights through deliberate indifference to their need for adequate treatment of gender dysphoria. (Doc. 383). Along with that Order, the Court issued more injunctive relief to remedy the constitutional violations proven by Plaintiffs at trial ("operative injunction").[5] (Doc. 384). Within the following few months, the Court also appointed two Co-Monitors, Dr. Amanda Harris and julie graham, MFT. (Docs. 418, 423). As Co-Monitors, they submit reports detailing their observations regarding compliance, or lack thereof, with the ordered injunctive relief. (*Id.*). Generally, Dr. Harris oversees Defendants' implementation of the ordered relief regarding medical aspects of gender-affirming care, and julie graham maintains responsibility for oversight of IDOC's compliance with the search, private shower, and training provisions. (*Id.*).

After the entry of the operative injunction, the parties and the Co-Monitors continued to work towards compliance with the granted injunctive relief. But in November 2022, Plaintiffs filed a Motion for Finding of Contempt listing a slew of disheartening deficiencies in administering and monitoring hormones, scheduling surgery consultations and surgeries, providing gender-affirming commissary items, cross-gender searches, private showering, coordinating social transition, and training prison staff. (Doc. 455). Defendants responded to that motion asserting that, although Plaintiffs preferred a swifter pace, they made diligent, ongoing efforts to comply with the timelines and actions set by the Court. (Doc. 462).

---

[5] This document carries the title of "Preliminary Injunction," which fuels Defendants' argument in the pending motion to vacate, but the implication of the Order will be discussed further below.

The Court continued to hold the motion under advisement. Discouragingly, IDOC's continued lack of progress towards the ordered injunctive relief necessitated additional enforcement orders to keep efforts on track and provide measurable benchmarks for the formidable work ahead. (Docs. 522, 552, 584). Along with several status conferences, the Court entered these orders with deadlines for certain actions, reports, and certifications to be completed. (*Id.*). The Court also sternly warned of a contempt finding and possible sanctions for continued non-compliance with its operative injunction. (*Id.*).

Now, after issuance of the enforcement orders and over a year after entry of the operative injunction, Defendants argue that the injunctive relief issued by the Court automatically expired 90 days after issuance, and the Court's recent enforcement orders erroneously attempt to execute the expired injunctions along with imposing additional obligations that exceed the limitations in the Prison Litigation Reform Act ("PLRA"). (Doc. 587). For example, Defendants urge that the Court impermissibly required specific actions within specific timeframes instead of permitting Defendants discretion to plan and execute remedial measures. (*Id.*). According to Defendants, Plaintiffs also cannot prove a continuing constitutional violation (deliberate indifference to a serious medical need). (*Id.*). As such, Defendants move to vacate the Court's enforcement orders (Docs. 522, 552, 584), request an acknowledgement that the operative injunction (Doc. 384 (incorporating Docs. 186, 187, 211, 212, 226)) is expired and has no effect, and seek permission to provide updated evidence of IDOC's ongoing efforts before entering further relief. (Doc. 587). Simultaneously, Defendants ask the Court to stay compliance

with the challenged orders. (Doc. 588). Plaintiffs filed timely responses to both motions. (Docs. 597, 598).

MOTION TO VACATE (DOC. 587)

**I.   <u>Legal Standard</u>**

Under Federal Rule of Civil Procedure 60, a court may relieve a party from a final judgment, order, or proceeding because the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or for any other reason that justifies relief. FED. R. CIV. P. 60(b)(5)-(b)(6). For the first ground for vacating an order in Rule 60(b)(5), a party must show that it has achieved that the objectives of the order or decree. *Shakman v. Pritzker*, 43 F.4th 723, 728 (7th Cir. 2022). Consideration of a motion under Rule 60(b)(5) does not permit re-litigation of issues which the judgment already resolved. *Money Store, Inc. v. Harriscorp Finance, Inc.*, 885 F.2d 369, 372 (7th Cir. 1989). In some circumstances, cases involve more than one final decision, for example, post-judgment orders entered pursuant to the jurisdiction a court has retained to enforce a prior order, may be considered final orders. *See Armstrong v. Schwarzenegger,* 622 F.3d 1058, 1064 (9th Cir. 2010).

**II.   <u>Discussion</u>**

In their Motion to Vacate, Defendants argue that no final order issued after the bench trial, all imposed preliminary injunctions expired within 90 days after issuance, and the newly imposed obligations in subsequent enforcement orders exceed the limitations imposed by the PLRA. Defendants also assert that the Court has erred by

continuing and incorporating older preliminary injunctions that already expired.

Moreover, Defendants assert that the imposition of any additional injunctive relief against them, through the enforcement orders, lacks a finding that such relief is narrowly drawn, extends no further than necessary to correct the violation of a constitutional right, and is the least intrusive means necessary to correct the violation of the constitutional right as required by the PLRA, under 18 U.S.C. § 3626(a). What's more, Defendants accuse the Court of conflating the Plaintiffs' and Co-Monitors' suggestions with what is constitutionally required, without making the statutorily required findings that such relief is necessary to remedy a constitutional harm. As such, Defendants contend that the Court has erred by entering orders contrary to the plain language of the PLRA and impermissibly infringing upon Defendants' discretion. Defendants also emphasize that they have attempted to deferentially alert the Court as to these issues in multiple ways before formally seeking to vacate the orders.

     **a.**  *Injunctive Relief Standards*

Preliminary injunctions are temporary injunctions issued before or during trial to prevent an irreparable injury from occurring before the court has a chance to decide the case.[6] To issue preliminary injunctive relief, courts engage in a muti-step inquiry. *International Ass'n of Fire Fighters, Local 365 v. City of East Chicago,* 56 F.4th 437, 446 (7th Cir. 2022). At the threshold, the injunction-seeking party must show some likelihood of succeeding on the merits, that it lacks an adequate remedy at law, and it will suffer

---

[6] *See Preliminary Injunction,* BLACK'S LAW DICTIONARY (11th ed. 2019), accessed via Westlaw.

irreparable harm if preliminary relief is denied. *Cassell v. Snyders,* 990 F.3d 539, 544-45 (7th Cir. 2021). From there, a court balances the irreparable harm the non-moving party will suffer if preliminary relief is granted against the irreparable harm to the moving party if relief is denied. *Id.* (citing *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of America, Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008)). A court also must consider the public interest, including any consequences of granting or denying injunctive relief to non-parties. *Id.*

In contrast, the issuance of a permanent injunction involves a trial on the merits.[7] In the case of a bench trial, a court issues findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a)(1), and enters a final order granting or denying the requested relief. The standard for permanent injunctive relief is similar to that of a preliminary injunction. But because permanent injunctive relief is a form of relief on the merits, a plaintiff must demonstrate not simply a probability of success on the merits but actual success. *Vaughn v. Walthall,* 968 F.3d 814, 824-25 (7th Cir. 2020). Thus, permanent injunctive relief is appropriate when the injunction-seeking party shows: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

---

[7] *See Permanent Injunction*, BLACK'S LAW DICTIONARY (11th ed. 2019), accessed via Westlaw (defining "permanent injunction" as "[a]n injunction after a final hearing on the merits").

"The PLRA circumscribes the scope of the court's authority to enter an injunction in the corrections context." *Westefer v. Neal*, 682 F.3d 679, 683 (7th Cir. 2012); 42 U.S.C. § 1997e & 18 U.S.C. § 3626. The PLRA delineates slightly different rules for preliminary and prospective injunctive relief. For preliminary injunctive relief, the PLRA dictates that it "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). Further, a court must give substantial weight to any adverse impact on public safety or the operation of a criminal justice system and respect the principles of comity within the statute in tailoring preliminary relief. *Id*. For preliminary injunctions subject to the PLRA, automatic expiration occurs after 90 days, unless the court makes the necessary findings for entry of prospective relief and makes the order final before expiration of the 90-day period. *Id*.

Similarly, the PLRA constrains the scope of prospective relief to only the extent necessary to correct the violation of the Federal right of particular plaintiffs. 18 U.S.C. § 3626(a)(1)(A). To grant prospective relief, a court must find "that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." *Id.* In familiar fashion, the PLRA requires courts to afford substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the ordered prospective relief. *Id.* A defendant may move to terminate prospective relief that does not meet this standard. *Miller v. French*, 530 U.S. 327, 333 (2000). Section 3626(b)(2) provides that a defendant "shall be entitled to the immediate termination of any

prospective relief" lacking the requisite narrowness-need-intrusiveness finding. But "prospective relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right" and satisfies the narrowness-need-intrusiveness requirement. 18 U.S.C. § 3626(b)(3).

### b. *February 2022 Order*

The Court provides this brief explanation of the standards for injunctive relief, specifically under the PLRA, to lay the foundation for a necessary discussion clarifying the February 2022 Order (Doc. 383), the operative injunction (Doc. 384), and the effect of each on this case.

In its February 2022 Order, the Court endeavored to explain its final findings of fact and conclusions of law from the August 2021 bench trial. In doing so, the Court issued a ruling on the merits of the case finding that Defendants acted with deliberate indifference to Plaintiffs' serious medical need of gender dysphoria in violation of the Eighth Amendment. As a result, the Court ordered prospective injunctive relief as an equitable remedy to this constitutional violation. Admittedly, the Court, throughout its February 2022 Order, referred to either "preliminary relief" or simply "injunctive relief," outlined the standard for preliminary injunctive relief,[8] and titled the accompanying injunction a "Preliminary Injunction." Simply put, this was a mistake.

---

[8] Immediately after describing the standard for preliminary injunction, the Court referred to the narrowness-need-intrusiveness standard for prospective relief under the PLRA. (Doc. 383, p. 64). This inconsistency further signals the Court's intention to issue prospective or permanent relief, rather than preliminary relief.

But from the substance of the February 2022 Order and operative injunction, along with the context and ongoing actions of the Court and the parties, it is clear that the relief was intended and understood to be *permanent* injunctive relief resulting from the evidence presented at the bench trial.

First, the Court's justification for injunctive relief provided in the February 2022 Order satisfied the requirements for permanent injunctive relief. In evaluating the prudence of preliminary injunctive relief, the Court found that remedies available at law inadequately compensated Plaintiffs' injuries, the balance of hardships between Plaintiffs and Defendants warranted a remedy in equity, and the injunction served public interest. (Doc. 383, p. 65). These are all necessary findings to satisfy permanent injunctive relief as well. To issue permanent injunctive relief, as opposed to preliminary relief, a court must find actual success on the merits of the claim rather than likelihood of success. In its February 2022 Order, the Court explicitly made such a finding. The Court held that, based on the evidence presented at trial thoroughly recounted in the Order, Defendants violated Plaintiffs' Eighth Amendment rights for failure to provide constitutionally required treatment for gender dysphoria and exhibited ongoing deficiencies in delivery of medically necessary treatments on a systemic, statewide level in IDOC correctional institutions. (Doc. 383, pp. 66, 70). With this finding, the permanent injunctive relief was appropriate and provided closure on the merits after the bench trial.

The February 2022 Order and subsequent operative injunction satisfy the PLRA's requirement that the granted prospective relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and represents the least

intrusive means necessary to correct the violation, as well as considering the adverse impact on public safety or operation of a criminal justice system. These narrowness-need-intrusiveness inquiries overlap significantly and can blend together. "What is important, and what the PLRA requires, is a finding that the set of reforms being ordered—the 'relief'—corrects the violations of prisoners' rights with the minimal impact possible on defendants' discretion over their policies and procedures." *Armstrong*, 622 F.3d at 1071.

In its Order, the Court thoroughly explained the evidence at trial and explicitly outlined the need for injunctive relief to correct the persistent unconstitutional treatment of Plaintiffs' serious medical condition of gender dysphoria. In the "Treatment of Gender Dysphoria" section of its February 2022 Order, the Court reiterated many of the principles established in its prior orders concerning the appropriate treatment for gender dysphoria, including the World Professional Association for Transgender Health ("WPATH") Standards of Care, which are considered the benchmark for appropriate care.[9] (Doc. 383, pp. 4 n. 3, 5-9). Thus, the Court has considered WPATH's Standards of Care as the constitutional floor of treatment for gender dysphoria. In its Order, the Court clearly tailored its injunctive relief in accordance with this constitutional floor, breaking down relief into categories reflected in WPATH's Standards of Care—social role transition, psychotherapy, surgery, and cross-sex hormone therapy. The Order reviewed the IDOC policies regarding transgender inmates and their various inadequacies along with the specific testimony at trial further substantiating those inadequacies. (*Id.* at pp. 9-

---

[9] Notably, as the Court asserted long ago in this case, Defendants do not offer any other standard of care that rivals that of WPATH, which could be an appropriate, accepted alternative and establish a lower constitutional floor. (Doc. 186, p. 31).

61).

The February 2022 Order and operative injunction also incorporate relief that does not intrude upon IDOC's discretion to develop solutions, policies, and procedures to deliver constitutionally required care to transgender inmates. The Court identifies the primary focus of its ordered injunctive relief as *outcomes* that raise IDOC's treatment onto the constitutional floor, rather than prescribing the methods for *how* IDOC achieves those outcomes. (*Id.* at pp. 66-68). Lastly, the February 2022 Order clearly identifies and evaluates extensive testimony regarding public safety and institutional security implications related to the injunctive relief sought by Plaintiffs. (*Id.* at pp. 31-34). Ultimately, the Order, in aggregation, establishes that the granted relief satisfies the narrowness-need-intrusiveness requirement, along with consideration of public safety and institutional security. The Court provides this explanation to highlight the February 2022 Order's compliance with the PLRA's mandate for prospective relief. To be sure, in its Motion to Vacate, Defendants do not appear to challenge the February 2022 Order for lacking a narrowness-need-intrusiveness finding, but rather they argue that the subsequent enforcement orders lack such a finding—which the Court will address below.

Additionally, after the bench trial in 2021, the Court made preliminary rulings from the bench which support the notion that the February 2022 Order amounted to the Court's Final Findings of Fact and Conclusions of Law along with permanent injunctive relief. (Doc. 328). In reaching the decision to issue immediate interim preliminary relief, the Court stated, "So, obviously I am going to have to continue to follow up with permanent injunctive relief and may at some point consider the appointment of an

independent monitor to ensure ongoing compliance, but that's an issue for another day."
(*Id.* at pp. 7-8). The Court also said, "Notably, the request for preliminary injunctive relief
was vigorously opposed by counsel, as was permanent injunctive relief during this trial."
(*Id.* at pp. 4-5). Alluding to the permanent injunctive relief to come, the Court mentioned
that "there are simply some issues that have come to light in the past four days that are
so serious, *such serious violations of the Eighth Amendment*, that they must be immediately
addressed[,]" and further that, "I find that Defendants *continue to be deliberately indifferent
to Plaintiffs' serious medical condition*, that is gender dysphoria[.]" (*Id.* at pp. 9, 11-12)
(emphasis added). The Court immediately entered its Preliminary Findings of Fact and
Conclusions of Law, along with a Preliminary Injunction Order after the trial. (Docs. 331,
332). Eventually, the Court entered the February 2022 Order finalizing its findings from
the trial and allowing the forewarned injunctive relief to come to fruition.

Moreover, the Court's announcement that an independent monitor may be
appointed to ensure compliance with permanent injunctive relief paired with its eventual
appointment of independent monitors[10] points to the permanent nature of the Court's
injunction. In its Order explaining the need for a Monitor to oversee Defendants'
compliance, the Court stated that "the post-trial remedial phase of this matter is
sufficiently complex to exceed the Court's ability to effectively and timely evaluate the
records to determine whether Defendants are making adequate progress toward

---

[10] In an Order on December 13, 2021, the Court advised the parties of its intention to appoint a Monitor to
oversee Defendants' compliance with its preliminary injunctions up until that point. (Doc. 370). In its
February 2022 Order, it incorporated the use of the Monitor to assess and advise the Court on how to
"remedy the unconstitutional treatment of transgender prisoners in IDOC custody…and work with the
parties to accomplish those revisions." (Doc. 383, p. 70).

compliance with the Court's orders." (Doc. 370, p. 5). Again, the Court recognizes its own

mislabeling, but the context surrounding the February 2022 Order provides clarity as to

the intended permanent nature of the relief granted.

In further evidence that the parties understood the injunctive relief as permanent,

the Court points to the behavior of the parties from the issuance of the operative

injunction until the filing of Defendants' present motion to vacate. Although Defendants

contend that the operative injunction expired on May 8, 2022 (90 days after issuance),

Defendants continued to acknowledge the role of the Co-Monitors, engaged in status

conferences and many other communications with the Co-Monitors, Plaintiffs, and the

Court, and responded to Plaintiffs' Motion for Finding of Contempt.

Despite these multiple opportunities, Defendants failed to raise any issue with the

operative injunction as expired preliminary relief. Then, over *a year* after the issuance of

the February 2022 Order and operative injunction, Defendants raised the argument that,

under the PLRA, preliminary injunctive relief automatically expires after 90 days, and, as

such, they have no further obligation to comply with the operative injunction without

further hearings or findings by the Court. Unsurprisingly, Defendants' argument arrives

on the heels of threatened sanctions for their continued noncompliance. This attempt is

disingenuous, at best, given Defendants' behavior for over a year treating the February

2022 Order as prospective, permanent injunctive relief and understanding the Court's

authority to ensure and monitor compliance with the ordered relief. To allow Defendants

to raise this argument in such an untimely fashion would seriously disrupt this case.

"A party's unreasonable delay in advancing a good ground for a change in a previous

ruling is normally a compelling ground for deeming even a good ground waived." *Carr v. O'Leary*, 167 F.3d 1124, 1126 (7th Cir. 1999). Defendants are attempting to set this case back to square one, which is impermissible at this stage. Clearly, based on the context and behavior of the parties, the February 2022 Order and subsequent operative injunction, despite a mislabeling, actually provide permanent injunctive relief.

The Court recognizes that it should have issued an accompanying judgment in favor of Plaintiffs after its February 2022 Order. As described, the February 2022 Order included the Court's final findings of fact and conclusions of law after the August 2021 bench trial and granted permanent injunctive relief. This amounted to final judgment in favor of Plaintiffs.

### c. *Enforcement Orders & Prior Preliminary Injunction Orders*

As for the prior preliminary injunctions, regrettably, the Court recognizes its procedural failure to appropriately renew each injunction upon the automatic 90-day expiration encompassed in the PLRA. Again, the parties failed to raise this argument in a timely fashion for the Court to make necessary adjustments to those orders. Defendants contend that they raised the expiration argument in 2020 within their response to Plaintiffs' Renewed Request for Appointment of Independent Monitor. (Doc. 226). In its Order denying that request, the Court directed Defendants to raise this argument in an independent motion for the Court to evaluate. (Doc. 246). Defendants declined to do so. As such, the case proceeded under the assumption that the preliminary orders remained in effect. This was also a mistake.

The Court outright rejects Defendants' argument that the Court's recent

enforcement orders (Docs. 522, 552, 584) were based on those initial injunctions. The Court reincorporated the terms of its prior, albeit expired, injunctions directly into the February 2022 Order and operative injunction, which constitute permanent, final injunctive relief, as explained above. The content of those orders became part of the permanent injunctive relief granted by the Court by their explicit reincorporation based on findings from the bench trial. As such, the enforcement orders were not based on the expired preliminary orders entered by the Court, but rather on the February 2022 Order and operative injunction. To the extent that Defendants argue the enforcement orders should be vacated under Rule 60(b)(5) because they are based on an earlier judgment that has been reversed or vacated, the Court disagrees.

Of course, when a court issues a permanent injunction, it automatically, with or without explicit reservation of jurisdiction, retains jurisdiction to enforce it. *McCall-Bey v. Franzen*, 777 F.2d 1178, 1183 (7th Cir. 1985). Federal courts are not reduced to issuing injunctions against state officers and crossing their fingers in hopes for compliance. *Hutto v. Finney*, 437 U.S. 678, 690 (1978). After issuance, an injunction may be enforced. *Id.* "An injunction is supposed to be a swift and effective remedy, summarily enforceable through contempt or other supplementary proceedings in the court that issued the injunction." *Id.*

Here, the Court has engaged in many efforts and supplementary proceedings to enforce its injunction and ensure compliance including reviewing briefing on Plaintiffs' contempt motion, hosting several status conferences and continued contempt hearings, and evaluating numerous reports from the Co-Monitors regarding areas of compliance and non-compliance. Its recent enforcement orders are a product of those efforts. All of

the requirements outlined in the enforcement orders are congruent with the spirit of the February 2022 Order and operative injunction (the permanent injunctive relief in this matter).

Defendants further argue that the enforcement orders must be terminated because they prescribe prospective relief but do not contain the necessary PLRA narrowness-need-intrusiveness findings. Defendants emphasize that the orders are not tied to constitutional violations. Criticizing the enforcement orders, Defendants argue that the Court impeded their discretion and ran afoul of the PLRA by mandating specific actions and timelines. To this end, Defendants primarily take issue with the Court's direction to contact other providers for gender-affirming surgery, despite their preference to work with one trusted surgeon to set up pre- and post-surgical guidelines, training, and accommodations, and to develop a gender-affirming kit for commissary items. Defendants also heavily rely on the Seventh Court's decision in *Rasho v. Jeffreys*, 22 F.4th 703 (7th Cir. 2022), to argue that the Court is conflating the most effective or preferred solution with what is constitutionally required.

But the Court's enforcement orders do not attempt to issue additional or new prospective injunctive relief. Instead, the enforcement orders are aimed at enforcing the terms of the already imposed permanent injunctive relief providing more clear and specific ways to achieve those objectives given Defendants' continued failures and delays in complying with their obligations under the operative injunction. Through the status conferences/continued hearings on the contempt motion, and reflected in its enforcement orders, the Court clearly believes that Defendants have failed to comply

with its injunction in many ways. Notably, many of the deadlines within the enforcement orders are reporting deadlines to keep the Co-Monitors and Court apprised of Defendants' progress. Other deadlines relate to the previously ordered relief—like deadlines for blood hormone level monitoring, coordinating surgical consultations, and scheduling surgeries—and these deadlines are all imposed due to Defendants' active noncompliance with the operative injunction. For example, the operative injunction (as did the prior injunctions to no avail) directs Defendants to "ensure that timely hormone therapy is provided when medically necessary, including the administration of hormone dosage adjustments, and to perform routine monitoring of hormone levels." (Doc. 384, p. 2). As Defendants have failed to act in such a "timely" manner, the Court's enforcement orders clarify the term "timely" and provide Defendants a reasonable opportunity to comply before fully finding them in contempt and issuing sanctions. Given the sequence of events justifying permanent injunctive relief and leading to the operative injunction, the Court believes it is within its equitable powers to clarify and create deadlines where Defendants have demonstrated a failure to comply. As with Defendants' arguments related to *Rasho*, the Court has made clear that its injunctive relief meets the constitutional floor for medical care and treatment of transgender inmates and aligns with the WPATH Standards of Care. Indeed, Defendants have never pointed to any standards that require less in adequately treating gender dysphoria.

The Court considers its enforcement orders an effort to allow Defendants to come into compliance within an extended time period before finding them in contempt, as well as a further clarification of its operative injunction for areas in which Defendants continue

to miss the mark and complain about the difficulty in effecting compliance. But "[t]he scope of an injunction has no rigid perimeter, and a court may modify an injunction to adapt to changed circumstances" as well. *Rockwell Graphic Systems, Inc. v. DEV Industries, Inc.*, 91 F.3d 914, 920 (7th Cir. 1996). Lack of full compliance can be the sort of changed circumstance that justifies extending a means contemplated by the original injunction or issuing additional substantive measures and injunctive relief. *Norman v. McDonald*, 930 F. Supp. 1219, 1227 (N.D. Ill. 1996); *see also Hutto*, 437 U.S. at 687 (a pre-PLRA case finding that the "long and unhappy history of the litigation" justified a comprehensive order with time limits to insure against the risk of inadequate compliance).

If the Court did modify its operative injunction, it would necessarily need to make the findings required in the PLRA (narrowness-need-intrusiveness). Again, the Court does not find that it modified its operative order and, as such, does not conclude that any such finding was required under the PLRA. *See* 18 U.S.C. § 3626(b)(2) (stating that a defendant is entitled to the immediate termination of any prospective relief if the relief was approved or granted in the absence of a narrowness-need-intrusiveness finding). Each enforcement order—especially the most recent—recounts the ongoing status conferences with the parties, describes the ongoing delays, announces the need for measurable benchmarks, provides ample leeway for Defendants' discretion in ordering reporting, conferral and discussion with the Co-Monitors and Plaintiffs to develop plans, and reiterates Defendants' ongoing obligations under the operative injunction. Thus, even if construed as modifications given Defendants' ongoing noncompliance, the orders meet the requirements under the PLRA for narrowness-need-intrusiveness. Notably,

Defendants also complained, in their response to Plaintiffs' Motion for Finding of Contempt, that "the injunctive relief at issue is overly broad and not easy to measure." When a defendant argues that an injunction's vagueness makes it impossible to know how to precisely comply with a court's command, it is well within a court's authority to make a reasonable modification in response. *See United States v. Spectrum Brands, Inc.*, 924 F.3d 337, 358 (7th Cir. 2019). So, in any event, a modification may be permissible here.

For these reasons, the Court denies Defendants' Motion to Vacate the Court's enforcement orders. (Doc. 587). With this denial, the Motion to Stay Compliance is also denied as moot. (Doc. 588).

It is also necessary to clarify two of Defendants' main areas of concern within the enforcement orders. With its direction to contact other providers for gender-affirming surgery consultations and surgeries, the Court was not attempting to frustrate Defendants' discretion by specifically prescribing that Defendants use additional surgeons, especially providers unvetted or unapproved. The Court was, however, ordering Defendants to evaluate other options, as their plan of using one surgeon to satisfy various components of the operative injunction is clearly ineffective and causing Plaintiffs to continue to suffer constitutional harms. Defendants can exercise their discretion as to which other medical providers to use, how to find those providers, and how to evaluate those providers. Moreover, regarding the "gender affirming kit," the Court has simply directed Defendants to create a list of gender-affirming versions of items already provided to cisgender inmates, such as grooming items and undergarments, and ultimately provide those items to class members. This aligns with

the relief ordered in the operative injunction and, as discussed by the Court earlier, provision of these items is necessary to meet the constitutional floor for treatment of gender dysphoria.

MOTION FOR FINDING OF CONTEMPT (DOC. 455)

## I.  Legal Standard

District courts possess inherent power to enforce their orders and ensure judicial proceedings are conducted in an orderly manner. *F.T.C. v. Think Achievement Corp.*, 144 F. Supp. 2d 1029, 1033-34 (N.D. Ind. 2001). A court's power to enforce its order by civil contempt rests within this inherent authority. *Pearle Vision, Inc. v. Romm*, 541 F.3d 751, 757 (7th Cir. 2008). To hold a party in contempt, the district court must identify an order or decree from the court which provides in specific detail an unequivocal command which the party in contempt violated. *Stotler and Co. v. Able,* 870 F.2d 1158, 1163 (7th Cir. 1989). Such violation need not be "willful" for the party to be in contempt, rather a court may find a party in civil contempt when that party failed to be "reasonably diligent and energetic in attempting to accomplish what was ordered." *Id.* The violation of a court order must be proven by clear and convincing evidence. *Goluba v. School Dist. of Ripon*, 45 F.3d 1035, 1037 (7th Cir. 1995).

## II.  Discussion

Plaintiffs argue that Defendants have not shown reasonable diligence in complying with the Court's unequivocal orders to provide constitutional care to the serious detriment of the class members. Relying on class members' accounts and Co-Monitor reports, Plaintiffs contend that Defendants failed to provide hormone therapy to

over a third of the Plaintiff class and less than 15 percent of all class members receiving

hormone therapy tested within the appropriate therapeutic range. Regarding gender-

affirming surgeries and pre-surgical hair removal, at the time of the motion[11] no class

member had received or had been scheduled for surgery or completed pre-surgical hair

removal. For class members who already received approval for surgery, none had

completed pre-surgical hair removal. Similarly, Plaintiffs reported slow or non-existent

efforts towards transferring transgender women out of male prisons, fostering social

transition, completing an efficacious PRISM program, providing appropriate

commissary items, mitigating search, shower, and safety issues, and educating staff.

On the other hand, Defendants argue that Plaintiffs appear concerned not with

compliance but with the amount of time it is taking to achieve compliance. Further,

Defendants state that speed should not be the primary concern when dealing with prison

policy changes or with medical care that results in irreversible changes to physical

anatomy. Defendants maintain that they have complied, within the limits of their control,

to provide timely hormone therapy. As for gender affirming surgeries, Defendants note

that the Court's order contained no requirement that surgeries occur within a certain

timeframe, and as such Plaintiffs cannot complain about the pace of providing surgery.

Defendants also fault Dr. Schechter's change of positions and hospitals as the hindrance

---

[11] Based on recent reporting by Co-Monitor Dr. Harris, some progress has been made in these areas. For surgery, in 2023, a total of six surgeries have been completed (four vaginoplasties and two chest reconstructions). An additional 17 individuals have been identified as able to progress to surgical consultation, 15 of whom have scheduled appointments (updates are pending as to whether any appointments have occurred, and some are scheduled as far out as April 2024). (Doc. 674).

to scheduling surgeries. With pre-surgical hair removal, Defendants argue that they complied with the Court's orders by finalizing a contract for hair removal services and making hair removal services available. Within the several other areas of the injunction (Continuing Quality Improvement program, transfers and social transition, PRISM program, commissary, searches and identification policies, showers, training), Defendants argue they have been dutifully compliant with the Court's unambiguous orders and acted with reasonable diligence, especially considering the lack of ordered timelines and generalized commands.

As is clear from the Co-Monitor's reporting and the status conferences with the parties, Defendants' efforts fall short of reasonable diligence and energy in attempting to accomplish the ordered relief. The Court has certainly alluded to this finding in its three enforcement orders. Instead, Defendants continue to create their own bottlenecks in effecting the ordered relief, such as limiting themselves to only one medical provider, Dr. Schechter, with an overly saturated surgical schedule for surgical consultations and surgeries of class members. [12] Moreover, Defendants' argument regarding Plaintiffs' desired rushed timing for prison policy changes and irreversible surgeries focuses only on the burden to Defendants in effecting these ordered changes, however, they fail to see that speed *is and should be* an obvious concern in rectifying *constitutional* harms. Their glacial pace ensures that class members continue to suffer from the same constitutional injuries the Court identified after the bench trial *more than two years ago*. To add insult to

---

[12] Defendants reported on June 1, 2023, that another provider was expected to join Dr. Schechter's practice on July 1, 2023. (Doc. 590). But that potential expansion of access to surgery has not been confirmed.

injury, Defendants also boast that they have complied with the Court's ordered injunctive relief because the Court never specified deadlines, and then, in their Motion to Vacate, they criticize the Court for exceeding its authority under the PLRA by imposing deadlines for compliance. They want it both ways. But this cannot be so, as it would render a court's equitable powers useless.

The Court has reviewed clear and convincing evidence, from the motions, status conferences, and Co-Monitor reports, that leads the Court to believe that Defendants were (and perhaps still are) in contempt of the Court's operative injunction. But because of the confusion that this Court unintentionally infused into this case concerning the nature of the operative injunction, and given the considerable time that has passed since the issuance of the Court's enforcement orders and the filing of the Motion for Contempt Finding, the Court is inclined to avoid imposing sanctions at this time. Instead, the Court will set another status conference for the parties and the Co-Monitors to get this case back on track. After that status conference, Defendants must confer with the Co-Monitors to develop and propose a plan with reasonable timelines to achieve compliance in each of the areas identified in the operative injunction. The Court will consider the proposed timelines and either clarify or modify the operative injunction or enter another enforcement order with the timelines for compliance and reporting. To be sure, if Defendants remain in contempt, Plaintiffs are encouraged to file another motion, and the Court will not hesitate to investigate and issue sanctions as necessary to ensure compliance.

CONCLUSION

For these reasons, the Court **DENIES** Defendants' Motion to Vacate (Doc. 587), **DENIES as moot** Defendants' Motion to Stay Compliance (Doc. 588), and **GRANTS in part and DENIES in part** Plaintiff's Motion for Contempt Finding (Doc. 455). Moving forward, the Court and the parties will take extra care to fully comply with the terms of the PLRA in relation to the permanent injunction. The Court will set another status conference for the parties and the Co-Monitors to get this case back on track and kickstart Defendants' proposed timeline for compliance.

Further, to clean up the mistakes reflected in the Court's February 2022 Order and the subsequent operative injunction, the Clerk's Office is **DIRECTED** to modify the docket text for the operative injunction to read "PERMANENT INJUNCTION (to be interpreted in accordance with the Court's Order at Doc. 678)." The Clerk's Office is also **DIRECTED** to enter judgment for Plaintiffs, as should have been done after the entry of the February 2022 Order. Judgment should be entered without closing the case as the Court retains jurisdiction to enforce and monitor compliance with its injunction.

The Court recognizes that these solutions are not perfect and apologizes for the procedural confusion created with its prior orders.

**IT IS SO ORDERED.**

**DATED:  November 16, 2023**

_Nancy J. Rosenstengel_

_____

**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**