IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JANIAH MONROE,
MARILYN MELENDEZ,
LYDIA HELÉNA VISION,
SORA KUYKENDALL, and
SASHA REED, individually and on
behalf of a class of similarly situated
individuals,

        Plaintiffs,[1]

v.

STEVEN BOWMAN,
MELVIN HINTON, and
LATOYA HUGHES,

        Defendants.

Case No. 3:18-CV-00156-NJR

# MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

      This case was brought on behalf of a class consisting of all prisoners in the custody of the Illinois Department of Correction ("IDOC") who have requested evaluation or treatment for gender dysphoria (Doc. 213).[2] The named Plaintiffs are transgender women currently incarcerated in IDOC facilities. The named Defendants are, respectively, the IDOC Chief of Health Services, the IDOC Chief of Mental Health, and the IDOC Acting Director, all sued in their official capacity.

      Plaintiffs have filed a Motion for Transfer of Class Member [Name Redacted] and

---

[1] The named Plaintiffs, and many members of the Plaintiff class, use chosen names reflecting their gender identity rather than their given names at birth. Throughout this Order, the Court refers to each Plaintiff by their chosen name, which may not match the name in IDOC records.
[2] The class was certified on March 4, 2020 (Doc. 213).

Other Class Members out of Pinckneyville Correctional Center, based on the alleged repeated violations of this Court's Orders concerning showers and searches that have harmed class members (Docs. 606, 607).[3] Defendants responded in opposition to the motion (Doc. 617 and sealed exhibits Docs. 619-620), and Plaintiffs replied (Doc. 627 and sealed Doc. 628). Plaintiffs subsequently submitted sealed Declarations from 22 class members housed at Pinckneyville[4] regarding conditions there (Docs. 636, 640, 662).

An evidentiary hearing was held on October 12 and October 23, 2023 (Docs. 652, 664). Six class members testified regarding their experience at Pinckneyville with access to private showers and requests for their body searches to be conducted by female staff members. IDOC officials Lieutenant Mac-Shane Frank (Internal Affairs, Pinckneyville), Pinckneyville Warden David Mitchell, Transfer Coordinator Doug Stephens, and Dr. Shane Reister also testified.

## BACKGROUND

The Court's first Order for preliminary injunctive relief in this matter was entered on December 19, 2019, following a two-day evidentiary hearing completed on August 1, 2019 (Docs. 186, 187, amended on March 4, 2020 at Doc. 212). Among other matters, Defendants were ordered to cease the policy and practice of depriving gender dysphoric prisoners of medically necessary social transition and to develop a policy to allow such transition (including individualized placement decisions, avoidance of cross-gender strip

---

[3] Doc. 606 is the Motion with class members' names redacted; Doc. 607 is the sealed, unredacted version.
[4] One of these class members had been transferred from Pinckneyville to Centralia Correctional Center as of October 12, 2023, and one other class member was moved to Menard Correctional Center shortly thereafter.

searches, and access to gender-affirming clothing and grooming items), and to advise the Court regarding steps taken to train all correctional staff on transgender issues. (Doc. 212).

The second Order for preliminary injunctive relief was entered on August 9, 2021, after a four-day bench trial[5] (Docs. 331, 332).[6] That Order included preliminary findings of fact and conclusions of law from the bench trial and noted that the December 2019 Preliminary Injunction (Doc. 212) continued in force. It included specific timelines related to hormone therapy and consideration of class members' requests for transfer to a facility matching their expressed gender; directed Defendants to "immediately ensure that transgender inmates are allowed access to a private shower;" and directed that "Plaintiff class members shall be allowed to choose the gender of the correctional officer who will conduct a search of their person, and the search **SHALL BE** conducted by a correctional officer of the gender requested." (Doc. 331, pp. 11-12) (emphasis in original). Supplemental briefing and responses were ordered (Doc. 331, pp. 13-24).

On December 13, 2021, the Court advised the parties that a Special Master/Monitor would be appointed to oversee Defendants' compliance with the ordered injunctive relief and implementation of IDOC's revised Administrative Directives regarding transgender prisoners, and to assess and advise the Court and parties regarding further policy revisions needed to remedy the unconstitutional

---

[5] The undersigned had issued a verbal ruling for specific preliminary injunctive relief at the close of the bench trial on August 5, 2021, later set forth in the Order of August 9, 2021 (Doc. 331; Doc. 349, pp. 972-92).
[6] A correction to the ordered injunctive relief was made on August 18, 2021, to reflect the correct target testosterone level for transgender females undergoing hormone treatment (Doc. 336).

treatment of class members (Doc. 370).

The undersigned issued the full findings of fact and conclusions of law related to the August 2021 bench trial on February 7, 2022, in the third Order for injunctive relief (Docs. 383, 384). As clarified in an Order entered earlier today, November 16, 2023, the third Order for injunctive relief, filed in February 2022, provided permanent injunctive relief after the bench trial on the merits. (Doc. 678). This Order incorporated the evidence adduced during the bench trial as well as supplemental filings from the parties pursuant to the August 9, 2021 Order (*see* Docs. 335, 346, 355, 357, 359, 369), summarized progress toward compliance with prior orders and areas where compliance had not yet been achieved, incorporated the previously ordered injunctive relief, and ordered additional injunctive relief. As relevant to the Motion to Transfer, the additional relief directed Defendants to update the Court on steps taken to avoid cross-gender body searches including IDOC's transgender identification policy, consideration of transfer requests, and measures taken to ensure private shower access (Doc. 383, pp. 78-81, 86-87).

The Court appointed two Co-Monitors, Dr. Amanda Harris and julie graham, MFT, on April 5, 2022, and May 10, 2022, respectively (Docs. 418, 423). Each Co-Monitor has submitted reports detailing their observations regarding compliance and noncompliance with the ordered injunctive relief. Co-Monitor graham was assigned monitoring duties regarding IDOC's compliance with the search and private shower provisions.

Plaintiffs filed a Motion for Contempt Finding in November 2022 (Doc. 455; *see also* Defendants' Response at Doc. 462 and Reply at Doc. 477). The Court held several status

hearings related to the issues raised in the contempt motion and directed the parties to meet in an effort to resolve issues. Several meetings between the parties and the Co-Monitors were held in early 2023 as a result, however, those meetings ceased after Defendants filed their Motion to Vacate the previously ordered injunctive relief Orders (Doc. 587). That motion was denied. (Doc. 678).

TESTIMONY AT EVIDENTIARY HEARING

*<u>Plaintiffs' Evidence</u>*

**O.A.**

O.A., a transgender woman, stated in her Declaration filed September 18, 2023, that upon her arrival at Pinckneyville on June 16, 2023, she had been physically attacked by correctional officers who pushed her down and trampled on her legs (Doc. 636, pp. 2-3). Officer Koontz and other staff have called her "faggot" and repeatedly told her she is in a men's facility. She has consistently been unable to have a private shower because other prisoners are allowed to walk through the area while she is in the shower. The shower curtain is "skimpy," allowing people nearby to see in. Further, prison staff in the "bubble" near the shower can see into the enclosure. On June 27, 2023, O.A. was strip searched by a male officer who ignored her transgender ID. She has filed grievances over these incidents but sometimes staff will not give her grievance forms. In late June, an officer tore up the letter she was planning to send to her lawyers. An officer also tore up another letter she received from the ACLU; on the same day, she saw an officer spit on her food tray.

At the hearing, O.A. testified that she had been housed at Pinckneyville for about

five months after having been transferred there from Centralia Correctional Center (Doc. 654, pp. 9-20). She does not feel safe at Pinckneyville. She described an incident in late August 2023 when she was taking what was supposed to be a private shower, and an officer let other prisoners out into the area to go to Health Care for insulin shots (Doc. 654, pp. 12-13). She was scared and wrote a grievance. She was interviewed by Lieutenant Frank about the incident, and he pressured her to sign his written summary without reading it first. She had not been informed of the outcome of that investigation (Doc. 654, p. 21).

On September 26, 2023, when O.A. was on her way to an attorney visit, an officer told her that having her attorney call the prison would make her time worse at Pinckneyville (Doc. 654, pp. 13-14). She tried to tell the sergeant about this but was ignored, so she began a hunger strike. The next day she was moved to a hunger strike unit, where Officer Adcock did not allow her to have a shower and called her derogatory names (Doc. 654, pp. 15-16). Officer Adcock, who is male, had previously strip-searched O.A. Warden Mitchell refused to speak to O.A. unless she ended her hunger strike.

O.A. has requested to transfer to Logan[7] three or four times since coming to Pinckneyville. She is on hormone injections and began her transition four years ago. The mental health supervisor at Pinckneyville (Ms. Loos) told O.A. that Dr. Puga would not transfer any transgender inmate to Logan until after they had surgery. O.A. had requested surgery but got no response. Her hormone levels are currently in the target range (Doc. 654, p. 17). She had also been told her transfer was denied because of her

---

[7] Logan Correctional Center is designated to house female prisoners.

criminal history and/or discipline history, and her predator/vulnerable status. She requested review of that status by writing to Dr. Melvin Hinton but has not received a response (Doc. 654, p. 23).

O.A. also filed a grievance after she was sexually abused and harassed by a male nurse who gave her a hormone injection. Lieutenant Frank, with another officer present, interviewed her on September 25, 2023. She had not been informed of the outcome of that investigation.

**M.L.**

M.L. is a transgender woman, housed at Pinckneyville since August 23, 2023. In her Declaration and her testimony, she stated that in September 2023, Officer Sims wrapped his hands around her neck and shoved her against a wall (Doc. 640, p. 37; Doc. 654, p. 27). She was refused medical attention and was unable to file a grievance over the incident because staff would not give her a grievance form. She is on suicide watch and is not allowed a private shower; two male prisoners can see her whole body and she cannot lock the shower door. She is "always" searched by a male officer (Lieutenant Ridgeway) despite her ID card noting she should be searched by a female officer.

Her hormone treatment, which she had been on since November 2021 at Lawrenceville Correctional Center, was halted when she came to Pinckneyville despite her desire to continue it (Doc. 654, p. 29).

On the day of her testimony, M.L. was searched by a male officer (Sims), who ordered her to submit to the strip search or he would document she refused her legal call.

The same thing had happened the previous day. Sims also mocked her and called her names while she was on suicide watch (Doc. 654, pp. 28-29).

M.L. was due to be transferred to Menard after the hearing; she had previously been sexually assaulted while housed there.

**A.B.**

A.B., also a transgender woman, has been at Pinckneyville since April 2022 (Doc. 654, p. 36). She does not have access to a private shower because other inmates, porters, and officers walk around the deck near the showers and the shower curtains are not wide enough to prevent people from seeing in (Doc. 640, p. 7; Doc. 654, pp. 38-39, 41-42). When a lockdown is imposed, she has to shower while male inmates are out in the dayroom; this happens at least once weekly. When officers announce shower time for her, they use language such as "tranny showers" and "gay showers."

She is not allowed to have a female officer conduct a pat-down body search despite showing her ID card stating she should be searched by a female.

Officer Koontz called her "faggot ass sissy transgender bitch" in July 2023 (Doc. 640, p. 7; Doc. 654, p. 36). She never got a response to her grievance over that incident. Officer Vaughn has told other inmates she has AIDS. The Internal Affairs officer called her a "fag" while discussing her hunger strike and crisis watch on September 23, 2023. She is not safe continuing her transition at Pinckneyville due to her fear of other inmates and staff.

**K.C.**

K.C. is a transgender woman, housed at Pinckneyville since August 7, 2023

(Doc. 640, p. 19). Because of mistreatment and an assault on her by staff members, she had been on a hunger strike for 26 days when she testified (Doc. 654, p. 47). On August 17, 2023, Officer Sims hit K.C. in the face and shoulder with a large, heavy key ring that he threw from the gallery above her (Doc. 654, pp. 49-51). The next day she was interviewed by Lieutenant Frank about the incident; he accused her of lying and insisted what happened was an accident. She changed her statement to say the keys hit her on the face (not on her head) because of Lieutenant Frank's pressure (Doc. 654, p. 51). On August 16, 2023, an officer slammed a chuckhole on her finger while K.C. was requesting help to submit a mental health slip; nearby officers laughed at the incident (Doc. 640, p. 20). Staff, including mental health staff, do not call her by her preferred name or pronouns. She cannot always get grievance forms to complain about the mistreatment.

On September 1, 2023, a male nurse administered K.C.'s hormone injection and then spanked her buttocks, leaving her feeling violated and unsafe (Doc. 640, p. 20).

She does not have access to a private shower. On August 15, 2023, during her shower time, an inmate grabbed her buttocks. She filed a PREA[8] complaint; the matter is still under investigation (Doc. 640, p. 20). Officers call over the intercom "trans shower," "tranny showers," or "gay showers" when it is her shower time (Doc. 640, p. 21; Doc. 654, p. 58). The shower curtain in 5 House has a mesh net and does not block the entire shower door; people on the top gallery or walking past can see into the shower (Doc. 654, pp. 56).

**S.C.**

S.C. has been at Pinckneyville since September 2022 (Doc. 640, p. 24). She fears for

---

[8] Prison Rape Elimination Act.

her safety every day due to the violence and hatred against transgender people (Doc. 654, p. 60). She has been housed in the Health Care unit because of a fall that fractured her vertebrae, and since September 15, 2023, has been in an overflow area near Health Care, Wing 6-A. Before her fall, she had been housed in 5 Delta 17 (Doc. 654, p. 66). She does not have access to a private shower; she must shower sitting down and the officer in the bubble can see her body from above. She has noticed Officer Jones looking at her in the shower (Doc. 654, pp. 63-64). The top of the shower curtain is mesh and does not fully cover the person showering; she filed a grievance over this on October 7, 2023, but has not received a response (Doc. 654, pp. 64, 68). Before she was moved to the Health Care unit, she stopped asking for a private shower because it was unsafe. Staff announce "tranny showers," "transgender showers," and—one time "fag showers"—over the intercom. She was harassed and bullied while in the single shower line (Doc. 640, pp. 24-25).

S.C. had to discontinue hormone treatment because of medical complications. The medical director (Dr. Myers) refuses to acknowledge she is transgender; mental health staff often misgender her and many other staff misgender her and call her names (Doc. 640, p. 25; Doc. 654, pp. 61-62). On September 22, 2023, she was searched by a male officer before leaving the prison for an MRI, despite her ID notation for search by a female. She was in a wheelchair and endured the search so she could attend the medical appointment. The male officer who patted her down massaged her leg and groped her private area (Doc. 654, pp. 62-63; 66-67). She filed a PREA complaint over the incident on September 27, 2023 (Doc. 654, p. 69). She met with the Warden on September 26, 2023, to

discuss her complaints against Dr. Myers and issues with Lieutenant Frank, and later met with external investigator Stanhouse (Doc. 654, pp. 70-71).

S.C. had been approved for a transfer to Graham before her injury but has been told she now cannot go there because it is not an ADA facility (Doc. 640 p. 26). On October 4, 2023, she discussed the possibility of a transfer to a minimum security level and an emergency transfer for her safety with Lieutenant Frank (Doc. 654, p. 65).

**D.B.**

D.B., a transgender woman, testified from Centralia Correctional Center, where she had been transferred from Pinckneyville eight days before the hearing (Doc. 654, p. 72). She had been at Pinckneyville since December 2021. While there, she endured harassment and abuse from other inmates, including having feces thrown into her cell, which ruined all her belongings. She received no response to her complaint about the incident (Doc. 640, p. 15). Correctional officers also treated her with hostility—C/O Hall threw away D.B.'s ID card, which prevented her from going to chow or recreation (Doc. 654, pp. 75-76). Officer Sims called her a faggot and gay. The culture in 5 House, where she and most of the other transgender women were housed, was that staff seemed to hate transgender people (Doc. 640, p. 16).

D.B. requested to be searched by a female officer at Pinckneyville, but her requests were often refused. She has been forcibly patted down by male officers. If a female officer was summoned to perform the search, she sometimes had a long wait for the officer to arrive (Doc. 640, p. 16).

D.B. did not feel safe using the shower at Pinckneyville because it was not private.

She used her own bed sheet to cover the shower door because officers allowed workers to walk by the showers while she was inside. After moving to Centralia, she felt relief to be away from the mental abuse, discrimination, and harassment, and was now able to continue her transitioning. She had stopped taking her hormones while at Pinckneyville because the muscle breakdown made her more vulnerable, and she feared being assaulted.

## Defendants' Evidence

### Lieutenant Mac-Shane Frank

Lieutenant Frank is the Internal Affairs Supervisor at Pinckneyville, where he has worked since June 2014 (Doc. 644, p. 81). He interviewed O.A. multiple times regarding her complaints. Frank prepares written statements summarizing his interviews.

Frank concluded that O.A.'s June 2023 complaint (Case No. 2023-PNK-5130), which included allegations of a physical attack on her by staff, a strip search by a male officer, and a private shower violation on July 10, 2023,[9] were unsubstantiated (Doc. 654, pp. 85, 99-100). He denied forcing or coercing O.A. to sign his written statement or accusing her of lying (Doc. 654, p. 83). Frank investigated O.A.'s complaint that other inmates were allowed out during her shower. He substantiated with video evidence and staff statements that two individuals in custody were let out of their cell and exited the wing, but he had not yet interviewed those individuals to complete the investigation (Doc. 654, pp. 85-86). He later stated this shower complaint was unsubstantiated

---

[9] Defendants included documentation on Case No. 2023-PNK-5130 with their response to the Motion to Transfer (Sealed Doc. 619).

(Doc. 654, p. 96). His investigation of O.A.'s PREA abuse allegation is still ongoing (Doc. 654, p. 88).

Frank described the shower facilities in Pinckneyville, which include single stall showers in Units 6-B and 5, as well as the Health Care Unit shower (Doc. 654, pp. 91-94). Two Exhibits were admitted: Exhibit M depicts the shower configuration in Units 1 through 4, which is similar to that in sickbay (Sealed Doc. 655); Exhibit N shows the shower stalls that are located in Housing Unit 5 (Sealed Doc. 656). Exhibit M depicts a wide shower opening that is covered by a curtain, the top portion of which consists of see-through mesh. To the left of the curtained area is a partial wall with an open area above. The wall stops at the same height as the solid portion of the shower curtain; this would allow the person inside the shower to be viewed from the chest or shoulders up. Exhibit N depicts a metal-framed door leading to a single shower stall. Approximately the bottom third of the door is solid metal. The upper two-thirds of the door is clear and covered with an opaque shower curtain, but there is a gap of a few inches on the left side of the curtain where the inside of the shower can be viewed.

Frank described the shower policy for transgender individuals, stating they have the same shower access as others in general population but are allowed to shower when no other individuals in custody are on the wing (Doc. 654, pp. 95-96). He explained that a transgender individual may be let out for a shower at the same time that individuals going to insulin line are let out, but the expectation is that those people would be out of the unit before the transgender individual would take her shower (Doc. 654, pp. 97-98).

Frank's investigation of S.C.'s allegation that a male officer groped her during a

pat down search connected to her medical transport is ongoing (Doc. 654, pp. 89-90). He also interviewed K.C. after her complaint of being struck by the key ring, and denied threatening or coercing her regarding her statement (Doc. 654, pp. 90-91).

Frank confirmed that policies or memos had gone out regarding search procedures, and stated, "unfortunately, it's not happening like the policy and the memos is written." (Doc. 654, p. 97).

**Warden David Mitchell**

Mitchell has been Warden/Chief Administrative Officer at Pinckneyville for about two years and eight months (Doc. 668, p. 6). He signs off on the decisions on all grievances and does the initial review on grievances marked "emergency" to determine whether they should be handled on an emergency/expedited basis. He receives about 10-15 grievances each day. He will deem a matter to be an emergency if it involves an individual's immediate safety or security, a due process violation, medical issues, or anything that a reasonable person would think is an emergency. Mitchell is receiving grievances from class members and is not aware of any inmate being denied grievance forms. Individuals in custody may speak with Mitchell in person when he tours the facility (usually on a weekly basis); they also may write to him or call the constituent services/complaint line, which is available to inmates' family and friends (Doc. 668, pp. 8-9, 11). Complaints about staff conduct are referred to Internal Affairs for investigation. If the complaint is against an Internal Affairs officer, it is investigated by an external state investigator (Doc. 668, pp. 9-10).

Mitchell has been contacted by Co-Monitor julie graham numerous times via email

and once by telephone. He has forwarded her concerns regarding staff to Internal Affairs (Lieutenant Frank). Mitchell has personally looked into shower curtain complaints. The investigations of issues raised by graham have not yet been concluded (Doc. 668, pp. 20-21).

Class members are allowed to have a private shower on the wing during the 3-to-11 p.m. shift after the facility count check (Doc. 668, p. 12). Mitchell reiterates the private shower policy with staff every three months. *Id.* He is aware of two private shower violations. In the first incident, staff documented that some individuals were out on the wing during a class member's private shower. An Employee Review Hearing will be held to determine whether discipline of the involved staff member is warranted (Doc. 668, p. 13). The other incident is still under investigation by Internal Affairs. No staff members have yet been found guilty (Doc. 668, p. 20).

Mitchell is aware that if a class member has "female" on the back of their ID, a body search or pat-down should be conducted by a female staff member (Doc. 668, p. 14). Approximately three female staff have volunteered to conduct such searches; if they are not available, a person from the Region 2 volunteer list will be sought. Staff have been trained on the policy.

If a staff member self-reports a search violation, it would be referred for an Employee Review Hearing. If a complaint is made or a violation is otherwise alleged, Mitchell refers it to Internal Affairs to investigate. He is aware of two or three instances of search policy violations (Doc. 668, p. 15). One was reported by the staff member, who was not aware the individual searched was a class member because they did not have

their ID at the time of the search. The other two instances are pending a hearing. He has followed up by reiterating the policy through shift commanders, warden's bulletins, memos, and talking to staff during rounds (Doc. 668, p. 16). Mitchell estimated that the last instance of a cross-gender search of a class member happened two or three months ago, but it may have been three weeks ago (Doc. 668, p. 20).

Most class members at Pinckneyville are housed in B or D wing in 5 House, but some are in other areas (Doc. 668, p. 18).

Mitchell had not participated in any training about misgendering of class members or the care of individuals with gender dysphoria (Doc. 668, p. 19). It would be hard for him to know if a class member had been denied access to a grievance form. He has received at least one grievance regarding a lack of access to grievance forms (Doc. 668, pp. 19-20).

### Doug Stephens

Doug Stephens is the Transfer Coordinator for the IDOC, based in Springfield, and has worked in that office since May 1997 (Doc. 668, p. 22). His office is in charge of placement for all individuals brought into custody in the reception center, their initial and subsequent placements in facilities, and their security level.

Mr. Stephens explained the criteria assessed by his office when considering a recommendation for transfer: the individual's time to MSR; their security level; any medical/mental health issues; substance abuse issues; security threat group issues; Keep Separate From ("KSF") or enemy issues; any protective custody needs; previous adjustments at other facilities; their kind of commitment; and vulnerable status (Doc. 668,

p. 23). An individual can request a transfer through their counselor or the classification committee at their facility (Doc. 668, pp. 23, 28). If the warden approves, the transfer request would come to Stephens' office, where the final approval or denial would be made. If the warden denies the transfer request, then the process is over (Doc. 668, p. 28). A facility can request a transfer for reasons such as a reduced security placement, mental health or substance abuse treatment; again, if the warden approves, the transfer office will make the final determination (Doc. 668, p. 24). If the transfer request is for the inmate to move to a particular facility, Stephens' office looks at the reason for the transfer, determines whether the person meets the criteria for the requested facility including whether they had been at that facility before and why they were transferred out, as well as all the criteria he listed.

Security levels include maximum, medium, and minimum security; an individual's security level may be reduced if they had been in programming or had not received discipline. Pinckneyville is a medium security facility; other medium facilities are Graham, Big Muddy River, Centralia, Danville, Dixon, Hill, Illinois River, Shawnee, Sheridan, and Western. Menard also houses medium security prisoners (Doc. 668, pp. 25, 33). Logan is a multilevel facility, housing maximum, medium, and minimum-security individuals (Doc. 668, p. 33). A person who has been disciplined may be transferred laterally to another medium-security facility, but a higher amount of discipline could bump them up to maximum security (Doc. 668, p. 25-26). A Keep Separate From list would prevent a medium or minimum-security individual from transferring to a facility housing their enemy, because it is more difficult to keep inmates separate in those

facilities as opposed to in a maximum-security facility. Bed space in the new facility is also a factor in transfer decisions.

Approved transfers are normally carried out on a Wednesday (Doc. 668, pp. 28-29). Stephens' office may approve an immediate transfer if requested by a warden, for instance, if there was a staff assault or safety/security concern. At times, an inmate whose transfer is approved may not be moved right away; there may be a "transfer stop" for a medical hold or medical appointment, for example.

In the past, the transfer office did not consider whether a person has gender dysphoria in making transfer decisions. However, about two or three months ago, they began to look at whether an individual is transgender and "potentially placing them in specific facilities throughout the department." (Doc. 668, p. 31). When making transfer decisions, Stephens' office does not take into consideration whether a class member will have access to a private shower at any facility or whether staff of the appropriate gender will be available to conduct body searches (Doc. 668, p. 32). Those issues are handled at the facility level. Likewise, the availability of group therapy for class members and whether there are pending complaints about harassment of class members are not part of the transfer determination; the Transfer Coordinator's office is not notified of complaints.

Stephens was not aware of any class members who have a pending transfer request to move to Logan and knew of no plans to transfer any class member there (Doc. 668, pp. 33-34). As of the week before the hearing, Stephens had not been aware that IDOC is required to reevaluate requests for transfer to Logan every six months.

Stephens approved the transfer of O.A. from Centralia to Pinckneyville on June

15, 2023, after considering the request for seven minutes (Doc. 668, p. 34). He would have looked at all the criteria he listed, including KSF issues, current discipline, and security level. Stephens did not speak to any medical professionals before making the decision to transfer O.A., nor did he consider her own preferences based on any safety concerns (Doc. 668, pp. 34-35).

Stephens' office receives about 200-400 transfer requests each week. He would not normally speak with medical or mental health staff before approving a transfer. It would be the warden's responsibility to address any medical issues and get approval to transfer. The Office of Health Services would decide whether to lift a medical hold to allow a transfer.

### Dr. Shane Reister

Dr. Reister is IDOC's Southern Regional Psychologist Administrator.[10] He described the PRISM[11] program at Centralia Correctional Center (Doc. 668, p. 37). The facility has potential bed space for at least 104 individuals in the PRISM program, but they do not have enough mental health or BHT (Behavioral Health Technician) providers to expand the population to that size. They are attempting to hire staff. Currently, individuals who are on the waiting list to enter the PRISM program may transfer to Centralia while they wait to be admitted to PRISM. There are 34 people on the wait list,

---

[10] Dr. Reister testified at the August 2021 trial regarding the development of the PRISM program at Centralia and other matters relevant to class members. He is a Licensed Clinical Psychologist and has held his current position since 2013. (Doc. 383, pp. 47-50).

[11] The PRISM program is a special housing unit created to address safety concerns of transgender prisoners. Participants may be transgender or cisgender, and must agree to take part in peer education and training on anti-racism, anti-transphobia, anti-heterosexism, and anti-sexism (Doc. 383, p. 50).

11 of whom are in other institutions (Doc. 668, pp. 38-39). The current population in the PRISM program is in the low 20s (Doc. 668, p. 42). The goal is to have individuals in the PRISM program who will be respectful of others' gender identity in a safe space.

Many IDOC locations have staffing problems with mental health providers. Pinckneyville is not fully staffed, but Dr. Reister expects that new staff will start soon (Doc. 668, p. 40). Transgender-specific group programming is due to restart soon at Pinckneyville. Dr. Reister did not know about staffing issues that may exist at Logan (which is not in his region), other than they are missing a mental health authority (Doc. 668, p. 44). Dr. Reister oversees about 11 institutions in the Southern region, including Pinckneyville, where he visits once every month or two to meet with mental health providers (Doc. 668, p. 45). There is a severe mental health backlog at Pinckneyville, such that hundreds of people are not being seen at the recommended intervals (Doc. 668, pp. 45-46). Other facilities also have a mental health backlog (Doc. 668, p. 48). Pinckneyville has many inmates with disciplinary problems, who may end up in restrictive housing (Doc 668, p. 46). People with antisocial personality disorder are less concerned about misgendering or the impact of their behavior on transgender individuals and could impact other prisoners' safety (Doc. 668, p. 48). Pinckneyville and Menard both have large restrictive housing areas.

The transfer process to Logan for class members is handled by Dr. Puga's office (Doc. 668, p. 44). Dr. Reister does as much as he can to help on transgender issues in addition to his other responsibilities (Doc. 668, p. 47). He continues to participate in transgender care telephonic conferences, where providers can talk about cases and get

feedback on working with transgender individuals (Doc. 668, pp. 48-49).

Dr. Reister has discussed with Co-Monitor graham plans for a discussion-style training for staff on transgender issues, and he believes Dr. Puga is submitting a plan to the training academy for feedback (Doc. 668, pp. 41-42).

### *Report by Co-Monitor julie graham*

Co-Monitor graham has sent email messages to Warden Mitchell a number of times, most recently with the concern raised by the class members who testified at the recent hearing over possible retaliation against them (Doc. 668, p. 50). The shower curtain issue is confusing because some photographs seem to depict appropriate privacy measures, but she did not receive pictures of other showers. Warden Mitchell is supposed to be addressing these matters. If she tells Warden Mitchell about a concrete thing that is a problem, he handles it (Doc. 668, p. 52). Nonetheless, complaints about staff have continued for the past year and a half.

Co-Monitor graham interviewed class members at Pinckneyville in March 2023; they raised the same complaints then as they raised with class attorneys months later (Doc. 668, p. 51). It seems that private shower access is getting worse, especially with lockdowns and staffing problems. More than a year ago, Warden Mitchell assured graham that staff are not announcing "gay or tranny showers," but this complaint has come up in every subsequent interview, as well as in the ACLU documentation. "Something is broken there, because people are still experiencing it." (Doc. 668, p. 52). If people don't file grievances, the Warden will not know about the problem, but class members cannot file grievances without access to the forms or grievances are destroyed.

She has suggested that grievance forms be set out in the dayroom so inmates don't have to go through a staff member. Complaints persist that staff interfere with access to grievance forms.

Progress on training programs is extremely slow. Dr. Reister indicated he would begin the new training at Pinckneyville because there are so many complaints about staff there (Doc. 668, p. 53). She observed that when changes happen, staff get reactive and resentful about anything that seems to be an additional requirement, because they are overworked and understaffed. Changes [regarding transgender prisoners] are perceived as "special treatment," but it is simply just appropriate treatment and following the law. Staff need a chance to vent about that and to be reeducated about how to think about treatment of transgender people. The didactic training to date is generally not held in person, which is why the "T for T" (training for trainers) is important—that training would be in person. But that has not happened yet, and graham had not heard that there is a plan to follow through with the T for T. Graham thinks that the discussion-based training suggested by Dr. Reister and Dr. Puga is a better plan.

### *Supplement to Record Submitted After Evidentiary Hearing*

On November 9, 2023, Plaintiffs filed supplemental information in support of their Motion to Transfer (Doc. 671 and Sealed Doc. 672). The Sealed document (labeled "Exhibit A") consists of the PRISM Wait List and related lists referenced by Dr. Reister during his testimony. Dr. Reister provided this list to Plaintiffs after the hearing concluded. Plaintiffs contend that the potential transfer of class members to the PRISM program at Centralia is not a realistic substitution for transfers to Logan to achieve safety

or social transition for class members. PRISM is currently at capacity. Of the 34 individuals on this waiting list, only nine are identified as transgender or trans woman; 19 are identified as cisgender; and 6 have no gender identity indicated (Doc. 672, p. 2).

Defendants have been given until November 17, 2023, to respond to Plaintiffs' supplementary material (Doc. 673).

LEGAL STANDARDS

*Modification of Permanent Injunction*

"The scope of an injunction has no rigid perimeter, and a court may modify an injunction to adapt to changed circumstances." *Rockwell Graphic Systems, Inc. v. DEV Industries, Inc.*, 91 F.3d 914, 920 (7th Cir. 1996). Lack of full compliance can be the sort of changed circumstance that justifies extending a means contemplated by the original injunction or issuing additional substantive measures and injunctive relief. *Norman v. McDonald*, 930 F. Supp. 1219, 1227 (N.D. Ill. 1996); *see also Hutto, v. Finney*, 437 U.S. 678, 687 (1978) (a pre-PLRA case finding that the "long and unhappy history of the litigation" justified a comprehensive order with time limits to insure against the risk of inadequate compliance); *see also United States v. Spectrum Brands, Inc.*, 924 F.3d 337, 358 (7th Cir. 2019) (approving the district court's reasonable modifications of a permanent injunction to ensure compliance with the spirit of the original injunction and prevent future similar harms that led to such injunction). To grant any prospective relief under the Prison Litigation Reform Act, the court must find "that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C.

Page 23 of 32

§ 3626(a)(1). A court must also "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." *Id.*

*Eighth Amendment Deliberate Indifference*

The Eighth Amendment prohibits cruel and unusual punishment and "imposes a duty upon states to provide adequate medical care to incarcerated individuals." *Boyce v. Moore,* 314 F.3d 884, 888-89 (7th Cir. 2002). Deliberate indifference to the "serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) (citation omitted). Deliberate indifference has two elements. The first is whether the prisoner has an "objectively serious medical condition." *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011); *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). The second element requires a showing that a prison official has subjective knowledge of—and then consciously disregards—an excessive risk to inmate health. *Greeno,* 414 F.3d at 653; *see also Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). Deliberate indifference involves "intentional or reckless conduct, not mere negligence." *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010).

Over the course of this matter, the evidence has demonstrated pervasive deficiencies in delivery of medically necessary care and treatment for transgender individuals in custody on a systemic, statewide level in IDOC correctional institutions. *See, e.g., Wellman v. Faulkner,* 715 F.2d 269, 272 (7th Cir. 1983); *Cleveland–Perdue v. Brutsche*, 881 F.2d 427, 430–31 (7th Cir. 1989) (recognizing claims of systemic health care deficiencies as a distinct category of deliberate indifference claims, as opposed to one

based on "isolated instances of indifference to a particular inmate's medical needs"). In this context, deliberate indifference can be demonstrated by "proving there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care[,]" or by showing "repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff" which result in an excessive risk of serious harm. *Wellman*, 715 F.2d at 272; *see also Rasho v. Jeffreys*, 22 F. 4th 703, 710 (7th Cir. 2022) ("persistence in a course of action known to be ineffective" can support an inference of deliberate indifference) (citing *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662–63 (7th Cir. 2016); *Phillips v. Sheriff of Cook Cnty.*, 828 F.3d 541, 554 (7th Cir. 2016)).

## DISCUSSION

Back in 2019, Defendants conceded that Plaintiffs' gender dysphoria is a serious medical condition. (Doc. 186, pp. 29-30). In the December 2019 Preliminary Injunction, the Court concluded that Plaintiffs met their burden of showing a likelihood of success on the merits of their deliberate indifference claim. (Doc. 186, p. 35). This Court recognized in that initial Order that social transition for persons with gender dysphoria is an important component of medical treatment. This includes recognition of their gender identity, chosen name, and pronouns; consideration for placement in a facility matching their gender identity; and access to gender affirming commissary items (Doc. 186, pp. 24-35). Among other matters, Defendants were ordered to allow class members' social transition by developing policies to make individualized placement decisions and to avoid cross-gender strip searches (Docs. 186, 212).

Two years later, the evidence adduced during the August 2021 bench trial showed that Defendants had allowed the unconstitutional conditions of Plaintiffs' confinement to persist, despite their awareness that during this period Plaintiffs were not receiving adequate medical care or social transition for their gender dysphoria and suffered serious harm (anxiety, depression, suicidal ideation and suicide attempts, and self-mutilation) as a result. Plaintiffs' 2021 trial testimony explained the irreparable harm they continued to experience due to Defendants' failure to provide even minimally adequate treatment of their gender dysphoria. The Court concluded that the evidence introduced at trial showed serious ongoing violations of the Eighth Amendment, and this conclusion was supported by the parties' supplemental filings. Consistent with the Court's discussion in the previous Orders (Docs. 186, 331), the undersigned found that Plaintiffs were entitled to additional injunctive relief (Docs. 383, 384). The harm to Plaintiffs could not be compensated with monetary damages, and the balance of harms and the public interest weighed in favor of granting injunctive relief. The undersigned made rulings from the bench on August 5, 2021, ordering that Defendants must immediately ensure class members' access to a private shower; Defendants shall allow class members to choose the gender of the officer who will conduct a search of their person and the search shall be conducted by an officer of the requested gender; and Defendants shall evaluate class members' requests to transfer to a facility matching their expressed gender within 120 days (Doc. 328, pp. 16-18). These directives were memorialized in the August 2021 and February 2022 Orders for injunctive relief (Docs. 331, 383).

More than *two years* after the August 2021 bench trial, the testimony given in

connection with Plaintiffs' Motion to Transfer, as well as the Declarations from class members, demonstrates Defendants' ongoing failure to comply with this Court's Order to provide class members with private showers and to honor their choice of gender of the official who will perform body searches at Pinckneyville.

Promises and intentions to correct the shower facilities to provide privacy and safety have gone unfulfilled and attempts to address identified problems have failed. These problems have persisted even though Co-Monitor graham has communicated class members' repeated reports of private shower violations to Defendants and directly to Warden Mitchell on a number of occasions during 2022 and 2023 (*see* Docs. 444, 450, 460, 546, 559, 573, 591, 647).

Defendants' Exhibits M and N depict that the shower facilities offered to class members obviously fail to completely shield their bodies from view (Docs. 655, 656). Each of the six class members who testified related similar experiences of the lack of privacy in Pinckneyville's shower facilities: other inmates were allowed into the shower area or were otherwise in a location where they could see into the shower, and guards were in positions allowing them to see into the shower from above. Some, but not all, of these problems were due to the inadequacy of the shower curtains.

Clearly, this Court's Orders in 2019 and 2021 and its permanent injunctive Order from 2022 have not been sufficient, at least at Pinckneyville, to achieve what would seem to be a simple goal of providing private shower facilities to the transgender women who are currently housed in that male-designated institution. Not only that, prison officials' persistent announcements of "tranny" or "gay" shower time and the like endangers class

members by "outing" them to fellow inmates who have targeted them for abuse. Such treatment by staff members and other inmates has caused class members to fear for their safety to the extent that some have discontinued their gender-affirming hormone treatment to avoid becoming a target and/or reduce their vulnerability if attacked.

Class members' testimony regarding cross-gender body and strip searches is extremely concerning. The undersigned was shocked to learn that a transgender woman class member (M.L.) was forced to undergo a search by a male officer *immediately before her appearance to testify at the recent hearing* (Doc. 654, pp. 26-27). Class members' ID labels showing they are to be searched by a female are consistently ignored by staff. Pinckneyville officials have utterly failed to comply with this Court's clear directive that they must honor class members' choice of gender of the person who will conduct searches of their person. Defendants' own witness, Frank, admitted that searches are "not happening like the policy and the memos is [sic] written." (Doc. 654, p. 97). Transgender female class members testified in earlier proceedings, as well as in the recent hearing, that having to submit to body searches by male officers is traumatic and humiliating. Even worse, one class member (S.C.) testified that her pat search by a male officer further crossed the line into sexual abuse (Doc. 654, p. 63). In that incident, the search was in connection with a pre-planned medical appointment, so officials would have had advance notice to provide a female officer to conduct the search, yet failed to do so. These ongoing violations of the unambiguous Orders of this Court are unacceptable, especially in light of IDOC officials' knowledge that these Orders and IDOC's own policies are not being followed.

Finally, it is notable that according to Doug Stephens, about two or three months ago his office began to consider—*for the first time*—whether transgender individuals requesting transfers should potentially be placed in "specific facilities throughout the department" (Doc. 668, p. 31). On the one hand, this statement raises a concern because Defendants were ordered in *August 2021* to consider transfer requests from class members who wished to move to a facility matching their gender identity within 120 days, and then to reconsider any denials within 180 days thereafter, thus specific facility placement (Logan or Centralia/PRISM) should have been a consideration *long ago* (Doc. 331, p. 11). On the other hand, if Mr. Stephens' statement indicates that Defendants are considering possible consolidation of class members' placement into fewer facilities within IDOC, such a move is likely to be beneficial to class members. Co-monitor graham has advocated for this approach to facilitate matters such as appropriate training of prison staff regarding treatment of class members, to simplify the provision of private showers and searches by staff of class members' chosen gender, and to potentially help keep gender affirming items stocked in those facilities' commissary.

To summarize, the evidence demonstrates that the constitutional violations previously found by this Court regarding searches and showers are still ongoing at Pinckneyville. The Court finds that to remedy the continuing constitutional violations experienced by the 22 class members at Pinckneyville who submitted a Declaration in support of the Motion to Transfer, additional injunctive relief is necessary. The additional relief outlined below is narrowly tailored to address the repeated and rampant harm and harassment faced by inmates at Pinckneyville, especially regarding shower and search

procedures. This relief is warranted due to the repeated violations of the Court's permanent injunction and constitutional violations described above. These measures will help ensure the constitutionally required treatment and safety of transgender inmates currently residing at Pinckneyville. By ordering officials at Pinckneyville and the Placement Office to seriously and appropriately evaluate transfer requests by the 22 class members who submitted declarations in support of the Motion to Transfer, the Court has selected the least intrusive means of remedying the ongoing constitutional violations and has preserved the discretion of IDOC officials in approving and effecting transfers. As shown by the long-standing noncompliance with the Court's other orders on shower and search issues, the Court's previously attempted injunctive relief has proven ineffective. This relief is also granted in consideration of any adverse impact on public safety or the operation of a criminal justice system. The Court finds no adverse impact on public safety in requiring IDOC officials to seriously consider transfer requests in the interest of safety and security of the transgender inmates seeking transfer. As far as the operation of a criminal justice system, these measures are meant to increase safety and security as well as minimally interfere with Pinckneyville officials' discretion in managing the operation of their facility.

The Court reiterates its extreme disappointment in the apparent and ongoing mistreatment of class members in IDOC institutions. The recalcitrance of IDOC officials in complying with the ordered injunctive relief is wearing on the undersigned's patience. It is hoped that these additional measures will mitigate some of the more egregious violations.

Accordingly, the Motion to Transfer is **GRANTED IN PART** as follows:

1.  For each of the 22 class members who submitted a Declaration in support of the Motion to Transfer and who are still housed at Pinckneyville, Defendants shall construe that Declaration as a request from that individual to transfer to another institution (*see* Docs. 636, 640, 662). Defendants shall evaluate these transfer requests and issue a decision on each, on or before **December 22, 2023**.

2.  Each transfer request referenced above shall be evaluated in light of the criteria listed by Transfer Coordinator Doug Stephens: how long before the individual is eligible for release on MSR; their security level; any medical/mental health issues; any substance abuse issues; any security threat group issues; any enemy/KSF issues; any protective custody needs; the individual's previous adjustment at other facilities; the nature of the individual's commitment; the individual's vulnerable status; and whether the individual meets the criteria for the requested facility (Doc. 668, pp. 23-24). In addition, the transfer evaluation shall include consideration of each individual's gender dysphoria condition (including related mental health considerations), gender identity, related safety issues, and whether a transfer to a facility matching the individual's gender identity is appropriate. (*See* Docs. 331, 383, 584). The person who makes the transfer decision, whether the Warden, an official in the Transfer Coordinator's office, or another official, must show how these criteria were applied.

3.  At the conclusion of each transfer evaluation, Defendants shall issue a written decision to each class member so evaluated, which shall explain the reason(s) for the decision in light of each criterion, and certify that each of the criteria listed in #2 was considered. Defendants shall forward a copy of each decision to the parties' counsel and to the Co-Monitors. Approved transfers shall be implemented as soon as possible.

4.  In addition, on or before **December 29, 2023**, Defendants shall file with the Court, under seal, an attestation under penalty of perjury by the official who made the decision on each transfer request, that the official considered each criterion in making their decision. Where a transfer request is denied, the attestation shall explain in detail the reason(s) for such denial in light of the criteria enumerated above. If a transfer is denied due to a KSF designation, the attestation shall identify the individual(s) who must be kept separate and shall confirm that the KSF individual is still located at the facility where the class member would otherwise be eligible to transfer to.

5.  For each transfer request from a Pinckneyville class member that is denied, Defendants shall reconsider that request **60 days** after such denial, and shall

issue another decision within **75 days** of the denial. The reconsideration decision will be considered and communicated to the class member, counsel, the Co-Monitors, and filed with the Court in the manner outlined in paragraphs 2-4 above. Going forward, any transfer request that is denied upon reconsideration shall again be reconsidered under these provisions.

**IT IS SO ORDERED.**

**DATED:  November 16, 2023**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**