IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,<br><br>    Plaintiffs,<br><br>v.<br><br>LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN,<br><br>    Defendants. | Civil No. 3:18-cv-00156-NJR |

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR TRANSFER OF CLASS MEMBER A.M. AND OTHER CLASS MEMBERS OUT OF MENARD CORRECTIONAL CENTER**

Defendants' Response shows defiance of the Court's orders and indifference to the health and safety of the class. Menard is unusually hazardous, among IDOC's prisons, for the class members. Defendants shamelessly try to turn that into a reason not to grant relief. They refuse to recognize familiar class-wide problems and have a poor grasp of the class definition. Defendants had six weeks to respond to this motion. Instead of taking remedial actions to lessen the class members' suffering, Defendants provide far-fetched legal arguments, assert that they have no duty to address prison violence, and attach two declarations that do not address the substance of what the class members attest. Defendants provide no reason for the Court not to grant immediate relief to transfer class members out of Menard.

**I.  Plaintiffs' Menard Motion shows systemic problems that Defendants have failed to address with court-ordered relief.**

In a bid to revamp their unsuccessful standing argument, Defendants first argue that the conditions in Plaintiffs' Menard Motion and the relief sought do not pertain to class-wide issues.

1

Dkt. 741 at 3-4. But the issues at Menard—what Defendants inaccurately refer to as "local claims" (*id.* at 4)—are not limited to just one facility. They reflect systemic problems that have afflicted class members from the beginning, and which need systemic solutions that Defendants have been unwilling to implement.

The Court has ordered Defendants to fix problems like the ones at Menard since 2019. In its permanent injunction order, this Court ordered Defendants to: ensure access to private showers (Dkt. 383 at 81), provide gender-affirming commissary items (Dkt. 383 at 80), stop all cross-gender searches (Dkt. 383 at 78), complete and implement training for correctional officers on transgender issues and awareness, including the harm of misgendering and harassment (Dkt. 383 at 84), evaluate Plaintiff class members who requested transfer to a facility aligning with their expressed gender (Dkt. 383 at 79), along with other necessary relief. These orders were not just in the Court's permanent injunction two years ago; they were also in preliminary injunction orders from December 2019 (Dkts. 186, 187, 212) and August 2021 (Dkts. 331, 332, 336), and were reinforced in subsequent enforcement orders due to Defendants' ongoing non-compliance. *See* Dkts. 522, 552, 584. The Court set up these relief categories to address the unconstitutional treatment of Plaintiff class members in IDOC custody and ensure they get medically necessary social transition and treatment for gender dysphoria. The conditions raised in Plaintiffs' Menard Motion are *exactly* what this Court's permanent injunction order addresses.

The urgent issues at Menard were highlighted in this Court's permanent injunction order from two years ago, involving Plaintiff Sora Kuykendall. The Court emphasized how IDOC officials denied Ms. Kuykendall's hormone therapy request and refused to evaluate her for gender dysphoria. Dkt. 383 at 17. Only after Ms. Kuykendall attempted self-castration did officials diagnose her with gender dysphoria. *Id.* Additionally, the Court highlighted that Ms. Kuykendall

faced degrading experiences such as "strip searches by male officers in the presence of male inmates" and "sexual harassment, groping, beatings, hostility, and threats to her safety in Menard." *Id.* at 19-20. These disturbing incidents at Menard exacerbated Ms. Kuykendall's gender dysphoria symptoms. *See id.* at 20. The conditions Ms. Kuykendall endured mirror class members' experiences at Menard today.

Almost two years ago, the Court found "class members housed at Menard remain without access to a private shower" and that Defendants "[had] not complied with the Court's Order". *Id.* at 81. Defendants' photograph at the time showed a shower at Menard with only a see-through sheet covering the door. Dkt. 359-7 (under seal); *see also* Dkt. 383 at 81. Recent photographs of Menard showers submitted by Defendants show the same problem, including the *same see-through sheet covering the shower door*. Dkt. 741 at Ex. O (under seal). Defendants have yet to provide a single picture showing a properly covered shower at Menard that meets the Court's order for private showers. *See id.* The Defendants' prolonged delay in addressing what the Court called a "simple goal" (Dkt. 680 at 27), is utterly inexcusable at this stage.

### A. The Court's Pinckneyville order shows that Menard's conditions are symptoms of wider systemic deficiencies within IDOC.

The Court's previous ruling on the Plaintiffs' Pinckneyville Motion underscores that the issues at hand are class-wide. *See* Dkt. 680. Class members at Pinckneyville experienced strikingly similar abuses as those at Menard and were also denied crucial social transition and treatment for gender dysphoria. *See* Dkt. 606. Ultimately, the evidence presented at Pinckneyville led the Court to determine that constitutional violations "are still ongoing" and necessitated "additional injunctive relief," resulting in transfer evaluations. Dkt. 680 at 28-29. This Court has already ruled that such conditions—like those at Menard—are systemic issues directly tied to this Court's previous orders. See *id.* The fact that conditions are worse for class members at Menard than at

some other IDOC prisons does not mean that they are not systemic issues and is certainly not a reason to deny these class members prompt relief.

> B.  **Defendants' failure to treat transfer decisions as medical decisions continues to put class members at serious risk.**

A fundamental problem persists: Defendants are still assigning class members to facilities based on their genitalia, ignoring the Court's order to evaluate transfers for class members to a facility matching his or her expressed gender. *See* Dkt. 383 at 71-72, 79-80. Defendants' TAC meeting minutes show they are not treating class members' transfer requests as medical decisions. *See* Dkt. 741 at Ex. A (under seal). Defendants focus on vague security issues, KSFs, a class member's so-called "instability," and like reasons to deny transfers. *See id.*; *see also* TAC Meeting Minutes from December 19, 2023, and December 21, 2023, attached hereto as Exhibit A (under seal). Most importantly, the TAC meeting minutes fail to address how a transfer would support a class member's social transition or alleviate gender dysphoria. *See id.*

*More than four years ago*, this Court ordered that Defendants guarantee "decisions about the treatment for gender dysphoria are made by [qualified] medical professionals . . . ." Dkt. 186 at 37; *see also* Dkt. 383 at 68 ("qualified professionals who are competent to make medical decisions on treatment for gender dysphoria must be the ones making decisions."). But in the TAC meeting minutes from January 16, 2024, Dr. Puga states that transfers to other male facilities "is a decision that needs to be made by the Warden's staff." Dkt. 741 at Ex. A at 2 (under seal).

A clear illustration of the Defendants' flawed transfer process—and the underlying issues within TAC—is their recent response to this Court's Pinckneyville order. The Court ordered Defendants to evaluate transfers for class members based on the following specific criteria: "consideration of each individual's gender dysphoria condition (including related mental health considerations), gender identity, related safety issues, and whether a transfer to a facility matching

4

the individual's gender identity is appropriate." Dkt. 680 at 31. Defendants did not follow the Court's order, rather they devised a transfer process that did not consider the specified criteria. Remarkably, during Defendants' discussion on transfers for Pinckneyville class members the term "social transition" is not mentioned once in the TAC meeting minutes. *See* Exhibit A. Moreover, Defendants failed to transfer *any* class member from Pinckneyville to Logan or Centralia's PRISM program, despite the overwhelming majority of class members expressing a preference for these facilities.

By brazenly insisting that Menard is "critical" as one of the consolidated prison facilities (referred to as "Centers of Excellence") for security reasons (Dkt. 741 at 6-7), Defendants further demonstrate their failure to regard housing placements and transfers as medical decisions.

## II. Defendants defy settled constitutional principles by saying that violence is just a fact of prison life.

Defendants' Response reflects their indifference to the suffering of the class and constitutional law. Defendants assert the "inherent risk of violence within prisons is an unfortunate reality." Dkt. 741 at 5-6. However, as the Supreme Court stated decades ago, in a case about a transgender prisoner, "[t]he Constitution does not mandate comfortable prisons, *but neither does it permit inhumane ones*." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (emphasis added). If Defendants were right, they could simply cite the "inherent risk of violence within prisons" to shirk all constitutional obligations. Simply put, the conditions at Menard are inhumane, and Defendants' practical and legal indifference to those conditions shows that class members cannot be made safe there.

## III. Defendants' appeal has not deprived the Court of jurisdiction over this case.

Equally unavailing is Defendants' contention that their notice of appeal has deprived the Court of any ability to act here, citing *MillerCoors LLC v. Anheuser-Busch Cos., LLC*, 940 F.3d

5

922, 923 (7th Cir. 2019). *See* Dkt. 741 at 5 ("While this matter is on appeal, any new decision rendered of the district court's relief that is subject to the appeal should lie with the appellate court[.]"). Defendants have appealed two of the Court's November 2023 orders, Dkts. 678 and 679; Dkt. 699. Plaintiffs' Motion seeks a modification of the Court's February 2022 order, not the November 2023 orders appealed by Defendants, and there is no reason to think that the Court is going to modify those orders while the appeal is pending. In addition, Defendants themselves have acknowledged that, absent a stay order, this case can and will proceed pending appeal; their Motion to Stay would be unnecessary if the sweeping rule Defendants suggest here was the law.

As *MillerCoors* itself notes, there are procedures in the Federal Rules for addressing a modification of an order that is (actually) on appeal. *See* 940 F.3d at 923-24 (citing Fed. R. Civ. P. 62.1). Defendants have so far failed to disclose exactly what issues they are going to raise on appeal (*see* Dkt. 699), so at best, Defendants' contention is very premature. In the extremely unlikely event that an order issuing from the Court's consideration of Plaintiffs' Motion appears to implicate one of those still-unknown issues, that can be addressed at an appropriate time.

**IV.    Defendants fail to address Menard class members' declarations.**

Defendants' Response ends with irrelevant attacks on some of the declarant class members. Dkt. 741 at 7-17. They attach over 400 pages (under seal) of material of little evidentiary value. There is a declaration by Lieutenant Hanks of Internal Affairs about investigations that have found nothing, and the Menard Warden's general declaration about processes for addressing complaints (processes that manifestly do not work). Dkt. 741 at Ex. D (under seal); Dkt. 741-1 (Ex. P). Defendants seem to think that the fact that class member K.M. is now out of custody eliminates the reality that while at Menard she engaged in life-threatening acts of self-harm, or that the fact

that they do not understand that J.P is a class member somehow moots her declaration. Dkt. 741 at 13-14, 15-17.

Defendants ignore at least half of the class member declarants, and as to the few they address their arguments, at best, create fact disputes.

- **A.M.**[1] Defendants acknowledge four allegations of sexual assault by IDOC staff and another inmate (Dkt. 741 at 7-8). Defendants report that three of those incidents are still under investigation, despite their severity and having taken place months ago. *Id.* Even as to the fourth—an alleged sexual assault by a guard—Defendants recognize the investigation could not be completed by blaming A.M. for lack of information (*id.* at 8). Defendants do not contest that A.M. was strip-searched by male guards thirteen times, yet somehow maintain they adhere to policies and look into violations after the fact. *See id.* at 12. Defendants' response that A.M. has been declared too "unstable" for transfer (*see id.* at 13), is painfully circular because A.M. is living in unspeakable conditions. Defendants provide no evidence that A.M. is aware of her presentation to THAWC, and no justification why she has not been considered for surgery. *See id.*

- **M.L.** states that an officer sexually assaulted her on October 25, 2023 (Dkts. 705 and 740, Ex. 4 at ¶ 9 (under seal)). Lieutenant Hanks's declaration states that he "could not find any reports" of the assault but that he interviewed her on October 24, 2023 "at which time M.L. alleged PREA against another individual in custody." (Dkt. 741, Ex. D at ¶ 7.a. (under seal)). An interview the day before a sexual assault is irrelevant. The fact there are no reports reflects that M.L. asked for grievance forms and could not get them, and could not "call PREA and report the rape because I do not get phone privileges in segregation." Dkt.

---

[1] Plaintiffs have not yet filed a signed version of A.M.'s declaration (Dkt. 705, Ex. 3) because undersigned counsel has mailed her a copy but A.M. has not received it or other legal mail.

705 and 740, Ex. 4 at ¶¶ 15, 16 (under seal). The remainder of Defendants' discussion of M.L. (Dkt. 741 at 8-10) is no more illuminating. Defendants acknowledge at least three other reports of threats and abuse by M.L. (some of which may well be related to the "PREA against another individual in custody" that Lt. Hanks acknowledges), *see* Dkt. 741 at 9, but the Hanks Declaration states without explanation that as to the two of which he has "documentation," "it was determined that [the] incident did not meet the PREA standards." Dkt. 741, Ex. D at ¶ 7.a, b (under seal). Defendants simply ignore M.L.'s statements about routine verbal abuse. Dkt. 741, Ex. 4 at ¶¶ 11, 12 (under seal).

- **C.B.** "fought back and defended herself" after her drunk and over-aggressive male cellmate demanded oral sex. Dkts. 705 and 740, Ex. 8 at ¶ 6 (under seal). Defendants' response focuses on how many stitches the cellmate reportedly required and the amount of blood staff are reported to have seen (Dkt. 741 at 10), not the fact that they put a transgender woman at risk of sexual assault by housing her in a tiny cell with a male prisoner. Defendants ignore that they *once again put C.B. at risk by housing her with a male prisoner* after she was released from segregation for the earlier incident. *See* Dkts. 705 and 740, Ex. 8 at ¶ 14 (under seal). Defendants also ignore C.B.'s statements about (1) extended delay to start hormone treatment (*id.* at ¶¶ 4, 8-9, 15); (2) abusive language and other abusive treatment from staff (*id.* at ¶¶ 7, 8, 10); (3) having to shower with groups of men (*id.* at ¶ 16) and (4) being always searched by men (*id.* at ¶¶ 7, 13).

- **T.F., C.P., and T.S.** Defendants seem to think that the fact that Internal Affairs lacks reports, "pending investigations," or investigated and "found unsubstantiated" some (far from all) of the harassment and abuse to which they attested somehow disposes of their sworn statements. Dkt. 741 at 10-11. To the contrary, it proves nothing.

- **J.P.** Defendants spend pages attacking J.P. presumably because she supports some of A.M.'s declaration, but their attack shows their ignorance of the class definition, which does not require a class member to have a gender dysphoria diagnosis. *See* Dkt. 213. Defendants argue J.P. is not a class member who has a gender dysphoria diagnosis. *See* Dkt. 741 at 15. In reality, Defendants have known that J.P. is transgender since at least May 2023. *See id*. Their response and exhibits do not dispute J.P.'s declaration that she asked for hormone *treatment* from mental health seven months ago and does not have hormones, private showers, commissary, or non-cross-gender searches. *See id.* at 15-16. Rather, Defendants provide inaccurate[2] and salacious accounts of J.P.'s sexuality and mental health which are irrelevant to class membership and her Eighth Amendment right to medical care.

These piecemeal and irrelevant attacks on certain class members aside, Defendants do not even try to contest most of what the thirteen class members declare under oath. This includes:

- Staff routinely use foul and abusive language to class members. *See* Dkts. 705 and 740, Exs. 3-10 (under seal); Dkts. 717 and 740, Exs. 12, 13 (under seal); Dkt. 740, Ex. 15 (under seal).

- Inability to obtain or safely use clothes and other gender-affirming items. *See* Dkts. 705 and 740, Exs. 5, 6, 8, 10, 11 (under seal); Dkt. 740, Ex. 14 (under seal).

- Violent physical assaults by staff, including sexual assault. *See* Dkts. 705 and 740, Exs. 3, 4, 6, 8 (under seal); Dkts. 717 and 740, Ex. 13; Dkt. 740, Ex. 15 (under seal).

- No private showers with some leading to class members—like Sora Kuykendall years ago—bathing in their cells. *See* Dkts. 705 and 740, Exs. 3, 5, 7,8, 11 (under seal); Dkts. 717 and 740, Ex. 13; Dkt. 740, Exs. 14, 15 (under seal).

---

[2] Defendants state that a September 2023 mental health report "ruled out" a gender dysphoria diagnosis because J.P. "identifies as a black, Jewish, lesbian female." *See* Dkt. 741 at 16 [citing Ex. V at 99]. But that report provides that mental health "[w]ill continue to work on gender dysphoria diagnosis to either confirm or rule out" and refers to J.P. as "Ms." *See* Ex. V at 98. The mental health evaluation form, which reflects J.P.'s multiple identities, provides that her gender is "transgendered." *See* Ex. V. at 100.

9

- Long delays in accessing or disruptions in hormone treatment. *See* Dkts. 705 and 740, Exs. 3-5, 7, 8, 10 (under seal); Dkts. 717 and 740, Ex. 12; Dkt. 740, Ex. 14 (under seal).

Defendants seem to think that the fact that some of the class members at Menard have reported many incidents of abuse and assault means that they are not believable. To the contrary, it shows that although the Court ordered Defendants to provide healthcare, including mental health care and social transition, Defendants have continued to disobey by "mechanically assigning housing based on genitalia" considering "security" only. Social transition is impossible under the daily threat of violence and abuse. Defendants essentially concede that Menard is a violent place unsuitable for vulnerable class members and that they have no plan to do anything about it.

## CONCLUSION

For these reasons, Plaintiffs respectfully request that this Court (1) order that class member A.M. be immediately transferred out of Menard to Logan or to another IDOC facility where she will be safe, and (2) order the transfer of all class members at Menard who want to be transferred to Logan or other safer IDOC facilities.

Dated: February 13, 2024

Respectfully submitted by:

*/s/* Camille E. Bennett

| | |
|---|---|
| **Abby L. Parsons**<br>KING & SPALDING LLP<br>1100 Louisiana Street, Suite 4100<br>Houston, TX 77002<br>Telephone: (713) 751-3294<br>*aparsons@kslaw.com* | **Camille E. Bennett**<br>**Michelle T. García**<br>**Alexis Picard**<br>**Mason Strand**<br>ROGER BALDWIN FOUNDATION<br>OF ACLU, INC.<br>150 North Michigan Avenue, Suite 600<br>Chicago, IL 60601<br>Telephone: (312) 201-9740<br>Facsimile: (312) 288-5225<br>*cbennett@aclu-il.org*<br>*mgarcia@aclu-il.org*<br>*apicard@aclu-il.org*<br>*mstrand@aclu-il.org* |

**Thomas E. Kennedy III**
**Sarah Jane Hunt**
KENNEDY HUNT P.C.
906 Olive Street, Suite 200
Saint Louis, MO 63101
Telephone: (314) 872-9041
*tkennedy@KennedyHuntLaw.com*
*sarahjane@KennedyHuntLaw.com*

**Amelia H. Bailey**
**Thomas J. Leahy**
**Ashton Dubey**
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
*amelia.bailey@kirkland.com*
*thomas.leahy@kirkland.com*
*ashton.dubey@kirkland.com*

**Malita Picasso**
AMERICAN CIVIL LIBERTIES UNION
125 Broad Street
New York, NY 10004
Telephone: (212) 549-2561
*mpicasso@aclu.org*

**Brent P. Ray**
KING & SPALDING LLP
110 N. Wacker Drive, Suite 3800
Chicago, IL 60606
Telephone: (312) 995-6333
Facsimile: (312) 995-6330
*bray@kslaw.com*

*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I certify that on February 13, 2024, I electronically filed the foregoing document and any exhibits with the Clerk of this Court by using the CM/ECF system, which will accomplish service through the Notice of Electronic Filing for parties and attorneys who are Filing Users.

By: */s/* Camille E. Bennett