*JANIAH MONROE, et. al. v. STEVEN MEEKS, et. al.*
*Case No. 3:18-CV-00156-NJR*
*United States District Court for the Southern District of Illinois*
Report from the Second Co-monitor
julie graham, MS   July 31, 2024

Menard

I met with Warden Wills on 7.10.24 and emailed with him multiple times.

**Cameras**
There are not cameras in protective custody. It is a fiscal issue. They would like to have more cameras. It would support their work for IDOC to install cameras in PC. Allegations could be better addressed if there were cameras and cameras provide protection for incarcerated people and staff alike. They would make investigations easier as well. While I am loathe to say what their fiscal priorities should be, the cost of the attorneys, the court, the monitor, the outside PREA investigators, the internal investigations etc. would likely outweigh the cost of the cameras.

**Single cells**
All transgender individuals with an ID which states they are transgender are provided a single cell. There was an individual who stated she was provided a single cell and then later a cell mate was placed in her cell. Warden Wills is investigated that and it was accurate, but shortly afterwards, when the individual was identified, the person was again single celled.

**Shower curtains**
Warden Wills is exploring how to ensure the shower curtains can not be removed. He will speak with maintenance to see if there is a solution. He stated transgender people are showered first or last in PC, after others are secured in their cells. He will reiterate the shower policy to ensure that people are being let out for private showers and that curtains should be up.

The curtains are removable. It would be better to have panels, like the ones in Lawrence, to cover the cells. This way they cannot be removed and no allegations could be made that staff are removing them. It is a simple fix in this case as the showers appear similar to Lawrence.

Allegations
They are actively investigating all of the allegations against staff and incarcerated people. PREA allegations are now investigated externally and are impartial. He does not have an update beyond these incidents are still in the process of being investigated. He reiterated that they follow the policy and investigate every allegations.  They reiterate the policies quarterly.

He stated that they investigated the allegation that the brother of an individual who allegedly raped an incarcerated person had been placed on the same wing as the alleged victim. He could not find any brothers who worked together. There is an investigation occurring.

He stated the individual who reported being left to lie in a pool of blood by staff was untrue, those staff assessed the individual and she was taken to the infirmary.

Individuals report they don't know the names of some of the staff they interact with. Staff wear polo shirts and their name isn't on those shirts. They are getting new uniforms and the staff members name will be on the uniforms.

All issues I raise with the warden are investigated and addressed. I do not know the results of those investigations, but believe they are happening from discussions and email exchanges with the warden. He ensured that all individuals received undergarments and the make up orders. That all individuals are single celled based on previous conversations and information.

Culture
Allegations about Menard's culture being hostile to incarcerated transgender people have persisted over two years of interviewing different individuals.

While I firmly believe that the Warden and Chief Hammer's provide directives and direction to staff, something is not working that these reports of antagonism towards transgender people persist and that some of them are more serious, such as staff assaults and incarcerated people assaulting transgender women.

Pre-release planning
The filing from the AG's office raised the issue that they do not know who specifically I am talking about in reports. What is true is that there is a fear of retaliation in many of the facilities and I provide names and information directly to the wardens when that is necessary. Warden Wills had the names of the individuals who were to be released. The AGs office did not.

While it is difficult to find housing for some people based of their crime, it is much more difficult to find that same housing for a transgender individual because of discrimination against transgender people. It basically will take more time and planning than it will for non-transgender people. Anything that is difficult, will be more difficult when it involves transgender people. Trying to stop the revolving door to return to prison is critical for transgender women and relevant informed pre release planning is a component of that.

### Logan

I spoke with Chief Eddy regarding issues that were alleged regarding a transgender man on a hunger strike related to lack of shower privacy. The warden agreed that because of staffing issues, there were more incarcerated individuals wandering into his housing unit than were supposed to be there.

She had addressed the situation by offering the individual a private shower outside of day room time and they are trying to address staffing and also reiterated the need to give tickets to people who are inappropriately in their day room.

### Lawrence

I emailed with Warden Brown regarding the report that panels were placed on only one shower and the women were taken to shower together so only one had a private shower. Earlier in April, I believed the situation was resolved through communication with Warden Brown and Chief Hammers. Lawrence responded to shower complaints by placing a panel on shower doors.

I was disappointed to learn panels were only placed on one door in each unit. The warden stated that the policy is that the transgender women use that shower one by one. This is not what the transgender women report. They reported to the their attorneys that three will be taken to shower together and only one gets privacy.   If they don't cover more doors, then staff must always follow the policy. If they were following the policy,  I do not think there would be a concern about there only being 1 private shower.

Taking women, one at a time, to shower in the single remediated stall seems like a set up for negative feelings among overburdened staff because it's a time waste and would feel like special treatment.

The warden reiterated lockdown policy as well. Again, if those policies were being followed, I don't believe we would be hearing reports that trans women are not receiving showers.

I requested that he reiterate the policy and ensure staff were following it and consider adding more panels to eliminate this problem.

On April 3rd I received two CC'd emails that stated:

"We plan to fix all areas affected by the end of the week."

"Maintenance is finishing up on the panels on each with in Housing Unit 6. Attached are the pictures. For reference, our Chief Engineer who is approximately 6 foot tall or a little more stood in the shower to show what it would look like. All areas that house transgender individuals will have the same modification done to the shower doors by tomorrow, COB. All showers will be done on the upper deck of the housing units so the individuals living in the cells across the showers can't look down from their cells into the showers. For tonight the individuals that do not live in Housing Unit 6 will be offered showers in the Healthcare Unit per your direction.

These emails lead me to believe the situation was being appropriately responded to and that panels would be installed in all relevant showers.

### Dixon

I interviewed individuals at Dixon in June. Information from those interviews was provided to Warden Tack. I also followed up on multiple angry emails that I received directly from the mother of an incarcerated person at Dixon.

I received shower photos that were adequate except for one area and Warden Tack said she would meet with maintenance and try to resolve the issue.

There were issues with accessing the phone due to gangs. Gangs reportedly control the phones. The Warden feels they have improved that situation and for one of the individuals who complained, the issues were less related to gender than behaviors.

The individual whose mother was emailing, according to the Warden, stated she had a concussion and Warden Tack said this was not true. She did not have a concussion and did receive medical care and was appropriately returned to her cell after being cleared by medical after she returned from the hospital. There were other inconsistencies between what was alleged by the individuals' mother and what the warden stated was

occurring. This is also a nuanced situation where the issues involved may have very little to do with gender identity. There are and were investigations into the allegations.

Warden Tack reiterated the policies to staff. The warden reports that she speaks with the transgender women. She specifically spoke with them about bras and recently about access to the phones. She tried to track down concerns over bras.

Cells
Dixon has permitted transgender women to cell together if they choose to and if it's appropriate.

Only one woman, the one whose parent contacted me, reported being unsafe in her cell. That situation is complicated. Dixon ordered a keep separate following an altercation with that individual and her cellmate. They have very few single cells. They have even fewer ADA single cells.

Lockdowns
It is accurate they are understaffed and frequently on lock down status.
This limits access to support groups.

Searches
No one I spoke with reported searches were an issues. No one complained about searches or being groped or touched inappropriately during searches.  Warden Tack reports that improving the participation of staff took time, that it was a change and that change has taken time.

Commissary
There is access to commissary for those with money.  There is a promise that state issued bras and underwear are coming—so someone is communicating about that. People know they have that right.

Grievances
The warden reports that grievances have improved over time. No on complained that they didn't have access to forms. Individuals still feel grievances are useless as it remains staff's word against theirs.

Pontiac

The plaintiff raised a report of an individual not being accommodated. In following up, there was confusion regarding their ID, they previously were on the list of transgender people and later it was determined they did not meet criteria and no longer had an ID. Since they are not on the list they are not eligible for private showers or an ID.

General Issues

Showers
Facilities all have policies and procedures that incarcerated people allege that the staff do not follow. As a monitor from a distance, I have no way of knowing if this is true or not. I can't know if staff remove the shower curtains and watch or permit porters or others to be out while showers are occurring. Even a surprise visit would not assist with determining the veracity of those claims. Curtains in many facilities are removable. In some they are just sheets. It's possible staff remove them out of ignorance or overzealousness or malice.

All facilities should find a permanent solution to this problem. They have to individualize the solution based on the specific facilities shower stalls. Maintenance came up with the panel solution and so I believe that between custody and maintenance, they could solve this problem in creative ways.

It is possible that individual staff are not following the protocol laid down by the wardens. If they did, the individuals would not be reporting the problems they are reporting. So holding individuals accountable is critical as well as ensuring the flow of accurate information.

Conflicting Reports
When I speak to incarcerated people, what they say generally is consistent with what they report to to their attorneys. When I speak to Wardens or Dr. Puga there is often some nuance or mitigating information that is left out of the allegations. These allegations need to be followed up individually. There are issues that are not related to gender identity, there are issues where gender identity exacerbates a situation and there are situations that are clearly about gender identity.

Because there continue to be allegations after years now of monitoring, it raises a concern for me. Despite training, despite reminders and directives, incarcerated people

still report a hostile environment. Menard is a difficult prison for everyone, however, the reported hostility about gender identity is above and beyond what others have to tolerate or negotiate to live at Menard. Training, reminders from Wardens, policy reminders, seem to not be enough to shift the culture.

Phones
Individuals across several institutions said that gangs control the phones and particularly do not like LGBTQ people and stop them from using the phones. This has been an ongoing problem and needed remediation. The phone matters because of PREA and, of course, just human connection. Access to PREA forms have been an issue in various facilities.

Process failures
There needs to be someone holding the stake of transgender people in each facility rather than monitors and attorneys. Monitors or attorneys hearing months after an incident and trying to sort it out retroactively is not an effective intervention.

If the wardens or assistant wardens met with the transgender individuals in their custody once a quarter to determine whether the culture is improving would help a great deal.   They could better identify the custody staff who need more support or accountability.  It is an investment in real change.

I suspect the reluctance to consistently meet with this group of vulnerable individuals is seeing that as special treatment when it's really about remediation for inequity. It's not special, it's responsive to a deficit. Just like installing the cameras at Menard's protective custody unit are investments or new panels on shower doors. IDOC must invest time and resources to remediate issues for this population.

Another critical issue is that the IDOC attorneys are not included on the email threads from the plaintiffs when they raise issues. These go to the AGs office. It would be helpful if IDOC attorneys got these emails as well as they can be more agile in their response. Creating a more effective process is important. Moving forward, the second co-monitor will work more closely with the IDOC attorneys to address concerns. With the new co-monitor, it is time to address process issues.