*JANIAH MONROE, et. al. v. STEVEN MEEKS, et. al.*
*Case No. 3:18-CV-00156-NJR*
*United States District Court for the Southern District of Illinois*
*Final* Report from the Second Co-monitor
julie graham, MS   September 30, 2024

## Overview

There have been changes at IDOC over the past two years. However, IDOC is not an agile, responsive system. While many of the issues are systemic and structural, for instance, staffing vacancies in custody and specialty services, IDOC is committed to persisting with the processes they have in place. IDOC lacks internal mechanisms to alert them when there are problems related to gender. The current system of having attorneys or monitors discover problems could be replaced by internal systems that could self-correct more expediently, efficiently, and cost-effectively. This matters not just to the individuals but to the continued "problematization" of transgender people in the IDOC. Rather than being simply people with different needs that can easily be accommodated with a cluster of changes, their human needs become a battleground. Transgender people are in distress in IDOC, and the change in the IDOC system is occurring but at a glacial pace.

The recommendations I made in my very first report two years ago are still relevant. IDOC has agreed with some of these recommendations—it simply takes them a long time to make changes. Change that should have happened over six to nine months is still in process. This document will make explicit recommendations based on my experience with IDOC and other DOCs.

As a monitor located in another state, I never know what is true. Often, there are nuanced conversations that need to be had—an individual will report an incident and leave out critical information that only speaking with the warden elucidates. I have talked with many wardens; most address what I ask them to address, get back to me promptly and are cooperative. Some take the time to truly understand the needs of the incarcerated transgender people in their facility. Wardens should consult with the monitors to understand what is behind requests from the court or the individuals. The wardens can be caught between the legal department, the monitor, and the individuals under their care.

Despite responsivity and professional behavior on the part of wardens, transgender people continue to report being unsafe and suffering related to their gender identity. Wardens cannot always know what is happening in their facilities. A minor intervention, such as meeting with or appointing someone to meet with the transgender women, would ensure the wardens know more quickly what the concerns are and if there are specific bad actors among an otherwise professional staff. This could be a temporary intervention until the wardens have a better understanding of what is occurring in their facilities related to gender identity. The wardens are professionals who will address what is occurring. It doesn't work well for monitors or attorneys to get the information months later about an incident and then ask wardens to investigate and address these items.

I've spoken with many of the transgender people who were incarcerated in Illinois at least once. The stories are very consistent. Transgender people report staff misconduct ranging from continuous disrespect and name-calling to assaults or permitting other incarcerated individuals to harass or assault them.

There is a culture at IDOC that permits slurs and other degradations. I suspect that this is because transgender people are misperceived as problems, as troublemakers demanding "special" attention, or as deviant. Regardless, the culture problem that persists at IDOC needs to shift to one of basic professionalism. Staff do not need to change their personal views; they do need to change their behaviors. Wardens and administration have to help staff separate beliefs from behaviors. Corrections staff work with many types of people they disapprove of—no correctional officer would approve of behaviors like murder or child sexual abuse, yet corrections staff work with these incarcerated people and treat them professionally.

Everyone has aspects of their job they do not like, disagree with, or wish weren't part of their work. Using someone's correct pronoun is not more problematic than many aspects of a correctional staff's job—for instance, contraband surveillance watch and searching through feces. No one wants to do that, but it is part of a correction officer's job. Being respectful to transgender people, even when an individual may disapprove of them, is part of the job. Treating all incarcerated people respectfully will mean fewer grievances, more cooperation, and a better environment for all.

Areas addressed by the second co-monitor

**Commissary**
Commissary carrying bras and underwear has improved in many facilities. Universal commissary has yet to be implemented. Universal commissaries permit individuals to receive items commonly available at both male or female facilities. If you are in a male facility, accessing all the products offered to women at Logan is difficult. It can also be confusing because some items are discontinued or donated and may be available in one place and not available generally. Before IDOC agreed to universal commissary, there was a list of items that transgender people were to be able to access, and these have not consistently been available, either. This is a frustrating system.

Supply chain issues, bureaucratic issues, and communication issues initially plagued the commissary. Placing Ms. Schroeder in charge of make-up was very helpful. She was to be in charge of transgender-related commissary, but later it was only explicitly makeup. Getting makeup to people proved to be a complicated task. This has greatly improved; having a point person to speak with helped immeasurably. Reducing the number of facilities where transgender people are housed would also make commissary more responsive.

Just as with makeup, someone needs to be in charge of all aspects of the commissary to ensure transgender people get the items they need. Body products have a scent typically associated with men or women. Unscented or unisex products are not a good substitute for people who want or need typically gendered-scented products.

**Clothing Room**
Clothing rooms have improved, but incarcerated people in several places continue not to know they are eligible to receive free underwear and bras, or they report they do not receive them. The official policy is often at odds with the reported implementation in various institutions. This seems very facility-specific. It is also unclear why people report not receiving free clothing when their wardens state that they have received gender-appropriate clothing.

Having a point person available to solve these discrepancies would help. The tool kit, too, would inform people of their rights to clothing access.

**Showers**
What the IDOC reports and the photos they send are often at odds with what the transgender people report. Transgender people report that the shower curtains or the tarps/sheets they put up over the external cell bars are taken down and that the photos I see are not representative of their reality. I have no way of knowing what is true.

When I have raised concerns about showers, wardens take them seriously. However, wardens might not know if individual staff removed the tarps or got individuals out for showers. Unless wardens are physically there when individuals are taking showers, they do not know if their rules are appropriately implemented. There may be staff who do not follow policy. Further, hanging sheets over cells does not meet the need to see heads and feet in the showers as they cover the full field of view. There needs to be a permanent respectful and responsive solution.

When maintenance identified placing permanent panels over the doors to the showers at one of the facilities, it solved the privacy problem for that specific facility. However, they only installed the panels on certain stalls. Individuals report that staff aren't following the policies regarding shower stalls. This is an example of two issues: corrections creatively creating a solution—ultimately, that is what will best address problems that arise, and even this can fail if staff do not follow policy.

In segregation and mental health units, incarcerated people do not have privacy. There are ways to ensure a person is safe and has privacy. These units do not have curtains or doors. When an individual is in a mental health crisis, it should not be exacerbated by denying them privacy about their transitioning bodies.

**Administrative Directive**
I received a revised copy on 1/11/24 and reviewed my significant concerns with Dr. Puga and Ms. Jennings on 1/23/24. Some of my comments from the previous version last year were addressed in that revision. Dr. Harris and I provided IDOC with written feedback. My feedback was annotated comments on 34 pages. I had not received the next draft or final copy of the AD by the end of my tenure. The AD is critical to clearing up confusion and resistance. And it was not revised and released in the two years that I was monitor.

**Training**
For Staff

By now, everyone should have completed at least one cycle of training or attended the orientation with its unit on transgender people. Those trainings are mandatory, and unlike the earlier training, IDOC has the infrastructure to track cycle training. Training should evolve into improved staff behaviors. However, from speaking with incarcerated people, they still report a lack of basic professionalism on the part of many custody staff. More training is needed, but beyond training, accountability for behaving in accordance with basic professionalism is needed. Further, without a current AD, it can confound what policy is for staff members.

Cycle training should be updated annually and revised every other year to prevent repetition of material the seasoned staff already know. Repetition of the same material inures people to empathic learning. Future cycle training could focus on understanding gender dysphoria and how it manifests in a carceral setting.

Live training that permits staff to discuss their concerns and better understand the administrative directives' process and policies is crucial. These occurred at Logan and were facilitated by the Moss group. Staff reported they were useful. This is important because it shows that staff are not just recipients of training, but integral to the process. They need a chance to be heard and to get answers to their questions.  Dr. Reister also developed training for the reduced number of units that were to focus on transgender individuals, and that training would permit staff to engage with the presenters about their concerns.

Initially, there were to be T4Ts (trainings for trainers) provided by the staff whom the Moss group trained. I do not believe these have occurred. I was told they were waiting for the decision about which facilities would be the designated facilities for transgender people. When the number of prisons where transgender people are placed is reduced, training should be targeted at those facilities. Dr. Reister stated that he is unaware whether they will use the training he developed or the Moss group training. All facilities should receive the basic training that Logan, or that Dr. Reister developed, and it's unclear how that process will unfold.

For Incarcerated people
The brief training developed by the Moss group for incarcerated people should be helpful. It had not been implemented. Every individual at Logan should see that training. Incarcerated people should also have groups to discuss their concerns and experiences. Newly incarcerated people should see it during orientation. Incarcerated people, just like the staff, react badly to having no chance to have their questions answered and concerns addressed.

**Grievances**
Many incarcerated people discussed their frustrations with the grievance procedure. This varies by facility, and reflects that the grievance system at IDOC is deeply under-resourced. Despite the official policies and what Chief Hammers tries to instill, incarcerated people continue to report difficulties in both grievances and PREA reports.  I have never received copies of grievances as had been discussed previously, nor directly received results of grievances, or details about them. I understand there are personnel issues involved. The outcomes that I sometimes hear about are unsubstantiated or unfounded.

Incarcerated people report filing grievances and never hearing back. They report being told by staff that no one cares if they file grievances or retaliation for grievances. Several individuals report observing grievances be destroyed. Many grievances come back unsubstantiated or unfounded, and incarcerated people report that the word of a staff person will always trump the word of a convicted felon or a transgender person. Many incarcerated people report a feeling of hopelessness regarding grievances.

When people must rely on custody staff to physically handle their grievances, it creates distrust. While administration will say that there are various ways that people can access the grievance procedures or even PREA, these can be impeded or potentially circumvented by staff. Recently, one incarcerated person stated she had observed a staff member ripping up a grievance and discarding it. Additionally, she overheard that individual discussing the grievance with another staff member. If a grievance can be discarded, that would explain the experience many people report that they never hear back. People are supposed to receive a ticket with a number on it when they file a grievance. Many report they do not.

During lockdowns, staff are to bring a box for grievances to the individual cells—so that staff do not touch the grievances themselves. This is true when people are in segregation as well. Many transgender people in IDOC report this does not happen. Once again, there is an official policy or rule that incarcerated individuals report is not their reality at IDOC.

One individual reported that she hadn't gotten her grievances responded to, so she filed the grievance with the supervisor of the staff person who was supposed to take her grievances. She did get a response to that grievance and stated she believed it demonstrated that the assigned staff member was not filing her grievances. When people create workarounds to the procedures, it generally means they are not working well. Incarcerated individuals at IDOC are resourceful in their attempts to be heard. The most egregious of these is transgender women who managed to preserve an alleged attacker's semen because they did not believe that PREA rules would be followed.

Many individuals have given up on filing grievances as pointless or only filing them when something extremely egregious occurs or a monitor or lawyer insists. Wardens report they get grievances and thus believe all is well. This is a system failure. Wardens need to discuss with transgender people what their experiences are with filing grievances. If what transgender people report is true, wardens should get weekly grievances from many, if not most, transgender people. When issues are brought up to administrators months after the fact, I have mostly heard a reiteration of the grievance policy. Policies don't prevent bad actors from behaving inappropriately.

If a person is not permitted to access the phones, either because of custody level or they are in a facility where gangs control access to the phones, phones are functionally unavailable. Phones are a way to access PREA.

Something breaks down related to PREA. Transgender people report experiencing harassment or abuse that would violate PREA and state they are told that the experience does not rise to the level of a PREA incident. There needs to be PREA officer training that is specific to transgender

people so that those investigators understand what constitutes a PREA issue for transgender people. IDOC should hire and promote people who specifically want to be PREA investigators and are comfortable with transgender people and all other groups of people, as this might improve PREA responses.

Investigations take a long time.
Investigations are staff and time-intensive. I assume they genuinely take as long as they do, but when affected individuals do not hear back or don't hear back for prolonged periods, it undermines faith in the system. Transgender people should use the systems in place and not rely on attorneys and monitors unless there is no other choice. However, the barriers in the system create the need to use external individuals. As a monitor, it seemed to me that it took a long time to hear back the few times I did hear back about investigations. Cameras and body cameras would decrease the staff investigation time and the distress over "he said/she said' allegations and would protect staff from false allegations and protect transgender people from bad actors.

**Tool Kit**
The tool kit was revised, but it never had the details needed to be useful. It needs timelines and specific information. Currently, it is a very simple and general handout. It's not a "how-to " document.

The tool kit should say what is available related to gender, how to request it, and explicitly state the timelines associated with those requests so that the individual can track where they are in a process. The way the system currently functions creates anxiety and distress and makes people more likely to complain and grieve and hyperfocus on gender-related issues.

**Summary**
Anything problematic for incarcerated people will be worse for transgender people.  Transgender people are a vulnerable group who are also members of every other group, from STGs to every ethnic group to every spiritual group to every commitment offense. Transgender women are specifically targeted in prison because they are women in men's prisons or are perceived to be problems or deviants. Transgender men are less visible and feel equally disrespected, and nonbinary people are invisible to IDOC. TGD people need more resources in a resource-scarce environment and flexibility in an environment designed to be rigid. While IDOC has systems set up, those systems are not responsive to the reality of incarcerated transgender lives. The goal would be for existing processes to work for everyone—the grievance process, PREA, healthcare, etc. The reality is that they have not, and it forces people to utilize the courts and attorneys.

Transgender people at IDOC have been asking for what they need for a long time. Transgender people have also been patient and acknowledged when they see change occurring.

When I ask what would help, they want:

- To be safe from violence and harassment
- They want staff to treat them professionally and with respect. This is not special treatment; it's basic professionalism.
- They want to know what their rights are

- Many want to be together and not ostracized and isolated
- They want to know where they are in the process of being transferred or where they are in the process of receiving medical care or IDs.
- They want change to occur faster. Recently, one woman acknowledged that she finally felt safer having the right to a private shower and a single cell, but wondered why it had to take so long to get to that point. She'd been assaulted in the time she had been waiting for those accommodations.
- To be seen and understood by IDOC

Recommendations

1) Cameras protect staff and incarcerated people alike. There should be an audit of all facilities, and no vulnerable people, like transgender women, whether they are officially deemed vulnerable or not, should be placed where there are no cameras. Cameras should be placed carefully to protect privacy.

It is concerning that there are no cameras in West House at Menard as there are transgender women there. What this means for the transgender women housed there is that bad actors on the staff or other incarcerated people could behave with impunity because it will always be a "he said/she said" situation.

Staff should wear body cameras. It would protect staff and incarcerated people alike. Body cameras would likely eliminate the "he said/she said" concerns. If a staff member is unjustly accused, the camera footage would show that. If a staff member turns the camera off, that is a meaningful action. Body cameras have helped in other DOCs. While cameras are an additional cost, in the long run, they will protect IDOC and lessen litigation costs.

2) A single point of reference
IDOC should hire a person to track the needs and progress of transgender women in IDOC. That individual could also visit correctional centers in person and determine if shower curtains are up or if commissaries and clothing rooms have what they report having. There needs to be a single point of reference in Illinois—one person whose job it is to track the needs of transgender women until the system itself can keep up to date on their needs. This person could also act as an ombudsperson.

There needs to be an ombudsperson who the transgender people can appeal to about transgender-related issues. The system hasn't yet been able to integrate transgender people and their needs into the dailyness of prison life, and until they do, having a point person to address problems that arise specific to gender identity would be helpful. Incarcerated people report they believe they are in line for surgery or transfer, and they do not know where they are in that process or they are incorrect. (This has improved for some people in IDOC.)  The same issue is true of status with IDs. It wastes more expensive specialty staff or attorneys' time to address minor issues.

3) Create and empower a small group of staff to tackle creating relevant solutions. When IDOC asks its staff to solve a problem, such as the showers having panels placed over them, IDOC rises to that challenge. Were IDOC to impanel a group of people to solve the unique problems that transgender people encounter, I fundamentally believe that they would make significant improvements that work for IDOC. The solution has to come from within IDOC, but be informed by the transgender people incarcerated in IDOC.

Prolonging changes across years that could take six months to implement in a coordinated, planned way means that in the interim, transgender people suffer, and animosity builds towards this group of vulnerable people. Staff weary of hearing about transgender people reinforcing the perception that this is special treatment rather than remediation for systems that did not work for

a vulnerable group of people. Just as with ADA, it's not special treatment, it is responsive treatment for a population with different needs.

The lack of specific attention to address the problem simply exacerbates the mental health and safety issues of transgender people. It will take focused attention—not business as usual to make the necessary changes. The processes that are in place may eventually work, but in the interim people are suffering.

4) A gender-trained social worker should meet with each person and fill out a gender preferences form that they sign, stating they filled it out. (unless they are unable to read and write.) This way, staff perceptions don't override the experience or expressed needs of the transgender individual. This will assist IDOC in tracking what a person needs now, and then IDOC can move forward systematically rather than haphazardly. This will also protect IDOC if someone says they have been raising an issue and it's not on that form. Each individual would be provided a tool kit, and the social worker would answer their questions about the housing and medical process and ensure the individual was on the appropriate lists.  In the future, this will simply be done at reception/intake.

5) The tool kit should include more detail on timelines, which are critical. For example, it could say that "within 48 hours of disclosure, a person should be single-celled, provided private showers, etc. "  "When one requests a medical appointment for hormones, within 14 days, they should have met with a medical provider." It would also describe the process to be followed when these deadlines are not met.

6) Reduce the number of facilities to six (2 min, 2 max, 2 med) and concentrate transgender individuals who volunteer in those facilities.  Those facilities should have more training, relevant resources, support groups, appropriate commissary, private showers, etc.

7) WPATH Standards of Care 8 should be adhered to. [1]WPATH SOC7 stated that Primary Care Providers could assess and treat gender dysphoria with hormones without a referral to a mental health provider.  While prison is a different context than the community, the current process is cumbersome and creates barriers to care.  A mental health evaluation is helpful when there is uncertainty about a diagnostic picture.  A group such as THAW would be valuable in complicated cases or a contested diagnosis. The current process simply delays access to care and IDs.

8) Identification Cards
At IDOC, the ID stating one is transgender and eligible for private showers, perhaps eligible for single cells, or to have gender-appropriate searches is the key to safety for many women.

Temporary solutions

---

[1] Coleman E,  et al. Standards of Care for the Health of Transgender and Gender Diverse People, Version 8. Int J Transgend Health. 2022 Sep 6;23(Suppl 1):S1-S259. doi: 10.1080/26895269.2022.2100644. PMID: 36238954; PMCID: PMC9553112.

It takes too long to get ID cards, and in the interim, while the individual is in process and THAW is confirming gender identity, individuals are at risk. Anyone who is perceived to be female—has breast development or typical female features—should be eligible for private showers and single cells when available despite where they are in the process of getting an ID. I've heard from many transgender people that this is a prolonged process that often hits bumps in the road.

Staff following the existing policies rightly will not respond to a verbal request to be searched by female staff if a person's ID does not state that the search preference is female. This can be true despite a woman having breasts and being visually perceived as female.

When an inmate comes out as transgender, they should IMMEDIATELY be eligible for private showers and searches by the appropriate gendered staff and a single cell, when available. The THAW process can then take all the time they need to confirm someone's gender identity and eligibility for gender-related items and activities.

ID changes
Transgender people may change their ID back to male for safety concerns. There were several times when there was confusion about what it meant to the transgender person to have their IDs changed back to male. Individuals were still identifiable as trans, yet they no longer had documentation supporting access to private showers, etc. If a person changes their ID, someone should meet with them to ensure they understand the implications and ensure they aren't making the change because of a lack of safety that could be remediable in other ways. Further, if someone has breasts in a male facility—regardless of their gender identification—they likely require increased protection.

Post-surgery IDs
Transgender women post-surgery want to have the "Male" marker removed from their ID and be searched by staff like other women rather than searched by staff who are willing to search a transgender person. One individual reported that a staff member told her it was against her constitutional rights to strip search a woman who was born a man. There should be a process to change the individual's ID post-surgery. If the ID cannot be changed, then there should be an adjustment made to that policy to permit post-operative transgender women to be searched by any female staff, just like other women. This should be outlined in the tool kit.

Future of IDs
There must be a better way to keep people safe than using ID cards. Not everyone will choose to be "out" in the general population, which many people experience as unsafe for people who are perceived to be or are transgender or LGBTQ. (It is reasonable to not "come out" if a person can avoid coming out until one can be physically safe to do so. This choice is a psychological and emotional cost to the individual; trading physical safety for mental health.) QR codes and scanners or RFID are places the IDOC could invest as these are already used for cafeteria and medical issues in other places.

9) Pre-release planning
Relevant pre-release planning must be provided long before a transgender woman is released. This came up with several transgender women I spoke with. There is necessary medical

planning, particularly for women who are in the process of seeking surgery or who need their hormones continued.

Transgender women have complicated needs related to housing. It can be very difficult to find appropriate halfway houses and post-release programs for transgender women due to discrimination.  IDOC doesn't run those programs, so they must work with what they find in the community. If it is difficult to find post-release housing for sex offenders or people with serious mental illness, it will be doubly difficult if that individual is also transgender.

IDOC should plan for this extended process related to releasing transgender women to prevent the revolving door of recidivism. This is extra work and requires awareness and knowledge on the part of IDOC, and it may be different from what they provide to cisgender offenders. Potentially, it is more similar to those provided to people with ADA issues.

10) Assign someone to manage the commissary and clothing rooms, similar to what was done with makeup. It needs to be truly universal. Individuals housed in any location need to be able to explore their gender identity without going through THAW or being officially identified as transgender.

People in C grade cannot access gender-affirming items due to limited money and limited access to commissary. It's not the same for a transgender woman to be denied access to foundation as it is for a cisgender woman to be denied make-up.

11) Celling is a critical issue for transgender people in terms of physical and psychological safety. Transgender people are hyper-vigilant and often cannot sleep because they are fearful of their cellmates. Anxiety and disturbed sleep create a cycle of distress that can lead to decompensation. A request for a single cell is about safety and not special privileges. Cell individuals with people they choose or other transgender women with similar ratings. Co-locate those cells in the same area of the facility to decrease isolation.

Some incarcerated transgender women never talk with another person who isn't trying to be sexual with them, harass them, or is employed by IDOC. STGs try to get transwomen moved out of their units. Other incarcerated people ostracize or actively abuse them, leading to avoidance of activities. They are desperately lonely and transitioning to female in a hyper-masculine and prison-oriented culture. Girls generally grow up with other women to model themselves after and learn about what it means to be female from supportive adults. Transwomen are often isolated from peers and learn about being female from men who want to use them, distorting what female gender identity is about. Isolation increases the lack of safety and harms an individual's mental health.

When transgender women are celled with men, unsurprisingly, they report being sexually assaulted, raped and harassed. I've spoken with many women who report that they were placed in cells with highly aggressive men or sex offenders. Refusing a cell assignment results in disciplinary actions—generally being sent to ad seg—and losing privileges and many  report losing property. Transgender women must weigh safety versus privileges and property. There

should be a more nuanced response to refusing cell assignments because of safety issues rather than preference.

12) Prepare transgender women for the experience of moving to Logan or Decatur. Brief training should be developed for transgender women who are transferring to Logan. Transgender women interested in transferring should meet with transgender women already at Logan to discuss their experiences before transferring. The experience is different from what many women expect.

Ensure Decatur is set up to support transgender men (Clothing, commissary, support groups, etc.). Permit them to attend groups at Logan virtually for continuity of care.

13) Wardens should assign an individual to meet with the transgender people as a group at least once a quarter until there are consistent reports that staff are behaving professionally. Wardens respond when issues are raised but cannot respond if they do not know about them. Grievances do not work to alert wardens of the needs of transgender people in many facilities.

Wardens want their staff to behave professionally. There needs to be accountability. First, wardens need to know who is doing what and demonstrate an interest in staff following policy. Wardens must have first-hand information from the transgender people themselves. Staff who are aware that wardens are attending to this issue are more likely to follow policy. Staff who know that transgender people will report them for actual inappropriate behavior, and there will be accountability are more likely to behave professionally, and staff who know that administration will support them when there are false allegations will be empowered to do their jobs. Actual knowledge of what is happening in a facility is the beginning of righting the system.

14) There needs to be staff accountability and zero tolerance for staff harassing or intentionally disrespecting transgender people. Reminding staff and wardens about the policies and procedures is not enough—it is not working to ensure that transgender people are safe in IDOC. Cycle training is not enough, either. Specific training should be provided for all the wardens, assistant wardens, and other supervisors to hold staff accountable for policies they do not understand or disagree with. As some transgender people point out, staff reportedly have told them that no one cares if they complain or grieve. Wardens must demonstrate they do care. Staff need to confront each other on inappropriate behavior, and this, while professional behavior, is not supported by the current culture.

15) Wardens need to ensure that grievance handling in their facility is done as described in the AD. Custody staff should not have the opportunity to interfere with grievances.

16) Create a better way of tracking transgender people in IDOC. I will leave this to Dr. Harris. There should be a way to determine who has ever stated they were TGD or questioning and have all the information related to that disclosure tracked. (Where they are at in the process of applying for gender affirmative housing, medical care, ID, etc.) It should be a simple database with protected health information. This information could also identify where there are problems at IDOC—for instance where people are detransitioning for safety reasons.

17) Security and psychiatry need to understand the connection between gender dysphoria, hair removal, and makeup and make relevant new recommendations.

<u>Hair removal is not a nice-to-have item, it is necessary.</u>
Body hair is a secondary sex characteristic, and many transgender women need to remove it to decrease their gender dysphoria. IDOC confuses the idea of makeup and hair removal which covers the secondary sex characteristics and creates dysphoria, with makeup that people might use to look more attractive. Generally, people use makeup to enhance their self-esteem or appearance. They are enhancing characteristics they already have. Transgender women with male secondary sex characteristics developed by testosterone are not enhancing; they are remediating.

Eyeliner or lip gloss are arguably enhancements, but the need for foundation and hair removal is different. They are not enhancements but remediations. Hair removal and foundation should be considered similar to binders or gaffs in that they both disguise secondary sex characteristics.

Razors and shavers
The razors that are provided are inadequate for the needs of transgender women. Many transgender women shave their entire bodies and not just their faces. This means using a lot of razors. Razors get dull on body hair pretty quickly. Magic shave can be helpful and should be available to everyone, and some people report they cannot get it. Longer term, a plan for electrolysis and laser would be important for permanent hair removal. Handheld Intense pulsed light treatment could be made available.

Magic Shave seems it could help out when people are denied easy access to razors because they are in MH segregation, although many people report it's ineffective or an irritant. Nair, has also been requested. Effective electric shavers should be made available to transgender women, even those who are indigent.

<u>Segregation and reducing dysphoria related to secondary sex characteristics</u>
When people are placed in segregation to punish them, they should NOT universally have binders, hair removal products, or foundation taken away. They should not be punished by exacerbating their gender dysphoria.

If a transgender individual is having a mental health crisis, it will exacerbate their gender dysphoria to deny access to items designed to decrease their gender dysphoria. It will not improve their mental health to have their facial hair grow out or not to be able to flatten unwanted breasts. Unless binders create a ligature risk for that *individual* person—if a binder improves their mental health, they should be permitted to have them. The clinical assessment of a person in crisis should also address needs related to their gender dysphoria.

Mental health providers must find ways to address gender dysphoria and social transition when people are in a mental health crisis. In healthcare, we treat the whole person. If a person, with diabetes, hypertension, and bipolar disorder is in crisis, we don't stop treating their hypertension or their diabetes until we get their mania under control. IDOC stops treating gender dysphoria as though it were optional rather than a disorder that must also be treated. In crisis, mental health providers often reinforce or strengthen supports that people need in order to improve their mental

status. A component of treatment for gender dysphoria is social transition and gender expression, and it should be supported—not denied.

<u>Shower stalls in segregation and mental health segregation should be altered to create privacy in protective or mental health housing where there is concern about safety.</u>
Safety and privacy related to gendered bodies should not be mutually exclusive.

<u>Indigent people</u>
Medical providers should prescribe hair removal items, foundation, binders and gaffs to reduce gender dysphoria. These should be available to incarcerated people without means.

18) Create responsive policies for non-binary people who are incarcerated. Illinois has an X on it's ID.  Illinois can expect an increasing number of nonbinary people.  Non-binary people remain pretty invisible in IDOC, and one individual I spoke with stated that staff taunted them—as being confused and weird.

19) Sports bras are meant to be worn for limited periods of time. Many transgender women have implants that are large in size to be proportional to the width of their chest.  Having supportive bras for large breasts is important to prevent neck and shoulder pain. Having appropriate bras for women with newly developing breasts is also important. Sports bras are compressing.

20) Plaintiffs should include the IDOC and AG's office attorneys in all communication. There should be more communication between the IDOC attorneys and the AGs office.

21) Transgender women repeatedly stated they felt they were denied equal access to work. Because transgender women are discriminated against in the community and often leave education early, education and work opportunities need to be transparently fair and accessible.

22) Recruit, and hire, transgender and gender-diverse people to work in custody and specialty services. It may improve awareness and understanding of transgender people.

23) Rebuilding prisons.  In the future, IDOC is rebuilding two prisons, Logan being one of them. In addition to replacing a decrepit and out-of-date building, it will permit a new culture to develop. Hiring a specialist consultant in corrections related to transgender individuals would benefit IDOC to create a facility that is more responsive to the needs of the entire female population, including transgender women. Logan has plant or facility issues that create tensions between transgender women and other populations.  Hiring a specialist to help with the design concerning the needs of all women, including transgender women will be important.