*JANIAH MONROE, et. al. v. STEVE MEEKS, et. al.*

*Case No. 3:18-CV-00156-NJR*

*United States District Court for the Southern District of Illinois*

Fourth report of the first Co-Monitor

December 30, 2024

Submitted by: Amanda L. Harris, MD, MPH (First Co-Monitor)

**Section 1: Introduction**

    This report is respectfully submitted to the Court and the involved parties. Since the first report issued in August, 2022, there have been many positive changes with regard to the medical care and management of transgender patients in custody with IDOC. In addition, it appears that IDOC has taken seriously some of the suggestions made by the co-monitors regarding improving the safety of class members through consolidation, when possible, to prisons where staff are better trained/equipped. They are also moving ahead with plans to hire a Transgender coordinator/navigator and have discussed the responsibilities that person will have at a recent TAC meeting. There have been notable improvements in the quality of communications from the TAC and THAW committees to individuals under consideration; letters now provide clear instruction on steps needed for reconsideration when there is a denial or need for further review. Most encouragingly, I am seeing more reports of individuals who have been held in custody for

many years now coming forward for treatment of gender dysphoria, citing new knowledge or new feelings of comfort with exploring their gender expression.

If we think back two years, it was rare to house transwomen in a women's facility, yet as of November, 2024 there are 14 transwomen at Logan. The process for attaining entry and consideration for transfer is also clearer and the feedback to inmates during that process is more precise. The Tool Kit appears to be providing the information people need to successfully navigate the system. Centralia, which hosts the PRISM program has become a trans-friendlier prison, and is often requested by those seeking transfer, even if they are not able to enter the program itself. For some, the move to a more welcoming facility is the beginning of the process of gender exploration.

In terms of access to gender-affirming hormone therapy, in the recent past this was limited to oral formulations; medical staff were reluctant to prescribe without specialist input, which could delay treatment and create barriers to care. Now the vast majority of patients on gender affirming hormones have a choice of formulation and the overwhelming majority opt for injectable treatment, which requires less day-to-day management and no risk of diversion. Medical staff are more knowledgeable about how to titrate medications and do so routinely. If they are not comfortable, access to UIC's Endocrinology clinic via telehealth is a valuable resource and is used widely and regularly.

In terms of gender-affirming surgeries, the slow pace, which was the primary complaint previously, has improved. Co-monitor julie graham and I previously were not overly concerned that surgery should be prioritized above safety, access to gender affirming hormones, and encouraging a more tolerant and welcoming environment. Noting that undergoing a complex surgery (such as vaginoplasty) in a carceral setting is never ideal, in some cases, patients truly

2

benefit from this step in their gender transition. It is not at all surprising that IDOC proceeds most cautiously in this area, but again, the steps have been made clearer, with the "pathway to informed consent" as well as letters of support from clinicians familiar with the patients submitted for THAW committee review. As I remarked previously, however, I still wonder if patients should be given the option to consult with a surgeon to review options *before* embarking on this process, as many may decide that surgery is not what they ultimately want or, for example, they may decide that orchiectomy alone is a better option or a good first step before considering a vaginoplasty.

It has also become apparent that more individuals are genuinely opting *out* of treatment while incarcerated or are changing their gender identity to non-binary after having been given an opportunity to explore it. It is prudent to be skeptical of any sudden reversal of intention and to be concerned about coercion or intimidation, or, on the flip side, for manipulation and secondary gain. No doubt both are happening still, but in some cases it really is not. In those cases, individuals are making choices that are in their best interests after they have been allowed to explore options and the doors are left open if those interests change. This is important progress. This has raised a new problem, however, regarding how to manage individuals who wish to be *removed* from the class, which I explore below.

**Section 2: Update on the Class Population**

According to Document 213, filed on March 4, 2020, the class was certified as "all prisoners in the custody of IDOC who have requested evaluation or treatment for gender dysphoria." At the time, class members were estimated to number approximately 115 people.

That number has more than doubled since then by IDOC's own count. As of November 2024, IDOC counts 260 people with confirmed gender dysphoria diagnosis and an additional 15 unconfirmed. As has been noted before, maintaining an accurate census of the class population is a complex task but record-keeping in this regard has improved considerably, with regular monthly updates done by IDOC. Even still, the discrepancy between the count of class members known to the monitors and those identified by IDOC has a wide variation. I have attempted now to home in on the reasons for this in the hopes of achieving a transparent process.

      Firstly, I want to acknowledge that the task is complicated by the fact that at any given time, people are entering and exiting the system, are called away to other jurisdictions, or are in the process of being evaluated by medical and mental health staff; some are even changing their own understanding of their gender identity. Happily, there are far fewer clerical errors at this point and far fewer gross inaccuracies or conflicts in the information provided. It is my hope (and expectation) that the remaining incongruities can be resolved over the next few months. The goal is to bring the census count into reasonable agreement given the variables at play by creating a clear process for reconciling the various lists.

The table below shows the current number of people on each of the "lists" maintained by IDOC and by me (First Co-monitor). [Please see Attachments to this report for the complete lists and summary sheets.]

| On First Co-Monitor List but not on IDOC List | On Both Lists | On IDOC List but not on 1st Co-Monitor List |
|---|---|---|
| 30 Total<br>Previously followed by IDOC for GD or GD evaluation/treatment;<br><br>17 were listed as trans female;<br>2 were listed as trans male;<br><br>9 of are now "unknown"<br>2 are non-binary. | 200 Total<br>Currently in care or otherwise being regularly monitored and evaluated;<br><br>150 are receiving hormone treatment;<br><br>16 have gender identity "unknown"<br>(almost all new to class). | 75 Total<br>Not on First Co-monitor list<br><br>69 are new, pending diagnosis, or not currently seeking treatment;<br><br>5 are on parole, released, or otherwise not in system;<br><br>1 was thought by co-monitor to be not in class due to denial of GD. |

At present, 200 people are essentially agreed to be part of the class by me and IDOC. I have another 30 who I am not sure should be excluded, but I require further clarification. IDOC has an additional 75 that are being evaluated and are listed as "confirmed" or "pending" GD, but I have not added to my list because I have not seen documentation to support the diagnosis yet. I have found that if I add everyone on the IDOC lists to my list, I have to remove many of them the following month, so I have been delaying this slightly in order to avoid distraction. This may well be why my list has 30 people that IDOC no longer does. It makes perfect sense that IDOC should cast a wide net and allow many more people to be evaluated than end up in the class. We just need to work out a better system so that I can better monitor the process for inclusion or exclusion from the class—what documentation should be required? What criteria met? My sense is that removal from the protections of the class should have a higher bar than entry into it. Recent THAW committee meetings have addressed a few of these members and made clear that

the reasons for removal were thoroughly considered and deliberated. These meetings concerned a few exceptionally well-known class members with complex histories, but this process is not pursued for every person who I find has been "dropped" from the list. I believe some standard procedural action could easily be devised to "clean up" the lists monthly and provide accountability that I would be able to monitor.

*Non-binary – a growing category*

There has been a slight uptick in people who self-identify as "non-binary" and do not seek hormone treatment despite being given a diagnosis of gender dysphoria. These are individuals who are almost all housed at Logan, causing the official count at that facility to be higher than before (84 now vs 44 two years ago by IDOC count, 68 now by my count). Of the 68 at Logan (my count), 31 identify as transmen, 8 as non-binary, 14 as transwomen, and 15 are unknown; of note, the unknown count now includes the main named plaintiff in this case (on my list). Forty-seven of the 68 are receiving hormones at Logan (mostly transwomen and transmen as well as several new people who do not have full data available to me). The reason I bring this up in this report is that based on the class definition provided above, the task of identifying who should be included in active class monitoring has become more muddied. Individuals may not be actively seeking out evaluation and treatment (e.g. non-binary identifying persons or those who simply don't want to transition in prison), yet they are getting evaluated pro-actively by IDOC. I commend IDOC for anticipating individuals who need or desire evaluation and treatment, but I'm not sure they should be included in the class if they demonstrate capacity and do not *want* evaluation and treatment. I would appreciate the Court's guidance on this.

Thus far, I have been removing people from my list when there is clear documentation that they have been released from custody (online search of inmate lookup) or there is credible

evidence that they do not carry a gender dysphoria diagnosis. I tend to value the patient's own statements or documentation of those statements by medical professionals the highest in this regard. When individuals continue to have uncertainty or other mental health issues that compromise their capacity, I prefer to leave them on the list for active monitoring. Perhaps we could devise a category for "treatment" versus "monitoring" that would make sense, with "inclusion" or "removal" reserved for those who do not meet criteria for gender dysphoria and do not seek treatment for gender transition / gender affirmation. These are complicated categories to parse, but my point is that the protections of the class, in spirit, should help those who suffer abuse, neglect, prejudice, etc. for their gender expression so that they can be afforded access to care and social transition if desired. It is a matter of debate, I think, if including everyone who is not cis-male or cis-female is necessary if those people are comfortable in their bodies and seek no interventions or accommodations.

**Section 3: Treatment for Gender Dysphoria – Hormone Therapy**

**Chart of population at various points in time***

Below is the updated breakdown of class members by gender identity (from my counts).

|  | 8/2/2022 | 1/3/2023 | 4/7/2023 | 11/13/2023 | 12/1/2024 |
|---|---|---|---|---|---|
| Total class members attributed ever | 195 | 238 | 251 | 320 | 372 |
| Total in custody (and in class) | 175 | 177 | 186 | 243 | 230 |
| Trans Women | 126 (72%) | 105 (59%) | 118 (63%) | 162 (66%) | 144 (63%) |
| Trans Men | 24 (14%) | 22 (12%) | 30 (16%) | 44 (27%) | 31 (13%) |
| Non-binary | 1 (<1%) | 3 (2%) | 4 (2%) | 6 (2%) | 17 (7%) |
| Cis man | 2 (1%) | 0 | 0 | 0 | 0 |
| Unknown | 22 (13%) | 47 (27%) | 34 (18%) | 31 (13%) | 38 (17%) |
|  |  |  |  |  |  |
| **Total of class on GAH (% of class)** | **114 (65%)** | **123 (69%)** | **124 (67%)** | **146 (60%)** | **153 (67%)** |
| Trans Women | 101 (80%) | 92 (87%) | 96 (81%) | 111 (69%) | 109 (76%) |
| Trans Men | 12 (50%) | 20 (91%) | 27 (90%) | 32 (72%) | 27 (87%) |
| Non-binary | 0 | 0 | 1 | 1 | 3 (18%) |
| Unknown** |  |  |  | 2 | 14 (37%) [8 housed in male division, 6 in female division] |

*Please note that previous versions of this chart had errors in percentages, corrected now.
** Unknown to co-monitor due to being newly admitted or missing data

*Transwomen*

The percentage of Trans Women on gender-affirming hormone treatment remains steady at 76%. The absolute number of individuals being treated has also remained steady; presumably the "unknown" reportedly receiving hormones who reside in the male division will be classified as transwomen eventually, bringing that number to 117.

*Transmen*

The percentage of the population identified as trans men has returned to the baseline of around 13%, lending credence to my previous comment that this was due to mis-identification of "butch" women at Logan. The percentage on GAH has also returned closer to the previous

8

baseline of around 90%. Nearly all of the trans male hormones are managed in-house at Logan without the need of UIC specialty assistance.

*UIC endocrinology clinic*

The number of individuals who are under the care of the endocrinology clinic has remained steady. The clinic logged 94 visits in the first 6 months of 2024, comparable to the 88 visits in the first 6 months of 2023. There are 107 active patients; 94 identify as trans women, 5 as transmen, 5 as non-binary, and 3 have "unknown" gender identity. Sixty-five individuals are on hormones and being managed by medical staff *outside* of the UIC clinic. They are achieving good hormone targets without specialty input; this is a credit to medical staff training and comfort with managing GAH. I see no appreciable difference in patients whose hormones are managed with endocrinology clinic input versus those who are not. It is likely also a direct result of the consolidation of class members on hormones mostly to four facilities: Big Muddy, Logan, Centralia, and Pontiac. Presumably that consolidation has made it easier for staff to learn and effectively manage this population's needs. The GAH regimen has also become fairly standardized within IDOC (and in the community) making this much easier for primary care to manage.

**Section 4: Treatment for Gender Dysphoria – Gender Affirming Surgery**

The rate at which surgeries are approved increased again in 2024. As of August, 2024, fifteen have been approved, compared to seven in 2023. Five out of nine anticipated for the year were already completed. As noted previously, the THAW committee process appears to be more streamlined, but I do not have an update at this point regarding the actual capacity of the surgeon or how quickly patients are able to move through the process. Based on the number of surgeries approved this year, I fully expect that there will be a greater number completed in 2025.

**Section 5: Transfers**

There is an active attempt to consolidate the population into fewer facilities. As previously noted, the majority who are on hormones are now concentrated in 4 facilities. The below information was furnished by IDOC on their monthly reports; I have placed it in one chart for comparison:

**Change in number of class members housed in different facilities:**

| Facility | Oct 2023 | July 2022 | Nov 2024 | On hormones Nov 2024 |
|---|---|---|---|---|
| Logan | 57 | 30 | 84 | 48 |
| Centralia | 28 | 20 | 33 | 24 |
| Pontiac | 18 | 22 | 25 | 20 |
| Pinckneyville | 17 | 8 | 9 | 4 |
| Big Muddy | 12 | 9 | 24 | 18 |
| Menard | 12 | 5 | 8 | 8 |
| Dixon | 9 | 3 | 15 | 7 |
| Illinois River | 9 | 0 | 12 | 4 |
| Western Illinois | 7 | 3 | 5 | 3 |
| JTC | 6 | 6 | 4 | 2 |
| Danville | 4 | 3 | 3 | 1 |
| Decatur | 4 | 0 | 1 | 0 |
| Graham | 4 | 0 | 11 | 6 |
| Lawrence | 4 | 5 | 5 | 2 |
| Stateville NRC | 4 | 0 | 0 | 0 |
| Jacksonville | 3 | 0 | 1 | 1 |
| Shawnee | 3 | 11 | 3 | 1 |
| Taylorville | 2 | 2 | 0 | 0 |
| Vandalia | 1 | 0 | 0 | 0 |
| Robinson | - | - | 6 | 4 |
| Fox Valley ATC | 1 | 0 | 0 | 0 |

TAC meetings are documented in detail and that information is shared with me regularly. This has been very valuable in understanding the concerns of IDOC when people seek transfer or other accommodation. Dr. Puga chairs these meetings and the participants exhibit reasonable judgement in dealing with the matters before them.

**Trainings**

IDOC provided a list of 172 staff members who completed WPATH training—166 were listed as receiving a certificate (passing). The remainder will need to re-take the training.

**Action items**

Once again, I am providing a full compilation of "face sheets" for review and correction. I am also including the details of the lists referenced earlier in this document.  Please see Appendix A included with this filing.

In the coming months, I would like to:

- Work out a list management plan with IDOC after we get clarification on a process for addition and removal of class members;
-  Obtain an update on the surgical evaluations and expected capacity of the contracted surgeons
- Obtain an update on PRISM /Modified PRISM, Centralia
- Ensure that individuals identified as transgender who are not receiving treatment have clear documentation of their refusal of such treatment
- Continue regular monitoring of appropriate medical care, including regular review of UIC endocrinology notes, quarterly labs, 0700 and 0701 forms, TAC and THAW committee documents and letters.