# Exhibit 1

```
                                                              Page 1
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF ILLINOIS
 2
 3
 4   JANIAH MONROE, MARILYN MELENDEZ, )
     LYDIA HELENA VISION, SORA        )
 5   KUYKENDALL, and SASHA REED,      )
     individually and on behalf of a  )
 6   class of similarly situated      )
     individuals,                     )
 7                                    )
              Plaintiffs,             )
 8                                    )
         vs.                          ) No. 3:18-cv-00156-NJR
 9                                    )
     LATOYA HUGHES, MELVIN HINTON,    )
10   and STEVEN BOWMAN,               )
                                      )
11            Defendants.             )
12
13
14
15         Videotaped deposition of LIEUTENANT CURTIS
16   DALLAS, taken remotely before NADINE J. WATTS, CSR, RPR,
17   and Notary Public, pursuant to the Federal Rules of
18   Civil Procedure for the United States District Courts
19   pertaining to the taking of depositions, commencing at
20   10:02 a.m. Central Daylight Time on the 9th day of May,
21   A.D., 2025.
22
23
24
```

```
 1            There were present at the taking of this
 2   deposition the following counsel:
 3            (Appeared via videoconference)
              ARNOLD & PORTER KAYE SCHOLER, LLP by
 4            MS. SARAH E. PRATHER
              250 West 55th Street
 5            New York, New York  10019
              (212) 836-8000
 6            sarah.prather@arnoldporter.com
                 on behalf of the Plaintiffs;
 7
 8            (Appeared via videoconference)
              HINSHAW & CULBERTSON, LLP by
 9            MR. JAMES M. BRODZIK
              521 Main Street
10            Suite 300
              Belleville, Illinois  62220
11            (618) 277-2400
              jbrodzik@hinshawlaw.com
12
                   -and-
13
              (Appeared via videoconference)
14            HINSHAW & CULBERTSON, LLP by
              MR. CALVIN EDWARDS, JR.
15            151 North Franklin Street
              Suite 2500
16            Chicago, Illinois  60606
              (312) 704-3000
17            cedwards@hinshawlaw.com
18               on behalf of the Defendants.
19
20
21   ALSO PRESENT VIA VIDEOCONFERENCE:
22            Ms. Jamie Pritzker, Veritext videographer
23            Mr. Dewey Nelson, Veritext concierge
24
```

```
                                                    Page 3

 1       VIDEOTAPED DEPOSITION OF LIEUTENANT CURTIS DALLAS
 2                     TAKEN MAY 9, 2025
 3
 4   EXAMINATION BY                                    PAGE
 5   Ms. Sarah E. Prather                                 5
 6                        EXHIBITS
 7                  (no exhibits marked)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
                                                            Page 4
 1         THE VIDEOGRAPHER:  Good morning.  We are going on
 2    the record at 10:02 a.m. on May 9th, 2025.
 3              Please note that this deposition is being
 4    conducted virtually.  Quality of the recording depends
 5    on the quality of camera and Internet connection of
 6    participants.  What is seen from the witness and heard
 7    on screen is what will be recorded.
 8              Audio and video recording will continue to take
 9    place unless all parties agree to go off the record.
10              This is media unit 1 of the video-recorded
11    deposition of Lieutenant Curtis Dallas taken by counsel
12    for plaintiff in the matter of Janiah Monroe and others
13    individually and on behalf of a class of similarly
14    situated individuals versus Latoya Hughes, Melvin
15    Hinton, and Steven Bowman, filed in the United States
16    District Court, for the Southern District of Illinois,
17    Case No. 18-cv-00156-NJR.
18              My name is Jamie Pritzker, representing
19    Veritext, and I am the videographer.  The court reporter
20    is Nadine Watts from the firm Veritext.
21              I am not authorized to administer an oath, I am
22    not related to any party in this action, nor am I
23    financially interested in the outcome.
24              If there are any objections to the proceeding,
```

Page 5

1   please state them at the time of your appearance.
2           Counsel and all present remotely will now state
3   their appearances and affiliations for the record,
4   beginning with our noticing attorney.
5       MS. PRATHER:  Good morning.  This is Sarah Prather
6   on behalf of Arnold & Porter -- from Arnold & Porter on
7   behalf of all plaintiffs.
8       MR. BRODZIK:  James Brodzik with Hinshaw &
9   Culbertson on behalf of the defendants, and I'm
10  representing Mr. Dallas for the purposes of this
11  deposition.
12      MR. EDWARDS:  Calvin Edwards, also with Hinshaw &
13  Culbertson, on behalf of all defendants.
14      THE VIDEOGRAPHER:  Thank you.  Will the court
15  reporter please swear in the witness and then, Counsel,
16  you may proceed.
17               LIEUTENANT CURTIS DALLAS,
18  called as a witness herein, having been first duly
19  sworn, was examined upon oral interrogatories and
20  testified as follows:
21                    EXAMINATION
22                  by Ms. Prather:
23      MS. PRATHER:  Q   Good morning, Lieutenant Curtis.
24      A    Good morning.

```
                                                        Page 6

1         Q    Would you please state -- would you please state
2    and spell your first name -- full name for the record.
3         A    Curtis Dallas, C-U-R-T-I-S, last name
4    D-A-L-L-A-S.
5         Q    Have you been deposed before?
6         A    No, this is my first time.
7         Q    And you understand that your testimony is being
8    taken under oath today?
9         A    Yes.
10        Q    When I ask a question, we'll need you to give a
11   verbal response and not a headshake or a nod.  Do you
12   understand?
13        A    Yes.
14        Q    And if you don't understand any of my questions,
15   please let me know.
16        A    Yes.
17        Q    If I ask you a question, I can assume -- and you
18   answer, I can assume that you understand the question
19   that I was asking?  Sorry.
20        A    Yes.
21        Q    Is there any reason you cannot answer my
22   questions fully and truthfully today?
23        A    No.
24        Q    Are you represented by counsel today?
```

Page 53

1  self-harming and I know about it, okay, this person has
2  self-harmed and they're general population and then
3  have -- they're just -- That's the way it is.
4      Q    You mentioned that it's a mental health thing.
5  Is that something that was covered in your IDOC
6  training?
7      A    Yes.
8      Q    Can you elaborate?
9      A    Elaborate as in like -- What do you mean?
10     Q    What specifically was covered in the training
11 about self-harm being a mental health thing for any
12 prisoner, whether it's general population or transgender
13 status?
14     A    Oh, that's a broad topic.  That's an entire day
15 of training.
16     Q    And just so I'm understanding, the training is
17 telling you that it's a mental health thing or that's
18 the conclusion that you're reaching on your own?
19     A    I'm going to say that it is a mental health
20 thing for self-harming based on the training that was
21 presented to me.
22     Q    Let's turn to investigations that you handle as
23 part of Internal Affairs.  Can you describe your job
24 responsibilities?

Page 54

1    A    Based on -- It could be a reportable incident
2  where a fight happens on the yard.  If force is used, I
3  investigate if the force was proper.  Staff misconduct,
4  I make sure that -- if the staff was being negligent.
5         I investigate a broad topic of things.  It's
6  kind of broad as to how I go about doing it.  It's just
7  based on the information that's provided to me at the
8  time.
9    Q    How is the information provided to you?
10   A    Through a reportable incident or a documented
11 incident through a -- through our incident reports.
12   Q    Are these phone calls or paper records or
13 telephone conversations, in person?
14   A    E-mail and paper records.
15   Q    You mentioned the phrase reportable incident.
16 Is that something that's a defined term?
17   A    Yes.
18   Q    What is the definition of a reportable incident?
19   A    Anything that happens in the sense that the
20 entire facility should be worried about.
21   Q    Is it things to do with individual prisoners?
22   A    Not specifically.  It can be -- A reportable
23 incident could be -- Let's say we get in a shipment for
24 the commissary.  If the driver slips or a malfunction

Page 76

```
 1   from fighting.  After that, that's an open and shut
 2   case.  The officer was doing -- performing his duties to
 3   basically stop great bodily harm from both parties.
 4        Q    And if it's an open and shut case, is there any
 5   document reflecting the fact that the investigation was
 6   conducted and then shut?
 7        A    Yes.
 8        Q    What type of document is that recorded on?
 9        A    The case summary.
10        Q    Are case summaries used to record every type of
11   investigation that's conducted?
12        A    Yes.
13        Q    Does a case summary record whether you reviewed
14   videos or conducted interviews?
15        A    Yes.
16        Q    Is a committee involved in any part of the
17   Internal Affairs investigation?
18        A    No.
19        Q    Is there an appeals process for the decision
20   that's made into an investigation that Internal Affairs
21   conducts?
22        A    So are you asking me if someone doesn't agree
23   with the outcome and investigation, is there someone who
24   can overturn it?
```

Page 77

1   Q   Yes.  Is there a process by which prisoners can
2   appeal a decision?
3   A   Yes, if they do not agree with it, they can file
4   a grievance.
5   Q   I'm just trying to make sure that I understand
6   the process because you often reference grievances as
7   what kicks off an investigation.
8   A   Yes.  Grievances -- In so many ways a grievance
9   is the individual in custody's way of an incident
10  report.  So if it's something they don't agree with
11  or -- they can file a grievance and say, hey, I don't
12  agree with this or this was not met.  It's a forum for
13  the individuals in custody to voice their complaints.
14  Q   Do you have any understanding about the process
15  for prisoners, including transgender prisoners, for
16  filing these grievances and --
17  A   No.
18  Q   -- complaints?
19  A   No.  They just show up on my desk, or in my
20  e-mail I should say.  I'm not familiar with the
21  background work.
22  Q   Are investigations into these incidents reported
23  by e-mail as well?
24  A   Yes.

Page 78

1     Q    Approximately how many of the incidents are
2    reported by e-mail as opposed to a paper form?
3     A    All.
4     MS. PRATHER:  Mr. Brodzik, we would request
5    production of those e-mails.  They were not produced as
6    part of the production that have been made.  There have
7    been no documents produced related to Lieutenant Dallas
8    and, you know, his work in investigating these things
9    that he's referring to.
10          So we'd request production of those as part of
11   the materials that plaintiff previously requested
12   production for in advance of the hearing.
13    MR. BRODZIK:  The production of every grievance
14   e-mail that Lieutenant Dallas has ever received?
15    MS. PRATHER:  No, specifically the e-mails that he
16   testified that he has about these grievances.  For
17   instance, there were no e-mails produced, and he said
18   that he investigated a grievance by Joseph Murphy, who's
19   a plaintiff in this case, and it was in the time period
20   in which the documents were requested for production.
21    MR. BRODZIK:  I don't believe he testified to that.
22    THE WITNESS:  I didn't testify to that.  That is not
23   something I testified to.
24    MS. PRATHER:  Q    Did you not testify that you

Page 79

```
 1    conducted an interview related to the Murphy complaint
 2    after you came back from paternity leave in March 2025?
 3         A    That was a PREA case.  That wasn't a complaint.
 4         Q    Are PREA cases documented by e-mail?
 5         A    Not always.  They are -- If an individual in
 6    custody alleges PREA, there is a process that goes
 7    through it.  So if there is a grievance filed, the
 8    grievance is sent to me by the grievance officer, and
 9    then we'll conduct an investigation based on the
10    grievance that's provided to us and information in the
11    grievance.
12         Q    To make sure that I have this down correctly,
13    e-mail can be used for triggering the PREA case
14    investigation or a typical grievance investigation;
15    either of them can be submitted to you by e-mail; is
16    that right?
17         A    Yes.
18         MS. PRATHER:  Okay.  Then, Mr. Brodzik, our request
19    stands, that we request e-mails related to the class
20    members and the investigations that have been conducted.
21         MR. BRODZIK:  Have you sent us a formal request for
22    these documents?
23         MS. PRATHER:  They were within the same scope of our
24    prior document production request.  I can certainly
```

Page 80

1  confirm that by e-mail and send you a follow-up.  But
2  I'm just putting that out there, that we will certainly
3  be following up for those materials and we do request
4  production of them.
5       MR. BRODZIK:  Duly noted.
6       MS. PRATHER:  Q   Switching gears a little bit, do
7  you agree that any decision about surgery of any kind is
8  a medical one?
9       MR. BRODZIK:  Objection, speculation.
10      MS. PRATHER:  I'm asking for his personal knowledge.
11      MR. BRODZIK:  Go ahead.
12      THE WITNESS:  I do not make any decisions for
13  surgery.
14      MS. PRATHER:  Q   Have you heard of any requests by
15  transgender prisoners at IDOC or Menard for
16  gender-affirming surgery?
17      A   No.  That is something that I'm not privy to.
18      Q   And you never heard of any -- You've never heard
19  of anyone requesting that?  Not --
20      A   No.
21      Q   -- to you personally, but to anyone.
22      A   No.  That is something that I'm not part of a
23  conversation of.
24      Q   Do you personally believe that gender-affirming