# Exhibit 3

```
                                          Page 1

 1            IN THE UNITED STATES DISTRICT COURT

 2            FOR THE SOUTHERN DISTRICT OF ILLINOIS

 3     JANIAH MONROE, MARILYN

 4     MELENDEZ, LYDIA HELENA

 5     VISION, SORA KUYKENDALL,      Case No.

 6     and SASHA REED,               3:18-cv-00156-NJR

 7     individually and on

 8     behalf of a class of

 9     similarly situated

10     individuals,

11                  Plaintiffs,

12       vs.

13     LATOYA HUGHES, MELVIN

14     HINTON, and STEVEN

15     BOWMAN,

16                  Defendants.

17     ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

18

19            REMOTE VIDEO DEPOSITION OF

20              WARDEN ANTHONY WILLS

21               May 15, 2025

22              10:04 AM Central

23

24        Stenographically Reported By:

25     Deanna Amore - CRR, RPR, CSR - 084-003999
```

Page 2

1                    APPEARANCES OF COUNSEL
             (All Participants Appeared Remotely.)
2
     On Behalf of the Plaintiffs, JANIAH MONROE, MARILYN
3    MELENDEZ, LYDIA HELENA VISION, SORA KUYKENDALL, and
     SASHA REED, individually and on behalf of a class
4    of similarly situated individuals:
5              KIRKLAND & ELLIS
               THOMAS J. LEAHY
6              NIKKI MARCOTTE
               333 Wolf Point Plaza
7              Chicago, Illinois 60654
               thomas.leahy@kirkland.com
8              nikki.marcotte@kirkland.com
9    On Behalf of the Defendants, LATOYA HUGHES, MELVIN
     HINTON, and STEVEN BOWMAN:
10
               HINSHAW & CULBERTSON
11             JAMES M. BRODZIK
               521 Main Street
12             Suite 300
               Belleville, Illinois 62220
13             jbrodzik@hinshawlaw.com
                    -and-
14             HINSHAW & CULBERTSON
               CALVIN EDWARDS, JR.
15             151 North Franklin Street
               Suite 2500
16             Chicago, Illinois 60606
               cedwards@hinshawlaw.com
17
18   ALSO PRESENT:
               Tim Tupiak, Legal Videographer
19             Eric Vavrasek, Concierge-Tech
               ACLU of Illinois, Mason Strand
20
21
22
23   Job Number: 7353189
24
                    *   *   *   *   *
25

Page 3

1                    I N D E X

2  WITNESS                                EXAMINATION

3  WARDEN ANTHONY WILLS

4      EXAMINATION BY MX. MARCOTTE                    5

5      EXAMINATION BY MR. BRODZIK              141

6                      EXHIBITS

7    Exhibit 1      3.17.2025 Declaration of    19

8                   Warden Anthony Wills

9    Exhibit 2      4.1.2021 AD 04.03.104,      70

10                  Evaluation, Treatment and

11                  Correctional Management

12                  of Transgender Offenders

13                  AD; 373986-997

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1       THE VIDEOGRAPHER:  Good morning.  We are going

2    on the record.  The time is 10:04 AM Central time

3    on May 15, 2025.

4              Quality of recording depends on quality of

5    camera and Internet connection of participants.

6              What is heard from the witness and seen

7    from his camera is what will be recorded.

8              Audio and video recording will continue to

9    take place unless all parties agree to go off the

10   record.

11             This is Media Unit Number 1 in the

12   video-recorded deposition of Anthony Wills taken in

13   the matter of Monroe versus Hughes, filed in the

14   United States District Court for the Southern

15   District of Illinois, Case Number 3:18-cv-00156-NJR.

16             My name is Tim Tupiak.  I am the

17   videographer.  The court reporter is Deanna Amore.

18   We are both with Veritext Legal Solutions.

19             I am not related to any party in this

20   action, nor am I financially interested in the

21   outcome.

22             If counsel will now state their

23   appearances and affiliations for the record,

24   beginning with the noticing attorney, after which

25   the reporter will administer the oath.

Page 5

1        MX. MARCOTTE:  Nikki Marcotte, on behalf of the

2    plaintiff and plaintiff class, of Kirkland & Ellis,

3    along with my colleague, T.J. Lehigh, also of

4    Kirkland & Ellis, and co-counsel of the ACLU,

5    Mason Strand.

6        MR. BRODZIK:  James Brodzik, with

7    Hinshaw & Culbertson, on behalf of all defendants,

8    and for limited purpose of this deposition,

9    representing Anthony Wills.

10                        (Whereupon, the witness was

11                         duly sworn.)

12        THE STENOGRAPHER:  You may proceed.

13                    WARDEN ANTHONY WILLS,

14    called as a witness herein, having been first duly

15    sworn, was examined and testified as follows:

16                       EXAMINATION

17    BY MX. MARCOTTE:

18        Q.   Good morning, Mr. Wills.

19        A.   Good morning.

20        Q.   Would you start by stating your name for

21    the record?

22        A.   Anthony Wills.

23        Q.   Now correct me if I'm wrong, Mr. Wills,

24    but I assume you've sat for a few depositions

25    before today?

```
                                              Page 6
 1        A.   Yes, I have.

 2        Q.   So then given our limited time today,

 3   I only want to touch on a ground rule or two before

 4   I jump in.  Is that okay with you?

 5        A.   Yes.

 6        Q.   First, you understand that you are

 7   testifying under oath today; correct?

 8        A.   Correct.

 9        Q.   And you understand that this means you are

10   required to testify truthfully and that if you

11   don't, you could be subject to perjury charges;

12   right?

13        A.   That's correct.

14        Q.   And is there any reason why you would be

15   unable to testify truthfully and accurately today?

16        A.   No.

17        Q.   What kind of device are you using for

18   today's deposition?

19        A.   Laptop computer.

20        Q.   Do you have anything, any other

21   applications aside from the Zoom, open on that

22   laptop?

23        A.   Outlook, I think, pops up periodically.

24        Q.   Okay.  If you could do me a favor and

25   please close out of all of your other documents and
```

```
                                                      Page 7
 1    applications except for the Zoom conference.
 2         A.    Give me one second.
 3         Q.    That's okay.
 4         A.    All right.  I'm ready.
 5         Q.    And just I ask that you please not refer
 6    to any items on your laptop unless I direct you to
 7    do so.  Is that fair?
 8         A.    That is fair.
 9         Q.    Now, have you got any physical documents
10    or notes with you for today's deposition?
11         A.    No, I have not.
12         Q.    And, finally, are you alone in the room
13    where you are or is someone in there with you?
14         A.    I'm alone.
15         Q.    If at any point someone comes into the
16    room where you are, will you please let me know?
17         A.    Yes, I will.
18         Q.    Now, Mr. Wills, you are being represented
19    by James Brodzik for today's deposition; is that
20    correct?
21         A.    That is correct.
22         Q.    When did you learn that you were going to
23    be deposed in connection with this particular case?
24         A.    Approximately 30, 60 days ago.
25         Q.    So about one or two months ago?
```

Page 8

1       A.   Yeah.

2       Q.   And since that time I assume you've

3  prepared for this deposition?

4       A.   Yes, I have.

5       Q.   Did you review any documents to prepare

6  for today's deposition?

7       A.   Few documents, yes.

8       Q.   And what were those documents?

9       A.   Just the memo -- from the training memo

10  that I have presented to the staff as well as some

11  of my memos of direction that I've submitted to the

12  staff.

13      Q.   And these are documents that you submitted

14  specifically to Menard staff?

15      A.   That is correct.

16      Q.   And do they relate to the care and

17  treatment of trans individuals in custody at

18  Menard?

19      A.   That is correct.

20      Q.   Do you know if these documents have been

21  produced in this case?

22      A.   No, I do not know.

23      MX. MARCOTTE:  I'd just like to state for the

24  record, Mr. Brodzik, to the extent these documents

25  have not been produced, that you please do so as

Page 23

1    last approximately a half hour to an hour.

2        Q.   And when you say you emailed with

3    julie graham, were these about the concerns that

4    julie raised in julie's reports?

5        A.   That is correct.

6        Q.   And those concerns were about --

7    specifically about treatment of trans individuals

8    incarcerated at Menard; is that right?

9        A.   That's correct.

10       Q.   Do you know if those emails have been

11   produced in this litigation?

12       A.   I don't know.

13       MX. MARCOTTE:  And, Mr. Brodzik, I am going to

14   note for the record to the extent these emails have

15   not been produced, we ask that they be produced as

16   soon as possible following the deposition as they

17   are responsible to our original requests.

18   BY MX. MARCOTTE:

19       Q.   Mr. Wills, do you know if -- you have been

20   required to search through your emails looking for

21   discovery -- documents that are -- sorry.  Strike

22   that.

23            Have you been required to search your

24   emails for communications that are responsive to

25   the plaintiff and class members' discovery requests

Page 24

1   in this case?

2       MR. BRODZIK:  Object to form.

3       THE WITNESS:  No, I have not.

4   BY MX. MARCOTTE:

5       Q.   All right.  Now you mentioned you mostly

6   spoke with julie graham via email or phone

7   concerning julie graham's monitor reports about the

8   treatment of trans individuals at Menard.

9            And what generally did you speak -- or

10  what generally did you discuss during these

11  communications with julie graham?

12      A.   Typically, it was just different concerns

13  that was raised by the different individuals that

14  was having issues or concerns.

15      Q.   And what were those concerns, if you

16  remember?

17      A.   One was being that they felt unsafe, they

18  hadn't received their commissary items, they --

19  their sexual assault cases weren't being

20  investigated, or they hadn't heard the results of

21  their investigation, those types of complaints.

22      Q.   When julie graham raised these complaints

23  with you, did you do anything to follow up or

24  investigate those claims?

25      A.   Yes, I did.

Page 26

1    that she was bringing to my attention.

2        Q.    Now, you noted that you resolved some of

3    the issues that julie graham raised.  Were there

4    issues that julie raised that you were not able to

5    resolve?

6        A.    The ones I wasn't able to give her a

7    response to were some of the investigations, and

8    that was because at the time of her asking or

9    inquiring, the investigations hadn't been concluded

10   yet.  So I can only give her the information that

11   I could -- I could give her.

12       Q.    Okay.  I want to shift gears a little bit

13   and talk about your employment history.

14            You're currently the warden of Menard

15   Correction Center; is that right?

16       A.    Yes.

17       Q.    And you've been in that position since

18   approximately April 2020?

19       A.    That is correct.

20       Q.    And before April 2020, did you also work

21   for IDOC?

22       A.    Yes, I did.

23       Q.    And when I say "IDOC," you understand that

24   I mean Illinois Department of Corrections; right?

25       A.    That is correct.

Page 55

1    what those are?

2         A.    It's a bulletin drafted by myself that is

3    directed towards a policy or a procedure here at

4    the facility.

5         Q.    Okay.  And when do you draft -- strike

6    that.

7              So you said it's directed toward a policy

8    or procedure.  How does that information get

9    disseminated?  To whom does it get disseminated?

10        A.    It gets disseminated to all staff here at

11   the facility through -- it's drafted in a hard copy

12   as well as email form.  The hard copy is drafted

13   toward the shift commander to be read at roll call

14   seven days a week on every shift, and the email

15   copy is sent to the department heads to be read at

16   their department head meetings, and, then, in all

17   my meetings, I reiterate as well with the

18   department heads.

19        Q.    Do you ever direct any of your staff to

20   post these bulletins publicly in any of the units

21   at Menard?

22        A.    In some cases, yes, they're posted in

23   their offices or in the sergeant area where the

24   staff meet every morning and get their keys and get

25   their items in the living units.

Page 57

1    communication out to the staff, as well as

2    individuals.  It's key within the facility with a

3    large magnitude of the individuals and the staff

4    membership.

5        Q.   So you're not necessarily issuing or

6    sending out Warden Bulletins in response to

7    specific violations.  Is that fair to say?

8        A.   That is correct.

9        Q.   Now in your time as warden, have you ever

10   drafted or issued a warden bulletin specifically

11   relating to treatment of transgender individuals

12   incarcerated at your facility?

13       A.   Yes, I have.

14       Q.   How many times would you say you drafted

15   or issued a bulletin specifically related to trans

16   individuals incarcerated at Menard?

17       A.   I don't know that specific number.

18       Q.   Less than ten probably?  Less than ten in

19   the last five years?

20       A.   Yes.

21       Q.   You mentioned earlier when you were

22   preparing for your deposition that you reviewed

23   some documents, including training documents and

24   memos to staff.  Are these memos to staff that

25   you're talking about the Warden's Bulletins?

Page 58

1       A.    That is correct.

2       Q.    And do you know if those bulletins have

3    been produced in this case?

4       A.    I don't know.

5       Q.    Have you been asked to turn over the

6    Warden's Bulletins in response to discovery in this

7    case?

8       A.    Not that I can recall, no.

9       Q.    What about the training documents you

10   mentioned you reviewed in preparation for your

11   deposition?  Do you know if those have been

12   produced?

13      A.    Not that I can recall.

14      Q.    Have you been asked to turn over those

15   documents in response to plaintiff's discovery

16   requests in this case?

17      A.    No, not that I can recall.

18      Q.    Now, you mentioned --

19      MX. MARCOTTE:  Actually, I just want to state

20   for the record we are going to request any and all

21   copies of these training documents and Warden's

22   Bulletins relating to the treatment of trans

23   individuals incarcerated at Menard as these should

24   be responsive to our original discovery request.

25           Mr. Brodzik, I will, of course, follow up

Page 59

1   with an email to make sure you have all of these.
2   BY MX. MARCOTTE:
3        Q.   All right.  Mr. Wills, going back to these
4   less than ten Warden's Bulletins that you've issued
5   for the treatment of trans individuals incarcerated
6   at Menard, do you recall when you drafted any of
7   these bulletins?
8        A.   No, I do not.
9        Q.   Okay.  And do you recall what issues you
10  covered in any of these bulletins?
11       A.   I -- showering, showering alone, one;
12  utilization of the shower curtain is also another
13  one.  Those are what I definitely recall.
14       Q.   Anything about commissary items and access
15  to commissary items?
16       A.   That's another one that's been put out
17  that I sent out if I can recall, yeah.
18       Q.   And what was your -- do you remember what
19  your bulletin stated about access to commissary
20  items for trans individuals?
21       A.   No, I don't.  I don't recall.
22       Q.   So aside from the showering or single --
23  I'm sorry -- single stall shower or private shower
24  issues, the commissary issues, do you recall any
25  other topics that were discussed in these bulletins

Page 60

1   that you sent out regarding Menard class members or

2   trans individuals incarcerated there?

3       A.   No, I don't recall.

4       Q.   Any bulletins relating to harassment by

5   staff or encouraging other prisoners to harass or

6   abuse trans prisoners in any way?

7       MR. BRODZIK:  Object to form.

8       THE WITNESS:  I don't recall.

9   BY MX. MARCOTTE:

10      Q.   Okay.  And what prompted you to send these

11  bulletins out?

12      A.   Again, reiterating policy and procedures,

13  the making sure that the individuals are treated

14  fairly, and they are receiving the items that they

15  should be receiving.

16      Q.   Did you issue these bulletins after

17  discussions with julie graham where julie raised

18  concerns about these issues with you?

19      A.   The bulletins are quarterly.  So they go

20  out quarterly without even being brought up by

21  ms. graham.  They go out regardless.

22      Q.   So you have not drafted and issued a

23  bulletin relating to the treatment of trans

24  prisoners at Menard in response to any concerns

25  that have been raised directly with you?

Page 61

1      A.    No, not that I can recall.  No, not that

2   I can recall.  A lot of the issues -- a lot of

3   memos that's been drafted were already drafted that

4   were situations where I identified that I felt like

5   needed to be reiterated, and that's what got them

6   into the rotation of being reiterated to the staff.

7      Q.    And do you recall the individuals to whom

8   you sent these bulletins?  The same ones we

9   discussed previously?

10      A.    The bulletins go to all staff.

11      Q.    And do you know if these bulletins went to

12   any of the West House staff?

13      A.    They went to all staff.

14      Q.    Now, how did you ensure that the staff

15   members working in West House reviewed these

16   bulletins?

17      A.    If they stood roll call because they both

18   have to be read at roll call.  And all the West

19   House staff are to stand roll call, and if I were

20   to ensure they all heard it, if they were present

21   that day, they got the memo, and they heard the

22   memo read at roll call.

23      Q.    What if a staff member isn't present to

24   hear it and hasn't received it in the email?

25      A.    Then there's a hard copy for them to

Page 62

1   review.  If they are not available there in that

2   duration, they are to review all the memos being

3   read that's kept in a binder in the shift

4   commander's office for them to review.

5       Q.   Now, how do you ensure these individuals

6   comply with the bulletins you send out in regard to

7   treatment of trans individuals incarcerated at

8   Menard?

9       A.   The assurance of the compliance is the --

10  actually making observations by the shift commander

11  or the cell house major or lieutenant that works

12  over there or Nee House, as far as that matter go,

13  that's assigned in the cell house, they are also

14  assuring that the policies and procedures are being

15  adhered to as well.

16      Q.   Do you directly ensure that your staff is

17  complying with these or do you just rely on the

18  word from your shift commanders and the individuals

19  who run the houses to tell you that they're

20  complying with it?

21      A.   I do both.  I actually do tours and walk

22  around the facility.  So if I'm walking around the

23  facility and things are happening, I can witness

24  it, and there's other cases where the cell house

25  lieutenant and sergeants and majors in the cell

Page 117

1    and then you also send out a memorandum or bulletin
2    that reiterates the appropriate procedures for
3    staff; right?
4        A.    That's correct.
5        Q.    Since becoming warden, has any trans
6    individual at Menard raised concerns with you about
7    inappropriate double celling?
8        A.    Yes, that's -- through ms. graham that was
9    raised, and at that point, I took it upon myself to
10   attempt to rectify the situation, single celled the
11   individuals that was the transgender population.
12       Q.    Okay.  So you made -- did you make it a
13   policy at Menard to single cell trans prisoners
14   after julie graham raised that concern with you?
15       A.    Yes, I did.
16       Q.    Okay.  And are you -- how are you ensuring
17   compliance with that directive?
18       A.    The bulletin went out as well as to my
19   placement staff in my placement office advising
20   them that those individuals are to be
21   single celled.
22       Q.    And when did you send out that
23   Warden's Bulletin saying that?
24       A.    That one may not have been a
25   Warden's Bulletin.  I believe it was a memo that's

Page 118

1    been placed probably since late '23-'24 time frame.

2    I am not a hundred percent sure.

3        Q.   Do you know if that memo has been produced

4    in this litigation?

5        A.   No, I do not.

6        MX. MARCOTTE:  Okay.  And to the extent it has

7    not, we are requesting that it be produced as

8    responsive to our original request for production.

9    BY MX. MARCOTTE:

10       Q.   Mr. Wills, are you aware of any

11   allegations by Menard class members that known

12   violent prisoners who hate trans women are being

13   placed in cells with trans class members without

14   any valid consideration or approval per your

15   policy?

16       MR. BRODZIK:  Object to form.

17       THE WITNESS:  No, I'm not aware.

18   BY MX. MARCOTTE:

19       Q.   Are you aware that these violent prisoners

20   are subsequently physically or sexually assaulting

21   these class members?

22       MR. BRODZIK:  Object to form.

23       THE WITNESS:  No, I am not aware.

24   BY MX. MARCOTTE:

25       Q.   You would agree with me that that conduct

Page 126

1    Menard to look into those specific allegations?

2        MR. BRODZIK:  Object to form.

3        THE WITNESS:  I can't recall that.

4    BY MX. MARCOTTE:

5        Q.   Let's see.  Looking back at Exhibit 1,

6    paragraph 6, you note that when issues concerning

7    access to private showers, when those are raised

8    with you, you advise the relevant cell house major

9    of the issue and send out a memorandum or bulletin

10   that reiterates the appropriate procedures for

11   staff.

12           So since becoming warden, has any trans

13   incarcerated individual at Menard raised these

14   specific issues concerning access to private

15   showers?

16       A.   They, again -- through ms. graham, she

17   advised me of the concerns.

18       Q.   Okay.  And how many times has julie graham

19   raised the concerns with you?

20       A.   I can't recall that either.  Sorry.

21       Q.   Was it more than five?  Less than five?

22       A.   I would say more than five.

23       Q.   And you discussed these issues with

24   julie graham via email and over the phone?

25       A.   Yes.

Page 143

1                    C E R T I F I C A T E

2

3          I, DEANNA AMORE, a Shorthand Reporter and

4     notary public, within and for the State of

5     Illinois, County of DuPage, do hereby certify:

6          That WARDEN ANTHONY WILLS, the witness

7     whose examination is hereinbefore set forth, was

8     first duly sworn by me and that this transcript of

9     said testimony is a true record of the testimony

10    given by said witness.

11         I further certify that I am not related to

12    any of the parties to this action by blood or

13    marriage, and that I am in no way interested in the

14    outcome of this matter.

15

16         IN WITNESS WHEREOF, I have hereunto set my

17    hand this 17th day of May 2025.

18

19

20

21         Deanna M. Amore, CRR, RPR, CSR

22

23

24

25