## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,

          Plaintiffs,

v.

LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN,

          Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil No. 3:18-cv-00156-NJR

### DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' SUPPLEMENTAL COMPLAINT

Defendants, LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN ("Defendants"), by and through their undersigned counsel for their Answer and Affirmative Defenses to Plaintiffs' Supplemental Complaint, state as follows:

### PARTIES

### I.  NAMED PLAINTIFFS

1.      Plaintiffs Janiah Monroe, Marilyn Melendez, Sora Kuykendall, and Sasha Reed (collectively, the "Named Plaintiffs") are transgender women currently incarcerated in IDOC facilities and, like other members of the class, have requested evaluation or treatment for gender dysphoria and have suffered serious harm and are at substantial risk of suffering additional serious harm as a result of Defendants' deliberate indifference to their serious medical needs. Ms. Lydia Helena Visión is no longer incarcerated in IDOC.

**ANSWER:    Defendants admit that named Plaintiffs, Janiah Monroe, Marilyn Melendez, Sora Kuykendall, and Sasha Reed are transgender women currently incarcerated**

**in IDOC. Defendants admit that Lydia Helena Visión is a named Plaintiff, and a transgender woman who is currently on parole and is no longer housed at IDOC. Defendants deny the remaining allegations in this paragraph.**

*Plaintiff Janiah Monroe:*

2.      Today, Ms. Monroe lives at Logan Correctional Center, a women's prison. Defendants, however, have not allowed her to socially transition as a woman. They have isolated her from other female prisoners and not allowed Ms. Monroe to work or attend school. Despite the previous 11-year history of Ms. Monroe receiving hormone therapy, Defendants currently refuse to provide Ms. Monroe with access to hormone therapy and gender affirming surgery. In or about 2021, Ms. Monroe began the surgery process by completing a required step called the "Pathway to Consent" but Defendants subsequently cancelled her consultation with a surgeon. Defendants have denied her necessary medical treatment for gender dysphoria, including social transition, mental health support, hormone treatment, and surgery.

**ANSWER:    Defendants admit that the named Plaintiff is a transgender woman currently incarcerated within IDOC at Logan Correctional Center. Defendants deny the remaining allegations in this paragraph.**

*Plaintiff Marilyn Melendez:*

3.      Today, Marilyn lives in Logan. In 2023, seven years after she requested it, she received gender affirming surgery at IDOC. As a result of the surgery, Ms. Melendez's symptoms of gender dysphoria have lessened. Defendants, however, have denied her other necessary medical treatment for gender dysphoria, including social transition, and she continues to suffer as a result.

**ANSWER:    Defendants admit that the named Plaintiff is a transgender woman currently incarcerated within IDOC at Logan Correctional Center. Defendants deny the remaining allegations in this paragraph.**

*Plaintiff Sora Kuykendall:*

4.     Today, Ms. Kuykendall lives in Logan. Defendants have isolated Ms. Kuykendall at Logan because she is a transgender woman. She has very little contact with cisgender women at Logan, has limited access to programs, and receives hardly any mental health support. As a result, her mental health and gender dysphoria have worsened. Defendants have also denied or delayed her necessary medical treatment for gender dysphoria, including social transition and surgery. Defendants have needlessly delayed Ms. Kuykendall's progress to surgery by failing to make competent electrolysis available.

**ANSWER:    Defendants admit that the named Plaintiff is a transgender woman currently incarcerated within IDOC at Logan Correctional Center. Defendants deny the remaining allegations in this paragraph.**

*Plaintiff Sasha Reed:*

5.     Today, Ms. Reed lives at Centralia Correctional Center, a men's prison. From 2017 to February 23, 2022, Ms. Reed was in IDOC's custody, and on September 19, 2023, Ms. Reed was readmitted to IDOC. From 2023 through December 2024, the male guards conducted strip-searches and pat downs of her, even when she requested female officers to do so. She filed a grievance, but the male guards' behavior did not change. Defendants have denied her necessary medical treatment for gender dysphoria, including social transition, mental health support, proper hormone treatment, and surgery.

**ANSWER:   Defendants admit that the named Plaintiff is a transgender woman currently incarcerated within IDOC at Centralia Correctional Center. Defendants deny the remaining allegations in this paragraph.**

## II.    DEFENDANTS

6.    Defendant Latoya Hughes is the Acting Director of IDOC and is sued in her official capacity. As acting Director of IDOC, Hughes is responsible for establishing, monitoring, and enforcing overall operations, policies, and practices of the Illinois state prison system, including the provision of constitutionally adequate medical care for class members, prisoners who have requested evaluation or treatment for gender dysphoria. In all her actions in this supplemental complaint, Hughes is acting under the color of state law and in the course of her employment.

**ANSWER:   Defendants admit that Defendant Hughes may be responsible for carrying out injunctive relief ordered by the Court in connection with this litigation. Defendants admit that Defendant Hughes acted under color of state law and in the course of her employment. Defendants deny the remaining allegations in this paragraph.**

7.    Defendant Dr. Steven Bowman is the Medical Director for IDOC and is sued in his official capacity. As Medical Director, Bowman is responsible for ensuring that IDOC healthcare policies, directives, and protocols are properly implemented at all facilities and for updating and creating administrative directives, clinic, and health guidelines including those related to the care for gender dysphoria. In his actions described in this supplemental complaint, Defendant Bowan is acting under the color of state law and in the course of his employment.

**ANSWER:   Defendants admit that Steven Bowman is the Medical Director for IDOC. Defendants admit that Defendant Bowman may be responsible for carrying out injunctive relief ordered by the Court in connection with this litigation. Defendants admit**

that Defendant Bowman acted under color of state law and in the course of his employment. **Defendants deny the remaining allegations in this paragraph.**

8.    Defendant Dr. Melvin Hinton is the statewide Mental Health Supervisor for IDOC and is being sued in his official capacity. As Mental Health Supervisor, Defendant Hinton acts as the statewide mental health supervisor and facilitates and oversees several facets of mental health services. He oversees and provides psychological care, psychiatric evaluations, and crisis intervention. These services include treatments that relate to the care for gender dysphoria. In all of his actions described in this Complaint, Defendant Hinton is acting under the color of state law and in the course of his employment.

**ANSWER:    Defendants admit that Melvin Hinton is the Chief of Mental Health Services for IDOC. Defendants admit that Defendant Hinton may be responsible for carrying out injunctive relief ordered by the Court in connection with this litigation. Defendants admit that Defendant Hinton acted under color of state law and in the course of his employment. Defendants deny the remaining allegations in this paragraph.**

## NATURE OF THE CLASS CASE AND NEW FACTUAL ALLEGATIONS

### III.    BACKGROUND

9.    In 2018, the named Plaintiffs, six transgender women filed this class action lawsuit on behalf of all prisoners in IDOC who have requested evaluation or treatment for gender dysphoria. Dkt. 1.

**ANSWER:    Defendants admit the allegations in this paragraph.**

10.    After a preliminary injunction hearing in December 2019, the Court found that the World Professional Association for Transgender Health ("WPATH") dictated medically accepted

Standards of Care for treating gender dysphoria. Dkt. 186 at 3. The treatment options included social transition, cross-sex hormone therapy, psychotherapy, and surgery. *Id*. at 3-4. Social transition included recognition of gender identity, chosen name and pronouns; consideration for placement in a facility matching their gender identity; safe and effective hair removal; and clothing that affirms gender and access to gender-affirming commissary items. *See id*. at 4, 24-35. The Court also found the Endocrine Society Guidelines "are internationally recognized baseline guidelines for the adequate treatment of gender dysphoria" as to hormone therapy and that "hormone therapy that falls below the Guidelines is considered less than adequate treatment." *Id*. at 5-6. The Court noted that the parties agreed that "gender dysphoria is an objectively serious medical condition." *Id*. at 29, 31. Since Defendants did "not put forth a single expert to contest the Standards of Care or offer an opinion about the appropriate level of care for transgender inmates [ . . . ] this Court joins many other courts who agree the Standards of Care are the appropriate benchmark for treating gender dysphoria. *Edmo v. Corizon, Inc*., 935 F.3d 757, 769 (9th Cir. 2019) (and cases cited therein)." *Id*. at 31.

**ANSWER:    Defendants admit Dkt. 186 is a court document and that the court document speaks for itself. Defendants deny the allegations in this paragraph to the extent that they are inconsistent with the court document.**

11.    In March 2020, the Court amended the preliminary injunction and certified the class as "all prisoners in the custody of [Illinois Department of Corrections] who have requested evaluation or treatment for gender dysphoria." Dkt. 213.

**ANSWER:    Defendants admit Dkt. 213 is a court document and that the court document speaks for itself. Defendants deny the allegations in this paragraph to the extent that they are inconsistent with the court document.**

12.     In August 2021, the Court held a bench trial and found that the "evidence introduced at trial shows serious ongoing violations of the Eighth Amendment" and entered a preliminary injunction. *See* Dkts. 319-320, 324, 328, 331, 336. From the bench, the Court ruled that Defendants had to immediately ensure class members' access to a private shower, ensure that class members chose the gender of the officer who would search them, and evaluate class members' transfer requests to a facility matching their expressed gender within 120 days. *See* Dkt. 328 at 16-18. On February 7, 2022, the Court issued a memorandum and order summarizing the trial evidence, factual findings, and conclusions of law, incorporating the August 2021 memorandum and order. Dkt. 383. That day, the Court entered another preliminary injunction requiring Defendants to provide gender-affirming care for Plaintiffs and the class. Dkt. 384.

**ANSWER:     Defendants admit Dkts. 319-320, 324, 328, 331, 383 and 384 are court documents and that the court documents speak for themselves. Defendants deny the allegations in this paragraph to the extent that they are inconsistent with the court documents.**

13.     On May 10, 2022, the Court appointed Co-Monitors Dr. Amanda Harris and julie graham. Dkt. 423. The Co-Monitors monitored Defendants' compliance with the injunction, filing multiple reports. *See* Dkts. 439, 444, 502, 647, 674, 682, 865-866.

**ANSWER:     Defendants admit Dkts. 439, 444, 502, 647, 674, 682, 865 and 866 are court documents and that the court documents speak for themselves. Defendants deny the allegations in this paragraph to the extent that they are inconsistent with the court documents.**

14.     In November 2022, Plaintiffs filed a Motion for Finding of Contempt alleging that Defendants failed to timely and properly administer and monitor hormone therapy (over a third of

the class was not receiving hormones and only 8.8% of transgender women were within ranges established by the Endocrine Society Guidelines), schedule surgery consultations and surgeries (no class members had received one), provide gender-affirming commissary items, conduct appropriate searches, provide private showers, and train prison staff. Dkt. 455.

**ANSWER:    Defendants admit Dkt. 455 is a court document and that the court document speaks for itself. Defendants deny the allegations in this paragraph to the extent that they are inconsistent with the court document.**

15.    In May 2023, Defendants moved under Fed. R. Civ. P. 60(b) to vacate the Court's enforcement orders (Dkt. 587) and moved to stay compliance with them (Dkt. 588).

**ANSWER:    Defendants admit Dkts. 587, and 588 are court documents and that the court documents speak for themselves. Defendants deny the allegations in this paragraph to the extent that they are inconsistent with the court documents.**

16.    In July 2023, Plaintiffs moved to transfer class members out of Pinckneyville Correctional Center because Defendants were failing to provide ordered treatment for gender dysphoria, namely private showers and no cross-gender searches to class members, amongst other issues. Dkts. 606-607. The Court held evidentiary hearings in October 2023. Dkts. 669-670.

**ANSWER:    Defendants admit Dkts. 606, 607, 669, and 670 are court documents and that the court documents speak for themselves. Defendants deny the allegations in this paragraph to the extent that they are inconsistent with the court documents.**

17.    On November 16, 2023, the Court granted in part and denied in part Plaintiff's Motion for Finding of Contempt, but did not enter sanctions. Dkt. 678 at 26. The Court explained that "[it] has reviewed clear and convincing evidence, from the motions, status conferences, and

Co-Monitor reports, that leads the Court to believe that Defendants were (and perhaps still are) in contempt of the Court's operative injunction." *Id*. at 25. The Court also denied Defendants' motion to vacate, finding the motion to stay moot. *Id*. at 26. The Court explained that it made a mistake when it titled the February 7, 2022 injunction "preliminary" (*id*. at 10) and directed the clerk to enter judgment to Plaintiffs (Dkt. 679). The Court partially granted Plaintiffs' motion to transfer class members out of Pinckneyville. Dkt. 680.

**ANSWER:    Defendants admit Dkts. 678, 679 and 680 are court documents and that the court documents speak for themselves. Defendants deny the allegations in this paragraph to the extent that they are inconsistent with the court documents.**

18.    On December 14, 2023, Defendants filed a notice of appeal of the order denying the motion to vacate the enforcement orders, partially granting contempt, and the judgment entered on November 16, 2023. Dkt. 699. Defendants did not appeal the order granting the motion to transfer class members out of Pinckneyville.

**ANSWER:    Defendants admit Dkt. 699 is a court document and that the court document speaks for itself. Defendants deny the allegations in this paragraph to the extent that they are inconsistent with the court document. Defendants admit that they did not appeal the order granting the motion to transfer class members out of Pinckneyville.**

19.    In October 2024, Co-monitor julie graham wrote in her final report, that "Transgender women are specifically targeted in prison because they are women in men's prisons or perceived to be problems or deviants. Transgender men are less visible and feel equally disrespected, and nonbinary people are invisible to IDOC." Dkt. 830 at 8. She concluded that "[w]hile IDOC has systems set up, those systems are not responsive to the reality of incarcerated transgender lives." *Id*.

**ANSWER:    Defendants admit Dkt. 830 is a court document and that the court document speaks for itself. Defendants deny the allegations in this paragraph to the extent that they are inconsistent with the court document.**

20.     On December 5, 2024, the Seventh Circuit Court of Appeals found that the preliminary injunction entered on February 7, 2022, expired as an operation of the Prison Reform Litigation Act (PLRA) on May 8, 2022, and remanded the case to the Court for further proceedings. *Monroe v. Bowman*, 122 F.4th 688, 694 (7th Cir. 2024). Afterward, the parties provided notice of the PLRA's limitations on appointments of monitors (Dkt. 859) and the Court dismissed the Co-Monitors (Dkt. 867).

**ANSWER:    Defendants admit that the Seventh Circuit Court of Appeals authored *Monroe v. Bowman*, 122 F.4th 688 (7th Cir. 2024). Defendants admit Dkts. 859 and 867 are court documents and that the court documents speak for themselves. Defendants deny the allegations in this paragraph to the extent that they are inconsistent with the court documents.**

21.     As of April 1, 2025, according to Defendants' records, the transgender population included approximately 290 prisoners in 33 prisons in Illinois. With approximately 94 transgender prisoners at Logan Correctional Center, the women's prison, and 196 transgender prisoners in prisons for men. Defendants estimated an additional 22 prisoners who were "pending" – i.e., Defendants have not confirmed a diagnosis of gender dysphoria.

**ANSWER:    Defendants admit the allegations in this paragraph.**

22.     In 2024, Logan had a population of about 1,055 prisoners, with 80 transgender men

and nonbinary individuals, and 14 transgender women.[1]

**ANSWER:    Defendants admit the allegations in this paragraph.**

## IV.    GENDER DYSPHORIA AND CURRENT STANDARDS OF CARE

1.      Gender identity is a person's internal sense of being female, male, a blend of female and male, or alternate gender. Everyone has a gender identity.

**ANSWER:    Defendants admit the allegations in this paragraph.**

2.      Gender dysphoria, according to the *American Psychiatric Association's Diagnostic & Statistical Manual of Mental Disorders*, Fifth Edition, Text Revision (DSM-5-TR), is a diagnostic term for the condition of clinically significant distress resulting from the lack of congruence between a person's gender identity and their sex designated at birth. To be diagnosed with gender dysphoria, the incongruence must have persisted for at least six months and be accompanied by clinically significant distress or impairment in social, occupational, or other important areas of functioning.

**ANSWER:    Defendants admit that gender dysphoria is a specific mental disorder meeting diagnostic criteria of the current version of the Diagnostic and Statistical Manual of Mental Health Disorders (DSM) that includes a marked incongruence between an individual's experienced or expressed gender and his or her assigned gender. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.**

3.      Gender dysphoria is a serious condition that, if left untreated, causes serious

---

[1] *See* John Howard Ass'n, *Monitoring Visit to Logan Correctional Center 2024*, 3, https://static1.squarespace.com/static/5beab48285ede1f7e8102102/t/681b8a52d9c5c554bd7d0568/1746635347535/JHA+Report+Logan+2025+FINAL.pdf.

physical and psychological harm. Symptoms of untreated gender dysphoria can include anxiety, depression, eating disorders, socially isolating behavior, self-harm, and suicidality.

**ANSWER:    Defendants admit that untreated gender dysphoria can lead to adverse consequences. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.**

4.    WPATH and the Endocrine Society have established clinical practice guidelines for the treatment of gender dysphoria. The current version, the Standards of Care for the Health of Transgender and Gender Diverse People, Version 8 ("WPATH SOC 8") was published in 2022.[2] The Endocrine Society, which is a professional association of endocrinologists, first issued guidelines for the treatment of gender dysphoria in 2011 and updated the guidelines in 2017.[3] The accepted standards of care for the treatment of gender dysphoria in the WPATH and Endocrine Society guidelines apply to people in prisons.

**ANSWER:    Defendants admit that WPATH and the Endocrine Society have established clinical practice guidelines for treatment of gender dysphoria. Defendants admit that that WPATH SOC 8 provides recommendations. Defendants deny that Defendants are constitutionally required to follow the recommendations. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.**

---

[2] Eli Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int. J. of Transgender Health S1-S259 (2022), https://wpath.org/publications/soc8.

[3] Wylie C. Hembree et al., *Endocrine Treatment of Gender Dysphoric/Gender Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. of Clinical Endocrinology & Metabolism 3869 (2017) (identifying the "need, risks and benefits, analysis of alternatives, ruling out contraindications, accepted standards of care, and thorough informed-consent process"), https://www.endocrine.org/clinical-practice-guidelines/gender-dysphoria-gender-incongruence.

5.      The Standards of Care explicitly state that "the entire list of recommendations of the SOC-8 apply equally to individuals residing in institutions" such as prisons:

> [T]he recommendations put forth here apply to all institutions that house [transgender and gender diverse] individuals, both carceral and noncarceral (Porter et al., 2016). All of the recommendations of the Standards of Care apply equally to people living in both types of institutions. People should have access to these medically necessary treatments irrespective of their housing situation within an institution (Brown, 2009). Care for an institutionalized person must consider the individual does not have the access that non-institutionalized persons have to securing care on their own.[4]

**ANSWER:    Defendants admit that this paragraph accurately quotes from the Standards of Care but deny that Defendants are constitutionally required to follow the recommendations of WPATH SOC-8's Standards of Care. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.**

6.      Additionally, the National Commission on Correctional Health Care recommends that medical care for prisoners with gender dysphoria "should follow accepted standards developed by professionals with expertise in transgender health," citing the Standards of Care.[5]

**ANSWER:    Defendants admit that National Commission on Correctional Health Care published *Position Statement: Transgender and Gender Diverse Health Care in Correctional Settings* 3. Defendants deny that Defendants are constitutionally required to follow the recommendations of the National Commissio'n on Correctional Health Care.**

---

[4] *See supra* n.2.

[5] *See* National Comm'n on Correctional Health Care, *Position Statement: Transgender and Gender Diverse Health Care in Correctional Settings* 3 (2020) ("The clinical decision making to initiate or advance hormone medication treatment or candidacy for surgical interventions while incarcerated or upon release needs to be based on individual medical need, risks and benefits, analysis of alternatives, ruling contradictions, accepted standards of care, and a thorough informed-consent process."), https://www.ncchc.org/position-statements/transgender-and-gender-diverse-health-care-in-correctional-settings-2020/

**Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.**

7.     The WPATH SOC-8 recommendations for institutions include: (1) health care professionals who are responsible for providing gender-affirming care to prisoners recognize that the recommendations apply equally to all transgender and gender diverse people in prison; (2) all staff be trained on gender diversity and medical staff receive intensive training or consult with outside professionals; (3) medical professionals who prescribe and monitor "hormone therapy do so without undue delay;" (4) staff and medical professionals support gender affirming surgical treatments sought by individuals "without undue delay"; (5) administrators, health care professionals and all others allow gender appropriate clothing and grooming items; (6) all institutional staff address transgender and gender diverse prisoners by their chosen names and pronouns at all times; (7) administrators, health care professionals and other officials responsible for making housing decisions consider the individual's housing preference, gender identity and expression, and safety considerations, rather than their anatomy or sex assigned at birth; (8) housing policies should ensure the safety of transgender and gender diverse prisoners without using segregation or isolation; and (9) private use of showers and toilet facilities for prisoners, and pat- downs, cavity searches and strip searches should be conducted by a staff member of the same gender identity.[6]

**ANSWER:    Defendants admit that WPATH SOC 8 provides recommendations. Defendants deny that Defendants are constitutionally required to follow the recommendations.**

---

[6] *See id*. at S01-S09.

## V.    IDOC POLICY CONCERNING THE CARE OF TRANSGENDER PRISONERS AND PRISONERS WITH GENDER DYSPHORIA.

8.    Despite the fact that proper diagnosis and effective treatment of gender dysphoria are well-understood among medical professionals, IDOC has adopted policies, procedures, and practices that deny prisoners evaluation and medically necessary treatment for gender dysphoria in contravention of medical science.

**ANSWER:    Defendants deny the allegations in this paragraph**.

9.    Four months before trial, in April 2021, IDOC issued Administrative Directive 04.03.104, Evaluation, Treatment and Correctional Management of Transgender Offenders., authorized by former Defendant, Rob Jeffreys.[7]

**ANSWER:    Defendants admit the allegations in this paragraph.**

10.    The policy states that it "seeks to foster an environment where all offenders, including Transgender, intersex, and gender incongruent offenders, are living in a dignified manner with full respect of their right to be free from discrimination, harassment, victimization, bullying or violence whether emotional, physical or verbal. The Department seeks to meet the medical, mental health, transition, and security needs of all segments of the population."[8]

**ANSWER:    Defendants admit that this version of IDOC's Administrative Directive 04.03.104 went into effect April 1, 2021 and that the policy is a written document that speaks**

---

[7] Illinois Dep't of Corr., Administrative Directive, 04.03.104 *Evaluation, Treatment and Correctional Management of Transgender Offenders* (Apr. 1, 2021),
https://idoc.illinois.gov/content/dam/soi/en/web/idoc/aboutus/policies/policies/programs-and-services/403104-evaluation-treatment-and-correctional-management-of-transgender-offenders.pdf.

[8] *Id.*

**for itself. Defendants deny the allegations in this paragraph to the extent that they are inconsistent with the document.**

11.    The policy creates two committees, which make decisions about the evaluation and treatment of transgender prisoners. The Transgender Administrative Committee (TAC) decides housing placements (or transfers) and specifies the gender of the officer who will search a transgender prisoner. The Transgender Health and Wellness Committee (THAW) provides medical oversight for medical and mental health care for transgender prisoners, including whether a prisoner is approved for gender-affirming surgery.

**ANSWER:    Defendants admit the allegations in this paragraph, but deny the above is a complete representation of all of the duties of TAC and THAW.**

12.    Despite this policy, at the end of the trial in August 2021, the Court found that Defendants were not implementing it, "nor are the staff following it, nor has treatment or care demonstrably improved." Dkts. 349 at 217:23-25, 218:1-2.

**ANSWER:    Defendants admit Dkt. 349 is a court document and that the court document speaks for itself. Defendants deny the allegations in this paragraph to the extent that they are inconsistent with the court document.**

13.    In the last four years, Defendants have not issued a new policy.

**ANSWER:    Defendants admit they have not issued a new Administrative Directive on the treatment and care of transgender individuals in custody since April 1, 2021. Defendants deny the remaining allegations contained in this paragraph.**

**VI.    DEFENDANTS FAIL TO PROPERLY EVALUATE AND PROVIDE NECESSARY MEDICAL CARE FOR GENDER DYSPHORIA.**

14.    IDOC and each of the named Defendants is and has been deliberately indifferent to the systemic failures to evaluate and provide treatment to class members.

**ANSWER:    Defendants deny the allegations in this paragraph.**

A.    **IDOC Fails to Evaluate Prisoners for Gender Dysphoria and Delays Treatment.**

15.    Transgender prisoners face significant delays before IDOC evaluates them for gender dysphoria and even longer delays before IDOC initiates medically necessary treatment. These delays are contrary to the Standards of Care.

**ANSWER:    Defendants deny the allegations in this paragraph**.

16.    Defendants' policy states that "all offenders shall undergo a detailed medical history, physical examination and mental health screening during the reception and classification process."[9] Further evaluations for gender dysphoria shall "occur within seven working days" for offenders identified at the initial screening or "for any offender newly disclosing gender incongruence status at their parent facility."[10]

**ANSWER:    Defendants admit that this version of IDOC's Administrative Directive 04.03.104 went into effect April 1, 2021 and that the policy is a written document that speaks for itself. Defendants deny the allegations in this paragraph to the extent that they are inconsistent with the document.**

17.    Yet, when class members enter IDOC's reception, Defendants fail to provide evaluations for gender dysphoria when class members identify themselves as transgender and/or

---

[9] *Id*. at Sec. II.F.

[10] *Id.*

gender diverse, express a desire to continue hormone therapy or other gender affirming care, or otherwise ask for gender affirming care.

> **ANSWER:** **Defendants deny the allegations in this paragraph.**

18.     When class members arrive at their "home" facilities and disclose that they want to be evaluated or treated for gender dysphoria, Defendants still do not provide prompt screenings, instead delaying evaluations of class members for months and even years.

> **ANSWER:** **Defendants deny the allegations in this paragraph.**

19.     These failures to provide timely evaluations make it impossible for class members to receive adequate treatment as Defendants limit or do not provide necessary gender affirming care, such as hormone therapy and surgery, and social transition, to prisoners without a gender dysphoria diagnosis. Defendants disregard the substantial risk of harm to class members.

> **ANSWER:** **Defendants deny the allegations in this paragraph.**

> **B.** **Hormone Therapy is Denied, Delayed, or Improperly Provided.**

20.     IDOC inadequately provides hormone therapy to prisoners with gender dysphoria. Even once a prisoner obtains hormone therapy, IDOC routinely provides hormones that are not medically recommended or appropriate, fails to adequately monitor the prisoner's hormone levels, and fails to ensure proper dosages.

> **ANSWER:** **Defendants deny the allegations in this paragraph.**

21.     WPATH SOC 8 recommends that medical professionals prescribing and monitoring hormones should do so "without undue delay and in accordance with the SOC-8."[11]

---

[11] *See supra* n.2, at S106.

Endocrine Society guidelines recommend screening for adverse reactions to hormone therapy through both clinical evaluation and laboratory monitoring of hormone levels every 3 months during the first year of hormone therapy, and one to two times a year after that.[12]

**ANSWER:    Defendants admit that WPATH SOC 8 provides recommendations. Defendants deny that Defendants are constitutionally required to follow the recommendations.**

22.    Defendants have denied and continue to deny, delay, or improperly provide hormone therapy to Named Plaintiffs and other class members, putting them at risk of significant harm to their health. The consequences of failing to initiate medically necessary hormone therapy can include increased gender dysphoria, depression, surgical self-treatment by autocastration, and suicidality.

**ANSWER:    Defendants deny the allegations in this paragraph**.

23.    Yet, class members are told they must wait six months between diagnosis of gender dysphoria and beginning hormones, although many wait much longer to actually receive treatment. This six month "requirement" appears nowhere in WPATH or Endocrine Society guidelines, nor is it stated in the Administrative Directive.[13]

**ANSWER:    Defendants deny the allegations in this paragraph.**

24.    For those who have seen this hormone therapy alleviate their gender dysphoria, denying, abruptly withdrawing, or improperly providing this care can result in a return of symptoms they previously experienced. Some results of hormone therapy are reversible, so

---

[12] *See supra* n.3, at 3889.

[13] *See supra* nn.2-3 & n.7.

transgender men may lose masculinization, and transgender women may lose feminization of their bodies, exacerbating their gender dysphoria.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

25.    As discussed above, despite an 11-year history of Janiah Monroe receiving hormone therapy in IDOC, and Ms. Monroe' requests to resume hormone therapy, Defendants have refused to provide hormone therapy to Ms. Monroe. Without hormone therapy for the last year, Ms. Monroe's body has become more masculine; she has grown thicker facial hair, and her skin has toughened, exacerbating her gender dysphoria and harming her mental health.

**ANSWER:    Defendants deny Janiah Monroe has asked for and has not received hormone treatment for over a year. Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph**.

26.    Yet, as of April 1, 2025, Defendants' records reflected that only 159 of 290 transgender prisoners had received hormone therapy, or about 54% of the transgender population.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. Defendants deny, however, that all 290 transgender individuals in custody of IDOC have requested or want hormone therapy.**

27.    Moreover, when Defendants transfer class members from one male prison to another, Defendants fail to continue to provide and monitor hormone therapy for class members.

**ANSWER:    Defendants deny the allegations in this paragraph.**

28.    For example, when another class member who was transferred from Statesville to Pinckneyville Correctional Center had to wait almost six months after her transfer to begin

receiving hormones again. She was told that this was because her medical paperwork had not been transferred, although she continued to receive medications that were not related to gender dysphoria. She had been on hormones for 16 months at Statesville, and had to put in 14 requests to medical before her hormones were restarted.

> **ANSWER:    Defendants deny the allegations in this paragraph.**

29.    Even when Defendants do provide some access to hormone therapy, Defendants still fail to provide proper or consistent dosage and fail to follow Endocrine Guidelines to monitor properly the hormone levels of Plaintiffs and class members. Failing to monitor hormone levels could result in dangerous levels of estrogen: an increased risk for blood clots or strokes if the estrogen level is too high, or for osteoporosis if the estrogen levels are too low, among other potential complications.

> **ANSWER:    Defendants deny the allegations in this paragraph.**

30.    Even once class members are provided with hormones and monitoring, problems persist. One class member receiving hormone therapy was told by her endocrinologist that her estrogen levels were so low they were indistinguishable from a cisgender man. When she reported this to the medical team responsible for administering her hormones, they refused to increase the dosage of her shot, despite the recommendation of the endocrinologist.

> **ANSWER:    Defendants deny the allegations in this paragraph.**

31.    Yet another class member had her shot administered incorrectly by a nurse, causing her to become seriously ill and require a trip to the hospital.

> **ANSWER:    Defendants deny the allegations in this paragraph.**

32.    Transgender women class members at Menard Correctional Center often have their

shots administered in front of male correctional officers. These shots are administered in the gluteus muscle and require the patient to pull down their pants to receive the shot. When class members complained, they were told that they would have to choose between having the male officer in the room or no longer getting a shot. Some have had shots skipped in retaliation for complaining. One class member reported being taken out of the room by the male correctional officer and groped after complaining about his presence during her shot.

**ANSWER:    Defendants deny the allegations in this paragraph.**

### C.    Mental Health Care is Denied, Delayed, or Improperly Provided.

33.    WPATH SOC 8 provides that psychotherapy for transgender and gender diverse people is not just medically necessary but can also improve resilience in hostile and disabling environments.[14]

**ANSWER:    Defendants admit that WPATH SOC 8 provides recommendations. Defendants deny that Defendants are constitutionally required to follow the recommendations.**

34.    Over 23 years ago, in passing the Prison Rape Elimination Act (PREA), Congress recognized that federal and state prisons can be hostile environments for transgender and diverse prisoners who are more vulnerable to verbal and physical abuse, sexual harassment and rape because of who they are.

**ANSWER:    Defendants admit the allegations in this paragraph.**

35.    IDOC is no different. The prisons have been and continue to be a hostile and

---

[14] WPATH SOC 8 also states that psychotherapy can be helpful to treat psychological concerns relating to gender dysphoria and coming out, but it should not be mandatory for people to undergo gender affirming care. *See supra* n.2, at S175.

disabling environment for Plaintiffs and class members, harming their mental and physical health. Such environments can cause class members to detransition or stop gender-affirming care, further exacerbating their gender dysphoria.

**ANSWER:    Defendants deny the allegations in this paragraph.**

36.    After the trial in August 2021, the Court found that Plaintiffs experienced verbal and physical abuse, sexual abuse, mistreatment, and misgendering by IDOC guards and male prisoners, harming Plaintiffs' mental health. *See* Dkts. 383 at 23-13, 14, 19, 26.

**ANSWER:    Defendants admit Dkt. 383 is a court document and that the court document speaks for itself. Defendants deny the allegations in this paragraph to the extent that they are inconsistent with the court document.**

37.    Over two years later, in October 2023, at an evidentiary hearing to transfer 22 class members out of Pinckneyville Correctional Center, a men's prison, class members testified that mental health providers, doctors, and guards refused to acknowledge that they are transgender and misgender them. *See e.g.*, Dkt. 680 at 9-10, 11. Despite court orders that required no-cross gender searches and private showers, male guards subjected them to strip searches and denied class members private showers (*id*. at 5-8, 9-11). Male guards abused class members by choking one class member (*id*. at 7), throwing heavy keys at a class member's head (*id*. at 9), and groping another class member's genitals (*id*. at 10). The male nurse sexually abused two class members while providing hormone shots (*id*. at 7, 9). Class members testified that they experienced sexual abuse and unwanted touching from male prisoners, too. *Id*. at 9. Further, the Court found "prison officials' persistent announcements of 'tranny' or 'gay' shower time and the like endangers class members by 'outing' them to fellow inmates who have targeted them for abuse." *Id*. at 27-28. "Such treatment by staff members and other inmates have caused class members to fear for their

safety to the extent that some have discontinued their gender-affirming hormone treatment to avoid becoming a target and/or reduce their vulnerability if attacked." *Id*. at 28.

**ANSWER:    Defendants admit Dkt. 680 is a court document and that the court document speaks for itself. Defendants deny the allegations in this paragraph to the extent that they are inconsistent with the court document.**

38.    Defendants continue to fail to provide or inadequately provide mental health treatment for Plaintiffs and class members' gender dysphoria in these hostile and disabling environments. Defendants fail to provide consistent individual and group therapy to class members with gender dysphoria.

**ANSWER:    Defendants deny the allegations in this paragraph.**

39.    Since her transfer to Logan, Defendants have placed Janiah Monroe in segregated housing where she has been isolated from other women prisoners and not allowed to participate in programming or have a job. At Logan, Ms. Monroe has received little mental health care for her gender dysphoria. A nurse practitioner typically visits Ms. Monroe once a month for five to ten minutes.

**ANSWER:    Defendants admit Janiah Monroe has spent time in restrictive housing at Logan Correctional Center due to various disciplinary infractions. Defendants deny the remaining allegations in this paragraph.**

40.    By November 2023, Ms. Monroe had attempted suicide about nine times. In 2024, Plaintiff Janiah Monroe attempted suicide twice. In January 2024, to transfer out of Logan, Ms. Monroe asked to stop her hormone therapy. Rather than provide Ms. Monroe with mental health support to understand why she would want to detransition after 11 years, Defendants removed her

diagnosis of gender dysphoria. In 2025, Ms. Monroe was on crisis watch for cutting herself and tried to kill herself in April 2025.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

41.    In or about August 2024, Plaintiff Sora Kuykendall experienced a severe mental health crisis and attempted to take her own life because of the ongoing isolation, loneliness, and discrimination she experiences at Logan.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

42.    While at Logan, Ms. Kuykendall spends nearly 23 hours a day in isolation. She is currently housed in 8 Center Wing, along with mostly other transgender women. She has little to no interaction with cisgender women and is also excluded from certain programs offered at Logan, such as the PAWS program.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

43.    Logan also places transgender women in D-Wing, as well as 11 Center Wing—which are all units that are segregated from cisgender women and limit any meaningful integration and social transition into the broader female population. Transgender women in these housing units often face lockdown-type conditions. On D-Wing, transgender women are confined to their cells with very little out-of-cell time. As of now, there are about 4 transgender women housed on D-Wing. For 8 and 11 Center Wings, transgender women are confined to their wings, without access to other areas of the Logan facility. Transgender men can also be housed on D-Wing. Currently,

25

there are about 8 or 9 transgender men on D-Wing. This segregation and isolation can exacerbate class members' gender dysphoria and their need for mental health support.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

44.     Ms. Kuykendall describes her experience at Logan as profoundly lonely.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

45.     The night before her suicide attempt, Ms. Kuykendall stayed up all night feeling anxious, upset, and depressed. The following morning, on the day of her suicide attempt, Ms. Kuykendall used a razor blade to cut her throat over and over again. Ms. Kuykendall remembers wanting to die in that moment. Her clothing and mattress were completely soaked in blood.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

46.     Since transferring to Logan, Ms. Kuykendall has consistently told mental health staff about her chronic suicidal ideations, which are because of the isolation and discrimination she's experienced as a transgender woman. In the days leading up to her suicide attempt, Ms. Kuykendall again alerted mental health staff about her suicidal ideations. Despite these warnings and pleas for help, no one from mental health took action or intervened. Ms. Kuykendall was ignored.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

47.     After her suicide attempt, Logan staff placed Ms. Kuykendall on crisis watch—

which subjected her to even more isolation. Ms. Kuykendall explained to staff that this kind of isolation on crisis watch would only worsen her mental health, but her concerns were again ignored. While on crisis status, IDOC staff did not let Ms. Kuykendall shower for about four or five days and Ms. Kuykendall did not have access to any of her gender-affirming commissary items.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

48.    After her crisis watch, Ms. Kuykendall was supposed to receive more regular mental health check-ins and follow-ups, yet Ms. Kuykendall was only seen twice during this post-crisis watch period. These two follow-ups lasted only a few minutes.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

49.    The Mental Health Professional ("MHP") Ms. Kuykendall did see during this time admitted to Ms. Kuykendall that she had limited knowledge of gender dysphoria. Ms. Kuykendall was also assigned to see this same MHP when she was moved back to 8 Center Wing.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

50.    During 2023-2024, Plaintiff Sasha Reed did not have regular access to mental health providers to treat her gender dysphoria. She was very depressed, went on crisis watch, and attempted suicide.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

51.    As the experiences of the Named Plaintiffs illustrate, Defendants fail to provide individuals with gender dysphoria with consistent individual or group therapy and mental health care they need.

**ANSWER:    Defendants deny the allegations in this paragraph.**

52.    Defendants fail to provide the majority of class members with consistent mental health care to treat their gender dysphoria. Many prisons do not have group therapy that addresses gender dysphoria for class members, and sessions with individual providers are not routine.

**ANSWER:    Defendants deny the allegations in this paragraph.**

**D.    IDOC Fails to Provide or Delays Gender Affirming Surgery.**

53.    WPATH SOC 8 recommends that staff and medical professionals support gender-affirming surgeries sought by prisoners "without undue delays."[15] As recognized by both this Court and the WPATH standards, gender-affirming surgery is a medically necessary treatment option for gender dysphoria.

**ANSWER:    Defendants admit that WPATH SOC 8 provides recommendations. Defendants deny that Defendants are constitutionally required to follow the recommendations.**

54.    The consequences of failing to provide gender-affirming surgery when medically necessary without undue delay for class members can include surgical self-treatment by autocastration, depression, increased gender dysphoria, and suicidality.

---

[15] *See supra* n.2.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

55.    For years, Defendants have delayed or denied gender-affirming surgeries for class members.

**ANSWER:    Defendants deny the allegations in this paragraph.**

56.    Since the filing of the original complaint, only eight class members—out of a class of more than 290 and including many in urgent need of surgery—have received gender-affirming surgeries while in Defendants' custody. Of those, five were top surgeries (mastectomies) for transgender men, and only three were vaginoplasties for transgender women.

**ANSWER:    Defendants admit that class members have received gender affirming surgeries while in Defendants' custody.   Defendants deny that all approximately 290 individuals diagnosed with gender dysphoria in IDOC custody have requested gender-affirming surgery. Answering further, Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.**

57.    Notably, most of these surgeries took place in 2023, shortly after Plaintiffs filed their motion for contempt. At the time Plaintiffs filed their motion for contempt in November 2022, not a single class member had received gender-affirming surgery. In fact, only one individual had even completed 90% of the electrolysis required before surgery.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

58.    Disturbingly, this pattern of delay and denial has continued. To Plaintiffs' knowledge, no class member has received gender-affirming surgery in 2025 as of the date of this

filing.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

59.    Defendants' current policy and practice have no timeline or deadlines for decisions as to the medical necessity of gender-affirming surgeries, nor when any denials are to be communicated to class members.[16]

**ANSWER:    Defendants deny the allegations in this paragraph.**

60.    All six Plaintiffs who filed this case in 2018 requested gender affirming surgery, but only one, Marilyn Melendez, has received gender affirming surgery. Ms. Monroe requested it in 2008, Defendants approved Ms. Monroe for surgery in 2021, but she has not received it. Ms. Kuykendall requested surgery in 2015 but has not received it.

**ANSWER:    Defendants admit that Marilyn Melendez received gender affirming surgery. Defendants deny the allegations contained in this paragraph to the extent they imply Defendants' actions are the cause of the delay of Janiah Monroe's gender-affirming surgery. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.**

61.    Ms. Melendez, the only named Plaintiff to have received surgery (vaginoplasty), first requested gender-affirming surgery in 2019, but she had to wait four years for this medically necessary health care. She received a vaginoplasty in 2023.

**ANSWER:    Defendants admit that Marilyn Melendez received gender affirming surgery.  Answering further, Sora Kuykendall has refused several dates to proceed forward**

---

[16] *See supra* n.7, at Sec.II.H.2.

**with gender-affirming surgery while in DOC custody. Janiah Monroe is not presently a candidate for gender affirming surgery. Lydia Helena Vision has been paroled and is no longer in DOC Custody.**

62.    These prolonged delays are not unique to just the Named Plaintiffs—they are representative and indicative of what other class members experience when seeking surgery.

**ANSWER:    Defendants deny the allegations in this paragraph**.

63.    The Court has repeatedly ordered Defendants to provide gender-affirming surgeries for class members, and to take necessary steps toward surgeries.

**ANSWER:    Defendants admit that Plaintiffs are referring to several court documents, however, the documents that Plaintiffs refer to lack a citation. Defendants deny the allegations in this paragraph to the extent that they are inconsistent with the referenced court documents.**

64.    In August 2021, the Court explicitly required Defendants to evaluate requests for surgical treatment and set a timetable for this evaluation, starting with the earliest-made requests. Dkt. 331 at 11. In that same order, the Court also ordered that Defendants finalize a contract with an outside surgeon to perform surgeries for approved class members. *Id*. at 12.

**ANSWER:    Defendants admit Dkt. 331 is a court document and that the court document speaks for itself. Defendants deny the allegations in this paragraph to the extent that they are inconsistent with the court document**.

65.    In February 2022, the Court further ordered Defendants to "ensure the availability to class members of all medically necessary hair removal services, in addition to and including hair removal to prepare for gender-affirming surgery, within 30 days of the date of this Order."

31

Dkt. 383 at 74. The Court also ordered Defendants to "provide an update on the status of those approved for surgery, including whether any preliminary treatment—such as hair removal—has occurred, whether any surgeries have occurred, and the plans for post-surgery facility placement and treatment." *Id*. at 78. Defendants were also ordered to "provide a detailed explanation as to why individual requests for surgery were denied." *Id*. at 78.

**ANSWER:    Defendants admit Dkt. 383 is a court document and that the court document speaks for itself. Defendants deny the allegations in this paragraph to the extent that they are inconsistent with the court document**.

66.    In December 2022, Defendants were ordered to "*identify* . . . other potential surgical providers who may be able to provide less complicated surgeries for class members." Dkt. 494 (emphasis added). The purpose of adding more surgical providers was to speed up gender-affirming surgical consultations and procedures after years of delays.

**ANSWER:    Defendants admit Dkt. 494 is a court document and that the court document speaks for itself. Defendants deny the allegations in this paragraph to the extent that they are inconsistent with the court document**.

67.    In January 2023, Defendants were again ordered to "file under seal a list of providers *contacted* for gender-affirming surgery, no later than February 28, 2023." Dkt. 522 (emphasis added). Defendants failed to do so. Instead, Defendants claimed that one surgeon could handle all approved surgeries for class members. Dkt. 540.

**ANSWER:    Defendants admit Dkt. 522 is a court document and that the court document speaks for itself. Defendants deny the allegations in this paragraph to the extent that they are inconsistent with the court document**.

68.    In April 2023, Defendants were ordered again to report on additional surgical providers. Dkt. 552. Again, Defendants failed to do so. Dkt. 571.

**ANSWER:    Defendants admit Dkt. 571 is a court document and that the court document speaks for itself. Defendants deny the allegations in this paragraph to the extent that they are inconsistent with the court document**.

69.    In May 2023, Defendants were ordered yet again to contact additional surgical providers by June 15, 2023. Dkt. 584.

**ANSWER:    Defendants admit Dkt. 584 is a court document and that the court document speaks for itself. Defendants deny the allegations in this paragraph to the extent that they are inconsistent with the court document**.

70.    At this point, given Defendants repeated disregard for this specific order, the Court firmly stated that "[i]f Defendants again fail to comply with the Court's directives and schedule . . they will be held in contempt, and the Court will impose appropriate sanctions." *Id*. at 9. Defendants then filed their Motion to Vacate and Motion to Stay.

**ANSWER:    Defendants admit Dkt. 584 is a court document and that the court document speaks for itself. Defendants deny the allegations in this paragraph to the extent that they are inconsistent with the court document**.

71.    In November 2023, the Court stated—without equivocation—that "Defendants continue to create their bottlenecks in effecting the [Court's] ordered relief, such as limiting themselves to only one medical provider, [. . .], with an overly saturated surgical schedule for surgical consultations and surgeries of class members." The Court emphasized that Defendants "fail to see that speed *is and should be* an obvious concern in rectifying *constitutional* harms. Their

glacial pace ensures that class members continue to suffer from the same constitutional injuries the Court identified after the bench trial *more than two years ago*." *Id*. at 24 (emphasis in original).

**ANSWER:    Defendants admit that Plaintiffs are referring to a court document, however, the document that Plaintiffs refer to lack a citation. Defendants deny the allegations in this paragraph to the extent that they are inconsistent with the referenced court document**.

72.    And yet, Defendants have created other bottlenecks that continue to delay surgeries. For example, one issue has been the lack of access to electrolysis, a prerequisite to certain gender-affirming surgeries, like vaginoplasties. For years, Defendants only had one electrologist who was only at Logan. This meant that electrolysis was only available to the small number of class members, who were transgender women, housed there.

**ANSWER:    Defendants deny the allegations in this paragraph.**

73.    Upon information and belief, Defendants only recently hired a second electrologist at another IDOC facility. But the vast majority of class members still lack access to electrolysis services because they are not housed there.

**ANSWER:    Defendants admit that that they recently hired an additional electrologist. Defendants are also in the process of hiring another electrologist. Defendants deny the remaining allegations in this paragraph.**

74.    The process for requesting gender-affirming surgery is opaque and often inconsistent. Many class members have submitted numerous surgery requests—often dozens—to medical and mental health staff at IDOC, yet they hardly ever receive any response.

**ANSWER:    Defendants deny the allegations in this paragraph.**

75.    For the few whose surgery request reaches the THAW committee, the entity that

Defendants have designated to decide who receives surgery, the committee's process is a black box. It is unclear what, if any set criteria, the THAW committee uses to assess surgery requests; how decisions are made and by whom; or why surgery requests are delayed or denied. THAW's process is also riddled with inconsistencies and inexplicable decisions, and it is not uncommon for class members to be "re-presented" or "re-referred" to the committee without much explanation or guidance.

> **ANSWER:** **Defendants deny the allegations in this paragraph.**

76.    Defendants' delays and failure to provide access to gender-affirming surgeries has resulted in Named Plaintiffs and class members' prolonged suffering, worsening gender dysphoria, depression, anxiety, and has resulted in class members going on hunger strikes, self-harming and cutting, or worse, attempting suicide or self-surgery and castration.

> **ANSWER:** **Defendants deny the allegations in this paragraph.**

> **E.    IDOC Fails to Permit, Accommodate, and Facilitate Social Transition Necessary to Treat Gender Dysphoria.**

77.    IDOC fails to permit, accommodate, and facilitate social transition—"living part time or full time in another gender role, consistent with one's gender identity"—that is medically necessary treatment for gender dysphoria.

> **ANSWER:** **Defendants deny the allegations in this paragraph.**

78.    Social transition is the process of transgender and gender diverse people expressing themselves in ways that reflect their gender identity and public recognition of their gender identity. Social transition can include living in housing that corresponds with the prisoner's gender identity, using clothing, hairstyles, hygiene, and grooming products (such as makeup and hair removal products) that reflect gender identity, and being addressed by a chosen name and pronouns

consistent with their gender identity. Social transition can reduce gender dysphoria, depression, anxiety, self-harm ideation and behavior, and suicidality.

**ANSWER:    Defendants admit that social transition for individuals diagnosed with gender dysphoria is deemed important by medical and mental health professionals. Defendants deny any wrongdoing related to the social transition of transgender inmates at IDOC.**

79.    Among other things, IDOC (i) mechanically places transgender women in facilities for male inmates, without considering whether a female facility would be more appropriate; (ii) isolates and segregates class members, even at Logan; (iii) denies class members access to gender affirming clothing and grooming items; (iv) misgenders prisoners with gender dysphoria, failing to recognize and respect their gender identity; (v) fails to provide class members with private showers; and (iv) routinely subjects transgender women to strip searches performed by male staff. These failures prevent, or seriously limit, class members' ability to live consistent with their gender identity, which in turn worsens their gender dysphoria.

**ANSWER:    Defendants deny the allegations in this paragraph.**

(i)    <u>Defendants place class members into housing that reflects their sex assigned at birth.</u>

80.    WPATH SOC 8 recommends "officials responsible for making housing decisions. . . . should consider the individual's housing preference, gender identity, and expression, and safety considerations, rather than solely their anatomy or sex assignment at birth."[17] It also recommends placing transgender and gender diverse prisoners in housing that ensures their safety without segregating or isolating prisoners. It explains that "separation of people based on sex assigned at

---

[17] *See supra* n.2, at Statement 11.7, S108.

birth, a policy almost universally implemented in institutional settings [. . . ] can create an inherently dangerous environment."[18]

**ANSWER:    Defendants admit that WPATH SOC 8 provides recommendations. Defendants deny that Defendants are constitutionally required to follow the recommendations.**

81.    Defendants have routinely placed and continue to place class members into housing that corresponds with the sex they were assigned at birth, not their gender identity. This deprives class members of the ability to socially transition and live amongst their peers. It also places class members in dangerous male prisons, where they are vulnerable to sexual and physical abuse because they are transgender or gender diverse.

**ANSWER:    Defendants deny the allegations in this paragraph.**

82.    When Defendants place class members into housing that does not correspond with their gender identity, they also place them into housing and in cells with male prisoners who sexually harass and abuse them.

**ANSWER:    Defendants deny the allegations in this paragraph.**

83.    As explained in Co-monitor julie graham's report from October 2024, "transwomen are often isolated from peers and learn about being female from men who want to use them, distorting what female gender identity is about. Isolation increases lack of safety and harms an individual's mental health." Dkt. 830 at 11.

**ANSWER:    Defendants admit that julie graham's report from October 2024 is a written document that speaks for itself.  Answering further, Defendants admit that Dkt. 830**

---

[18] *See id.*

is a public court document and that this court document speaks for itself. Defendants deny the allegations in this paragraph to the extent that they are inconsistent with these documents.

84.    "When transgender women are celled with men, unsurprisingly they report being sexually assaulted, raped and harassed." *Id*. Co-Monitor julie graham has "spoken with many women who report that they were placed in cells with highly aggressive men or sex offenders. Refusing a cell assignment results in disciplinary actions – generally being sent to ad seg- and losing privileges and many report losing property. Transgender women must weigh safety versus privileges and property." *Id*.

**ANSWER:**    **Defendants admit that julie graham's report from October 2024 is a written document that speaks for itself.  Answering further, Defendants admit that Dkt. 830 is a public court document and that this court document speaks for itself. Defendants deny the allegations in this paragraph to the extent that they are inconsistent with these documents.**

85.    Such placements not only result in physical and mental harm to class members, but some class members decide to stop socially transitioning or are afraid to come out as transgender for fear of physical or verbal abuse. Other class members decided to stop receiving gender-affirming treatment, such as hormone therapy, to avoid abuse by male prisoners and guards.

**ANSWER:**    **Defendants deny the allegations in this paragraph.**

86.    Defendants place most class members in IDOC male prisons, not Logan. As of 2024, of the total 290 transgender prisoners, 80 transgender men and nonbinary prisoners and only 14 transgender women (representing 4.8% of the total transgender population) were housed at

Logan.

**ANSWER:    Defendants admit that most class members in IDOC are housed in other prison facilities and not housed in Logan Correctional Center. Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

87.    Defendants place a small percentage of class members at Centralia Correctional Center, a medium security male prison that has the PRISM program. The PRISM program, however, is not designed for class members; rather, it serves people deemed vulnerable by Defendants, including cisgender prisoners.

**ANSWER:    Defendants admit there are class members housed at Centralia Correctional Center. Defendants deny the remaining allegations in this paragraph.**

88.    As of October 2023, according to IDOC's records, there was a waitlist of 30 people who wanted to be transferred to PRISM, and 20 of the 30 were cisgender male prisoners.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

89.    When class members request transfers out of dangerous male prisons, Defendants have failed to make decisions, delayed decisions, and decided transfers without considering class members' need for gender dysphoria treatment and social transition, including safety from physical and verbal abuse from male prisoners and guards.

**ANSWER:    Defendants deny the allegations in this paragraph.**

90.    For example, in October 2023, Doug Stephens, the Transfer Coordinator for IDOC since 1997, submitted a declaration (Dkt. 668) and testified at an evidentiary hearing concerning

Plaintiff's Motion to Transfer [Name Redacted] and Other Class Members out of Pinckneyville Correctional Center. *See* Dkt. 680. According to Stephens, Defendants' transfer office "did not consider whether a person has gender dysphoria in making transfer decisions." *See* Dkt. 680 at 18. About July or August 2023, the transfer office "began to look at whether an individual is transgender and 'potentially placing them in specific facilities throughout the department'." *Id*. The transfer office did "not take into consideration whether a class member will have access to a private shower at any facility, or whether staff of the appropriate gender will be available to conduct body searches." *Id*. "Likewise, the availability of group therapy for class members and whether there are pending complaints about harassment of class members" was not part of the transfer determination. *Id*.

**ANSWER:    Defendants admit that Doug Stephens's declaration is a written document that speaks for itself. Doug Stephans's testimony in the Pinckneyville evidentiary hearing speaks for itself. Defendants deny the allegations in this paragraph to the extent that they are inconsistent with the document and his testimony and further deny the allegations to the extent they imply that housing decisions for individuals diagnosed with gender dysphoria are not carefully considered.**

91.    Defendants' TAC decides whether class members may transfer to Logan or Centralia PRISM. The TAC does not apply a consistent criterion in assessing whether placing class members at Logan or Centralia PRISM to social transition would assist their gender dysphoria.

**ANSWER:    Defendants admit TAC decides whether class members may transfer to Logan Correctional Center or Centralia Correctional Center. Defendants deny the remaining allegations in this paragraph.**

92.    Since 2021, the TAC has denied the majority of requests from class members to

transfer to Logan and Centralia PRISM.

**ANSWER:    Defendants admit the allegations in this paragraph.**

93.    As of November 2022, Defendants granted only six of 58 transfer requests from class members seeking to transfer to Logan. *See* Dkt. 439 at 12.

**ANSWER:    Defendants admit the allegations in this paragraph.**

(ii)    <u>Even at Logan, Defendants isolate and segregate transgender prisoners.</u>

94.    As explained above, at Logan, Defendants have segregated and isolated Plaintiffs and class members. In doing so, Defendants limit Plaintiffs and class members' ability to social transition and live in their gender, and such isolation hurts class members' mental health and gender dysphoria.

**ANSWER:    Defendants deny the allegations in this paragraph.**

95.    When Ms. Kuykendall first got to Logan, she was initially housed in 10 Center Wing before being moved to the more restrictive D-Wing where she spent approximately 11 months. Sora did not have any disciplinary issues before being moved onto D-Wing. After D-Wing, she was transferred to live at 8 Center Wing, where she currently lives now.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

96.    On 8 Center Wing, transgender women are confined and cannot move outside of the wing. There are gates on both ends of the wing which are locked. There are also cameras in the shower area in the wing, and Ms. Kuykendall states there is no real privacy in the shower area.

**ANSWER:    Defendants admit that the doors on each end of the wing are kept locked for safety and security of the institution, except when individuals are being**

**transported in and out for writs, appointments, chow lines, yard or gym. There is a gate to the dayroom on the wing that is kept locked except when dayroom is in progress. Defendants deny the remaining allegations in this paragraph.**

97.     Starting around the end of 2024, transgender men at Logan have also been segregated onto D Wing, even when they are not classified maximum security. One class member described this placement as worse than segregation in terms of time spent outside of his cell and privileges. Class members are not allowed outside even though there is a patio on the unit, denied gym time because of short staffing, and have gone weeks without any yard time at all.

   **ANSWER:    Defendants deny allegations in this paragraph.**

   (iii)    <u>Defendants fail to provide gender affirming clothing and commissary to facilitate social transition.</u>

98.     WPATH SOC 8 recommends that transgender individuals be given access to clothing and grooming items that align with their gender identity. This part of social transition allows individuals to express their gender identity in ways that are visible to those around them, and helps them with self-affirmation of that identity, and to reduce gender dysphoria, depression, anxiety, self-harm ideation, and suicidal ideation.[19]

   **ANSWER:    Defendants admit that WPATH SOC 8 provides recommendations. Defendants deny that Defendants are constitutionally required to follow the recommendations.**

99.     Defendants' Administrative Directive provides that transgender, intersex, or gender incongruent prisoners shall have access to commissary items consistent with their gender identity

---

[19] *See supra* n.2, at Statement 11.5, S107.

from a list approved by the TAC.[20] The list of approved items shall be reviewed annually by the THAW. Despite this policy, Defendants fail to provide gender-affirming commissary items to class members consistently.

**ANSWER:    Defendants admit that this version of IDOC's Administrative Directive 04.03.104 went into effect April 1, 2021 and that the policy is a written document that speaks for itself. Defendants deny the allegations in this paragraph to the extent that they are inconsistent with the document. Defendants deny the remaining allegations in this paragraph.**

100.    Gender affirming clothing includes medical devices such as chest binders for transgender men, and gafs or compression underwear for transgender women. It also includes gender-aligned clothing, including men's or women's undergarments, which are issued to each incarcerated individual.

**ANSWER:    Defendants admit the allegations in this paragraph.**

101.    These items are a necessary part of medical treatment for gender dysphoria. Dkt. 383 at 46. Gender-affirming commissary items may aid in physical aspects of transition in addition to helping with social transition. For example, body hair is a secondary sex characteristic, and many transgender women need to remove it to decrease their gender dysphoria. *See* Dkt. 830 at 13.

**ANSWER:    Defendants admit the allegations in this paragraph.**

102.    At the 2022 bench trial, Plaintiffs' security expert testified that there was no security justification for denying gender-affirming clothing and grooming items to transgender

---

[20] *See supra* n.7.

prisoners. Dkt. 383 at 31. Prison officials have a responsibility to provide these medically necessary items to transgender prisoners, just as they have a responsibility to provide walkers, back braces, or other medical devices to incarcerated individuals with other medical conditions. *Id.* at 32.

**ANSWER:    Defendants admit that Dkt. 383 is a written court document that transcribed the bench trial that occurred in 2022 and that this court document speaks for itself. Plaintiffs' security expert's testimony in the bench trial speaks for itself. Defendants deny the allegations in this paragraph to the extent that they are inconsistent with the court document and Plaintiffs' expert's testimony**.

103.    Administrative Directive 04.03.104 states that incarcerated people are allowed to have undergarments that match their gender and that "[t]he Department shall provide such undergarments throughout the offender's incarceration."[21]

**ANSWER:    Defendants admit that this version of IDOC's Administrative Directive 04.03.104 went into effect April 1, 2021 and that the policy is a written document that speaks for itself. Defendants deny the allegations in this paragraph to the extent that they are inconsistent with the document.**

104.    Despite this policy, Defendants deny class members gender affirming clothing or make them wait extremely long times to receive those items once requested, and as recently as October 2024, some class members do not even know that they can receive free gender-affirming underwear and bras. *See* Dkt. 830 at 3.

**ANSWER:    Defendants deny the allegations in this paragraph.**

---

[21] *See supra* n.7, at p. 9.

105.    Access to commissary is often dependent on both the prison a class member is housed at, and where in that prison they are housed. At some male prisons, no gender-affirming commissary is offered at all. Other prisons provide special order sheets, which are brought to transgender prisoners in their cells, but items are often sold out, or the sheets are handed out at infrequent and unpredictable intervals. Class members housed in segregation are often completely cut off from the commissary, even when their placement in segregation is not a punishment. Class members who are on crisis watch are denied access to gender-affirming commissary items, which exacerbates their gender dysphoria and overall mental health.

**ANSWER:    Defendants deny the allegations in this paragraph.**

106.    For example, in November 2023, Plaintiff Sasha Reed was transferred to Pinckneyville Correctional Center. When she arrived, Ms. Reed asked for bras and panties, but Defendants did not provide them to her until about February 2024, after she wrote a grievance.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph**.

107.    In 2024, transgender women have reported waiting a year or more after a diagnosis of gender dysphoria to receive a bra, if they receive one at all. One class member had been denied a bra for so long, she assumed she had to buy one herself but could not afford it.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph**.

108.    It is also common for transgender women class members to have bras, gafs, and underwear thrown away when guards search their cells. Requests for replacements are ignored, and grievances filed about the ignored requests are denied or similarly ignored.

**ANSWER:    Defendants deny the allegations in this paragraph.**

109.    Transgender men and nonbinary class members at Logan report similar issues with chest binders. Wait times to receive these medically necessary items are excessively long. Transgender men and nonbinary class members have also reported receiving men's compression sports shirts, which do not provide appropriate compression of breasts to address gender dysphoria.

**ANSWER:    Defendants deny the allegations in this paragraph.**

110.    At Menard Correctional Center, those in general population can order some gender affirming items through the regular commissary line. However, class members feel very unsafe ordering these items where male prisoners can see and hear what they are ordering.

**ANSWER:    Defendants deny the allegations in this paragraph.**

111.    Gender-affirming items often sell out because cisgender prisoners buy them before transgender prisoners have an opportunity. For example, at Logan, boxers sell out because cisgender women like to wear them as well. At men's prisons, makeup sells out because cisgender men buy it to use in art projects.

**ANSWER:    Defendants deny the allegations in this paragraph.**

112.    When class members can purchase gender affirming items, these items are often thrown away by correctional officers during cell shakedowns and sweeps. These items are not contraband, and no reason has been given as to why these items would be confiscated or trashed.

**ANSWER:    Defendants deny the allegations in this paragraph.**

113.    As recently as March of 2025, class members at Pinckneyville reported being sent back to their cells when they wore makeup to eat. They had to file a report to Internal Affairs

before they were allowed to walk around wearing the makeup.

**ANSWER:  Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

> (iv)  <u>Defendants' failure to prevent misgendering and verbal and physical abuse by guards and staff, and prisoners.</u>

114.    Using a class member's chosen name and pronouns is an important part of social transition necessary to treat gender dysphoria. WPATH SOC 8 recommends that prison staff address transgender and gender diverse prisoners by their chosen names and pronouns at "all times."

**ANSWER:  Defendants admit that WPATH SOC 8 provides recommendations. Defendants deny that Defendants are constitutionally required to follow the recommendations.**

115.    Defendants, however, routinely fail to require officers, staff, and even mental health providers and doctors to use the preferred names and pronouns of class members.[22]

**ANSWER:  Defendants deny the allegations in this paragraph.**

116.    Moreover, as described above, class members face verbal and physical abuse by guards, staff and other prisoners because of their gender identity. Such abuse can interfere with class members' willingness to be open with their gender identity, social transition, and cause class members to not seek or stop medically necessary care for gender dysphoria.

**ANSWER:  Defendants deny the allegations in this paragraph.**

117.    As Co-Monitor julie graham stated in October 2024, "Transgender people report

---

[22] *See supra* n.2, at S101.

staff misconduct ranging from continuous disrespect and name-calling to assaults or permitting other incarcerated individuals to harass or assault them. There is a culture at IDOC that permits slurs and degradations." *See* Dkt. 830 at 2.

**ANSWER:    Defendants admit that julie graham's report from October 2024 is a written document that speaks for itself.  Defendants admit that Dkt. 830 is a court document and that this court document speaks for itself. Defendants deny the allegations in this paragraph to the extent that they are inconsistent with these documents.**

118.    From 2023 through December 2023, at Pinckneyville, the male guards routinely misgendered Plaintiff Sasha Reed and made jokes about her breasts. Even at Logan, guards and staff use the wrong pronouns and fail to use preferred names for class members. Misgendering undermines class members' social transition.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

119.    In December 2023, Plaintiffs filed motions to transfer class members out of Menard, a men's prison, submitting seventeen declarations from class members which described how both male guards and prisoners misgendered and subjected class members to verbal, sexual and physical abuse. Dkts. 705, 716-17, 739-40, 762-63, 779-80, 811, 800, 823, 843.

**ANSWER:    Defendants admit Plaintiffs filed motions to transfer class members out of Menard and that Plaintiffs submitted declarations from class members but deny the remaining allegations of this paragraph.**

120.    Despite being on notice of male guards and prisoners' misgendering and abuse of class members at Menard, Defendants did little or nothing to address it.

48

**ANSWER:    Defendants deny the allegations in this paragraph.**

121.    In February 2025, Plaintiffs filed a motion for preliminary injunction to prohibit Defendants from placing class members in Menard because both male guards and prisoners' misgendering and abuse continue against class members. Dkt. 873.

**ANSWER:    Defendants admit that Plaintiffs filed a motion for preliminary injunction to prohibit Defendants from placing class members in Menard. Defendants deny the remaining allegations in this paragraph.**

(v)    Defendants fail to provide class members with private showers.

122.    The WPATH SOC 8 recommends that transgender individuals who are incarcerated be given access to a private shower to help them feel safe from harassment and threats of physical violence.[23]

**ANSWER:    Defendants admit that WPATH SOC 8 provides recommendations. Defendants deny that Defendants are constitutionally required to follow the recommendations.**

123.    Administrative Directive 04.03.104, effective April 1, 2021, requires that transgender prisoners be allowed to shower privately, and with the same frequency as cisgender prisoners.[24]

**ANSWER:    Defendants admit that this version of IDOC's Administrative Directive 04.03.104 went into effect April 1, 2021 and that the policy is a written document that speaks**

---

[23] *See supra* n.2, at 11.9.

[24] *See supra* n.7, at p. 9.

for itself. Defendants deny the allegations in this paragraph to the extent that they are inconsistent with the document.

124.    On August 9, 2021, this Court ordered as part of its Preliminary Injunction, that class members must be allowed to access private showers. Dkt. 332 at 3.

**ANSWER:    Defendants admit Dkt. 332 is a court document and that the court document speaks for itself. Defendants deny the allegations in this paragraph to the extent that they are inconsistent with the court document.**

125.    Despite this order, Sora Kuykendall had no access to a private shower from the time the Court issued its Preliminary Injunction on August 9, 2021, through the time of Ms. Kuykendall's transfer out of Menard and into Logan in late October 2021. Dkt. 383 at 81. In its February 2022 order continuation, the Court took notice of Defendants' failure to follow its orders, as well as the continuing lack of access to showers for class members still at Menard. *Id*. The Court continued its order that private showers be made available to class members, and further ordered that Defendants inform the Court within 14 days of the steps taken to comply with the order at each prison housing class members. *Id*.

**ANSWER:    Defendants admit Dkt. 383 is a court document and that the court document speaks for itself. Defendants deny the allegations in this paragraph to the extent that they are inconsistent with the court document.**

126.    In 2023, class members described Defendants' systematic failure to provide private showers to class members in survey responses filed with the Court. *See* Dkts. 615-616, 697-698.

**ANSWER:     Defendants admit Dkts. 615, 616, 697, and 698 are court documents and that the court documents speak for themselves. Defendants deny the allegations in this paragraph to the extent that they are inconsistent with the court documents.**

127.    In October of 2023, class members at Pinckneyville gave extensive testimony over multiple days about being denied access to private showers, and being mocked, called slurs, and watched in the shower because they are transgender. Following this hearing, the Court found that Defendants' failure to provide private showers was "ongoing", that promises to fix the shower issues had gone unfulfilled, and that "attempts to address identified problems had failed." Dkt. 680 at 27.

**ANSWER:     Defendants admit Dkt. 680 is a court document and that the court document speaks for itself. Defendants deny the allegations in this paragraph to the extent that they are inconsistent with the court document.**

128.    The curtains hung across the showers at Pinckneyville were so small that people walking by could see easily, and other prisoners were often allowed into the area of the showers while class members were using them. Additionally, guards could see into the showers from watchtowers higher up on the wing. *Id*. Guards often called class members to the shower by calling out "tranny shower" and would call class members similar slurs as they went to and from their shower. *Id*. at 27-28. The Court found that the issues were so extreme, and attempts to address them so inadequate, that on November 16, 2023, it ordered that each of the class members who had submitted declarations supporting the motion be considered for transfer out of Pinckneyville.

**ANSWER:     Defendants admit Dkt. 680 is a court document and that the court document speaks for itself. Defendants deny the allegations in this paragraph to the extent that they are inconsistent with the court document.**

129.    At almost the same time as the Court's order was issued, Sasha Reed was transferred *into* Pinckneyville. Ms. Reed encountered the same problems that the other class members had: the showers at Pinckneyville did not provide Ms. Reed with privacy, and other male prisoners could see her breasts, which was embarrassing and dangerous for her. It took more than seven months and repeated transfer requests from Ms. Reed and other class members still at Pinckneyville before she and several others were transferred to Centralia.

**ANSWER:    Defendants admit that Sasha Reed was transferred to Centralia from Pinckneyville. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.**

130.    The same issues regarding showers that have been addressed over and over in this litigation continue in 2025. Class members across facilities report either having no access to a private shower or having issues with that access because of inadequate coverings on the shower.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

131.    Class members who are forced to share showers with male prisoners fear for their lives, particularly if they are on hormones, or have feminine bodies with breasts and hips. Many resort to taking "bird baths"—effectively giving themselves a sponge bath in their cells—to avoid the risk of physical or sexual assault by male prisoners.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

132.    Even single showers often are inadequately covered, with curtains that either do not go all the way to the top of the shower stall, or that have netting in them that is see-through. Some

stalls are covered with metal plates with holes through which class members can be seen.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.**

133.    When class members are placed in segregation or on crisis watch, the showers are not private, which causes class members to feel humiliated, unsafe, and vulnerable.

**ANSWER:    Defendants deny the allegations in this paragraph.**

(vi)    Defendants fail to prohibit cross-gender searches of class members.

158.    WPATH SOC 8 recommends that "in carceral environments, pat downs, strip searches, and body cavity searches should be conducted by staff members of the same sex" and that "incidental viewing of searches by other employees should be avoided."[25]

**ANSWER:    Defendants admit that WPATH SOC 8 provides recommendations. Defendants deny that Defendants are constitutionally required to follow the recommendations.**

159.    Orders to cease cross-gender searches followed a similar trajectory throughout this litigation as orders to provide private showers. The Court ordered Defendants to develop a policy to cease cross-gender searches in its 2021 Preliminary Injunction, and continued that order in 2022 and 2023, finding that such searches are "traumatic and humiliating," and that they continued to be the norm for many class members. Dkt. 680 at 28.

---

[25] *See supra* n.2, at 11.9.

**ANSWER:    Defendants admit Dkt. 680 is a court document and that the court document speaks for itself. Defendants deny the allegations in this paragraph to the extent that they are inconsistent with the court document.**

160.    In 2021, Defendants developed a system by which transgender prisoners could be identified by their correct gender on their ID, and a policy which required "unclothed visual searches" be conducted "by the gender of the staff designated on their offender identification card."[26] Thus, a transgender woman could have female on her ID, indicating a female officer should search her.

**ANSWER:    Defendants admit the allegations in this paragraph.**

161.    This part of Defendants' Administrative Directive has never been followed consistently. In 2023, class members described Defendants' systematic failure to allow class members to be searched by officers of their gender in survey responses filed with the Court. *See* Dkts. 615-616, 697-698. This problem continues today.

**ANSWER:    Defendants admit Dkts. 615, 616, 697, and 698 are court documents and that the court documents speak for themselves. Defendants deny the allegations in this paragraph to the extent that they are inconsistent with the court documents. Defendants deny the remaining allegations in this paragraph.**

162.    In some of the men's prisons, male guards conduct searches of class members, even if class members show their ID or request female guards.

**ANSWER:    Defendants deny the allegations in this paragraph.**

---

[26] *See supra* n.7, at p. 8.

163.    At Menard, male guards frequently search transgender women. Male guards threaten class members with mace if class members do not immediately comply with orders to undress. If class members insist that they are supposed to be searched by a female officer, they are ignored. Some class members have been groped and sexually assaulted during these searches.

**ANSWER:    Defendants deny the allegations in this paragraph.**

164.    In other prisons, class members who ask for female guards to search them must wait up to an hour, affecting their ability to attend medical appointments, go to their jobs, take legal calls, go to court, or visit family members. As a result, some class members reluctantly agree to searches by men so that they do not have to wait and miss critical appointments.

**ANSWER:    Defendants deny the allegations in this paragraph.**

## AFFIRMATIVE DEFENSES

Defendants set forth the following affirmative defenses to place Plaintiffs on notice of possible defenses and other matters that may preclude recovery in whole or in part. Defendants reserve the right to re-evaluate, restate, or remove any defenses and/or assert any additional defenses. By setting forth such matters herein, Defendants do not assume the burden of proving any matter upon which Plaintiffs bear the burden of proof under the applicable law.

### FIRST AFFIRMATIVE DEFENSE

The Supplemental Complaint fails to state a claim upon which relief can get granted against Defendants.

### SECOND AFFIRMATIVE DEFENSE

Civil Rights claims raised in Illinois state or federal courts are subject to a two year statute of limitations. Any claims or Defendants identified in this action more than two years after

Plaintiffs and their putative class's cause of action accrued are barred by the applicable statute of limitations.

### THIRD AFFIRMATIVE DEFENSE

Under Section 1997e(e) of the Prisoner Litigation Reform Act, Plaintiffs and their putative class must exhaust their administrative remedies before filing a Section 1983 lawsuit. According to the Illinois Department of Corrections Administrative Directive, individuals in custody must follow the grievance procedure to exhaust administrative remedies. Plaintiffs and their putative class have not exhausted their administrative remedies as required by the Prison Litigation Reform Act.

### FOURTH AFFIRMATIVE DEFENSE

Under Section 1997e(e) of the Prison Litigation Reform Act:

No Federal civil action may be brought by a prisoner confined in a jail or prison or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of title 18, United States Code).

42 U.S.C. § 1997e(e). Plaintiffs and their putative class cannot show that they have suffered any physical injury relating to the allegations in their supplemental complaint. Thus, under Section 1997e(e) of the Prison Litigation Reform Act, Plaintiffs and their putative class cannot seek damages solely for alleged mental distress.

### FIFTH AFFIRMATIVE DEFENSE

To the extent Plaintiffs and their putative class are suing Defendants for monetary damages in their official capacity such claims for relief are barred by the Eleventh Amendment.

### SIXTH AFFIRMATIVE DEFENSE

To the extent Plaintiffs and their putative class are suing Defendants for injunctive relief that is not intended to address ongoing constitutional violations, the Eleventh Amendment and sovereign immunity bar such claims.

## SEVENTH AFFIRMATIVE DEFENSE

To the extent Plaintiffs and their putative class are suing Defendants for injunctive relief that is not intended to address ongoing constitutional violations at Illinois Department of Corrections facilities in which Plaintiffs and their putative class currently reside, under Article III of the Constitution, Plaintiffs' and their putative class's prayer for injunctive relief is moot.

## EIGHT AFFIRMATIVE DEFENSE

The injunctive relief that Plaintiffs and their putative class are seeking not narrowly drawn and is thus barred by the Prison Litigation Reform Act.

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a)(1)(A).

## NINTH AFFIRMATIVE DEFENSE

One or more of Plaintiffs' claims involve the claims and issues in *Lippert et al. v. Ghosh et al.*, N.D. Ill. Case No. 10-cv-4603, and *Rasho et al. v. Walker et al.*, C.D. Ill. Case No. 07-cv-01298. To the extent that Plaintiffs are members of the classes that have been certified in Lippert and Rasho, Plaintiffs' claims are duplicative and potentially barred by the doctrines of *res judicata* and collateral estoppel.

## TENTH AFFIRMATIVE DEFENSE

Defendants intend to rely upon additional defenses that may become available or appear during the proceedings in this case and hereby reserve their rights to amend their answer to assert any such defense.

## JURY DEMAND

Defendants respectfully requests a trial by jury.

WHEREFORE, based on the foregoing, Defendants, Hughes, Hinton and Bowman, deny that Plaintiffs are entitled to any relief, including but not limited to injunctive relief, damages, costs, or attorneys' fees. Defendants pray that this Honorable Court grant judgment in their favor and against Plaintiffs on all aspects of Plaintiffs' Supplemental Complaint and further request that this Honorable Court grant judgment of the Defendants' fees, costs and such other relief that this Court deems just and appropriate.

Date: June 16, 2025                    Respectfully submitted,

DEFENDANTS LATOYA HUGHES, MELVIN HINTON, and STEVEN BOWMAN

 /s/ James M. Brodzik
One of the Attorneys for Defendants

James M. Brodzik, #6311003
Hinshaw & Culbertson LLP
701 Market Street, Suite 260
St. Louis, MO 63101
Telephone: 618-310-2325
jbrodzik@hinshawlaw.com
DEFENDANTS LATOYA HUGHES,
MELVIN HINTON, and STEVEN
BOWMAN

**<u>CERTIFICATE OF SERVICE</u>**

       I certify that on June 16, 2025, I served the foregoing document upon all counsel of record by filing same with the Clerk of the Southern District of Illinois using the Court's electronic filing system.

                                                */s/ James M. Brodzik*