# Exhibit 1

Page 1

1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF ILLINOIS

2

3

4    JANIAH MONROE, MARILYN MELENDEZ, )
     LYDIA HELENA VISION, SORA          )
5    KUYKENDALL, and SASHA REED,        )
     individually and on behalf of a    )
6    class of similarly situated        )
     individuals,                       )
7                                        )
              Plaintiffs,               )
8                                        )
         vs.                            ) No. 3:18-cv-00156-NJR
9                                        )
     LATOYA HUGHES, MELVIN HINTON,      )
10   and STEVEN BOWMAN,                 )
                                         )
11            Defendants.               )

12

13

14

15            Videotaped deposition of LIEUTENANT CURTIS

16   DALLAS, taken remotely before NADINE J. WATTS, CSR, RPR,

17   and Notary Public, pursuant to the Federal Rules of

18   Civil Procedure for the United States District Courts

19   pertaining to the taking of depositions, commencing at

20   10:02 a.m. Central Daylight Time on the 9th day of May,

21   A.D., 2025.

22

23

24

Page 2

```
 1          There were present at the taking of this
 2   deposition the following counsel:
 3          (Appeared via videoconference)
            ARNOLD & PORTER KAYE SCHOLER, LLP by
 4          MS. SARAH E. PRATHER
            250 West 55th Street
 5          New York, New York  10019
            (212) 836-8000
 6          sarah.prather@arnoldporter.com
 7             on behalf of the Plaintiffs;
 8          (Appeared via videoconference)
            HINSHAW & CULBERTSON, LLP by
 9          MR. JAMES M. BRODZIK
            521 Main Street
10          Suite 300
            Belleville, Illinois  62220
11          (618) 277-2400
            jbrodzik@hinshawlaw.com
12
               -and-
13
            (Appeared via videoconference)
14          HINSHAW & CULBERTSON, LLP by
            MR. CALVIN EDWARDS, JR.
15          151 North Franklin Street
            Suite 2500
16          Chicago, Illinois  60606
            (312) 704-3000
17          cedwards@hinshawlaw.com
18             on behalf of the Defendants.
19
20
21   ALSO PRESENT VIA VIDEOCONFERENCE:
22          Ms. Jamie Pritzker, Veritext videographer
23          Mr. Dewey Nelson, Veritext concierge
24
```

Page 3

1      VIDEOTAPED DEPOSITION OF LIEUTENANT CURTIS DALLAS

2                      TAKEN MAY 9, 2025

3

4    EXAMINATION BY                                  PAGE

5    Ms. Sarah E. Prather                              5

6                        EXHIBITS

7                  (no exhibits marked)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 4

1      THE VIDEOGRAPHER:  Good morning.  We are going on

2    the record at 10:02 a.m. on May 9th, 2025.

3           Please note that this deposition is being

4    conducted virtually.  Quality of the recording depends

5    on the quality of camera and Internet connection of

6    participants.  What is seen from the witness and heard

7    on screen is what will be recorded.

8           Audio and video recording will continue to take

9    place unless all parties agree to go off the record.

10           This is media unit 1 of the video-recorded

11    deposition of Lieutenant Curtis Dallas taken by counsel

12    for plaintiff in the matter of Janiah Monroe and others

13    individually and on behalf of a class of similarly

14    situated individuals versus Latoya Hughes, Melvin

15    Hinton, and Steven Bowman, filed in the United States

16    District Court, for the Southern District of Illinois,

17    Case No. 18-cv-00156-NJR.

18           My name is Jamie Pritzker, representing

19    Veritext, and I am the videographer.  The court reporter

20    is Nadine Watts from the firm Veritext.

21           I am not authorized to administer an oath, I am

22    not related to any party in this action, nor am I

23    financially interested in the outcome.

24           If there are any objections to the proceeding,

Page 5

1    please state them at the time of your appearance.

2            Counsel and all present remotely will now state

3    their appearances and affiliations for the record,

4    beginning with our noticing attorney.

5      MS. PRATHER:  Good morning.  This is Sarah Prather

6    on behalf of Arnold & Porter -- from Arnold & Porter on

7    behalf of all plaintiffs.

8      MR. BRODZIK:  James Brodzik with Hinshaw &

9    Culbertson on behalf of the defendants, and I'm

10   representing Mr. Dallas for the purposes of this

11   deposition.

12     MR. EDWARDS:  Calvin Edwards, also with Hinshaw &

13   Culbertson, on behalf of all defendants.

14     THE VIDEOGRAPHER:  Thank you.  Will the court

15   reporter please swear in the witness and then, Counsel,

16   you may proceed.

17                    LIEUTENANT CURTIS DALLAS,

18   called as a witness herein, having been first duly

19   sworn, was examined upon oral interrogatories and

20   testified as follows:

21                    EXAMINATION

22                    by Ms. Prather:

23     MS. PRATHER:  Q   Good morning, Lieutenant Curtis.

24     A   Good morning.

Page 6

1      Q   Would you please state -- would you please state

2   and spell your first name -- full name for the record.

3      A   Curtis Dallas, C-U-R-T-I-S, last name

4   D-A-L-L-A-S.

5      Q   Have you been deposed before?

6      A   No, this is my first time.

7      Q   And you understand that your testimony is being

8   taken under oath today?

9      A   Yes.

10      Q   When I ask a question, we'll need you to give a

11   verbal response and not a headshake or a nod.  Do you

12   understand?

13      A   Yes.

14      Q   And if you don't understand any of my questions,

15   please let me know.

16      A   Yes.

17      Q   If I ask you a question, I can assume -- and you

18   answer, I can assume that you understand the question

19   that I was asking?  Sorry.

20      A   Yes.

21      Q   Is there any reason you cannot answer my

22   questions fully and truthfully today?

23      A   No.

24      Q   Are you represented by counsel today?

Page 7

1      A    Yes.

2      Q    I'd like to confirm, are you currently employed

3  with IDOC at Menard correctional facility?

4      A    Yes.

5      Q    How long have you been employed at IDOC?

6      A    Eight years and three months.

7      Q    What's your current position?

8      A    Lieutenant.

9      Q    How long have you held that position?

10     A    Since June 1st of '22.  So almost three years

11  now.

12     Q    What are your responsibilities?

13     A    I'm an Internal Affairs lieutenant right now.

14     Q    And how long have you had that position?

15     A    August 12th of 2024.

16     Q    What are your responsibilities as Internal

17  Affairs?

18     A    I conduct internal investigations for the -- for

19  Menard Correctional Center.

20     Q    And before you had the Internal Affairs

21  position, what position did you hold?

22     A    I was still a lieutenant, and I was on the 3:00

23  to 11:00 shift, and I was the West House lieutenant.

24     Q    What's a 3:00 to 11:00 shift?

Page 8

1    A    Second shift.

2    Q    And West House is an area of Menard?

3    A    Correct.

4    Q    And how long did you hold that position?

5    A    Ballparking, it would probably be anywhere

6    between eight months and a year that I actually was

7    assigned to that position.

8    Q    What about before then?  Any other positions?  I

9    just want to capture the full eight years.

10    A    I was a sergeant 2 on day shift.  I was still a

11    sergeant on midnights, which I had general relief

12    assignments or -- I was in the general relief pool.  So

13    I was pretty much everywhere.

14         And I was an officer prior to that.  And it

15    was -- I had some general relief responsibilities,

16    whereas I was put wherever they needed me.  And I was

17    assigned to North 2 restrictive housing showers.  And

18    before that I was assigned a relief duty in the East

19    House.

20    Q    And I guess what about before you joined IDOC,

21    what did you do?

22    A    I worked security at a casino.

23    Q    How long did you -- how long did you do that?

24    A    A little over five years.

Page 9

1    Q   Have you had any training in your current role?

2    A   Yes, a little bit.  It was more or less

3 on-the-job training with senior staff and an internal --

4 well, and ISI who helped me through some of the rough

5 patches.  And I am scheduled for training regularly.

6    Q   What is ISI?

7    A   Internal -- internal security investigator.

8    Q   And could you just explain?  So they do training

9 for you?

10   A   They train me in my role.

11   Q   Are they an employee of IDOC or Menard?

12   A   Yes.

13   Q   What was covered in the training, for the senior

14 staff and ISI training?

15   A   That's very broad.  Really -- That's a really

16 broad topic.  Pretty much the general idea of how to

17 start and conduct an investigation.  Interviewing.

18 Let's see.  PREA is a -- has been -- always has been a

19 big topic since I've joined IDOC.

20        Let me see what else.  Pretty much

21 professionalism, report writing, reporting structure.

22 That's all that's coming to mind right now.

23   Q   About how long did the training last, just

24 approximately?

Page 10

1        A    The initial training is 40 hours, and then you

2    have continued follow-up training afterwards.  Yeah,

3    that's it.

4        Q    Did anybody else participate in the training?

5        A    Yes, there's a group training.

6        Q    Who else participated?

7        A    I cannot answer that one.  I couldn't even tell

8    you.  It was -- There's a lot.

9        Q    Were the other employees from IDOC or other

10   employees from Menard?

11       A    IDOC.

12       Q    And how about training in your prior roles, have

13   you had any training?

14       A    Yes.

15       Q    Could you briefly describe that training?

16       A    My prior training, we have an annual cycle

17   training.  I was a TAC officer.  There's training for

18   that.  It was a 40-hour training.  There is an academy

19   that we go to to learn proper cuffing procedure, report

20   writing, chain of command structure.

21       Q    And when you said TAC officer, what do you mean?

22       A    I was part of the tactical unit prior to my role

23   that I'm currently in.

24       Q    And that would be before August of 2024?

Page 11

1      A   Yes.

2      Q   Do you currently participate in any committees

3  at Menard?

4      A   No.

5      Q   Did you previously participate in any committees

6  at Menard?

7      A   Yes.

8      Q   Which ones?

9      A   The Adjustment Committee.

10     Q   What's the Adjustment Committee?

11     A   The Adjustment Committee is the -- I guess you

12  would call it court for Menard.  I was a minority seat

13  holder.

14     Q   What does that mean?

15     A   Just to have a diverse group of individuals on a

16  panel to I guess have a court proceeding, so to speak,

17  for charges brought up against other individuals.

18     Q   How long did you sit on that committee?

19     A   I can't tell you a hundred percent truthfully.

20  I know it was around the time that I made sergeant.

21     Q   Ballpark, a couple years, longer?

22     A   Let's see, I made sergeant in August of 2018.

23  So roughly I would say late 2018 up until my appointment

24  in Internal Affairs.  So roughly about four years, give

Page 12

1    or take.

2        Q    And you said that it was like a court

3    proceeding.  Were there meetings as well?

4        A    A court proceeding, yes.

5        Q    Could you describe what -- When the committee

6    convenes, what happens?

7        A    The committee would convene.  We would -- Well,

8    someone would read tickets off to the individual in

9    custody.  They would confirm if they're guilty or not

10   guilty.  There will be background investigations done,

11   whether or not if there's any evidence, some evidence,

12   or whatever the case may be, and the Adjustment

13   Committee will make a determination afterwards.

14       Q    Was the evidence actually considered at the

15   hearing or was that done beforehand?

16       A    Before and after.

17       Q    And so what was your role at the actual

18   hearings?

19       A    At the hearings I would listen to what the

20   individual's testimony was.  We would read the tickets.

21   If there was any supporting evidence or testimony, we

22   would go over that.  After that's done, a determination

23   would be made.

24       Q    How long -- I guess for approximately how long

Page 13

1    did these hearings last?

2        A    Hearings is just them initially coming in to say

3    if they're guilty or not guilty.  They would provide a

4    statement of witnesses.  So it could be -- Sometimes we

5    hear 50 or 60 tickets in a given day.  So I can't really

6    give you an exact time of how long it would take.

7        Q    What -- Were there any records generated by the

8    committee?

9        A    Can you elaborate on that?

10       Q    Sure.  Was there record keeping of what the

11    committee considered at the hearings?

12       A    Yes.

13       Q    What type of records?

14       A    I really couldn't tell you.  I just know they

15    kept records of anything -- any and all things that were

16    obtained for the hearing.

17       Q    Did you ever sign any documents related to the

18    hearing proceedings?

19       A    Yes.

20       Q    And what were those?

21       A    Whether they were guilty, not guilty, charges

22    changed, whether if the charge was substantiated in the

23    ticket or not.  So they would make changes to it.  And I

24    would basically sign to agree to it.

Page 14

1    Q   And were you signing at the end of the
2    proceeding or later on?
3    A   Later on.  It wasn't at the end of the
4    proceeding.  A lot of times the proceeding was too soon
5    to sign for it because we hadn't had a chance to review
6    anything.
7    Q   And just to make sure I'm understanding,
8    would -- when you're considering these tickets, they
9    would be considered at multiple different hearings?
10   Like a particular ticket could be considered multiple
11   times?  Or if you could just explain the process a
12   little bit more.
13   A   If I were to -- Let's say an officer would write
14   a ticket today.  Usually within a week we'd make
15   arrangements to hear the ticket.  Prior to, if there's
16   any video or witnesses on the ticket, we'd talk to them,
17   view a video.  After that we'd have the hearing.  They
18   would plead guilty or not guilty.  And we'd go from
19   there.
20   Q   Were you involved -- Oh, sorry.  Go ahead.
21   A   No, go ahead.  I'm sorry.
22   Q   Were you actually taking the witness statements
23   or how did you review the witness testimony?
24   A   We had someone either writing down the witness

Page 15

1    testimony or some -- I'd say about 50 percent of the

2    time they would have a handwritten statement.

3        Q    And you also mentioned video footage?

4        A    Yes.

5        Q    Who obtained the video footage?

6        A    Internal Affairs.

7        Q    I guess what's the process for collecting the

8    video footage and then watching it as part of these

9    hearings?

10       A    They would -- they would -- If they -- If

11   something of note would happen, if there is cameras in

12   the vicinity, they would note the time, they would

13   record the footage, back it up, and they would store it

14   for a hearing in particular.

15       Q    Just before we continue, I think there's some

16   background noise.

17       A    Sorry.  I thought that this was a more sound

18   place, but we just had an emergency tone go off.

19       Q    Understood.  Is there any way to close your door

20   or --

21       A    Oh, the door is closed.

22       Q    Okay.  Understood, understood.  We can continue,

23   unless -- I don't know if it's being captured on the

24   video or the -- if it's interfering with the court

Page 16

1    reporter.

2         Okay.  You had mentioned that if the video

3    captured something of significance or of note.  What do

4    you mean by that?

5         A    Let's say if there was a staff assault.  We

6    would record -- we would keep that.  Or if they -- the

7    individual in custody stated that he or she didn't do

8    anything, then the video would show that he or she

9    didn't do anything, and we would use that to confirm

10    their guilt or non-guilt.

11         Q    Is there a policy that spells out the situations

12    that share the video being identified, whether it

13    exists, and then, you know, saving it and backing it up?

14         MR. BRODZIK:  Object to form.  I don't understand

15    what that question is.

16         MS. PRATHER:  Q    Is there a policy that specifies

17    when the video that's related to these incidents that

18    are being investigated and brought up at this hearing,

19    is there a policy as to when they're actually reviewed

20    as part of this process?

21         A    Not to my knowledge.

22         Q    Were you making the decisions as to whether the

23    video footage was being pulled?

24         A    In my current role, I could.  If there's

Page 17

1  something to note, we make sure that we back it up,

2  especially if someone is making allegations that

3  something did or did not happen.  That way it could be

4  kept for future reference.

5      Q   I'd like to switch gears a little bit.

6          Have you spoken with any of the named

7  defendants in this case?

8      A   Can I see the list?

9      Q   Sure.  Steve Hinton?

10     A   Steve Hinton?

11     Q   H-I-N-T-O-N.

12     A   What's his title?

13     Q   He's a defendant in this case.

14     A   No, not particularly.  I've seen his name come

15  across some things, but I haven't really spoken to him.

16     Q   What about Melvin Meeks?

17     A   It doesn't ring a bell, no.

18     Q   Rob Jeffreys?

19     A   No, it doesn't ring a bell.  Rob Jeffreys --

20  Unless this Rob Jeffreys is -- you're explaining --

21  Well, just name, was the former Director of IDOC.

22     Q   Did you have any conversations with him about

23  this case?

24     A   No.

Page 18

1     Q   Have you spoken with any other IDOC employees

2   about the litigation?

3     A   No.

4     Q   Have you spoken with Dr. William Puga?

5     A   I don't even know who that is.  No, I have not.

6     Q   Have you spoken with Shane Reister?

7     A   No.

8     Q   Any conversations with Dr. LaMenta Conway?

9     A   No.

10     Q   Do you recall seeing a deposition notice for

11   today?

12     A   Yes.

13     Q   When did you see that?

14     A   I can't remember.  It's in my e-mail.

15     Q   What, if anything, did you do to prepare for

16   today's deposition?

17     A   Not much really.

18     Q   Did you speak with counsel?

19     A   Yes, I did speak with counsel.  That's about it.

20     Q   When?

21     A   The -- Was that -- I think it was yesterday.

22   No, it wasn't yesterday.  This morning.

23     Q   Just one conversation?

24     A   Two.  Yester -- This morning and earlier this

Page 19

1   week.

2        Q    For how long?

3        A    Maybe an hour.

4        Q    Total or for each time you spoke with them?

5        A    The first time was approximately -- was a little

6   over an hour.  The second time was probably about 20 or

7   30 minutes.

8        Q    Did you review any documents?

9        A    No.

10       Q    What's your understanding of this lawsuit?

11       A    It's a class action lawsuit brought to --

12   brought upon the Illinois Department of Corrections by a

13   transgender -- by transgender -- the transgender

14   community.

15       Q    What's your basis of that understanding?

16       A    That they are improperly placed.

17       Q    Could you elaborate?

18       A    Their needs are not being met.

19       Q    And in that context you learned about the

20   lawsuit?

21       A    Yes.

22       Q    From who?

23       A    My current counsel.

24       Q    When?  When did you learn about it?

Page 20

```
 1      A    During our first deposition, pre -- well, our
 2   first talk, so to speak.
 3      Q    What do you mean talk?
 4      A    To prepare me for the deposition.
 5      Q    And just to confirm, you have not been deposed
 6   before?
 7      A    Correct.
 8      Q    When were you contacted about participating in
 9   the lawsuit as a witness?
10      A    I cannot give you an exact date, but I have
11   e-mails that I was going to be deposed.
12      Q    This week, last week, a month ago?
13      A    I'd have to check my e-mails to actually tell
14   you the exact time, but I get a lot of e-mails from
15   legal about certain things and I try to answer them as
16   soon as possible.
17      Q    Do you have any rough sense of when exactly you
18   were contacted about being a witness in this lawsuit?
19      A    I would say roughly maybe a couple weeks.
20      Q    Who contacted you?
21      A    I got an e-mail from our legal department.
22      Q    And what's your understanding of why you were
23   chosen to be a witness?
24      A    I couldn't tell you, other than just being here.
```

Page 21

1        Q    What do you mean just being here?

2        A    I'm employed with Illinois Department of

3   Corrections and I am -- I've been around for quite some

4   time working with the general population and restrictive

5   housing population.

6        Q    Have you attended any of the previous legal

7   proceedings in this lawsuit?

8        A    No.

9        Q    Have you reviewed any transcripts from this

10  lawsuit?

11       A    No.

12       Q    Have you reviewed any orders entered by any

13  court in this case?

14       A    No.

15       Q    Are you aware that a court has entered

16  preliminary injunction orders in this case?

17       A    I can't confidently say yes or no.

18       Q    Can you elaborate?

19       A    I can't say if there have been preliminary

20  injunctions or not.  I can't remember.

21       Q    Do you know what a preliminary injunctive order

22  is?

23       A    Yeah, a little bit.  It basically is saying that

24  we have to provide information, evidence, about a