IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

JANIAH MONROE, et al.,            )
                                  )
            Plaintiffs,           )
                                  )
v.                                )   No. 3:18-cv-00156-NJR
                                  )   East St. Louis, Illinois
STEVEN BOWMAN, et al.,            )
                                  )
            Defendants.           )

TRANSCRIPT OF PROCEEDINGS
**EVIDENTIARY HEARING**
**DAY #1**
BEFORE THE HONORABLE NANCY J. ROSENSTENGEL
UNITED STATES CHIEF DISTRICT JUDGE

MAY 27, 2025

Stephanie Rennegarbe, RDR, CRR, CBC
IL CSR #084-003232
750 Missouri Avenue
East St. Louis, IL  62201
618-482-9226
Stephanie_Rennegarbe@ilsd.uscourts.gov

*Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription*

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFFS:   Michelle T. Garcia, Esq.
                           Mason Strand, Esq.
 3                         Alexis Picard, Esq.
                           Roger Baldwin Foundation of ACLU, Inc.
 4                         ACLU of Illinois
                           150 N. Michigan Avenue
 5                         Suite 600
                           Chicago, IL  60601
 6                         apicard@aclu-il.org
                           mstrand@aclu-il.org
 7                         mgarcia@aclu-il.org

 8                         Anne J. Hudson, Esq.
                           Kirkland & Ellis, LLP.
 9                         300 N. LaSalle Street
                           Chicago, IL  60654
10                         anne.hudson@kirkland.com

11                         Thomas J. Leahy, Esq.
                           Sarah Legault, Esq.
12                         Kirkland & Ellis, LLP.
                           333 West Wolf Point Plaza
13                         Chicago, IL  60654
                           thomas.leahy@kirkland.com
14                         sarah.legault@kirkland.com

15                         Abby L. Parsons, Esq.
                           Arnold & Porter
16                         700 Louisiana Street
                           Suite 4000
17                         Houston, TX  77002
                           Abby.Parsons@arnoldporter.com
18
                           Brent P. Ray, Esq.
19                         Stephen Ferro, Esq.
                           Arnold & Porter
20                         70 West Madison Street
                           Suite 4200
21                         Chicago, IL  60602-4321
                           Brent.ray@arnoldporter.com
22                         stephen.ferro@arnoldporter.com

23                         Sarah Prather, Esq.
                           Arnold & Porter, LLP.
24                         250 West 55th Street
                           New York, NY  10019
25                         sarah.prather@arnoldporter.com
```

```
 1   APPEARANCES CONTINUED:

 2   FOR THE PLAINTIFFS:    Erica Elaine McCabe, Esq.
                            Arnold & Porter, LLP
 3                          601 Massachusetts Ave, NEW
                            Washington, DC  20001-3743
 4                          erica.mccabe@arnoldporter.com

 5
     FOR THE DEFENDANTS:    Justin M. Penn, Esq.
 6                          Calvin Edwards, Jr., Esq.
                            Hinshaw & Culberton, LLP.
 7                          151 N. Franklin Street
                            Suite 2500
 8                          Chicago, IL  60606
                            jpenn@hinshawlaw.com
 9                          cedwards@hinshawlaw.com

10                          James M. Brodzik, Esq.
                            Hinshaw & Culbertson, LLP.
11                          521 West Main
                            Suite 300
12                          P.O. Box 509
                            Belleville, IL  62220
13                          jbrodzik@hinshaw.com

14

15

16

17

18

19

20

21

22

23

24

25
```

I N D E X

**OPENING STATEMENTS:**                                **PAGE**

BY MR. RAY                                                 12
BY MR. EDWARDS                                             18


**WITNESSES CALLED TO TESTIFY:**

▮▮▮▮▮▮▮▮▮▮
DIRECT EXAMINATION BY MS. PARSONS                          24
CROSS EXAMINATION BY MR. EDWARDS                           60
REDIRECT EXAMINATION BY MS. PARSONS                        66

▮▮▮▮▮▮▮▮▮▮
DIRECT EXAMINATION BY MS. GARCIA                           69
CROSS EXAMINATION BY MR. EDWARDS                          106
REDIRECT EXAMINATION BY MS. GARCIA                        111

▮▮▮▮▮▮▮▮
DIRECT EXAMINATION BY MS. GARCIA                          113
CROSS EXAMINATION BY MR. EDWARDS                          146
REDIRECT EXAMINATION BY MS. GARCIA                        151


E X H I B I T S

| EXB # | DESCRIPTION | ID'D | ADMT'D |
| --- | --- | --- | --- |
| #1 | ▮▮▮▮▮▮ Declaration | 38 | 60 |
| #2 | TAC Meeting Minutes 4/29/25 | 53 | 60 |
| #3 | ▮▮▮ Binder | 79 | 80 |
| #4 | ▮▮▮ Grievance 8/13/24 | 93 | 93 |
| #5 | ▮ Binder | 127 | 128 |
| #6 | ▮ Grievance 11/25/23 | 122 | 122 |
| #7 | ▮ Grievance 3/20/24 | 135 | 135 |

```
 1                  (Proceedings began at 9:09 a.m.)

 2                  ***************************

 3            THE CLERK:  The Matter of Monroe, et al. v. Bowman,

 4    et al., case #18-cv-156, is called for Day #1 of an

 5    Evidentiary Hearing.  Will the parties please identify

 6    themselves for the record?

 7            MR. RAY:  Good morning, Your Honor.  Brent Ray on the

 8    record for the Plaintiffs in this matter.  Along with me are

 9    my colleagues, Ms. Abby Parsons, Ms. Sarah Prather, Ms. Erica

10    McCabe, and Mr. Stephen Ferro.  Also on the team from Kirkland

11    & Ellis are Mr. Thomas Leahy, who is somewhere, and Ms. Sarah

12    Legault and Ms. Anne Hudson; and from the ACLU, Ms.  Michelle

13    Garcia and Ms. Alexis Picard.

14            THE COURT:  All right.  Well, good morning, Counsel.

15            MR. PENN:  Good morning, Your Honor, Justin Penn.  I

16    represent the Defendants, along with my partners James Brodzik

17    and Calvin Edwards.

18            THE COURT:  All right.  Well, good morning, Counsel.

19            MR. PENN:  Good morning.

20            THE COURT:  So, I understand there are a few things

21    to take up before we begin the testimony, Ms. Parsons?

22            MS. PARSONS:  Thank you, Judge.  I just have one

23    issue for you this morning.  We have made a challenge to the

24    protective order under paragraph 5, which is Docket 88 in this

25    case.
```

1          Defense Counsel has identified or has marked, rather,

2    documents we would like to use and show to our class members

3    during their testimony today.  Examples of these include

4    handwritten grievances by the person herself, also requests

5    for protective custody that were filed with Menard, so that

6    also came from the class member.  So, there's a number of

7    documents that are subject to those two categories.

8          And then additionally we have TAC -- there was a TAC

9    meeting minutes document that was marked as Attorney Eyes

10   Only.  That meeting happened on April 29th of this year, and

11   at least one of our class members was considered, ██████

12   ██████, that's going to be testifying first today.  The

13   contents of that meeting minutes, per the protocol and per the

14   testimony we got from Dr. Puga, he is supposed to be sending

15   her a letter with the written reasons for her denial, so the

16   meeting minutes include those reasons.  So, only by matter of

17   timing she would not know that information and so we would ask

18   that that document be subject to Confidential designation

19   instead of Attorneys Eyes Only.

20         And to be clear, under the protective order, Judge,

21   Section 3B designates information that's Attorneys Eyes Only

22   cannot be shown to the Plaintiffs, so it does specifically

23   exclude class members.

24         The last document that we are seeking to downgrade

25   right to confidential is the investigation by Internal Affairs

1    for ███████, and this document contains -- and this

2    document contains, for example, medical records of hers which

3    are results from rape kits that were done at the hospital.  To

4    our knowledge she's never been given a copy of her own medical

5    records despite multiple requests to do that, so we would like

6    to be able to show those to her today.  And I may be able to

7    use portions of this or submit portions of this.  It is a long

8    document.  It's 55 pages long, Judge.  But, it is about her --

9    It's about her allegations, and so that one we would be

10   willing to downgrade portions of it, if we could.  But, the

11   other ones, the TAC meeting minutes and the entirety of the

12   grievances and the requests for PC, we would request a

13   downgrade.  We identified those documents this morning for

14   Defendants and we do have additional class members to come.

15   Those are the ones that I know about just for today, but we

16   did see this categorical over-designation For Attorneys Eyes

17   Only and it is impacting our ability to conduct our

18   examinations today.

19          THE COURT:  Okay.  Who wishes to respond for the

20   Defense?

21          MR. BRODZIK:  Good morning, Your Honor.  I think that

22   we will be able to come to an agreement over the vast majority

23   of this.  We just haven't -- They just sent us over a list of

24   Bates numbers and we just requested that you send us the

25   actual documents so we can pull them quickly, but I think we

1    are going to be able to come to an agreement on this.

2          THE COURT:  All right.  Well, certainly, you know, we

3    are in a bench trial, it's a little different.  Certainly

4    things that relate to the Plaintiffs and, you know, their --

5    certainly things that they filed or any other things that

6    relate to them it seems to me by The Attorneys Only wouldn't

7    be appropriate.  We are not -- And I think we can make other

8    precautions that they are not put in the public record, so why

9    don't we just exchange -- show them the document before you

10   are going to use it, but it seems like it's not that big of a

11   stretch to go from Attorneys Eyes Only to Confidential.

12          MR. BRODZIK:  Agreed.

13          THE COURT:  Okay.  Now, speaking of that, though, I

14   guess -- I looked back, because it's very unlike us not to

15   give a specific date for an exhibit list to be provided.  Just

16   as a practical matter, we have to keep track of all the

17   exhibits, so you should have the template that we used before

18   or Deana can send it to you again.  And I'm going to task the

19   Plaintiffs -- we have got a lot of people here for the

20   class -- someone to be working on that list as the exhibits

21   come in.  Deana has other things to take care of while we are

22   going along with witnesses, so Plaintiffs can document which

23   exhibits they are using and then at the end of the day

24   exchange that with the Defendants and get a copy to Deana so

25   that we have a proper record of the trial.

1          And then I did get this morning the witness list, and

2   so we expect in person today ████████████████████████.

3          Is that correct, Ms. Parsons?

4          MS. PARSONS:  It is, Judge.

5          THE COURT:  The other microphone should be working if

6   you want to --

7          MS. PARSONS:  Those were the three writs issued for

8   today, those are the class members we intend to call today.  I

9   did want to alert the Court that the only witnesses the

10  Defense has suggested to call live, they are planning to call

11  them on Thursday and Friday, so there is a chance that if our

12  testimony runs short today we might not need the whole day.

13  That could be true -- That's also true for tomorrow.  We have

14  three writs issued for tomorrow and then the next day is two

15  writs and we have no writs for Friday.  We have estimated our

16  time to the Defendants.  It could go a full day today, but it

17  might not.  I just wanted to alert you that we don't have --

18  We only are planning to call our class members which are

19  subject to the writs, so we don't have an ability to call

20  another witness today if that's the case.

21         THE COURT:  Okay.  Well, I was hopeful we would be

22  finished by Thursday.  Does the Defense have anyone available

23  that we -- I mean, again, it's -- we don't have a jury.  So,

24  if we need to go out of order, it seems we could to fill the

25  time.  Is anyone available?

```
 1              MR. PENN:  Judge, we don't have anybody available

 2    today.  We can see how today goes, and if they go faster than

 3    we think we can try and fill somebody for tomorrow.  Given the

 4    travel and the doctors' schedules, I'm afraid we are not going

 5    to be able to get to the doctors, as I understand it, until

 6    Friday, but I can check and see on that.

 7              THE COURT:  Okay.  If you would check and see,

 8    because it seems to me we should be able to get finished with

 9    this Thursday.

10              MR. PENN:  I would love that.  They estimated two

11    hours for their witnesses on their side for their Directs.

12    That's the estimation they gave us, so that's kind of what we

13    worked off of.  But, if that ends up changing we will do our

14    best to get us out of here by Thursday.

15              THE COURT:  Okay.  All right.  Sounds good.

16              Ms. Parsons, anyone else we need to take up?

17              MS. PARSONS:  I think that's everything for this

18    morning.  Thank you, Judge.

19              THE COURT:  Anything from the Defense?

20              MR. PENN:  Just one small matter, and I am only

21    alerting the Court because it may come in -- well, it will

22    come in probably as we are sitting here.  We have talked to --

23    I wouldn't say we've met and conferred, because I don't think

24    we have had time on that.  We filed a motion to strike some

25    declarations that were filed on Friday, and I don't think it's
```

1    going to be an issue that needs to be taken up right now,

2    because we have talked to Counsel and I don't think there's

3    going to be any reference to those declarations today.  Or, if

4    there are, they are limited to declarations we think we

5    already had, according to Counsels' representations.  So, I

6    just wanted to raise it, because I don't want Your Honor to

7    think we are springing this as this hearing is starting.  It

8    will come in as soon as somebody in Chicago files it, but we

9    can take it up later.

10           THE COURT:  So it hasn't been filed yet?

11           MR. PENN:  I don't see it, so I can't say it hasn't

12   been filed.

13           LAW CLERK:  It was just filed.

14           THE COURT:  It was just filed.  Okay.  Well, my law

15   clerks will be looking at that.  Just give me a heads up if

16   something comes up before.

17           MR. PENN:  I think we are going to be good to not

18   have to address it until then.  Thanks, Judge.

19           THE COURT:  Okay.  Well, let's get our first witness

20   on the stand, and that's ████████████.

21           MS. PARSONS:  Judge, we had a very brief opening

22   statement, if you will hear it.

23           THE COURT:  Oh, okay.  Sure.  Hold on one second.  Is

24   the Defense prepared to make an opening statement?

25           Okay.  All right.  Mr. Ray?

1          MR. RAY:  Thank you, Judge, and thank you for taking

2    the balance of your week to hear testimony regarding issues at

3    Menard.  And as Your Honor will hear, these issues are serious

4    and they require Court intervention.  As you know, Your Honor,

5    we have been representing this class now -- this case has an

6    '18 date at the start of it, it's hard to believe, and here we

7    are in 2025.  And throughout this case we have been talking to

8    our class members as they've moved throughout the IDOC system,

9    and what we've discovered in the last particularly two years

10   is that Menard has peculiar issues that are systemic and then

11   they are severe, and they range from misgendering to abuse by

12   officers and consistent macing of our class members, strip

13   searches by male guards, continued lack of access to private

14   showers.  Many of our class members have been washing up in

15   their own cells, because they are terrified to use the

16   showers.

17          We have recurring segregation and isolation of our

18   class members, which makes social transition impossible.  When

19   mental health is available, it is often irregular and

20   inadequate.

21          Hormone treatment.  There are large gaps between

22   administrations and they too are not done in a safe, nor

23   respectable manner.  And limited considerations for surgery,

24   even when the Pathways session is completed, a lack of

25   consideration is given for many of our class members at all.

1              And the problem is that all of these things that I

2    have just talked about, Your Honor, were put forth in our

3    original motion 18 months ago.

4              And what you will also hear, Your Honor, is what

5    makes Menard different from some of the other facilities in

6    the State of Illinois is a culture of violence.  The violence

7    not only of physical abuse, but also sexual abuse.  Multiple

8    class members have been raped by guards, and it's not just one

9    bad apple here, Your Honor.  There is a culture of violence

10   towards transgender women in Menard through multiple guards

11   and officers in multiple parts of the prison over multiple

12   periods of time.

13             And what's worse than that is that that violence goes

14   downstream, and other incarcerated individuals who are not

15   class members see how our class members are treated and they

16   too respond with violence and threats and humiliation.  And so

17   this culture of violence, which by itself would be

18   intolerable, prohibits our class members from any semblance of

19   social transition.  And if class members cannot feel safe in

20   their facility -- And we know that prison is not supposed to

21   be a day camp.  But, if they can't feel safe, then the

22   standards of care cannot be met.

23             THE COURT:  Mr. Ray, how many class members are

24   housed at Menard at this moment, would you say?

25             MR. RAY:  That's always an interesting question, Your

1    Honor, because we have had some very recent transfers, but I

2    think our best estimates puts the total amount at I believe

3    around 20 to 25.  Six have been transferred, though, in the

4    last few weeks, not to Logan, but to other facilities, and so

5    we have actually seen and you will hear from ███████████ in

6    a moment, she was transferred to Lawrence just three weeks

7    ago.  And so while the time line of this abuse is long and the

8    notice was 18 months ago, at the very least with our original

9    motion being filed in December of 2023, only recently have the

10   Defendants started to scurry around, and say, "Oh, let's move

11   some people, let's actually" -- What they have done is they've

12   done a new survey.  Dr. Reister, who's never reviewed the

13   declarations in this case, any of them, was somehow alerted to

14   the fact that there were problems at Menard just last month

15   and decided to run a survey to say, "Hey, do you want to be

16   transferred," of all Menard class members, and they threw

17   together a last-minute TAC committee meeting on April 29th,

18   where they considered five class members for transfer to

19   Logan; four were quickly denied.  And this committee, Your

20   Honor, I know you have got some experience with this, this is

21   a very similar committee to what we have seen before run by

22   Dr. Puga, staffed by many of the same people, still goes up to

23   vote as to what happens.  You will see the minutes from this

24   meeting in this hearing, Your Honor, that they largely just

25   considered what the prior offenses were of the individuals,

```
 1    not about whether their hormones were in line or whether they

 2    were effectively social transitioning or whether or not -- and

 3    this is the crux of, of course, this hearing -- is whether

 4    this is a safe environment for these individuals.

 5          THE COURT:  You mean by prior convictions, their

 6    underlying offense of conviction?

 7          MR. RAY:  Yes, Your Honor.

 8          THE COURT:  So, I have, I believe, 19 declarations.

 9    So, there are class members for whom I don't have a

10    declaration?

11          MR. RAY:  There are a few, and then I believe there

12    are class members that -- because obviously there's movement

13    throughout the system.  Some of our original declarants, I

14    believe, have been released or they've been transferred to a

15    different facility, and then we have even had new class

16    members be revealed to us in the last month or so, and so I

17    believe this is -- Counsel is referring to a Motion to Strike.

18    These are class members who are relatively new to us, like in

19    the last month, who we've been trying to be virtually given

20    contact with and figure out what their conditions are like at

21    Menard.

22          So, as soon as we are able to understand who is at

23    Menard, we are trying to get in touch with these individuals

24    and ask them what their conditions are like and, if they would

25    like to submit a declaration, give them an opportunity.  We've
```

 1    attempted to do that.  I'm not trying to pre-argue this

 2    motion, Your Honor, not even read it, obviously, but we have

 3    been trying to give the Court as much on-the-ground recent

 4    information as possible.  We are sensitive, of course, to the

 5    fact we are asking for preliminary relief.  Preliminary relief

 6    is by its nature of the law extraordinary.  But the relief

 7    that we are seeking here, Your Honor, which is to -- to have

 8    all class members transferred out of Menard.  And we

 9    understand that certainly some of them are ready for Logan,

10    others may not be, but there is an emerging, sort of a smaller

11    subset of facilities within IDOC where transgender women are

12    safer, certainly safer than Menard.  And that's something that

13    if you recall, Your Honor, Miss Graham, julie graham, in her

14    report continually advocated for a consolidation, trying to

15    pick a smaller subset of facilities where resources could be

16    consolidated, where individuals who are better trained and

17    more sympathetic and more able to address the basic needs of

18    transgender women could be centered.  And so that's one of the

19    aspects of the relief that we are seeking.

20         But another one that's important, Your Honor, is that

21    -- and we know this case is going to be moving forward to

22    trial and we are hopeful that trial can occur sometime this

23    calendar year -- is that what we see at Menard is that the

24    issues of violence and sexual violence towards our class

25    members are so engrained it does not seem possible for them to

1    be addressed in a way to erase or at least alleviate the

2    irreparable harm that our class members face until this case

3    goes to trial.  And, so, part of the relief that we are also

4    seeking is that the Defendants not be allowed to transfer

5    anyone into Menard or put any known class members there until

6    a final decision can be reached on the merits of this case.

7         THE COURT:  All right.  And one last question.  What

8    do you suggest should be considered as current conditions?

9    Like what time frame?

10        MR. RAY:  So, we think that the -- Certainly we see a

11   continuum of mistreatment all the way through from the time

12   that our first motion was filed in December of 2023, until

13   today.  The individuals you will hear from in this hearing

14   will testify not only into what they have experienced has gone

15   through that entire time period, but also up until today.  The

16   issue that we know you will hear from the Defendants in this

17   case is, well, those are things that occurred last year, you

18   were just seeking temporary -- sorry -- your preliminary

19   relief based on what's going on right now.  The problem is

20   that if you suddenly put a -- you know, a shower curtain up or

21   all of a sudden there is now another mental health person on

22   staff at Menard, it doesn't make the irreparable harm or erase

23   the culture of violence at Menard just go away like that

24   (snap).  And so the current situations must take into account

25   the culture that this institution has.  And it's not just at a

```
 1   moment in time and it's not from one person's view, and that's

 2   why we are trying to provide Your Honor a number of class

 3   members and not only in live testimony, but also through

 4   declarations, to show from the various viewpoints of people

 5   who are very isolated throughout this institution experiencing

 6   the same type of abuse and neglect and deliberate

 7   indifference.

 8           So, I hope I've answered your question, Your Honor.

 9   The main point is that the conditions that exist now we don't

10   think can be addressed by changing policies or switching

11   around people at Menard.  These are systemic issues of this

12   facility that will exist today, tomorrow, and going forward,

13   and that's why this temporary preliminary relief is required

14   through trial.

15           THE COURT:  Okay.  Thank you.

16           MR. RAY:  Thank you.

17           THE COURT:  Are you Mr. Edwards?

18           MR. EDWARDS:  Yes.

19           THE COURT:  If you would start by answering the first

20   question, what do you think I can look at as far as current

21   conditions?

22           MR. EDWARDS:  Current conditions, I believe you look

23   at within the past six months to a year.

24           Honestly, Your Honor, I might not be the best suited

25   for answering these questions.
```

1          MR. PENN:  You're good.

2          MR. EDWARDS:  But ultimately I believe we are going

3    to stand on the arguments we made in our response brief to

4    Plaintiffs' Motion for Preliminary Injunction.

5          And I can make a brief opening statement, if you are

6    okay with that, Your Honor.

7          THE COURT:  Sure.

8          MR. EDWARDS:  Okay.  Prison Litigation Reform Act

9    requires Courts give prison administrators wide latitude to

10   cite constitutionally adequate procedures.  As noted by the

11   Seventh Circuit in the appeal in this matter, the criminal

12   justice system has been binary in every way.  And

13   modifications to deal with transgender individuals in custody

14   require monumental change, and Menard has done so here.

15         Since the original preliminary injunction there have

16   been two committees created to foster a healthy environment

17   for transgender individuals in custody; the Transgender

18   Administrative Committee, TAC, and the Transgender Health and

19   Wellness Committee, THAWC.  And, first, TAC reviews placement,

20   transfers, safety, commissary, and security concerns of

21   transgender individuals in custody; and, second, THAWC

22   provides medical oversight for medical and mental healthcare.

23   And these committees reinforce the policies and directives in

24   place at Menard that foster an environment where transgender

25   individuals in custody are living in a dignified matter with

1    full respect of their right to be free from the

2    discrimination, harassment, victimization, and bullying, or

3    violence, whether emotional, physical or verbal, and these

4    committees seek to meet the medical and mental health

5    transitions and security needs of the transgender population

6    at Menard.

7            Over the course of this hearing today or over the

8    course of this hearing over the next couple days you will hear

9    the testimony of Warden Wills, Dr. Reister, Dr. Puga, Dr.

10   Conway.  And first you will hear from Warden Wills who will

11   testify about the operations, policies and procedures at

12   Menard; second, you will hear from Dr. Reister who will

13   testify about the medical treatment, the mental healthcare,

14   and the transfer process for transgender individuals in

15   custody at Menard; and, thirdly, you will hear from Dr. Puga

16   who will testify about the medical treatment, mental health

17   services and transgender individuals in custody at Menard;

18   and, finally, you will hear from Dr. Conway who will testify

19   about medical and mental health services and considerations

20   for transfer of transgender individuals in custody at Menard.

21           And additionally you will hear over the course of the

22   next few days from multiple Plaintiffs' witnesses that all

23   have unique needs and all these needs differ from their peers.

24   However, the testimony of each individual is distinctive and

25   we should remember that these are distinctive individuals that

 1    should be considered in a case-by-case basis and ultimately

 2    under the Prison Litigation Reform Act, the Plaintiffs

 3    requested relief is not nearly withdrawn and extends much

 4    farther than necessary to correct the alleged harm and it's

 5    not the least restrictive means or least intrusive means.

 6            So, after you hear all the evidence and the arguments

 7    raised in the briefs, we ask this Court to deny the

 8    Plaintiffs' request for preliminary injunction.

 9            THE COURT:  All right.  Thank you, Mr. Edwards.

10            And one thought on the Defense witnesses, too, I know

11    if they are in Chicago and traveling, I mean, I would be

12    amenable to them being by video.

13            You know, would the Plaintiff have an objection to

14    that?

15            MS. PARSONS:  No objection, Judge.

16            THE COURT:  Okay.  Because especially if they are --

17    It's a lot easier to set up than someone who's incarcerated,

18    so we could set up a video.  So, just throwing that out there.

19    It would save them a lot of travel.

20            MR. PENN:  I'm sure they would appreciate that.

21            Judge, did you want us to address the current

22    conditions question?

23            THE COURT:  Sure.

24            MR. PENN:  I'll briefly say Mr. Edwards referred to

25    our brief and in that we talk about this a little bit, but let

 1    me put a fine point on it.  We are here for an injunction, and

 2    so an injunction has to enjoin or affect something that's

 3    currently happening.  So, I take my friend at his point that

 4    there is going to be a time where we will talk about what

 5    happened in the past.  But current -- for purposes of an

 6    injunction, current conditions are current conditions.  That's

 7    all we can enjoin.  When we get to a trial we can redress all

 8    the other things that are at issue in this case that go back

 9    to the beginning of this case.  But, for purposes of an

10    injunction, I don't know how we would enjoin things that are

11    not current.  They have to be today, they have to be ongoing,

12    they have to be happening, otherwise we can't have an

13    injunction.  Not to say that we won't deal with all the rest

14    of it later.  I just want to make sure we are putting this in

15    the proper box so we have this properly framed if there's

16    ongoing litigation, that will be litigation.  Right now we are

17    just dealing with current conditions, that's it.  We can talk

18    about everything else.

19          THE COURT:  For you, current means today?

20          MR. PENN:  Current means something that is occurring

21    now.  I don't mean today as exclusive to today.  If it was

22    happening a week ago, it's still ongoing.  That is a current

23    condition.  But I don't think Your Honor can enjoin things

24    that are not happening and I don't think Your Honor can cause

25    effect to change -- an injunction, change things that are not

 1    currently the condition, just as a matter of law.  I mean, as

 2    a matter of principal, you know.  That's what an injunction

 3    is.  We will deal with the rest of it.  I'm not suggesting

 4    they won't get their day in court, I want to be very clear on

 5    that; they will.  It's just not at a preliminary injunction

 6    hearing.  Thank you.

 7            THE COURT:  Well, I certainly want -- and I think

 8    Plaintiffs would want, too -- I want to be very careful about

 9    the parameters in light of what happened last time.

10            MR. PENN:  Thanks, Judge.

11            THE COURT:  Okay.  Now, let's get our witness.

12            ████████████, before we get started, I am going to

13    ask you to take an oath.

14            COURTROOM DEPUTY:  Please raise your right hand the

15    best you can.  Thank you.

16            (Plaintiff, ████████████, sworn).

17            COURTROOM DEPUTY:  Please state your name for the

18    record.

19            ████████████████████████.

20            MS. PARSONS:  Would it be possible to remove her hand

21    shackles?

22            THE COURT:  I usually refer to the guards.  Is she

23    going to need to use them?

24            MS. PARSONS:  I might hand up documents, just a very

25    few.

```
 1              THE COURT:  Okay.  Can we remove just the hand?

 2              MS. PARSONS:  Thank you, Judge.

 3              THE COURT:  All right.  Thank you, gentlemen.  You

 4   may proceed.

 5

 6                        DIRECT EXAMINATION

 7   BY MS. PARSONS:

 8   Q.  Good morning, ▮▮▮▮.

 9   A.  Good morning.

10   Q.  Would you like to introduce yourself more fully to the

11   Judge?

12   A.  I'm ▮▮▮▮.

13   Q.  Do you want to tell her a little bit about yourself?

14   A.  Yeah, so I'm ▮▮▮▮.  I have been a transgender for like

15   13 years now and I am just going through a lot right now.  I

16   was in a car crash recently on the 15th, and so I am in a

17   little pain right now and some nerve damage.  So, sometimes I

18   might have to stand up to get better seating or something, but

19   right now I am in pain.  I haven't been receiving medical

20   attention or none of that, so I am hoping to get that soon,

21   and haven't been receiving my estradiol hormones or my

22   vitamins and many other medications that I normally take that

23   I am prescribed.

24              THE COURT:  You were in a car accident on May 15?

25   A.  Yes, ma'am.
```

1    Q.  Tell the Judge a little bit about your car accident.

2         THE COURT:  Yeah, how did that happen?

3    A.  I was going to court, and then like on our way, 20 minutes

4    from Lee County, the officer -- We were supposed to stop at a

5    stop sign, and the officer, I guess he -- when he went across

6    the cross-section, I don't know if he stopped completely or --

7    I'm not sure.  I just know he went across the cross-section

8    and the car smashed into us and the car hit only -- the impact

9    of the car hit only my section, which I was in the back of the

10   van in like a metal box that's made into the back of the van,

11   and then an EMT came and extracted me out of the van and

12   rushed me to the hospital, and the doctor examined me and gave

13   me medication.  But, once I came back to the institution, the

14   nurse basically told me I wasn't going to receive the

15   prescribed medication that the doctor that I have seen at the

16   hospital prescribed me.  She said some Dr. Babich -- that was

17   the doctor, the Lawrence doctor -- was going to give me

18   something else.  And I said that I needed pain medication for

19   that night.  I was injected three times at the hospital in

20   order to get me to be mobile, to even get me to move, because

21   my body was in shock and numb, and I told her I needed

22   medication that night and she just wouldn't give it.  So, I

23   was waiting on some medication.  And he gave me some

24   inflammatory medication without seeing me, without even

25   examining me.  He just gave me some inflammatory medication,

1    and that's all I have been receiving.

2            THE COURT:  Okay.  Thank you.

3    Q.  ███████, where do you currently live?

4    A.  In Lawrence Correctional.

5    Q.  And when were you transferred there?

6    A.  The 8th of this month.

7    Q.  And where did you live before that?

8    A.  At Menard Correctional.

9    Q.  Do you remember about how long you lived at Menard?

10   A.  Since, I would say, October 5th of '22.

11   Q.  So, that's almost three years?

12   A.  Yes.

13   Q.  Do you know why you were transferred to Lawrence?

14   A.  Well, I do know that I had -- Something happened to me in

15   Pontiac where I was assaulted by staff sexually, and I was

16   trying to get transferred and so I -- so I think that was the

17   transfer originally.

18   Q.  You just said "Pontiac".  Do you mean Menard?  Was that

19   assault at Menard?

20   A.  Say it again.

21   Q.  I think maybe you misspoke.  You said you had a sexual

22   attack at Pontiac and that's why you were maybe transferred.

23   A.  You said why was I transferred from Menard?

24   Q.  Yes.

25   A.  Like I thought you said why was I transferred to Menard.

1    Q.  Let me ask another question.  Do you have any

2    understanding why IDOC transferred you from Menard to

3    Lawrence?

4    A.  They didn't tell me.  It was a pop-up transfer.  But I

5    have been trying to be transferred for the longest, because,

6    yes, I was sexually assaulted at Menard and assaulted in many

7    other ways physically, and so I have been trying to get a

8    transfer, but I guess I just -- It was a pop-up transfer.

9    Q.  Where were you asking to be transferred?

10   A.  To Logan, preferably.

11   Q.  Why?

12   A.  I mean, it's better for my gender stability, my gender

13   expression, and I feel like it's more comfortable for me to be

14   around women, because I can learn from them, I can fully

15   express myself without being judged, etcetera.

16   Q.  So, you have lived at a number of IDOC facilities.  Can

17   you tell the Court where you have lived before?

18   A.  I have been -- It's my second time in Lawrence.  I have

19   been in Dixon, I have been in Pontiac, and I have been in

20   Menard.

21   Q.  How does Menard compare to the other facilities you have

22   lived at?

23   A.  Menard is like a concentration camp.  It's horrible.

24   Compared to the other prisons, more prisons are tolerable and

25   more, I guess, towards expression or gender, but Menard is

1    like it's no way to be a transwoman at Menard.

2    Q.  Let's talk about some of that culture at Menard that you

3    are talking about and let's start with your experience with

4    the guards.  I know you mentioned already a few times a sexual

5    assault.  Can you -- Is your experience of assault and sexual

6    assaults with the guards at Menard limited to one particular

7    person or across the board?

8    A.  It's all across the board.  I believe it's somewhat of a

9    -- My experience with the staff, I feel like they have a --

10   it's like they have a cultural setup that cultivates this type

11   of ideal.  Like if you are not against what I express, like as

12   my gender and like the transgenders I have known, I think it's

13   going to be hard for you if you are the type of person that is

14   naturally opposed to my type of lifestyle, then they tend to

15   reward you, they tend to allow you to be more freely

16   aggressive towards us, they tend to allow you to be more

17   disrespectful and harmful.

18   Q.  I know you have had several things that have happened to

19   you by the guards, but I want to focus on one particular

20   incident.  Can you explain what happened to you on or around

21   December 12, 2023, at Menard?  Do you remember that date?

22   A.  Yes, ma'am.  I know I was going to yard originally, and

23   while walking -- It was a transgender, she has some type of,

24   like, -- like she can't walk as good, so I was walking her to

25   yard.  And while on the yard, the staff was kind of aggressive

1   towards me.  I guess they didn't like me off jump, but they

2   also didn't like the other trans girl I was with, so they was

3   basically harassing us.  They saw me, I had shorts on and my

4   tank top.  They like kept making a deal about me, like how I

5   was walking her, how slow we was walking.  And was I telling

6   him, "Well, she's barely able to walk."  And because I

7   responded saying this, they made me go back to the housing

8   unit.  So, once I got back there and my -- The staff that was

9   there was C/O Dunbar, he's the five-day staff that was on that

10  gallery, and he was just basically like, "What's wrong," and

11  stuff like that.  He always used to show this type of -- like

12  as if he liked me, like he was trying to pick me up or like he

13  always showed an attitude towards me, but me being in so much

14  frustration, instead of me normally -- like I normally like

15  brush it off, "Get away from me" type, I was basically, "I

16  need Mental Health, I need to talk to crisis team.  I need

17  Mental Health, because right now I'm dealing with harassment."

18  And he put me in a room which was maybe like three galleries

19  up and it's next door to a lieutenant's office.  He put me in

20  that room and he was like, "Okay, Mental Health is going to

21  come talk to you," but he was just sitting in there with me

22  and it was an overbearing pressure, like I felt like the

23  energy in the room was starting to feel tension, so I was just

24  like looking at him and he became sexual with me and

25  aggressive and forcing me to do oral on him and just sexual

1  stuff.  And he came and then after all of that he was like

2  just sitting there, was like, "Isn't it better?  I can help

3  you with this," and was like talking to me and then walked out

4  the room.

5  Q.  Okay.  So was there any physical evidence of the sexual

6  assault by C/O Dunbar?

7  A.  Yes, I -- it was.  His sperm was only on my clothes and my

8  hands.  But when it happened, the first thought I had was,

9  "I'm not taking it anymore, I am reporting this," and it's

10  like I kept the sperm in my mouth, and when he walked out and

11  I hurried up and like spit most of it in the shirt -- the

12  thermal shirt I was wearing, like at the neck part, and I like

13  squeezed it in so I knew it was going to stick, and then as

14  soon as Mental Health walked in to talk to me, which was the

15  original reason I was up there, I instantly told them what

16  happened.  I was like, "This guy just did this, I mean, it's

17  not the first time," etcetera, and he was basically helpful.

18  Q.  Okay.  I know you were thinking about preserving the

19  evidence on your clothing.  Do you remember -- You said you

20  had a white shirt on.  Do you remember any other pieces of

21  clothing that you had on?

22  A.  I know I had a tank top on under there, a bra, and my

23  thermal, and I had some of my regular shorts, gym shorts, and

24  sweat -- sweat pants or something over the gym shorts, yeah,

25  and I had my regular shoes and all of that.

1    Q.   Okay.   So, what happened after you talked to Mental

2    Health?

3    A.   Well, Mental Health was basically -- Originally they was

4    like, "What was your mental health crisis?  Are you suicidal

5    and are you homicidal," and all of that, and I was just like

6    right now I want to focus on I need medical attention, I need

7    a rape kit, I need to go out."  And he was like, "Well, I will

8    talk to someone."  He went out and he talked to I believe a

9    Lieutenant Brandon, and then Brandon came in, was like,

10   "What's going on?"  And I told him exactly what I told them at

11   Mental Health, like Dunbar of "He forced himself on me, he

12   made me do oral, I got his sperm and I want to go out right

13   now."  He was like, "All right, hold on."  He left out with

14   Dunbar.  And then Dunbar was basically talking to him in the

15   hallway, and then Dunbar came back from the hallway and said,

16   "Are you seriously going to do this to me?"  And he was

17   telling me that he -- it wasn't going to go how I expected,

18   like something would happen to me if I want to go through with

19   this.  And what I believed at that time, I thought he was just

20   talking and trying to scare me, but the lieutenant came back

21   in and was like, "We are taking you back to your cell right

22   now.  Someone will come talk to you or come get you later on."

23   So, I knew it wasn't protocol.  I knew I was supposed to go

24   straight to the rape kit, but instead they put me back in my

25   cell on one gallery, and then maybe like a couple hours three

1    tac team officers came to the cell and was like, "Cuff up."

2            And me being in population, they don't cuff you up to

3    leave out your cell.  It's strictly like a restrictive housing

4    type of thing for security when they cuff you.  So, I was

5    appalled, like why am I being cuffed up, like what's going on.

6    And they was just like, "You want to be here.  You are not a

7    good little faggot and you are not a good this, you're not a

8    good that," and was trying to get me to react in the negative

9    way.  So, I was just like, "Okay, let me get ready, let me get

10   dressed."  And they was like, "No, come cuff up now."  So, I

11   was like if I don't I can't put close on, I can't do this.

12   And they was just like, "We are going to spray you."  So, for

13   fear I cuffed up.  They took me to R&C, receiving unit.

14   Originally we was walking toward the healthcare.  They went to

15   a bullpen, they went to talk to some nurses and then came back

16   out and grabbed me and then took me straight to R&C.  I did

17   not talk to any Medical, I did not talk to any -- not a nurse,

18   not a doctor, not anybody that worked in Medical.  They took

19   me straight to the R&C receiving unit.  As they was putting me

20   in my cell there was more derogatory mannerisms, using -- They

21   was just basically aggressive, and they put me in a cell,

22   opened the chuck and sprayed me.  I think it was Sanders, the

23   one who squatted down, and it was like a maneuver I guess he

24   learned in tactical.

25   Q.  They sprayed you with mace in your cell while you were

1    trying to seek medical attention, is that right?

2    A.  I was going to R&C.  I wanted the medical attention for

3    the rape kit, but instead of them giving me the medical

4    attention they took me in R&C, which was not the same housing

5    unit I was living in.  And while they was putting me in the

6    cell and I was talking to them, like not expecting, like,

7    okay, when am I going out or is someone coming to pick me up,

8    and he just squatted down and sprayed.  And it was so quick, I

9    didn't even know I was being sprayed with the OC spray until

10   like it was a gush of like -- when it was gushing out through

11   the chuck and it was hitting me.  And I was backing up like,

12   "What?"  And they just kept spraying like a period of time.

13   And not just a burst, it was like a long spray.  And then they

14   hurried up, closed the chuck and just walked off.  So, it was

15   Slinkard, Sanders, Sergeant Murphy, and they just walked off

16   and everybody started kicking their doors and coughing and

17   they was like, "Are you okay?"  People was calling me, like,

18   "Are you good?  Are you good?"  But, I just couldn't breathe.

19   You know, I couldn't breathe.

20   Q.  Was there an investigation that eventually happened

21   because of this incident that day with Dunbar and then the

22   thing that followed with the attack in your cell?

23   A.  I know that after a point of time, because they didn't

24   want to do no -- they didn't want to help me.  They came back

25   the same day after I was sprayed, the same tac team, the

```
 1    sergeant came back 30 minutes, 40 minutes later and pulled me

 2    out and put me in another cell, but the tac team came right

 3    back, sprayed me again and brought me down to the ground as if

 4    I was being combative, but I wasn't.  I felt like they was

 5    covering up what was happening.

 6           So, they took me to seg, and I kept asking, "I need

 7    to go to Internal Affairs, I didn't get medical attention, I

 8    didn't do anything," stuff like that, and they was basically

 9    like they was nonresponsive towards my complaint.

10           So, three days later, eventually, yes, it was -- I

11    guess they started an investigation.

12    Q.  Did someone from the Internal Affairs come to talk to you

13    about the incident?

14    A.  A Lieutenant Hanks, yes.

15    Q.  Our records show that that was on the 13th, so the next

16    day.  Does that sound right?

17    A.  Yes.

18    Q.  Okay.  Did you ask Lieutenant Hanks for medical attention

19    and the rape kit?

20    A.  Yes, ma'am.

21    Q.  What happened?

22    A.  He told me that, "I don't authorize that and they are

23    saying you refused," so I'm not going to get it.  I was like,

24    "How would I refuse if this whole incident happened for me

25    asking for a rape kit?"  And he was like, "Well, you are not
```

1    going to get it, so I just came here to talk about this

2    alone."  I'm was like, "Okay.  Well, now that you took my

3    statement on what happened with the rape, can you take my

4    statement with the tactical team assaulting me?"  He said,

5    "That's not what this is about, I'm not here to talk about

6    that," and just left out the room.

7    Q.  Have you ever seen any results of the investigation that

8    Lieutenant Hanks was conducting?

9    A.  No.

10   Q.  Have you ever seen -- Strike that question.  Did you ever

11   get a rape kit performed?

12   A.  Yes.  As I said, like three days later, I believe, that's

13   what I believe the investigation started off of.  I didn't

14   know if Lieutenant Hanks started it the next day, but I know

15   that that's when they actually gave me the rape kit, yeah.

16   Q.  Do you recall what person at Menard that you asked for the

17   rape kit actually helped you get one?

18   A.  Yeah, Nurse Morgan.  She was helpful, yes.

19   Q.  So, Nurse Morgan helped you go outside Menard to the

20   hospital for a rape kit, is that right?

21   A.  Yes.

22   Q.  Okay.  And so did you talk -- When you were getting the

23   rape kit administered, did you tell them about the physical

24   evidence that you were trying to preserve?  How did that go?

25   A.  Yes, I was talking to the same lady, and the staff that

1    came with me was already like -- They just -- The energy

2    wasn't right with me and I know that by experience with Menard

3    that they was probably trying to -- So I told then, "Can you

4    please call someone and make sure they pick up the rape kit?

5    Because they are telling me they are bringing it back to

6    Menard, and that shouldn't be possible if I am claiming rape

7    on Menard staff, so don't be bringing it back and they can

8    possibly tamper with it," and she was like, "Well, I'll call

9    the Attorney General and see what I can do."

10   Q.  Okay.  Did they take your clothing at the hospital that

11   you thought had evidence on it?

12   A.  Yes, I know for a fact the -- she took pictures of the

13   exact spots.  I put my hand in the area where I spit the semen

14   at, and she took a picture of it and saw -- Like you can tell

15   the discoloration of the shirt, you can tell it's some type of

16   like liquid or something that was there.  I said, "This is

17   where the sperm is at, I spit."  And she took pictures of it,

18   took the shirt, took the tank top I had under that, and I

19   said, "There should also be sperm on the wrists."  And she

20   took that and wrote it down and marked it down in the same

21   packet, and then they took -- Yeah, that was -- I think that's

22   all the clothing that they took.  And, yeah, she took

23   pictures, swabbed my mouth and did the process.

24   Q.  Our records show that this hospital trip was on December

25   14th, so that was two days after the attack?

1    A.  Well, I think that if the 12th is the attack.  So, yes,

2    the second day, two days, yeah.

3    Q.  Do you remember if they took any swabs of outside your

4    face or neck?

5    A.  She swabbed my neck in the area where I spit on the shirt,

6    because it was -- yeah.

7    Q.  So, that would have been the part where you would have

8    expected semen to have been?

9    A.  Yes, after a couple of days.  I didn't brush or wash, but

10   I think it probably would have dissolved in my mouth after a

11   few days or went away, but I knew for a fact it should still

12   be there, yeah, on my shirt.

13   Q.  Have you ever been shown the results of your rape kit?

14   A.  Not necessarily.  They didn't show me any results or their

15   investigation, but Internal Affairs officer maybe a week

16   before I left or something like that, a couple of weeks before

17   I left Menard came to me and was talking to me about a swab,

18   and I just -- Once he started saying the results was this, and

19   it -- it started to infuriate me, because I felt like he's not

20   telling about the rape kit, so I refused to sign what he

21   trying to get me to sign and I left out the room.

22   Q.  You said that was a week before you left Menard?

23   A.  Yeah, like a few weeks before I left Menard, yes.

24   Q.  Okay.  You left Menard on the 8th of May, is that right?

25   A.  Yes, ma'am.

1   Q.  Okay.  Have you written down the story that you are

2   telling us today about this assault in some court filings?

3   A.  Yes, I wrote grievances on it and I also wrote a couple of

4   activists telling them like what's going on with the

5   transgenders, stuff like that, what's happening to us.

6   Q.  Did you sign a declaration in this case for our Judge to

7   read?

8   A.  Yes, ma'am.

9   Q.  Okay.

10          MS. PARSONS:  Judge, may I approach the witness?

11          THE COURT:  You may.

12          MS. PARSONS:  ECF 763, Exhibit 3.

13          So, for the record, I have handed ██████████ what

14   I have marked as Exhibit 1.  This was previously filed on the

15   docket as 763, Exhibit 3.

16   Q.  (By Ms. Parsons) ████████████, can you look at this

17   document I have handed you and identify it for us?

18   A.  Yes, ma'am, this is my declaration.

19   Q.  If you look at the last page, do you see when you first

20   signed it?

21   A.  Yes, ma'am.

22   Q.  What day was that?

23   A.  This was on the 8th of 2024.  03/08/2024.

24   Q.  And that was when you signed it with an ink pen, right?

25   A.  Yes, ma'am.

1    Q.  Do you see above that there's an electronic signature?

2    A.  Yes.

3    Q.  Do you recall me giving you permission for you to sign

4    that electronically?

5    A.  Yes, ma'am.

6    Q.  What date was that?

7    A.  December 21, 2023.

8    Q.  You can take a look at anything you want to look at in

9    here, but if I could turn you to page three, starting at

10   paragraph around 11, does this look like the incident that you

11   described to the Court this morning about C/O Dunbar and the

12   sexual assault?

13   A.  Yes, looks like it.  Yes, this is it.

14   Q.  Okay.  I just wanted to ask you a question.  In paragraph

15   3 on this declaration, on the first page you talk about a

16   different sexual assault by a Lieutenant Dallas.  Do you see

17   that?

18   A.  Yes.

19   Q.  Do you know that officer's first name?

20   A.  No, ma'am.

21   Q.  Do you know if he's still working at IDOC?

22   A.  Yes, and he's now mysteriously the head over Internal

23   Affairs or the Lieutenant of Internal Affairs.

24         THE COURT:  Over all of IDOC?

25   A.  No, ma'am, just I believe of Menard.

1             THE COURT:  Okay.

2    Q.  So, I know you've submitted a declaration in this case.

3    Have you also filed a separate action for the rape by C/O

4    Dunbar?

5    A.  Yes, ma'am.

6    Q.  When did we do that?

7    A.  January, I believe, of this year.

8    Q.  Okay.  I would like to turn now -- I know at the beginning

9    you said it was the guards that were causing this cultural

10   violence, but also other incarcerated persons at Menard, how

11   they contributed to this feeling of lack of safety.

12            Can you describe for the Court how other people in

13   custody treat you as a transgender woman?

14   A.  Well, I mean, I think it's the energy -- like the staff is

15   making the environment like this, but the inmates are going

16   off of what they are allowed to do, in my opinion.  And

17   although some might have opposition towards us or hatred

18   towards us for whatever reasons, I believe that the hatred is

19   simply because they are allowed to do it, like it is being

20   promoted and rewarded.  So, like they treat us with so much

21   disrespect or they -- Like the staff will let us be in seg and

22   not having shaving products and we'll come out looking and

23   dressed, you know, in a certain manner that don't fit my

24   preferred gender expression, and then the guys would be, "Oh,

25   what is that?  Oh, that's a man, that's not a woman," a lot of

1    things that can be mentally harmful and has been mentally

2    harmful, and the staff will laugh or the staff will be -- or

3    they will come go to these guys' doors and talk with them

4    like, "Oh, yeah, that's ███████," and so many things like this,

5    and this is making it bigger and more widespread throughout

6    the prison.

7    Q.  How does the behavior by other persons in custody and the

8    staff, how does that impact your ability to express yourself

9    through your gender identity and socially transition?

10   A.  I mean, it makes me scared.  Like it makes me not just

11   scared to be who I am or express myself, but it makes me feel

12   like every time I try to complain or try to point out what's

13   going on and what's not, what shouldn't be happening, it's

14   like I am being punished for it.  So, it's like they are

15   expecting me to just sit down, shut up and take what's

16   happening, so it's causing me to be unstable, it's causing me

17   -- A lot of times I have been wanting to hurt myself, a lot of

18   times I've been wanting to -- and sometimes I have hurt myself

19   dealing with this.

20   Q.  I know you mentioned being in seg.  Can you tell the Court

21   all the different places you have lived in Menard?

22   A.  West House and North 2.

23   Q.  Any other places?

24   A.  No.  I was hospitalized for -- I was in their healthcare

25   unit for a while after, you know.

1    Q.   Okay.  Have you ever lived in PC at Menard?

2    A.   Yes.

3    Q.   How is PC different than segregation?

4    A.   I mean, it's really the same.  It's like segregation

5    actually has certain cameras set up.  Protective custody has

6    literally no secure areas for the housing of the inmates.

7    Like it's no -- Like the general population areas have

8    cameras, but the part that's supposed to be protected, like

9    protective custody, has no cameras set up to review or, you

10   know, secure the areas, and the treatment from these inmates

11   is basically the same, similar.  Some of them might be, you

12   know, sexually attracted, it might tend to help us.  But, the

13   majority of these guys coming from the general population

14   areas are aggressive and show the same type of attitudes.

15   Q.   You said protective custody doesn't have cameras.  Is that

16   West House?

17   A.   Yes, ma'am.

18   Q.   Okay.  So, have you been assigned to segregation because

19   of discipline?

20   A.   Sometimes I believe that they -- I do sometimes become

21   unstable and may have made mistakes, but the majority of times

22   is not necessarily a disciplinary thing, it's more so a tool

23   to try to keep me from reporting them or to try to keep me

24   from being more expressive or flamboyant as my nature as a

25   transwoman.

```
 1   Q.  How does living in segregation, how does that affect your

 2   ability to socially transition?

 3   A.  Well, I am segregated for real.  They are calling it

 4   restrictive housing, but I'm segregated.  No other girls are

 5   around me mostly, and I am smack dab in the middle of some

 6   aggressive gang-bangers.  The workers that's passing out the

 7   food, that's dealing with our property and everything are also

 8   general population inmates.  There's gang-bangers, and the

 9   violence is making it just impossible to be who I am, you know

10   what I mean, as a transwoman.

11   Q.  Let's talk about your mental health treatment at Menard.

12   Have you ever had a group therapy session at Menard?

13   A.  I believe I had maybe one group in population.  In seg

14   there's no groups at all.  And the group that I had in

15   population was not a transgender-oriented type of setting.  It

16   was just for everybody or anybody.

17   Q.  Okay.  For the last six months, let's say, how often have

18   you seen a mental health professional at Menard?

19   A.  Like just recently, before I left Menard, they

20   mysteriously popped up with a mental health lady that can see

21   us, but only seen her maybe five times, but, yeah, that's it.

22        THE COURT:  Five times over the last six months or

23   five times like right before you left?

24   A.  Over the last six months.

25   Q.  And is that person Ms. Klausing?  Does that sound right?
```

1    A.  Yes.

2    Q.  And when did you start seeing Ms. Klausing, the beginning,

3    like when you first saw her?

4    A.  She just popped up maybe a month and a half before I left,

5    something like that.

6    Q.  April of 2025, maybe?  Does that sound right?

7    A.  Yes, ma'am.

8    Q.  Did Ms. Klausing try to go over any treatment plans or

9    anything with you?

10    A.  Yes, she started, but she -- the treatment plan was

11    something I didn't make with her.  Normally in other

12    facilities when I do treatment plans, they sit down with you,

13    "Okay, these are our goals for treatment."  She just put

14    something together and tried to get me to sign it.

15    Q.  Did it have anything to do with your hormone therapy or

16    mental health treatment?

17    A.  Nothing at all.  It was all based on something

18    security-wise, like something I believe Security made her or

19    intimidated her into making up or whatever.

20    Q.  Can you explain what you mean that it was based on

21    security issues?

22    A.  Like it was stating things like, "Well, my goal is to stay

23    out of seg, my goal is not to be aggressive, my goal is to" --

24    basically like just those.  It was nothing like, "Oh, I want

25    to be more expressive, I want to have group, I want to have

1    makeup, I want to have" -- It was nothing like that.

2    Q.  How did Ms. Klausing's visit and this treatment plan, how

3    did it make you feel?

4    A.  It made me feel -- I felt like they was trying to do

5    something quick to make it seem like they were doing their job

6    the whole time, but they knew it wasn't.  It was just

7    something just so that they can show.  But the dates on

8    everything that I signed, I made sure that I put the date down

9    on there to show that it was just happened.

10   Q.  Let's talk about some of your actual medical care, your

11   hormone treatments while you were living at Menard.  Can you

12   tell the Court about your experience receiving hormones at

13   Menard?

14   A.  It was terrible.  I went from the pills to the shots

15   again, back to the pills, and back to the estradiol patch.

16   The shots, I was scared.  I feel like it was the best for me,

17   because they work best, but the shots I was scared of

18   injections, because I was hospitalized.  The nurse gave me an

19   injection in my lower back -- Even though I normally get it in

20   the gluteus muscle, she gave it to me in like the lower back

21   area, and as soon as she pushed it in I heard like a popping

22   sound, and she was like -- And, we both kind of jumped and she

23   was like, "Oh," and still squeezed whatever was in the syringe

24   inside of me, and it was just a burning sensation rushing in

25   my back.  And I was looking at her, and she's smiling and

1    she's like, "Well, it's good.  Maybe you have something in

2    there, maybe like tissue damage."  I was like, "Okay."  I went

3    back to my cell, but instantly I got cotton mouth, felt sick,

4    and I started banging on the window telling the C/O, "I need

5    medical attention, like something is not right right now."

6    And from that day forward I couldn't walk, I couldn't use the

7    bathroom, they had to put me in the healthcare unit of the

8    facility for a week.  They said my white blood cells level was

9    low, like multiple things was going wrong with me.

10   Q.  Did you describe that, too, in your declaration that we

11   just looked at?

12   A.  I believe so, yes.

13   Q.  Okay.  Did you have distrust of the people who were

14   administering hormones at Menard?

15   A.  Yes.  For one, they wasn't trained, which I read many

16   statements from cases that stated they had to be trained to

17   administer these hormones.  They wasn't trained in the way

18   they was handling us, like it was Amanda shots constantly --

19   "I don't know why they give you guys this.  You're males.

20   What is this?  I don't know why they give you guys this."  And

21   I asked her one day why, and she said, "Because it's

22   taxpayer's money they are spending money on." It was always

23   something that made me feel, "Okay, look, can I choose the

24   nurse giving it to me or can I like -- yeah, just give me the

25   patches, I will put them on myself," because it was just

```
 1   making me -- the whole environment medically was just

 2   uncomfortable.

 3   Q.  Have these incidents with the administrators and your

 4   distrust of that, has that impacted your administration of

 5   hormone therapy?

 6   A.  Yes.  I believe that the fact that I was reporting Amanda

 7   and Nicole and multiple nurses, they just wasn't giving me my

 8   hormones after a while.  Like they just like -- I will go

 9   three months, then I will get it for a month, then go another

10   four months, then I'll get it for a couple weeks, then only

11   get one pill.  Like it was always like something.  Like it was

12   either not consistent and it was always a lower dosage than I

13   was supposed to get.  They said, "Oh, the pharmacy hasn't got

14   it yet.  We still got to get another this."  It was always

15   something.

16   Q.  Just to be clear for the Court, do you want your hormone

17   therapy?

18   A.  Of course.

19   Q.  Have you had your hormone levels tested recently?

20   A.  Yes.

21   Q.  When was the last time you remember?

22   A.  The last time, I believe, was in January.  But, as I

23   stated, they wasn't -- I have been on the patches now,

24   estradiol patches now for maybe six months, seven months, or

25   something similar to that, and it haven't been coming to me.
```

1    So, it was like -- And also they gave me a medication in a

2    cup, which is -- it's a crush-and-flow order they claim is

3    supposed to be for each institution, and I'm not knowing what

4    I'm taking, there's no label on it.  It's a crushed pill, a

5    powdery form water, it comes in the cup already, and I am

6    drinking it.  So, I'm not knowing what I am taking.  But over

7    time I started feeling sick and my facial hair started to grow

8    again, my muscles started paining me, so I wasn't actually

9    getting what I was supposed to be getting.

10   Q.  Have you heard what your hormone levels were, at least

11   from the January blood draw?

12   A.  I know the nursing -- the medical staff in Menard was

13   telling me that I was -- that the levels was fine, but when I

14   talked to Dr. Katz, he told me specifically that they are

15   trash, like it doesn't even seem like you are taking hormones,

16   and first they were fluctuating you in from too high Estrogen,

17   like your Estrogen was too high for cis women hormone level,

18   but now it's depleted and now your testosterone is higher than

19   cis males or a male's testosterone.  I was like how is this

20   even possible?  How is my testosterone higher than what's

21   expected for a male?  It's as if I was getting testosterone

22   medication.

23   Q.  How does this process of bouncing back and forth and

24   getting your levels read to you that are high for

25   testosterone, how does that make you feel?

1   A.   I mean, to be honest, now thinking back and understanding

2   what he said about the levels, I think it was causing the

3   gender issues I was having, like the crises I was having with

4   the facial hair growing and the smells coming back, like

5   everything was just making me uncomfortable mentally and

6   emotionally, I was just distressed.

7   Q.   I know you mentioned shaving.  Let's talk about your

8   grooming abilities at Menard.  So, let's focus on the time

9   just like the six months before you left Menard.  Do you have

10  that time period in your mind?

11  A.   Yes.

12  Q.   Okay.  Can you tell the Court whether you had access to a

13  private shower?

14  A.   Yeah, we had showers.  Like I was in seg for the last six

15  months, so I had the single shower.  But the grooming is not

16  possible, either.  Like they had razors they was supposed to

17  issue out to us when we go to shower, but it was always like

18  either I got to go to shower -- Everybody is supposed to go to

19  shower with their boxers and tank tops.  And I told them, "I

20  wear panties and bra or I wear a gav."  And he was just like,

21  "Well, you have got to wear something if you are not wearing

22  no thermals or no jump suits."  I was like, "Are you telling

23  me the only way I can get these items or get a shower is I

24  have got to walk down this lane with my bra and panties on?"

25  It was always something.  So, I couldn't get the showers.  Or

1    when I did, like, "Okay, I'll wear some boxers only if I can

2    get a razor.  I will wear these boxers to the shower."  And

3    they would trick me, let me get the boxers, go to the shower,

4    and, "Oh, we don't have any more razors."  So, it was always

5    no access to these razors.

6    Q.  Let me make sure I understand.  So, you had a private

7    shower but you had to walk through the gallery in your bra and

8    panties to get there?

9    A.  Yes.

10   Q.  How did that experience make you feel, ███████████?

11   A.  Terrible.  I remember the last time I walked in, it was

12   like my cheeks was hanging out of the underwear and all of

13   that, but the guys was like -- it's like some guys, "Oh, that

14   junk fit," or whatever and stuff, little comments they was

15   saying was making me feel like I was a piece of meat, made me

16   feel like I wasn't human, it made me feel like I was being --

17   Q.  Did that experience have an impact on your ability to

18   socially transition at Menard?

19   A.  Yes.

20   Q.  Let's talk about being strip-searched at Menard.  Do you

21   have an ID that reflects that you identify as transgender?

22   A.  Yes, ma'am.

23   Q.  At Menard did you request to be strip-searched by a female

24   officer?

25   A.  Yes, ma'am.

1    Q.  How often was that honored?

2    A.  It was maybe out of the whole time I was there I was

3    probably was strip-searched by a woman three or four times.

4    But they have a machine there that was supposed to be used for

5    strip-search, and it's a new -- It's the girls that's in there

6    now, they have the staff called Buettner that's with them, and

7    he's a male with a beard and everything, but he's the one they

8    keep trying to use to strip-search us.  And I have a PREA on

9    him saying while he strip-searched me he was making comments

10   like saying -- like comments towards my body, and they still

11   forcing me to strip-search with him.

12   Q.  So, Officer Buettner, can you explain to the Court why

13   Menard was having you strip out with Officer Buettner?

14   A.  Well, apparently they was trying to make it seem like this

15   guy was -- as if he identified as a woman.  And I asked him,

16   "Did you take hormones, did you" -- because when I had to go

17   through the process of saying I identified as a woman, the

18   doctor had to know that I lived a certain amount of time as a

19   woman in the world, the doctor had to know I took hormones for

20   a certain amount of time.  So, I said him, like, "Are you

21   going through these same processes?  He was, "No, I'm a chick

22   with a beard."  I am like, "That's not funny.  Like you are

23   manipulating the system."

24   Q.  How did that whole experience make you feel?

25   A.  It made me feel like he didn't really care.  If they can

1   make him strip-search a male, then make him strip-search me,

2   and then a regular cis woman can't strip-search the male

3   there, that means you all don't believe he's a woman, so why

4   would you make him strip-search me?

5          And I was also written a ticket for not

6   strip-searching for him.  They made it seem like I was

7   hindering the process of the routine of the institution all

8   because I told them, "Take me to the machine, I don't want to

9   strip-search with him," because he was making me

10  uncomfortable.

11  Q.  Have you ever been strip-searched by the machine?

12  A.  Maybe a couple times, but they always say it's broken.

13  Q.  Okay.  I want to talk about your recent transfer again to

14  Lawrence.  So, even though you live at Lawrence now, do you

15  still want a transfer to Logan?

16  A.  Yes.

17  Q.  Going back as long as you have been incarcerated, you

18  know, how long have you been asking for a transfer to Logan?

19  A.  I have been asking since I came to IDOC in the year 2021,

20  I believe it was around April, since I came to IDOC, I have

21  been requesting Logan transfer.  I have been on hormones since

22  the world.  I came to IDOC as a girl, so it was, like, yes.

23  Q.  Before this month have you ever heard that your case for a

24  transfer to Logan was ever presented to a TAC committee?

25  A.  No.

```
 1   Q.  Do you know what the TAC committee is?

 2   A.  I know TAC and THAW.

 3   Q.  Has you recently learned that your case was presented to

 4   the TAC committee?

 5   A.  Yes.

 6   Q.  Do you understand whether they granted your request for a

 7   transfer to Logan?

 8   A.  Do I understand -- Say it again.

 9   Q.  Do you understand whether or not they agreed to transfer

10   you to Logan?

11   A.  Apparently they did -- they said I -- they refused me.

12   Q.  Okay.

13          MS. PARSONS:  I would like to mark for the record

14   Defendants' Exhibit 2.  It has a Bates number of 0425915.

15          May I approach, Your Honor?

16          THE COURT:  You may.

17   Q.  (By Ms. Parsons)  ████████████, do you see at the top of

18   the document I have handed you that's Exhibit 2, do you see

19   it's titled Transgender Administrative Committee Meeting?

20   A.  Yes, ma'am.

21   Q.  Do you see the date on that?  What's the date?

22   A.  April 29, 2025.

23   Q.  And I'll represent to you that these are meeting minutes

24   from the April 29th, 2025 TAC committee meeting.

25          ████████████, if you look about two-thirds of the
```

```
 1   way down the page, it says, "███████████████████████"
 2   Do you recognize that?
 3   A.  I recognize that as my name.
 4   Q.  Yeah.
 5   A.  Yes.
 6   Q.  Is that your IDOC number?
 7   A.  Yes, ma'am.
 8   Q.  You see right next to your name, it says the presenter is
 9   Ms. Morris.  Do you know who that is?
10   A.  Yes, I know she works at Menard.
11   Q.  Is she a mental health provider?
12   A.  She is -- Yes, she is.
13   Q.  Okay.  Has she ever done therapy or group sessions with
14   you?
15   A.  No.
16   Q.  Okay.  How much does Ms. Morris know about the reasons why
17   you would want to transfer to Logan?
18   A.  Obviously none at all.  She's not actively in
19   correspondence with us or was when I was there.
20   Q.  Did you ever talk to Ms. Morris personally about a
21   transfer to Logan or why you wanted that?
22   A.  I spoke to her and I asked her about groups, I asked her
23   about a transfer to Logan.  I did tell her -- I wrote her a
24   couple of times also telling her about my status and how long
25   I have been a transwoman.
```

1  Q.  Okay.

2  A.  But she's not actively like -- She doesn't do groups, she

3  doesn't talk to us about gender awareness or expression.  She

4  just come there and do the suicide packet and don't see her

5  again.

6  Q.  From your personal experience did you feel supported by

7  Ms. Morris at Menard?

8  A.  Not at all.

9  Q.  So, let's look at the reasons.  You see some bullet points

10  on this Exhibit 2, ███████████?  Do you see those?

11  A.  Yes, ma'am.

12  Q.  I would like to talk to you about the documents and the

13  information they considered in denying your transfer, okay?

14  A.  Yes, ma'am.

15  Q.  Okay.  First, the first bullet says you are asking to

16  transfer out of Menard because you have three lawsuits against

17  Menard.  Is that accurate?

18  A.  Not at all.

19  Q.  Okay.  The second bullet it says you are labeled as a

20  vulnerable and predator.  Do you have an understanding of

21  those terms at Menard?

22  A.  I know that I am vulnerable because of my expression and

23  the fact that I have been sexually assaulted a few times.

24  Q.  Okay.  The fourth bullet says, "Her hormones were listed.

25  Estrogen was lower than expected, parenthesis 34, and

1    testosterone was high, parenthesis 1102, given her prescribed

2    hormones.  Compliance questioned."  Do you see that?

3    A.  Yes, ma'am.

4    Q.  How does it make you feel to know that the TAC committee

5    questioned your compliance in taking your hormones as a part

6    of their reasons to deny you a transfer?

7    A.  Truthfully, I feel like Ms. Morris is incompetent, because

8    if she was actually working for me, to help, she would have

9    brought my grievances that I wrote on a complaint about not

10   receiving my hormones from the medical staff or the

11   inconsistent hormone dosage or treatment.

12   Q.  Okay.  The next -- And I think we talked about your

13   hormone levels a lot.  Are these numbers consistent with what

14   you understood your hormone levels to be?

15   A.  No, originally the doctors was telling me that my Estrogen

16   was -- I had great -- good levels before I came to Lawrence --

17   I mean before I came to Menard, and through the time there it

18   was fluctuating, but I never knew it would have been something

19   like this.

20   Q.  Okay.  The next bullet it says, "She has a 107 ticket on

21   3/19/25 for masturbation while female was on the gallery."  Do

22   you see that?

23   A.  Yes, ma'am.

24   Q.  Do you have a recollection of what that is referring to?

25   A.  Yes, I know that I was written a ticket by staff, but it

1  was because -- it was like a retaliatory ticket to use against

2  me to try to basically keep me in seg.

3  Q.  Did that happen?

4  A.  It never actually happened.  And the committee, I believe,

5  normally gave you six months for something like that, and they

6  didn't give me six months for that, nor did the alleged female

7  staff that he claims was being masturbated to, she didn't put

8  her name as a witness, didn't come to the committee, she

9  didn't want to go along with the fabrication.

10 Q.  Do you know why?

11 A.  Because she knew he was fabricating.  She didn't want to

12 put it on me.  They know -- Most females that come across me

13 know that I'm generally a great person.

14 Q.  Any other bullet points on this as a basis?  Let me ask

15 you this.  Strike that question.

16        Is there any reason that you know of that would be a

17 reason not to transfer you to Logan?

18 A.  There's no reason I should not be transferred to Logan.

19 Q.  ███████████, I know you have been through a lot and you

20 have really wanted to come here and talk to the Judge.  Is

21 there anything else that you want the Court to know about --

22 about your experiences at Menard and why you think that it's

23 not safe for you?

24 A.  I just feel like it's an aggressive environment.  I think

25 they cultivating this type of violent behavior.  They are

1    rewarding it.  They don't respect you unless you are violent,

2    because they have a history of gang influence in that cultural

3    environment and they just can't respect the vulnerability of a

4    person.  Even with the women that works there, they keep the

5    women -- It's like a certain type of male is the dominant.

6    The woman is, "You go cook, you go clean, stay out the way,

7    speak and spoken to," type of environment for the males and

8    their women that work there, so they treat us even worse.

9           MS. PARSONS:  Judge, if you wouldn't mind giving me a

10   moment to confer with my colleagues, I think I am almost done.

11          THE COURT:  Sure.

12          (Brief interruption in proceedings)

13   Q.  (By Ms. Parsons) I have got a really smart team back

14   there.  I have to check with them first.

15          A few quick questions about -- I know you said you

16   got to wear a bra and panties when you were at Menard.  How

17   much access did you have to gender-affirming items at Menard?

18   A.  Considering the bra and panties I had was maybe a year and

19   a half old, something like that, we don't really get those

20   types of items regularly and they wasn't able to -- like never

21   was able to get them in seg.  But the fact there was staff

22   there that kind of sympathized with my issues, and he kind of

23   let me have the old ones I had in my box.

24   Q.  Did you ever trade things like food or grievance forms for

25   items from commissary?

1  A.  That's the only way I was able to get those items, yes.  I

2  always had to give them my food or maybe sew someone's clothes

3  or fix something for somebody just to get those items, yes.

4  Q.  Other than bra and panties, were there any items you were

5  able to get by trade or anything else that helped you get

6  gender-affirming item?

7  A.  Yeah, a few times I was able to get some shots of Magic

8  Shave, squeeze some Magic Shave out the tube for me to use,

9  yes.

10  Q.  So, for hair removal you either used Magic Shave or razors

11  whenever you could get access to them?

12  A.  I never had access to the razors, I was never able to get

13  those.  But some inmates, like they able to get Magic Shave,

14  and they will give me some if I give them a couple trays, or

15  they will squeeze some out for me.

16  Q.  In your experience at Menard, were you ever in the course

17  of a disciplinary action or punishment, did they ever take

18  your gender-affirming items?

19  A.  Yes, for most times they always was taking my property,

20  but it seems like when I did get some of my property back it

21  was always missing items that was specific to my gender-

22  affirming care.

23  Q.  Okay.  ███████████, I don't have any more questions.

24  Thank you for -- Unless the Judge has any questions for you,

25  Defense Counsel is going to ask you some questions now.

1    A.  All right.  Thank you.

2            THE COURT:  Just to be clear, Ms. Parsons, you marked

3    and showed the witness Exhibits 1 and 2.

4            MS. PARSONS:  Yes.

5            THE COURT:  Do you seek the admission of those at

6    this time?

7            MS. PARSONS:  I do.  Thank you, Your Honor.

8            THE COURT:  So, 1 and 2 will be admitted.

9            All right.  Cross-examination.

10

11                     CROSS EXAMINATION

12    BY MR. EDWARDS:

13    Q.  Good morning, ███████████.  How are you doing?

14    A.  Good morning, sir.

15    Q.  I am also sorry about your accident earlier.

16    A.  That's okay.

17    Q.  Yeah.  So, I just had a few short questions for you.

18            So, you mentioned you have been living at Lawrence

19    since about May 8, is that correct?

20    A.  May 8, yes.

21    Q.  Okay.  And you were at Menard for almost three years?

22    A.  Yes.

23    Q.  And how long have you been in prison with the Illinois

24    Department of Corrections?

25    A.  Since the year 2021, beginning of the year.

1  Q.  Okay.  And what led to that imprisonment?

2  A.  My -- I copped out.

3  Q.  And what do you mean by "copping out"?

4  A.  I took time for the case that I was incarcerated for.

5  Q.  Okay.  And what was the case that you were incarcerated

6  for?

7  A.  Sexual assault.

8  Q.  Okay.  Do you recall the charge?

9  A.  Yeah, sexual assault.

10  Q.  Sexual assault.  And that was the conviction, then, as

11  well, sexual assault?

12  A.  I'm assuming.

13  Q.  Okay.  And what was the first place that you were housed

14  in after you -- after your conviction?

15  A.  Lawrence.

16  Q.  Lawrence; okay.  Do you understand if Lawrence -- what

17  type of facility Lawrence is?  Is it like a medium level,

18  maximum level?

19  A.  Currently I believe it is medium max.

20  Q.  Medium max.  And Menard.  Do you know the classification

21  at Menard?

22  A.  Menard is a max.

23  Q.  Okay.  You mentioned you want to go to Lawrence -- Not

24  Lawrence, sorry.  You mentioned you want to go to Logan.  Do

25  you know the classification for Logan?

```
 1   A.  I do believe Logan has all three, or at least medium and

 2   max, because they have max females there.

 3   Q.  Have you ever filled out a transfer request prior to your

 4   transfer to Lawrence?

 5   A.  A transfer request with the QMHP?

 6   Q.  Yes.

 7   A.  Yes.

 8   Q.  Do you know how long QMHP has been around?

 9   A.  I'm not sure of your question.

10   Q.  Let me rephrase.  Explain what QMHP is.

11   A.  Mental health personnel.

12   Q.  And is that one of the mental health personnels that you

13   saw within the past six months at Menard?

14   A.  What do you mean?

15   Q.  You mentioned earlier that the -- there was mental health

16   staff that had been seeing you for at least five times in the

17   past six months, Ms. Klausing, I believe.

18   A.  Right.

19   Q.  Was that one of the individuals that you filled out your

20   transfer request with?

21   A.  Yes, I asked Ms. Klausing for a transfer.

22   Q.  Okay.  Thank you for clarifying.

23          And you requested to transfer to which facility?  I

24   apologize.  Can you refresh me a little bit?

25   A.  Logan.
```

```
 1   Q.  Logan.  And you were transferred to Lawrence, is that

 2   correct?

 3   A.  No, that's not correct.

 4   Q.  Okay.  How did you get to Lawrence?

 5   A.  I was transferred to Lawrence, but that's not -- that

 6   wasn't the nature of my request, the mental health.

 7   Q.  Understood.  Understood.  Thank you.  And, so, let's talk

 8   a little bit about your hormones.  So, you said that you take

 9   hormones regularly, or at least at Lawrence?  How is the

10   hormone situation there?

11   A.  I haven't been receiving hormones.

12   Q.  Okay.  But, you had hormones in the past at Menard?

13   A.  Menard issued me hormones.  It wasn't consistent.

14   Q.  Okay.  You said you had pills that you would take?

15   A.  I was on pills, the injections, and patches.

16   Q.  Okay.  And you prefer patches?  That's correct, right?

17   A.  I prefer the injection.

18   Q.  You prefer the injection.  Okay.  And you mentioned

19   earlier -- You said you don't believe the healthcare staff

20   there was trained, is that correct?

21   A.  Yes.

22   Q.  And how do you know that information?

23   A.  Because that's something they told me.

24   Q.  They told you personally?

25   A.  Yes.
```

1    Q.   Okay.  Have you ever refused hormones at Menard?

2    A.   No.

3    Q.   So if somebody were to offer you pills instead of a shot,

4    you would take the pills?  I don't know how that works, sorry.

5    I apologize.

6              Can you explain a little bit if there were no shots

7    how -- what is the process for hormones?  How do you receive

8    the difference between hormones --

9    A.   I'm not sure.  I'm not Medical.  I don't work that

10   facility.

11   Q.   Understood.  So, do you know if you have ever been

12   assessed as a predator by anyone at the Illinois Department of

13   Corrections?

14   A.   No.

15   Q.   And you don't know why that seems on the THAWC notes that

16   you were assessed as vulnerable and predator, right?

17   A.   Correct.

18   Q.   Okay.  Do you know if you have ever been assessed as a

19   flight risk by anyone at the IDOC?

20   A.   No, I wasn't assessed as a flight risk.

21   Q.   Okay.  And when you were in protective custody you

22   mentioned you were single-celled, is that correct?

23   A.   Correct.

24   Q.   And that was in the West House?

25   A.   Correct.

```
 1    Q.   Okay.

 2               MR. EDWARDS:  Your Honor, may I have a moment?

 3               THE COURT:  You may.

 4               (Brief interruption in proceedings)

 5    Q.   (By Mr. Edwards) Thank you, ███████████.  Just a few

 6    more questions.

 7               It might be a little sensitive questions, but your

 8    conviction, was that -- You said sexual assault.  Was that

 9    sexual assault of a male or female?

10    A.   A female.

11    Q.   Okay.  And --

12               MS. PARSONS:  Objection, Judge.  The objection is --

13    The question is argumentative.  I think the testimony that

14    came in was that ███████████ took a plea deal.  I think the

15    repeated use of conviction is misleading.

16               THE COURT:  Well, plea deal is -- a plea is still a

17    conviction.  You are not disputing that she has a conviction?

18               MS. PARSONS:  No, Judge.  I'll withdraw that.

19               THE COURT:  Okay.

20    Q.   So, ███████████, you said it was a female, is that

21    correct?

22    A.   Yes.

23    Q.   And was the female an adult or was the female a minor?

24    A.   The female is an adult right now.

25    Q.   At the time of the event, was the female an adult or a
```

1    minor?

2    A.  Yes.

3    Q.  Yes as to --

4    A.  A minor.

5    Q.  Okay.

6         MR. EDWARDS:  Actually, may I have one more moment,

7    Your Honor?

8         THE COURT:  You may.

9    Q.  (By Mr. Edwards) ████████████, I have no further

10   questions for you.

11        THE COURT:  Any Redirect?

12

13                    REDIRECT EXAMINATION

14   BY MS. PARSONS:

15   Q.  Very brief.  Counsel just asked you if you understood

16   whether you felt like a flight risk.  Do you remember that

17   question?

18   A.  He said was I assessed as a flight risk, yes.

19   Q.  I want to have you look at Exhibit 2 again, the document

20   we looked at.  Do you have that document in front of you, ████

21   ████████?

22   A.  Yes, ma'am.

23   Q.  We looked at the first page, the information they

24   considered.  But if you turn to the second page of Exhibit 2,

25   do you see at the top there's a name that says, "Dr. Puga"?

1  Do you see that?

2  A.  Yes.

3  Q.  Do you know Dr. Puga?

4  A.  I heard of the name.

5  Q.  Have you ever met with him in person?

6  A.  No, ma'am.

7  Q.  Ever seen him at Menard?

8  A.  No, ma'am.

9  Q.  Okay.  I want to point you to the second sentence.  It

10  says, "She is also in restrictive housing for conspiring to

11  escape and that is a very serious offense."  Do you see that?

12  A.  Yes.

13  Q.  Have you ever been given a ticket for conspiring to escape

14  when you lived at Menard?

15  A.  Yes.

16  Q.  Can you explain that to the Judge?

17  A.  I went to Court, and while in Court I told my Judge that I

18  was raped in Menard and that I didn't want to return, I wasn't

19  receiving medical attention, that they were drugging me and I

20  wasn't receiving, you know, like any type of mental health or

21  medical, and then the Judge basically was trying to get me to

22  explain everything that happened.  The staff that I was

23  walking with was basically like, "Okay, we have got to get him

24  back to Menard."  The Judge said, "I will see what I can do

25  and as far as documenting, but you have got to go back to

1   Menard."  I went back to Menard and I just received a ticket

2   two days later for conspiring to attempting to escape.

3   Q.  And did you also get an extended time period in

4   segregation for that?

5   A.  Yes, ma'am, I got six months across the board.  They

6   elevated my security risk, it made me a Level E.

7           MS. PARSONS:  No further questions, Judge.

8           THE COURT:  All right.  So, let's take about a

9   15-minute break, and get your next witness in the stand.

10          Are we finished with ██████████?  Is she excused

11  to go back?

12          MS. PARSONS:  Yes, Judge.

13          THE COURT:  So, she is excused to return?  No

14  objection?

15          MR. PENN:  Yes, Judge.

16          THE COURT:  Okay.  Let's resume at 11:00 a.m.

17          COURTROOM DEPUTY:  All rise.

18          (Court in recess from 10:46-11:03)

19          COURTROOM DEPUTY:  All rise.

20          THE COURT:  Be seated, everyone.  Our next witness is

21  in the stand.

22          COURTROOM DEPUTY:  Please raise your right hand.

23          (Plaintiff, ██████████, sworn)

24          COURTROOM DEPUTY:  Please state your name for the

25  record.

1      ████████████████████████████

2           MS. GARCIA:  For the record, Your Honor, Michelle

3      Garcia --

4           THE COURT:  Thank you, I was just going to ask.  You

5      all moved around.  I thought I had it figured out.  Okay,

6      thank you.

7           MS. GARCIA:  -- with the ACLU.  Thank you very much.

8

9                          DIRECT EXAMINATION

10     BY MS. GARCIA:

11     Q.  Good morning, █████████.  It's good to see you.

12     A.  Good morning.  You, too.

13     Q.  █████████, what pronouns do you use?

14     A.  *She* and sometimes *Them*.

15     Q.  What's your IDC number?

16     A.  ██████.

17     Q.  And how long have you lived at Menard?

18     A.  About three years, three and a half, approximately.

19     Q.  Are you a transgender woman?

20     A.  Yes.

21     Q.  Do you have a gender dysphoria diagnosis?

22     A.  Yes.

23     Q.  When did you first realize that you were a transgender

24     woman?

25     A.  2023.

1    Q.   Did you inform anyone at Menard that you are a transgender

2    woman?

3    A.   Yes.

4    Q.   Who did you inform?

5    A.   Mental Health.

6    Q.   How did you inform them?

7    A.   Verbally.

8    Q.   And after you told mental health staff that you were

9    transgender in 2023, did any of the guards know?

10   A.   Yes, the guard that was standing by overheard the

11   conversation.

12   Q.   And what was that guard's name?

13   A.   Karundo.

14   Q.   And did this affect how Officer Karundo treated you?

15   A.   Yes.

16   Q.   Can you explain?

17   A.   Well, he told -- he told the other inmates about my

18   conversation with Mental Health, which, for one, was

19   different, because they never spread anything about what they

20   hear me speak to the Mental Health or health staff about.  So,

21   that, for one, was different.  But, he also played lookout

22   while they would like jump me and things like that, and --

23   Q.   Okay.   ▒▒▒▒▒▒▒, I'm going to back up a little bit.

24        Did Officer Karundo tell people that you were

25   transgender?

```
 1   A.  Yes.

 2   Q.  And did that affect how male prisoners treated you?

 3   A.  Yes, it did, which is why I was trying to keep it to

 4   myself in the beginning and just talk to Mental Health about

 5   it.

 6   Q.  Okay.  Did Officer Karundo tell any other officers that

 7   you were a transgender woman?

 8   A.  Yes.

 9   Q.  Did that affect how the officers treated you as a

10   transgender woman?

11   A.  Yes.

12   Q.  Can you explain what you mean by that?

13   A.  Berating me about it in front of other -- other inmates,

14   pretty much letting it be known about my -- about my whole

15   situation when I originally only was trying to talk to Mental

16   Health about.

17   Q.  _____, why want to keep your identity as a

18   transgender woman a secret?

19   A.  Because of how they were already being treated amongst --

20   amongst general population and things like that.  They were

21   usually being ran off, beaten, just easy targets to be picked

22   on.

23   Q.  When you say "they," you are talking about transgender

24   women being beaten off and targeted?

25   A.  Yes.
```

1  Q.  And who was doing the targeting?

2  A.  The inmates and the staff in concert together.

3  Q.  Okay.  So I want to go back to something you mentioned

4  about Officer Karundo.

5  A.  Yes.

6  Q.  I am directing your attention to June or July 2023.  You

7  said that Officer Karundo acted as a lookout?

8  A.  Yes, he watched on the edge of the gallery and watched as

9  I was being jumped by other inmates.

10  Q.  And who jumped you?

11  A.  Vice Lords and a few other random gang members.  They kind

12  of -- They kind of group up against the LGBT community

13  members; so, yeah, they were the ones that jumped me that day.

14  Q.  Did Officer Karundo do anything to stop the male prisoners

15  from jumping you and assaulting you?

16  A.  No.

17  Q.  Were you hurt?

18  A.  Yes.

19  Q.  Can you describe your injuries?

20  A.  Yes, I had a -- I had like a sore -- a sore temple when I

21  was hit.  My arm was stepped on.  It was fairly quick, a few

22  punches, and they just tried to like stomp me out until

23  someone told them to stop.  Another inmate that knew me tried

24  to tell them to stop and they ran off.  And that's -- I

25  noticed Karundo kind of standing at the edge as it was -- as

1   it was happening, and he was still there when they was done

2   and he walked them off on a pass.

3   Q.  And how did it make you feel to see Officer Karundo

4   watching you get beat up and not do anything?

5   A.  It felt like it wouldn't have happened if -- if I never

6   had mentioned anything about the transgender thing, because

7   before they wouldn't like let other inmates harm me, they

8   would have took us all to seg or there would have been some

9   type of disciplinary action.

10  Q.  How do the guards treat transgender women in Menard?

11  A.  Pretty -- Pretty rough.  Sometimes it can go from any

12  miniscule level to like just taking sheets on a shakedown,

13  something like that, to macing them over, you know, petty

14  arguments, disputes, just -- It's a different treatment

15  altogether, not allowing them to have, like, showers and

16  things like that.  It's pretty rough, but I didn't know it

17  until I kind of got it firsthand.

18  Q.  Before you came out as transgender how were you treated?

19  A.  Just like one of the regular inmates.  And by "regular," I

20  just mean nonLGBT.  So, the officers will kind of like

21  mutually let people kind of fend for themselves, but at the

22  same time they would jump in if any, like, danger was to

23  happen, they would equally protect me from danger just as much

24  as they would protect the next person from danger from me

25  equally.

1    Q.  Now, you mentioned that you were jumped by prisoners in

2    June 2023 --

3    A.  Yes.

4    Q.  -- because you are trans.  Have you been assaulted by

5    anyone else because you are transgender?

6    A.  Yes.

7    Q.  How do the males treat transgender women at Menard?

8    A.  Really rough, just always try to make sure that they stay

9    inside their cell and never come out or run them off to PC.

10   They don't really like transgenders being in general

11   population at all, so they kind of do whatever they can.

12          So, it can go from a number of things as far as

13   beating them out of their commissary, beating them up in the

14   shower, just threatening them, not sharing the phone with them

15   when the phone comes on the gallery, making sure that they are

16   always skipped so they won't be able to call their family,

17   things of that nature.

18   Q.  And this treatment -- Did you witness this treatment?

19   A.  Yes.

20   Q.  And did it affect your gender dysphoria?

21   A.  Yes.

22   Q.  Can I explain how?

23   A.  Because as long as nobody didn't bring it up I wouldn't

24   bring it up and I would kind of blend in with the rest of

25   everybody else.

1    Q.  So, did it affect your ability to socially transition as a

2    transgender woman, to be open that you are a transgender

3    woman?

4    A.  Yes.

5    Q.  I'm going to direct your attention, █████████, to an

6    incident that occurred in March 2024.  In March 2024, did male

7    prisoners sexually assault you in the shower?

8    A.  Yes.

9    Q.  Can you describe what happened?

10   A.  They jumped me in the shower for coming to the shower, and

11   they held me down by my dreads and one inserted a thumb into

12   my rectum as they -- as they kicked and beat me with their

13   fist.

14   Q.  And how many men held you down?

15   A.  About -- About four.

16   Q.  Were you scared?

17   A.  Yes.

18   Q.  Did you cry out for help?

19   A.  Yes.

20   Q.  Did anyone come and help you?

21   A.  No.

22   Q.  How did you feel when you cried out for help and no one

23   helped you?

24   A.  That someone probably already knew and just didn't want to

25   come, because the shower that we were in was pretty close to

1   the office and there's usually a guard within distance just in

2   case something like that happens.  They would come and mace

3   the whole entire shower or mace the area of people that were

4   fighting.  You know, I have seen it happen between what I

5   would say is heterosexual inmates.

6   Q.   ██████████, after these men assaulted you did you cut

7   your long hair?

8   A.   Yes.

9   Q.   Why?

10  A.   I didn't want it to be used against me the way it was in

11  the shower.

12  Q.   How did cutting your long hair make you feel?

13  A.   Ashamed.

14  Q.   Did it affect you -- how you felt about yourself as a

15  woman?

16  A.   Yes.

17  Q.   Can you explain?

18  A.   I loved the fact that I have long hair.  It was just a

19  part of my identity and who I felt as a person.  I have grown

20  dreads almost as long as I remember, and it was just the way

21  that people recognize me as me, but it was kind of hard to get

22  rid of them, but it felt necessary.

23  Q.   To protect yourself from a further assault?

24  A.   Yes, and because it reminded me of the dirty shower floor

25  that I was -- that my dreads was soaked in while I was being

1    assaulted.

2    Q.    ████████████, at the time that you were sexually assaulted

3    at Menard in March of 2024, did anyone offer you a private

4    shower?

5    A.    No.

6    Q.    Did you continue to shower with men afterwards?

7    A.    No.

8    Q.    What did you do to wash up?

9    A.    I washed up in my cell.

10   Q.    Did you do anything to have privacy while you were washing

11   up?

12   A.    Yeah, I would put, like, my sheet up to kind of block from

13   people being able to see me bare naked.

14   Q.    Is having your sheet up in your cell permitted at Menard?

15   A.    No.

16   Q.    Were you disciplined for it?

17   A.    Yes.

18   Q.    How often were you disciplined for it?

19   A.    I was disciplined twice within -- within the span of like

20   about a week.

21   Q.    Did you receive tickets for it?

22   A.    Yes.

23   Q.    Did it affect your security?

24   A.    Yes.

25   Q.    How so?

1    A.   Because I was -- I was -- I was taken out of my cell into

2    seg and then out of a one-man cell and I was -- Placement

3    forced me to go to East House after that.

4    Q.   We will get to that in just a minute, okay?

5    A.   Okay.

6    Q.   After you were assaulted in the shower by male prisoners

7    did you file a grievance in May 2024?

8    A.   Yes.

9    Q.   Why did you file the grievance?

10   A.   I filed a grievance because the main guy who assaulted me

11   that day, I knew he was out of prison the month before, his

12   outdate was the month before, and I felt safe running to

13   protective custody and filing a grievance against the guy now

14   that he wasn't in the range of the prison, or at least I

15   thought he was kind of a powerful guy as far as having

16   influence over guards and inmates.

17   Q.   And what did you grieve?

18   A.   I grieved the PREA.

19   Q.   What did you want to happen as a result of the grievance?

20   A.   I wanted to be protected from inmates and from the Vice

21   Lords that were -- that had attacked me.

22   Q.   Did you ask for a private shower?

23   A.   Yes.

24   Q.   Did you ask for a transfer?

25   A.   Yes.

1   Q.  And why did you want a transfer after you were assaulted?

2   A.  Because I didn't want to be in the same prison that that

3   type of stuff was going on where they would -- where they

4   would collude together with inmates and guards.  It was hard

5   enough fighting inmates.

6   Q.  ███████████, I'm going to direct you to open up your

7   binder.

8           MS. GARCIA:  Your Honor, would you like a binder?

9           THE COURT:  Yes, please.

10  Q.  (By Ms. Garcia) ██████████, I am marking this -- I am

11  directing your attention to the first tab that you have there.

12  A.  Uh-huh.

13  Q.  I am marking this document as Plaintiffs' Exhibit 3.

14  A.  Okay.

15  Q.  Okay.  I am showing you a document entitled Illinois

16  Department of Corrections Offender's Grievance, dated May 29,

17  2024.

18  A.  Yes, I see it.

19  Q.  Do you see it?  Did you take a look at it?

20  A.  Yes.

21  Q.  Have you seen this grievance before?

22  A.  Yes.

23  Q.  What is it?

24  A.  It is a grievance that I filed in the facility at Menard

25  Correctional Center.

1    Q.   Is that your handwriting?

2    A.   Yes.

3    Q.   Is that your signature?

4    A.   Yes.

5    Q.   Is this the grievance that you filed after you were

6    sexually assaulted in the showers?

7    A.   Yes.

8            MS. GARCIA:   Your Honor, we offer Plaintiffs' Exhibit

9    3 into evidence.

10           THE COURT:   3 will be admitted.

11   Q.   (By Ms. Garcia) ███████████, take a minute to look at the

12   exhibit.   I want to ask you a question again that I asked you.

13   Did you ask for any particular kind of housing?

14   A.   A facility where I can receive proper medical care.

15   Q.   And what kind of medical care were you referring to?

16   A.   Medical care for my gender transition.

17   Q.   What medical care did you want?

18   A.   I wanted any type of medication that they could offer and

19   surgery, things of that nature.

20   Q.   Okay.   And at the time that you filed this grievance were

21   you receiving any sort of -- When you say "medication," do you

22   mean hormone therapy?

23   A.   Yes.

24   Q.   At the time you filed this grievance in March 2024, were

25   you receiving hormone therapy?

1    A.  No.

2    Q.  Had you -- Had anyone spoken to you about gender-affirming

3    surgery?

4    A.  They said it was possible.  But as far as me getting it,

5    they still haven't helped me out with any plan or directive of

6    how it can be achieved.

7    Q.  And at the time that you filed this grievance did you

8    think that you would be able to get medical care for gender

9    dysphoria at Menard?

10   A.  Yes, I was hoping that it would be offered or at least

11   allow me to go to a facility that would help me.

12   Q.  Okay.  Thank you.  We are done with that exhibit.

13   A.  Okay.

14   Q.  Okay.  After the assault, where did you live in Menard?

15   A.  I was living in East House.  After I got out of seg I went

16   to Cell 1020.

17   Q.  Did you feel safe in East House?

18   A.  No.

19   Q.  Is East House general population?

20   A.  Yes.

21   Q.  And why didn't you feel safe?

22   A.  The reason I didn't feel safe is because I wasn't allowed

23   to take a single shower.  And when I tried to take a shower, I

24   was told by the inmates that this time I would be stabbed if

25   they seen me in the shower, so I applied for PC, and it took a

1   while for the guard to actually allow me to go to PC.

2   Q.  And PC -- You mean protective custody?

3   A.  Yes.

4   Q.  And did you move into protective custody in July 2024?

5   A.  Yes, I was in protective custody at least by May.  That's

6   why I felt comfortable to file the grievance.  And by July I

7   was still there at the time -- I believe July I was in Cell

8   703 in West House.

9   Q.  Did you have a cellmate named Michael Tate?

10  A.  Yes.

11  Q.  Can you -- When was Michael Tate put in your cell?  Was

12  this when you were in protective custody?

13  A.  Yes.

14  Q.  And when was Michael Tate put in your cell?

15  A.  It was the day I had a Mental Health pass, approximately

16  July 9th, and I had a Mental Health pass about my PREA

17  grievance that was filed about the March shower incident, and

18  I was asked by staff was there any retaliation or things of

19  that nature.  I was out of my cell for probably about five

20  minutes, it was about 10:00 in the afternoon at that time,

21  about going on 11 a.m., and when I returned Michael Tate was

22  already in my cell.

23  Q.  What was your response when you saw Michael Tate in your

24  cell?

25  A.  Complete shock.

1  Q.  Why were you shocked?

2  A.  For a few reasons.  The first one being that no guard told

3  me that I was getting a celly that day.  The second reason was

4  because he had a -- he had a tattoo on his face that resembled

5  pretty much the mark of a Vice Lord.

6  Q.  And why were you concerned that he had a tattoo showing

7  that he was a Vice Lord?

8  A.  Because it felt like I was being ambushed and I was

9  supposed to be protected.  And not only that, because of my

10  ID, me being a transgender inmate, I wasn't supposed to have a

11  celly.

12  Q.  How do Vice Lords treat transgender women at Menard?

13  A.  Very harshly.

14  Q.  What do you mean by that?

15  A.  They are pretty much the leading gang that -- that spews

16  hate about the LGBT community.

17  Q.  Were you scared of Michael Tate?

18  A.  Yes.

19  Q.  Did Michael Tate attack you?

20  A.  Yes, he did.

21  Q.  When did he do that?

22  A.  About a few days later, approximately on the 14th.

23  Q.  Can you describe what happened?

24  A.  I was -- It was the day after Donald Trump had got shot,

25  and I was trying to talk to a neighbor about whether he

1  thought it was conspiracy or not, and out of the blue Michael

2  Tate had approached me and asked me something that made me

3  kind of lean in to figure out what he was saying, and then he

4  just sucker-punched me out of the blue.  And when I came to, I

5  was on the bottom bunk, which was the bunk that he was

6  occupying at the time, and I was stuck between him and the

7  bunk and started realizing that I was being sexually assaulted

8  by him.

9  Q.  Did he pin you down?

10  A.  Yes, he pinned me down with his left arm.  When I tried to

11  move, he like -- kind of like grappled me, scratched up my

12  back as I tried to get up from under his hold, but I was

13  pinned down because he was a pretty heavy-set guy.

14  Q.  And your pants were down?

15  A.  Yes.

16  Q.  And he was on top of you?

17  A.  Yes.

18  Q.  Did you call out for help?

19  A.  Yes.

20  Q.  Did anyone come help you?

21  A.  No.

22  Q.  Did any male guards come help you?

23  A.  No.  A male guard came by the cell, but by that time I had

24  rolled Michael Tate off of me and we were fighting back and

25  forth.  The guard just kind of watched and walked off twice.

1    Q.    Why did you fight Michael Tate?

2    A.    Because I was trying to protect myself from being further

3    assaulted.

4    Q.    And after the guard walked off, how did you feel?

5    A.    I felt like I was alone in there, because I had just sent

6    one of the inmate workers that knew me quite well to go get

7    the guard specifically, and he had told me that the guard was

8    already up on his way back up the stairs to bring other

9    inmates back from a pass, so I felt like it would be over

10   soon.  But he just kind of like shrugged past us, locked the

11   other guys up in their cells, and then he came back and

12   watched for a little bit as we were grappling and still

13   fighting and he walked off again.

14   Q.    Did the fight eventually get broken up?

15   A.    Yes.  I had to call out to a guard that was holding a gun

16   on the catwalk, and I kind of flagged him down as I -- well,

17   with my voice I kept screaming for him, because Tate had me

18   pinned to the bars.

19   Q.    And did he come down to the cell?

20   A.    From the catwalk he could -- he could basically walk

21   within range of, you know, of seeing us, and he pulled out his

22   gun and threatened to shoot if Tate didn't get off of me.

23   Q.    Did he get off of you?

24   A.    Yes, he backed up and he sat on the toilet.

25   Q.    Okay.  And did anyone come and cuff you up?

1    A.  Yes, there were -- The guard that was our original gallery

2    guard showed up with a white shirt, which I believe is either

3    a sergeant or a lieutenant, and then a few other guards came,

4    as well.  And they told us to cuff up, but neither one of us

5    wanted to cuff up first, so I suggested that we cuff up at the

6    same time so we wouldn't have to worry about the other one

7    harming the other one while they were in cuffs.

8    Q.  ████████, were you hurt as a result of the assault by

9    Tate?

10   A.  Yes.

11   Q.  How were you hurt?

12   A.  My back was scratched up, I had a -- I kind of had a

13   throbbing pain from being hit in my cheek bone, and my rectum

14   and scrotum area were badly irritated from when he was trying

15   to pin me down.  I think it was some type of strategy or

16   something he was using, but he was like grabbing my genitals

17   and pulling at them every time I tried to roll him off of me,

18   and the nail of his thumb kept on like scratching that area

19   really bad, so I had like scratches down there and stuff.  It

20   was like really sore.

21   Q.  Did you go to healthcare?

22   A.  Yes.

23   Q.  What happened at healthcare?

24   A.  I told the nurse about my scratch on the back, I told her

25   that I wanted to file a PREA right then and there.

1   Q.  Did she tell you file a PREA?

2   A.  No, not exactly.  She told me that she was new and that

3   she had to go talk to somebody and she would be right back.

4   But, when she came back she just apologized and said she

5   didn't know what to do.

6   Q.  So, you weren't able to file a PREA right then and there?

7   A.  No.

8   Q.  Did you report rape to the nurse?

9   A.  I did.

10  Q.  Did the nurse give you a rape kit?

11  A.  No.

12  Q.  Did you want one?

13  A.  Yes, if they would have offered it I would have took it.

14  Q.  Now, after Healthcare where did you go?

15  A.  I went to the seg building in North 2, and then I was

16  processed by I/A.

17  Q.  Okay.  Did the Internal Affairs officer interview you?

18  A.  Yes.

19  Q.  Did the Internal Affairs officer take pictures of your

20  back?

21  A.  Yes.

22  Q.  Did you report the rape to the Internal Affairs officer?

23  A.  At that time I only admitted that Tate tried to rape me

24  and I fought him off, because we were around so many other

25  inmates and people that knew me that I was a little too

1   embarrassed at that time to admit within earshot of everybody

2   that Tate had actually succeeded, because I knew how far that

3   would have traveled around the prison.

4   Q.  Let me get this straight.  The Internal Affairs officer

5   talked to you while other people could hear?

6   A.  Yes.

7   Q.  Besides the nurse, did you mention the rape to anyone

8   else?

9   A.  Yes, eventually I -- When it first happened I mentioned it

10  to the guards that came to the door to cuff us up.  They told

11  me just wait and they will get me out of here and processed,

12  so I thought they meant they will have my PREA processed with

13  the nurse, so then I told her second.  And I also told the

14  guard that was transporting me from the West House cell house

15  where me and Tate were housed, to the Healthcare, and he said

16  that he was new so he didn't really know what to do, so

17  technically he was the second person and then the nurse was

18  third.  And eventually I did reveal to I/A in more closed

19  setting what actually did happen that day.

20  Q.  Did you receive any mental health care as a result of the

21  rape?

22  A.  No.

23  Q.  Did you want it?

24  A.  Yes.

25  Q.  Now, did Menard discipline you for defending yourself?

1    A.   Yes.

2    Q.   Can you explain how they disciplined you?

3    A.   They said that -- They said that I was refusing to cuff up

4    and that I disobeyed a direct order by not cuffing up at the

5    exact second that they told me to cuff up due to my safety

6    concerns of being cuffed while in a cell with Tate.  And then

7    suggesting we both be cuffed up at the same time, they counted

8    it as disobeying a direct order, so I was punished for that.

9    I was also punished for fighting Tate and I was given, I

10   believe, 30 days or so of seg time or something around there.

11   30 days of seg time.

12   Q.   Can you describe the conditions of segregation?

13   A.   Segregation is pretty much you're in a cell by yourself,

14   segregated behind -- behind a door or behind like a wall and

15   you're allowed very limited movement, which is ironic, because

16   the entire prison is kind of like segregation, but in this

17   area you are not allowed to have certain accommodations like

18   your TV or certain appliances, property.  All of those things

19   go to storage while you are in a cell by yourself.

20   Q.   And being placed in segregation, how did that make you

21   feel?

22   A.   It made me feel like I was being punished for defending

23   myself and that I was being over-punished for speaking up

24   about what happened, because it was my first fight.  And

25   typically with first fights they only give you seven days seg

1    time, but they found an excuse or a way to give me 30 days for

2    the fight.

3    Q.   Where were you placed after segregation?

4    A.   I was -- I was placed in East House.

5    Q.   And that's in general population?

6    A.   Yes.

7    Q.   And how does general population in East House treat

8    transgender women?

9    A.   Very harshly as far as the violence goes there.  As I

10   mentioned before, I wasn't even allowed to try to get a shower

11   in with the group, even though I was being denied my single

12   shower.  They were threatening to stab me, so I knew that if I

13   went back to -- if I went back to East House that things

14   wouldn't go well for me, so I immediately tried to sign back

15   into the PC.

16   Q.   And what happened?  Did you get protective custody?

17   A.   Yes, I was placed in protective custody in the -- I'm

18   sorry.  It's an area next to B of I.

19   Q.   ██████████, that's fine, you don't have to know the

20   precise place.

21              In protective custody were you single-celled?

22   A.   Yes, I was single-celled, I was supposed to be, until they

23   moved me.

24   Q.   And when they moved you what happened?

25   A.   They put me from cell 916 to cell 901 where another Vice

1    Lord named Jones was housed.

2    Q.  And how did you -- What was your response when you saw

3    that there was another Vice Lord in the cell with you?

4    A.  That there's no way I am naive enough to believe that this

5    is a mistake that they made twice.  It made me feel like even

6    placement is in a -- It made me regret that I filed a

7    grievance about what happened in the shower in March, because

8    I probably would have never got put in this predicament.  I

9    felt like it was a repeat, like it was all going to happen

10   again.

11   Q.  Did you let anyone know about this?

12   A.  Yes, as far as I could.  I told them I'm not supposed to

13   have a celly and things like that.  I showed them the back of

14   my ID.

15   Q.  What was on the back of your ID?

16   A.  It showed that I was a transgender inmate and that I was

17   to be searched by a female guards only.

18   Q.  Who did you show this to?

19   A.  I showed it to the guard that was moving me to cell 901.

20   Q.  What was his response?

21   A.  That I could catch a ticket and go to seg by refusing

22   housing or I could just deal with it.

23   Q.  What did you decide to do?

24   A.  I decided not to refuse housing, because it can go against

25   my record and stop me from being transferred.  I would have

1   been stuck in Menard even longer off of a behavioral

2   disciplinary action.

3   Q.   Okay.  After Tate sexually assaulted you in July did you

4   file a grievance in August 2024?

5   A.   Yes, I did.

6   Q.   Why did you file one?

7   A.   Because it was the first time I was able to get to a

8   grievance, and I filed it because I felt I had -- I had to do

9   something to stand up for myself.

10  Q.   Did you explain that you were transgender?

11  A.   Yes.

12  Q.   Why did you explain that?

13  A.   Because it felt necessary to reiterate the fact that I was

14  transgender and I wasn't supposed to be housed in a cell with

15  Tate or any other inmate that's not transgender.

16  Q.   What did you want to happen as a result of your grievance?

17  A.   I wanted them to stop placing me in the -- in bad

18  situations, but after that grievance they put me in a cell

19  with Jones.

20  Q.   Did you ask for the removal of the discipline for

21  fighting?

22  A.   Yes.

23  Q.   Did you ask to transfer?

24  A.   Yes, I did.

25  Q.   ███████████, I'm going to mark as Exhibit -- Plaintiffs'

```
 1   Exhibit 4.  In your binder, if you go to the next tab, I'm

 2   showing you a document entitled Illinois Department of

 3   Corrections Offender's Grievance, dated August 13, 2024.  Is

 4   this the grievance you just talked about?

 5   A.  Yes.

 6   Q.  Have you seen this exhibit before?

 7   A.  No, not as an exhibit.  I seen it when I wrote it, the

 8   original.

 9   Q.  Thank you.  I didn't realize my question was sort of

10   silly.

11   A.  Okay.

12   Q.  Is that your handwriting?

13   A.  Yes.

14   Q.  And that's your signature?

15   A.  Yes.

16          MS. GARCIA:  Your Honor, we offer Plaintiffs' Exhibit

17   4 into evidence.

18          THE COURT:  4 will be admitted.

19   Q.  (By Ms. Garcia) _____, can you look at Plaintiffs'

20   Exhibit 4 for a moment, please?

21   A.  Yes.

22   Q.  Can you look at what you requested that they do?

23   A.  Yes.

24   Q.  Now, I'm going to ask you a question again.  Did you

25   request anything in particular from Menard to help you?
```

1    A.  Yes.  For one, no more retaliation for my -- from any

2    officers in concert with gang members, specifically Vice

3    Lords.  For my PREA processes I asked for fair and humane

4    treatment in housing units.  I asked for no C-grade for the

5    fight that had happened between me and Tate and

6    acknowledgement that I wasn't supposed to be placed in a cell

7    with other inmates.

8    Q.  And did you receive anything that you aggrieved?

9    A.  No.

10   Q.  You can close the book.

11   A.  All right.

12   Q.  Where do you live now at Menard?

13   A.  I live in PC.  They flipped the sides from odd to even, so

14   right now I am still in West House, but cell 819.

15   Q.  Does West House have any cameras?

16   A.  No.

17   Q.  How does that make you feel knowing there are no cameras

18   in West House?

19   A.  Anxiety, like something could possibly happen and no one

20   would ever know, it would just be whatever story is made up.

21   Q.  And when you say "something could possibly happen," who

22   are you talking about?  What are you afraid of?

23   A.  For example, when I was forced to go in a cell with Jones

24   in 901, something could have happened.  He revealed to me that

25   he was told to not only harm me, but to kill me, because he

1    had a life sentence and was going through an appeal process

2    himself, so he said he didn't want anything to do with what

3    they were trying to have him do to me and we ended up cordial,

4    luckily.  But, not having those cameras there makes me think

5    about what could have happened if Jones wasn't in such a

6    cordial mood.

7    Q.  Now, are you single-celled right now?

8    A.  Yes.

9    Q.  How long have you been single-celled?

10    A.  I have been single-celled since my grievance, probably

11    like I think about -- about around December of last year.

12    Q.  December 2024?

13    A.  Yes.

14    Q.  Okay.  Do you feel safe single-celled as a transgender

15    woman in protective custody?

16    A.  I feel safer versus -- versus when I am housed with other

17    random inmates or Vice Lords.

18    Q.  Why did you say "safer"?

19    A.  Because I still don't feel safe at Menard.

20    Q.  ████████, do you have an ID that reflects that you are

21    female?

22    A.  Yes.

23    Q.  Does it reflect that you want female guards to search you?

24    A.  Yes.

25    Q.  Approximately when did you receive it?

1    A.   About April -- April of 2023, approximately.

2    Q.   After you received that ID, did male guards strip-search

3    you?

4    A.   Yes.

5    Q.   How often did it happen?

6    A.   As often as I would go visit my daughter -- I mean, my

7    daughter would visit, have a contact visit with me, and I

8    would go to North 2, and they would search me sometimes during

9    a shakedown search where the house would get shaken down,

10   sometimes then.  But generally, as often as I would go on my

11   visits with my daughter I would be -- I would be searched by a

12   male guard.

13   Q.   And being searched by a male guard, did that affect your

14   gender dysphoria?

15   A.   Yes.

16   Q.   Did that affect your ability to social transition as a

17   woman and be out as a transgender woman?

18   A.   Yes.

19   Q.   Have you had visits with your daughter in 2024?

20   A.   Yes.

21   Q.   In each of those visits you were strip-searched by a man?

22   A.   Yes.

23   Q.   Have you had visits with your daughter in 2025?

24   A.   Yes.

25   Q.   In each of those visits were you strip-searched by a man?

1  A.  Yes.

2  Q.  Before coming to court were you strip-searched by a man?

3  A.  Yes.

4  Q.  How did that make you feel?

5  A.  Like the back of my ID meant nothing.

6  Q.  Now, ▬▬▬▬▬▬, in protective custody do you have access

7  to a private shower?

8  A.  No.

9  Q.  How do you wash up?

10 A.  I wash up in a cell in my housing unit.

11 Q.  You testified earlier that you would put up a sheet for

12 privacy.  Are you still doing that?

13 A.  Not as often.  I would just sometimes wash up during a

14 time where I would think everybody is asleep or while a guard

15 isn't walking by, that way the sheet, then, isn't used against

16 me to put me in seg.

17 Q.  Right now at Menard can you buy female commissary items?

18 A.  No.

19 Q.  Do you wear makeup?

20 A.  No.

21 Q.  Why not?

22 A.  Because I don't want to get hassled by the inmates around

23 me or by the people that are selling them to me.

24 Q.  If you weren't going to be hassled would you wear it?

25 A.  Yes.

1  Q.  What about hair removal?  Are you able to remove your

2  facial hair?

3  A.  No.

4  Q.  Would you like to remove it?

5  A.  Yes.

6  Q.  How does having facial hair make you feel as a transgender

7  woman about your body?

8  A.  The way that it grows, it just makes me feel very

9  uncomfortable at times, to say the least.

10  Q.  ███████████, do you have access to female undergarments,

11  like a bra or panties?

12  A.  Another inmate gave me a bra, so I have that one.

13  Q.  When did she give you that bra?

14  A.  About -- About January of this year.

15  Q.  Did anyone at Menard offer you a bra or panties?

16  A.  Besides that inmate, no.

17  Q.  Would you like to have those items?

18  A.  Yes, available to buy my own or just available, period,

19  yes.

20  Q.  How would having those items make you feel?

21  A.  Like myself.

22  Q.  Currently, ███████████, are you receiving hormone therapy?

23  A.  As of the 17th of this month, I was just started on a few

24  medications.

25  Q.  So you were started hormone therapy May 17, 2025?

1   A.   Yes.

2   Q.   And what are you taking?

3   A.   I didn't receive the names of them.  They just started

4   coming, so I started taking them.

5   Q.   And how do you receive the medication?

6   A.   Through a nurse that comes at third shift, about 2 or 3:00

7   in the morning.

8   Q.   And are you awake when she shows up?

9   A.   No, they usually have to wake me up.

10  Q.   Okay.  Have you missed any medication?

11  A.   Yes.

12  Q.   And how did it make you feel to miss your hormone therapy?

13  A.   Like I needed a better schedule setup.

14  Q.   Do you take any other medication at Menard?

15  A.   Yes.

16  Q.   And when is that delivered to you?

17  A.   Between 6 and 9 p.m. on second shift.

18  Q.   And do you miss that medication when you get it?

19  A.   No.

20  Q.   ███████████, when did you first request hormone therapy at

21  Menard?

22  A.   Approximately like a year and a half ago.

23  Q.   So, in 2023?

24  A.   Yes.

25  Q.   Did anyone give you an explanation why you waited a year

```
 1   and a half for hormone therapy?

 2   A.   In the beginning they just told me that they have to

 3   monitor me to see if I would change my mind or something to

 4   that nature.

 5   Q.   And how are you monitored?

 6   A.   Actually, I have no idea.

 7   Q.   Besides hormone therapy, do you want gender-affirming

 8   surgery?

 9   A.   Yes.

10   Q.   What kind of gender-affirming surgery would you like?

11   A.   The one that would change my genitalia.

12   Q.   Why do you want that?

13   A.   So I could be accepted and confirmed as a female.

14   Q.   How does having a penis make you feel?

15   A.   It makes me feel uncomfortable, to say the least.

16   Q.   Do you think about it daily?

17   A.   Yes.

18   Q.   Do you think about it -- How many times a day do you think

19   about it?

20   A.   A lot.  The fact that it makes me feel like I'm not

21   myself.  I mean, I have only had one use for it and that's to

22   create the beautiful kids that I have made, but besides that I

23   just wanted to be myself.

24   Q.   Have you received any information about gender-affirming

25   surgery at Menard?
```

1   A.   No.

2   Q.   And, I am sorry, I don't know if you already said this.

3   When did you first make that request for surgery?

4   A.   About -- About approximately a year ago for the surgery.

5   Q.   And how did you request the surgery?

6   A.   Verbally, and sometimes through written kites, and then I

7   signed a contract with Mental Health to have it done.

8   Q.   When was that done?

9   A.   The contract was signed about a month and a half ago,

10  about approximately two months ago.

11  Q.   Is this contract known as *Path to Informed Consent*?  Does

12  that ring a bell?

13  A.   It may be.

14  Q.   Okay.  So, just to be clear, you requested surgery over a

15  year ago, and just less than two months ago you had a

16  discussion about gender-affirming surgery?

17  A.   Yes.

18  Q.   Okay.  Let's talk about transfers.

19  A.   Okay.

20  Q.   We have sort of talked a little bit about it.  Did you

21  submit two declarations in this case in 2024 to transfer out

22  of Menard?

23  A.   Yes.

24  Q.   You also testified that you asked to transfer as part of

25  your May 2024 grievance?

1   A.   Yes.

2   Q.   Do you want to transfer out of Menard now?

3   A.   Yes.

4   Q.   Why?

5   A.   Because I want to get the proper care and be in an

6   environment that's a little bit more adaptable to the gender

7   dysphoria thing instead of it being kind of like an

8   environment of religious hatred towards it.

9   Q.   Who has religious hatred towards transgenders at Menard?

10  A.   It seems like the guards and the inmates, too.

11  Q.   Have you heard of the Transgender Administrative

12  Committee, TAC?

13  A.   No, not by that name.

14  Q.   Did you know that the TAC committee met on April 29th,

15  2025, about your transfer request?

16  A.   No, I didn't.

17  Q.   Did anyone talk to you about this?

18  A.   I believe a lady walked up and asked me did I want to

19  transfer somewhere, but I thought that was the counselor.

20  Sometimes the counselor will do that.

21  Q.   When did this lady walk up and ask if you wanted to

22  transfer?

23  A.   Possibly around that time that you mentioned.

24  Q.   How long did you speak to her?

25  A.   For -- I mean, she asked me the question, I answered, and

```
 1   then she walked off.
 2   Q.   And so she didn't ask you any reasons -- any questions
 3   about why you want to transfer?
 4   A.   No.
 5   Q.   Where would you like to transfer?
 6   A.   To either Logan, Centralia, or Mt. Sterling, somewhere
 7   that's a little more progressive.
 8   Q.   And Logan is a women's prison.  Why do you want to
 9   transfer to a women's prison?
10   A.   Because I feel I would fit in.
11   Q.   Would it help your ability to transfer as a woman?
12   A.   Yes.
13   Q.   Would it help your gender dysphoria?
14   A.   Yes.
15   Q.   And why did you also mention Centralia prison?
16   A.   Because from what I have been learning from other
17   transgender inmates that there's a very supportive community
18   there.
19   Q.   Has anyone at Menard told you about Centralia PRISM?
20   A.   Yes.
21   Q.   Who?
22   A.   Another transgender inmate.
23   Q.   But nobody who actually worked at Menard?
24   A.   No.
25   Q.   And Mental Health never discussed PRISM with you?
```

1   A.  No, besides that one time that the lady asked where did I

2   want to go.

3   Q.  Okay.  ███████████, is there anything else you want to

4   explain to the Court about your experiences at Menard as a

5   transgender woman?

6   A.  I have never had issues with certain things when I was

7   seen as a regular inmate.  For example, contact with my

8   lawyers, contact with you.  For example, mail to the courts or

9   anything.  But, since coming out as a transgender, not only

10  have I been bullied in so many other ways, but when it comes

11  to the way that my mail was mishandled, things that were

12  blocked or mysteriously missing, I feel very harassed.

13  Q.  And can you talk about what happened with legal calls with

14  me?

15  A.  The legal calls were sometimes blocked all the time or,

16  you know, just getting like the runaround.  For example, like

17  even with the mail thing and having contact with you has been

18  so hard that my appeal lawyer is having issues with getting

19  any type of legal calls or contact with me, because it's as if

20  by blocking our contact they think that they are also blocking

21  -- by blocking his contact with me, it's like they think they

22  are blocking my contact with you, as well.

23          On one of the grievances that I filed I had to write

24  four handwritten copies after the incident with Tate, and I

25  sent one to Springfield to the John Howard Association and I

1    put one in the grievance box, as it's supposed to be

2    processed, and then I mailed one to you certified mail to make

3    sure it could be tracked.  And the only one that survived is

4    the one that came to you through certified mail, and even then

5    it was -- it was slowed down when I would write the counselor

6    to see -- to check on the tracking numbers and, you know, to,

7    "Hey, where is this mail that I sent Michelle Garcia, my

8    lawyer?"  I would be told things like -- And I still have the

9    copies.  I would be told things, "It says on the UPS website

10   that it still hasn't been delivered," you know, and it would

11   take months.  But then when you finally received it we were

12   able to -- able to make -- to process it.

13   Q.  Okay.

14         THE COURT:  And when was this?  This was shortly

15   after the grievance in August of 2024?  When was it that you

16   sent the certified letter?

17   A.  Oh, I sent it -- I sent it out that day.  I sent it out

18   August 13th, the day it was mailed, the day I written it.

19         THE COURT:  Okay.

20   Q.  (By Ms. Garcia) Okay.  ▮▮▮▮▮▮▮▮, we are done for now.

21   The other side is going to ask you questions.

22         THE COURT:  Ms. Garcia, you said her case was

23   presented to TAC on April 29th, but I don't see it mentioned

24   in the minutes that I have in Exhibit 2.  Is there a separate

25   set of minutes?

1           MS. GARCIA:  Let me just check, Your Honor.

2           THE COURT:  Okay.

3           MS. GARCIA:  I do apologize, Your Honor.  That is not

4    on that exhibit.  I made a mistake.

5           THE COURT:  Okay.

6           MS. GARCIA:  She was not considered by the TAC group

7    on that date.

8           THE COURT:  Okay.

9           MS. GARCIA:  I apologize.

10          THE COURT:  No, I am just trying to keep myself

11   straight.  Thank you.

12          All right.  Who will cross-examine?

13

14                    CROSS EXAMINATION

15   BY MR. EDWARDS:

16   Q.  Good afternoon, ██████████.

17   A.  Hello.

18   Q.  I just have a few quick questions for you.

19          So, you arrived to Menard about three years ago, is

20   that correct?

21   A.  2021.

22   Q.  2021, okay.  And you realized you were transgender in

23   2023, is that also correct?

24   A.  Yes.

25   Q.  Okay.  So, I'm just going to go a little bit through your

1    background about what led you to your imprisonment in the
2    Illinois Department of Corrections.
3    A.   Okay.
4    Q.   So, what happened to lead you to being imprisoned in the
5    Illinois Department of Corrections?  Let's start there.
6    A.   I was convicted in earlier 2021 in Lake County, Lake
7    County jail of Illinois.
8    Q.   Okay.  And what were the charges that were filed against
9    you?
10   A.   Attempted murder, home invasion, and aggravated criminal
11   sexual assault.
12   Q.   And were you found guilty on those charges?
13   A.   Yes.
14   Q.   And where was the first place that you went to after your
15   conviction?
16   A.   Stateville.
17   Q.   Okay.  How long did you stay in Stateville?
18   A.   About a month or so.
19   Q.   Okay.  Let me take this back a little bit.  What year did
20   you get convicted?
21   A.   I got convicted 2021, also.
22   Q.   So, you were in Stateville for a little bit and then where
23   did you go next?
24   A.   Menard.
25   Q.   Menard.  And so can you walk me through the process a

```
 1   little bit about how does somebody become -- how does a
 2   transgender inmate reach transgender status?  How do you
 3   declare transgender status?
 4   A.  I'm sorry.  Can you rephrase the question?
 5           MS. GARCIA:  Objection.  Calls for speculation.
 6           THE COURT:  Well, I think if you know, how do you let
 7   someone at the prison know that you are transgender?
 8   A.  Oh, you reach out to mental health staff and I believe you
 9   go through them, which is what I did.
10   Q.  Okay.  And so you realized in 2023 that you were
11   transgender, and then in April of 2023, you also received an
12   ID indicating that you are transgender, is that correct?
13   A.  You said April of 2023?
14   Q.  Yeah, that's what you testified to.
15   A.  No, April 2024.
16   Q.  April of 2024.
17   A.  I received the ID.
18   Q.  You received the ID, okay.
19           And, so, prior to that -- Actually, strike that.
20           Currently you are single-cell housed, is that
21   correct?
22   A.  Yes.
23   Q.  And you have been single-house cell housed since April of
24   2024, is that correct?
25   A.  Yes.
```

```
 1   Q.  And you feel much safer now than before you were housed
 2   single-cell cell house, is that also correct?
 3   A.  Than when I was housed single-cell where?
 4   Q.  Strike that.
 5            You testified earlier you felt safer --
 6   A.  Safer.
 7   Q.  -- that you are now single-cell housed.  And where are you
 8   housed now?
 9   A.  I am sorry.  Just to clarify, I felt safer than when I was
10   housed with Vice Lords, --
11   Q.  Yes.
12   A.  -- other inmates that weren't transgender --
13   Q.  Yes.
14   A.  -- that were being used to attack me.
15   Q.  Thank you for that clarification, ██████████.
16            So where are you currently housed?
17   A.  I am currently housed in West House in cell 819 in
18   protective custody.
19   Q.  Okay.  One moment.
20   A.  Uh-huh.
21            (Brief interruption in proceedings)
22   Q.  And I'm going to go back a little bit to when you first
23   entered into Menard.
24            Do you know whether Menard is a maximum security
25   prison?
```

1    A.  I believe so.

2    Q.  Okay.  And do you know the security of the prisons that

3    you want to go to?  You mentioned Centralia, you mentioned

4    Logan, you mentioned Mt. Sterling.

5    A.  Yeah, I believe Pontiac was one of the original requests I

6    was trying to make to if it had to be maximum, just somewhere

7    outside of Menard when I was feeling attacked specifically by

8    Menard staff and inmates.

9    Q.  Okay.  And do you know if you have ever been assessed as a

10   predator by anyone at the Illinois Department of Corrections?

11   A.  I have not.

12   Q.  Do you know if you have been assessed as a flight risk by

13   anyone at the Illinois Department of Corrections?

14   A.  I have not been.

15   Q.  Okay.

16           MR. EDWARDS:  May I have another moment?

17           THE COURT:  You may.

18           (Brief interruption in proceedings)

19   Q.  (By Mr. Edwards) Thank you, ███████.  We have no

20   further questions.

21   A.  Okay.

22           THE COURT:  Any Redirect?

23

24

25

                         REDIRECT EXAMINATION

1    BY MS. GARCIA:

2    Q.  ▮▮▮▮▮▮▮▮, just to be clear, do you have an appeal of

3    the underlying conviction that placed you into prison?

4    A.  Yes.  Yes, I do.

5    Q.  That's it.  Thank you.

6    A.  Okay.

7            THE COURT:  All right.  Can this witness be excused?

8            MS. GARCIA:  Yes, Your Honor.

9            THE COURT:  Okay.  Any objection?

10           MR. PENN:  No.

11           THE COURT:  No; okay.  All right.  You are excused.

12           So, let's break until about 12:45.

13           And ▮▮▮▮▮▮▮ will be our next witness.  Okay.  Have

14   her in the stand, ready to go, and we will resume at 12:45.

15           MR. PENN:  Judge, there is one issue that I would

16   like to take up before we do a witness.  We can do it with

17   this witness here, just --

18           THE COURT:  Okay.

19           MR. PENN:  Very briefly.  Because this is a bench we

20   have not been objecting to leading questions, and we are

21   assuming that because it's a bench it will go to the veracity.

22   I just don't want to interrupt constantly on leading or

23   speculation.  Some of it has been like hearsay answers.  Are

24   we okay to not be constantly interrupting on that, or does

1    Your Honor prefer that we lodge a standing objection when we

2    get into that line of questioning?

3         THE COURT:  I mean, you can.  I don't want you to

4    constantly interrupt.  And I will give latitude given the --

5    you know, the inexperience of the witnesses with Direct and

6    those types of things.

7         MR. PENN:  Okay.  We will just do one and then --

8         THE COURT:  Okay.  If you think something is coming

9    into evidence, though, that is inadmissible, I would want you

10   to make an objection.

11        MR. PENN:  The ones I am most concerned about are

12   hearsay, and it's in answers, not questions.  And it ends up

13   being in a longer answer.  And I want to be respectful, we

14   want to be respectful, and I don't want to be -- I don't want

15   to --

16        THE COURT:  Well, maybe the best way would be for you

17   just to make that argument --

18        MR. PENN:  We will start doing it a little bit more.

19   Thanks, Judge.

20        THE COURT:  Okay.  We will resume at 12:45.

21        COURTROOM DEPUTY:  All rise.

22        (Court in recess from 12:14-12:45 p.m.)

23        COURTROOM DEPUTY:  All rise.

24        THE COURT:  Be seated, everyone.  I got in trouble by

25   the Marshals of not having the witnesses being restrained.

```
 1   So, I am told the restraints --

 2           Are you able to move your hands?  Can you move a

 3   paper?

 4           Okay.  I think it will work.  Again, it's a bench

 5   trial and for security, but as long as the witness is able to

 6   review a document.

 7           So, _____, I'm going to ask at this time that you

 8   take an oath.

 9           COURTROOM DEPUTY:  Please raise your right hand the

10   best you can.

11           (Plaintiff, _____, sworn)

12           MS. GARCIA:  Your Honor, we have a witness binder for

13   _____, as well.

14           THE COURT:  Okay.

15

16                       DIRECT EXAMINATION

17   BY MS. GARCIA:

18   Q.  Good afternoon, _____.  My name is Michelle Garcia.

19   I'm with the ACLU.  Good to see you.

20   A.  Good to see you.

21   Q.  _____, can you state your name for the record?

22   A.  _____.

23   Q.  And what's your IDOC number?

24   A.  _____.

25   Q.  And what pronouns do you use?
```

1    A.   She, Her, and Miss.

2    Q.   And are you a transgender woman who lives at Menard?

3    A.   Yes, I am.

4    Q.   Do you have a gender dysphoria diagnosis?

5    A.   Yes, I do.

6    Q.   And when did you receive that diagnosis?

7    A.   The latest one I have is in 2023.

8    Q.   When was the first gender dysphoria diagnosis?

9    A.   Many years ago.  I can't remember the exact date.

10   Q.   Was this when you were in the Illinois Department of

11   Corrections?

12   A.   Yes, it was.

13   Q.   Now, when did you arrive at Menard?

14   A.   Approximately, I think, in 2023.

15   Q.   And when you arrived at Menard where did you live?

16   A.   I was in segregation, isolated housing.

17   Q.   Why were you in isolated housing?

18   A.   Because of an assault on an officer in Galesburg, Hill

19   Correctional.

20   Q.   How long were you in isolated housing?

21   A.   Three months.

22   Q.   After you were isolated housing where did you live?

23   A.   Menard protective custody.

24   Q.   So, you were placed in protective custody at Menard in

25   around June 2023?

1    A.  Yes.

2    Q.  And from June 2023 to the present, have you lived in

3    protective custody at Menard?

4    A.  Yes, I have.

5    Q.  As a transgender woman do you feel safe living in

6    protective custody at Menard?

7    A.  No, I do not.

8    Q.  Can you explain why?

9    A.  I don't know where to start.  On one side it's PC, the

10   other side it's population and letting them come together.  I

11   have been harassed by staff, assaulted by staff, and even was

12   raped by staff.  Last year you have also open up the door, let

13   two inmates in there, be committed, you end up in the

14   hospital.  There's several reasons.

15   Q.  How many hours a day do you spend in your cell in

16   protective custody?

17   A.  24.

18   Q.  Why do you spend 24 hours a day in your cell?

19   A.  Because they claim short staff, so we -- No, we don't have

20   no religious service.  Transgenders can't have no job, we

21   don't have no school, and we might get yard maybe once or

22   twice a month.

23   Q.  How does staying in your cell almost 24 hours affect you?

24   A.  Depressing, stressed out.

25   Q.  Does it allow you to socially transition as a woman?

1    A.  No, it allows me to get -- like overthink things too much,

2    because I tried habitating myself twice, and it's just like

3    the rate that I am going, like ain't nobody trying to do

4    nothing and I'll be having the urge to do that again.

5    Q.  Just to be clear, what urge do you have to do again?

6    A.  Cut my penis off.

7    Q.  When did you attempt to cut your penis off?

8    A.  The first time, that would be like maybe 2022, 2021,

9    somewhere up in there.

10   Q.  And when was the second time?

11   A.  It was like a week or two before each other, because when

12   I did it the first time I thought I figured out the problem

13   why it didn't work the first time, so I tried it again.

14   Q.  Okay.  And why did you want to cut off your penis?

15   A.  Because the way I was born, it ain't the way I should

16   feel, that I should be a woman and always had the qualities of

17   being a female.

18   Q.  ███████, can you explain how the guards treat transgender

19   women at prison?

20   A.  They don't have no -- They purposely go out their way to

21   degrade us, disrespect us, and as soon as you say something

22   back you get a discipline ticket.  But when we write them up,

23   nothing happens.

24   Q.  Can you give me an example of how a Menard guard

25   disrespected you or --

1   A.   Yes.   Last year they came up to our cell, got like ten

2   cells in a row, and took us and put us in the bullpen, and

3   they had approved and unapproved protected custody for it to

4   be separated, but they put us all in the bullpen together, and

5   it was me and another girl that was in that section, and they

6   was taking people in the shower two people at a time, and they

7   took her and another guy in the shower and stripped them

8   naked.   But by me being last, I was the odd person.   So, when

9   I come to the shower, the sergeant that -- of the tac team,

10  that's our five-day sergeant on the 3 to 11 shift, I told him,

11  "You know me, you know I'm a transgender."   He's like, "I

12  don't care about that."   I said, You know you have got a x-ray

13  machine."   "If you don't strip you are likely out."   I said,

14  "For what?"   He said, "What you going to do, no strip."   So,

15  when I started taking my clothes off, they took my underwear,

16  they're like, "These boy panties, they got shit stains in

17  these," he said, "We are going to take these."   Then they saw

18  my package, they said, "Maybe he is a transgender," like it

19  was cracking a joke.   I'm like, "Why are you all doing this

20  here?"

21          So, when they took me out to the bullpen, they put me

22  in the bullpen on the population side, then they took me off

23  population side and put me back on PC side.   When I saw a cell

24  house lieutenant, I was like telling them -- I was trying to

25  tell him what happened.   He said, "Well, you are PC, you don't

1    have no rights."  And they had a female guard at the door,

2    they told her, you know, "In case something comes back about

3    this, you just say you strip-searched on him," and then she

4    wrote me a ticket saying by me being a transgender woman she

5    searched me and found pockets on my pajamas.

6    Q.  Did you have pockets on your pajamas?

7    A.  Yes, I did.

8    Q.  I'm going to back up a little bit.  We will talk a little

9    bit more about that in just a moment.

10   A.  Okay.

11   Q.  Let me back up just a moment.  I'm directing your

12   attention to the end of October or early November 2023.  Did a

13   Menard guard mace you when you were in your cell?

14   A.  Yes, I went to the shower -- Well, I'm put in the bullpen

15   before I go to shower.  It's in the winter.  I got on T-shirt,

16   shorts, can't wear no socks.  And the bullpen is like -- The

17   cage is like right here, the bullpen is literally right

18   by this -- the door literally right there.  So, it's in the

19   wintertime.  They had the door open, and nobody was showering,

20   because I was supposed to be going in there.  So, I'm like,

21   while I stood there, "Take me back to the cell."  That was

22   like after me being there for ten or 15 minutes.  So, he made

23   me stay another 20 or 30 minutes.  So, when he started taking

24   me up to my cell, I'm like, "Man, I'm writing you up, because

25   you are supposed to put me in the shower.  You are supposed to

1  be in the bullpen.  And I'm going to towel out you sissies,

2  I'll towel out you sissies."  So, he put me in my cell.

3      So, I am in the cell watching TV.  About two or three

4  hours later there's a switch by the door where they can turn

5  the light on inside our cell, and he turned the light on, he's

6  like, "Come here."  I was like, "What's up?"  "What was that

7  about?"  Like, "You had me in the bullpen for so long I wanted

8  to come back to my cell."  So, I saw him reach for his pepper

9  gas.  I'm like, "What are you going to do?"  He's like, "Put

10  the TV out, put the TV out," and aimed at my head.  So, I

11  turned my back towards him, and he sprayed me, emptied the can

12  with the mace.  Now, by the cell house being so old, the

13  windows are literally like mirrors, so all the people could

14  look and see what's going on in there, right?  So, he called

15  for backup, they come up there.  Now, this officer was

16  supposed to go downstairs, but he stayed behind.  He takes my

17  TV and banged it on the bed and breaked it in half.  So, the

18  sergeant pulled me down in the shower, and I am hollering up

19  to everybody, like, "Man, I didn't do nothing.  They lying on

20  me.  I didn't do nothing, I didn't do nothing."  So, this time

21  the Sarge sprayed me with pepper gas.  He like, "Well, sissy,

22  go on, we got four to go."

23      So, when I wrote this up I had affidavits from other

24  inmates actually seeing this through the window and heard what

25  happened, and they never was talked to or he was never seen.

```
1              MR. PENN:  Judge, I am sorry.  I would just -- I
2   would just object to hearsay to the extent that any of the
3   statements were offered for the truth the matter asserted.
4              THE COURT:  All right.  The objection is noted.
5              MR. PENN:  Thanks, Judge.
6              MS. GARCIA:  Your Honor, I would say that those
7   statements were made by employees of the Defendants and that
8   those are statements by a party opponent and not hearsay.  I
9   would also say that Your Honor could consider hearsay because
10  this is a preliminary injunction hearing and you have that
11  ability to consider that evidence, as well.
12             THE COURT:  All right.
13  Q.  (By Ms. Garcia)  ███████, let's talk about the macing
14  incident.  After you were maced, did the Menard guards allow
15  you to shower?
16  A.  No, they took me to the healthcare and allowed me to wash
17  my eyes off at the healthcare, but I didn't shower for my
18  body, no.
19  Q.  And where did you go afterwards?
20  A.  I went to isolated housing.
21  Q.  And in isolated housing, in segregation, what were the
22  conditions like?
23  A.  Oh, my God.  They didn't have no regular cell, so they had
24  to put me in a cell, what they call the suicide cell, and
25  that's no running water, nothing, no nothing.  Blood, feces
```

1  all over the walls, everything.  It was a filthy cell, no

2  mattress, no nothing.

3  Q.  In that cell could you wash your body that was covered

4  pepper sprayed?

5  A.  Only with toilet water.  I could wash my butt with toilet

6  water.

7  Q.  Okay.  Did you have a blanket?

8  A.  No, I didn't have anything.

9  Q.  And how long were you in that restrictive housing?

10  A.  For that, for maybe like two or three weeks, if that long.

11  About two, three weeks.

12  Q.  And were you given an opportunity to wash your body?

13  A.  Yeah, after a couple of days.

14  Q.  ▊▊▊▊▊▊, I want you to open the binder on your desk.  Can

15  you get it open?

16  A.  Uh-huh.

17  Q.  Can you go to the last tab?

18  A.  To the last what?

19  Q.  The last tab, tab 3.

20  A.  You say the last page or the last --

21  Q.  Tab 3.  Let me help you.

22  A.  Okay.

23  Q.  Okay.

24  A.  Thank you.  Yeah, I just had eye surgery, so it's really

25  going to be hard for me to see.

```
 1   Q.  What eye surgery did you have, ██████?
 2   A.  I had the left one -- I had the right one done Friday and
 3   I had the left one done a week before.
 4   Q.  Okay.
 5   A.  I had cataract surgery.
 6   Q.  Okay.  I am marking this document as Plaintiffs' Exhibit
 7   6.  It's, for identification purposes, Illinois Department of
 8   Corrections Individual in Custody Grievance.  It's dated
 9   November 25, 2023.
10            ██████, I am showing you a document, it's
11   Individual in Custody Grievance dated November 2023.  Do you
12   recognize this document?
13   A.  Yes, I do.
14   Q.  Have you seen it before?
15   A.  Yes, I have, I wrote it.
16   Q.  What is it?
17   A.  It's a grievance filed on an officer that assaulted me.
18   Q.  Is that your signature on page one?
19   A.  Yeah.
20   Q.  Is this the grievance for the macing incident that you
21   just testified to?
22   A.  Yes, it is.
23            MS. GARCIA:  Your Honor, we offer Plaintiffs' Exhibit
24   1 into evidence -- Plaintiffs' Exhibit 6 into evidence.
25            THE COURT:  All right.  6 will be admitted.
```

1    Q.  (By Ms. Garcia) When you filed this grievance, ████████,

2    what did you want to happen?

3    A.  Be removed from Menard.

4    Q.  Why did you want to be moved from Menard?

5    A.  Because I feel my life is threatened at Menard.

6    Q.  Where would you want to go and where did you want to go?

7    A.  To have my surgery and go to Logan.

8    Q.  Okay.  ████████, before you lived at Menard did you live

9    at Hill Correctional Center, known as Galesburg?

10   A.  Yes, I was.

11   Q.  And how did the Hill compare to Menard and how they

12   treated transgender women?

13   A.  I got to say Galesburg was better.  It was better.

14   Q.  How was it better?

15   A.  Because the staff, they respected us as transgender.  But

16   if you got a good mental health or okay mental health or

17   somebody that care, it can make your life a whole better, and

18   we have somebody at Hill that was working on mental health

19   that cared about the girls, so life was better.  But it was

20   still within their cell assignment, even though on -- even

21   though I am labeled as transgender, they was trying to assign

22   me as being a Vice Lord, and that's why I kept having a

23   problem with Galesburg and I was moved like 25 times in six

24   months in Galesburg.

25   Q.  So, you mentioned at Galesburg you had a good mental

```
 1   health provider --
 2   A.  Yes.
 3   Q.  -- that helped you and the other girls?
 4   A.  Yes.
 5   Q.  When you were at Menard did you have a good mental health
 6   provider?
 7   A.  When I first got there we probably had one for like two
 8   months, then we didn't have none until recently we just got
 9   another one, like two months ago.  So, over the last year we
10   ain't had nobody.
11   Q.  Would you have liked to see a mental health provider to
12   talk about gender dysphoria?
13   A.  That's another problem.  In PC at Menard, when you ask for
14   Mental Health they spray you.  They don't -- You call for
15   crisis, anything, they spray you with -- with a riot gas.
16   Q.  Can you give me an example of what you mean when you are
17   talking about how they spray you?  Are these male guards at
18   Menard?  Are they spraying people who ask for help?
19   A.  Yes.  Say for example you are a guard and I am telling you
20   I am having issues or having a crisis, need to see Mental
21   Health.  They're like, "Stop hanging yourself, stop killing
22   yourself," and then they spray you.  That's what they do.
23   That's Mental Health.  I am going to some like -- like I'm
24   going to get my patches --
25   Q.  Did this happen to you, ███████?
```

1    A.  No, because I know not to call them.  I just deal with it.

2    Q.  How do you know about this incident?

3    A.  Because it happened all around me.  And it's other girls

4    that it happened to, also.  That's a known practice at Menard.

5    Q.  When you were at Galesburg did you have a class ID that

6    identified you as female?

7    A.  Yes, I did.

8    Q.  Did the ID reflect that you wanted female officers to

9    search you?

10   A.  Yes, I did.

11   Q.  When you arrived at Menard in March 2023, did you want

12   female officers to strip-search you?

13   A.  Yes.

14   Q.  Did male guards strip-search you in 2023?

15   A.  Yes, because of the reason on the back of my ID it says

16   search by male.

17   Q.  Did you want it to be like that?

18   A.  No.  Why would I want a male to search me when I'm a

19   female?

20   Q.  How did being searched by men make you feel as a

21   transgender women?

22   A.  Disrespected, degraded.

23   Q.  Did male guards strip-search you in 2024?

24   A.  2024, yes.

25   Q.  How many times did that happen?

```
 1   A.   Wow, at least -- at least three times, because every time
 2   I went to seg I got stripped by a male.  At least three times.
 3   Q.   And in 2025, did male guards strip-search you?
 4   A.   2025, yes; yes.
 5   Q.   And in coming to court today did a male guard strip-search
 6   you?
 7   A.   Yes.
 8   Q.   How did it feel to be strip-searched by a man?
 9   A.   Disrespected, because no -- a woman wouldn't want a man --
10   They are like violating my body.
11   Q.   Does it affect your ability to socially transition as a
12   woman?
13   A.   Yes.
14   Q.   Does it affect your gender dysphoria?
15   A.   Yes.
16   Q.   ████████, on December 12, 2024, did you file your own
17   motion for a temporary restraining order and preliminary
18   injunction in this actual case?
19   A.   Yes, I did.
20   Q.   Did you -- Why did you do that?
21   A.   Because of the case with the shower incident and when I
22   come to Menard, I started off taking pills for hormones, but
23   because theyre short on staff they was unable to give me pills
24   like I was supposed to, so my doctors at UIC took me off the
25   pills and put me on the patches, then they not give me patches
```

1    like the way you do it, so they took me off patches, then put

2    me on the shots, and I just started doing shots.

3    Q.  What did you -- In your Motion for Preliminary Injunction

4    what did you want the Court to order?

5    A.  I wanted them to make sure I get my hormone therapy like

6    I'm supposed to get it, put me in to have my surgery, for me

7    to get my surgery, because I met all the requirements, I did

8    everything I was supposed to do, and to be transferred to

9    Logan.

10   Q.  Okay.  ▉▉▉▉▉▉, I'm going to show you a document in the

11   first part of your binder.  I am marking this exhibit as

12   Plaintiffs' Exhibit 7.

13           THE COURT:  Just to be clear.  We haven't had a 5,

14   correct?

15           MR. RAY:  I apologize.  It is 5.

16           THE COURT:  Okay.  We did 6, so I think it should be

17   5.

18           MS. GARCIA:  Okay.  Sorry, Your Honor.

19   Q.  (By Ms. Garcia) ▉▉▉▉▉▉, I am showing you a document

20   titled Notice of Filing, Order to Show Cause and Temporary

21   Restraining Order.  It's 31 pages.

22   A.  Uh-huh.

23   Q.  It includes a memorandum of law --

24   A.  Yes.

25   Q.  -- and Exhibits A through E?

1  A.  Yes.

2  Q.  Is this the motion that you filed?

3  A.  Yes, it is.

4  Q.  And is that your handwriting on it?

5  A.  Yes, it is.

6  Q.  And is your signature on it?

7  A.  Yes, it is.

8         MS. GARCIA:  Your Honor, we offer Plaintiffs' Exhibit

9  5 into evidence.

10         THE COURT:  5 is admitted.

11  Q.  (By Ms. Garcia) ███████, could you turn to page three

12  that you have marked as 3 of 31 at the bottom?

13  A.  I can.

14  Q.  At the top it says Declaration Support of Plaintiffs'

15  Motion for Temporary Restraining Order and Preliminary

16  Injunction.

17  A.  Yes.

18  Q.  Do you see that?

19  A.  Yes.

20  Q.  Does the declaration refer to an incident that occurred on

21  December 8, 2024?

22  A.  Yes.

23  Q.  Can you describe in your own words what happened on

24  December 8, 2024, that was the basis for this declaration?

25  A.  This is the incident about -- Oh, this is the incident I

1   just told you about when they came to my door, said they

2   wanted me to shake down and they took me out of my cell.  It

3   was like maybe ten cells, and they put us all in the bullpen.

4   They had an approved and unapproved in the bullpen together

5   and there was only two transgenders within that group.  And

6   they took the first girl with another man and strip-searched

7   them.  By me being the last one, I was the odd person, they

8   put me in there and the sergeant -- I'm like, "You know I'm a

9   transgender, because you're our five-day sergeant, you work

10  our gallery on 3 to 11."  He said, "I'm the cat officer now.

11  Take your clothes off or you are going to isolated housing."

12  I said, "But, you know I'm transgender.  What do you want me

13  to do?"  So I took my clothes off, and when I gave him the

14  underwears, I gave him my boy panties with the shit stains to

15  him.  So I gave him my underwears.  And then also in the room

16  I'll call John Doe, I don't know his name at the time, he saw

17  the patches and he told them, like, "Oh, maybe he is a

18  transgender," like he was cracking a joke.  And then I put

19  back on my clothes and they put me in the bullpen on

20  population side.  Then they took me out of population side,

21  put me in the bullpen on PC side, and I saw the lieutenant.  I

22  was trying to tell him what happened, he said, "Well, you are

23  in PC, you ain't got no rights."  So when I was standing right

24  there by the front door, this officer, her name is Kate, and

25  the lieutenant told her that if anything come behind us, you

1    just say you shook him down.  So, that same day I get a ticket

2    saying that she shook me down, and she wrote me a ticket for

3    having pockets in my pajamas when she never did anything, she

4    was no part of detecting this.

5    Q.    ████████, when they placed you in a bullpen with another

6    prisoner, a male prisoner, how did that make you feel?

7    A.    I was defenseless.  I'm defenseless, because I can't --

8    I'm a older woman, but by me being a homo and stuff, all my

9    levels is as a woman.  And that would be like a woman fighting

10   a man.

11   Q.    Was December 8, 2024, the last time male guards at Menard

12   placed you in a holding pen with someone that you felt was

13   dangerous?

14   A.    No, it just happened recently.

15   Q.    When did it happen, more or less?

16   A.    Around about three weeks ago.  Like I say, 2 gallery --

17   Q.    Did that happen in May?

18   A.    May, yes.

19   Q.    May 2025?

20   A.    Yes, this month.

21   Q.    Can you describe to the Court what happened?

22   A.    Yes, 2 Gallery, 4 Gallery, 6 Gallery, 8 Gallery is

23   approved.  6 Gallery is intake and unapproved.  Now, it's one

24   big old cage, but it's split in the middle; one for approved

25   PC, one for unapproved PC.  They put me in a cage unapproved,

 1    and I feel it was intentionally done, because you know this is

 2    an unapproved cage.  Not only is it unapproved, here's the

 3    person that assaulted me that I have got a lawsuit on that I

 4    got a keep away from, but they still put me in the cage with

 5    this person.

 6    Q.  So, let's back up a little bit.

 7            They put you in the unapproved protective custody

 8    side?

 9    A.  Yes.

10    Q.  There was a man in that unapproved protective custody

11    side --

12    A.  Yes.

13    Q.  -- that you have a keep-separate from?

14    A.  Yes.

15    Q.  And why do you have a keep separate from this man?

16    A.  Because he assaulted me in Pontiac -- I mean, not Pontiac.

17    Pinckneyville.  I'm sorry.

18    Q.  Were you scared when you saw this man?

19    A.  Yes, I even notified the guard.

20    Q.  What did the guard do?

21    A.  He's like, "Don't worry, you all be approved eventually."

22    Q.  And how long were you in this cage with this man?

23    A.  Maybe like five or ten minutes, but the other guys were

24    like, "Man, why did you tell him?  Why did you tell him?  You

25    are a stool pigeon.  Why did you tell him?"  I just kept on

1    begging the guard to get me up out of there.  Eventually he

2    let me up out of there.

3    Q.  Did you tell the guard that you had a keep-separate from

4    this man?

5    A.  Yes, I did.

6    Q.  Did you give the male's information to the guard?

7    A.  Yes.  I also wrote a grievance about it, too.

8    Q.  And who did you submit the grievance to?

9    A.  I put it -- They come up with a grievance box, and you put

10   your grievance in the grievance box, the police come up there

11   like three or four times a week.

12   Q.  And have you heard anything about your grievance?

13   A.  No, I have not.

14   Q.  Do you expect anything?

15   A.  I expect something back, but I don't expect them to do

16   something.

17             Could I say something, though?  The incident about

18   the shower, what I said, the only way they investigate that

19   incident, because I wrote the mayor -- I mean, the governor.

20   When I wrote the governor, the governor sent the paperwork to

21   I/A Lieutenant Dallas.  This happened about a month ago.  As a

22   matter of fact, he called me, and that's the only reason why

23   he investigated this issue that happened way back when,

24   because I wrote a letter to the governor and the governor told

25   him to investigate it.

1          MR. PENN:  Judge, same objection on hearsay.

2  Q.  Had Lieutenant Dallas ever talked to you about any of your

3  other incidents that you have grieved concerning treatment as

4  a transgender women?

5  A.   No, because my understanding is he just got that position

6  being Lieutenant of Internal Affairs.

7  Q.  Why did you feel the need to write to the governor about

8  what had happened?

9  A.  Because Menard, they got something called PREA, but they

10  don't honor none of that, nothing.  Just like I told you about

11  the incident with the police started with the pepper gas.  I

12  had affidavits, I have witnesses, they was never called;

13  never.  So, the director got a boss, and whoever the

14  director's boss is was the governor, so I wrote him.  That's

15  the only way you get anybody to look into it.

16  Q.  I'm going to switch gears a little bit.

17  A.  All right.

18  Q.  Okay.  Before Menard, did you request gender-affirming

19  surgery in September of 2022?

20  A.  Yes, and I saw the film for it, the movie for it.

21  Q.  What was that film?

22  A.  What the movie is, it shows you how it's done from A to Z,

23  and this is part of the steps you have got to take in order

24  for your paperwork to be presented to the committee to

25  become -- to be getting the surgery.

1   Q.  And did you sign any paperwork so that you could receive

2   gender-affirming surgery?

3   A.  Yes, I did.

4   Q.  Did you request a vaginoplasty?

5   A.  Yes, I have.

6   Q.  During the time that you have lived at Menard, have you

7   wanted that surgery?

8   A.  Yes, I have.

9   Q.  Have you asked about it?

10  A.  I did, like you said, the movie -- I try to keep up my

11  medical records, so I had a copy of that paper.  When the new

12  Mental Health come in for us, I gave her a copy of that.  Then

13  you have got to do a transgender journey, like your whole life

14  span, I gave her that, and she told me like three weeks ago

15  she submitted it.  I have never heard -- I never gotten

16  anything back from it.

17  Q.  When did you complete that gender journey journal?  Did

18  you do that when you were at Hill Correctional Center?

19  A.  Basically, yeah.  And I have been holding it almost two

20  years before I was able to turn it in.

21  Q.  Have you filed any grievances about not getting your

22  surgery?

23  A.  Yes, I have.

24  Q.  Did you file a grievance about not getting your surgery in

25  March of 2024?

1    A.  I can't -- I don't know the exact date, but I did.

2    Q.  Let's take a look, if you go to tab 2 in the binder.

3    A.  Okay.  Okay.

4    Q.  ▇▇▇▇, take a moment to review that.

5    A.  All right.

6    Q.  Does that refresh your memory?

7    A.  Uh-huh.

8            THE COURT:  Is that a *yes*?

9    A.  Yes, I'm sorry.

10   Q.  In March of 2024, did you file a grievance concerning your

11   request for surgery?

12   A.  Yes.

13   Q.  And what did you want to happen as a result of that

14   grievance?

15   A.  I want -- I wanted them to submit the paperwork that I got

16   to give to them so I can go in front of the committee to get

17   my surgery.

18           MS. GARCIA:  I'm going to be marking this as Exhibit

19   7, Your Honor.

20           THE COURT:  Okay.

21           MS. GARCIA:  I move to enter it into evidence.

22           THE COURT:  7 will be admitted.

23   Q.  (By Ms. Garcia) When you submitted this in March of 2024,

24   did anyone respond at Menard?

25   A.  The gal -- Yes, she said that she gave the -- If I recall,

1  she said she gave the paperwork to the person that it was

2  supposed to went to, but it never said I was submitted or

3  anything or I was going in front of the committee, none of

4  that.

5  Q.  Did you receive a letter denying you the surgery in March

6  of 2024?

7  A.  No, I never even received a letter saying I was submitted.

8  Q.  Do you still want that surgery?

9  A.  Yes, I do.

10  Q.  How does having a penis make you feel?

11  A.  Like I am not a woman.

12  Q.  What does the vaginoplasty surgery mean to you?

13  A.  It would mean the world to me.  If I could -- If I can

14  have the surgery today and die tomorrow, I will be a happy

15  person.

16  Q.  Let's talk a little bit more about the conditions at

17  Menard.

18  A.  Uh-huh.

19  Q.  Do you have access to a private shower?

20  A.  (Laughter).

21  Q.  You laughed.  Why did you laugh?

22  A.  Because they don't even ask if we want to go to the

23  shower, they don't even take us to the shower.  And I ain't

24  been to the shower in a year since the last time this

25  happened.

1  Q.  You haven't been to a private shower or any shower in over

2  a year?

3  A.  Yes, ma'am, more than a year.

4  Q.  ███████, how do you wash up?

5  A.  Soap and water inside my cell.  And that's another thing,

6  comes another problem, because they say you can't have

7  curtains up, but at the same time if I am a female and my body

8  is exposed, they write me a ticket for that.  So it's a damned

9  if you do, damned if you don't.  You have to play cat and

10 mouse just to take a bath in your cell.

11 Q.  Have you received a ticket for having a curtain up for

12 your privacy?

13 A.  No.

14 Q.  Why not?

15 A.  Because I have to be watching the gallery, make sure no

16 police on the gallery.  I have my neighbor watch while I wash

17 up.

18 Q.  Would you like to have a private shower?

19 A.  Yes, I would love to have a private shower.

20 Q.  ███████, do you have access to female commissary items,

21 like makeup or hair removal products?

22 A.  No, ma'am.  Like when I first got in Menard we had it.

23 Like I said, once Ms. Wells left -- because she had it at

24 first.  She gone.  And I say she be gone like a year and a

25 half, and we ain't got nothing, no nothing.  And the only way

1    I got some panties and bras, when you go to -- As a matter of

2    fact, when you come to this, go on your writ, they take you to

3    the Clothing, they take you to the B of I.  So, when I was at

4    Clothing, I was just going to be bold, they will write me a

5    ticket, whatever they are going to do.  I walked straight up

6    to the supervisor, I was like, "Look, I been putting in plenty

7    of clothing slips.  I filed grievances, you lied and said you

8    gave me stuff, but you never gave me anything."  He said,

9    "Come here to my office."  I went to his office.  They had

10    boxes of panties, boxes of bras, and then he gave me some.

11    Q.  Let me just make this clear.  When you were going out for

12    a medical writ --

13    A.  Uh-huh.

14    Q.  -- you walked past the clothing room?

15    A.  Yeah, but going in there they have got to ask you your

16    size.

17    Q.  And you saw the boxes of panties and bras?

18    A.  No, I talked to the supervisor that run the clothing room

19    and I asked him, like, "Man, I filed a slip -- put in clothes

20    slips, I filed a grievance, and you lied on the grievance,

21    said you gave me panties and bras, and you never gave me

22    anything."  He said, "Come with me."  He took me to his office

23    and they had boxes of panties and boxes of bras and he gave me

24    three each.

25    Q.  And when did this happen?

```
 1   A.  Last week.
 2   Q.  So, the first time you had female underwear at Menard was
 3   last week?
 4   A.  Yes.
 5   Q.  And it was because you asked, nobody offered it to you?
 6   A.  Right.
 7   Q.  Let's go back to the female commissary items.  Would you
 8   like to have makeup?
 9   A.  Yes.
10   Q.  Why?
11   A.  Because it would make me feel beautiful, make me feel like
12   I'm a woman.
13   Q.  What about removing your body hair?
14   A.  Yes.
15   Q.  Do you have a way to remove your body hair?
16   A.  Yeah, I got a razor.
17   Q.  Are you able to use the razor at all times at Menard?
18   A.  Yes.
19   Q.  Okay.  ▮▮▮▮▮▮, are you receiving hormone therapy?
20   A.  Yes.
21   Q.  And when did you start receiving hormone therapy?
22   A.  When I left the Hill.  When I left the Hill, was that in
23   2023?
24   Q.  2022.
25   A.  2022, I'm sorry.  Because Pinckneyville doctor, he wasn't
```

1   doing it, so I wasn't able to start it until I got to Hill.

2   Q.   And you mentioned seeing Dr. Katz --

3   A.   Yes.

4   Q.   -- at UIC.

5   A.   Yes.

6   Q.   How often do you see Dr. Katz?

7   A.   I see him every three months.   Beautiful person.

8   Q.   Have there been any issues with the provision of hormones

9   while you have been at Menard?

10  A.   Yes.

11  Q.   I think you started to explain that, but let's break that

12  down a little bit.

13  A.   Okay.

14  Q.   How were you first given hormones at Menard?

15  A.   I first started in pill form.   They used to give me a

16  blister packs, maybe like -- No, take that back, I'm sorry.

17  They bring it twice a day.   The nurse will give it to you.

18  Q.   Did you have any problems with the nurse giving it to you?

19  A.   Yes, because they say short-staffed or nurse wouldn't be

20  there, they only do emergency meds, and my hormone pills

21  weren't considered as emergency.

22  Q.   Did you miss hormones?

23  A.   Huh?

24  Q.   Did you miss getting your hormones?

25  A.   Yes, I did.

1    Q.  How often did that happen?

2    A.  A lot.  A lot.  That's how we came up with the solution

3    with the patches.

4    Q.  Who came up with the solution of the patches?

5    A.  UIC.  We thought that was going to be the solution, but it

6    wasn't.

7    Q.  And how often are you given your hormone patch -- were you

8    given your hormone patch?

9    A.  I was supposed to be given my hormone patches on Mondays

10   and Thursdays.

11   Q.  And did the nurses at Menard give you your hormone patches

12   on Mondays and Thursdays?

13   A.  No, we go weeks at a time, days at a time.  That's what I

14   was saying about the mental health thing.

15   Q.  When you say weeks at a time and days at a time, were you

16   receiving your hormone patches during that time period?

17   A.  No, I wasn't getting them, period.

18   Q.  So, there would be weeks at a time that you did not

19   receive your hormone patch?

20   A.  Yes.

21   Q.  And missing hormones for weeks at a time, how did that

22   affect your body?

23   A.  Oh, my God.  You have heat flashes, your attitude would be

24   up and down all around.  And, like I say, you can't call

25   Mental Health, because they'll spray you.  You take it out on

1    your friends or whoever you can talk to.  You would be bugging

2    up for no reason.  And what are we going to do?  We can't do

3    nothing.

4    Q.  And, so, you said that you eventually transitioned to

5    shots?

6    A.  Yes.

7    Q.  When did that happen?

8    A.  About like two weeks ago I talked to them.

9    Q.  And how have the -- Who's been giving you your hormone

10   shots?

11   A.  The nurse.

12   Q.  Have you had any issues with how the nurse has given you

13   your hormone shots?

14   A.  No.  No, yes, I do.  I take two shots; one they just given

15   me, and I take one shot once a month.  The one I take once a

16   month, 99 percent of the time I get it in my butt.  So, when

17   you go what they call sick call, might be a little area about

18   the size of this, and you be in handcuffs, then they have got

19   a steel stool that's embedded into the concrete, can't go

20   nowhere.  And they have got a steel chain around that with

21   another cuff to go around your handcuff and they cuff.  Even

22   all this done, the male officer, he's still standing there

23   while I pull my pants down, and I can't say nothing if I tell

24   them, "Man, you know, you are not supposed to be in here."

25   "Then you must not want your shot."  So, I have got to let him

1    see my butt while I get my shot.  I have got to go through

2    this routine once a month.  And now that I have got to switch

3    the hormones, normally I go there once a month, I get the

4    shots now every two weeks, so three times a week I have got to

5    go through the police seeing my booty.

6    Q.  And how did it feel three times a month --

7         Let me ask again and you can say how it feels.  How

8    does it feel three times a month for a male guard to see your

9    body when you are getting a shot, to see your butt?

10   A.  It feel like I'm being raped.

11   Q.  And when's the last time that this happened?

12   A.  I get the once-a-month shot at the beginning of the month,

13   so the beginning of May.

14   Q.  And have you gotten the shot in May?

15   A.  Yes.

16   Q.  This happened most recently in May --

17   A.  Yes.

18   Q.  -- of 2025?

19   A.  Yes.

20   Q.  How would you like to get your hormone shots?

21   A.  With just me and a female nurse.

22         MS. GARCIA:  May I have just one minute?

23         (Brief interruption in proceedings)

24   Q.  (By Ms. Garcia) ██████, have you spoken to anybody at

25   the Transgender Administration Committee about your request to

1    transfer?

2    A.  No.

3    Q.  If you could speak to them, what would you want to say?

4    A.  That I would like to be put in for my operation to become

5    a woman, I fit all the qualifications, I did everything they

6    asked of me, and I still ain't been submitted.

7    Q.  ███████, if you had to stay at Menard as a transgender

8    woman and you were denied the transfer, how would that make

9    you feel?

10   A.  It'd make me feel bad, but I probably just give up,

11   because it's an ongoing -- It's understanding when you don't

12   know, but when you just intentionally just degrade and

13   disrespect the person intentionally -- And that's what they

14   do, because there ain't no consequences.  The only solution we

15   have got is court, and this take years.  I could tell you

16   stuff that happened in just one month, just one month, let

17   alone two or three years.  How you -- How you put me in a cage

18   with a person that's not approved?  You know he's not

19   approved.  Okay, we don't forget that.  But he's a

20   keep-separate.  So you repeatedly done this.  I feel it's some

21   type of retaliation.  You intentionally done this.  How could

22   you make this an accident?

23   Q.  Did the guards that put this unapproved person in the cage

24   with you, do they still work at Menard?

25   A.  Yes, they does.

```
 1   Q.  And the guards that have strip-searched you, even though

 2   you wanted to be strip-searched by a female officer, do they

 3   still work at Menard?

 4   A.  Yes, they do.

 5   Q.  And the nurse who has given you the shot in front of that

 6   male guard, does she still work at Menard?

 7   A.  Yes, she does.  I just had another incident for some

 8   reason this month -- I have been locked up 26 years.  I have

 9   been on more writs this month.  It's like they are trying to

10   get everything together this month for some reason.  But, when

11   I went out, I got my left eye done, a lieutenant -- He usually

12   takes me out, but he wasn't here that day, so it was a female

13   lieutenant.  And all of -- And the B of I, they had me all

14   right there.  So, when she walked past, she's like, "No, I'm

15   not shaking down that man."  So, there was another lieutenant

16   that was looking for the key for the x-ray machine, so when he

17   -- Another woman officer also gave him the key to the x-ray

18   machine, and he went to the x-ray machine, he said, "Get in

19   there, man."  So, I was like, "What's your name?"  He said,

20   "Nobody."  So, I got in the x-ray machine.  So, he

21   purposefully disrespected me.

22         So, I got in the x-ray machine.  So, when I got in

23   the x-ray machine, the woman said, "Oh, we have got a dick and

24   balls."  This is the type of stuff I go through daily; daily.

25   And my only final resort is a grievance.  Whatever the police
```

1 say, that's what happened.  I don't care how many witnesses

2 you ask for, how many affidavits you put with that, they are

3 not hearing none of it.

4 Q.  And this incident that you mentioned just now where the

5 female officer refused to search you and said that you had a

6 dick and balls, --

7 A.  Uh-huh.

8 Q.  -- when did this happen?

9 A.  Like two weeks ago when I was getting my left eye done.

10 Q.  So, in May 2025?

11 A.  Yes.

12 Q.  I have no further questions.

13        THE COURT:  Cross-examination.

14        MS. GARCIA:  Just stay.  They are going to ask you

15 some questions.

16 A.  Okay.

17                    CROSS EXAMINATION

18 BY MR. EDWARDS:

19 Q.  Good afternoon, ███████.

20 A.  Hello.

21 Q.  ███████, do you know if there are any transgender guards

22 at Menard?

23 A.  Yes.

24 Q.  And who are the transgender guards at Menard?

25 A.  That's the only one I know (indicating).

```
 1    Q.  And is this transgender guard a guard that identifies as a

 2    male?

 3    A.  Yes.

 4    Q.  And just to reiterate, you don't know if there are any

 5    other transgender guards at Menard?

 6    A.  No.

 7            THE COURT:  No, you don't know or, no, there are

 8    none?

 9    A.  No, I don't know.  No, sir, I don't know.

10    Q.  Would you object to being strip-searched by a transgender

11    female guard?

12    A.  I cannot object to anything.  It's either you are going to

13    do it or you go to seg.

14    Q.  Understood.  Let's take a step back a little bit.

15            So, how long have you been imprisoned at the Illinois

16    Department of Corrections?

17    A.  26 years.

18    Q.  And what led you to that imprisonment?

19    A.  A sexual assault on a female.

20    Q.  Okay.  And what year did that occur?

21    A.  1999.

22    Q.  And you were convicted of that?

23    A.  Yes, I was.

24    Q.  And was the female an adult or a minor?

25    A.  Adult.
```

1   Q.  Adult.  And have you ever been affiliated with any gangs?

2   A.  Yes, I was.

3   Q.  And what gangs were you affiliated with?

4          MS. GARCIA:  Objection, relevance.

5          MR. EDWARDS:  It goes to the nature of his offense or

6   maybe the nature of his time at -- Sorry.  It goes to █████

7   ████ nature of her offense.

8          MS. GARCIA:  From 26 years ago?

9          THE COURT:  Yeah, I don't see the relevance at all.

10         MS. GARCIA:  Move to strike.

11  Q.  (By Mr. Edwards) I apologize, ████████.

12         THE COURT:  All right.  I will disregard that.

13  Q.  ████████, do you have any affiliation with the Vice Lords

14  at Menard?

15         MS. GARCIA:  Objection.

16         THE COURT:  Are you asking currently or --

17  Q.  Currently.

18  A.  I am a transgender woman.  By me being a transgender

19  woman, if I would try to even act like I was a Vice Lord that

20  is death, death, death.  The laws are against any type of

21  homosexuality, any type.

22  Q.  Understood.  Thank you, ████████.

23         Have you ever been assessed as a predator by anybody

24  at the Illinois Department of Corrections?

25  A.  No.

1    Q.    �find, have you ever assaulted an officer while you
2    were at Menard?
3    A.    At Menard, no, I have not.
4    Q.    Have you ever been charged with assaulting an officer at
5    Menard?
6    A.    Attempt assault.
7    Q.    So, you have been charged with attempt assault at Menard,
8    is that correct?
9    A.    Yes.
10   Q.    And were you found guilty of that attempt assault at
11   Menard?
12   A.    Yes.
13   Q.    And what are the requirements to getting gender-affirming
14   surgery?
15   A.    For you to see the movie and for you to turn in your
16   transgender journal.  Oh, and your levels got to be low.
17   Q.    Your levels have to be low?
18   A.    Yeah.
19   Q.    Okay.  And when did you fill out the paperwork to get
20   gender-affirming surgery?  When was it fully completed?
21   A.    About a year and a half ago.  I saw the movie like in
22   2022, I wrote my journal almost a year and a half ago, but I
23   wasn't able to turn it in to the right person, because they
24   didn't have mental health staff until about six months ago.
25   Q.    And are you currently single-celled right now?

```
 1   A.   Yes, I am.
 2   Q.   And have you ever met with the Transgender Health and
 3   Wellness Committee, or what they call THAWC?
 4   A.   Who?
 5   Q.   THAWC.  The THAWC committee.
 6   A.   Hu-huh.
 7   Q.   Or the TAC committee?
 8   A.   Uh-huh.  No.
 9            THE COURT:  Say yes or no, please.
10   A.   Okay.  No.
11   Q.   Okay.  I am going to take a moment.  One second, ███████.
12            (Brief interruption in proceedings)
13   Q.   ███████, was the guard that searched you today a
14   transgender guard?
15   A.   Say again.
16   Q.   Was the guard that searched you today before you entered a
17   transgender guard?
18   A.   Yes.
19   Q.   Okay, thank you.  Again, one moment.
20            ███████, was the guard that searched you today a
21   transgender female guard?
22   A.   No.
23   Q.   Okay.  I have no more questions, ███████.  Thank you for
24   your testimony.
25            THE COURT:  Any Redirect?
```

```
 1
 2                         REDIRECT EXAMINATION
 3   BY MS. GARCIA:
 4   Q.  Do you know the name of the guard that searched you today?
 5   A.  Careful not to mess it up.  Buettner.
 6   Q.  And when you see this guard, do you see him as a man?
 7   A.  Yes, I do.
 8   Q.  Does it matter that they are transgender to you?
 9   A.  They are a man, so what would be the difference?
10   Q.  Thank you, ███████.
11           THE COURT:  All right.  That concludes this witness's
12   testimony.
13           Do the Plaintiffs have any further witnesses for us
14   today?
15           MS. PARSONS:  No, Judge, our witnesses are all being
16   called pursuant to writs and today we only have three.
17           THE COURT:  Okay.  Does the Defense have anyone they
18   could put on this afternoon?
19           MR. PENN:  We don't.  I'm sorry, Judge, we tried.
20           THE COURT:  Okay.  Are you able to get anyone for
21   tomorrow or Thursday?
22           MR. PENN:  We are hopeful -- Well, Thursday for sure.
23   We are hopeful for tomorrow, and we are going to try to line
24   up at least one for the afternoon.
25           THE COURT:  Okay.
```

```
 1            MR. PENN:  We will report it as soon as we know.
 2            THE COURT:  Okay.  Well, this witness can be excused.
 3       It's 1:50.  We will finish for the day.
 4            Now, Ms. Parsons, when do you think your team will be
 5       able to get a response on file to the Motion to Strike that
 6       was just filed this morning?
 7            MS. PARSONS:  Hopefully before 4:30 tomorrow, maybe
 8       before lunchtime.
 9            THE COURT:  Yeah, everything is working on a
10       condensed schedule, so as fast as you can.  In the meantime, I
11       will be looking at that.
12            So, just to confirm, today we had seven exhibits.
13       Deana, we went kind of out of order with ██████.  5 is what
14       they listed as first, which is Doc. 845 on the record; 6 is
15       the grievance dated November 25, 2023; and 7 is the grievance
16       dated March 20, 2024.
17            So everyone agree, seven exhibits today?
18            Ms. Parsons?
19            MS. PARSONS:  Yes, and we will be filling out the
20       template that Ms. Brinkley sent us and we will get it back for
21       her tonight, and that will include the exhibits from today
22       that were entered and the remainder of the expected exhibits
23       that we know of right now, and we are keeping track of what's
24       going in and describing them.  We apologize for the delay.
25            THE COURT:  Okay.  Well, I appreciate that.
```

1          So, Counsel should exchange your witness list that is

2   expected for tomorrow, for Thursday, if possible, and that

3   includes whatever Defense witnesses may be called tomorrow.

4          What time is the first witness scheduled on the writ?

5          COURTROOM DEPUTY:  To be here at 8:30.

6          THE COURT:  Okay, to start at 9:00.  Well, we will

7   resume at 9:00 tomorrow morning, as well, and get through as

8   much as we can.

9          Is there anything else, Ms. Parsons, we should take

10  up, Mr. Ray?

11         MS. PARSONS:  I don't think so, Judge.

12         THE COURT:  Okay.  From the Defense, anything else?

13         MR. PENN:  No, thank you.

14         THE COURT:  Okay.  Everyone make good use of your

15  afternoon, and I will see all at 9:00 tomorrow morning.

16         COURT SECURITY OFFICER:  All rise.

17         (Court in recess at 1:52 p.m.)

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2                  *   *   *   *   *   *   *

3      I, Stephanie K. Rennegarbe, RDR, CRC, Official Court

4    Reporter for the U.S. District Court, Southern District of

5    Illinois, do hereby certify that I reported with mechanical

6    stenography the proceedings contained in pages 1-154; and that

7    the same is a full, true, correct and complete transcript from

8    the record of proceedings in the above-entitled matter.

9

10   */S/ Stephanie K. Rennegarbe,*          06/05/2025
     IL CSR, RDR, CRC
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25