```
1              IN THE UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF ILLINOIS
2

3  JANIAH MONROE, et al.,          )
                                   )
4            Plaintiffs,           )
                                   )
5  v.                              )  No. 3:18-cv-00156-NJR
                                   )  East St. Louis, Illinois
6  STEVEN BOWMAN, et al.,          )
                                   )
7            Defendants.           )

8

9

                    TRANSCRIPT OF PROCEEDINGS
10                    EVIDENTIARY HEARING
                           DAY #2
11        BEFORE THE HONORABLE NANCY J. ROSENSTENGEL
             UNITED STATES CHIEF DISTRICT JUDGE
12
                         MAY 28, 2025
13

14

15

16

17

18

19

20
              Stephanie Rennegarbe, RDR, CRR, CBC
21                  IL CSR #084-003232
                    750 Missouri Avenue
22              East St. Louis, IL  62201
                      618-482-9226
23         Stephanie_Rennegarbe@ilsd.uscourts.gov

24   Proceedings recorded by mechanical stenography; transcript
             produced by computer-aided transcription
25
```

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFFS:    Michelle T. Garcia, Esq.
                            Mason Strand, Esq.
 3                          Alexis Picard, Esq.
                            Roger Baldwin Foundation of ACLU, Inc.
 4                          ACLU of Illinois
                            150 N. Michigan Avenue
 5                          Suite 600
                            Chicago, IL  60601
 6                          apicard@aclu-il.org
                            mstrand@aclu-il.org
 7                          mgarcia@aclu-il.org

 8                          Anne J. Hudson, Esq.
                            Kirkland & Ellis, LLP.
 9                          300 N. LaSalle Street
                            Chicago, IL  60654
10                          anne.hudson@kirkland.com

11                          Thomas J. Leahy, Esq.
                            Sarah Legault, Esq.
12                          Kirkland & Ellis, LLP.
                            333 West Wolf Point Plaza
13                          Chicago, IL  60654
                            thomas.leahy@kirkland.com
14                          sarah.legault@kirkland.com

15                          Abby L. Parsons, Esq.
                            Arnold & Porter
16                          700 Louisiana Street
                            Suite 4000
17                          Houston, TX  77002
                            Abby.Parsons@arnoldporter.com
18
                            Brent P. Ray, Esq.
19                          Stephen Ferro, Esq.
                            Arnold & Porter
20                          70 West Madison Street
                            Suite 4200
21                          Chicago, IL  60602-4321
                            Brent.ray@arnoldporter.com
22                          stephen.ferro@arnoldporter.com

23                          Sarah Prather, Esq.
                            Arnold & Porter, LLP.
24                          250 West 55th Street
                            New York, NY  10019
25                          sarah.prather@arnoldporter.com
```

```
 1   APPEARANCES CONTINUED:

 2   FOR THE PLAINTIFFS:    Erica E. McCabe, Esq.
                            Arnold & Porter, LLP.
 3                          601 Massachusetts Avenue, NW
                            Washingotn, DC  20002-3743
 4                          erica.mccabe@arnoldporter.com

 5
     FOR THE DEFENDANTS:    Calvin Edwards, Jr., Esq.
 6                          Hinshaw & Culberton, LLP.
                            151 N. Franklin Street
 7                          Suite 2500
                            Chicago, IL  60606
 8                          312-704-3000
                            cedwards@hinshawlaw.com
 9
                            James M. Brodzik, Esq.
10                          Hinshaw & Culbertson, LLP.
                            521 West Main
11                          Suite 300
                            P.O. Box 509
12                          Belleville, IL  62220
                            618-277-2400
13                          jbrodzik@hinshaw.com

14

15

16

17

18

19

20

21

22

23

24

25
```

1                                I N D E X

2       **WITNESSES CALLED TO TESTIFY:**                        **PAGE**

3       ▓▓▓▓▓▓▓▓▓▓

        DIRECT EXAMINATION BY MR. FERRO                 168
4       CROSS EXAMINATION BY MR. BRODZIK                194

5       ▓▓▓▓▓▓▓▓▓▓▓▓▓

        DIRECT EXAMINATION BY MR. STRAND                200
6
        ▓▓▓▓▓▓▓▓▓▓▓▓
7       DIRECT EXAMINATION BY MS. PICARD                204
        CROSS EXAMINATION BY MR. BRODZIK                234
8
        ANTHONY WILLS
9       DIRECT EXAMINATION BY MR. BRODZIK               242
        CROSS EXAMINATION BY MS. HUDSON                 263
10      EXAMINATION BY THE COURT                        296
        CONTINUED CROSS EXAMINATION BY MS. HUDSON       298
11      REDIRECT EXAMINATION BY MR. BRODZIK             299
        RECROSS EXAMINATION BY MS. HUDSON               303

12

13                              E X H I B I T S

14
        EXB #              DESCRIPTION              ID'D      ADMT'D
15
        Plf #10    ▓▓▓▓▓▓▓▓ Grievance 12/7/24        209       209
16      Plf #11    ▓▓▓▓▓▓▓▓ Response 3/13/25         213       213
        Plf #12    ▓▓▓▓▓▓▓▓ Grievance 10/6/24        222       222
17      Plf #49    Report of Investigation           280       281

18      Deft #1    04.03.104 Admin Directive         244       241

19

20

21

22

23

24

25

```
 1                    (Proceedings began at 9:05 a.m.)

 2                    ************************

 3          COURTROOM DEPUTY:  The matter of Monroe, et al. v.

 4   Bowman, et al., case #18-cv-156, is called for Day 2 of

 5   Evidentiary Hearing.  Will the parties please identify

 6   themselves for the record?

 7          MS. PARSONS:  Good morning, Abby Parsons on behalf of

 8   Plaintiff from the law firm of Arnold & Porter.  With me today

 9   are my partner, Brent Ray, Sarah Prather, Erica McCabe, and

10   Stephen Ferro.

11          Also with us from the ACLU are Michelle Garcia, Mason

12   Strand, Alexis Picard.

13          And from Kirkland & Ellis, T.J. Leahy and Sarah

14   Legault.

15          THE COURT:  All right.  Good morning, Counsel.

16          MS. PARSONS:  Good morning.

17          MR. BRODZIK:  James Brodzik on behalf of Defendants,

18   with Hinshaw Culbertson, and with me is Calvin Edwards.

19          THE COURT:  All right.  We don't have Mr. Penn today?

20          MR. BRODZIK:  He will not be here today.

21          THE COURT:  Okay; all right.  I understand our

22   witness is here, but there were some things to take up.

23          So, Ms. Parsons, what do we need to address?

24          MS. PARSONS:  Mason Strand will address the Court

25   first, Judge.
```

```
 1              MR. STRAND:  Your Honor, would you like me at the

 2   podium?

 3              THE COURT:  I think that would be best.  Get to the

 4   microphone.

 5              MR. STRAND:  So, Your Honor, we have one of our

 6   witnesses, ▆▆▆▆▆▆▆▆, who is -- Your Honor, before we

 7   start, we would ask if it's possible to clear anyone from

 8   IDOC.  It's just a sensitive matter that we wanted to talk

 9   about.

10              THE COURT:  You mean counsel or --

11              MR. STRAND:  No, not counsel.  I'm sorry, Your Honor.

12              THE COURT:  Is there anyone here from IDOC?  The

13   gentleman in the back is from the Marshals Service.

14              MR. STRAND:  Okay.  Thank you, Your Honor.

15              THE COURT:  Sure.

16              MR. STRAND:  So, ▆▆▆▆▆▆▆▆ is very, very nervous

17   about testifying today, and her -- basically she said if there

18   are guards from IDOC in the room she doesn't feel she will be

19   able to testify.  So, what we would like to request -- and we

20   have talked to Defense Counsel, they have no objection -- is

21   that when she is brought out to testify that the shackles be

22   put on in the witness chair, and then that any IDOC guards be

23   cleared from the room.  She's just very scared of retaliation.

24   And so that is our request, Your Honor, that she be able to do

25   that.  She says she doesn't feel she can testify if they are
```

1  not cleared from the room.

2          THE COURT:  Okay.  I was -- Well, I don't even know

3  if this is possible.  That will be my next question to Mr.

4  Batson.

5          But, I assume it's just IDOC and perhaps if we had

6  Deputy Marshals here?

7          MR. STRAND:  That's right, Your Honor.  She doesn't

8  have a problem with the Marshals.

9          THE COURT:  Okay.  Mr. Batson, I know this is a

10  little unconventional.  Would it be possible to have deputies

11  sit through the testimony if she remains shackled from IDOC?

12          MARSHAL BATSON:  Our position would be that it's an

13  IDOC prisoner and it's up to the IDOC to provide security and

14  custody while those prisoners are in our building.  And --

15          THE COURT:  Well, the option would be that there

16  would be no one in here.

17          MARSHAL BATSON:  The Marshals Service would be not --

18  We would have grave concerns about that.

19          THE COURT:  Well, I have grave concerns.  There are

20  very valid concerns about retaliation.  That's a large part of

21  what this case is about, so I think it's reasonable to not

22  have the IDOC here or have them step out.  I understand that

23  that's how it's supposed to be, that IDOC guards are here, but

24  I think they are very valid concerns about retaliation.  This

25  isn't the normal type of case.

1          So, and, again, if she's shackled -- And we resolved

2   yesterday that we have hand shackles that will still allow the

3   witness to review documents, so I will grant that request that

4   the IDOC won't be here.

5          MARSHAL BATSON:  Do we -- Your Honor, do we know how

6   long the testimony will be so I can make manpower allocations?

7          THE COURT:  Any idea on that?

8          MR. STRAND:  Your Honor, I don't expect it will be

9   more than an hour.

10         THE COURT:  Okay.  And when do you expect to call --

11         MR. STRAND:  She's our second witness.

12         THE COURT:  Okay.  All right.  Well, Mr. Batson, if

13  you can make arrangements, great.  If not, it is what it is.

14         MARSHAL BATSON:  Yes, Your Honor.

15         THE COURT:  Okay.

16         MR. STRAND:  Thank you, Your Honor.  And the other

17  thing is would it be possible for me to tell her, so she's

18  aware?

19         THE COURT:  Yeah, that's fine.  Anything else?

20         MS. PARSONS:  Just one thing, Your Honor.

21         Good morning, Abby Parsons.  Happy to report that we

22  have a few lawyers that are taking their first examinations

23  this morning, Stephen Ferro and Alexis Picard, so I am happy

24  to share that with the Court.  We would just ask for the

25  Court's help that only one lawyer from Defense Counsel is

1    objecting at a time.  Yesterday we had more than one, and it

2    would be very disruptive for a first examination.

3         THE COURT:  Sure.  Well, yeah, I was going to

4    comment -- and I didn't get around to it yesterday -- but

5    that's always my rule, one lawyer/one witness.  I think Mr.

6    Penn just felt compelled to jump in.  He's not here today, so

7    hopefully that won't be a problem

8         So, Counsel, whoever is doing the Cross does the

9    objections.

10        MS. PARSONS:  Thank you, Judge.  I know witness

11   schedule has been in flux.  We would seek the Court's help in

12   getting at least some information of next order of witnesses.

13   We have been disclosed that Warden Wills would be the next

14   person, but, given the timing we would like to be more

15   prepared on, you know, which cross-examinations are coming.

16   So, I don't know if we can get further information from

17   Defense on that.

18        THE COURT:  Okay.  Well, I was going to ask first,

19   Mr. Brodzik, if -- Were we able to confirm anyone else?  We

20   have Warden Wills today.  Anybody for tomorrow?

21        MR. BRODZIK:  My understanding is Drs. Puga and

22   Conway are going tomorrow.  I think Reister will have to go

23   Friday.  I don't think he's available until Friday.

24        THE COURT:  Friday morning?

25        MR. BRODZIK:  Friday morning.  And I would assume he

1    would go first, as there's no one else scheduled for Friday.

2    So, I would assume 9 a.m. Friday.  He's going to make his best

3    efforts to be here in person.  Puga and Conway are going to be

4    remote.  They are at a conference, I believe.  They're at

5    something up in Chicago.  They can't be here in person.

6              MS. PARSONS:  Were they originally scheduled to be

7    here on Thursday?  That was the original disclosure.

8              MR. BRODZIK:  I think Wills was Thursday and the

9    doctors were all on Friday.  We had one -- Yeah.

10             MS. GARCIA:  That's right.

11             THE COURT:  Okay; all right.  Does that answer your

12   question?

13             MS. PARSONS:  Yes.  Thank you, Judge.

14             One additional thing that my colleague, Sarah

15   Prather, will address.

16             THE COURT:  Okay.

17             MS. PRATHER:  Good morning, Your Honor, Sarah

18   Prather.  Defendants have promised this is about our Motion to

19   Compel and our Motion to Enforce, Docket 942.  Defendants have

20   promised to produce additional documents today in response to

21   our motion.  We have yet to receive all of those documents, so

22   at this time we do reserve the right to come back to the Court

23   once we have assessed those documents that have been produced

24   to see if anything is missing.

25             Given that some of the documents also relate to

1    Warden Wills, who is testifying this afternoon, we do reserve

2    the right to recall him, if necessary.  We do not expect to

3    recall him, but we do reserve the right to do so once we have

4    received the documents.  So, at this time we are not at an

5    impasse, but, you know, we reserve the right to seek the

6    Court's assistance at a later time if the parties do come to

7    an impasse.

8            THE COURT:  Okay.  Well, I did note that in response

9    to the Motion to Compel the Defendants say that they are in

10   the process of conducting an ESI search and intend to produce

11   any responsive nonprivileged e-mails by today, and hopefully

12   as to Warden Wills those will be produced.  But, of course, if

13   something comes up in the documents that you need to recall

14   him, I would allow you to do so.

15           MS. PRATHER:  Thank you, Your Honor.

16           THE COURT:  Okay.  I will leave that motion pending

17   for now and I'm hoping later that it can be denied as moot.

18   But, I will leave it pending for now.

19           And then whoever wants to respond to the Motion to

20   Strike, do the Plaintiffs still intend to file a written

21   response or would you prefer to respond verbally?

22           MS. GARCIA:  Your Honor, we do intend to file a

23   written response this afternoon, if that would work for

24   timing.

25           THE COURT:  Okay.  Yeah, that's fine.  I have been

1    looking at it, but, okay, that's fine.

2            I would ask the Defendants, as to other declarations

3    that have been filed, I didn't see anywhere where the

4    Defendants had responded to those declarations other than in

5    your responsive brief to the Motion for Injunction.

6            Have you filed any specific responses to other

7    declarations?

8            MR. BRODZIK:  No, we have not, Your Honor.

9            THE COURT:  Okay.  And then, also, yesterday the

10    Defense did make an objection to some hearsay, and I did want

11    to note, first of all, that the procedures here on a

12    preliminary injunction motion are less formal and I can

13    consider less extensive evidence than if it were a trial on

14    the merits.  And indeed relaxed evidentiary standards for this

15    stage at preliminary injunction permit a District Court to

16    consider hearsay, so the question -- Some of it I don't even

17    think was considered, but, again, hearsay evidence can be

18    considered and I can rely on affidavits and hearsay materials

19    which would be admissible -- which would not be admissible for

20    the final hearing.  So, I just did want to note that.

21            Okay.  Anything else from the Plaintiffs before we

22    begin?

23            MS. PARSONS:  No, Your Honor.

24            THE COURT:  All right.  Anything from the Defendants?

25            MR. BRODZIK:  No, Your Honor.

```
 1          THE COURT:  Okay.  Let's get our first witness in the
 2   stand.
 3          About what time -- How long do you think this witness
 4   will take, whoever is doing the examination?
 5          MR. FERRO:  Your Honor, Stephen Ferro on behalf of
 6   Plaintiffs.  I expect this witness will take about an hour;
 7   maybe a little bit less, maybe a little bit more.
 8          THE COURT:  Okay.  Deana, could you notify the
 9   Marshals Service we think this one will take -- And yesterday
10   they were taking an hour and Cross wasn't very long, so we
11   expect an hour, hour and a half.  We can take a break if they
12   need more time.  If they are coming up.  Just say if they are
13   intending to come up, we think it will start maybe --
14          MR. FERRO:  Your Honor, I have some binders of some
15   exhibits that may be used during the examination.  Would you
16   like to have them now?
17          THE COURT:  Sure.
18          Deana, just say if they are coming up, we think that
19   witness will start between 10:30 or 11:00, between 10:30 and
20   11:00.
21          Are those the more relaxed hand shackles that we had
22   yesterday?
23          CORRECTIONAL OFFICER:  Yes.
24          THE COURT:  Okay.  Let's see.  We have ███████.
25          ███████, I'm going to ask you to take an oath at
```

1    this time.

2         COURTROOM DEPUTY:  Please raise your right hand the

3    best you can.

4         (Plaintiff, ██████████, sworn).

5         COURTROOM DEPUTY:  Please state your name for the

6    record.

7         ██████████████████████████.

8         THE COURT:  You may proceed.

9         MR. FERRO:  Thank you, Your Honor.

10

11                    DIRECT EXAMINATION

12   BY MR. FERRO:

13   Q.  Good morning, ████.  It's nice to meet you in person.

14        Can you please state your preferred name for the

15   record?

16   A.  ██████████.

17   Q.  And what is your IDOC number?

18   A.  ███████.

19   Q.  And what are your preferred pronouns?

20   A.  She.

21   Q.  Where do you currently reside, ██████████?

22   A.  Pontiac -- Menard Correctional Center.

23   Q.  And how long have you been housed at Menard?

24   A.  Like two years.

25   Q.  ██████████, have you been diagnosed with gender dysphoria?

1    A.  Yes.

2    Q.  And when were you diagnosed by IDOC?

3    A.  About two years ago.

4    Q.  Does around September of 2023 sound, right?

5    A.  Yes.

6    Q.  Did you struggle with your gender identity before coming

7    to Menard?

8    A.  As far as what?

9    Q.  Did you take hormones before you were incarcerated?

10   A.  Yes.

11   Q.  Did you take any other actions to make yourself feel like

12   a woman before you came to prison?

13   A.  Yes.

14   Q.  What did you do?

15   A.  The way I dressed, the way I behaved, and the normal

16   stuff.

17   Q.  Did you attempt to alter your genitals in any way before

18   coming to prison?

19   A.  Yes.

20   Q.  How did you do that?

21   A.  I attempted self-mutilation by shooting myself in the

22   groin.  I was receiving black market hormones and just regular

23   makeup, clothing, and anything that I can get to get me closer

24   to feeling outside how I felt inside in appearance.

25   Q.  Do you recall roughly how long on the inside you felt like

1  a woman?

2  A.  Since I was like a kid; three, two.

3  Q.  Thank you, ██████████.  You mentioned that you took

4  hormones before coming to prison.  Are you still receiving

5  hormone treatment?

6  A.  Yes.

7  Q.  I want to talk a little bit more about that treatment.

8  How long have you been receiving hormones at Menard?

9  A.  About a little over a year.  Like about 13 months.

10  Q.  And do you have blood work done to check your hormone

11  levels?

12  A.  Yes.

13  Q.  How often roughly are your hormones checked?

14  A.  About every two months.

15  Q.  Do you recall when the last time your hormones were

16  checked?

17  A.  I would say probably about a month or so ago.  I don't

18  remember exactly.  Probably over a month.

19  Q.  And have you discussed your hormone relevance recently

20  with anyone at Menard?

21  A.  Yes.

22  Q.  Who did you talk to?

23  A.  A medical director who came and evaluated me.

24  Q.  And what did that medical director tell you about your

25  hormone levels?

1  A.  That I have been undertreated, I have been undermedicated,

2  and that -- that I have been undermedicated.

3  Q.  Did he say whether your hormone levels are closer to that

4  of a cisgender man or woman?

5  A.  Yes, he said it was closer to a male due to the levels

6  that I was on, so he -- So with the dosage that I was

7  receiving, they was so low, he gave me 200 percent more dose

8  than what I was receiving, because he said basically that's

9  what I should have been getting from the get-go.

10  Q.  How did you react to hearing that you had been

11  undermedicated with respect to your hormones?

12  A.  Distressed, stalled out, because I had previously, prior

13  to that, how I got before him, was because I continually write

14  grievances saying that I have been -- that I am being

15  undermedicated.  So, they finally put me before the medical

16  director, and he reviewed my files and, I mean, he had no

17  connection to Menard, he had no reason to like hold back, and

18  he just told the truth and said, "You have been

19  undermedicated."

20  Q.  Why are hormone levels important to you as a transgender

21  woman?

22  A.  Because it allowed me to feel -- to develop a little

23  more -- It make me feel the same way I feel inside in

24  appearance-wise.

25  Q.  Would you say that it helps you socially transition?

1   A.   Yes.

2   Q.   ███████████, are you seeking gender-affirming surgery?

3   A.   Yes.

4   Q.   Why?

5   A.   Because it shouldn't be there from the get-go.

6   Q.   Are your hormone levels important to help you get

7   transgender surgery?

8   A.   Yes, because for some reason IDOC has some type of policy

9   that you have to be at a certain level before you can get any

10  type of reassignment surgery, so now I just got to continually

11  wait being I was -- due to the fact that I was undermedicated.

12  Q.   So, I think you said earlier your hormone levels increased

13  by 200 percent, is that right?

14  A.   No, the levels didn't increase.  The medication that I was

15  receiving was at a certain dosage, so he increased the dosage

16  by 200 percent.

17  Q.   Thank you for catching me on that.

18       Your pills have changed, but your levels haven't?

19  A.   I ain't been tested since I started the new dosage.

20  Q.   When did you start that new dosage?

21  A.   I would say about three weeks ago.  Roughly about three

22  weeks ago.

23  Q.   And you mentioned that you complained about your hormone

24  levels to Menard.  How did you do that?

25  A.   I wrote several grievances.  Each time I went out to see

1    medical staff I spoke to them, which I lied on my grievances,

2    it's probably about 14 times, somewhere, yeah, about 14 times

3    I spoke to him, meaning that I was out to see him, and nothing

4    never happened, because they wasn't in charge of medication

5    for all of this and transition.

6    Q.  How do you know that they weren't in charge?

7    A.  Because they told me.  It was more or less to come out,

8    the ones you see about your back or you're having headaches or

9    your mental health, and none of those is in charge of

10   medication.

11   Q.  Did the officers say that they would follow up on your

12   complaints in any way?

13   A.  No, the grievance came back and said, "You saw the doctor,

14   you saw the Healthcare 14 times," so they -- And according to

15   the grievance, they -- they met their standards, because I was

16   complaining to see Healthcare, so they just said, "Okay, well,

17   you saw Healthcare or this date, this date, this date, what

18   more do you want?"

19   Q.  And all of those times you saw Healthcare they told you,

20   "We can't help you with your hormones"?

21   A.  No.  "We are going to refer you to the doctor.  We are

22   going to refer you to the doctor."  This lasted probably like

23   seven months or so.

24   Q.  I want to make sure I have got your testimony.  You have

25   been complaining about your hormones for seven months?

1    A.  I have been complaining, yes.

2    Q.  Prior to this change in medication, can you think of a

3    single other time that Menard has helped you with your

4    hormones?

5    A.  No.  Only when I got there, because prior to coming there

6    I was being stalled out in Pontiac.  So once I got to Menard,

7    luckily I ran into somebody that really did care, and she went

8    and she talked to some people and got me before some people

9    and then something started happening.  It was Mental Health.

10   Once I saw Mental Health and she saw the mental health stuff

11   that I was going through, and so she referred me back to them

12   and, like, "You all need to do something," and then I started

13   getting my medicine.

14   Q.  So, between starting your medication and this change

15   within the past three weeks, you can't think of any time they

16   helped you with your medication other than that?

17   A.  No.

18   Q.  Thank you, ██████████.  I want to turn your attention to

19   an incident that recently took place at Menard Correctional

20   Center.  Do you recall a large-scale search of the facility

21   that happened around September 2024?

22   A.  Yes.

23   Q.  Where were you during that search?

24   A.  In my cell.

25   Q.  Did anyone enter your cell during the search?

1   A.  Yes.

2   Q.  Who entered your cell?

3   A.  Well, the Tac Team officers.  The statewide Tac Team came

4   and searched the building that we was all in.

5   Q.  You said the Tac Team.  Who are they?

6   A.  They are the ones, the special officers that -- the

7   Tactical Response Team.

8   Q.  Can you tell the Judge what these guards were wearing?

9   A.  All black, like bullet -- like bulletproof or

10  stab-resistant vests on.  Some had like things over their

11  faces and make sure they didn't have -- None of them didn't

12  have name tags.  They take their name tags off.

13  Q.  What did these guards do when they were in your cell?

14  A.  Well, they came to my door -- They came to my door, they

15  asked -- They came to my door, started cussing for no reason,

16  "Give me your F'ing clothes," because I guess they are trying

17  to be aggressive for no reason.  And I got out the bed, I went

18  to the door, I gave them my ID, I said, "I'm a female.  You

19  can't -- you have got to have a female officer to search me."

20  And so it started -- One officer started looking -- kind of

21  looking down the hall for the female officer, but then the

22  other officer said he didn't care.  He took my ID, walked off.

23  Once he took my ID and walked off, he came back with three

24  more -- three more officers and a can of mace, like a 12-ounce

25  or bigger can, like a baby fire extinguisher of mace, and

1    said, "Give me your F'ing clothes."  So, I didn't want to get

2    maced.  Under duress, I took the clothes off and gave him the

3    clothes.  And once I gave him the clothes and he started

4    taking me through the paces, "Lift your arms up, open your

5    mouth, and turn around" -- which I didn't want to do, but I'm

6    under duress.  So, I turned around, and made me almost to the

7    point of like touching my toes and spread my butt, and he want

8    to -- While they are sitting there with their little

9    flashlight looking, and they started making comments where one

10   of them said -- because I can see them back there -- one of

11   them said, "He might -- He might be transgender," I guess by

12   examining my butt or something.

13   Q.  I want to break down what you just told us for the Court.

14           You said that you showed the first officer your ID

15   badge.  What does that ID badge say?

16   A.  ID badge, on the back it said female.  It say female and

17   female search.

18   Q.  And what does that mean to you, female search?

19   A.  Well, that you only can be searched by females.

20   Q.  And these three officers who searched you in your cell in

21   September, were they female officers?

22   A.  No.

23   Q.  These officers who said, "I think you might actually be

24   transgender" while you were bending over, these were all male?

25   A.  Yes.

1    Q.  ███████████, during the strip search did the officers do

2    anything to your cell?

3    A.  Yes.

4    Q.  What did they do?

5    A.  They overly ransacked it.  They never returned my ID, they

6    took all my affirming products; -- makeup, underwear, bra,

7    anything -- anything related to that, they took it all.

8    Q.  And why are those items important to you?

9    A.  Because they help me identify more on the outside of who I

10   am on the inside.  And so I use those products daily and just

11   -- even if it's just sitting in my cell, and I just -- I need

12   them.

13   Q.  Has IDOC replaced the items that were taken from you?

14   A.  No.

15   Q.  So, in near nine months since your cell was tossed, IDOC

16   hasn't replaced your bras, panties, or makeup?

17   A.  No.  I filed the grievance with Springfield and they said

18   the institution will handle it how they handle it, so it's a

19   dead issue.

20   Q.  ███████████, can you replace these items from the

21   commissary?

22   A.  If I want to get punched up.

23   Q.  What do you mean by that?

24   A.  When you go to commissary you go with a group of -- whole

25   bunch of group of people, they are standing around the windows

1    and they're right there with you and everybody watching what

2    everybody buy.  And so I am housed in a unit with regular

3    general population people, not protective custody people, a

4    house of regular gang-bangers and guys who want to be super

5    tough, just regular general population people.  So, if I think

6    about buying some of this stuff, it's going to continue to be

7    more of a problem than I am already having a problem.

8    Q.  Do you feel safe purchasing gender-affirming items from

9    the commissary at Menard?

10   A.  No.

11   Q.  Will Menard deliver these commissary items to your cell if

12   you ask them to?

13   A.  Pontiac did; but, no, Menard won't.  You have got to get

14   it right there or you won't get it.

15   Q.  And how do you know that Pontiac will deliver items to

16   your cell if you asked them to?

17   A.  Because I purchased items at Pontiac.

18   Q.  You were housed there before you came to Menard?

19   A.  Yes.

20   Q.  █████████, how did this strip-search incident affect your

21   mental health?

22   A.  It put me super in a mental -- mental state that I hadn't

23   been in in years, years, and it caused me to be -- to feel so

24   bad the way that I was treated that I ended up self-harming,

25   which I hadn't done in -- I can't even remember the last time

1    that I, like, self harmed.  So, it just made me feel almost

2    dead a little bit.  So, when you are feeling that way, the

3    only way you can feel, like, something is you, like, self-harm

4    not to kill yourself, but just to like feel something, so you

5    start cutting and doing whatever it is that you can do to try

6    to feel a little something.

7    Q.  You said you reported this incident to the prison staff in

8    a grievance?

9    A.  Yes.

10   Q.  Did you receive any response from Menard about this?

11   A.  Yes, I received a response from the grievance, because I

12   didn't know who the officer was.  They identified the officer

13   at this time, and then they stated that it wasn't no proof

14   about what I was saying.  The officer said he didn't do it, so

15   it's a dead issue.

16   Q.  Has IDOC ever agreed with any of the grievances you filed

17   related to your transgender care?

18   A.  No.

19   Q.  I want to talk now a bit more generally about the staff at

20   Menard.  Do staffers at the facility make comments about your

21   transgender identity?

22   A.  Constantly.

23   Q.  What kind of things do they say?

24   A.  They make sure that they try to say, "He, he, he," even

25   though you don't want to be called "he," and they call you

1    "it," and any type of derogatory word that they can come up

2    with.  They try to expose you to other prisoners.  I guess and

3    that way they are trying to make somebody do something to you

4    or any worse way that they can.  If it's shakedown and you

5    need a female, then they all get to hollering, "It need a --

6    It need a female," or "Transgender need a female."  You don't

7    have a name no more.  You just become "it" and anything they

8    can think of other than your actual name.

9    Q.  How does the use of these "he" and "it" pronouns make you

10   feel?

11   A.  It makes you just wish you could just hide somewhere and

12   just disappear.

13   Q.  Does it affect your ability to live as a woman?

14   A.  Yes, because it's safer to be -- look like a male in

15   appearance in the environment that I am in versus really being

16   who you want to be.  The only time I can really do that is

17   when I am in my cell at night, then I can be who I want to be.

18   But when you come out that cell, you can't be around those

19   guys looking a certain way or you will get punched up.

20   Q.  ███████████, do you know a staffer named Miss Dane?

21   A.  Yes.

22   Q.  Did she make any comments recently about your transgender

23   identity?

24   A.  Yes.

25   Q.  What did she say?

1  A.  Well, I was complaining to her a little bit about the

2  environmental effects of where I was around, and her comment

3  was, "Why don't you just not be transgender," like you can

4  just really do that.  So, and it's not the first time that she

5  made it.  She just constantly asking me stuff like that, "Why

6  don't you just not be transgender, you wouldn't have to worry

7  about all the stuff you are going through," like being spit on

8  when I come down the gallery and different stuff like that.

9  Q.  How does it affect you when Miss Dane asks, "Why don't you

10 just stop being transgender?"

11 A.  Well, it get me depressed and upset, and sometimes I think

12 she's trying to bait me, so I just try to shake it off,

13 because I'm kind of at an age where I can just try not to pay

14 attention as much as I can.

15         THE COURT:  What is Miss Dane's position?

16 A.  Correctional officer.  She work the gallery five days a

17 week.

18 Q.  Does she run into you five days a week?

19 A.  Yeah, she work the gallery.  She come to the door every

20 day.  She works the gallery five days a week.

21 Q.  ████████, you mentioned that you filed grievances with

22 IDOC.  In their responses to your grievances what pronouns do

23 they use for you?

24 A.  "He" -- Well, some of them they use "they." They starting

25 to get a little hold of it.  Some of them, they use "they."

1    It's kind of like a mismatch.  It all depends who's hearing

2    it, because the grievances is not heard by like a grievance

3    officer.  Some of them is heard by like random officers, I

4    guess whoever they put them in front of, just a random

5    correctional officer, and then they just don't know the rules

6    or really just don't care anyway.

7    Q.  Have you ever seen a grievance that uses your preferred

8    pronouns?

9    A.  Yes.

10   Q.  How many would you say?

11   A.  I don't count them.  I am just looking at the results of

12   did I win it or not.

13   Q.  You say that most of them use he/him pronouns still?

14   A.  Yes.

15   Q.  How does that affect you?

16   A.  Every time somebody say -- think of saying "he" or

17   anything like that get me upset.

18   Q.  ▇▇▇▇▇▇▇, I would like to talk a little bit about your

19   housing.  Where are you typically housed within Menard?

20   A.  Well, for the last, I would say, about a year or two --

21   well, year and a half, roughly about a year, I was housed in

22   North 2 -- North 2 restrictive housing unit.  We had a

23   building where all the segregational people is housed at.

24   Q.  And why are you kept there?

25   A.  Because -- Because I am a transgender female and they

1    wanted to move me out of general population.  They wanted to

2    put me -- They just wanted to move me out of general

3    population, so they put me over there, which is awful, which

4    is worser.

5    Q.  You say it's worse.  Why?

6    A.  Because you are housed on the gallery with disciplinary

7    segregation prisoners.  They got a history of throwing feces,

8    spitting, and assaulting other people.  And so where I am

9    housed at, where I was -- The gallery has, I believe, 54 cells

10   on the gallery.  The first cells up 'til 36 is disciplinary

11   segregation, guys that -- guys that got known history of

12   throwing feces, just, period, they are there.  And then the

13   back half got general population prisoners like me and the

14   workers.  So, it's 14 of us to the back.  It's seven workers

15   and seven of us, and the rest in front is general segregation

16   prisoners.  So, when you are leaving, when you come and go off

17   the gallery -- These guys is mental.  They have got no TVs,

18   got nothing, so they are going to troll you and talk to you,

19   and if you are not standing next to the officers you are going

20   to get spit on, like I have been spit on numerous times, and

21   you are going to get verbally assaulted, sexually assaulted.

22   It's just a marathon of activity that go on that just it's

23   overwhelming.

24   Q.  Have you complained about the behavior of these other

25   inmates to the staff at Menard?

1   A.  Yes, through several grievances.

2   Q.  Do you complain when officers walk past your cell about

3   your neighbors?

4   A.  No, because they listen to me.  Then you are going to be

5   -- In their mind you are going to be considered a fag, a

6   transgender, and a stool pigeon.

7   Q.  You said they listen to you.  Who's they?

8   A.  Everybody, because it's a closed environment, so you have

9   got to write letters.  So, yes, I write letters.  I gave

10  several letters to, like, Miss Dane and let her know what's

11  going on, but she's going to repeat whatever you say anyway,

12  because she's got guys that she's cool with, so she will

13  repeat it.  But, I for sure wrote grievances.  And through

14  these grievances I outlined who was doing what, who was

15  harassing me, who spit on me, who did this, and the grievance

16  come back, the response is, "Your placement is administrative

17  decision.  No further actions will be taken."

18  Q.  Do you fear the inmates who live around you?

19  A.  Of course.  I don't want feces thrown on me, in my face,

20  and urine and things that they accumulated.  They call them

21  like glock dookies, and so that means in place of having a gun

22  they just put it inside a milk carton and they call it glock

23  dookie, and it's messed up with feces, urine, Magic Shave, and

24  they just keep these containers in their cell and let them

25  brew.  And for anybody that they have a problem with, even

1  officers, they throw it on them, because their cells not

2  getting shook down, so they have the stuff and you are going

3  to get it, it's just a matter of time.

4  Q.  Do you think these other inmates have a problem with you

5  because you are transgender?

6  A.  Yes, it's made known every day.

7  Q.  What type of things do you do to try to keep yourself

8  safe?

9  A.  If I am walking down the gallery I try to make sure I walk

10  with the officer.  I don't respond to them, to feed them, make

11  them get more upset, and that's the only thing I can do.  I

12  can't do nothing else, just -- And I walk close to the bars.

13  Like when I walk down the gallery, all the cells is open bars,

14  so they're to my right, so the rail -- the guardrail that keep

15  you from falling over the rail is to my left, so I make sure I

16  stay close as I can to my left, and then I make sure I am

17  looking at each person as I am walking past their cell so I

18  can make sure they ain't got nothing in their hands, but that

19  still don't stop them.  Sometimes you are just going to come

20  past and not pay attention.  And that's when you are going to

21  get spit on.  Or you may run through a gauntlet of spit.  You

22  can't get past all of it, so you just got to take a spit and

23  then you just go on to your cell and wash it up and you may

24  get spit on another day.

25  Q.  When you are in your cell do you try to remain quiet to

1    try to avoid harassment?

2    A.  Yes; yes.

3    Q.  How do you do that?

4    A.  By not saying nothing.  Because any time my voice is being

5    heard, then it's, "Oh, the transgender on the gallery, get

6    your faggot A off the gallery.  No transgenders on the

7    gallery."  And then they -- It's just a marathon, because they

8    have got a group of guys, they all piggybacking and they all

9    jump on you together verbally and sexually.  It's never just

10   one.  One might start.  He might start to say, "Hey, get the

11   transgender off the gallery.  Transgender, you don't get no

12   air time, you don't get to say nothing on the gallery."  Then

13   once he start -- Again, these guys are mental.  They have got

14   no TVs, no nothing.  And then they start in and it's -- It's

15   been three days straight that one guy just kept going.  And

16   three days straight is generally he's up on drugs, so he's

17   going three days straight hollering at the top of his lungs,

18   and then he encourage others to bang on my wall and knock on

19   the ceiling, call my name all day, and the only escape that

20   you have got is try to stuff your ears up with your headphones

21   and cut them as loud as you can to the most -- For me, I just

22   -- I don't even listen to rock and roll.  I just put on a rock

23   and roll station, because it's the loudest stuff, and just cut

24   it up as loud as I can to try to drown them out.

25   Q.  You said that some of these inmates would jump at you

1   sexually.  What did you mean by that?

2   A.  I mean like verbally, not -- because we are never

3   together.  So, it's just sexual comments and "Chick with a --

4   chick with a penis," but they don't say "penis."  And they

5   just say -- It's just a whole bunch of -- a whole list of

6   things, whatever you can think of, they can say it to try to

7   hurt your feelings, but they are really trying to get you to

8   respond back.  And if you respond back, they call it getting

9   in your head and that would make them happy.  But the more you

10  don't respond, then they get upset and that's when spitting

11  and acting like they are going to snatch you through the bars

12  and making all the threats to you and all this different type

13  of stuff.

14  Q.  Do you have access to Group Mental Health where you are

15  currently housed?

16  A.  No, but the segregational prisoners do.

17  Q.  Have conditions in the cell block improved since the start

18  of this year, in your opinion?

19  A.  Say that again.

20  Q.  Have conditions improved at the cell block since the start

21  of the year, in your opinion?

22  A.  No, it got worser.

23  Q.  ███████, in your own words could you tell the Judge

24  what it's like being a transgender woman at Menard?

25  A.  Something that you wish you never was, make you wish that

```
 1   you was just like the rest of the guys there, that way you
 2   wouldn't have to worry about the headache.  It's like a
 3   constant -- It's like a constant job that you have just got
 4   to -- every day you have got to deal with these people, deal
 5   with those, and so you really be wishing that, "Hey, I wish I
 6   could be" -- as society say, I wish I could be fixed and be a
 7   regular so-called heterosexual or a male or just a male in
 8   general and -- because it's safer that way, it's mentally --
 9   it's more mentally sound that way.  I wouldn't have to worry
10   about trying to -- I wouldn't have to worry about mutilating,
11   self-mutilating, I wouldn't have to worry about the time I
12   shot myself in the groin, I wouldn't have to worry about no
13   medication, none of it.  It would be less of a headache.  I
14   wish it all could go away, but I was born how I was born and I
15   can't do nothing about it, so I have got to weather the storm.
16   Q.  Do you feel safe at Menard as a transgender woman?
17   A.  No.
18   Q.  Why not?
19   A.  Because I have already proven it by me being spit on and
20   harassed.  It's just an opportunity and a threat that I am
21   receiving.  It's like, "When I catch you I am going to do
22   this, I'm going to stick a broom up your butt, I'm going to do
23   this," and all the different type of stuff that I know these
24   guys done have a history of doing and stuff.  Yeah, so, yes,
25   it's just a matter of time if somebody able to get their hands
```

1    on me and enough of them, if they feel like they can do it,

2    they are going to do whatever they can to try to get some type

3    of recognition because Miss -- I don't understand it, but it

4    become something -- why they point fingers at me, they are

5    doing some of the same stuff.  Well, not some of the same

6    stuff, because I'm not doing the stuff they are doing.  But

7    they are doing behavior that's more in their words -- their

8    behaviors than me to the way they are attacking people.

9         For example, it's become some type of practice where

10   you beat a guy up -- where they beat a guy up, pull his pants

11   down and spit in his butt, those types of behaviors.  It's

12   just hundreds of cases of that, like, "Come on, where did that

13   become a part of it at?"  But, that's what they do.  "I'm

14   going to beat you -- I'm going to knock you out, then I'm

15   going to spit on your butt."  And they done this stuff to

16   plenty of people and not only there, but, yeah, they just --

17   that's the thing to do.  They feel it's the worst way to

18   humiliate a person is attack them sexually.

19   Q.    ████████, you asked to be transferred out of -- Excuse

20   me.  Have you been -- asked to be transferred out of Menard?

21   A.  Have I put in for transfer?  Yes, I put in for transfers.

22   I put a transfer in for Menard in April.

23   Q.  Why do you want to be transferred out of Menard?

24   A.  I want to be transferred to a facility where I can receive

25   better affirming care, wherever that facility is, but I can

1    participate in mental health groups, because when you are

2    sitting in those cells and you can't talk -- you don't have

3    nobody to talk to, that's like one of the worsest things.  We

4    don't have nobody to express, or you don't have a collective

5    group of peoples that have the same mind that you are going

6    through that -- or going through the same thing that you are

7    going through that can relate to the pain that you are going

8    through and the traumas and the struggles, all of this stuff.

9    It's just like having a whole -- having a whole house on your

10   back, trying to carry it.

11   Q.  What steps have you taken to try and get transferred out

12   of Menard?

13   A.  I made sure -- Since I have been at Menard, I made sure

14   that I -- make sure that I stayed out of trouble, any type of

15   disciplinary infractions, I stayed in A-grade, I avoid a lot

16   of confrontations that I probably should have defended myself

17   in, but it was best to just take the licking and just keep it

18   moving so that I won't have no type of disciplinary issues,

19   and so I avoided all those.  And that's the only thing that I

20   could do is just stay out of trouble and stay in A-grade,

21   don't catch no disciplinary tickets, and just try to be a

22   model -- a model prisoner, which I -- which that's my goal.

23   Q.  You say you are trying to be a model prisoner.  Have you

24   tried to lower your security level?

25   A.  My security level has been lowered.

1    Q.   What is it currently?

2    A.   My security level is medium.  When I first got to Menard

3    my security level was -- was maximum security.  It had been

4    lowered to a medium.  And they have something called

5    aggression level that they, like, tag you with these different

6    type of numbers.  Like your aggression level is a 30, some

7    guys aggression level is over the board.  They considered 9 of

8    -- 9 or better is high aggression.  So, but when I got to the

9    facility my aggression level was maybe like a 14 or something,

10   or somewhere up there.  It wasn't over 20.  But then by me

11   staying out of trouble, my aggression level went down to like

12   an 8.

13   Q.   Do you know if your aggression level is currently at

14   moderate?

15   A.   Yes.

16   Q.   And your aggression level is currently at moderate, is

17   that right?

18   A.   Yes.

19   Q.   ████████, how would being located at a women's facility

20   like Logan change your life?

21   A.   Well, I would say any facility, I just -- Not just Logan,

22   but any facility where I can receive affirming care is my

23   goal, where I can wear my makeup, where I can -- if I want to

24   grow my hair or whatever like I want to do, I can just do what

25   I want to do.  If I want to paint my nails, I can feel happy

1   coming out of my cell with my nails painted.  I can feel happy

2   coming out my cell with lipstick on, I can feel happy wearing

3   my clothes as I want to wear my clothes, I can put a bra on if

4   I want to.  I don't try to hide -- I don't have to try to hide

5   nothing.  It would just be like a whole sunny day shining

6   versus me being in the dark that I am in right now, because

7   it's constant, like I am hiding under the bed and you can't

8   express yourself where it kind of make you feel like somebody

9   got their hand over your mouth and your nose and you are

10  feeling suffocated, that I would be able to breathe, just --

11  anywhere I can go where I can just receive some affirming

12  care.

13  Q.  Thank you, ███████.

14        MR. FERRO:  Your Honor, I'm going to take a moment to

15  confer with Counsel.

16        THE COURT:  Okay.

17  Q.  (By Mr. Ferro) ███████, I have just got a few more

18  questions for you.  You mentioned a nice mental health person

19  who started you on hormones at Menard.  Do you know if that

20  person still works there?

21  A.  I don't know.  I haven't seen her, so -- As a matter of

22  fact, I don't think she worked -- One thing -- One thing I do

23  know is when you -- Because I think she went out of her way to

24  contact some peoples and let them know what was going on.  So

25  when you have those type of people, they disappear.  So, I

1    ain't seen her in a long time.  I saw -- I have been seeing

2    another mental health woman who's just as nice, but once they

3    nice and try to help you, they disappear.

4    Q.  You also said that you believe Menard has gotten worse

5    since the start of the year.  Why is that?

6    A.  Because it's harder to see Mental Health one-on-one.

7    Prior to that you are kind of able to see Mental Health where

8    they bring you out your cell one-on-one and you can go sit in

9    a room and you can talk to them.  And, so, now to the point is

10   where you sit at your -- they will come to your door trying to

11   talk to you, but you can't talk to them at your door because

12   you have a person to your right listening, you have got a

13   person up under you listening, then that's going to start a

14   whole 'nother issue.

15        Other things might happen is, since the year began,

16   not only does we not allowed -- It's nothing.  No education

17   programs, no group therapy, no -- only been allowed -- For the

18   year, only been allowed two out-of-the-cell recreational times

19   for the whole year.  So, this year been really bad when you

20   only get two out-of-cell times for the whole year so far.

21   Q.  Thank you very much for your testimony, ███████.

22        I understand the other lawyer is going to ask you

23   some questions now.

24        MR. FERRO:  Your Honor, I have nothing further at

25   this time.

```
1            THE COURT:  Mr. Ferro, you didn't use any of these
2    exhibits, is that correct?
3            MR. FERRO:  That's correct.  These were just
4    potential.  I am happy to collect those now or --
5            THE COURT:  Okay, yeah.  You can have those back.
6            All right.  Cross-examination?
7
8                     CROSS EXAMINATION
9    BY MR. BRODZIK:
10   Q.  Good morning, ███████.
11   A.  Good morning.
12   Q.  Prior to being housed at Menard you were housed at
13   Pontiac, is that correct?
14   A.  Yes.
15   Q.  Do you know why you were transferred to Menard?
16   A.  I was -- I guess, yeah, because I had a disciplinary
17   ticket, and so they just moved me out at Menard.
18   Q.  What was that ticket for?
19   A.  Dangerous communication.
20   Q.  What was that dangerous communication?
21   A.  I was being harassed, and I sent my sister a letter -- I
22   mean, a message -- No, I was talking to her on the telephone.
23   I sent -- I was talking to my sister on the telephone and I
24   said, "These guys don't understand until somebody do something
25   to them, but I am staying out the way, because I don't want to
```

```
 1    get in trouble."  And so they wrote me up for that and they
 2    put me in the hole and they transferred me out of Menard.
 3    Q.  Prior to Pontiac had you been housed in any other
 4    facilities?
 5    A.  In IDOC, no.
 6          I'll back up.  Not within the two -- Not since 2005,
 7    I was in the street.  But since I have been back in IDOC, no,
 8    Pontiac was the first place I have been to.
 9    Q.  Were you in a IDOC facility sometime prior to 2005?
10    A.  Yes.
11    Q.  And where was that?
12    A.  Danville, Pinckneyville, different -- I don't remember all
13    the facilities, but I know it was Danville, Pinckneyville,
14    Galesburg in the '90s, and Pontiac and Menard.
15    Q.  When you were back in Danville and Pinckneyville in the
16    '90s, what was your charging offense?  Why were you in prison
17    at that time?
18    A.  I was locked up for carjacking and attempt murder.
19    Q.  And you went back into prison in 2005, is that correct?
20    A.  No, I left 2005.
21    Q.  When did you go back?
22    A.  2009.
23    Q.  What was your charging offense --
24    A.  Hold on.  2017.
25    Q.  2017.  Were you also in prison sometime in 2009?
```

```
 1    A.  I wasn't in IDOC in 2009.  I was in Cook County jail.

 2    Q.  Why were you in Cook County jail in 2009?

 3    A.  For different charges.

 4    Q.  What were those charges?

 5    A.  I had a criminal sexual assault, kidnapping, a robbery,

 6    and just different -- Yeah, that's what I had.

 7    Q.  Okay.  Sir -- Ma'am, have you been found guilty of rape in

 8    the past?

 9    A.  Yes.  No.  No, I apologize, no.

10    Q.  Have you been found guilty of criminal sexual assault?

11    A.  Yes.

12    Q.  How many victims were you found guilty of criminal sexual

13    assault of?

14          MR. FERRO:  Object at this time, Your Honor, to

15    relevance.

16          THE COURT:  Well, it's cross-examination.  I will

17    allow it.

18    A.  Well, I wasn't found guilty of no charges.

19    Q.  Did you plead?

20    A.  Yes.

21    Q.  Okay.  How many victims of criminal sexual assault did you

22    plead to?

23    A.  Four.

24    Q.  Four.  Were these women?

25    A.  Yes.
```

1    Q.   Were they minors?

2    A.   Two was.

3    Q.   Are you currently single-celled?

4    A.   Yeah, where I am housed at.  But prior to me -- prior to a

5    year ago, no, I had a room -- I had several roommates.

6    Q.   Do you prefer being single-celled or did you like having a

7    roommate better?

8    A.   Well, it was somebody -- If he was somebody I could get

9    along with, it didn't matter if I had a roommate or not.

10   Q.   So, in your estimation, as long as your roommate is

11   agreeable, you don't mind if you are single-celled or have a

12   roommate?

13   A.   As long as he's not judgmental and try to attack me or

14   anything like that.  Well, it really didn't matter then,

15   because somehow I ended up with roommates that was kind of

16   seeing the same thing that I saw life.

17   Q.   You testified earlier about the denial of grievances that

18   you have received.  Have you ever appealed any of those

19   denials?

20   A.   Each and every one.

21   Q.   Okay.  And do you get responses on them?

22   A.   Yes.

23   Q.   Have you had any overturned?

24   A.   No.

25   Q.   Are you aware of a transgender support group at Menard?

1    A.  No.

2    Q.  Not aware of one.  Okay.  Are you aware of whether you are

3    scheduled to be transferred currently?

4    A.  No, I have been denied transfer.

5    Q.  Transferred to Logan, or any location?

6    A.  I put in for a transfer to Galesburg and it'd been denied,

7    and I wrote a grievance and the grievance been denied.

8    Q.  Did the denial of your transfer, did that contain any

9    rationale as to why it was denied?

10   A.  "It's an administrative decision and we don't have to tell

11   you nothing.  You are denied."

12           MR. BRODZIK:  No further questions, Your Honor.

13           THE COURT:  Any Redirect?

14           MR. FERRO:  No Redirect at this time, Your Honor.  I

15   would just ask that ██████████ be excused.

16           THE COURT:  Okay.  Any objection to excusing?

17           Okay, all right.  That concludes her testimony.  We

18   will take -- Let's take about a 15-minute break and, if we

19   can, then we will proceed with ██████████.  I think I

20   misspoke earlier.

21           Okay.  Court's in recess.

22           COURT SECURITY OFFICER:  All rise.

23           (Court's in recess from 10:04-10:25).

24           COURT SECURITY OFFICER:  All rise.

25           THE COURT:  Be seated, everyone.  We have ██████

1    ██████████    in the stand.  As requested by Plaintiffs' Counsel

2    earlier, ████████████ had some concern about testifying with

3    IDOC guards present, and so they are outside of the courtroom.

4    As a courtesy, we have two Deputy Marshals present during the

5    testimony.  This is a very unusual and highly-sensitive case.

6    It's an unfortunate thing that anyone would feel that those

7    tasked with taking care of them might just do the opposite.

8    If I had a representative of IDOC here I could have sought

9    assurances that that would not be the case, but I don't.  And

10   given many of the allegations in this case, I think that her

11   concerns may be valid.

12          So, I appreciate the Marshals Service being here, we

13   will get through this testimony, and it is what it is.

14          All right.  You will be doing the Direct?

15          MR. STRAND:  Yes, Your Honor, Mason Strand.

16          THE COURT:  Okay.  Before we begin, I'm going to ask

17   you to take an oath, ████████████.

18          COURTROOM DEPUTY:  Please raise your right hand the

19   best you can, thank you.

20          (Plaintiff, ████████████, sworn).

21          COURTROOM DEPUTY:  Would you please state your name

22   for the record?

23   ██████████████████████████.

24          COURTROOM DEPUTY:  Can you move this up closer?

25          THE COURT:  You may proceed.

```
 1              MR. STRAND:  Thank you, Your Honor.  May I present
 2   this binder?
 3              THE COURT:  You may.  Thank you.
 4
 5                        DIRECT EXAMINATION
 6   BY MR. STRAND:
 7   Q.  Good morning.
 8   A.  Good morning.
 9   Q.  So we have just had your name for the record.  What's your
10   preferred name?
11   A.  ████.
12   Q.  ████?
13   A.  (Witness nod).
14              THE COURT:  Scoot up a little closer, perhaps.  Thank
15   you.
16   Q.  I know you are soft-spoken, so I want to make sure they
17   can hear you, okay?  And, sorry, just whenever I ask you a
18   question, you have to make sure you say *yes* or *no* or a further
19   response, okay?
20   A.  Okay.
21   Q.  All right, thanks.
22              THE COURT:  Much better.
23   Q.  All right.  So, what is your gender identity?
24   A.  Transgender.
25   Q.  What pronouns do you use?
```

1    A.  Her, they, them.

2    Q.  And how long have you known that you are transgender?

3    A.  Since I was a little kid.

4    Q.  A little kid.  How did you know that?

5    A.  I don't want to answer.  I don't feel comfortable doing

6    this.

7    Q.  You don't feel comfortable answering this question?

8    A.  I don't want to do none of this.

9    Q.  What -- What's going on?

10   A.  I just don't feel comfortable.

11   Q.  Why don't you feel comfortable?

12   A.  Like something going to happen to me.

13   Q.  By a guard?

14   A.  By the C/Os at Menard.

15        THE COURT:  That's why I excused them.  There are no

16   C/Os in the room.

17   A.  I still don't want to do this.

18   Q.  So, even without the C/Os in the room you are worried

19   about retaliation?

20   A.  Yes, I still don't feel comfortable doing it.

21   Q.  If we were able to say that -- If we were to ask for some

22   sort of assurance that you won't have retaliation, would that

23   help you at all?

24   A.  I just don't want to do it.

25        THE COURT:  Why do you think that you will be subject

1    to retaliation?  Has that happened recently?

2    A.  They do stuff to, like, make us not feel wanted, like you

3    just don't feel comfortable.

4            MR. STRAND:  Can I have just a moment, Your Honor?

5            THE COURT:  You may.

6            (Brief interruption in proceedings)

7    Q.  (By Mr. Strand) I just want to ask, did you testify at our

8    Pinckneyville hearing?

9    A.  Yes.

10   Q.  And is that why you are afraid to testify here today?

11   A.  Yes.

12   Q.  Did something happen after that hearing?

13   A.  After I testified I got transferred to Menard.

14   Q.  Okay.  And was that your understanding of what was going

15   to happen when you found out you were going to be transferred?

16   A.  No.

17   Q.  What did you think was going to happen?

18   A.  They told me that I was going to go to Centralia or Joliet

19   Treatment Center.

20   Q.  Okay.  And you ended up going to Menard?

21   A.  Yes.

22   Q.  And are you afraid that that's going to happen again?

23   A.  Yes.

24   Q.  Okay.  Is there anything about your experience while you

25   have been at Menard that you want the Court to know, that you

 1   feel comfortable sharing today?

 2   A.  No.

 3   Q.  Okay.  All right.  We understand.  We want to thank you

 4   for being here today.

 5           MR. STRAND:  And, Your Honor, I'm not going to ask

 6   any further questions at this time.

 7           THE COURT:  Okay.  And we will take another short

 8   break so that ████████████ can be excused and get the next

 9   witness in the stand.

10           All right.  Court's in recess.

11           COURT SECURITY OFFICER:  All rise.

12           (Court's in recess from 10:30-10:37)

13           COURT SECURITY OFFICER:  Be seated, everyone.  We

14   have ██████████████?

15           MS. PICARD:  That's correct, Your Honor.

16           THE COURT:  Before we begin, I'm going to ask you to

17   take an oath.

18           COURTROOM DEPUTY:  Please raise your right hand the

19   best you can.  Thank you.

20           (Plaintiff, ████████████████, sworn).

21           COURTROOM DEPUTY:  Please state your name for the

22   record.

23           ████████████   My preferred name is ████████████████,

24   but obviously I was ████████, but preferred name is ████████.

25           MS. PICARD:  Your Honor, Alexis Picard on behalf of

1    Plaintiffs.   Before I ask my questions to ████, I have got a

2    binder of exhibits.   May I approach the bench?

3            THE COURT:   Yes, you may.   And actually, I will trade

4    you.

5

6                        DIRECT EXAMINATION

7    BY MS. PICARD:

8    Q.   Good morning, ████.

9    A.   Good morning.

10   Q.   Can you please state your preferred name for the record?

11   A.   ████████.

12   Q.   And what name would you like the Court to use when

13   addressing you?

14   A.   ████.

15   Q.   ████?

16   A.   Yes.

17   Q.   What is your IDOC number?

18   A.   ████.

19   Q.   And, ████, what is your gender identity?

20   A.   Nonbinary, trans nonbinary.

21   Q.   Okay.   Can you share with the Court what that means to

22   you?

23   A.   Just to me it means I am gender fluid, I guess, like I am

24   both, I guess, male and female.

25   Q.   ████, where do you currently live?

1    A.  West House PC.

2    Q.  What correctional center?

3    A.  Menard Correctional Center.

4    Q.  How long have you been at Menard?

5    A.  Since January 17th or January 18th, 2024.

6    Q.  So, you have been housed at Menard for about approximately

7    a year and a half?

8    A.  Yeah.

9    Q.  How would you describe your experience as someone who is

10   transgender and nonbinary at Menard?

11   A.  Can I say "hell"?  Because to me it's hell.  Obviously I

12   call it the pits of hell for a lot of different reasons, but

13   it's -- to me it's not conducive to the betterment of

14   individuals in custody.  I don't -- I don't see people

15   correcting theirself, I don't see as a place of correction of

16   making us better or I don't see equality.  There's a lot of

17   things we are subjected to that -- We don't have cameras in

18   PC, but in East House, where they are gang-banging crazy, they

19   have got cameras to protect them and give them their equal

20   protection; but us in West House PC, we ask for crisis team,

21   we get sprayed.  So, a lot of stuff we are subjected to that

22   people don't get to see.  You know, we are talking, but come

23   live it and see if we're just talking.

24   Q.  ██████, you just testified that it's not conducive to

25   individuals who are incarcerated.  Is it conducive to

1    individuals who are transgender or nonbinary?

2    A.   No, because they don't want us to be transgender in their

3    prison.  They don't -- It's more of a hassle for officers and

4    Mental Health and whoever else to have to sign the paperwork.

5    So, no, I don't -- to me, personally, no, I don't feel it's

6    conducive to trans.  It's not their cup of tea.

7    Q.   And, ████, you just said that they don't want you to be

8    transgender.  Who is *they*?

9    A.   Just officers, administration.

10   Q.   At Menard?

11   A.   Yeah.

12   Q.   Okay.  ████, would you describe Menard in any other way

13   other than a pit of hell?

14   A.   For me it's a place of -- currently a place for growth.

15   Obviously I have got to make the best out of a bad situation,

16   but I have got forced there.  So, there's nothing I can do,

17   but make the better of a situation.  I have got a family that

18   wants me to come home.

19   Q.   ████, have you been diagnosed with gender dysphoria?

20   A.   Yeah, I still don't know the doctor's name, the guy's

21   name, but back in like February -- February or March.  I don't

22   know the actual date, I haven't seen the paperwork myself,

23   but --

24   Q.   And when you say February or March, are you saying of

25   2025?

1   A.  Of 2025, yeah, I'm sorry, I have got to clarify.

2   Q.  Don't apologize.  So, ████, just to make sure I have it

3   correct, you were diagnosed with gender dysphoria just a few

4   weeks ago?

5   A.  Yeah.

6   Q.  And this diagnosis was at Menard?

7   A.  At Menard.

8   Q.  Did you tell staff at Menard your transgender and

9   nonbinary in 2024?

10  A.  Yeah, towards the end.  Towards the end.  First it was,

11  "I'm a member of the LGBTQ community," and figured it would

12  go -- you know, they would get me approved and whatever, and

13  it didn't.  I have to be, I guess, actually specific I'm

14  transgender and whatnot.

15  Q.  You said that it didn't happen.  Can you explain to the

16  Court what you mean by that?

17  A.  So, I came to Menard January 18th, 2024.  I went from

18  crisis watch onto PC on West House.  I put in trying to get

19  approved protective custody, everybody made it seem like if I

20  say this I will get approved.  I didn't get approved, so it

21  was just like a nonstop thing, they didn't want to approve me.

22  Q.  Yeah.  So, after you told Menard staff that you are

23  transgender in 2024, did anything happen?

24  A.  I mean, they made it seem like they are going to start the

25  process or whatever, but I actually ended up getting something

1    back from, I think, Carri Morris, and she came up with the

2    story of, "Oh, you know it's a huge waiting list."  It's not

3    that many transgenders waiting to get -- become transgender or

4    recognized as transgender.  I'm pretty sure I'm the only

5    person you are doing this to right now, but, okay, ma'am,

6    whatever.

7    Q.  In 2024, did Menard staff give you a class member ID that

8    released your gender?

9    A.  No, I didn't get that until 2025.

10   Q.  Okay.  And in 2024, did they class member ID that listed

11   your search preferences?

12   A.  Nope, I didn't get that until 2025.

13   Q.  In 2024, did you have access to a private shower where no

14   one could see you?

15   A.  No, I actually got into a situation because of not having

16   a private shower.

17   Q.  Okay.  In 2024, did you have access to hormones?

18   A.  No.

19   Q.  Okay.  So, ███████, you just mentioned something -- a

20   response that you got from a Carri Morris, is that right?

21   A.  Yes.

22   Q.  Okay.  Was that in response to a grievance that you filed?

23   A.  Yeah, I sent her a grievance, because I was trying to

24   understand like everybody else is -- They started the hormone

25   treatment, they, you know, changed their ID however, what's --

1  what's the reason I am not getting anything in response to you

2  all?  And all of a sudden she responded back and told me

3  that's a long process and just wait it from there.

4  Q.  So, ▮▮▮▮, this grievance you filed at Menard was about

5  wanting to be recognized as transgender?

6  A.  Recognized and given equality.

7  Q.  Okay.  ▮▮▮▮, I would like to show you that grievance and

8  ask you some questions about it.

9  A.  Okay.

10 Q.  Can you please open the binder in front of you?  Do you

11 see a number one?  And let's look at that document.

12          ▮▮▮▮, is this the grievance you filed asking to be

13 recognized as transgender?

14 A.  Yeah.

15 Q.  Did you write this grievance?

16 A.  Yes.

17 Q.  And is that your signature on the grievance?

18 A.  Yes.

19 Q.  ▮▮▮▮, do you see the sticker on the bottom of the

20 grievance marked as Plaintiffs' Exhibit 10?

21 A.  Yes.

22          MS. PICARD:  Your Honor, Plaintiffs move to admit

23 Plaintiffs' Exhibit 10 into evidence.

24          THE COURT:  10 will be admitted.

25 Q.  (By Ms. Picard) ▮▮▮▮, can you look at the top of the

1   grievance?  Do you see the date at the top?

2   A.   Yes.

3   Q.   Okay.  When did you file this grievance?

4   A.   12/7/24.

5   Q.   That's December 7, 2024?

6   A.   Yes.

7   Q.   Why did you file this grievance?

8   A.   Like I said, I wasn't getting any recognition as a

9   transgender any other way.  So, usually grievance is the last

10  resort if they don't respond back to request slips or you

11  can't, you know, see them face-to-face.  It's usually write a

12  grievance and somebody will respond back eventually to your

13  grievance.  And this is actually crazy, this is one of the

14  grievances I got back.  I don't usually get my grievances

15  back, but I actually got this grievance back.

16  Q.   And what was the relief that you were requesting?

17  A.   Just to be acknowledged, to be given equality.  I mean,

18  just for myself, obviously for anyone that, you know, being

19  subjected to this, you know, have this, you know, just what do

20  you call disorder or gender dysphoria, you know, to be given

21  equality, you know, to be acknowledged.  Because if you know

22  your identity, but people don't identify you as that, then who

23  are you to them, you know?  That's kind of where I was at with

24  it.

25  Q.   So, you just said that it was to give you equality.

1    A.  Yes.

2    Q.  Why was it important for you to get equality at Menard?

3    A.  Because America made it seem like that's what we are

4    entitled to in this life, is equality and liberty.  So, I

5    mean, in Menard, definitely equality on the good side of the

6    table or the bad side of the table.  So I need some type of

7    protection.

8    Q.  ████, why did you mark this grievance as an emergency

9    grievance?

10    A.  Couple different reasons, but one of the reasons was they

11    wasn't able to acknowledge me that I was going to become

12    extremist amd go on suicide watch, hunger strike, stuff I had

13    to do in Shawnee.  I let them know it's important to me, it

14    should be important to you, as well.  You know, it is an

15    emergency, but they always shoot it down and say it's

16    non-emergency.  Even if you was hurt, they'll shoot it down

17    and say it wasn't emergency.

18    Q.  So being recognized as transgender is important to your

19    mental health?

20    A.  To me it is, yeah.

21    Q.  ████, looking at the bottom of the grievance where it

22    says Emergency Review with the two check boxes, do you see

23    that?

24    A.  Yeah.

25    Q.  Okay.  Now, did Menard treat your grievance as an

1    emergency?

2    A.   No, no, no.  This is -- So, 12/12, I didn't actually get

3    to talk to somebody, a transgender coordinator until 2025.

4    Obviously it wasn't that important to them.

5    Q.   How did it make you feel that it wasn't that important at

6    Menard?

7    A.   Looked over, cast aside, like I don't -- It's like I feel

8    like you all give them -- I feel everyone should get equal

9    protection.  I feel like you'll give more attention to those

10   that shouldn't be getting certain attention.  I don't know,

11   maybe it's -- maybe I am just biased against that, I don't

12   know.

13   Q.   ████, you testified earlier that you did receive a

14   response to this grievance.

15   A.   Yeah.  Yeah, she -- So when -- I don't know if that's in

16   here, but attached to the grievance was basically her saying

17   that it's a huge waiting list.  I wish I could have brought --

18   I didn't know you could bring your paperwork with you.  I

19   would have brought everything with me.  But they was just

20   telling me it's a huge waiting list, even though it's not.

21   But, it's a huge waiting list and it's something that takes a

22   lot of time.  But I have been in Menard since, like I say,

23   January 18th, last year, and I have seen people get recognized

24   like (snap) right then and there.  So, I don't know actually

25   anymore.

1    Q.    ▆▆▆, do you see that number 3 tab in the binder?  Let's

2    look at that document.  Do you recognize this document?

3    A.    Yes.

4    Q.    Is this the document that you are referring to that you

5    received in response to your emergency grievance about being

6    recognized as transgender?

7    A.    Yes.

8    Q.    Okay.  And, ▆▆▆, do you see the sticker on the bottom of

9    the document marked as Plaintiffs' Exhibit 11?

10   A.    Yes.

11           MS. PICARD:  Your Honor, Plaintiffs move to admit

12   Plaintiffs' Exhibit 11 into the record.

13           THE COURT:  11 is admitted.

14   Q.    (By Ms. Picard) ▆▆▆, I would like you to take a minute

15   to review this exhibit.

16           So, what was Menard's response to your emergency

17   grievance?

18   A.    They just -- The counselor -- The counselor told me,

19   "Well, you know, you wrote the grievance, whatever, you should

20   get approval, like they will approve you after this grievance,

21   it shouldn't be no issue to get approved," and I still didn't

22   get approved.  I didn't get approved, didn't get recognized,

23   didn't get anything that they told me was supposed to come

24   from writing these grievances.

25   Q.    And did it say that there was a lengthy process to be

1    recognized as transgender?

2    A.   Well, the counselor did and Ms. Morris did, but like

3    actually in the grievance, no.

4    Q.   Okay.  And how did it feel when Ms. Morris and the

5    counselor said that there was a lengthy process to be

6    recognized?

7    A.   They are blowing smoke.  Obviously you are not telling me

8    the truth.  You are telling me what you think I want to say or

9    you think I want to hear, because it's not telling me the

10   truth.  It's not going to be processed.  It's just that you

11   really don't want me to labeled as transgender, you don't want

12   me to be in a single cell, you don't want me to have a single

13   shower, you don't want that because I am in the way of whoever

14   you want to put in this cell or double up the cell with.  Like

15   it's they don't want -- they try to avoid certain things, and

16   that's one of the things they want to avoid with me.

17   Q.   ▮▮▮▮, I would like to ask you some questions about

18   hormone therapy now.

19   A.   Okay.

20   Q.   Are you currently receiving hormone therapy?

21   A.   Yeah, I can't pronounce them.  I'm taking a blue pill and

22   white pill.

23   Q.   And when did you start receiving hormones?

24   A.   So, I was supposed to start receiving it in April.  I

25   talked to a Dr. Glen Babich the 18th of April.  He told me to

```
 1   fill out the paperwork and basically the process would be
 2   expedited, that I would go on hormones not far after that.  It
 3   was a lie.  I filled out the paperwork, turned it in the same
 4   day and everything, and didn't hear nothing from nobody after
 5   that.
 6   Q.   ████, I want to make sure I have got the dates right.
 7   When you say April, are you suggesting 2025?
 8   A.   Yeah, I'm sorry.  I should have clarified.
 9   Q.   That's okay.
10   A.   April 2025, April 18.
11   Q.   When did you actually get put on hormones?
12   A.   May -- Like May 14, May 13.
13   Q.   Just a few weeks ago?
14   A.   2025, yeah.
15   Q.   Okay.  Did you want to be on hormones earlier?
16   A.   Yeah, I actually tried to get them in Dixon in 2021, and
17   they were giving us hell on getting them in Dixon, too.  So,
18   it's not an easy process.
19   Q.   Why isn't it an easy process?
20   A.   I don't know, actually.  I don't -- I just -- Maybe they
21   want to save money.  I don't -- I mean, obviously I could
22   speculate, but to be truthful I just -- I don't really know
23   why the process is as it is.  Maybe it's just too much
24   paperwork, too much -- they don't have enough manpower.
25   Whatever the excuse is that they conjure is the reason.
```

```
 1   Q.  How did it feel to have to wait so long for hormones?

 2   A.  I felt -- It just felt like I wasn't important in their

 3   eyes.  I mean, I may still not be important in their eyes, but

 4   I just felt like it wasn't important to them.

 5   Q.  Did not having hormones for that long affect how you feel

 6   about your body?

 7   A.  Yeah, to some extent I am still like trying to figure

 8   myself out and everything, but, yeah, I know what people that

 9   are on hormones before I got on it, how they felt, you know,

10   and they are telling me all how they feel, how it makes them

11   feel, whatever, so I was trying to, you know, prepare for that

12   situation, and it's just like it was an eventual that actually

13   never manifested until this year.

14   Q.  And did not being on hormones for so long affect your

15   mental health?

16   A.  Yeah, obviously I'm actually already a depressed person,

17   I'm a bipolar person.  But, yeah, like I said, my grandma said

18   that she thought I should have been a girl growing up, so she

19   seen that for whatever reason.  But, yeah, it kind of affected

20   me, because I felt like, you know, in our minds we feel like

21   we have to have this or have this or have this to fit in to

22   who we are, which, I mean, it's true.  Like in life people

23   wear certain clothes for a reason, people cook certain foods

24   for a reason, so, I mean, it's true we are accustomed to

25   things for a reason.
```

1  Q.  ████, do you take any other medications besides hormones

2  at Menard?

3  A.  I take Lamictal, that's lamotrigine, for seizure disorder;

4  I take Abilify for bipolar depression; I take Prazosin (ph)for

5  posttraumatic stress syndrome.  I missed one.  Abilify --

6  Okay, yeah.

7  Q.  So, you take other medications at Menard --

8  A.  Yeah.

9  Q.  -- other than hormones?  ████, have you --

10 A.  Oh, and Cymbalta.  I am sorry I missed that.  And

11 Cymbalta, but it's for nerve damage.  They jumped on me last

12 year in Shawnee and messed up my hand and stuff.

13 Q.  Okay.  Have you experienced delays getting those

14 medications at Menard?

15 A.  No, no, they usually -- it's usually on back order, like

16 they'll say, "Oh, this pill was out and I actually found --

17 you know, that's why it's two of them, instead of one, because

18 I had to put two of them together to make your dosage."  But

19 usually, yes, there's no complication in that regard.

20 Q.  Okay.  ████, have you ever been strip-searched by male

21 officers at Menard?

22 A.  Yeah, a lot of times.

23 Q.  How many times?

24 A.  I never actually counted.  Maybe I should go back and

25 actually count.  I have never actually counted, but --

1    Q.  Is it a lot?

2    A.  Yeah, before -- before -- before the acknowledgement as

3    transgender and after, still, they will still -- They don't

4    care.  Like I say, we don't have cameras, so it's our word

5    against their word, and who are they going to take?  I mean,

6    obviously they are going to take their employees' side over

7    our side.

8    Q.  ███████, when you say acknowledgement as transgender, do you

9    mean that you have the class member ID now?

10   A.  Yeah, now I have one that says, "Gender: Female; Female

11   Search."  So, nine times out of ten if it gets to shakedown,

12   they will just put us in a bullpen and that's the most of it.

13   Q.  Okay.  And, so just to confirm, since you have received

14   your class member ID card you have still been strip-searched

15   by a male?

16   A.  Yeah, twice.  I can remember twice that happened, once

17   actually a couple weeks ago.  So, yeah, twice.

18   Q.  ███████, I just want to make sure that the Court Reporter

19   can hear my full question, --

20   A.  Okay.

21   Q.  -- so just let me finish my question and then I will have

22   you respond and you can take as long as you would like to

23   respond, okay?  Sounds good.

24         So, ███████, can you describe to the Court what usually

25   happens during a strip search at Menard?

1    A.  Very impersonal to me.  So, "Hey, individual, we are

2    shaking you down, come over here.  Yeah, take everything off.

3    Okay.  All right.  Open your mouth.  Let me see inside your

4    mouth, behind your ears, through your ear.  Let me check your

5    pits.  Okay, separate your junk down there, separate that.

6    Okay, now bend over at the waist, squat and cough."

7    Q.  Do you have to remove all of your clothing?

8    A.  Yeah, you have to.  If you refuse, you are getting maced.

9    That's a fact.  If you don't take your clothes off, you are

10   getting maced.  That's a fact.  That's a fact.

11   Q.  How does it make you feel when male officers strip-search

12   you?

13   A.  Demoralizing.  I don't -- I mean, it's just I don't -- I

14   understand they have got a job to do, so I can't -- You know,

15   I can't say they are wrong for doing their job, but it's just

16   -- it just feels wrong to me, though, especially with some of

17   the officers, it just feels -- it just feels wrong to me.  I

18   am cool and all that.

19   Q.  But you prefer female officers to search you?

20   A.  If I had to choose, yeah, but I would rather not be

21   searched by anybody.  If I could choose, put me through the

22   body scanner every time.  But preferably, yeah, a woman, but

23   we don't have that choice.

24   Q.  Can you ask for a female officer to search you at Menard?

25   A.  That's laughable.

1   Q.  Why is it laughable?

2   A.  They don't -- They don't want their female officers doing

3   this.  The only time we are actually going to get a female to

4   strip us out is coming on these writs.  And to me, the reason

5   I believe is because it's cameras.  If there were no cameras I

6   don't think they would have their females doing that then.  I

7   mean, that's part of the territory.

8   Q.  When was the last time a male officer strip-searched you?

9   A.  Last week.  Last week was -- They came and did a shakedown

10  and they did -- But he actually apologized, because he didn't

11  realize the identification situation.  So he was like, "Man,

12  don't write me up or nothing, I did not know -- I would have

13  just put you in the bullpen, I was just doing my job."

14  Q.  But during that search you had to do the same thing?

15  A.  Yeah, it's like that every time.  They want to make sure

16  all your orifices are completely devoid of any contraband.

17  Q.  ████, I want to ask you a few questions about where you

18  are housed at Menard.  Where are you housed?

19  A.  West PC.

20  Q.  When you say PC, does that mean protective custody?

21  A.  Protective custody.

22  Q.  Before you were in PC where were you housed?

23  A.  I was housed in East House.

24  Q.  Were you in general population?

25  A.  General population.

1    Q.  How long were you in general population?

2    A.  Not long, actually.  About four or five days.  They told

3    me, "Hey, we don't want you over here, don't" -- you know,

4    "you come out to the yard it's going to be a situation, you

5    come to the shower it's going to be a situation."  I just want

6    to go home, so I will just go on suicide watch and avoid the

7    whole situation, and that's what I did.  I went on suicide

8    watch thinking I was going to be on for three days, and it's

9    been 21 days, and then went over to West House PC back in

10   April of last year, 2024.

11   Q.  Okay.  Do you feel safe --

12   A.  No.

13   Q.  -- at Menard?

14   A.  And I have PTSD, so I am naturally paranoid anyway.  But,

15   no, I mean, with reason.  You can question every person in

16   West PC, they will tell you why, you know, you are in fear of

17   being in West PC, but, hey.

18   Q.  ████, have you ever been denied protective custody?

19   A.  Five times or six times.  Five times.

20   Q.  Did you ever file a grievance about the PC denials?

21   A.  Yeah.

22   Q.  ████, let's go back to the binder I gave you.  Can you

23   please turn to the number 2 and let's take a look at that

24   document.  Do you see that document, ████?

25   A.  Oh, wait.  It start at 2 with the grievance?

1    Q.  I apologize.  We have gone a little bit out of order.

2           MS. PICARD:  Your Honor, may I approach?

3           THE COURT:  You may.

4    A.  Okay.

5    Q.  (By Ms. Picard) ▆▆▆▆, is this your grievance?

6    A.  I didn't hear, I'm sorry.

7    Q.  ▆▆▆▆, is this your grievance?

8    A.  Yes, this is my grievance.

9    Q.  Okay.  Did you write this grievance?

10   A.  Yes, I wrote this grievance.

11   Q.  And is that your signature on the grievance?

12   A.  That is my signature.

13   Q.  ▆▆▆▆, do you see the sticker on the bottom marked as

14   Plaintiffs' Exhibit 12?

15   A.  Yes, I do.

16          MS. PICARD:  Your Honor, Plaintiffs move to admit

17   Plaintiffs' Exhibit 12 into evidence.

18          THE COURT:  12 is admitted.

19   Q.  (By Ms. Picard) ▆▆▆▆, can you look at the top of your

20   grievance?  Do you see the date at the top?

21   A.  10/6/2024.

22   Q.  So you wrote this and filed this grievance October 6,

23   2024?

24   A.  Yeah.

25   Q.  Okay.  What was this grievance about?

1    A.  Basically I was trying to tell them, man, you keep denying

2    me protective custody, keep putting me on kickout, keep

3    subjecting me to me all these other things, but approving

4    everybody else.  And some was identified of the same thing and

5    you are all approving them right away, what is the reason?

6    Like I'm not giving you any problems.  Regardless of the

7    reports falsified by Shawnee Correctional Center, I didn't

8    catch the assault or whatever you all are holding against me

9    in this prison, but, you know, just trying to figure out

10   what's going on.

11   Q.  ████, I want to direct your attention to the middle

12   section of your grievance, the section that says "Relief

13   Requested"?  Do you see that?

14   A.  Yes.

15   Q.  What was the relief you were requesting?

16   A.  To be basically have it investigated by an outside

17   external -- like external investigator, because I felt like if

18   it was investigated by them then they will take it serious

19   then.  Like they have got somebody above them looking down at

20   them and telling them, "This is the directive you are supposed

21   to follow to the extent of the law and you are still not

22   following it and what's the reasoning behind it."  And that

23   was kind of my reasoning for saying that, because I was hoping

24   -- It didn't happen, but still put it in there anyway.

25   Q.  And in the relief that you were requesting, did you also

1    request a transfer out of Menard?

2    A.  Yeah, yeah.  Definitely don't want to be in this crazy

3    place.

4    Q.  Why don't you want to be at Menard?

5    A.  Menard is -- Menard is like a -- It's like an entity

6    outside of IDOC.  It's like it's -- And obviously like you

7    going to have good and bad with everything.  And that's even

8    with officers.  You have got officers that are good, you have

9    got officers that are bad.  But I want to get out this place,

10   because I feel that not only am I not getting equality, but

11   I'm not getting anything to better myself.  Like obviously I

12   can buy these books and I can study this or study that, but

13   that only go so far.  Like what is that going to show in the

14   world?  They want to see papers saying you are classified as

15   this or you have got this certificate, you learned this or you

16   learned that.  So it's not conducive for me to behind this

17   cage for nothing, like for nothing.  To me it's for nothing.

18   Q.  ▮▮▮▮▮, while you were in general population did you have

19   access to a private shower where no one could see you?

20   A.  No, you are going as a group or you are not going at all.

21   I don't even think they do that in general population.

22   Q.  Where did you have to shower in general population?

23   A.  In my sink, which I am perfectly fine with bird-bathing,

24   but in my sink.

25   Q.  Did you have to birdbath because you felt unsafe?

1    A.  Yeah, even now I still do, but a lot of different reasons

2    now.  But, yeah, even now I don't go to their showers.

3    Q.  And how often do you have to birdbath to clean yourself?

4    A.  I have OCD, so I kind of go overboard a little bit, two or

5    three times a day, but that's probably overboard.

6    Q.  Have you asked officers at Menard for a private shower?

7    A.  Yeah.  And some of them will say, "Yeah, okay, we will

8    pull you out," or they'll tell you they will pull you out, "We

9    will pull you out," and you will be waiting all day.  They

10   always come back, "Oh, I forgot I was supposed to come back

11   and get you."  I'm like, "It's all right, I done took my

12   birdbath three times waiting on you to come back and get me."

13   It happens.  I'm not saying they didn't actually genuinely

14   forget, but I don't believe in consequences all the time,

15   either.

16   Q.  ████, I would like to ask you a few questions about an

17   incident you mentioned in your declaration.  You provided a

18   sworn declaration in this case.

19   A.  Yes.

20   Q.  What happened while you were in the showers on October 14,

21   2024?

22   A.  So, this day in particular I am not even supposed to be

23   going out with a group at all.  I am on intake.  Intake

24   protective custody, the stipulation behind that is you are

25   supposed to be in the cell by yourself, shower by yourself.

1    This day in particular it's documented I'm supposed to be in a
2    shower myself.  I told the officer, like he come to me door,
3    "Hey, you ready to shower?"  I'm like, "Yeah."  But I hear
4    other doors opening.  So, I am like, "Are you talking about
5    after everybody come back from the shower?"  "No, talking
6    about now, you are going to shower with them."  "I'm on
7    intake, that's approved protective custody.  I'm not even
8    supposed to be around them, they are not supposed to be around
9    me."  He said, "You want to shower or you don't want to
10   shower?"  I need to wash my hair, so, yeah, I want a shower.
11   I come out to shower.  I come out to shower and I'm on my own
12   little corner.  A dude come up to me, tell me, "I don't like
13   you, you are a fag, you should die, kill yourself," all this
14   bull crap and then go to swinging.  Now, I am capable, so I
15   defend myself.  It go a whole different way, seemed like we
16   were fighting, but when I went to the Adjustment Committee I
17   told them, "It wasn't a fight.  I was defending myself.  It
18   was me or him and it was not going to be you."
19   Q.  And when this inmate was attacking you were you injured?
20   A.  Yeah, my hand -- My hand was already messed up anyway from
21   what happened in Shawnee, so really it kind of like acclimated
22   the nerve damage in my hand, and I had a little swelling under
23   my eye or whatever.
24   Q.  How did the attack in the shower affect you?
25   A.   I felt like there's no protection no matter what's going

```
 1    on in this place.  Like, yeah, you all know what the protocol

 2    and procedure is, but yet you still don't follow it and then

 3    you retaliate against me if I grieve it and bring it up as an

 4    issue.  It is an issue.  It's a directive that you are

 5    supposed to follow for administration just as us.  If you give

 6    us these directives to follow, if we don't follow it obviously

 7    we are subject to disciplinary infractions and otherwise.

 8    Q.    ████, I would like to ask you a few questions about

 9    another incident that you mentioned in your declaration.

10          At Menard has an officer ever choked you?

11    A.  Yeah, that was crazy.  Literally six months after I got

12    assaulted in handcuffs at Shawnee Correctional Center last

13    year, January 17th, I refused to come off hunger strike.  The

14    year before that I was actually trying to kill myself

15    literally with a razor blade on suicide watch and they didn't

16    follow any protocol procedure even though I told them, "I just

17    cut into my femoral artery, I need you to help me," and they

18    didn't care.  They subjected me to deliberate indifference,

19    punishment, let me in the room with the razor blade and on

20    30-minute watch, even though protocol and procedure was

21    supposed to put me on continuous watch after I displayed any

22    overt signs of self-injurious behavior, but they didn't follow

23    protocol and procedure to any extent.  So, before I am on

24    hunger strike, expressing my First Amendment, protesting

25    deliberate indifference, and basically my fear of the security
```

```
 1   and the mental health as a whole that I feel like they don't
 2   care if I kill myself, they all plotting this eventual certain
 3   occurrence.  So, I did refuse to come off hunger strike.  Five
 4   minutes after I refused, I am handcuffed up the whole time.  I
 5   am on camera getting sprayed with mace, dropped on my face in
 6   handcuffs, drug upstairs.  They tried to make it appear I
 7   kicked the officer.  I told them, "Review the footage.  It
 8   doesn't show me kicking anything.  All you are going to see me
 9   doing is" --
10         THE COURT:  Can you slow down a little bit?  She's
11   trying to take down everything you say and you talk really
12   fast.  Okay.  So, start that again and slow down a little bit.
13   A.  Okay.
14   Q.  ████, let's go back.  Six months after this incident, did
15   something happen at Menard on July 17, 2024?
16   A.  I was taken out front by an officer named Roberts and a
17   lieutenant named Dallas in handcuffs under the guise that I
18   was going to seg.  And they didn't have a reason, so I'm,
19   like, "What's the reason I am going to segregation, you are
20   telling me to cuff up?"  And obviously I can't disobey a
21   direct order, because if I do I'm going to get sprayed.  So,
22   I'm going to cuff up, but I still like to know what I'm going
23   to seg for.  And they took me out front.  Literally as soon as
24   I got around the corner, Roberts started choking me.  And all
25   I could think to do was not fight, I don't want you to think I
```

1    am going to be aggressive with you or anything, so I just let

2    them choke me.  When I finally got some air to breathe, I told

3    them, "Hey, I'm not going to fight you, I'm not going to hurt

4    you, I'm not going to do whatever you think is about to come

5    from this.  It's not going to come from this.  You are going

6    to be hurting me and I'm just going to let you, I want to be a

7    passivist in all of this," and it's like I threw him off.  His

8    whole demeanor changed, he let me go, sat me down, it was

9    like, "Hey -- Hey, we all right.  We all right."  Pretty sure

10   we are not all right.  We are far from that, but, sure, I will

11   tell you we are all right so you don't do it to me again.

12   Q.  Which officer choked you?

13   A.  C/O Roberts.  And Lieutenant Dallas, the commanding

14   officer, was watching it.

15   Q.  Lieutenant Dallas was watching it.

16          Did either Officer Roberts or Lieutenant Dallas call

17   you any names?

18   A.  Yeah, so Roberts was saying a lot less, I think he was

19   thrown off.  But Lieutenant Dallas, when I sat down, that's

20   when he started his little spiel about how he hates protective

21   custody, we are fags, we need to go out -- back in general

22   population, take our licks like a man, however his prejudice

23   gets us.

24   Q.  Did anything happen to either Officer Roberts or

25   Lieutenant Dallas after they choked you?

1   A.  I assume they got put under investigation, because me and

2   a lot of people are documenting this incident, and all of a

3   sudden Lieutenant Dallas is removed from the cell house and

4   C/O Roberts is moved from the cell house.  But, C/O Roberts is

5   back in the cell house now.

6   Q.  So, you have seen Officer Roberts since July 17, 2024?

7   A.  Yeah; yeah.

8   Q.  And when you see Officer Roberts, the officer that choked

9   you, how does that make you feel?

10  A.  Squeamish, paranoid.  I don't know if this is going to be

11  the date that you want to take out your aggression on me or

12  you anger on me or not.  So, I try to avoid them, try to ask

13  many any questions.  Like a lot of these officers now, I try

14  not to answer them any questions if I don't have to.  I clean

15  my room, stay to myself, I say less to them.

16  Q.  ▮▮▮▮▮, do Menard officers call you ▮▮▮▮▮▮▮?

17  A.  Some of them do.  Some of them just call you "inmate,

18  individuals."  But some of them actually have called me

19  ▮▮▮▮▮▮▮ or my last name; but, yeah.

20  Q.  Okay.  And do Menard officers call you any slurs?

21  A.  Yeah.  Actually, we were coming from the yard one day and

22  the officer -- Like he was in a vivid conversation with the

23  person next to him, and all of a sudden he paused and looked

24  up and said, "Come on, line up, fags."  But in my mind I know

25  if I say something back it's going to be a worser situation.

1    I'm like, "You're right, you got that, sir.  We are going to

2    line up and keep it moving."  So, we did.  We essentially keep

3    on moving.

4    Q.    ████, you said this was during yard.  When did that

5    happen exactly?

6    A.    We haven't been to yard for a while, so about a month ago.

7    Q.    So, a month ago an officer called you that?

8    A.    About a month ago.

9    Q.    How does it feel being called those names?

10   A.    I mean, it's -- it's disrespectful, but then like another

11   side of me, I'll tell myself, like, well, they are calling me

12   something that originally didn't mean how you are using it.

13   You are calling me a fag when originally the British called

14   fags -- their cigarettes fags, but whatever.  You are calling

15   me a cigarette.  So, in my mind you are calling me a

16   cigarette.  But I know the venom behind it, you know.  You are

17   implying you don't like homosexuals or anybody part of the

18   LGBTQ community, which, I mean, it's your right, you know,

19   they say it's free will, so move accordingly.

20         MS. PICARD:  Your Honor, may I have a brief moment to

21   confer with Plaintiffs' counsel?

22         THE COURT:  You may.

23         (Brief interruption in proceedings).

24   Q.    (By Ms. Picard) ████, I just have a few more questions

25   for you, okay?

1    A.   Okay.

2    Q.   Earlier you testified that there was an incident in the

3    showers in October 14, 2024, where another inmate attacked

4    you.

5    A.   Yes, ma'am.

6    Q.   Did any officers at Menard try to stop what was happening

7    to you?

8    A.   Eventually, yeah.   Eventually I guess they seen like a guy

9    bleeding and whatever, and they are like, "Oh, hey, stop

10   before I mace you."   And, like I said, I got chronic

11   bronchitis, so anything involving pepper spray I try to avoid.

12   So, I didn't waste no time, I ran right over to them.   "Hey,

13   I'll cuff up right now.   I don't want to argue, fight with

14   you," and essentially took me outside and everything was fine

15   and dandy.   They ended up macing him, and then because they

16   labeled us a fight, they ended up coming out and macing me.   I

17   am like, "You didn't mace me in the middle of the incident,

18   you came out and maced me ten minutes later," and I'm like,

19   "I'm not even doing anything."

20   Q.   How does mace affect you?

21   A.   It's aggressive.   It's like -- I guess mace is meant to

22   take the oxygen out the air anyway.   So, that coupled with

23   chronic bronchitis is like -- it's like you're suffocating and

24   can't do nothing about it, really can't.   Once it gets into

25   your pores it's over with, you can't do nothing about it.

1  Q.  ████, is there anything else that you would like the

2  Court to know how Menard has treated you as a transgender and

3  nonbinary?

4  A.  I just -- I just want the Court to know that like people

5  are -- we are people first.  Regardless of what we say we are

6  or who we are, whatever, we are people.  And they say we are

7  human, so we should be treated as such, like irregardless of

8  what we are locked up for, our disciplinary infraction, what

9  are we are doing, we are supposed to be treated like people.

10  I don't feel like -- To me, I don't feel like prison is for

11  any person.  I feel like all the money that America is wasting

12  could be invested in rehabilitative services that could really

13  be more, you know, beneficial than this quote/unquote

14  Department of Corrections.

15  Q.  And based on the experience -- experiences you have shared

16  with the Court today, ████, do you feel safe at Menard?

17  A.  No, I wrote a grievance saying that I am in fear of

18  retaliation, but it won't be the first time I got beat up by

19  somebody, so I'm sure it won't be the last.

20  Q.  Would you like to transfer out of Menard?

21  A.  Immediately, if possible, but I don't think that's

22  possible.

23  Q.  Where would you like to go?

24  A.  Centralia PRISM program would be wonderful, but, hey --

25  Q.  Thank you, ████.  I believe opposing counsel is going to

1   ask you some questions now.

2   A.  I understand.

3          THE COURT:  All right.  Cross-examination.

4

5                      CROSS EXAMINATION

6   BY MR. BRODZIK:

7   Q.  Good morning, ███████████.

8   A.  Good morning.

9   Q.  Can you tell me when you are were first incarcerated with

10  the IDOC, the year?

11  A.  That would probably be 2013.

12  Q.  And do you know from what charge you were incarcerated?

13  A.  Not exactly.  I just know that they told me that I would

14  no longer be able to be in DJJ, that they switched me from

15  little DOC to big DOC and that was the process.

16  Q.  Have you been out of prison since 2012?

17  A.  Yeah.

18  Q.  When did you get out?

19  A.  Well, just here recently I was just out January 9th of

20  2023.

21  Q.  Why did you go back?

22  A.  Officers fabricated aggravated battery on a peace officer.

23  No body cams, so 9:00 at night they say I kicked an officer, I

24  actually didn't.  My Public Defender even said I didn't do it,

25  but he said because of my background, "Take the time or take

1    more time, whichever one sounds better to you."

2    Q.  So, you pled?

3    A.  Yeah.

4    Q.  Do you mean how many years you got?

5    A.  I took eight years of 50.

6    Q.  And in 2023 -- Well, strike that.

7          Prior to your reentering the penal system in 2023,

8    where were you housed?

9    A.  So, from the county jail, Jefferson County jail, I went to

10   Graham receiving as far as the south -- Graham receiving.  So

11   I went to SRC, which was Graham receiving.  And then I went

12   from Graham receiving to Shawnee Correctional Center.

13   Q.  Were you ever in Dixon?

14   A.  Yeah, I was in Dixon.  I paroled out of Dixon in January

15   9, 2023.

16   Q.  So you started in Shawnee or you started in Dixon?

17   A.  No, I started in Dixon.

18   Q.  Okay.  When you were in Dixon did you ever inform the

19   staff, mental health treatment individuals that you were

20   transgender?

21   A.  Yeah, I actually told -- told -- I still can't remember

22   her name, but I just told her about it.  She told me -- like

23   tell me, "Here is the process," but, you know, she started

24   putting me in for groups and different things, but like it

25   didn't get towards the hormone and everything else at that

1    time.

2    Q.  Were you out of prison by the time that would have come

3    around?

4    A.  Yeah, yeah.  It is -- It was -- I don't know how it is

5    now.  Because then at Dixon there was a little process going

6    on with them trying to figure everything out.  They didn't

7    actually have a transgender coordinator for real.

8    Q.  Dixon didn't have a transgender coordinator?

9    A.  No, they didn't have a transgender coordinator for real.

10   Q.  When you went back into Shawnee, did you inform the staff

11   at Shawnee you were transgender?

12   A.  I told them I was part of LGBTQ community.  I assumed the

13   transgender thing was already documented, but it wasn't.  I

14   guess that doesn't work that way, but I assumed it was already

15   documented.

16   Q.  Did you fill out any paperwork at Shawnee indicating that

17   you were transgender?

18   A.  No, actually I was more on trying to get my PTSD medicine,

19   trying to get groups, trying to get mental health treatment.

20   I was more focused on that at that time.

21   Q.  Okay.  And you said that while you were at Shawnee you

22   went on a hunger strike and suicide watch?

23   A.  Yeah.

24   Q.  Why did you do that?

25   A.  So, the suicide watch was just basically depressions of

1   life, too much going on at one time, too much for me to cope

2   with.  I needed to be in a situation where I can, you know, be

3   away from everybody in solitude or whatever, without having to

4   go to seg, and that, you know, went on suicide watch and came

5   off, went back on, came off, went back on.

6   Q.  When you were at Shawnee were you double-celled?

7   A.  Yeah, I was actually double-celled.

8   Q.  Why did you end up getting transferred to Menard, do you

9   know?

10  A.  Under the guise of staff assault, they said that I kicked

11  an officer.  Camera doesn't reflect it.  It all ended up

12  getting investigated by Springfield.  They didn't think it was

13  going to go that way.  It went a whole different way for them.

14  But, yeah, under the guise of staff assault, they said I

15  kicked an officer, even though the cameras doesn't show me

16  kicking anything.

17  Q.  Was your sentence extended due to the allegation that you

18  kicked the police officer?

19  A.  No.

20  Q.  Okay.  So, you come to Menard.  When exactly did you

21  inform the staff or fill out formal paperwork to state that

22  you were transgender?

23  A.  I'm obviously on papers now.  I think the first time was

24  around May of 2024.

25  Q.  Okay.  Do you know when you received your -- Well, strike

 1   that.

 2        You now have an ID that states you are a transgender

 3   individual?

 4   A.  Yeah, that was this year, yeah.

 5   Q.  And your ID states your search preferences; you have that?

 6   A.  Yeah.

 7   Q.  Are you single-celled now?

 8   A.  Yeah.

 9   Q.  Do you prefer to be single-celled?

10   A.  Yeah.

11   Q.  Are you receiving hormones?

12   A.  Yes.

13   Q.  You filled out paperwork for hormone treatment in mid

14   April of 2025, correct?

15   A.  What was the question?

16   Q.  You filled out your paperwork to receive hormones in mid

17   April 2025?

18   A.  Yeah, April 18.

19   Q.  You started receiving them in May?

20   A.  Yeah.

21   Q.  You started receiving hormones.  Do you speak with Mental

22   Health at Menard?

23   A.  Yeah.

24   Q.  How often do you do that?

25   A.  They make it seem like they are going to come around more

1    often, but it's usually once a month.

2    Q.  Okay.  If you need to speak with someone on a more

3    frequent basis, can you do that?

4    A.  They say.  You know, it's on the contrary, but, yeah, they

5    say you can drop a kite and somebody will come see you, but

6    obviously the paperwork -- "Oh, you did?"  You dropped kites

7    and they did never come talk to you?"  So, yeah.

8    Q.  Do you ever speak with the Transgender Health and Wellness

9    Committee or THAW?

10   A.  I assume it's Jamia Klausing you are speaking of.  I'm not

11   sure.  That's the only person I have spoken to as far as

12   transgender coordinator is Jamia Klausing.  I don't know who

13   those other people are.

14   Q.  Have you ever spoken with anyone from the Transgender

15   Administrative Committee?

16   A.  I don't know who that is, either, so I'm going just to say

17   no.  I don't know who that is.

18   Q.  Have you put in any formal transfer requests?

19   A.  Yeah, I put them in through counselors, I put it in my

20   grievances.  Yeah, I've put it in a lot of requests.  I

21   actually did one through Ms. Klausing, too, the transgender

22   coordinator.  She came and asked me about transferring.

23   Q.  And were those requests -- Were they to a particular place

24   or just out of Menard?

25   A.  Well, it was a particular place.  The top of the list was

 1   Centralia's PRISM program, but they have alternatives,

 2   obviously.  I told her, you know, if not Centralia, I was in

 3   Dixon for almost five years.  I know what's coming with Dixon.

 4   They, for the most part, follow their protocols and

 5   procedures.

 6   Q.  Are you currently categorized as a maximum security

 7   prisoner?

 8   A.  Yes, I am.

 9   Q.  Have you put any requests to go to Logan?

10   A.  Ms. Klausing supposedly was doing that, but I don't know

11   -- I don't know what they have actually done.

12   Q.  Are you aware of what the status level of Centralia is?

13   A.  No, I don't -- All this is new stuff to me.

14   Q.  Okay.  I don't think I have any further questions.  Thank

15   you, ███████████.

16   A.  You're welcome.

17           THE COURT:  All right.  Any Redirect?

18           MS. PICARD:  No, Your Honor.  No Redirect.

19           THE COURT:  That completes her testimony.  Do

20   Plaintiffs have any more witnesses for today?

21           MS. PARSONS:  No, Your Honor.

22           THE COURT:  Okay.  And you have Warden Wills this

23   afternoon?

24           MR. BRODZIK:  Wills is currently on an inspection,

25   what I am told.  He's should be available around 1:30, 2:00.

1    I will put in a word and see if we can get him on earlier.

2         THE COURT:  Okay.  Do you have anybody else for us

3    today?

4         MR. BRODZIK:  The doctors can't be here today.

5         THE COURT:  Okay.  Well, reach out and see if we can

6    get him sooner, the sooner the better, and then let us know.

7         And is Jerod on board to help with this?

8         COURTROOM DEPUTY:  He will come over lunch.

9         THE COURT:  So we will get IT setting up.  So, we

10   will go ahead and take a break.  My hope would be we could

11   start at 12:30, 1:00.

12        MR. BRODZIK:  I will let your Deputy know.

13        THE COURT:  Okay.  Well, don't go far, everyone, and

14   when we have Warden Wills available we will resume.  So, the

15   Court's in recess.

16        COURT SECURITY OFFICER:  All rise.

17        (Court's in recess from 11:28-12:30)

18        COURT SECURITY OFFICER:  All rise.

19        THE COURT:  All right.  Be seated, everyone.

20        Okay.  We have Warden Wills by video.  You are

21   probably can't see me very well.  Can you hear me, Warden

22   Wills?

23        WARDEN WILLS:  Yes, I can.

24        THE COURT:  Okay.  I'm going to ask you to take an

25   oath at this time.

```
 1            COURTROOM DEPUTY:  Please raise your right hand.

 2            (Defense witness, Warden Anthony Wills, sworn).

 3            COURTROOM DEPUTY:  Would you please state your name

 4   for the record?

 5            WARDEN WILLS:  Anthony Wills.

 6            COURTROOM DEPUTY:  Thank you.

 7

 8                       DIRECT EXAMINATION

 9   BY MR. BRODZIK:

10   Q.  Good afternoon, Warden Wills.  Can you hear me all right?

11   A.  Yes, I can.

12   Q.  Okay.  Are you currently employed by the IDOC?

13   A.  Yes, I am.

14   Q.  And can you please tell us your position?

15   A.  I am the Warden of Menard Correctional Center.

16   Q.  How long have you been the Warden of Menard Correctional

17   Center?

18   A.  Since April of 2020.

19   Q.  Could you explain your day-to-day responsibilities as

20   Warden at Menard?

21   A.  Yes, my day-to-day operation is operations and

22   programming, long-term and short-term, overseeing those

23   things.

24   Q.  Can you explain what operations is?

25   A.  Operations would be the security aspects, the safety and
```

1    security of the facility, maintaining those, as well as

2    deploying my staff to various assignments around the facility.

3    Q.  Can you describe what programming means?

4    A.  Programming would be the education, mental health,

5    healthcare, those essentials that's offered to the individual

6    in population.

7    Q.  Warden, do you have the authority to hire or fire staff at

8    Menard?

9    A.  No, I don't have the authority to hire or fire.  I can

10   make recommendations, but no hiring or firing.

11   Q.  Who has the ultimate authority to hire and fire at Menard?

12   A.  The Director of the Department of Corrections.

13   Q.  And who's that?

14   A.  Director LaToya Hughes.

15   Q.  I am going to -- Warden, do you have a document that was

16   sent to you earlier this morning?

17   A.  Yes, I do.

18   Q.  Okay.  I'm going to --

19           Do you know what this document is?

20   A.  Yes.

21   Q.  And what is it?

22   A.  It's Administrative Directive 04.03.104, Evaluation,

23   Treatment and Correctional Management for Transgender

24   Offenders.

25   Q.  Did you prepare this document?

1   A.   No, I did not.

2   Q.   Do you know who did?

3   A.   Yes, the -- It was written and produced by Compliance and

4   Policy and Procedure team.   They drafted it, and then it was

5   finally approved by the Director of the Department of

6   Corrections.

7   Q.   Is this a document that you implement during your -- or

8   you use during your day-to-day duties as Warden at Menard?

9   A.   Yes, I referenced this document time and time whenever a

10  question or any issues arise that pertains to this topic.

11           MR. BRODZIK:   I would like to move to mark that as

12  Defendants' Exhibit 1.

13           THE COURT:   All right.   This will be marked as

14  Defendants' Exhibit 1.

15  Q.   (By Mr. Brodzik) Are Menard staff required to undergo any

16  training in regards to this document?

17  A.   Yes, Menard staff is required -- security staff does an

18  annual 40 hours of training.   Out of 40 hours, four hours of

19  it is in reference to administrative directives, and that's

20  done annually.

21  Q.   When you say the staff trains or has training in relation

22  to this document, what is staff comprised of?

23  A.   All staff, a hundred percent of the staff within the

24  department -- within the facility goes through an annual cycle

25  training and they get an opportunity to train on any updated

1    or any changes that has occurred throughout the year.

2    Q.  So, is every individual employed by Menard trained yearly

3    on this administrative directive?

4    A.  Yes, they are.

5    Q.  Okay.

6         THE COURT:  I want to jump in.  Warden, you said they

7    go through 40 hours of training once a year, four hours of

8    that is dedicated to administrative directives.  Is that all

9    of the administrative directives in the prison?

10   A.  Yes, they get an opportunity to review all the

11   administrative directives, touch on any topics of anything

12   that has changed from year to year.

13        THE COURT:  So, it wouldn't be four hours just as to

14   this Administrative Directive 04.03.104?

15   A.  No.

16        THE COURT:  Okay.  Thank you.

17   Q.  (By Mr. Brodzik) Do you know how long of that 40 hours of

18   training per year is based on Administrative Directive

19   04.03.104?

20   A.  No, I can't say exactly the time frame that is allotted

21   for 04.03.104.  I just know that there's four hours allotted

22   to address any of the newer or amendments to any of the ADs or

23   any changes of the ADs.

24   Q.  Okay.  Is compliance amongst the staff at Menard tracked

25   when they go to this training?

1   A.  Yes, it is.

2   Q.  How is it tracked?

3   A.  It's tracked through our internal and external audits

4   that's conducted within the facility and within the agency.

5   The audit instrument is broken down.  This administrative

6   directive is broken down and each one of these aspects of this

7   AD is reviewed.

8   Q.  So, your testimony is that every aspect of 04.03.104 is

9   included in the training?

10  A.  Yes, it is.

11  Q.  Okay.  Do staff have an avenue to ask you or other

12  individuals at Menard questions if they have questions about

13  that particular training, 04.03.104?

14  A.  Yes, they actually have an avenue that they can ask me

15  questions, and if I can give the answer or if I have to pick

16  up this particular AD and review it again, I utilize that at

17  that time to try to assist with any questions.  And if --

18  Again, if I don't know the answer, I will reach out and find

19  out the answer through some of my resources.

20  Q.  And who are those resources?

21  A.  My resources would be the TAC committee.  So, within that

22  TAC committee I can always reach out to the Psychiatry

23  Department that oversees -- that sees that as part of the TAC

24  committee.

25  Q.  Do you ever deal with the THAW committee?

1  A.  Every once in a while when we have an individual that is

2  requesting to start having treatment, hormonal treatment, then

3  at that point the THAW committee comes together, and because

4  the individual that's requesting is from Menard, then I am

5  included in that committee and then at that point questions

6  may be asked by me.

7  Q.  When a transgender inmate at Menard requests hormones, how

8  is that request routed or what is the process for the

9  requesting hormones?

10  A.  They can actually send the request to the TAC committee

11  here at the facility, which is my mental health provider, or

12  they can actually send it to myself, which I would route it to

13  my mental health provider to send it up to Psychiatry or the

14  THAW Committee, and at that point, then, they can start the

15  process of reviewing with the team that's a part of the THAW

16  Committee, Chief of Operations, Chief of Psychiatry, the

17  variety of different people that's also been appointed, that

18  can be appointed, and at that point that decision is made at

19  that time.

20  Q.  Okay.  If a transgender inmate or any inmate has an

21  allegation against staff of harassment or abuse or misconduct,

22  where is that concern routed to?

23  A.  That concern is routed not just to myself, but it's also

24  routed to my Internal Affairs, and then because it's such a

25  serious matter it's thoroughly investigated.

1    Q.   What's the investigation process entail?

2    A.   The investigation would entail interviewing of the victim,

3    and then at that point, if they can identify the suspect, the

4    suspect would be interviewed, as well, and then if -- and they

5    will be -- and based off of their admission or what was

6    identified by the victim, it's possible that the victim could

7    have an assessment done, physical assessment, and from that

8    physical assessment to deprive of any kind of evidence of any

9    kind of sexual assault that has occurred.  And all that is

10   being done by -- It's done by my -- The assessment, physical

11   assessment first is done by my medical staff, and then based

12   off of their findings then they send it to an outside hospital

13   outside the facility for another assessment from there.

14   Evidence is -- could potentially be collected, which will be

15   -- Once it's collected it would be turned over to Internal

16   Affairs.

17   Q.   Okay.  And then are you involved with any process of the

18   Internal Affairs review?

19   A.   No, I am not.

20   Q.   Once Internal Affairs reaches their findings, are those

21   findings routed to you?

22   A.   Yes, I am made aware of the findings, whether the

23   allegations are substantiated or not.

24   Q.   Okay.  So every allegation of harassment, abuse, or sexual

25   misconduct made by a transgender inmate ends up on your desk

1    some way or another?

2    A.   Yes.

3    Q.   Okay.  Do you know what a pattern or practice is?

4    A.   Repeat that question again.

5    Q.   A pattern or practice.

6    A.   No, I do not.

7    Q.   Do you know what a pattern is?

8    A.   Yes, I know what a pattern is.

9    Q.   Do you believe there is a pattern of harassment of

10   transgender prisoners at Menards -- Menard?

11   A.   No, to be quite frank with you, I understand that this is

12   a very difficult population or even a situation of being

13   incarcerated, and I -- I agree that there could be a

14   substantial amount of harassment that could possibly go on,

15   but that harassment is definitely not tolerated.  And if --

16   The most important thing is safety.  So, to answer your

17   question, there -- if there is any kind of pattern -- And I

18   don't think it is, because I'm not made aware of it.  Once I'm

19   made aware of any situation, the situation is addressed.

20   Safety and security of this facility is the most importance.

21   Q.   Do you believe there's a pattern of sexual misconduct by

22   staff of transgender prisoners at Menard?

23   A.   No, I do not.  And, again, if so, I would be made aware of

24   it.  I have not been made aware of any of that nature.

25   Q.   Do you believe there's a pattern of misgendering

1    transgender prisoners at Menard?

2    A.  No, I do not.

3    Q.  You're not a medical health professional, are you?

4    A.  No, I am not.

5    Q.  Okay.  If a transgender prisoner at Menard has medical

6    needs, where are those needs referred to?

7    A.  My Healthcare Department.

8    Q.  How involved are you with the day-to-day healthcare of

9    transgender prisoners at Menard?

10   A.  Day-to-day not very much.  I have an assistant warden that

11   oversees programs, as well, so -- and I have a healthcare

12   administrator that oversees the actual healthcare.  Those -- I

13   rely on those staff members to be a little bit closer involved

14   with the day-to-day operations.

15   Q.  Are you aware of any allegations of the denial of

16   gender-affirming care by transgender inmates at Menard?

17   A.  No, I'm not aware.  And, again, if that behavior -- if

18   that was going on, me being the warden of Menard Correctional

19   Center, I would be made aware of that.

20   Q.  Are you aware of any allegations of the denial of hormone

21   treatment by transgender inmates at Menard?

22   A.  No, I'm not.

23   Q.  Does Menard have a practice of macing transgender inmates

24   who request mental health services?

25   A.  No, that would not be tolerated.  That kind of behavior

1    would not be tolerated and it would be investigated to the

2    utmost.  And, again, for that to actually happen, I would have

3    been made aware of it.  Again, being the warden, there is a

4    line of communication that the individuals have with me

5    through mail, and that would be something that I would be made

6    aware of, especially with the use of OC or mace, it's -- it

7    would spread around the facility, around the area, the housing

8    area.  So, no.

9    Q.  Are all of the transgender inmates at Menard housed in the

10   same location?

11   A.  Not all of them, but the majority of them is, yes.

12   Q.  And where is that?

13   A.  In the West Cell House.

14   Q.  Are the transgender inmates at Menard single-celled or

15   double-celled?

16   A.  They are actually single-celled.  That was something that

17   approximately a year and a half ago I chose to single-cell the

18   population.  It was brought to my attention that the

19   individuals were feeling uncomfortable, unsafe, being in a

20   cell with someone that was non-trans, so I made the decision

21   to single-cell that population once they were identified as

22   transgender.

23   Q.  Have you received any complaints from transgender inmates

24   regarding being single-celled?

25   A.  No, I have not.

1  Q.  Are you aware of any allegations of transgender inmates at

2  Menard being denied access to grievance forms?

3  A.  No, I have not.

4  Q.  Are you aware of any allegations of transgender inmates at

5  Menard being denied access to legal calls?

6  A.  No, I'm not.

7  Q.  How about any allegations of transgender individuals being

8  denied access to the law library?

9  A.  No, I have not.  And, again, if any of those amenities

10 were not being issued or offered to the population, I would be

11 made aware of.  Again, the communication is open for them to

12 send me any kind of mail or notes of that fashion of any

13 issues like that.

14 Q.  Who handles PREA complaints at Menard currently?

15 A.  Internal Affairs.

16 Q.  Okay.  If an allegation is made against a member -- a PREA

17 allegation is made against a member of Internal Affairs, does

18 Internal Affairs continue to review and investigate that

19 allegation?

20 A.  No, they do not.  That investigation -- That particular

21 investigation would be routed to an external team of

22 investigators outside of the facility and they would conclude

23 that investigation.

24 Q.  Can you explain who that external investigation team is?

25 A.  The external investigation team is a team of external

1    investigators that -- that doesn't work actually inside the

2    facility.  They actually travel around to different facilities

3    conducting investigations that -- that is more -- that is

4    higher sensitive than the actual facility can handle, and

5    those are the cases that is usually cases that either pertains

6    to something involving the actual Internal Affairs of the

7    facility or anything that's deemed sensitive for the facility

8    to handle.

9    Q.  Warden Wills, do you ever address the staff as a whole on

10   transgender issues at Menard?

11   A.  I communicate with the staff at Menard through e-mail and

12   through hard memos and bulletins, hard copies, and that

13   information is disseminated through roll call and it's read

14   seven days a week and then it's also kept on file for any of

15   the staff to review at a later date.

16   Q.  Okay.  Do any of your bulletins that you write concern

17   transgender inmates at Menard?

18   A.  Yes, they do.

19   Q.  And what topics do those bulletins address?

20   A.  Those topics could address the accommodations of whether

21   it's commissary items to shower items, things of that nature.

22   Q.  Okay.  And what do your bulletins state in reference to

23   commissary items?

24   A.  That commissary items for the transgender population is

25   made available, and based off of their identification on their

```
 1   ID card allows them to be able to purchase the transgender

 2   items that's on the commissary list.

 3   Q.  What have your bulletins in regards to shower policy

 4   stated?

 5   A.  The bulletin will report that anyone that identifies as

 6   transgender should be showered alone with a shower curtain

 7   provided to allow for privacy for the individual to feel safe

 8   and comfortable during shower time.

 9   Q.  Warden, does the West House at Menard currently have

10   cameras?

11   A.  The West House doesn't have cameras currently, but it's

12   actually been requested and at this point hasn't -- we haven't

13   gotten allocation for the cameras at this point.

14   Q.  Okay.  When was the request made?

15   A.  The request has been made for several years now.  The

16   request started in 2021, and until present day the request has

17   been made to introduce cameras into that cell house.

18   Q.  Who approves or denies those requests?

19   A.  Those go all the way up to the Central Office for physical

20   to actually make the approval process.  The team is up there,

21   the Chief of Physical, as well as Chief of Operations.

22   Q.  And just to be sure, have you made this request every year

23   since you have been the warden at Menard?

24   A.  Yes, I have.

25   Q.  Have you been given any rationale for the denial of the
```

1    allocation of funds for cameras in the West House?

2    A.  No, not 100 percent.  At this point it's just the funds

3    wound up just not being there at that point in time.  And,

4    again, that's why I continue the request, because I know the

5    importance and the seriousness of cameras and the benefit of

6    the cameras not just for the safety of individuals, but also

7    the staff.  So, I just felt like it would be very important to

8    continue making that request as the warden, because safety is

9    of the utmost importance to me.

10    Q.  Do you make determinations on the transferring of

11    prisoners?

12    A.   No, I don't make the determinations; I make the requests

13    for the transfers.

14    Q.  Who makes the determination on whether a transfer will be

15    approved or denied?

16    A.   That comes from the Transfer Coordinator's Office out of

17    the Central Office.

18    Q.  When a transgender prisoner makes a transfer request, is

19    that sent to the general transfer unit or is that sent to TAC?

20    A.  It's actually sent to TAC, and then TAC will send it up to

21    THAW, which the Transfer Coordinator's Office -- member of the

22    Transfer Coordinator's Office is part of that committee, as

23    well, so that committee will assess and make that

24    determination.

25    Q.  Do you need to approve or deny transfer requests at the

1    end of the approval process or the denial process?

2    A.  No.  Again, I would just make the recommendations, and

3    that's as far as my job scope goes.

4    Q.  Are you aware of how many transgender prisoners are

5    currently housed at Menard?

6    A.  There is 16 currently housed at Menard.

7    Q.  How many total prisoners are currently housed at Menard?

8    A.  A little less than 2,000.

9    Q.  16 out of 2,000, is that correct?

10   A.  Yes.

11   Q.  I'm going to get into some specifics accommodations.

12            Is the policy and procedure at Menard that

13   transgender inmates are strip-searched by an officer that

14   aligns with their gender?

15   A.  Yes.

16   Q.  Do you have any transgender female guards who work at

17   Menard?

18   A.  Yes, I do.

19   Q.  Do those transgender female guards perform strip searches

20   on other transgender females at Menard?

21   A.  Yes they do.

22   Q.  Do you have any transgender male guards who work at

23   Menard?

24   A.  No, I do not.

25   Q.  What is -- Do you have female officers that work at

1    Menard?

2    A.  Yes, I do.

3    Q.  Do you know how many female officers you have employed by

4    Menard currently?

5    A.  I would say approximately a hundred.

6    Q.  Do those female guards perform strip searches of

7    transgender females at Menard?

8    A.  Yes, they do.

9    Q.  What is the process during strip searches or lockdowns

10   when a strip search needs to be made of a transgender female?

11   What is the process to ensure that they are being searched by

12   an individual that aligns with their gender?

13   A.  We have a list of -- If there's a search that needs to be

14   done, we have a list of female staff here that volunteers that

15   are willing to conduct the searches, and at that point in time

16   that staff member would be notified to come and do the search

17   of the transgender population.  If, by chance, that staff

18   member or there's no staff on grounds, we actually have a

19   statewide list and we can reach out to neighboring facilities

20   and have those females come over to conduct a search, as well.

21   Q.  Do you have a body scanner at Menard that can assist with

22   strip searches?

23   A.  We have a body scanner, but it's not to assist with the

24   searches.  It's to search any individual of any contraband

25   that's on their person.

1    Q.  Is that a -- Is the body scanner something that can be

2    moved from one place to another or is that stationary?

3    A.  It's stationary.

4    Q.  Where is that located?

5    A.  It's actually located in my R&C building, my receiving and

6    receptive -- my receiving center, and it's a stationary piece

7    of equipment where the individuals will come over and walk

8    through the machine.

9    Q.  How far is that from West House?

10   A.  Probably, approximately, a little less than a hundred

11   yards.

12   Q.  How big is Menard prison?

13   A.  Menard sits on 2700 acres, the entire compound is 2700

14   acres.  Within the walls it's probably approximately four to

15   five acres within the confines of the actual prison.

16   Q.  And what is the security level of Menard?

17   A.  Maximum security.  Actually, maximum, medium, and minimum.

18   We have a little bit of everything; primarily max.

19   Q.  What percentage of inmates at Menard are maximum security?

20   A.  Approximately 70 percent.

21   Q.  Do transgender female inmates at Menard shower privately

22   or separately from general population?

23   A.  Yes, they do.

24   Q.  Is the policy and procedure of Menard to hang a sheet over

25   the shower when a transgender inmate -- or the shower door

1    when a transgender inmate is showering?

2    A.   The policy is that when a transgender individual goes into

3    the shower, we have a shower curtain that hangs on the door

4    that allows privacy for the individual to be able to shower.

5    Q.   Can inmates at Menard refuse to shower?

6    A.   Yes, they can.

7    Q.   Do you have a lot of inmates at Menard who refuse to

8    shower?

9    A.   Unfortunately I am not aware of the actual number of

10   individuals that refuse showers.

11   Q.   Are you aware of any transgender female inmates who have

12   refused the private shower?

13   A.   No, I am not aware of that, either.  That has not came to

14   my attention.

15   Q.   Does Menard carry feminine products in the commissary?

16   A.   Yes, they do.

17   Q.   Can you explain for us what feminine products Menard

18   currently carries?

19   A.   They currently carry razors, the hair removal cream,

20   makeup, lipstick, eyeliner, mascara, and along with that

21   feminine hygiene products, like pads and tampons and things of

22   that nature.

23   Q.   Do they carry feminine undergarments?

24   A.   Undergarments is kept in my clothing house, and those are

25   given out upon request yearly to the individuals that need

1    those products.  The undergarments is the underwear, as well

2    as the bras.

3    Q.  If a transgender inmate wants to request underwear, female

4    underwear or a bra, how do they go about doing that?

5    A.  They would send a request to the individual clothing

6    house, and at that point they will fulfill that order based on

7    if their time is due.  Again, it's kept -- it's done every

8    year, so all the individuals are aware that any clothing items

9    that is state-issued is yearly, and upon request, when that

10   year is up, then they will -- that order will be fulfilled,

11   and that's whether it's pants, shirt, boots, things of that

12   nature, as well as the undergarments.

13   Q.  So is the yearly delivery of undergarments and

14   state-issued clothing, is that policy the same for cisgendered

15   inmates at Menard and trans females at Menard?

16   A.  That is correct.  But, along with that -- I must say,

17   along with that, when I have identified that -- if I have

18   identified that an individual has not received what they have

19   -- what they should receive, then I will make -- I would

20   address that.  If it's brought to my attention I will address

21   it immediately and take action.  And I have done that already

22   with the population over there, the transgender population.  I

23   have actually had staff walk around and make sure all the

24   individuals have all the items that they need so that we can

25   fulfill their order at that point in time and make it -- and

1    fix any kind of problems that we have had.

2    Q.  Are there hair removal products available in the

3    commissary that do not include the use of a razor?

4    A.  Yes, it is.  There's a cream that does hair removal.

5    Q.  Are there any classes of inmate at Menard who are

6    precluded from purchasing razors?

7    A.  No, we -- Razors are available at the commissary, and then

8    unless an individual is on some type of crisis or they could

9    be -- it could be harmful for them to use, then those would be

10   the ones that wouldn't be able to utilize a razor.  But,

11   otherwise everyone is eligible to use a razor.

12   Q.  Whose job is it to make sure that the commissary is

13   carrying all of these products?

14   A.  I have supply supervisors that oversee the commissary,

15   along with that my business administrator that processes all

16   the orders for the commissary items.  That collaborative team

17   oversees the commissary and makes sure all the items are

18   available.

19   Q.  Are you aware of whether those items are available as we

20   sit here today?

21   A.  Yes, I am fully aware that all items are available today.

22   Again, that's something else that if the items are not

23   available, I would be made aware of.  Again, being the warden,

24   they will make sure that I am made aware if something is

25   missing.

1    Q.  How do transgender inmates go about purchasing these

2    feminine products at the commissary?

3    A.  They would write that down on their list or go over --

4    when they walk over they would select those items that they

5    need or want and then purchase them at the end of -- Once they

6    walk through commissary, at the end they make that purchase.

7    Q.  Are prisoners at Menard able to request commissary items

8    to be delivered to their cells?

9    A.  Yes.  In some cases individuals that are not able to walk,

10   they write -- they create a list of commissary items, and the

11   list is fulfilled and it's put into a bag and it's delivered

12   to the individuals, and at that point that's how they receive

13   their commissary items.

14   Q.  There's a cost associated with the purchase of commissary

15   items, is that correct?

16   A.  Yes, it is.

17   Q.  Is that for all prisoners at Menard?

18   A.  Yes, it is.

19   Q.  Do transgender inmates at Menard have identification

20   badges or cards that reflect their gender identity of choice?

21   A.  Yes, they do.  They -- They have on their ID, back of

22   their ID, it actually says transgender.

23   Q.  How does a transgender inmate go about procuring one of

24   these ID cards?

25   A.  Once they meet with the mental health provider or make the

1  request, then the mental health provider will meet with them

2  and they will go through the panel of questioning that they

3  have, and at that point it's submitted to Psychiatry.

4  Psychiatry will assess and make the determination.

5  Q.  Do you know how long the process takes from the first time

6  a transgender inmate requests the female or feminine

7  transgender ID and to the point where they actually get that

8  ID?

9  A.  From my experience, I have seen it go as fast as a week up

10  to approximately 30 days.

11  Q.  Are you aware of any transgender inmates at Menard who

12  have requested a transgender status ID who have not received

13  one?

14  A.  No, not at this time.

15  Q.  Okay.  Those are all the questions I have for you right

16  now.

17         THE COURT:  All right.  Cross-examination.  Tell me

18  your name again, please.

19         MS. HUDSON:  Anne Hudson.

20         THE COURT:  Okay.  Thank you.

21

22                    CROSS EXAMINATION

23  BY MS. HUDSON:

24  Q.  Good afternoon, Warden Wills.  My name is Anne Hudson.  We

25  have never met before, but I just want to ask you a few

1    questions today.

2        Warden Wills, you would agree with me that

3    transgender individuals in custody at Menard are in a

4    especially vulnerable population, true?

5    A.  Yes, I agree 100 percent.  It's very difficult managing a

6    facility of this size with the transgender population, but we

7    are adamant about doing everything we can to make sure they

8    are safe and they are treated equally.

9    Q.  Understood.  You understand that one of the reasons that

10   transgender individuals in custody are especially vulnerable

11   population is they are more likely to be subject to verbal and

12   emotional abuse, is that fair?

13   A.  Yes, I would say that's fair.

14   Q.  They are also more likely to be subject to physical

15   violence, right?

16   A.  That's -- Yes, that is true.

17   Q.  Now, you understand that transgender individuals may

18   experience gender dysphoria, right?

19   A.  Yes.

20   Q.  And that is a serious medical condition?

21   A.  Mental -- Yes, mental condition; yes, it is.

22   Q.  And without proper medical care, individuals with gender

23   dysphoria can experience significant distress, true?

24   A.  Yes.

25   Q.  Some may even become suicidal or attempt suicide, right?

```
 1   A.  Yes, I concur.

 2   Q.  Now, a crucial part of medical care for gender dysphoria

 3   is medical and social transitioning, is that fair?

 4   A.  Yes.

 5   Q.  And social transition means being able to live consistent

 6   with your gender identity, right?

 7   A.  Yes.

 8   Q.  It's also important to be able to live safely consistent

 9   with your gender identity, is that fair?

10   A.  That's exactly what we try to do.

11   Q.  Now, you talked on Direct that the majority of transgender

12   individuals in Menard are at West House, right?

13   A.  Yes.

14   Q.  And West House doesn't have any security cameras, right?

15   A.  That is correct.

16   Q.  You'd agree this lack of cameras in West House is a safety

17   issue, right?

18   A.  Yes.  Yes, I agree 100 percent, and that's the reason why

19   I have been making numerous requests year after year to get

20   those cameras in that building.

21   Q.  Without cameras it can be difficult to verify if your

22   staff is complying with IDOC's rules and policies, right?

23   A.  Yes, but at the same time, though, being the warden of

24   this facility I think that I would be made aware if some

25   policy and procedures are not being adhered to from the
```

1    population, as well as my audit instruments may discover.

2    Q.  But you would agree that without cameras it's difficult to

3    verify whether your staff is, in fact, complying with IDOC's

4    rules and policies regarding the treatment of trans prisoners,

5    right?

6    A.  Yes.

7    Q.  Now, you testified on Direct that it's Menard's policy to

8    provide a safe and secure environment to all individuals in

9    custody, right?

10   A.  Yes.

11   Q.  And as a warden you are responsible for ensuring that,

12   right?

13   A.  Yes, I am.

14   Q.  And that's one of the reasons why it's concerning to you

15   to hear reports of transgender individuals in custody at

16   Menard that do not feel safe, right?

17   A.  Yes, that is.

18   Q.  But, in your time as warden you have received reports of

19   that happening, right?

20   A.  Yes, I have.

21   Q.  There have been between -- somewhere between 50 and a

22   hundred incidents where you have learned of a transgender

23   individual reporting feeling unsafe or experiencing harassment

24   or assault, right?

25   A.  Yes.  And I'll need to say that in my time, which has been

1    five years of warden at this facility, it doesn't seem that

2    severe with it being that many over my tenure.  But, we take

3    them very serious as they come along and then thoroughly

4    investigate it 100 percent.

5    Q.  So, although reports of individuals feeling unsafe are

6    concerning to you, you are not concerned about 50 to a hundred

7    incidents of class members feeling unsafe or experiencing

8    harassment or abuse?

9    A.  Yes, over my -- over the entire five year-span, yes.

10   Q.  Now, some of those incidents have involved allegations of

11   sexual or physical assault by a staff member, right?

12   A.  That is correct.

13   Q.  I believe you estimated somewhere around 20 instances

14   where you have learned of allegations of sexual assault

15   against class members, is that right?

16   A.  That is correct.

17   Q.  Now, when you learn of these kind of allegations you turn

18   them over to Internal Affairs to investigate, right?

19   A.  That is correct.

20   Q.  And based on those investigations you are responsible for

21   making recommendations of discipline, right?

22   A.  Yes.

23   Q.  Now, if an investigation finds that an allegation was

24   unsubstantiated there wouldn't be any discipline for staff, is

25   that fair?

1    A.   That is correct.

2    Q.   And you can't remember any investigation that has come

3    back with a finding that a staff member has, in fact, harassed

4    or assaulted a prisoner, true?

5    A.   That is correct.  And, again, if there was it would be --

6    discipline would be progressively implemented at that point in

7    time.

8    Q.   But, fair to say since you can't remember any

9    investigation that came back with a finding of a substantiated

10   allegation that you can't remember any instances where a staff

11   member has, in fact, been disciplined for harassing,

12   assaulting, or abusing a transgender individual in custody,

13   right?

14   A.   During my -- During my time as warden here, no, I don't

15   recall of any.  But, again, if there was, they will be

16   thoroughly handled and investigated and the staff will be

17   disciplined.

18   Q.   One of the reasons why an investigation may come back with

19   a finding of an unsubstantiated allegation is if there are

20   conflicting statements, right?

21   A.   That's potential, yes.

22   Q.   You'd agree with me, sir, that if there are instances of

23   allegation of assault, there's always going to be conflicting

24   statements, right?

25   A.   It potentially could be, yes.

1    Q.  Another reason why there might be an investigation that's

2    unsubstantiated is the lack of video footage, right?

3    A.  That is correct.

4    Q.  And as we have discussed, most allegations made by

5    transgender individuals in Menard are going to lack video

6    footage, right?

7    A.  In some cases, yes.

8    Q.  The majority of cases, right, as that's where the majority

9    of transgender individuals are in custody?

10   A.  That is correct, yes.

11   Q.  Now, Warden, as warden you are responsible for overall

12   operations and administrations at Menard, right?

13   A.  Yes, I am.

14   Q.  You are responsible for the supervision and protection of

15   all individuals incarcerated at Menard?

16   A.  That is correct.

17   Q.  And I believe you testified on Direct or agreed that that

18   population is around 2,000 individuals, right?

19   A.  My entire facility, yes.

20   Q.  And the population of the class members within Menard is a

21   small group of that 2,000, right?

22   A.  That is correct.

23   Q.  You are also responsible for supervising and overseeing

24   all correctional staff at Menard, right?

25   A.  That is correct.

1  Q.  And ensuring that they comply with IDOC's policies and

2  administrative directives, right?

3  A.  That is correct.

4  Q.  Approximately how many correctional staff are there

5  currently employed at Menard?

6  A.  Approximately 800.

7  Q.  And to take a step back, you talked about the fact that

8  you have the opportunity or the staff has the opportunity to

9  ask you questions about administrative remedies that they

10  don't understand.  Do you remember that?

11  A.  Yes.

12  Q.  But you don't recall any instance where a staff member has

13  asked you a question about the administrative directive that

14  you were discussing in your direct, true?

15  A.  That is true; not that I can recall.

16  Q.  Of those 800 correctional staff, some have been at Menard

17  for a long time, right?

18  A.  Yes.

19  Q.  Fair to say some of those staff have been in place before

20  the administrative directive was in place?

21  A.  That is correct.

22  Q.  And some have been at Menard longer than you have been

23  warden at Menard, right?

24  A.  That is correct.

25  Q.  You would agree with me it can be hard for getting people

1  who have been doing something for a long time to change and

2  start doing it differently, is that fair?

3  A.  Yeah, I can agree with that, and that's the reason why I

4  reiterate my memos and bulletins the way that I do, because I

5  understand the difficulty and the seriousness of safety.  So,

6  yes, I agree, and that's the reason why I continually

7  reiterate to those staff members and new staff members, as far

8  as that matter goes, because we do have turnover here at the

9  facility.  So, yeah, it's very serious.

10  Q.  You got to my next question.  That's why you remind them

11  about the policies so regularly.  So, we can move on.

12         But, you agree that as one person there's no way for

13  you personally to monitor and ensure compliance with all 800

14  staff members at all times, right?

15  A.  That is correct.

16  Q.  You can only address what is brought to your attention,

17  fair?

18  A.  Yes.

19  Q.  And I believe on Direct you -- Sorry.  You might not

20  necessarily be aware of every issue that's going on at Menard,

21  fair?

22  A.  No, if it's not brought to my attention there's no way I

23  can address any situation.  But, as the information is brought

24  to my attention, I do address the situations.

25  Q.  I believe you have testified before that you are not aware

1    of any specific instance of harassment of transgender

2    individuals in custody at Menard, is that fair?

3    A.  That is fair.

4    Q.  But you testified on Direct there could be instances of

5    harassment by staff members that you may not be aware of,

6    fair?

7    A.  That's fair to say.  Again, if it's not brought to my

8    attention I can't address anything.

9    Q.  You are not currently aware of any violations of the

10   administrative directive of the treatment of transgender

11   individuals in custody at Menard, right?

12   A.  That is correct.

13   Q.  I want to talk about some of the ways in which you may

14   become aware of violations.

15          From time to time you tour the facility, right?

16   A.  That is correct.

17   Q.  But, again, if some violation happens while you are not

18   touring the facility, you wouldn't see it, obviously?

19   A.  It would be reported if something was not occurring.

20   Again, the individuals can write me and reach out to me, stop

21   me while they see me walking around the facility and address

22   seeing a situation that they feel they need to talk to me

23   about.

24   Q.  Right, I was going to say you can't be everywhere at once.

25   You rely on subordinates or staff, shift commanders to report

1  violations to you, right?

2  A.  Yes, that is correct.

3  Q.  Those shift commanders themselves also can't be everywhere

4  at once, either.  They would have to observe violations in

5  order to report them to you, fair?

6  A.  Yes, or have it reported to them, as well.

7  Q.  And neither you or your shift commanders can know

8  something that isn't reported to you, fair?

9  A.  That is fair to say.

10  Q.  So, you also rely on Internal --

11  A.  Keep in mind, we have Lieutenants and Sergeants, along

12  with the line staff that's in the cell houses at all times.

13  Anything reported to them can report to the Major and it's

14  documented via 434 of an incident.  So, there's several

15  different ways to communicate out as they receive any

16  information, not just to the Major, but also in that avenue to

17  communicate with myself.

18  Q.  Understood.  But essentially in order for you to become

19  aware of any violations, at some point someone must report

20  either that they violated or someone that they saw violated a

21  policy, is that fair?

22  A.  That is fair.

23  Q.  And so far you have not been aware of any -- you have not

24  been made aware of any violations of the IDOC's administrative

25  directive?

1    A.  That is correct.

2    Q.  Okay.  Now, sometime after you became warden of Menard you

3    became aware of this lawsuit, right?

4    A.  That is correct.

5    Q.  And you are aware that as part of this lawsuit this Court

6    has in the past issued injunctions requiring IDOC to provide

7    gender-affirming care to classmates, right?

8    A.  That is correct.

9    Q.  And you learned about those injunctions approximately

10   three years ago, right?

11   A.  Yes.

12   Q.  And in those three years you have not reviewed any of this

13   -- any of the litigation documents in this case, including any

14   Court orders, right?

15   A.  Actually, I have.  I spoke with julie graham, which was

16   one of the monitors that would reach out to me via e-mail and

17   phone call and made me aware of some of the complaints and

18   issues that was occurring.  And as she made me aware of the

19   situations, that's when I was attempting to address -- as she

20   brought them to my attention, I was addressing some of those

21   issues.

22   Q.  All right.  So, you talked -- You spoke with julie graham.

23   Did you ever read julie graham's reports that were filed in

24   this case?

25   A.  Yes, I did.

1  Q.  Okay.  But you have not reviewed any Court orders, is that

2  fair?

3  A.  As long as they were a part of -- I believe they were part

4  of julie's reports.  So if that was the case, yes, I reviewed

5  them.

6  Q.  Outside of anything that's contained in julie graham's

7  reports, you have not reviewed any Court orders or other

8  documents from this litigation, fair?

9  A.  I think that's fair.

10 Q.  Okay.  You are not aware specifically of what the Court

11 ordered in those injunctions, right?

12 A.  Should have been fair treatment of the transgender

13 population; fair and equal treatment.

14 Q.  Okay.  So, since you have not reviewed the specifics of

15 those orders, you are not aware of what was in them or what

16 you needed to do to bring Menard into compliance, right?

17 A.  Again, the things that julie brought to my attention and

18 we discussed in lengthy conversation of all the concerns, I

19 believe I have done that and I have attempted to do that to

20 the utmost of my ability to comply with the orders.

21 Q.  Okay.  Outside of conversations with julie graham, you

22 have not reviewed anything from this Court, correct?

23 A.  That is correct.

24 Q.  You understand you're testifying here today because

25 certain class members incarcerated at Menard have filed

1    motions and declarations relating specifically to the

2    conditions at your facility, right?

3    A.   Yes.

4    Q.   Are you aware that certain class members originally sought

5    to be transferred out of Menard in December of 2023?

6    A.   Yes.

7    Q.   And in connection with that motion are you aware that 18

8    class members at Menard filed declarations regarding their

9    experience at your facility?

10   A.   Yes.

11   Q.   And in the 18 months since that motion and those

12   declarations were filed, you have not reviewed any of those

13   declarations, correct?

14   A.   And, again, like I said earlier, I believe I have.  I

15   can't say a hundred percent in depth, but I have reviewed the

16   documentations.  I don't remember exactly which ones, but I

17   have reviewed the -- some of the documentations.

18   Q.   You reviewed the documentations in the sense you have

19   reviewed julie graham's report and spoken with julie graham,

20   correct?

21   A.   Yes.

22   Q.   You have not reviewed any of the motions or declarations

23   that class members have filed in this court regarding their

24   desire to be transferred out of Menard, true?

25   A.   I can't recall 100 percent.

```
 1    Q.  Sir, you gave a deposition in this case, right?

 2    A.  Yes.

 3    Q.  And in that deposition you were -- you took an oath to

 4    tell the truth, right?

 5    A.  Yes.

 6    Q.  You were asked certain questions and you gave answers to

 7    those questions?

 8    A.  Yes.

 9    Q.  You did your best to tell the truth, true?

10    A.  Yes.

11    Q.  Turning your attention to your deposition, page 16, lines

12    9 through 11.  You should have a copy.

13         In your deposition were you asked the question, "Have

14    you had an opportunity to review either of those motions or

15    declarations," and did you give the answer, "No, I have not"?

16    A.  Yes, I did.

17         MR. BRODZIK:  Objection.  The testimony says either

18    of "these" motions, and you just said "those" motions.

19    Q.  Did you see that question and that answer, sir?

20    A.  Yes, I see it.

21    Q.  So, since you haven't reviewed the declarations filed in

22    connection with your testimony today, fair to say that you

23    aren't aware of the specific allegations in those

24    declarations, true?

25    A.  True.
```

1    Q.  And because you weren't aware of the specific allegations

2    in those declarations, you have not investigated or directed

3    anyone to investigate those specific allegations, true?

4    A.  Again, and I have said earlier that, yes, when julie

5    graham brought those allegations or any allegations to my

6    attention they were investigated.

7    Q.  Understood.  You understand since julie graham's reports

8    have been filed another motion has been filed for class

9    members to be transferred out of Menard, true?

10   A.  Yes.

11   Q.  And in connection with those motions, an additional 13

12   declarations, I believe, have been filed in connection with

13   that second motion, right?

14   A.  Okay.

15   Q.  And these are declarations filed after julie graham's

16   reports, right?

17   A.  Okay.

18   Q.  You haven't reviewed those declarations, true?

19   A.  True.

20   Q.  And because you haven't reviewed those declarations you

21   have done nothing to investigate the allegations in them,

22   right?

23   A.  If the individual has brought it to my attention of the

24   allegations of any sort, they have been investigated or are

25   being investigated.

```
 1   Q.  Sitting here today, you can't say whether you have

 2   investigated any of the allegations in the declarations that

 3   have been filed in this court because you haven't reviewed

 4   those declarations, true?

 5   A.  If they were brought to my attention they have been

 6   investigated.

 7   Q.  Okay.  I want to talk a little bit about one of the

 8   investigations.

 9   A.  Okay.

10   Q.  You testified on Direct that everything is investigated

11   thoroughly, true?

12   A.  That is correct.

13   Q.  And it's -- when you receive allegations of abuse, you

14   refer those to Internal Affairs, right?

15   A.  Correct.

16   Q.  And then you oversee the investigations?

17   A.  I don't oversee the investigations.  I get the conclusion

18   of the investigation.

19   Q.  Understood.  If you received an investigation that you

20   thought wasn't thorough, could you require more investigation

21   be done?

22   A.  Yes, I could.

23   Q.  And you -- I believe you said that any investigation

24   regarding abuse or harassment of class members has come across

25   your desk, right, would have come across your desk?
```

1    A.  It would have, yes, that is correct.

2    Q.  Okay.

3         MS. HUDSON:  Mr. Young, could we pull up tab 2, which

4    is Plaintiffs Exhibit 49?  It's a Report of Investigation

5    ending in case number 5609.

6    Q.  (By Ms. Hudson) This is an example of a report of an

7    investigation done by Internal Affairs, right?

8    A.  Yes.

9    Q.  These are the reports -- the thorough investigations you

10   testified to on Direct, right?

11   A.  Yes.

12   Q.  Now, specifically if we see on the top, there's a subject

13   name, ██████████, and a time and date of December 12, 2023.

14   Do you see that?

15   A.  Yes.

16   Q.  So, this document refers to -- this investigation was of

17   an allegation made by ████████████.  That's ██████████████,

18   right?

19   A.  Yes.

20   Q.  Okay.  Now, you -- if we see -- This Court has heard

21   testimony regarding this allegation.  I just want to talk to

22   you a little bit about the investigation.

23         If we go to page 4 of this document -- Sorry.

24         MS. HUDSON:  Sorry, Mr. Young.  Could we go to the

25   case summary, the first paragraph?

```
 1   Q.  (By Ms. Hudson) We see the first line of the case summary
 2   says this investigation was conducted at the request of Senior
 3   Public Administrator Warden Anthony D. Wills.  Do you see
 4   that?
 5   A.  Yes.
 6   Q.  So, this investigation was commenced because you referred
 7   an allegation to Internal Affairs, right?
 8   A.  That is correct.
 9   Q.  And if we go to the fourth page, which is the last page of
10   the report before the attachments, there's a signature of an A
11   -- appears to be an A.W.  Would those be your initials, sir?
12   A.  Yes.
13         MS. HUDSON:  Move to admit Plaintiffs' Exhibit 49
14   into evidence.
15         THE COURT:  49 will be admitted.
16   Q.  (By Ms. Hudson) So, I want to turn to page three now --
17   Sorry, page one.  You understand that this allegation involved
18   an allegation of sexual assault made by ███████, right?
19   A.  Yes.
20   Q.  And specifically it was an allegation of sexual assault by
21   a Correctional Officer Dunbar, right?
22   A.  Yes.
23   Q.  Now, if we go to the third page in the conclusion
24   paragraph, you will see that the findings of this
25   investigation were that these allegations were
```

1    unsubstantiated.  Do you see that?

2    A.  Yes.

3    Q.  And it gives three reasons why the investigation was

4    unsubstantiated.  You see lack of direct evidence, conflicting

5    statements, and lack of video footage.  Do you see that?

6    A.  Yes.

7    Q.  We talked about how there's always going to be conflicting

8    statements when it comes to allegations of abuse, right?

9    A.  That is correct.

10   Q.  We talked about the difficulty of video footage when it

11   comes to allegations of abuse against transgender inmates,

12   right?

13   A.  That is correct.

14   Q.  I want to talk to you a little bit about the third reason,

15   then, direct evidence.

16          You would agree that testimony of the victim would

17   constitute direct evidence, right?

18   A.  That is correct.

19   Q.  Just like your testimony here is direct evidence, right?

20   A.  That is correct.

21   Q.  You'd also agree that forensic evidence would be direct

22   evidence, right?

23   A.  That is correct.

24          MS. HUDSON:  Now, if we go to the first paragraph of

25   the case summary, Mr. Young, if you could start about four

1  lines down where it says ███████

2  Q.  (By Ms. Hudson) It says, ██████ reported to him that she

3  was raped earlier today and was requesting a rape kit be

4  completed."  Do you see that?

5  A.  It hasn't been blown up for me to be able to see.

6        MS. HUDSON:  I don't know if we can make it any

7  bigger, Mr. Young.

8  Q.  (By Ms. Hudson) Can you see that, Warden Wills?

9  A.  Yes, I can now.

10  Q.  And then it goes on, ██████ further explained that the

11  rape was just oral sex and she can prove that it happened

12  because she has the sperm in her throat and on her clothes."

13  Do you see that?

14  A.  Yes.

15  Q.  You understand a rape kit was done in this case, right?

16  A.  Yes.

17  Q.  Let's look at what was found in that.

18        MS. HUDSON:  If we could turn to page ending 905, Mr.

19  Young.

20        This is a report from the Illinois State Police of

21  laboratory data DNA.  Will you blow up the top, Mr. Young?

22  Q.  (By Ms. Hudson) And as part of -- If we can -- If you see,

23  there's certain lab items listed, including an ISP sexual

24  assault evidence kit.  Do you see that?

25  A.  Yes.

1  Q.  And then below that there are certain sub items listed

2  that were also submitted and tested for DNA, right?

3  A.  Yes.

4  Q.  If we go to the next page for the results -- Sorry, just

5  to step back real quickly.  If we go back to page three of

6  this document, the second -- two paragraphs above Conclusion,

7  there's one that starts Illinois State Police Division.  Do

8  you see that?  It's reported that "DNA returned that no other

9  human DNA was found."  Do you see that?

10 A.  Again, it's not blown up.  Okay.  Okay, yes, I see it.

11 Q.  So that was the -- That's the lack of direct evidence that

12 the conclusion is relying on, no other human DNA being found,

13 is that fair?

14 A.  That's fair to say.

15 Q.  Okay.  If we go back to the results of the DNA

16 investigation on page 906, once we get there if we could blow

17 up items 1C1.  Item 1C1 is a sample from swab of the left

18 cheek and neck area.  Do you see that?

19 A.  Yes.

20 Q.  Could you read how many contributors were found in this

21 sample?

22 A.  I think that says 2 -- or point 2.

23 Q.  Yeah, I believe it says -- There's a 16 footnote and then

24 a colon and then 2.  Does that look right?

25 A.  Yes.

1    Q.  So, there were two contributors, two different people's

2    DNA that were found on this sample, right?

3    A.  Yes.

4    Q.  And are you aware that no DNA was ever submitted for

5    Correctional Officer Dunbar?

6    A.  No, I was not aware of that.

7    Q.  Are you aware that Correctional Officer Dunbar was not

8    interviewed as part of this investigation until April 1st,

9    2025?

10    A.  Yes, based off the conclusion of the investigation, yes, I

11    was aware -- I have seen that within the report.

12    Q.  In your opinion would a thorough investigation wait 17

13    months before investigating the subject of the allegation?

14    A.  Based off of investigations, it just depends on the actual

15    investigator that's handling the investigation.  I don't get

16    involved in how they do their investigation.  I am just aware

17    of the conclusion of the investigation.  No, I was not aware

18    that it took that long to conduct an interview, but, again,

19    that's their area of expertise, not mine.

20    Q.  Now, you are aware that no -- the second contributor to

21    this DNA sample was never identified as part of this

22    investigation?

23    A.  Yes, I am aware.  Based off of this that you are showing

24    me, yes, I'm aware that there were two contributors.

25              MS. HUDSON:  If we could go, Mr. Young, to page 909.

1   Q.   (By Ms. Hudson) We talked about in addition to the rape

2   kit there was also additional evidence that was collected as

3   part of that process, right?

4   A.   Yes.

5          MS. HUDSON:   If we could blow up the items submitted.

6   Q.   (By Ms. Hudson) So, in addition to the samples taken from

7   ██████████, there was also certain items submitted, as

8   well, right?

9   A.   Yes.

10  Q.   Including a gray zip jacket, a white tank top, and a bra.

11  Do you see that?

12  A.   Yes.

13  Q.   We talked about that in her allegation, ████████████

14  believed that there would be DNA on her clothing, as well,

15  right?

16  A.   Yes.

17  Q.   Now, this form at the top is listed as DNA cancellation

18  report.  Do you see that?

19  A.   Yes.

20  Q.   That means that none of these items that were submitted as

21  part of this investigation were ever tested for DNA, right?

22  A.   I'm not for sure what that actually means, so I can't

23  testify to that.

24  Q.   Okay.

25  A.   I don't know exactly what that means.

```
 1           MS. HUDSON:  If we go down, Mr. Young, to the items
 2    listed, there's a paragraph starting, "The requested
 3    analysis."  Can you blow that up?
 4    Q.  (By Ms. Hudson) It says, "The requested analysis has been
 5    cancelled."  Do you see that?
 6    A.  Yes.
 7    Q.  So that means that none of those items were ever tested
 8    for DNA, is that fair?
 9    A.  Yeah, that's fair to say.
10    Q.  Fair to say that you can't find direct evidence when you
11    don't test for it?
12    A.  Again, that would be the discretion of ISP to conduct the
13    analysis on the collection of the evidence, not Menard or
14    Investigations, as far as that goes.
15    Q.  You believe that ISP would have cancelled that request for
16    analysis to be done, not Menard?
17    A.  Yes, 100 percent Menard would not have had any involvement
18    with ISP in their collecting of evidence.
19    Q.  Could Menard request evidence be tested?
20    A.  We can -- That was the request.  When we submitted it to
21    the ISP, that was our request at that point in time.
22    Q.  And when they returned back that the analysis was
23    cancelled, could Menard request that it still be tested?
24    A.  Yes, we could have requested again, but the results would
25    have been probably the same, my assumption.  I have never
```

1  asked for another request of evidence to be tested a second

2  time.

3  Q.  It says at the bottom, "Evidence may be resubmitted."  Do

4  you see that?

5  A.  Yes.

6  Q.  And Menard never requested that these items be tested,

7  right?

8  A.  That is correct, other than when we submitted it to the

9  State Police initially.

10  Q.  Okay.  All right.

11       MS. HUDSON:  You can put that down, Mr. Young.

12  Q.  (By Ms. Hudson) Warden, you agree that the administrative

13  directive requires that class members have access to private

14  showers, right?

15  A.  That is correct.

16  Q.  And if a staff were to refuse to allow a class member to

17  have access to private showers, that would violate the

18  administrative directive, right?

19  A.  That is correct.

20  Q.  And you have regularly-issued bulletins reminding staff of

21  the private -- of the transgender shower accommodation, right?

22  A.  That is correct.

23  Q.  And you've previously certified to this Court that Menard

24  was in compliance with that requirement, right?

25  A.  Yes.

1    Q.  Let's take a look at that declaration.

2         MS. HUDSON:  Mr. Young, could you pull up tab 4?

3    Q.  (By Ms. Hudson) This is Wills -- This is a declaration of

4    yours dated February 28, 2023.

5         MS. HUDSON:  Blow up the title, Mr. Young.

6    Q.  (By Ms. Hudson) Do you see that that is a declaration of

7    Anthony Wills?

8    A.  Yes.

9    Q.  Do you see up at the top it says, "Filed February 28,

10   2023"?

11   A.  Yes.

12   Q.  If you look at paragraph three -- Sorry, maybe this is tab

13   5.

14        MS. HUDSON:  If we could look at paragraph 3 of that,

15   Mr. Young.

16        Sorry, back to the other -- Sorry.  Go back to the

17   other one, Mr. Young.  It's the February 20th.

18        Sorry, there's two paragraph 3s.  That was my fault.

19        Go to the second paragraph 3, Mr. Young.  There we

20   go.

21   Q.  (By Ms. Hudson) Here you certified to the Court that

22   Menard complies with IDOC's requirement of private showers for

23   transgender individuals.  Do you see that?

24   A.  Yes.

25   Q.  If we go down to paragraph five, it says, "Transgender

1    individuals in custody are provided showers with the use of a

2    shower curtain," right?

3    A.  Yes.

4    Q.  You testified today that that's the same method of

5    Menard's compliance today, right?

6    A.  That is correct.

7    Q.  Yet between 2023 and today, you have been made aware of

8    ongoing issues with regards to access of private showers,

9    right?

10   A.  I have not been made aware of any issues or concerns of

11   their privacy of the showers.  I have not been made aware.

12   Q.  julie graham advised you of concerns regarding access to

13   private showers, right?

14   A.  Yes.

15   Q.  julie graham multiple times advised you of those concerns,

16   right?

17   A.  Yes.

18   Q.  And in response you reiterated the policy to your staff,

19   right?

20   A.  Yes.

21   Q.  You did not investigate any specific instances of issues

22   with private showers, right?

23   A.  No, there was -- nothing was brought to my attention other

24   than what julie graham advised me of.  I actually made direct

25   observation myself of seeing individuals being escorted to the

1   shower by themselves utilizing the shower curtain, so at that

2   point there was nothing more to do but to continue reiterating

3   the policy of private showers and utilization of the shower

4   curtains.

5   Q.  How often have you observed or monitored transgender

6   individuals being taken to showers?

7   A.  Probably less than ten times.

8   Q.  And so all other times where you are not there to monitor,

9   you are not sure whether -- you can't be sure whether the

10  shower curtain is being used, right?

11  A.  No, I cannot be for sure, but the individuals would advise

12  me, as well as the making sure of the supervision that's over

13  there, the shift supervisors, as well as the lieutenants, is

14  present to advise me if there's -- if they are not adhering to

15  the policy.

16  Q.  And you're not aware if any of the declarations filed in

17  connection with this hearing involved specific allegations

18  made by class members regarding their lack of access to

19  private showers, right?

20  A.  That is correct.

21  Q.  And you have not investigated or directed anyone else to

22  investigate those allegations in those declarations, right?

23  A.  That is correct.

24  Q.  You understand that cross-gender strip searches also

25  violate the administrative directive regarding the treatment

1  of transgender individuals in custody, right?

2  A.  That is correct.

3  Q.  And it would be a violation of the policy if a staff

4  member refused to honor the request to not have cross-gender

5  strip searches by class members, right?

6  A.  That is correct.

7  Q.  Now, you have also previously certified to the Court that

8  Menard was in compliance with that requirement, right?

9  A.  That is correct.

10  Q.  Now, we can pull up tab 5, which is your declaration dated

11  March 13, 2023.

12           MS. HUDSON:  If we could blow up just the top of

13  that, as well.

14  Q.  (By Ms. Hudson) Again, you see that this is one of your

15  declarations, right?

16  A.  Yes.

17  Q.  And that it was filed on March 14, 2023?

18  A.  Yes.

19           MS. HUDSON:  If we could blow up paragraphs 3 and 3.

20  Q.  (By Ms. Hudson) All right.  You certify that IDOC required

21  searches of individuals as -- identified as transgender,

22  intersex, or gender incongruent be performed by gender of

23  staff designated on their identification card.  Do you see

24  that?

25  A.  Yes.

1    Q.  And in the next paragraph you say, "Menard complies with

2    the IDOC's requirement regarding searches for transgender

3    individuals through the following methods," and you list two

4    methods.  Do you see that?

5    A.  Yes.

6    Q.  The first one that you certified to this Court was how you

7    would comply with this requirement was the utilization of a

8    body scanner.  Do you see that?

9    A.  Yes; yes.

10   Q.  But, today you'd agree that that scanner is not used for

11   regular searches of transgender prisoners, right?

12   A.  That is correct.

13   Q.  And there's, in fact, never been a time when the scanner

14   has been used for strip searches of transgender individuals,

15   right?

16   A.  That is correct.

17   Q.  Now, you are not aware of any instance where there has not

18   been a female guard available to search a class member, right?

19   A.  That is correct.

20   Q.  But you have been made aware in your time as warden of

21   violations of this search policy, fair?

22   A.  It's been investigated.

23   Q.  Sure.  But you have been made aware of somewhere between

24   25 and 50 search violations that have been brought to your

25   attention, right?

1  A.  Yes; yes.

2  Q.  In response to each of those 25 to 50 violations, your

3  response has been to reiterate IDOC's policy, right?

4  A.  That is correct.

5  Q.  And you were not aware of allegations by class members

6  filed in connection with this hearing that they have continued

7  to be subject to improper cross-gender strip searches, right?

8  A.  That is correct.

9  Q.  Would it surprise you to learn that two -- the multiple

10  class members have testified in court that in their searches

11  that they have received on their way to testify to court that

12  they were searched by male correctional officers?

13  A.  That was a transgender female that actually conducted that

14  search.

15  Q.  Did you observe -- What was the name of that transgender

16  female that conducted that strip-search?

17  A.  I can't recall her name.

18  Q.  You're not aware that the class members testified that

19  they were searched by male prison guards?

20  A.  What date and time are you referencing?

21  Q.  Yesterday.

22  A.  It was a transgender female that conducted the search.

23  Q.  Okay.  So, your testimony is that the class member was

24  incorrect about the gender of the correctional officer that

25  strip-searched them?

1    A.   That is correct.

2    Q.   How many strip-searches performed by transgender female

3    guards have you observed?

4    A.   I've not observed any.

5    Q.   When was the last time you observed a strip-search

6    performed at Menard?

7    A.   Of a transgender or individuals in custody?

8    Q.   Of a transgender individual in custody.

9    A.   I have never been present during a strip search.

10   Q.   You are not aware of whether the declarations filed in

11   this case have involved multiple allegations of improper

12   cross-gender strip searches?

13   A.   Repeat your question again.

14   Q.   You are not aware of the allegations and the declarations

15   filed by class members in this -- Sorry, step back.

16        You have not reviewed -- We have discussed you have

17   not reviewed the declarations filed ahead of this hearing,

18   right?

19   A.   Yes.

20   Q.   So you are not aware that those declarations include

21   allegations of continued improper cross-gender strip searches,

22   fair?

23   A.   Yes.

24   Q.   And you have not investigated or directed anyone else to

25   investigate those specific allegations, true?

```
 1   A.  Not those, because -- unless they have been brought to my

 2   attention, no.

 3   Q.  Have you requested to review any of the declarations filed

 4   in connection with your testimony today?

 5   A.  No, I have not.

 6   Q.  Okay.

 7           MS. HUDSON:  Your Honor, can I just speak with my

 8   Counsel for a second?

 9           THE COURT:  Sure.  I want to ask a question, though.

10

11                         EXAMINATION

12   BY THE COURT:

13   Q.  Warden Wills, when you say a transgender female guard,

14   what do you mean by that?  How does the person appear?

15   A.  The officer appears to look like the way that they were

16   born as, but all staff is dressed in the same uniform,

17   gray-in-color uniform top, dark black pants, male or female,

18   and his driver's -- and her driver's license actually reflects

19   her gender.

20   Q.  Okay.  I'm a little confused.  So, if it's a person who

21   was born with, say, female genitalia and then has transitioned

22   so that from the outside that person looks more like a male,

23   say with facial hair, would you call that person transgender

24   female or transgender male?

25   A.  Transgender female, because they were born as a male.
```

1  Q.  Okay.  Now, wait.  If they were born as a female and then

2  have taken hormones so that they now from outward appearances

3  look more like a man, what would you call that person?

4  A.  That would be a trans female.

5  Q.  And what would you call someone that was born with male

6  genitalia who then takes hormones to look like a female from

7  the outside?

8  A.  Trans male.

9  Q.  And it's your testimony that Menard has transgender female

10  guards, meaning someone who was born as a man and transitioned

11  to look like a woman?

12  A.  Yes.

13  Q.  And is there -- Do you have any guards who were born

14  female who have transitioned to look like a man?

15  A.  Not to my knowledge.

16  Q.  Okay.  Then, Warden Wills, I can't ask you about the

17  content of any conversation, but were you briefed on the

18  testimony of the witnesses who testified here today or

19  yesterday?

20  A.  No, I was not.

21  Q.  Okay.  Okay.  We have established you haven't reviewed the

22  declarations.  Were you aware that this hearing was going on

23  this week before you were asked to --

24  A.  Yes, I was.

25  Q.  Okay.  Okay, thank you.

 1              THE COURT:  You can follow up.

 2              (Brief interruption in proceedings)

 3              MS. HUDSON:  I'm just going to confer with Counsel.

 4              THE COURT:  Yeah, they are going to confer.  Give

 5       them a minute.

 6              MR. BRODZIK:  Apologies.

 7              (Brief interruption in proceedings)

 8

 9                      CONTINUED CROSS EXAMINATION

10       BY MS. HUDSON:

11       Q.  Just a few more questions, Warden Wills.

12              MS. HUDSON:  Mr. Young, if you could pull up

13       Plaintiffs' Exhibit 49 again, which is tab 2.  If you could

14       just blow up the case investigator.  This is, again, the

15       Report of Investigation that we have discussed.

16       Q.  (By Ms. Hudson) Warden Wills, who was the case

17       investigator on this investigation?

18       A.  Investigator Dallas.

19       Q.  And did you hire Investigator Dallas to be the running the

20       investigations of Internal Affairs at Menard?

21       A.  I didn't hire him; he was appointed.  And, yes, I

22       appointed Dallas.

23       Q.  Understood.  So, you appointed Investigator Dallas to run

24       Internal Affairs at Menard and run investigations, right?

25       A.  Yes.

1   Q.  And are you aware -- As part of your decision to appoint

2   Investigator Dallas, were you aware of his history of

3   allegations or reports of misconduct that have been made

4   against Investigator Dallas?

5   A.  Yes, I was, and I entrusted his integrity to do his job

6   thoroughly and at the utmost -- with the utmost respect --

7   Q.  You understood --

8   A.  -- of the facility and the agency.

9   Q.  Understood.  In appointing Investigator Dallas, you were

10  aware that multiple class members had filed allegations of

11  abuse and misconduct against Investigator Dallas?

12  A.  I had seen those previous investigations against Mr.

13  Dallas, so, yes, I was aware.

14  Q.  Okay.  No further questions.

15

16                      REDIRECT EXAMINATION

17  BY MR. BRODZIK:

18  Q.  Hi, Warden Wills.

19  A.  Hi.

20  Q.  You are not an expert in DNA collection, are you?

21  A.  No, I'm not.

22  Q.  You are not a forensic pathologist?

23  A.  No, I am not.

24  Q.  Okay.

25          MR. BRODZIK:  Is there a way that we can have the

1   Plaintiffs' exhibit blown back up.  They have taken it down.

2   We were just using it.

3           THE COURT:  Exhibit 49, can we put that back up?

4           MS. HUDSON:  Yeah, Mr. Young, if you are still on, if

5   you would pull that up.

6           MR. BRODZIK:  Okay.  Could we go to Doc #0425905?

7   Q.  (By Mr. Brodzik) Okay.  That's the May 2nd, 2024 report

8   that you previously testified on page 906, the next page over,

9   Warden, would you agree that sample 1C1, sample form swab

10  lists number of contributors 2?

11  A.  Yes.

12  Q.  And it lists that the assumed contributor is ███████

13  ██████?

14  A.  Yes.

15  Q.  Okay.  If we look to page 425909, that is a document you

16  talked about titled the Laboratory DNA Cancellation Report,

17  and that date is 5/2/2024, as well, correct?

18  A.  Yes.

19  Q.  Okay.  Now, if we go to 425911, it's two pages later, can

20  you tell me -- can you read the report date of that?

21  A.  Sir, can you blow it up?  8/22/2024.

22  Q.  Okay.  And that's after the cancellation on May 2, 2024,

23  correct?

24  A.  Yes.

25  Q.  So, would you agree that a DNA laboratory result was run

1    after that cancellation occurred, correct?

2    A.  Yes.

3    Q.  Okay.  And can you go to the next page, 0425912, and under

4    the 1C1, the swab of the left neck and cheek area?  Can you

5    tell that?  Can you tell me the number of contributors that

6    were found on rerun?

7    A.  One.

8    Q.  Okay.  Can you tell me who that individual is identified

9    as?

10   A.  ███████████.

11   Q.  And was that second -- or I guess the 8/22/2024 report,

12   was that reflected as being reviewed in the investigation you

13   signed off on?

14   A.  Yes.

15   Q.  Okay.  Thank you.

16        Warden Wills, you testified that you did not

17   personally read the Court filings that occurred in this case

18   or some declarations that occurred in this case, is that

19   correct?

20   A.  Yes.

21   Q.  However, do you have a legal team that keeps you apprised

22   of the goings-on in these trials?

23   A.  Yes, I do.

24   Q.  Have you spoken with the IDOC legal about this suit --

25   A.  Yes, I have.

1    Q.   -- and the pleadings that were filed --

2    A.   Yes, I have.

3    Q.   -- and the declarations that were filed?

4    A.   Yes, I have.

5    Q.   Okay.  I think those are all -- Oh, you know what?  One

6    more question.  I just wanted to get clarification of

7    something.  The undergarments we were talking about, the

8    state-issued undergarments, --

9    A.   Yes.

10   Q.   -- do they cost any money?

11   A.   No, they don't.  They are all free of charge.

12   Q.   I'm sorry I talked over you.  Can you restate that?

13   A.   They are all free of charge to the individuals.

14   Q.   Okay.  Earlier we talked about training on the

15   administrative directive.  Is there any other cycle training

16   that the employees at Menard undergo in regards to gender

17   dysphoria or transgender matters?

18   A.   I send my mental health staff to training, as well, to be

19   abreast of any changes or any updates to any of the

20   transgender information that's been disseminated.

21   Q.   Okay.  So, there was some testimony about a transgender

22   female officer that performed strip searches of other

23   transgender females at Menard, correct?

24   A.   Yes.

25   Q.   And an officer that was present in the courtroom yesterday

1    that performed strip searches of the inmates who provided

2    testimony, correct?

3    A.  Yes.

4    Q.  Okay.  Is your understanding that that individual is a

5    transgender female, meaning she was born a male and is now a

6    female?

7    A.  That is correct.

8    Q.  And that individual's license plates reflects that their

9    gender is female?

10           THE COURT:  Driver's license?

11   Q.  Driver's license, I'm sorry.

12   A.  That is correct.

13   Q.  Okay.  Thank you, very much.  No further questions.

14           MS. HUDSON:  Briefly, Your Honor?

15

16                    RECROSS EXAMINATION

17   BY MS. HUDSON:

18   Q.  Warden Wills, you just testified that you speak with your

19   legal counsel about the substance of this case, correct?

20   A.  Yes.

21   Q.  And that they inform you of the allegations that are made

22   in this case?

23   A.  Yes.

24   Q.  What have they told you about what allegations have been

25   made and what the concerns are in this litigation?

1           MR. BRODZIK:  Objection.  He testified that he spoke

2  with IDOC people.

3  Q.  Understood.  IDOC's legal counsel, what have they told you

4  about the substance of this case?

5  A.  Basically the --

6           MR. BRODZIK:  Your Honor, this is privileged

7  information.

8  A.  -- what the allegations are.

9           THE COURT:  Okay.  Hold on, hold on.  I mean, yeah,

10  that's why I didn't ask about specifics of conversations.  How

11  do you get around attorney/client privilege?

12           MS. HUDSON:  They relied on the substance of those

13  conversations to testify in Court today.  I believe that

14  breaks the privilege.

15           MR. BRODZIK:  I don't believe he testified that he

16  relied on his IDOC counsel to talk about his testimony; just

17  what's in pleadings.

18           THE COURT:  Well, he said that he hadn't reviewed the

19  declarations himself, but that he relies on Legal to tell him

20  about what's going on in the case.  Now, and I had -- I had

21  asked about getting an update yesterday about testimony.

22           MR. BRODZIK:  My argument would be that an update

23  from the goings-on in a lawsuit from a legal department does

24  not waive all attorney/client privilege.

25           MS. HUDSON:  Agreed, but the testimony was that he's

1   aware of the substance of the allegation because he's been

2   made aware of it through conversations with Counsel, and I

3   would like to explore what they have told him about the

4   substance of the allegations, if that's how he knows about

5   them.

6           THE COURT:  Okay.  Why don't you ask him about some

7   of the allegations and whether he's aware of those without

8   getting into specifics about that conversation, such as -- And

9   I was going to ask, too, that there's been testimony that the

10  culture at Menard is not only that slurs against transgender

11  inmates occur, but that culture actually encourages them.

12          Are you aware of that, Warden Wills?

13  A.  Yeah, I'm fully aware of the cultural difficulties that a

14  transgender individual may encounter.  And, again, that's the

15  reason why I do take it very serious and I reiterate my memos,

16  because I am attempting to change the culture of the facility

17  a little bit at a time and, in doing that, showing that my

18  concerns is hopefully making the changes within this facility,

19  because I do understand the difficulties that it could be

20  living in this environment as a transgender.

21          THE COURT:  Do you want to ask other specifics?

22  Q.  (By Ms. Hudson) Have you -- Were you aware of the

23  allegations of consistent misgendering and emotional -- and

24  verbal harassment made by staff members against transgender

25  individuals at Menard?

1    A.  I was made aware, again, of the allegations, and when

2    those allegations were brought to my attention they were

3    turned over to Internal Affairs to investigate, yes.

4    Q.  Did you personally investigate what staff members were

5    involved -- would have been involved in any of that verbal

6    harassment or misgendering?

7    A.  No, I personally don't investigate any allegations.  I

8    would leave that to my investigation team to conduct those

9    investigations.

10   Q.  To the extent that any specific concerns -- you were made

11   aware of any specific concerns as part of these conversations

12   with counsel, you didn't personally investigate any of them,

13   is that fair?

14   A.  That is fair.

15   Q.  And did you, as part -- In response to these conversations

16   with counsel about these allegations, did you make any

17   referral to an Internal Affairs and direct them to investigate

18   those allegations?

19   A.  Not anything in particular, just as the investigations are

20   brought to their attention for them to conduct the

21   investigations.

22   Q.  But nothing specifically in response to any allegations

23   you were made aware of in connection with this hearing?

24   A.  No.

25   Q.  Okay.  Did IDOC's counsel provide you any written

1    documents or summaries of allegations in this case?

2    A.  No, they did not.

3    Q.  No further questions.

4            THE COURT:  Okay.  All right.  Thank you, Warden

5    Wills.  That concludes your testimony.

6            Okay.  We don't have anybody else today, so we will

7    break for the day, it's 2:15, resume tomorrow morning at 9:00.

8            Now, I understand -- Let's see.  Tomorrow we --

9            Yeah, you can disconnect, Warden Wills, or however

10   you can do that.  There you go.

11           Okay.  So, tomorrow we have ███████████ and ████████

12   ███████ by video.

13           Okay.  And, Defense, who will you call tomorrow?

14           MR. BRODZIK:  We should have Dr. Puga and Dr. Conway

15   tomorrow via Zoom.

16           THE COURT:  Okay.  What's the earliest that they are

17   available?

18           MR. BRODZIK:  That I am not sure at the moment.  I

19   would assume if we start at 9:00 it would be around noonish

20   again, 11:30, 12:00.

21           THE COURT:  We have one set for 9:00, one at 10:30.

22   I mean, as long as one of them is available by noon that

23   should be fine, and then the other one ready to go right after

24   that.

25           And then Dr. Reister is coming Friday morning in

1    person, perhaps?

2            MR. BRODZIK:  Friday, and we may be calling Major

3    Schoenbeck as a rebuttal witness.

4            THE COURT:  Would that be in person?

5            MR. BRODZIK:  In person, yeah.

6            MS. PARSONS:  Your Honor, Major Schoenbeck was not on

7    their witness list.

8            MR. BRODZIK:  The deposition was taken.  He's a

9    rebuttal witness.  We can send you the amended witness --

10           THE COURT:  Well, he was on your list as a *may call*.

11           MS. PARSONS:  I'm not sure what rebuttal case we are

12   talking about.  We are here on an evidentiary hearing, so --

13           THE COURT:  Well, I will take that up tomorrow, but

14   just -- Wait.  And that would be in rebuttal you would call

15   Schoenbeck on Friday, if allowed to do so?

16           MR. BRODZIK:  Correct, yes.

17           THE COURT:  And Dr. Reister will be ready to go

18   either in person or by video by 9 a.m.?

19           MR. BRODZIK:  9 a.m. Friday.  Trying to get out of

20   here early.

21           MS. GARCIA:  Your Honor, we filed a response to the

22   seconded emergency motion, the declarations, and if you want

23   some additional argument I am happy to give that to you now,

24   but we did file a response.

25           THE COURT:  Okay.  Well, let me take a look at the

1  response this evening, and if I need anything else I will let

2  you know.

3          MS. GARCIA:  Thank you.

4          THE COURT:  Okay.  Have a nice evening, everyone.  Be

5  careful getting to wherever you are going, and I will see all

6  tomorrow morning at 9:00.

7          COURT SECURITY OFFICER:  All rise.

8          (Court in recess at 2:18)

9

10

11                     REPORTER'S CERTIFICATE

12               *   *   *   *   *   *   *

13    I, Stephanie K. Rennegarbe, RDR, CRC, Official Court

14  Reporter for the U.S. District Court, Southern District of

15  Illinois, do hereby certify that I reported with mechanical

16  stenography the proceedings contained in pages 155-309; and

17  that the same is a full, true, correct and complete transcript

18  from the record of proceedings in the above-entitled matter.

19

20  /S/ Stephanie K. Rennegarbe,              06/04/2025
    IL CSR, RDR, CRC

21

22

23

24

25