1              IN THE UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF ILLINOIS

2

3  JANIAH MONROE, et al.,        )
                            )

4           Plaintiffs,    )
                            )

5  v.                     )  No. 3:18-cv-00156-NJR
                            )  East St. Louis, Illinois

6  STEVEN BOWMAN, et al.,        )
                            )

7           Defendants.    )

8

9

                TRANSCRIPT OF PROCEEDINGS

10               **EVIDENTIARY HEARING**
                     **DAY #3**

11       BEFORE THE HONORABLE NANCY J. ROSENSTENGEL
          UNITED STATES CHIEF DISTRICT JUDGE

12

                   MAY 29, 2025

13

14

15

16

17

18

19

20

          Stephanie Rennegarbe, RDR, CRR, CBC

21             IL CSR #084-003232
              750 Missouri Avenue

22          East St. Louis, IL  62201
              618-482-9226

23      Stephanie_Rennegarbe@ilsd.uscourts.gov

24   *Proceedings recorded by mechanical stenography; transcript*
         *produced by computer-aided transcription*

25

```
 1    APPEARANCES:

 2    FOR THE PLAINTIFFS:    Michelle T. Garcia, Esq.
                             Mason Strand, Esq.
 3                           Alexis Picard, Esq.
                             Roger Baldwin Foundation of ACLU, Inc.
 4                           ACLU of Illinois
                             150 N. Michigan Avenue
 5                           Suite 600
                             Chicago, IL  60601
 6                           apicard@aclu-il.org
                             mstrand@aclu-il.org
 7                           mgarcia@aclu-il.org

 8                           Anne J. Hudson, Esq.
                             Kirkland & Ellis, LLP.
 9                           300 N. LaSalle Street
                             Chicago, IL  60654
10                           anne.hudson@kirkland.com

11                           Thomas J. Leahy, Esq.
                             Sarah Legault, Esq.
12                           Kirkland & Ellis, LLP.
                             333 West Wolf Point Plaza
13                           Chicago, IL  60654
                             thomas.leahy@kirkland.com
14                           sarah.legault@kirkland.com

15                           Abby L. Parsons, Esq.
                             Arnold & Porter
16                           700 Louisiana Street
                             Suite 4000
17                           Houston, TX  77002
                             Abby.Parsons@arnoldporter.com
18
                             Brent P. Ray, Esq.
19                           Stephen Ferro, Esq.
                             Arnold & Porter
20                           70 West Madison Street
                             Suite 4200
21                           Chicago, IL  60602-4321
                             Brent.ray@arnoldporter.com
22                           stephen.ferro@arnoldporter.com

23                           Sarah Prather, Esq.
                             Arnold & Porter, LLP.
24                           250 West 55th Street
                             New York, NY  10019
25                           sarah.prather@arnoldporter.com
```

```
 1   APPEARANCES CONTINUED:

 2   FOR THE PLAINTIFFS:    Erica E. McCabe, Esq.
                           Arnold & Porter, LLP.
 3                         601 Massachusetts Ave, NW
                           Washington, DC  20001-3743
 4                         erica.mccabe@arnoldporter.com

 5
     FOR THE DEFENDANTS:   Justin M. Penn, Esq.
 6                         Calvin Edwards, Jr., Esq.
                           Hinshaw & Culberton, LLP.
 7                         151 N. Franklin Street
                           Suite 2500
 8                         Chicago, IL  60606
                           312-704-3000
 9                         jpenn@hinshawlaw.com
                           cedwards@hinshawlaw.com
10
                           James M. Brodzik, Esq.
11                         Hinshaw & Culbertson, LLP.
                           521 West Main
12                         Suite 300
                           P.O. Box 509
13                         Belleville, IL  62220
                           618-277-2400
14                         jbrodzik@hinshaw.com

15

16

17

18

19

20

21

22

23

24

25
```

1                  I N D E X

2     **WITNESSES CALLED TO TESTIFY:**             **PAGE**

3     ███████████████

     DIRECT EXAMINATION BY MS. GARCIA        323
4     CROSS EXAMINATION BY MR. PENN           368

5     ████████████████

     DIRECT EXAMINATION BY MS. MCCABE        373
6     CROSS EXAMINATION BY MR. BRODZIK        399

7     DR. WILLIAM PUGA
     DIRECT EXAMINATION BY MR. PENN           403
8     CROSS EXAMINATION BY MS. PARSONS        441
     EXAMINATION BY THE COURT                 502
9     CONTINUED CROSS EXAMINATION BY MS. PARSONS    505
     REDIRECT EXAMINATION BY MR. PENN        506

10

     DR. LAMENTA CONWAY
11     DIRECT EXAMINATION BY MR. BRODZIK       514

12

13               E X H I B I T S

14     EXB #            DESCRIPTION           ID'D      ADMT'D

15     Plf #35      ███████ Grievance       327       333
     Plf #43      Admin Review Conference      340       346
16     Plf #46      ███████ Declaration      349       354
     Plf #50      Spreadsheet              471       471
17     Plf #51      4/18/25 E-mail          481       481
     Plf #52      4/29/25 TAC Minutes       490       506
18

     Deft #2      Flow Chart               410       441
19     Deft #3      Transfer Requests        418       441
     Deft #4      Job Posting             438       441

20

21

22

23

24

25

```
 1                    (Proceedings began at 9:04 a.m.)

 2                    ***********************

 3              COURTROOM DEPUTY:  The matter of Monroe, et al. v.

 4    Bowman, et al., case #18-cv-156, is called for Day 3 of

 5    Evidentiary Hearing.

 6              MS. PARSONS:  Good morning, Your Honor.  Abby

 7    Parsons, counsel for the Plaintiffs.  With me are my

 8    co-counsel from the ACLU and Arnold & Porter and Kirkland &

 9    Ellis.

10              THE COURT:  All right.  Good morning, Counsel.

11              The court reporter needs names of who's at Counsel

12    table.  Ms. Parsons, Ms. Ray --

13              MS. PARSONS:  Ms. Erica McCabe from Arnold & Porter,

14    Sarah Prather from Arnold & Porter, Stephen Ferro from Arnold

15    & Porter, and Sarah LeGault from Kirkland & Ellis.

16              THE COURT:  Okay.  Thank you.

17              MR. PENN:  Good morning, Your Honor, Justin Penn.  I

18    represent the Defendants along with my partners, James Brodzik

19    and Calvin Edwards, Jr.

20              THE COURT:  All right.  Well, good morning, Counsel.

21              So, we have our next witness by video.  I understand

22    there are some things to take up before that.

23              MS. PARSONS:  Yes, two things, Judge.  First, we

24    heard yesterday for the first time that Major Schoenbeck was

25    going to be called as a rebuttal witness.  That's fine, if
```

1   that's how we will proceed, but we don't have an Offer of

2   Proof for that witness and we would ask for one of those

3   before we plan a cross-examination for that witness tomorrow.

4           THE COURT:  As to what he's being offered -- what the

5   testimony will be?

6           MS. PARSONS:  Yes, he was not on their witness list

7   and we included Offers of Proof in the witness list and we

8   don't have one for Major Schoenbeck.

9           THE COURT:  Okay.  I would assume that's not a

10  problem?

11          MR. PENN:  Not a problem.

12          THE COURT:  Okay.  Well, offer that when we take a

13  break between witnesses.

14          MS. PARSONS:  Thank you, Judge.

15          And Ms. Prather is going to address one other thing

16  regarding the Motion to Compel.

17          Okay.  Maybe come -- Please come to a microphone.

18          MS. PRATHER:  Good morning, Sarah Prather from Arnold

19  & Porter on behalf of all Plaintiffs.  So, as you know, last

20  Friday we filed a Motion to Compel to enforce documents from

21  Defendants.  And in response to that motion Defendants did

22  promise to produce e-mails related to grievance investigations

23  and PREA investigations at Menard's Internal Affairs

24  investigation.  And those emails related to initiating

25  investigations, actually discussing those investigations, and

```
 1    then actually concluding them.  Defendants did not produce

 2    those materials yesterday.  These are the e-mails that we were

 3    discussing yesterday morning.

 4         So, at this time we would request an adverse

 5    inference, which was the same relief that we did seek in our

 6    motion.  And the adverse inference that we would request is

 7    that because the e-mails have not been produced we were not

 8    able to use them to cross-examine any witnesses and Defendants

 9    should not be able to rely on the documents or the e-mails in

10    opposition to our deliberate indifference on the allegations

11    and the basis of our preliminary injunction hearing today.

12         THE COURT:  Okay.  Who wishes to respond?

13         MR. PENN:  Judge, I will briefly respond.  My

14    understanding is that we are going through a large volume of

15    e-mails that we are trying to get through as fast as we can.

16    We are not objecting to their production, but we physically

17    can't produce them by today.  So, we are doing our best.  We

18    have not come -- This is not a situation where we have come to

19    terms -- agreeable search terms.  You know, this isn't

20    something where we worked with -- We have asked and we would,

21    but we don't have agreeable search terms, so it's not like a

22    situation where we are -- We are going through a lot of

23    e-mails.

24         THE COURT:  So, you have someone actively reviewing

25    those e-mails at this time?
```

1          MR. PENN:  Yes.

2          THE COURT:  Okay.  Well, I will take it under

3    advisement, we'll see where we get and what relief might be

4    appropriate after this if you don't get them today.

5          MS. PRATHER:  Thank you, Your Honor.

6          MR. PENN:  Judge, one other issue -- And I'm not sure

7    that -- Let me just ask the question.  With respect to ████

8    ████    yesterday, I don't know if that is testimony that's

9    going to be considered by the Court, because there wasn't

10   really any -- Well, we didn't have an opportunity to ask

11   questions, and I don't know if that's -- if there was any

12   evidence elicited.  I would say there wasn't, but I don't know

13   if the Court is considering ████████    time on the stand or

14   if we need to address that with a motion to exclude it because

15   we were not given an opportunity to -- It was kind of a weird

16   situation.

17         THE COURT:  Well, sure, I mean, you weren't given an

18   opportunity to ask questions because she didn't testify to

19   anything.  She basically took the stand and said, "I don't

20   want to testify."  I mean, I think she answered a few

21   preliminary questions.  But given her reluctance to testify at

22   all, I didn't think cross-examination was appropriate.

23         MR. PENN:  I don't disagree.  As long as we

24   understand that that's not evidence, her refusal to

25   testify.

1          THE COURT:  Well, I think that -- I think I can

2     consider it, the fact that she was -- and I did have to

3     consider that and get the Marshals in here -- the fact that

4     she was scared to testify because of fear of retaliation.

5          MR. PENN:  So, that's what I am asking.  So, that is

6     -- The Court is considering that as evidence?

7          THE COURT:  Mr. Ray, do you want to respond?

8          MR. RAY:  Yes, Your Honor, and we absolutely agree

9     that's something that should be considered here, because it

10    pretty much goes to the claims the class members are making

11    because they feel retribution, retaliation from the staff, and

12    there's no motion to strike made of her testimony at the time.

13    So while her testimony was limited, it certainly is germane to

14    the issues that we are presenting at this hearing and should

15    be considered alongside all the other class member testimony.

16         THE COURT:  Well, that's true, there wasn't any

17    motion to strike.  I mean, I don't know how I could just not

18    consider the fact that we had a witness say "I'm afraid to

19    testify," and, in fact said, "because I testified at a prior

20    hearing, and right after that I got transferred to Menard."

21         MR. PENN:  I understand that, but my point is we were

22    not given -- We will address it in a motion.

23         THE COURT:  Yeah, file a motion.  Certainly given

24    that the witness was already obviously very intimidated, the

25    last thing I was going to do is add to that by letting

1    cross-examination occur.

2            MR. PENN:  I totally understand.  I'm not revisiting

3    that.

4            THE COURT:  Now, and you weren't here yesterday, but

5    I also did comment -- I will just be honest, I am troubled we

6    don't have any representative from IDOC.  Just like the last

7    time, nobody is here to listen to the testimony of these

8    witnesses.  I know they are all busy and whatever, but these

9    are very serious allegations and there's not a representative

10   of the Department of Corrections here to listen.  At the last

11   trial when this Defense team was not counsel, I ordered the

12   named Defendants to read the transcript and file an

13   attestation that they had done so, because it troubled me.

14   And here we are now, years later, and still nobody.  And I

15   bring this up --

16           MR. PENN:  There was someone here on the first day.

17           MR. BRODZIK:  And yesterday.

18           MR. PENN:  And yesterday

19           THE COURT:  Who was here?

20           MR. PENN:  On the first day there was somebody from

21   both -- Well, Megan was here from --

22           THE COURT:  Who's Megan?  I don't know who Megan is.

23           MR. BRODZIK:  Megan Ditzler.

24           THE COURT:  So that's the Attorney General's office.

25           MR. PENN:  No, no, no.  I don't think Megan's

```
 1   Attorney General.

 2          MR. BRODZIK:  Should be IDOC.

 3          MR. PENN:  I think she's IDOC.  And she was here

 4   yesterday.  Well, no, Judge, I would like to address this.

 5          THE COURT:  Okay.  Well, I only bring this up now

 6   because I said yesterday if we had had someone from IDOC

 7   here -- and I made this comment yesterday -- say the warden or

 8   an assistant warden or the director, someone maybe could have

 9   given her some assurances that there would not be retaliation.

10   But I commented there is no one.  And, I mean, I can give her

11   assurances all day long, but we know that, you know, that

12   things happen.  I had no idea that there was retaliation after

13   the last hearing, or at least she claims there was

14   retaliation.  So, you know, that's not before me, but --

15          MR. PENN:  Judge, I will get you Megan's title, but,

16   I mean, she's been here both days.  I understand --

17          THE COURT:  Was that the woman sitting in the back

18   left?

19          MR. PENN:  Yes.

20          THE COURT:  Okay.  Well, so I say that because I

21   think if she's with IDOC now, she used to be with the Attorney

22   General's office, I believe.

23          MR. PENN:  I will confess ignorance to that.  I don't

24   know.

25          THE COURT:  Well, anyway, that --
```

```
 1              COURTROOM DEPUTY:  It shows that she's an attorney
 2    with the Attorney General's office.
 3              THE COURT:  On the docket sheet?
 4              COURTROOM DEPUTY:  Not on this case, but in other
 5    cases.
 6              THE COURT:  Okay.  Deana says CM/ECF shows she's with
 7    the Attorney General's office.
 8              MR. PENN:  As I say, I will find out.
 9              THE COURT:  Okay.  And I asked the warden yesterday,
10    "Were you" -- You know, I didn't want to ask about the
11    substance of the conversations, but "Were you briefed on the
12    testimony?"
13              MR. PENN:  Judge, I have heard your concerns.  We are
14    way far afield from where I started on this.  I will file a
15    motion.
16              THE COURT:  You can file a motion about ████████.
17              MR. PENN:  Yeah, that's fine.  Thanks, Judge.
18              THE COURT:  I also want to also, before we start,
19    address the Defendant's emergency motion to strike the
20    untimely filed declarations at docket entry 947.  I reviewed
21    that and the Plaintiffs' response.  I note the issue is that
22    Defendants argue that they have received several new class
23    member declarations on the eve of the hearing that were not
24    attached or cited in Plaintiffs' original brief in support of
25    their motion for preliminary injunction and they want these
```

1    stricken under Rule 12(f) as untimely, improper and

2    prejudicial for continuance of the hearing.  Obviously that

3    was now denied.  Now, Plaintiffs argue that these declarations

4    shall provide evidence of current conditions and the

5    Defendants, of course, are urging now that current conditions

6    are the only relevant conditions for potential injunctive

7    relief.  And I asked yesterday and was told by Defendants that

8    they have not specifically responded to other previously filed

9    declarations outside of their responsive brief, so I have

10   reviewed the eight new declarations, and they are not lengthy

11   or complex.  They allege the same kind of conduct discussed in

12   the motion for preliminary injunction.  Clearly the situation

13   at Menard is ongoing and the new declarations capture

14   allegations of more recent or, as we say, current conditions

15   at Menard and, of course, some of the declarations are from

16   newly identified class members, so of course they could not

17   have been provided sooner.

18        So, the request to strike the declarations is denied.

19   If Defendants want to file a response, I will give you time to

20   do so on or before June 12th, which I think is two weeks from

21   today.

22        Okay.  With that, Ms. Parsons, anything else we need

23   to take up before we begin?

24        MS. PARSONS:  No, Your Honor.

25        THE COURT:  All right.  Mr. Penn, anything else?

```
 1              MR. PENN:  No, Your Honor.
 2              THE COURT:  Okay.  Now, are we ready to go?  Who is
 3    our next witness?
 4              COURTROOM DEPUTY:  ██████████████████████.
 5              THE COURT:  Okay.  Jerod, if you are out there, we
 6    are ready.
 7              ██████████████, can you hear me okay?
 8              ██████████████:  I can hear you.  I can't see anything,
 9    though.
10              It went away.  I can hear them go.
11              THE COURT:  All right.  As long as you can hear.
12              ██████████████:  Okay.  Now I can see.
13              THE COURT:  You can see now.  Okay.  All right.
14              Before you testify, I'm going to ask you to take an
15    oath.
16              COURTROOM DEPUTY:  ██████████████, could you please
17    raise your right hand the best that you can?  Thank you.
18              (Plaintiff, ██████████████ sworn).
19              COURTROOM DEPUTY:  Thank you.  Please state your name
20    for the record.
21              ██████████████████████.
22
23                        DIRECT EXAMINATION
24    BY MS. GARCIA:
25    Q.  Good morning, ██████████████.  It's me, Michelle from the
```

1    ACLU.

2    A.  Hi, Michelle.

3    Q.  Good to see you.

4    A.  Good to see you, too.

5    Q.  ███████████, I'm going to show you some documents today,

6    just a couple, okay, and we are going to go -- we are going to

7    talk about your experiences at Menard.  Could you let the

8    Court know if you cannot see them on the screen or if you need

9    assistance and we will try to blow them up for you, okay?

10   A.  Okay.

11   Q.  Okay.  All right.  ██████████, what name do you prefer to

12   call yourself?

13   A.  ████████.

14   Q.  Can you spell that?  We have a Court Reporter here taking

15   down everything that you say.

16   A.  That's ██████████.

17   Q.  Okay.  And what's your IDOC number?

18   A.  ████████.

19   Q.  And what pronouns do you use?

20   A.  She, her.

21   Q.  Are you a transgender woman?

22   A.  Yes, I am.

23   Q.  Do you have breasts?

24   A.  Yes, I do.

25   Q.  And, ██████████, how long have you lived at Menard?

1  A.  Since June 7th, 2022.

2  Q.  Do you have a gender dysphoria diagnosis?

3  A.  Yes, I do.

4  Q.  And approximately when did you receive that?

5  A.  Around the middle of the year, 2023.

6  Q.  In 2023, ███████████, did you notify Menard that you

7  wanted help to socially transition?

8  A.  Yes, I did in January of that year.

9  Q.  What kind of help did you want to have to transition to a

10  transgender woman?

11  A.  Gender-affirming products.  I also wanted to be approved

12  for protective custody because I was more vulnerable to sexual

13  assaults by the other inmates.

14  Q.  What kind of gender-affirming care products?

15  A.  Like makeup, female attire.  I wanted to get the elective

16  facial hair removal surgery.

17  Q.  Did you also want private showers?

18  A.  Yes, I wanted that, too.  I wanted the private showers, I

19  wanted to be individually placed in housing, and I wanted to

20  be strip-searched by females only.  I didn't want to be

21  strip-searched by male officers.

22  Q.  Did you want a --

23  A.  Also --

24  Q.  ███████████, I apologize.  You were talking.  Keep going.

25  A.  I also wanted to start the hormone treatment therapy.  I

1  was still new to transitioning, so I was still learning about

2  everything that there was to offer about gender dysphoria.

3  Q.  At the time that you made this request did you have an

4  identification card that identified you as female?

5  A.  No, I did not.

6  Q.  Could you make a request to be searched by a female guard?

7  A.  No, I could not, not without the ID.

8  Q.  And when you made this request in 2023, did you receive

9  help that you requested to socially transition?

10  A.  No, I was directed to talk to the transgender mental

11  health coordinator that was employed at Menard in the West

12  House at that time who was -- Her name was Mrs. Wilkes.  I had

13  seen her for about six months regularly, I think it was about

14  once or twice a month.  For those six months I had requested

15  the private showers, to be approved protective custody, to

16  receive the transgender identification card to protect myself

17  from cross-gender strip searches.  Everything I requested, she

18  basically -- she kept spinning me, telling me that it would

19  take a really long time to get all that stuff, so after six

20  months I stopped seeing her.  I haven't received anything from

21  her.

22  Q.  Okay.  Did you file a grievance about this?

23  A.  Yes, I did.

24  Q.  ███████████, I'm going to direct you to a document that we

25  are marking -- has been marked as Plaintiffs' Exhibit 35.

```
 1          COURTROOM DEPUTY:  Ms. Garcia --
 2   A.  I can see it, I can't really read the writing on it.
 3   Q.  Thank you, very much.  Can you see it now?
 4   A.  Yeah, I can.
 5          MS. GARCIA:  Curtis, would you just take a moment and
 6   scroll down so that ████████████ can see the whole document?
 7   It's just one page.
 8          Curtis, would you mind going back to the top of the
 9   document.
10   Q.  (By Ms. Garcia) At the top of the document it says
11   Illinois Department of Corrections, Individual in Custody
12   Grievance.  Do you see that, ████████████?
13   A.  Yes, I see it.
14   Q.  Okay.  It's dated January 21, 2024.  Do you see that, ██████
15   ████████?
16   A.  It's dated 2024.
17   Q.  That's right.
18   A.  I think I got the year wrong.
19   Q.  That's okay.  Don't worry about that.  And it says,
20   "Individual: ████████████████?
21   A.  Yes.
22   Q.  Okay.  Is that your handwriting on the grievance?
23   A.  Yes, it's my handwriting.
24   Q.  Did you write this grievance?
25   A.  Yes, I did.
```

1    Q.  Okay.  ███████████, can you look at the date and summary

2    of the grievance?

3          MS. GARCIA:  Curtis, could you please zoom into it?

4    It's the paragraph below.

5    Q.  (By Ms. Garcia) ██████████, why don't you take a moment

6    to read it.

7    A.  Okay.

8    Q.  And let me know when you are done.

9    A.  Okay.  I'm finished.

10   Q.  Okay.  You wrote, "On January 16th, 2023, I notified the

11   Menard Correctional Center administration that I changed my

12   gender identity from male to female, transgender.  I was

13   directed by the staff to meet with the Transgender Mental

14   Health Coordinator Ms. Wilkes to receive aid with

15   transitioning."

16          Is this the person that you were referring to just a

17   moment ago?

18   A.  Yes, Ms. Wilkes.

19   Q.  Okay.  And then you wrote, "After meeting with her

20   multiple times throughout the duration of six months, I never

21   received any help from her regarding transgender care."

22   A.  That's correct.

23   Q.  Did Ms. Wilkes provide an explanation as to why you didn't

24   get any help for your transition care?

25   A.  She kept tell me that it would take a very long time to

1   receive anything.  I requested the private showers, to be

2   individually housed.  I also requested the ID to start the

3   hormones, and she continually kept telling me that it would

4   take a very long time to receive any of that, but she never

5   told me if she was actively trying to get me started on

6   anything or if she was actively trying to get me this

7   treatment for gender dysphoria.  She just -- she kept telling

8   me that it would take a really long time to get all that

9   stuff, so after six months I stopped seeing her.

10  Q.  Okay.  How did it make you feel not to get this help?

11  A.  Ignored.

12  Q.  Did it affect your gender dysphoria in any way?

13  A.  Yes, it did, because I was -- at that time I was still not

14  approved protective custody, so I was constantly having new

15  cellmates who were sex offenders, locked up for violent sexual

16  offenses, and, you know, at that time I still did everything I

17  could to help myself transition.  You know, I always had long

18  hair, I always had breasts since I think 2020, and at the same

19  time like I have to live in a cell with these inmates who are,

20  you know, criminals who are sexually violent and sexually

21  aggressive, so it's very dangerous for me.  I was always

22  having anxiety on top of my other health issues.  It was very,

23  very distressing, to say the least.

24  Q.  I'm going to show you a different section of this

25  document, ███████████.

1          Further down the page is the counselor's response,

2     which is dated May 21st, 2024.  Do you see that, ████████?

3     A.  Yes, I see it.

4     Q.  Okay.  Now, the counselor wrote, "Contacted Placement and

5     was notified that you are correctly housed.  Contacted West

6     Cell House and their records show that you do, in fact, get

7     single-celled showers."

8          So, at the time of this date of May 2024, were you

9     living in West Cell House?

10    A.  Yes, I was.  But they did not run the private showers the

11    way they had -- the way the counselor responded to in the

12    grievance.  The inmates on kickout status, they were -- they

13    all showered together.  The only time an inmate would go to

14    the shower by himself, when they actually did run single

15    showers, was when they were on intake status.

16    Q.  And during this time were you on intake status?

17    A.  I would be on intake status for two weeks out of the month

18    at most, so -- and they rarely ran the showers for the intake

19    inmates, because when there's like 25, 30 inmates on intake

20    status on one gallery, it takes a very long time for them to

21    run every single inmate who's on intake status, so usually the

22    C/Os don't even bother to do it.  I have got in the habit of

23    just washing up in my cell.

24    Q.  And as a transgender woman were there any efforts by the

25    Menard guards to give you a private shower when you were in

1    the West Cell House during this time?

2    A.  No, there was never any special accommodation.  As long as

3    I was not approved protective custody, I was treated like any

4    other normal population inmate.

5    Q.  And can you explain to the Court, how would you wash up in

6    your cell?

7    A.  Well, I would take -- I would get a cable cord and I would

8    remove the rubber hosing around the wire of the cable cord to

9    make a makeshift water hose, I would attach it to my sink, and

10   then I would stand on my legal correspondence box and then

11   shower like that, with using the water hose to run the water

12   over me.  And I showered like that for years; I still do.

13   Q.  Even to this day you shower in your cell?

14   A.  Yes, to this day I still do.  When I get shaken down, they

15   always take it because it's unauthorized property.  But

16   usually I don't get a ticket for it, but they still take it,

17   so I always have to, you know, buy a new cable cord and make

18   another one.  But, I still shower like that to this day.

19   Q.  Why in 2025 do you find it necessary to shower that way?

20   A.  Because they still run even the transgender inmates into

21   the shower with all the other inmates.  When I did see, I

22   believe it was the doctor, for the evaluation for the hormone

23   treatment therapy, I had requested the private showers, and

24   she had told me that the transwomen, they just shower with all

25   the other inmates, like she had never even heard of, you know,

```
 1    a transwoman being given private showers.  So, that was -- You

 2    know, that kind of -- That surprised me to hear that directly

 3    from her, because I was thinking she was the one that was

 4    going to get me, you know, the private showers, the permit

 5    that I was supposed to get, from what I had heard.  But, like

 6    I said, she told me all the transwomen, they just shower with

 7    all the other inmates.

 8    Q.  Now, ███████████, I'm going to direct you to a little bit

 9    more that's on this document.

10          It says, "Menard directives state that a woman must

11    search another woman or even a transgender, even though they

12    are a man."  Do you see that, ████████████?

13    A.  Yes, I see that.

14    Q.  How does this statement make you feel about yourself as a

15    transgender woman?

16    A.  Like the person who wrote it doesn't understand what

17    gender dysphoria is or how serious it can be and that, you

18    know, like I had already knew, they don't take transwomen

19    seriously, they see us as jokes, they treat us as jokes when

20    we get shaken down, whenever they mock us or taunt us and say

21    -- whenever they insult us or harass us, it just reaffirms

22    what I already knew.

23          MS. GARCIA:  Your Honor -- Curtis, we don't need to

24    have it blown up anymore.

25          Your Honor, I would like to move Plaintiffs Exhibit
```

```
 1    35 into evidence.

 2              THE COURT:  35 will be admitted.

 3              MS. GARCIA:  You can take down the document, thank

 4    you.

 5    Q.  (By Ms. Garcia) Now, ███████████, you mentioned Ms. Wilkes

 6    and she was the transgender mental health coordinator.  Does

 7    she still work at Menard?

 8    A.  No, she doesn't.  I believe she -- she either resigned or

 9    she quit in -- I think it was before the end of the year 2023.

10    It might have been early '24.  It was a while ago.

11    Q.  And do you know if Menard replaced Ms. Wilkes and hired

12    another mental health coordinator?

13    A.  Yes, I'm not sure who the new one was directly after her,

14    but I don't think she worked here for very long, because we

15    had actually gotten another one -- I'm not sure how many had

16    been hired and left after Ms. Wilkes, but I know that our

17    current transgender mental health coordinator, Ms. Klausing, I

18    think she started working in the West Cell House in early --

19    early this year.

20    Q.  In 2025?

21    A.  Yeah.

22    Q.  Do you recall meeting with any transgender health

23    coordinators in between Ms. Wilkes and Ms. Klausing?

24    A.  Not after Ms. Wilkes, only Ms. Klausing.

25    Q.  So, you did not meet with any mental health -- transgender
```

1    mental health coordinators between when Ms. Wilkes left, which

2    you said before 2024, and when Ms. Klausing started in 2025?

3    A.  Yes, I did have an interview or, I mean, an evaluation

4    with the doctor who -- or I think she was the nurse who gives

5    the evaluation for the Estrogen, the hormone treatment therapy

6    and the testosterone blockers.  I did talk to her.  But after

7    her, Ms. Klausing was the only known mental -- transgender

8    mental health coordinator that I talked to.

9    Q.  Okay.  Thank you.  So, let's transition a little bit.  And

10    you talked a little bit about housing and protective custody

11    and let's follow up a little bit about that, ███████████.

12         When you arrived in Menard June, 2022, where were you

13    housed?

14    A.  In the East Cell House, in population.

15    Q.  How did you feel living in East Cell House population?

16    A.  It was scary.  It's the most dangerous part of Menard.

17    It's where all the -- It's the disciplinary housing unit of

18    Menard, so it's where the most violent and aggressive inmates

19    are housed.

20    Q.  How did the male prisoners treat transgender women in the

21    general population in East House?

22    A.  They are very anti-LGBTQ.  I had been harassed many times

23    about being feminine, so I was only in the East Cell House

24    like six months before I went into seg and then I signed into

25    protective custody from seg.

1   Q.  Did Menard approve you for protective custody in 2022?

2   A.  No, I was denied after two days.  The counselor told me it

3   would take two weeks to find out if I was going to be approved

4   or denied, but then he came to me like two days after I talked

5   to him that I was denied.  It was very --

6   Q.  I apologize, ███████████.  I'm the one that talked over

7   you.  I'm sorry.

8   A.  You are fine.

9   Q.  Could you repeat your last sentence about the counselor?

10  A.  So when I signed into protective custody, I had told him

11  that I was basically being threatened by certain members of

12  the East Cell House group or the East Cell House gang members

13  and I needed protective custody, because my life was in

14  danger.  So, after speaking with him, he told me it would take

15  about two weeks to find out if they were going to approve me

16  or deny me protective custody.  Two days after speaking with

17  him, he came to my door and told me that I was denied

18  protective custody.

19  Q.  How did it feel that you were denied protective custody?

20  A.  I was scared, because I was thinking that I was going to

21  be kicked back out to the East Cell House.  I didn't know

22  anything about the kickout status or that I would grieve it

23  and then have to wait to see the Administrative Review Board

24  in Springfield, so I was worried.

25  Q.  Did you apply again for protective custody?

1    A.  Yes, I did.  I was on kickout status for about one month,

2    I was moved to the West Cell House protective custody housing,

3    which was 5 Gallery, and that was the gallery where they hold

4    all the inmates on intake status and kickout status.  So I was

5    on kickout status for one month.  I had seen the

6    Administrative Review Board and they had denied me, so I had

7    signed -- I was forced to leave protective custody and go back

8    to the East Cell House.  When I went over there I immediately

9    demanded a crisis team.  So I went on crisis because they were

10   not letting me sign back into protective custody.  So when

11   they took me to suicide watch, the crisis watch, I was there

12   for like five days, and then they let me sign back into

13   protective custody, then they took me over to the West Cell

14   House to 5 Gallery.

15   Q.  Okay.  I am directing your attention to September or

16   October of 2023.  Did Menard deny you protective custody in

17   2023?

18   A.  Yes, they did.  So, from the very first time that I was

19   denied protective custody I had went through a cycle of being

20   -- of signing into PC, being denied, kickout status, getting a

21   cellmate.  So for the first two weeks of the month I would be

22   on intake status.  And then when the administration denied me,

23   I would be on kickout status for the rest of the month and I

24   would be given a cellmate.  So every month from the very first

25   month that I was nonPC, I was going through this process of

1    getting denied, getting a cellmate, getting kicked out to

2    population, signing back into PC, signing in on intake, and

3    then, you know, being denied again, and it was over and over

4    again up until September of 2023.

5    Q.   Okay.  So, when you were in -- I am directing your

6    attention to September and October of 2023.  Can you describe

7    what happened when Menard placed you in a cell with a male

8    prisoner on kickout status?

9    A.   Yeah, so I believe I was in 23 cell on 5 Gallery.  I had

10   had an inmate moved into my cell.  He had been my inmate

11   before -- or, I mean, my cellmate.  He was moved into my cell.

12   I had woken up in the middle of the night to somebody groping

13   me and, you know, I lifted my head up and I seen him

14   masturbating with one hand and groping me with another hand.

15   I ended up fighting this inmate.  When I -- I didn't tell the

16   C/O or anybody.  It was late at night.  So, I waited for I

17   think it was a week or two before I was kicked back out to

18   population, and then when I signed back into PC and had the

19   interview with I/A, I had told them about what happened and

20   told them I wanted a KSF, which is a Keep Separate From order,

21   on this inmate so he wouldn't be placed back into my cell,

22   because he was a sex offender, he was locked up for aggravated

23   criminal sexual assault.

24        So, the I/A officer, he told me that he couldn't --

25   he couldn't do anything about putting a KSF on him or

1    anything, but that if anything happened again then I should

2    write on my tablet to the support help about what happens or

3    anything and that they should be able to see it.

4    Q.  Now, ▓▓▓▓▓▓▓, let's back up a little bit.

5         You said that this male prisoner, you believed, was a

6    sex offender?

7    A.  Yeah, he showed me his papers.  He was convicted of

8    aggravated criminal sexual assault.

9    Q.  Okay.  And when this prisoner -- When he -- When this male

10   prisoner grabbed you and groped you and masturbated on you did

11   you call out for help?

12   A.  No, I didn't.  I was scared.  So I immediately jumped up

13   from my mattress, I started fighting with him for about ten or

14   15 minutes.  We both stopped, and then for the next week and a

15   half, you know, we basically -- you know, we never said

16   anything to each other.  I was praying that when I did see --

17   or when I did feel safe enough to actually report it to I/A

18   that they would actually do something, but they couldn't care

19   less.  So, like I said, they wouldn't give me the Keep

20   Separate From order.  I never filed a PREA.  I had written

21   PREAs before on inmates through the grievance process, but the

22   counselor always responded that it didn't substantiate a PREA.

23   Q.  Okay.

24   A.  So, I waited until I had the I/A interview, told them

25   about what happened.  They refused to do anything about it, so

1    it was for, I think, another -- another month he became my

2    cellmate again.  Eventually he was actually approved

3    protective custody, and I was still denied at that time.

4    Q.  How did it make you feel that the man that sexually

5    assaulted you was approved protective custody and you were

6    not?

7    A.  I was angry, because, you know, he didn't identify as

8    trans.  You know, he was just an inmate that was -- He was

9    Level E.  I was angry that they had moved him in my cell,

10   because he was Level E, on top of everything, because inmates

11   that are on Level E, they have to move cells like every two

12   months.  And whoever their cellmate is, they have to move with

13   them.  So, you know, for -- He was my cellmate for

14   approximately four months altogether, so it was like the third

15   month he was my cellmate is when the incident occurred, and

16   then after that he became my cellmate again for another month,

17   and that was -- you know, that when he got approved, I was

18   denied.  It had taken me two years to get approved for

19   protective custody.

20   Q.  ▮▮▮▮▮▮▮▮, when were you finally approved for protective

21   custody?

22   A.  In December of last year.

23   Q.  Is that December of 2024?

24   A.  Yes.

25   Q.  ▮▮▮▮▮▮▮▮, I would like to show you another document.

1    It's Plaintiffs' Exhibit 43.

2    A.  Can you zoom in?  Okay, I see it.

3    Q.  At the top it says, "Illinois Department of Corrections,

4    Hearing of Administrative Review Board, Video Conference."

5        Do you see that?

6    A.  Yes, I see it.

7    Q.  Document date says, "Date of hearing: September 26, 2024."

8        MS. GARCIA:  Curtis, is it possible for you to

9    highlight that?

10   Q.  (By Ms. Garcia) Do you see that, ███████████?

11   A.  Yes, I see it.

12   Q.  Okay.  And it says the grievant name, ████████████?

13   A.  Yes, I see it.

14   Q.  Okay.  Earlier you talked about having a hearing with the

15   Administrative Review Board.  Do you recognize this document,

16   ████████████?

17   A.  Yes, I think I probably received six or seven of them.  I

18   have been denied protective custody more times than I could

19   count, but I only received a copy of my denial from

20   Springfield, I think, maybe every other time that I was denied

21   protective custody.  But I didn't have the video conference

22   with the Administrative Review Board every time I was denied

23   protective custody.  I had seen them probably four or five

24   times, and then after that they would just deny me

25   immediately.  They wouldn't even care to see me.

1        Even when I received the transgender identification

2   card, I was still being denied by the administration and by

3   the Administrative Review Board.

4   Q.  Directing your attention to the "Statement to ARB (in

5   summary)."

6        MS. GARCIA:  Curtis, will you scroll down a little

7   bit, please?  Perhaps if you could blow that up, if you can.

8   Okay.  Thank you.

9   Q.  (By Ms. Garcia) It states, "I didn't know I was denied, I

10  haven't been heard in about a year.  I received my transgender

11  ID in late July when I started taking testosterone blockers.

12  It's just here, there's a lot of dangerous inmates.  I can be

13  placed with anyone, I've been placed with sex offenders."

14       What did you mean by "it's just here, there's a lot

15  of dangerous inmates"?

16  A.  Being a maximum security prison, you know, it's the most

17  dangerous prison in Illinois, but it's especially dangerous

18  for certain inmates who are more vulnerable to sexual assault,

19  like members of the LGBTQ community.

20  Q.  Later on it states, "I'm involved with Monroe v. Menard

21  case about the treatment of transgenders."

22  A.  Yes.

23  Q.  Why did you mention the Monroe case to the Administrative

24  Review Board?

25  A.  Because I felt like they were intentionally denying me

```
 1   because Menard was denying me since Menard doesn't really care

 2   about members of the LGBTQ community or anything that's going

 3   on with them in the courtroom or in prison.  The

 4   Administrative Review Board in Springfield, they seem to be

 5   complicit in how Menard treats their inmates, because they --

 6   every time I wrote a grievance about anything, the counselor

 7   would always, you know, give me a -- I call it a nonresponse,

 8   a response that doesn't make any sense, or a response that

 9   contradicts, you know, what actually happened.

10        So, I brought it up because I wanted them to know

11   that, you know, I was seeking help elsewhere since Springfield

12   wasn't trying to help, you know, the ACLU of Chicago, God

13   bless them, you know, they are fighting for these inmates.

14   Q.  Thank you, ███████.  I'm directing your attention to

15   the third sentence from the bottom.

16        And it says, "I was harassed, my hair was braided and

17   I was taken to seg for refusing to take them out.  I called

18   PREA."

19   A.  Yes, I did.

20   Q.  Could you explain what, if anything, happened when your

21   hair was braided?

22   A.  So, before I did my hair, got dreadlocks, I was braiding

23   my hair into four braids.  So, I have a lot of hair when it's

24   loose and it's very frizzy when it's loose, so I usually

25   braided it into four sections coming down, which they were
```

1   easily searchable.  I had been wearing my hair like that for,

2   I think, a couple of weeks.  I was going to the medical

3   building for about a week and a half, I was getting my

4   hepatitis B vaccinations, and I believe it was the -- the end

5   of the first week I had been going there I was standing in the

6   cage with all the other inmates and some of them had

7   dreadlocks that were braided.  I was standing by the door, and

8   this female lieutenant, she was walking past the bars and she

9   had seen me and she had told me that I couldn't have braids in

10  my hair, that I needed to take them out because it was a new

11  rule.  And, you know, I refused to take the braids out of my

12  hair.  I said, "That's ridiculous, I'm not taking the braids

13  out of my hair."

14  Q.  █████████, may I just ask a question?  What did your

15  braided hair mean to you as a transgendered woman?

16  A.  It wasn't only a way for me to, you know, groom myself to

17  be presentable, it was also a way to, you know, express my

18  gender identity.  And, you know, she had gotten another C/O to

19  come to the bars and he told me to take the braids out of my

20  hair.  I refused to again, so they told me to cuff up.  I

21  cuffed up, they took me to the body scanner and they scanned

22  me and then they walked me to seg.

23          I was in seg for a week and a half before I seen the

24  Adjustment Committee, and then they -- I asked them if it was

25  a rule violation to have braids in my hair and they told me

1    that it wasn't.  They said they would just give me, you know

2    -- that they would only find me guilty for the insolence for

3    refusing to take the braids out of my hair.

4            And, yeah, so they kicked me out of seg the day after

5    I seen the committee.  They -- When I was walking out of seg

6    they took me to the property area where all the inmates

7    receive their property and then go back to population.  So, my

8    property was not down there.  I had asked where my property

9    was, they said that they never brought it down to me, so they

10   walked me all the way back to the West Cell House.  I was on 9

11   Gallery -- I was moved to 9 -- I believe it was 923, and I was

12   at 923 cell for 24 days without my property.  The only thing I

13   had was the blues that I left seg with, and I had written

14   probably 20 requests to property to receive my property.  I

15   had spoken to three different sergeants who were working in

16   the cell house, the West Cell House, about receiving my

17   property, and they all kept telling me that they had me

18   written down to go over there and that they were going to get

19   it to me and stuff.

20           So, after 24 days I realized that this was an ongoing

21   form of harassment because of not just refusing to take braids

22   out of my hair, but because I had been involved with the

23   Monroe case.  So I was slow to realize that I was facing

24   retaliation.  So when I did, I called PREA, and then the very

25   day after I talked to PREA on the phone -- the day after I

1    made the PREA report on the phone, I/A, they came and got me

2    out of my cell, they told me that they were going to write me

3    a ticket for calling PREA and it was only for inmates who are

4    raped.  I informed them that PREA was also for sexual

5    harassment and I told them I thought I was being harassed for

6    being transgender and I was being retaliated against and

7    that's why they were refusing to give me my property.

8         So, when I explained that to them they didn't write

9    me a ticket, even though they threatened to.  They immediately

10   walked me over to Property, they gave me all of my property

11   and, you know, they took me back to my cell and that was the

12   end of it.

13        MS. GARCIA:  Curtis, could you zoom back out to the

14   full document, please?  And could you go to the second page of

15   the document?

16   Q.  (By Ms. Garcia) ▰▰▰▰▰▰, do you see that document?

17   A.  Yes, I see it.

18   Q.  Did the Administrative Review Board recommend that you not

19   stay in protective custody?  Did they deny you protective

20   custody?

21   A.  They did deny me protective custody.  I know they kept

22   trying to get me to transfer to another medium security

23   prison.  I had been refusing a transfer to medium security

24   prisons.

25   Q.  Okay.

1   A.  My security level had been medium for about two years now,

2   but I didn't feel safe.  You know, I don't feel safe anywhere

3   outside of my cell.  I was --

4   Q.  ████████, just --

5   A.  I'm sorry.

6   Q.  ████████, can you give me one moment, please?

7       MS. GARCIA:  Your Honor, we would like to enter

8   Exhibit 43 into evidence.

9       THE COURT:  43 will be admitted.

10  Q.  (By Ms. Garcia) ████████, you mentioned that you were

11  being offered to transfer to a medium prison -- security

12  prison.  Were those male prisons?

13  A.  Yes, those were all male prisons, like the medium security

14  unit of Menard, which I think they called The Hill, the

15  counselor submitted me to go up there.  I refused to go up

16  there.  I just continue to keep signing into protective

17  custody.

18  Q.  Okay.  Were you offered to go to any female medium

19  security prisons, like Logan?

20  A.  No.  No, I had put in my own submission to go, and they

21  gave me a piece of paper that said per mental health review I

22  was not eligible to go to Logan at that time, and that was the

23  only thing they gave me.

24      I did want to add that when the Tac Team shook us

25  down it was shortly after I had called PREA about, you know,

1   being taken to seg for having braids in my hair.  I had

2   braided my hair again.  When they took me out of my cell and

3   when they took me to the chapel where they were holding all

4   the inmates, they put me in the legal phone call booth and

5   they made me take the braids out of my hair again, and one of

6   the C/Os told me that if I braided my hair again they were

7   going to shave my head.

8          MS. GARCIA:  Curtis, would you take down the document

9   so we can see ████████████?

10  Q.  (By Ms. Garcia) Now, ████████ how did it feel for a

11  guard to tell you that if they saw you with braids again they

12  were going to shave your head?

13  A.  I was scared and I was really mad, because being a

14  transwoman that's not something any woman want to hear, you

15  know, that someone is going to shave their head, especially

16  for something as frivolous as having braids in your hair.  You

17  know, it's ridiculous.  I didn't call the PREA or I didn't

18  report that, but I do remember it vividly.

19  Q.  Why didn't you report it?

20  A.  Because I was afraid of suffering more retaliation.  I

21  just took the braids out of my hair and I stopped braiding my

22  hair after that.  It was shortly after I decided to dreadlock

23  my own hair, which was difficult, but, you know.

24  Q.  I do.  Now, ████████████, in September of 2024, did you

25  apply for protective custody again?

1    A.  Yes, I did.

2    Q.  And Menard approved you for protective custody in or about

3    December of 2024?

4    A.  Yes, I was approved.  One of the C/Os -- the gallery

5    officer that worked on my gallery on 9 Gallery, he had came to

6    my cell in the morning and told me that they had looked up in

7    their computer and seen that I was labeled transgender, so I

8    was approved, and that's all they said to me.  And then they

9    moved me to 7 Gallery -- I think it was 7 Gallery, 11 cell,

10   and told me I was on single-cell status and, you know, that

11   was it, and just like that I was approved for protective

12   custody.

13   Q.  And when you lived in protective custody did you feel

14   safe?

15   A.  No, I didn't.

16   Q.  Can you explain why?

17   A.  I was still around a lot of the same inmates that I had

18   been placed in cells with inmates that I had been to the yard

19   with, inmates that have groped me, and I just -- knowing that

20   I don't have access to private showers, even though Menard

21   officials will say that I do and that -- that they have it

22   available, they are not giving them to the inmates.  So, you

23   know, it's scary that I am in a prison where I am supposed to

24   receive certain things because of the -- of the laws of

25   Illinois law now, but Menard is not -- not complying with any

1  of them even though they are writing on paper that they are.

2  So, it's -- You know, it's irritating.  And, like I said, it's

3  distressing, it's scary.  I don't leave my cell for anything,

4  I don't go to the yard.  The only thing I go to -- The only

5  thing I leave my cell for is commissary, when I walk over to

6  commissary.  And just 40 days ago my neighbor was trying to

7  groom me.

8  Q.  ▇▇▇▇▇▇▇, we are going to get -- we are going to get to

9  segregation.  Just give me a moment, okay?

10  A.  Okay.

11  Q.  I would like to show you a document that's been marked as

12  Plaintiffs' Exhibit 46.

13  A.  Okay.

14  Q.  The title of it is Declaration of ▇▇▇▇▇▇▇▇▇▇.

15  A.  Yes I see it.

16  Q.  You see it, okay?

17  A.  Yeah.

18      MS. GARCIA:  Could you scroll through the document so

19  that ▇▇▇▇▇▇ could see it?  Could you go to the last page,

20  please?

21  Q.  (By Ms. Garcia) ▇▇▇▇▇▇▇, do you see your signature on

22  the last page?  It's very faint, but do you see it?

23  A.  Yes, I do.  The seg pens they give us to write with are

24  terrible quality, they never want to work.

25  Q.  And could the date be highlighted?  Perhaps that would

1  help ███████ see that.  It's dated March 8, 2025.

2  A.  Yes.

3  Q.  Do you recognize this document?

4  A.  Yes, I do.

5  Q.  Is it your declaration that you signed as part of this

6  case?

7  A.  Yes, it is.

8  Q.  ███████, I'm going to direct your attention to

9  paragraph 4.

10       It begins with, "In or about December 2024, male

11  guards came to my cell and ordered me to leave my ID behind

12  and to cuff up or handcuff you."  Do you see that?

13  A.  Yes, I see it, I remember that.

14  Q.  And in December of 2024, did you live in protective

15  custody?

16  A.  Yes, I did.  This was, I think, two weeks after I was

17  approved protective custody is when this happened.

18  Q.  Can you elaborate what happened to you?

19  A.  So, they were doing shakedowns on all the galleries, and

20  they were doing shakedowns in a very strange way.  I had been

21  at Menard for years and I had never seen them shake people

22  down the way they were doing this.  They came to -- They would

23  do like half the gallery.  First they went to the middle of 7

24  Gallery towards the end, they took -- they cuffed all the

25  inmates up and they took them all out.  They put them in the

1    cage down on the first floor and they strip-searched each one

2    individually in the shower, and any inmate that had altered

3    clothing, like pockets sewn onto their sweatpants or pockets

4    sewn onto their clothes and everything, they would take those

5    in the shower, so they wouldn't give them back to them.  And

6    they told the inmates not to take anything, just to cuff up

7    when they left the cell, and then that's how they proceeded to

8    shake down the entire gallery.

9            They came to my cell and they did the same thing.

10   They told me not to grab anything, to turn around, cuff up, so

11   I turned around and cuffed up.  They walked me down to the

12   cage with all the other inmates, and one by one they took each

13   of us into the shower and they strip-searched each one of us

14   just like that.

15           I had a pocket sewn onto my sweatpants and they had

16   taken those from me, they told me I couldn't have them back,

17   so they walked me back to the cage in my thermal bottoms, so I

18   just had a T-shirt and my thermals on.

19   Q.  And, ████████, when they took you to the showers --

20   And, I apologize.  I misspoke.  I said 4, but it's paragraph

21   7.

22           When they took you to the showers and you were

23   strip-searched, did the male -- was it a male guard that

24   strip-searched you?

25   A.  Yes, it was three male officers.  So, when I walked into

1  the shower they directed me to the corner of the back of the

2  shower, and it was just three officers, they were all standing

3  next to each other and they strip-searched each one of us just

4  like that.

5  Q.  How did it feel to be strip-searched --

6  A.  It make me feel -- I'm sorry.

7  Q.  Let me repeat myself, ███████.  How did it feel to be

8  strip-searched by the male guard?

9  A.  It was very uncomfortable.  I had never seen inmates

10  strip-searched like that before, so I felt like it wasn't just

11  -- They weren't just looking for things.  There was something

12  else they were doing on top of it.  Like I don't know if they

13  were trying to, you know, get some sort of sexual

14  gratification from strip-searching the inmates like that, but,

15  you know, it made me feel very uncomfortable.  It's like for

16  the first time -- I had been strip-searched before at Menard,

17  but that was the one time I was strip-searched at Menard and I

18  felt like this was wrong, this wasn't supposed to be

19  happening.

20        And they had taken -- A lot of inmates who did have

21  altered clothing -- You know, not all of them were wearing

22  thermal bottoms.  Luckily I was wearing thermals.  Some of

23  them were just wearing underwear.  So everybody that had

24  altered clothes, they had to walk back to their cell, some

25  inmates were in underwear and just like that, just shower

1    shoes.  Like I said, it was --

2    Q.    ████████████, when you said that some other inmates were

3    just wearing their underwear, did that include transgender

4    prisoners at Menard?

5    A.  Yeah, well, I was the only transwoman on the gallery on my

6    side, on my half of the gallery that was strip-searched.  But

7    the other inmates, like I said, not all of them were wearing

8    thermal.  Some of them were just wearing underwear, so they

9    had to walk back to their cells just wearing underwear and

10   their shower shoes and their shirt.

11   Q.  I'm going to direct your attention to paragraph five.  Do

12   you see that, ████████████?

13   A.  Yes.

14   Q.  And here it says, "In or about January 2025, there was a

15   shakedown of the prison.  The guard took me and other

16   transgender women out of our cells in 10 Gallery to the body

17   scanner.  The guards mocked me and other transgender women by

18   calling us tranny and threatening to cut our hair off."

19   A.  Yes, this actually occurred right after Donald Trump was

20   inaugurated.  They had ran a cell house shakedown and this is

21   when this occurred.  So, this was a separate event from when

22   the C/O told me he was going to shave my head for having

23   braids in my head.  This was a separate time.

24        They had ran the routine cell shakedown, and it was

25   when we were lined up walking back to the cell house the C/Os

1    were standing around calling the transwomen trannies and

2    telling us that we were past due for needing a haircut and

3    stuff.  I mean, they were openly taunting us, like harassing.

4    I would call it harassing.  And if we said anything, they

5    would just walk us to seg for insolence.

6             MS. GARCIA:  Your Honor, I would like to enter into

7    evidence Plaintiffs' Exhibit 46.

8             THE COURT:  That's this declaration?

9             MS. GARCIA:  That's right, Your Honor.

10            THE COURT:  Okay.  46 will be admitted.

11            MS. GARCIA:  We can close the document.

12   Q.  (By Ms. Garcia) Now, ██████████, you mentioned earlier

13   that you spent a period of time recently in segregation.

14   A.  Yes, I have been in seg for 41 days now.

15   Q.  Are you in segregation right now?

16   A.  Yes, I am.  This was the longest I have ever been in seg.

17   Q.  Why did Menard place you in segregation?

18   A.  So, on the 18th of last month, my neighbor, he had been

19   grooming me, he had wanted sexual favors.  I realized he was

20   grooming me.  I rejected him, told him that it wasn't

21   happening.  Him and his home -- They were all Gangster

22   Disciples.  They said that they were going to stab me on

23   commissary day and steal my commissary bag.  Because I was on

24   A-grade, so I would buy a hundred dollars in food.  And

25   usually every month I would sell my commissary for money on my

1  books and that's how I make money in prison, I just sell my

2  commissary.  So, one inmate, he had sent -- he had paid

3  another inmate, he said it was a thousand dollars, apparently

4  it was drugs, and he had sent him a shank and he was two cells

5  down from me, the inmate he sent the shank to.  And on store

6  day he was paid to stab me so that he could take -- so that

7  whether he killed me or not, the C/Os would wrap me and him

8  up, and then the guy who paid him would be able to steal my

9  commissary bag.

10       So, when I left my cell on that subsequent store day

11  I had had books tied around my stomach and my chest like a

12  makeshift vest, that way they wouldn't be able to stab through

13  me.  I dropped a tip to the C/Os and let him know that I

14  received a credible threat that I was going to be stabbed by

15  some inmates on store day.

16       So, when I left my cell they had frisked me, they had

17  found the books that I had tied around my stomach and chest.

18  They had walked me to seg under investigation.  They

19  interviewed me, I told them what had happened, that my

20  neighbor was trying to groom me, when I refused his -- you

21  know, his offer and stuff, that's what led all to it.  Then

22  they told me that I had to -- you know, I had to move around,

23  that I couldn't be in protective custody anymore.

24       I have been in seg for 41 days.  Usually

25  investigation is only 28 days.  After I had been interviewed

1    by the administration they said they were going to contact

2    I/A.  I/A never came and talked to me.  I don't think they

3    really care that me specifically, you know, that my life is in

4    danger.

5    Q.  So, ██████████ can you -- Just one moment, ██████████.

6          Can you describe what it's like -- what your cell is

7    like in segregation?

8    A.  Well, I was behind the bars -- I was in the seg cell which

9    had bars for the door for 25 days.  I had had a legal call

10   with you, I believe it was on Monday, and then the day after

11   that I had had a mental health call pass with Ms. Klausing.

12   And while I was being -- While I was talking to her my cell

13   was shaken down, they said that my fan was altered, which my

14   fan was not altered, because they brought my fan to me.  But

15   they said that my fan was altered, there was extra fan parts

16   in my cell, like fan coverings and a fan stand, which was

17   stuff that was already in the cell that they had moved me

18   into.  So, they had given me unauthorized property tickets.

19   They gave me a lot of tickets, just a bunch of tickets, and

20   then they moved me out of that cell into -- which was 714

21   cell, and then they moved me to 8 Gallery, 18 cell, which is

22   behind the door.  So instead of bars in front of my cell, I

23   have a door.  So, like, I have no way of -- Really, I have no

24   way of actually looking out of my cell.  When they bring our

25   steak trays to us they have to have an officer open the

1    chuckhole so that they can put our trays through it and then

2    they lock the chuckhole back up.  So, I have been in 818 cell

3    behind the door for, I think, like 16 days now, because I have

4    been in seg for 41 days now.

5           And I had seen the Adjustment Committee, they told me

6    next time if they move me into a cell and I see any -- any

7    like extra property, like pieces of fans or anything, just to

8    give them to the C/Os.  I told them I would.  I wasn't really

9    thinking anything about it, but they -- Like I said, they told

10   me they were going to look into it, especially investigation

11   about me being stabbed, and that was the last I heard from

12   them.  So, as far as I know they could have found me guilty on

13   all the tickets and given me, you know, however long in seg.

14   But, I have been in seg for 41 days and I'm SMI, so this is

15   the longest I have ever been in seg.

16   Q.  Okay.  Is the segregation affecting your mental health?

17   A.  Yes, it is.  I haven't shaved in 41 days since I left, you

18   know, protective custody.

19          They did run showers last Friday, and we are not

20   allowed to wear our jumpsuits out of our cell when we go to

21   the showers, when we are behind the door.  So, I had to walk

22   to the shower in my underwear and my shirt, and apparently all

23   the inmates who are in seg behind the door, they have to walk

24   to the shower in just their underwear and their shirts.

25          When I was behind the bars on 7 Gallery we could walk

1   to the shower with our jumpsuits on.  So, I'm not sure what's

2   up with that, but that just -- you know, that just happened

3   last week.

4   Q.   ██████████, how does it feel not to be able to shave?

5   And when we talk about shave, we are talking about your face,

6   right?

7   A.   Yes, it causes not just emotional discomfort, but it

8   causes a physical discomfort.  I have a tendency to scratch my

9   face until it's raw just because the facial hair causes a

10  physical discomfort.  I don't real fully understand it, I

11  don't know if it's part of gender dysphoria or if it's, you

12  know, just something that I can't tolerate, but I hate having

13  facial hair.  I never leave my cell without shaving first.

14  You know, I don't feel comfortable having facial hair.  I

15  would like to get the facial hair removal surgery done even if

16  I have to pay for it, but, you know, I don't have any

17  resources to do that.

18  Q.   ██████████, you mentioned that you had to walk to the

19  shower in your underwear.  How did it feel to have to walk to

20  the shower -- walk to the shower in your underwear?

21  A.   I was angry, because I was just on 7 Gallery and they let

22  us walk to the shower in our jumpsuits, so it's weird that now

23  we are behind -- inmates who are behind the door, they have to

24  walk to the shower in just their shirt and underwear, so that

25  doesn't really make any sense to me.  But, like I said, they

1    gave me C-grade tickets just for having the extra fan parts in

2    my cell and then they said my fan was altered, so because of

3    that they moved me behind the door.

4          And usually the only inmates who are placed behind

5    the door in seg are inmates who are extremely aggressive,

6    extremely violent.  They might be, you know, trying to throw

7    feces or they might be trying to, you know, commit 107s on

8    female staff.  The inmates behind the door are usually the

9    worst of the worst.  My aggression is like 7.  My aggression

10   level is very low.  My security level has been at a medium

11   since 2020.  Since the end of 2023, my security level has been

12   a medium.  So, on top of me being SMI, there's no reason for

13   me being placed behind the door.  And, like I said, all this

14   happened after my last legal call with you on that Monday.  It

15   was like two Mondays ago.  I am losing track.

16   Q.  I know you are losing track, ███████████.  Two Mondays

17   ago, this is approximately sometime in April or May of 2025?

18   A.  Yeah.

19   Q.  Okay.  Can I -- Have there been any issues opening the

20   door to your cell?

21   A.  Yeah, for some reason after my last legal call with you,

22   you know, they couldn't get my door open, couldn't get the

23   lock open, so they had to call a locksmith.  And the

24   locksmith, he almost had to take the door completely apart and

25   then put it back together, and then he left before the C/Os

```
 1   even tried it to see if it was actually going to work.  So,

 2   when the locksmith left, the C/Os tried to open my door again

 3   and it wouldn't open, so they just -- You know, for like a

 4   week they just left it like that, and then they finally called

 5   the locksmith back.  It was a different locksmith, and then he

 6   did the same thing, almost completely took the door apart and

 7   put it back together, and they had to spray a lot of WD-40 on

 8   it to get the locks to actually work, but they finally got it

 9   to work.

10   Q.  During the time they couldn't open the door -- and you

11   said it was about a week -- did you miss two legal calls with

12   me?

13   A.  Yes, I did.

14   Q.  How did it feel missing legal calls with your attorney

15   because Menard couldn't open the door while you were in

16   segregation?

17   A.  I was angry about it.  You know, there was nothing I could

18   do, so I was just even more depressed.  I don't know if

19   somebody sabotaged my door so it wouldn't open, but I wouldn't

20   put it past anybody at Menard.  But, yeah, you know, just more

21   stuff piling up.

22   Q.  Okay.  All right.  ██████████, I would like to move to a

23   few more things and wrap up, okay?

24   A.  Okay.

25   Q.  Now, you right now have an ID that you can request females
```

1  to search you, right?

2  A.  Not anymore.  I did when I was in 714 cell.  Like I said,

3  they moved me to 818 cell and they -- My ID was in 714 cell.

4  They gave me my property without any of my hygiene in it, so

5  they just gave me some of my paperwork and that was it.  My ID

6  was not in it, so my ID is missing now.  I don't know where

7  that is.  Like I said, all my hygiene, that disappeared.

8  Q.  ██████████ --

9  A.  That's the only thing I received.

10  Q.  ██████████, have you been searched by male guards in

11  2025?

12  A.  Yes, it was after my legal call with you, the day after my

13  legal call with you when I had my Mental Health call pass with

14  Ms. Klausing when they were shaking my cell down, they had

15  strip-searched me again.  It was a cross-gender strip search,

16  a male officer strip-searched me.  And a lieutenant, he was

17  standing by the door when I was being strip-searched, watching

18  me, and when I left -- when the officer had finished

19  strip-searching me and I walk past him, he said that he barely

20  recognized me.  So, I don't remember if he was the one who

21  threatened to shave my head or not.  He definitely knew who I

22  was.  I didn't really remember who he was.  But, he definitely

23  recognized me and he had made that clear to me that he knew

24  who I was.  So, I'm not sure if I am being retaliated against

25  now.  I definitely feel like they do not care that somebody

```
 1   was going to murder me in protective custody, that somebody
 2   was actively going to stab me so that the inmates over there
 3   could steal my commissary.
 4   Q.   ██████████ --
 5   A.   You know, I --
 6   Q.   Yeah.
 7   A.   It just -- It doesn't get any worse, you know, because now
 8   in protective custody, just walking over to commissary isn't
 9   safe for me anymore.
10   Q.   Just to clarify for the Court, when you were
11   strip-searched by a man so that you could attend a mental
12   health appointment, did that occur in May of 2025?
13   A.   Yes, and this was after my interview with Ms. Klausing.
14   This was after my call pass with Ms. Klausing.
15   Q.   Thank you for clarifying.  In 2025, at Menard, ██████
16   ██████, do you have access to female commissary items like
17   nail polish or eyeliner?
18   A.   They don't have any nail polish.  I do have some black
19   eyeliner.  Well, I did.  I don't know if it's still in my
20   property or not, but I did have access to that.
21   Q.   If you had access to it, would you wear it?
22   A.   Yes, I would.  I wore it in -- I was wearing it in the
23   West Cell House before I was approved protective custody.
24   Whenever I did feel comfortable leaving my cell, I would put
25   black eyeliner on.  I would like to get some nail polish, but
```

```
 1   they don't sell that down there.  Only time they did offer me
 2   a female commissary list with the cosmetics on it, you know, a
 3   lot of it -- The only stuff that I did want was black eyeliner
 4   and nail polish, so they only had the black eyeliner and some
 5   other eyeliners and stuff.  I don't feel safe -- I don't feel
 6   comfortable wearing -- you know, fully transitioning where I
 7   am at, because not only is my life in danger because of the
 8   other inmates, the administration are very clear that, you
 9   know, they couldn't be any happier about how much I am
10   suffering.  So, it's really bad down here.
11   Q.  Yeah, I really appreciate you sharing that, ██████████.
12   A.  Yeah, I -- I was going to say Centralia was going to be
13   the prison that I was going to submit for if I couldn't go to
14   Logan.  I'm not sure if they altered my security level because
15   of the tickets I just previously caught, just unauthorized
16   property tickets and stuff, but they are not -- the Adjustment
17   Committee hasn't given me a summary to any of the tickets, so
18   I don't know what's going on or what they are doing.  All I
19   know is they have me snowed in behind the door and there's
20   really nothing I can do except sit and wait.
21        I wrote to the counselor about the investigation,
22   like, you know, what's come up from it, and the counselor
23   hasn't responded to me.
24   Q.  Okay.  ██████████, I'm going to direct your attention to
25   female, quote, underwear and clothing.  In 2023, did you
```

 1  request a bra and panties from Menard?

 2  A.  Yes, I did.  No, you said 2023?

 3  Q.  Yes, I'm going back in time.  I'm going to go from then.

 4  No, you didn't?

 5  A.  I didn't receive them, no.

 6  Q.  Didn't receive them.  Okay.  Did you request bra and

 7  panties from Menard in 2024?

 8  A.  I think I did, again, but I didn't receive anything until

 9  this year.

10  Q.  And when did you receive bra and panties from Menard in

11  this year?

12  A.  I think it was February or it might have been March of

13  this year.

14  Q.  Did those items fit you?

15  A.  No, they didn't.  They were way too small.

16  Q.  Did they offer you any other sizes?

17  A.  No, they didn't.  I was told that the bras are very

18  expensive, they were almost like $20 on commissary, so that's

19  my entire state pay, so I wouldn't really be able to afford

20  one.

21  Q.  Okay.  Now, ███████, I'm going to direct your

22  attention to hormones and surgery.

23          In April 2025, did you refuse hormone therapy?

24  A.  Yes, I did.

25  Q.  Can you explain to the Court why you refused hormone

1  therapy in April of 2025?

2  A.  I had learned that the sentencing laws in Illinois might

3  be changing very soon, and if that happens I may be able to be

4  paroled out a lot sooner than I thought.  I do want to have

5  children when I get out, so I wanted to be careful about the

6  gender-affirming care that I do get, that I do receive,

7  because I don't want it to alter my sperm cell count.

8  Q.  Okay.  And, ███████████, did you also refuse

9  gender-affirming surgery specifically for your genitalia?

10  A.  Yes, I did.

11  Q.  Can you explain to the Court why?

12  A.  Because I want to have children in the future when I do

13  get out.  I was taking the testosterone blockers in 2024 for

14  about six months.  The nurses, they stopped giving me my

15  testosterone blockers, my spirolactone, they stopped giving

16  them to me.  For some reason, I don't know, I had taken two of

17  them one night, and the nurse, you know, the day after, she

18  had stopped giving them to me.  I had written a grievance.  I

19  still have it in my property, I just found it.  I never turned

20  it in because, like I said before, the grievance process down

21  here is laughable to say the least, especially the responses

22  that I get from the counselor.  When I had written a grievance

23  about not receiving my property, when I left seg after being

24  taken to seg for having braids in my hair -- I'm sorry?

25  Q.  No, it's okay.

1    A.  I was going to say, the counselor, he had responded to my

2    grievance and said that he called North 2, and they said that

3    I left seg with my property, even though I had been in the

4    West Cell House for almost a month with no property and that I

5    had been constantly writing to the property cell house

6    requesting my property.  When I wrote a grievance before

7    calling PREA, the counselor just said that he called North 2,

8    and North 2 said that I left seg with my property.  So, the

9    responses to the grievances the inmates receive are almost

10   laughable.

11   Q.  Yeah.  Even with the refusals of hormone therapy, do you

12   still identify as a transgender woman?

13   A.  Yes, I do.

14   Q.  Even refusing gender-affirming surgery for your genitalia,

15   do you still identify as a transgender woman?

16   A.  Yes, I do.  I had been nonbinary -- nongender-conforming

17   most of my life.  It was in 2023 that I decided to transition

18   to transwoman.  Like I said, I do want to get the facial hair

19   removal surgery, like I said, even if I have to pay for it on

20   my own.  I just need the resources to be able to do it.

21          When I had talked to the nurse about the facial hair

22   removal surgery, she said that it wasn't elective or that I

23   wasn't able to, like, choose if I wanted it or not, so it's

24   just something I will probably just have to do when I get out.

25   Q.  ████████, can you tell the Court how do male guards at

1    Menard treat transgender prisoners?

2    A.   Like we are jokes, like we are here to amuse them.

3    Q.   And does this --

4    A.   Like we are not people.

5    Q.   ████████, how does this behavior affect your ability to

6    transition?

7    A.   Severely.  It completely prevents it.  And it's sad that

8    even being SMI, not being able to receive treatment for any

9    type of mental illness or mental disorder, you know, Menard is

10   just -- they have proven to be incapable of actually treating

11   inmates and rehabilitating them.

12   Q.   If you could transfer out of Menard where would you like

13   to go?

14   A.   I would like to go to Logan Correctional Center.  I know

15   that the other transwomen there are definitely given the

16   gender dysphoric treatment and gender-affirming care that they

17   need, and I feel like in a male prison the way I have been

18   refusing to transfer to male prisons is because it's a lot

19   more dangerous, because the doors are always unlocked, so

20   anybody can go into your room any time of the day.  The C/Os

21   can't be anywhere at all times, so I don't feel safe being in

22   male prisons, which is why I have been refusing to transfer.

23   You know, I stay in my cell, I don't leave my cell, I shower

24   in my cell.  The only reason I do leave my cell and have been

25   leaving my cell is for my legal calls with you and also to

```
1    walk over to commissary, but now going to commissary might not
2    be an option anymore.
3    Q.  Thank you, ███████████.  I have no further questions.
4         THE COURT:  All right.
5    A.  Thank you.
6         THE COURT:  ███████████, Defense Counsel will have
7    some questions for you.
8    A.  Okay.
9
10                      CROSS EXAMINATION
11   BY MR. PENN:
12   Q.  Hi, ██████████.  My name is Justin Penn.  I represent the
13   Defendants in this case.  Can you see me and hear me okay?
14   A.  Yes, I can.
15   Q.  Okay.  I have just got a few questions for you.  I don't
16   think it will take long.
17        How long have you been imprisoned with the Illinois
18   Department of Corrections?
19   A.  Since June -- No, since May of 2022.
20   Q.  And do you know what was the charging offense or crimes
21   for which you are currently serving a sentence?
22   A.  Yes, I was convicted of first-degree homicide.
23   Q.  Have you ever filed a transfer request?
24   A.  Yes, I have.
25   Q.  And where did you want to go?
```

1    A.  To Logan Correctional Center.  They denied me -- They had

2    given me a paper that said per mental health review I was not

3    eligible to go to Logan at that time, and that was the only

4    time I had requested a transfer.  And administration -- I'm

5    sorry.

6    Q.  No, go ahead.

7    A.  I was going to say the administration submitted me to

8    transfer to the medium security unit side of Menard at the end

9    of 2023, when my security level dropped to a medium, but I

10   refused to go there and I continue to sign into protective

11   custody.

12   Q.  With respect to the denial to go to Logan, do you know

13   what the nature of the -- what -- Why was it denied, did you

14   say?

15   A.  They gave me a paper that said per mental health review I

16   was not eligible to go to Logan at that time, and that was the

17   only thing the paper said.  There was no written explanation

18   of like when I would be evaluated or reevaluated for future

19   transfer, because I was told that I was supposed to be given

20   an evaluation to transfer and at least a reevaluation if I was

21   denied, but they never did any of that.  They just told me

22   that I wasn't eligible to go to Logan at that time.

23   Q.  Do you know what per mental health review means?

24   A.  No, not really.

25   Q.  Do you know -- Have you ever been diagnosed with any

```
 1   mental health conditions that would have --

 2           MS. GARCIA:  Objection, relevance.

 3           THE COURT:  Overruled.

 4   A.  Yes, I was diagnosed with --

 5   Q.  Go ahead.

 6   A.  I'm sorry?

 7   Q.  No, no, no.  It's okay.

 8   A.  I was diagnosed with schizophrenia and antisocial

 9   personality disorder and, on top of that, now gender

10   dysphoria.

11   Q.  I know you filed that grievance that we looked at earlier.

12   Have you filed other grievances?

13   A.  Yes, I filed grievances regarding PREAs, I have filed

14   other grievances for other issues.  I filed quite a few

15   grievances.  I don't really file that many anymore now.

16   Q.  You testified about that episode with your cellmate, and I

17   am talking about the one where the cellmate abused you.

18   A.  Yes.

19   Q.  Did you file a grievance on that one?

20   A.  No, I didn't.

21   Q.  When you're not in segregation at Menard are you

22   single-celled?

23   A.  Yes, I am now through protective custody.

24   Q.  Yeah, in segregation you testified about showers.  Are you

25   offered showers to shower individually in segregation?
```

1    A.  Yes, in segregation the showers down here are single

2    showers, so there's only like one shower in each small room.

3    Q.  You talked about your refusal to be transferred to a

4    medium male prison.  And is it fair to say that you feel safer

5    at Menard under your current conditions than you would at a

6    medium security male prison?

7    A.  Yes.

8    Q.  Do you know what your projected parole date is?

9    A.  2038.

10          MR. PENN:  If I could have just one minute.

11          THE COURT:  You may.

12          MR. PENN:  Thanks, Judge.

13   Q.  (By Mr. Penn) Thank you.  I don't have anything further.

14          THE COURT:  Any Redirect?

15          MS. GARCIA:  Actually, ▮▮▮▮▮▮▮, I just wanted an

16   opportunity to say good-bye and thank you for your testimony.

17          ▮▮▮▮▮▮▮:  Okay.

18          MS. GARCIA:  I don't have any further questions.

19          ▮▮▮▮▮▮▮:  Okay.

20          MS. GARCIA:  Good to see you.

21          ▮▮▮▮▮▮▮:  You, too.

22          THE COURT:  Thank you, ▮▮▮▮▮▮▮.  That concludes

23   your testimony.  Let's take a break, we will get the next

24   witness ready to go.  Everyone can break.  Let's say we will

25   start back at 10:55.

```
 1              COURT SECURITY OFFICER:  All rise.

 2              (Court's in recess from 10:36-11:00)

 3              COURT SECURITY OFFICER:  All rise.

 4              THE COURT:  Be seated, everyone.  We have our next

 5    witness ready by video.

 6              Jerod, we are ready whenever you are.

 7              THE COURT:  Okay.  Can you hear me okay?

 8              ███████████:  Yes, I can hear you, but I can't see

 9    anybody.

10              THE COURT:  Okay.  I think we are going to change

11    that so you can see a picture of the courtroom.

12              IT SPECIALIST:  Can you ask that individual to come

13    back in and help you again?  I think when I put you in the

14    waiting room it blanked the screen?

15              (Brief interruption in proceedings)

16              CORRECTIONAL OFFICER:  Is everything working now?  Is

17    that what you needed?

18              THE COURT:  Can you see us now?

19              ███████████:  Yeah.  Can you hear me?

20              THE COURT:  Yeah, we can hear you.

21              ███████████, before we begin I'm going to ask you

22    to take an oath.

23              COURTROOM DEPUTY:  Please raise your right hand.

24              (Plaintiff, ███████████, sworn)

25              COURTROOM DEPUTY:  Please state your name for the
```

1   record.

2              ███████████:  Good morning.  My name is ██████

3   ████████████████████ and my last name is spelled

4   ████████████.

5              THE COURT:  You may proceed.

6              MS. McCABE:  Thank you, Your Honor.

7

8                        DIRECT EXAMINATION

9   BY MS. McCABE:

10  Q.  Good morning, ██████████.  Could you give us your IDOC

11  number?

12  A.  My IDOC number is ███████.

13  Q.  And, ██████████, where are you testifying from this

14  morning?

15  A.  I am testifying from Dixon Correctional Center?

16  Q.  Are you in a private room?

17  A.  Yes.

18  Q.  And do you feel safe to share your testimony today?

19  A.  Yes, I feel safe.

20  Q.  ██████████, as I'm sure you know, we have a Court

21  Reporter here taking down our conversation.  There might be a

22  bit of lag between our video feed, so I will do my best to not

23  speak over you while you are answering.  And if I do, just let

24  me know and I will let you finish your answer, okay?

25  A.  Okay, thank you.

1   Q.   Okay.   What are your preferred pronouns?

2   A.   She.

3   Q.   And does that mean you identify as a transgender woman?

4   A.   Yes, 100 percent.

5   Q.   Have you been diagnosed with gender dysphoria?

6   A.   Yes, I have.

7   Q.   When did you receive that diagnosis?

8   A.   I received the diagnosis like 2019.

9   Q.   Did you know that you were experienced gender dysphoria

10  before 2019?

11  A.   Yes.

12  Q.   At what age did you become aware of that gender dysphoria?

13  A.   Like in my teens, like say around 11, 12, something like

14  that.

15  Q.   And then when did you begin your medical transition?

16  A.   I started my transition February 22, 2020.

17  Q.   And had you done anything to transition before that time?

18  A.   Yes.  Yes, I have, but I was constantly getting denied.

19  Q.   ███████████, I notice when you were sitting down that

20  you had a bandage around your wrist.  Are you okay?

21  A.   I'm in pain.

22  Q.   Can you tell us what happened?

23  A.   What happened was I think on Sunday, May 25th, of this

24  year, I was having a chest pain, and the officer called the

25  healthcare unit and they called me to come to the healthcare

1    unit.  And this happened around 7:25 p.m., And when an inmate

2    is going to the healthcare unit at that particular time,

3    because usually it's dark outside you have to go through the

4    van.  So a van, an officer -- two officers was in there.  The

5    driver, I can't really see his name, but the other passenger,

6    his name was Officer Jared Pipo (ph), they were in the van and

7    they proceeded to take me to the healthcare unit.  And they

8    put -- The officer that was sitting by the passenger side,

9    Officer Pipo (ph), I have had past history of him of verbally

10   threatening me and harassing me and it's all documented, and I

11   have already exhausted my administrative remedy.

12           So, upon getting to the healthcare unit, the door was

13   open, and as I proceed to step down I heard him tell the

14   driver to move the car, to move the van.  So, the van was

15   jerked, so I fell and I fell on the ground and they both was

16   laughing.  And when I got up, I got to the healthcare unit,

17   they checked me out for my chest pain, and I told them they

18   purposely got me injured purposely, so I was treated.  They

19   gave me a Ace band, ice pack, it was documented.  I've got a

20   copy of it, of the incident, and I'm getting a checkup every

21   three days.

22   Q.  You said you had been harassed before.  Did you understand

23   why you were being harassed or in what way you were being

24   harassed?

25   A.  Yes.

1    Q.  Can you tell us about that?

2    A.  Because of my gender identity as a transgender woman, I

3    was constantly getting harassed by a lot of Dixon male staff

4    members because of my being a transgender woman, and

5    constantly I have been told that we -- "You are in a male

6    facility, you are going to have to deal with it."  And when I

7    file my grievances in accordance to my constitutional rights,

8    I get retaliated over and over and over again.  So, it's been

9    a current event having been mentally traumatized and I truly

10   fear for my safety not just at Dixon, but in a male facility.

11   Q.  Now, ████████████, you just mentioned Dixon.  It's correct

12   you don't currently reside at Menard, right?

13   A.  No; no.

14   Q.  How long have you been housed at Dixon?

15   A.  I have been in Dixon now like 16, 17 months.

16   Q.  And do you -- do you want to live at Dixon today?

17   A.  No.  No, please, no.

18   Q.  Where do you want to live?

19   A.  At Logan.

20   Q.  Why do you want to transfer to Logan?

21   A.  I want to transfer at Logan as soon as possible, because I

22   feel that Logan would better care for my safety concern and my

23   sanitary risk.  And, also, being a transgender woman, it's a

24   lot of things that Logan can provide for you, as far as trying

25   to enhance your transition as far as electrolysis, that Dixon

1    does not have, and I feel like being in an environment like

2    that can help solve my safety concern and my sanity that there

3    is in any male facility I have been housed.

4    Q.  Have you requested transfer to Logan?

5    A.  Yes, I have.

6    Q.  So, are you familiar with the transfer process for

7    transgender individuals in custody?

8    A.  Oh, yes.

9    Q.  Okay.  I am going to ask you a few questions about that

10    process, okay?

11    A.  Okay.

12    Q.  Are you familiar with the TAC committee?

13    A.  Yes, I do.

14    Q.  What is the TAC committee?

15    A.  The TAC committee consists of the THAW committee -- The

16    THAWC committee, they are in charge of providing you with your

17    gender-affirming surgery.  And the TAC committee, they are the

18    ones as far as your placement, as far as getting transferred

19    to a female facility and things of that nature.

20    Q.  You've requested transfer through the TAC committee to

21    other facilities, is that correct?

22    A.  Yes.

23    Q.  How many times do you think you have requested transfer

24    through TAC?

25    A.  Probably about eight, nine, almost ten times.

1    Q.  Do you remember the first time you requested transfer

2    through TAC?

3    A.  Yes, I remember.

4    Q.  When would that have been?

5    A.  That was like in 2021.

6    Q.  So, if you are requesting transfer eight or nine times

7    since 2021, is it right that you have requested transfer about

8    every six months?

9    A.  Yes.

10   Q.  Why are you requesting transfer every six months?

11   A.  I was requesting for transfer every six months, because I

12   truly fear for my safety in a male facility because I have

13   been dealing with so many sexual abuse and harassment, verbal

14   threat, physical threat, things of that nature.  So, according

15   to the TAC committee policy you have to be on hormone for a

16   year, and I have done that.  So every six months is their

17   policy saying that if you get denied, you have to wait six

18   months and you will get re-presented, so that's the reason why

19   I always ask for presentation every six months.  And every six

20   months they always come with a different reason of denying me,

21   which does not make sense to me.

22   Q.  Well, we will talk about those reasons in just a moment.

23   If you could request transfer more frequently, would you?

24   A.  Yes.

25   Q.  I want to walk through the TAC process and your experience

1    in the TAC process.  How do you go about the process of

2    requesting a transfer for TAC?

3    A.   In order for you to request for a transfer through the TAC

4    committee you have to go through a transgender coordinator.

5    Once you bring it to up to your transgender coordinator, when

6    it's six months or time frame come around, they will present

7    you to the TAC committee and they would go through everything

8    to see if you are complying with your medication, if you are

9    -- if you are being transitioned for over a year.  So that's

10   the process every six months.

11   Q.   Do you have to fill out any forms?

12   A.   Oh, yeah, our transgender coordinator come to us and you

13   have to like sign some statement, fill out a form, and it gets

14   presented to the TAC committee on the day of your time on the

15   six month's time.

16   Q.   I'm sorry to interrupt you.  What kind of information do

17   you include on those forms or what type of information is

18   typically included on those forms?

19   A.   Okay.  On those forms are included what are your desires

20   to transfer to Logan and you have to state your reason, are

21   you -- they ask you, "Are you going through any type of sexual

22   harassment or sexual abuse," and you state the reason, the

23   time, whoever were involved in that.  And they will ask the

24   question as far as have you been transitioning for over a

25   year.  That statement has to be filled out by your transgender

1    coordinator.  And, also, last but not least, "Are you

2    complying with your medication," which I have been complying

3    since five and a half years since I started my transition.

4    I'm on hormone injection at this present moment.  So those are

5    the procedures.

6    Q.  And when you meet with the transgender coordinator to fill

7    out those papers are you forthcoming?  Do you share all of

8    your information about your gender dysphoria and your

9    treatment?

10   A.  Yes, 100 percent.

11   Q.  Why is it important to you that your transgender

12   coordinator knows all about your experiences and your medical

13   history related to gender dysphoria?

14   A.  It's important because that's one of the key notes that

15   they will present to the committee, the people that sits in

16   the panel, when they come to your transfer to Logan, potential

17   transfer to Logan.  So, that's why it's so important to bring

18   that forward to your transgender coordinator, so that they can

19   elaborate when they have their meeting about your issues and

20   your concerns, things of that nature.

21   Q.  And so once all of that work is done, you said that the

22   case -- or your case for transfer is presented to TAC.  Does

23   TAC ultimately make a decision about whether or not you

24   qualify for transfer?

25   A.  Yes.

1    Q.  And how are you notified about their decision on your

2    transfer request?

3    A.  Oh, okay.  Within like a week, no later than two weeks

4    after your hearing with the TAC committee, the transgender

5    coordinator would bring some type of form stating Dr. Puga --

6    which he is the cochairman of the TAC committee -- it would

7    state Dr. Reister, it would state the women's chief -- Chief

8    of the Women's Division, I think it's Chief Eddy, something

9    like that.  So, it would state that, and Dr. Puga would

10   basically emphasize why you were denied.  It might be because

11   of tickets that you caught, you go onto suicide watch, we just

12   need more evaluation before we decide.  So, those are the

13   things that come with the form.

14   Q.  So, we will get into the details of the denial letters

15   that you have received over the last five years, but before we

16   do that you just said the TAC hearing.  Are you normally

17   allowed to participate in those TAC hearings?

18   A.  No, not at all.

19   Q.  So you don't typically get to advocate for yourself about

20   why you want to transfer to Logan, correct?

21   A.  No, I -- No, I have only had one opportunity.

22   Q.  We are going to talk about that in a moment, okay?

23        If TAC denies your request to Logan, are you allowed

24   to reapply to transfer to the same facility -- are you allowed

25   to reapply for transfer to Logan?

1   A.   Yes.

2   Q.   Is there anything different about renewing your request or

3   reapplying for transfer?

4   A.   Yes.

5   Q.   What's different about that process?

6   A.   Okay.  What's different about that process is that they

7   will start you again from the beginning, meaning that you have

8   to start from the first day and you have to go six months, you

9   know, before they will start that process again.  You have to

10  go through the same thing as far as going through the

11  transgender coordinator to talk to you, why you want to

12  transfer to Logan, are you complying with your medication.

13  So, it's basically the same thing.  You have to go through the

14  same thing again from the beginning.

15  Q.   Do you have to show that you have made progress on

16  whatever reason you were given for denial the previous time?

17  A.   Yes.

18  Q.   So, for example, if you -- Well, you know what?  Let me

19  ask a different question.

20          This isn't the first time that you have testified

21  before this Court, correct?

22  A.   Correct.

23  Q.   You testified about the conditions and treatment in

24  Pinckneyville back in October of 2023, is that right?

25  A.   Correct.

1    Q.  Okay.  Approximately how many times did you request

2    transfer to Logan before you testified in the Pinckneyville

3    case?

4    A.  Before the Pinckneyville case, like five, six, seven times

5    at the most.

6    Q.  What kind of feedback were you getting from TAC about

7    those requests to transfer?

8    A.  "We need more observation, you just caught a minor ticket,

9    you went on suicide watch," things of that nature.

10   Q.  Were you getting any indication from TAC that you would be

11   a good fit for a transfer to Logan before you testified at

12   Pinckneyville?

13   A.  Yes.

14   Q.  Were you getting any positive feedback from the TAC

15   committee about your transition journey or your behavior,

16   discipline reports before the Pinckneyville hearing?

17   A.  No.

18   Q.  Did you ultimately think based on TAC's feedback that you

19   would be able to transfer to Logan at some point?

20   A.  Yeah, I was praying on that.

21   Q.  Why did you think you would be able to transfer to Logan?

22   A.  I know for a fact that I will be able to transfer to

23   Logan, because honestly I have done everything that they have

24   asked me to do to be a potential candidate to transfer to

25   Logan.  I have proved to them that I am -- I am 100 percent

1    into my transition, I've proven to them that I am not a

2    violent person, I've proven to them that I am 100 percent

3    compliant with my medication.  But it seems like it's always a

4    roadblock, it's always a different reason that they deny me

5    constantly and constantly.  And when I bring up my situation

6    as far as my safety concern, they never seem to want to

7    address it.  It's always the ticket, suicide watch, you are

8    going on hunger strike, protesting how your constitutional

9    rights were being violated, so they were never really

10   concerned about my safety concern, things of that nature.

11   Q.  I want to back up and ask you about a TAC meeting that

12   happened in May of 2023.  Did you request transfer in May of

13   2023?

14   A.  Yes, I did.

15   Q.  Were you ultimately denied your request to transfer to

16   Logan?

17   A.  Yes, I was.

18   Q.  Do you know why you were denied at that time?

19   A.  At that time they said due to -- I think they said due to

20   my charges, and then it says that due to my vulnerable status

21   and predator status, stuff like that, yeah.

22   Q.  And had you heard about the issue with your underlying

23   conviction and your predator status before from the TAC

24   committee?

25   A.  No, that was the first time.

1    Q.  So, the first time was in May of 2023?

2    A.  Yes.

3    Q.  Would it surprise you to know that during that meeting Dr.

4    Puga, Dr. Reister talked about how well you had been doing in

5    the program?

6    A.  Yes.

7    Q.  Did you know that they thought you had been doing well?

8    A.  Yes --

9    Q.  I apologize.

10        THE COURT:  Hold on.  One at a time.  ▮▮▮▮▮▮▮▮▮▮,

11   let her finish the question before you answer, because the

12   Court Reporter is trying to take everything down.

13   A.  I'm sorry.

14        THE COURT:  No, no.

15   Q.  I will say the question again.  Would it surprise you to

16   know that they thought you were doing well in your facility at

17   that May 2023 TAC meeting?

18   A.  Yes.

19   Q.  Did you have any hope that you would be transferred to

20   Logan based on your repeated requests for transfer?

21   A.  Yes, I did.

22   Q.  Okay.  And then in October of 2023, you testified in the

23   Pinckneyville case, correct?

24   A.  Correct.

25   Q.  What did you think would happen after you testified in

1    that case?

2    A.    After I was done testified in that case I was optimistic

3    along with the other transgender that I am going to be

4    transferred to Logan.  You know, I was really looking forward

5    to that, because I know -- I was a hundred percent sure that

6    it would definitely ease all the pain and suffering that I

7    have been subjected to.  But, to my surprise it never happened

8    and it really broke my heart.

9    Q.    After the Pinckneyville case were you ultimately

10   transferred?

11   A.    Yes, I was transferred.

12   Q.    Did you get a chance to request the facilities you wanted

13   to be transferred to after that hearing?

14   A.    Yes.

15   Q.    Which facilities did you request?

16   A.    I request for Logan, and then my last option was Graham

17   Correctional Center.

18   Q.    Were you transferred to either Logan or Graham after the

19   Pinckneyville hearing?

20   A.    No, I wasn't.

21   Q.    Were you told that you would be transferred to Logan or

22   Graham after the Pinckneyville hearing?

23   A.    Yes.

24   Q.    And instead of being dropped off at Logan or Graham after

25   that hearing where were you dropped off?

1   A.  Well, unfortunately I was dropped off at Dixon

2   Correctional Center.

3   Q.  To make sure I understand, you were told you were getting

4   taken to Logan or Graham, and instead they took you to Dixon?

5   A.  Correct.

6   Q.  Did you understand why you were being transferred to

7   Dixon?

8   A.  Yes.

9   Q.  Why did you understand you were being transferred to

10  Dixon?

11  A.  I was told by the transgender coordinator at that time at

12  Pinckneyville, I think Ms. Molly, something like that was her

13  name, she stated transgender coordinator at Springfield

14  decided to transfer me and others to Dixon Correctional

15  Center.

16  Q.  Did you understand why?

17  A.  I don't understand why, but I was told that it was done by

18  the Transgender Coordinator Douglas Stephens, or something

19  like that, that was his name.

20  Q.  How did it feel to think you were in a van on the way to

21  Logan and instead to find yourself at Dixon?

22  A.  It was devastating.  I was devastated to the point that I

23  couldn't get up for almost a couple weeks or so.

24  Q.  Did it impact your mental health?

25  A.  Oh, yes, it does.

1    Q.  In what way?

2    A.  In the way I completely shut down, I didn't want to speak

3    to nobody, didn't want to eat for almost ten days not because

4    I was on hunger strike, because I was just -- I didn't want to

5    be bothered by everything.  But then after that I had to get

6    out of that mood and keep praying and hoping that one of these

7    days it's going to happen.

8    Q.  Why do you think they told you they were taking you to

9    Logan when they weren't?

10   A.  I think they did that to maybe they think that it was

11   going to be some type of reaction in a negative way, and which

12   I am not like that, so they would rather just lie so that I

13   wouldn't react in a negative way until they get to the

14   location that they were taking me to, which was Dixon.

15   Q.  Are you still -- I'm sorry.  You know what?  Let me ask a

16   different question.

17          Were you treated any differently after the

18   Pinckneyville hearing?

19   A.  Yes, I was.

20   Q.  Can you tell us about that?

21   A.  After the Pinckneyville hearing -- I think the

22   Pinckneyville hearing was October something, if I'm not

23   mistaken.  They turned their -- Lieutenant Frank, I think

24   that's his name at Pinckneyville, called me and another

25   transgender, and they were harassing us, harassing me saying,

1    "You guys want to testify against us, we'll make your life

2    miserable, we will put you in seg."  And upon getting to my

3    housing unit, my housing unit 1B, as soon as I got there my

4    cell was totally turned upside down.  They even broke my hot

5    pot and my TV.  I had to buy another TV.  And ever since that

6    testimony happened it was just chaos, and I was just praying

7    just to get out of there because I was afraid for my life over

8    there.

9    Q.  Have you been treated any differently by the TAC committee

10   since you testified at Pinckneyville?

11   A.  In some subtle way, yeah.

12   Q.  Could you tell us about that?

13   A.  Yeah, ever since I did that hearing, it seems like the TAC

14   committee look at me in a different way.  Because every time

15   since that hearing that I have put in a request to be urgently

16   transferred to Logan because of the things I was going

17   through, the transgender coordinator always said that, "Oh,

18   they denied you."  And I can remember a couple of times it

19   wasn't even a hearing time, they had a meeting on their own

20   and my situation was brought up, and the transgender

21   coordinator at Dixon told me that Dr. Puga literally told them

22   that, "We are not sending her," you know.  So, but every six

23   months I still try to put in for it, because that's the policy

24   and that's what the Court order said that we should be putting

25   in for every six months.

1    Q.  I understand that you spoke with some people at Dixon in

2    January of this year about your desire to transfer to Logan.

3            Do you remember that?

4    A.  Yes, I definitely remember that.

5    Q.  I want to talk through that conversation.

6            Who did you speak with?

7    A.  I spoke with IDOC director, Director Hughes, and I spoke

8    to Chief of Mental Health, IDOC Chief of Mental Health, Dr.

9    Melvin Hinton.

10   Q.  How did that conversation happen?  How did that come

11   about?

12   A.  Okay.  I remember on January 22, 2025, I happened to -- I

13   came back from healthcare unit, as a matter of fact, and when

14   I got to the dayroom I saw like 16 or 18 Springfield members.

15   And I didn't know who Dr. Melvin Hinton was.  I know his name,

16   but facially I never met him, the director.  So, as I was

17   approaching my cell I happened to greet all of them, and the

18   director, Director Hughes, said, "How are you doing?"  And, "I

19   am I am fine."  And she saw my name on my ID.  "███████████,

20   how are you doing?"  And I said, "Fine."  And she said she got

21   a lot of my letters, and I started to cry and I poured myself

22   out asking for them to intervene on my issue.  So I was

23   showing them most of my documents, my PREA complaint, I was

24   sexually abused and harassed.

25   Q.  Really quickly, before you get too far, you are saying all

1    your letters.  Why had you been sending letters to Director

2    Hughes and to Dr. Hinton?

3    A.   Okay.  Well, I was sending letters because I was seeking

4    their help, their intervention on my issues.

5    Q.   And your issue, what do you mean by that?

6    A.   That I fear for my safety in a male facility.

7    Q.   So, you were reaching out to them, in addition to the TAC

8    committee, to get a transfer to Logan, is that correct?

9    A.   Yes.

10   Q.   Okay.  I am sorry for interrupting.  Continue.  So, you

11   are speaking with Director Hughes.  What else are you talking

12   about?

13   A.   As I started my statement, Director Hughes and Melvin

14   Hinton asked me that I should sit down.  And I sat on the

15   table and I was trying to show them all my documents that they

16   were looking at.  And I was asking them I would like to be

17   transferred to Logan, because I fear for my safety at Dixon or

18   any other male facility.  And I was showing them numerous

19   documents of my PREA complaint, being sexually abused and

20   harassed by inmates and staff.  So, Director Hughes informed

21   me that, "I guarantee you that Dr. Melvin Hinton will get you

22   videoconference interview with the TAC committee so that you

23   can express yourself to them and get transferred to Logan,"

24   and I told them I really appreciate it.

25   Q.   Okay.  And did you -- had you ever been opportunity to

1    speak to TAC over a video feed before?

2    A.  No, never.

3    Q.  When you were talking to Dr. Hinton did your predator

4    status also come up?

5    A.  Yes, I definitely brought it up.

6    Q.  Why did you bring it up?

7    A.  I brought it up because it seemed to be a roadblock for me

8    in the past, because they keep bringing it up.  And I was

9    telling Dr. Melvin Hinton that I'm not a predator.  This

10   incident happened in 2009, when I was -- when I was

11   incarcerated at that time, and at that time I wasn't a

12   transgender, I was just feminine, you know.  So I was

13   explaining to him that I was the one that filed a complaint on

14   the individual, a guy, but then I went home three days later,

15   and when I came back on this time right now, on the charges

16   that I am in right now, I realized that they put predator on

17   me and that individual for no reason whatsoever.

18   Q.  So, you were talking to Dr. Hinton about downgrading your

19   predator status, as I understand it, correct?

20   A.  Yes.

21   Q.  Based on that conversation with Director Hughes and Dr.

22   Hinton, how did you feel about the possibility that you could

23   transfer to Logan?

24   A.  I was optimistic by it coming from both of them.

25   Q.  Why were you optimistic?

1    A.  I was optimistic, because once I laid all the foundation

2    down as far as my issues, my safety concern, predator status,

3    they told me they would make sure that I transferred to Logan

4    and they would grant me the opportunity to express myself to

5    Dr. Puga and to all the chair people and the TAC committee.

6    And eight days later, like ten days later I was granted -- I

7    was granted the opportunity to speak to the TAC committee.

8    Q.  How did you feel when you were granted the opportunity to

9    speak to the TAC committee?

10   A.  Oh, I cried.  I was so happy, I was full of joy.

11   Q.  Why were you so happy?  What did that mean for you to be

12   able to speak to them in person -- well, over video?

13   A.  I was happy, because I knew for a fact that -- Because at

14   first I was thinking that being able to speak to these people,

15   because they are so highly important people, I was thinking

16   that they would be able to reason with me, to really feel the

17   pain that I have been going through and would grant me the

18   opportunity to prove myself, because it seems like they have

19   been having these negative thoughts about they send me, if

20   something would happen, and I knew for a fact that that's not

21   the case about me.  So, I was just hoping for them to give me

22   the opportunity just to go over there and prove myself,

23   because I feel like being over there would be the best fix for

24   me to able to cope with my gender dysphoria and the safety

25   concern that I am going through in a male facility.

1    Q.  Is it common for transgender individuals to get to

2    participate in a TAC hearing by video?

3    A.  It's -- I would say yeah, because they decide who they

4    want to give the opportunity to speak to the TAC committee.  I

5    would say yeah.

6    Q.  So you knew of other people who had been able to do that?

7    A.  Yes, I knew.

8    Q.  And what happened when those other individuals got to

9    speak to the TAC committee and advocate for themselves?

10   A.  They were transferred.  I know one particular person came

11   to my mind, ██████████, she was the other transgender, she was

12   given the opportunity to speak to the TAC committee and she

13   was transferred a month and a half later.

14   Q.  So how were you feeling going into that video conference?

15   A.  I was full of joy.  Like I said earlier, I knew for a fact

16   that I am going to -- I'm going to come out victorious.  And I

17   was a bit optimistic, but it didn't happen my way, because two

18   weeks later when I was told by the transgender coordinator

19   that he had bad news for me I just literally break down and he

20   told me that I was denied.

21   Q.  And I will get to there.  But before I do that, what did

22   you do to prepare for your video conference with TAC?

23   A.  What I did to prepare was -- well, as you already know, I

24   pray on it, okay, because I'm a believer in pray.  I pray on

25   it and I had all my paperwork ready, I went through

1  everything.  Basically I just want to open up to them to let

2  them know what I have gone through since I start my transition

3  and the urgency for me to be transferred, because I don't

4  deserve to be going through this kind of treatment at all, I

5  don't; not just me alone, any other transgender.

6  Q.  And that committee meeting was on February 7, 2025, right?

7  A.  Yes, it was on a Friday.

8  Q.  Who sat in on that TAC committee meeting?

9  A.  If I'm not mistaken, it was the cochairman, Dr. Puga, it

10 was Dr. Reister, and the Chief of Women's Division.  I think

11 it's Chief Eddy, if I'm not mistaken, yeah.

12 Q.  Now, you've testified that you came in to talk about all

13 of your experiences and why you want to transfer.  What kinds

14 of things were the members of the committee focused on?

15 A.  The members of the committee, they was 100 percent

16 focusing on complying with your medication, the ticket that

17 you received lately, you going on hunger strike protesting,

18 and you have been placed on suicide watch, which is called

19 crisis.

20 Q.  How did you feel coming out of that committee?  Did you

21 feel hopeful or what were your feelings coming out of the

22 meeting?

23 A.  I was feeling hopeful, but at the same time I was thinking

24 about during the hearing they weren't even discussing about my

25 safety concern, all the PREA complaints I had, all the sexual

1    abuse and harassment I have gone through, substantiated and

2    unsubstantiated.  Because I brought it up -- Every time I

3    brought it up they always go to another thing, they weren't

4    trying to expand on -- trying to, you know, like shift some

5    type of concern.  They were just focusing on, "Oh, okay, you

6    are complying with your medication.  Oh, you caught a ticket,

7    minor ticket.  Why is that?  You went on Crisis, why is that?

8    Well, that's not -- It seems to us that you are not mentally

9    stable."

10   Q.  How did you feel about the likelihood that your transfer

11   request would be granted after that February TAC meeting?

12   A.  To be honest with you -- and I am saying this from the

13   bottom of my heart -- I was 50/50.  And the reason why I say

14   50/50, they weren't trying to listen to me for my safety

15   concern.  That's the thing that makes me think otherwise,

16   because I think that that's -- I know for a fact that's the

17   most important thing, your safety, you know, but they weren't

18   trying to talk about that.  They were trying to talk about

19   other things that I felt like doesn't make sense when we are

20   discussing safety and sanity.  So, that's the reason want me

21   to say it's 50/50, that I wasn't sure and I was just leaning

22   towards the right and I was leaning towards the right.

23   Q.  And you said their main concern was medical, like

24   complying with hormone treatment.  Are you complying with your

25   hormone treatment?

1    A.  100 percent, yes.

2    Q.  And they also, you said, cared about your tickets.  Have

3    you been -- Have you done what you need to do to maintain a

4    good record?

5    A.  Yes, I have done.

6    Q.  And was your transfer request ultimately approved?

7    A.  No, it wasn't approved.

8    Q.  Why did you understand that it wasn't approved?

9    A.  I understand that it wasn't approved, because two weeks --

10   on February 24th, yes, if I'm not mistaken, February, 17 days,

11   I was given the opportunity to speak to the TAC committee, I

12   received a letter from the transgender coordinator, from Dr.

13   Puga saying that I was denied because of various reasons, you

14   know, so that's what happened.

15   Q.  What reasons were you given for being denied?

16   A.  They said -- They mentioned tickets, they mentioned that

17   not mentally stable, if I'm not mistaken, they mention about

18   your predator and label status, and they said, I think, your

19   charges or something like that, yeah.

20   Q.  Did they ask you to participate in any sort of treatment

21   program?

22   A.  Yeah.  Yes, they did.

23   Q.  What was that program?

24   A.  For the first time since I have been requesting for

25   transfer they finally came up with saying that, "We would like

1  for you to participate in a sex offender program," in which

2  that's the first time I have ever heard that.  So that's what

3  they were saying.

4  Q.  So although you had applied for transfer eight times

5  before that, this was the first time that you heard that was a

6  requirement for your transfer?

7  A.  Yes.

8  Q.  And do they offer that program at Dixon?

9  A.  No, they don't.

10 Q.  Have you continued to work to meet the requirements that

11 the TAC committee sets out for your transfer?

12 A.  Yes, I have.

13 Q.  How has this process of continuing to request transfer and

14 continuing to get denied, how has that impacted your mental

15 health?

16 A.  It has impacted me tremendously, you know, that I am

17 trying to handle it in a proper manner.  I mean, I literally

18 cry every day, because I'm constantly going through

19 mistreatment.  And once I file my grievances on it I get

20 retaliated again by staff members who are writing me a false

21 disciplinary ticket just to hinder my transfer to Logan,

22 because they know for a fact if you catch a ticket it's going

23 to hinder your transfer to Logan Correctional Center.

24 Q.  ███████████, how do you feel like you have been treated

25 by the TAC committee?

1    A.  Not fair.  I feel like I won't be getting a fair share

2    from them when it come to my transfer process to Logan

3    Correctional Center.

4    Q.  At this point has the TAC committee given you any sort of

5    clear path to be able to transfer to Logan?

6    A.  No.

7    Q.  And how does that make you feel?

8    A.  Very sad; very sad.

9    Q.  Thank you, ████████████, for your time.  I don't have any

10   other questions for you at the moment, but I think Defense

11   Counsel is going to ask you questions, okay?

12   A.  Okay.

13          THE COURT:  All right.  Cross-examination.

14

15                  CROSS EXAMINATION

16   BY MR. BRODZIK:

17   Q.  Hello, ████████████.  Can you hear me all right?

18   A.  Yes, good morning.

19   Q.  Good morning.  Just a few questions.  You testified that

20   in your discussions with the TAC meeting they discussed your

21   charges as a hindrance for you being transferred to Logan, is

22   that correct?

23   A.  Yes.

24   Q.  And what are the charges that you were found guilty for?

25   A.  I was found guilty of kidnapping and sexual -- sexual

1    harassment, something like that.

2    Q.  Do you know if it was aggravated criminal sexual assault

3    with a weapon?

4    A.  Yeah, right.

5    Q.  And was the victim of that aggravated criminal sexual

6    assault, was that a male or female?

7    A.  It was a female.

8    Q.  Do you know if that female was a minor?

9    A.  They told me the age, but they are not a minor.

10    Q.  Okay.  Do you know the age?

11    A.  Yes.

12    Q.  And what is it?

13    A.  They told me like 36, 38.

14    Q.  36, 38.  And are you aware that you are labeled as a

15    predator by the Illinois Department of Corrections?

16    A.  Yes, I wasn't aware of that until -- until this particular

17    time in prison.

18    Q.  Okay.  ████████████, you don't live at Menard, correct?

19    A.  No, I don't.

20    Q.  Have you ever lived at Menard?

21    A.  No.

22    Q.  Okay.  Earlier you had testified that after you testified

23    in the Pinckneyville case that they told you that you were

24    going to be transferred to Logan.  Can you tell me who "they"

25    is?

1   A.  Yes.  I was told by a transgender coordinator, Ms. Molly,

2   "They say it's going to be Logan or Graham Correctional

3   Center."

4   Q.  A Ms. Molly at Pinckneyville told you this?

5   A.  Yes, she was a transgender coordinator.

6   Q.  Okay.  Did you ever see any paperwork indicating that to

7   be the case?

8   A.  No.

9   Q.  Okay.  No further questions.

10          THE COURT:  Any Redirect?

11          MS. McCABE:  No, Your Honor.

12          THE COURT:  All right.  Thank you, ███████████.

13  That concludes your testimony and we can disconnect.

14          ████████████:  Thank you.

15          THE COURT:  Okay.  What time is Dr. Puga available?

16  Is that your next -- Well, let me confirm Plaintiffs don't --

17          COURTROOM DEPUTY:  Can I say something?

18          THE COURT:  Sure.  ███████████, hang on one second.

19          COURTROOM DEPUTY:  Our IT person has stepped away, so

20  if Dixon could disconnect you from the Zoom, that would be

21  wonderful.

22          ████████████:  May I call her to disconnect it?

23          COURTROOM DEPUTY:  Yes, absolutely.

24          THE COURT:  Do the Plaintiffs have any more witnesses

25  for us?

```
 1              MS. PARSONS:  We do not, Your Honor.

 2              THE COURT:  Who will the first Defense witness be?

 3              MR. PENN:  We have Dr. Puga available at 12:30, and

 4    if we wanted to we could push it up a little lit, I imagine.

 5    I haven't talked to him, but he's scheduled for 12:30.

 6              THE COURT:  Well, let's just plan on 12:30.

 7    Everybody can take a break for lunch and we will resume at

 8    12:30 with Dr. Puga.

 9              COURT SECURITY OFFICER:  All rise.

10              (Court's in recess from 11:46-12:32)

11              COURT SECURITY OFFICER:  All rise.

12              THE COURT:  Be seated, everyone.  We have Dr. Puga

13    ready to go, I understand.

14              Jerod, we are ready to go when you are.

15              THE COURT:  Dr. Puga, can you hear me okay?

16              No, we can't hear you.

17              DR. PUGA:  Yes, I can.

18              THE COURT:  There we go.  Before we begin your

19    testimony, I'm going to ask you to take an oath.

20              COURTROOM DEPUTY:  Dr. Puga, please raise your right

21    hand.

22              (Defense witness, Dr. William Puga, sworn).

23              COURTROOM DEPUTY:  Would you please state your name

24    for the record?

25              DR. PUGA:  William Puga.
```

1

2                          DIRECT EXAMINATION

3    BY MR. PENN:

4    Q.  Dr. Puga, can you give us your medical -- or your

5    education history?

6    A.  Yes, I went to Loyola University for undergraduate and I

7    got a Bachelor of Science in Psychology.  And from there I

8    went to University of Illinois and I got my Medical Doctorate

9    Degree there.  Then from there I went to Lutheran General

10   Hospital where I did my internship and residency in

11   Psychiatry, and from there I did two additional years of child

12   psychiatry training at Medical College of Virginia.

13   Q.  Are you license to do practice in Illinois?

14   A.  I am.

15   Q.  How long have you been licensed to practice here?

16   A.  I believe I was licensed in 1982.  So, since 1982.

17   Q.  I don't need you to go back that far, but could you give

18   us just a brief history of your professional work history as a

19   doctor?

20   A.  Yes, I have done several things.  I worked in private

21   practice in -- for -- in psychiatry, in both child psychiatry

22   and adult psychiatry; I worked as a hospitalist for about 17

23   years; I taught medical students who were at the University of

24   Illinois, on staff as an assistant professor.  I am also on

25   staff as assistant professor at SIU School of Medicine.  I

1  have served as a consultant to primary care in rural Illinois

2  and through OSF Healthcare.  I have -- In my work as a

3  hospitalist and at various hospitals I have had leadership

4  roles as far as directors of units at different levels as far

5  as inpatient -- adult inpatient and outpatient services; and

6  for the last eight years I have been working in the Department

7  of Corrections, the last seven of which I have been Chief of

8  Psychiatry for the Department of Corrections.

9  Q.  I think you have answered my next question, but do you

10  have a field of specialty?

11  A.  Well, my subspecialty was in child and adolescent

12  psychiatry, but in general I have practiced mostly general

13  psychiatry.

14  Q.  I would ask it different maybe.  Is psychiatry your field

15  of practice generally?

16  A.  It is.

17  Q.  And do you have any certifications or anything in

18  psychiatry?

19  A.  I am Board Certified with the American Board of

20  Psychiatry/Neurology.  I did receive a certification in -- as

21  a forensic examiner through University of Virginia, but that

22  was some time ago.

23  Q.  I'm sorry.  You said you are at the Illinois Department of

24  Corrections now.  How long have you been in that -- How long

25  have you been there?

1    A.   A little over seven years, since March of 2018.

2    Q.   What's your current job title?

3    A.   Chief of Psychiatry.

4    Q.   What are your job responsibilities as Chief of Psychiatry?

5    A.   Mostly overseeing the psychiatric treatment of our -- of

6    patients.  I am under the Office of Mental Health, and so the

7    Office of Mental Health oversees all of mental health and then

8    I, in particular, look at the psychiatric -- provision of

9    psychiatric care, that is medication, management of our

10   individuals.  I work on policy, I work on some things that I

11   share with Office of Health Services, such as I am working on

12   implementing medication for opioid use disorder through the

13   facilities, and I have been on the transgender committee and

14   was assigned for that shortly after coming into the Illinois

15   Department of Corrections.

16   Q.   In your job do you oversee other employees at IDOC?

17   A.   Only my secretary is a direct -- directly under me.

18   Q.   Do you oversee any patient care at Menard?

19   A.   Patient care is done by our vendor, and my responsibility

20   is to make sure that the vendor is doing what they should be

21   doing, but I personally do not.

22   Q.   Maybe an inartful question on my part.  With respect to

23   Menard, are you familiar with patient care there?

24   A.   To some degree, yes.

25   Q.   And are you familiar with patient care at other facilities

1    within IDOC?

2    A.  To some degree, yes.

3    Q.  Let me put it a different way.  Are you limited to

4    overseeing psychiatric work that is being done at Menard, or

5    is it for all of IDOC or something different?

6    A.  For all of IDOC.  We have approximately 30 -- 30 centers,

7    and so I don't actually go to -- go to the 30 facilities and

8    do any of the work or see any of the patients, but I will

9    consult and I will be -- I will hear from those that do, so I

10   have more of an indirect working with the individuals for the

11   most part.

12           MR. PENN:  Judge, I'm just looking at the screen.

13           THE COURT:  Hold on one second.  I don't know what --

14           MR. PENN:  We lost you, Dr. Puga, just for a second.

15           IT SPECIALIST:  Mr. Puga, can you turn your video and

16   mic back on?

17           THE COURT:  Is he frozen?  Right there.

18           COURTROOM DEPUTY:  He's good.

19   Q.  (By Mr. Penn) Dr. Puga, can you hear us?

20   A.  Yes.

21   Q.  So, Dr. Puga, we are here on a case that involves Menard.

22   Are you familiar with that case?

23   A.  Yes, I am.

24   Q.  And how long have you been --

25   A.  By the way, I can't see -- my screen says "Zoom" on there,

 1  but I don't -- I don't see anything else on my screen.

 2  Q.  We can hear you fine, but I'm sorry you can't see us.  We

 3  can see you fine, too.

 4  A.  Okay.

 5  Q.  You said you are familiar with this case.  How long have

 6  you been involved in this case, if you know?

 7  A.  Since the inception.

 8  Q.  Is it fair to say that you are one of the more

 9  knowledgeable people about the psychiatric aspects of this

10  case in that regard?

11  A.  Yes, when -- Yes, when I started at IDOC, this was under

12  Office of Health Services, and the person that was chairing it

13  at the time, or the Director of Office of Health Services,

14  felt that I was more qualified to take on the work of the

15  transgender committee, and so that's where -- You know, I was

16  placed on that committee probably, you know, fall of 2018, is

17  when I started that.  So, the things that have come up during

18  that time I have been made aware of as working committees and

19  with our working group.

20  Q.  Does that committee, the transgender committee, does that

21  still exist?

22  A.  Not as it started.

23  Q.  So, I think you have given me the intro.  I want to keep

24  us moving, because we have got another witness today.  And I

25  don't want to cut you off if you have more to say, but I want

```
 1   to move on, because I want to talk about the Transgender
 2   Health and Wellness Committee.  Are you familiar with that
 3   committee?
 4   A.  I am.
 5   Q.  I will call it THAW.  I have seen it as THAW or THAWC.
 6   You know what I mean when I say THAW?
 7   A.  Yes, I do.
 8   Q.  What is THAW?
 9   A.  THAW stands for Transgender Health and Wellness Committee,
10   and that is -- we subdivided the committees into those that
11   will oversee the mental health and physical health and we
12   separated that out from the Transgender Administrative
13   Committee, which the Transgender Administrative Committee will
14   look at more the security aspect, more or less, of our
15   transgender care, security, and placement.
16   Q.  Who's on that committee, if you know off memory?
17   A.  On the THAWC committee?
18   Q.  Yeah, the THAW.
19   A.  The THAW committee is chaired by Dr. Conway, and a few
20   other people sit on there.  She has appointed a number of
21   other people.  I sit on the committee, Dr. Hinton sits on the
22   committee as the chairman of the Department of Mental Health
23   or Chief of Mental Health, and I think she has some of her
24   nurse administrators that sit on the committee.  And nonvoting
25   -- There are nonvoting members, like Dr. Erica Anderson, who's
```

1    our consultant, and also Dr. Katz, who is an endocrinologist.

2    So they come in those meetings, also.

3    Q.  You answered this partially, but let me ask what sort of

4    issues does THAW take up?

5    A.  Well, they will look at a few things.  One of them --

6    Everybody who comes into the center and is newly diagnosed

7    with gender dysphoria, they will -- they will review the case.

8    And anything that is more relevant to the medical or mental

9    health piece of addressing with the -- regarding their care,

10   that's what they look at.

11   Q.  How often does the committee meet?

12   A.  Monthly.

13   Q.  And just generally speaking, how does it function?  Are

14   there votes?

15   A.  Yes, the people are presented who will -- as I mentioned,

16   some new people have been newly diagnosed, also people who are

17   requesting to have surgery, and so their case is presented and

18   everybody has an opportunity to -- Dr. Conway gives everybody

19   an opportunity to ask questions, to comment, and to have some

20   input into whatever the question, whatever the concern may be

21   or, you know, when they are coming in if there's anything else

22   that needs to be addressed.

23   Q.  Are hormones -- If hormones are being considered or

24   discussed, is that something that would be considered at the

25   THAW committee?

1    A.   Only if there's an issue.   Hormones are handled by the

2    physicians themselves as far as, you know, they don't need to

3    go to committee to get them approved for hormones.

4    Q.   That was my next question.   Then you said with respect to

5    surgeries.   Do you know how many surgeries have been performed

6    for inmates at Menard, just roughly, if you know?

7    A.   At Menard?

8    Q.   You can start generally at IDOC and then I was going to

9    ask you about Menard.

10   A.   I believe there have been at least five, and we have a

11   list of people that are preparing for surgery.

12   Q.   And anything else you want to share with us about THAW?

13   A.   Well, our endocrinologist is on most of the time, and Dr.

14   Katz has been wonderful.   You know, we have the other

15   physicians from the other facilities that is being presented

16   there, too, but it's an opportunity to also discuss other

17   nuances regarding hormone, hormone treatment and, as I

18   mentioned, Dr. Erica Anderson, who's our consultant and who,

19   herself, is openly, you know, transgender and postsurgical,

20   etcetera, and she's been very, very helpful in the running and

21   the working and the understanding of the committees.

22   Q.   I am going to ask you to look at an exhibit I sent you.

23   It's not marked for you, but it's going to be marked

24   Defendants' Exhibit 2.   It's a -- It's that flow chart.   Do

25   you know what I mean when I say "flow chart"?

1    A.   Yes.

2              MR. PENN:   Your Honor, may I approach?

3              THE COURT:   Approach me?   Yes.

4              MR. PENN:   It's a little weird to turn.

5              THE COURT:   Yeah, it is a little weird.

6    Q.   (By Mr. Penn) Dr. Puga, do you know what this document is?

7    A.   Yes, I do.

8    Q.   What is it?

9    A.   Something I created to try to make heads and tails out of

10   what we wanted -- what we want performed for our transgender

11   population, so I created it to help people understand the

12   various intricacies of dealing with this, yes.

13   Q.   Can you walk us through -- I don't want to spend a ton of

14   time on it, but I would like for you to decipher it, if you

15   can.

16   A.   Uh-huh.   It's a complicated process, and this is something

17   I have presented to our mental health staff several times as

18   far as trying to kind of explain, go through it.   And when

19   there have been changes and modifications, you know, I have

20   given them -- given them this.   And, actually, this is the

21   newest version.   But, I will -- I have looked through this

22   with them just to make sure that they know how this is to be

23   done, because it's complicated and there's a number of things

24   that come into play.

25              So, whenever there's a disclosure either at the

1    receiving center or at the facility, then there's a couple of

2    things that go on at the receiving center.  There's -- You

3    know, first of all, everybody gets a tool kit brochure if they

4    have transgender issues or gender dysphoria or what have you,

5    gender issues.  And the tool kit brochure kind of looks at

6    what is done in our department, what is available to them, how

7    to access treatment, etcetera.  So that's the first thing

8    that's done.

9           From there, if they come in through the receiving

10   center, then if they are on medications, hormones, they

11   continue on it, and then they also have a mental health

12   evaluation.  You know, we at that point will take a look at

13   celling needs and what have you if they are coming in from the

14   R&C.  New disclosures into the facility, they get a tool kit

15   brochure, but at that point they also go to the psychiatric

16   evaluation.  So, the pivot point is the psychiatric

17   evaluation.  So, there are two forms that I request, ask them

18   to do; one is the diagnostic evaluation, if they have not had

19   one, or the progress note if they have already had a

20   diagnostic evaluation in a form that we created we call DOC

21   0701, which is the DSM criteria regarding gender dysphoria

22   diagnosis.  So they have it right there plain and simple, you

23   know, do they match this or do they not, and then at that

24   point a couple of important questions that need to be answered

25   before they can move on to hormones, such as do they -- are

1    they -- do they have capacity, do they have anything that

2    would impede their capacity to make decisions, as well as are

3    they -- is their mental health relatively controlled, stable.

4    And some of those questions that they --

5    Q.  Sorry.  Before you go to the next level, let me ask you,

6    there was one point that I -- over in the box on the left

7    under Disclosure at R&C, there's "MHE within 14 days," do you

8    see that?

9    A.  Yes.

10   Q.  What's MHE?

11   A.  Mental health evaluation.

12   Q.  So, does that mean that is to be performed within 14 days

13   of receiving?

14   A.  Yes, of disclosure, yes, uh-huh.

15   Q.  Okay.  Sorry, go ahead.  Continue.

16   A.  So, then if they are confirmed and have the diagnosis,

17   then at that point they are confirmed with gender dysphoria,

18   we put it on our -- what we call our problem list, which is

19   actually the medical list of issues that we deal with, so

20   everybody knows as far as medical folks and all and that

21   becomes something that is -- that's evident on the patient's

22   medical chart.  Then we have several things we do.

23         Identification, you know, we have a process where

24   they have -- where if -- on their ID it will say, you know,

25   the gender identification if they choose to put that on there.

1   More importantly, there's search preferences on the back of

2   their ID, and so they are asked to fill out a Form 0655, which

3   asks them their search preference, it asks them their gender

4   preference and approval to put that on the back of their card.

5   We modify the Offender 360, our offender management system,

6   and that's something that -- so certain people are allowed

7   access to that privileged information in order for security

8   and all.

9        We also refer them to Medical so they can have a

10  physical exam and they just determine whether they should be

11  on hormones or what have you or can be on hormones or want to

12  be on hormones, and then at the parent facility then at that

13  point we do a deeper dive as far as getting some more history.

14  The 0400 looks at the gender journey.  We make sure that we

15  look at the treatment plan as far as we have some groups that

16  we have available for transgender folks, we have other things

17  that we may do for them given their -- this particular issue,

18  so we want to make sure that that happens, and we schedule

19  them with the THAW committee to take a look at just to

20  present, just to make sure everything is working out the way

21  it should for that particular person.

22       While they are there, on an ongoing basis every six

23  months we review -- we do something called -- fill out the

24  0700s, which looks at whether there are any concerns about

25  their placement, whether there are any concerns about

1   accommodation, etcetera.

2   Q.  Can I stop you there?  I want to stop you there.  You add

3   a biannual review?

4   A.  Yes.

5   Q.  So, that's done every six months.  And who is that done

6   for?

7   A.  That's for everybody, everyone who is on our transgender

8   -- on our transgender list.

9   Q.  So everyone is reviewed every six months?

10  A.  That's correct.

11  Q.  Okay.  I interrupted you.

12  A.  That's correct.  And then at that point if there are

13  concerns or what have you, then there's a channel to working

14  -- working through that.

15          And then, there again, the other arrow, for later if

16  they are interested in gender-affirming surgery, there's

17  another process.  Now, there's further things we do beyond

18  this, but, you know, obviously we can't put everything down.

19  And, like I said, this I made specifically for our mental

20  health staff so they could understand, and so their role in

21  the gender-affirming surgery is that everything kind of goes

22  through and they are approved for surgery through the THAW,

23  then we provide letters of recommendation and we help with

24  that piece.  So, I wanted Mental Health to know exactly what

25  their role is in helping our folks with gender dysphoria.

1    Q.  Thank you, Doctor.  You can put that aside for now.

2    A.  Okay.

3    Q.  I want to ask you some questions about the Transgender

4    Administrative Committee, or TAC.  Do you know what that is?

5    A.  Yes, I do.

6    Q.  What's TAC?

7    A.  I sit as a cochairman.  The TAC committee looks at what we

8    call Transgender Administrative Committee, it looks at more

9    security needs, it looks at housing, other accommodations such

10   as showers, other accommodations such as transfer to female

11   division -- to the opposite gender division, also the -- it's

12   called commissary.  So those are some things that we take a

13   look at.

14   Q.  How many people --

15   A.  Identification.

16   Q.  Sorry?

17   A.  Identification.

18   Q.  How many people are on TAC?

19   A.  Seven.

20   Q.  And who's on TAC?

21   A.  So, the cochairs are both myself and Deputy Director

22   Smith, and what we did was we -- I intentionally weighed this

23   more towards security, because, you know, this is -- security

24   needs to weigh in a little more heavily, so four people are

25   security.  She is on -- Actually, Chief Hammer is the Chief of

1    Operations, assigned her to be in her -- in his place.

2         Deputy Director Locke, the -- our transgender

3    coordinator; Mr. Nottingham, who is PREA coordinator; Dr.

4    Reister; myself.  And who am I missing?  Dr. Conway.

5    Q.  Conway, yeah.

6    A.  So, but nonvoting member, Dr. Erica Anderson, is always

7    with us.

8    Q.  And why did you say that you placed an emphasis on

9    security with respect to this committee?

10   A.  Because safety and security is of utmost important in a

11   very dangerous setting.  Prison is extremely dangerous, and I

12   wanted to make sure that we weren't all making, you know,

13   decisions based on, you know, mental health and not having

14   knowledge of the security aspects that -- the correctional

15   aspect.  It's very important to consider.

16   Q.  I am going to --

17   A.  And, frankly, there was one situation where we looked at

18   this and the vote came down and it was 4-3, and all Security

19   voted one way and all Mental Health voted another.  And but

20   that was -- I thought it was perfectly fine, because you know

21   what?  This was about a safety and security issue, it wasn't

22   about -- You know, we have had a lot of security issues since

23   we started bringing transgender females over to Logan, and we

24   want to make sure that we make a right decision, that we make

25   a safe decision, that we -- you know, and so there are some

1    things that we don't know that they know, and so we need them

2    to contribute more heavily on that with those answers.

3    Q.  I'm going to ask you to -- I sent you the document called

4    TAC Transfer Request Presentations at the top.  Do you know

5    what I'm talking about?

6    A.  Yes.

7    Q.  I'm going to ask you some questions about that.

8           MR. PENN:  Your Honor, may I tender this?

9           THE COURT:  You may.

10   A.  Sorry.  Let me take a look at one other place.  I thought

11   I had it in this pile.

12   Q.  (By Mr. Penn) Just tell me when you have it.

13   A.  Okay.  I'm sorry.  I have it in front of me.

14   Q.  What is this document?

15   A.  This is something that I and the TAC committee came up

16   with as far as we wanted to have reported to us as we prepared

17   to review a person for transfer to the female division.

18   Q.  I want to go through these elements briefly and I am going

19   to ask you just for each one why it's a consideration.

20          So, why do you consider the reason for the requesting

21   transfer?

22   A.  Because that's pretty basic.  You know, there are some

23   people that request -- We had a transfer request, for example,

24   at one point, the reason for that was so that she can get a

25   job in another facility, it's easier to get a job, and so it's

1    like, "Okay, that's really not a transgender issue, this is

2    about being in line for a job."  And, you know, so as we look

3    further and all of that, if that was the presenting reason, if

4    that was the only reason given, you know, it didn't seem

5    appropriate.  So at that point it was like, okay, that's

6    something that's happened a different way.  Transfers are

7    handled if someone wants to go to one place to another they go

8    through the wardens and they go through whatever steps they

9    take and to determine the best placement, and I think there

10   was a time parameter on that as far as I think they can

11   request -- Anybody can request a change on an annual basis, I

12   think.  I'm not sure exactly how that works, because that's

13   under Security.

14   Q.  Is it fair to say that there's a variety of reasons why

15   people request transfer?

16   A.  Yes.

17   Q.  How about perception of safety at facility?  What does

18   that mean?

19   A.  We want to hear about, you know, is there a sense of lack

20   of safety while they are there and what might that be about,

21   and so those -- You know, because that's very important to

22   consider when it comes to transfer and, you know, we want to

23   make sure the person is in a safe environment; well, as safe

24   as it can be in a prison setting.

25   Q.  With respect to vulnerability to victimization, does that

```
 1   mean the vulnerability to where they currently reside?  I will
 2   just ask you, what does that mean?  What does vulnerability to
 3   victimization mean?
 4   A.  It could be.  That's kind of a general term.  It like
 5   where they reside, yes, and also we have something called the
 6   predator vulnerable scale that is used in our department, and
 7   I believe that goes -- The roots, I think, are in PREA, Prison
 8   Rape Elimination Act, and that's about, you know, how
 9   vulnerable are they and like, for example, their height and
10   stature.  Height and weight, their small stature, learning
11   disabilities, low IQ, things like that would be weighed in
12   that makes the person a little more vulnerable, you know, are
13   they -- are they being manipulated by other folks, are they --
14   You know, so we take a look at a number of factors like that
15   as far as assessing vulnerability, and that scale is something
16   that is used that we refer to.
17   Q.  I'm going to skip down to the bottom.  One of them on
18   there is the disciplinary record.  Do you look at that?
19   A.  Yes.
20   Q.  Why do you look at the disciplinary record?
21   A.  Because -- Because important with the PREA -- what the
22   PREA standards allow us to do is make a judgment based on
23   safety and security and an ability for the receiving facility
24   to adequately handle the individual.  So, you know, if there's
25   high security needs that are very difficult and all that would
```

1    make it difficult, you know, we need to know that.  If the

2    person is violent and aggressive and all and headed into a

3    facility with perhaps much, you know, much more vulnerable

4    people, you know, those are some things that we need to take a

5    look at, because, like I said, the standard we look at in

6    transfer is can this be safe and, you know, for everybody.  We

7    have to take everybody into consideration; can this be safe

8    and can this be -- you know, can the facility handle, you

9    know, the individual appropriately, adequately.

10   Q.  You can put that document away for now.

11          How often does TAC meet.  I can't remember if I asked

12   you that.

13   A.  At least monthly, and then ad hoc whenever we have issues

14   to consider or, you know, or if we are looking like we have a

15   backlog in patients to review we will -- You know, I think

16   last year we may have met 14, 15 times, probably.

17   Q.  I want to ask you a little bit more about the

18   considerations, just generally, that TAC looks to.  You

19   mentioned PREA.  What is PREA?

20   A.  This's the Prison Rape Elimination Act.  That kind of

21   realizes that all prisoners are vulnerable.  Every person that

22   comes into prison is vulnerable to rape and sexual abuse, and

23   so there are -- there's a lot of guidance and there's a lot of

24   work towards trying to eliminate rape and sexual assault in

25   prison, and so there are some parameters and some things that

1    have been built in in order to -- you know, to mitigate that

2    possibility.

3    Q.   What is MSR?

4    A.   Minimum sentence required -- I'm not sure.  MSR is the

5    date of release, and I believe that gets factored in.  That's

6    an operation term factored in based on -- They have a time of

7    release and then they have an MSR, if they can earn good time

8    in order to be released before that sentence.

9    Q.   And is that considered?

10   A.   We have considered it sometimes because -- because there

11   have been -- I think there was one -- at least one person,

12   there might have been a couple, that wanted to transfer and it

13   was the middle of the year and their release was in December,

14   and so then that kind of didn't make sense, because there's a

15   lot of things that need to happen before they can come over

16   and, plus, there's a transition phase that would be very

17   difficult for them and, you know, everybody else, and it just

18   didn't make logical sense for that to happen with such short

19   time left on a sentence.

20   Q.   Do you consider if someone is a flight risk?

21   A.   Yes.  You know, the women -- if they are going to the

22   women's division, the women's -- you know, you realize women's

23   division is very different than the male division, extremely

24   different.  You know, even at Logan, for example, where you

25   have minimum -- medium and maximum security folks and there

1    may be some minimum security if they need higher level of

2    mental health care, so they have all levels.  You know, the

3    security isn't tight and there is a lot more -- You know, most

4    of the women -- Vast majority of people that are there are not

5    for violent crimes, so there's more -- you know, there's a

6    little more -- So, yeah, you know, that's something that would

7    be more difficult for the -- for Logan to handle.

8    Q.  And are transgender inmates -- Well, let me ask you this.

9    Do you know when the most recent transgender inmate transfer

10   out of Menard was?

11   A.  Out of Menard?

12   Q.  Yeah.

13   A.  I don't know.  I would have to look.

14   Q.  Do you think it's in the last --

15   A.  I know we have one scheduled.  We have one scheduled to

16   go, you know, whenever -- whenever things get worked out.

17   Q.  Do you know if it's in the last month?

18   A.  Well, we approved somebody more recently.  Was that last

19   week?  And, so, usually they will get transferred within a

20   couple of weeks typically.  So there are reasons it may take

21   longer if they have a medical hold or whatever, so I can't

22   tell you exactly when or if the person has already

23   transferred, but it would have -- it will be soon if they have

24   not transferred yet.

25   Q.  I want to ask you about some of the other facilities

1    within IDOC about -- with which you are familiar.  How would

2    you characterize the challenges that other institutions face

3    with respect to housing transgender inmates as compared with

4    Menard's challenges?

5    A.  Well, you know, I keep hearing this on the national level,

6    but there aren't enough security guards, correctional

7    officers.  We don't have enough correctional officers

8    throughout our facilities.  I think there may be a couple that

9    are okay and we don't have enough mental health staff at our

10   facilities, we don't have enough medical staff at our

11   facilities.  And, you know, I think post COVID, you know,

12   those numbers even went down significantly just because, you

13   know, it's a difficult setting to work with, work in.  Most of

14   our facilities are in very rural areas, it's hard to track

15   people that have, you know, advanced degrees, and it's -- and

16   I hear that from every -- all my colleagues when I meet with

17   people from other states.  And so, you know -- So we are no

18   different than other states, but, yeah, we have our challenges

19   and sometimes institutions cycle in and out of good periods of

20   good staffing and other periods of not-so-good staffing.  I

21   don't know how to explain it.

22   Q.  That's okay.  Let me ask this.  You said that there are

23   staffing challenges.  Are there staffing challenges at most --

24   many of the prisons of Illinois?

25   A.  The vast majority, yes.  I believe we have two that are

1    fully-staffed mental-health-wise, and those are our smaller

2    institutions.

3    Q.  And then the mental health -- You said there are mental

4    health hiring challenges, as well.  Is that similar?  Is that

5    across the state?

6    A.  Yes, I think our numbers are something like -- I'm not

7    sure if this is an understatement, but more than 40 percent of

8    our positions are vacant.

9    Q.  With respect to transfers between or among prisons, so

10   when -- I am talking about now with transgender inmates being

11   transferred between prisons.  Do you have any experience or

12   knowledge of difficult transitions?

13   A.  Between other facilities, aside from going from male to

14   female facilities?

15   Q.  I am talking about transgender inmates that have had a

16   difficult transition.

17   A.  To Logan, yes; from male facilities to Logan, yes.

18   Between other facilities I --

19   Q.  Tell me about those -- Sorry.  Tell me about those with

20   respect to Logan.

21   A.  Well, it's not easy going from a male facility -- being

22   transgender female and going to a female division.  You know,

23   we -- In our interviews, three of us interview the individual,

24   Dr. Reister, the Chief of Women's Division, Chief Eddy, and

25   myself, and we always want to make sure they know that there's

1   a challenge going to the female division, because a lot of

2   people think that it's going to be wonderful, they come in,

3   the people are welcoming and, you know, it's a nice -- a

4   better environment, they can have good conversations, they can

5   do their nails, etcetera, etcetera.  And it sounds wonderful,

6   and I wish it were that way, but it's been a lot more

7   challenging than that.

8           In fact, we had somebody recently who has, you know,

9   three times approached TAC wanting to be transferred back to

10  the male division, and she said, you know, these women are

11  vicious, they are loud, they are caddy, they do a lot of what

12  she considers mean girl things, and she's been threatened,

13  she's been told, "Don't -- I know why you are coming here, you

14  are coming here to rape us."  So, she's gotten a lot of that,

15  you know, from her -- from the other cisgender females that

16  are there.  And I'll tell you, she's a sweet, kind, docile

17  transgender lady, so I was surprised that happened.  And, in

18  fact, we talked about it, strategies to be able to mingle in

19  and be able to acclimate, and we have the Mental Health work

20  with her to try to acclimate in, and that hasn't been

21  successful until finally she stopped taking her hormones and

22  she started sexually acting out there and now she's kind of

23  forced our hand.  But, she's not the only one.  There have

24  been a couple other ones who have approached us and said,

25  "Boy, this is not easy."

1    Q.  You are talking about transfers who went to Logan --

2    transgender females who went to Logan and now want to transfer

3    out?

4    A.  Yes, yes.  In fact, with the Moss Group, we had them come

5    in to work with our transgender -- our -- I'm sorry, our

6    cisgender population at Logan to try to help them and what

7    have you, and they were in a meeting and they just all walked

8    out and so they didn't accept the training and the support

9    that we were giving them to try to help them acclimate to the

10   changes that we were making.  And I'm sure that's not

11   everybody.  We have had some of our transgender females

12   acclimate very well and do very well.  It may be more

13   individual.  You know, It may just be those two or three

14   individuals that have had difficulties, but it's not an easy

15   thing to go from one facility to -- a male facility there.

16   Q.  Are you familiar with the term "presentment" as that term

17   is used to transgender individuals?

18   A.  Presentment?

19   Q.  Present, how they present.

20   A.  I haven't heard that term.

21   Q.  Let me ask it differently.  How a transgender person

22   chooses to express their gender, how they look is a term that

23   is sometimes referred to as they might present -- they look

24   traditionally more masculine or traditional, what society

25   would consider traditionally more masculine.  Are you familiar

1    with that concept?

2    A.  Yes; yes.

3    Q.  Is that something that's considered?

4    A.  Well, not as a negative, but just something to be noted.

5    For example, the person that will be transferred shortly, when

6    we met with her, you know, and she presents -- She's 5'11",

7    she said 210 pounds, and she looks muscular and she's bald,

8    and so I told her -- we told her -- Actually, I started that.

9    I said, "You know what?  One thing to understand is that just

10   the way you look may get you some attention that you may not

11   expect and may not want, because what happens" -- And the

12   feedback we have gotten from the females at Logan is that --

13   And we understand that a lot of women at Logan have been

14   victims of abuse, physical abuse, domestic violence, sexual

15   abuse, and, in fact, we do a trauma-centered approach to the

16   women at Logan because of that, and about 80-some percent of

17   the women are in the Mental Health caseload, and a lot of it,

18   like I said, because of their history of trauma, etcetera.

19   And so that's one of the things that has been very difficult

20   for women to accept is somebody, you know, looking physically

21   outwardly like a male, although she in the inside, you know,

22   feels like a woman, she's gentle, you know, she's nonviolent,

23   you know.  But, there again, on the outside she looks

24   threatening to many people.  So, though it didn't go against

25   her, we still approved her to move on, you know, it's

 1   something that we have to consider and also be able to help,
 2   you know, the women who'll be seeing her and as well as being
 3   able to build some resilience to whatever may come as a
 4   result.
 5   Q.  Do you know if the majority of requests from transgender
 6   inmates are a request to transfer to Logan?  Are the majority
 7   of requests -- Go ahead.
 8   A.  I'm sorry, I'm not sure I understood that question.
 9   Because the TAC only looks at those that are going to be
10   cross-gender transfers, so I'm not sure if someone else has
11   asked to go to a different facility.
12   Q.  Do you know who Janiah Monroe is?
13   A.  Yes, I do.
14   Q.  Who's that?
15   A.  I think she was the fourth woman to be brought over to
16   Logan from a male facility.
17   Q.  And what were the circumstances after her transfer?  Was
18   that a smooth transfer?
19   A.  Well, I interviewed her personally before and went to
20   Pontiac to interview her before she came over, and I thought
21   she would be a good candidate to move over and, you know,
22   there again a lot of -- a lot of legal pressures and what have
23   you, but, you know, she had done well for the last two years
24   at Pontiac, she was not a disciplinary problem and she had --
25   you know, she had proved that she could handle herself pretty

well, and so everything seemed to look good and -- until she transferred over.

And so from the time she transferred over there was a lot of -- lot of threatening behaviors, a lot of sexualized behaviors, I think, throughout the years.

I had one of the transgender females that I moved over from -- actually, she was from Dixon, I believe -- said to me, because she had known, she had heard about Janiah Monroe, she said, "You know what?  You don't send your worst people over first, you send your best people."  She said, "I was in the military.  You always send your best people over first."  And I know she's made it difficult for us because of her acting out and all that, and she was right.  We didn't know what to do with her, because she was so aggressive and she was threatening and she was intimidating the females and the officers.  She was sexually acting out and it was report after report after report of that.  She's had charges of rape. I'm not sure where that has gone.  You know, she has -- More recently she had sex on the yard and she was claiming that she wanted to have a family and wanted everybody else -- you know, wanted a family and so did the girl that she had sex with and then not wanting to be on hormones any longer and wanting to -- chest masculinization surgery and wanted to be on testosterone, and, you know, so extremely difficult; extremely difficult.  And then there again it's like you have to

1    segregate her in order to keep her and everybody else safe,

2    but you can't really do that.  It's not what we wish for her

3    or anybody else.  And so it's been very, very difficult.  Very

4    difficult.  She's made it -- And she's assaulted several

5    times.  In fact, I saw three videos of her -- of assaults that

6    were on videos, and two people -- one person had a seizure

7    after the assault, the other one had a very bad head

8    concussion and ended up going to the hospital.  The third that

9    I saw I think was obviously very bruised.  But, you know,

10   coming up from behind them and without notice and without

11   confronting face-to-face, coming up behind them and starting

12   to hit them with all of her might, you know, and that type of

13   thing obviously makes the whole milieu extremely scared and

14   very upset and it's difficult.

15          So, yes, I am familiar with Miss Monroe, and at this

16   point I don't think she wants to be on hormones, so she may

17   not be on hormones.  There was a time -- a period of time

18   where she didn't -- I think she might have gotten back on

19   hormones, but she didn't want to be on hormones.  Yeah, it was

20   very difficult.  She was scheduled for surgery and then she

21   didn't -- she refused the preliminary hair removal that was

22   necessary beforehand and so she was -- you know, she sabotaged

23   her -- you know, what she said she was hoping to get.

24   Q.  Where is she at currently?

25   A.  She's at Logan.

1    Q.  Is she set for a transfer?

2    A.  No.  We have requested that because of some legal issues

3    that that's going to be pending in the future court hearing.

4    Q.  Can I ask you very generally, can you explain why some

5    inmates are considered minimum, medium, or maximum level

6    security?

7    A.  Well, that's -- that's outside my realm.  I can tell you a

8    little bit about what you believe.

9    Q.  Well, here's where I am going.  I want to talk about the

10   differences in transfers, but among those, mid to max, max to

11   mid, max to medium, and then the classifications of different

12   facilities.

13        So, just generally speaking, you understand that some

14   inmates are max security, some are immediate security and some

15   are minimum, correct?

16   A.  Yes, I do; yes, I do.

17   Q.  And very generally speaking, is your understanding that

18   that's based on a criminal offense level?

19   A.  Yes.

20   Q.  Okay.

21   A.  Yes, and there's some fluidity with that.  Like, for

22   example, if someone were medium, but they wanted to go to the

23   max facility because they have special programming or whatever

24   that they need, they can go -- they can go up if they wanted

25   to, if they approve, if they agree to it.  Or, if someone is

1    minimum they can go to a medium.  But you can't go the

2    opposite way unless you have -- You can go from being max

3    security to being minimum.  But, if you are max security and

4    you say, "I want to go to this medium security place," you are

5    not allowed to.  Or if you are medium and you say, "I want to

6    go to this programming at a lower minimum security," you can't

7    do that, unless -- But there's way of revisiting your security

8    level and, you know, if you -- if you are -- you know, if

9    disciplinary and all, if you do things right, you can be moved

10   down as far as to less restrictions.

11   Q.  Do you know what PRISM is, that's P-R-I-S-M?

12   A.  Yes, I do.

13   Q.  What is that generally?

14   A.  A program we set up -- We modeled it after a program we

15   have at Danville, but it's mostly -- it's a LGBTQ program

16   that's voluntary that's set up at Centralia, and it houses

17   probably the majority of our transgender folks.  So, there's

18   some LGBTQ, and I think we have had at least one person that

19   wasn't LGBTQ, but was more vulnerable, and kind of looking at

20   -- kind of working at skill-building as far as resilience, and

21   so mostly skill building.

22   Q.  Do you know what the Transgender Center for Excellence is?

23   A.  That's a term that has been used primarily -- Yeah, it's

24   been used for the group of facilities that we have designated

25   to take care of our transgender folks in the male divisions.

1    Q.  Dr. Puga, I'm going to ask you now to look at a document

2    that I sent you that is the administrative directive from

3    2021.  It's been marked as Defendant's Exhibit 1.

4         MR. PENN:  Your Honor, I have a copy for you, but we

5    have already marked it.  Would you like me to tender a copy to

6    you?  I can give you another one.

7         THE COURT:  Yeah, if you have one that I can have.

8    Q.  (By Mr. Penn) Do you have that?

9    A.  Yes, I do.

10    Q.  Are you familiar with this document?

11    A.  Yes, I am.

12    Q.  What is that document?

13    A.  It's the administrative directive, the policy on how we

14    are to handle our gender dysphoria and transgender population.

15    It was -- I helped craft this from the -- You know, what we

16    had prior to this was very skeletal and only dealt with the

17    evaluation and treatment, but we needed -- After we were

18    having transgender committee meetings and there were a lot of

19    questions that came up and all of that and I said, "You know

20    what?  We really need something more comprehensive to deal

21    with a number things," and so this is what we had come up

22    with.  That's before 2021.

23    Q.  If you turn to page 3 of 12 -- Your top right-hand corner

24    has numbers.  So, if you go to page 3 of 12, there's a top

25    line, second -- first full sentence says, "The TAC reviews

1    shall be made on a case-by-case determination." Do you see

2    that?

3    A.  Yes.

4    Q.  You've testified quite a bit about, generally speaking,

5    but can you give me in a few words why TAC reviews are made on

6    a case-by-case determination?

7    A.  Well, because some things are -- you have to give

8    consideration to some things, and it's hard to make a blanket

9    statement when there are some -- you know, some things need to

10   be considered differently, and so we -- that's why we review

11   everything and don't say, "Okay, these are the exact criteria

12   that you are" -- It has to be looked at.  And everybody is

13   different and every situation is a little different, and so,

14   you know, we want to honor that and be able to make a decision

15   that's appropriate for that particular person in our custody.

16   Q.  Would it be fair to say that -- Strike that.

17          If you go to G, the section G, that has the

18   evaluation requirements.

19          What is that?  What is that section about?

20   A.  Yeah, so there are some things that we want to get as far

21   as a history about the individual so we can understand -- so

22   we can understand them and what their needs are and be able to

23   have some working knowledge of the individual's journey --

24   their gender journey and also understand how best to address

25   their needs.

1    Q.   Is this document still in effect?

2    A.   This document, meaning this AD?

3    Q.   Yeah, the AD.

4    A.   Well, we have taken a long time, meaning more than a

5    couple of years, to revamp this AD, and it's -- it has gone

6    through some modification.  And the new version I thought was

7    going to be out last month, or the month previous, but I think

8    there was some other questions that needed to be answered and

9    worked through before we could put out that version, so it's

10    -- this is an old working version of --

11    Q.   And you have a new -- You have been working on a new

12    version, is that right?

13    A.   Yes.  All this is in evolution.  All of this is really an

14    understanding of how this fits into our -- into corrections.

15    There's a lot of new knowledge, new understanding, you know,

16    when something is new.  A lot of it is trial and error and you

17    think that's the right way and this is the way you are going,

18    and you have to kind of revisit and relook at things as in

19    anything that is new and evolving, and there aren't templates

20    and well-trodden paths.

21    Q.   If you go to page 9 of 12, I'm going to ask you about

22    paragraph 7 talks about transports.  It says, "Whenever

23    possible at male facilities, both male and female staff shall

24    be on a transport that include a transgender offender to allow

25    search options."  Do you see that?

1    A.  Yes.

2    Q.  Are there times when it's not possible at a male facility

3    to have both a male and female staff be available?

4    A.  I have heard that that's been difficult.

5    Q.  And in those instances is it still important to perform a

6    strip search?

7    A.  Whenever people are leaving the facilities there's a lot

8    of danger that can happen and we want to keep our society safe

9    and, you know, ourselves safe and IDOC safe, so, sure, yes, it

10   is important.

11   Q.  You said you had staffing shortages at Menard.  Are

12   staffing levels, let's say in the last six months, are they

13   increasing or decreasing?

14   A.  That I couldn't tell you.  I know that just in general

15   things have been reducing and there hasn't been an increase.

16   I think a lot of the political -- A lot of the police unrest

17   in the early 2020s, with Floyd, etcetera, has really

18   discouraged a lot of people from going through the

19   correctional world, the police world, and I think it's been

20   more difficult, I think, to bring people on in these roles.

21   Q.  How about a -- With respect to transgender care, do you

22   have any job postings currently?  Let me ask you differently,

23   because it might be something new.  I'm going to ask you to

24   look at the transgender advocate document that I sent you.

25   A.  Yes, okay.  So --

```
 1   Q.  And I don't have a question yet.  Hang on.

 2           MR. PENN:  I'm going to mark this as Defendants'

 3   Exhibit -- Am I up to 4?

 4           COURTROOM DEPUTY:  4.

 5   Q.  (By Mr. Penn) Defendant's Exhibit 4.

 6           MR. PENN:  May I approach, Your Honor?

 7           THE COURT:  You may.

 8   Q.  (By Mr. Penn) Do you recognize this document?

 9   A.  Yes, I do.

10   Q.  What is that?

11   A.  That's the posting of the job for the Transition Patient

12   Advocate that we have been -- that we have worked on crafting

13   this position for our department.

14   Q.  Is this a new position?

15   A.  Yes, no one's ever been in this position before.

16   Q.  And have you filled it?

17   A.  I believe so.  And that's why I hesitated to answer your

18   previous question, because I'm not sure if -- You know, the

19   last I heard, which was a week or two ago, we had --

20   interviews had occurred and we had three very strong people

21   that were going to be -- I think obviously you offer it one at

22   a time, so I -- I'm not sure what the exact status is today of

23   this, whether they accepted it, but we had three very strong

24   advocates that the people that were interviewing were very

25   impressed by the people who were coming -- who came for this
```

1    job posting.

2    Q.  Dr. Puga, what is CQI?

3    A.  Continuous quality -- That's our quality control, so to

4    speak, and --

5    Q.  Can you describe it a little bit?

6    A.  Yeah, so CQI in general and more specifically to

7    transgender, we look at some of the -- what we expect to

8    happen for our transgender population, and we take a look at

9    making sure that what we expect is happening.  And so we were

10   doing that -- There's been some evolution with that, you know.

11   We were doing it initially for a sampling of people, and then

12   I think our federal monitor said, "You only have 100-some

13   people, you should do it on everybody."  And we have 300

14   people, so now we have to do it on 309 people -- 302, I think

15   was the last count, and so actually we have been working with

16   Southern Illinois University to develop our CQI, and they

17   developed -- They have done a very nice job.  They are working

18   with that with our medical department.  And so we have come up

19   with a tool with them and they are going to be -- they are

20   taking care of our CQI for us.

21         The patient advocate is going to be an important

22   person in this, because that's the person who will, you know,

23   dig deeper into the concerns of things that come up and make

24   sure things get rectified.  You know, this person is assigned

25   to be the transgender person's advocate, and that person --

1   and make sure that they get their needs met and any concerns

2   and that all comes up to our level, and so they are going to

3   be our eyes and ears, but more so, you know, their advocate

4   and not -- you know, not our agent, but they are going to be

5   their advocate and we will be -- you know, we will have a

6   better idea and be able to rectify any issues that may come

7   up.

8   Q.  Do you know --

9   A.  We are excited to have this position.

10  Q.  Do you know what WPATH is, W-P-A-T-H?

11  A.  Yes, World Association of Transgender Health, yes.

12  Q.  Do you have an understanding of how IDOC is regarded by

13  other penal institutions in other states in regard to its

14  handling of transgender inmates?

15  A.  Well, you know, because I sit in Illinois and don't have

16  an outsider view, I think some of the things that we have

17  found was some people come to us and ask us about how we are

18  doing things and in wanting to model some of what we did.  I

19  think it was a year or two ago, there was -- North Carolina

20  has done that.  Indiana does not have the ability to do

21  surgery, that hasn't been -- They wanted to transfer us a

22  couple of people, because they don't have -- they can't do

23  that, they don't have the ability to do that.  I think there's

24  also -- Florida has reached out to us and asked for assistance

25  with their transgender care.

1          We have -- We were invited through the Illinois

2     School of Professional Psychology last year in March to

3     present a forum, a national forum to discuss transgender care

4     in corrections, and I believe that -- from what I heard -- and

5     the Governor wasn't able to be there, but the Governor was

6     awarded a plaque based on the work that we have been doing in

7     the State of Illinois for the advancement of transgender care

8     in corrections.

9     Q.   Dr. Puga, I don't have any more questions for you.  I may

10    have in a few minutes, but thank you for your time.

11    A.   You're welcome.

12          MR. PENN:  Judge, one more thing.  I didn't move to

13    admit the exhibits.

14          THE COURT:  You did not.

15          MR. PENN:  May I move to admit Defense Exhibits 2, 3

16    and 4?

17          THE COURT:  Okay.  2, 3 and 4 will be admitted.

18          MR. PENN:  Thank you, Judge.

19          MS. PARSONS:  Thank you, Judge.  Just checking on the

20    Zoom, is Mr. Delaney on the line?

21          MR. DELANEY:  Hello.

22

23                      CROSS EXAMINATION

24    BY MS. PARSONS:

25    Q.   Hi, Dr. Puga.  My name is Abby Parsons.  We have met

1    before.

2    A.  Yes.

3    Q.  I just want start with a few things you talked about on

4    Direct.

5            First of all, I think you said that the THAW

6    committee reviews every single person in IDOC's custody that

7    identifies as transgender every six months.  Did I hear you

8    say that right?

9    A.  No.

10   Q.  So, who is doing an every six-month review for the entire

11   300-person class?  I think I misunderstood your testimony.

12   Can you restate that?

13   A.  Right.  So, we do a biannual review.  We have our Mental

14   Health folks meet with our individuals in custody and to fill

15   out the 0700 -- yeah, IDOC 0700 forms, so that's done on a --

16   on a bimonthly basis, January and July.

17   Q.  Right.  And IDOC has the staffing in Mental Health to

18   speak to every single class member, 300 of them twice a year,

19   is that right?

20   A.  We have -- Our individuals are seen regularly and we are

21   -- we give them a month to do that in their regular context,

22   which is generally at least once a month, and so we -- we give

23   them a month.  We have had to extend a few people past that

24   one-month period in order to get those done, but we

25   double-check and make sure that we get all those back.

1    Q.  Okay.  Dr. Puga, you mentioned the CQI program.  We have

2    heard a lot about that over the years and it sounds like you

3    finally got that in place.  When did Southern Illinois

4    University get that up and running, that tool that you

5    mentioned?

6    A.  I don't remember if it was after last -- mid last year or

7    -- you know, because I know they did that in January, but I'm

8    not sure -- I'm not sure if that was the second time or the

9    first, because we had -- we had worked on it, we went back and

10   forth as far as the tool that we have, and so kind of working

11   on it with them.

12   Q.  So, you are still not sure as you sit here today whether

13   that's an operative tool for CQI?

14   A.  Oh, no, I think it's operative, but, like I said, I'm not

15   sure whether it started in January or it started in July.  I'm

16   not sure.  But we worked on it and everything looked good and

17   it was approved sometime -- I believe it might have been --

18   yeah, sometime last summer, I believe.  But I don't -- I don't

19   recall when exactly it was approved.

20   Q.  Sometime this year, is that fair?

21   A.  Sometime last year.

22   Q.  So, 2024, is that what you are talking about?  Or 2025?

23   A.  Their tool -- Yes, their tool was completed and approved

24   sometime mid last year, yes.

25   Q.  So, mid last -- of 2024, is that right?  Is that what you

1    are saying?

2    A.  Yes.

3    Q.  Okay.  You talked a lot about Janiah Monroe.  She's the

4    named class Plaintiff of this case, right?

5    A.  The first name on the class, yes.

6    Q.  She has another lawsuit against the Illinois Department of

7    Corrections, right?

8    A.  I believe so.

9    Q.  And that's pending in another district in this state,

10    right?

11    A.  Yes.

12    Q.  You have given depositions in that case, right?

13    A.  I believe so, yes.

14    Q.  And you know that there are proceedings in that case where

15    IDOC is denying her hormone treatment and there's motions

16    pending about that currently.  You know that, right, Doctor?

17    A.  No, I don't think that IDOC is denying her hormones.

18    Q.  You didn't bring any documentation to support anything you

19    said about Janiah Monroe here today, did you?

20    A.  No, but if you would like I can find some.  But, no, I

21    didn't.

22    Q.  Okay.  And I think you said that TAC considers each person

23    on a case-by-case basis in the class.  Did you say that?

24    A.  That's correct.

25    Q.  So, it would not be -- it would not be fair to judge the

1  entire class based on Miss Monroe's experience at Logan, isn't

2  that right?

3  A.  It's important to learn from issues that come up in all

4  circumstances, whether it's Miss Monroe or anybody else.

5  Q.  I think you told the Court that there was a training by

6  the Moss Group at Logan and you reported that everyone walked

7  out, right?

8  A.  Yes.

9  Q.  You did not attend that training, did you?

10  A.  That's correct.

11  Q.  I want to go back to the vote you talked about.  You

12  brought an example to the Court about a 4-3 vote.  Do you

13  remember talking about that on Direct?

14  A.  Yes.

15  Q.  Do you remember what class member the TAC committee was

16  considering?

17  A.  No.

18  Q.  But in that instance you said there were four Security

19  votes no and three Mental Health votes yes.  Did I hear you

20  right?

21  A.  Yes.

22  Q.  So, Doctor, in every case Security can vote down a

23  transfer for every single class member based on your system,

24  isn't that fair?

25  A.  Isn't that fair?  Is that your question?

```
 1   Q.  That's the structure of your committee, right?  Four
 2   Security, three Mental Health.  Every single time they vote by
 3   party line Security wins out, isn't that right?
 4           MR. PENN:  Object to the characterization.
 5   A.  Because Security --
 6           THE COURT:  Hold on, Dr. Puga.
 7           What is your objection?
 8           MR. PENN:  Object to the characterization as party
 9   line.
10           THE COURT:  Well, it's cross-examination.  I will
11   allow it.
12           MR. PENN:  All right.
13   A.  They are trained to see where security issues occur and
14   they know more about that than I do, and prison is a very
15   dangerous place and I want to -- you know, I -- And if they
16   feel that strongly about this, then I think I need to listen
17   to the people that are in charge of safety in a prison.
18   Q.  And just to be clear, you're not -- you're not the
19   security side of the TAC committee, right?  You are on the
20   mental health side?
21   A.  That's correct.
22   Q.  There's other people on the TAC committee that watch over
23   the security concerns of the class members and other people in
24   custody at IDOC, right?
25   A.  You could say that.
```

1    Q.  You don't serve any security role as Chief of Psychiatry

2    at the Illinois Department of Corrections, do you, Doctor?

3    A.  It depends on how you define that, because if my

4    medication management of a person who's acutely psychotic and

5    manic and aggressive and agitated, you know, if that helps

6    reduce their agitation, aggression, what have you, am I

7    helping with security?  I am absolutely helping in and

8    involved in security of the facility.  There are laws around

9    giving and forced medication against a person's will for

10   security purposes and maintaining the safety and security of

11   people in the prison.  And, so, am I directly involved in

12   security hands-on, putting on wrist restraints, what have you?

13   No.  But is what I do as part of helping security in the

14   facility?  I think I have a role in it indirectly.

15   Q.  On the TAC committee if you and your cochair, who's

16   sitting in for Chief Hammers, right, she's on the security

17   side?

18   A.  Yes.

19   Q.  If the two of you were to disagree about a security issue

20   you would defer to her, right?

21   A.  Yes.

22   Q.  And if it was a mental health issue she would defer to

23   you, isn't that fair?

24   A.  Yes.

25   Q.  Dr. Puga, on Direct I think you talked about Defendants'

1    1, the administrative directive.  Do you still have that?

2    A.  Yes.

3    Q.  I think you called this -- this document, Defendants'

4    Exhibit 1, the old working version.  Did I hear you say that

5    correctly?

6    A.  It's more than four years old and, yes, we are working off

7    of it, yes.

8    Q.  This is the current and enforceable administrative

9    directive that governs evaluation, treatment, and correctional

10   management of transgender offenders at IDOC today, isn't that

11   right, Doctor?

12   A.  That's correct.

13   Q.  And this went into effect right before our trial in 2021.

14   Do you remember that?

15   A.  I believe so.

16   Q.  And you thought the new one was going to come out maybe a

17   month ago, right before this trial?

18   A.  I thought it was going to come out two years ago, frankly.

19   Q.  You have been working on it a long time, right?

20   A.  Yes, I have, yes.

21   Q.  I want to go -- You and your counsel talked about

22   transports in the AD.

23           MS. PARSONS:  Mr. Delaney, could you pull up

24   Defendant's Exhibit 1 for me, if you have it?

25   Q.  (By Ms. Parsons) Dr. Puga, you have that exhibit in front

1    of you?

2    A.  Yes.

3    Q.  Okay.  I'm looking at page 9 of 12.  Sounds like we are

4    going to pull it up.

5    A.  Yes.

6    Q.  At the bottom there's a paragraph 7, with the title

7    Transports.  Do you see that, Dr. Puga?

8    A.  Yes.

9    Q.  And I think your counsel talked about the first line,

10   "Wherever possible at male facilities, both a male and female

11   staff shall be on a transport that includes a transgender,

12   intersex, or gender incongruent offender."  Do you see that?

13   A.  Yes.

14   Q.  That doesn't say "may," does it?

15   A.  It says "shall."

16   Q.  And this is the administrative directive that governs how

17   the prisons are run, isn't that right?

18   A.  Yes.

19   Q.  I would like to look at Defendants' Exhibit 4.  This is

20   that job posting for the Transgender Patient Advocate position

21   I think you talked about on Direct.  Do you remember that, Dr.

22   Puga?

23   A.  Yes.

24   Q.  And you recently filled that position or you are close to

25   filling that position, is that what I heard you say?

1    A.   Yes.

2    Q.   When did you post this job?

3    A.   Well, Dr. Conway -- This is under Dr. Conway's purview,

4    and I believe it might have been -- I would have to say third

5    or fourth quarter of 2024, I believe.  I'm not sure, but I

6    believe it was late last year.

7    Q.   Maybe six months ago?

8    A.   Possibly.

9    Q.   Okay.  And I think I heard you say that you had three

10   really strong candidates that wanted this job.

11   A.   Yes.

12   Q.   And at 40 percent vacancy at IDOC, why don't you hire all

13   three of them?

14   A.   We only have one person scheduled to be in this position

15   for 302 people.

16   Q.   Dr. Puga, was this job posting -- Was this your idea?

17   A.   This has fallen under Dr. Conway.  This is something that

18   we had talked about some time ago.  It may have originated --

19   It originated some time ago and -- but I believe, you know,

20   this isn't -- this isn't something I was directly involved in.

21   Q.   Could it have originated shortly after the August 2021

22   trial when the Plaintiffs suggested this position directly to

23   IDOC?  Is that when it could have been, Dr. Puga?

24   A.   It could have been.

25   Q.   And just for the record to be clear, IDOC has taken four

1    years to now fill the position, is that right?

2    A.  If that's accurate and if that was what was agreed upon at

3    that point or if it was just a suggestion, yes.  But four

4    years may have gone by.

5    Q.  Dr. Puga, as chair or cochair of the TAC committee you see

6    all requests for our class members to transfer to the women's

7    division, right?

8    A.  Yes.

9    Q.  And you would agree that most of the transgender women

10   that come before TAC are denied a transfer to Logan, right?

11   A.  That's correct.

12   Q.  In the last year, can you name any class member from any

13   facility, not just Menard, that was transferred to Logan?

14   A.  Yes.

15   Q.  Who was it?  On Direct you couldn't name anybody from

16   Menard, but you can name somebody in the last year that TAC

17   approved for a transfer?

18   A.  Yes, the last person was someone -- Yes, I do -- I can.

19   Q.  What person was that?

20   A.  The last name is ███████.

21   Q.  And when was that?

22   A.  I don't recall.  Possibly three months ago.

23   Q.  And I think you testified on Direct that ████████ was

24   the person from Menard that the TAC committee recently

25   considered and you personally authorized a transfer to Logan,

1   isn't that right?

2   A.  The committee had authorized, yes.

3   Q.  And you talked about how a transfer for her or any class

4   member to Logan is not easy, right?

5   A.  I believe that's true.

6   Q.  Today I think I heard you say it wasn't wonderful.  At

7   your deposition I think you said, "It's not an idyllic

8   situation to transfer to Logan."  Those are your words, right?

9   A.  It could be, yes.

10  Q.  And that's because you think a transgender individual is

11  not going to be accepted and welcomed into the community as

12  cisgender women at Logan, right?

13  A.  No.

14          THE COURT:  That's not right, or you don't think they

15  would be welcome?

16  A.  That's not right.

17  Q.  Do you remember giving us a deposition -- I guess it was

18  May 22nd.  That's last Thursday.  Do you remember that, Dr.

19  Puga?

20  A.  I think as I stated --

21  Q.  No, no, I have a question pending.  You were deposed --

22          THE COURT:  Hold on.  Hold on.  One at a time.

23          MS. PARSONS:  Thank you, Judge.

24          THE COURT:  So, I think the question was do you

25  remember being asked last Thursday -- or do you remember

1    giving your deposition last Thursday, May 22nd.

2    A.  Yes.

3    Q.  (By Ms. Parsons) Okay.  And you were asked questions under

4    oath?

5    A.  I was.

6    Q.  And you swore to tell the truth?

7    A.  I did.

8          MS. PARSONS:  Mr. Delaney, can you pull up Dr. Puga's

9    transcript from May 22, at page 62?  Let's look at lines 4

10   through 13.  Actually, if you could grab the question above

11   that, that would help.

12         The question you were asked, "Are you aware of other

13   transgender inmates who would prefer to be at Logan rather

14   than Menard?"

15         And why don't you take a look at your answer, Doctor.

16   A.  I'm sorry, I can't see it.  I don't have a screen.

17   Q.  You can't see any of our documents?

18   A.  No, I just have -- My screen says "Zoom" on it and I don't

19   have any visual.

20   Q.  Okay.  Well, let me read it to you, Dr. Puga.  Your answer

21   was, "Well, the reason -- the reason I answer the way I do is

22   that Logan isn't -- it's not an easy idyllic transfer option

23   as we would hope.  And so going to Logan doesn't mean that it

24   becomes easy for a transgender individual.

25         And so if a transgender individual has an idea that

1    they want to go to the Logan and they are going to be accepted

2    and welcomed into the community of women, that is -- it

3    isn't -- for many people it isn't easy."

4         You said that last week, didn't you, Dr. Puga?

5    A.  Yes.

6         MS. PARSONS:  You can take that down, Mr. Delaney.

7    Q.  (By Ms. Parsons) And that's because you think cisgender

8    women have a lot of difficulty accepting transgender women

9    because they don't look like them, right, Dr. Puga?

10   A.  No.

11   Q.  You gave some examples on Direct from a person you didn't

12   name who had recently wanted to transfer out of Logan.

13        Do you know what person -- You gave some examples to

14   the Court.  Do you know her name?

15   A.  Yes.

16   Q.  What's her name?

17   A.  ███████████.

18   Q.  You know her preferred name is ██████, right, Dr. Puga?

19   A.  Yes.  ████████████████, yes.

20   Q.  Yes.  And ████████████ complaints about her experience at

21   Logan -- again, case-by-case.  ██████████████ experience, you

22   emphasized that the women at Logan were loud, right?

23   A.  Yes.

24   Q.  And --

25   A.  That's what she said.

1    Q.  And they write PREAs on her, Doctor, saying that she only

2    transferred there to attempt to have sex with them, isn't that

3    what you said?

4    A.  No, I said that they told her that she only came to have

5    sex with them, not that they write PREAs of that.  I don't

6    know what they wrote PREAs of, but I know they, yeah -- So,

7    that's what she said she was told by them.

8    Q.  I think you compared it to the movie Mean Girls, right?

9    A.  No, she used those words, that they were being mean girls

10   and she used those words.  I am quoting what she said in her

11   interview.

12   Q.  Yeah, you came to testify in this court to explain these

13   experiences to the Judge, right?  You wanted her to know that?

14   A.  I was asked about this, and so I was asked -- I was

15   answering questions that I was asked.  I did not come to this

16   court with specific -- I didn't come with any agenda in

17   specific to bring up.

18   Q.  Dr. Puga, you have been to Logan, haven't you?

19   A.  Yes.

20   Q.  And there are women of all shapes and sizes there, aren't

21   there, Doctor?

22   A.  Yes.

23   Q.  People that have committed a whole range of crimes, right,

24   Doctor?

25   A.  I imagine so, yes.

1    Q.  Would it surprise you that 58 people in custody at Logan

2    are on the sex offender list?  Would that surprise you,

3    Doctor?

4    A.  No.

5    Q.  And you know that Logan has a maximum security part,

6    right?

7    A.  Yes.

8    Q.  And medium security; true?

9    A.  Yes.

10    Q.  And minimum security; yes?

11    A.  Yes.

12    Q.  It is the only IDOC facility in the female division,

13    right?

14    A.  No.

15    Q.  I think I heard you say on Direct that the -- that prison

16    is a terrible place, right?

17    A.  Yes.

18    Q.  It's not just male prisons that are terrible places.

19    Female prisons are terrible places, too, aren't they, Doctor?

20    A.  Yes.

21    Q.  And there are women there that have committed murder,

22    right?

23    A.  Yes.

24    Q.  Armed robbery, arson, the whole gamut, right?  The entire

25    State of Illinois, women get sent there?

1  A.  I would imagine.  I would imagine, yes.

2  Q.  And I think I heard you suggest on Direct that their

3  security functions are somehow lower than a male prison.  Is

4  that what you were suggesting to this Court under oath?

5  A.  Security functions?  I'm not sure what you mean by that.

6  Q.  I don't have the quotation from the transcript, but I

7  think you said security is much less at the women's facility.

8  Isn't that what you said?

9  A.  No, I think what I said or what I meant to say was that

10  because there is not the -- because the predominant people

11  there are there because of nonviolent crimes, it's -- it's a

12  very different vibe than in male prisons.

13  Q.  You know there are already many transgender prisoners at

14  Logan, right?

15  A.  Yes.

16  Q.  More than 90 people who identify as transgender, right?

17  A.  Yes.

18  Q.  And our current numbers show that only 14 are transgender

19  women.  Does that sound about right to you, Dr. Puga?

20  A.  That sounds about right.

21  Q.  And the remainder are transmen, right?

22  A.  Yes.

23  Q.  Based on your experience in IDOC, do all of the transmen

24  present as male at Logan?

25  A.  I don't know.

1    Q.   Okay.  So, just to be clear, there could be people that

2    live in Logan that have a full beard, right?

3    A.   I don't know.

4    Q.   And there could be people at Logan that are bald, right,

5    Doctor?

6    A.   That's correct.

7    Q.   Certainly people at Logan that are taller than 5'11" and

8    200 pounds, right, Doctor?

9    A.   They could be.

10   Q.   And you counseled ████████████ to get ready for her

11   transfer because she might not fit in?  That's what you told

12   her?

13   A.   That she may be -- she may be targeted because of her

14   looks, yes.

15   Q.   Isn't the right question whether ██████ feels like she

16   fits in, not whether you think that, Dr. Puga?

17   A.   I wanted her to be prepared.  I wanted her to be prepared

18   for anything and to understand that if her -- if her thought

19   was that she was going to go over and be accepted with open

20   arms that, you know, that that would burst her bubble very

21   quickly and that she needs to be prepared for anything and be

22   able to, you know, handle that with, you know, with -- first

23   of all, be prepared, and, second, that she will have some

24   assistance from the mental health team to be able to help her

25   accommodate.

```
1    Q.  I understand.  You were trying to make sure she felt
2    accepted.
3            Dr. Puga, unfortunately you weren't here for any of
4    this week.  We had multiple class members that came to testify
5    before this Court that live at Menard.  And, Dr. Puga, though
6    -- So you didn't hear any of their testimony this week, Dr.
7    Puga, did you?
8    A.  No.
9    Q.  And you didn't read any of the transcripts from the first
10   three days of this hearing?
11   A.  No.
12   Q.  But, Dr. Puga, you have read all the declarations that
13   have been filed by the class members in Menard going back to
14   almost 18 ago, haven't you?
15   A.  Yes.
16   Q.  And you know that those class members report being raped
17   at Menard, right?
18   A.  Some of them, yes.
19   Q.  And those transgender women are regularly sexually
20   assaulted at Menard.  You know that, don't you, Doctor?
21   A.  I don't know what the facts are, but that's what's been
22   reported.
23   Q.  They report physical attacks almost on a daily basis and
24   you know that, don't you, Doctor?
25   A.  I have heard that.
```

1  Q.  They are regularly humiliated and misgendered and

2  ostracized, too.  And you know that, too, don't you, Doctor?

3  A.  I don't know that as a fact, because I know when I spoke

4  with the federal monitor, Ms. Graham -- I'm sorry, julie

5  graham, initially she would take people's information at face

6  value and we certainly would look at it, and then she realized

7  that a lot of that was -- you know, needed to be investigated

8  and looked at, because some of it wasn't truthfully reported

9  to her.  And, so, over time we talked about that as far as,

10  you know, she was making statements initially based on what

11  she was hearing, and later on she had to kind of backtrack and

12  look deeper into it to see whether those allegations and those

13  things were actually truthful.  So, I -- So, I -- I don't

14  know.  Certainly you have to accept what they say and you have

15  to take it at face value, but you have to also follow it up

16  and investigate and, you know, is this really true, is this

17  really happening?  So, I don't know.  I don't know what the

18  truth is.  I'm not there, I didn't see any video.

19  Q.  That's a really good point.  After you read all the

20  declarations of the class members in this case you did nothing

21  to investigate any of them, isn't that right, Doctor?

22  A.  We as a group had looked at that and went through that in

23  multiple sessions, and the people that were in charge in

24  looking at security and all investigated that.  So, me

25  personally, I didn't, but I witnessed people talking about it

1   and working on it and making plans, you know, including the

2   Chief of Operations, including the Warden, including other

3   people.  So, you know, that's -- I thought that -- I saw

4   action taken and so those weren't ignored, but it was

5   investigated.  And as I mentioned, you know, you take it, you

6   hear it and you look at it.  And so I was seeing that it was

7   being looked at and investigated and that's what I was seeing.

8   Q.  I think you misheard my question.

9        I said you personally, Dr. Puga, read all those

10  declarations and did nothing yourself to investigate whether

11  any of the claims described in those more than 20 declarations

12  of class members at Menard, isn't that right, Doctor?

13  A.  If you -- If you discount me speaking with people who are

14  the appropriate people that would look at it -- Because that

15  was my role in looking at this.  You know, I did not

16  personally go and investigate these issues.

17  Q.  Dr. Puga, you have -- you have a role at the highest level

18  of IDOC in policymaking, don't you?

19  A.  I wouldn't say the highest level, but, yes, one of the

20  highest levels.

21  Q.  You have been working on this AD for a long time, right,

22  and this is the highest directive that governs treatment of

23  transgender people at IDOC, right?

24  A.  Yes.

25  Q.  And in the 18 months since our first motion on this -- on

1    this facility has been involved -- has been filed, rather, you

2    haven't recommended a single policy change at IDOC to address

3    them, right?

4    A.  I don't know that that's true.  I think we -- I would have

5    to look back and see what our new policy is looking like that

6    we -- the events we made, but we actually had a working policy

7    that we looked at with Dr. Harris, as well as julie graham, so

8    for a while we were working on those things together.

9    Q.  Do you remember answering questions last Thursday, Dr.

10   Puga, at your deposition?

11   A.  Yes.

12          MS. PARSONS:  Mr. Delaney, could you pull up Dr.

13   Puga's deposition transcript at page 66, please, and zoom in

14   on lines 1-4?

15   Q.  (By Ms. Parsons) I know it's not on your screen, Dr. Puga,

16   so I will read you the question and answer you were asked last

17   Thursday:

18          "Question:  Since January 1st, 2024, have you

19   personally recommended any policy changes at Menard to address

20   these complaints?

21          Answer:  No."

22          Was that the question and the answer you gave last

23   Thursday, Dr. Puga?

24   A.  Yes, but that's not the question that you asked me a

25   minute ago.

```
 1   Q.  Dr. Puga, we agree that you oversee --
 2           MS. PARSONS:  We can take that down, Mr. Delaney,
 3   thank you.
 4   Q.  (By Ms. Parsons) You know there are problems at Menard; we
 5   can agree on that?
 6   A.  Yes, there are problems everywhere, yes.
 7   Q.  And you oversee all mental health treatment at IDOC,
 8   including Menard?
 9   A.  No.
10   Q.  You don't have any oversight for the mental health
11   treatment that's provided at Menard?
12   A.  Yes.
13   Q.  And that's including of the Wexford mental health
14   professionals that work there?
15   A.  In -- Well, as I mentioned earlier in my testimony, the
16   Chief of Mental Health is over all of mental health.  I more
17   specifically take a look at the psychiatric part of that.  So,
18   and I am -- So, he is above me and he -- his decisions
19   supersede and overrule mine.
20   Q.  Are you suggesting, Dr. Puga, that you don't have any
21   responsibility for the mental health treatment that's provided
22   at Menard?  Is that your testimony?
23   A.  No, but what I am saying is that it's not as broad and
24   sweeping as your question was leading.
25   Q.  Let me ask another one.  Do you have responsibility for
```

1    the mental health treatment that's provided at Menard

2    Correctional Center, Doctor?

3    A.  Indirectly, yes.

4    Q.  Okay.  You yourself are -- You are a physician, Dr. Puga,

5    right?  You explained your credentials again to this Court,

6    right?

7    A.  Yes.

8    Q.  And you can treat people with gender dysphoria, right?

9    A.  I can, although that's not my role in -- yes.

10   Q.  You are probably overqualified for the job, but you could

11   see a class member if she needed a mental health service at

12   Menard, couldn't you?

13   A.  I could.  Our vendors are actually put in that position,

14   but, yes, I am a licensed physician and --

15   Q.  In the last two years, you know that -- you know that IDOC

16   had a significant staffing issue at Menard, didn't you,

17   Doctor?

18   A.  Yes.

19   Q.  You testified a lot about staffing on Direct, right?

20   A.  Yes.

21   Q.  And those staffing shortages included mental health

22   providers, true?

23   A.  Yes.

24   Q.  Dr. Puga, during the time that there was a significant

25   staffing shortage of mental health providers at Menard, there

1    was no reason you couldn't have gone to see some of those

2    patients, right?

3    A.   Would a Supreme Court Judge come down and fill your

4    position if you couldn't do your job?  I imagine they could.

5    I imagine I could.  It's not my role, it's not my -- It's not

6    my role and -- but could I do it, am I allowed to do it?  I

7    can do that, but, like I said, that's not my role, and yes.

8    Q.  But you saw the need and you didn't fill it; you

9    personally, Dr. Puga, right?

10   A.   For psychiatric staffing, we did pretty well as far as

11   psychiatric staffing there, and we -- we had a loss in

12   somebody just recently, about a month and a half ago, but

13   prior to that our psychiatrists were actually -- you know, we

14   had enough in our -- And so our -- We have enough.  We had --

15   You know, we didn't -- the shortage was among our mental

16   health professionals, our Master's level therapists.

17   Q.  I see.  So if there was a psychiatric role you could have

18   filled that much easier, right?

19   A.   Yes.

20   Q.  Are you aware that at least three class members at Menard

21   were waiting for a psychiatrist to confirm their diagnosis of

22   gender dysphoria for more than a year because there was no

23   psychiatrist to do that?  Were you aware of that Dr. Puga?

24   A.   No.

25   Q.  And you could have confirmed that diagnosis, right?

1   A.  I have the capacity -- the capability of diagnosing, yes.

2   Q.  But you didn't do that for those three people at Menard,

3   right?

4   A.  I believe one of them -- No, I didn't do that.

5   Q.  Dr. Puga, you agree that hiring professionals in rural

6   areas is not an easy task, right?

7   A.  That's correct.

8   Q.  And that's true for Menard and most of the IDOC facilities

9   that are in rural areas of this state, right?

10  A.  That's correct.

11  Q.  You would agree with me, then, that if class members lived

12  in IDOC facilities that were closer to urban areas it might be

13  easier to hire mental health professionals; is that fair?

14  A.  Not necessarily.

15  Q.  You'd agree with me that class members would have better

16  access to mental health services if there was adequate

17  staffing at facilities, right?

18  A.  Yes.

19  Q.  Back to Menard, there are a few new mental health

20  professionals at Menard, I think you told us about last week,

21  do you remember that?

22  A.  Yes.

23  Q.  Ms. Klausing is one of them?

24  A.  Yes.

25  Q.  Were there any new mental health providers that are new to

1    Menard?

2    A.  I believe there were a total of three that -- four that we

3    added on in the last few months.

4    Q.  So, four new ones?

5    A.  Yes.

6    Q.  Okay.  But you still don't consider the staffing shortages

7    at Menard to be resolved now, right?

8    A.  That's correct.

9    Q.  And you still have at least five mental health provider

10   vacancies at that facility alone?

11   A.  That's correct.  Just about all our facilities have

12   shortages of providers, except for maybe two places.

13   Q.  Dr. Puga, I want to talk about a recent TAC meeting that

14   you conducted.  I think -- Before we look at the document, I

15   think you told us that the timing of that meeting was so you

16   were able to look at the class members that wanted a transfer

17   before this hearing, right?

18   A.  Yes, that is correct.

19   Q.  And at the meeting you considered five of the class

20   members for a transfer from Menard to the women's division,

21   right?

22   A.  Was it five or four?  I don't recall.

23   Q.  We will look at the document in just a minute.

24          And before that meeting in April 2025, April 29,

25   2025, no transgender person was considered for a transfer by

1    TAC out of Menard since at least before January 1st of 2024,

2    isn't that right?

3    A.  I would have to look at records.  I don't know.

4    Q.  And of the five class members that you considered at the

5    TAC meeting on April 29th, you only personally spoke to one of

6    them, right?

7    A.  Yes, I had spoken to one of the other people sometime ago;

8    but, yes.

9    Q.  And the person you spoke to that was considered at the

10   meeting, you didn't speak to her until after the meeting,

11   isn't that right?

12   A.  That's correct.

13   Q.  And that's ████████████████ that you are going to

14   recommend for a transfer to Logan?

15   A.  That's correct.

16   Q.  So, fair that before that meeting you had not spoken to

17   any of the five people that were considered for transfer?

18   A.  As I mentioned, I had spoken with one of the other people

19   before, but that was quite some time ago.

20   Q.  Was that ████████████, Dr. Puga?

21   A.  Yes.

22   Q.  And I think you testified last week that was years ago?

23   A.  Yes.

24   Q.  Dr. Puga, you have never been to Menard, right?

25   A.  No, I have been to Menard.

1   Q.  You have?  When's the last time you were there, Dr. Puga?

2   A.  I don't recall.  It's been a while.  I have been there at

3   least three or four times since I have been in this position.

4   Q.  You haven't been there since January 1st, 2024, at least,

5   right?

6   A.  Probably, yes.

7   Q.  The five people that the TAC committee considered at the

8   meeting on April 29, they were considered because they were

9   the only people at Menard that requested a transfer to Logan,

10  right?

11  A.  That's correct.

12  Q.  And you relied on a survey that Dr. Reister put together

13  before this hearing to find out who wanted a transfer to

14  Logan, right?

15  A.  I believe everyone was asked about transfer requests and

16  so we didn't overlook anybody, yes.

17  Q.  Certainly.  And the five people that the committee

18  considered were the ones that wanted a transfer to Logan.

19  That's what you told us last week at your deposition.  Do you

20  remember that?

21  A.  Yes, that's correct.

22  Q.  Okay.  Let's take a look --

23          MS. PARSONS:  Mr. Delaney, could you pull up for

24  me -- It's a spreadsheet in native form -- Bates number

25  0426111.

```
 1    Q.  (By Ms. Parsons) And we will pull that up for you, Dr.

 2    Puga, and see if you can tell me what it is.

 3    A.  I can't see it because of my screen.

 4          THE COURT:  I'll tell you what.  We are probably due

 5    for a break anyway.  Let's take a short break and we will get

 6    our AV specialist to see if he can get it so that Dr. Puga can

 7    see the screen.  So, let's take about a 10-minute break.

 8          COURT SECURITY OFFICER:  All rise.

 9          (Court's in recess from 2:23-2:37)

10          COURT SECURITY OFFICER:  All rise.

11          THE COURT:  Be seated.  They told me they figured out

12    the issue with the screen, so you may continue.

13          MS. PARSONS:  Thank you, Your Honor.

14    Q.  (By Ms. Parsons) Dr. Puga, I understand you can see the

15    screen, is that right?

16    A.  Yes, I can.

17    Q.  There were five people considered by the TAC committee on

18    April 29, 2025, and those people were considered for a

19    transfer because they were the only people at Menard that

20    requested a transfer to Logan, is that right?

21    A.  From what I was told, yes.

22    Q.  You were told that by Dr. Reister who compiled a survey

23    and that's what we see on the screen.  Do you recognize that,

24    Dr. Puga?

25    A.  Yes.
```

1          MS. PARSONS:  I'm going to mark this spreadsheet as

2    Plaintiffs' Exhibit 50 and, for the record, it was produced in

3    native form with Bates number 0426111.

4    Q.   (By Ms. Parsons) Dr. Puga, you relied on information in

5    this spreadsheet prepared by Dr. Reister as part of your work

6    on the TAC committee, right?

7    A.   I reviewed it and I think there's a column further to the

8    right that is presentation-needed and was presenting to the

9    TAC for Logan, so I more specifically was looking at that.

10         MS. PARSONS:  Your Honor, Plaintiffs move Plaintiffs'

11   Exhibit 50 into evidence.

12         THE COURT:  50 will be admitted.

13   Q.   (By Ms. Parsons) Thank you, Dr. Puga.

14         MS. PARSONS:  Let's see if we can zoom in to the

15   column that says transfer to Logan.  Mr. Delaney, I can't read

16   it from here, but could you zoom in for us?

17         Let me check the screen real quick, Your Honor, if I

18   may go back to my seat.

19         THE COURT:  Yeah.

20         MR. DELANEY:  I can't see one that says --

21         THE COURT:  "Presents to TAC for Logan"?

22         MS. PARSONS:  Thank you so much, Deana.

23         Mr. Delaney, could you zoom in to column S, as in

24   Sam?

25         THE COURT:  "Wants Logan."

```
 1              MS. PARSONS:  "Wants Logan," thank you.
 2    Q.  (By Ms. Parsons) Dr. Puga, do you see column S on
 3    Plaintiffs' Exhibit 50, it says, "Wants Logan"?  Do you see
 4    that?
 5    A.  Yes.
 6              MS. PARSONS:  If you could scroll down, Mr. Delaney.
 7    Q.  (By Ms. Parsons) There's yeses and nos, right?
 8    A.  Yes.
 9    Q.  And there's a lot more yeses than five, would you agree
10    with me, Dr. Puga?
11    A.  I would have to take a look.
12    Q.  I can help you with this, Dr. Puga.  I have counted 11
13    yeses in the column that says "Wants Logan" of class members
14    that Dr. Reister's spoke to that wanted a transfer to Logan;
15    does that sound fair?
16    A.  I only see part of this.  I see six on here.  One, two,
17    three, four, five, six, but I can't see the rest of it.  So,
18    if you counted 11, I trust -- Well, --
19    Q.  On this one you can trust me, Dr. Puga.  There's 11.
20    There's a row for ███████.
21              MS. PARSONS:  Mr. Delaney, I'm not sure if you can
22    see the offender name.
23    Q.  (By Ms. Parsons) ███████.  That one says -- If you
24    go over to "Wants Logan," there's a blank.
25              Just for the record, ███████ was here and
```

1    testified before the Court and very much wanted to transfer to

2    Logan.  So, by our count there were 12 people on this

3    spreadsheet, Exhibit 50, that wanted a transfer to Logan.

4    Does that sound right, Dr. Puga?

5    A.  This particular chart might have -- I don't know.  There

6    were a number of revisions to the chart and I don't know why

7    they have revised, whether that meant that they changed their

8    mind or whether they are -- I think there was somebody that

9    had already transferred.  There were different reasons why

10   some things had changed.  So, this says, "Last medical update,

11   5/12."  I don't know if there was -- if -- You know, I don't

12   know.  There are multiple versions of this, and the ones that

13   I saw, you know, like I said, I thought were, you know, things

14   were proceeding the way they should be.  So I don't know what

15   version this is, I don't know how many versions of this

16   spreadsheet there were, but it was a working spreadsheet and

17   there were a lot of things that happened as far as, you know,

18   to move some of these numbers and what have you.  But, I can't

19   -- What I saw -- What I saw when I looked at it and I saw the

20   numbers in the column, it seemed like they were doing the

21   right thing and so I proceeded forward.

22   Q.  Dr. Puga, this document was produced to us by counsel for

23   IDOC.  You don't have any reason to doubt its accuracy, do

24   you?

25   A.  At this moment in time, you know, I didn't -- I didn't

1    create this, so I -- you know, and I don't know how many

2    versions there is.  I don't know if this is accurate for that

3    particular date.  I can't tell you that.  But I know there

4    were -- I have seen -- I saw -- I have seen at least three or

5    four different versions of this, so I'm not sure where in the

6    development, you know, this falls.

7    Q.  That's fine.  We will ask Dr. Reister this tomorrow, but I

8    do have a few more questions about this.

9          So, the seven other people that weren't considered by

10   TAC for transfer to Logan, I will point you to on this

11   spreadsheet next to "Wants Logan," there's a column with the

12   letter R that says, "Present to THAW needed."  Do you see

13   that?

14   A.  "Present to THAW needed," yes.

15   Q.  Do you see that?

16   A.  Yes.

17   Q.  And there's a number of answers in this column, but a lot

18   of them say things about hormones.  So, "Not on -- not on H,

19   not on H, too short on H."

20          To you, do you understand that relates to hormone

21   therapy?

22   A.  I would assume.

23   Q.  Okay.  Is it possible that the -- whether they were

24   presented to a committee or not might have been tied to

25   whether they were on hormones or not?

1   A.  That I don't know, because the -- I have seen a number of

2   presentations at the THAW committee that had people that

3   weren't on hormones long enough, and so I don't know if that's

4   exclusionary criteria and they say, "Wait until you have

5   achieved your 12 months as per -- you know, per our surgical

6   team."  I don't know.

7   Q.  The 12-month requirement you just talked about per the

8   surgical team, can you explain what that is, Dr. Puga?

9   A.  Yes, I think based on the surgical team at the -- at Rush,

10  they have certain criteria for surgery, and one of them is, I

11  believe, being on hormones for the last 12 months and then the

12  other is the letters of recommendation.  And I am not sure

13  what other -- You would have to ask Dr. Conway about other

14  specifics.

15  Q.  Thank you, Dr. Puga.  There's no requirement that you be

16  on hormone therapy to be transferred to Logan, right?

17  A.  That's correct.

18  Q.  Okay.  I think I directed you to the wrong column in

19  Plaintiffs' Exhibit 50.  Let's look at the one to the other

20  side of S, which is column T, and it says, "Present to TAC for

21  Logan."  Do you see that?

22  A.  Yes.

23      MS. PARSONS:  If you could scroll down a little bit

24  in that column, Mr. Delaney.

25  Q.  (By Ms. Parsons) You can see there's a -- there's cells of

1    column T in Plaintiff's Exhibit 50 that says, "Not on H."

2         Do you see that?

3    A.  Yes.

4         MS. PARSONS:  If you could stop there a minute, I see

5    a few rows we can look at.

6    Q.  (By Ms. Parsons) Let's look at 19 and 20, just as an

7    example.  Are you there, Dr. Puga?

8    A.  Yes.

9    Q.  We are highlighting them.  Okay.  So, in column S for

10   offender named ███████████, I think she goes by ██████,

11   it says she wants Logan in column S, but "Presents to TAC for

12   Logan," it says, "Not on H."  Do you see that?

13   A.  Yes.

14   Q.  And you did not consider ████████ as one of the people

15   for transfer for Logan in your April 25, 2025 meeting, right?

16   A.  That's correct.

17   Q.  Let's look at the row below that, row 20 of Plaintiffs'

18   Exhibit 50.  That's ███████████.  I'm not exactly sure of her

19   preferred name.  Go to column S for "Wants Logan."  There's a

20   "yes," and then column T, "Present to TAC for Logan," again,

21   "Not on H," right?

22   A.  That's correct.

23   Q.  You agree with me, Doctor, that there's no requirement to

24   be on hormone therapy to get a transfer, so if those people

25   wanted a transfer to Logan they should be considered by the

1    TAC committee for a transfer, right, regardless of their

2    hormone therapy status?

3    A.  Yes.

4    Q.  Dr. Puga, does the TAC committee have plans to evaluate

5    the other 12 women for transfer to Logan?  What are your plans

6    for that?

7    A.  We are going to see whoever -- whoever is referred to the

8    TAC committee.

9    Q.  So, that's just a wait-and-see thing for you, Dr. Puga?

10   See who comes up for transfer?

11   A.  Yes.  If they are still interested in pursuing transfer,

12   then we will review them at TAC.

13   Q.  Well, we will follow up with you to see if those other

14   seven women got evaluated for transfer the next time we talk,

15   okay, Dr. Puga?

16   A.  Sure.

17   Q.  At the TAC meetings, it's fair to say that a mental health

18   professional usually presents the candidate for transfer, is

19   that correct?

20   A.  That's correct.

21   Q.  You agree those mental health providers, they play an

22   important role at the meeting, true?

23   A.  Yes.

24   Q.  Because they work closely with the individuals, they see

25   them for therapy, right?

1    A.  Yes.

2    Q.  And they might be able to answer questions that the

3    committee members have about the person being considered that

4    they would otherwise not know, right?

5    A.  Yes.

6    Q.  They help bring the information to life off the page,

7    right?

8    A.  Yes.

9    Q.  Okay.  The mental health provider for the five individuals

10   that TAC considered on April 25, that was -- the one at Menard

11   is Ms. Jamia Klausing, right?

12   A.  She is seeing, I believe, most of our transgender

13   population.  I'm not sure if she's seen all of them, but she

14   was assigned to it after her training and after her -- you

15   know, after a period of time, I believe.

16   Q.  I'm sorry, I didn't mean to interrupt you, Doctor.  Were

17   you finished with your answer?

18   A.  Yes, I believe so.

19   Q.  Dr. Puga, you asked Ms. Klausing to prepare the paperwork

20   in advance of the April '25 -- April 29, 2025 meeting, right?

21   A.  Yes.

22   Q.  And you know she's new to Menard, right?

23   A.  Yes.

24   Q.  So you had to help her with some instructions, isn't that

25   right?

1   A.  When I asked my secretary to send that along, yes, and Dr.

2   Reister and Ms. Morris was working with her, but, yes, because

3   she's new.

4   Q.  Okay.  And I think this was an exhibit you testified on

5   Direct.

6        MS. PARSONS:  And we can take that spreadsheet down,

7   Mr. Delaney, thank you.  That was difficult to look at.  I

8   appreciate your help.

9        Can we pull up Defendants' Exhibit 3?

10  Q.  (By Ms. Parsons) This is something you testified about on

11  Direct, Dr. Puga.  This is that -- It was a list of factors

12  that the TAC committee considered.

13       MS. PARSONS:  Mr. Delaney, if we could pull that up,

14  that would help, Defendant's Exhibit 3.

15  A.  Yes, I have that.

16  Q.  (By Ms. Parsons) It's a Bates number 0426125.

17  A.  Yes.

18  Q.  Do you have it, Dr. Puga?

19  A.  Yes, I do.

20  Q.  You recognize this is something you talked about on

21  Direct, right?

22  A.  Yes.

23  Q.  This was actually a list of factors that you sent to Ms.

24  Klausing on April 18th, to try to help her learn how to do

25  this process, right?

```
 1   A.  It's a complex question.  I had my secretary send it to
 2   her to make sure she had it and to make sure what was
 3   expected, but, there again, like I said, she had coaching from
 4   her supervisor, or from Carri Morris, and Dr. Reister, so I
 5   didn't know whether she had received it, but I wanted to make
 6   sure that she had had it.
 7   Q.  I want to follow up.  Carri Morris -- At your deposition
 8   you told me she was administrative, her role was
 9   administrative in nature.  Is she the supervisor to Ms.
10   Klausing?
11   A.  She's a senior member -- therapy member there, and so with
12   the absence, with the lack of therapists and what have you,
13   she's done a lot of -- done a little bit of everything and a
14   lot of individual work with people, and so she -- You know,
15   she is an IDOC -- in an IDOC supervisory role, but, like I
16   said, because of the lack of staff, I think she has been
17   involved and she's seen individuals and working with them, as
18   well.
19   Q.  Is she a mental health provider?
20   A.  Yes, she is.  She's what we call a Social Worker 4, so
21   she's at the higher level of social worker credentialing.
22   Q.  Okay.
23        MS. PARSONS:  You can take that down, Mr. Delaney.  I
24   will come back to it in just a moment.
25        I would like to pull up document marked Bates number
```

```
 1    042613.

 2           For the record, I will mark this as Plaintiffs'

 3    Exhibit 51.

 4           If you could zoom in on the top, Mr. Delaney, please?

 5    Q.  (By Ms. Parsons) Dr. Puga for the record, this is an

 6    e-mail from Lisa Bogert.  That's your secretary, right?

 7    A.  It is.

 8    Q.  It's dated April 18, 2025, right?

 9    A.  Yes.

10    Q.  Okay.  And it's directed to Carri Morris, Shane Reister

11    and William Puga, do you see that?

12    A.  Yes.

13    Q.  And the cc. line is Jamia Klausing.  That's the mental

14    health provider at Menard, right?

15    A.  Yes.

16    Q.  So in this string of e-mails, you were sending the

17    attachment that we just looked at on -- that was marked as

18    Defendants' Exhibit 3.

19    A.  Yes.

20           MS. PARSONS:  I would like to move Plaintiffs'

21    Exhibit 51 into evidence, Your Honor.

22           THE COURT:  51 will be admitted.

23           MS. PARSONS:  Thank you.

24    Q.  (By Ms. Parsons) So, let's go back to Defendants' Exhibit

25    3, okay?  So you send this to Ms. Klausing and others on
```

1    Friday, April 18th, about 11 days before the TAC meeting,

2    right?

3    A.  I believe so, yes.

4    Q.  And Ms. Klausing filled out the paperwork for transfers

5    for four out of the five transgender women that were presented

6    at that meeting, right?

7    A.  I'm not sure.  I'm going to have to take a look at who

8    signed it as far as authoring it, because there's --

9    there's -- there are two areas there, but I would have to look

10   back and see.  Whether she did it or Ms. Morris did it, I'm

11   not sure.

12   Q.  I can represent to you I have looked at the documents, Ms.

13   Klausing signed four of them and Ms. Morris signed the fifth.

14   Okay.  That wasn't my question.

15          Dr. Puga, it's fair to say these factors on

16   Defendants' Exhibit 3, that you testified on Direct, you came

17   up with those factors.  That wasn't your secretary, right?

18   A.  Yes, probably with the committee I think we agreed upon

19   these, yes.

20   Q.  I think I heard you say on Direct, and I know that you

21   said that it's a case-by-case basis for transfer.  But I think

22   I also heard you say there's no set factors for considering

23   whether a transfer is appropriate.  Did I understand your

24   testimony correctly, Dr. Puga?

25   A.  Well, everything is subject to evaluation.

1    Q.  Right.  And so if you are a class member, Dr. Puga, and

2    you are trying desperately to get a transfer to Logan and you

3    are trying to figure out "What do I have to do for the TAC

4    committee to approve me," despite multiple requests over and

5    over and getting denied and denied and the goal posts keep

6    changing, what would your advice be to those class members,

7    Dr. Puga, as to how they are supposed to get approved by TAC?

8    A.  Well, we have had -- I think just by, just historically,

9    that did happen with somebody, and we ended up -- actually two

10   people, and the TAC committee ended up interviewing her and

11   hearing her concerns, their concerns, both of them.

12           MS. PARSONS:  I would like to move to strike that

13   answer as nonresponsive.

14           THE COURT:  That's not responsive at all.  The

15   question was what does a person who's desperately trying to

16   get a transfer out of Logan -- and I am summarizing -- trying

17   to figure out what they need to do and the goal posts -- what

18   would your advice be to those class members when the goal

19   posts keep changing, something to that effect.

20           MS. PARSONS:  Thank you, Judge.

21   Q.  (By Ms. Parsons) Do you have an answer to that question,

22   Dr. Puga?

23   A.  Yes, I think historically they have written to me and they

24   have -- and they have had requests for interviews and

25   discussion, and we have done that.

```
 1   Q.  Looking at this list that's Defendants' Exhibit 3, you

 2   would agree with me --

 3             MS. PARSONS:  If we just zoom in on the top few items

 4   without bullet points at the top, Mr. Delaney.  Thank you.

 5   Q.  (By Ms. Parsons) You testified about all of these factors

 6   on Direct, right, Dr. Puga?

 7   A.  I did.

 8   Q.  You'd agree with me that many of these factors include

 9   aspects of safety for the person that's being considered for a

10   transfer, right, how safe that person is?

11   A.  Yes.

12   Q.  So that -- And you agree with me the reason for requesting

13   a transfer, the first bullet, I think on Direct you gave an

14   example of whether they wanted a job.

15             Dr. Puga, first of all, you know that people with

16   gender dysphoria can't have jobs at IDOC, right?

17   A.  No.

18   Q.  Dr. Puga, you would agree with me that oftentimes for our

19   class members there's not a single reason they have for

20   requesting a transfer, right?

21   A.  Most people have various reasons.

22   Q.  That's right.  And the perception of safety at the

23   facility, it would really help to talk to that person to

24   understand how safe or unsafe they feel at the facility,

25   right?
```

1    A.  And by way of the QMHP and staff, we get that -- that's

2    why we have that question for them, to review with them.

3    Q.  Right.  And for that to be an effective proxy for our

4    class members seeking to attack themselves, that mental health

5    provider has to know them, right, Dr. Puga?

6    A.  They have to have a conversation with them, yes.

7    Q.  And you agree you can learn a lot in a short conversation,

8    right, Dr. Puga?

9    A.  Sometimes, yes.

10   Q.  Just to be clear, you didn't speak to any of these five

11   people before considering them for transfer on the April 29th

12   meeting, right?

13   A.  That's correct.

14          MS. PARSONS:  Okay.  We can take that document down.

15   Q.  (By Ms. Parsons) And just to close the loop on this, Dr.

16   Puga, at the TAC meeting it was Carri Morris that presented

17   each of the five class members for transfer, and not Ms.

18   Klausing, the mental health provider, right?

19   A.  That's correct.

20   Q.  Dr. Puga, during those TAC committee meetings, Ms. Morris,

21   Ms. Klausing and others collect a set of documents for the TAC

22   committee to review at the meeting, right?

23   A.  Yes.

24   Q.  And you and the TAC committee members, you rely on the

25   information in those documents to make a transfer decision,

```
 1  don't you?
 2  A.  Yes.
 3         MS. PARSONS:  Judge, I think his video is frozen.
 4         COURTROOM DEPUTY:  Jerod is checking on him.
 5         THE COURT:  Yeah, Jerod is checking on him.  It's
 6  odd, we can hear him, but I don't know what's going on.
 7  Q.  (By Ms. Parsons) Dr. Puga, can you hear me?
 8  A.  Yes.
 9  Q.  We will try to fix your video, but in the meantime we will
10  ask you questions.
11  A.  Okay.
12  Q.  Dr. Puga, you didn't do anything to verify the accuracy of
13  the records you reviewed before the April 29, 2025 meeting,
14  did you?
15  A.  Beforehand?
16  Q.  Right.
17  A.  No.
18  Q.  And nobody on the TAC committee is assigned that job of
19  reviewing the accuracy of the records that TAC bases its
20  transfer decisions on, right?
21  A.  No.
22  Q.  You take them at face value, right?
23  A.  No.
24  Q.  You don't?
25  A.  Yes.
```

1    Q.  I think we just established that you and nobody else on

2    the TAC committee does anything to verify the accuracy of the

3    records that the TAC committee is relying on, right?

4    A.  No, that's not my statement.

5    Q.  Do you remember being asked these questions at your

6    deposition last Thursday, Dr. Puga?  I am happy to pull it up

7    for you.

8    A.  I don't remember that in particular.

9    Q.  Okay.  Let's take a look at it.

10            MS. PARSONS:  Mr. Delaney, could you pull up Dr.

11   Puga's transcript at page 66?  And let's go to lines 16

12   through 23.

13   Q.  (By Ms. Parsons) So, Dr. Puga, my colleague, Stephen

14   Ferro, asked you, "We talked earlier today about records that

15   the TAC reviews before the meeting.  Do you do anything to

16   verify the accuracy of the records that you review prior to

17   the meetings?

18            Answer:  No.

19            Question:  Nobody on the TAC is assigned to review

20   the accuracy of those records prior to the meeting?

21            Answer:  No."

22            Do you remember being asked those questions and

23   giving those answers, Dr. Puga?

24   A.  I don't specifically recall, but let me clarify.

25   Q.  Sorry, Dr. Puga, that wasn't my question and your Counsel

1   can ask anything they want to follow up.  My question is were

2   those the questions asked and were those the answers you gave?

3   A.  Apparently they were questions and those are my answers.

4   Q.  Okay.  You were telling the truth last Thursday and you

5   are under oath again today, right?  You are here to tell the

6   truth, Dr. Puga?

7   A.  Yes, I am.

8   Q.  Dr. Puga, do you recall testifying here in this court --

9   You were live in August 2021, were you not?

10  A.  Yes.

11  Q.  And do you recall that you and I talked a lot about your

12  training as it relates to issues surrounding gender dysphoria?

13  A.  Somewhat.

14  Q.  I just want to revisit the topic of any ongoing training

15  you have done.

16         This Court is aware that IDOC has annual training for

17  its staff and, Dr. Puga, you attend that virtual training

18  every year at IDOC?

19  A.  I do.

20  Q.  And you have done that annually since the August 2021

21  trial?

22  A.  Since we have had those available, yes.

23  Q.  And you have also attended a two-day WPATH training that

24  IDOC hosts, as well?

25  A.  Yes, I have.

1    Q.  And at least as of the August 2021 trial, you told the

2    Court that you attended a virtual training at the Mayo Clinic.

3    Do you remember doing that before trial?

4    A.  Yes.

5    Q.  And aside from -- Between the trial time in August of 2021

6    and January 1st of this year, the only formal training that

7    you did related to gender dysphoria was before that time, it

8    was that Mayo Clinic training, is that right?

9    A.  If you mean formal CME training, yes.

10    Q.  Okay.  And outside of any conversations you were having

11    among IDOC employees, you couldn't recall any other trainings

12    that you did between the trial -- excuse me -- between January

13    1st, 2024, and today?

14    A.  With the consultants who are not IDOC employees, yes.

15    Q.  I am almost finished, Dr. Puga.

16           Let's look specifically at Plaintiffs' Exhibit 2.

17           MS. PARSONS:  Mr. Delaney, if you could help me and

18    pull that up.  Could you zoom in on the top of that so we can

19    see the header?  Thank you.

20    Q.  (By Ms. Parsons) Dr. Puga, this has already been admitted

21    into evidence as Plaintiffs' Exhibit 2.  I understand this is

22    the minutes from the April 29, 2025 TAC meeting.  Would you

23    agree with that?

24    A.  Yes.

25    Q.  You read these minutes before they were issued, right?

```
 1   A.   Yes.

 2   Q.   And you agreed with them?

 3   A.   Yes.

 4   Q.   You're the cochair of the committee, of course?

 5   A.   Yes.

 6   Q.   And if anyone wants to know the details of what happened

 7   at the TAC meeting, this is the only record that would come

 8   from it, right?

 9   A.   I believe so, yes.

10   Q.   I would like to --

11        MS. PARSONS:  You can set that aside, Mr. Delaney.  I

12   would like to pull up another exhibit, Bates number 0426112.

13        I would like to mark for the record this as

14   Plaintiffs' Exhibit 52.  This is a new one.  If you could zoom

15   in on the top, Mr. Delaney, thank you.

16   Q.   (By Ms. Parsons) This also appears to be meeting minutes

17   from the TAC Committee on April 29, 2025.  Do you see that?

18   A.   Yes.

19        MS. PARSONS:  For the record, this document was

20   produced to Plaintiffs last night.

21   Q.   (By Ms. Parsons) Dr. Puga, is this the same document as

22   Plaintiffs' Exhibit 2?

23   A.   Looks like it's similar to what you just showed me just

24   prior to that, and so there was only one -- one record of

25   April 29, 2025, I believe.
```

1    Q.  Okay.  Dr. Puga, are you aware of multiple versions of

2    this document?

3    A.  I was sent a copy from my secretary, and so typically I go

4    through it and modify for, you know, corrections and sometimes

5    wording errors or what have you.

6    Q.  So, you have seen multiple versions of this document?

7    A.  I have seen one version and then I modified it.

8    Q.  Okay.

9    A.  So the two versions exist, then two versions may exist,

10   yeah.  But the official version is the one that I modified.

11   Q.  Okay.  And the version that you modified, is that the one

12   that you used to testify on Direct?

13            MR. PENN:  I'm just going to object.  I don't think

14   we used this.

15            THE COURT:  I don't think this was used on Direct.

16            MS. PARSONS:  Okay.  I'll withdraw the question.

17            THE COURT:  What is the difference between this

18   document and Exhibit 2?

19            MS. PARSONS:  Well, let me do that.  I knew this was

20   on Zoom.  We prepared a demonstrative showing the differences.

21   If the Court will indulge us I will pull up a red line between

22   the two versions.  Is that okay, Your Honor?

23            THE COURT:  No, that will be fine.

24            MS. PARSONS:  Mr. Delaney, could you pull up the Word

25   document that I will represent to the Court as the red line

1    between Plaintiffs' Exhibit 2 and Plaintiffs' new 52?

2         Let's take a look -- If you could zoom in on the

3    bottom half of the first page.

4    Q.  (By Ms. Parsons) Let's look at the entry for ███████

5    or ███████████, who's already testified at this hearing.

6         You see that hormone levels were stricken.  Do you

7    see that, Dr. Puga?

8    A.  Yes.

9    Q.  Do you recall whether you added that in when you modified

10   it or whether you struck it when you modified it?

11   A.  I don't remember.  Well, if it was stricken -- I don't

12   know.  I don't know.

13   Q.  Let's take a look at the next page, let's see if maybe we

14   can figure this out.

15         MS. PARSONS:  Next page for me, Mr. Delaney.  Zoom in

16   on the top half of this page of our demonstrative Exhibit 1.

17   Q.  (By Ms. Parsons) You see there's some edits to this

18   section, Dr. Puga.  Can you tell whether you were adding or

19   deleting those phrases in the final version of your minutes?

20   A.  Yes.

21   Q.  Which is it?

22   A.  Yeah, well, I believe I -- I think what -- what is

23   stricken is what I edited.

24   Q.  So, your secretary originally had written -- Let's focus

25   on the phrase, "Her committing offense is sexual abuse of

1   minor female children."  Do you see that?

2   A.  Yes.

3   Q.  In the original version your secretary included that from

4   her observations at the meeting, and then when you edited it

5   you deleted it; is that what you are telling us?

6   A.  You know, I don't know.  I would have to look at my -- you

7   know, the -- I would have to study this a little bit.  I don't

8   know exactly.

9   Q.  This is your committee, right, Dr. Puga?

10  A.  Yes, but some of this doesn't make sense.  It says, "In

11  restrictive housing for conspiring to escape," yes, but, you

12  know, she didn't actually escape.  I don't know how I -- I

13  don't know why that would have been changed like that.

14  Q.  And Dr. Puga --

15  A.  And I don't know why I would have dropped the sexual

16  abuse.  I don't know.

17  Q.  Well, the only other explanation is that you added that

18  sentence in; is that your testimony?

19  A.  No, I think what's stricken is stricken, but I don't think

20  -- Yes, I may have, yes.  Yes, I -- Actually, I think what is

21  stricken there is I think what I probably added secondarily,

22  because labeled as a predator -- Predator is labeled, so I

23  think that's why I would capital -- and "conspiring to

24  escape," because my secretary wrote "escaping," and then, yes,

25  the committing offense was an issue that we had brought up, so

1  I believe that was something I may have added that she may

2  have omitted.

3  Q.  I see.  So, you added the information that was discussed

4  at the meeting related to ██████████ committing offense

5  being sexual abuse of minor female children, is that right?

6  A.  I believe so, yes, because that was presented in the group

7  and she didn't include it.

8  Q.  Okay.  If that's the case, my understanding, then, that

9  Plaintiffs' Exhibit 2 would be the final version of these

10 meeting minutes.  Does that make sense to you, Dr. Puga?

11 A.  I would have to look and see.  I'm not sure exactly which

12 one you are describing now.

13 Q.  Okay.

14 A.  So, it would have been the one prior to this or the one

15 that --

16 Q.  I understand.

17        MS. PARSONS:  Mr. Delaney, thank you.  You can take

18 that down.  I think we've solved the mystery.  If you could

19 pull up Plaintiff's Exhibit 2 again, please.

20 Q.  (By Ms. Parsons) And let's look at the second page, the

21 portion we were just looking at in the red-line demonstrative

22 exhibit just to confirm this.

23        Okay.  So, in the first section, that's referring to

24 your comments, right, Dr. Puga?  Do you see that?

25 A.  Yes.

1  Q.  And this version references a conspiring to escape, right?

2  A.  Yes, I had notes on -- that I took while we had these

3  meetings, and then I compared them to what she had written and

4  I modified them, yes.

5  Q.  Okay.  So you, after the fact, went back and added,

6  because it was important the fact that ███████████████

7  committing offense was sexual abuse of minor female children,

8  right?

9  A.  Yes, an important consideration.

10  Q.  Dr. Puga, I know you have said on multiple occasions today

11  that the safety of the class member at their current facility

12  is important to you and the TAC committee, right?

13  A.  Yes.

14  Q.  And these minutes, Plaintiffs' Exhibit 2, are the only

15  record of what went on at the TAC committee meeting.  We have

16  agreed on that, right?

17  A.  Yes.

18  Q.  And Dr. Puga, you agree that there's not a single mention

19  of the safety of the person requesting a transfer in any of

20  these minutes, right?

21  A.  From what I recall, I don't think so.

22  Q.  The word "safety" doesn't appear anywhere in this

23  document.  Would that surprise you, Dr. Puga?

24  A.  We discussed that and, you know, there have been times

25  when safety was an issue and we had them transferred

1    elsewhere, but I -- I don't recall -- I don't recall that in

2    this meeting.

3    Q.  Okay.  Several of these -- of the people that you

4    considered at this meeting came here to this Court and

5    testified.  Do you understand that, Dr. Puga?

6    A.  Yes.

7    Q.  Okay.  Let's look at the first one, ███████████, on the

8    first page of Plaintiffs' Exhibit 2.  There's some bullet

9    points here.  First bullet point says, "There's three lawsuits

10   against Menard."

11        Dr. Puga, do you know that that's not true?

12   A.  It doesn't matter to me, but I don't know why that's in

13   there, yes.

14   Q.  Does it matter that one of those lawsuits relates to the

15   sexual assault of ████████████ by a guard?

16   A.  I didn't know that.

17   Q.  Which means the committee didn't know that, either, right?

18        MR. PENN:  Objection, speculation.

19        THE COURT:  Well --

20        MR. PENN:  Objection, speculation.  Go ahead.

21        THE COURT:  It's cross-examination.  I will allow it.

22   Q.  You are the chair of the committee and you were at the

23   meeting, right, Dr. Puga?

24   A.  Yes, there are other people that would -- you know that

25   could possibly know about that, but I didn't know about that.

1  Q.  Okay.  And on the next page of Plaintiffs' Exhibit 2, you

2  thought it was a very serious offense that she had a ticket

3  for conspiring to escape, right?

4  A.  That's what the -- That's what we determined as a group,

5  yes.

6  Q.  And ████████████ came here to testify and explained that

7  the basis of that ticket was her standing in front of a Judge

8  in a courtroom saying she was terrified to go back to Menard.

9  Did you know that, Dr. Puga?

10  A.  No.

11  Q.  The next person considered on this list, on Plaintiffs'

12  Exhibit 2, is ████████████.  Do you see that?

13  A.  Yes.

14  Q.  And ████████ was the person that you recommended for a

15  transfer, right?

16  A.  Yes.

17  Q.  And your notes on this section said, "It doesn't sound

18  like she has any areas of concern."  Do you see that?

19  A.  Yes.

20  Q.  Dr. Puga, you didn't -- none of these notes reflect her

21  underlying conviction, does it?

22  A.  Not in the notes.

23  Q.  Would it surprise you that she was convicted for

24  kidnapping and murder?

25  A.  No.

```
 1   Q.  That would not surprise you?

 2   A.  No.

 3   Q.  Did you know that already?

 4   A.  I believe it was brought up as we -- as we looked at

 5   committing offense, yes.

 6   Q.  The next person considered in Plaintiffs' Exhibit 2, which

 7   is the TAC meeting you just conducted, was for ████████.  Do

 8   you see that?

 9   A.  Yes.

10   Q.  ████████ came to testify this week.

11        Dr. Puga, your notes on ████████ reflect based -- I

12   think that's a typo.  I think it should say, "The statement of

13   facts showed that they tied up the victim and penetrated her."

14        Do you see that?

15   A.  Yes.

16   Q.  So, that's ████████ underlying offense, is that right?

17   A.  Yes.

18   Q.  And you personally made a note of that at the meeting?

19   A.  Yes, I believe so.

20   Q.  Do you know when that crime happened, Dr. Puga?

21   A.  No.

22   Q.  Would it surprise you it was 26 years ago?

23   A.  That didn't -- She's older, so perhaps.

24   Q.  But, you used that as an important reason for denying her

25   transfer to Logan today, right?
```

1    A.   There have been times when at other facilities things were

2    perfectly fine, and then we see a resurgence of issues at the

3    next facility, so that's something that we weigh in on.  But,

4    that's something that was brought up by the team.

5    Q.   Let's take a look at the next person presented that was

6    ███████████.   You know ███████████, right?

7    A.   Yes.

8    Q.   She was the person you spoke to years ago?

9    A.   Yes.

10   Q.   You know ███████████ identified as transgender well before

11   your program existed to keep track of prisoners in Illinois,

12   right?

13   A.   Yes.

14   Q.   ███████████ was seeking a transfer to Logan.  It says on

15   the bullet point that she wanted somewhere with more

16   programming.  Do you see that?

17   A.   Yes.

18   Q.   And ███████████ submitted a declaration in this case that

19   you read when it came out, right, Dr. Puga?

20   A.   I'm sorry.  Can you repeat the question?

21   Q.   ███████████ was one of the class members that submitted a

22   declaration and you testified that you reviewed all those when

23   they were filed.  Do you remember that?

24   A.   Yes.

25   Q.   And in ███████████ declaration she reported sexual

 1    assault by a guard.  That didn't make it into this -- into

 2    these notes, did it, Dr. Puga?

 3    A.  No.

 4    Q.  And you know ███████████ is almost 60 years old and serving

 5    a life sentence, right?

 6    A.  Yes.

 7    Q.  And in her declaration she explains that she is -- she has

 8    severe osteoarthritis and can barely walk.  You would know

 9    that if you read her declaration, right, Dr. Puga?

10    A.  Yes.

11    Q.  And still -- Let's look at your comment on ███████████.

12    "She has a lot of assault charges on her record."

13         Do you really consider a 60-year-old fully-disabled

14    person as a threat of assault at Logan, Dr. Puga?

15    A.  Well, when I met her she assaulted a mental health worker

16    with a -- with her cane and I think badly injured her, and

17    that's what got her out of Menard at that time.  That was a

18    couple of years ago.

19    Q.  Okay.  The next person considered was ███████████, but

20    she prefers the name ███████████ and she came to testify this

21    week.  You didn't see her testimony, right?

22         MR. PENN:  Judge, I'm going to object.  These are

23    witnesses.  I mean, were we supposed to bring our witnesses to

24    observe the testimony?

25         THE COURT:  Well, no, but I think she's --

1              MR. PENN:  It's an inappropriate question.

2              THE COURT:  Well, she's asking him, and I assume a

3     question is going to reference what this witness said.

4     Q.  I will withdraw it.  Withdrawn.

5              Let's look at the first bullet point for ███████████.

6              The committee considered that ███████████ has

7     suffered -- that other individuals have spit at her.  Do you

8     see that?

9     A.  Yes.

10    Q.  The committee didn't consider ███████████ testimony and

11    what she described in her declaration of a humiliating

12    experience where she was strip-searched by multiple male

13    guards who made her spread her cheeks and they taunted and

14    laughed at her for being transgender.  The committee didn't

15    consider that for ███████████ when they were considering the

16    safety -- her safety when she was getting a transfer to Logan,

17    right, Dr. Puga?

18    A.  I didn't hear that.  That wasn't brought it up.

19    Q.  The incident of ███████████ being strip-searched by

20    multiple male guards and humiliated for being transgender that

21    she included and wrote about in her declaration months ago,

22    the committee didn't consider this less than a month ago when

23    she was seeking a transfer to Logan, correct?

24    A.  I don't remember that being brought up in the committee.

25    Q.  Dr. Puga, I know you weren't here for these hearings.

1   Each of these witnesses testified for about an hour and all of

2   us in the room were able to learn all of these things that the

3   class members have felt at Menard.  It took us an hour.  You

4   didn't spend any time with any of these people to learn how

5   they felt about living at Menard, did you?

6   A.  Not aside from what was reported in the meeting.

7           MS. PARSONS:  Nothing further, Your Honor.

8           THE COURT:  All right.  I just have a couple of

9   questions, and if you want to follow up on any of mine, and

10  then I will allow Redirect.

11

12                       EXAMINATION

13  BY THE COURT:

14  Q.  This meeting -- April 29th meeting, Dr. Puga, how did it

15  take place?  Was it in person or virtual?

16  A.  Virtual, Your Honor.

17  Q.  Okay.  So everybody was in different locations pretty

18  much?

19  A.  Yes.

20  Q.  Okay.  Just curious.  This new Transgender Patient

21  Advocate, --

22  A.  Yes.

23  Q.  -- once that person is hired where will that person sit?

24  Like where will the office be?

25  A.  I don't know.  Probably -- I'm not sure where they live,

1    because this is a statewide position, so I would imagine if

2    they live closer to the city it will be somewhere in one of

3    the facilities closer to the city, City of Chicago, and if

4    they are further south somewhere, you know, they can -- They

5    will have some flexibility, I believe, either Springfield or

6    Chicago.

7    Q.  Okay.  And you think this person would be expected to

8    travel to different facilities on a regular basis?

9    A.  Yes.

10   Q.  Okay.  And then just a couple of things I am curious about

11   where you talk about how the -- that upon arrival at Logan

12   that cisgender women aren't receptive to the transgender

13   women.  Do you remember you talked about that?

14   A.  Yeah.

15   Q.  Are all the cisgender females at Logan nice to each other?

16   A.  Well, there are fights -- You know, it's not -- It's not

17   easy.  I think, you know, as I mentioned, there are some

18   people -- some transgender females have acclimated and done

19   very well, and yet some haven't, and so -- But it's still a

20   challenge, because I think some of the cisgender women

21   sometimes are very aggressive with them as far as verbally

22   and --

23   Q.  But, I mean just to each other.  Aren't cisgender -- I

24   mean, mean girls are mean girls, aren't they, to each other

25   sometimes?

1    A.   Yeah.

2    Q.   I mean, I went to junior high and high school.  I mean,

3    girls can be mean, right?

4    A.   Yes, yes.

5    Q.   And then as far as -- Aren't there problems -- or, you

6    know, are there problems, I am just curious, between, if you

7    know, cisgender women making sexual advances on each other?

8    A.   And to the transgender women, yes.

9    Q.   Okay.  And then does the Illinois Department of

10   Corrections consider the height and weight of an individual --

11   of a cisgender man, for instance, when deciding where to place

12   a cisgender man?

13   A.   Yes, I think celling and all is dependent -- I think

14   there's an algorithm that goes into celling, into what cell

15   they are assigned to.

16   Q.   Okay.  Celling, but not facility, correct?

17   A.   Not facility, right.

18   Q.   Okay.  And I do not mean this facetiously in any way, but

19   it's my understanding that if someone born male is taking

20   hormones to become a female, taking those hormones regularly

21   and properly, the male parts don't work, correct?

22   A.   Not always.  There are times when it does and certainly,

23   for example, in ██████████ case, you know, she does have

24   full erectile functioning and I think that's for the -- I have

25   asked this question to our endocrinologist.  He said yes, for

1    the most parts that's true when you have atrophy of the

2    testicles and such, but, yeah, there are people despite that

3    they can still fully function.  So it's not a guarantee that

4    it has a negative effect on that.

5            I have had some -- I had one transgender woman I

6    spoke to that she said that even on hormones she still got

7    erections when she woke up and it really bothered her and so

8    -- you know, so despite being on adequate amounts of hormones.

9    Q.  Okay.  But, of course, that's one of the reasons why a

10   transgender female might want to have surgery, correct?

11   A.  Yes.

12           THE COURT:  You can follow up if you have anything,

13   Ms. Parsons.

14

15                   CONTINUED CROSS EXAMINATION

16   BY MS. PARSONS:

17   Q.  One question on follow-up hormone therapy.  I know the TAC

18   committee considers hormone levels and at least in the people

19   considered in the April 29th meeting, you understand the class

20   members want to take the hormones, but they are not getting

21   them and that might affect their levels.  You would agree with

22   that, Dr. Puga?

23   A.  If they are not getting it, yes.

24   Q.  Nothing further.

25           THE COURT:  Ms. Parsons, I'm not sure if you moved

1    for the admission of 52.  Or were you just using that for

2    cross-examination?

3              MS. PARSONS:  Let's move to admit it.  Thank you,

4    Judge.

5              THE COURT:  52 will be admitted, but not the

6    demonstrative that you used, the red-line.

7              MS. PARSONS:  That's right.

8              THE COURT:  All right.  Any Redirect?

9              MR. PENN:  Just a little bit, Judge.

10

11                        REDIRECT EXAMINATION

12   BY MR. PENN:

13   Q.   ███████████.  Do you know -- I don't want to lead this,

14   but is ██████████ a transgender female, do you know?

15   A.   Yes`, she is.

16   Q.   There was a lot of talk about a conversation you had with

17   her.  What was the purpose of that conversation?

18   A.   We were assessing for appropriateness to transfer to

19   Logan.

20   Q.   And she was transferred, correct?

21   A.   Yes, she was --

22   Q.   Go ahead.

23   A.   Yeah, as I mentioned, I'm not sure if she's already or --

24   but, yes, the process is in place.

25   Q.   She was approved for transfer?

1    A.   She was approved.

2    Q.   You weren't trying to dissuade her from that, were you?

3    A.   No.

4    Q.   And she was convicted for -- Well, they said that she was

5    convicted for murder and you still transferred her?

6    A.   Correct.

7    Q.   There was a lot of discussion about your not investigating

8    individual claims.  Is it your job to investigate individual

9    claims?

10   A.   No.

11   Q.   And do you have people -- I mean, does IDOC have divisions

12   that investigate claims and people that investigate claims?

13   A.   Yes; yes.

14   Q.   With respect to the committees that you are on, there was

15   a lot of questions about the accuracy of the documents or

16   information that you are reviewing and that you didn't

17   personally investigate it.  Do you have people that do that

18   for the committees?

19   A.   Well, what happens is that during the TAC, typically, for

20   example, our Operations people are looking up other

21   information.  So, oftentimes Mr. Nottingham is looking up the

22   PREAs, looking up the other information while we are in the

23   midst of, you know, the conference.  Or, if there's other

24   questions that come up, we will do a further dive there during

25   that meeting.  So the expectation is that the MHP who is

1    presenting will have the chart in front of them so they can

2    give us information that we may ask.

3    Q.  And in your experience on these committees, is the

4    information usually accurate?  And, let me be clear.  I'm not

5    suggesting -- If someone makes an allegation, I'm not asking

6    you if the allegation is truthful.  What I am saying is the

7    data that you are looking at, is it normally accurate?

8          MS. PARSONS:  Objection, Your Honor.  Calls for

9    speculation.

10          THE COURT:  Well, if he knows he can answer.

11    A.  I'm assuming it is.

12          THE COURT:  Hold on.  One at a time.  Let him finish.

13    Q.  Let's let you finish.

14    A.  I don't have a way of fact-checking that.  I am assuming

15    people know that, you know, this is not a committee that is a

16    stonewalling committee that we are not -- It's not there to

17    keep people out, you know, it's to allow people who can be

18    successful and who could be appropriate to come in.  And so,

19    you know, there's -- I don't have -- So, if they -- whatever

20    they present, it isn't because we want it slanted in any way.

21    Q.  And in your experience on these committees, are there --

22    is there a lot of data that has been proven that has been

23    shown to be wrong later?

24    A.  Well, just because a person has been successful at one

25    facility doesn't -- it doesn't guarantee success at another.

1    Q.  No, that's not my question.  I'll move on.

2           With respect to the spreadsheet that you gave a lot

3    of testimony about, did you create that spreadsheet?

4    A.  No.

5    Q.  Do you maintain that spreadsheet?

6    A.  No.

7    Q.  Are you responsible for populating that spreadsheet?

8    A.  No.

9    Q.  I understand that you're not meeting and that the TAC

10   committee is not always meeting with inmates in the TAC

11   process or in the committee process, but do you have an

12   understanding of whether there are people, including medical

13   providers, that are speaking with those people?

14   A.  Yes.

15   Q.  And are they?

16   A.  Yes.

17   Q.  And are they reporting back to the committee?

18   A.  Yes.

19   Q.  The last thing.  You talked about the safety of

20   transferees.  So if someone puts in for a request to transfer,

21   a transgender inmate, for example, you do consider the

22   transgender inmate's safety, correct?

23   A.  Yes.

24   Q.  In your experience, when a transgender inmate -- a

25   transgender female inmate is going to a female -- a cis

1    female, generally cis female population, generally speaking is

2    it more likely that that's going to pose a risk to the

3    transgender female inmate or to the cisgender population?

4         MS. PERSONS:  Objection, calls for speculation.

5         THE COURT:  Hold on.  So, the objection to the

6    question -- Speak into the microphone, if you would, for

7    Steph.

8         MS. PARSONS:  I objected on the basis of speculation

9    and calls for expert testimony, Your Honor.

10         THE COURT:  Well, again, if he knows.  He said, "In

11    your experience."  So, if you can say, Dr. Puga.

12    Q.  Do you understand the question?

13    A.  No, I don't.  If I can have it either rephrased or read

14    back.

15    Q.  So, let me just say it this way:  I know you consider the

16    safety of the individual being transferred.

17         THE COURT:  And when you say that, Mr. Penn, are you

18    meaning the subjective perception of that person or the

19    objective perception of their safety?

20         MR. PENN:  That's the distinction I am drawing,

21    Judge.

22    Q.  (By Mr. Penn) What I'm saying is an inmate requests to be

23    transferred -- Let's say it this way.  A male inmate requests

24    to be transferred and the male inmate requests to be

25    transferred to a female -- all female, all cisgender female

1    population.  Generally speaking, is that -- are you going to

2    be more concerned about the cisgender population accepting a

3    transfer of a male, of a cisgender male, or are you going to

4    be more concerned about the cisgender male's safety in a

5    cisgender female population?

6            MS. PARSONS:  Objection.  Outside the scope of my

7    cross-examination.

8            THE COURT:  Well, I think it is.  And nobody is

9    talking about cisgender males to cisgender female prisons.

10           MR. PENN:  Judge, she asked about the safety of

11   transferees, she asked about that being a consideration, and

12   she went through the notes and said nowhere in here are you

13   considering the safety of the transferee, and I am asking

14   about the safety of the transferee.  It's not outside the

15   scope.

16           THE COURT:  Okay.  But I think -- I mean, you are

17   asking about a cisgender male transferring to a cisgender --

18   to a female facility?

19           MR. PENN:  What I am trying to say is when -- there

20   are considerations here on both sides, both for the population

21   and for the transferee, --

22           THE COURT:  Sure.

23           MR. PENN:  -- and in some instances the transferee is

24   going to a safer population than -- is being transferred to a

25   population where the consideration is larger for the

1    destination than it is for the transferee.  So, if you take a

2    12-year-old kid and you are going to put him in max, you are

3    going to be concerned about the 12-year-old kid.

4            THE COURT:  Sure.

5            MR. PENN:  But if you are transferring an 18-year-old

6    in-shape person to a -- to juvenile, you are not going to be

7    worried about the transferee.

8            THE COURT:  Right.  Well, ask the question --

9            MR. PENN:  I will withdraw the question.  We have got

10    another witness to come here.  I think it's self-evident, but

11    I will withdraw the question.

12    Q.  (By Mr. Penn) Dr. Puga, thank you for your time.  I don't

13    have any questions for you.

14    A.  You're welcome.  Thank you.

15            THE COURT:  All right.  Do we have Dr. Conway

16    available, Mr. Penn?

17            MR. BRODZIK:  She was on and then she got off.

18            THE COURT:  All right.  Well, let's take a break.

19    Let's get her and do as much as we can with her.

20            Ms. Parsons, on a break have you and Counsel

21    addressed the Offer of proof of Schoenbeck?

22            MS. PARSONS:  We have received it.  Thank you, Judge.

23            THE COURT:  Let me just say, before I forget, after

24    Dr. Conway -- I don't know if we will finish her today.  I

25    have exhibits admitted today -- whoever is in charge of

```
 1    exhibits -- 35, 43, 46, 50, 51 and 52 from the Plaintiffs, and
 2    from the Defendants 2, 3 and 4.
 3            Does that match your records, Mr. Penn?
 4            MR. PENN:  Yes, Judge.
 5            THE COURT:  Okay.  Whoever on Plaintiffs?
 6            MS. PARSONS:  Yes, Judge.
 7            THE COURT:  All right.  I just like to keep on that
 8    while we are with it.  So, let's take a ten-minute break and
 9    we will resume with Dr. Conway.
10            COURT SECURITY OFFICER:  All rise.
11            (Court's in recess from 3:42-3:52)
12            COURT SECURITY OFFICER:  All rise.
13            THE COURT:  Be seated, everyone.  Do you have a feel
14    for how long --
15            MR. BRODZIK:  45 to an hour.
16            THE COURT:  Okay.  Well, we may have to stop and
17    resume.  Is she available tomorrow morning?
18            MR. BRODZIK:  We can ask her.
19            THE COURT:  Dr. Conway, can you hear me okay?
20            DR. CONWAY:  I can hear you.
21            THE COURT:  So, I'm not sure we are going to be able
22    to complete your testimony today.  Are you available tomorrow?
23            DR. CONWAY:  I think so.  One second.
24            Yes, that will work.
25            THE COURT:  Tomorrow morning, say about 9:00?
```

```
 1              DR. CONWAY:  Yes, that will work.

 2              THE COURT:  Let's do as much as we can today.

 3              So, before you begin your testimony I'm going to ask

 4  you to take an oath.

 5              DR. CONWAY:  Okay.

 6              COURTROOM DEPUTY:  Dr. Conway, please raise your

 7  right hand.

 8              (Defense witness, Dr. LaMenta Conway, sworn).

 9              COURTROOM DEPUTY:  Thank you.  Would you please state

10  your name for the record?

11              DR. CONWAY:  LaMenta S. Conway.

12

13                       DIRECT EXAMINATION

14  BY MR. BRODZIK:

15  Q.  Good afternoon, Dr. Conway.  Sorry for making you wait

16  around for a couple of hours, but appreciate you doing so.

17  A.  No problem.

18  Q.  Can you please state your educational history for the

19  Court?

20  A.  I received my Bachelor's degree from DePaul University in

21  Biological Sciences, completed my Master's in Public Health

22  and Biostatistics and Epidemiology from the University of

23  Illinois, then went on to complete my medical degree from Rush

24  University Medical Center Chicago, completed a dual residency

25  program at the University of Illinois in Internal Medicine and
```

1    Pediatrics.

2    Q.  Do you have a particular field within medicine that you

3    specialize in?

4    A.  I'm just internal medicine and pediatrics.

5    Q.  Do you have any post medical school training that you have

6    undergone?  Residency, Fellowship, anything like that?

7    A.  My residency was Internal Medicine and Pediatrics.  That

8    was the residency.

9    Q.  Are you Board Certified in any field?

10    A.  I am Board Certified in Internal Medicine.

11    Q.  Are you licensed to practice medicine in the State of

12    Illinois?

13    A.  Yes.

14    Q.  How long have you been licensed to practice medicine in

15    the State of Illinois?

16    A.  Since 1998.

17    Q.  Can you give us a brief history of your professional work

18    as a medical doctor?

19    A.  Yeah, upon graduation from my residency program or post

20    medical school training I worked in the inner city of Chicago

21    at Mt. Sinai.  At the same time I also had an academic or held

22    an academic appointment for about five and a half years at the

23    University of Illinois where I taught medical students,

24    primarily resident physicians, some medical students.  After

25    that I went to Indiana University where I continued academic

1    medicine at that location.

2            When I returned to Chicago I actually pivoted and

3    began to do hospital-based medicine, so I have been more of a

4    specialist or became more of a specialist in hospital or acute

5    care medicine.  I did that for about ten years.  As well

6    worked at the Veterans Hospital, Hines VA as an academic

7    hospitalist; also training medical students and resident

8    physicians at Loyola before coming over to the Illinois

9    Department of Corrections six years ago.

10   Q.  Prior to coming over six years, how long were you

11   responsible for direct patient care during your career?

12   A.  The entire time.  So, direct patient care was for the

13   entire extent of my care -- my time.

14   Q.  And you mentioned that you currently work for the Illinois

15   Department of Corrections, correct?

16   A.  Yes.

17   Q.  And you have been with the IDOC for, what was it, six

18   years?

19   A.  Six years in September, yes.

20   Q.  What's your current role with the IDOC?

21   A.  I am Deputy Chief of Medicine for the Illinois Department

22   of Corrections, Office of Health Services.

23   Q.  How long have you served in that role?

24   A.  From the time that I came on board.

25   Q.  What are your current job responsibilities with your

1    current position with the IDOC?

2    A.   My current job responsibilities have -- They have changed

3    a little bit, because we now have regions that we are

4    responsible for.  So, I am more responsible for the clinical

5    oversight, if you will, of the central region, which is the

6    center of the state, but I also manage programs like

7    transgender health from the medical perspective, as well as

8    the dementia-friendly prisons, HIV, infectious diseases, and

9    diabetes and related types of programs.

10   Q.   So, just so I understand it, the State's now broken up

11   into regions for coverage, is that right?

12   A.   Correct.

13   Q.   And you know -- You have said -- testified that there's a

14   central.  So, is there a northern and a southern, or something

15   like that?

16   A.   Yes, there is.

17   Q.   Okay.  And so while you mainly work in the -- strike that.

18        Is Menard prison -- What region is that located in?

19   A.   Central region.

20   Q.   Central region?

21   A.   I'm sorry, I didn't mean to say that.  Southern region.

22   Q.   Southern region.

23   A.   Yes.

24   Q.   And although that's located in the southern region, you

25   still have job duties related to that prison, is that correct?

1   A.   Correct.

2   Q.   And what are those duties?

3   A.   That's related to transgender health from the medical

4   perspective.

5   Q.   Okay.  Do you supervise anyone in your current position?

6   A.   Yes, I do supervise people.

7   Q.   Do you know how many, under an umbrella how many you

8   supervise?

9   A.   I supervise other people that are in administrative roles,

10   probably five persons, thereabouts.

11   Q.   Do you oversee patient care at Menard?

12   A.   No.

13   Q.   Do you treat patients yourself at Menard?

14   A.   No.

15   Q.   Are you responsible for patient care at any other

16   facilities in the southern region of the IDOC?

17   A.   No.

18   Q.   Do you serve in any other roles or committees while

19   employed with the IDOC?

20   A.   So, as an administrator for the state we do -- you know,

21   as clinical roles and things come up, we manage those.  For

22   example, COVID would probably be a good example of something

23   that we manage, and I did that before we even had the regions.

24   So, things like that come up fairly routinely.

25   Q.   Do you serve on any committees related to your work with

1    the transgender community?

2    A.  I serve on the Transgender Health and Wellness Committee.

3    Q.  Do you also serve on the Transgender Administrative

4    Committee, or TAC?

5    A.  I am a member, yes.

6    Q.  Are you a voting member?

7    A.  Yes.

8    Q.  Okay.  Can you name any other individuals that serve on

9    the TAC committee?

10   A.  Dr. Puga, Dr. Reister, and the other persons I can't name

11   by name.  Maybe Chief Eddy.  But there's others that are more

12   from an administrative perspective.  I can't name the names

13   offhand.

14   Q.  Okay.  Would you say that the majority of your work with

15   the transgender community or health is comprised of work with

16   TAC or THAW, the Transgender Health and Wellness Committee

17   that you previously testified about?

18   A.  The Transgender Health and Wellness.

19   Q.  Okay.  Can you describe for the Court what the -- Is it

20   all right if I just call the THAW?  You understand what I'm

21   talking about?

22   A.  Sure, that's what I call it, as well.

23   Q.  Can you describe for me what the role of THAW is?

24   A.  So, the role of the THAW committee is basically an

25   opportunity to look at more holistically at just the

1   health-related, health medical, health mental health related

2   concerns of the patient.  So the types of things that would

3   come to the THAW committee are when, for example, a person is

4   a new -- newly identified as transgender person.  Those people

5   will be presented if they -- You know, if they present

6   themselves as being a transgender person and their diagnosis

7   is confirmed, that person will be presented to the THAW

8   committee so we could be familiar with the person.  If a

9   person has decided to remove themselves from the designation

10  of being a transgender person, that also is done or spoken

11  about.  That's not something we have to decide, but it's

12  discussed at that meeting.

13          Then persons who have complex medical conditions at

14  the facility, want to have collaborative conversations with

15  other healthcare providers, that's done at the THAW committee.

16  And then the request for gender-affirming surgeries are done

17  at the THAW committee meeting, as well.

18  Q.  Does the THAW committee have any role in ensuring that

19  transgender inmates have badges or identification to

20  identifying them as transgender?

21  A.  No.

22  Q.  Which committee, TAC or THAW, deals with the general

23  administrative issues relating to the transgender community?

24  A.  Can you define what you mean by "general administrative"?

25  Q.  Yeah, that's a great question.  I would say the review of

1    hormones, the making sure that people are getting medication,

2    making sure individuals are getting their identification

3    cards, those type of administrative duties.

4    A.  So those are very distinct and separate, you know, which

5    resulted from the first order back in 2019, so those are not

6    combined.  So there is always the opportunity for there to be

7    crossover, because there are several of us that are on both

8    committees.  However, those are separate issues.  So, if a

9    person has an issue related to something administrative,

10   accommodations, badges, things of that nature, that would be

11   on the TAC committee.  If there is a concern related to

12   medical and mental health, that would be on our side with the

13   four things that I described.

14   Q.  What is your role with the THAW committee?

15   A.  I'm the chair.

16   Q.  And what are the duties and responsibilities of the

17   chairwoman of the THAW committee?

18   A.  Primarily to administer, you know, or lead the meeting

19   that we have monthly, the THAW committee meeting.  I help

20   direct and create or at least, you know, suggest or recommend

21   policy that's all medically related.  I helped push for

22   different things that I think that is needed within, you know,

23   the transgender health community.  For example, we needed --

24   because we had so many more people that were being approved in

25   the south, for example, we needed to get electrolysis services

1    in the south so that people would not have to wait to be

2    transferred to like a Logan in order to -- which is where our

3    electrologist was, so things like that.  So, just try to be

4    basically preemptive and preventative whenever we can to try

5    to get things done.

6    Q.  How often does the THAW committee meet?

7    A.  Once a month.

8    Q.  Is that set on a specific date every month?

9    A.  Typically the first Tuesdays of the month, typically.

10   Sometimes we will do an extra one if there's -- You know, if

11   there's a backlog of people that are interested in being

12   presented for surgery, for example, we will sometimes add

13   additional ones, but, yes.

14   Q.  Can you tell me on average how long those meetings last?

15   A.  They last from -- They start at 1:00 and they last to

16   about 3:00, typically.

17   Q.  How many members of the THAW committee are there?

18   A.  The members include myself, Chief of Mental Health Melvin

19   Hinton, Dr. Puga, Dr. Reister.  There are ad hoc members like

20   Dr. Katz, who's an endocrinologist and sees our patients, as

21   well, from the University of Illinois.  There's Dr. Erica

22   Anderson, again ad hoc, who's our consultant.  Previously Dr.

23   Norman Schechter, who's a gender-affirming surgeon, he would

24   be on the meetings, but not so much now because he's got a lot

25   of surgical responsibilities.  But then the regional

1   coordinators.  So, for example, there are administrative

2   nurses, if you will, who served in the role of regional

3   coordinator, we call it, over the healthcare administrators

4   for each facility.  They will be on the call.  And I believe

5   that there are other mental health folk that may be on there.

6   And, of course, attending the meetings will be the mental

7   health professionals that are presenting the patient, as well

8   as the medical doctors and the nurse and healthcare

9   administrators who are also co-presenting that patient.  So,

10  it's definitely very, very collaborative.

11  Q.  Those mental health professionals that are presenting a

12  patient, are those mental health professionals from the

13  institution that that patient is currently housed at?

14  A.  Correct.

15  Q.  So, if you are dealing with a patient at Menard, it would

16  be a Menard mental health worker?

17  A.  That's correct.  It's typically a social-worker-level

18  trained person or a psychologist-level trained is the mental

19  health professional or sometimes the mental health authority,

20  along with the nursing and/or doctors on the medical side that

21  co-present with the patient, for the patient.

22  Q.  Does the THAW committee actually provide medical services?

23  A.  Tell me what you mean by medical services.

24  Q.  I would say hands-on medical services.

25  A.  So, the THAW committee, as in voting members of the THAW

1    committee, no, we don't provide medical services.  If you are

2    referring instead to our ad hoc member who is such an

3    extraordinary contributor, like Dr. Katz from Endocrinology,

4    patients can be referred to him directly, and that is very

5    helpful, because oftentimes he would weigh in on some things

6    that he may have experienced that can help with, you know,

7    information that they may not have or understand.  So, he is

8    the only person.

9    Q.  So, who provides the actual hands-on patient care to IDOC

10   inmate patients?

11   A.  So, it would be -- Are you talking about any patient right

12   now, or are you speaking specifically for transgender people?

13   Q.  Any patient.

14   A.  I'm sorry?

15   Q.  Any patient.

16   A.  Oh, all patients are seen by either a staff physician, a

17   staff medical director, possibly a regional medical director.

18   Depending on coverage, it could be an extender or mid level,

19   like a nurse practitioner or a PA, and then, of course, all of

20   the nurses that are assigned to that facility, as well.

21   Q.  You anticipated my next question.  Are those the same

22   individuals providing care for the transgender community

23   within the prison system?

24   A.  Yes, I mean by title, sure, they are the same people.

25   They will be different people from facility to facility.

1    Q.   Okay.  And patient care is provided on a facility-by-

2    facility basis, is that correct?

3    A.   Tell me what you mean by that.  I'm sorry.

4    Q.   So, the hands-on patient care that we were just talking

5    about, that is primarily administered on a facility-by-

6    facility basis, is that correct?

7    A.   Yes, doctors at that facility that are hired to work at

8    that facility will take care of the patients at that facility,

9    that is correct.

10   Q.   Are you aware of how many full-time doctors there are on

11   staff at Menard?

12   A.   Currently I believe we have two that are on staff

13   presently, that does shift, and then there's also the regional

14   medical director who provides additional coverage, but I

15   believe there are two at present.

16   Q.   Can you explain the working relationship between THAW and

17   the individual medical doctors at a facility like Menard?  Is

18   there much medical overlap there?

19   A.   There is not a overlap, but there's a working relationship

20   in the sense that if those doctors need some assistance or if

21   we need to provide training -- that's another thing that I may

22   not have mentioned before -- that's something that the THAW

23   committee will make available for all doctors.  For example,

24   we will have -- Quite often we may have -- or several times a

25   year, I would say -- educational surveys, services or

1    in-services, if you will, that I will set up with some

2    particular specialist, like the endocrinologist.  So those are

3    some of the ways that we may overlap with the people there and

4    then at the THAW committee.

5    Q.  Going back, you testified about the THAW committee meeting

6    with new disclosures.  Do I have that right?

7    A.  You mean in terms of why they might be -- what or who is

8    presented at the THAW committee meeting?

9    Q.  Maybe a better question is what is a new disclosure in the

10   purview of the THAW committee?

11   A.  Sure.  So, under the purview of the THAW committee there's

12   nothing specific to us, it's really just our opportunity to be

13   aware of all of the patients that are -- because we don't

14   provide direct medical care as administrators and policy

15   creators, etcetera.  So, this is our opportunity at the THAW

16   committee to get familiar with the name of a patient that may

17   be new to us because that person has just recently -- I think

18   the most common phrase that people will use is "come out."

19   So, if a person comes out and declares themselves as being a

20   transgender identity, that person will ultimately be confirmed

21   and brought to the THAW committee.

22        When they are brought to the THAW committee, we are

23   talking about things like their gender journey, some of the

24   experiences they may have, how they are doing today, what some

25   of their needs are, do you think they need anything else, and

1    so it was meant to be an opportunity to just get to know this

2    new patient that's new to us.  And they're, of course, on the

3    caseload at that point, as well, so we are just more aware of

4    them.

5    Q.  So when you state a new disclosure meets with the THAW

6    committee, is that an in-person meeting, a Zoom meeting, or

7    how is that initial meeting occur?

8    A.  THAW committee meeting is once a month, always over Zoom,

9    and the patient themselves is not at the meeting.  The patient

10   is being presented by the persons at the facility.  So, the

11   mental health people take the lead on it, because they are the

12   ones responsible for the diagnosis and such, and then the

13   medical people will come in combination with them, as well,

14   and then they will all present this patient.

15          And maybe a good example of the way the duties are

16   delineated, Mental Health they talk about the diagnosis of

17   gender dysphoria, some of the gender journey, and then Medical

18   would take over somewhere midways through the presentation and

19   they'll talk about baseline labs, you know, what the

20   medication is that the patient was started on and things like

21   that.  That's how the two are presenting together.

22   Q.  Does the THAW committee monitor things like hormone levels

23   in transgender inmates?

24   A.  We did at one time, because that was something that we

25   were asked to do and I do think at the time it was a good

1    idea.  We don't currently -- The THAW committee doesn't
2    currently monitor them.  We have more or less reverted back
3    to the initial recommendation of the Court, is that these
4    things are to be managed by the local facilities, and our goal
5    is just to try to empower people to do a better job of doing
6    that.  But, there was a time that every quarter I met with
7    many of the -- you know, the facilities, or actually all of
8    the facilities, and we would review the labs of patients and
9    help the doctors, nurses, etcetera, with their plans for the
10   patient.
11   Q.  If a transgender inmate would like to start hormones, does
12   that request have to be approved by the THAW committee before
13   hormones can start, or is that still kept ground level at the
14   facility?
15   A.  Right, that was one of the requirements of, you know, the
16   first preliminary injunction, so that absolutely ended really
17   on the day of the preliminary injunction.  And our goal was
18   just try to empower them to do a good job so it would not --
19   you know, to make sure that it got done.  So, to answer your
20   question, it's definitely at the facility level.
21   Q.  Does the THAW committee handle requests for transgender
22   reassignment surgeries, for instance?
23   A.  Yes.
24   Q.  Okay.  So, hormones, no.  Gender reassignment surgery,
25   THAW deals with that?

1    A.  That's correct.

2    Q.  Okay.  How long have you been personally dealing with

3    patient care as it relates to the transgender community?

4    A.  Are you referring to at IDOC?

5    Q.  Generally speaking.

6    A.  Generally speaking, prior to coming to the Illinois

7    Department of Corrections, in my clinical years, when I worked

8    in the clinic, I definitely took care of patients who were

9    transgender.  Also, less often when I was an academic

10   hospitalist, because it's more acute medicine, but I would say

11   probably before I started at IDOC, at least ten years before

12   that I interacted with a fair number of transgender patients

13   that I have had to take care of.

14   Q.  Within the IDOC present day, do you play a role in how

15   medical care policy is implemented for the transgender

16   community?

17   A.  Yes.

18   Q.  And how is that?

19   A.  Just providing consultation, being another voice at the

20   table to discuss some of the things that we think the patients

21   may need, and then obviously to bring more of medical

22   expertise, because not everyone is a clinical provider and

23   myself and Dr. Puga are.

24   Q.  Broad picture, not transgender, just generally within the

25   IDOC prison system are there security concerns that affect how

1    medical healthcare can be given?

2    A.  Can you give me an example so I can make sure I understand

3    your question?

4    Q.  Sure.  So, statewide I am assuming some prisoners may be

5    violent or unpleasant to deal with and then you have a doctor

6    at a facility who has to provide medical care for them.  How

7    does the process work of having, you know, potentially violent

8    criminal interacting with a doctor who's trying to provide

9    hands-on care in a prison setting?

10   A.  So not everyone requires, you know, obviously just like in

11   the community we're required daily hands-on care.  You know,

12   people don't require to see the physician on a daily basis or

13   even a monthly.  Sometimes it's even quarterly basis,

14   depending on their age and condition.  But, if a person is

15   violent and they are in what we call restrictive housing,

16   typically the doctor or the healthcare provider would need to

17   see them what we call cell side.  Or, if they need to bring

18   them out to a certain location, then that can happen, too.

19   But, typically people who are being seen in restrictive

20   housing, or let's say if a person is sick and they are in the

21   infirmary, the doctors can go see them cell side.  If they're

22   in the infirmary they will go see them in the infirmary and

23   they will do infirmary rounds two to three times a week.  So,

24   it just depends on what their medical needs and conditions

25   are.

1    Q.  So, for instance, a transgender inmate at Menard requests

2    hormones, they need to meet with the medical provider

3    presumably to be prescribed the hormones.  Where are those

4    appointments or meetings taking place?

5    A.  So I can't speak to a specific and what they would do in

6    that case, but if a patient is in restrictive housing because

7    of some sort of suicide attempt or some other mental

8    instability or violence attempt, typically the goal is to make

9    sure that their mental health condition is reasonably, you

10   know -- reasonably managed prior to starting new therapies.

11   You wouldn't do that with anyone.  So Mental Health would

12   definitely follow them.  And when it's safe to, you know,

13   resume any type of medical therapy, then they would do it.

14   And if it is safe to continue medications, then they will

15   continue.  Most medications will probably get started -- And I

16   am only speaking, since I'm not there at Menard or any of the

17   other facilities to speak with details.  But typically my

18   understanding of what is done is if a patient is on high blood

19   pressure medication, for example, and they are able to

20   continue the high blood pressure medication, they would

21   continue it.  If they had a new therapy that is suggested,

22   then if it's appropriate then they will start it.

23   Q.  Okay.  So, for instance, in the instance of hormones, a

24   transgender patient requests hormones, who makes the ultimate

25   decision regarding whether that hormone treatment will be

1    given and what type of hormone, the prescription for the

2    hormone?  Who makes that final decision?

3    A.  It would be the physician.  So the medical physician, you

4    know, will have to -- And this is where consent is important.

5    So let's say that a person has suffered some sort of mental

6    deterioration of some sort, if there's some psychosis, that

7    person may or may not be in a position to consent.  One of the

8    things that you have to do before you start hormone therapy is

9    you have to describe the risk and benefit.  Most people know

10   the benefit, but they may not know some of the risks that may

11   be attached.  You have to be able to sign that, the patient

12   has to say, "Yes, I understand the risk and I am ready to go."

13   And so that's something the doctor would have to evaluate with

14   the patient, have the patient sign, and start it.  So, in

15   terms of care, the doctors always make the decision regarding

16   safety first with a patient.

17   Q.  You talked about THAW not having a hands-on role and

18   things like prescribing hormones.  Does THAW play a role in

19   any sort of transfer request?

20   A.  No, we don't play a role in transfer request, no; that's

21   TAC.

22   Q.  What is the difference between your role in TAC and THAW?

23   A.  THAW is one hundred percent exclusively about the four

24   things that I had mentioned about people who want surgery.

25   Maybe this would be a good example.  We will decide if a

1    person meets the criteria for surgery without regard to

2    accommodations where the person is and things of that nature.

3          If accommodations need to be addressed or if its

4    advantageous knowing that a person has been approved for

5    surgery, when that patient is presented to TAC it could be

6    that they will say, "Hey, you know this person was presented

7    to the THAW committee and approved for surgery.  They also

8    want to go to Logan.  Let's talk about this patient."

9          So, it's separate.  We do that intentionally so that

10   there's no administrative aspects that will impact our

11   decision.  So, we are not looking at behavior in the sense of

12   whether or not someone would get a surgery, but if a person is

13   having a psychotic episode, we know by the WPATH standards

14   that mental health conditions have to be reasonably well-

15   controlled.  So, in that sense there may appear to be some

16   overlap, but it is purely focused on the mental and medical

17   health.  That's how we make our decisions, and not

18   administrative where the person is or where they want to be.

19   They are completely separate.

20   Q.  And when did this dual TAC/THAW committee structure --

21   When was that implemented?

22   A.  That was shortly after -- I can't remember the exact time,

23   but shortly after the consent decree of 2019, possibly in

24   2020.  So, I don't want to be quoted on the date and time,

25   because I don't remember.  We have had a lot of rulings here

1    and there, so I don't remember.  But that was our answer to

2    making sure -- and I think it was a good -- very good

3    decision, quite frankly, based on why, you know, it was

4    suggested that they separate, and I think that has been good

5    and that's been since 2020, somewhere around there.

6    Q.  Do you serve in any other leadership roles within the

7    IDOC?

8    A.  Just simply -- No different leadership roles, but in terms

9    of medical leading of particular initiatives, you know, that's

10   the type of thing that I take leadership in.  For example,

11   like COVID I was one of the big leaders there, because at the

12   time it was just myself and our agency medical director.  So,

13   those kinds of things.

14   Q.  Have you had to deal with any staffing shortfalls on the

15   mental or medical health side of your work with the IDOC?

16   A.  I wish I could; I really do.  It's not something that we

17   have control over.  You probably know that hiring in terms of

18   medical staff is through our vendor, and some of the IDOC

19   staff is through CMS, Central Management System.  So, there

20   are a few layers and -- a few layers, I will use that word.

21   But, yes, we are sometimes and oftentimes aware of the

22   shortfalls, but we are not, in our role, in a position to fix

23   them.

24   Q.  Are you familiar with the term CQI?

25   A.  Yes.

1    Q.   What is that?

2    A.   It means continuous quality improvement.

3    Q.   Does IDOC track patients CQI?

4    A.   Yes, IDOC tracks patients CQI, that is correct.

5    Q.   And how do they track that?

6    A.   So, essentially right now, because we don't have an

7    electronic healthcare record, some of our CQI, with the help

8    of SIU, so Southern Illinois University, is tracked depending

9    on the data, by REDCap with SIU, some data, and other data is

10   tracked by the HUCA, which is the healthcare unit

11   administrators and administrators with their Excel sheets,

12   etcetera.  And once, I believe, a month the healthcare

13   administrators and the regional coordinators, which are nurse

14   coordinators, just review the continuous quality improvement

15   initiatives of that particular facility; morbidity, mortality,

16   backlogs, sick -- you know, sick calls, things like that.  And

17   most recently we added -- I'm not quite sure where Menard is

18   with this one, that's not my facility.  But most recently we

19   set up a CQI for transgender health so that can be automated

20   at the level of the facility.

21   Q.   To your knowledge, does the IDOC ensure that transgender

22   patients have access to medical care?

23   A.   Yes.

24   Q.   Okay.  And that would include Menard?

25   A.   Yes.

1    Q.  Can you tell me what type of services that type -- that

2    care at Menard would include?

3    A.  The care at any facility would be the same, including

4    Menard, and of course not every facility is created equal,

5    which I am sure you know.  But there's direct patient care

6    provided by the people onsite.  Of course there's the mental

7    health department, which provides it onsite.  Patients can

8    also do outpatient care and typically in the local facility,

9    local community.  And, if needed, before we broke into

10   divisions, I have approved people even for bone marrow that

11   wasn't covered by Medicaid, and the patient had to go across

12   the river to St. Louis at Barnes-Jewish.  So, really, any care

13   that they need is what we are obligated to provide.  Whether

14   there are breaches or not, I'm sure that's happened and has

15   happened, but our goal is to make sure everyone gets the care

16   that they need.  So, it's in the local facility, it's local

17   outpatient, it's emergency care when needed, it's inpatient at

18   the nearby hospitals, and sometimes it's even care at

19   Barnes-Jewish or in St. Louis if certain resources for

20   tertiary care is not available nearby that's indicated.

21   Q.  So, are transgender inmates at Menard, are they afforded

22   mental health evaluations?

23   A.  So, they -- I will say that they should be afforded mental

24   health evaluations, that currently I am aware that they are

25   receiving that care.

1    Q.  Are they afforded group therapy sessions?

2    A.  Group therapy depends on coverage at each facility, but

3    it's standard at most facilities.  It will vary depending on

4    who's there and, you know, what the needs are of the patients.

5    Q.  Are you aware of whether Menard has a transgender group

6    therapy session or group, for lack of a better word, that

7    transgender inmates can meet with?

8    A.  I'm not aware of whether or not they have that group

9    therapy, sorry.

10   Q.  Are you aware of whether transgender inmates at Menard are

11   afforded individual therapy sessions?

12   A.  I believe so, yes, for sure.

13   Q.  Are transgender inmates at Menard provided hormone

14   therapy?

15   A.  Yes.

16   Q.  Are transgender inmates at Menard provided

17   gender-affirming care items?

18   A.  Yes.

19   Q.  Are transgender inmates at Menard provided surgery

20   consultations?

21   A.  I will say this:  We have had a number of patients who

22   were formerly in Menard who have been evaluated for surgery

23   and they are waiting for surgery.  So, that has definitely

24   happened, and we have a group that will be getting evaluated

25   for surgery when -- you know, once they meet the criteria,

1    once they have completed the class with the surgeon.  But,

2    yes, they are offered the same thing at any other facility in

3    the state.

4    Q.  How does the THAW committee play a role in ensuring that

5    those types of medical care we just talked about are provided

6    to transgender inmates at a facility like Menard?

7    A.  Outside of -- Well, the THAW committee -- That's not

8    actually the role of the THAW to go back to each facility and,

9    you know, to manage the day-to-day that's going on in the

10   facility.  I wish that we could do that or that we had the

11   bandwidth to do that, but essentially that's the

12   responsibility of each facility.  I think one of the remedies

13   for patients, you know, has been grievances and/or sick calls

14   is one way that they communicate whether or not some of their

15   needs may or may not be -- are being met.

16   Q.  Does the THAW committee play a role in approving gender-

17   affirming surgeries for the transgender inmates at Menard or

18   any facility?

19   A.  Yes, we play a role.  We play the role in making sure that

20   people are approved for gender-affirming surgery, yes.

21   Q.  Can you describe for the Court that process of approval?

22   A.  Sure.  Patients essentially are presented to the THAW

23   committee, and typically the kinds of things that we are

24   looking for is not whether or not they are perfect or

25   everything, all the -- you know, every point lines up, but

1  whether or not their mental health issues, if present, are

2  reasonably controlled, and Mental Health typically vouches for

3  those things.  And there tends to be, for those who are

4  presented, fairly -- I would say very support -- Most of the

5  time what I have seen for our mental health providers is

6  typically more of the advocate role than the support role.

7  But I do think they share fairly honestly their experience in

8  caring for the patient.

9         Other types of things we look for for a person that's

10  going for surgery, particularly for like a vaginoplasty, which

11  is very serious, we want to make sure that their hormone

12  levels are consistent and that they have been taking them for

13  about a year.  It doesn't have to be exact, but about a year

14  is the expectation, and that's also what's expected from the

15  WPATH standards.  And once those patients are presented, we

16  simply had a consensus vote and we -- you know, or a raise of

17  hand, we will call -- ask how many vote for or against, and

18  whatever the -- You know, what's the word I am looking for?

19  Whatever the majority is is what the decision is.  And the

20  patient, if they are approved, then they are approved on that

21  day.  Once they are approved, the next steps is that they will

22  have to complete what we call Pathway to Informed Consent,

23  which is just a class taught by the gender-affirming surgeon,

24  Dr. Schechter, where he goes through a PowerPoint just to make

25  sure they understand what the process looks like in general.

1    And if they are like, "You know what?  Yes, this is for me, I

2    feel good about this," then they will need a letter of support

3    within 30 days from their mental health provider and a letter

4    from their medical provider that there are no concerning or

5    worrisome contraindications.  If they were a transmale, for

6    example, they may need a mammogram for getting chest surgery.

7    So, various things are required.  And then the next thing is

8    the patient will start electrolysis.  And that's something

9    where we did have a delay, because it was extraordinarily

10   difficult to get an esthetician type person who does

11   electrolysis to come into the prison, but we now have someone

12   who will be coming and starting and going to the south.  So,

13   those are the process and that part can take a while.  So, the

14   electrolysis services can take anywhere from three to six

15   months, depending on how much hair growth there is, so that is

16   a part of the delay.  And then they are scheduled to see the

17   surgeon when they are closer to hair removal, like the near

18   complete hair removal, then they will see the surgeon with the

19   actual in-person consultation, then it's scheduled.

20   Q.  Is there a specific hospital or hospital system where the

21   actual gender-affirming surgeries take place?

22   A.  Yes, presently we use Rush -- we use Rush, and the

23   facility that we use for healing is the Joliet Inpatient

24   Treatment Center.  So, we actually opened that center on our

25   end, the medical unit, long before it was actually ready to be

opened broadly, specifically, and exclusively for the purposes

of getting our transgender patients getting taken care of.

And now it's up and running and it runs well and everyone at

the Joliet treatment center, which is in Joliet, of course,

all work closely with the Rush gender-affirming surgery

program at Rush and they have all been trained on taking care

of people post vaginoplasty, how to manage their dilations,

which is -- can be complex.  They typically stay in

Chicagoland area or Joliet for about a month so that they can

go back and forth with a reasonable distance back to Rush, and

once Rush releases them, things there are okay, ready to go,

then they return back usually to Logan.  And that's the

process.

Q.  How long on average does it take for the THAW committee

approving you for reassignment surgery to the date of the

surgery?

A.  It's hard for me to answer that one, to be honest, because

there's so many factors that can influence it.  For some

reason it could have been as little as a year or six months.

Then for other people it can be longer.  Like, for example, we

have had several patients, even one that was formerly at

Menard, when she was ready to go, she cancelled her surgery

twice.  That actually happens.  We have other people that when

we got them at the door of surgery, people who claim to have

wanted it forever, when they are getting ready to have the

1    surgery literally refuse to have the surgery and then come

2    back later and say, "Oh, no, I want my surgery."  So, we have

3    had all sorts of presentations, and admittedly one of our

4    delays has been electrolysis, more -- sometime last year,

5    because we lost our former electrolysis, and so it took us

6    maybe four or five months to get another one.  And don't quote

7    me on the exact amount of time, but I think it was around that

8    time to get someone approved and to be credentialed and

9    background-checked in order to come within the facility.  And

10   once that happened we started over again and it's probably

11   been almost a year with that person.

12   Q.  Can you tell me how many -- how many gender-affirming

13   surgeries that THAW has approved in the past four years, five

14   years, something like that, or yearly?

15   A.  Sure.  And sorry for interrupting you.  We are at -- And I

16   don't want to misstate, but I believe we are at 56 approvals

17   and -- Well, you haven't asked me, but we have had eight that

18   have been completed more recently.  And, of course, obviously

19   not all of them were able to move directly into that surgery

20   space because of the things that I mentioned to you.  When we

21   first actually, you know, began to approve them, all of the

22   things were happening at once.  We didn't have a place to

23   actually have the people recuperate, so that was the first

24   barrier.  We tried to get a convalescence center.  No one

25   would take -- No one would take our individuals in custody,

1    and then that -- when you talk about some of the things that I

2    do, that's when I pushed the State to open up JITC, which it

3    had not been open at that time, because I knew we were not

4    going to be able get our patients into surgery.  Rush wouldn't

5    keep them -- They would keep them in ICU if they needed them

6    or on the hospital floor, but they would not transfer them to

7    their rehab facilities.  So, those were some of the things

8    that made it -- made some of the earlier challenges with our

9    patients, but that's kind of where we are with that.

10   Q.  Do you feel like the process is improving as time moves

11   on?

12   A.  I feel like the improvement has been -- I feel like we are

13   looking at another department.  That doesn't mean that I don't

14   think that there should be more improvements and that there

15   are places where there's gaps and things that need to be

16   fixed, but from where I started and when I walked in following

17   the initial cease and desist and the initial consent decree, I

18   feel like we have made night and day progress.  Personally,

19   that's the way I see it.  And, you know, I am very happy with

20   what we have done, but I will be happier if we could do more,

21   of course.

22   Q.  Have you ever worked in any healthcare system where every

23   patient need was able to be addressed?

24   A.  Sadly, no, not in the U.S.

25   Q.  Are there any resource limitations within the IDOC that

1    play a factor into how transgender care is provided?

2    A.    Staffing would be one, correctional staffing would be two.

3    So, you need healthcare staff, but you also need the ability

4    -- and this -- I am not thinking about the correctional

5    healthcare staff.  It impacts all healthcare.  Mental

6    healthcare specifically would impact more of the transgender

7    health, if you wanted to be specific.  But correctional

8    healthcare, corrections or correctional staff plays a role

9    because there is a decrease in the number of people that want

10   to be in law enforcement, unfortunately, and thereby also in

11   corrections.  So when you are talking about moving patients or

12   housing patients, it does become a challenge when there is not

13   enough correctional staff, operations to do things with

14   people.  Those are some of the primary limitations.

15   Q.    Now, in your role on the TAC committee you are a voting

16   member, correct?

17   A.    Correct.

18   Q.    So you make -- You vote on determinations and whether to

19   send transgender inmates from their male centric or cis male

20   prisons to Logan?

21   A.    Correct.  Or Centralia, yes.

22   Q.    Or Centralia?

23   A.    Uh-huh.

24   Q.    Does your clinical training play any part into how you

25   rationalize whether a transfer should be approved or denied?

1    A.  Yes, that's possible, yes.

2    Q.  And what factors do you personally look at when trying to

3    determine whether a request for transfer to Logan or Centralia

4    should be approved or denied?

5    A.  So, when looking at Logan, knowing that I have an

6    obligation to all patients, including the women that are

7    housed already at Logan, I will be thinking about, you know --

8    because I know that it's not possible or it's not -- There are

9    always concerns for safety for all patients.  And if a person

10   has a very high level of testosterone and they -- and they

11   want to go to Logan and they not only have a high level of

12   testosterone, but they refuse to take the medications that

13   they say they need for -- you know, for their medical

14   socialization, if you will, it does -- it is one of the things

15   that I would consider, because we do know even though no one

16   knows the exact number, where or when, when people have a

17   higher level of testosterone that is a transgender woman,

18   their ability to impregnate someone that's at our Logan

19   facility, that is always a possibility.  So, that is something

20   that we think about and I think about.  And more as it relates

21   to noncompliance, as opposed to just simply aberrant number

22   here or there.  That's not what I am really thinking about.

23   Q.  Does hormone treatment play a factor in considering a

24   transfer request to Logan?

25   A.  It is one of the considerations.

1   Q.  But it's not -- Hormones in and of themselves are not a

2   yes or no answer?

3   A.  Correct, because there may be a person -- And I don't

4   think we have had a case quite like this, but there may be a

5   person that is a transperson that can't take hormones, like

6   maybe they have a blood clotting disorder for which it's

7   well-documented and, you know, they are at risk for taking

8   hormones.  We wouldn't want to expose them to a risk and at

9   the same time not allow them to have a social transition.  We

10  haven't had a situation like that specifically, but that would

11  be an exception to that, for example.

12  Q.  Dr. Conway, do you know what WPATH is?

13  A.  Yes, it's the World Professional Association For

14  Transgender Health.

15  Q.  And what is WPATH aside from its name?

16  A.  WPATH is an organization.  They are not -- Well, they do

17  certify, quote/unquote, but it is not a certification that's

18  honored or recognized by any of our medical associations like

19  the Endocrinology Society or ABIM, Internal Board -- American

20  Board of Internal Medicine, or even American Academy of

21  Physicians in Medicine, Family Physicians.  But, it is an

22  organization that does bring a certain amount of commitment to

23  the transpeople and I think they have also led in that

24  commitment, so they are an organization that we respect, that

25  we value the knowledge they have provided, and, in fact, we

1    actually use WPATH to create our Foundations course, which is

2    one that is offered by WPATH.  Like if you go to their

3    website, they offer the WPATH course, Foundations course.

4    They created one for us in consultation with our own

5    transgender consultant, and we provide that to over -- we

6    provided that to over 400 -- actually, higher now -- medical

7    people at IDOC.  So, we do regard them as being a leader.  Not

8    the only voice, but definitely an important voice.

9    Q.  Are you familiar with WPATH standards of care?

10   A.  Yes.

11   Q.  Do you use WPATH standards of care as part of your work?

12   A.  We have used WPATH standards of care as part of our work,

13   yes.

14   Q.  Can you explain or describe what the WPATH standards of

15   care are?

16   A.  So, there's a lot of aspects of WPATH standards of care,

17   and in many ways they may replicate some of the things you see

18   in endocrinology, so they talk, I would say, in general about

19   recommendations.  One of the things I think about WPATH and

20   where we used them was for the surgery recommendations.  But,

21   they talk about everything.  They have standards of care for

22   children, for pre-pubertal children, for transwomen, for

23   transmen, and then general ideas and philosophies related to

24   those.

25   Q.  Have you yourselves received any WPATH training?

1    A.   The training that I had mentioned, yes, and I have done

2    some other -- I think I have done at least one other WPATH

3    local training or seminar.  But, yes, the GEI foundations that

4    was created for our people, I participated in that.

5    Q.   And you are WPATH-certified?

6    A.   I'm not WPATH-certified.  That's not something that I

7    elected to do.

8    Q.   Do you know how many professionals at the IDOC are

9    WPATH-certified?

10   A.   I don't know how many people at IDOC.  I know one of our

11   members -- one of our leaders was formerly certified.  I don't

12   know if he maintained his certification.  I might add that it

13   is not a very rigorous certification, it just didn't seem

14   something that I needed to.  It basically requires that you do

15   a Foundations course, which I have done, and then do a mental

16   health advance course and have some mentoring by a WPATH

17   person.  And that's not a very rigorous certification in my

18   opinion, but I don't think it's something that, you know, to

19   be poo-pooed upon.  It's great to do and another way to

20   advance your knowledge, one way to advance your knowledge.

21   Q.   Outside of WPATH, do you have any other methods that you

22   use for keeping current with issues related to the transgender

23   community?

24   A.   I do work really closely with our endocrinologist.  I

25   bring him in to teach sessions and update our doctors and

1    nurses.  He's an endocrinology specialist, very passionate in

2    particular about transhealth, and I utilize him.  I also do

3    reading, part of my boards prep and, you know, re-Board

4    Certification for continuing Board Certification.  I am

5    working on those things in that area, as well.

6    Q.  Do you attend any professional conferences on transgender

7    care?

8    A.  You know, I would if the opportunity was there.  It's not

9    very -- It's not very easy to do that at IDOC, but it would be

10   nice if we had that kind of access and accessibility.  That's

11   not typically the kind of thing that you see in State

12   Government, but I do try to do it on my own as best I can.

13   Q.  Do you personally provide any training on transgender care

14   to employees at IDOC?

15   A.  You know, when I was doing -- for about a year when we

16   were doing the quarterly lab draws, for example, and helping

17   them understand, you know, peak and trough and when's the best

18   time to do injections and time of injections with your blood

19   draw and looking at the levels and assisting, recommending to

20   them, "Hey, maybe this person should see a endocrinologist,"

21   or, you know, "You still have a little room to titrate this

22   patient up, so consider that."  So, obviously it's the

23   doctor's thoughts, but they always welcome suggestions.  So,

24   that's probably my role.  And, as I had shared earlier, I also

25   do try to provide other professionals to come in and teach

1    them.  But personally in that setting, the quarterly -- and

2    even at THAW, I play a role -- In addition to the

3    endocrinologist, I think we all play a collaborative role in

4    helping the facility with their decision once a patient is

5    presented.

6    Q.  Are you familiar with court-appointed monitor julie

7    graham?

8    A.  I do know julie graham.  I did not work with her

9    personally.  I worked with the medical doctor exclusively.  I

10   was on several calls with julie graham, but my work was

11   exclusively with the medical person.  We spent all of our time

12   together.

13   Q.  Okay.  You have spoke with her on the phone, you said, is

14   that right?

15   A.  What I meant is on a call.  Like I have been on calls with

16   her, with other members of our team.

17   Q.  Got it.

18   A.  But julie worked a lot more with probably Dr. Puga and Dr.

19   Reister, but she also did a lot of -- She connected quite a

20   bit before leaving with the individual facilities, the

21   wardens, etcetera.  Our work just did not cross paths.

22   Q.  Based on your observations and personal knowledge and

23   experience, has transgender patient care improved within the

24   IDOC over the past five years?

25   A.  In my opinion, night and day.  And, as I said before, can

1    it be better, do I want it to be better, is my mission and my

2    goal to make it better?  Yes.  I have personally been impacted

3    by the stories of the people.  I have gone and visited people

4    in the hospital once they had surgeries, just because I wanted

5    to see their face, and I saw the tears come down their face.

6    When they say, "You did it, you made it happen, I didn't think

7    it was going to happen, Dr. Conway, but you did it," and I

8    said, "I told you we were going to make it happen."  I said,

9    "I'm sorry it took you so long -- it took us so long."  Yes,

10   those are moments that I live for, to be quite honest, and it

11   has been very rewarding to see the improvement, but I don't

12   get comfortable, because I know that we still have a long way

13   to go and the staffing shortages and things, you know, do

14   cause barriers.  But, yes, night and day compared to when I

15   was asked by the former medical agency director to take on the

16   job of leading from the medical perspective.  I think the THAW

17   committee and the decision -- or the decision of the Court to

18   split -- It wasn't told that we had to split, but it was told

19   that the interactions of, you know, operational people shall

20   bear no -- it should bear no connection to the decisions that

21   we make medically, I agree, couldn't agree more, and I think

22   that, you know, creating the THAW committee and all that we

23   have done in our little small committee has been a wonderful

24   change and I have seen the impact on the patient's personally.

25   Q.  Thank you, Dr. Conway.  No further questions.

1    A.   Okay.

2              THE COURT:  All right.  So, it is getting late.  We

3    are going to recess for the day and we will resume with

4    cross-examination tomorrow morning.

5              So, Dr. Conway, can you be available again on video

6    at 9:00 tomorrow morning?

7              DR. CONWAY:  Yes, ma'am, I can.

8              THE COURT:  We will see you then.  So, you can

9    disconnect now.

10             DR. CONWAY:  Okay.

11             THE COURT:  Can you have Dr. Reister ready to go

12   after Dr. Conway?

13             MR. PENN:  We can.

14             DR. CONWAY:  Thank you, guys.

15             MR. PENN:  So, Judge, we are -- we were planning on

16   having him here in person at 9:00.  I don't know if we have a

17   sense of how much you are going to have on cross?

18             MR. LEAHY:  Hour to an hour and a half, I expect.

19             MR. PENN:  And we have our one rebuttal witness which

20   we were also planning on doing in person.

21             THE COURT:  Okay.

22             MR. PENN:  Yeah, let me just talk to them.  I think

23   we will have -- we may have the rebuttal witness come first,

24   if that's okay, because it's going to be quick, and we will do

25   Dr. Reister around 11:00.  We will get it all started before

1   lunch.

2          THE COURT:  I don't think the live witnesses need to

3   be here by 9:00.  Maybe have them like 10:00.

4          MR. PENN:  Yeah, I will do 10:00, 10:30 for them.

5   I'll do 10:00.

6          THE COURT:  Okay, sounds good.  So, Court's in recess

7   for the day.  Everyone be safe going home and we will see you

8   ready to go at 9:00 tomorrow.

9          COURT SECURITY OFFICER:  All rise.

10         (Court's in recess at 4:56)

1                    <u>REPORTER'S CERTIFICATE</u>

2                 *   *   *   *   *   *   *

3      I, Stephanie K. Rennegarbe, RDR, CRC, Official Court

4   Reporter for the U.S. District Court, Southern District of

5   Illinois, do hereby certify that I reported with mechanical

6   stenography the proceedings contained in pages 310-554; and

7   that the same is a full, true, correct and complete transcript

8   from the record of proceedings in the above-entitled matter.

9

10  <u>/S/ Stephanie K. Rennegarbe,</u>          <u>06/04/2025</u>
    IL CSR, RDR, CRC
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25