1               IN THE UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF ILLINOIS
2

3   JANIAH MONROE, et al.,              )
                                        )
4              Plaintiffs,              )
                                        )
5   v.                                  )   No. 3:18-cv-00156-NJR
                                        )   East St. Louis, Illinois
6   STEVEN BOWMAN, et al.,              )
                                        )
7              Defendants.              )

8

9

                   TRANSCRIPT OF PROCEEDINGS
10                    **EVIDENTIARY HEARING**
                          **DAY #4**
11           BEFORE THE HONORABLE NANCY J. ROSENSTENGEL
               UNITED STATES CHIEF DISTRICT JUDGE
12
                        MAY 30, 2025
13

14

15

16

17

18

19

20
               Stephanie Rennegarbe, RDR, CRR, CBC
21                   IL CSR #084-003232
                       750 Missouri Avenue
22               East St. Louis, IL  62201
                        618-482-9226
23          Stephanie_Rennegarbe@ilsd.uscourts.gov

24    *Proceedings recorded by mechanical stenography; transcript*
             *produced by computer-aided transcription*
25

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFFS:    Michelle T. Garcia, Esq.
                            Mason Strand, Esq.
 3                          Alexis Picard, Esq.
                            Roger Baldwin Foundation of ACLU, Inc.
 4                          ACLU of Illinois
                            150 N. Michigan Avenue
 5                          Suite 600
                            Chicago, IL  60601
 6                          apicard@aclu-il.org
                            mstrand@aclu-il.org
 7                          mgarcia@aclu-il.org

 8                          Anne J. Hudson, Esq.
                            Kirkland & Ellis, LLP.
 9                          300 N. LaSalle Street
                            Chicago, IL  60654
10                          anne.hudson@kirkland.com

11                          Thomas J. Leahy, Esq.
                            Sarah Legault, Esq
12                          Kirkland & Ellis, LLP.
                            333 West Wolf Point Plaza
13                          Chicago, IL  60654
                            thomas.leahy@kirkland.com
14                          sarah.legault@kirkland.com

15                          Abby L. Parsons, Esq.
                            Arnold & Porter
16                          700 Louisiana Street
                            Suite 4000
17                          Houston, TX  77002
                            Abby.Parsons@arnoldporter.com
18
                            Brent P. Ray, Esq.
19                          Stephen Ferro, Esq.
                            Arnold & Porter
20                          70 West Madison Street
                            Suite 4200
21                          Chicago, IL  60602-4321
                            Brent.ray@arnoldporter.com
22                          stephen.ferro@arnoldporter.com

23                          Sarah Prather, Esq.
                            Arnold & Porter, LLP.
24                          250 West 55th Street
                            New York, NY  10019
25                          sarah.prather@arnoldporter.com
```

1    APPEARANCES CONTINUED:

2

3    FOR THE PLAINTIFFS:    Erica E. McCabe, Esq.
                            Arnold & Porter, LLP.
                            601 Massachusetts Avenue, NW
4                           Washington, DC  20001-3743
                            erica.mccabe@arnoldporter.com

5

6    FOR THE DEFENDANTS:    Justin M. Penn, Esq.
                            Calvin Edwards, Jr., Esq.
                            Hinshaw & Culberton, LLP.
7                           151 N. Franklin Street
                            Suite 2500
8                           Chicago, IL  60606
                            312-704-3000
9                           jpenn@hinshawlaw.com
                            cedwards@hinshawlaw.com

10

11                          James M. Brodzik, Esq.
                            Hinshaw & Culbertson, LLP.
                            521 West Main
12                          Suite 300
                            P.O. Box 509
13                          Belleville, IL  62220
                            618-277-2400
14                          jbrodzik@hinshaw.com

15

16

17

18

19

20

21

22

23

24

25

<u>I N D E X</u>

**WITNESSES CALLED TO TESTIFY:**                    **PAGE**

<u>DR. LAMENTA CONWAY</u>
CROSS EXAMINATION BY MR. LEAHY                561


<u>MAJOR JOSHUA SCHOENBECK</u>
DIRECT EXAMINATION BY MR. BRODZIK            589
CROSS EXAMINATION BY MS. PRATHER             605
EXAMINATION BY THE COURT                     619
CONTINUED CROSS EXAMINATION BY MS. PRATHER   620
REDIRECT EXAMINATION BY MR. BRODZIK          621


<u>DR. SHANE REISTER</u>
DIRECT EXAMINATION BY MR. PENN               622
CROSS EXAMINATION BY MR. RAY                 637
REDIRECT EXAMINATION BY MR. PENN             659
EXAMINATION BY THE COURT                     660
CONTINUED REDIRECT EXAMINATION BY MR. PENN   662

<u>E X H I B I T S</u>

| <u>EXB #</u> | <u>DESCRIPTION</u> | <u>ID'D</u> | <u>ADMT'D</u> |
|---|---|---|---|
| Plf #53 | 4/30/25 Incident Review | 612 | 615 |

```
 1                   (Proceedings began at 9:01 a.m.)

 2                    *********************

 3          COURTROOM DEPUTY:  The matter of Monroe, et al. v.

 4   Bowman, et al., case #18-cv-156, is called for Day 4 of

 5   Evidentiary Hearing.  Will the parties please identify

 6   themselves for the record?

 7          MS. PARSONS:  Good morning, Your Honor.  Abby Parsons

 8   on behalf of the Plaintiffs from the Law Firm of Arnold &

 9   Porter.  With me is the team, Brent Ray, Stephen Ferro, Sarah

10   Prather.  Also from Kirkland & Ellis, T.J. Leahy and Anne

11   Hudson; and from the ACLU, Michelle Garcia.

12          THE COURT:  All right.  Good morning, Counsel.

13          MR. PENN:  Good morning, Justin Penn for the

14   Defendants.  With me is James Brodzik and Calvin Edwards, Jr.

15          THE COURT:  All right.  Good morning, Counsel.

16          So, I understand there's one matter to take up before

17   we begin.

18          MS. GARCIA:  Yes, Your Honor.  The parties by

19   agreement have -- would like to submit the deposition

20   transcripts of two witnesses into evidence.

21          I'm sorry.

22          THE COURT:  Hold on.

23          MS. GARCIA:  Good morning, Your Honor.  Michelle

24   Garcia on behalf of Plaintiffs.  The parties, by agreement,

25   would like to submit the entire deposition transcripts of two
```

```
 1   witnesses who are not here today; Defendant LaToya Hughes and

 2   Jane Moskus, into evidence.

 3         THE COURT:  Who is the second witness?

 4         MS. GARCIA:  Jane Moskus.  She's the Transfer

 5   Coordinator at Menard or for transfers for IDOC, I should say.

 6         THE COURT:  Okay.  And this is by agreement?

 7         MS. GARCIA:  This is by agreement.

 8         And, additionally, Your Honor, we have a bench

 9   memorandum concerning your question about current conditions

10   that we would like to offer to the Court and obviously provide

11   a copy to Defense Counsel, as well.

12         THE COURT:  Okay.  And if Defense Counsel wants to

13   respond to that, you may.

14         MR. PENN:  Thanks, Judge.

15         THE COURT:  Okay.  Do you have the deposition

16   transcripts here or are you going to e-mail them?

17         MS. GARCIA:  I think we were going to e-mail them so

18   you have an electronic for them.

19         THE COURT:  Perfect.  Send them to my proposed

20   document folder.

21         MS. GARCIA:  Thank you, Your Honor.

22         THE COURT:  Anything else?

23         Okay.  We have Dr. Conway ready to go.

24         Jerod, we are ready, if you are out there.

25         Good morning, Dr. Conway.  Can you hear me?
```

```
 1              DR. CONWAY:  Good morning.  Yes, I can.
 2              THE COURT:  Okay.  So, I will just remind you you are
 3     still under oath and we will now proceed with
 4     cross-examination.
 5
 6                           CROSS EXAMINATION
 7     BY MR. LEAHY:
 8     Q.  Good morning.  This is Thomas Leahy again.  We had a
 9     conversation last week.  First off, after you finished up your
10     direct examination yesterday, did you have any conversations
11     with anybody about the substance of your testimony?
12     A.  No, sir, I did not.
13     Q.  Did you review any additional documents between yesterday
14     and today related to this case?
15     A.  No, I didn't.
16     Q.  I want to talk to you briefly about a new position at IDOC
17     that we learned about during Dr. Puga's testimony yesterday.
18     Are you familiar with the Transgender Patient Advocate
19     position?
20     A.  Yes.
21     Q.  No one's ever had that position before in IDOC, correct?
22     A.  That's correct.
23     Q.  Dr. Puga said something like that this position was going
24     to be under you or was part of your role.  Did you create this
25     position?
```

1  A.  The agency created the position, but, yes, we all

2  together, you know, discussed what we thought would be, you

3  know, relevant or helpful aspects of this new position, yes.

4  Q.  You thought it would be helpful to have an additional

5  advocate for transgender individuals in custody?

6  A.  Correct.

7  Q.  Has anyone been hired for this position?

8  A.  No, but they have been interviewed and they have a few

9  candidates that they have moved forward that they will be

10  discussing with those candidates whether or not they will be

11  taking the position.

12  Q.  Have any offers been made yet?

13  A.  Not yet.  Not to my understanding, let's say that.  I'm

14  not sure, because we are not involved with that piece of it.

15  Q.  Do you know where their office will be?

16  A.  Their office will be downtown in Chicago.

17  Q.  And do you know who they will report to?

18  A.  They will report to me.

19  Q.  Do you have a projected start date?

20  A.  I don't have a projected start date, but knowing how

21  things are done at Central Management Services, which is where

22  the position has to come through, I am hoping we are looking

23  at a start date within the next month or so.  That's my best

24  -- my best estimate.

25  Q.  Thank you, Dr. Conway.

1    A.   Uh-huh.

2    Q.   So, I want to reorient us to this morning a little bit.

3    This evidentiary hearing is about Plaintiffs' February 2025

4    motion to transfer individuals with gender dysphoria out of

5    Menard, right?

6    A.   Yes.

7    Q.   You did not review the affidavits filed with that motion,

8    correct?

9    A.   You mean ever?  I did, actually, when I did the deposition

10   and maybe before that I saw some of the information from it,

11   but not previous to that.

12   Q.   So, you reviewed the affidavits submitted in connection

13   with the February 2025 motion?

14   A.   I believe that I have seen it, yes.

15   Q.   Did you review those documents in between the date of your

16   deposition and today?

17   A.   No, I did not.

18   Q.   Dr. Conway, during our conversation in your deposition

19   last week you stated that you had not reviewed those

20   documents.

21   A.   Correct, and I am saying -- No, I don't recall saying that

22   I never saw them, but -- No, I don't recall saying that.

23            MR. LEAHY:  Mr. Delaney --

24   A.   Let me clarify what I'm saying here.  I am saying that

25   when you and I spoke is when I actually reviewed the

1    documents, and I may have seen it before then.  I think what I

2    said before is that I hadn't seen it at the time that you had

3    asked me had I seen it.  That is what I recall from that

4    conversation.

5    Q.  (By Mr. Leahy) So you reviewed the affidavits in between

6    your deposition and today?

7    A.  No, I did not.  Not between today and the deposition that

8    did not occur, no.

9    Q.  I'm sorry, Dr. Conway.  I'm a little confused.  You had

10   not reviewed the affidavits in advance of your deposition and

11   you have not reviewed them in between your deposition and

12   today, but you are telling us today that you have reviewed

13   them?

14   A.  I have not reviewed the deposition (sic) between today and

15   when we had the deposition.  And at the time of the

16   deposition, I reviewed them with you when you put them in

17   front of me.  And what I was saying is I may have seen it

18   before, but had not reviewed them in detail before that, if

19   that makes sense.  That's just to my best recollection.

20   Q.  Sure.

21   A.  For certain, I saw it when you placed it before me.

22   Q.  So, Dr. Conway, a few things.  First, you used the word

23   "deposition" about whether or not you had reviewed it.  You

24   meant "affidavits," is that right?

25   A.  Okay.  Maybe I don't know the terms you are using.  So,

1    whatever was shared with me at the deposition is what I saw at

2    the deposition and that's what I am referring to.  I believe

3    that an affidavit was shared with me at the deposition, and

4    that's the deposition that I am referencing.  I have not

5    reviewed that affidavit between the time of the deposition and

6    today, is what I am actually saying.

7    Q.  So would you agree that if I did not show you any

8    affidavits during the deposition that you have not seen any

9    affidavits related to this case?

10   A.  I don't recall whether or not I actually saw it before

11   then, but if I did, it may have been just the idea that it was

12   sent.  I didn't review it in any detail, that's for sure.

13   Q.  Dr. Conway, are you perhaps talking about the declaration

14   -- the list of witnesses submitted by Counsel for IDOC, the

15   document that I showed you during your deposition?

16   A.  The list of witnesses?

17   Q.  Did you review any written statements by class members

18   related to this lawsuit?

19   A.  No, did not.

20          THE COURT:  At any point?

21   Q.  At any point, Dr. Conway?

22   A.  I have not reviewed any messages of any of the class

23   members at all, if that's what your question was.  I did not.

24   Q.  Thank you, Dr. Conway.

25   A.  Yes.

1    Q.  The first time you remember hearing about Plaintiffs'

2    concerns at Menard was in March of this year, correct?

3    A.  That's correct.

4    Q.  You were not aware that Plaintiffs filed a different

5    motion to transfer class members out of Menard in January

6    2024, correct?

7    A.  That is correct.  I learned that from you.

8    Q.  So, fair to say you also did not review the affidavits

9    submitted in connection with that earlier motion, right?

10   A.  Can you tell me what the affidavit is?  Because I think

11   that's where I am stumbling a bit.

12   Q.  Absolutely.  So, the affidavits, you may have heard them

13   referred to as declarations, where they're written statements

14   of the class members telling their stories about their

15   experiences at Menard.

16   A.  Okay, thank you.  See, I didn't understand what you meant

17   by that.  I thought you were referring to just the case

18   itself.  So, no, I did not see that at all, no.

19   Q.  Thank you, Dr. Conway.  And if at any point I use a term

20   that you could use a definition for, please just let me know.

21   A.  Yeah, I thought I knew.  I realize I didn't.  No worries.

22   Q.  Thank you.  You do not treat individual patients in your

23   role at IDOC, correct?

24   A.  That's correct.

25   Q.  And you've not reviewed any medical records for patients

1    at Menard in connection with their concerns, correct?

2    A.  Not medical records, no.  But I have discussed labs and

3    things of that nature with some of the HUAs, yes.

4    Q.  You have not spoken to any individuals with gender

5    dysphoria at Menard in the last year, correct?

6    A.  I have not.

7    Q.  In your role on the THAW committee you no longer track

8    hormone levels at Menard, correct?

9    A.  That's correct.

10   Q.  Prior to -- When Dr. Harris left her role as an

11   independent monitor, is that when you stopped tracking hormone

12   levels department-wide?

13   A.  Sometime before that, actually.

14   Q.  So, would you agree that you knew more about individual

15   hormone levels prior to Dr. Harris leaving her post than you

16   do today?

17   A.  About the individual hormone levels, yes, of every single

18   class member, yes.

19   Q.  I want to talk to you a little bit about your role on the

20   THAW committee.  And you understand that if I say "THAW

21   committee" I mean Transgender Health and Wellness Committee,

22   right?

23   A.  Correct.

24   Q.  That committee was created by an administrative directive,

25   right?

1    A.  Yes.

2    Q.  That administrative directive became effective April 1st,

3    2021.  Does that sound right?

4    A.  I don't remember the date, to be honest.

5    Q.  Sure.  So let's take a look at it, then.

6              MR. LEAHY:  Mr. Delaney, if you could show what was

7    Defendants' Exhibit 1, the administrative directive.

8    Q.  (By Mr. Leahy) Right at the box, the first box, are you

9    able to see the document on your screen, Dr. Conway?

10   A.  Yes, I see it.

11   Q.  Do you see in the upper right corner the effective date of

12   April 1, 2021?

13   A.  Yes.

14   Q.  So, that's the date this became department policy, right?

15   A.  Well, I don't know if this is the earliest date, but if

16   you say that it is, then it's the earliest date.  I just don't

17   know that.  I know that this is, you know, this particular AD,

18   but what I didn't know is whether or not there was one before

19   that.  That's what I meant by dates.

20   Q.  Sure.  And I'm asking about administrative directives

21   after that date.  You are not aware of any formalized

22   administrative directives about transgender care from after

23   April 1, 2021, correct?

24   A.  I just don't know the dates, I'm sorry.

25   Q.  Have you seen any updated administrative directives

1   related to the evaluation, treatment, and correctional

2   management of transgender offenders with an effective date

3   after April 1st, 2021?

4   A.  I don't believe there was, but I can't recall whether or

5   not there was one in between.  I guess that's what I'm saying.

6   Q.  When we were back at trial way back in August of 2021,

7   this is the same version of the administrative directive that

8   we discussed in August, correct?

9   A.  I would assume that that is the same one.

10  Q.  Since this administrative directive was issued, you

11  created a new form for IDOC called the Request For

12  Gender-Affirming Surgery, is that right?

13  A.  Yes.

14  Q.  And other than this new form, there have been no

15  additional changes to how IDOC provides medical care to

16  individuals with gender dysphoria since the administrative

17  directive, correct?

18  A.  I wouldn't say that.  There's been many things, but you

19  would have to ask me specifically about different things.

20  And, yes, there's been different forms.  I don't know that if

21  every form that we use had -- was incorporated at that time.

22  In fact, I know for a fact it was not.  One of the newer forms

23  is the Transgender Matrix, and there's been updates of other

24  forms that are not concurrent, necessarily, with the AD.  So,

25  we are not bound to just having an AD and then, therefore,

1    can't initiate new forms that may help us with our duties.

2    So, I just can't tell you -- It would be impossible for me to

3    recollect what dates we may have instituted certain forms

4    unless you ask me specifically about those forms.

5    Q.  Sure.

6    A.  But I can answer you that the form that you mentioned is a

7    newer form, but I cannot say that that's the only new form

8    since February of -- since April of 2021.  I'm certain that

9    that's not the case.

10   Q.  Dr. Conway, during our conversation last week you were

11   under oath, right?

12   A.  Yes.

13        MR. LEAHY:  Mr. Delaney, can you please show

14   Dr. Conway's transcript, page 114, lines 1 through 5?

15   Q.  Dr. Conway, while you were under oath, did I ask you the

16   question, "Other than the creation of this form, have there

17   been any other changes to how IDOC provides medical care to

18   individuals with gender dysphoria," and did you give the

19   answer, "I can't think of any additional ways"?

20   A.  I don't know what form that this is even referencing,

21   because when you and I met I talked about several forms that I

22   had created, that I know for a fact that I created.  So, I

23   don't know what form this particular -- this little excerpt is

24   from, and I know that we have new forms and we discussed them

25   at the deposition.  So, it's more than the one form, so maybe

1    this was a misunderstanding of what you are asking.  But,

2    also, I don't know what form you are referencing here.

3    Q.  Okay, Dr. Conway.

4         MR. LEAHY:  Mr. Delaney, could we please go back to

5    the administrative directive, page 3?  There's a definition

6    there for the Transgender Health and Wellness Committee, if

7    you don't mind pulling that up.

8    Q.  (By Mr. Leahy) Can you see that on your screen,

9    Dr. Conway?

10   A.  Yes.

11   Q.  So, the Transgender Health and Wellness Committee,

12   according to the administrative directive, is a committee

13   responsible for reviewing medical and mental health care for

14   the transgender, intersex, and gender incongruent offenders or

15   offenders diagnosed with gender dysphoria, is that right?

16   A.  Yes.

17   Q.  And the definition goes on to say that the chair of the

18   committee is the Agency Medical Director or Deputy Chief of

19   Health Services.  That's you, right?  You are the Deputy Chief

20   of Health Services?

21   A.  Yes.

22   Q.  You have served as the chair of the Transgender Health and

23   Wellness Committee since it was created, correct?

24   A.  Correct.

25   Q.  You take that responsibility seriously, right?

1    A.  Yes.

2    Q.  As the chair, you are responsible for reviewing or medical

3    and mental health care for individuals with gender dysphoria,

4    right?

5    A.  As the chair I am responsible for helping to create policy

6    and initiatives and innovation for the transgender persons.

7    Q.  What the administrative directive says is that the

8    committee that you are the chair for is responsible for

9    reviewing medical and mental health care for individuals with

10   gender dysphoria, right?

11   A.  I don't -- I don't exactly know what you are trying to

12   suggest or what you are suggesting.

13   Q.  I am not suggesting anything, Dr. Conway.  I am just

14   asking if you are the chair of the committee that is

15   responsible for the medical and mental health care for

16   individuals diagnosed with gender dysphoria.

17   A.  Yes, but I don't know what you mean by "care".

18   Q.  Let's talk about the process for obtaining care.

19          In order to receive hormone therapy for medical

20   treatment of gender dysphoria, individuals with gender

21   dysphoria in custody must have their diagnosis confirmed by a

22   psychiatrist, correct?

23   A.  Yes.

24   Q.  It is only a psychiatrist within IDOC who can confirm a

25   gender dysphoria diagnosis, right?

1    A.  Yes.

2    Q.  Medical staff cannot prescribe hormones until an

3    individual has been seen by a psychiatrist, right?

4    A.  Yes.

5    Q.  The THAW committee will not review an individual's

6    treatment until they are a confirmed diagnosis of gender

7    dysphoria, right?

8    A.  Yes.  Now, that's not to say that if a person -- if there

9    was some concern about a particular patient that they can't be

10    presented, but typically patients who have diagnoses for -- or

11    confirmed diagnosis of gender dysphoria are the ones that may

12    be presented.  However, it's important to understand that

13    being presented doesn't mean that we actually are responsible

14    for making care directives for that patient, but they will be

15    presented so that we are aware of that patient, yes.

16    Q.  And according to your process under the AD and how you

17    have been implementing it, people are not presented to the

18    THAW committee until after a confirmed diagnosis by a

19    psychiatrist, right?

20    A.  Typically, yes.

21    Q.  If a patient does not --

22    A.  With the exception that I -- I'm sorry -- with the

23    exception that I just indicated.

24    Q.  If a patient does not have access to mental health

25    services, the THAW committee would not know that they have a

1    confirmed diagnosis, right?

2    A.   That's correct.

3    Q.   So I want to move from process to obtaining care to

4    approach to care.

5    A.   Okay.

6    Q.   You spoke with your counsel yesterday about the treatment

7    available at Menard, right?

8    A.   I think we spoke on some aspects of that, yes.

9    Q.   You said there are two medical staff at Menard, plus a

10   regional director, is that right?

11   A.   Yes.  To my understanding, yes.

12   Q.   And that's for a population of over 2,000 individuals or

13   so?

14   A.   I don't know the exact number.

15   Q.   You don't directly oversee treatment at Menard, right?

16   A.   No.

17   Q.   When you were speaking with your counsel yesterday about

18   the resources available to individuals with gender dysphoria,

19   you were speaking about what the policy says, not necessarily

20   what's happening on the ground at Menard, is that right?

21   A.   Can you give an example or just repeat that?

22   Q.   Sure.  So, you spoke with your counsel yesterday about the

23   resources that should be available to patients under the

24   administrative directive, right?

25   A.   I believe that's probably accurate, yes.

1    Q.  But you don't know necessarily on the ground at Menard

2    what's happening in terms of treatment, right?

3    A.  I don't.

4    Q.  You would agree that social transition is a necessary

5    component of treating gender dysphoria for some individuals,

6    right?

7    A.  Yes.

8    Q.  Social transition is a component of medical care for

9    individuals with gender dysphoria, right?

10   A.  Yes.

11   Q.  Being denied the ability to socially transition can

12   exacerbate feelings of gender dysphoria, correct?

13   A.  It can, yes.

14   Q.  Social transition might include things like speaking to

15   Mental Health Services about an individual's gender journey,

16   right?

17   A.  It could, yes.

18   Q.  Hair removal?

19   A.  Possibly.

20   Q.  Using pronouns aligned with one's gender identity?

21   A.  What is the question as it relates to that?  You were

22   mentioning mental health, and now we are talking about --

23   Q.  Is using pronouns aligned with the individual's gender

24   identity part of social transition?

25   A.  Yes, for some who wish to have that, yes.

1    Q.  Social transition might also include things like updating

2    a gender identity marker on an individual's ID?

3    A.  Yes.

4    Q.  Updating search preferences for an individual?

5    A.  Yes.

6    Q.  Changing a cell assignment for somebody?

7    A.  Potentially, yes.

8    Q.  Access to private showers?

9    A.  Yes.

10   Q.  And access to things like personal grooming items aligned

11   with one's gender identity?

12   A.  Yes.

13   Q.  We can agree that transfer to a better environment for an

14   individual with gender dysphoria could be a component of their

15   medical care, right?

16   A.  Yes.

17   Q.  You're aware that individuals at Menard allegedly have

18   been seeking transfer from Menard to Logan, but that they have

19   never been presented to the TAC or THAW committees, correct?

20   A.  I have learned that that was the case for some, yes.

21   Q.  You've not taken any steps to investigate whether or not

22   individuals are being denied access to the TAC or THAW

23   committees, correct?

24   A.  Yes, we did take steps, but not to investigate.  So, yes,

25   we took steps relative to their care, and I think I shared

1   that at the deposition, but, yes, we have taken steps, but not

2   to investigate, no.  That's not actually my role.

3   Q.  In your role as the chair of the committee responsible for

4   reviewing mental health and health care -- and medical care

5   for individuals with gender dysphoria, you don't see part of

6   your role as making sure they have access to the committees

7   responsible for their care?

8   A.  Making sure they have access.  But you said investigation,

9   and that typically would occur on-site.  That's what I was

10  referring to.  If I were aware that there was an issue related

11  to care, yes, I would want to look into that and I would look

12  into that, although I don't have the leverage to actually

13  control the hiring and, you know, firing of people at that

14  facility, unfortunately.

15  Q.  So, despite being the chair of the THAW committee, you

16  don't actually have any authority to make sure individuals

17  have access to that committee, correct?

18  A.  Have access to what committee?

19  Q.  The THAW committee.

20  A.  Yeah, I don't understand what you mean by making sure that

21  the members have access to the THAW committee.  I'm not sure

22  if I understand that question.

23  Q.  So you are the director -- you are the chair of the THAW

24  committee, right?

25  A.  Yes.

1    Q.  And you learned that individuals were alleging that they

2    could not access the THAW committee or be presented to the

3    THAW committee, right?

4    A.  Yes.

5    Q.  But your role does not empower you to investigate those

6    allegations or those concerns raised by patients, right?

7    A.  So, I don't know if I want to say "investigate".  Maybe we

8    are differing on the word that we use.  But, I am empowered to

9    follow up on the things that you have identified and I did

10   follow up on those matters.

11   Q.  So, you did take steps to investigate whether or not

12   individuals are being denied access to the TAC or THAW

13   committee?

14   A.  So, let me just clarify.  No, I did not take steps to find

15   out whether or not the people were having access.  It was

16   determined that they did not have access.  You presented that,

17   I learned about that in or around the time of March of 2025.

18   I also shared with you that I was not around for a good

19   portion, because illness and away.  I also explained that to

20   you.  But, I did also tell you -- I am pretty sure we

21   discussed this in the deposition -- that I took steps to

22   actually -- Once those persons were identified to speak with

23   the Healthcare and once those persons were confirmed, we did

24   get those persons scheduled or we got them -- they will be

25   scheduled for an upcoming THAW meeting.  So, that's the extent

```
1    of what I am able to do.
2             Investigate, I did not.  But, in terms of my
3    authority and power to speak to the healthcare people there
4    and to actually provide remedy is what I did.  Those are the
5    kinds of things that I can do.
6             THE COURT:  And just to be clear, we are talking
7    about at Menard?
8             MR. LEAHY:  Yes, Your Honor.
9             THE COURT:  Okay.
10   Q.  (By Mr. Leahy) So, Dr. Conway, you first learned about the
11   concerns at Menard in March of this year, correct?
12   A.  Somewhere around that time, yes.
13   Q.  The concerns that class members raised in their January
14   24, 2024 motion, you did not learn about those at that time,
15   correct?
16   A.  I did not.
17   Q.  You're aware that individuals with gender dysphoria at
18   Menard allege that they are being denied access to private
19   showers, correct?
20   A.  I have learned that, yes.
21   Q.  You have not taken any steps to confirm whether or not
22   individuals with gender dysphoria at Menard have access to
23   private showers, right?
24   A.  No, I have not taken steps.  I believe that that may be
25   the case as it was presented, so I have been told.  But,
```

1    again, this is not actually a role of the THAW committee.  So,

2    investigating whether people at Menard did or did not have

3    access to showers is not the role that I am in, but I have

4    taken it at face value that that was most likely the case and

5    I haven't heard otherwise.

6    Q.  So investigating whether or not individuals have access to

7    private showers is not part of your role of reviewing medical

8    and mental health care for individuals with gender dysphoria?

9    A.  No, that is not part of my role.

10   Q.  You're aware that individuals with gender dysphoria at

11   Menard are alleging that they have been sexually assaulted by

12   male guards and inmates because of their gender identity,

13   correct?

14   A.  I have heard that, as well.

15   Q.  You would agree that an individual would have a hard, if

16   not impossible, time socially transitioning if they are being

17   sexually assaulted, true?

18   A.  I agree that anyone that's sexually assaulted in a prison

19   will not do well, including those who are transgender.

20   Q.  And it could make socially transitioning in a male

21   facility impossible, correct?

22   A.  I don't know that it would make it impossible.

23   Q.  You would also agree that access to hormones can be

24   medically necessary to treat gender dysphoria for some

25   individuals, right?

1   A.  Yes, I agree.

2   Q.  You are aware that Plaintiffs are alleging that they are

3   being denied access to hormone therapy at Menard, correct?

4   A.  Yes.

5   Q.  You did not take any steps to confirm whether patients

6   were being denied access to hormone therapy at Menard,

7   correct?

8   A.  That is incorrect.  So, once again, we are using the word

9   "investigation," which I don't feel comfortable with your

10  word.  I don't investigate.  I learned in March about these

11  patients.  Since that time I have met with the healthcare

12  staff.  Those who were actually confirmed have started hormone

13  therapy and that is what I did.  I am in a position to assist

14  and making sure things happen, not an investigative role.

15  Q.  Sure.

16  A.  But in terms of making sure it happened, once I was aware,

17  yes, I did that and, yes, it happened.

18  Q.  And you became aware in March of 2025, correct?

19  A.  Yes, that is correct.

20  Q.  You did not hear about the allegations about access to

21  hormone therapy at Menard that were submitted via declaration

22  affidavit starting in January 2024, correct?

23  A.  No, I did not receive information about declarations

24  submitted to the legal department in January of 2024; no, I

25  did not know that.

1    Q.  Yesterday you discussed working with Dr. Harris to track

2    hormones department-wide, correct?

3    A.  Yes.

4    Q.  And that tracking included hormone levels for individuals

5    with gender dysphoria on hormone therapy at Menard, right?

6    A.  For those who were under -- on that list that were

7    confirmed and were receiving hormones, yes, we tracked those

8    hormones.

9    Q.  In your role --

10   A.  We won't be tracking hormones for people that were not on

11   the list or were not confirmed.

12   Q.  In your role as the chair for the committee responsible

13   for reviewing medical and mental health care for individuals

14   with gender dysphoria, you do not track hormone levels,

15   correct?

16   A.  Presently, no.

17   Q.  You would agree that access to mental health services is

18   necessary for the treatment of gender dysphoria for some

19   individuals, right?

20   A.  Yes, I do.

21   Q.  Yesterday you were asked if transgender individuals at

22   Menard are afforded mental health evaluations, and you

23   answered that they should be afforded mental health

24   evaluations and that currently you're aware that they are

25   receiving care.

```
 1              There was a period of time where Menard wasn't
 2    getting evaluations, right?
 3    A.   Yes.
 4    Q.   You've described that as a substantial period of time,
 5    right?
 6    A.   I don't know the actual period of time.
 7    Q.   But you have described it as a substantial period of time
 8    that they were not getting their gender -- their gender
 9    dysphoria diagnoses confirmed, right?
10    A.   I don't know the length of time.  Any time without mental
11    health services is too long, but I don't know the amount of
12    time.
13    Q.   Were you aware that there were some individuals with
14    unconfirmed gender dysphoria at Menard on IDOC's so-called
15    transgender report for over a year?
16    A.   I have learned that, yes.  I have heard that there were
17    people for a period of time.  I didn't know the length, but,
18    yes, I am aware.
19    Q.   And for as long as those class members at Menard had
20    unconfirmed gender dysphoria diagnoses, they did not have
21    access to medical services, right?
22    A.   Medical services for hormone therapy for those who may
23    wish -- Are we speaking specifically for hormone therapy?
24    Q.   I will ask my question again.  For as long as those
25    individuals had unconfirmed gender dysphoria at Menard, they
```

1    could not receive hormone therapy, correct?

2    A.  Yes.

3    Q.  You received the -- what IDOC calls the transgender report

4    via e-mail each month, right?

5    A.  No, I don't receive those every month, but I have access

6    to them.  I can get those.

7    Q.  You have been e-mailed them in the past, right?

8    A.  I have received them before, yes.

9    Q.  And so you can see whether or not an individual's gender

10   dysphoria diagnosis has been confirmed, right?

11   A.  I can.

12   Q.  And so you could see whether or not individuals with

13   gender dysphoria at Menard had been confirmed over time,

14   correct?

15   A.  Yes.

16   Q.  While those individuals at Menard were waiting to have

17   their gender dysphoria diagnoses confirmed, you couldn't take

18   any steps to give them their hormones, right?

19   A.  I would not give them their hormones.  So, can you just

20   maybe rephrase that question?  I'm not sure if I understand

21   what you are asking me.

22   Q.  Sure.  So despite your position as chair of the THAW

23   committee, you could not facilitate those individuals' gender

24   dysphoria diagnoses being confirmed at Menard, right?

25   A.  I would not in my role facilitate that, that's correct.

```
 1   Q.  You have to rely on psychiatrists to do that despite your
 2   role, right?
 3   A.  Typically we rely on Psychiatry, yes, and their mental
 4   health providers.
 5   Q.  You would agree that gender-affirming surgery is a
 6   necessary component of treating gender dysphoria for some
 7   individuals, right?
 8   A.  Yes.
 9   Q.  Yesterday you said that the THAW committee approves
10   requests for surgery, right?
11   A.  Yes.
12   Q.  According to the administrative directive, you're
13   responsible for making decisions about the medical necessity
14   of surgery, right?
15   A.  Yes.
16   Q.  The THAW committee considers the underlying offense for
17   which an individual has been incarcerated when evaluating
18   requests, true?
19   A.  No.
20   Q.  Dr. Conway, during our conversation last week -- and you
21   were under oath --
22        MR. LEAHY:  Mr. Delaney, can you pull up the
23   deposition transcripts, page 85, lines 15-18?
24   Q.  (By Mr. Leahy) Dr. Conway, when you were under oath during
25   your deposition about this hearing, did I ask you the
```

1    question, "Does the THAW committee consider the underlying

2    offense for which an individual has been incarcerated when

3    evaluating requests?"  Do you see that?

4    A.  I do see that.

5    Q.  And do you see where under oath you gave the answer, "I

6    believe they do"?

7    A.  Yes, I see that.  I apparently misunderstood it.

8    Q.  Thank you, Dr. Conway.

9    A.  I must have misunderstood it, because that is not what we

10   do.  We have people that have committed murder, rape, and all

11   sorts of committing crimes and they have all had transgender

12   surgery, so that is actually not correct.  I may have thought

13   that you were referring to the TAC committee.  So, I may have

14   -- but that is not a true statement.  That is incorrect.

15          MR. LEAHY:  Mr. Delaney, we can take that down.

16   Q.  (By Mr. Leahy) Dr. Conway, yesterday you also discussed

17   WPATH.  Do you recall that?

18   A.  Yes.

19   Q.  You stated that IDOC uses WPATH standards for evaluating

20   and treating individuals with gender dysphoria, right?

21   A.  I said that we have used those as part of our education

22   tool and they have been incorporated as the standards of care

23   for WPATH-7, were actually included with our gender-affirming

24   protocol, yes.

25   Q.  You are aware WPATH has updated their standards since the

1    7th edition, correct?

2    A.  Yes, I am.

3    Q.  You are aware that WPATH used an evidence-based scientific

4    approach to create new standards in 2022, right?

5    A.  I don't know the process that they used to come up with

6    their standards, quite frankly.

7    Q.  But, you are aware that WPATH issued new standards in

8    WPATH-8?

9    A.  Yes, I am aware.

10   Q.  IDOC does not use those updated standards, correct?

11   A.  That's correct.

12   Q.  The training that you spoke about yesterday regarding

13   WPATH, that uses the old standards, correct?

14   A.  Yes.  I'm not sure how different they are minus the

15   surgery piece, but, yes, that was based on Standards of Care

16   7.

17   Q.  Dr. Conway, in your role as the chair of the committee

18   responsible for reviewing medical and mental health care for

19   individuals with gender dysphoria, you do not have the

20   authority to hire or fire providers, correct?

21   A.  No.  Recommendations is what we can do.

22   Q.  You cannot confirm or ensure that individuals have access

23   to private showers, correct?

24   A.  Not in my role, no.

25   Q.  The THAW committee responsible for overseeing medical and

```
 1    mental health care cannot institute a transfer of an

 2    individual, correct?

 3    A.   That is correct.

 4    Q.   I don't think I have any further questions, Dr. Conway,

 5    thank you.

 6            THE COURT:  Any Redirect?

 7            MR. BRODZIK:  No Redirect, Your Honor.

 8            THE COURT:  All right.  Thank you, Dr. Conway.  That

 9    concludes your testimony.

10            DR. CONWAY:  Thank you.  Should I just cut out?

11            THE COURT:  Yes, you can disconnect.

12            Okay.  Did Mr. Penn go to get your next witness?

13            MR. BRODZIK:  Yes.

14            THE COURT:  Do you have any more witnesses today?

15            MR. BRODZIK:  He will be in person.  We can flip this

16    around.

17            THE COURT:  Okay.  We don't have more witnesses for

18    video, so, Jerod, you can go home today.

19            (Brief interruption in proceedings)

20            THE COURT:  Sir, come up here to my left.

21            Good morning.  Before you sit down I'm going to ask

22    you to take an oath.

23            COURTROOM DEPUTY:  Please raise your right hand.

24            (Defense witness, Joshua Schoenbeck, sworn).

25            COURTROOM DEPUTY:  Please be seated.  And please
```

1    state your name for the record.

2            MR. SCHOENBECK:  My name is Joshua Schoenbeck.

3            COURTROOM DEPUTY:  Would you spell your last name,

4    please?

5            MR. SCHOENBECK:  S-C-H-O-E-N-B-E-C-K.

6            COURTROOM DEPUTY:  Thank you.

7

8                        DIRECT EXAMINATION

9    BY MR. BRODZIK:

10   Q.  Mr. Schoenbeck, where are you currently employed?

11   A.  I'm currently employed at Menard Correctional Center.

12   Q.  What is your title at Menard?

13   A.  Shift Supervisor, or Major.

14   Q.  Is it all right if I call you Major Schoenbeck?

15   A.  That is fine.

16   Q.  How long have you been employed with the IDOC?

17   A.  Just over 15 years.

18   Q.  And aside from Major, what other positions have you held

19   within the IDOC?

20   A.  I started out as a Correctional Officer, I promoted to

21   Correctional Lieutenant, and now I am currently the Shift

22   Supervisor.

23   Q.  And how long have you been Shift Supervisor?

24   A.  February 2024; February 1st.

25   Q.  And what are the -- And is Major and Shift Supervisor --

1    Are those interchangeable terms?

2    A.   Yes.

3    Q.   Okay.  What are the duties and responsibilities that come

4    with being a Major?

5    A.   At Menard the Majors usually supervise the shift.  On day

6    shift the Majors also supervise housing units.

7    Q.   How many staff members are you responsible for on your

8    shift?

9    A.   I am in charge of the whole shift.  It's anywhere between

10   a hundred and 150 staff.

11   Q.   Do you report to anybody?

12   A.   I report to the wardens.

13   Q.   Is that Warden Wills or are there assistant wardens or

14   lower-level wardens?

15   A.   There are -- There are assistant wardens, as well.

16   Q.   How many assistant wardens are there?

17   A.   Three.

18        THE COURT:  Do you report to all three or just one of

19   them?

20   A.   Depending on the day.

21        THE COURT:  Okay.

22   A.   I would say typically the Assistant Warden of Operations

23   is our main, but if he is not available we will go through.

24   Q.   Have you worked in any other facilities aside from Menard?

25   A.   I have not.

1    Q.   What level of security is Menard?

2    A.   Menard is a maximum security facility.

3    Q.   Is there a difference or can you tell us the difference

4    between a maximum security prison and, say, a medium security

5    prison?

6    A.   Medium security -- Maximum security is obviously the most

7    secure facilities.  As you step down, minimum might not even

8    have a gun tower on its perimeter, different fencing.  The

9    individuals housed at a minimum have short sentences,

10   typically nonviolent crimes; maximum, they have either gotten

11   in trouble while in prison during that, or their crime or

12   amount of time would have them at the max facility.

13   Q.   What is your educational background?

14   A.   I have a Bachelor's Degree.

15   Q.   Where did you go to school?

16   A.   Southern Illinois, Carbondale.

17   Q.   Do you through any sort of training in connection with

18   your employment at the IDOC?

19   A.   When I hired in I went through a six-week IDOC training

20   academy, and then annually we do -- we call it cycle training,

21   just update on newer policies that have been activated

22   throughout the year.

23   Q.   Is that a once-a-year training or is that continuous

24   training throughout the year?

25   A.   It's a once-a-year, but it's usually -- usually rotates

```
 1   about every ten to 11 months to keep everybody.

 2   Q.  And how many hours is that training?

 3   A.  It's five days, so --

 4   Q.  Five days meaning five 8-hour days, 40 hours?

 5   A.  40 hours, yeah.

 6   Q.  Are you trained on prison safety?

 7   A.  Yes.

 8   Q.  Guard training?

 9   A.  Yes.

10   Q.  Use of force?

11   A.  Yes.

12   Q.  Any other topics that you can think of that you are

13   trained on?

14   A.  It's a wide range; just anything you might be involved in

15   in your daily jobs.

16   Q.  Are you given any specific training in regards to

17   transgender prisoners?

18   A.  Yes, there's a transgender training that comes through our

19   cycle training and there's also an online training that's

20   required through IDOC.

21   Q.  Is the online training -- Are you counting that as part of

22   the 40 hours, or is that outside of the 40 hours?

23   A.  It's usually separate.  It's something we have to -- There

24   are several online trainings we have to squeeze in throughout

25   the year on our own time throughout the workday.
```

1    Q.  Can you tell me how many hours of the 40 hours of training

2    you receive yearly are centered on the transgender community?

3    A.  Exactly, I don't know.

4    Q.  All right.  I'm going to ask you about a few different, I

5    guess for lack of a better word, goings-on or prison life.

6    A.  Okay.

7    Q.  Are there policies and procedures generally speaking in

8    regards to how prisoners shower at Menard?

9    A.  There is.

10   Q.  Could you walk us through the process of showering just in

11   terms of general population?

12   A.  Okay.  General population, there's -- it's a community

13   shower.  Depending on the number of shower heads in that

14   specific shower, depending on the cell house, it varies.  So,

15   say there's ten shower heads available.  Staff would get out

16   ten individuals, they would be escorted to the shower.  Their

17   property, like their towel or soap, would be searched before

18   they go in, make sure there's no contraband.  They would be

19   secured in the shower.  When everybody has completed the

20   shower, they are escorted back out of the shower to their

21   cells and secured and then you move on to the next group.

22   Q.  That search when they are leaving for shower, what does

23   that search entail?

24   A.  When they are leaving they are usually not searched; just

25   when they come in, because you are making sure they are not

1    bringing anything like a weapon into the shower.

2    Q.   The search when they are leaving their cell going to the

3    shower, what does that search entail?

4    A.   When they are leaving their cell you would go -- they will

5    have like a towel and things.   You will search that property,

6    maybe a quick pat search.

7    Q.   So, say, for instance, there's ten individuals in the

8    shower.   When they are done showering do they come out one by

9    one?   Does everyone have to stay in the shower until the whole

10   process is over?   How does that work?

11   A.   Everybody is complete or finished, and then you let them

12   all out at one time.

13   Q.   Is there a time limit on how long they get to shower?

14   A.   Usually they get approximately 15 minutes.

15   Q.   Are there -- In these communal showers are there any

16   dividers amongst the shower heads?

17   A.   There's not.

18   Q.   Are there any areas within Menard where, rather than

19   communal showers, individuals are showered in a single, I

20   guess, cell shower or single-stall shower?

21   A.   There are a couple of those in, I think, two of the cell

22   houses.

23   Q.   Do you know what cell houses those are?

24   A.   North 2 cell house and North 1 cell house has single-stall

25   showers.

1  Q.  So, per your example, ten inmates are taken to shower,

2  they return, and then another ten are taken.  Is that how that

3  works?

4  A.  Correct.

5  Q.  And how long does that process take to shower an entire

6  block?

7  A.  Just the one flip, say the ten -- the first ten, I would

8  say 20 to 30 minutes, depending on -- just depending on how

9  long they are in the shower.

10 Q.  And how many separate instances of groups of individuals

11 are going to shower at any given shower shift?

12 A.  Depends on the schedule.  They offer -- Everybody's

13 offered a shower three days a week.  Like one gallery has --

14 West House, for example, has up to 50 individuals, so there's

15 a potential for five flips.

16 Q.  Are inmates required to shower?

17 A.  They are not.

18 Q.  How often are inmates offered the opportunity to shower

19 every week?

20 A.  Three times a week.

21 Q.  Now, are there any policies or procedures in regards to

22 transgender inmates showering?

23 A.  There is.

24 Q.  Do those differ from the normal general population

25 policies and procedures?

1    A.  They do.

2    Q.  Can you explain the difference for me?

3    A.  It's the same process, except it's one person at a time.

4    Once they are completed you secure that individual and bring

5    the next one.

6    Q.  Can you walk me through the process on how the guards at

7    Menard facilitate that that process is being followed?

8    A.  So, on that process it's made known that transgender

9    individuals shower single-shower status.  So, they would go to

10   the gallery, key-open the door, escort that individual to the

11   shower, secure the shower door, let them shower.  Once the

12   shower -- they completed their shower, they will be escorted

13   back to their cell.

14   Q.  Are there any -- How would a guard going to take a

15   transgender inmate to the shower be informed that this

16   individual's transgender, they need an individual shower?  Is

17   that something you do or are the guards aware of that ahead of

18   time?

19   A.  Guards are aware.  There's a list within the cell house,

20   and an individual can make the guard aware, as well.

21   Q.  Are there any policy or procedures put in place to ensure

22   that transgender inmates receive any form of privacy while

23   they are showering?

24   A.  Yes, all -- I forgot to mention all shower lines there's a

25   shower curtain, because it is -- it's a prison, so there's a

1    bar to see through the door.  We have a shower curtain that we

2    hang on a hook for -- well, it's a welded metal hook on each

3    side of the shower door to where you can see people's head so

4    you can tell if there's an altercation.

5    Q.  Is that shower curtain hung for both transgender prisoners

6    and cisgender prisoners?

7    A.  It's supposed to be on for all prisoners.

8    Q.  Has anyone or any inmates -- transgender inmates at Menard

9    ever forced to shower?

10   A.  No.

11   Q.  Do you personally assist with the private showering

12   procedures for transgender inmates at Menard?

13   A.  I do not.

14   Q.  Does the implementation of proper transgender showering

15   procedure fall under your purview as a major?

16   A.  Yes.

17   Q.  Are you -- As a major are you aware of any instance when

18   this procedure for transgender inmates showering is not being

19   followed?

20   A.  I am not.

21   Q.  Are all transgender inmates at Menard single-celled?

22   A.  Yes.

23   Q.  Are there any rules for housing transgender inmates, or is

24   the rule just single cell?

25   A.  Single cell.

1    Q.   Major, do you know what mace is?

2    A.   Yes.

3    Q.   And what is mace?

4    A.   Mace is something that we do not use.  It's more of a

5    chemical.  We use pepper spray.

6    Q.   What is the difference between mace and pepper spray?

7    A.   My understanding is pepper spray is made of actual

8    peppers, it's ground down -- The whole process, I'm not a

9    professional on that.  But I believe mace has got more

10   chemicals versus pepper spray.

11   Q.   Is every prison guard at Menard -- Are they issued pepper

12   spray?

13   A.   Not every; depending on the assignment.

14   Q.   In your house or your block that you are currently a Major

15   over, does every guard have pepper spray?

16   A.   The gallery officers, the sergeant, and lieutenant will

17   have one.

18   Q.   Does IDOC provide any training on the proper use of pepper

19   spray?

20   A.   Yes, there is -- there's an OC training and there's also

21   in the six weeks they do an OC training, as well.

22   Q.   You say every six weeks?

23   A.   No, in the six-week initial training for the correctional

24   officer training program.

25   Q.   Sorry, I misunderstood you.

1           What are the circumstances that would warrant the use

2    of pepper spray on an inmate?

3    A.  To prevent harm to an individual, whether it would be

4    themself or another, protect property, preserve evidence,

5    prevent or suppress a riot, things of those natures.

6    Q.  Is pepper spray used on a regular basis?

7    A.  Frequently, yes.

8    Q.  Are there any procedures or policy at Menard that require

9    the documentation of using pepper spray?

10   A.  If a staff member utilizes pepper spray they are required

11   to initiate an incident report at the very least and notify

12   their chain of command.

13   Q.  Would it be appropriate for a prison guard to use pepper

14   spray on a prisoner as a form of retaliation for filing a

15   grievance or a complaint?

16   A.  It would not.

17   Q.  Have you ever witnessed an officer utilizing pepper spray

18   on an inmate because they filed a grievance or a complaint?

19   A.  No.

20   Q.  Are you aware of any situations where a Menard staff

21   member's used pepper spray on a transgender inmate because

22   they have filed a grievance?

23   A.  No.

24   Q.  Are you aware of any situation at Menard where a staff

25   member's used pepper spray on a transgender inmate because

1    they requested access to mental health service?

2    A.   No.

3    Q.   In your role as a Major, is it fair to say that if pepper

4    spray is used by any one of the -- was it a hundred or 200

5    people under your command -- that you would be notified about

6    it?

7    A.   Yes.

8    Q.   Complaints and grievances would be filed likely by other

9    members -- or other inmates in the cell block?

10   A.   Of course, yes.

11   Q.   What happens in a cell block if an officer sprays pepper

12   spray?

13   A.   You're going to know if it's sprayed if it's in the cell

14   house.  You spray -- It's definitely the most effective in, I

15   guess, the area that it is used, but everybody in that general

16   area will smell it and will likely sneeze.  When it's deployed

17   we usually open windows, turn on fans to suck that out of the

18   building.

19   Q.   Are there policies and procedures used for cleanup after

20   pepper spray is utilized?

21   A.   If it's utilized in the cell we would have, like, workers

22   or staff would go in and clean the cell to remove the -- you

23   know, whatever residual, I guess, pepper spray.

24   Q.   If pepper spray is utilized on an inmate do they need to

25   shower afterwards, clean their face?  How does the cleanup

1    process work on an inmate?

2    A.   Immediately if it's in their facial region, which you're

3    supposed to -- training tells you to aim for like the mucus

4    membrane area, which is right around your eyes and nose, they

5    are immediately taken usually to Healthcare to utilize what

6    they call the eyewash station where -- cold water, to rinse it

7    off your face.

8    Q.   Are inmates searched at Menard?

9    A.   Yes.

10   Q.   How often are searches performed?

11   A.   I would say depending on the search -- Cell searches have

12   to be completed at least once a month at minimum.  Pat-down

13   searches or unclothed searches can be completed -- or, like,

14   restrictive housing and unclothed search is completed any time

15   an individual leaves their cell.  Before searching a cell, it

16   is policy that you are allowed to do an unclothed search on an

17   individual to make sure whatever contraband might be in the

18   cell they didn't sneak out with them, for example.

19   Q.   There's been talk at this hearing about contraband.  What

20   is contraband for a prisoner?

21   A.   Contraband could be anything that they are not allowed to

22   have.  It could be from like homemade weapons.  Drugs is our

23   big concern.  Homemade weapons and drugs are our two main

24   concerns.  It could be anything down to a broken TV, as far as

25   a minor contraband.

1    Q.  Are inmates allowed to speak with you anonymously if they

2    would like to?

3    A.  Yes.

4    Q.  Does that happen regularly?

5    A.  As a cell house major I have received anonymous letters or

6    kites, as we call them within the prison system.  I have a

7    lock box in the cell house, it's labeled "Major," that I have

8    the key for.  I find anonymous notes in there frequently.

9    Q.  How does an inmate provide you with one of these anonymous

10   kites?

11   A.  If they are out of their cell for a pass or line movement,

12   it's in an area where they walk past, they can drop it in the

13   box.  They can ask staff to put it into the box, if they would

14   like to.  They can ask an individual-in-custody worker to put

15   it in the box for them.

16   Q.  What are the circumstances that necessitate strip searches

17   at the prison?

18   A.  Safety and security issues.  Like I said, you are looking

19   for contraband after -- shaking down a cell or returning an

20   individual to the cell.  Before they go on court writs and med

21   furloughs all individuals are searched and, like I said, when

22   they are in restrictive housing all individuals, before coming

23   out of their cell, are to be strip-searched.

24   Q.  Can you define a strip-search?

25   A.  An individual is asked to remove all of their clothing,

1    put the clothing in the bar, so usually in a secure area,

2    staff will search all the clothing and return the clothing

3    back to the individual and then ask them to get dressed, watch

4    them.  And then put them in restraints, if needed, and escort

5    them where they need to go.

6    Q.  Is strip search -- Aside from checking the clothes is

7    there any hands-on contact with the inmates?

8    A.  No hands contact.  It's all orders, verbal orders to, you

9    know, turn around, open your mouth, hold out your tongue,

10   things of that nature, so you can see and make sure there's no

11   contraband hidden in their mouth.

12   Q.  Is there an IDOC policy regarding strip searches on

13   transgender inmates?

14   A.  Yes.

15   Q.  And what is that policy?

16   A.  They are to be searched by their preferred gender.

17   Q.  And as a major, do you make certain that if you're -- a

18   transgender inmate on your block needs to be searched, that

19   they are searched by someone with the gender of themselves?

20   A.  Yes.

21   Q.  Okay.  Have you ever witnessed individuals opposite the

22   gender of the transgender prisoner strip-searching them?

23   A.  I have not.

24   Q.  Are cells of transgender inmates subject to search?

25   A.  They are.

1    Q.  Is that on a set basis or is that only if there's a

2    concern of contraband?

3    A.  It can be on a set -- a set basis or if there's a concern

4    of contraband.  Like I said, at minimum, once a month all

5    cells at Menard are searched.

6    Q.  Would it be proper for an IDOC staff to take an inmate's

7    personal property that is not contraband?

8    A.  No.

9    Q.  Are you aware of any instances of this occurring?

10   A.  No.

11   Q.  Are you aware of any situations where a guard has taken

12   noncontraband items from a transgender prisoner?

13   A.  I'm not.

14   Q.  Are you aware of anyone on the IDOC staff taking

15   gender-affirming care items from transgender prisoners?

16   A.  I am not.

17   Q.  Do transgender inmates have access to the commissary?

18   A.  They do.

19   Q.  To your knowledge, is there any difference between the

20   items provided to cisgender male inmates and transgender

21   inmates at the commissary?

22   A.  There are items offered for them.

23   Q.  Can you explain to me what those items are?

24   A.  I believe there is limited cosmetics and undergarments.

25   Q.  Do you know if there's soap?

```
 1   A.  Exactly what, I do not.

 2   Q.  Okay.  Deoderant?

 3   A.  They do offer deodorant.  What deodorants exactly, I don't

 4   know.

 5   Q.  You don't work in the commissary?

 6   A.  I do not.

 7          MR. BRODZIK:  No further questions, Your Honor.

 8          THE COURT:  All right.  Cross-examination.

 9

10                       CROSS EXAMINATION

11   BY MS. PRATHER:

12   Q.  Good morning, Major Schoenbeck.

13   A.  Good morning.

14   Q.  You came to Court today to offer testimony in rebuttal to

15   class members testimony this week that we heard, is that

16   right?

17   A.  Excuse me?

18   Q.  You came to court today to testify in rebuttal to class

19   member testimony from transgender inmates in Menard that we

20   heard this week, is that right?

21          MR. BRODZIK:  Objection.  I don't believe he's a

22   lawyer.  I don't know if he knows what a rebuttal witness is.

23          THE COURT:  Well, maybe just -- instead of saying,

24   "In rebuttal," you are here to offer testimony that is

25   different from what's been offered by the class members at
```

1    Menard.

2          Do you understand that?

3    A.  Possibly, yes.  I was asked to be a witness for the state.

4    That's what I was told.

5    Q.  And you weren't here all week to hear the testimony

6    yourself, correct?

7    A.  Correct.

8    Q.  Did you read the transcripts?

9    A.  No.

10         MR. PENN:  Judge, I -- I'm sorry.

11         THE COURT:  Yeah, wrong lawyer.

12   Q.  You didn't read the transcripts, is that right?

13   A.  I did not.

14   Q.  You also didn't read the declarations from the class

15   members, correct?

16   A.  I did not.

17   Q.  Then how exactly do you know about the testimony that you

18   are responding to today?

19         MR. BRODZIK:  Objection.  I don't think he ever

20   testified that he knew about testimony he was responding to.

21         THE COURT:  Correct, that will be sustained.

22   Q.  Were you asked by counsel to respond to testimony from

23   class members -- Let me rephrase.

24         Were you asked to testify today to respond to class

25   members' testimony?

1    A.  I was not.

2    Q.  Have you had any conversations with counsel about your

3    testimony today?

4    A.  With this counsel -- I spoke with a lawyer from their

5    firm.

6    Q.  When?

7    A.  Yesterday.

8    Q.  What did they say to you?

9            MR. BRODZIK:  Objection, privilege.

10           MS. PRATHER:  Your Honor, this is not privileged and

11   this witness being called as a rebuttal is a waiver of the

12   privilege, because this -- Let me rephrase.  So, Major

13   Schoenbeck did not review any of the declarations, he also did

14   not read any of the transcripts, and so all of his knowledge

15   about what the class members testified to this week was

16   provided by counsel, and so that is a waiver of the

17   attorney/client privilege, so we are entitled to know what

18   exactly he was provided by his counsel as a basis of the

19   testimony from class members to know what to say in response.

20           MR. BRODZIK:  I'm not sure there's been an allegation

21   that he's aware of what's been testified to thus far.  I don't

22   think he's testified to that.

23           THE COURT:  Yeah, I don't think he has, either.  So,

24   maybe ask a different question.  But, I'm not sure if it's

25   been waived.  That's a difficult question.

1  Q.  (By Ms. Prather) So you don't know exactly what the class

2  members testified to this week, is that right?

3  A.  Correct.

4  Q.  Let's turn to private showers.  You testified on Direct

5  that the policy is supposed to be that transgender prisoners

6  are required to have access to private showers, is that right?

7  A.  Correct.

8  Q.  And at your deposition you testified that you can't think

9  of a time when that policy wasn't followed, correct?

10  A.  Correct.

11  Q.  You are also not aware of any reports or grievances of

12  transgender prisoners not being given access to private

13  showers, is that right?

14  A.  Correct.

15  Q.  You also supervise over a hundred to -- Let me rephrase.

16  You also supervise 100 to 150 employees per shift, is that

17  right?

18  A.  As shift commander, if I am running the shifts, yes.  As a

19  cell house it would be less.

20  Q.  How many people would you oversee?

21  A.  As a cell house supervisor, in that aspect I would have

22  20.

23  Q.  So you supervise anywhere from 20 employees per shift to a

24  hundred to 150 per shift, correct?

25  A.  It would depend on my role that day, yes.

1    Q.  It's not your job, sir, to take prisoners to showers,

2    correct?

3    A.  Correct.

4    Q.  And you haven't investigated any issues about access to

5    private showers, is that right?

6    A.  Correct.

7    Q.  And you don't exactly know whether transgender inmates at

8    Menard are always given access to private showers, correct?

9    A.  Correct.

10   Q.  Let's turn to the commissary items.

11           Since 2019, you are not aware of any changes to

12   gender-affirming items in the commissary, correct?

13   A.  I'm not sure when the changes -- I know they made changes

14   to commissary.  The exact changes, I don't know.  There's

15   probably been a lot of changes since 2019.

16   Q.  Do you recall giving deposition testimony in this case?

17   A.  Yes.

18   Q.  And that was under oath?

19   A.  Yes.

20           MS. PRATHER:  If we could pull up -- May I approach,

21   Your Honor?

22           THE COURT:  You may.

23   Q.  (By Ms. Prather) So, if you could turn to tab 1 in the

24   binder, and we are going to go to page -- And this is your

25   deposition transcript.  If we could go to page 49.  Sorry, 43.

```
 1            Are you there with me?
 2   A.  Not quite.  All right, 43.
 3   Q.  Starting on line 4, it says here:  "Have you seen any
 4   changes in transgender prisoners' access to gender-affirming
 5   care items since December 2019?"  Line 10, your answer:  "No."
 6   A.  Correct.
 7            MR. BRODZIK:  What page did you say?
 8            THE COURT:  Page 43.
 9            MS. PRATHER:  4 to 10.
10            MR. BRODZIK:  Okay, sorry.
11   Q.  (By Ms. Prather) That's a "no," since 2019, you are not
12   aware of any changes to gender-affirming items in the
13   commissary, correct?
14   A.  Specific changes, correct.
15   Q.  And that's your testimony?
16   A.  Yes.
17   Q.  You've also never heard of anybody being deprived of
18   gender-affirming care items from the commissary?
19   A.  No.
20   Q.  You testified on Direct that you were aware of a few items
21   from the commissary, including underwear, correct?
22   A.  Yes.
23   Q.  What's the basis of that testimony?
24   A.  I just heard in passing that that is offered in
25   commissary.
```

```
 1   Q.  But you don't, in fact, know yourself if underwear are

 2   available in the commissary?

 3   A.  I do not know exactly what, no.

 4   Q.  On any given day or basis?

 5   A.  No.

 6   Q.  And you can close the binder in front of you.

 7           Switching gears a little bit, Menard policy requires

 8   that you refer to transgender prisoners with a term that they

 9   would like to be identified as, is that right?

10   A.  Correct.

11   Q.  You've testified that you are not aware of any

12   misgendering at Menard, correct?

13   A.  Correct.

14   Q.  You have worked there for 15 years?

15   A.  Correct.

16   Q.  You work at West House.  You oversee West House?

17   A.  I do.

18   Q.  That's the majority of where our class members live?

19   A.  Correct.

20   Q.  Would it surprise you to know that during many -- during

21   the testimony of many of our class members this week they have

22   been referred to as a "he"?

23   A.  No.

24   Q.  That wouldn't surprise you?

25   A.  It would not.
```

```
 1   Q.  I'm going to pull up the last document.
 2           If you could turn to tab 4 in the binder --
 3           MS. PRATHER:  And we are going to mark this as
 4   Plaintiffs' Exhibit 53.
 5   Q.  (By Ms. Prather) Let me know when you are there.
 6           Do you see that document?
 7   A.  It's right after the tab 4, correct?
 8   Q.  Yep.
 9   A.  Yes.
10   Q.  The title of this document is Sexual Abuse Incident
11   Review.
12   A.  Correct.
13   Q.  The incident review date is April 30, 2025, top right
14   corner, incident reviewed.  Do you see that?
15   A.  Yes.
16   Q.  And this is an incident report for West House?
17   A.  Correct.
18   Q.  It's about a sexual assault?  I will direct you to the
19   incident summary at the very bottom.
20   A.  Okay.
21   Q.  Third line from the bottom, ███████ reported that once in
22   the mental health interview room, C/O Dunbar removed the
23   handcuffs from ██████ and this is when the sexual assault took
24   place.  ██████ reported there being oral sex, groping, and
25   fondling."  Do you see that?
```

```
1    A.  I do.

2    Q.  This is a report about a sexual assault?

3    A.  It is.

4    Q.  And it's about ████████████████?

5    A.  Yes.

6    Q.  And ██████████████ is also known as ████████████████████?

7    A.  Does that say that in here?

8    Q.  ████████████████ is a transgender female?

9    A.  Okay.

10   Q.  I will direct your attention to the top portion, Alleged

11   Victim Information.  Do you see that it says "LGBT Status,"

12   and it says, "Gay and transgender"?

13   A.  Yes.

14   Q.  Now, let's turn to the third page of this document.  Do

15   you see your signature on here, --

16   A.  I do.

17   Q.  -- Agent Schoenbeck?  You signed this document?

18   A.  Yes.

19   Q.  Let's go through the other people who also signed it.  We

20   first have Curtis Dallas, he's the Internal Affairs

21   Lieutenant?

22   A.  Correct.

23   Q.  Then we have two correctional officers?

24   A.  Correct.

25   Q.  And then we have Sheri Buettner?
```

```
 1   A.  Yes.

 2   Q.  Officer Buettner is the PREA compliance officer?

 3   A.  Yes.

 4   Q.  Is Officer Buettner a man or a woman?

 5   A.  Female.

 6           THE COURT:  Like born female or presents as female?

 7   A.  Born female.  She's not a correctional officer.  She's

 8   nonsecurity.

 9           THE COURT:  Is there a correctional officer named

10   Buettner?  B-U-E-T-T-N-E-R?

11   A.  I'm not sure if it's the exact spelling, but, yes.

12           THE COURT:  Okay.

13   Q.  Next we have Connie Dole, a nurse?

14   A.  Yes.

15   Q.  Then we have Carri Morris, --

16   A.  Yes.

17   Q.  -- social worker.  And then this form is signed by Warden

18   Wills?

19   A.  Yes.

20   Q.  That's who you report to?

21   A.  Correct.

22           MS. PRATHER:  We would like to admit exhibit --

23   Plaintiffs' Exhibit 53 into evidence.

24           THE COURT:  I think it already is, isn't it?

25           MS. PRATHER:  No, Your Honor, we actually received
```

```
 1   this document yesterday from Plaintiffs.

 2            THE COURT:  Okay.  53 is the Sexual Abuse Incident

 3   Review, and it will be admitted.

 4   Q.  (By Ms. Prather) Let's turn to page 2.  It says here, "Was

 5   there monitoring technology where the incident occurred?"

 6            Do you see that?

 7   A.  I'm sorry.  Where are we at?

 8   Q.  Page two, if you just flip one page before that.  So

 9   sorry, it's tab 4, same document, second page.

10   A.  Yes.

11   Q.  It says in the -- a little bit below the top of the

12   document, "Was there monitoring technology where the incident

13   occurred?"  Do you see that?

14   A.  Yes.

15   Q.  What is the answer?

16   A.  "No."

17   Q.  That means there's no cameras there, right?

18   A.  Correct.

19   Q.  And this is in West House?

20   A.  Correct.

21   Q.  Next portion says, "Is it recommended that monitoring

22   technology be deployed or augmented to supplement

23   supervision?"  What does it say?

24   A.  It says, "No."

25   Q.  There's no recommendation to actually install videos in
```

1    West House, correct?

2    A.  Correct.

3    Q.  Let's turn the page back to page three.

4         The top of this one says, "Does this allegation or

5    result of this investigation indicate a need to change a

6    policy or procedure to better prevent, detect, or respond to

7    sexual abuse?"  What does it say?

8    A.  It says "No."

9    Q.  There's no recommendation to change the policy, correct?

10   A.  Correct.

11   Q.  And this form was filled out April 30, 2025?

12   A.  Correct.

13   Q.  The incident date was actually from December 12, 2023,

14   correct?

15   A.  Correct.

16         MS. PRATHER:  If I could just take a brief moment to

17   confer?

18         THE COURT:  Sure.

19         (Brief interruption in proceedings)

20   Q.  (By Ms. Prather) Just two final topics to cover with you.

21         You testified that you don't know whether transgender

22   individuals at Menard are searched by male officers, is that

23   right?

24         MR. BRODZIK:  Objection.  I think that misstates his

25   prior testimony.

```
 1              THE COURT:  No, it's cross-examinations.  If he can
 2   say, answer it.
 3   A.  I stated that they are to be searched by their gender of
 4   their preference.
 5   Q.  Do you observe transgender individuals being searched?
 6   A.  I do not.
 7   Q.  And you testified at your deposition that you actually
 8   don't have any information about whether inmates at Menard who
 9   are transgender are actually, in fact, searched by officers of
10   an opposite gender, correct?
11   A.  Correct.
12   Q.  Do you know a correctional officer named Kevin Buettner?
13   A.  I do.
14   Q.  He works at Menard?
15   A.  Buettner works at Menard.
16   Q.  Is correctional Officer Buettner a man or a woman?
17   A.  I believe he identifies as a woman.
18   Q.  So, we have Sheri Buettner and then Kevin Buettner?
19   A.  Correct.
20   Q.  Sheri Buettner presents as a male or woman?
21   A.  Woman.
22   Q.  And Kevin Buettner presents as a male or a woman?
23   A.  Woman.
24              THE COURT:  Does Kevin Buettner have a full beard?
25   A.  He does.
```

```
 1            THE COURT:  And you're saying that Kevin Buettner was
 2  born as a male, but presents as a woman?
 3  A.  Correct.
 4  Q.  We heard some testimony this week that one of the
 5  correctional officers here was a transgender individual.  Do
 6  you know which one that was?
 7  A.  I'm going to assume we are talking about Buettner because
 8  of the previous questions, but no.
 9  Q.  But you don't, in fact, know?
10  A.  No.
11  Q.  Major, an individual in custody can't tell actually
12  whether someone has mace or pepper spray in their hand, is
13  that right?
14  A.  Correct.
15  Q.  And you would agree that mace is a general term that most
16  people would think for some type of control tool, correct?
17            MR. BRODZIK:  Objection.  That's speculation.  You
18  are asking him to know what other people are thinking is in
19  the officer's hands.
20            THE COURT:  Well, if he can -- if he can answer.  I
21  mean, mace is a general term.  Do you know if most people
22  confuse the terms mace and pepper spray?
23  A.  It's more of a -- I think a slang term, I would say, for
24  it.
25            THE COURT:  Mace is slang for pepper spray?
```

1    A.  Yes.

2    Q.  So you'd agree that if a grievance or a PREA report that

3    refers to mace, that could actually, in fact, refer to pepper

4    spray?

5    A.  It could.

6    Q.  You testified that you are not aware of pepper spray being

7    used in retaliation against a transgender individual in

8    custody, correct?

9    A.  Correct.

10   Q.  And you know that retaliation against someone is not

11   allowed?

12   A.  Correct.

13   Q.  But you wouldn't expect an officer to report his or her

14   motivation to retaliate in using pepper spray?

15   A.  Correct.

16   Q.  That's all the questions.  Thank you.

17        THE COURT:  I have a couple questions before we do

18   Redirect.

19

20                    EXAMINATION

21   BY THE COURT:

22   Q.  Whenever there's an allegation of rape and a rape kit is

23   done, is it procedure to take a DNA sample from the person

24   that's accused of doing the rape?

25   A.  The exact things on that, I'm not sure.  I know that's

```
 1   more of the investigation side.  At that point it's out of

 2   Major's control.  I know the victim, if it's deemed a rape,

 3   they are sent to an outside hospital.

 4   Q.  Okay.  Then you talked about transgender inmates being

 5   taken to private showers.  Are you aware of any incidents

 6   where on the way to the shower -- Well, let me ask you this:

 7   On the way to the shower does the inmate have to walk through

 8   the gallery with just underwear on?

 9   A.  No.

10   Q.  They are allowed to go to the shower fully clothed?

11   A.  Yes.

12   Q.  Okay.

13            THE COURT:  You can follow up if you want.

14

15                   CONTINUED CROSS EXAMINATION

16   BY MS. PRATHER:

17   Q.  And that's in West House?

18   A.  Yes.

19   Q.  Have you actually observed anybody being taken to the

20   private showers?

21   A.  I have not.

22   Q.  So you don't know, in fact, whether that happens or not?

23   A.  No.

24   Q.  No further questions.

25            THE COURT:  All right.  Any Redirect?
```

1          MR. BRODZIK:  Yes.

2

3                          REDIRECT EXAMINATION

4    BY MR. BRODZIK:

5    Q.  Major, going back to this sexual abuse incident report

6    that you were questioned about and that you signed, this

7    report was -- or this instance or allegation was thoroughly

8    investigated, correct?

9    A.  As far as I know, yes.

10   Q.  And it states in the summary that following the

11   allegation, ███████████, also known as ███████████, was

12   provided a rape kit, correct, the bottom of page one?

13   A.  Correct.

14   Q.  And that the results of the rape kit indicated that ███████

15   or ███████████ was the only DNA present?

16   A.  Correct.

17   Q.  Okay.  On the top of this sheet, it says ███████████,

18   also known as ███████████, has an STG affiliation of

19   Mafia Insane Vice Lords.  What is an STG affiliation?

20   A.  A security threat group.

21   Q.  Is that someone who is threatening her?

22   A.  Street term.  A slang term would be a gang or organized.

23   Q.  Meaning they are in the gang or they're --

24   A.  It means they were at least at one time a member.

25   Q.  Okay.  No further questions.

```
 1              THE COURT:  All right.  Let's take a short break.  Is
 2   Dr. Reister here and ready to go?
 3              MR. PENN:  I believe the answer is yes.  He was
 4   texting.
 5              THE COURT:  All right.  We will resume at 10:40.
 6              COURT SECURITY OFFICER:  All rise.
 7              (Court in recess from 10:30-10:42)
 8              COURT SECURITY OFFICER:  All rise.
 9              THE COURT:  Dr. Reister, come up to the stand.
10   Before you sit down I'm going to ask you to take an oath.
11              COURTROOM DEPUTY:  Please raise your right hand.
12              (Defense witness, Dr. Shane Reister, sworn)
13              COURTROOM DEPUTY:  Please be seated and please state
14   your name for the record.
15              DR. REISTER:  Shane Reister.
16
17                      DIRECT EXAMINATION
18   BY MR. PENN:
19   Q.  Dr. Reister, good morning.  Thank you for being here.  Can
20   you give us a brief summary of your educational history?
21   A.  Yeah, I graduated in 1995 from the University of
22   Wisconsin-Milwaukee, then I went to Illinois School of
23   Professional Psychology in Chicago, I graduated with a
24   Master's and a Doctorate in 2003.
25   Q.  What's your Master's in?
```

1    A.   Master's in Clinical Psychology.

2    Q.   And the Doctorate?

3    A.   Clinical Psychology.

4    Q.   Is that your field of specialty?

5    A.   It is.

6    Q.   Are you licensed to practice psychology in Illinois?

7    A.   I am.

8    Q.   For how long?

9    A.   I believe since 2008.

10   Q.   Give you give us a brief summary of your professional

11   background?

12   A.   Yes, I started off with my post-doc and my early years and

13   postgraduate at the treatment detention facility, I started in

14   Joliet, then they moved the facility to Rushville, and that is

15   a sex-offense-specific treatment center for the Sexually

16   Violent Persons Act.  And then I moved over to Wexford Health

17   Services and I worked as a staff psychologist at Dixon

18   Correctional Center for five years, and after that for the

19   last 12 years I have worked as a Southern Regional

20   Psychologist Administrator for the State of Illinois, so I

21   moved to a State position.

22   Q.   Is that with the Illinois Department of Corrections?

23   A.   It is.

24   Q.   How long have you been there, five years did you say?

25   A.   I have been in this position for 12 years.

1   Q.   What's your current title?

2   A.   Southern Regional Psychologist Administrator.

3   Q.   What are the responsibilities of that job?

4   A.   I oversee and take a look at clinical services across the

5   southern area.  There are ten prisons and two boot camps.  So

6   that one boot camp currently doesn't have any individuals in

7   custody.  But, I oversee those programs over there, I provide

8   supervision for the mental health authorities, which are State

9   positions, at the various sites.  I take a look at things like

10  backlogging, challenges to the system, I might work with the

11  wardens on space issues, trying to get programs running

12  efficiently, those sorts of things.

13  Q.   Do you supervise any people?

14  A.   My direct supervision is for the State mental health

15  social worker force at each site.

16  Q.   And do you know how many people that is?

17  A.   Well, there are ten prison settings that have those

18  positions.  I have vacancies at some of them over the last few

19  months, but I will actually have all nine -- or, I'm sorry,

20  ten sites filled on June 1st, and there will be one more

21  position that we are going to have to TA in the region, and

22  that hasn't posted yet.

23  Q.   Do you oversee patient care at Menard?

24  A.   I do.  It's part of the jurisdiction.

25  Q.   And can you describe that?  In what way do you oversee

1    that?

2    A.   I monitor service delivery, I get reports on problems with

3    service delivery, like cancellations, backlogging of seeing

4    people on time for psychiatry and for mental health providers.

5    When I go and I visit, I am taking a look at what kinds of

6    things are obstacles, and then I will work with the

7    administration there and with the mental health team to

8    overcome some of those challenges and I also provide

9    consultation, clinical consultation for staff members.

10   Q.   And is that the same job responsibilities that you have at

11   the other nine facilities?

12   A.   Yes.

13   Q.   Do you have any other roles at IDOC?

14   A.   I also serve on the statewide Transgender Administrative

15   Committee and the Transgender Health and Wellness Committee.

16   Q.   And that's TAC and THAW?

17   A.   I'm sorry.

18   Q.   Go ahead.

19   A.   And I also work with Dr. Anderson, who's our expert, doing

20   the transgender care case conferences once a month.

21   Q.   Okay.  Well, it's Friday and we have heard a lot about TAC

22   and THAW, so I'm not going to ask you to go through in detail

23   what they do.  Just assume that we are all aware of it.

24   Please feel free to offer anything you want, but I'm not going

25   to go through those in detail.

1              Is it fair to say that you play a part with clinical

2    decisions and mental health care relating to transgender

3    patients?

4    A.  Yes.

5    Q.  To your knowledge are there security concerns that affect

6    how mental health care is provided at IDOC?

7    A.  There are concerns that we are, you know, aware of.

8    Q.  And you work to -- Is it fair to say that you work to

9    provide mental care within the boundaries of those security

10   concerns?

11   A.  That's true, that's the area I'm looking at.

12   Q.  I said we are not going to talk about TAC and THAW, but I

13   will ask you, does the separation of responsibility between

14   THAW and TAC play a role in striking that balance?

15   A.  It does.  It makes sure that people on the THAW committee,

16   which has clinical backgrounds, are making decisions.

17   Q.  You talked -- I think you referred to this.  Have you had

18   to deal with staffing shortfalls?

19   A.  Yes, we have significant staffing shortfalls across the

20   south at various sites, and particularly at Menard.

21   Q.  Are you familiar with the term CQI?

22   A.  Yes.

23   Q.  What's that?

24   A.  It's called the Continuous Quality Improvement.

25   Q.  Does IDOC track patients' CQI?

1   A.  Yes.

2   Q.  And, how?

3   A.  For transgender care, twice a year we have CQI.

4   Q.  In your current role, how often do you visit Menard?

5   A.  About once a month, or at least a few times a month.

6   Q.  And what do those visits entail?

7   A.  I will usually meet with the mental health authorities,

8   see what's going on.  I will meet with various staff members

9   that might have questions or concerns, and then if there's

10  something going on regarding the administration and

11  operational kinds of concerns I need to bring to the warden, I

12  will talk to the wardens, as well.

13  Q.  Who is the mental health authority or what is the mental

14  health authority?

15  A.  The mental health authority is the Social Worker-4, and

16  that is Carri Morris.

17  Q.  What's Carri's role?

18  A.  Carri's role is to oversee the day-to-day mental health

19  and service delivery.

20  Q.  Are you aware of orders that have been entered in this

21  case?

22  A.  Yes.

23  Q.  And have you seen those orders or talked about those

24  orders?

25  A.  Yes, a few years ago those orders came in and I reviewed

1   them.

2   Q.  With respect to Menard, have there been steps that have

3   been taken to improve the level of patient care in the

4   transgender community?

5   A.  Yes, one of the things we implemented was additional

6   training for our clinical staff.  We had a two-day WPATH

7   training.  World Professional Association of Transgender

8   Health came in and created some targeted trainings that would

9   be important for IDOC treatment providers.  And so we did that

10  and then we also implemented the Transgender Care Case

11  Conferences so people could present cases, talk about cases,

12  come up with clinical responses that are responsible.

13  Q.  Has IDOC revised its intake or recordkeeping in any way?

14  A.  In terms of recordkeeping, we are in the process of moving

15  to electronic health records.  That's something that's

16  occurring to improve our system of delivery.

17  Q.  Does Menard ensure that transgender patients have access

18  to mental health evaluations?

19  A.  Yes, we do track the mental health evaluations as part of

20  our data tracking, and I get reports on that once a week.

21  Q.  Does Menard ensure that transgender patients have access

22  to medical services?

23  A.  Yes.

24  Q.  How about like through group therapy?

25  A.  I'm sorry?

1    Q.   How about group therapy?   Do they do group therapy?

2    A.   Yes, we do group therapy.

3    Q.   Do they have individual therapy?

4    A.   They have very limited individual therapy.   That would be

5    for crisis responding, daily crisis watches, and as needed.

6    Sometimes we need to interview our transgender population,

7    like, for example, recently we had many interviews to see what

8    they wanted, like, for example, whether they wanted to go to

9    Logan or that they wanted gender-affirming surgeries, so we

10   had to do that one-on-one.

11   Q.   How about mental health evaluations?

12   A.   Mental health evaluations are one-on-one.

13   Q.   Do they get hormone therapy?

14   A.   They do get hormone therapy through the medical

15   department.

16   Q.   Do they have access to gender-affirming items, if you

17   know?

18   A.   They have gender-affirming items, they get some property,

19   and then there's also a universal commissary for universal

20   gender-affirming property.

21   Q.   How about surgery consultations?

22   A.   Surgery consultations, we do a video conference with Dr.

23   Schechter, and he is our primary surgeon that we use for

24   gender-affirming surgery.   What we will do is bring in a panel

25   of individuals in custody who are interested in gathering more

1    information on surgeries, and they will have an opportunity to

2    have a presentation what the risk and benefits are and then

3    they have an opportunity to ask questions, and then if they

4    want to pursue and continue on with gender-affirming surgery

5    they would do a one-on-one with Dr. Schechter at some point

6    down the line.

7    Q.  You have talked about this a little bit, but are you aware

8    of anyone conducting interviews with transgender inmates with

9    respect to how care is provided?

10   A.  Yes, we currently have Ms. Klausing, who is our person

11   that is doing that individual work trying to gather

12   information regarding what their needs are.

13   Q.  I am going to show you what's been marked as -- It's not

14   marked here, but it's been marked Plaintiffs' Exhibit 50.

15   It's a spreadsheet, and I printed it on one page.  It's very

16   small, but I think you can read it.

17            MR. PENN:  You guys want to pull it up electronically

18   if you can't read that.

19            Judge, may I approach?

20            THE COURT:  You may.

21            MR. PENN:  I think you will be able to read it.

22            THE COURT:  I'm pretty sure I can't, but I will try.

23            MR. PENN:  We can send an electronic one.

24            THE COURT:  I'm good.

25            MR. PENN:  I did my best.

1    Q.   (By Mr. Penn) There's a lot of information on this, but I

2    will just say can you just run through maybe just the headings

3    and tell us what this -- what those are, what they mean?

4    Well, let me strike that.

5            Did you make this document?

6    A.   I made this in conjunction with Reva -- and I'm going to

7    butcher her last name -- it's Engel-something.  And she

8    provided us some basic information, but we needed to update

9    because we had columns that we needed, and so we created some

10   columns.

11   Q.   How do you use this?

12   A.   We utilize this through Ms. Klausing will go through and

13   interview individuals and see what their needs and wants are.

14   And then, like, for example, if you go to the column, "Wants

15   Logan," --

16   Q.   Uh-huh.

17   A.   -- that is letting us know yes or no if they want to do a

18   -- If they need a presentation for transfer from the male to

19   female division, they usually go to Logan first, and so we

20   have that.

21           We also have some other housing requests that some

22   individuals want like, for example, the PRISM program, which

23   is a transgender sensitive program.

24           We also are taking a look at columns like the 701

25   Form column.  Now, that form is used to determine if somebody

 1    has gender dysphoria and if they are a candidate for hormone

 2    treatment.  And then once an individual has the 701 completed

 3    and a gender dysphoria diagnosis is identified, then there is

 4    a referral that goes over to Medical, and then Medical will

 5    arrange a consult with the medical provider so that hormone

 6    treatment can be started.

 7    Q.  What does receiving hormones mean?

 8    A.  That means that they were already on hormones.

 9    Q.  What's "Last Seen by MH"?  It's right in the middle to the

10    right.  It's up at the top, sorry.

11    A.  That one is one that we don't use as much, to be honest,

12    in Mental Health Department.  There are some dates there that

13    I believe the psychiatric care providers may have met with

14    individuals, so --

15    Q.  How about on, "Presents to TAC for Logan"?  Do you see

16    that column?

17    A.  Yes.

18    Q.  Right under that it says, "Too short on H."  What does

19    that mean?

20    A.  We were prioritizing, because there are so many people

21    that want to go to Logan, and we could only present -- we

22    could only basically gather the information for so many at

23    once, and so what we needed to do was prioritize and create a

24    list.  We still have presentations to do in June, and so we

25    prioritized those that were on hormones over a year as the

1    first batch of individuals, and so then we are going through

2    the list and we are trying to, you know, get caught up with

3    it.

4    Q.  Then I am just going to look as to other housing requests.

5    In that column, if you drop down two, there's one that says,

6    "PRISM."  Do you see that?

7    A.  Yes.

8    Q.  So did that person -- that's ███████████, it looks

9    like -- Did ████████████ request -- I'm sorry.  I'm going

10   back to Logan.  Where is Logan?

11   A.  "Wants Logan"?

12   Q.  "Wants Logan."  No, no, go two more down, sorry.

13              ███████████  It says that she wants Logan, yes, and

14   then it says, "Other housing request, PRISM."

15   A.  Yes.

16   Q.  So, does that mean that she has indicated she would like

17   Logan or PRISM?

18   A.  Yes, that's the indication.  One of the challenges,

19   though, for Menard individuals is the PRISM program is at

20   Centralia Correctional Center and that's a medium security

21   facility, and so they need to be medium or minimum security to

22   be able to go to PRISM.  So, that's one of the challenges for

23   a lot of the people on this list.

24   Q.  Do you have anything else you want to share about this

25   list?

1   A.  Well, it's a working document and so we are constantly

2   having to update it, because we have transfers in and things

3   like that.

4   Q.  And transfers out?

5   A.  And transfers out.  So, it is a working document, it is a

6   fluid document.

7   Q.  Have there been any recent transfers out of Menard?

8   A.  There have been.

9   Q.  Is TAC involved with that decision?

10  A.  I'm -- Well, yes, we had -- And I don't know -- I'll be

11  honest, I don't know whether she left yet, but we did have a

12  TAC hearing for an individual in custody, ████████████, and

13  she was approved to transfer over to Logan Correctional Center

14  and I haven't heard one way or the other if she's actually

15  left yet.

16  Q.  And there are transfers to other facilities, as well?

17  A.  Well, there are other transfers to other facilities that

18  the TCO makes all the time.

19  Q.  Is dealing with security concerns in connection with

20  medical care something that is unique to the transgender

21  community?

22  A.  No.

23  Q.  Do you know who julie graham is?

24  A.  julie graham was the assistant federal monitor.  She no

25  longer is doing the federal monitoring, but at one point she

1   was.

2   Q.  Are you familiar with any reports she did?

3   A.  Yeah, she did reports.

4   Q.  And did you review those reports?

5   A.  I did review the reports.

6   Q.  And did you try and make changes according to -- in light

7   of those reports?

8   A.  Yeah, we were trying to do things.  We were making

9   universal commissary, we were working on trying to get

10  commissary delivery.  I know that was a concern of hers.

11  Again, she was -- or they were concerned regarding, you know,

12  our basic operations, administrative operations.

13  Q.  I apologize.  Are julie's pronouns they, them?

14  A.  I believe they are.  She goes by -- Well, she goes by

15  julie as her pronoun, so she doesn't use they/them or he/her.

16  Q.  I will refer to julie as julie.

17  A.  julie, yes.

18  Q.  Apologies for that.

19          Based on your overall observations since you have

20  been there, has patient care improved or gotten worse in the

21  last five years as it pertains to transgenders?

22  A.  Well, it's improving.  Our clinical skills are increasing

23  due to the increased education.  We still have challenges with

24  staffing levels, but we are working toward getting that.

25          For example, at Menard we only had one MHP, one

1    mental health professional for quite a long time over the last

2    year, but we have been able to -- Wexford Health Sources has

3    been able to recruit three additional mental health providers

4    which has helped with tracking and making sure that people are

5    getting the needs that they have.

6    Q.   And have you taken steps to ensure that Menard has the

7    resources it needs or, to the best of your ability, to make

8    sure that they have the resources they need?

9    A.   Yeah, I continue to provide the education with Dr.

10   Anderson on the clinical consultations.  We are working on

11   developing some additional educational materials and trainings

12   for our staff.  We are, again, meeting once a month.  We

13   recently created this chart, for example, in order to improve,

14   since we discovered that there were some individuals that

15   weren't getting their needs met in an efficient manner.  So

16   we've worked on improving by, you know, creating a better

17   tracking system.

18   Q.   All right.  Thank you, Dr. Reister.  I don't have any

19   questions.

20        THE COURT:  All right.  Cross-examination.

21        MR. RAY:  May I approach, Your Honor?

22        THE COURT:  You may.

23

24

25

```
 1                      CROSS EXAMINATION

 2   BY MR. RAY:

 3   Q.  Dr. Reister, good morning.

 4   A.  Good morning.

 5   Q.  It's nice to speak with you again.

 6   A.  Yes.

 7   Q.  Dr. Reister, you have taken an interest in the transgender

 8   community over a number of years, correct?

 9   A.  Yes.

10   Q.  And you have kept abreast of the standards of care for

11   transgender individuals over that time?

12   A.  Yes.

13   Q.  And you agree that gender dysphoria is a serious medical

14   condition, correct?

15   A.  Definitely.

16   Q.  And you agree that WPATH sets forth the relevant standards

17   of care for transgender individuals, right?

18   A.  Yes, it provides some guidance for us.

19   Q.  And based upon that guidance, you would agree that social

20   transition is an important aspect of care?

21   A.  I agree.

22   Q.  And that is to be able to express one's self publicly in a

23   way that aligns with one's gender identity?

24   A.  Yes.

25   Q.  That's important whether you are incarcerated or not,
```

1    right?

2    A.   That is correct.

3    Q.   And when you are incarcerated, expressing yourself

4    publicly means being able to express yourself in your prison

5    environment?

6    A.   Yes.

7    Q.   And you would agree that if a transgender incarcerated

8    person was subject to staff abuse it would make social

9    transition difficult?

10   A.   Yes.

11   Q.   You would agree that if a transgender incarcerated person

12   was subject to misgendering it would make social transition

13   difficult?

14   A.   Yes.

15   Q.   You would agree that the transgender incarcerated person

16   was subject to sexual violence it would make social transition

17   difficult?

18   A.   Yes.

19   Q.   And you agree that one cannot effectively social

20   transition if you are scared to come out of your cell,

21   correct?

22   A.   Correct.

23   Q.   Or if you are consistently put in segregation?

24   A.   That makes it difficult, but they can come out of their

25   cell for yard time and various activities.

1    Q.  One cannot effectively social transition if one is scared

2    to buy gender-affirming items at commissary for fear that you

3    will be beaten up?

4    A.  Yes, that would be very concerning.

5    Q.  One cannot effectively social transition if the staff

6    creates or fosters a hostile environment for transgender

7    prisoners, correct?

8    A.  Yes, we would not want to have a hostile environment.

9    Q.  I'm sorry?

10   A.  Yes, we would not want to have a hostile environment.

11   Q.  All right.  Just broadly speaking, then, one cannot

12   effectively social transition if one does not feel safe,

13   correct?

14   A.  Well, I think that individuals will have varying levels of

15   social transition, and not feeling safe is one of those

16   challenges to go as far as they may want to go.

17   Q.  But they can't effectively social transition if they don't

18   feel safe?

19   A.  Yes, they need to feel safe.

20   Q.  A facility does not provide adequate treatment for gender

21   dysphoria when the environment does not permit social

22   transition to occur?

23   A.  Well, there are varying -- There are varying levels of an

24   ability, for example, for programming and group, there may be

25   more safety for individuals to express themselves in certain

1  settings at the prison, and then there may be other areas that

2  makes it very difficult to transition in other areas.

3  Q.  I will ask my question again, and I apologize for bubbling

4  the words to be -- to start.

5  A.  Okay.

6  Q.  But let me ask it one more time.

7          A facility does not provide adequate treatment for

8  gender dysphoria where social transition cannot effectively

9  occur at that facility.

10  A.  You would need to have adequate treatment in order to

11  transition.

12  Q.  Part of that adequate treatment is social transition,

13  correct?

14  A.  Yes.

15  Q.  Now, you are, as you were when you testified in this

16  courtroom four years ago, the Southern Regional Psychologist

17  Administrator for IDOC?

18  A.  Yes.

19  Q.  And you have 11 -- Maybe you dropped one.  Do you have ten

20  or 11 prisons?

21  A.  I have 11 prisons and then there are two boot camps, and

22  one of the boot camps happens to be empty since COVID.

23  Q.  Okay.  And Menard is one of your prisons, right?

24  A.  That's correct.

25  Q.  And you remain now, as you were then, a very busy person?

1   A.  Yes.

2   Q.  Then in addition to all this work in your 11 prisons and

3   two boot camps, you have retained responsibilities regarding

4   IDOC transgender population, correct?

5   A.  Yes.

6   Q.  You have responsibilities on the THAW committee?

7   A.  Yes.

8   Q.  On the TAC committee?

9   A.  Yes.

10  Q.  Doing transgender care case conferences with Dr. Anderson?

11  A.  Yes.

12  Q.  And those responsibilities are statewide, correct?

13  A.  Those are statewide.

14  Q.  You wish you had more time to spend on the transgender

15  issues, don't you?

16  A.  Yes.

17  Q.  But with your very busy schedule you do the very best you

18  can, right?

19  A.  Yes.

20  Q.  Your role as Southern Regional Psychologist Administrator

21  requires you to visit your 11 prisons, right?

22  A.  Yes.

23  Q.  I believe you just testified you visit Menard two to three

24  times per month, sometimes weekly?

25  A.  Yes.

1    Q.  And you visit Menard more than other facilities because

2    you know it is a higher stress environment than other prisons,

3    right?

4    A.  That's correct.

5    Q.  You also visit Menard more than other facilities, because

6    there are staffing challenges at Menard, right?

7    A.  Yes.

8    Q.  And your average visit at Menard is between three and a

9    half and five hours in length; would you agree with me?

10   A.  Yes.

11   Q.  And during your visits, you visit and sit with a number of

12   people at Menard, right?

13   A.  Yes.

14   Q.  You visit with the mental health authority, Carri Morris?

15   A.  Yes.

16   Q.  You visit with the MHPs there?

17   A.  Yes.

18   Q.  You visit with behavioral health technicians?

19   A.  Yes.

20   Q.  And the assistant wardens of programs?

21   A.  Yes.

22   Q.  And then some of these visits even you have access to walk

23   some of the units in Menard, right?

24   A.  Yes.

25   Q.  And over the time in your position, the 12 years, you have

 1   gone to all the units in Menard?

 2   A.  Yes, I have had tours of all the units.

 3   Q.  And to be clear, your visits are not specific to

 4   transgender issues at Menard, right?

 5   A.  That is correct.

 6   Q.  You are overseeing the MHPs who treat all mental health

 7   issues at Menard, right?

 8   A.  Yes, all mental health issues, including gender dysphoria.

 9   Q.  Would you agree with me that there's somewhere north of

10   1,500 prisoners at Menard?

11   A.  Yes.

12   Q.  And statistics would say conservatively about 40 percent

13   of prisoners suffer from mental illness?

14   A.  Yes.

15   Q.  So that yields about 600 prisoners at Menard who require

16   mental health care?

17   A.  Yes.

18   Q.  And you just testified for a long time Menard had one

19   mental health provider, is that right?

20   A.  That is correct.

21   Q.  Despite the frequency length and depth of your visits to

22   Menard, you cannot tell the Court today that Menard is a safe

23   place for transgender inmates, can you?

24   A.  No.

25   Q.  You don't know whether Menard actually has a private

 1   shower available, do you?

 2   A.  No.

 3   Q.  You don't know whether transgender prisoners at Menard are

 4   strip-searched by female guards, do you?

 5   A.  No.

 6   Q.  And this lack of knowledge is partially due to the fact,

 7   Dr. Reister, that when you visit Menard you do not speak with

 8   the transgender prisoners there, do you?

 9   A.  I have not.

10   Q.  You instead rely upon the mental health providers for

11   that, right?

12   A.  That's correct.

13   Q.  And the shortages in mental health providers at Menard

14   that we have been talking about, this has sometimes gone on

15   for months and years at a time, right?

16   A.  Yes.

17   Q.  And it's also the case that you don't have any involvement

18   in hiring the mental health providers, right?

19   A.  That's correct.

20   Q.  You don't have any way to know whether a mental health

21   provider is providing adequate care for a transgender

22   prisoner, do you?

23   A.  I am -- Based on my discussions and the case

24   consultations, that's the only way that I know.

25   Q.  The only reason you are able to know is because you're

1  relying on what the mental health provider is telling you?

2  A.  Yes.

3  Q.  You're not able to sit in on any sessions between a

4  transgender prisoner and their mental health provider,

5  correct?

6  A.  I do not.

7  Q.  Would you agree with me that privacy is important during a

8  mental health provider visit?

9  A.  Yes.

10  Q.  So, holding a mental health visit in the gallery with

11  other prisoners within earshot, that is not adequate care, is

12  it?

13  A.  No, that is not.

14  Q.  Now, you're aware that many transgender inmates submitted

15  declarations to this Court asking to be transferred from

16  Menard, right?

17  A.  Correct.

18  Q.  And you have no recollection of having ever received or

19  reviewed these declarations, have you?

20  A.  I'm aware of them.  I can't remember exactly where it was.

21  I know that our legal department did make us aware.

22  Q.  Dr. Reister, you have never reviewed these declarations,

23  though, have you?

24  A.  I don't believe I have.

25  Q.  You have never investigated the claims made in these

1  declarations, have you?

2  A.  No.

3  Q.  And, therefore, you have no basis to dispute the veracity

4  of the statements in these declarations, do you?

5  A.  True.

6  Q.  You also did not attend any of the hearings earlier this

7  week, correct?

8  A.  That's correct.

9  Q.  You didn't review any of the transcripts?

10  A.  No.

11       MR. PENN:  Judge, I object to this line of

12  questioning.  He's a witness and he shouldn't be doing that,

13  and I think it's improper to give the implication that he

14  should.

15       MR. RAY:  I'm not implying anything.  I'm just asking

16  a yes-or-no question.

17       THE COURT:  Yeah, I think it's just asking if he has.

18  I think that's fair for cross-examination.

19       MR. PENN:  To ask if he's been in court watching

20  witnesses?

21       THE COURT:  Well, to find out what knowledge he has

22  about the allegations that are being made by the class, yes.

23       MR. PENN:  The question of whether he was here

24  watching witnesses implies that he could or should have been.

25  That's all I'm going to say.  That's my objection.

1            THE COURT:  Okay.  And I'm not saying that he should

2    have either, but it does go to what he knows.

3    Q.  (By Mr. Ray) Dr. Reister, regardless of whether you were

4    here or not this week, you have no basis to dispute the

5    veracity of the testimony elicited this week from class

6    members, do you?

7    A.  I believe that my colleagues are honest, and so I have no

8    basis.  I didn't see or hear what they said.

9    Q.  Maybe my question was imprecise.  Let me ask it again.  Do

10   you know that certain class members, transgender prisoners,

11   provided testimony earlier this week?

12   A.  I was not aware of that.

13   Q.  Okay.  So, therefore, you have no basis to dispute the

14   veracity of their testimony, correct?

15   A.  Correct.

16   Q.  All right.  And setting aside the fact that you have no

17   basis to dispute the veracity of the declarations or the

18   testimony in this matter from class members, you would agree

19   with me that when you have multiple accounts of similar

20   problems at a single facility that can be a sign that

21   something is wrong?

22   A.  It bears further investigation.

23   Q.  Because multiple accounts can demonstrate a pattern of

24   behavior, can't they?

25   A.  It's possible.

1  Q.  And patterns of behavior in a prison can be difficult to

2  change, correct?

3  A.  It requires some clear direction and some monitoring.

4  Q.  But patterns of behavior in a prison can be difficult to

5  change, correct?

6  A.  Behavioral change is difficult, and if it's entrenched

7  then it can be.  That's why it requires, you know,

8  administration to be attentive and, you know, observing and

9  monitoring and providing corrective actions and education.

10 Q.  Does the phrase *deliberate indifference* mean anything to

11 you?

12 A.  Yes.

13 Q.  Would you agree that an act of deliberate indifference

14 occurs when you know there's a problem, you acknowledge it is

15 severe, and you choose to ignore it?

16        MR. PENN:  Object just to the extent it calls for a

17 legal conclusion.

18        THE COURT:  Well, he's not a lawyer, but, yeah, he

19 can answer what -- what he understands the term to mean.

20 A.  Yeah, my understanding of deliberate indifference is when

21 you don't take action to try to improve a situation and take

22 corrective actions.

23 Q.  Because you know there's a problem, you know it's severe,

24 and you choose to ignore it?

25 A.  If you -- Yes, if you believe that it's severe and it

1    warrants a response, then, yeah, you need to do something.

2    Q.  Now, because of this case you recently decided to do a

3    survey, right?

4    A.  Yes.

5    Q.  And that was of all transgender incarcerated persons at

6    Menard, right?

7    A.  That's correct.

8    Q.  And I believe the results of this survey was the

9    spreadsheet, which is Exhibit 50, which your counsel just took

10   you through, right?

11   A.  That's correct.

12   Q.  Okay.  Now, the purpose of this survey was to have the

13   mental health professional ask each transgender prisoner where

14   they wanted to transfer, is that right?

15   A.  That's correct.

16   Q.  And the mental health professional who was responsible for

17   that was Ms. Klausing?

18   A.  That's correct.

19   Q.  And how long has Ms. Klausing been the mental health

20   provider at Menard?

21   A.  I don't know the exact date, but she's one of our new

22   providers.

23   Q.  In fact, she started this year, right?

24   A.  I believe it was this year.

25   Q.  Do you know if Ms. Klausing had any access to the

1    declarations that the class members at Menard had provided?

2    A.  I don't know whether she did.

3    Q.  You didn't provide them to her, right?

4    A.  I did not.

5    Q.  This survey, the results of which we see in Exhibit 50 --

6    The survey occurred in mid to late April of this year, right?

7    A.  Yes.

8    Q.  Last month?

9    A.  Yes.

10   Q.  And you asked Ms. Klausing to do this?

11   A.  Yes.

12   Q.  It was your idea?

13   A.  Yes.  We needed to do something to correct the problem

14   that we identified.

15   Q.  Okay.  And you did decide to do this in April, last month,

16   because you became aware of the concerns that they, Menard,

17   was having and you wanted to follow up, right?

18   A.  Yes.

19   Q.  And before April 2025, before last month, you were not

20   aware of the fact that Menard transgender prisoners had

21   concerns?

22   A.  No.

23   Q.  So, even though you visit Menard two to three times per

24   month, sometimes weekly, you spend hours per visit, you talk

25   to the mental health authority, you talk to the MHPs, you talk

1   to the assistant warden, you walk the units, you were not

2   aware of these concerns, were you?

3   A.  No.

4   Q.  And no one forwarded you the declarations of the class

5   members, did they?

6   A.  No.

7   Q.  Now, your interest level in transgender issues within

8   IDOC, that's not a secret.  That's well-known to your peers,

9   right, --

10   A.  Yes.

11   Q.  -- including to Dr. Puga and Dr. Conway?

12   A.  Yes.

13   Q.  Yet, neither of them forwarded you any of the

14   declarations, did they?

15   A.  I don't recall them forwarding any.

16   Q.  I'd like to take a look at the spreadsheet in a little

17   more detail.  Do you have it before you, sir?

18   A.  I do.

19   Q.  All right.  Did the data in this spreadsheet come from Ms.

20   Klausing's interview with transgender prisoners?

21   A.  Yes.

22   Q.  Did you do anything to verify the accuracy of this data?

23   A.  No.

24   Q.  Let's look at the column that says, "Present to TAC for

25   Logan."

1    A.  Yes.

2    Q.  This column indicates who upon this list will be presented

3    at the next TAC meeting for transfer to Logan, correct?

4    A.  Yes.

5    Q.  Who entered the data in this column?

6    A.  I believe she did and I did.  I believe that was a

7    combination.  We were sending e-mails back and forth and

8    trying to update this as best we could.  So, I don't know

9    exactly who entered the specific data, but it was one of us.

10   Q.  And you say you had a criteria that involved being on

11   hormones for over one year.

12   A.  Yes.

13   Q.  And you'd agree being on hormones for over one year

14   requires the hormones to be effectively administered by the

15   facility, right?

16   A.  That's correct.

17   Q.  And I believe you already testified that the other

18   individuals on this list who were not presented at the April

19   29th TAC meeting, they will be considered for transfer to

20   Logan later?

21   A.  Yes, I told them to present and prepare as many as they

22   could and I asked them to try to get everybody seen by the

23   June TAC meeting.

24   Q.  Okay.

25            THE COURT:  I have confused myself somehow.  The TAC

1    and THAW, when they meet, are they about ordinarily evaluating

2    individuals from all facilities?

3    A.  Yes.

4           THE COURT:  It's not like a meeting for Menard, a

5    meeting for Dixon --

6    A.  That's correct.  It was just there are so many people that

7    we have that --

8           THE COURT:  From Menard?

9    A.  From Menard, because that's come about and came to our

10   attention recently.

11          THE COURT:  Okay.  Sorry to interrupt.

12          MR. PENN:  That's fine, Your Honor, of course.

13   Q.  (By Mr. Penn) So this meeting we are talking about that

14   occurred on April 29th, that was a special TAC meeting to be

15   held before this hearing, right?

16   A.  Yes.

17   Q.  And that committee is run by the TAC committee, by Dr.

18   Puga?

19   A.  That's correct.

20   Q.  And so did Dr. Puga ultimately select the transgender

21   prisoners that were going to be considered at the April 29th

22   meeting?

23   A.  No.

24   Q.  But he sets the agenda for the meeting normally, right?

25   A.  He sets the agenda after we send in the names and the DOC

1    0400 form, which is a summary of different topics related to

2    the gender journey and what have you.

3    Q.   Okay.  At the April 29th meeting, the TAC committee denied

4    all but one of the requests to transfer to Logan, correct?

5    A.   That's correct.

6    Q.   And for that meeting, the declarations that those

7    individuals submitted to this Court in advance were not

8    available, correct?

9    A.   That's correct.

10   Q.   And no one thought to permit the prisoners to attend by

11   video, did they?

12   A.   No.

13   Q.   Dr. Reister, of the 11 prisons in your region, while all

14   are IDOC facilities, you would agree each has their own

15   culture, correct?

16   A.   Yes, they are all different.

17   Q.   And you would agree with me that certain facilities are

18   known to have safer cultures for transgender prisoners than

19   others?

20   A.   Well, like, for example, the Centralia prison is very

21   culturally sensitive to transgender issues, so that would be

22   an example of one that's very sensitive.

23   Q.   So you would agree with me that certain facilities are

24   known to have safer cultures for transgender prisoners than

25   others, right?

1    A.   Yes.

2    Q.   And a prison's culture develops over time, right?

3    A.   Yes.

4    Q.   I believe you used the word earlier that some cultures are

5    entrenched.

6    A.   Yes.

7    Q.   And that would mean that certain cultures would be

8    resistant to training?

9    A.   Potentially.

10   Q.   And a big part of a prison's culture has to do with the

11   staff that work at that prison, correct?

12   A.   Correct.

13   Q.   Because while there may be a warden at the top, the staff

14   is there every day working with the inmates, right?

15   A.   Yes.

16   Q.   And some staff come and go, but other staff stay in a

17   facility for a long time, don't they?

18   A.   They do.

19   Q.   So while policies can change, the staff of a facility can

20   largely stay the same, right?

21   A.   Well, if you don't do proper training and proper

22   supervision.

23   Q.   So, even if a policy can change, the culture of a facility

24   can also stay the same, right?

25   A.   It can, but it could also train -- you can train to make

1   the culture change.

2   Q.  And if that change happens, it changes slowly, usually,

3   right?

4   A.  Yes, but hopefully progressive.

5   Q.  So, you would agree, then, if a facility has a culture

6   that creates an unsafe environment, you can't just snap your

7   fingers and make it safe, right?

8   A.  Well, you can monitor closer using cameras and various

9   things that administration could do.  The administration

10  could, you know, walk the halls, the tiers to, you know,

11  effect the cultural change, see things in progress, and

12  then -- you know, so there are things that can be actively

13  done immediately.

14  Q.  Like cameras?

15  A.  Yes.

16  Q.  Those are important?

17  A.  Yes.

18  Q.  You also agree that if policies change at the facility,

19  they still rely upon the underlying staff to execute them,

20  right?

21  A.  Yes, if the policy changes the staff are the ones that

22  have to implement it.

23  Q.  So, for example, if you have a policy providing a private

24  shower, --

25  A.  Yes.

1    Q.  -- unless the staff actually goes and retrieves the

2    prisoner from his or her cell, then it doesn't matter, does

3    it?

4    A.  Yes, you have to have somebody retrieve the individual for

5    the private shower.

6    Q.  And you can have a policy against misgendering, but if the

7    officer does it anyways, the culture stays, right?

8    A.  Yes, that's why you need to do constant training, which we

9    do continuously.  Every year we have cycle training where we

10   emphasize transgender care, trying to affect the culture.

11   Q.  Do you know how many staff are at Menard?

12   A.  I will be honest, I don't.

13   Q.  It's about 800.  Does that sound about right?

14   A.  I can see that.

15   Q.  And do you know how many transgender prisoners are at

16   Menard?

17   A.  Approximately 20 to 25.

18   Q.  Would you agree with me that transferring 20 prisoners --

19   20 to 25 prisoners is an easier feat than auditing training,

20   investigating, and ultimately having to sometimes fire up to

21   800 staff in that facility?

22   A.  Well, I would want -- I would want the staff to be

23   properly trained, because if you are having a problem with the

24   transgender population then you are having problems with other

25   populations.  You need to appropriately -- You know, you need

1    to appropriately supervise and train your staff.

2    Q.  Dr. Reister, when did you put in transgender training at

3    Menard?

4    A.  Oh, goodness.  Well, I initiated -- I initially had a

5    training that I provided before the court case originally, and

6    then after that court case we did the enhancement with the

7    WPATH training.  I don't remember the exact year, to be

8    honest, but it was, you know, after the original court date.

9    Q.  So, you have had transgender-specific training at Menard

10    for over five years?

11    A.  Yes.

12    Q.  If that training was going to make a noticeable difference

13    at the culture of Menard, do you think it should have worked

14    by now?

15    A.  Well, I am hoping that it's going to be an improvement.

16    You know, I don't oversee, for example, the security that

17    falls under the administration that would do that, so I don't

18    have direct information on the effectiveness.  If I get

19    information from the administration, then we can always work

20    on modifying our trainings.

21    Q.  In the meantime, isn't the words of the prisoners who live

22    there relevant information to see if the training is working?

23    A.  It is relevant.

24    Q.  No further questions.

25           THE COURT:  Any Redirect?

```
 1              MR. PENN:  A little bit.

 2

 3                    REDIRECT EXAMINATION

 4    BY MR. PENN:

 5    Q.  I want to follow up briefly on right where you were.

 6          With respect to, you said, security is -- I mean,

 7    security is everybody's job, but technically security is not

 8    your job, right?

 9    A.  That's correct.

10    Q.  And I don't think it's your job to monitor showers.

11    A.  No.

12    Q.  And I don't think it's your job to ensure that commissary

13    is stocked.

14    A.  Correct.

15    Q.  And I don't think it's your job to investigate claims of

16    wrongdoing or abuse.

17    A.  Correct.

18    Q.  And there's been a lot about these declarations.  Do you

19    -- You are familiar with the orders that have been entered in

20    this case?

21    A.  Yes.

22    Q.  And you are generally aware of what this case is about; is

23    that fair?

24    A.  Yes.

25    Q.  And you have been generally apprised with what this case
```

1    is about?

2    A.  Yes.

3    Q.  And when you look at a TAC transfer, you do look at the

4    concerns raised by the individual inmate?

5    A.  Yes.

6    Q.  And those are considerations, --

7    A.  Yes.

8    Q.  -- among other considerations, --

9    A.  Yes.

10   Q.  -- like the safety of the people, the inmates at the

11   transfer location?

12   A.  Correct.

13   Q.  No further questions.

14          THE COURT:  Let me ask -- I have a question for Dr.

15   Reister.  You can follow up and you can follow up.

16

17                          EXAMINATION

18   BY THE COURT:

19   Q.  When you testified here about Pinckneyville, --

20   A.  Yes.

21   Q.  -- you talked about the PRISM program at Centralia, and

22   there -- I think there was bed space for 100 or so

23   individuals, but there weren't enough mental health providers

24   at that time, which I think was October of 2023, --

25   A.  Yes.

```
 1   Q.  -- to fill those.  What's the status of those now at
 2   PRISM?  I'm just curious.
 3   A.  Well, we have prioritized the PRISM program, and so now we
 4   are having a lot more groups than we used to have.  You know,
 5   staffing is always a challenge.
 6   Q.  When you say "a lot more groups," do you mean of
 7   individuals in custody?
 8   A.  For individuals in custody having groups available.  Yeah,
 9   we increased the number of groups.
10   Q.  Okay.  And is there still a challenge of mental health or
11   behavioral health technicians?
12   A.  Yes, there is.
13   Q.  Okay.  So, how many do you think are in PRISM now, if you
14   know?
15   A.  Oh, I didn't prep that.
16   Q.  Okay.  Do you think it has increased or decreased, if you
17   had to guess, since October of 2023?
18   A.  We have -- We have put in everybody.  There's not a
19   waiting list anymore.  And, in fact, we have a cohort starting
20   that will start in July, and so we will start over this month
21   interviewing those who have submitted and we have enough space
22   to take in everybody.
23   Q.  Okay.  When you say a cohort that has submitted, an
24   individual in custody who want to transfer to PRISM?
25   A.  Who wants transfer.  What we can do is you can remain in
```

1    the PRISM program as long as you want, but then every three

2    months when the new good-time credit contracts come due, then

3    we add in the next cohort of individuals to the program.  And

4    we have enough space to accommodate our current list, so we

5    should be able to get everybody who wants to go there who

6    qualifies.  The biggest challenge with Menard is that so many

7    of them are maximum security.

8    Q.  Right; okay.

9         MR. PENN:  I was going to put a fine point on that.

10

11             CONTINUED REDIRECT EXAMINATION

12   BY MR. PENN:

13   Q.  PRISM is Centralia?

14   A.  Yeah, it's at Centralia.

15   Q.  Centralia is medium?

16   A.  Medium, yeah.

17   Q.  That's all I was going to say.

18        THE COURT:  Do you have any follow-up on what I just

19   asked?

20        MR. RAY:  I do not, Your Honor.

21        THE COURT:  Okay; all right.  Thank you, Dr. Reister.

22        DR. REISTER:  Thank you.

23        THE COURT:  Okay.  Well, that concludes the

24   testimony, no more Plaintiffs or Defendants.  Honestly, I am

25   open if Counsel wants to give a short closing argument of

1    sorts, or I will take briefing.

2             MR. PENN:  I would rather do briefing.

3             THE COURT:  Okay.  That's fine.  And, I was going to

4    say, before I forget, I will give you a week to respond to the

5    bench memo if you want to respond.  Is that enough time?

6             MR. PENN:  Yeah, that should be plenty.

7             THE COURT:  And do we think we can do a closing

8    arguments brief in a week, as well?

9             MR. RAY:  Yes.

10            MS. GARCIA:  Your Honor, we would also like to submit

11   Proposed Findings of Fact and Conclusions of Law.

12            THE COURT:  Well, I have been thinking of that in

13   talking to my law clerks.  I don't know that I really need

14   those.  I think what I would like is basically argument of

15   what you think the testimony -- what the testimony established

16   and --

17            MR. PENN:  Judge, one -- I am sorry, I will step up.

18            One procedural -- I think we probably need to do a

19   week after our response to the -- You gave us a deadline to

20   respond to the new declarations.

21            THE COURT:  Oh, to the new declarations, right.

22            MR. PENN:  So, as orderly, I think we will probably

23   need to do a week after that.  That would also allow us to get

24   the transcripts.  So, I think it was June 12th, I think.

25            MR. BRODZIK:  Yeah.

```
 1              THE COURT:  Okay.

 2              MR. PENN:  So, that would make it June 19th, is the

 3    only thing I would ask.

 4              THE COURT:  Okay.

 5              MS. GARCIA:  Your Honor, we had discussed with

 6    Defense Counsel providing these Proposed Findings of Fact and

 7    Conclusions of Law and had agreed upon suggesting to the Court

 8    about a month from today to provide that material to you.

 9    From the Plaintiffs side we think it might be helpful for the

10    Court, because the PLRA, Prison Reform Litigation Act,

11    requires there to be these specific findings in order to

12    support an injunction, and so it was something that the

13    parties had discussed providing to the Court as to be helpful.

14              THE COURT:  Okay.

15              MR. PENN:  Well, Judge, I don't need them.  I would

16    rather do a closing where that can be addressed, but --

17              THE COURT:  Well, I mean, she makes a good point.  I

18    have to make the specific finding.  So, you can submit those,

19    and maybe -- I mean, would it -- Maybe it would be helpful for

20    you to respond to what they submit.

21              MR. PENN:  That's probably easier.

22              THE COURT:  Okay.  When do you think -- By the way,

23    June 19th is a federal holiday, so we will say June 20th.

24              So, how soon do you think you can submit yours?

25    Could you by --
```

1              MS. GARCIA:  June 26th, Your Honor?

2              THE COURT:  Okay.  So, and then -- So, the Plaintiff

3     will submit Proposed Findings of Fact and Conclusions of Law,

4     and send those in Word form to my proposed document folder,

5     and then I will give Defendants two weeks?

6              MR. PENN:  That would be great.

7              THE COURT:  Okay.  Two weeks after that.  So, what's

8     two weeks after we -- Are we getting into the 4th of July?

9              MR. BRODZIK:  It's right after 4th of July.

10             MR. RAY:  Your Honor, if I may, I think the parties

11    could probably effectively do an exchange on the 26th of June,

12    instead of a submission and response.

13             THE COURT:  Okay.  Let's do both sides on June 26,

14    which is a Thursday.  And how about this:  Then I will give

15    each of you a week if you want to file any specific objections

16    to the other side's proposed findings, and that would be,

17    well, July 3rd.  Okay.

18             MS. GARCIA:  That's fine, Your Honor.

19             THE COURT:  So, yeah, I think getting the transcript

20    would be helpful.  I know, also, as I think we have done in

21    the past, request redactions before the transcript is made

22    public.

23             And then just to be clear, I think the only exhibit

24    we had admitted today was 53, and then, of course, the

25    depositions you are going to send me.

1          MS. GARCIA:  That's right, Your Honor.

2          THE COURT:  Anything else from the Plaintiffs?

3          MS. PRATHER:  Yes, Your Honor.

4          Your Honor, we still have not received all of the

5     documents that Defendants promised to produce, and so we would

6     request that we can submit a proposed adverse inference for

7     Your Honor to consider.

8          THE COURT:  Okay.  Where are we on getting the

9     documents?

10          MR. PENN:  Yeah, Judge, so my understanding -- I

11     guess I will stand here.

12          My understanding is that they -- I think there were

13     50 or so e-mails they went over last night.  That represents

14     five hours of work that was done by Megan, the IDOC employee

15     that's been splitting her time between here and reviewing the

16     documents.  That represents about 22 percent of -- the review

17     of about 22 percent of the total e-mails.  So, we would

18     propose a rolling production on this.  We are not at trial.

19     If they want to -- If they want an adverse inference, I would

20     say please give me seven days to respond or explain why we

21     shouldn't, or I can focus on that time and try and keep

22     producing these documents.  Or, we can keep it open if they

23     have other questions afterwards, after we produce it.  I don't

24     have a problem with that.  I mean, I can only do what I can

25     do.

1          MS. PRATHER:  Your Honor, these documents were

2    ordered to be produced by April 18, 2025, in the Motion to

3    Compel that you granted.  These documents are responsive to

4    those prior requests and there's been no explanation provided

5    to date as to why these weren't even identified in the first

6    instance.  And, so, you know, the suggestion of a rolling

7    production has not resolved, you know, the issue that we

8    addressed in our Motion to Enforce.

9          THE COURT:  Well, I will give you seven days to

10   respond to the Motion for Adverse Inference, take that and, of

11   course, the motion that we were here on itself under

12   advisement.  And, then, but continue to produce the documents.

13         MR. PENN:  Yeah, we will.  They're --

14         THE COURT:  And if Plaintiffs want to seek further

15   relief once all the documents are produced, then that's an

16   issue for another day.

17         MR. PENN:  Thanks, Judge.

18         MS. PARSONS:  Sorry, Judge.  Just one clarification.

19   Do you need a new motion for that, or is that just a follow-up

20   to the motion?

21         THE COURT:  I'm just going to take it as a verbal

22   motion here.

23         MS. PARSONS:  Thank you, Judge.

24         THE COURT:  And the Defendants will respond in seven

25   days.

1          MR. PENN:  Thanks, Judge.

2          THE COURT:  Okay.  Anything else from Plaintiffs?

3     Anything from Defendants?

4          Okay.  The motion is under advisement.

5          Everyone be careful going home, have a nice weekend.

6          COURT SECURITY OFFICER:  All rise.

7          (Proceedings adjourned at 11:40)

8

9

10                    REPORTER'S CERTIFICATE

11               *   *   *   *   *   *   *

12    I, Stephanie K. Rennegarbe, RDR, CRC, Official Court

13   Reporter for the U.S. District Court, Southern District of

14   Illinois, do hereby certify that I reported with mechanical

15   stenography the proceedings contained in pages 555-668; and

16   that the same is a full, true, correct and complete transcript

17   from the record of proceedings in the above-entitled matter.

18

19   _/S/ Stephanie K. Rennegarbe,_              06/05/2025
     IL CSR, RDR, CRC
20

21

22

23

24

25