## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **JANIAH MONROE,[1]**<br>**MARILYN MELENDEZ,**<br>**LYDIA HELÉNA VISION,**<br>**SORA KUYKENDALL, and**<br>**SASHA REED, individually and on**<br>**behalf of a class of similarly situated**<br>**individuals,**<br><br>　　　　**Plaintiffs,**<br><br>**v.**<br><br>**STEVEN BOWMAN,**<br>**MELVIN HINTON, and**<br>**LATOYA HUGHES,**<br><br>　　　　**Defendants.** | <br><br><br><br><br><br><br><br>**Case No. 3:18-CV-156-NJR** |

## <u>MEMORANDUM AND ORDER</u>

**ROSENSTENGEL, Chief Judge:**

On February 14, 2025, Plaintiffs filed a Motion for Preliminary Injunction Prohibiting Class Members from Living at Menard Correctional Center ("Menard"). (Docs. 873, 874). Defendants filed a response in opposition on March 21, 2025. (Doc. 892). After several continuances, the Court held an evidentiary hearing on the motion from May 27 to 30, 2025. For the following reasons, the motion is granted.

### BACKGROUND

#### A. *Initial Injunctions*

This litigation was brought in January 2018 on behalf of a class of Plaintiffs,

---

[1] The named Plaintiffs, and many members of the Plaintiff class, use chosen names reflecting their gender identity rather than their given names at birth, which may not match the name in IDOC records.

certified as "all prisoners in the custody of IDOC who have requested evaluation or treatment for gender dysphoria." (Doc. 213). The named Plaintiffs are transgender women currently incarcerated in Illinois Department of Corrections ("IDOC") facilities. The named Defendants are, respectively, the IDOC Medical Director, IDOC Chief of Mental Health, and the IDOC Director, all sued in their official capacity.

Plaintiffs assert that Defendants' policies and practices subject the class to a substantial risk of serious harm and injury from inadequate and delayed evaluation and treatment of gender dysphoria, in violation of their rights under the Eighth Amendment, and they seek injunctive relief to remedy the flaws in IDOC's treatment of transgender inmates. (Doc. 1, pp. 36-38; Doc. 935).[2] The alleged problems include the IDOC's:

- use of committees comprised of unqualified officials to make decisions regarding the medical treatment, security, and placement of transgender inmates;

- widespread delays or denials in evaluating prisoners for gender dysphoria and in providing hormone therapy and hormone monitoring;

- failure to consider or provide gender-affirming surgery as part of medically necessary treatment for gender dysphoria;

- failure to accommodate and facilitate social transition for individuals with gender dysphoria, including lack of access to gender-affirming clothing and grooming items, failing to make individualized housing placement decisions, and permitting cross-gender strip searches; and

- failing to provide access to medical and mental health providers competent to treat gender dysphoria.

---

[2] Plaintiffs filed a supplemental Complaint on May 15, 2024 (Doc. 935), to which Defendants responded at Doc. 968.

The Court first granted preliminary injunctive relief following a two-day evidentiary hearing completed on August 1, 2019. (Docs. 186, 187, 212). Defendants were directed to develop policies and procedures to ensure that qualified medical professionals would determine inmates' treatment for gender dysphoria; allow inmates to obtain evaluations for gender dysphoria; ensure the provision of necessary hormone therapy; and take steps to train correctional staff on transgender issues. The class was certified on March 4, 2020. (Doc. 213).

A four-day bench trial was held in August 2021, after which the undersigned issued a preliminary order from the bench for immediate injunctive relief, followed by a written order on August 9, 2021. (Docs. 328, 331, 332). That Order noted the provisions of the December 2019 Preliminary Injunction continued in force. It also set timelines related to hormone therapy and consideration of class members' requests to transfer to a facility matching their expressed gender. Finally, it directed Defendants to provide transgender inmates access to a private shower and gender-affirming commissary items, and to allow transgender inmates to choose the gender of the officer who would conduct a search of their person. (Doc. 331).

On February 7, 2022, the full Memorandum and Order for additional injunctive relief was issued. (Docs. 383, 384). The Court appointed two Special Masters/Co-Monitors, who provided numerous reports regarding Defendants' compliance with the ordered injunctive relief beginning in late 2022. (Docs. 418, 423).[3]

---

[3] Co-Monitor Dr. Amanda Harris submitted reports at Docs. 439, 502, 592, 674, 849, and 864. Co-Monitor julie graham's reports are found at Docs. 444, 450, 460, 546, 573, 591, 602, 630, 631, 647, 682, 718, 745, 764, 788, 824, and 830). Co-Monitor Dr. Soo Chun replaced Co-Monitor graham in late 2024 and provided a

Plaintiffs also filed a motion in July 2023 to transfer class members out of Pinckneyville Correctional Center. (Docs. 606, 607). After evidentiary hearings in October 2023, the Court partially granted the Pinckneyville transfer motion. (Doc. 680).

B. *The Appeal*

In May 2023, Defendants moved to vacate the orders for injunctive relief. (Doc. 587). The Court denied Defendants' motion to vacate the earlier injunctive relief orders in November 2023, and Defendants appealed on December 14, 2023. (Docs 678, 699).

Plaintiffs initially sought to transfer class members out of Menard in a motion filed in December 2023. (Docs. 705, 715). The Court stayed consideration of that motion during the pendency of the appeal. (Doc. 826). Co-Monitor julie graham noted persistent serious safety concerns at Menard in her reports of April and June 2024. (Docs. 764, 788).

On December 5, 2024, the Seventh Circuit Court of Appeals vacated the February 2022 injunction, concluding it had expired 90 days after its issuance, pursuant to the Prison Litigation Reform Act ("PLRA"). *Monroe v. Bowman*, 122 F.4th 688 (7th Cir. 2024). In light of that decision, the Court relieved the Co-Monitors of their appointments in January 2025. (Doc. 867). Plaintiffs then renewed their motion to transfer class members out of Menard to another IDOC facility. (Docs. 873, 874).

C. *Gender Dysphoria and the IDOC*

Gender dysphoria is a condition in which a person experiences clinically

---

report at Doc. 835.

significant distress stemming from incongruence between one's experienced or expressed
gender and one's assigned gender. (Doc. 186, p. 3); *Monroe*, 122 F.4th at 691; *see also
Campbell v. Kallas*, 936 F.3d 536, 538 (7th Cir. 2019). Gender dysphoria is considered a
serious medical condition with psychiatric components; it has been removed from the
mental and behavioral disorders in the World Health Organization Classification of
Diseases and the Diagnostic and Statistical Manual of Mental Disorders. (Doc. 158, p. 95;
Doc. 325, pp. 538-39; Doc. 353, p. 379).[4]

The World Professional Association for Transgender Health ("WPATH") is a
professional association dedicated to understanding and treating gender dysphoria.
(Doc. 157, p. 98).[5] WPATH promulgates Standards of Care for treating gender dysphoria.
(Doc. 123, Ex. 13, p. 8).[6] The WPATH standards are endorsed by organizations including
the World Health Organization, the American Medical Association, the American
Psychological Association, the Endocrine Society, and the National Commission on
Correctional Health. (Doc. 186, p. 31). Joining several other courts, this Court concluded
in 2019 that WPATH's Standards of Care "are the appropriate benchmark for treating
gender dysphoria." (*Id.* at p. 31); *see Edmo v. Corizon, Inc.*, 935 F.3d 757, 769 (9th Cir. 2019)
(and cases cited therein). The WPATH standards outline treatment options for gender
dysphoria, including social role transition, cross-sex hormone therapy, psychotherapy,

---

[4] Doc. 158 contains the transcript of testimony of Plaintiffs' expert Dr. Randi Ettner during day two of the
evidentiary hearing of August 1, 2019. (Doc. 158, pp. 5-100); Doc. 325 contains Dr. Ettner's testimony during
day three of the 2021 trial, a.m. session, August 4, 2021 (Doc. 325, pp. 523-574): Doc. 353 contains testimony
of Plaintiffs' expert Dr. Vin Tangpricha during day two of trial, p.m. session, August 3, 2021 (Doc. 353,
pp. 376-480).
[5] Testimony of Dr. Tangpricha during day one of evidentiary hearing, July 31, 2019. (Doc. 157, pp. 88-184).
[6] Doc. 123, Ex. 13 is the WPATH Standards of Care, 7th Version, dated 2012.

and surgery. (Doc. 158, pp. 14-21, 88-92);[7] *see Monroe*, 122 F.4th at 691. The Endocrine Society Guidelines are internationally recognized baseline guidelines for the adequate treatment of gender dysphoria with hormones; therapy that falls below these guidelines is considered less-than-adequate treatment. (Doc. 157, pp. 91, 98-99, 102-10).[8] WPATH also lists the minimum qualifications a mental health professional must attain in order to assess and treat gender dysphoria. (Doc. 123, pp. 28-29).

The IDOC's Administrative Directive 04.03.104,[9] "Evaluation, Treatment and Correctional Management of Transgender Offenders," effective April 1, 2021, designates two committees to oversee matters involving "transgender, intersex and gender incongruent offenders or offenders diagnosed with Gender Dysphoria"—the Transgender Administrative Committee ("TAC") and the Transgender Health and Wellness Committee ("THAW Committee"). These two bodies replaced IDOC's former singular Transgender Care Review Committee "TCRC," which oversaw health-related treatment, security concerns, and placement of transgender inmates under the 2019 revised draft version of A.D. 04.03.104, and the "Gender Identity Disorder Committee" that handled these matters under the 2013 version of the policy. (Doc. 1; Doc. 186, pp. 1-2, 7; Doc. 383, pp. 9-11).

D.  *The TAC and THAW Committees*

The TAC has seven voting members and is currently co-chaired by IDOC Deputy

---

[7] Testimony of Dr. Ettner during day two of evidentiary hearing, August 1, 2019 (Doc. 158, pp. 5-100).
[8] Testimony of Dr. Tangpricha, day one of evidentiary hearing, July 31, 2019.
[9] Administrative Directive 04.03.104 was admitted as Defendants' Exhibit 1 in the May 2025 evidentiary hearing on the instant motion. The April 1, 2021 version replaced the May 1, 2013 version that was entitled "Evaluation of Offenders with Gender Identity Disorders." (Doc. 186, pp. 7-8; *See* Doc. 383, pp. 9-11).

Director Smith and Chief of Psychiatry Dr. Willam Puga. Other voting members include
IDOC Chief of Operations Justin Hammer, Deputy Director Locke (transgender
coordinator), Mr. Nottingham (PREA[10] coordinator), Dr. Shane Reister (IDOC Southern
Regional Psychologist Administrator), and Dr. LaMenta Conway (Deputy Chief of
Medicine in the Office of Health Services). Consultant Dr. Erica Anderson is a non-voting
member. (*Id.* at pp. 416-417). The TAC is responsible for reviewing the safety and security
needs and placement of the transgender, intersex, and gender incongruent population.
The TAC reviews and votes on requests from class members to transfer to a prison
aligning with their gender identity (Logan for transgender women), as well as transfer
requests to the PRISM program at Centralia, accommodations, and ID badge issues.
Dr. Puga designed the TAC to weigh security concerns above mental health concerns,
with four of the seven voting members representing security interests. (*See* testimony of
Dr. Puga, Doc. 958, pp. 407-09, 415-18, 433; Dr. Conway, Doc. 958, pp. 521, 533, 544).

The THAW Committee reviews medical and mental health care for the population
and considers requests for gender-affirming surgery; it generally meets monthly over
Zoom for members to vote on surgery requests after comments and input. Dr. LaMenta
Conway is the current THAW Committee chair; other members include Dr. Melvin
Hinton (Chief of Mental Health), Dr. Puga, Dr. Reister, and non-voting/ad hoc members
Dr. Erica Anderson and Dr. Katz (the University of Illinois endocrinologist who treats
class members). Dr. Norman Schechter, the gender-affirming surgeon, has also

---

[10] Prison Rape Elimination Act.

participated in THAW Committee meetings. (Dr. Puga, Doc. 958, pp. 408-409;
Dr. Conway, Doc. 958, pp. 522-23).

EVIDENTIARY HEARING

The following is a summary of the testimony given at the May 2025 evidentiary
hearing.

A. *Plaintiffs' Evidence*

**1. A.M.**[11]

A.M. has identified as a transgender woman for 13 years. (Doc. 956, pp. 24-68).[12]
She was housed at Menard from October 5, 2022, through May 8, 2025, when she was
transferred to Lawrence Correctional Center, another male facility. (Doc. 956, p. 26). A.M.
has sought a transfer to Logan Correctional Center, a women's facility, since coming to
IDOC "as a girl" in April 2021, in hopes that placement there would help her gender
stability and expression. (*Id.* at pp. 27, 52).

Before Menard, A.M. was incarcerated at Dixon, Lawrence, and Pontiac
Correctional Centers. Compared to the other prisons, "Menard is like a concentration
camp. It's horrible." A.M testified that other prisons are more tolerant toward gender
expression, but there's "no way to be a trans woman in Menard." (*Id.* at pp. 27-28). The
staff culture at Menard allows and rewards disrespect and aggression toward LGBTQ
people. (Doc. 956, p. 28). Inmates are encouraged to harass and disrespect transgender
prisoners because they see how staff mistreat trans people at Menard. (*Id.* at pp. 40-41).

---

[11] The Court will refer to the class member witnesses by their initials, as their testimony includes highly
sensitive personal health information. (*See* Order at Doc. 966, granting motion to redact transcripts).
[12] A.M.'s written declaration (Doc. 763, pp. 3-9) was admitted as Plaintiff's Exhibit 1. (Doc. 956, pp. 38, 60).

A.M. is punished if she complains. (*Id.* at p. 41). This atmosphere has caused her to self-harm. (*Id.*).

On December 12, 2023, A.M. was sexually assaulted by correctional officer Dunbar after she asked to see a mental health provider about an incident of verbal harassment. (*Id.* at pp. 29-37). Dunbar put A.M. into a room to wait for the mental health worker and then forced A.M. to perform oral sex on him. (*Id.* at pp. 29-30). Afterwards, he said he could "help" her. He left the room, and A.M. spit his semen onto her shirt to preserve the evidence. (*Id.* at p. 30). When the mental health provider arrived, A.M. immediately reported the assault to the provider and to Lieutenant Brandon. She also requested a rape kit. Lieutenant Brandon spoke to Dunbar in the hallway, after which Dunbar re-entered the room and threatened A.M. if she went through with the report. (*Id.* at p. 31). Against protocol, A.M. was taken back to her cell rather than taken for the rape kit collection.

A couple hours later, three tactical team officers (Slinkard, Sanders, and Seargent Murphy) verbally harassed A.M., cuffed her, and took her to the R&C (Receiving) unit without seeing any medical provider. (*Id.* at pp. 32-33). When A.M. asked when she was going to medical, Sanders sprayed her with OC (pepper) spray through the cell door's chuckhole, then walked off. A.M. couldn't breathe. The same tactical team returned about 30 to 40 minutes later and moved her to another cell. The team came back and sprayed her again, then took her to the ground as if she was being combative, although she was not. They moved her to segregation and ignored her requests to see Internal Affairs ("IA") and to get medical help. (Doc. 956, pp. 33-34).

The next day, Lieutenant Hanks of IA interviewed A.M. She again requested a

rape kit and medical attention, which he refused. (*Id.* at pp. 34-35). On December 14, 2023,
Nurse Morgan took A.M. to the hospital where evidence, including her clothing, was
collected for the rape kit. (*Id.* at pp. 35-36). A.M. asked the nurse not to send the rape kit
back to Menard, fearing tampering. The nurse said she would call the Attorney General
to see what she could do. A.M. wrote grievances regarding the attack. (*Id.* at p. 38).
A.M. was not informed of the results from the 2023 rape kit or the investigation until May
2025, a few weeks before her transfer to Lawrence. (*Id.* at p. 37).

A.M. had been housed in Menard's Protective Custody ("PC") unit in West House,
where there are no cameras. (*Id.* at pp. 41-43). Cameras are installed in the segregation
and general population areas. In segregation, it was impossible for A.M. to be a visible
trans woman because she was surrounded by gang member inmates. During the last six
months while A.M. was in segregation, she was offered a single shower, but she had to
walk through the gallery to the shower area in her bra and panties. (*Id.* at pp. 49-50). She
agreed to wear boxers if she could get a razor, but guards didn't give her one. She was
mocked on the way to the shower.

There is no group therapy for transgender inmates at Menard. (*Id.* at pp. 43-45). In
April 2025, A.M. saw a mental health worker, Ms. Klausing, who began a treatment plan
for her, but the plan had nothing to do with her transgender status. She estimates she saw
a mental health provider about five times during her final six months in Menard.

A.M. testified that hormone therapy at Menard was terrible. (*Id.* at pp. 45-49).
A nurse once gave A.M. a hormone injection in her lower back instead of the gluteus
muscle, which made her so sick that she spent a week in the health care unit. After that,

A.M. did not trust the medical providers. She changed from injections to pills, but the pills were not consistently provided. She then requested the estradiol patch so she could self-administer the medication, but she did not receive it. In January 2025, a doctor told A.M. that her blood hormone levels looked like she had not been taking hormones at all; her testosterone level was higher than that of a cisgender male.[13] A.M. has never refused hormones.

A.M.'s ID card shows she is a trans female and should be searched by a female officer, but that search preference was only honored three or four times at Menard. (*Id.* at pp. 50-51). A.M. was searched a couple times with the scanner machine, but other times when she asked for a machine search, she was told it was broken. Officer Buettner has strip-searched her and made comments on her body. (*Id.* at pp. 51-52). Buettner continued to strip-search A.M. even though she filed a PREA complaint against Buettner. A.M. was issued a disciplinary ticket for refusing to allow Buettner to strip search her.[14] Buettner has described herself as a "chick with a beard," and told A.M. she is not transitioning with hormones.

A.M. was not issued gender-affirming commissary (magic shave and razors) or clothing items while in segregation. Her bra is one and a half years old. (*Id.* at pp. 58-59).

A.M.'s request to transfer to Logan had never been presented to the TAC until

---

[13] A.M. also testified she has not been receiving hormone therapy since arriving at Lawrence. (Doc. 956, p. 63).

[14] Buettner was present in Court as one of the guards who accompanied Menard class members but did not testify. Buettner has the physical appearance of a man with a full beard. Other witnesses' testimony was unclear as to Buettner's gender identity, but Defendants later attested that Buettner identifies as a transgender female. (*See* Doc. 956, pp. 150-51; Doc. 985, p. 4; *see also* Order granting motion to clarify the record, Doc. 1007). The Court thus refers to Buettner as "she."

recently, when it was denied. (Doc. 956, pp. 52-57, 60). (*See* Plaintiffs' Exhibit 2, TAC
minutes from April 29, 2025). Mental health provider Ms. Morris presented A.M.'s
transfer request to the TAC. A.M. had spoken and written to Morris about her request for
transfer to Logan, but Morris did not advocate for the transfer request. A.M. disputes the
accuracy of the information listed as reasons to deny her transfer. The TAC "questioned"
her "compliance" with hormone treatment based on her low estrogen and high
testosterone levels. A.M. insists Menard staff failed to provide her hormones as
prescribed and notes the TAC did not consider her grievances on that issue. A March 19,
2025 ticket for masturbation was unfounded and fabricated; A.M. never engaged in that
conduct, the alleged victim did not support the ticket, and she asserts the ticket was
issued as retaliation to keep her in segregation. A.M. explained her ticket for "conspiring
to escape" was based on her telling the judge at a court appearance that she had been
raped in Menard and denied medical attention, and did not want to return there. That
disciplinary ticket resulted in her serving six more months in segregation and having her
security risk elevated. (Doc. 956, pp. 67-68).

   **2. D.H.**

   D.H., a transgender woman diagnosed with gender dysphoria, has been
incarcerated at Menard for over three years.[15] (Doc. 956, p. 69). She testified that she first
realized her gender identity in 2023, which prompted her to inform mental health staff at
Menard. (*Id.*). She wanted to keep her gender identity secret because of the harsh

---

[15] Before transferring to Menard, D.H. was placed in Stateville. (*Id.* at p. 107). She has never been assessed
as a predator or flight risk within IDOC. (*Id.* at p. 110).

treatment in general population and for fear of becoming a target. (*Id.* at p. 71). But when she verbally communicated her status to mental health staff, a nearby guard overheard the conversation and "outed" her to other staff and prisoners. (*Id.* at pp. 70-71).

Life changed after that. D.H. described how guards and other inmates harassed and berated her. (*Id.* at pp. 70-72). In one incident in June or July 2023, she remembers being jumped by inmates associated with the Vice Lord gang, a group openly against the LGBT community. (*Id.* at pp. 72-73, 83). During the violent attack, a guard stood by watching and let it happen. (*Id.*). In general, D.H. discussed the treatment of transgender women in Menard as "pretty rough" and notably different from treatment of cisgender inmates. (*Id.* at pp. 73, 104). D.H. also discussed interference with legal calls and mail since being outed. (*Id.* at pp. 104-105).

D.H. witnessed and experienced other inmates forcefully taking commissary items from transgender inmates, beating them up in the shower, threatening them, and refusing to share the phone with them. (*Id.* at p. 74). This treatment is damaging for her gender dysphoria and ability to socially transition. (*Id.*). Specifically, in March 2024, four male inmates pinned D.H. down by her dreadlocks in the shower, beat her, and sexually assaulted her by sticking a thumb in her rectum. (*Id.* at pp. 75-76). No staff intervened despite her cries for help. (*Id.*). She cut her long hair after that. (*Id.* at pp. 76-77). With no access to a private shower, she started washing in her cell to protect herself. (*Id.* at p. 77). D.H. wrote a grievance in May 2024. (*Id.* at pp. 79-81).[16] In the grievance, she described

---

[16] This grievance was admitted as Plaintiffs' Exhibit 3.

her sexual assault, sought medical care for her gender dysphoria, including hormone therapy or surgery, and asked about a transfer to receive such treatment. (*Id.* at pp. 80-81).

After the assault, D.H. lived in a general population unit in East House at Menard. (*Id.* at p. 81). She felt unsafe there because she lacked access to a single shower and was threatened with violence by other inmates if she went to the shower with them. (*Id.* at pp. 81, 90). She moved to PC. (*Id.* at pp. 81-82). While in PC in July 2024, D.H. shared a cell with another inmate known to be involved with the Vice Lord gang. (*Id.* at pp. 82-83). Her cellmate attacked and raped her. (*Id.* at pp. 83-90).[17] She fought back, called for help, saw a guard watch without intervening, and got another guard's attention. (*Id.* at pp. 84-86). Both inmates were cuffed up. (*Id.* at p. 86). After moving to healthcare, she reported the rape to the nurse but did not receive a rape kit. (*Id.* at p. 87). Internal Affairs interviewed D.H. in earshot of other inmates. (*Id.* at pp. 87-88). She was disciplined and spent 30 days in segregation before moving back to East House. (*Id.* at pp. 88-89).

Eventually, D.H. requested and received placement in PC. (*Id.* at p. 90). Again, she shared a cell with another Vice Lord-affiliated inmate, which she suspected was no coincidence. (*Id.* at pp. 90-92). Nothing happened while the two shared a cell, but she feared it might, especially given the lack of cameras in West House. (*Id.* at pp. 94-95). Starting in December 2024, D.H. moved to PC with no cellmate.[18] (*Id.* at p. 95). Being

---

[17] D.H. wrote a grievance in August 2024 about this incident. (*Id.* at pp. 79-81, 91-94). This grievance was admitted as Plaintiffs' Exhibit 4.

[18] Her testimony is inconsistent as to when she started living single-celled. On direct examination, D.H. said she did not have a cellmate starting in December 2024. (Doc. 956, p. 95). On cross examination, she said she has been housed in a single cell since April 2024. (*Id.* at p. 108).

single-celled, she feels safer, but not safe. (*Id.*).

D.H. described her ability to socially transition at Menard. Since April 2024, D.H. has carried a prisoner ID that reflects her transgender status and indicates she should only be searched by female guards. (*Id.* at pp. 91, 95-96, 108). But male guards strip-search her on a regular basis during shakedowns or any time she visits with her daughter. (*Id.* at p. 96). This practice has continued into 2025, and D.H. explained that it affects her gender dysphoria and ability to socially transition. (*Id.*). She still lacks access to a private shower and washes up in her cell. (*Id.* at p. 97). D.H. lacks access to makeup and hair removal products in the commissary. (*Id.* at pp. 97-98). She feels she cannot wear makeup for fear of being hassled by other inmates, and her facial hair makes her feel very uncomfortable. (*Id.*). Staff at Menard have not offered her any feminine undergarments. (*Id.* at p. 98).

As for gender-affirming medical care, D.H. testified that less than two weeks before the hearing she started hormone therapy, despite requesting it a year and a half earlier, in 2023. (*Id.* at pp. 98-99). To feel accepted and confirmed as a female, one year ago she requested gender-affirming surgery to change her genitalia. (*Id.* at pp. 100-101). Less than two months ago, D.H. finally had a discussion about surgery with prison officials. (*Id.* at p. 101). Ultimately, she seeks transfer out of Menard because of the environment of "religious hatred" towards transgender individuals by guards and inmates and believes a transfer would help her gender dysphoria.[19] (*Id.* at pp. 101-103).

---

[19] D.H. filed two declarations in this case seeking transfer from Menard. (Docs. 779; 780; 842; 843; 956, pp. 101-102).

### 3. J.D.

J.D. is a transgender woman who was diagnosed with gender dysphoria while in IDOC custody many years ago and received the same diagnosis again in 2023. (Doc. 956, pp. 113-151).[20] She has been in prison for 26 years. She was transferred to segregation at Menard in 2023 after an officer assault at Hill Correctional Center. In June 2023 she was placed in PC, where she remains. J.D. does not feel safe in PC because she has been assaulted and raped by staff. She stays in the cell 24 hours per day and is allowed yard only once or twice per month. She cannot socially transition as a woman. In 2021 or 2022, she twice tried to cut off her penis because the way she was born is not the way she feels. (*Id.* at p. 116).

Guards at Menard purposely degrade and disrespect transgender women, and if J.D. says anything back, she will be disciplined. In one incident in 2024, guards put her in the bullpen together with other inmates, some of whom had not been approved for PC, in preparation to strip search them and take them to the shower. The PC-approved inmates should have been kept separate from the unapproved inmates. J.D. told the sergeant she is transgender and asked to be searched using the x-ray machine; he refused and ordered her to strip. Guards took her underwear and mocked her, joking that "maybe he is a transgender." (Doc. 956, p. 117). She told a lieutenant about the incident; he responded that she has no rights in PC. An officer told a female guard to say she strip-searched J.D. "in case something comes back about this." (*Id.* at p. 118).

---

[20] Several of J.D.'s documents were admitted as Plaintiffs' Exhibits 5, 6, and 7. (Doc. 956, pp. 122, 128, 135).

In late October or early November 2023, J.D. was placed in the bullpen before going to the shower, wearing only a t-shirt and shorts. After waiting for 15-20 minutes, she asked a guard to return her to her cell. (*Id.* at pp. 118-123). The guard made her stay in the cold bullpen for another 20-30 minutes. When he took J.D. back to her cell, she told him she would write him up for not putting her in the shower. Two or three hours later, the guard came to her cell, aimed his pepper spray at her head, and told J.D. to turn off her TV. J.D. turned her back to him and the guard sprayed her until the can was empty. The guard broke J.D.'s TV, and the sergeant pulled her down to the shower and sprayed her again with pepper spray.

The guards took J.D. to healthcare and allowed her to wash her eyes but did not let her shower. They moved her to the suicide cell, which had no running water, no mattress, and had blood and feces all over the walls. She had no way to wash the pepper spray off her body until a couple days later. She was kept in restricted housing for two or three weeks.

In J.D.'s grievance over the incident, she requested to be moved from Menard, preferably to Logan. [21] Her previous placement at Hill Correctional Center was better than Menard because Hill staff respected her as transgender and the mental health provider cared about "the girls." (*Id.* at pp. 123-24). In contrast, Menard had no mental health provider for approximately a year, until a new one was hired two months ago. She does not ask the Menard guards to summon mental health for her because she has

---

[21] Plaintiffs' Exhibit 6 contains J.D.'s grievance dated November 2023 over the macing/spraying incident. (Doc. 956, p. 122).

witnessed guards spraying inmates who asked for crisis intervention.

At Hill, J.D.'s ID card showed she was female and should be searched by a female officer. (*Id.* at p. 125). However, against her wishes, her Menard ID said she should be searched by a male officer. She was strip-searched by males at least three times from the time she arrived at Menard in 2023 through 2025. She was strip-searched by a male officer before coming to court to testify in this hearing.[22] (*Id.* at pp. 125-26). She felt disrespected and violated by these cross-gender searches, and it affected her gender dysphoria.

On December 12, 2024, J.D. filed a *pro se* motion for injunctive relief in this case, because of the shower incident December 8, 2024, when she was strip-searched by a male officer under threat of segregation, and the inconsistent hormone treatment at Menard. She had been on pills and then patches, neither of which were properly provided. (*Id.* at pp. 126-29). Her motion sought proper hormone therapy, gender-affirming surgery, and a transfer to Logan.[23] On December 8, 2024, J.D. was placed in the bullpen with a male prisoner. She felt defenseless because her hormone levels were in female range. Again, in May 2025, J.D. was placed in a cage with male inmates who were not approved for PC, including an inmate who had assaulted her at Pinckneyville and who should have been kept separate from her. (*Id.* at pp. 130-32). When she told the guard about the keep-separate order, he delayed moving her, and other inmates accused her of being a stool pigeon. J.D. filed a grievance over the matter had not received a response. She believes an investigation of the incident was recently begun after she wrote to the governor. (*Id.*

---

[22] It is possible the searching officer was Buettner; J.D. did not identify the person by name.
[23] J.D.'s motion was admitted as Plaintiffs' Exhibit 5. (Doc. 956, pp. 127-128).

at pp. 132-33).

J.D. requested gender-affirming surgery in September 2022, before coming to Menard. In March 2024, J.D. filed a grievance over not getting surgery and asked that her request be presented to the committee.[24] She never received a response indicating whether her surgery was denied or even whether the request was submitted. She viewed the required educational film and signed paperwork for a vaginoplasty. (*Id.* at pp. 133-36). J.D. fits all the qualifications for gender-affirming surgery; she has done all that was asked of her and wants her application for surgery to be submitted. (*Id.* at p. 144). She was unable to turn in her paperwork for nearly two years and just recently gave it to the new mental health worker at Menard. That worker told J.D. three weeks ago she would submit the paperwork but J.D. has not heard any response. J.D. testified that having the vaginoplasty "would mean the world to me…. If I can have the surgery today and die tomorrow, I will be a happy person." (*Id.* at p. 136).

J.D. has not had access to a private shower for the last year; she washes up in her cell. (*Id.* at p. 137). She puts up a curtain for privacy even though if she is caught, she would get a disciplinary ticket. She has not had access to female commissary items such as makeup or hair removal products for the last year and a half. She had not received panties or bras since her transfer to Menard until last week, when she got three sets of female underclothes after asking the clothing room supervisor. (*Id.* at p. 138).

J.D. began receiving hormone therapy in 2022 at Hill and sees and endocrinologist,

---

[24] J.D.'s surgery grievance was admitted as Plaintiffs' Exhibit 7. (Doc. 956, p. 135).

Dr. Katz, at the University of Illinois-Chicago ("UIC") every three months. (*Id.* at p. 140-43). At Menard, she was given hormones in pill form but often did not receive them when nurses were short-staffed. To address that problem, UIC switched J.D. to hormone patches, which she was to receive twice each week. However, the Menard nurses failed to consistently provide the patches, and J.D. went for weeks at a time without them. When she missed her hormones, she would have hot flashes and emotional upheaval. She could not call for mental health care because she feared being pepper sprayed. About two weeks ago, her medication was switched again to injections, which are given three times a month by a nurse, most recently in May 2025. When J.D. gets the injections, a male guard is always present even though she is shackled to a stationary steel stool. J.D. feels like she is "being raped" each time the male guard sees her pull down her pants to get the shot in her bottom. She would like to get the injections with only the female nurse present.

If she were denied a transfer and had to stay at Menard, J.D. feels like she would just give up. The male guards who put her in the cage with the keep-separate-from inmate and who strip-searched her still work at Menard. In May 2025, when J.D. went out for a medical writ, she was searched in the x-ray machine by officers who misgendered her and commented on her male genitalia. (*Id.* at pp. 144-145).

### 4. T.S.

T.S., a transgender woman diagnosed with gender dysphoria in September 2023, has been housed at Menard for about two years. (Doc. 957, pp. 168-169). T.S. testified that she has felt like a woman since age two or three. (*Id.* at pp. 169-170). Before her incarceration in IDOC, T.S. took black-market hormones and dressed and behaved in

alignment with her female gender identity. (*Id.* at p. 169). She also attempted self-mutilation by shooting herself in the groin. (*Id.*).

In the last year at Menard, T.S. has been receiving hormone treatment. (*Id.* at p. 170). As part of that process, her hormone levels are checked through blood work every two months. (*Id.*). Recently, T.S. spoke with a medical director, who indicated that her levels resemble that of a cisgender man. (*Id.* at pp. 170-171). Medical providers increased her dosage after these results. (*Id.* at p. 171). Her new dosage began three weeks before the hearing. (*Id.* at p. 172). The under-medication has impacted her ability to socially transition. (*Id.*). T.S. also desires gender-affirming surgery, and her hormone levels impact her qualification for surgery within IDOC. (*Id.* at pp. 171-172). T.S. wrote several grievances and complained about her hormone treatment for seven months. (*Id.* at pp. 172-174). She testified that, other than at her initial admission to Menard and this medication change three weeks before the hearing, Menard staff had not helped her with medication or hormone therapy. (*Id.* at p. 174).

T.S. recounted a situation in September 2024 where a masked tactical team swept the building, entered her cell, and aggressively strip-searched her after threatening to deploy pepper spray. (*Id.* at pp. 174-176). Even though she identified herself as transgender and presented her ID, the male officers persisted with the search. (*Id.* at pp. 175-176). After ransacking her cell, the officers confiscated her ID, makeup, underwear, and bra—all of which T.S. considers necessary for her daily life and identity. (*Id.* at p. 177). In the nine months since this incident, Menard has not replaced these items. (*Id.*). Due to the lack of privacy, she fears buying gender-affirming products from the

commissary, as inmates may see her purchases and retaliate. (*Id.* at pp. 177-178). T.S. testified that at Pontiac, she had these items delivered to her cell, but not at Menard. (*Id.* at p. 178). This incident caused her to self-harm through cutting. (*Id.* at pp. 178-179).

T.S. explained that staff at Menard constantly comment on her transgender identity, misgender her, use derogatory language, and expose her to other inmates. (*Id.* at pp. 179-180). She described the use of dehumanizing language like calling her an "it," which makes her feel like hiding or disappearing. (*Id.* at p. 180). This staff conduct affects her ability to live as a woman, because she only feels safe being herself at night in her cell. (*Id.*).

As to housing, T.S. described her placement for the past year in restrictive housing as worse than general population. (*Id.* at pp. 182-183). The gallery also houses disciplinary segregation prisoners, and as a result, there are ongoing issues with spitting, verbal assault, and sexual assault, in what T.S. calls "a marathon of activity." (*Id.* at p. 183). She has written several grievances about these conditions. (*Id.* at pp. 183-184). The other inmates have a problem with her transgender status and make this known on a daily basis. (*Id.* at p. 185). T.S. tries to remain silent in her cell to avoid confrontation; otherwise, she faces derogatory and harassing comments. (*Id.* at pp. 185-187). In her view, the conditions have worsened over the last year. (*Id.* at p. 187). She also has no access to group mental health in her current housing. (*Id.*). One-on-one mental health treatment is also difficult to receive; mental health staff visit the cells, where there is no privacy from other inmates. (*Id.* at p. 193).

Overall, the conditions at Menard make T.S. wish she was not transgender but that she blended in with the other inmates. (*Id.* at pp. 187-188). T.S. testified that she does not

feel safe at Menard as a transgender woman because of the barrage of harassment and

threats, including threats of sexual attacks, directed at her. (*Id.* at pp. 188-189). In April,

she asked for a transfer out of Menard to receive better gender-affirming care, including

mental health groups to treat her isolation, at a different facility.[25] (*Id.* at pp. 189-190).

Such a transfer would allow her to freely express her gender identity and feel like herself.

(*Id.* at pp. 191-192). T.S. carefully stays out of trouble and avoids disciplinary issues to

maintain her eligibility for transfer. (*Id.* at p. 190). Her behavior has caused her security

and aggression levels to decrease to medium and moderate, respectively. (*Id.* at p. 191).

### 5. A.B.

Before A.B. took the witness stand, the Court granted Plaintiffs' request to exclude

IDOC personnel from the courtroom during her testimony based on counsel's

representation that A.B. feared retaliation if she testified. (Doc. 957, pp. 160-62, 199-203).

A.B. stated she has identified as a transgender female since childhood. (*Id.* at p. 201). A.B.

had testified in a previous evidentiary hearing in this case regarding conditions at

Pinckneyville Correctional Center. After that testimony, she was told she would be

transferred to Centralia or the Joliet Treatment Center, but instead, she was transferred

to Menard. She refused to testify further in the present hearing because of her fear that

something similar would happen again. (*Id.* at pp. 201-03). Plaintiffs' counsel asked no

additional questions.[26]

---

[25] T.S. filed declarations in this case seeking transfer from Menard. (Docs. 705; 739; 740; 874; 940; 940-1).
[26] The Court denied Defendants' motion to strike and disregard A.B.'s testimony. (Doc. 1006).
(*See* Docs. 984, 995, 996).

**6. A.R.**

A.R. has been housed at Menard since January 2024 and identifies as non-binary

transgender.[27] (Doc. 957, pp. 204-205). A.R. felt this identity from a young age and stated,

"my grandma said that she thought I should have been a girl growing up." (*Id.* at p. 216).

A.R. describes Menard as "the pits of hell." (*Id.* at p. 205). In West House PC, A.R. states

that the lack of cameras allows the inmates to be subjected to unchecked misconduct. (*Id.*).

In February or March 2025, while at Menard, A.R. received a gender dysphoria diagnosis, at

which point she also received a transgender ID. (*Id.* at pp. 206-207). Early in 2024, A.R.

sought to be recognized as transgender and non-binary but was not given access to a

private shower or hormone therapy. (*Id.* at pp. 207-209). In December 2024, A.R. filed a

grievance seeking recognition as transgender.[28] (*Id.* at pp. 209-211). A.R. marked the

grievance as an emergency because A.R. felt close to going on suicide watch and hunger

strike, and to warn Menard staff of the importance and seriousness of the grievance. (*Id.*

at p. 211). Menard officials did not treat the grievance as an emergency. (*Id.* at pp. 211-

212). Being recognized as transgender is important for A.R.'s mental health. (*Id.* at p. 211).

A.R. started hormone therapy a few weeks before the hearing. (*Id.* at pp. 214-215).

A.R. sought hormone therapy as early as 2021, while at Dixon. (*Id.* at p. 215). Not receiving

hormones impacted A.R.'s mental health, especially as someone with bipolar depression.

(*Id.* at p. 216). As to other medications, A.R. seems to receive those without delay. (*Id.* at

---

[27] A.R. had been in Dixon in 2022, where A.R. told mental health staff about being transgender. (Doc. 957, p. 235). A.R. was transferred to Menard from Shawnee after a disciplinary charge for staff assault. (*Id.* at pp. 236-237).
[28] This grievance was admitted as Plaintiffs' Exhibit 10, and the grievance response was admitted as Plaintiffs' Exhibit 11.

p. 217). At Menard, A.R. is also strip-searched by male guards, even with the transgender acknowledgment on her ID card. (*Id.* at pp. 217-218). This practice makes A.R. feel demoralized. (*Id.* at p. 219). A.R. described requesting a female officer to search as "laughable." (*Id.* at p. 220). A.R. speaks with mental health staff, who usually come around once a month. (*Id.* at pp. 238-239).

Prior to living in West House PC, A.R. lived in East House in general population. (*Id.*). While in general population, A.R. had no access to a private shower and resorted to "bird-bathing" in the cell's sink. (*Id.* at p. 224). To avoid the threats of other inmates, A.R. went on suicide watch to go back into PC. (*Id.* at p. 221). A.R. does not feel safe at Menard and suffers from post-traumatic stress disorder and paranoia. (*Id.*). A.R. has been denied PC a handful of times, which led to filing a grievance in October 2024.[29] (*Id.*). In the grievance, A.R. also requested transfer out of Menard. (*Id.* at p. 224). A.R. suffered an attack in the shower on October 14, 2024, where A.R. fought back in self-defense and was injured.[30] (*Id.* at pp. 225-226). Officers eventually intervened and deployed pepper spray; A.R. was sprayed after being cuffed and after the altercation was over. (*Id.* at p. 232).

A few months before, in July 2024, A.R. described an incident where a Menard officer named Roberts choked her while the commanding officer, Dallas, watched. (*Id.* at pp. 228-229). After the choking, Dallas expressed animus toward PC inmates, calling them "fags." (*Id.* at p. 229). Both officers were removed from the cell house, but Roberts has since returned. (*Id.* at p. 230). Seeing Roberts in the cell house makes A.R. feel

---

[29] This grievance was admitted as Plaintiffs' Exhibit 12.
[30] A.R. filed declarations in this case seeking transfer from Menard and describing this incident. (Docs. 880; 881-3; 908; 909-2; 957, pp. 225-229).

squeamish and paranoid. (*Id.*). While some officers at Menard use A.R.'s preferred name, others use slurs like "fags." (*Id.* at pp. 230-231). These slurs have been used as recently as a month before the hearing. (*Id.*). A.R. feels the slurs are disrespectful but tries to reframe them as innocuous. (*Id.* at p. 231). Ultimately, at Menard, A.R. feels unsafe, experiences inhumane treatment, and lives in fear of retaliation. (*Id.* at p. 233). A.R. seeks a transfer from Menard and put in a transfer request with Jamia Klausing, the new transgender coordinator. (*Id.* at pp. 233, 239-240). A.R.'s security status is currently maximum. (*Id.* at p. 240).

### 7. D.F.

D.F. is a transgender woman diagnosed with gender dysphoria who has been housed at Menard since June 2022. (Doc. 958, pp. 324-325). D.F. has partially physically transitioned and has had breasts since 2020. (*Id.* at pp. 324, 329). At Menard, D.F. requested help with social transition, including gender-affirming care, makeup, feminine attire, facial hair removal surgery, protective custody, private showers, searches by female officers only, and hormone therapy treatment. (*Id.* at pp. 325-326). She met with the transgender mental health coordinator at Menard in 2023, Ms. Wilkes, over a six-month period. (*Id.* at p. 326). Although D.F. requested gender-affirming care, Wilkes expressed that everything would take a long time, so D.F. stopped seeing her.[31] (*Id.*). Not receiving help made D.F. feel ignored and affected her gender dysphoria. (*Id.* at p. 329). Because she had no access to PC, she lived in a cell with other inmates, some of whom

---

[31] D.F. filed a grievance about this issue in January 2024. (Doc. 958, pp. 327-329). The grievance was admitted as Plaintiffs' Exhibit 35 (Doc. 958, p. 333).

were sexually violent and aggressive. (*Id*.).

Generally, D.F. feels that Menard medical and correctional staff do not take transgender women seriously, looking at them as jokes, and mocking, taunting, insulting, and harassing them. (*Id*. at pp. 332, 367). According to D.F., such conduct completely prevents her ability to transition. (*Id*. at p. 367). In D.F.'s understanding, Wilkes was the transgender mental health coordinator at Menard, but left at the end of 2023 or early 2024, and Ms. Klausing assumed the role in 2025. (*Id*. at pp. 332-333).

As to showering, D.F. testified that in West House single showers were supposed to occur for those on PC intake status, but, due to volume, correctional officers did not bother to take inmates for single showers. (*Id*. at p. 330). D.F. developed the habit of washing up in her cell. (*Id*.). In 2025, she continues to shower this way because officers still run transgender inmates into the shower with all the other inmates. (*Id*. at p. 331).

When D.F. arrived at Menard in 2022, she lived in East House, which houses general population inmates. (*Id*. at p. 334). D.F. categorized this cell block as "the most dangerous part of Menard…where the most violent and aggressive inmates" live. (*Id*.). In her experience, the male prisoners in East House treat transgender women with constant harassment expressing their anti-LGBTQ sentiments. (*Id*.). D.F. went into segregation within six months and then signed into PC. (*Id*.). She sought PC because she was being threatened by prisoners in the East House, including gang members, and felt her life was in danger. (*Id*. at p. 335). Her request for PC was denied. (*Id*.). While on temporary kickout status, D.F. applied for PC again. (*Id*. at pp. 335-336). Eventually, that request was denied and she reentered East House. (*Id*. at p. 336).

From 2022 to September 2023, D.F. engaged in a cycle of requesting crisis and suicide watch, signing into PC intake, being denied long-term PC, going on kickout status, getting a cellmate, then repeating the process. (*Id.* at pp. 336-337). When on kickout status in September 2023, Menard placed D.F. in a cell with a male prisoner. (*Id.* at p. 337). In the middle of the night, D.F. woke up to her cellmate groping her and simultaneously masturbating. (*Id.*). She fought him but did not call for help. (*Id.* at pp. 337-338). Once she was back in PC, internal affairs interviewed D.F., and she disclosed the incident and sought a Keep Separate From order on this inmate. (*Id.* at p. 337). That request was denied. (*Id.*). She did not file a PREA, because she had in the past to no avail. (*Id.* at p. 338).

D.F. also described an incident where guards forced her to take out her braids, despite other inmates also having braided hair.[32] (*Id.* at pp. 342-343). As a transgender woman, her braids allowed her to express her gender identity. (*Id.* at p. 343). D.F. later learned that braids did not constitute a rule violation, but refusing an order to remove the braids did. (*Id.* at pp. 343-344). Menard officials denied her access to her property and forced her to remain without it for 24 days. (*Id.* at p. 344). D.F. viewed this as an ongoing form of harassment and retaliation. (*Id.* at pp. 344-345). Soon after this incident, D.F. was forced to remove her braids again at the threat of guards shaving her head. (*Id.* at pp. 346-347). D.F. was denied PC again and was offered a transfer to a male medium security prison, but she refused because she felt unsafe. (*Id.* at pp. 345-346).

In December 2024, D.F. was finally approved for PC. (*Id.* at pp. 339, 347-348).

---

[32] During a video hearing, D.F. made a statement to the Administrative Review Board regarding this incident. (Doc. 958, pp. 340-346; Plaintiffs' Exhibit 43).

Despite finally living in PC, she still felt unsafe. (*Id.* at p. 348). She lived among inmates who had groped her, and she had no access to private showers. (*Id.* at pp. 348-349). D.F. only leaves her cell for commissary. (*Id.* at p. 349). Around the time she moved to PC, D.F. experienced a shakedown.[33] (*Id.* at p. 350). Male officers strip-searched everyone in the shower area, confiscated all clothes with pockets, and walked D.F. back to her cell wearing only a t-shirt and thermal bottoms. (*Id.* at pp. 350-352). She felt uncomfortable, and noticed others, including transgender inmates, were walked back to their cells in just underwear. (*Id.* at pp. 352-353). Another shakedown occurred in January 2025. (*Id.* at p. 353). This time, officers brought transgender inmates to the body scanner and used taunting and harassing words like "tranny" and threated to cut their hair. (*Id.* at pp. 353-354).[34]

At the time of the hearing, D.F. was housed in segregation after her neighbor, a member of the Gangster Disciples, repeatedly asked for sexual favors. (*Id.* at p. 354). She rejected him, and she was later told the gang paid a nearby inmate to stab her on commissary day and steal her commissary bag. (*Id.* at pp. 354-355). To protect herself, she left her cell with books strapped to her stomach and chest. (*Id.* at p. 355). Once officers discovered the books and heard of the threat, they sent D.F. to segregation for investigation. (*Id.*). Internal affairs has yet to interview her about the incident. (*Id.* at p. 356). Life in segregation is much more restricted and limited. (*Id.* at pp. 356-357). And, when guards run the individual showers, segregation prisoners cannot wear their

---

[33] D.F. filed declarations in this case seeking transfer from Menard and describing this incident. (Docs. 739; 740; 762; 763; 880; 881-1; 908; 909-1; 958, pp. 350-354).
[34] D.F. described this incident in a declaration admitted as Plaintiffs' Exhibit 46.

jumpsuits, so they walk to the showers in underwear and a shirt. (*Id.* at pp. 357-358, 370-

371). D.F. is not allowed to shave, which causes her emotional and physical discomfort.

(*Id.* at p. 358). In addition, she missed legal calls due to a broken door in segregation. (*Id.*

at pp. 359-360).

In May 2025, D.F. had an interview with Ms. Klausing, the new transgender

coordinator at Menard. (*Id.* at p. 362). After that call pass, she was strip-searched by male

officers. (*Id.*). She explained that, currently, she has no access to nail polish but had black

eyeliner at some point. (*Id.* at pp. 362-363). D.F. feels unsafe and uncomfortable fully

transitioning at Menard. (*Id.* at p. 363). She did not receive feminine undergarments until

February or March 2025, after requesting them for two years, and they did not fit her. (*Id.*

at pp. 363-364). As to hormone therapy, she refused participation in April 2025, because

she possibly desires to have children when released. (*Id.* at pp. 364-365). Despite this, she

still identifies as a transgender woman. (*Id.* at p. 366). She wishes to transfer out of

Menard to Logan Correctional Center. (*Id.* at p. 367). But she feels safer at Menard under

the current conditions than she would at a medium security male prison where doors are

unlocked and inmates can enter others' cells. (*Id.* at pp. 367, 371). At Menard, she never

leaves her cell except for legal calls and commissary. (*Id.* at pp. 367-68).

### 8. O.A.

O.A. is a transgender woman currently housed at Dixon Correctional Center in a

single cell. (Doc. 958, pp. 373-401). She experienced gender dysphoria starting at age 11

or 12 and was diagnosed with the condition in 2019. (*Id.* at p. 374). She began her medical

transition on February 22, 2020. She has been compliant with her hormone medication

for five and a half years and is currently on injections.

Male staff at Dixon have harassed O.A. because of her transgender identity, and she experienced retaliation when she filed grievances. (Doc. 958, pp. 375-76). She fears for her safety in any male facility.

O.A. has never been housed at Menard. (Doc. 958, p. 400). She has been in Dixon for 16 to 17 months and has sought a transfer to Logan for safety reasons and to move forward with her transition. Beginning in 2021, O.A. has submitted eight or nine transfer requests to the TAC through the transgender coordinator, approximately once every six months. Each time, she gets a different reason for denial. Her transfer requests included her history related to gender dysphoria as well as her experiences of sexual harassment and safety concerns. Normally she does not personally participate in the TAC hearing. (*Id.* at p. 381).

In October 2023, O.A. testified in this case about the conditions and treatment in Pinckneyville, where she was housed at the time. She had requested a transfer to Logan about five to seven times without success. The stated reasons for the TAC's denial of her transfer included the need for more observation, issuance of a minor ticket, going on suicide watch, or going on a hunger strike. (*Id.* at pp. 383-84). In May 2023, the TAC denied her transfer because of her charges of conviction and her vulnerable and predator status. Those reasons had never previously been stated to her. O.A. testified in the October 2023 hearing on the Pinckneyville transfer motion, and this Court ordered Defendants to offer a transfer to class members in Pinckneyville. O.A. was then allowed to name the facilities where she wished to transfer; she chose Logan and Graham. She

was told she would go to one of those prisons, but instead she was moved to Dixon. (*Id.* at pp. 386-87, 401). O.A. was devastated because she thought she was going to Logan. After testifying—but before she was moved from Pinckneyville—O.A. found her cell had been tossed and her TV and hot pot were broken. She was also harassed and threatened by staff. (*Id.* at pp. 388-89).

On January 22, 2025, O.A. happened to encounter several IDOC officials in the Dixon dayroom, including Dr. Melvin Hinton and Director Latoya Hughes. Hughes stated she had received O.A.'s letters. O.A. asked them to intervene and help her transfer to Logan because she fears for her safety at Dixon (or any male facility). She showed them documentation of her PREA complaint and sexual abuse/harassment by inmates and staff. Hughes told O.A. she would get a video interview with the TAC. (*Id.* at pp. 390-91). O.A. also asked Dr. Hinton about downgrading her predator status, which dated back to 2009.

On February 7, 2025, O.A. participated in a videoconference with the TAC. She related all her experiences since her gender transition. The committee members focused only on her compliance with medication, a recent ticket, a hunger strike, and her placement on suicide/crisis watch. They did not listen to O.A.'s safety concerns, PREA complaints, or the sexual abuse and harassment she experienced. Two weeks later, she was notified her transfer was denied based on tickets, mental instability, predator status, and her charges of conviction. The TAC asked her to participate in a sex offender program, which was the first time this was brought up. There is no sex offender program

offered at Dixon.[35] (*Id.* at pp. 394-99).

   B. *Defendants' Evidence*

   **1. Warden Anthony Wills**

   Anthony Wills, the Warden of Menard since April 2020, testified by video on Wednesday, May 28, 2025. (Doc. 957, pp. 242-307).

   About 70% of Menard's nearly 2,000 inmates are classified as maximum security; the facility also houses medium and minimum-security prisoners. (*Id.* at pp. 256, 258). Sixteen transgender prisoners are currently held at Menard. (*Id.* at p. 256).

   Wills discussed IDOC's Administrative Directive (A.D.) 04.03.104, titled "Evaluation, Treatment and Correctional Management for Transgender Offenders," admitted as Defendants' Exhibit 1. (*Id.* at pp. 243-46). Menard security staff undergo 40 hours of annual training. Four hours of this training covers all administrative directives, including this one, and focuses on new or amended directives. Wills could not say exactly how much training time is devoted to A.D. 04.03.104. Staff can ask him questions about the directive, and Wills contacts the TAC if he cannot answer a question. Approximately 800 correctional staff are employed at Menard. (*Id.* at p. 270). Wills did not recall any instance where a staff member had asked him questions about the Administrative Directive on transgender prisoners. He regularly reminds staff about the policies, but he cannot ensure all 800 staff members are in compliance. He relies on shift

---

[35] Information available on the IDOC website indicates that the only institution offering a Sex Offender Program is the Big Muddy River Correctional Center, a medium security male facility. https://idoc.illinois.gov/facilities/correctionalfacilities/facility.big-muddy-river-correctional-center.html (last visited August 19, 2025).

commanders to report violations to him; incidents can be documented and reported up the chain of command. (*Id.* at p. 272). So far, Wills has not been made aware of any violations of the A.D.

Wills is included in THAW[36] Committee meetings if an individual at Menard requests hormone treatment. (*Id.* at p. 247). Menard inmates can request hormones from a mental health provider or from Wills, after which the THAW Committee would review the request.[37]

If a class member alleges harassment, misconduct, or abuse by a staff member, the concern is routed to Wills and to IA, which would investigate. (*Id.* at pp. 247-49). IA interviews the victim and the suspect, collects any evidence, and possibly sends the victim to an outside hospital. Any evidence collected is turned over to IA (Doc. 957, p. 248). Wills is notified of the result of the investigation. Wills does not believe there is a pattern of harassment of transgender prisoners at Menard because he has not been made aware of it. He stated, "there could be a substantial amount of harassment that could possibly go on, but that harassment is definitely not tolerated." (*Id.* at p. 249). If he is made aware of a situation, it is addressed. He has not been made aware of a pattern of sexual misconduct or misgendering of transgender prisoners by Menard staff. PREA complaints are handled by IA, but if a PREA allegation is made against an IA member, it is investigated by an external team. (*Id.* at pp. 252-53).

---

[36] *See* testimony of Dr. LaMenta Conway, below, for a description of the THAW Committee's role regarding gender-affirming care.
[37] Dr. Conway testified that the THAW Committee does not decide whether hormone treatment will be approved; hormones are given by the facility medical providers when a person has been diagnosed with gender dysphoria and requests hormone therapy.

Wills relies on his staff members to provide health care to class members. He is not aware of any allegations of denial of gender-affirming care or hormone treatment; if it was going on, he would be made aware of it. (*Id.* at p. 250).

He has not been made aware of, and would not tolerate, a practice of macing transgender inmates who request mental health services. Prisoners can communicate with him through mail to raise such concerns. (*Id.* at pp. 250-51).

Most transgender inmates at Menard are housed in the same location, the West House, and are single-celled. Wills decided about a year and a half ago to single-cell any individual identified as transgender, after learning transgender inmates were feeling unsafe in a cell with a non-trans person. (*Id.* at p. 251). West House does not have cameras, although he has requested them yearly since 2021 for safety reasons. (*Id.* at pp. 254-55).

Wills communicates with Menard staff via email, memos, and bulletins that are read every day. Some of these bulletins concern transgender issues such as commissary items and showers. (*Id.* at pp. 253-54, 258-59). Anyone who identifies as transgender should be showered alone with a shower curtain for privacy. Wills is not aware of any transgender female inmates who have refused a private shower. It would be a violation of the A.D. for a Menard staff member to deny a class member a private shower. (*Id.* at p. 288). Wills filed a declaration in this case in February 2023, stating class members at Menard are provided showers with the use of a shower curtain; this method is still used today. (*Id.* at p. 290). After Wills's February 2023 declaration, former Co-Monitor julie graham advised Wills of concerns raised by class members regarding access to private showers. Wills reiterated the private shower policy to staff. Wills had not reviewed the

declarations filed by class members in this case in connection with the current motion, nor did he direct any investigation into the allegations contained in them. (*Id.* at pp. 276-79, 291).

Inmates whose ID card identifies them as transgender may purchase the transgender items on the commissary list. (*Id.* at p. 253). All feminine products, including razors, hair removal cream, and cosmetics, are available in the commissary. (*Id.* at pp. 259, 261). An inmate writes a list of items they want from commissary, and then walks there to select and purchase what they want. If an individual is not able to walk, they may have commissary items delivered. (*Id.* at p. 262).

Female undergarments are kept in the clothing house and are given out yearly, free of charge, upon request. (*Id.* at pp. 259-60, 302). A transgender inmate's request for undergarments will be fulfilled when the individual's year is up. (*Id.* at p. 260). If Wills becomes aware that an inmate has not received what they should, he will address it immediately.

Wills does not decide whether an inmate is granted a transfer, but he sends transfer requests/recommendations to the TAC, which sends them to the THAW Committee. (*Id.* at pp. 255-56).

Menard's policy and procedure is for strip searches on transgender inmates to be conducted by an officer who aligns with the inmate's gender. (*Id.* at pp. 256-58). There are transgender female guards at Menard who perform strip searches on transgender female prisoners, and some of the approximately 100 female guards volunteer to perform strip searches on transgender females. If no female staff member is available for a strip

search, officials can reach out to a female guard at a neighboring facility to conduct the

search. A refusal of staff to honor a class member's request not to undergo a cross-gender

strip search would violate policy. (*Id.* at p. 292). Over the past five years, Wills was made

aware of between 25 and 50 search violations; he responded by reiterating the IDOC

policy. (Doc. 957, pp. 293-94). Wills was not aware that class members allege they

continue to be subjected to improper cross-gender strip searches, including two who

testified they were searched by a male officer before attending this hearing. Wills asserted

the person who conducted the search on the first day of the hearing, May 27, 2025, was a

transgender female. (*Id.* at pp. 294-95, 303).

The body scanner at Menard, located in the R&C (Receiving) building about

100 yards from West House, is used to search any individual for contraband. Wills's

declaration, dated March 14, 2023, certified that Menard complies with the IDOC's

requirement for searches of transgender individuals in part through use of the body

scanner. However, Wills testified that the scanner has never been used for strip searches

of transgender individuals. (*Id.* at p. 293).

A transgender inmate can obtain an ID card with the transgender designation by

meeting with a mental health provider, who submits the request to Psychiatry for

assessment and determination. (*Id.* at p. 263). The process may take from a week to

approximately 30 days. Wills was not aware of any transgender inmates at Menard who

have not received a transgender status ID card after requesting one.

During cross examination, Wills agreed that transgender individuals in custody at

Menard are especially vulnerable to verbal, emotional, and physical abuse. (*Id.* at p. 264).

He acknowledged that gender dysphoria is a serious mental condition that can result in significant distress including suicide attempts, and that medical and social transitioning is a crucial part of medical care for gender dysphoria. The lack of cameras in the West House is a safety issue, which is why Wills has made numerous requests for cameras there. Without cameras, it is difficult to verify whether staff are complying with IDOC rules and policies on the treatment of trans prisoners. (*Id.* at pp. 264-65). As warden, Wills is responsible for providing a safe and secure environment to Menard prisoners. Over the last five years, Wills has learned of between 50 and 100 reports of a transgender individual feeling unsafe or experiencing harassment or assault. (*Id.* at pp. 266-67). About 20 reports involved alleged sexual or physical assault by a staff member. No investigation has found such a complaint to be substantiated, and no staff member has been disciplined. (*Id.* at pp. 267-68). Allegations may be found unsubstantiated if there are conflicting statements or there is no video footage. Wills does not have the authority to hire and fire Menard employees; this authority belongs to IDOC Director LaToya Hughes. (*Id.* at p. 243).

Wills learned approximately three years ago of previous injunctions issued in this case. He has spoken with former Co-Monitor julie graham, read her reports, and attempted to address issues brought to his attention. (*Id.* at pp. 274-75). Wills did not review any court orders or other documents that were not included in graham's reports. (*Id.* at pp. 276-79).

Wills confirmed that the December 2023 sexual assault allegation made by A.M.

was deemed unsubstantiated after investigation. (Doc. 957, pp. 279-88).[38] He admitted
that the alleged perpetrator, Officer Dunbar, was not interviewed as part of the
investigation until April 1, 2025, 17 months after the alleged incident. Wills was not aware
that the officer's DNA was never submitted for testing with the rape kit, even though the
initial sample of the "left cheek/neck area" showed there were two contributors. (*Id.* at
p. 285). A.M.'s jacket and tank top were never tested for DNA; the test was canceled on
May 2, 2024. (*Id.* at p. 287). On August 22, 2024, DNA testing was repeated on the "left
cheek/neck area" and showed only one contributor, A.M. (*Id.* at pp. 300-01).

Wills appointed Investigator Dallas, who conducted the investigation into A.M.'s
alleged December 2023 assault, to run the Internal Affairs department at Menard. (*Id.* at
p. 298). Before making this appointment, Wills was aware that multiple class members
had filed allegations of abuse and misconduct against Dallas. (*Id.* at p. 299).[39]

## 2. Dr. William Puga

Dr. Puga is IDOC's Chief of Psychiatry, a position he has held since March 2018.[40]
(Doc. 958, pp. 404-05). Psychiatry falls under the broader Office of Mental Health. (*Id.*). In
this role, Dr. Puga oversees the psychiatric treatment of all IDOC inmates, including

---

[38] The investigation report was admitted as Plaintiffs' Exhibit 49 (Doc. 957, p. 281).

[39] A.M.'s written declaration, dated April 2, 2024, describes a July 2023 sexual assault against her by Dallas
in the shower. (Doc. 763, pp. 3-4).

[40] Dr. Puga began working for IDOC eight years ago. He received his undergraduate degree in psychology
from Loyola University, and his medical doctorate from the University of Illinois. (Doc. 958, p. 403-04). He
completed an internship and residency in psychiatry at Lutheran General Hospital, and two additional
years in child psychiatry training at Medical College of Virginia. (*Id.*). His prior work includes private
practice in child and adult psychiatry, 17 years as a hospitalist, instruction at the University of Illinois and
Southern Illinois University School of Medicine, and primary care consultancy. (*Id.* at pp. 403-404).
Dr. Puga has board certification with the American Board of Psychiatry/Neurology and certification as a
forensic examiner through the University of Virginia. (*Id.* at p. 404).

medication management. (*Id.* at pp. 405-406). Dr. Puga does not directly oversee patient

care, but he ensures that IDOC's medical vendor acts appropriately. (*Id.* at p. 405). He

also works on policy and has served on transgender committees since shortly after joining

IDOC. (*Id.*). Dr. Puga directly supervises only his secretary. (*Id.*). With respect to Menard,

Dr. Puga is familiar with patient care "to some degree." (*Id.*). Dr. Puga explained that he

does not actually visit the 30 facilities in IDOC or treat any patients, but he consults with

the treatment providers at the facilities. (*Id.* at p. 406). He has not been to Menard since at

least January 2024. (*Id.* at pp. 468-469).

As to ongoing training, Dr. Puga attends a virtual training each year at IDOC

relating to gender dysphoria. (*Id.* at p. 488). He also attends a two-day WPATH training

that IDOC hosts annually. (*Id.*). And, before the previous bench trial in 2021, Dr. Puga

attended a virtual training at the Mayo clinic. (*Id.* at p. 489).

IDOC's original transgender committee has evolved over time, and Dr. Puga has

participated since its inception. (*Id.* at pp. 407-408). Dr. Puga serves on both the current

TAC and THAW Committees. (*Id.* at pp. 408-409, 416). The THAW Committee reviews

the cases of all inmates newly diagnosed with gender dysphoria from a medical and

mental health perspective. (*Id.* at p. 409). The THAW Committee only discusses hormones

if an issue is raised—treating physicians handle hormones themselves without committee

approval. (*Id.* at pp. 409-410). Across IDOC, Dr. Puga estimated five surgeries have

occurred, and the THAW Committee keeps a list of others preparing for surgery. (*Id.* at

p. 410). To qualify for surgery, the THAW Committee and the surgery team at Rush

Medical Center require 12 consistent months of hormones. (*Id.* at p. 475). The THAW

Committee created a document to keep track of the transgender population and to help
mental health staff view their role in helping treat gender dysphoria.[41] (*Id.* at pp. 410-412,
415).

Dr. Puga provided a high-level overview of the complicated process of assessing
gender dysphoria diagnoses and the steps that are supposed to ensue. (*Id.* at pp. 411-412).
When a disclosure occurs, especially in receiving, the inmate receives a brochure
explaining the department and access to treatment. (*Id.* at p. 412). If the disclosing inmate
is currently taking medications or hormones, they are continued on those and, within
14 days, they receive a mental health and psychiatric evaluation. (*Id.* at pp. 412-413).
During the psychiatric exam, two forms should be completed—a diagnostic evaluation
and a progress note. (*Id.* at p. 412). At that point, celling needs are evaluated. (*Id.*). Once
mental health confirms a gender dysphoria diagnosis, several other pieces fall into
place—the inmate receives an ID that lists search preferences, the inmate's profile in
Offender 360 is modified accordingly, the inmate receives a medical referral for a physical
examination to assess readiness for hormone therapy, and then the parent facility
conducts a deeper dive into the gender journey and creates a treatment plan. (*Id.* at
pp. 413-414). From there, the treatment plan for each transgender individual is reviewed
every six months.[42] (*Id.* at pp. 414-415). Surgery evaluations require another process. (*Id.*
at p. 415).

---

[41] This "flow chart" was admitted into evidence as Defendants' Exhibit 2.
[42] This appears to be an ideal best practice, rather than reality. On cross-examination, Dr. Puga revisited his
answer without clarifying whether biannual reviews actually happen for each class member. (Doc. 958,
p. 442). Instead, he said individuals are seen regularly. (*Id.*).

The TAC focuses on security needs, housing, showers, transfers to opposite gender divisions, and commissary. (*Id.*). (*Id.* at p. 415). Apparently, many security concerns have arisen in transferring transgender inmates to Logan.[43] (*Id.* at p. 417). The TAC considers several factors in evaluating a transgender woman's transfer request to a female division, including the reason for requesting the transfer, perception of safety at the facility, vulnerability to victimization, disciplinary record, minimum sentence required or release date, and flight risk assessment.[44] (*Id.* at pp. 418-423). Sometimes they consider physical gender presentation, including height and weight of individuals. (*Id.* at pp. 427-429). The TAC considers each transfer request on a case-by-case basis. (*Id.* at pp. 434-435). Most of the transgender women who seek transfer before the TAC are denied transfer to Logan. (*Id.* at p. 451).

In anticipation of this hearing, Dr. Reister, the IDOC's Southern Regional Psychologist Administrator, completed a survey of transgender inmates at Menard.[45] Using that survey, the TAC hosted a virtual meeting at the end of April 2025 to evaluate five class members for a transfer from Menard to the women's division. (*Id.* at pp. 467-468, 470, 502). Dr. Puga only personally spoke to one of the individuals considered for transfer, aside from a conversation a while ago with another one of the individuals, and he did not verify the accuracy of the records reviewed before the April 2025 meeting. (*Id.*

---

[43] The TAC only evaluates cross-gender transfer, i.e., transfers of transgender women to Logan. (*Id.* at p. 429).

[44] In accordance with these considerations, Dr. Puga explained that the PREA acknowledges that all prisoners can be vulnerable to rape and sexual abuse and provides guides to mitigate that possibility. (*Id.* at pp. 421-422). A list of information items that should be presented to the TAC for each transfer request was admitted into evidence as Defendants' Exhibit 3.

[45] Dr. Reister's survey was admitted as Plaintiffs' Exhibit 50.

at pp. 468, 486-487). But he contends that investigation of individual claims is not his job. (*Id.* at p. 507). Notably, the meeting notes from this TAC meeting do not reflect discussion of the safety concerns raised in the transgender inmates' declarations. (*Id.* at pp. 495-502).[46]

Dr. Puga generally discussed PRISM, a voluntary LGBTQ-supportive program at Centralia. (*Id.* at p. 433). This program houses the majority of IDOC's transgender inmates. (*Id.*). The program targets skill-building, like resilience. (*Id.*). IDOC also uses the term "Transgender Center for Excellence" to describe the group of facilities designated to house transgender inmates in the male divisions. (*Id.*). Dr. Puga helped draft the Administrative Directive ("A.D.") containing the policy for handling the gender dysphoria and transgender population within IDOC, which has been years in the making.[47] (*Id.* at pp. 434-435, 448). He hopes to have an updated A.D. soon. (*Id.* at p. 436). In addition to a new A.D., Dr. Puga helped draft a job posting for a patient advocate for transgender inmates, but this is driven more by Dr. Conway.[48] (*Id.* at pp. 438-439, 450). In some capacity, the new patient advocate will work with quality control metrics, which are outsourced to Southern Illinois University.[49] (*Id.* at p. 439). This role will likely be stationed in Chicago or Springfield and require travel to the various facilities. (*Id.* at pp. 502-503).

Across the board, Dr. Puga cited staffing issues with correctional and mental

---

[46] The TAC notes from the April 29, 2025 meeting were admitted as Plaintiffs' Exhibit 2.
[47] The current A.D. was admitted as Defendants' Exhibit 1.
[48] This job posting was admitted as Defendants' Exhibit 4.
[49] This program is called "CQI," and Dr. Puga believes it launched sometime in summer 2024. (Doc. 958, pp. 439, 443-444).

health personnel as an ongoing challenge. (*Id.* at pp. 424-425). He stated that more than 40 percent of IDOC's mental health positions are vacant. (*Id.* at p. 425). At Menard, at least five mental health provider vacancies currently exist. (*Id.* at p. 467). Dr. Puga also described issues with transgender inmates from male facilities moving into Logan, a female facility. (*Id.*). He warns inmates before their transfer that it may not be as easy a transition as they think, to prepare them for all possibilities. (*Id.* at pp. 425-426, 458). In some situations, the female inmates at Logan are unwelcoming to the transgender transferees. (*Id.* at pp. 426-427). Dr. Puga has seen this type of reception lead to sexual misbehavior and stopping hormones. (*Id.* at p. 426). At the same time, other transferees succeed in their transition to life at Logan. (*Id.* at p. 427). There are also transgender men at Logan, along with the transgender women who have transferred there. (*Id.* at pp. 457-458).

In one specific example, Dr. Puga describes the tumultuous transfer of named class member Janiah Monroe.[50] (*Id.* at pp. 429-432). Despite personally interviewing her and assessing her as a good candidate for transfer, Dr. Puga asserted that after her transfer, Monroe has exhibited threatening, intimidating, aggressive, violent, and sexualized behavior at Logan leading to injuries of other inmates. (*Id.* at pp. 430-431). According to Dr. Puga, Monroe desired to discontinue hormones and refused the preliminary hair removal for surgery. (*Id.* at p. 431). Monroe still resides at Logan. (*Id.* at pp. 431-432).

---

[50] Dr. Puga has been deposed in another proceeding involving Monroe related to denial of her hormone treatment. (Doc. 958, p. 444). Dr. Puga stated, however, that he does not believe IDOC is denying her hormone treatment. (*Id.*). Dr. Puga confirmed he had no documentation to support these assertions about Monroe, but he could find some. (*Id.*).

After reviewing the declarations in this case, Dr. Puga discussed the allegations with a broader group of staff. (*Id.* at pp. 459-461). While he did not personally investigate, he saw others take action to investigate the accusations in the declarations filed by class members regarding the conditions at Menard. (*Id.* at pp. 460-461).

### 3.  Dr. LaMenta Conway

Dr. Conway is the Deputy Chief of Medicine for IDOC's Office of Health Services, a post she has held for six years. (Doc. 958, pp. 514-552; Doc. 959, pp. 561-588). She is a board-certified physician in Internal Medicine, licensed in Illinois since 1998. She is responsible for clinical oversight of the central region of the state, and also manages transgender health from the medical perspective, including for Menard. (Doc. 958, pp. 514-18). She does not oversee patient care at Menard, nor does she treat patients herself. (Doc. 958, p. 518; Doc. 959, pp. 566-67). She had not spoken to any individuals with gender dysphoria at Menard within the last year. (Doc. 959, p. 567).

Dr. Conway chairs the THAW Committee. Its role is to look holistically at the medical and mental health related concerns of individuals identified as transgender whose gender dysphoria diagnosis is confirmed. Newly identified transgender individuals are presented to the THAW Committee so the committee adds them to their caseload and notes where they are on their gender journey, including any gender-affirming medication and labs. Patients are co-presented to the THAW Committee by regional coordinators/administrative nurses, other mental health staff, and the mental health professionals, doctors, nurses, and healthcare administrators. The THAW Committee collaborates with other providers regarding individuals with complex

medical conditions and addresses requests for gender-affirming surgeries. As the THAW Committee chair, Dr. Conway recommends medical-related policies, such as making electrolysis services available in the southern region. (Doc. 958, pp. 522-23).

Medical care for transgender persons in custody is provided by the doctors and medical staff at their individual prison, and by the regional medical director. Menard currently has two full-time doctors on staff for the population of 2,000 inmates. (*Id.* at pp. 525-27; Doc. 959, pp. 573-74). The doctor at each prison makes the decision whether an individual will start hormone treatment and what type of medication they will receive. (Doc. 958, p. 532). Medical staff cannot prescribe hormones until the individual has been seen by a psychiatrist and has their gender dysphoria diagnosis confirmed. (Doc. 959, p. 571). The THAW Committee does not currently monitor hormone levels for transgender inmates; this is done at the local facility level. (Doc. 958, pp. 525-27). Dr. Conway stopped tracking class members' hormone levels some time before Dr. Harris left her Co-Monitoring role. (Doc. 959, p. 567). The THAW Committee does not review a person's treatment until they have a confirmed diagnosis of gender dysphoria. If an inmate does not have access to mental health services, then the THAW Committee will not know they have a confirmed diagnosis. (*Id.* at pp. 573-74). Dr. Conway does not necessarily know what treatment is happening on the ground at Menard. (*Id.* at p. 575).

An individual seeking gender-affirming surgery is presented to the THAW Committee, which decides whether surgery is medically necessary. The THAW Committee looks at whether any mental health issues are reasonably controlled, whether hormone levels are consistent, and whether the person has been on hormones for about

a year. (Doc. 958, pp. 538-39; Doc. 959, pp. 585-86). They do not consider the individual's

underlying offense. Several class members who were formerly in Menard have been

approved by the THAW Committee for gender-affirming surgery, and there is another

group that will be evaluated for surgery once they meet the criteria. (Doc. 958, pp. 537-

38). If the majority of the THAW committee votes to approve surgery, the person must

complete the class taught by Dr. Schechter and get letters of support from their mental

health and medical providers. Next, they would start electrolysis, which may take from

three to six months. There was a delay of four or five months when no electrolysis

provider was available. When hair removal is nearly complete, they have an in-person

consultation with the surgeon and schedule surgery. Gender-affirming surgeries are

performed at Rush. Recovery from vaginoplasty takes place at the Joliet Inpatient

Treatment Center. (*Id.* at pp. 539-42). Fifty-six individuals have been approved for

surgery; eight have been completed.

Dr. Conway is also a voting member of the TAC. In considering whether to grant

a transfer to Logan, a person with a high testosterone level who refuses to take medication

would present safety concerns. (*Id.* at pp. 521, 533, 544).

IDOC does not have an electronic healthcare record; some data is tracked with the

help of Southern Illinois University and other data is tracked by the healthcare unit

administrators on Excel sheets. (*Id.* at p. 535). Continuous quality improvement ("CQI")

is reviewed monthly by each facility. A CQI was set up for transgender health at the

facility level.

According to Dr. Conway, mental health evaluations should be afforded to

transgender inmates at Menard. (*Id.* at p. 536). She admitted though that there was a "substantial" period of time where Menard inmates were not getting mental health evaluations. (Doc. 959, pp. 582-83). She learned that some individuals were on the transgender report as "unconfirmed" for gender dysphoria for over a year. While they remained unconfirmed, they could not get hormone therapy. (*Id.* at pp. 583-84). The transgender report is generated monthly, and Dr. Conway receives or can access it to see whether a person's diagnosis has been confirmed. She can look at that matter over time. As the THAW Committee chair, Dr. Conway would not facilitate those individuals' diagnoses being confirmed at Menard; the THAW Committee relies on the psychiatrists and mental health providers to diagnose. (*Id.* at pp. 583-84). She can, however, assist to make sure things happen. Dr. Conway learned in March 2025 of allegations that class members had been denied access to hormone therapy. She met with the healthcare staff, and the individuals who were confirmed have started hormone therapy. (*Id.* at pp. 580-81).

To create the foundations training course given to over 400 IDOC medical staff, IDOC has used the WPATH standards created prior to 2022.[51] (Doc. 958, p. 547; Doc. 959, p. 587). Dr. Conway works closely with the endocrinology specialist, who consults with IDOC doctors and nurses.

Dr. Conway believes that transgender patient care in IDOC has improved over the past five years, a change of "night and day" from when she took on her role. (*Id.* at

---

[51] WPATH issued revised standards in 2022 in WPATH-8. (Doc. 959, p. 587).

pp. 550-51). It is her goal to make it better, and she knows they have a long way to go, particularly with staffing shortages.

On cross-examination, Dr. Conway discussed a new position within IDOC, the Transgender Patient Advocate, which will report to her. (Doc. 959, pp. 561-62). The hiring process is near complete, and the person may start within a month.

Dr. Conway did not review any written statements by class members filed in connection with this case. (*Id.* at p. 565). She was not aware that Plaintiffs had filed a motion to transfer class members out of Menard on January 24, 2024, and she had not reviewed any of the class members' declarations filed at that time. She did not learn of the concerns at Menard raised in the January 2024 motion until March 2025. (*Id.* at p. 579).

Dr. Conway agreed that social transition is a component of medical care for people with gender dysphoria, and being denied the ability to socially transition can exacerbate dysphoric feelings. (*Id.* at p. 575). A transfer to a better environment could be a component of medical care for prisoners with gender dysphoria. (*Id.* at p. 576). Around March 2025, Dr. Conway learned that some Menard class members have been seeking a transfer but have never been presented to the TAC or THAW committees. When she learned they did not have access to the process, she took steps to schedule them for THAW Committee consideration once their diagnosis was confirmed. (Doc. 959, pp. 576-78). Also in March 2025, she learned of allegations that class members were denied access to private showers. She did not take steps to confirm the allegations because that is not her role, but she takes the allegations at face value and has not heard otherwise. (*Id.* at p. 580). She also heard about allegations of sexual assault on class members by guards and inmates

because of their gender identity.

### 4. Joshua Schoenbeck

Major Joshua Shoenbeck testified as Defendants' rebuttal witness. He works as a shift supervisor at Menard,[52] a role he has held since February 2024. (Doc. 959, p. 589). He has been employed at Menard for over 15 years in various positions, including correctional officer and correctional lieutenant. (*Id.* at pp. 589-590). Schoenbeck's duties as a shift supervisor, or major, include supervising the shift of between 100 and 150 correctional staff and the housing units. (*Id.* at p. 590). Depending on the day, he reports to the warden and assistant wardens at Menard. (*Id.*). Schoenbeck attended a six-week training academy when he started, and, annually, he completes one 40-hour training cycle to receive updates on new policies. (*Id.* at pp. 591-592). That training covers prison safety, guard training, use of force, and a wide range of other topics affecting his day-to-day job. (*Id.* at p. 592). Training related to transgender inmates also comes through this cycle training. (*Id.*). In addition, IDOC requires an online training as to transgender inmates. (*Id.*).

Schoenbeck testified to the general policies and procedures at Menard. (*Id.* at p. 593). General population inmates are brought to community showers that vary depending on the cell house and number of shower heads. (*Id.*). Staff escort 10 individuals to the showers at a time and search their towels and soap for contraband beforehand. (*Id.*). Once everyone has completed their shower, which usually takes about 15 minutes,

---

[52] Schoenbeck received his bachelor's degree from Southern Illinois University Carbondale. (Doc. 959, p. 591). He confirmed that Menard is a maximum security facility. (*Id.*).

the group is escorted back out of the shower to their cells. (*Id.* at pp. 593-595). The process

continues with another group of 10, until everyone has showered. (*Id.*). Showers are

offered three days a week. (*Id.* at p. 595). According to Schoenbeck, North 1 and North 2

cell houses have single-stall showers. (*Id.* at p. 594). This shower procedure applies

equally to transgender inmates, but they are to be escorted one at a time. (*Id.* at pp. 595-

596). This policy is "made known" to the guards, and the cell house has a list of

transgender individuals. (*Id.* at p. 596). In addition, for all prisoners, a shower curtain is

supposed to cover part of the shower door. (*Id.* at p. 597). Schoenbeck does not personally

assist with private showering procedures for transgender inmates at Menard, but he was

unaware of any instance where this procedure is not followed. (*Id.*). Schoenbeck had not

observed anyone being taken to private showers, and he does not know whether

transgender inmates at Menard are always provided private showers. (*Id.* at pp. 609, 620).

At Menard, transgender inmates are supposed to be single-celled. (*Id.* at p. 597).

In Schoenbeck's unit, the gallery officers, sergeant, and lieutenant carry pepper

spray. (*Id.* at p. 598). They receive training on how to use the pepper spray in the six-week

introductory course. (*Id.*). Staff use pepper spray frequently to prevent harm to a prisoner

or staff member, to protect property, to preserve evidence, or to prevent or suppress a

riot. (*Id.* at p. 599). After deploying pepper spray, officers must complete an incident

report and the chain of command must be notified. (*Id.*). Schoenbeck considers using

pepper spray in a retaliatory fashion as inappropriate and is unaware of any incident

where pepper spray was used against a transgender inmate in retaliation. (*Id.* at p. 599).

Because of its widespread effects, there are cleaning protocols after a guard uses pepper

spray for cleaning the area, as well as the individual sprayed. (*Id.* at pp. 600-601).

Search practices at Menard include completing cell searches at least once per
month. (*Id.* at p. 601). Pat-down body searches or unclothed searches, like in restrictive
housing, may be completed anytime an individual leaves their cell. (*Id.*). For example, an
unclothed search may occur before a cell search to check for contraband. (*Id.*). Strip
searches, where an inmate removes all clothing, are used to address safety and security
issues, for inmates on restrictive housing, or when inmates leave their cells on writs or
for medical furloughs. (*Id.* at pp. 602-603). But even strip searches are meant to be
conducted without hands-on contact. (*Id.* at p. 603). Contraband generally includes any
unpermitted item, like homemade weapons, drugs, or a broken television. (*Id.*). Officers
are not permitted to confiscate items that are not considered contraband. (*Id.* at p. 604).
Transgender inmates are supposed to be searched by a staff member of their preferred
gender. (*Id.*). Schoenbeck had never witnessed a transgender prisoner being strip-
searched by a guard of the opposite gender, but he does not observe transgender
individuals being searched. (*Id.* at pp. 604, 617).

Schoenbeck heard in passing that gender-affirming care items are available in
commissary but previously testified that no changes to gender-affirming commissary
items have occurred since 2019. (*Id.* at pp. 609-610). As a major, Schoenbeck frequently
receives anonymous letters or kites, which can be placed in a locked box in the cell house.
(*Id.* at p. 602). Schoenbeck testified he is unaware of any ongoing issue of misgendering
of transgender prisoners at Menard. (*Id.* at p. 611).

On cross-examination, Schoenbeck reviewed a Sexual Abuse Incident Review,[53] dated April 30, 2025, related to the incident in December 2023 involving A.M., who testified on the first day of the hearing. (*Id.* at pp. 612-613). Schoenbeck signed that document. (*Id.* at p. 613). He confirmed that the West House lacks cameras, and he was unaware of any recommendation to install cameras. (*Id.* at pp. 615-616). Schoenbeck stated that the Incident Review report noted A.M. had a security threat group affiliation with the Vice Lords gang. (*Id.* at p. 621).

### 5. Dr. Shane Reister

Dr. Reister is the IDOC Southern Regional Psychologist Administrator, a position he has held for 12 years. (Doc. 959, pp. 622-662). Dr. Reister holds a Master's degree and a Doctoral degree in Clinical Psychology and has been licensed in Illinois since 2008. (*Id.* at pp. 622-24, 640). He oversees clinical services and supervises the "mental health authorities" (the individuals who oversee day-to-day mental health service delivery) for the 10 prisons and two boot camps in the southern area, including Menard. Reister monitors service delivery, gets reports on cancellations and backlogs, conducts site visits to identify obstacles, and holds clinical consultations with staff members. (*Id.* at pp. 625-26). He is involved with clinical decisions and mental health care for transgender patients. He serves on the TAC and the THAW Committee and works with Dr. Erica Anderson on monthly transgender care case conferences. CQI for transgender care is conducted twice per year. (*Id.* at p. 627).

---

[53] This incident review was admitted as Plaintiffs' Exhibit 53.

Dr. Reister makes site visits to Menard two to three times a month, sometimes weekly, which last between three-and-a-half to five hours. (*Id.* at pp. 626-27, 641). He visits Menard more often than other facilities because it is a higher stress environment and there are staffing challenges. He meets with Menard mental health authority Carri Morris, the mental health providers, behavioral health technicians, the assistant warden of programs, and he sometimes walks the units. Dr. Reister has toured all the Menard units. (*Id.* at pp. 642-43). The site visits cover all mental health issues, not just gender dysphoria. He estimates that, conservatively, there are about 600 prisoners who require mental health care at Menard. There have been significant staffing shortfalls for mental health social workers, particularly at Menard, but all vacancies should be filled by June 1. (*Id.* at pp. 624-26). Menard went for months or years at a time with only one mental health provider; there was just one during 2024 for a long period. (*Id.* at pp. 634-35, 643-44). Staffing levels are now improving as Wexford Health Sources[54] hired three more mental health providers. (*Id.* at pp. 635-36). Reister believes patient care has been improving over the last five years due to increased clinical education.

Dr. Reister did not know whether Menard actually makes private showers available, or whether transgender prisoners are strip searched by female guards. He does not speak directly with the transgender prisoners but relies on the mental health providers. (*Id.* at p. 644). He does not hire the mental health providers. He only knows

---

[54] Wexford was the contractor providing medical and mental health staffing to IDOC prisons; on July 1, 2025, Centurion Health became IDOC's healthcare services vendor. *See* July 24, 2025 Memorandum from Director Latoya Hughes to All Individuals in Custody, https://idoc.illinois.gov/content/dam/soi/en/web/idoc/news/memostopopulation/7.24.25-Updated-Transition-of-Comprehensive-Healthcare-Services-Provider-memo-individuals.pdf.

whether a provider is giving adequate care based on what the mental health provider tells him during discussions and case consultations. (*Id.* at p. 644). For a provider to hold a mental health visit in the gallery where other prisoners are within earshot is not adequate care. (*Id.* at p. 645). Dr. Reister agreed that multiple accounts of similar problems at a facility can demonstrate a pattern of behavior, and patterns can be difficult to change. (*Id.* at p. 647-48).

Dr. Reister was aware that class members at Menard have asked for transfers. He had not reviewed their written declarations or investigated their claims and had no basis to dispute the veracity of their statements or testimony. (*Id.* at p. 645-47).

Dr. Reister reviewed the prior court orders in this case a few years ago, after which he took steps to improve patient care for the transgender community by holding two-day WPATH training for clinical staff and implementing Transgender Care Case Conferences to present and discuss cases and devise clinical responses. (*Id.* at p. 628).

IDOC is moving to electronic health records. Dr. Reister tracks the mental health evaluations and gets weekly reports. Menard offers group therapy and very limited individual therapy (crisis response, crisis watches, and as needed).

At Dr. Reister's direction, Ms. Klausing, a recently hired mental health provider at Menard, held one-on-one interviews in April 2025 with the Menard transgender population to gather information on their needs, including whether they wanted to transfer or have gender-affirming surgery. (*Id.* at pp. 629, 650). Those interested in gender-affirming surgery have a group video conference with Dr. Schechter to get information on surgery risks and benefits and to ask questions. The individuals who want

to pursue surgery then have a one-on-one meeting with Dr. Schechter. (*Id.* at p. 629-30).

Dr. Reister and another staff member created a spreadsheet[55] for better tracking of the

transgender individuals at Menard. The chart includes whether the individual wants to

transfer to Logan or to PRISM, whether they are already on hormone treatment, whether

they need a referral for gender dysphoria assessment, when they were last seen by mental

health, whether they have been presented to the TAC for Logan, whether they have been

on hormones for over a year, and whether their hormone level is sufficient. (*Id.* at pp. 631-

32, 636, 651-52). Hormones must be effectively administered for a person to stay on them

for the required year. (*Id.* at p. 652). The chart is a working document and is being updated

to reflect transfers in or out.

This chart was used to prioritize who would be presented to the TAC for transfer

to Logan, starting with those on hormones over a year. They are trying to catch up;

Dr. Reister told staff to present and prepare as many Menard class members as possible

so everybody could be seen by the June TAC meeting. (*Id.* at pp. 632-33, 652-53). One

individual (T.P.) was approved for Logan at the TAC meeting on April 29, 2025. (*Id.* at

pp. 634, 654). That April 29 meeting was specially scheduled to be held before the hearing

in this case. All the other requests were denied on that date. (*Id.* at pp. 653-54). The class

members' individual written declarations submitted to this Court were not available for

the April 29 meeting. In considering a transfer request, the TAC looks at the concerns

raised by the individual and the safety of the inmates at the transfer location. (*Id.* at

---

[55] The spreadsheet was admitted as Plaintiffs' Exhibit 50.

p. 660).

Dr. Reister reviewed julie graham's reports while she served as a Co-Monitor (*Id.* at pp. 634-35). He tried to make changes including moving to a universal commissary.

Dr. Reister agreed that social transition is a component of adequate treatment for gender dysphoria. (*Id.* at pp. 637, 640). The WPATH standards of care provide some guidance for his staff. He acknowledged that if a transgender incarcerated person is subject to staff abuse, misgendering, and/or sexual violence, social transition is difficult. Similarly, a person cannot effectively socially transition if they are scared to come out of their cell, scared to buy gender-affirming items at commissary for fear of being beaten, or if staff creates or fosters a hostile environment. (*Id.* at pp. 638-39). A transgender person needs to feel safe to socially transition. (*Id.* at pp. 639-40). Dr. Reister could not state that Menard is a safe place for transgender inmates. (*Id.* at p. 643).

Dr. Reister's understanding of deliberate indifference is "when you don't take action to try to improve a situation and take corrective actions . . . if you believe it's severe and it warrants a response, then, yeah, you need to do something." (*Id.* at pp. 648-49). He directed the survey of all transgender persons at Menard conducted in mid-April 2025, resulting in the spreadsheet (Plaintiffs' Exhibit 50) because they "needed to do something to correct the problem that we identified." (*Id.* at p. 650). Prior to April 2025, Dr. Reister was not aware that transgender prisoners at Menard had concerns, despite his frequent visits there. Nobody in IDOC had forwarded the class members' declarations to him, even though Dr. Puga, Dr. Conway, and others are aware of his interest in transgender issues. (*Id.* at p. 651). Dr. Reister was unaware whether Ms. Klausing had access to the

class members' declarations.

Dr. Reister agreed that certain facilities are known to have safer cultures for transgender prisoners than other institutions. (*Id.* at p. 654). Some prison cultures are entrenched and potentially resistant to training. Staff may serve long term, so even if a policy changes, the culture may stay the same and change may happen slowly. Monitoring with cameras and administration walking the halls to effect cultural change toward a safer environment would help. (*Id.* at pp. 655-56). When policies change, the staff still have to implement the policies. IDOC's yearly cycle training emphasizes transgender care, attempting to affect the culture. (*Id.* at p. 657). Transgender specific training has been given to Menard staff for over five years now. (*Id.* at p. 658). Dr. Reister does not have direct information on the effectiveness of that training; he agrees that the words of the prisoners at Menard is relevant information to see whether the training is working. (*Id.* at p. 658).

In October 2023, Dr. Reister testified that the Centralia PRISM program had bed space for about 100 prisoners, but there were not enough mental health providers for that number of participants. (*Id.* at p. 660). Currently, staffing of mental health providers and behavioral health techs is still a challenge, but PRISM has been able to increase the number of groups of inmates it accepts. (*Id.* at pp. 660-61). Dr. Reister was not prepared to give the current number of inmates in PRISM, but noted there is no longer a waiting list. A new cohort will start in July 2025 after they interview those who want to transfer there. Every three months, when the new good-time credit contracts come due, they add the next cohort of individuals to the program. He expects to take everybody who qualifies

to transfer into PRISM. The biggest challenge with moving Menard inmates to PRISM is that so many of them are maximum security, and Centralia is medium. (*Id.* at pp. 661-62).[56]

## LEGAL STANDARDS

### *Eighth Amendment Deliberate Indifference*

The Eighth Amendment prohibits cruel and unusual punishment and "imposes a duty upon states to provide adequate medical care to incarcerated individuals." *Boyce v. Moore,* 314 F.3d 884, 888-89 (7th Cir. 2002). Deliberate indifference to the "serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Deliberate indifference has two elements. The first is whether the prisoner has an "objectively serious medical condition." *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011); *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). The second element requires a showing that a prison official has subjective knowledge of—and then consciously disregards—an excessive risk to inmate health. *Greeno,* 414 F.3d at 653; *see also Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). Deliberate indifference involves "intentional or reckless conduct, not mere negligence." *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010).

Plaintiffs' original and supplemental Complaints allege pervasive deficiencies in delivery of medically necessary care and treatment on a systemic, statewide level in IDOC

---

[56] The parties agreed to submit into evidence the deposition transcripts of Defendant LaToya Hughes (IDOC Director) and Transfer Coordinator Jane Moskus. (Doc. 959, pp. 559-60). (No Exhibit numbers were assigned).

correctional institutions. *See, e.g., Wellman v. Faulkner,* 715 F.2d 269, 272 (7th Cir. 1983);

*Cleveland–Perdue v. Brutsche,* 881 F.2d 427, 430–31 (7th Cir. 1989) (recognizing claims of

systemic health care deficiencies as a distinct category of deliberate indifference claims,

as opposed to one based on "isolated instances of indifference to a particular inmate's

medical needs"). The instant motion claims that class members at Menard are

experiencing, and being harmed by, these deficiencies to an extreme degree. In this

context, deliberate indifference can be demonstrated by "proving there are such systemic

and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate

population is effectively denied access to adequate medical care[,]" or by showing

"repeated examples of negligent acts which disclose a pattern of conduct by the prison

medical staff" that result in an excessive risk of serious harm. *Wellman*, 715 F.2d at 272;

*see also Rasho v. Jeffreys*, 22 F. 4th 703, 710 (7th Cir. 2022) ("persistence in a course of action

known to be ineffective" can support an inference of deliberate indifference) (citing

*Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662–63 (7th Cir. 2016); *Phillips v. Sheriff*

*of Cook Cnty.*, 828 F.3d 541, 554 (7th Cir. 2016)).

*Injunctive Relief*

Preliminary injunctions are extraordinary and drastic remedies that should not be

granted unless the movant makes a clear showing that it has carried its burden of

persuasion. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Under Federal Rule of Civil

Procedure 65, the party moving for an injunction has the burden of showing that it has

some likelihood of succeeding on the merits, that no adequate remedy at law exists, and

that it will suffer irreparable harm if injunctive relief is not granted. *Mays v. Dart*, 974 F.3d

810, 818 (7th Cir. 2020) (citing *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020));

*Planned Parenthood v. Comm'r of Ind. State Dept. of Health*, 699 F.3d 962, 972 (7th Cir. 2012).

If the movant establishes these elements, the Court must then balance the potential harm

to the movant if the preliminary injunction were denied against the potential harm to the

non-movant if the injunction were granted. *Mays*, 974 F.3d at 810 (citing *Courthouse News

Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018)). The court's balancing process takes a

"sliding scale" approach: the more likely the movant is to win on the merits, the less the

balance of harms needs to weigh in the movant's favor, and vice versa. *Id.* The Court must

also consider whether granting the preliminary injunction is in the public interest.

*Courthouse News Serv.*, 908 F.3d at 1068.

The PLRA applies to suits filed by incarcerated people and limits the equitable

relief a district court can order. 42 U.S.C. § 1997e & 18 U.S.C. § 3626.

> Preliminary injunctive relief must be narrowly drawn, extend no further
> than necessary to correct the harm the court finds requires preliminary
> relief, and be the least intrusive means necessary to correct that harm. The
> court shall give substantial weight to any adverse impact on public safety
> or the operation of a criminal justice system caused by the preliminary
> relief[.]

18 U.S.C. § 3626(a)(2). *See also Brown v. Plata*, 563 U.S. 493, 530 (2011).

## DISCUSSION

Defendants conceded early in this case that Plaintiffs' gender dysphoria is a

serious medical condition. (Doc. 186, pp. 29-30). The Court concluded in December 2019

that Plaintiffs met their burden of showing a likelihood of success on the merits of their

deliberate indifference claim and issued the first Preliminary Injunction. (Doc. 186, p. 35).

At the August 2021 trial, the evidence amply demonstrated that Defendants were aware that Plaintiffs were not receiving adequate medical care or social transition for their gender dysphoria and suffered serious harm, including suicide attempts, as a result. Nonetheless, Defendants allowed these conditions to persist over the two-year period following entry of the first Preliminary Injunction (Doc. 186), so the Court ordered further injunctive relief immediately upon conclusion of the 2021 trial, and additional relief in the expanded order of February 2022 (Doc. 383).

The instant motion focuses on alleged mistreatment experienced by those members of the Plaintiff class held at Menard. Warden Wills testified that there were 16 transgender prisoners at Menard. According to Dr. Reister's transgender population spreadsheet (Plaintiff's Exhibit 50), approximately 21 transgender and gender-incongruent individuals were at Menard at the beginning of May 2025.[57] In the time since Plaintiffs filed their original motion seeking transfers from Menard in December 2023, at least eight additional class members who were housed at Menard were later released or transferred. (See Doc. 999).[58] Class members continued to be moved to Menard (or were newly identified as transgender) during the pendency of this motion. For example, after Plaintiffs filed the instant motion, on March 12, 2025, Defendants informed Plaintiffs of

---

[57] One individual on the chart, T.P., was approved for transfer to Logan at the April 29, 2025 TAC meeting; the IDOC inmate locator website shows she is now there. (Doc. 959, p. 634). https://idoc.illinois.gov/offender/inmatesearch.html (last visited Sept. 12. 2025).

[58] Doc. 999 is Plaintiffs' chart of declarations of Menard inmates. Seventeen individuals filed declarations in support of Plaintiffs' original transfer motion; eight of those are not listed on Dr. Reister's spreadsheet, indicating they were transferred or released. Seven of the original declarants still at Menard filed supporting declarations for the February 2025 motion (Doc. 874); a total of 14 declarations are associated with that motion (Doc. 999). One of these declarants (witness A.M.) was transferred to another prison shortly before the evidentiary hearing.

six new class members at Menard who were not identified previously. (Doc. 887, p. 4)[59] Other class members face the possibility of transfer there in the future, as Menard houses medium-security and minimum-security prisoners in addition to the maximum-security population.

For these reasons, the Court finds that Plaintiffs' motion is properly brought as seeking relief applicable to all class members. The harms alleged in the instant motion stem from IDOC's system-wide policies and practices, the same as described in the original and supplemental Complaints. The relief sought for class members who are now or may be held at Menard fits within the class-wide risk of present and future harm resulting from Defendants' failure to adequately provide care and treatment for individuals with gender dysphoria.

In remanding this case, the appellate court noted: "The district court need not forget what has happened in the last six years of litigation, but new injunctive relief will need to address the current situation." *Monroe v. Bowman*, 122 F.4th at 697. This Court's previous orders and Defendants' subsequent actions and inaction provide context for evaluating current and recent conditions at Menard. Defendants have been well informed of the relevant standards for medical and mental health care for individuals with gender dysphoria, including the importance of social transition, which includes providing a safe environment for transgender individuals, rather than allowing them to be targeted for mistreatment, misgendering, and assault. This Court long ago identified specific areas

---

[59] Doc. 887 was Plaintiffs' response to Defendants' Emergency Motion to Strike Plaintiffs' Untimely Declarations (Doc. 884).

needing change, including prohibition of cross-gender body searches, affording private
showers, and provision of gender-affirming clothing and personal care items, which
Defendants have incorporated into their official policies. Unfortunately, however, class
members at Menard—and elsewhere—continue to report violations of these standards.
Timely evaluation of those with gender dysphoria and the provision of effective gender-
affirming medical care, including regular monitoring of hormone dosages, has been of
critical concern from the beginning of this case. Improvements in medical treatment were
noted by the court-appointed Co-Monitor as of the end of 2024. Yet, the testimony and
declarations from Menard class members indicate those improvements have not been
maintained.

With regard to the instant motion to transfer class members out of Menard, the
Court finds the testimony of Plaintiffs' witnesses to be credible. This includes: (1) their
accounts of assaults by correctional officers and fellow inmates (including instances
where officers failed to intervene), (2) delays by mental health staff in evaluating them
for gender dysphoria and confirming transgender status, (3) failure by medical staff to
timely, properly, and consistently render medically necessary hormone treatment, (4) a
persistence by supervisors and correctional staff to conduct cross-gender body searches,
(5) delays by facility staff and the TAC to consider transfer requests, as well as cursory,
questionable evaluations and denials of such requests, and (6) lack of access to gender-
affirming clothing and other items.

The officer's sexual assault on A.M. that occurred in December 2023 was not timely
investigated, and Menard officials' handling of the rape kit was questionable. D.H. was

sexually assaulted by inmates in March 2024 and staff failed to intervene. She was subsequently housed in PC with a cellmate who raped her in July 2024 with a guard watching; no rape kit was done. Only in December 2024 was she placed in a single cell, but she still feels unsafe. A.R. was choked by guards in July 2024 and attacked in the shower by inmates in October 2024. D.F. was sexually assaulted by her cellmate in September 2023; her request to be kept separate from her attacker was denied.[60] Each of these witnesses expressed fear for their safety when placed in proximity with male inmates, particularly in the showers. These examples indicate a pattern of serious assaults and disregard for the safety of transgender inmates, a particularly vulnerable population, at Menard. Defendants' evidence failed to indicate that any measures have been taken to prevent future assaults against class members. Warden Wills's decision to house most transgender prisoners in the same wing makes logical sense, but his chosen location in the West House, where there are no security cameras, places them at continued risk. Major Schoenbeck was only able to speak to general procedures (how things should work, not how they do), and the Court finds it unlikely that he is unaware of officers misgendering transgender inmates at Menard.

Plaintiffs' witnesses universally described a culture of disrespect, harassment, and violence by Menard correctional officers that encourages the same mistreatment by fellow prisoners. This culture exacerbates class members' gender dysphoria and hinders social transitioning. Warden Wills acknowledged that "a substantial amount of

---

[60] Four of the declarations submitted by non-testifying class members described sexual assaults by Menard officers in October 2023, December 2023, and May 2024; one other described a sexual assault by a Menard inmate in May 2024. (Doc. 874-3).

harassment" could be going on. Wills testified that he was aware of around 20 reports of sexual or physical assault by a staff member during the past five years, but none were substantiated by IA, and no staff members were disciplined.

Defendants notably failed to controvert any of the class members' testimony regarding their experiences and the conditions at Menard. While Dr. Conway and Dr. Reister expressed sincere intentions to improve conditions for the transgender population, the testimony failed to convince the Court that these intentions are being translated into effective changes at Menard. Warden Wills admitted that he cannot know whether the guards who interact with inmates on a day-to-day basis, conducting body searches, overseeing showers, transporting class members to medical appointments, etc., are complying with the prison's policies regarding transgender inmates. Again, Schoenbeck described the applicable policies, but he did not know whether class members were being provided private showers and, in fact, he has never observed anyone being taken to private showers. Likewise, he had not observed body searches of transgender prisoners. Dr. Puga had not visited Menard since at least January 2024. He acknowledged that at least five mental health provider positions were vacant at Menard. Dr. Conway had not spoken to any Menard individuals with gender dysphoria within the past year and did not necessarily know what medical treatment Menard inmates are receiving. Dr. Conway acknowledged that if an individual cannot access mental health services, they cannot obtain a confirmed diagnosis of gender dysphoria, which is a prerequisite for any medical treatment.

The witnesses who are attempting to medically transition described serious

problems with obtaining consistent and effective hormone treatment, including delays in obtaining the necessary confirmation of their transgender status, thus delaying their ability to receive gender-affirming care. This is particularly distressing in light of the progress that was documented by Co-Monitor Dr. Amanda Harris in providing and monitoring gender-affirming hormone treatment after this Court ordered injunctive relief in 2022. The testimony and declarations from Menard class members demonstrate serious backsliding in the provision of basic hormone therapy since the cessation of active monitoring. The testimony and recent TAC records establish that transgender women's failure to reach targeted female hormone levels is a barrier to consideration for transfer to Logan. Class members are also unable to progress toward obtaining gender-affirming surgery if hormone levels are out of line. Plaintiffs' witnesses who sought surgery, including D.H., J.D., and T.S., have been unable to obtain timely evaluation, let alone approval.

Plaintiffs' evidence showed that mental health care at Menard, both psychotherapy for those with gender dysphoria and evaluation of those seeking diagnosis and confirmation as transgender within the IDOC system, has been sporadic at best. Dr. Reister acknowledged significant shortfalls in mental health staffing, with only one mental health provider at Menard for a period of months or years. His representation that these positions should be filled as of June 2025 does not reassure the Court that these deficiencies will be corrected in a timely fashion.

Plaintiffs have met their burden to show a likelihood of prevailing on the merits of their claim that Defendants are deliberately indifferent to the serious medical needs of

prisoners at Menard with (or seeking evaluation for) gender dysphoria. There is no

adequate remedy at law to compensate for the ongoing risks to Menard class members'

medical needs, mental health, and physical safety, so long as they remain incarcerated

under the conditions prevailing in that institution. Class members at Menard have

suffered and are suffering ongoing irreparable harm due to Defendants' failure to

provide necessary medical and mental health care or an environment where they are safe

from abuse by IDOC staff and other inmates on account of their transgender status.

Despite official policies adopted by Defendants, correctional officers at Menard continue

to target class members with verbal harassment—and worse—based on their gender

identity. Correctional officers routinely ignore the directives against cross-gender body

searches, interfere with social transition by confiscating and/or destroying gender-

affirming items, and permit hostile inmates to mistreat and assault class members.

Menard staff have failed to provide consistent and effective gender-affirming medical

care. These pervasive problems convince the Court that preliminary injunctive relief is

warranted to avoid further irreparable harm to class members at Menard.

Turning to the balance of equities in this matter, a denial of injunctive relief would

cause serious and irreparable harm to class members. In contrast, the potential harm to

Defendants if injunctive relief is granted is minimal. Menard is not the only maximum-

security level facility in the IDOC system,[61] and some class members now at Menard may

qualify for placement in lower security level prisons. The number of class members now

---

[61] The IDOC's website lists four other maximum security correctional centers: Illinois River, Lawrence,
Pontiac, and Stateville, as well as "multi-security" institutions including Dixon and Logan.
 https://idoc.illinois.gov/facilities.html (last visited Aug. 29, 2025).

at Menard (approximately 16 to 20) can be accommodated in other suitable institutions without difficulty. Notably, Defendants themselves had been considering a plan, strongly recommended by former Co-Monitor julie graham, to consolidate class members into a smaller number of prisons (the "Transgender Centers for Excellence"), which would enable IDOC to concentrate resources and training regarding the transgender population. Such consolidation would likely improve conditions for class members in those locations, not only by removing them from Menard, but also by improving efficiency for Defendants in providing constitutionally adequate care for the transgender population.

Accordingly, the motion for preliminary injunctive relief will be **GRANTED** as set forth below.

Some of the specific relief requested by Plaintiffs in their post-hearing briefing goes beyond the scope of their motion.[62] Plaintiffs identified the concern, which has been ongoing since the inception of this case, that TAC, the committee that determines whether to grant class members' requests for transfer to a prison matching their gender identity (in the case of transgender women, transfer to Logan), is dominated by officials who are not trained medical or mental health professionals. The testimony strongly suggests that the TAC does not give sufficient weight to class members' needs for social transition and safety. Plaintiffs' proposal for IDOC to add one trained mental health professional experienced in treating gender dysphoria as a voting member of the TAC and other suggested revisions to TAC's operations merit consideration by Defendants. But the

---

[62] The parties submitted post-hearing briefing directly to the Court; these briefs are not filed on the record.

request to transfer Menard class members elsewhere can be granted without mandating those changes.

### PRELIMINARY INJUNCTIVE RELIEF

1.  Defendants shall file under seal, on or before **September 19, 2025**, a list of class members presently housed at Menard including each individual's name and IDOC number.

2.  Defendants shall transfer every class member now housed at Menard to another facility no later than **October 15, 2025**. Defendants shall take into consideration the individual's preference(s) as to the location of the transfer, but Defendants will make the final decision. Given the Court's previous Order transferring class members out of Pinckneyville Correctional Center (Doc. 680), the Court cautions that class members not be transferred to Pinckneyville, to avoid recurrence of the issues that came to light there.

3.  In determining where each class member will be transferred, Defendants shall consider the individual's gender dysphoria condition (including related mental health considerations), gender identity, related safety issues, and whether a transfer to a facility matching the individual's gender identity is appropriate. Defendants shall also consider the transfer criteria they previously described to this Court (*See* Doc. 680, p. 31; Doc. 668, pp. 23-24) including: the length of time before the individual is eligible for release on MSR; their security level; any medical/mental health issues; any substance abuse issues; any security threat group issues; any enemy/KSF issues; any protective custody needs; the individual's previous adjustment at other facilities; the nature of the individual's commitment; the individual's vulnerable status; and whether the individual meets the criteria for the requested facility.

4.  Defendants shall notify each individual class member of their new placement in writing, at least **seven days** in advance of the physical transfer, stating where the individual will be moved. The notice shall explain the reason(s) for the placement/transfer decision and the consideration of each of the above criteria. A copy of each decision shall be simultaneously forwarded to class counsel.

5.  Going forward, no individual identified as a member of the Plaintiff class shall be transferred to Menard, and if a class member arrives at Menard through the reception and classification process (intake), that class member shall not be assigned to Menard as their permanent institution. If an individual housed at Menard is later identified as a member of the Plaintiff class, that person shall be transferred to a different facility within **21 days** of such identification.

6. Any class member transferred from Menard who is not moved to Logan or another facility matching their gender identity shall be allowed to submit a transfer request to Logan or another facility matching their gender identity within **60 days** of their initial transfer.

7. Defendants shall provide to the Court and to Plaintiffs' counsel a monthly report of the status of any known class member currently housed at Menard, including the timing and result of any pending, upcoming, or concluded transfer decisions. The first report shall be due on or before **September 26, 2025**. Defendants also shall produce to Plaintiffs' counsel each month, beginning **September 26, 2025**, all documentation related to class members at Menard including transfer requests, grievances, PREA complaints and investigations, TAC notes, and medical and mental health records including documentation of hormone levels for those on such therapy.

8. Defendants shall provide an update to the Court and Plaintiffs' counsel on the status of matters that were "in progress" at the time of the May hearing, including the status filling mental health staff vacancies at Menard (and within IDOC overall) and whether and when a new PRISM cohort of inmates was transferred into that program (since May 30, 2025), no later than **September 19, 2025**.

Pursuant to *MillerCoors LLC v. Anheuser-Busch Companies, LLC*, 940 F.3d 922 (7th Cir. 2019), the Court will enter the terms of the preliminary injunctive relief set forth above in a separate document.

The Court will hold another evidentiary hearing within 90 days to evaluate whether the above injunctive relief shall be extended. Notice will be given by separate order.

**IT IS SO ORDERED.**

**DATED:  September 12, 2025**

**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**