IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,<br><br>    Plaintiffs,<br><br>v.<br><br>LATOYA HUGHES, MELVIN HINTON, and LAMENTA CONWAY,[1]<br><br>    Defendants. | Civil No. 3:18-cv-00156-NJR |

**PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION FOR A PARTIAL STAY PENDING APPEAL**

Defendants offer no justification to partially stay this Court's well-reasoned injunction (Dkts. 1008, 1009) pending appeal and fail to meet their burden to show the circumstances deserve the Court's discretion to stay the injunction. *See* Dkt. 1024 ("Mot."). The record is instead replete with evidence of Defendants' ongoing and severe deliberate indifference toward Plaintiffs' safety and well-being. The Court heard evidence for four days, accepted substantial post-hearing briefing, and rendered a detailed opinion. To partially stay the injunction while Defendants appeal effectively undoes the relief the Court thoughtfully handed down.

The Court should deny Defendants' Partial Motion to Stay.

---

[1] Dr. LaMenta Conway has succeeded former defendant, Dr. Steven Bowman, who was sued in his official capacity as the Medical Director for the Illinois Department of Corrections ("IDOC"). *See* Dkt. 935, ¶ 7. Following Federal Rule of Civil Procedure 25(d), Plaintiffs substitute Dr. LaMenta Coway for Dr. Steven Bowman in the caption.

**LEGAL STANDARD**

A preliminary injunction is not stayed with an appeal unless the Court orders it. *See* FED. R. CIV. P. 62(c)(1). "A stay pending appeal is 'an extraordinary remedy.'" *Adriana M. Castro, M.D., PA. v. Sanofi Pasteur Inc.*, No. 13 C 2086, 2013 WL 3771493, at *1 (N.D. Ill. July 18, 2013) (quoting *Kuri v. Edelman*, 491 F.2d 684, 687 (7th Cir. 1974)). Because a stay is an "intrusion into the ordinary processes of administration and judicial review," it is not awarded as a "matter of right." *Nken v. Holder*, 556 U.S. 418, 427 (2009). Instead, "the issuance of a stay is left to the court's discretion" using four factors: (1) whether the stay applicant has made a strong showing that it is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. *Id.* at 434. "The first two factors … are the most critical." *Id.* And at all times, "[t]he party requesting a stay bears the burden of showing that the circumstances justify an exercise of [the court's] discretion." *See id.* at 433-34.

**ARGUMENT**

**I.    Defendants Are Unlikely to Succeed on the Merits of Their Appeal.**

To satisfy the first factor, Defendants must make a "strong showing" of likelihood of success on the merits of their appeal. *Id.* at 434. This is a high bar: a mere "possibility of relief" or a "better than negligible" likelihood of success does not suffice. *See id.* (internal quotation marks omitted). The bar is heightened further where, as here, "the applicant's arguments have already been evaluated on the success scale" and rejected by the Court. *In re Forty-Eight Insulations, Inc.*, 115 F.3d 1294, 1301 (7th Cir. 1997); *see also* Mot. ¶ 20 (Defendants conceding this point). It follows that "mere recitation of arguments previously made and rejected … is not nearly enough" to establish a strong showing of likelihood of success on the merits. *Endress +*

2

*Hauser, Inc. v. Hawk Measurement Sys. Pty. Ltd.*, 932 F. Supp. 1147, 1149 (S.D. Ind. 1996); *accord Doe No. 1 v. Att'y Gen. of Ind.*, No. 1:20-cv-03247, 2022 WL 22703986, at *1 (S.D. Ind. Nov. 2, 2022) (collecting cases).

Defendants fall well short of meeting this high threshold. **First**, Defendants argue that the injunction "does not specifically address the [ ] constitutional defects alleged by the class members." *See* Mot. ¶¶ 26, 29, 32, 34-35. Defendants previously raised this argument in their opposition to Plaintiffs' preliminary injunction motion. *See* Dkt. 892, at 5-7. And as Defendants concede, the Court rejected this argument. *See* Mot. ¶ 40. The Memorandum and Order explained that the ongoing harms taking place at Menard stem from the same "system-wide policies and practices … described in the original and supplemental Complaints," and "the relief sought for class members who are now or may be held at Menard fits within the class-wide risk of present and future harm resulting from Defendants' failure to adequately provide care and treatment for individuals with gender dysphoria." Dkt. 1008, at 63. Because the injunction and Memorandum and Order "encompass harms experienced by all Class Members" as outlined in Plaintiffs' Supplemental Complaint, it is therefore proper. *See Daniels v. Jeffreys*, No. 07-1298, 2023 WL 5501217, at *5 (C.D. Ill. Aug. 25, 2023) (finding the Court could grant a preliminary injunction motion regarding a specific IDOC facility where the motion "detail[ed] injuries … that are nearly identical to those outlined in the Complaint among IDOC as a whole").

Defendants provide no meaningful challenge to this straightforward analysis. Defendants only cite one case—*Thorne v. Dix*—in support of their argument. *See* Mot. ¶ 32. But *Thorne* involved an individual plaintiff who filed a complaint alleging he received inadequate medical care for injuries sustained in 2020, then sought a preliminary injunction for a discrete wrist injury he suffered in 2021. *See* No. 20 C 50487, 2021 WL 12241064, at *1 (N.D. Ill. Sept. 27, 2021). In

3

contrast, Plaintiffs' preliminary injunction motion and operative pleading both seek relief from injuries arising from the *same* source: Defendants' constitutionally deficient procedures for treating gender dysphoria.

**Second**, Defendants argue that the injunction must fail because Plaintiffs' named class representatives did not testify at the evidentiary hearing, and because there are no adequate representatives for the "Menard class." Mot. ¶ 33. Again, Defendants pressed this argument at length in their opposition brief and proposed conclusions of law. *See* Dkt. 892, at 3-5. And again the Court rejected Defendants' argument, holding that "Plaintiffs' motion is properly brought as seeking relief applicable to all class members." Dkt. 1008, at 63. This conclusion follows well-settled law: the Seventh Circuit held that "once a class is properly certified, statutory and Article III standing requirements must be assessed with reference to the *class as a whole*, not simply with reference to the individual named plaintiffs." *Payton v. County of Kane*, 308 F.3d 673, 680 (7th Cir. 2002) (emphasis added); *see also Sosna v. Iowa*, 419 U.S. 393, 402 (1975) (observing that Article III standing may persist in a class action "even though the claim of the named plaintiff has become moot"). The Court certified the class here over *five years ago* (*see* Dkt. 213) and it is undisputed that Class Members resided and continue to reside at Menard. Plaintiffs continue to have standing to seek the relief granted by the injunction.

For similar reasons, Defendants' argument about the "need for subclasses" carries little weight. *Cf.* Mot. ¶ 33 n.1. Even Defendants acknowledge that courts only create subclasses where class members "might have diverse and adverse interests." *Id.* (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626-27 (1997)). All Class Members here, however, have the *same* interest in avoiding a facility infected with "a culture of disrespect, harassment, and violence." Dkt. 1008, at 65. Defendants did not provide—and cannot plausibly provide—any reason why a subset of

4

Class Members would actively seek housing at Menard or suffer adverse effects from the injunction.

***Third***, Defendants argue that the injunction does not satisfy the need, narrowness, and intrusiveness ("NNI") requirements of the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626(a)(2).  *See* Mot. ¶¶ 27-28, 30-31, 36-39.  Yet again, this claim rehashes Defendants' arguments in their opposition brief and proposed conclusions of law.  *See* Dkt. 892, at 19-22.  Like the two preceding arguments, the Court already addressed it.  *See* Dkt. 1008, at 61 (observing that the PLRA's NNI requirements applied to the instant motion).

In its Memorandum and Order, the Court found it necessary to enjoin defendants from housing Class Members at Menard to correct the harm caused by Defendants' deliberate indifference.  Specifically, the "pervasive problems" at Menard "convince[d] the Court that preliminary injunctive relief is warranted to avoid further irreparable harm." *Id.* at 68.  The Court further held that the injunctive relief it ordered was narrowly tailored to address the harms facing Class Members, since the Class Members "can be accommodated in other suitable institutions without difficulty" and consolidation of Class Members would "improv[e] efficiency for Defendants in providing constitutionally adequate care." *Id.* at 68-69.  Indeed, the Court further narrowed its order by denying some of the relief requested by Plaintiffs.  *See id.* at 69 (holding that Plaintiffs' request to have IDOC "add one trained mental health professional experienced in treating gender dysphoria as a voting member of the [Transgender Administrative Committee]" went "beyond the scope of their motion").

The Court's conclusions follow case law and common sense: it is easier for Defendants to relocate a few dozen Class Members than it is for Defendants to change the persistent "culture of disrespect, harassment, and violence" at Menard. *Id.* at 65; *see also id.* at 67 (observing "serious

5

backsliding" in the treatment of Class Members at Menard since 2022). The fact that Defendants have identified over twenty new Class Members who currently reside or recently resided at Menard does not change this analysis. *Cf.* Mot. ¶¶ 8, 41. The number of Class Members currently or recently housed at Menard still pales in comparison to the nearly 2,000 prisoners housed at the facility, to say nothing of the nearly 30,000 prisoners housed in IDOC facilities across the state.[2] And conditions at Menard continue to fall well below the constitutional floor, as Plaintiffs will show at the upcoming evidentiary hearing. *See* Dkt. 1028. The provisions of the injunction relating to newly identified Class Members thus satisfy the PLRA's NNI requirements, and the Court should not issue a partial stay of those provisions. *See Hoskins v. Dilday*, No. 16-CR-334, 2017 WL 951410, at *7 (S.D. Ill. Mar. 10, 2017) (finding that "a transfer from Menard [was] the least intrusive means of protecting Plaintiff from the risk of irreparable harm" given Defendants' "ongoing, serious constitutional violations"); *Morales Feliciano v. Rullan*, 378 F.3d 42, 55 (1st Cir. 2004) ("[A] record of abject failure matters in the [NNI] inquiry.").

Defendants' alleged authority to the contrary—*Dunmore v. Hodge*—is factually inapposite. *See* Mot. ¶ 36. In *Dunmore*, an individual plaintiff sought a court-ordered transfer to a facility that would provide "better equipment and more advanced therapy techniques" to assist with his disability. The *Dunmore* court denied his request, finding that Defendants could more easily remedy the harm through "attention from qualified medical providers." *See* No. 3:14-184, 2014 U.S. Dist. LEXIS 150404, at *1-2 (S.D. Ill. July 22, 2014). In contrast, Defendants presented no evidence that they could address the pervasive and systemic failures to treat and evaluate gender dysphoria at Menard, including allowing for safe social transition of Class Members, with greater "attention" from medical professionals. *See* Dkt. 1008, at 65-68. For example, Defendants' claim

---

[2] *See Prison Population Data Sets*, Ill. Dep't of Corr., https://idoc.illinois.gov/reportsandstatistics/prison-population-data-sets.html (last updated Sept. 30, 2025).

6

that they would rectify their "significant shortfalls in mental health staffing" did "not reassure the Court that [Menard's] deficiencies will be corrected in a timely fashion." *Id.* at 67. And vacancies still exist at Menard, even after the injunction.

The Court also ensured its injunction did not unduly intrude on prison administration by allowing Defendants to "make the final decision" regarding where Class Members would be transferred. Dkt. 1008, at 70; Dkt. 1009, ¶ 2. This fact preserves "administrative discretion and flexibility" for Defendants and readily distinguishes the present case from Defendants' cited authorities. *Cf.* Mot. ¶ 38 (citing *Westefer v. Neal*, 682 F.3d 679, 681-82, 686 (7th Cir. 2012)). In contrast to the prescriptive injunction issued in *Westefer*, the Court's injunction does not mandate implementation of an administrative directive or dictate how Defendants should make transfer decisions. On the contrary, the injunction allows Defendants to transfer Class Members to one of many other IDOC facilities. *See* Dkt. 1009, ¶ 2; *see also* Dkt. 1008, at 68 n.61 (noting that IDOC has "four other maximum security correctional centers" and multiple "'multi-security' institutions"). Given the serious and entrenched constitutional shortcomings at Menard, this injunctive relief is "least intrusive means of protecting Plaintiff[s] from the risk of irreparable harm." *See Hoskins*, 2017 WL 951410, at *7. Notably, Defendants never suggested any alternative solution. *See Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1071 (9th Cir. 2010) (finding defendants' intrusiveness arguments "remarkably weak" where they did "not suggest any means to protect class members' rights … that are more narrow or less intrusive than those ordered by the district court").

To the extent that Defendants complain that the injunction and Memorandum and Order do not "identify the appropriate standard of medical care required by the Eighth Amendment" (*see* Mot. ¶¶ 28, 39-40), they are factually mistaken. The Court held that World Professional

7

Association for Transgender Health ("WPATH") Standards of Care provide "the appropriate benchmark for treating gender dysphoria," and it reiterated that holding in its Memorandum and Order. *See* Dkt. 1008, at 5 (quoting Dkt. 186, at 31); *accord Edmo v. Corizon, Inc.*, 935 F.3d 757, 769 (9th Cir. 2019).

And to the extent that Defendants complain that compliance with the Constitution is too burdensome "given the Department's limited resources" (Mot. ¶ 40), these arguments are legally irrelevant: "A demonstration that an order is burdensome does nothing to prove that it was overly intrusive." *Armstrong*, 622 F.3d at 1071.

In sum, the merits arguments in Defendants' motion fail to make the "strong showing" necessary to obtain a stay pending appeal. *See Doe No. 1*, 2022 WL 22703986, at *1.

## II. Defendants Are Unlikely to Suffer Irreparable Harm Absent a Stay.

Defendants did not—and cannot—demonstrate that compliance with this Court's September 12, 2025 preliminary injunction will cause them irreparable harm. Most generously, Defendants claim that they will suffer harm if forced "to continuously defend against their compliance" with both the injunction and "any ancillary matters that arise that were not specifically part of the preliminary injunction." Mot. ¶¶ 45-47. But this Court already rejected these recycled arguments. *See* Dkt. 826, at 9-12; *compare id.* at 9-10, *with* Mot. ¶ 47. Defendants offer no explanation for why the Court should rule differently now.

"Irreparable harm occurs when the 'legal remedies available to the movant are inadequate.'" *A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 774 (7th Cir. 2023)). For a harm to be deemed "irreparable," it must be "both certain and great, actual and not theoretical, beyond remediation, and of such imminence that there is a clear and present need for

8

equitable relief." *Mexichem Specialty Resins, Inc. v. E.P.A.*, 787 F.3d 544, 555 (D.C. Cir. 2015) (internal quotation marks and emphasis omitted).

Defendants' speculation that Plaintiffs "will move for another transfer motion or potentially for additional contempt actions" does not constitute harm. Mot. ¶ 47. Nor does Defendants' concern about "the awkward position of continuing to litigate this matter and defend their ongoing compliance actions" while petitioning for appeal constitute harm. *Id.* The Seventh Circuit made clear that the ordinary incidents of litigation do not constitute "irreparable harm." *Crist v. Miller*, 846 F.2d 1143, 1144 (7th Cir. 1988); *PaineWebber Inc. v. Farnam*, 843 F.2d 1050, 1051 (7th Cir. 1988); *Lindell v. Frank*, No. 02-C-0021-C, 2003 WL 23198184, at *3 (W.D. Wis. Aug. 25, 2003) ("I am unconvinced that defendants have shown irreparable harm. … Rather, many of defendants' arguments can be characterized as speculative and as examples of inconvenience."); *see, e.g.*, *Robbins v. Pepsi-Cola Metro. Bottling Co.*, 637 F. Supp. 1014, 1020-21 & n.20 (N.D. Ill. 1986), *aff'd*, 800 F.2d 641 (7th Cir. 1986) (explaining that "[a]side from [ ] hypothetical speculation on the future" the defendant had not shown any tangible evidence of irreparable harm). Defendants fail to present *any* evidence or argument explaining how their compliance with this Court's preliminary injunction would cause any harm beyond "the ordinary incidents of litigation."

Defendants also suggest that they are concerned about an increase in the number of individuals seeking to become Class Members and the difficulty of finding additional housing accommodations for Class Members outside of Menard. Mot. ¶¶ 11-13, 41. These speculative administrative concerns likewise do not amount to "irreparable harm" because this constitutional remedy has long been required and known. From 2019 to December 2024, the Court required Defendants to evaluate and treat Class Members' gender dysphoria, including providing appropriate housing placement not based on genitalia but by evaluating Class Members' requests

9

to transfer to a facility matching their gender identity. *See* Dkts. 186, 212, 332, 336, 383. Indeed, Defendants' own administrative directive from 2021 provides some guidance on how to identify Class Members and provide appropriate housing based on their gender identity.[3] And as part of regular administration of the prison, Defendants also regularly transfer incarcerated individuals between IDOC facilities. The only difference is that the Court's injunction requires Defendants to take faster actions to remedy the likely constitutional violations, but that is the nature of a preliminary injunction to remedy immediate harms. Defendants' continued compliance with ongoing legal obligations and standard IDOC operating procedures cannot now constitute irreparable harm because Defendants petitioned for appeal.

Finally, to the extent Defendants suggest that the preliminary injunction forces them to violate the Prison Rape Elimination Act (PREA) and its implementing regulation by dedicating a specific wing for Class Member housing (Mot. ¶ 14), they are mistaken. While PREA generally prohibits placing transgender inmates "in dedicated facilities, units, or wings solely on the basis of such identification or status," the prohibition gives way if such placement is required by a "legal judgment for the purpose of protecting [transgender] inmates." 28 C.F.R. § 115.42(g).

### III. Plaintiffs Will Suffer Substantial Injury Absent This Preliminary Injunction.

Because Defendants did not demonstrate legally sufficient grounds for a stay under the most critical factors, their requested relief should be denied. *Nken*, 556 U.S. at 434 ("The first two factors of the traditional standard [for assessing whether to issue a stay] are the most critical."). Consideration of the third factor, however—whether the Plaintiffs will suffer substantial injury if a stay is issued—similarly weighs against Defendants' requested relief.

---

[3] Illinois Dep't of Corr., Administrative Directive, 04.03.104 *Evaluation, Treatment and Correctional Management of Transgender Offenders* (Apr. 1, 2021), https://idoc.illinois.gov/content/dam/soi/en/web/idoc/aboutus/policies/policies/programs-and-services/403104%20Evaluation,%20Treatment%20and%20Correctional%20Management%20of%20Transgender%20Offenders.pdf.

To assess whether a stay is warranted under this factor, courts must balance the equities and determine which party will suffer the greater injury. *See Soundboard Ass'n v. FTC*, 254 F. Supp. 3d 7, 14 (D.D.C. 2017) (requiring courts to "weigh the harm that the movant will incur if the [stay] is denied against the harm the [nonmovant] will suffer if the challenged action is enjoined"). Here, the scale tips heavily towards Plaintiffs.

Plaintiffs' safety, health, and wellbeing are entirely controlled by Defendants, who consistently demonstrate blatant indifference to Plaintiffs' constitutional rights. And although Defendants outline various "efforts" to improve the care and safety of Class Members at Menard and other IDOC facilities (Mot. ¶ 50), evidence and testimony from Class Members establish that these "efforts" are disingenuous and facially inadequate. For example:

- Defendants argue that "[i]mprovements in medical treatment were noted by the court-appointed Co-Monitor as of the end of 2024." Mot. ¶ 50. But the Court found that "the testimony and declarations from Menard class members indicate those improvements have not been maintained." Dkt. 1008, at 64. And the Co-Monitor "noted persistent serious safety concerns at Menard" in julie graham's reports from that same year. *Id.* at 4.

- Defendants argue that Warden Wills "took action" to protect Class Members (Mot. ¶ 50), but Wills testified at the hearing that "a substantial amount of harassment" could be going on at Menard, and that he was aware of 20 reports of assault against Class Members by Menard staff in the past five years (Dkt. 1008, at 65-66).

- Defendants attest that Dr. Conway and Dr. Reister expressed "sincere intentions" to improve conditions for the transgender population (Mot. ¶ 50), but their

11

"testimony failed to convince the Court that these intentions are being translated into effective changes at Menard" (Dkt. 1008, at 66).

At present, almost seven years after the initiation of litigation, Plaintiffs still require ongoing court intervention to achieve anything resembling relief. The record in this case demonstrates that Plaintiffs and other Class Members were, are, and will remain in danger while in the custody of Defendants. *See id.* at 68. The Court concluded that:

> Class members at Menard have suffered and are suffering ongoing irreparable harm due to Defendants' failure to provide necessary medical and mental health care or an environment where they are safe from abuse by IDOC staff and other inmates on account of their transgender status. Despite official policies adopted by Defendants, correctional officers at Menard continue to target class members with verbal harassment—and worse—based on their gender identity.

*Id.* The harm to Plaintiffs of a stay far outweighs any inconvenience to Defendants of having to comply with this Court's injunction.

## IV. The Balance of Equities Favors Plaintiffs.

Defendants failed to articulate any valid public interest justifying a stay. Defendants instead repeat the same arguments that this Court rejected in 2024. Specifically, Defendants argue for "[p]reservation of the *status quo*," refer back to the PLRA, and suggest that "a governmental entity has an interest in non-interference by a federal court with presumptively valid rules." Mot. ¶ 52 (citing *Peterson v. Village of Downers Grove*, No. 14 C 09851, 2016 WL 427566, at *5 (N.D. Ill. Feb. 4, 2016)). These arguments remain unpersuasive.

First, the "status quo" Defendants seek to preserve at Menard and other prisons is an unchecked culture of abuse toward Class Members. While Defendants mention their prior legal argument that under the PLRA they should be able to "craft procedures and plan how to implement relief" (*Id.*), those administrative actions are not the same as presumptively valid laws or regulations. And absent judicial intervention, Defendants repeatedly fail to provide adequate

medical care to Class Members or any environment where Class Members are safe from abuse by IDOC staff and other inmates. *See* Dkt. 1008, at 68. Indeed, the Seventh Circuit recognized injunctive relief can be necessary under the PLRA where there are continued violations of constitutional rights by an Illinois prison, and the state cannot rely on "cost and logistical difficulties" to avoid its constitutional obligations. *See Howe v. Hughes*, 74 F.4th 849, 858-59 (7th Cir. 2023).

Second, Defendants' reliance on *Peterson* to suggest that governmental entities have an interest in non-interference by a federal court is unsupported. *Peterson* remains distinguishable because it involved an action to enjoin "enforcement of a law or regulation," whereas this injunction relates to IDOC's administrative placement decisions. 2016 WL 427566, at *5. *Peterson* is further distinguishable as a First Amendment challenge to a municipal ordinance, which carries a presumption of validity "absent a ruling to the contrary." *Id.* at *2 (collecting Supreme Court cases).

In contrast, the Seventh Circuit found that "enforcing a constitutional right is in the public interest." *See, e.g.*, *Whole Woman's Health All. v. Hill*, 937 F.3d 864, 875-76 (7th Cir. 2019) (denying the state's motion to stay the injunction as modified by Court of Appeals to allow clinic to provide medication abortions). Because "upholding constitutional rights serves the public interest," it necessarily follows that continued enforcement of this Court's preliminary injunction would serve the public interest as well. *Joelner v. Village of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004).

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion for a partial stay pending appeal.

Dated: November 12, 2025

**Brent P. Ray**
ARNOLD & PORTER
KAYE SCHOLER LLP
70 West Madison Street Suite 4200
Chicago, IL 60602-4231
Telephone: (312) 583-2325
*brent.ray@arnoldporter.com*

**Abby L. Parsons**
ARNOLD & PORTER
KAYE SCHOLER LLP
700 Louisiana Street Suite 4000
Houston, TX 77002-2755
Telephone: (713) 576-2442
*abby.parsons@arnoldporter.com*

**Thomas E. Kennedy III**
**Sarah Jane Hunt**
KENNEDY HUNT P.C.
906 Olive Street, Suite 200
Saint Louis, MO 63101
Telephone: (314) 872-9041
*tkennedy@KennedyHuntLaw.com*
*sarahjane@KennedyHuntLaw.com*

**Malita Picasso**
AMERICAN CIVIL LIBERTIES UNION
125 Broad Street New
York, NY 10004
Telephone: (212) 549-2561
*mpicasso@aclu.org*

Respectfully Submitted:

*/s/ Abby L. Parsons*
_____
**Camille E. Bennett**
**Michelle Teresa García**
**Alexis Picard**
**Mason Strand**
ROGER BALDWIN FOUNDATION OF ACLU, INC.
150 North Michigan Avenue, Suite 600
Chicago, IL 60601
Telephone: (312) 201-9740
Facsimile: (312) 288-5225
*cbennett@aclu-il.org*
*mgarcia@aclu-il.org*
*apicard@aclu-il.org*
*mstrand@aclu-il.org*

**Amelia H. Bailey**
**Thomas J. Leahy**
**Anne J. Hudson**
**Ashton Dubey**
**Nicole R. Marcotte**
KIRKLAND & ELLIS LLP
333 Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
*amelia.bailey@kirkland.com*
*thomas.leahy@kirkland.com*
*anne.hudson@kirkland.com*
*ashton.dubey@kirkland.com*
*nikki.marcotte@kirkland.com*

*Attorneys for Plaintiffs*

14

## **CERTIFICATE OF SERVICE**

      I certify that on November 12, 2025, I electronically filed the foregoing document with the Clerk of Court by using CM/ECF system, which will accomplish service through the Notice of Electronic Filing for parties and attorneys who are Filing Users.

      By:    */s/ Abby L. Parsons*