## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JANIAH MONROE,<br>MARILYN MELENDEZ,<br>LYDIA HELÉNA VISION,<br>SORA KUYKENDALL, and<br>SASHA REED, individually and on<br>behalf of a class of similarly situated<br>individuals,<br><br>      Plaintiffs,<br><br>v.<br><br>STEVEN BOWMAN,<br>MELVIN HINTON, and<br>LATOYA HUGHES,<br><br>      Defendants. | Case No. 3:18-CV-00156-NJR |

## <u>MEMORANDUM AND ORDER</u>

**ROSENSTENGEL, Chief Judge:**

This matter is before the Court on Defendants' motion to stay the preliminary injunction issued by the Court on September 12, 2025, pending their appeal. (Doc. 1024). For the following reasons, the motion is denied.

### BACKGROUND

The Court recounted the lengthy history of this litigation in its most recent Order. (Doc. 1008). To summarize the most relevant aspects, Plaintiffs brought this case in January 2018 on behalf of a putative class later certified as "all prisoners in the custody of" the Illinois Department of Corrections ("IDOC") "who have requested evaluation or treatment for gender dysphoria." (Doc. 213). The named plaintiffs are transgender

inmates currently incarcerated in Illinois Department of Corrections ("IDOC") facilities. The named defendants are, respectively, the IDOC Medical Director, IDOC Chief of Mental Health, and the IDOC Director, all sued in their official capacities.

Plaintiffs assert that Defendants' policies and practices subject the class to a substantial risk of serious harm and injury from inadequate and delayed evaluation and treatment of gender dysphoria, in violation of their rights under the Eighth Amendment, and they seek injunctive relief to remedy the flaws in IDOC's treatment of transgender inmates. (Doc. 1, pp. 36-38; Doc. 935). The alleged problems include the IDOC's:

- use of committees comprised of unqualified officials to make decisions regarding the medical treatment, security, and placement of transgender inmates;

- widespread delays or denials in evaluating prisoners for gender dysphoria and in providing hormone therapy and hormone monitoring;

- failure to consider or provide gender-affirming surgery as part of medically necessary treatment for gender dysphoria;

- failure to accommodate and facilitate social transition for individuals with gender dysphoria, including lack of access to gender-affirming clothing and grooming items, failing to make individualized housing placement decisions, and permitting cross-gender strip searches; and

- failing to provide access to medical and mental health providers competent to treat gender dysphoria.

The Court first granted preliminary injunctive relief following a two-day evidentiary hearing in August 2019. (Docs. 186, 187, 212). The Court directed Defendants to develop policies and procedures to ensure that qualified medical professionals would determine inmates' treatment for gender dysphoria; allow inmates to obtain evaluations for gender dysphoria; ensure the provision of necessary hormone therapy; and take steps

to train correctional staff on transgender issues. The class was certified on March 4, 2020. (Doc. 213).

After a four-day bench trial in August 2021, the Court continued the provisions of the 2019 preliminary injunction and set timelines related to hormone therapy and consideration of class members' requests to transfer to a facility matching their expressed gender. Additionally, it directed Defendants to provide transgender inmates access to a private shower and gender-affirming commissary items, and to allow transgender inmates to choose the gender of the officer who would conduct a search of their person. (Doc. 331). The Court issued its full findings of fact and conclusions of law, along with additional injunctive measures, on February 7, 2022. (Doc. 383).

In May 2023, Defendants moved to vacate the orders for injunctive relief. (Doc. 587). The Court denied Defendants' motion in November 2023; they appealed. (Docs 678, 699). While the appeal was pending, Plaintiffs asked the Court to order class members be transferred from Menard Correctional Center ("Menard"). (Docs. 705, 715). The Court stayed consideration of that motion during the pendency of the appeal. (Doc. 826).

On December 5, 2024, the Seventh Circuit Court of Appeals vacated the February 2022 injunction, concluding it had expired 90 days after its issuance, pursuant to the Prison Litigation Reform Act ("PLRA") of 1996. *Monroe v. Bowman*, 122 F.4th 688 (7th Cir. 2024); *see also* 18 U.S.C. § 3626(a)(2). After the case returned to this Court, Plaintiffs renewed their motion to transfer class members out of Menard to another IDOC facility.

(Docs. 873, 874). The Court held an evidentiary hearing on the motion from May 27-30, 2025, and heard testimony from 13 witnesses.

On September 12, 2025, the Court issued its decision granting Plaintiffs' motion and ordered several remedial measures. (Doc. 1009). First, Defendants were to file, under seal by September 19, 2025, a list of class members presently housed at Menard.[1] Second, Defendants were to transfer every class member residing at Menard to another facility by October 15, 2025.[2] The Court cautioned Defendants not to transfer any class member to Pinckneyville Correctional Facility in light of issues with that facility discussed in prior orders. (Doc. 680). Third, the Court directed Defendants to consider each class member's specific gender dysphoria condition, their gender identity, related safety issues, and whether a transfer to a facility matching their gender identity would be appropriate in assessing where each class member would be transferred. Fourth, Defendants were to notify each class member of their new placement at least seven days before their transfer and provide an explanation of the reasons for the decision. A copy of each decision also was to be furnished to class counsel. Fifth, the Court barred Defendants from placing any class member at Menard going forward and instructed Defendants to assign class members to a different institution if they arrived at Menard through the intake process. If an individual housed at Menard later is identified as a class member, they must be transferred within 21 days. Sixth, if a class member is not moved to Logan Correctional Center (a women's facility) or another facility matching their gender identity, they must

---

[1] Defendants complied with this directive at Doc. 1011-1 and Doc. 1013.
[2] Defendants submitted a list of 38 individuals who were transferred from Menard as of October 16, 2025 (Doc. 1025).

be permitted to submit a request to transfer to such facilities within 60 days of the initial

transfer. Seventh, Defendants were to provide the Court and class counsel monthly

reports on the status of class members housed at Menard and the timing and result of

any transfer decisions. Finally, Defendants were to provide a status report regarding

certain matters "in progress" as of the May 2025 evidentiary hearing, including the status

of mental health staff vacancies at Menard.[3] The Court also announced that it would hold

a subsequent evidentiary hearing within 90 days "to evaluate whether the above

injunctive relief shall be extended." (Doc. 1008 p. 71).

Defendants filed an interlocutory appeal of that decision on October 10, 2025

(Doc. 1006) and subsequently moved to stay portions of the order. (Doc. 1024). Not

surprisingly, Plaintiffs oppose the request for a stay. (Doc. 1039).

DISCUSSION

Defendants ask the Court to stay the portions of the September 2025 injunction

requiring the transfer of class members from Menard identified after that date, providing

class members relocated from Menard a right to request a transfer if they are not placed

at Logan or another facility matching their gender identity, and requiring Defendants to

report monthly on the status of transfer decisions. (Doc. 1024 p. 3). Defendants represent

that they have worked diligently to transfer all known class members housed at Menard

to other IDOC facilities by the Court's deadline of October 15, 2025. The numbers

provided make it difficult to assess whether full compliance has been achieved. They state

---

[3] Defendants filed this report at Doc. 1011.

that there were 22 confirmed or potential class members housed at Menard before the Court issued the injunction in September. That number has grown to 43, however, and 38 of those individuals were transferred to other facilities as of October 21, 2025.

According to Defendants, the near doubling in the size of class members at Menard has created certain administrative challenges. They report that "at least 25 additional individuals" have requested evaluation for gender dysphoria. It is not clear whether these 25 individuals are distinct from the additional class members discussed above. Menard's mental health providers apparently have determined that the majority of these additional class members do not meet the criteria for gender dysphoria but nevertheless must be transferred under the terms of the Court's Order. Many of these individuals are in protective custody or require restrictive housing, adding complexity to the transfer process. Defendants state that they have reopened a wing of the Illinois River Correctional Center that has not housed inmates in years in order to adequately address a housing shortage caused by the Court's Order. Defendants express concern that the creation of a dedicated wing for class members would violate federal regulations, *see* 28 C.F.R. § 115.42(g), so they are relocating non-class members from other facilities to the newly reactivated facility.

Under Federal Rule of Civil Procedure 62(c), a district court's order for injunctive relief is not stayed even if an appeal is taken, unless the court orders otherwise. During the pendency of an appeal of a final judgment granting, continuing, or modifying an injunction, a district court may "suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights." Fed. R. Civ. P. 62(d).

Rule 62 works in coordination with Federal Rule of Appellate Procedure 8(a), which dictates that "[a] party must ordinarily move first in the district court for . . . an order suspending, modifying, restoring, or granting, an injunction while an appeal is pending."

"The party requesting a stay bears the burden of showing that the circumstances justify an exercise of [the Court's] discretion" to grant the stay. *Nken v. Holder*, 556 U.S. 418, 433-34 (2009). In deciding whether to grant a stay pending appeal, the Court must consider four factors: "(1) whether the stay applicant has made a strong showing that [they are] likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken*, 556 U.S. at 434 (quoting *Hilton v. Braunskill,* 481 U.S. 770, 776 (1987)); *Camelot Banquet Rooms, Inc. v. United States Small Bus. Admin.*, 14 F.4th 624, 628 (7th Cir. 2021); *In re A & F Enters., Inc. II*, 742 F.3d 763, 766 (7th Cir. 2014). The first two factors are the most critical, *Nken*, 556 U.S. at 434, but those two factors are weighed on a "sliding scale," *In re A & F Enters.*, 742 F.3d at 766. "[T]he greater the moving party's likelihood of success on the merits, the less heavily the balance of harms must weigh in its favor, and vice versa." *Id.*

### a. Defendants' Likelihood of Success on the Merits of the Appeal

Defendants acknowledge that they must demonstrate a "strong showing" that they likely will prevail on the merits in order to obtain a stay. First, they argue that the preliminary injunction order fails to specifically address the constitutional defects alleged by the class members and does not afford IDOC an adequate opportunity to remedy the constitutional deficiencies. Second, they contend the injunction does not satisfy the

PLRA's requirement that injunctive relief be "narrowly drawn," extend "no further than necessary," and use the "least intrusive means necessary" to address the violation. They argue that the preliminary injunction "favors" certain facilities, like Logan, but does not explain how those facilities meet any constitutional standard or how the disfavored facilities fail to meet constitutional standards. Third, Defendants maintain that the Court's Order is untethered from the medical claims asserted by the class and privileges individuals who wish to be transferred from Menard. Fourth, Defendants point out that none of the named class representatives offered evidence in support of the requested injunction and observe that there is not a sub-class certified for individuals housed at Menard, whose interests may be adverse to those of other class members.

For their part, Plaintiffs argue that Defendants have not demonstrated a strong likelihood of success where the Court already has considered and rejected each of their arguments. They emphasize that the Court's September 2025 Order explained how the ongoing harms to class members at Menard relate to the system-wide issues described in the original and supplemental complaints and detailed how injunctive relief was necessary to address the risk of harm of housing class members in that facility. Plaintiffs also reject the idea that named class members need to have testified at the hearing to be entitled to injunctive relief. They likewise push back on Defendants' contention that class members have adverse interests and emphasize that all share an interest in avoiding the unconstitutional conditions at Menard. Plaintiffs also say the Court's injunction satisfies the PLRA's requirement that the relief be narrowly tailored because relocating several dozen class members is minimally burdensome, and the Order left discretion with

Defendants on where to house each class member. They also observe that Defendants
never offered any alternative solutions.

Defendants have not shown they are likely to prevail on appeal. As Plaintiffs point
out, the Court already has considered and rejected many of Defendants' primary
arguments. There is little reason to think that these recycled points merit a different
outcome now. The Seventh Circuit has explained that where a party seeks a stay pending
appeal and their "arguments have already been evaluated on the success scale, the
applicant must make a stronger threshold showing of likelihood of success to meet his
burden." *Matter of Forty-Eight Insulations, Inc.*, 115 F.3d 1294, 1301 (7th Cir. 1997) (citing
*Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th
Cir. 1991)); *see also Endress + Hauser, Inc. v. Hawk Measurements Sys. Pty. Ltd.*, 932 F. Supp.
1147, 1149 (S.D. Ind. 1996) (explaining that a party's "mere recitation of arguments
previously made and rejected . . . is not nearly enough").

Defendants first contend that the Order fails to address specifically the alleged
constitutional defects alleged by the class members and does not afford IDOC an
opportunity to participate in developing solutions. Not so. In its Order, the Court
explained in detail how the conditions at Menard violated the Eighth Amendment rights
of class members to access adequate treatment for their gender dysphoria. The Court
emphasized that Defendants "have been well informed of the relevant standards for
medical and mental health care for individuals with gender dysphoria, including the
importance of social transition, which includes providing a safe environment for
transgender individuals, rather than allowing them to be targeted for mistreatment,

misgendering, and assault." (Doc. 1008, p. 63). Nevertheless, class members assigned to

Menard "continue[d] to report violations of these standards." (*Id.* at p. 64). The Court

concluded that there was substantial, credible, and uncontroverted evidence of assaults

on class members by correctional officers and fellow inmates, delays in receiving

evaluations for gender dysphoria and medical treatment, persistent cross-gender body

searches, delays in considering transfer requests for class members seeking assignment

to a facility matching their gender identity, and a lack of access to gender-affirming

clothes and other items. (*Id.*). At this point in the litigation, Defendants cannot credibly

claim to be unaware of the constitutional deficiencies identified by the Court.

*E.g.*, (Doc. 383, p. 68) ("[C]lass members must have timely decisions and action on

requested treatment for gender dysphoria—including hormone therapy, surgery

requests, placement, transfer, commissary, and search accommodations."). Nor is it

accurate for Defendants to complain that they lacked an opportunity to participate in

developing remedies to rectify these deficiencies. The Seventh Circuit recognized that

this Court "need not forget what has happened in the last six years of litigation . . . ."

*Monroe*, 122 F.4th at 697. Defendants have actively participated in the implementation of

relief for class members since the beginning of this litigation. They identify no case

requiring additional consultation prior to follow-on remedial measures, provided those

measures otherwise comply with the PLRA.

Picking up on that point, Defendants argue that the PLRA forbids relief of the

scope ordered, but Defendants exaggerate the scope of the measures ordered by the

Court.

It is true that the PLRA imposes limits on the scope of relief that may be imposed

by a federal court. *See Howe v. Hughes*, 74 F.4th 849, 857 (7th Cir. 2023). Preliminary

injunctions "must be narrowly drawn, extend no further than necessary to correct the

harm the court finds requires preliminary relief, and be the least intrusive means

necessary to correct that harm." 18 U.S.C. § 3626(a)(2). "At bottom, federal courts must

ensure that 'substantial discretion and flexibility' remain 'in the hands of the prison

administrators.'" *Howe v. Hughes*, 74 F.4th 849, 857 (quoting *Westefer v. Neal*, 682 F.3d 679,

685 (7th Cir. 2012)). Considering the evidentiary record before the Court regarding the

conditions faced by class members at Menard, the measures it selected are well within

the bounds of the PLRA. Each is tailored to leave substantial discretion with IDOC's

leaders.

Defendants take aim at three provisions in particular: the requirement that class

members identified *after* September 12, 2025, be transferred from Menard, the ability for

Menard transferees who are not transferred to a facility that matches their gender identity

to request a transfer, and certain additional reporting requirements. Defendants should

not have been surprised by any of these measures. Their concern with the first provision

seems to be the increase in individuals who seek a gender dysphoria diagnosis. The

subtext of their argument is that some of these individuals may not have a legitimate

belief that they are a class member and may only be seeking a path out of Menard. That

is a possibility, but it is speculative at best, particularly given the evidence of mental

health care services at that facility adduced at the hearing. The evidence in the record

demonstrated that "mental health care at Menard, both psychotherapy for those with

gender dysphoria and evaluation of those seeking diagnosis and confirmation as transgender within the IDOC system, has been sporadic at best." (Doc. 1008, p. 67). And it was not apparent to the Court that these deficiencies would be rectified in a timely fashion. *Ibid.*

Requiring the transfer of class members to facilities where they can access diagnostic resources is a narrow remedy that is entirely appropriate under the circumstances. If psychological services have improved at Menard during the time since the May 2025 evidentiary hearing, Defendants are free to present such evidence at the upcoming hearing on December 8, 2025.

The second provision contested by Defendants—the right for class members transferred from Menard but not to Logan or another facility matching their gender identity to submit a transfer request within 60 days—likewise is narrowly drawn and leaves substantial discretion with IDOC. Notably, the Court did not specify that any class member must be transferred from their new facility. The Order merely afforded such individuals an opportunity to *request* a transfer. It is difficult to see how this provision intrudes on Defendants' discretion to manage the prison system as they deem appropriate.

Finally, Defendants do not explain how the reporting requirements imposed as part of the injunction, which focus on the whereabouts and status of the class members once housed at Menard, intrude on their discretion or exceed the scope of permissible relief under the PLRA. In sum, Defendants' have not demonstrated that the preliminary injunction violates the PLRA, and they are not likely to prevail on that argument.

Defendants also contend that the injunction fails to address class members'
medical claims because its "applicability is limited to a class of people who want to be
transferred out of Menard." (Doc. 1024 p.10). But as the Court explained in its Order,
relief tailored to the situation at Menard is appropriate due to the "risk of present and
future harm resulting from Defendants' failure to adequately provide care and treatment
for individuals with gender dysphoria" for "class members who are now or may be held
at Menard." (Doc. 1008 p. 63). Notably, class members continued to be moved to Menard
during the pendency of Plaintiffs' motion. To put it plainly, the evidence amply
demonstrated that the class as a whole credibly might be subject to constitutionally
inadequate medical care and associated mistreatment if they were transferred to Menard.

Finally, Defendants assert Plaintiffs are not entitled to injunctive relief because
none of the named class representatives offered evidence in support of the injunction,
and there is not a separate certified class for individual members housed at Menard,
whose interests may be adverse to those of other class members. The latter point may be
disposed of quickly. As explained above, the conditions at Menard warranted relief as to
all class members. The former argument is unpersuasive for similar reasons. The class
certified by the Court covers all prisoners in IDOC custody who have requested
evaluation or treatment for gender dysphoria. (Doc. 213). Plaintiffs alleged that IDOC
systematically failed to provide adequate treatment for that condition in violation of the
Eighth Amendment. And Plaintiffs, as was their right, adduced evidence demonstrating
particularly troublesome conditions at Menard in the manner they saw fit. It is immaterial
that none of this evidence came from the named plaintiffs. Those individuals merely are

class *representatives*. Defendants do not cite any authority holding that injunctive relief must be based in part on the testimony of class representatives. And the Court remains satisfied that the class representatives' claims are typical of the class and that they have and will continue to adequately represent the class. *Id.* at pp. 6-9.

Although Defendants "are not required to convince this Court that it has erred or win the Court over as to their case on the merits," *Monroe v. Bowman*, No. 18-00156, 2024 WL 3673132, at *4 (S.D. Ill. Aug. 6, 2024), they nevertheless must show a strong likelihood of success in their appeal. None of their arguments—individually or collectively—meet that standard. Thus, the Court concludes that this factor weighs against a stay.

### b. Will Defendants be Irreparably Harmed Absent a Stay?

Defendants locate irreparable harm in having to defend against further injunctive relief in the upcoming evidentiary hearing while also litigating the propriety of the first injunction in the court of appeals. (Doc. 1024, p. 14). This is not the first time they have raised litigation concerns as the source of irreparable harm. (Doc. 826, pp. 9-10). The argument did not take root previously, nor should it now. After all, it is well-settled that the burdens of litigation ordinarily do not constitute irreparable harm. *See Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 24 (1974) ("Mere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury."); *Crist v. Miller*, 846 F.2d 1143, 1144 (7th Cir. 1988) ("The ordinary incidents of litigation—the time and other resources consumed—do not constitute irreparable harm."). The Court is sensitive to the burden on counsel posed by this litigation but fails to see how that challenge constitutes the sort of irreparable harm that favors a stay. It also merits observation that

Defendants do not argue that complying with the preliminary injunction has or may compromise prison safety or security. Nor is it apparent that complying with the Order will put IDOC in violation of 28 C.F.R. § 115.42(g). As Plaintiffs point out, that rule, which generally prohibits prisons from segregating LGBTQ-identifying inmates in dedicated facilities, excepts situations where such placement is pursuant to a court order. In any event, the Court did not order class members be placed into a dedicated facility. Absent a stronger showing of irreparable harm, this factor weighs against a stay.

### c. Will a Stay Substantially Injure Plaintiffs?

By contrast, Plaintiffs would be irreparably harmed by a stay of the injunction. Defendants insist that little harm is likely because conditions with the prison system have improved, particularly with regard to class members' access to medical care and placement of many members at a female-designated facility. Defendants' efforts are commendable, and they are entitled to present evidence at the December 8 hearing that the conditions at Menard now satisfy constitutional standards. But the present state of the record does not convince the Court that a stay would be appropriate. (Doc. 1008, p. 64). Defendants argue that a stay will preserve the status quo, but the Court found the status quo at Menard incongruent with the Eighth Amendment rights of class members. A stay would permit Defendants to transfer class members back into that facility and would substantially harm Plaintiffs. Thus, this factor thus also weighs against Defendants.

*d. Does the Public Interest Weigh in Favor of or Against a Stay?*

Finally, Defendants argue the public interest favors minimal involvement by the Court in the operation and management of the State's prison facilities until appellate review of the proceedings can occur. Defendants pressed this point in a prior request for a stay, and the Court rejected it on that occasion reasoning that it made "little sense." (Doc. 826, p. 14).

The Seventh Circuit has held squarely that "[e]nforcing a constitutional right is in the public interest." *Whole Woman's Health All. v. Hill*, 937 F.3d 864, 875 (7th Cir. 2019). Here, that means the public interest is served by ensuring IDOC's facilities uphold their constitutional responsibility to furnish class members with adequate medical care. This factor thus also weighs against a stay pending appeal. In short, each factor weighs against staying any portion of the Court's September 2025 injunction during the pendency of Defendants' appeal.

Defendants also ask the Court to stay "related actions, evidentiary hearings, and any other matters that will alter the *status quo* while the appeal to the Seventh Circuit Court of Appeals is pending." (Doc. 1024 p. 16). There is no basis for that relief.

Defendants' desire for appellate review is obvious. What is not obvious is that such review will be forthcoming at this juncture. Many courts have concluded that the expiration of a preliminary injunction after the 90-day period specified by section 3626 of the PLRA moots an appeal of that injunction. *See Smith v. Edwards*, 88 F.4th 1119, 1124 (5th Cir. 2023); *Banks v. Booth*, 3 F.4th 445, 449 (D.C. Cir. 2021); *Norbert v. City & Cnty. of San Francisco*, 10 F.4th 918, 926 (9th Cir. 2021); *United States v. Sec'y, Fla. Dep't of Corr.*, 778

F.3d 1223, 1229 (11th Cir. 2015); *see also Victory v. Berks Cnty.*, 789 F. App'x 328, 333 (3d Cir. 2019). The preliminary injunction in this case will expire on December 11, 2025. Therefore, even if the Court accepted Defendants' suggestion to stay the upcoming evidentiary hearing, it appears that their appeal of the preliminary injunction will shortly be moot. *See Smith*, 88 F.4th at 1124; *Banks*, 3 F.4th at 449.

Full appellate review of the matter is not so far off. A bench trial is scheduled for next July. (Doc. 1000). Plaintiffs have asked the Court to reissue the preliminary injunction, and an evidentiary hearing in support of that request is scheduled in two weeks. (Doc. 1028). Defendants may use that opportunity to put on evidence contesting whether such relief should issue and, in the event Plaintiffs prevail, arguments about what form it should take.

### CONCLUSION

For the reasons explained above, Defendants' motion for a stay pending appeal (Doc. 1024) is **DENIED**.

**IT IS SO ORDERED.**

**DATED:  November 24, 2025**

**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**