## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **JANIAH MONROE,[1]**<br>**MARILYN MELENDEZ,**<br>**LYDIA HELÉNA VISION,**<br>**SORA KUYKENDALL, and**<br>**SASHA REED, individually and on behalf**<br>**of a class of similarly situated individuals,** | |
| **Plaintiffs,** | |
| **v.** | **Case No. 3:18-CV-156-NJR** |
| **LAMENTA CONWAY,**<br>**MELVIN HINTON, and**<br>**LATOYA HUGHES,** | |
| **Defendants.** | |

## <u>MEMORANDUM AND ORDER</u>

**ROSENSTENGEL, Chief Judge:**

On September 12, 2025, the Court ordered preliminary injunctive relief (Docs. 1008, 1009), granting Plaintiffs' Motion for Preliminary Injunction Prohibiting Class Members from Living at Menard Correctional Center ("Menard"). (Docs. 873, 874). Pursuant to the Prisoner Litigation Reform Act ("PLRA"), that Order expires after 90 days, on December 11, 2025. 18 U.S.C. § 3626(a)(2). Plaintiffs moved for reissuance of the Preliminary Injunction (Doc. 1028), and the Court held an evidentiary hearing on December 8, 2025. After considering the evidence and applicable law, the Court **GRANTS** Plaintiffs' motion and orders preliminary injunctive relief as set forth below.

---

[1] The named Plaintiffs, and many members of the Plaintiff class, use chosen names reflecting their gender identity rather than their given names at birth, which may not match the name in IDOC records.

B<small>ACKGROUND</small>

The Court recounted the lengthy history of this litigation in its September 2025 Order and incorporates by reference that portion of its decision. (Doc. 1008).

This litigation was brought in January 2018 on behalf of a class of Plaintiffs, certified as "all prisoners in the custody of IDOC who have requested evaluation or treatment for gender dysphoria." (Doc. 213). The named Plaintiffs are transgender women currently incarcerated in Illinois Department of Corrections ("IDOC") facilities. The named Defendants are, respectively, the Acting IDOC Medical Director, IDOC Chief of Mental Health, and the IDOC Director, all sued in their official capacity.

Plaintiffs assert that Defendants' policies and practices subject the class to a substantial risk of serious harm and injury from inadequate and delayed evaluation and treatment of gender dysphoria, in violation of their rights under the Eighth Amendment, and they seek injunctive relief to remedy the flaws in IDOC's treatment of transgender inmates. (Doc. 1, pp. 36-38; Doc. 935).[2] The alleged problems include the IDOC's:

- use of committees comprised of unqualified officials to make decisions regarding the medical treatment, security, and placement of transgender inmates;

- widespread delays or denials in evaluating prisoners for gender dysphoria and in providing hormone therapy and hormone monitoring;

- failure to consider or provide gender-affirming surgery as part of medically necessary treatment for gender dysphoria;

- failure to accommodate and facilitate social transition for individuals with gender dysphoria, including lack of access to gender-affirming clothing and grooming items, failing to make individualized housing placement decisions, and permitting cross-gender strip searches; and

---

[2] Plaintiffs filed a supplemental complaint on May 15, 2024 (Doc. 935), to which Defendants responded at Doc. 968.

Page 2 of 33

- failing to provide access to medical and mental health providers competent to treat gender dysphoria.

The Court issued several rounds of injunctive relief to Plaintiffs during the initial phase of the litigation. On December 5, 2024, the Seventh Circuit Court of Appeals vacated the then-operative injunction, concluding it had expired 90 days after its issuance, pursuant to the Prison Litigation Reform Act ("PLRA"). *Monroe v. Bowman*, 122 F.4th 688 (7th Cir. 2024).

After the case returned to this Court, Plaintiffs filed a supplemental complaint, and the Court issued an amended scheduling order to govern the proceedings on remand. (Docs. 935, 1000). Plaintiffs also moved for a preliminary injunction requiring Defendants to transfer class members out of Menard Correctional Center, a maximum-security level prison, to another IDOC facility. (Docs. 873, 874). The Court held an evidentiary hearing on the motion from May 27-30, 2025, and heard testimony from 13 witnesses.

On September 12, 2025, the Court issued its decision granting Plaintiffs' motion and ordered several remedial measures. (Doc. 1009). First, Defendants were to file, under seal by September 19, 2025, a list of class members presently housed at Menard.[3] Second, Defendants were to transfer every class member residing at Menard to another facility by October 15, 2025.[4] The Court cautioned Defendants against transferring any class member to Pinckneyville Correctional Center in light of issues with that facility discussed in prior orders. (Doc. 680). Third, the Court directed Defendants to consider each class member's specific gender dysphoria condition, their gender identity, related safety issues, and whether a transfer to a facility matching their gender identity would be appropriate in assessing where

---

[3] Defendants complied with this directive at Doc. 1011-1 and Doc. 1013.
[4] Defendants submitted a list of 38 individuals who were transferred from Menard as of October 16, 2025 (Doc. 1025).

each class member would be transferred. Fourth, Defendants were to notify each class member of their new placement at least seven days before their transfer and provide an explanation of the reasons for the decision. A copy of each decision also was to be furnished to class counsel. Fifth, the Court barred Defendants from placing any class member at Menard going forward and instructed Defendants to assign class members to a different institution if they arrived at Menard through the intake process. If an individual housed at Menard later is identified as a class member, they must be transferred within 21 days. Sixth, if a class member is not moved to Logan Correctional Center (a women's facility) or another facility matching their gender identity, they must be permitted to submit a request to transfer to such a facility within 60 days of the initial transfer. Seventh, Defendants were to provide the Court and class counsel monthly reports on the status of class members housed at Menard and the timing and result of any transfer decisions. Finally, Defendants were to provide a status report regarding certain matters "in progress" as of the May 2025 evidentiary hearing, including the status of mental health staff vacancies at Menard.[5] The Court also announced that it would hold a subsequent evidentiary hearing within 90 days "to evaluate whether the above injunctive relief shall be extended." (Doc. 1008 p. 71). Plaintiffs moved to re-issue the injunction on October 24, 2025. (Doc. 1028). Defendants did not respond to that motion.

Defendants, however, did file an interlocutory appeal of the preliminary injunction on October 10, 2025 (Doc. 1006) and subsequently moved to stay portions of the September Order pending the appeal. (Doc. 1024). The Court denied the motion for a stay on November 24, 2025. (Doc. 1048).

---

[5] Defendants filed this report at Doc. 1011.

EVIDENTIARY HEARING

The following is a summary of the testimony given at the evidentiary hearing on

December 8, 2025.

  A. *Plaintiffs' Evidence*

  **1. A.R.[6]**

  A.R. testified via video from Pontiac Correctional Center, where they currently reside.

A.R. identifies as non-binary transgender and has a diagnosis of gender dysphoria. A.R. also

testified during the May evidentiary hearing. (Doc. 1008 pp. 24-26).

  According to A.R., conditions at Menard remained poor after the May hearing. At

times, A.R. missed scheduled hormone doses because the prison nurse failed to make the

pills available or because medication was handed out in the middle of the night. A.R.'s body

searches were conducted by male officers on every occasion except one between May and

September. If A.R. asked to be searched by a female officer, the male officers disregarded the

request and threatened them with mace.

  A.R. testified that a few group therapy sessions for transgender inmates occurred

between May and October. However, these sessions were not very effective because the time

was split among approximately 20 individuals, and prison guards sometimes came up with

excuses for why class members could not attend or would make participants late to the

sessions. The guards at Menard became more hostile after A.R. testified in May and would

refer to A.R. using derogatory names.

  A.R. was transferred to Pontiac in October as a result of the Court's Order. Although

---

[6] The Court will refer to the class member witnesses by their initials, as their testimony includes highly
sensitive personal health information. (*See* Order at Doc. 966, granting motion to redact transcripts).

Pontiac was not A.R.'s preferred choice, A.R. explained that conditions at that facility were better than at Menard. On the bus ride out of Menard, A.R. was in tears and felt like a dark cloud had lifted. A.R. stated that the Pontiac guards do not display the same level of hostility as the guards at Menard and treat class members humanely. A.R. also feels no need to be in protective custody at Pontiac.

However, the shift to Pontiac did not go without issue. The facility's mental health providers removed the transgender marker from A.R.'s identification card when they learned A.R. did not identify as homosexual and identified as nonbinary (both female and male at times). Consequently, A.R. has been unable to purchase gender-affirming items from the commissary, unable to attend group therapy sessions, and unable to request a search by a female officer. A.R. presently is not taking hormones because they conflict with their other medications. If IDOC required A.R. to return to Menard, A.R. stated that they would have to be placed on suicide watch.

### 2. J.D.

Like A.R., class member J.D. was transferred to Pontiac from Menard as a result of the Court's Order. J.D. identifies as a transgender woman and has a gender dysphoria diagnosis. J.D. also testified at the May hearing. (Doc. 1008 pp. 16-20).

J.D. reported that conditions at Menard remained difficult after the May hearing. She missed her hormone treatments on at least five occasions. Gender-affirming items like makeup remained unavailable at the commissary, only male guards would search her, and she had no access to private showers so she had to wash up in her cell.

On July 8, 2025, J.D. was assaulted by two male prisoners and sustained injuries to one of her eyes. The guards did not come to her aid; instead, they sprayed her with mace and

placed her in restrictive housing. J.D. filed several grievances after the incident. One alleged that a Lieutenant Dallas, an Internal Affairs officer, failed to investigate. J.D. also filed a grievance against the prison's warden because she was frustrated that her other grievances had all been denied.

J.D. observed male guards at Menard treat trans inmates disrespectfully by calling them slurs and making fun of their undergarments. J.D. said the trans inmates were treated worse than other prisoners.

J.D. has achieved hormone levels consistent with a cisgender woman. At Pontiac, the staff are more friendly than at Menard, and J.D. can access feminine items from the commissary. However, some issues remain. J.D. reported that Pontiac's mental health providers removed the transgender designation from the identification cards of several class members. One mental health provider told J.D. she did not believe in gender dysphoria. As a result, the transgender group therapy sessions have shrunk to around four individuals. And J.D. testified that her hormone injections are administered in front of male inmates, which makes her feel violated.

Nevertheless, J.D. made clear that life at Pontiac was preferable to Menard and stated she would become suicidal if forced to return.

### 3.  T.S.

T.S. is a transgender woman who was housed at Menard for approximately two-and-a-half to three years, before being transferred to Lawrence Correctional Center on October 14, 2025, pursuant to the September 12, 2025 preliminary injunction. T.S. also testified at the May 2025 evidentiary hearing. (Doc. 957 pp. 168-193; Doc. 1008 pp. 20-23). Focusing on the time at Menard from the May 2025 hearing to October 14, 2025, T.S. was strip-searched by

male officers two or three times a month despite her I.D. notation and requests to be searched by a female. If she requested a female officer, male staff sometimes announced they needed a woman, exposing T.S.'s identity to other inmates on the gallery, or told her to "man up." Waiting for a female guard caused T.S. to miss time with visitors or recreation time outside, so she did submit to searches by male officers.

On the day T.S. was transferred to Lawrence, she was searched using Menard's body scanner. This is normally monitored by one person, but on that occasion at least ten other male officers stood around in the room and verbally harassed T.S. and other transgender inmates, commenting on their genitals and gender identity during the scan. T.S. described this treatment as typical of the culture at Menard.

T.S. experienced many interruptions in hormone medication at Menard between May and October 2025. Oral medications were delayed, incomplete, or both. More than once, the medications ran out entirely a week or ten days before T.S. was scheduled for blood work to monitor hormone levels. This resulted in T.S.'s hormone levels being off the targeted levels, setting back her progress, affecting her eligibility for a transfer and surgery, and causing the doctor to question her compliance. The lapses in medication caused T.S. to experience stress, depression, self-harm, and loss of appetite. T.S. requested injectable hormones so their administration would be documented.

T.S. had access to a private shower while in segregation in May 2025, but had no access to a single shower from August 2025 on, after returning to general population in Menard's East House. T.S. requested to shower separately as officers were supposed to take class members to shower alone after they ran the group shower, but staff told her to either go with the group or don't shower. T.S. stopped asking for a private shower to avoid exposing her

transgender status to other inmates.

At Lawrence, T.S. feels human again and can finally breathe, in contrast to the degradation she experienced at Menard that made her feel less than human. T.S. is getting regular hormone medication, describing it as "100% improved" compared to Menard, except for a two- to three-week interruption before Menard officials forwarded T.S.'s medications and medical file.

### 4. L.J.

L.J. has been an IDOC prisoner since 2017; she was at Menard from February 2025 until being transferred to Lawrence on October 14, 2025. L.J. was diagnosed with gender dysphoria in 2014 while incarcerated at the Cook County Jail. On September 11, 2025, L.J. was placed in protective custody in West House. She was supposed to be single celled, but instead was celled with inmate Hinkle, who was physically much larger than her. Guards threatened L.J. with pepper spray if she did not go into the cell. L.J. told Hinkle she was transgender. Hinkle said he was okay with that, but during the night he pinned L.J. down and sexually assaulted her. The next day and for several days thereafter, L.J. sent a kite to the warden, tried to talk to other officers, requested a PREA call and a crisis team, and filed grievances, but was ignored. She was allowed to make a PREA call on September 13, 2025.

Hinkle tried to attack L.J. again on September 13, 2025, in view of officers, who refused her pleas to take her out of the cell. On September 14, 2025, Hinkle pushed L.J. up against the cell bars, wrapped a piece of bed sheet around her neck, and started choking her. Officers McDonald and Harriman came up to the cell, L.J. asked for help, and Hinkle ran to the back of the cell. McDonald grabbed the bed sheet still wrapped around L.J.'s neck, choked her, and twisted her nipples while yelling homophobic and racial slurs. L.J. passed out and the

officers left. L.J. suffered a swollen, bruised neck with marks still visible during the hearing

and on her IDOC photograph (Exhibit 15), as well as fractured wrists. She did not receive any

medical attention and remained in the cell with Hinkle.

L.J. was able to call PREA on September 17, 2025, and reported the above attacks. An

internal affairs officer documented L.J.'s injuries on that date and sent her to an outside

hospital. Before the hospital trip, L.J. was searched by a male officer despite female search

documentation on her I.D. and her request for a female officer.

L.J. was put in a different cell but was not given sheets, towels, soap, a bed, or any of

her property. The toilet and water didn't work. She remained in that cell until the transfer on

October 14, 2025. She had a call with PREA again on September 19, 2025, escorted by Officer

McDonald, despite rules that he was not supposed to be near her. McDonald threatened to

kill her, asking why she called PREA on him, using racial and transphobic slurs. Later,

McDonald came to L.J.'s cell to perform a shakedown and strip-searched her despite her

request for a woman to perform the strip search. McDonald again threatened to kill L.J. using

slurs. L.J. was able to call PREA on September 23, 2025, to report the incident. When L.J. was

preparing for the transfer, McDonald attacked her, choking her neck on the ligature mark,

twisting her nipple, calling her slurs, and telling L.J. he destroyed her television and property.

L.J. summarized these attacks in a grievance dated October 20, 2025, and filed at Lawrence

(Exhibit 14).

L.J. wore eye shadow and lipstick when she testified via video during the hearing. At

one point, the Court went off the record to address a problem with L.J.'s video monitor. A

female officer entered the room with L.J. to fix the problem and commented, "What the hell

do you have on your eyes?" L.J. wears makeup while in her cell but ordinarily does not when

out in the dayroom.

L.J. previously took hormones while in the Cook County Jail but stopped taking them

because of some adverse effects. She did not get regular mental health treatment at Menard,

often because correctional officers documented falsely that she refused it.

### 5. Warden Anthony Wills

Plaintiffs called Anthony Wills as an adverse witness. Wills has been warden of

Menard since 2020 and also testified at the May hearing. (Doc. 1008 pp. 33-39). He confirmed

that much of his prior testimony regarding his work at Menard remains true now. He still

oversees approximately 2,000 inmates and 800 staff, whom he does not have the authority to

hire or fire. He relies on staff to report issues to him and represented that he would not know

of any issues unless such reports were made. As was the case in May, Menard's West House

does not have video cameras.

Wills did not sit down with any of the transgender inmates who testified at the May

hearing to learn more about their experiences. Although he has read the declarations

submitted in connection with the May hearing regarding class members' experiences, he did

not speak directly with any staff members implicated. Wills confirmed that no staff have been

disciplined in connection with the incidents discussed previously but stated that

investigations remain ongoing.

Wills confirmed that he read the Court's September 2025 Order. He testified that he

has not mandated any additional trainings or enacted any new policies at the prison. He did

not speak with any inmates or staff about the grievances submitted as evidence in connection

with the December hearing. Since May, he has not issued any new administrative directives

regarding the care of transgender individuals. He also agreed that transgender prisoners could face a substantial amount of harassment at Menard.

When questioned by Defendants' counsel, Wills testified that more than 50 individuals at Menard have sought evaluation for gender dysphoria since the Court issued its Order in September. Before that time, only about 30 had sought that diagnosis. The majority of those seeking the diagnosis have been residents of West House, which houses approximately 400 inmates, split evenly between general population and those in protective custody. All of the inmates in West House who have requested evaluation were in protective custody. Individuals who request an evaluation for gender dysphoria are moved from Menard within 21 days, regardless of whether they meet with a mental health professional first. Wills does not decide where an individual will go when transferred out of Menard.

Wills did not agree with the assertion by several class members who testified that guards at Menard use mace as a substitute for mental health care. If that were the case, he said, he would have received more grievances.

Wills confirmed that Menard serves as an intake facility and as part of that process, prisoners will answer questions about whether they experience gender dysphoria. Wills explained that it is not the role of mental health staff at his facility to determine whether a report of gender dysphoria is legitimate but only to take the information and refer it to psychiatry and let psychiatric staff make the decision.

B. *Defendants' Evidence*

1. **Justin Hammers**

Hammers served as the IDOC Chief of Operations from January 1, 2022, through October 31, 2025. He continued to be employed on a contractual basis in the same role until

December 1, 2025, and then helped with the new Chief's transition. The Chief of Operations'
role is to formulate and implement policies and training for all the adult male facilities,
including policies on commissary for the transgender population, overseeing the transfer
coordinator's office ("TCO"), and managing the transportation of people in custody to
outside appointments. Hammers previously had worked closely with former Co-Monitor
julie graham.[7] He could not recall the last time he issued any bulletin or memo regarding
policies on transgender prisoners, but he had not issued any after September 2025.

IDOC houses roughly 30,000 prisoners. Transfers and other prisoner movements are
normally scheduled one to two weeks in advance. The number of buses is limited, and they
often break down. Normally, 200 to 300 prisoners are transferred each week, many of these
incoming from reception centers.

To implement the preliminary injunction requiring transfer of class members out of
Menard, IDOC decided to open a formerly vacant unit at Illinois River Correctional Center
(a medium-security facility) to house maximum security and restrictive housing prisoners.
This required additional staff. Hammers opined that using Illinois River is not a sustainable
long-term solution to accommodate transferees from Menard. The facility has been put on
lockdowns due to lack of staff, necessitating cancellation of programs and services. Lawrence
is the only appropriate facility to transfer class members from Menard who are in general
population. Pontiac is also maximum security but is primarily for individuals in restrictive
housing; they try not to house general population inmates there. Stateville Correctional

---

[7] In connection with earlier orders, the Court appointed two Special Masters/Co-Monitors, who provided
numerous reports regarding Defendants' compliance with the ordered injunctive relief beginning in late
2022. (Docs. 418, 423). After the Seventh Circuit vacated the prior injunctions, the Court relieved the Co-
Monitors of their appointments. (Doc. 867).

Center is closed except for the Northern Reception Center. Logan, in the women's division, currently houses maximum security prisoners and is under a separate Chief of the Women's Division. Hammers did not work with that individual to consider housing Menard class members at Logan.

Lawrence Correctional Center currently has no mental health professionals on staff. Illinois River has a good level of mental health staffing, which influenced the decision to open the maximum-security wing there.

### 2. Dr. William Puga

Dr. William Puga is the IDOC's Chief of Psychiatry and serves as co-chair of the Transgender Administrative Committee ("TAC"). He also testified at the May evidentiary hearing. (Doc. 1008 pp. 39-45).

Dr. Puga testified that there were approximately 20 to 22 class members housed in Menard before the Court ordered their transfer to other facilities in September. In the time since, an additional 42 individuals at Menard have requested treatment for gender dysphoria. Class members from Menard have been transferred to Pontiac, Lawrence, Illinois River, Western Illinois, and Joliet Inpatient Treatment Center. The Dixon facility generally has not been used because that facility is for inmates with higher level mental health needs, and a gender dysphoria diagnosis is not sufficient.

The procedure for an inmate to request evaluation for gender dysphoria is the same as it was at the time of the May hearing. A mental health provider, typically a master's level social worker, will conduct an initial evaluation and schedule the individual for a psychiatric evaluation. During the psychiatric evaluation, a provider will assess whether the individual has experienced feelings corresponding to six criteria for at least six months. Those criteria

include whether an individual feels uncomfortable with their genitalia or feels like they are
the opposite gender of their birth. An individual who satisfies at least two of the six criteria
qualifies for a gender dysphoria diagnosis.

Due to the Court's September Order, from the time an inmate requests an evaluation,
they must be assessed within 14 days because they need a seven day notice before they are
moved to another facility. IDOC cannot always complete an assessment for gender dysphoria
within those 14 days.

Pontiac asked Dr. Puga to evaluate a group of the class members transferred to that
facility because many did not fit the traditional criteria for gender dysphoria. His team
reviewed approximately 20 inmates who had been transferred there and determined that
only two to four of them met the criteria for gender dysphoria. Dr. Puga's testimony was
somewhat imprecise about whether the 20 individuals he evaluated were part of the initial
cohort who were transferred to Pontiac or were individuals who sought a gender dysphoria
diagnosis after the September Order and transferred subsequently.

Dr. Puga explained that many of IDOC's facilities have shortages of qualified mental
health care providers. Lawrence, for instance, only has a social worker and no other mental
health staff. There are supposed to be seven total providers at that prison. Menard has three
mental health professionals, one social worker, and two other mental health providers who
are not yet fully licensed. Full staffing at that facility would require ten mental health
professionals. Dr. Puga's testimony suggested that Pontiac has more mental health care
providers than Menard, but the exact figure was somewhat unclear. Menard and Pontiac both
have staff identified as transgender care coordinators; Lawrence does not. He did not specify
the responsibilities associated with that role.

Due to the system-wide staffing shortages, class members have been transferred to
facilities with fewer mental health resources than they had at Menard. Dr. Puga also reported
that IDOC had hired a Transgender Patient Advocate; that individual began work on
December 1, 2025 (a week before the hearing). Dr. Puga did not specify what that individual's
role will be.

In May, Dr. Puga testified that he hoped to update the administrative directive
containing the policy for handling the gender dysphoria and transgender population within
IDOC. (Doc. 1008 p. 43). That process remains incomplete (seven months later). Dr. Puga
stated that IDOC's legal department still is evaluating the updated policy. He was not certain
when the policy would be issued.

On cross examination, Dr. Puga admitted that he had not visited Menard since
January 2024. He added that he did not recall seeing the additional declarations from class
members submitted in conjunction with Plaintiffs' motion. And Dr. Puga acknowledged that
the letters he sent to class members as notice of their transfer failed to include any explanation
of the placement decision (or consideration of what the Court ordered to be assessed "in
determining where each class member will be transferred" as set out in paragraph 3 of the
September Order) and instead merely listed certain factors with no discussion.

### 3.  Michelle Malone

Michelle Malone has worked in the Transfer Coordinator's Office since January 2023,
as the assignment coordinator, and since March 2025, as an assistant program manager. She
normally handles disciplinary transfers and assists with medical, transgender, and mental
health transfers. She has experience handling transgender individuals' transfer requests and
working with the TAC committee since January 2023. For class members' transfer requests,

she and the TAC review each person's disciplinary record, transfer history, whether they are taking hormones, and previous transfer requests. After September 12, 2025, Malone was assigned to move class members out of Menard, resulting in about 70-80 percent of her time being devoted to transgender transfer issues.

Meeting the 21-day deadline to transfer class members from Menard has been a struggle. She gave the example of bus schedules conflicting with individuals' health appointments, so separate transportation to the new facility must be arranged with security escorts, putting a strain on staff.

About 64 individual class members have been moved from Menard so far, and the numbers increase weekly—to five or six the week of December 1, 2025, and so far, four requests for the current week. The majority of those leaving Menard are maximum security inmates. Individuals classified as maximum security ordinarily cannot request a transfer. Malone believes this case is allowing Menard inmates to seek a transfer to which they otherwise would not be entitled. There are only three maximum facilities in the state, and for Pontiac the person must be in restrictive housing or protective custody. Malone believed 11 Menard class members requested transfer to Logan, but none were transferred there. She has moved some prisoners out of Lawrence to Menard to make room for class members leaving Menard.

Malone disclosed that the recently opened Illinois River wing for restrictive housing will be closed again on December 17, 2025. As individuals' restrictive housing time ends, they can be placed in Lawrence general population. She did not know how many transgender inmates from Menard were moved to Illinois River.

LEGAL STANDARDS

A. *Injunctive Relief*

The Court's September 2025 preliminary injunction expires automatically 90 days after its entry, "unless the court makes the findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period." 18 U.S.C. § 3626(a)(2).

Notwithstanding that deadline, courts have concluded that "[n]othing in the [PLRA] limits the number of times a court may enter preliminary relief." *Mayweathers v. Newland*, 258 F.3d 930, 936 (9th Cir. 2001); *Alloway v. Hodge*, 72 F. App'x 812, 817 (10th Cir. 2003); *see also* Catherine T. Struve, *Allowing the Courts to Step in Where Needed: Applying the PLRA's 90-Day Limit on Preliminary Relief*, 19 U. St. Thomas L.J. 407, 425 (2023) (observing that "neither the text nor the legislative history of the PLRA compels the conclusion that Section 3626(a)(2) forecloses effective preliminary relief—as it would do, in some cases, if it actually closed off all possibility of preliminary relief past an initial 90-day limit."). Indeed, the Seventh Circuit, in its prior decision in this case, cited approvingly to the Ninth Circuit's holding in *Mayweathers. See Monroe*, 122 F.4th at 697 (citing *Mayweathers*, 258 F.3d at 936). And district courts in this circuit expressly have contemplated the issuance of successive preliminary injunctions. *See Peacher v. Conyers*, No. 20-02997, 2022 WL 499893, at *3 (S.D. Ind. Feb. 17, 2022) (noting that a party "may request that [the preliminary injunction] be renewed no later than 14 days before the injunction expires."); *Jackson v. Wexford of Indiana, LLC*, No. 19-03141, 2019 WL 5566442, at *3 (S.D. Ind. Oct. 29, 2019) (similar); *Farnam v. Walker*, 593 F. Supp. 2d 1000, 1004 (C.D. Ill. 2009) ("[N]othing in § 3626 prohibits the entry of successive orders for preliminary injunction if needed."). Thus, the Court concludes that the PLRA does not restrict

its authority to issue successive preliminary injunctions until the matter proceeds to trial on the merits.

Having established that the Court *can* issue a subsequent preliminary injunction, the burden falls to Plaintiffs to "continue to prove that preliminary relief is warranted." *Mayweathers*, 258 F.3d at 936. As the Seventh Circuit has cautioned, "new injunctive relief will need to address the current situation." *Monroe*, 122 F.4th at 697.

The parties, by now, are familiar with the standard governing the issuance of preliminary equitable relief. The moving party must demonstrate:

(1)    they are likely to succeed on the merits of their claims (a strong showing, not simply a mere possibility, but also not as strong as proof by a preponderance);

(2)    there is no adequate legal remedy; and

(3)    they are likely to suffer irreparable harm if injunctive relief is not granted before final resolution of the claims.

*Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *DM Trans, LLC v. Scott*, 38 F.4th 608, 617 (7th Cir. 2022).

If the moving party makes that showing, then the Court must balance the potential harm to the moving party if the preliminary injunction were wrongfully denied against the potential harm to the non-moving party if the injunction were wrongfully granted, and the Court must consider the effect, if any, on the public of granting or denying the injunction. *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 539 (7th Cir. 2021); *DM Trans, LLC v. Scott*, 38 F.4th 608, 622 (7th Cir. 2022).

The PLRA adds a component to the analysis. That statute requires any injunctive relief to be narrowly drawn, extend no further than necessary to correct the violation of a federal

right, and be the least intrusive means necessary to correct the violation. *Brown v. Plata*, 563 U.S. 493, 530 (2011); 18 U.S.C. § 3626(a)(2). Courts must give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and must respect principles of comity in tailoring the relief. *Id.*

B. *Eighth Amendment*

The Eighth Amendment prohibits cruel and unusual punishment and "imposes a duty upon states to provide adequate medical care to incarcerated individuals." *Boyce v. Moore,* 314 F.3d 884, 888-89 (7th Cir. 2002). Deliberate indifference to the "serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). Deliberate indifference has two elements. The first is whether the prisoner has an "objectively serious medical condition." *Arnett v. Webster,* 658 F.3d 742, 750 (7th Cir. 2011); *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). The second element requires a showing that a prison official has subjective knowledge of—and then consciously disregards—an excessive risk to inmate health. *Greeno,* 414 F.3d at 653; *see also Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). Deliberate indifference involves "intentional or reckless conduct, not mere negligence." *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010).

Plaintiffs' original and supplemental complaints allege pervasive deficiencies in delivery of medically necessary care and treatment on a systemic, statewide level in IDOC correctional institutions. *See, e.g., Wellman v. Faulkner,* 715 F.2d 269, 272 (7th Cir. 1983); *Cleveland–Perdue v. Brutsche,* 881 F.2d 427, 430–31 (7th Cir. 1989) (recognizing claims of systemic health care deficiencies as a distinct category of deliberate indifference claims, as opposed to one based on "isolated instances of indifference to a particular inmate's medical

needs"). Plaintiffs' prior motion for injunctive relief claimed that class members at Menard are experiencing, and being harmed by, these deficiencies to an extreme degree, and the present motion alleges that these conditions have persisted.

In this context, deliberate indifference can be demonstrated by "proving there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care[,]" or by showing "repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff" that result in an excessive risk of serious harm. *Wellman*, 715 F.2d at 272; *Ollison v. Gossett*, 136 F.4th 729, 736 (7th Cir. 2025); *see also Rasho v. Jeffreys*, 22 F. 4th 703, 710 (7th Cir. 2022) (explaining that "persistence in a course of action known to be ineffective" can support an inference of deliberate indifference) (citing *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662–63 (7th Cir. 2016); *Phillips v. Sheriff of Cook Cnty.*, 828 F.3d 541, 554 (7th Cir. 2016)).

DISCUSSION

A. *Jurisdiction*

Before proceeding further, the Court must consider whether Defendants' interlocutory appeal of the September 2025 preliminary injunction—which remains pending before the Seventh Circuit—deprives it of jurisdiction to grant relief. *See Monroe v. Bowman*, No. 25-2803 (7th Cir.).

"The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982). However, that rule has several exceptions, "perhaps the foremost of which is that an appeal taken from an interlocutory decision does not prevent the district court from

finishing its work and rendering a final decision." *Wisconsin Mut. Ins. Co. v. United States*, 441 F.3d 502, 504 (7th Cir. 2006). Courts have interpreted the scope of this authority to include managing equitable relief while an appeal of a preliminary injunction is pending. *Kusay v. United States*, 62 F.3d 192, 194 (7th Cir. 1995) ("A district court . . . may consider whether to grant permanent injunctive relief while an appeal from a preliminary injunction is pending."); *Chrysler Motors Corp. v. Int'l Union, Allied Indus. Workers of Am., AFL-CIO*, 909 F.2d 248, 250 (7th Cir. 1990) (holding that an interlocutory appeal of a district court's injunction did not divest the court of jurisdiction to assess whether an employer had violated the injunction, which had not been stayed pending appeal).

This exception is embodied in Federal Rule of Civil Procedure 62(d) (formerly designated as Rule 62(c)), which permits the Court to "suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights" while an appeal of that injunction is pending. Fed. R. Civ. P. 62(d). By its plain terms, the rule grants the Court considerable authority to conduct proceedings related to equitable relief during the pendency of an appeal. As commentators observe, however, the scope of the rule has been "restricted by a gloss that limits the district court to acts designed to 'preserve the status quo.'" 16 *Wright & Miller's Federal Practice & Procedure* § 3921.2 (3d. ed.).

That proposition has been echoed by the Seventh Circuit. *See Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 384 (7th Cir. 2018) ("The civil rules allow the district court to modify an injunction to maintain the status quo pending appeal."); *Rakovich v. Wade*, 834 F.2d 673, 674 (7th Cir. 1987) (recognizing that district courts "retain[] the power throughout the pendency of the appeal to simply preserve the *status quo* by granting a stay of its judgment"). And district courts in this circuit have concluded similarly. *See City of Chicago v. Sessions*, 321

F. Supp. 3d 855, 881 (N.D. Ill. 2018) ("[T]he weight of practice and respect for both judicial efficacy and higher authorities dictate that district courts should use such power only in a manner that preserves the status quo and thus the integrity of the appeal."); *Duthie v. Matria Healthcare, Inc.*, 543 F. Supp. 2d 958, 960 (N.D. Ill. 2008) (similar); *S & S Sales Corp. v. Marvin Lumber & Cedar Co.*, 457 F. Supp. 2d 903, 906 (E.D. Wis. 2006) ("Construed narrowly, [Rule 62(d)] only authorizes district courts to issue orders designed to preserve the status quo or, perhaps somewhat more liberally, to preserve the integrity of the case on appeal.").

As it applies here, the question is whether re-issuing a preliminary injunction during the pendency of an appeal from a preliminary injunction that has expired under the PLRA's 90-day limitation would preserve the status quo. The Court concludes that a re-issuance would do so. First, re-issuing the injunction preserves the status quo for the class members while the court of appeals evaluates Defendants' challenge to the injunction. *See Mayweathers*, 258 F.3d at 935. Second, re-issuing the injunction would preserve the Seventh Circuit's jurisdiction. As this Court observed in its Order denying Defendants' motion to stay the September injunction pending appeal, that appeal likely will be rendered moot by the injunction's automatic expiration. *See Monroe v. Bowman*, No. 3:18-CV-00156-NJR, 2025 WL 3267798, at *7 (S.D. Ill. Nov. 24, 2025). Should Defendants seek appellate review of a re-issued injunction, the Court of Appeals could consolidate the new appeal with the prior appeal and maintain jurisdiction to review Defendants' appeal. *See* Struve, *supra*, at 432.

B. *Are Plaintiffs Entitled to Injunctive Relief?*

In its September Order, the Court concluded Plaintiffs were entitled to preliminary relief because they had established a likelihood of success on their Eighth Amendment claim, were subject to irreparable harm, and the equities favored relief. For that reason, the Court

ordered the transfer of class members out of Menard. Plaintiffs now seek the continuation of that relief for an additional 90 days, but to prevail they must "continue to prove that preliminary relief is warranted." *Mayweathers*, 258 F.3d at 936. That burden forces Plaintiffs into the somewhat strange task of demonstrating current conditions at Menard remain constitutionally deficient when few, if any, class members presently reside there. Nevertheless, the Court concludes the evidence adduced by Plaintiffs during the recent hearing is more than sufficient to justify continued relief.

Initially, Plaintiffs have demonstrated that they are likely to succeed on the merits of their claim that prison officials were deliberately indifferent to their medical needs. Defendants conceded early in this case that Plaintiffs' gender dysphoria is a serious medical condition. (Doc. 186 pp. 29-30). The present motion focuses on the alleged serious, pervasive, and longstanding mistreatment of those members of the Plaintiff class who were, are, or may be held at Menard. Over the history of this case, Defendants have been well informed of the harms experienced by class members at Menard (and elsewhere) when their treatment for gender dysphoria, including medical treatment and necessary social transition, has been denied, delayed, or both. The persistence and pervasiveness of these unconstitutional conditions, particularly at Menard, indicates deliberate indifference by the responsible officials.

Although the precise number of individuals transferred from Menard as a result of this Court's Order is somewhat unclear, Dr. Puga testified that approximately 20 individuals at Menard were identified as class members at the time the Court issued its Order in September, and approximately 40 additional class members have been identified and transferred since that time. During the hearing, Plaintiffs put on evidence from four class

members who were housed at Menard as recently as mid-October—A.R., J.D., L.J., and T.S. Each recounted in detail how the conditions at Menard remained problematic—to put it mildly—after the May evidentiary hearing, and the Court finds their testimony credible.

To start, class members described repeatedly missing dosages of medically necessary hormone treatment because the medication either was unavailable or not provided by the facility's medical staff. Group therapy to address the class members' gender dysphoria was sporadic at best, as sessions frequently were canceled. A.R. testified that even when the sessions did occur, prison guards would come up with excuses why they could not attend or make participants late.

Nor could class members address their gender dysphoria by transitioning socially. The testimony established that gender-affirming items were not available to purchase from the commissary. Each class member who testified noted that male correctional staff persisted in conducting body searches even when they requested the search be conducted by a female officer, and private showers were not available.

Perhaps most problematic, Plaintiffs' witnesses universally described a culture of disrespect, harassment, and violence by Menard correctional officers that encourages the same mistreatment by fellow prisoners. This mistreatment ranged from disrespectful comments about class members' bodies and clothing choices to the use of anti-trans slurs by guards and fellow inmates alike. And it escalated, regrettably, to violent assaults. J.D., for instance, described being assaulted by fellow inmates. Her grievances resulting from the incident went unaddressed, and she was placed in restrictive housing. L.J. testified that she was assaulted on multiple occasions by a prison guard, leaving a visible ligature mark around her neck and resulting in her hospitalization. Defendants did not put on *any* evidence refuting

these incidents. In fact, Warden Wills testified that he would not be surprised that class members faced substantial harassment at Menard.

Although Plaintiffs' witnesses have not resided at Menard for nearly two months, the Court considers their testimony persuasive evidence of present conditions. That is so because Defendants' witnesses all but admitted that little at Menard had changed since the May hearing. In fact, the evidence suggested remarkably little action by Defendants on any of the issues made plain by the May hearing, constituting persuasive evidence of deliberate indifference. Warden Wills testified that he did not speak with any class members after the May hearing and has not spoken with any correctional staff members who were implicated by testimony at that time. Apparently, investigations remain ongoing, but Wills offered little detail. Nor has Wills mandated additional trainings, enacted any new policies, or issued any administrative directives regarding the care of transgender individuals at Menard. Besides assuring compliance with the Court's September Order to transfer class members, he could not point to any action he had taken since the May hearing to improve the treatment of transgender individuals housed at Menard.

Likewise, Dr. Puga's testimony made clear that there has yet to be sufficient progress in improving the provision of medical and mental health services to class members at Menard. Full staffing at Menard would require ten mental health staff. The facility presently has three, along with two additional individuals who are not yet fully certified. Dr. Puga and Chief Hammers both testified that the situation is worse at several other facilities and apparently is particularly acute at Lawrence, which is supposed to have seven full-time providers but presently has none, and care is managed by a single social worker. Those revelations are concerning, but the poor conditions at other facilities are not a persuasive

reason to deny relief to class members at Menard. In any event, access to mental health services is only part of the story. Class members T.S. and L.J. were transferred to Lawrence from Menard and both testified that conditions at Lawrence were far better. T.S. stated that she timely receives hormones, is able to access feminine commissary items, and can shower in private. L.J., who had been assaulted at Menard, agreed that conditions at Lawrence were preferable (even though the Court witnessed an offhand harassing comment by a female corrections officer during the recent hearing).

Dr. Puga did testify that Menard has had a "transgender coordinator" on staff since April or May, but he offered little explanation for what that individual's role was or how she had been addressing issues identified during the May hearing. Similarly, although it is a welcome sign that IDOC has hired a transgender patient advocate, it is far from clear that the individual, with little more than a week under their belt, is prepared to tackle the scale of the challenges at Menard. Dr. Puga, for his part, has not visited Menard in nearly two years, so the Court does not find that his testimony sheds much light on present conditions at the facility.

To the contrary, the evidence at the hearing amply demonstrated that conditions at Menard remain substantially the same as they were in May. Put simply, the facility does not allow class members to safely seek treatment for their gender dysphoria as is their right under the Eighth Amendment. And despite IDOC officials being aware of the deficiencies, little, if anything, has been done. For these reasons, the Court concludes Plaintiffs likely will succeed on their Eighth Amendment claim.

Little need be said about the remaining factors. As was the case previously, "[t]here is no adequate remedy at law to compensate for the ongoing risks to Menard class members'

medical needs, mental health, and physical safety, so long as they remain incarcerated under the conditions prevailing in that institution." (Doc. 1008 p. 68). Indeed, multiple class members testified that they would become suicidal if forced to return to Menard. *Cf. Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1046 (7th Cir. 2017) (concluding a transgender plaintiff had no adequate remedy at law where he challenged a school policy that caused him to contemplate suicide). Any newly identified class members forced to endure the conditions prevailing at Menard likewise could not be adequately compensated at law for the mistreatment Plaintiffs have demonstrated is nearly certain to occur.

Turning to the balance of equities, a denial of injunctive relief would cause serious and irreparable harm to class members. In contrast, the potential harm to Defendants if the injunction were reissued is far less. As the Court observed in its prior Order, Menard is not the only maximum-security level facility within IDOC, and some class members may qualify for placement at lower-level facilities. (Doc. 1008 p. 68). Chief Hammers and Ms. Malone both testified that finding suitable alternative facilities for class members has proved challenging. By all appearances, however, IDOC has managed successfully, and Defendants do not explain how maintaining the status quo with respect to inmates already transferred out of Menard, and others still at Menard who may qualify for transfer, would cause irreparable harm. The Court is aware of Defendants' concern regarding the burden of continuously undertaking transfers for newly identified class members. The evidence was somewhat equivocal about the scale of the hardship: finding a proper placement for an inmate doubtless is challenging given constrained resources, but Chief Hammers testified that IDOC completes between 200 and 300 inmate transfers each week in the normal course. Ms. Malone, who is

responsible for transfer placements of class members, testified that only four to six class members regularly were identified at Menard each week. Compared to the scale of IDOC's regular operation, the burden of compliance seems relatively minor. *Cf. Howe v. Hughes*, 74 F.4th 849, 858-59 (7th Cir. 2023) ("[T]he state may not continue to rely on cost and logistical difficulties to evade its constitutional obligations. The PLRA does not shield states from unwanted expenditures necessary to comply with constitutional mandates."). In any event, the issue likely will be ameliorated by the Court's modification to the injunction discussed below.

Finally, the Court concludes that continuing the injunctive relief ordered previously, with certain modifications, satisfies the PLRA's requirement that the relief "be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). In light of the substantial evidence regarding the pervasive problems faced by class members at Menard, which have not improved since the prior Order, continuing to preclude Defendants from housing class members there (subject to the minor modification discussed below) remains the narrowest, least intrusive solution available. The Court did not mandate where any particular inmate be placed, leaving substantial discretion with IDOC to make an appropriate choice. Defendants also have never explained how any of the prior injunction's other provisions were unduly burdensome.

It also merits observation that Defendants did not file a brief in opposition to Plaintiffs' motion to re-issue the preliminary injunction and have provided little feedback on the form any relief should take. At the conclusion of the evidentiary hearing, the Court directed each side to submit memoranda detailing, among other issues, "how Paragraph 5 of the prior

injunction should be modified if the Court re-issues the injunction." (Doc. 1064 p. 2).
Defendants' submission entirely fails to address that issue. The Court understands
Defendants do not bear the burden of showing an order violates the PLRA, but their litigation
choices lead the Court to question the depth of their concern regarding the scope of this
preliminary relief.

The Court is gravely concerned to hear from class members transferred to Pontiac that
mental health providers there have questioned or outright reversed some individuals'
longstanding confirmed diagnoses of gender dysphoria, and as a result, ended their access
to gender affirming treatment specified in the IDOC's Administrative Directive (such as the
ability to specify the gender of the person conducting a body search, access to female
commissary items). The Court hopes that Defendants will take notice of and address these
concerns.

Having concluded, based on the evidence presented on December 8, 2025, that the
preliminary injunction prohibiting class members from being housed at Menard should be
reissued to prevent irreparable harm to class members, the Court now considers modification
of the specific relief ordered in September 2025. *See* Fed. R. Civ. P. 62(d).

Defendants have complied with the deadlines in paragraphs 1, 2, and 8 of the Order
for preliminary injunctive relief (producing a list of class members by September 19, 2025;
transferring those class members to other facilities by October 15, 2025; and updating
progress on filling mental health vacancies and PRISM transfers by September 19, 2025) (*See*
Docs. 1011, 1011-1, 1013, 1025). Therefore, paragraphs 1 and 8 will be omitted from the relief
ordered below; paragraph 2 will be included but a deadline now is unnecessary. New
individuals continue to request evaluation for gender dysphoria at Menard, new intakes or

other individuals later identified as class members there may qualify for a transfer, and

documenting disclosure regarding Menard class members continues to be appropriate.

Therefore, the provisions set forth in paragraphs 2-7 of Docs. 1008 and 1009 are still necessary.

The Court remains satisfied that these remedies satisfy the narrow-tailoring requirement of

the PLRA, are necessary to safeguard class members' right to constitutionally adequate

treatment for the serious medical condition of gender dysphoria, and preserve Defendants'

discretion and flexibility to determine placement of class members in institutions other than

Menard.

However, because of Defendants' concern regarding the potential problems created

by Paragraph 5, which ties an entitlement to transfer to an individual's request for a gender

dysphoria diagnosis rather than a confirmed diagnosis, the Court will modify that provision.

The modification does not expand the relief originally ordered but provides Defendants more

time to evaluate and implement transfers and is consistent with IDOC's own policy regarding

the timing of evaluations for gender dysphoria.

The Court **ORDERS** as follows:

1. (former paragraph 2)[8] Defendants shall transfer any class member housed at Menard
   to another facility in accordance with the provisions below. Defendants shall take into
   consideration the individual's preference(s) as to the location of the transfer, but
   Defendants will make the final decision. Given the Court's previous Order
   transferring class members out of Pinckneyville Correctional Center (Doc. 680), the
   Court cautions that class members not be transferred to Pinckneyville, to avoid
   recurrence of the issues that came to light there.

2. (former paragraph 3) In determining where each class member will be transferred,
   Defendants shall consider the individual's gender dysphoria condition (including
   related mental health considerations), gender identity, related safety issues, and
   whether a transfer to a facility matching the individual's gender identity is
   appropriate. Defendants shall also consider the transfer criteria they previously

---

[8] See Preliminary Injunction dated September 12, 2025 (Doc. 1009) for each reference to "former paragraph".

described to this Court (*See* Doc. 680, p. 31; Doc. 668, pp. 23-24) including: the length of time before the individual is eligible for release on MSR; their security level; any medical/mental health issues; any substance abuse issues; any security threat group issues; any enemy/KSF issues; any protective custody needs; the individual's previous adjustment at other facilities; the nature of the individual's commitment; the individual's vulnerable status; and whether the individual meets the criteria for the requested facility.

3. (former paragraph 4) Defendants shall notify each individual class member of their new placement in writing, at least **seven days** in advance of the physical transfer, stating where the individual will be moved. The notice shall explain the reason(s) for the placement/transfer decision *and the consideration of each of the above criteria*. A copy of each decision shall be simultaneously forwarded to class counsel.

4. (former paragraph 5) Going forward, no individual already identified as a member of the Plaintiff class shall be transferred to Menard. If a person arrives at Menard through the reception and classification process (intake) and is recognized by IDOC as a class member as part of IDOC's standard evaluation process, that class member shall not be assigned to Menard as their permanent institution. If an individual already housed at Menard requests an evaluation for gender dysphoria, IDOC shall conduct the requested evaluation within **seven working days**[9] and confirm such diagnosis in its sole discretion within **14 days** of the evaluation. Each person who is confirmed with a gender dysphoria diagnosis shall be transferred to a different facility within **21 days** of such confirmation. (See IDOC Administrative Directive No. 04.03.104, eff. 4/1/2021).

5. (former paragraph 6) Any class member transferred from Menard who is not moved to Logan or another facility matching their gender identity shall be allowed to submit a transfer request to Logan or another facility matching their gender identity within **60 days** of their initial transfer.

6. (former paragraph 7) Defendants shall provide to the Court and to Plaintiffs' counsel a monthly report, **by the last day of each month**, of the status of any known class member currently housed at Menard, including the timing and result of any pending, upcoming, or concluded transfer decisions. Defendants also shall produce to Plaintiffs' counsel each month, **by the last day of the month**, all documentation related to class members at Menard including transfer requests, grievances, PREA complaints and investigations, TAC notes, and medical and mental health records including documentation of hormone levels for those on such therapy.

---

[9] The seven "working days" deadline is IDOC's policy as provided in A.D. No. 04.03.104, "Evaluation, Treatment, and Correctional Management of Transgender Offenders." All other deadlines in this Order refer to calendar days.

Pursuant to *MillerCoors LLC v. Anheuser-Busch Companies, LLC*, 940 F.3d 922 (7th Cir. 2019), the Court will enter the terms of the preliminary injunctive relief set forth above in a separate document.

If Plaintiffs seek a re-issuance of this injunction, they must file a motion no later than **28 days** before this Order expires. The motion must certify that Plaintiffs have conferred with Defendants regarding the possibility of a stipulated order that would endure through the conclusion of trial on the merits. The conference must be held sufficiently in advance of filing the motion to allow a good faith exchange aimed at resolving the matter. A conference is not an email exchange. If a stipulation is not possible, the Court will schedule an evidentiary hearing on the motion and schedule deadlines by which evidence and a list of witnesses must be furnished to the Court.

**IT IS SO ORDERED.**

**DATED:  December 11, 2025**

**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**