UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELÉNA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>LATOYA HUGES et al.,<br><br>Defendants. | Civil No. 3:18-cv-00156-NJR |

**PLAINTIFFS' MOTION TO COMPEL DOCUMENTS RESPONSIVE TO THEIR FOURTH SET OF REQUESTS FOR PRODUCTION AND <u>FOR A NEW ESI ORDER</u>**

This case is eight years old. The class members continue to suffer, as the Court heard yet again, barely two months ago, at the Menard evidentiary hearing. Plaintiffs have nonetheless been forced to push back the case schedule multiple times because Defendants have refused to produce documents in a timely manner (*see* Dkt. 1074, 1090). Even now, with a fact discovery deadline of April 3, unless the Court orders Defendants to fulfill the most basic discovery obligations, Plaintiffs will be significantly prejudiced, including in their ability to take effective depositions of Defendants' witnesses. These problems are compounded by the fact that Defendants refuse to produce documents in an orderly and comprehensible manner, in violation of the rules and the 2018 ESI order. Common sense changes are needed to this order as well, but Defendants have refused to negotiate an updated ESI protocol. For these reasons, Plaintiffs have no choice but to move for an order compelling discovery under Fed. R. Civ. P. 37(a) and for a new ESI protocol.

1

Plaintiffs served the requests for production at issue here—their Fourth Set of Requests for Production to Defendants ("Fourth Requests," attached as Exhibit 1)—on September 26, 2025. Defendants produced the first documents responsive to these Requests on November 3, 2025—a meager 3,000 pages with no discovery index, along with a raft of generic objections. A second production on November 25 was some 7,000 pages, again with no discovery index, of which 4,000 *were a single pdf*—a veritable pdf scroll—of grievances from class members formerly placed at Menard. This scroll aside, the records in these two productions primarily consisted of records pertaining to the named plaintiffs, since Defendants maintained their legally unsupportable position that discovery in this case with a certified class should be limited to the class representatives.

On December 19, 2025, almost three months after the Requests were served, Defendants finally produced some email communications. These were produced in pdf and without an index, though Plaintiffs had repeatedly asked for electronic documents in native format, and had also sent a proposed revised ESI protocol to defendants in September—a document defendants simply ignored. These pdf-ed emails (some 14,000 pages) consisted almost entirely of communications between Defendants' personnel and the two former monitors, Dr. Amanda Harris and julie graham, and their production demonstrated two things: (1) at 13,000 pages, Defendants are quite capable of finding and producing sizable quantities of electronic communications, but (2) Defendants' determination—relying on the outdated 2018 ESI protocol—to convert electronic documents into pdfs before production only causes more delay (these remain the *only* emails produced to date, although many of the Fourth Requests seek them). It also makes the review and sorting of these documents needlessly burdensome.

On February 3, 2026, more than four months after the Fourth Requests were served, and after much back and forth between the parties, Defendants finally produced some medical and mental health records relating to class members who are not named plaintiffs—some 60,000 pages pertaining to some 65-70 class members, less than 25% of the class. *See* Dkt. 968 at 10 (as of April 2, 2025, according to Defendants' records the transgender population included approximately 290 prisoners in 33 prisons in Illinois). Defendants finally included a limited index which listed Bates for documents and the file names of pdfs (e.g., "Xerox Scan_01212026004035.pdf"), but they were not labeled to correspond to categories in the request for discovery. This production does not show Defendants' willingness or capacity to comply with their discovery obligations absent a court order—quite the contrary. It only arrived after Plaintiffs had sent last ditch communications indicating their intention to file this motion. Not only do these records pertain to less than a quarter of the class, it is impossible to tell whether they are complete records for these individuals. Even if they are, at this pace of production, class member health records will be completely produced sometime in 2027.

Persuasion and negotiation have failed to move Defendants. There have been many unproductive meet and confers and many emails. In these discussions, Defendants have continued to point to the Menard-related records they continue to produce—which they were *under orders* to produce. Only an order will move this case forward.

### **Legal standard**

"Federal Rule of Civil Procedure 26(b)(1) allows parties to 'obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense,' and public policy favors disclosure of relevant materials." *Reed v. Solvay Fluorides LLC*, 2025 WL 26774, at *1 (S.D. Ill. Jan. 3, 2025) (Rosenstengel, J.) (citation omitted). If the party from whom the documents are requested objects to their production, that party has the burden to show why a

3

discovery request is improper. *See* Rule 34(b); *Gile v. United Airlines, Inc.,* 95 F.3d 492, 495 (7th Cir. 1996); *In re Sulfuric Acid Antitrust Litigation,* 231 F.R.D. 331, 337 (N.D. Ill. 2005). That "burden cannot be met by a reflexive invocation of 'the same baseless, often abused litany' that the requested discovery is 'vague, ambiguous, overly broad, unduly burdensome' or that it is 'neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.' Despite court's repeated admonitions that these sorts of 'boilerplate' objections are ineffectual, their use continues unabated, with . . . needless imposition of costs on the opposing party." *Burkybile v. Mitsubishi Motors Corp.*, No. 04 C 4932, 2006 WL 2325506, at *6 (N.D. Ill. Aug. 2, 2006) (quoting *Swift v. First USA Bank,* No. 98-8238, 1999 WL 1212561 (N.D. Ill. Dec.15, 1999)).

When producing documents, "a blanket 'dump' of documents is deficient under Rule 34." *Alford v. Aaron Rents, Inc.*, No. 3:08-CV-683 MJR-DGW, 2010 WL 2765260, at *22 (S.D. Ill. May 17, 2010), *report and recommendation adopted in part*, No. 08-CV-683MJR, 2010 WL 2720798 (S.D. Ill. July 8, 2010) (citation omitted). "A party must produce documents as they are kept in the in the usual course of business or must organize and label them to correspond to categories in the request." Fed. R. Civ. P. 34(E)(i). If documents are produced, the party must include "any indices or other tool to guide … [the opposing party] to the responsive documents." *Id.* Without an index or sufficient guidance, there is a burden on the recipient of discovery. *Id.*

Finally, it is the duty of parties to engage in good faith discussions about discovery: "A party that steadfastly maintains a position without support is not engaging in a good faith discussion." *Gunn v. Stevens Sec. & Training Servs., Inc.*, No. 17 C 6314, 2018 WL 1737518, at *3 (N.D. Ill. Apr. 11, 2018). Evasion is not permitted. For the purposes of Rule 37(a), "an

evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond." Fed. R. Civ. P. 37(a)(4)

### I.   Plaintiffs' efforts to obtain class members' health records and other non-ESI records were stymied by Defendants' delays and baseless legal positions.

On August 21, 2025, the Court entered an amended scheduling order for this case with a fact discovery cut-off of December 23, 2025. Dkt. 1000. On September 3, at Plaintiffs' request, the parties had a meet and confer to discuss the contours of discovery going forward, including supplementing initial disclosures and serving new written discovery requests. (As described below, the parties' meet and confers also addressed ESI issues, but those will be separately discussed.) On September 26, Plaintiffs served the Fourth Requests (Exh.1). Among the documents sought—which Plaintiffs urgently need to keep this case on track and prepare for trial—are the "documents and communications relating to medical evaluation and treatment provided to persons in IDOC custody for gender dysphoria," including records relating to hormone treatment and surgeries (Request 1); "records relating to mental health evaluation and treatment for gender dysphoria provided to persons in IDOC custody" (Request 2); "documentation or communications of complaints or concerns raised by IDOC prisoners or any IDOC or vendor staff relating to any issues concerning any prisoner's gender identity or gender dysphoria," including grievances and PREA complaints, responses to same, as well as documents relating to any investigations of these (Request 4). Other requests seek policy and procedure documents, training materials, and documents showing the qualifications to treat gender dysphoria of the healthcare personnel working within IDOC, which have proven important over the life of this case (Requests 18-22). The Fourth Requests sought documents dating back to

February 7, 2022, the date of the Court's comprehensive opinion and order issued because of the trial in August 2021 (Dkt. 383, 384).

On October 23, 2025, Defendants' counsel reached out by email to request a one-week extension with respect to the Fourth Requests, stating that Defendants believed that "some of what is being requested has been produced prior to the last evidentiary hearing" but also that "we are working with the client to *complete our production* and responses and should be able to start producing materials in short order . . ." (10/23/25 A. Vaidya email, attached as Exhibit 2; emphasis added).

On October 30, 2025, Defendants' counsel reached out once again, this time to say that "Defendants intend to begin a rolling production on Monday with respect to Plaintiffs' Fourth Request to Produce" but also to request a meet and confer, stating that, "*With an eye towards completing production*, I wanted to check your availability to meet and confer on the scope of the production . . ." (10/30/25 A. Vaidya email, attached as Exhibit 3; emphasis added.)

On November 3, 2025, Defendants produced the approximately 3,000 pages relating almost exclusively to the named plaintiffs and served their Responses and Objections to the Fourth Requests. (Defendants' Responses and Objections to Plaintiffs' Fourth Set of Requests for Production attached as Exhibit 4.) Defendants' Responses (44 pages) made repetitious, generic objections to all of plaintiffs' definitions and requests: vagueness, ambiguity, breadth, and burden (*id.*, *passim*). They also objected to the time frame of requested discovery on the basis that only "current conditions" were relevant (*id*. at 2, 12, 14, 16-18, 21, 23-24, 27, 30, 32, 34-35, 37-38, 40-41, 43), and to producing documents relating to all class members on the basis that the request was "not limited to Plaintiff Class Representatives and therefore not reasonable in scope" (*id*. at 7-12, 15, 17, 19, 25, 29, 36, 39, 41-42).

Defendants failed to meet their burden to articulate any specific and legally sound objections to producing responsive documents. Defendants' generic boilerplate objections without any specific information are impermissible under Rule 34. *Giles,* 95 F.3d at 495; *see also, Burkybile,* 2006 WL 2325506 at *6-7 (overruling boilerplate objections and granting motion to compel). Their substantive legal positions, that they should only produce documents about "current conditions" and named plaintiffs, are insupportable and have already been rejected by the Court. As the Court has noted, the Seventh Circuit itself said in remanding this case that although new injunctive relief would have to be directed at current conditions, "The district court need not forget what has happened in the last six years of litigation . . ." *Monroe v. Bowman*, 122 F.4th 688, 697 (7th Cir. 2024); Dkt. 1008 at 63. This is aligned with the law of deliberate indifference which—as the Court has also explained—can be proven by "repeated examples of negligent acts which disclose a pattern of conduct" by prison officials, or "persistence in a course of action known to be ineffective." Dkt. 1008 at 60 (citations, quotations omitted). Similarly, Defendants' argument that only the class representatives' medical treatment is relevant has no legal support because the class is certified, as the Court has also explained to Defendants. *See* Dkt. 1048 at 13-14.

Finally, Defendants objected to a number of the "communications" requests and requests for IDOC policies and procedures and training materials as "protected by deliberate [sic] process privilege," by citing a Fifth Circuit case which reportedly observes that "if consultant hired to advise the agency that hired the consultant, the consultant functions as an employee would be expected to do" (*id*. at 26, 28, 31, 33, 36). The "deliberative process" privilege is not recognized by Illinois law. *People ex rel. Birkett v. City of Chicago*, 184 Ill.2d 521, 525 (1998) (affirming appellate court's rejection of the common law deliberate process privilege in discovery leaving

adoption to any legislative process). Whether it applies in a case such as this, involving a federal claim against state officials, is an unsettled issue. *See Murdock v. City of Chicago*, 565 F. Supp. 3d 1037, 1044 (N.D. Ill. 2021) (declining to recognize deliberative process privilege in federal question cases for state and municipal officials); *Santiago v. City of Chicago*, No. 19-cv-4652, 2023 WL 5096288, at *6-7 (N.D. Ill. Aug. 9, 2023) (reaching opposite conclusion). But since Defendants have not provided a privilege log, Plaintiffs have no idea whether Defendants are withholding any documents under this privilege, creating more delay.

After the meagre production on November 3, 2025, the parties had another meet and confer on November 11 and discussed the issues raised by Defendants' Responses without resolution. On November 25, Defendants produced the 4,000-page Menard grievance "scroll" and another 3,000 pages of which 2,679 related to the class representatives only. On December 12, since there had been no additional production, Plaintiffs' counsel wrote Defendants' counsel specifically noting that there was no legal basis of which Plaintiffs were aware for limiting discovery to the class representatives, and asking Defendants to provide that basis if they were going to continue to refuse to produce class-wide documents. (12/12/25 A. Hudson email, attached as Exhibit 5.) Defendants' response, on December 15, requested that plaintiffs "agree to limit inmate discovery to records within the last year or to representative class members." (12/15/25 A. Vaidya email attached as Exhibit 6.)

The parties held another meet and confer on December 19, 2025. To expedite some production, Plaintiffs agreed to limit their request for class member medical and mental health records, for the time being, to the past year—a significant concession since the Fourth Requests sought records back to February 2022. However, it was *not until February 3, 2026*, more than six

8

weeks later, that Plaintiffs received the first non-Menard production of about 70 class member medical and mental health records.

Plaintiffs are at a loss to understand what Defendants meant when they assured in October that they were about "to complete" production. Over the course of five months, Defendants have not acted in good faith with their boilerplate objections, baseless legal arguments, lack of privilege logs, and failure to produce at least 75% of the requested documents. The Court must compel responsive discovery.

## II.   Defendants have also obdurately continued to rely on the out-of-date 2018 ESI protocol to stall discovery.

The existing ESI protocol was entered in 2018. Dkt. 65. It is badly outdated, in many respects clearly inaccurate, and probably untrue in others. Among other defects, it "initially limit[s]" e-discovery to "January 31, 2015 to January 31, 2018" (¶ 5) but such information is not key to a case in 2026. It also identifies Wexford and the State's Central Management Services (CMS) as the only third parties "likely to have [relevant] ESI" (¶ 6), but Wexford has been succeeded by Centurion as IDOC's healthcare vendor, and UIC (which provides hormone telemedicine to class members) and SIU (which performs some quality assurance work for IDOC healthcare) are more likely to have relevant information now than CMS.

Finally, the 2018 protocol incorporates processes that reflect Defendants' technical capabilities in 2018, not 2026. For example, it puts in place a special review procedure if "the ESI search using search terms results in the identification of over 7,500 documents . . ." (¶ 8). 7,500 documents is a drop in any modern ESI bucket. The protocol makes representations whose truth is no longer known, such as stating that "Defendants' software limitations do not allow them to produce files in Plaintiffs' requested TIFF format" (¶¶ 12, 13) and asserting that Defendants "are not capable of producing" certain "metadata fields" including custodian, author,

9

title, date created, and date modified (¶ 15). Unintelligibly, the protocol permits production of emails and other electronically created files in either native format **or** "as Bates-labeled PDF" (¶ 12).

During the September 3 meet and confer, Plaintiffs' counsel pointed out that the ESI protocol needed revision, and on September 17, Plaintiffs provided a proposed revised ESI order to Defendants. (S. Legault 9/17/26 email and proposed revised ESI order attached as Exhibit 7.) The email requested a prompt meet and confer about the proposed order. (*Id*.) Defendants did not respond to this request or provide any comment on the protocol.

Plaintiffs' September 26, 2026, Fourth Requests seek multiple categories of highly relevant documents that include communications which almost certainly are or include emails, including documents "reflecting any instructions or directives given by IDOC to Wexford Health Sources, Centurion Health, or any other vendor or contractor relating to the evaluation, care, or treatment" of class members (Request 15), and"[a]ll communications including emails and notes relating to or discussing the evaluation, care, or treatment provided to any prisoner who has requested evaluation or treatment for gender dysphoria" (Request 16), as well as "documents and communications related to the revision and implementation of IDOC's Administrative Directive" (Request 20), and "documents and communications" relating to any quality assurance, quality improvement or audit program to assess the "evaluation, care, and treatment of prisoners with gender dysphoria" (Request 24). Other categories of requests may also, of course, capture emails.

In addition to the other generic objections noted above, Defendants objected to any request that might call for ESI "to the extent it requires Defendants to produce electronically stored information ("ESI") beyond the scope of the existing ESI Order (Doc. 65) *and/or*

10

*subsequent ESI agreements between the parties*," notwithstanding the fact that they had never responded to Plaintiffs' counsel's September email forwarding a new proposed protocol. (Exh. 4 at 7-10, 12, 15, 17, 19-20, 22-23, 25-26, 28-29, 31, 33, 35-36, 38-43.)

Defendants have obviously noticed the defects in the old ESI protocol because in their October 30 email, counsel noted the need "to agree to a new set of search terms" adding that "I believe the prior agreed search terms *may not appropriately encompass our current relevant timeframe*." (Exh. 3; emphasis added.) At the same time, Defendants have deployed the old protocol over the course of months to generate delay. When Plaintiffs complained of the complete lack of email production in their December 12 email (as well as the fact that Defendants' production did not even comply with the terms of the old ESI order0, and sent a list of proposed custodians and search terms to try to jump-start the process (*see* Exh. 5), Defendants' response, days later, indicated that they *had not yet run any ESI searches* as they had been waiting for *plaintiffs* to send search terms—a fact they had not shared with plaintiffs. (Exh. 6.)

Now, in mid-December, defendants were finally running searches. (*Id*.)  Plaintiffs responded by requesting the ESI "hit list" so that further narrowing could be agreed to as needed. (12/17/25 A. Hudson email, attached as Exhibit 8.)

Defendants did not provide the hit list. In emails setting up a meet and confer, Defendants' counsel did share that the custodian/search term list proposed by Plaintiffs had generated 412,317 hits, which they characterized as "excessive"—but they did not share the list for further analysis as Plaintiffs had sought. (12/19/25 A. Vaidya email, attached as Exhibit 9.) Plaintiffs *again* requested the hit counts but they were not provided. (12/19/25 B. Ray email, attached as Exhibit 10.)

11

At the parties' meet and confer on December 19, 2025, the parties further discussed ESI, and Plaintiffs again requested the hit list. On *January 5, 2026*, Defendants finally sent the hit list. (1/5/26 A. Vaidya email, attached as Exhibit 11.) The following day, plaintiffs' counsel asked for two pieces of clarifying information—whether the hit counts had been "de-duped" in any way, and whether any wildcard search terms had been used. (1/6/26 A. Hudson email, attached as Exhibit 12.) Defendants did not respond.

On January 12, Plaintiffs' counsel nevertheless sent a further email proposing specific changes that would reduce the number of "hits" by some 80% (from some 650,000 to some 130,000) even prior to de-duplication. (1/12/26 A. Hudson email, attached as Exhibit 13.) Defendants' response, on January 14, acknowledged the "proposal" and provided "initial thoughts"—namely, that "100,000+ emails would still be substantial" and proposed that, since the (antiquated) 2018 ESI order provided that there would be a further process of review of a subset in the event that ESI exceeded *7500* documents, Defendants would undertake to review a sample of 100(!) for a further meet and confer. (1/14/26 A. Vaidya email, attached as Exhibit 14.) Defendants also confirmed, however, that "the searches were not deduped," and that wildcard searches had also not been used, "but we are open to suggestions." (*Id*.) Finally, the email raised the possibility that Defendants might continue their past practice of converting emails into pdfs prior to production rather than producing them in native format, "but we can discuss . . ." (*Id*.)

On December 19, Defendants finally produced 13,000 pages of emails, in pdf, responsive to Plaintiffs' request for emails between the former monitors and defendants' personnel. These include multiple pdfs of the same chain, sometimes with only minor additions (a meeting invite), which cannot be sorted by custodian or other means. The production did not include an index or other guide to show which documents are responsive as required by Rule 34. Review is tedious

and burdensome. Plaintiffs are not reassured by Defendants' polite further offers to "discuss"—another word for no end in sight.

### III. Subsequent events show that nothing will change without a Court order.

On January 15, 2026, Plaintiffs' counsel sent a letter pursuant to Federal Rule of Civil Procedure 37 to Defendants' counsel noting that emails and meet and confers over the course of four months had led to little discovery. (1/15/26 C. Bennett letter attached as Exhibit 15.) The letter noted the very limited production to date in response to the Fourth RFP; Defendants' long-held reliance on the unsupportable position that discovery should be limited to the class representatives; the failure of previously previewed efforts to copy and produce documents to yield any results; defendants' failure to comply with the obligation to organize and label documents by the categories in the requests or provide an index, as required by Rule 34(b)(2)(E)(i); and the needless delays caused by Defendants' approach to ESI and reliance on the "stone tablet" method of converting electronic files to pdf. (*Id.*) Plaintiffs requested that Defendants explain how they proposed to address these issues.

Defendants' response, sent on January 21, 2026, once again failed to meet the issues or provide any path to resolution. (1/21/26 A. Vaidya letter, attached as Exhibit 16.) It pointed to "approximately 119,000 pages of records" produced "[o]ver the past year alone" (ignoring the fact that most of those pages were produced as result of the Court's Menard *orders*), and mysteriously pivoted away from discovery to complain that the *real* problems were not the "pace of production" or "the current ESI order," but (1) the 2018 complaint and (2) the class definition. (*Id.*) The letter did commit that emails (mysteriously "*to the extent* they are available in native format" (emphasis added)) would be so produced, but continued to insist that the process in the old ESI order for searches that generate more than 7,500 documents would be deployed—guaranteeing further, purposeless delay. The letter provided no dates for completion of

13

production and no assurance that substantial production in response to plaintiffs' *September 26, 2025* Fourth RFP would begin any time soon. (*Id.*)

On January 28, 2026, Plaintiffs' counsel sent a follow-up email to Defendants' counsel asking that they commit to a firm February 20 deadline for all production so that depositions could start in March and the case stay on track, given the now-existing deadlines for fact and other discovery. (1/28/26 C. Bennett email attached as Exhibit 17.) Defendants' response the following day promised a production of class member medical records starting on February 2, assured that "we are working with the client in our effort to make sure discovery is substantially completed prior to the February 18, 2026 status hearing," and also complained that it was not clear whether Plaintiffs sought a new ESI protocol or not. (1/29/26 A. Vaidya email attached as Exhibit 18.)

Counsel's assurance that they are "working with the client" to get discovery "substantially" completed this month, after months of delay and equivocation, is not good enough. As of this filing, more than four months after plaintiffs served the Fourth Requests, exclusive of records relating to Menard, which defendants have produced because they were ordered by the Court, defendants have produced critical records—medical and mental health records—for perhaps 25% of the class, a smattering of other documents (some TAC committee notes, resumes for Dr. Conway and some others, and the like), and one batch of emails (the monitor emails) from 2022-24.

Further, it is now clear that Defendants will continue to use the 2018 ESI protocol and its antiquated production methods and other processes as further excuses for delay. By failing to negotiate in good faith about an updated ESI order—or to negotiate at all—Defendants have forfeited their right to negotiate. Defendants have had plaintiffs' proposed ESI protocol since

14

mid-September. If they had objections to any of its provisions, those should have been heard long ago.

As the Court knows well, Plaintiffs must show that Defendants have been "deliberately indifferent" to the class's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Defendants long ago conceded that gender dysphoria was a serious medical need, so the proof at trial will revolve around the "subjective" element of deliberate indifference. This is an exacting standard. Deliberate indifference is more than negligence, *see id*. at 106; it requires both knowledge on the part of prison officials that prisoners face "a substantial risk of serious harm" and "disregard[] [of] that risk by failing to take reasonable measures to abate it." *Farmer v Brennan*, 511 U.S. 825, 847 (1994) (emphasis added). Simply put, Plaintiffs must show that Defendants knowingly failed to provide treatment that would meaningfully address the class members' gender dysphoria. Accordingly, the documents plaintiffs seek—but for the most part have not yet received—are essential to their case. The medical and mental health records of class members will show whether the class is in fact being provided care and treatment for their serious medical needs. And although circumstantial evidence can be enough to establish the subjective element of deliberate indifference (*see Farmer*, 511 U.S. at 842-43), the more direct evidence of knowledge plaintiffs seek is critical as well.

For these reasons, Plaintiffs respectfully request that the Court:

1) Order Defendants to complete production responsive to the Fourth Requests as currently agreed to by the parties (including the past year's worth of medical and mental health records for all class members) no later than February 20, 2026;

2) Order Defendants to provide indexes of produced documents in accordance with Fed. R. Civ. P. 34;

3) Order and enter Plaintiffs' proposed revised ESI protocol attached hereto in Exhibit 3;

4) Order Defendants to deduplicate and produce, in accordance with the revised ESI protocol, all emails resulting from the search terms provided by plaintiffs no later than February 20, 2026, withholding only those documents that can be withheld on the basis of attorney client or work product privilege;

5) Order Defendants to provide logs of any documents withheld on the basis of privilege no later than February 20, 2026; and

6) Grant any such further relief as the Court deems proper.

Dated: February 9, 2026                               Respectfully Submitted:

                                                     /s/ Camille E. Bennett

**Brent P. Ray**
**Erica McCabe**
**Stephen Ferro**
ARNOLD & PORTER
KAYE SCHOLER LLP
70 West Madison Street Suite 4200
Chicago, IL  60602-4231
Telephone: (312) 583-2325
*brent.ray@arnoldporter.com*
*erica.mccabe@arnoldporter.com*
*stephen.ferro@arnoldporter.com*

**Abby L. Parsons**
ARNOLD & PORTER
KAYE SCHOLER LLP
700 Louisiana Street Suite 4000
Houston, TX  77002-2755
Telephone: (713) 576-2442
*abby.parsons@arnoldporter.com*

**Sarah Prather**
ARNOLD & PORTER
KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-7816
*sarah.prather@arnoldporter.com*

**Camille E. Bennett**
**Michelle Teresa García**
**Mason Strand**
**Rachel Caldwell**
ROGER BALDWIN FOUNDATION OF ACLU, INC.
150 North Michigan Avenue, Suite 600
Chicago, IL 60601
Telephone: (312) 201-9740
Facsimile: (312) 288-5225
*cbennett@aclu-il.org*
*mgarcia@aclu-il.org*
*mstrand@aclu-il.org*

**Amelia H. Bailey**
**Thomas J. Leahy**
**Anne J. Hudson**
**Sarah Legault**
KIRKLAND & ELLIS LLP
333 Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
*amelia.bailey@kirkland.com*
*thomas.leahy@kirkland.com*
*anne.hudson@kirkland.com*
*sarah.legault@kirkland.com*

**Thomas E. Kennedy III**
**Sarah Jane Hunt**
KENNEDY HUNT P.C.
906 Olive Street, Suite 200
Saint Louis, MO 63101
Telephone: (314) 872-9041
*tkennedy@KennedyHuntLaw.com*
*sarahjane@KennedyHuntLaw.com*

**Malita Picasso**
AMERICAN CIVIL LIBERTIES UNION
125 Broad Street New
York, NY 10004
Telephone: (212) 549-2561
*mpicasso@aclu.org*

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on February 9, 2026, I electronically filed the foregoing document and exhibits with the Clerk of Court by using CM/ECF system, which will accomplish service through the Notice of Electronic Filing for parties and attorneys who are Filing Users.

By: /s/ Camille E. Bennett