**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| JANIAH MONROE,[1]<br>MARILYN MELENDEZ,<br>LYDIA HELÉNA VISION,<br>SORA KUYKENDALL, and<br>SASHA REED, individually and on behalf<br>of a class of similarly situated individuals,<br><br>   **Plaintiffs,**<br><br>**v.**<br><br>LAMENTA CONWAY,<br>MELVIN HINTON, and<br>LATOYA HUGHES,<br><br>   **Defendants.** | Case No. 3:18-CV-156-NJR |

## <u>MEMORANDUM AND ORDER</u>

**ROSENSTENGEL, District Judge:**

On September 12, 2025, and December 11, 2025, the Court ordered preliminary injunctive relief (Docs. 1008, 1009, 1070, 1071) to address certain unconstitutional conditions at Menard Correctional Center ("Menard") affecting inmates seeking treatment for gender dysphoria. Pursuant to the Prisoner Litigation Reform Act ("PLRA"), the Court's December expired after 90 days, on March 11, 2026. *See* 18 U.S.C. § 3626(a)(2). Plaintiffs, once again, have asked the Court to re-issue the preliminary relief for a further 90 days (Doc. 1111). On March 12, 2026, the Court heard testimony at an evidentiary hearing. At the conclusion of the hearing, the Court announced from the bench its decision to re-issue the injunction. The Court set out the specifics of the

---

[1] The named Plaintiffs, and many members of the Plaintiff class, use chosen names reflecting their gender identity rather than their given names at birth, which may not match the name in IDOC records.

injunctive relief in a separate order. (Doc. 1124). This memorandum and order summarizes the evidence adduced at the hearing and explains why the Court determined injunctive relief remains necessary.

## BACKGROUND

The Court recounted the lengthy history of this litigation in its September 2025 order and incorporates by reference that portion of its decision. (Doc. 1008).

This case was brought in January 2018 on behalf of a class of Plaintiffs, certified as "all prisoners in the custody of IDOC who have requested evaluation or treatment for gender dysphoria." (Doc. 213). The named Plaintiffs are transgender women currently incarcerated in Illinois Department of Corrections ("IDOC") facilities. The named Defendants are, respectively, the Acting IDOC Medical Director, IDOC's Chief of Mental Health, and the IDOC Director, all sued in their official capacity.

Plaintiffs assert that Defendants' policies and practices subject the class to a substantial risk of serious harm and injury from inadequate and delayed evaluation and treatment of gender dysphoria, in violation of their rights under the Eighth Amendment, and they seek injunctive relief to remedy the flaws in IDOC's treatment of transgender inmates. (Doc. 1, pp. 36-38; Doc. 935).[2] The alleged problems include the IDOC's:

- use of committees comprised of unqualified officials to make decisions regarding the medical treatment, security, and placement of transgender inmates;

- widespread delays or denials in evaluating prisoners for gender dysphoria and in providing hormone therapy and hormone monitoring;

---

[2] Plaintiffs filed a supplemental complaint on May 15, 2024 (Doc. 935), to which Defendants responded at Doc. 968.

- failure to consider or provide gender-affirming surgery as part of medically necessary treatment for gender dysphoria;

- failure to accommodate and facilitate social transition for individuals with gender dysphoria, including lack of access to gender-affirming clothing and grooming items, failing to make individualized housing placement decisions, and permitting cross-gender strip searches; and

- failing to provide access to medical and mental health providers competent to treat gender dysphoria.

The Court issued several rounds of injunctive relief to Plaintiffs during the initial phase of the litigation. On December 5, 2024, the Seventh Circuit Court of Appeals vacated the then-operative injunction, concluding it had expired 90 days after its issuance, pursuant to the Prison Litigation Reform Act ("PLRA"). *Monroe v. Bowman*, 122 F.4th 688 (7th Cir. 2024).

After the case returned to this Court, Plaintiffs filed a supplemental complaint, and the Court issued an amended scheduling order to govern the proceedings on remand. (Docs. 935, 1000). Plaintiffs also moved for a preliminary injunction requiring Defendants to transfer class members out of Menard Correctional Center, a maximum-security level prison, to another IDOC facility. (Docs. 873, 874). The Court held an evidentiary hearing on the motion from May 27-30, 2025, and heard testimony from 13 witnesses.

On September 12, 2025, the Court granted Plaintiffs' motion and ordered several remedial measures. (Doc. 1009). First, Defendants were to file, under seal by September 19, 2025, a list of class members presently housed at Menard.[3] Second, Defendants were

---

[3] Defendants complied with this directive at Doc. 1011-1 and Doc. 1013.

to transfer every class member residing at Menard to another facility by October 15, 2025.[4] The Court cautioned Defendants against transferring any class member to Pinckneyville Correctional Center in light of issues with that facility discussed in prior orders. (Doc. 680). Third, the Court directed Defendants to consider each class member's specific gender dysphoria condition, their gender identity, related safety issues, and whether a transfer to a facility matching their gender identity would be appropriate in assessing where each class member would be transferred. Fourth, Defendants were to notify each class member of their new placement at least seven days before their transfer and provide an explanation of the reasons for the decision. A copy of each decision also was to be furnished to class counsel. Fifth, the Court barred Defendants from placing any class member at Menard going forward and instructed Defendants to assign class members to a different institution if they arrived at Menard through the intake process. If an individual housed at Menard later is identified as a class member, they must be transferred within 21 days. Sixth, if a class member was not moved to Logan Correctional Center (a women's facility) or another facility matching their gender identity, they were to be permitted to submit a request to transfer to such a facility within 60 days of the initial transfer. Seventh, Defendants were to provide the Court and class counsel monthly reports on the status of class members housed at Menard and the timing and result of any transfer decisions. Finally, Defendants were to provide a status report regarding certain matters "in progress" as of the May 2025 evidentiary hearing, including the status

---

[4] Defendants submitted a list of 38 individuals who were transferred from Menard as of October 16, 2025 (Doc. 1025).

of mental health staff vacancies at Menard.[5] The Court also announced that it would hold a subsequent evidentiary hearing within 90 days "to evaluate whether the above injunctive relief shall be extended." (Doc. 1008, p. 71). Defendants filed an interlocutory appeal of the preliminary injunction on October 10, 2025 (Doc. 1006) and subsequently moved to stay portions of the September order pending the appeal. (Doc. 1024). The Court denied the motion for a stay on November 24, 2025. (Doc. 1048).

Plaintiffs moved to re-issue the injunction on October 24, 2025. (Doc. 1028). After conducting an evidentiary hearing on December 8, 2025, the Court concluded that the injunction should be re-issued with terms substantially similar to the prior order. (Doc. 1070). The Court narrowed the scope of the relief slightly, however, requiring Defendants to transfer from Menard only those class members with a confirmed gender dysphoria diagnosis. (*Id.* at p. 32). The Court ordered that inmates housed at Menard who seek an evaluation for gender dysphoria should be assessed within seven working days and directed IDOC to confirm the diagnosis "in its sole discretion" within 14 days of the evaluation. (*Id.*). If IDOC confirmed that an inmate at Menard suffered from gender dysphoria, the inmate was to be transferred to another facility within 21 days. (*Id.*). Defendants appealed the re-issued injunction, and the Seventh Circuit consolidated the appeal with the appeal of the prior injunction. *See Monroe v. Hughes*, Nos. 25-2803/25-3256 (7th Cir.). Both appeals remain pending.

On February 27, 2026, Plaintiffs moved to re-issue the preliminary injunction for

---

[5] Defendants filed this report at Doc. 1011.

an additional 90 days. (Doc. 1111). Defendants filed a response in opposition. (Doc. 1120).

The Court held an evidentiary hearing on March 12, 2026. At the conclusion of the

hearing, the Court announced from the bench that it would grant Plaintiff's motion.

EVIDENTIARY RECORD

*A. Stipulations of Fact*

Prior to the hearing, the Parties stipulated to the following facts:

1.  Menard serves as an intake Facility for the Illinois Department of
    Corrections ("IDOC").

2.  Warden [Anthony] Wills retired on January 1, 2026. Effective December 24,
    2025, IDOC named Matthew Plummer as the day-to-day Warden of
    Menard.

3.  The day-to-day Warden of Menard is responsible for approximately 2000
    individuals in custody housed at Menard maximum and medium security
    units and 800 staff.

4.  No warden within IDOC has the authority to hire or fire IDOC staff.

5.  IDOC currently employs approximately 21 mental health professionals at
    Menard ranging from Behavioral Health Technicians through Physician.

6.  There are currently 12 vacancies for mental health providers assigned at
    Menard.

7.  West House currently does not have cameras located within the housing
    unit.

(Doc. 1111-1).

### B. Plaintiffs' Evidence

**1. C.H.**[6]

C.H., who identifies as a transgender woman, testified via video from Menard Correctional center, where she currently resides. She realized at the age of four that she identified as a woman. Before her incarceration, she talked to a therapist and learned about treatment options, such as medication, but she did not pursue them at the time. Prior to arriving at Menard, C.H. was in the Sangamon County Jail and Graham Correctional Center. At Sangamon County, she sought treatment for gender dysphoria but was only offered protective segregation. After arriving at Graham on May 1, 2025, she told a nurse and officers that she was transgender. C.H. was told she would be referred to a counselor, but that never happened, and she was not evaluated for gender dysphoria.

C.H. was transferred to Menard on June 25, 2025, and she told a guard that she is a transgender woman. The guard advised her to write the unit counselor, which she did, but she got no response.

C.H. testified that Menard guards frequently voice anti-trans slurs when walking past her cell and have threatened her with physical harm, making comments like, "This isn't the time to be a tranny. You could find yourself hanging from the bars," and "Same thing happened to one of our staff, it happened to a tranny here." Regarding the second comment, C.H. learned the guard referred to an officer who had been badly beaten.

---

[6] The Court will refer to the class member witnesses by their initials, as their testimony includes highly sensitive personal health information. (*See* Order at Doc. 966, granting motion to redact transcripts).

C.H. is so fearful of an attack that she is scared to leave her cell. In or about October 2025 she told her cellmate she is transgender. He threatened to kill her in her sleep or beat her if she left her bed. She was so fearful of going to sleep that she refrained from taking the mental health medications that made her sleepy. She wrote multiple letters to her counselor, unit sergeant, and other officers seeking protection. She was moved to protective custody ("PC") in the West House on October 7, 2025, where she remains. But she continues to be fearful in PC because her cellmate there has threatened her, guards make disparaging comments and threats, and she has seen what other inmates do to transgender prisoners. There are no surveillance cameras in the West House PC area. She wrote multiple requests for a single cell to her counselor, as recently as last week, and made the same request to mental health staff, but neither responded.

C.H. notified Mental Health in October 2025 and November 2025 that she is a transgender woman. She made a transfer request and filed another grievance, and on January 6, 2026, a guard brought her a transfer sheet to fill out listing which three prisons she preferred for transfer (this document was admitted as Plaintiffs' Exhibit 1). She met with Ms. Klausing (Menard's transgender coordinator) after completing the transfer request. In late January 2026, C.H. had a brief telepsychiatry appointment evaluate her for gender dysphoria. That doctor told C.H. she would be seen again for evaluation via telepsych, but no follow-up has yet occurred. She wrote Mental Health again and filed a grievance in February 2026 seeking transgender care. Menard officials have not diagnosed C.H. with gender dysphoria. Documents submitted to the Court show that a telepsych appointment for C.H. on February 24 or 25, 2026, was canceled (Sealed Doc.

1112-3, Declaration of C.H.). C.H.'s Gender Dysphoria Evaluation of January 24, 2026, noted she has had four of the six characteristics for gender dysphoria for at least six months (only two are required) and experienced "significant distress or impairment in social, occupational, or other important areas of functioning." (Sealed Doc. 1112-6). However, the evaluator did not confirm a diagnosis of gender dysphoria, noting:

> At this time, there is insufficient information to determine whether the patient meets DSM-5 criteria for Gender Dysphoria. This was the provider's initial encounter with the patient, and the evaluation is limited by lack of prior records and collateral information. [The evaluator's final sentence is cut off and unreadable.]

*Id.*

C.H. wants to take hormones to connect with her feminine side. She allows her facial hair to grow in hopes she will be left alone if she looks like a "manly man." However, that forces her to be something she is not and causes her distress, and she continues to be targeted. She was mocked for trying to purchase gender affirming items at commissary, which staff refused to sell to her, so she stopped asking. Her unit counselor has not responded to her letters requesting access to those commissary items. She has never been allowed a private shower at Menard despite many written requests to the unit counselor. She washes up in her cell when her cellmate is asleep.

C.H. has not been transferred out of Menard and has not received a response to her transfer request. The list of transgender inmates at Menard for January 28, 2026 (Doc. 1112-7), produced by Defendants pursuant to the December 2025 injunction, shows C.H. as "REMOVED (no GD)."

C.H. wants to transfer because the threats, harassment, and bullying put her in

fear for her life and it seems nobody takes her requests for protection seriously.

### 2. S.J.[7]

S.J., who uses they/them pronouns, testified via video from Pontiac Correctional Center, where they have resided since a transfer from Menard on January 21, 2026. S.J. identifies as transgender and non-binary. They knew they were transgender since they were about 13 years old.

S.J. informed staff at Menard that they were transgender when they first assigned there in 2014, but they were not evaluated for gender dysphoria at that time. They raised the issue again in October 2025 as part of a grievance and in letters to mental health staff and Menard's transgender coordinator and followed up multiple times after failing to receive a timely evaluation. When they met with the transgender coordinator in December 2025, she informed S.J. that a person cannot be both transgender and non-binary, which caused S.J. confusion. S.J. ultimately received a confirmatory diagnosis for gender dysphoria and was transferred to Pontiac on January 21, 2026, pursuant to the December injunction. Presently, they are not seeking hormone therapy out of concern that it could make them vulnerable in the prison setting, but they might be interested in that treatment if they are transferred to a facility with a lower security classification.

S.J. stated that while housed at Menard, guards denied their requests for a private shower and directed them either to shower with other inmates or wash up in their cell. They ultimately opted for the latter. They also testified that staff would not sell them

---

[7] S.J.'s legal first name begins with an R, but their chosen name begins with an S.

gender-affirming commissary items, even though they requested panties, a sports bra, and makeup. They expressed discomfort about being unable to present publicly in a manner consistent with their gender identity.

S.J. also reported concerning experiences of verbal and physical abuse by prison guards at Menard. They testified that guards referred to them as a "fucking faggot" on one occasion and on another, they heard a guard describe transgender inmates as "bitch-ass pussies." They also noted a January 2024 incident where a guard punched them in the face, sprayed them with mace, and hit them. According to R.J, several other correctional officers then became involved. S.J. says the guards took them to a blind spot in the prison's infirmary where they beat them until another correctional officer intervened. S.J. believes the assault was connected to their transgender identity because the guards used the word "faggot" during the beating, and the incident took place after they had reported being trans to staff members. S.J. also described an incident that took place on October 26, 2025, when S.J. asked to be placed on crisis watch. S.J. says guards entered their cell, hog-tied them, and carried them out of the building in freezing weather. By that point, multiple staff members were aware that they identified as transgender.

At Pontiac, where S.J. now resides, they are housed in a single cell, can take individual showers, and are able to procure gender affirming items from the commissary. They also have met with mental health providers and can elect the gender of the prison officer conducting a body search. S.J. said they would rather kill themself than return to Menard.

*C.  Defendants' Evidence*

### 1.  Officer Angel Lepinske

Defendants presented testimony from one witness: Officer Angel Lepinske. Mr. Lepinske has worked as an intelligence officer at Menard since December 2025. Before then, he was a corrections officer at Menard for about one year. As an intelligence officer, his responsibilities include monitoring messages, phone calls, and conducting cell searches to investigate and mitigate security concerns in the prison, such as gang activity or contraband. He testified that inmates frequently pass hand-written letters, or "kites," among one another, which may be considered contraband. His testimony focused on two such letters that he recovered during his investigations.

On January 16, 2026, Officer Lepinske searched the cell of inmates X.L. and J.H. During the search, he located a two-page letter containing instructions for how to obtain a gender dysphoria diagnosis. The Court received the exhibit into evidence over Plaintiffs' objection. (Defdts' Ex. 1). The letter, which is unsigned, discusses the questions mental health care providers may ask during an assessment for gender dysphoria and provides a "cheat code" for how to answer the questions to ensure a diagnosis is confirmed. For instance, the letter instructs the unnamed recipient to indicate that they are open to hormone therapy even if they are not and to decline interest in "gender reassignment surgery," citing a desire to have kids in the future. The letter also instructs recipients to request the evaluator to use they/them pronouns.

On cross-examination, Officer Lepinske conceded that he did not know who wrote the letter or how it came to be in the cell. He also noted that J.H. was evaluated for gender dysphoria and did not receive a confirmed diagnosis; both J.H. and X.L. still are housed

at Menard.

Officer Lepinske also located another letter during a cell search on February 18, 2026. That letter, signed by an individual using the moniker "Twitch," also was received into evidence over Plaintiffs' objection. (Defdts' Ex. 2). The writer advised the unnamed recipient to "lie [and] say you['re] trans in a grievance" and "tell them you need to be transferred to [a] facility that will accommodate to your gender identity." On cross-examination, Officer Lepinske identified "Twitch" as inmate T.B. and confirmed that he still was housed at Menard awaiting evaluation for gender dysphoria.

## LEGAL STANDARDS

### A. *Injunctive Relief*

The Court's December 2025 preliminary injunction expires automatically 90 days after its entry, "unless the court makes the findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period." 18 U.S.C. § 3626(a)(2).

Notwithstanding that deadline, courts have concluded that "[n]othing in the [PLRA] limits the number of times a court may enter preliminary relief." *Mayweathers v. Newland*, 258 F.3d 930, 936 (9th Cir. 2001); *Alloway v. Hodge*, 72 F. App'x 812, 817 (10th Cir. 2003); *see also* Catherine T. Struve, *Allowing the Courts to Step in Where Needed: Applying the PLRA's 90-Day Limit on Preliminary Relief*, 19 U. St. Thomas L.J. 407, 425 (2023) (observing that "neither the text nor the legislative history of the PLRA compels the conclusion that Section 3626(a)(2) forecloses effective preliminary relief—as it would do, in some cases, if it actually closed off all possibility of preliminary relief past an initial 90-day limit.").

Indeed, the Seventh Circuit, in a prior decision in this case, cited approvingly to the Ninth

Circuit's holding in *Mayweathers*. *See Monroe*, 122 F.4th at 697 (citing *Mayweathers*, 258 F.3d

at 936). And district courts in this circuit expressly have contemplated the issuance of

successive preliminary injunctions. *See Peacher v. Conyers*, No. 20-02997, 2022 WL 499893,

at *3 (S.D. Ind. Feb. 17, 2022) (noting that a party "may request that [the preliminary

injunction] be renewed no later than 14 days before the injunction expires."); *Jackson v.

Wexford of Indiana, LLC*, No. 19-03141, 2019 WL 5566442, at *3 (S.D. Ind. Oct. 29, 2019)

(similar); *Farnam v. Walker*, 593 F. Supp. 2d 1000, 1004 (C.D. Ill. 2009) ("[N]othing in § 3626

prohibits the entry of successive orders for preliminary injunction if needed."). Thus, as

the Court held previously, the PLRA does not restrict its authority to issue successive

preliminary injunctions until the matter proceeds to trial on the merits.

Having established that the Court *can* issue a subsequent preliminary injunction,

the burden falls to Plaintiffs to "continue to prove that preliminary relief is warranted."

*Mayweathers*, 258 F.3d at 936. As the Seventh Circuit has cautioned, "new injunctive relief

will need to address the current situation." *Monroe*, 122 F.4th at 697.

The parties are familiar with the standard governing the issuance of preliminary

equitable relief. The moving party must demonstrate:

(1)     they are likely to succeed on the merits of their claims (a strong
        showing, not simply a mere possibility, but also not as strong as
        proof by a preponderance);

(2)     there is no adequate legal remedy; and

(3)     they are likely to suffer irreparable harm if injunctive relief is not
        granted before final resolution of the claims.

*See Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *DM Trans, LLC v. Scott*, 38 F.4th 608, 617 (7th Cir. 2022).

If the moving party makes that showing, then the Court must balance the potential harm to the moving party if the preliminary injunction were wrongfully denied against the potential harm to the non-moving party if the injunction were wrongfully granted, and the Court must consider the effect, if any, on the public of granting or denying the injunction. *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 539 (7th Cir. 2021); *DM Trans, LLC*, 38 F.4th at 622.

The PLRA adds a component to the analysis. That statute requires any injunctive relief to be narrowly drawn, extend no further than necessary to correct the violation of a federal right, and be the least intrusive means necessary to correct the violation. *Brown v. Plata*, 563 U.S. 493, 530 (2011); 18 U.S.C. § 3626(a)(2). Courts must give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and must respect principles of comity in tailoring the relief. 18 U.S.C. § 3626(a)(2).

### B. *Eighth Amendment*

The Eighth Amendment prohibits cruel and unusual punishment and "imposes a duty upon states to provide adequate medical care to incarcerated individuals." *Boyce v. Moore,* 314 F.3d 884, 888-89 (7th Cir. 2002). Deliberate indifference to the "serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). Deliberate indifference has two

elements. The first is whether the prisoner has an "objectively serious medical condition." *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011); *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). The second element requires a showing that a prison official has subjective knowledge of—and then consciously disregards—an excessive risk to inmate health. *Greeno*, 414 F.3d at 653; *see also Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). Deliberate indifference involves "intentional or reckless conduct, not mere negligence." *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010).

Plaintiffs' original and supplemental complaints allege pervasive deficiencies in delivery of medically necessary care and treatment on a systemic, statewide level in IDOC correctional institutions. *See, e.g., Wellman v. Faulkner,* 715 F.2d 269, 272 (7th Cir. 1983); *Cleveland–Perdue v. Brutsche,* 881 F.2d 427, 430–31 (7th Cir. 1989) (recognizing claims of systemic health care deficiencies as a distinct category of deliberate indifference claims, as opposed to one based on "isolated instances of indifference to a particular inmate's medical needs"). Plaintiffs' prior motions for injunctive relief claimed that class members at Menard are experiencing, and being harmed by, these deficiencies to an extreme degree, and the present motion alleges that these conditions have persisted.

In this context, deliberate indifference can be demonstrated by "proving there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care[,]" or by showing "repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff" that result in an excessive risk of serious harm. *Wellman*, 715 F.2d at 272; *Ollison v. Gossett*, 136 F.4th 729, 736 (7th Cir. 2025); *see also Rasho v. Jeffreys*, 22 F. 4th

Page 16 of 30

703, 710 (7th Cir. 2022) (explaining that "persistence in a course of action known to be ineffective" can support an inference of deliberate indifference) (citing *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662–63 (7th Cir. 2016); *Phillips v. Sheriff of Cook Cnty.*, 828 F.3d 541, 554 (7th Cir. 2016)).

## DISCUSSION

### A. *Are Plaintiffs Entitled to Injunctive Relief?*[8]

In its September and December orders, the Court concluded that Plaintiffs were entitled to a preliminary injunction because they had established a likelihood of success on their Eighth Amendment claim (particularly as it pertained to the conditions at Menard), were subject to irreparable harm, and the equities favored relief.

As they did in December, Plaintiffs seek the continuation of that relief for an additional 90 days, but to prevail they must "continue to prove that preliminary relief is warranted." *Mayweathers*, 258 F.3d at 936. The Court concludes that the evidence adduced by Plaintiffs during the recent hearing, when considered alongside the parties' factual stipulations, is more than sufficient to justify continued relief.

To start, Plaintiffs have demonstrated that they are likely to succeed on the merits of their claim that prison officials were deliberately indifferent to their medical needs. Defendants conceded early in this case that Plaintiffs' gender dysphoria is a serious medical condition. (Doc. 186, pp. 29-30). The present motion focuses on the alleged serious, pervasive, and longstanding mistreatment of those members of the Plaintiff class

---

[8] The Court incorporates by reference its prior holding that Defendants' interlocutory appeal does not divest it of jurisdiction to adjudicate Plaintiffs' pending motion to re-issue the injunction. (Doc. 1070, pp. 21-23).

who were, are, or may be held at Menard. Over the history of this case, Defendants have been well-informed of the harms experienced by class members at Menard (and elsewhere) when their treatment for gender dysphoria, including medical treatment and necessary social transition, has been denied, delayed, or both. The persistence and pervasiveness of these unconstitutional conditions, particularly at Menard, indicates deliberate indifference by the responsible officials.

During the hearing, Plaintiffs put on evidence from two class members — one is presently housed at Menard, and the other was housed at Menard as recently as January. Both recounted in detail how the conditions at Menard remain problematic — to put it mildly. The Court finds their testimony credible. In short, they described a facility where access to evaluation and treatment for gender dysphoria is woefully inadequate and social transition, a component of the accepted (and uncontested) standard of care, is essentially impossible.

First, Menard's responsiveness to reports of gender dysphoria by inmates remains deficient. C.H. testified that she repeatedly reported her gender dysphoria and identity as a transgender woman to a bevy of Menard staff, including the unit counselor, lieutenants, and sergeants, over a several-month period in late 2025. Only after filing a grievance did she meet with the prison's transgender coordinator and even then, the meeting was brief. C.H. also had a telepsych appointment in January to discuss her gender dysphoria, but the call only lasted 5-10 minutes. During that appointment, C.H. was told that a follow-up would be scheduled, but now, almost two months later, she has not heard any update and remains at Menard.

Page 18 of 30

S.J. shared a similar experience. They reported identifying as transgender and non-binary to Menard staff as long ago as October 2014. They raised the issue again in October 2025 as part of a grievance and in letters to mental health staff and Menard's transgender coordinator, following up multiple times after failing to receive a timely evaluation. IDOC's own administrative directives provide that an evaluation for gender dysphoria shall be conducted within seven working days of an inmate's report. *See* IDOC Administrative Directive No. 04.03.104(II)(F), eff. 4/1/2021. The parties' factual stipulations confirm that Menard has 12 vacant mental health provider (MHP) positions, likely contributing to the ongoing delays in evaluation at that facility.

When S.J. met with Menard's transgender coordinator in December 2025, she questioned their identity as both transgender and non-binary. However, S.J. ultimately received a confirmatory diagnosis and was transferred to Pontiac on January 21, 2026, pursuant to the December injunction. In sum, the uncontroverted evidence establishes that while some evaluations are occurring, they are difficult to obtain, and follow-up is irregular.

The evidence at the hearing also suggested that the conditions at Menard preclude class members from addressing their gender dysphoria by transitioning socially. At prior hearings, class members testified that gender-affirming items were not available to purchase from the commissary. At the most recent hearing, C.H. and S.J. said those items exist at Menard, but prison staff rejected their requests to purchase them. C.H. even testified that the staff member in charge of the commissary laughed at her when she asked to buy gender-affirming items. Both class members testified that male correctional staff

persisted in conducting body searches even when they requested the search be conducted by a female officer, and private showers were not available. As a result, both C.H. and S.J. refrained from using the shower and washed up in their cells.

Perhaps most problematic, and consistent with the testimony of other class members at prior hearings, C.H. and S.J. described a culture of disrespect, harassment, and violence by Menard correctional officers that encourages the same mistreatment by fellow prisoners. C.H. testified that she regularly heard officers use slurs when they walked by her cell. On one occasion, she heard an officer say, "this isn't the time to be a tranny. You could find yourself hanging from the bars." S.J. was called a "fucking faggot" by guards on one occasion and on another, S.J. heard a guard describe transgender inmates as "bitch-ass pussies." S.J. also detailed how the mistreatment escalated to physical assaults. They disclosed an incident in January 2024 where a guard punched them in the face, sprayed them with mace and hit them. S.J. says that several other guards transported them to a blind spot in the infirmary and beat them until another correctional officer intervened. S.J. believes the assault was connected to their transgender identity because the guards referred to them as a "faggot" during the beating and the incident occurred after they reported being trans to staff members. Another incident took place on October 26, 2025, when S.J. asked to be placed on crisis watch. S.J. says guards entered the cell, hog-tied them, and carried them out of the building in freezing weather. Multiple staff members were aware that they identified as transgender by that point.

Defendants did not put on *any* evidence refuting these incidents, and the consistency and persistence of reports of mistreatment *by correctional officers* at Menard

remains deeply concerning. The stipulations of fact make clear that Menard's warden (now Matthew Plummer) still lacks the authority to hire or fire staff, and it is not clear what action — if any — has been taken to address these issues. During the December hearing, Warden Wills testified that some investigations were ongoing, but he offered few details, and he could point to no actions he had taken to improve the treatment of transgender inmates at Menard, despite acknowledging the likelihood they could face mistreatment. (Doc. 1070, p. 26). There is no evidence of *any* progress on this front. It also remains the case that Menard's West House lacks video cameras, a basic tool that would protect inmates and staff alike.

To sum up, the Court finds that the conditions at Menard remain substantially the same as they were throughout 2025, when the undersigned determined that preliminary relief was warranted. Put simply, the facility does not allow class members to safely seek treatment for their gender dysphoria as is their right under the Eighth Amendment. And despite IDOC officials being aware of the deficiencies — particularly at Menard — little, if anything, other than compliance with the Court's prior orders transferring inmates out of that facility has been done to rectify the underlying conditions. IDOC's "persistence in a course of action known to be ineffective" supports a finding of deliberate indifference. *See Rasho*, 22 F.4th at 710. For these reasons, the Court concludes Plaintiffs likely will succeed on their Eighth Amendment claim.

Little needs to be said about the remaining preliminary injunction factors. As was the case previously, "[t]here is no adequate remedy at law to compensate for the ongoing risks to Menard class members' medical needs, mental health, and physical safety, so long

as they remain incarcerated under the conditions prevailing in that institution." (Doc. 1008, p. 68). Consistent with prior testimony of other class members, both C.H. and S.J. expressed credible concerns that they would be killed or become suicidal if forced to return to Menard. *Cf. Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1046 (7th Cir. 2017) (concluding a transgender plaintiff had no adequate remedy at law where he challenged a school policy that caused him to contemplate suicide). Any newly identified class members forced to endure the conditions prevailing at Menard likewise could not be adequately compensated at law for the mistreatment Plaintiffs have demonstrated is nearly certain to occur. And continued relief is warranted to prevent class members housed at other facilities from being transferred to Menard.

Turning to the balance of equities, a denial of injunctive relief would cause serious and irreparable harm to class members. In contrast, the potential harm to Defendants if the injunction were reissued is far less. As the Court observed in its prior orders, Menard is not the only maximum-security level facility within IDOC, and some class members may qualify for placement at lower-level facilities. (Doc. 1008, p. 68). On previous occasions, IDOC staff testified regarding the challenges posed by finding suitable alternative facilities for class members. By all appearances, however, IDOC has managed successfully thus far, and Defendants largely have abandoned arguments based on logistical difficulties in opposition to the present motion.

The Court feels compelled to address the evidence from Officer Lepinske that some individuals in custody at Menard may be attempting to take advantage of the Court's orders by feigning a gender dysphoria diagnosis to obtain a transfer. IDOC's

concern is legitimate. Nonetheless, the undersigned does not believe the prospect that some inmates are malingering counsels against continuing relief. According to Officer Lepinske, at least one of the inmates in the cell where evidence was found already was denied a gender dysphoria diagnosis by Menard's mental health providers. The Court is confident that competent mental health providers are capable of ascertaining which inmates present with credible symptoms of dysphoria, particularly when aided by extrinsic evidence, such as that discovered through Officer Lepinske's investigation. Absent evidence of a pattern of inmates successfully obtaining a transfer by feigning gender dysphoria, the Court believes relief of the nature it has previously ordered remains appropriate. The PLRA's requirement that this relief be re-evaluated in 90 days will permit Defendants to provide any newly discovered evidence that other prisoners are abusing this Court's order should Plaintiffs seek another reissuance.

On that note, the Court concludes that continuing the injunctive relief ordered previously, with certain modifications discussed below, satisfies the PLRA's requirement that the relief "be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). In light of the substantial evidence regarding the pervasive problems faced by class members at Menard, which, again, have not improved since the prior order, continuing to preclude Defendants from housing class members with a confirmed gender dysphoria diagnosis there remains the narrowest, least intrusive solution available. The Court did not mandate where any particular inmate be placed, leaving substantial discretion with IDOC to make an appropriate choice.

Defendants also have never explained how any of the prior injunctions' other provisions were unduly burdensome.

### B. *Defendants' Arguments*

Beyond their contention that Plaintiffs are not entitled to a preliminary injunction under the PLRA and the *Winter* factors, Defendants offer three primary points in opposition to further relief. None persuade.

First, Defendants argue that much of the evidence supporting Plaintiffs' request for injunctive relief lacks a nexus to the underlying Eighth Amendment deliberate indifference claim that is the focus of this lawsuit. They reason that Plaintiffs focus on a "culture of violence" at Menard rather than the lack of medical and mental health treatment described in the complaint. Not so.

As the Court discussed above, Plaintiffs' evidence demonstrates that the conditions at Menard, which Defendants control, "do[] not allow class members to safely seek treatment for their gender dysphoria as is their right under the Eighth Amendment." (Doc. 1070, p. 27). To the extent Defendants take aim at arguments describing a "culture of violence," their problem is with the standard of care for individuals experiencing gender dysphoria, which focuses in large part on the role of social transition. Simply put, if Defendants are deliberately indifferent to conditions hampering an inmate's ability to exist openly and safely in their identity, they may violate the Eighth Amendment. Whether the harms described by Plaintiffs might also be evidence of *other* constitutional violations does not detract from their Eighth Amendment theory.

Second, Defendants argue that the only remaining named Plaintiffs, Ms. Monroe

and Ms. Melendez,[9] lack standing to pursue injunctive relief related to Menard on behalf of the class because they are incarcerated at another facility and are at little risk of being transferred to Menard. In support of that position, Defendants cite a number of cases holding that an inmate's facility-specific claim is moot if they are transferred from that facility and there is no immediate threat that they will be returned there. *E.g.*, *Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003); *Knox v. McGinnis*, 998 F.2d 1405, 1413 (7th Cir. 1993); *Dunne v. Olson*, 67 F. App'x 939, 946 (7th Cir. 2003). However, those cases do not account for the reality that Ms. Monroe and Ms. Melendez are merely *representatives* of the class. Thus, even if they face little prospect of being transferred to Menard themselves, the entire class does not lose standing to relief. *See Sosna v. Iowa*, 419 U.S. 393, 402 (1975); *Payton v. Cnty. of Kane*, 308 F.3d 673, 681 (7th Cir. 2002) (explaining that "where a class has been properly certified, even the mootness of the named plaintiff's individual claim does not render the class action moot"). The class has standing to pursue injunctive relief related to the conditions at Menard.

Finally, Defendants argue that the injunction would only benefit a subset of class members housed at Menard rather than the class as a whole. But the Court previously rejected that argument when it determined the conditions at Menard were such that relief was warranted for "class members who are now or *may be* held at Menard." (Doc. 1008, p. 63) (emphasis added). Defendants also do not explain why the Court's equitable authority does not permit it to issue interim relief, based on evidence of particularly

---

[9] The parties have informed the Court that the other two named Plaintiffs no longer are capable of serving as class representatives, as one was released from custody and the other, regrettably, died by suicide. Plaintiffs state that they will file appropriate notices on the docket in short order.

egregious conditions, before a trial on the merits can occur to determine the proper scope
of any system-wide final relief.

### C. *Modifications to the Injunction*

At the conclusion of the hearing, Plaintiffs requested the Court modify the prior
injunction to address certain class members who have been removed from a list of
inmates with a confirmed gender dysphoria diagnosis even as their assessment by
medical providers remains is ongoing. This was of particular relevance given the
testimony of C.H.

In connection with their motion to reissue the preliminary injunction, Plaintiffs
filed the record of C.H.'s January 2026 evaluation for gender dysphoria, which was
conducted by Dr. Farzana Alam. (Doc. 1112-6). Dr. Alam reported that C.H. had at least
two of the six relevant indicators for gender dysphoria identified in the DSM-5, had
experienced those symptoms for more than six months, and had significant distress or
impairment in functionating. Nevertheless, Dr. Alam was unable to confirm a gender
dysphoria diagnosis for C.H. because it was her "initial encounter" and "the evaluation
[was] limited by lack of prior records and collateral information." (*Id.*). Curiously, the list
of transgender inmates at Menard for January 28, 2026 (Doc. 1112-7), produced by
Defendants pursuant to the December 2025 injunction, shows C.H. as "REMOVED (no
GD)." And, unfortunately, Defendants offered no evidence that any of C.H.'s prior
records have been requested or other "collateral information" sought.

In its prior order, the Court directed Defendants to evaluate individuals at Menard
who sought a gender dysphoria diagnosis "within **seven working days** and *confirm* such

diagnosis in its sole discretion within **14 days** of the evaluation." (Doc. 1070, p. 32 (emphasis added)). Putting aside the issue of whether C.H.'s evaluation was timely conducted, Dr. Alam's note facially satisfies the December order's requirement that an evaluation take place by indicating that C.H.'s gender dysphoria *could not* be "confirmed" as a diagnosis. This Court cannot and will not substitute its own judgment about whether C.H., or any other inmate, meets the criteria for a gender dysphoria diagnosis for that of IDOC's medical professionals. To do otherwise would exceed the limitations of the PLRA and the Court's own competencies.

But where, as here, a provider indicates they have been unable to "confirm" a diagnosis due to a lack of prior records or collateral information, common sense would dictate that *some effort* be taken to obtain those records or arrange for a follow-up assessment. It is not clear whether IDOC has taken those steps for C.H. or for several other inmates whose records were attached to Plaintiffs' motion. The Court therefore modified the prior injunction to clarify that IDOC must timely conduct a follow-up evaluation if an evaluator finds that they lack sufficient information to make a diagnosis of gender dysphoria. The Court also added a provision emphasizing that its order should not be construed to prevent any individual whose report of gender dysphoria is not confirmed from seeking future evaluation and/or treatment for that condition. As with any diagnosis, the fact an individual may not qualify for a gender dysphoria diagnosis at one time does not mean they will never qualify.

The Court does not intend these changes to dictate the diagnostic conclusions of any IDOC provider. The provider shall confirm a gender dysphoria diagnosis in their

sole discretion. Rather, the change is merely intended to ensure that uncertainty does not become an excuse for inaction.

<b>CONCLUSION</b>

For the reasons set forth above, Plaintiff's second motion to reissue the preliminary injunction (Doc. 1111) is **GRANTED**. The Court **ORDERS** as follows:

1. Defendants shall transfer any class member housed at Menard to another facility in accordance with the provisions below. Defendants shall take into consideration the individual's preference(s) as to the location of the transfer, but Defendants will make the final decision. Given the Court's previous Order transferring class members out of Pinckneyville Correctional Center (Doc. 680), the Court cautions that class members not be transferred to Pinckneyville, to avoid recurrence of the issues that came to light there.

2. In determining where each class member will be transferred, Defendants shall consider the individual's gender dysphoria condition (including related mental health considerations), gender identity, related safety issues, and whether a transfer to a facility matching the individual's gender identity is appropriate. Defendants shall also consider the transfer criteria they previously described to this Court (*See* Doc. 680, p. 31; Doc. 668, pp. 23-24) including: the length of time before the individual is eligible for release on MSR; their security level; any medical/mental health issues; any substance abuse issues; any security threat group issues; any enemy/KSF issues; any protective custody needs; the individual's previous adjustment at other facilities; the nature of the individual's commitment; the individual's vulnerable status; and whether the individual meets the criteria for the requested facility.

3. Defendants shall notify each individual class member of their new placement in writing, at least **seven days** in advance of the physical transfer, stating where the individual will be moved. The notice shall explain the reason(s) for the placement/transfer decision *and the consideration of each of the above criteria.* A copy of each decision shall be simultaneously forwarded to class counsel.

4. Going forward, no individual already identified as a member of the Plaintiff class shall be transferred to Menard. If a person arrives at Menard through the reception and classification process (intake) and is recognized by IDOC as a class member as part of IDOC's standard evaluation process, that class member shall not be assigned to Menard as their permanent institution. If an individual already housed at Menard requests an evaluation for gender dysphoria, IDOC shall conduct the

requested evaluation within **seven working days**.[10] <u>If an evaluator finds insufficient information after an interview to confirm whether the individual has gender dysphoria, a mental health provider shall conduct a follow-up evaluation within 21 days</u>. The provider shall confirm such diagnosis in their sole discretion within 14 days of <u>a completed</u> evaluation. Each person who is confirmed with a gender dysphoria diagnosis shall be transferred to a different facility within **21 days** of such confirmation. (See IDOC Administrative Directive No. 04.03.104, eff. 4/1/2021). Nothing in this Order shall be construed to prevent any individual whose report of gender dysphoria is not confirmed from seeking future evaluation and/or treatment for that condition.

5. Any class member transferred from Menard who is not moved to Logan or another facility matching their gender identity shall be allowed to submit a transfer request to Logan or another facility matching their gender identity within **60 days** of their initial transfer.

6. Defendants shall provide to the Court and to Plaintiffs' counsel a monthly report, **by the last day of each month**, of the status of any known class member currently housed at Menard, including the timing and result of any pending, upcoming, or concluded transfer decisions. Defendants also shall produce to Plaintiffs' counsel each month, **by the last day of the month**, all documentation related to class members at Menard including transfer requests, grievances, PREA complaints and investigations, TAC notes, and medical and mental health records including documentation of hormone levels for those on such therapy.

7. If Plaintiffs seek a re-issuance of this injunction, they must file a motion no later than **21 days** before this Order expires, along with a list of witnesses who will testify at a subsequent evidentiary hearing. Defendants shall respond to the motion no later than **seven days** before this Order expires and shall furnish a list of any witnesses. Plaintiffs' motion must certify that they have conferred with Defendants regarding the possibility of a stipulated order that would endure through the conclusion of trial on the merits. The conference must be held sufficiently in advance of filing the motion to allow a good faith exchange aimed at resolving the matter. A conference is not an email exchange. If a stipulation is not possible, the Court will schedule an evidentiary hearing on the motion.

---

[10] The seven "working days" deadline is IDOC's policy as provided in A.D. No. 04.03.104, "Evaluation, Treatment, and Correctional Management of Transgender Offenders." All other deadlines in this Order refer to calendar days.

Pursuant to *MillerCoors LLC v. Anheuser-Busch Companies, LLC*, 940 F.3d 922 (7th

Cir. 2019), the Court entered the terms of the preliminary injunctive relief set forth above

in a separate document. (Doc. 1124).

**IT IS SO ORDERED.**

**DATED:  March 16, 2026**

**NANCY J. ROSENSTENGEL**
**United States District Judge**